1   ISMAIL J. RAMSEY (CABN 189820)
    United States Attorney
2   MICHELLE LO (NYRN 4325163)
    Chief, Civil Division
3   PAMELA T. JOHANN (CABN 145558)
    Assistant United States Attorney
4
        450 Golden Gate Avenue, Box 36045
5       San Francisco, California 94102
        Telephone: (415) 436-7025
6       Facsimile: (415) 436-7234
        pamela.johann@usdoj.gov
7
    Attorneys for Defendant UNITED STATES
8   DEPARTMENT OF LABOR

9

10                      UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12

13  THE CENTER FOR INVESTIGATIVE        )  Case No. 22-cv-07182-WHA
    REPORTING and WILL EVANS,           )
14                                       )  **DEFENDANT DEPARTMENT OF LABOR'S**
            Plaintiffs,                   )  **BELLWETHER MOTION FOR SUMMARY**
15                                       )  **JUDGMENT**
         v.                              )
16                                       )  Date:   December 14, 2023
    UNITED STATES DEPARTMENT OF          )  Time:   8:00 a.m.
17  LABOR,                               )  Place:  Courtroom 12, 19th Floor
                                         )
18          Defendant.                   )
                                         )  The Hon. William Alsup
19  _____ )

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................ i

STATEMENT OF RELIEF REQUESTED ........................................................................ i

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF ISSUES TO BE DECIDED ...................................................... 1

III.    STATEMENT OF FACTS ....................................................................................... 1

        A.     EEO-1 Reports ............................................................................................. 1

        B.     Plaintiffs' FOIA Requests and DOL's Response .......................................... 4

IV.     LEGAL STANDARD .............................................................................................. 5

V.      ARGUMENT ........................................................................................................... 6

        A.     The EEO-1 Reports Are Confidential Commercial Information That Is
               Appropriately Withheld Under Exemption 4 ................................................ 6

               1.      The EEO-1 Data Is Commercial Information ................................... 8

               2.      The EEO-1 Reports Are Confidential. ........................................... 14

                      (a)     Customarily And Actually Treated As Private By The
                              Objectors. ........................................................................... 14

                      (b)     The Information Was "Provided to the Government Under an
                              Assurance of Privacy." ....................................................... 16

        B.     The Trade Secrets Act Bars Disclosure of the EEO-1 Reports. ................. 18

        C.     The FOIA Improvement Act of 2016 Does Not Compel Disclosure of the
               EEO-1 Reports. .......................................................................................... 19

               1.      The Foreseeable Harm Standard Does Not Apply Here Because
                       Disclosure Is Prohibited by the Trade Secrets Act. ....................... 20

               2.      The Foreseeable Harm Standard Is Satisfied Here. ....................... 21

VI.     CONCLUSION ...................................................................................................... 25

1

### NOTICE OF MOTION AND MOTION

2   PLEASE TAKE NOTICE that on December 14, 2023, at 8:00 a.m., or as soon thereafter as the

3   matter may be heard in Courtroom 12 of the United States District Court for the Northern District of

4   California, 450 Golden Gate Avenue, San Francisco, California, before the Honorable William Alsup,

5   Defendant United States Department of Labor ("Defendant" or "DOL"), by and though its attorneys,

6   will and hereby does move, pursuant to Federal Rule of Civil Procedure 56, for an order granting

7   summary judgment in its favor in this action brought pursuant to the Freedom of Information Act

8   ("FOIA") with respect to the information sought from DOL that originated from the following five

9   companies: DHL Global Business Services ("DHL"); Network Management Resources Inc. ("NMR");

10  Allied Universal Security Services ("Allied Universal"); Brandenburg Industrial Service Co.

11  ("Brandenburg"); and NorthShore University HealthSystem ("NorthShore") (collectively, "Bellwether

12  Objectors").  This motion is made on the grounds that DOL has released all non-exempt records

13  responsive to Plaintiffs' FOIA requests as they relate to the five Bellwether Objectors, and that the

14  records at issue were properly withheld pursuant to FOIA Exemption 4, 5 U.S.C. § 552(b)(4).

15  Defendant's motion is based on this Notice of Motion, the accompanying Memorandum of Points and

16  Authorities and supporting declarations and exhibits, the Court's files and records in this matter and

17  other matters of which the Court takes judicial notice, and any oral argument that may be presented.

18

### STATEMENT OF RELIEF REQUESTED

19  DOL requests that the Court grant summary judgment in favor of Defendant with respect to the

20  information submitted by the five Bellwether Objectors and responsive to Plaintiffs' FOIA requests.

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

This Freedom of Information Act ("FOIA") case involves a request by Plaintiffs for five years of confidential statistical workplace data submitted to the DOL's Office of Federal Contract Compliance Programs ("OFCCP") by all federal contractors between 2016 and 2020—a total of 74,999 reports from 24,355 federal contractors.  These reports contain sensitive, confidential information that is closely guarded and carefully protected by the objecting submitters.  The information falls within the broad category of documents covered by FOIA's Exemption 4, as redefined by the Supreme Court in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ("*Argus Leader*").  *Argus Leader* dispensed with the prior Exemption 4 standard that engrafted additional competitive harm requirements onto the statutory language, in favor of a simple and straightforward test of confidentiality under the ordinary and common meaning of that term.  The Supreme Court's test focuses on how the *owner* of the information treats it.  The information sought in this case—confidential workforce structure, composition, and allocation data, which defines an organization's operational framework—is competitively sensitive data that is kept strictly confidential by all of the Bellwether Objectors.  Under *Argus Leader*, this information is properly shielded from disclosure under Exemption 4.  The Supreme Court reaffirmed in that case that FOIA's "'exemptions are as much a part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirement.'"  139 S. Ct. at 2366 (citation omitted; alterations in original).  DOL respectfully requests that the Court grant summary judgment in its favor.

## II.     STATEMENT OF ISSUES TO BE DECIDED

1.      Did the Government properly withhold the EEO-1 reports of the five Bellwether Objectors under FOIA Exemption 4?

2.      Is the withheld workforce structure and composition data "confidential statistical information" that is prohibited from disclosure by the Trade Secrets Act, 18 U.S.C. § 1905?

## III.    STATEMENT OF FACTS

### A.      EEO-1 Reports

Employers with 100 or more employees are required to submit annual reports using Standard Form 100, commonly known as "EEO-1 reports," to the Equal Employment Opportunity Commission

("EEOC").  42 U.S.C. § 2000e-8(c) and 29 C.F.R. § 1602.7; Declaration of Michele Hodge ("Hodge Decl.") ¶ 6.  EEO-1 reports require companies to report their total number of employees across ten different job categories, and to break those numbers down according to race/ethnicity and gender.  Hodge Decl. ¶ 6 & Ex. B.  In all, the EEO-1 reports contain 140 points of unique data—seven race/ethnicity categories, across two genders, times ten job categories.  *Id.*  Employers consider the raw statistical data contained in these reports to be extremely sensitive information because it reflects both the personal demographic data of employees and the workforce allocation strategies of employers.  *E.g.*, Baxter Decl. ¶ 22; *see also* Declaration of Quinetta Roberson ("Roberson Decl.") ¶¶ 24-27; Hodge Decl. ¶ 7.  In recognition of the confidential and sensitive nature of this information, Congress mandated that the EEOC protect it from disclosure, and imposed criminal penalties for the public release of EEO-1 data by any EEOC employee.  42 U.S.C. § 2000e-8(e); Hodge Decl. ¶ 12.

A subset of those employers—companies with 50 or more employees that contract with the federal government—must submit EEO-1 reports to OFCCP.  41 C.F.R. § 60-1.7(a); Hodge Decl. ¶ 8.  OFCCP's mission is "to protect America's workers by ensuring nondiscrimination and supporting voluntary compliance by federal contractors and subcontractors, promote diversity through equal employment opportunity, and enforce the law."  *See* https://www.dol.gov/agencies/ofccp/about; Hodge Decl. ¶ 3.  The EEO-1 reports help OFCCP monitor the contracting companies' compliance with Executive Order 11246, which prohibits employment discrimination by government contractors.  Hodge Decl. ¶¶ 3-4.  Although the reports are not used to draw conclusions about discriminatory employment practices, they help OFCCP target potential areas that may warrant further evaluation.  *Id.* ¶ 11.  The Title VII provision that criminalizes the public disclosure of EEO-1 reports by EEOC employees does not on its face apply to OFCCP, *see Sears Roebuck & Co. v. Gen. Servs. Admin.*, 509 F.2d 527, 529 (D.C. Cir. 1974); for that reason, a FOIA request for EEO-1 data submitted to the EEOC will be denied pursuant to Exemption 3, which provides for the withholding of information prohibited from disclosure by another federal statute, 5 U.S.C. § 552(b)(3), but a FOIA request for the same data submitted to OFCCP is not subject to Exemption 3.  Nevertheless, OFCCP understands the important confidentiality concerns and expectation of privacy animating this provision, and also treats the reports as confidential to the maximum extent permitted by law.  Hodge Decl. ¶¶ 13-19 & Ex. D at 4; *see* Agency Information

1   Collection Activities, Final Comment Request: Revision of the Employer Information Report (EEO-1),

2   81 Fed. Reg. 45479, 2016 WL 3743396, at *45491 (July 14, 2016) ("EEOC Notice").

3          To avoid duplication of efforts and reduce the administrative burden on companies, EEOC and

4   OFCCP jointly developed the EEO-1 form, and created the Joint Reporting Committee ("JRC") to

5   administer the EEO-1 reporting system in a manner that establishes a single data collection to meet the

6   statistical needs of both agencies.  Hodge Decl. ¶ 9.  While the EEO-1 data is jointly collected by the

7   JRC, the submission portal is accessed through the EEOC (at https://www.eeocdata.org) and

8   administered by the EEOC.  *Id.*  Thus, in practice all companies, including federal contractors, submit

9   the data to the EEOC, which collects and reconciles the data, and then provides a database to OFCCP.

10  *Id.* ¶ 9 & Ex. C; *see also* EEOC Notice, 2016 WL 3743396, at *45492.  The EEOC "takes extensive

11  measures to protect the confidentiality and integrity of EEO-1 data in its possession" and maintains "a

12  robust cyber security and privacy program" to protect the data.  EEOC Notice, 2016 WL 3743396, at

13  *45492.  It transmits the database of EEO-1 reports subject to OFCCP jurisdiction "on an encrypted

14  storage device."  *Id.*; Hodge Decl. ¶ 12.  Data is securely stored by OFCCP, and access within the

15  agency is limited to a small number of staff.  Hodge Decl. ¶ 12.

16         As part of the data collection, the JRC assures all EEO-1 submitters that their reports are subject

17  to the confidentiality provisions of Title VII, 42 U.S.C. § 2000e-8(e), and that OFCCP "will protect the

18  confidentiality of EEO-1 data to the maximum extent possible consistent with FOIA and the Trade

19  Secrets Act."  Hodge Decl. ¶¶ 14-16 & Exs. B at 2, C at 35, D at 4; *see* EEOC Notice, 2016 WL

20  3743396, at *45491-92 ("The EEOC has successfully protected the confidentiality of EEO-1 data for

21  over 50 years"; "OFCCP ensures the confidentiality of contractor data to the maximum extent

22  permissible by law").  In addition, in compliance with Executive Order 12600's requirement of

23  predisclosure notification for confidential commercial information and pursuant to DOL's implementing

24  regulations, 29 C.F.R. § 70.26, OFCCP has a longstanding practice of providing federal contractors

25  notice of any request for the disclosure of their EEO-1 reports.  Hodge Decl. ¶ 18.  OFCCP provides this

26  notice because it believes the documents contain confidential information that is potentially protectable

27  from disclosure.  *Id.*  Under this procedure, OFCCP provides an opportunity for the submitter to object

28  before releasing any reports in response to a FOIA request. Where a submitter files an objection, OFCCP

1    evaluates the grounds for the objection and makes a final determination as to whether the objection is

2    valid.  *Id.*  Unless OFCCP determines that the report is not exempt from disclosure under Exemption 4,

3    OFCCP will not release any EEO-1 report.  *Id.*  OFCCP has never publicly released an EEO-1 report

4    except where it has determined that disclosure is required under FOIA.  Hodge Decl. ¶¶ 18-19.

5         **B.      Plaintiffs' FOIA Requests and DOL's Response**

6         Plaintiffs Center for Investigative Reporting ("CIR") and Will Evans submitted four FOIA requests

7    to OFCCP, merged into a single request as of June 3, 2022, seeking disclosure of consolidated (Type 2)

8    EEO-1 reports for all federal contractors for the years 2016 through 2020.[1]  Declaration of Kelechi

9    Ahaghotu ("Ahaghotu Decl.") ¶¶ 5, 6, 9, 17, 18, 20.  This request encompassed approximately 75,000

10   reports from a total of 24,355 unique federal contractors—many orders of magnitude larger than any EEO-

11   1 request that OFCCP had ever processed.  Ahaghotu Decl. ¶¶ 41-42, 64.  Beginning in August 2022,

12   shortly after the final modification of Plaintiffs' requests, OFCCP began providing notice and an

13   opportunity to object to all contractors who had submitted EEO-1 reports during the relevant period

14   pursuant to DOL's predisclosure notification process mandated by Executive Order 12600.  Notification

15   was provided through a published notice in the Federal Register, emails sent to all federal contractors for

16   whom OFCCP had contact information, and a dedicated portal on OFCCP's website.  After multiple

17   sources—including the Chair of the House Committee on Education and the Workforce—raised concerns

18   that that the notices had not reached many contractors who may object to the release of their confidential

19   data, OFCCP sent a predisclosure notification by U.S. Mail to all contractors, providing a final deadline of

20   March 31, 2023 for the submission of objections to OFCCP.  Ahaghotu Decl. ¶¶ 40-55.

21   OFCCP provided an initial interim release of data on March 2, 2023.  *Id.* ¶ 56. Following the

22   expiration of the final objection deadline, OFCCP released the majority of responsive reports—those

23   submitted by contractors that did not object to their disclosure.  That interim release on April 17, 2023,

24   comprised 56,419 EEO-1 Reports from 19,289 unique federal contractors.  *Id.* ¶ 57.  In addition, 621 of

25   the potentially responsive reports were determined to have been submitted by entities that were not

26   federal contractors at the time of the reports, and therefore not within OFCCP's jurisdiction.  *Id.* ¶ 59.

27

28   _____

[1] Type 2 reports require companies to disclose the 120 categories of race/ethnicity, gender, and job category data for all of their employees across all their establishments.  Hodge Decl. ¶ 11 & Ex. B.

A significant number of federal contractors, however, objected to the disclosure of their reports. OFCCP received objections from 4,796 unique federal contractors, corresponding to 16,905 EEO-1 Reports. *Id.* ¶ 64. OFCCP completed its evaluation of those objections on July 5, 2023. Following its review, OFCCP concurred that the data from 16,755 of these reports was appropriately withheld from release under Exemption 4. *Id.* ¶ 64.

At the Case Management Conference held on April 13, 2023, the Court directed DOL to select six representative objecting contractors for a bellwether summary judgment motion to evaluate whether the requested data from their EEO-1 reports is exempt from disclosure under FOIA. This motion is submitted in support of DOL's decision to withhold the EEO-1 Type 2 data for the following companies: (1) Allied Universal ("Allied"), the nation's largest provider of security guards and related services, *see* Declaration of Helene Baxter ("Baxter Decl."); (2) Network Management Resources Inc. ("NMR"), a small consulting business providing information technology, infrastructure, and procurement services to the government and commercial entities, *see* Declaration of Karen Sobieski ("Sobieski Decl."); (3) Brandenburg Industrial Service Co. ("Brandenburg"), a demolition and environmental remediation firm, *see* Declaration of Jack Jasinowski ("Jasinowski Decl."); (4) DHL Global Business Services ("DHL"), a leading global brand in the logistics service industry, *see* Declaration of Joshua Barcon ("Barcon Decl."); and (5) NorthShore University HealthSystem ("Northshore"), an integrated healthcare delivery system.[2] For the reasons set forth below and as established by the declarations submitted in support of this motion, the requested data constitutes commercial information obtained from these contractors and confidential, and it is therefore exemption from disclosure under Exemption 4.

## IV.    LEGAL STANDARD

"FOIA cases are typically decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F.Supp.2d 83, 87 (D.D.C. 2009). While the agency invoking an exemption in order to withhold requested records "bears the burden of demonstrating that the exemption properly applies

---

[2] Earlier today, the sixth Bellwether Objector informed DOL that it would no longer participate as a Bellwether Objector. In addition, the declarant for NorthShore was unable to finalize its declaration as of the filing of this motion. The NorthShore declaration will be submitted as soon as possible.

1  to the documents," *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009), the agency meets its burden when it

2  submits declarations that "contain reasonably detailed descriptions of the documents and allege facts

3  sufficient to establish an exemption." *Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008)

4  (quoting *Lewis v. Internal Revenue Serv.*, 823 F.2d 375, 378 (9th Cir. 1987)).  Declarations submitted by an

5  agency to demonstrate the adequacy of its FOIA response are entitled to a presumption of good faith.  *See,*

6  *e.g.*, *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015).  Where declarations give

7  reasonably detailed justifications for withholding and appear to be in good faith, "the inquiry ends and the

8  nondisclosure is upheld." *Id.* at 773 (citing *Hunt v. C.I.A.*, 981 F.2d 1116, 1119 (9th Cir. 1992)).  Whether

9  an agency has appropriately invoked an exemption to withhold responsive information is judicially reviewed

10  using a *de novo* review standard.  *See* 5 U.S.C. § 552(a)(4)(B); *see also U.S. Dep't of Justice v. Reporters*

11  *Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989).

12  **V.     ARGUMENT**

13          DOL conducted a reasonable search for records in response to Plaintiffs' consolidated FOIA

14  requests.  Ahaghotu Decl. ¶¶ 36-39.  It withheld 16,755 responsive EEO-1 reports under Exemption 4.[3]

15  This motion specifically addresses DOL's assertion of Exemption 4 with respect to the reports of the

16  five Bellwether Objectors.  As set forth below, these EEO-1 Reports are exempt from disclosure because

17  they are information that is "commercial or financial," "obtained from a person," and "confidential"

18  within the meaning of Exemption 4.  In addition, OFCCP is prohibited from disclosing the EEO-1

19  Reports under the Trade Secrets Act, 18 U.S.C. § 1905.

20          **A.     The EEO-1 Reports Are Confidential Commercial Information That Is**
                 **Appropriately Withheld Under Exemption 4.**

21

22          FOIA is intended to strike "'a workable balance between the right of the public to know and the

23  need of the Government to keep information in confidence.'" *John Doe Agency v. John Doe Corp.*, 493

24  U.S. 146, 152 (1989) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess., 6 (1966)). A record must be

25  disclosed under FOIA "unless it falls within one of [FOIA's] nine exemptions." *NLRB v. Sears, Roebuck*

26

27          [3] In addition 413 objectors asserted that some of their information was protected by Exemption 6,
    which exempts from disclosure information in which an individual has a substantial privacy interest that
28  outweighs the public interest in disclosure.  DOL is continuing to evaluate these claims, which require a
    case-by-case analysis of the asserted privacy interest.  Ahaghotu Decl. ¶ 65 n.14.

*& Co.*, 421 U.S. 132, 136 (1975). "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Argus Leader*, 139 S. Ct. at 2366 (cleaned up).

Exemption 4 shields from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). This exemption "was designed to protect confidential information" where it "would customarily not be released to the public by the person from whom it was obtained." *Forsham v. Harris*, 445 U.S. 169, 184-85 (1980). In *Argus Leader*, the Supreme Court held that the "term confidential," as it is used in Exemption 4, must be given its "ordinary, contemporary, common meaning" of "'private' or 'secret.'" 139 S. Ct. 2362-63. Relying on that ordinary meaning, the Court held that for information to be protectable as confidential under Exemption 4, it must be "customarily kept private, or at least closely held, by the person imparting it." *Id.* at 2632. The Supreme Court also asked, without deciding, whether "privately held information [might] *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private." *Id.* at 2363 (emphasis in original). The Court found no need to resolve that question, however, because the government had promised the owners of the information that it would keep their information private. *Id.* Accordingly, the Court concluded that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366.

In reaching this conclusion, the Court rejected the "substantial competitive harm" test engrafted onto Exemption 4 by the D.C. Circuit in *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767 (D.C. Cir. 1974) ("*National Parks*"). Under that test, information would be considered "confidential," and thus exempt from disclosure, only upon a showing that disclosure was likely to "cause substantial harm to the competitive position of the person from whom the information was obtained." *Lion Raisins, Inc. v. U.S. Dep't of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) (quoting *G.C. Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1112-13 (9th Cir. 1994)). This test, the *Argus Leader* Court reasoned, was "a relic from a bygone era of statutory construction" and was "inconsistent with the terms of the [FOIA] statute," 139 S. Ct. at 2364, 2361; indeed, all nine justices

agreed that "nothing in FOIA's language, purpose, or history" would inject this stringent "substantial competitive harm" requirement into the Exemption 4 inquiry.  139 S. Ct. at 2367 (Breyer, J., concurring in part and dissenting in part).  The Court concluded that Exemption 4 imposes no harm requirement whatsoever, describing even a modified harm standard as reflecting "a policy argument about the benefits of broad disclosure."  *Id.* at 2366 (emphasis in original).  Because Congress already made this policy determination when it enacted FOIA and sought a "workable balance" between disclosure and privacy, *id.*, policy considerations were not for the courts to reevaluate.

### 1.   The EEO-1 Data Is Commercial Information

The threshold requirement for the application of Exemption 4 is that the information constitute "commercial or financial information."  5 U.S.C. § 552(b)(4).  "The terms 'commercial' and 'financial' are given their ordinary meanings."  *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1194 (9th Cir. 2011) (citation omitted); *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987).  Records that "reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business" obviously satisfy the Exemption 4 standard.  *Public Citizen Health Research Grp. v. F.D.A.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  But courts have rejected a narrow view of these terms that would confine Exemption 4 to records that relate to these basic commercial functions.  *Id.*  Rather, the "ordinary meaning" of the term "commercial" is defined to encompass any information in which the provider has a "commercial interest," *Public Citizen Health*, 704 F.2d at 1290; *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  This broad "commercial interest" standard articulated by the D.C. Circuit in *Public Citizen Health* has been adopted in the Ninth Circuit and courts throughout the country.  *See*, *e.g.*, *Watkins*, 643 F.3d at 1194; *McClellan*, 835 F.3d at 1285; *New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 49-50 (1st Cir. 2015); *see also Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1128-29 (9th Cir. 2007) (quoting *McClellan*, 835 F.2d at 1285) ("information is commercial if it relates to commerce, trade, or profit").

Courts applying this standard have observed that under *Public Citizen Health*, the term "commercial" is "construed broadly." *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 337 F. Supp. 2d 146, 168 (D.D.C. 2004).  As long as the information, "in and of itself, . . . serves a commercial function or is of a commercial

1    nature," it will be considered "commercial" for purposes of Exemption 4.  *Nat'l Ass'n of Home Builders v.*

2    *Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (cleaned up). "[T]he question of whether information is

3    'commercial' boils down to a common sense inquiry into whether the proponent has a business interest in

4    that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009).

5        But the outer reaches of Exemption 4's "commercial or financial" standard are of little concern

6    here because the requested information falls squarely within its core.  The headcount and workforce

7    composition data contained in the EEO-1 reports both reveal "basic commercial operations" and are

8    directly "related to the income-producing aspects" of the submitting companies.  These are human

9    resource management metrics that are a central component of every organization's operational

10   framework.  Human capital is a core commercial resource.  Professor McKay, a Human Resource

11   Management expert, explains that human resource management—an organization's effort to acquire,

12   deploy, and retain a qualified workforce—is "crucial to business success" and allows an organization to

13   pursue and achieve its strategic objectives.  Declaration of Patrick McKay ("McKay Decl.") ¶¶ 7, 22.

14   The organizational structure of a company's workforce—the quantity of employees, distribution across

15   different job functions, and allocation of labor costs—is fundamental to the commercial identity,

16   operational welfare, and competitive advantage of that enterprise.  McKay Decl. ¶ 14, 22.  Workforce

17   structure and employee allocation are the result of considered effort and carefully planned staffing

18   strategies, and headcount and composition data are constantly monitored, analyzed, and refined in an

19   effort to maximize operational effectiveness.  McKay Decl. ¶ 15.  In addition, headcount totals and

20   staffing levels across occupation categories determine labor costs, which is often the most significant

21   lever on a company's balance sheet.  "Little more than common sense establishes that the number of

22   hours an employee works is commercial or financial in character."  *Plumbers & Gasfitters Local Union*

23   *No. 1 v. U.S. Dept. of the Interior*, No. 10-cv-4882, 2011 WL 5117577, at *1 (E.D.N.Y. Oct. 26, 2011);

24   *Pub. Citizen Found. v. U.S. Dep't of Labor*, No. 18-cv-00117, 2020 WL 9439355, at *7 (D.D.C. June

25   23, 2020) ("Information about a business's 'number of employees and employee work-hours' directly

26   pertains to that business's 'labor costs and productivity.'"); *Racal-Milgo Gov't Sys., Inc. v. Small Bus.*

27   *Admin.*, 559 F. Supp. 4, 6 (D.D.C. 1981) (describing "workforce data" as among the types of

28   "information protected from disclosure under exemption 4").

All of the Bellwether Objectors confirm that workforce composition and allocation data—how the companies have built and structured their workforce—is a core operational metric that is critical to their organizations' success.  *E.g.*, Baxter Decl. ¶¶ 7-11 ("Allied Universal's primary 'product' is its staff" of security guards, and its workforce headcount and structure determines its revenue and profitability); Sobieski Decl. ¶ 10 (EEO-1 workforce composition data reveal the results of "deliberate commercial decisions about how to best structure and operate the company"); Barcon Decl. ¶¶ 7-9 (DHL's EEO-1 reports show "how DHL has determined it should structure its workforce to have a well-run, profitable, and efficient business"); Jasinowski Decl. ¶¶ 13-14.  These companies monitor these metrics and refine their workforce size and structure to optimize operational outcomes.  Baxter Decl. ¶ 11; Sobieski Decl. ¶ 11; Barcon Decl. ¶ 8.  All of these companies consider this data to be critical commercial information.

In a series of cases that predate *Argus Leader*, courts throughout the country accepted without hesitation that employee headcount and workforce composition data—including the information contained in EEO-1 reports—qualify as "commercial" for purposes of Exemption 4.  *See*, *e.g.*, *Sears, Roebuck & Co. v. Gen. Services Admin.*, 384 F. Supp. 996, 1005 (D.D.C. 1974) ("[I]t is apparent . . . that EEO-1's and [Affirmative Action Plans] are commercial information obtained from a person.").  These prior decisions split on whether disclosure of this information would cause "substantial competitive harm" under the then-prevailing *National Parks* standard.  *Compare Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 165–66 (D.D.C. 1976), *aff'd sub nom. Nat'l Org. for Women v. Social Sec. Admin.*, 736 F.2d 727 (D.C. Cir. 1984), *with Westinghouse Elec. Corp. v. Schlesinger*, 392 F. Supp. 1246, 1247 (E.D. Va. 1974), *aff'd*, 542 F.2d 1190 (4th Cir. 1976).  But without exception, these courts either explicitly or implicitly ruled that workforce diversity data constitutes commercial information.[4]

---

[4] *See*, *e.g.*, *Burroughs Corp. v. Brown*, 501 F. Supp. 375, 380 (E.D. Va. 1980), *vacated on other grounds sub nom. Gen. Motors Corp. v. Marshall*, 654 F.2d 294 (4th Cir. 1981) (information including EEO-1s are "indisputably commercial in nature"); *Westinghouse*, 392 F. Supp. at 1247 (EEO-1 report "contains commercial or financial information which is confidential"); *Rubbermaid, Inc. v. Kleppe*, No. 76-1568, 1976 WL 731, at *2 (D. Md. Nov. 5, 1976) (same); *Holiday Inns, Inc. v. Kleppe*, No. 76-388, 1976 WL 671, at *2 (W.D. Tenn. Oct. 29, 1976); *U.S. Steel Corp. v. Schlesinger*, No. 183-74-A, 1974 WL 260, at *1 (E.D. Va. Sept. 20, 1974); *Sears*, 384 F. Supp. at 1005; *Metro. Life*, 426 F. Supp. at 159 ("manning tables," which "contain a breakdown by specific job categories by total number of employees and number of women and minorities in each category," constitutes "commercial information in that it pertains to the mode of operations, work force, policies, and employment practices" of a company);

1    In addition, the diversity data contained in the EEO-1 reports is itself inherently commercial.

2    Workforce diversity is considered a source of competitive advantage and serves important and well-

3    recognized business interests.  Roberson Decl. ¶¶ 8-14 & Ex. C at 3, 5-6.  Professor Roberson, an expert

4    in the area of the financial impact of diversity, equity, and inclusion in organizations, explains that

5    diversity creates business value and "is an organizational resource that translates into a competitive

6    advantage for firms through a greater capacity for resource acquisition, market access, innovation and

7    strategic flexibility."  *Id.* ¶ 9; *see also* McKay Decl. ¶ 9.  Companies track diversity data to "realize its

8    inherent commercial value."  *Id.* ¶ 15.  Specifically, diversity metrics are used to identify Diversity,

9    Equity, and Inclusion ("DEI") opportunities and challenges, establish benchmarks and accountability for

10   DEI progress, and make allocation decisions.  *Id.* ¶ 15 & 20-21.  Monitoring diversity benchmarks is

11   important for companies seeking to optimize the composition of their workforce to create value and

12   serve as a source of competitive advantage.   Diversity data is used internally by firms for business

13   purposes: "to monitor human resource management effectiveness, including staffing, performance

14   management, compensation, engagement and retention" and "to evaluate the effectiveness of employee

15   staffing and development strategies."  *Id.* ¶¶ 20-21.   The Bellwether Objectors affirm that they consider

16   diversity to be a strategic priority for the success of their organization's operations, that they consider

17   diversity data to have commercial value, and that they track diversity metrics for these reasons.  Baxter

18   Decl. ¶¶ 12-13; Sobieski Decl. ¶¶ 14-16; Barcon Decl. ¶ 10.

19   The intrinsic commercial significance of this data distinguishes the EEO-1 reports at issue here

20   from the "bare list" of employee names that was held to be not commercial in *Getman v. NLRB*, 540

21   F.2d 670, 673 (D.C. Cir. 1973).  That case is based on the principle that a person's identity, without

22   more, has no commercial value "in and of itself."  *See Am. Airlines v. Nat'l Mediation Bd.*, 588 F.2d

23   863, 870 (2d Cir. 1978); *Besson v. U.S. Dep't of Commerce*, 480 F. Supp. 3d 105, 110 (D.D.C. 2020).  If

24   the employee list serves a commercial function beyond merely identifying the employees—such as

25

26   *United Techs. Corp. v. Marshall*, 464 F. Supp. 845, 853 (D. Conn. 1979) (declining to grant preliminary
     injunction to prohibit disclosure of EEO-1 reports but also denying summary judgment motion and

27   allowing issue of whether release of EEO-1 data would cause substantial competitive injury to proceed
     to trial); *UniChrysler Corp. v. Schlesinger*, 412 F. Supp. 171, 176 & n.7 (D. Del. 1976), *vacated on*

28   *other grounds*, 565 F.2d 1172 (3d Cir. 1977), *vacated on other grounds sub nom. Chrysler Corp. v.*
     *Brown*, 441 U.S. 281 (1979).

*quantifying* employee classifications—it will be deemed commercial. *See American Airlines*, 588 F.2d at 870. This is the case even for employee classifications such as union membership that do not directly bear on a company's basic operations; "[l]abor unions, and their representation of employees, quite obviously pertain to or are related to commerce and deal with the commercial life of the country." *Id.* Even employee names themselves may qualify as commercial under Exemption 4 if the agency can demonstrate "something unique about the names that logically or plausibly renders them commercial in nature or function." *Besson*, 480 F. Supp. at 112; *Comptel v. F.C.C.*, 910 F. Supp. 2d 100, 116 (D.D.C. 2012).

In contrast to the employee identities in the "bare list" cases, the personnel headcount and workforce allocation data in the EEO-1 reports have inherent commercial value and serve a fundamental commercial function in the organization and structure of a company's operations. McKay Decl. ¶¶ 7, 15. This information reflects how the company has built its workforce to create a successful enterprise, and thus has commercial significance in and of itself. *Id.* ¶ 22. Submitters have a commercial interest in the data *per se*, not simply in the potential consequences of its release. *Cf. Citizens for Responsibility & Ethics in Washington("CREW") v. U.S. Dep't of Justice*, 58 F.4th 1255, 1262, 1268 (D.C. Cir. 2023). In dismissing the workforce composition data as mere "statistical information pertaining to employees" indistinguishable from a bare list of employee names in a prior case brought by Plaintiff to compel the disclosure of EEO-1 data, *CIR v. Dep't of Labor*, 424 F. Supp. 3d 771, 779 (N.D. Cal. 2019) ("*CIR I*"), Magistrate Judge Westmore did not make the required inquiry into "the nature of the information itself." *See CREW*, 58 F.4th at 1265. It is the *substance* of the statistical data here—headcount totals and across job categories, and workforce structure and composition—and not merely that it "pertains to employees" that makes the information commercial. Some employee lists may not serve this function—a list of employees' birthdays, a list of employees' political party affiliations, the paradigmatic unadorned list of employee names—and thus may not be protected under Exemption 4. But workforce composition data, which reflects core strategic, economic, and operational information about the submitter's enterprise, serves an inherent commercial function and falls squarely within the definition of "commercial."

While the workforce composition data here is broken down into ten job categories, some of which may comprise multiple job titles, the commercial nature of the data is not a function of its specificity but of its substance. *See CREW*, 58 F.4th at 1265. Even at its most general level—total employee headcount

across all job categories—this information reflects an organization's internal structure, operations, and labor costs.  Workforce tracking data serves a commercial function both when it is broken down into granular detail and when it is presented as an aggregated summary.[5]  *See* McKay Decl. ¶ 16.  The nature of that data does not change simply because it is less granular, just as U.S. census data is still population information whether it is presented as the entire nation's population or broken down into smaller communities and sub-groups.  Indeed, none of the pre-*Argus Leader* EEO-1 cases found that the EEO-1 reports somehow lost their fundamental commercial nature by virtue of reduced specificity, even though some noted that workforce composition data in the manning tables contained more detailed information.  *See*, *e.g.*, *Chrysler*, 412 F. Supp. at 177 n.7.  While the more general nature of the data may have been relevant to the question of whether the submitting companies could establish substantial competitive harm from the release of the data, and thus whether the data was *confidential* under Exemption 4 as it was then understood, *see United Techs.*, 464 F. Supp. at 853, the "substantial competitive harm" test is no longer the applicable standard for confidentiality and never was part of the commerciality standard.[6]

Without analyzing the inherent nature of the requested data, the Court in *CIR I* concluded that the workforce data was not commercial because it was insufficiently detailed to allow others to discern meaningful information about a company's structure to other.  *CIR I*, 424 F. Supp. 3d at 779.  But the commerciality test does not ask whether the information may have commercial value *to others*; it is satisfied by any information that relates to the commercial operations of *the submitter*. By imposing this requirement into the threshold commerciality inquiry, the *CIR I* court functionally revived a "competitive harm" standard, even though *Argus Leader* Court reasoned that there was no evidence that the specific Exemption 4 terms—including "commercial or financial information"— required any showing of substantial competitive harm, and the Court would not "ordinarily imbue statutory terms

---

[5] The EEO-1 10 job category functions correspond to existing sources of job analytic information, McKay Decl. ¶ 16, and reflect meaningful distinctions among employees; for example, the two "officer and managers" subcategories are intended "mirror the employers' own well established hierarchy of management positions."  Hodge Decl. Ex. D at 11.

[6] Even if some sort of harm showing were required as part of the commerciality inquiry, the evidence submitted in the objectors' declarations, and the explanations provided by Professors McKay and Roberson, establish that data presented in the consolidated EEO-1 reports could be used by competitors and others to discern significant commercial information about each company's workforce structure and composition, causing commercial harm to the submitters.  *See* Part V.C, *infra*.

with a specialized common law meaning when Congress hasn't itself invoked the common law terms of art associated with that meaning." *Id.* at 2365. Judge Westmore's suggestion that the same type of data chopped up differently could constitute commercial information acknowledges that this data is fundamentally commercial in nature. *See CIR 1*, 424 F. Supp. 3d at 779 (finding that the demographic information was not commercial "in light of the absence of information pertaining to specific positions or departments"). Exemption 4 requires nothing more.

### 2.    The EEO-1 Reports Are Confidential.

#### (a)    Customarily And Actually Treated As Private By The Objectors.

The central inquiry under Exemption 4 is whether the information that was submitted to the government is confidential. *Argus Leader* holds that the basic test for confidentiality is whether the information is "customarily and actually treated as private by its owner." *Argus Leader*, 139 S. Ct. at 2366. In setting forth this test, the *Argus Leader* Court cited approvingly the "much more traditional understanding of the statutory term 'confidential'" set forth in *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879-80 (D.C. Cir. 1992) (en banc). *Argus Leader*, 139 S. Ct. at 2365. The focus of this inquiry is "how the particular party customarily treats the information, not how the industry as a whole treats the information." *Center for Auto Safety v. National Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 17-18 (D.D.C. 2000) (citing *Critical Mass*, 975 F.2d at 880). Thus, under the *Argus Leader* formulation, treatment of the information by the submitters is dispositive.[7]

There can be little doubt that *Argus Leader* significantly expands the reach of Exemption 4 and that a substantial volume of previously releasable information is now protected from disclosure; as this

---

[7] While this Court in *ASBL* raised the theoretical possibility that a plaintiff might overcome a showing of confidentiality by pointing to "other competitors who release the information," *ASBL*, 411 F. Supp. 3d at 832, *Argus Leader* teaches that the relevant inquiry is how the *submitter* treats the information, not other companies. *See Argus Leader*, 139 S. Ct. at 2363, 2366 ("In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, *by the person imparting it*"; information is considered confidential where it is "both customarily and actually treated as private *by its owner*" (emphases added)); *Critical Mass*, 975 F.2d at 880. Moreover, each company's assessment of the need for confidentiality is industry-, context-, and circumstance-specific, so the disclosure of an EEO-1 report by one company based on its own subjective evaluation of its unique circumstances and ability to mitigate potential harm from disclosure cannot create a universal template for how all such reports should be treated. *See* Roberson Decl. ¶ 29. In any event, the majority of companies do not publicly disclose their EEO-1 data, and the Bellwether Objectors state that they are unaware of competitors who publicly release this information. Sobieski Decl. ¶ 22; Jasinowski Decl. ¶ 11; Baxter Decl. ¶ 16.

Court previously observed, plaintiffs face a "steep uphill battle under the new Exemption 4 standard." *American Small Business League v. Dep't of Defense*, 411 F. Supp. 3d 824, 832 (N.D. Cal. 2019) ("*ASBL*").  In *Argus Leader*, the confidentiality standard was met because the testimony on behalf of the owners of the information established that they "customarily do not disclose" the information "or make it publicly available 'in any way,'" and that even within a company, "only small groups of employees usually have access to it." 139 S. Ct. at 2363; *see also ASPCA v. Animal & Plant Health Inspection Serv.*, No. 19-cv-3112, 2021 WL 1163627, at *4 (S.D.N.Y. Mar. 25, 2021) (confidentiality established by agency declaration that the "information was 'customarily' treated as 'confidential' by the dealers and 'not ordinarily or actually released to the public'"). The same holds true here.  The confidentiality of the EEO-1 reports is closely guarded and zealously protected by all of the Bellweather Objectors, and disclosed only to a few employees on a need-to-know basis.

Allied Universal, for example, stores its data in a high-security storage system that is password protected and subject to periodic IT security audits.  Access is limited to a handful of employees. Baxter Decl. ¶ 17-18.  Likewise, NMR limits access to its EEO-1 reports to four employees, and the data is maintained within a secure site and subject to strict security controls.  Sobieski Decl. ¶¶ 18-19.  At DHL, only 20 employees, of the roughly 18,000 U.S. employees, have access to the EEO-1 reports.  Barcon Decl. ¶ 12.  GT stores its EEO-1 reports behind a series of data protection security measures and restricts access to a single employee and its outside Affirmative Action Consultant, who has committed to protect the confidentiality of the document.  Brandenburg, a company of approximately 800 employees, secures the EEO-1 data through data protection measures and limits access to four employees, on a need-to-know basis.  Jasinowski Decl. ¶ 18.  None of the Bellwether Objectors has ever disclosed the EEO-1 reports or made them publicly available in any way.  Sobieski Decl. ¶ 17; Baxter Decl. ¶ 24; Barcon Decl. ¶ 13; Jasinowski Decl. ¶ 20.  These security measures appear to be even stricter and certainly more detailed than in *Argus Leader*, where the court noted merely that within the submitting retailers, "only small groups of employees usually have access to it."  139 S. Ct. at 2363.

Although the government needs only to show "*that* the information is 'customarily and actually treated as private by its owner,' not necessarily *why* it is so treated, *C.R.E.W.*, 58 F.4th at 1270 (quoting *Argus Leader*, 139 S. Ct. at 2366) (emphasis added), the reasons that the companies protect the EEO-1

1   data confirms that these confidentiality efforts are both resolute and sincere.  DHL takes these measures

2   to "protect its staffing strategies and its personnel activities" and to honor the promise of confidentiality

3   it made to its employees.  Barcon Decl. ¶¶ 11, 14-15. Allied Universal takes numerous steps to maintain

4   the strict confidentiality because the underlying data has significant commercial value to the company.

5   Baxter Decl. ¶ 14.  Brandenburg makes a commitment of confidentiality to its employees and protects

6   them because they contain commercially valuable information in a highly competitive industry.

7   Jasinowski Decl. ¶¶ 15-17, 19-20.  These companies are committed to maintaining the confidentiality of

8   this information and have devoted considerable resources to protecting it.

9               **(b)     The Information Was "Provided to the Government Under an
                          Assurance of Privacy."**

10

11          As noted above, the Supreme Court did not reach the issue of whether a governmental assurance

12   of confidentiality is also required under Exemption 4.  Whatever the contours of that assurance-of-

13   confidentiality requirement may be, it is clearly satisfied here, as it was in *Argus Leader*, because the

14   government has long promised the EEO-1 submitters that it will keep the information private.

15          The EEO-1 reports are collected by the JRC through an encrypted online filing system accessed via

16   the EEOC website.  As part of the data collection, the JRC assures all EEO-1 submitters that their reports

17   will be kept confidential as required by section 709(e) of Title VII, and that OFCCP "will protect the

18   confidentiality of EEO-1 data to the maximum extent possible consistent with FOIA and the Trade Secrets

19   Act."  Hodge Decl. ¶¶ 14-16 & Exs. B at 2, C at 35, D at 4; *see* EEOC Notice, 2016 WL 3743396, at

20   *45491-92.  This statement—that OFCCP will protect the information to the maximum extent permitted—

21   is a clearly expressed assurance of confidentiality.  *See Cause of Action Inst. v. Exp.-Imp. Bank of the

22   United States*, No. 19-cv-1915 (JEB), 2022 WL 252028, at *19 (D.D.C. Jan. 27, 2022); *New York Times v.

23   FDA*, 529 F. Supp. 3d 260, 286 (S.D.N.Y. 2021).  And indeed, the objectors understood these statements

24   to provide an explicit assurance that the government would maintain the confidentiality of the information

25   they submitted through the JRC portal, and they relied on this baseline assurance of confidentiality in

26   collecting the data from their employees and in providing the data to the Joint Reporting Committee.

27   Baxter Decl. ¶ 27; Barcon Decl. ¶ 16; Sobieski Decl. ¶ 24; Jasinowski Decl. ¶ 23.

28          In addition, OFCCP has implicitly assured submitters that EEO-1 reports will be kept private

through its consistent practice of treating these reports as confidential.  *See ASBL*, 411 F. Supp. 3d at 834-35 (holding that "an implied assurance" of confidentiality suffices).  First, the reports are transmitted through an encrypted, password protected portal and stored securely by EEOC and OFCCP.  Hodge Decl. ¶ 12 & Ex. C. at 8; *see ASBL*, 411 F. Supp. 3d at 835.  Second, by regulation, OFCCP is permitted to use these reports only in connection with Executive Order 11246 or the Title VII of the Civil Rights Act, which by its terms mandates the confidentiality of the records.  *See* 29 C.F.R. § 60-1.7(c).  Consistent with this regulation and the backdrop of strict confidentiality expressed in Title VII, OFCCP treats these reports as confidential and has never voluntarily disclosed them to the public.  Hodge Decl. ¶ 13, 17.

Third, OFCCP follows the notification process prescribed by its regulations and Executive Order 12,600 when it receives a FOIA request for EEO-1 reports, Hodge Decl. ¶ 18; that process is required only when OFCCP receives a request that it believes seeks confidential information.  *See* 29 C.F.R. § 70.26; Executive Order 12600—Predisclosure notification procedures for confidential commercial information, 52 Fed. Reg. 23781 (June 23, 1987).  OFCCP has consistently invoked this notification procedure to give submitters an opportunity to object to the disclosure of their EEO-1 Reports.  Hodge Decl. ¶ 18.  DOL's regulations prevent it from disclosing any information subject to this procedure without first providing the submitter a notice of its intent to disclose, a statement of the reasons why the submitter's objections were not sustained, and a reasonable amount of time before disclosure so that the submitter can, if it wishes, file a reverse FOIA lawsuit to prevent disclosure.  *See* 29 C.F.R. § 70.26(f).  Fourth, except in instances where the submitters have not objected to disclosure, OFCCP has consistently withheld EEO-1 reports from release in response to FOIA requests where it has determined that Exemption 4 is applicable.[8]  Hodge Decl. ¶ 18.  This position signals to submitters OFCCP's baseline understanding that the EEO-1 reports are confidential, and confirms its practice of maintaining

---

[8] In one isolated instance in October 2018, DOL agreed to disclose five EEO-1 reports to resolve pending litigation in this District, after initially asserting that they were exempt from mandatory disclosure under Exemption 4. Hodge Decl. ¶ 19 n.2; *see Center for Investigative Reporting, et al. v. Department of Labor*, No. 18-cv-2008-JCS.  DOL's decision in that case was informed by the heightened substantial competitive harm standard required for application of Exemption 4 at that time, prior to the Supreme Court's *Argus Leader* decision.  During the same period, DOL continued to challenge the disclosure of EEO-1 reports in the FOIA litigation that ultimately resulted in the *CIR 1* decision.  But in any event, DOL's acquiescence to compelled disclosure under FOIA can hardly be considered a suggestion that DOL would not treat the information confidentially.

their confidentiality.  Baxter Decl. ¶ 28.  The government has never, through its acts or words, "suggested that it would not treat the companies' information confidentially," *ASBL*, 411 F. Supp. 3d at 835, or indicated to the submitters that it may disclose the information to anyone outside of the agency. *Cf. Pub. Justice Found. v. Farm Serv. Agency*, 538 F. Supp. 3d 934, 942 (N.D. Cal. 2021) (information provided in loan application held not confidential under the assurance of confidentiality prong where the government informed the applicant that then information may be disclosed "to a wide variety of non-governmental entities").

### B.    The Trade Secrets Act Bars Disclosure of the EEO-1 Reports.

FOIA is "exclusively a disclosure statute," and therefore its exemptions, including Exemption 4, are not in themselves "mandatory bars to disclosure." *Chrysler Corp. v. Brown*, 441 U.S. 281, 293 (1979). However, the Trade Secrets Act, 18 U.S.C. § 1905 ("TSA" or "Section 1905"), prohibits the government from disclosing a broad swath of information obtained from third parties. The TSA is a criminal prohibition against government disclosure "in any manner or to any extent not authorized by law" of information that "concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association." 18 U.S.C. § 1905. Where, as here, material falls within Exemption 4, the TSA "must be considered to ascertain whether the agency is forbidden from disclosing the information." *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1142 n.70 (D.C. Cir. 1987).

Although the Ninth Circuit has long held that "the scope of section 1905 and exemption (4) of the FOIA are the same or coextensive," *Pac. Architects & Eng'rs Inc. v. U.S. Dep't of State*, 906 F.2d 1345, 1347 (9th Cir. 1990), no court has decided whether these provisions remain identical in scope following *Argus Leader*.  *See Synopsys, Inc. v. U.S. Dep't of Labor*, No. 20-16414, 2022 WL 1501094, at *4 (9th Cir. May 12, 2022).  This Court does not need to resolve this question, however, because it is clear that the workforce data contained in the EEO-1 reports constitutes "confidential statistical data" that is specifically covered by the TSA.  *See Burroughs*, 501 F. Supp. at 382.

First, for the reasons discussed above, the data is confidential.  *See* Part V.A.2, *supra*.  Second, the workforce data contained in the EEO-1 Reports is "statistical data" under the plain meaning of those

terms.[9]  Plaintiffs themselves describe the content of the EEO-1 Reports as statistical data throughout their complaint.  *See*, *e.g.*, Dkt. No. 1 ¶¶ 12, 23 ("OFCCP collects workforce data), 27 ("EEOC collects two types of reports containing diversity statistics"; "Type 2 reports include demographic data"), 33, 37. Similar descriptions are found in the case law. *See. e.g.*, *United Tech.*, 464 F. Supp. at 844 (EEO-1 contains "raw statistical data"); *Chrysler*, 412 F. Supp. 171 (EEO-1s "contain statistical information"); *Nat. Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1041 (D.C. Cir. 1979) (describing EEO-1 reports as containing "statistical data about [appellees'] work force composition").  In the pre-*Argus Leader* EEO-1 cases, some courts enjoined the disclosure of EEO-1 reports under the Trade Secrets Act; those that did not relied on the fact that disclosure was authorized by law under Exemption 4 because of the heightened substantial competitive harm standard. *See Chrysler*, 412 F. Supp. at 177 n.7.  Even those courts not enjoining disclosure of the EEO-1 Reports, however, recognized that a DOL employee would face criminal liability under the TSA for disclosing the same type of confidential statistical data presented in more granular detail in the manning tables.  *Id.* at 177.  But Exemption 4 is now much broader in scope, and where information falls within its protection, FOIA can no longer provide the predicate legal authorization to avoid a TSA violation. *Cf. CNA Financial*, 830 F.2d at 1152 n.139. Nothing in the language of Section 1905 creates any specificity requirement or exempts confidential statistical information that is insufficiently granular.  Accordingly, DOL has concluded that disclosure of the EEO-1 reports is prohibited by the Trade Secrets Act.  Ahaghotu Decl. ¶ 77.

## C.    The FOIA Improvement Act of 2016 Does Not Compel Disclosure of the EEO-1 Reports.

Even if records fall within a FOIA exemption, the FOIA Improvement Act of 2016 ("FIA"), 5 U.S.C. § 552(a)(8)(A), permits the withholding of records only if the agency "reasonable foresees" that release would "harm an exemption-protected interest," *Rosenberg v. Dep't of Defense*, 342 F. Supp. 3d 62, 73 (D.D.C. 2018), or where "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(II).  Thus, where the FIA is applicable and disclosure is not otherwise prohibited, a purely technical application of an exemption may not be sufficient to justify withholding. *Judicial Watch, Inc. v. Dep't of Commerce*,

---

[9] The workforce data may also relate to the processes and operations of the objectors and to the amount or source of income, profits, losses, or expenditures. Baxter Decl. ¶ 32; Sobieski Decl. ¶¶ 26-27.

375 F. Supp. 3d 93, 101 (D.D.C. 2019).  This foreseeable harm requirement, however, is triggered only where an agency retains the discretion to disclose information notwithstanding the applicability of a FOIA exemption.  Even if it were applicable here, DOL determined that the release of the EEO-1 data would foreseeably harm several interests protected by Exemption 4.

> **1.**     **The Foreseeable Harm Standard Does Not Apply Here Because Disclosure Is Prohibited by the Trade Secrets Act.**

The foreseeable harm requirement never comes into play in this case because disclosure is prohibited by another law—the Trade Secrets Act.  In enacting the foreseeable harm standard in Section 552(a)(8)(I), Congress was concerned about "a growing and troubling trend towards relying on . . . discretionary exemptions to withhold large swaths of Government information, even though no harm would result from disclosure."  S. Rep. 114-4 at 323 (Feb. 23, 2015); *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 104 (D.D.C. 2019) (explaining that in passing the FIA, Congress was concerned about overuse of discretionary exemptions, and in particular Exemption 5).  But some withholdings are not discretionary, and Congress expressly provided, in subclause II, that the foreseeable harm standard does not apply if "disclosure is prohibited by law." As a result, "'[t]he foreseeable harm standard applies only to those FOIA exemptions under which discretionary disclosures can be made.'" *Rosenberg*, 342 F. Supp. 3d at 73 (quoting FIA Senate Report). In the case of "FOIA exemptions [that] by their own existing terms cover information that is prohibited from disclosure or exempt from disclosure under a law outside the four corners of FOIA," FIA does not require disclosure irrespective of a finding of foreseeable harm.  S. Rep. 114-4 at 8 & n.11; *see also* H.R. Rep. 114-391 (Jan. 7, 2016) at 9-10.

Among those laws "outside the four corners of FOIA" that prohibit disclosure is the Trade Secrets Act. The FIA Senate Report specifically referenced the Trade Secrets Act as an example of a statute outside of FOIA that prohibits disclosure.  S. Rep. 114-4 No. at 8 (quoting U.S. Department of Justice, *Guide to the Freedom of Information Act*, 2009 Edition ("DOJ FOIA Guide"), at 687–689 (2009)). Congress thus made clear that "[i]nformation that is prohibited from disclosure or exempt from disclosure by law," including information covered by "Exemption 4 if disclosure is prohibited by the Trade Secrets Act," is not subject to the foreseeable harm standard.  *Rosenberg*, 342 F. Supp. 3d at 73 n.1 (quoting

1    Senate Report and  DOJ FOIA Guide)).  Because disclosure of the EEO-1 Reports is prohibited by the

2    TSA, DOL does not have discretion to disclose this information, and it falls within the second prong of the

3    FIA, "disclosure prohibited by law," 5 U.S.C. § 552(a)(8)(A)(II), instead of the first, which imposes the

4    foreseeable harm requirement. Accordingly, the foreseeable harm standard does not apply in this case.[10]

5                    **2.    The Foreseeable Harm Standard Is Satisfied Here.**

6            To the extent the foreseeable harm standard does apply, it is satisfied here.  DOL determined that

7    disclosure of the EEO-1 reports would harm four interests protected by Exemption 4: the submitters'

8    interest in the confidentiality of the documents; their commercial or financial interests in keeping the

9    documents confidential; OFCCP's interest in the accuracy and availability of contractors' information;

10   and OFCCP's interest in the efficiency and effectiveness of its oversight program.  Hodge Decl. ¶¶ 20-

11   26; Ahaghotu Decl. ¶¶ 78.  DOL's predictive determination that disclosure would foreseeably harm an

12   interest protected by a FOIA exemption is committed to the judgment of the agency in the first instance,

13   and a court's review should be limited to whether its prediction of harm is reasonable. *See Rosenberg*,

14   342 F. Supp. 3d at 259-64 (finding agency burden under FIA satisfied where its declarations adequately

15   identify the harms that are reasonably foreseeable from disclosure).[11]

16           The foreseeable harm standard requires an inquiry into whether disclosure would reasonably

17   harm an "exemption-protected interest." *ASBL*, 411 F. Supp. 3d at 835. Broadly speaking, Exemption 4

18   is intended to protect the interests of both the government and submitters of information. *See Argus*

19   *Leader*, 139 S. Ct. at 2366 (FOIA exemption interests may include "providing private parties with

20   sufficient assurances about the treatment of their proprietary information so they will cooperate in

21   federal programs and supply the government with information vital to its work"); *Soucie v. David*, 448

22

23           [10] The defendants in *ASBL* did not argue that disclosure of the Exemption 4 material was
     prohibited by the TSA.  Thus, in finding the foreseeable harm test applicable and satisfied in that case,
24   this Court had no occasion to consider whether disclosure was prohibited by a law outside the four
     corners of FOIA.  *ASBL*, 411 F. Supp. 3d at 835-36. Similarly, the court in *CIR 1* did not consider
25   whether the data at issue was prohibited from disclosure by the TSA and therefore not subject to the
     foreseeable harm standard. *See CIR 1*, 424 F. Supp. 3d at 780.

26           [11] In contrast to the eight enumerated FOIA exemptions. which are listed as objective categories
     that can be evaluated by a court without reference to the agency's judgment as to their applicability, 5
27   U.S.C. § 552(b), the foreseeable harm requirement is satisfied if the *agency* reasonably determines that
     disclosure would harm an exemption-protected interest. Where the requirement is applicable, it is
28   satisfied as long as the agency undertakes the foreseeable harm inquiry and its determination is
     reasonable.

1  F.2d 1067, 1078 (D.C. Cir. 1971); *9 to 5 Org. for Women Office Workers v. Bd. of Governors of Fed.*
2  *Reserve Sys.*, 721 F.2d 1, 11 (1st Cir. 1983) (recognizing governmental interest in administrative
3  efficiency and effectiveness).

4       Regarding the private interest protected by Exemption 4, this Court held in *ASBL* "that the
5  relevant protected interest is that of the information's *confidentiality—*that is, its private nature." *ASBL*,
6  411 F. Supp. 3d at 836. Disclosure of the confidential information "would necessarily destroy the private
7  information, no matter the circumstance." *Id*. This conclusion is compelled by the Supreme Court's
8  interpretation of Exemption 4 in *Argus Leader*; because Congress failed to impose any additional harm
9  requirement in Exemption 4, it should not be engrafted onto the exemption through speculative
10 inferences about Exemption 4's extra-textual purpose. *Argus Leader* makes clear that the interest
11 protected by Exemption 4 is the confidentiality of the record maintained by the person who submitted
12 that record to the government.

13      Since this Court's *ASBL* decision, a competing standard has emerged from the Second Circuit
14 regarding the private interest that Exemption 4 is intended to protect. *See Seife v. FDA*, 43 F.4th 231,
15 242 (2d Cir. 2022). Under the *Seife* test, the government must reasonably foresee that disclosure would
16 harm the submitter's "commercial or financial interests." *Id.* All courts considering the standard after
17 *Argus Leader* agree, however, that the foreseeable harm requirement does not require a showing of
18 substantial competitive harm. *See S. Envtl. Law Ctr. v. Tennessee Valley Auth.*, No. 22-cv-00108, 2023
19 WL 2387360, at *12-13 (E.D. Tenn. Mar. 7, 2023) (court considers only whether disclosure would
20 cause foreseeable harm to the commercial or financial interests of the submitter, "not the gravity of the
21 harm potentially caused by disclosure"); *ASBL*, 411 F. Supp. 3d at 836 (refusing to countenance the use
22 of the FIA 'to circumvent the Supreme Court's rejection of *National Parks's* reliance of the legislative
23 history in determining the scope of the term 'confidential'"); *cf. CIR v. CBP*, 436 F. Supp. 3d at 113
24 (observing in dicta that the foreseeable harm requirement "replaces to some extent the 'substantial
25 competitive harm' test" and explaining that an exemption-protected interest would include  "causing
26 'genuine harm to [the submitter's] economic or business interests' . . . and thereby dissuading others
27 from submitting similar information to the government" (citing *Argus Leader*, 139 S. Ct. at 2369
28 (Breyer, J., concurring in part and dissenting in part)).

However foreseeable harm is measured, DOL's conclusion that disclosure would foreseeably harm an exempted-protected interest was reasonable. First, disclosure of these reports would destroy the private nature of the documents. Sobieski Decl. ¶ 35; Baxter Decl. ¶ 32.  Even if this alone is not sufficient to satisfy the foreseeable harm test in all circumstances, the nature of the specific documents at issue here confirms the inherent value of their confidentiality. Congress has expressed its heightened concern about the confidentiality of these reports by making it a crime for EEOC employees to disclose them. 42 U.S.C. § 2000e-8(e). This provision reflects Congress's understanding that the reports contain sensitive, private data that is worthy of special protection.  Release of these reports is directly contrary to congressional intent, as reflected in Title VII.

Second, release of the reports, especially five consecutive years of reports in one data dump, would foreseeably harm the economic and commercial interests of the submitters in a number of ways, as documented in the Bellwether Objectors' declarations and explained by Professors McKay and Roberson. McKay Decl. ¶¶ 14-22; Roberson Decl. ¶¶ 24-30.  Among these harms:

- Making raw diversity statistics available to the public, without context or explanation, can lead to mistaken perceptions about the diversity climate within an organization. McKay Decl. ¶¶ 12-13; Roberson Decl. ¶ 25. This can harm recruiting efforts and paradoxically undermine an organization's ability to build a diverse workforce. McKay Decl. ¶¶ 7-13; Barcon Decl. ¶ 23-24; Hodge Decl. ¶ 21.c. It could also jeopardize relationships with potential customers and teaming partners.  Sobieski Decl. ¶ 34; Jasinowski Decl. ¶ 27.

- Conversely, the large-scale dump of diversity data could lead to increased scrutiny and criticism by opponents of DEI efforts. Barcon Decl. ¶¶ 25-26. Legal and cultural developments in recent months have put companies in a precarious position as they attempt to promote diversity and inclusion in their organizations while trying to avoid customer backlash, negative press, potential lawsuits, and even boycotts.  The potential harm is not merely reputational.  Hodge Decl. ¶ 21.d.  Companies reasonably and increasingly fear that the public may draw incorrect and damaging conclusions from this raw data, provided without explanation or context, and will use this information in a way that will damage their commercial interests.  Roberson Decl. ¶ 30.

- Disclosure of the reports, especially over five years, would give competitors insight into companies' confidential human resource management strategies. McKay Decl. ¶ 20-22; Barcon Decl. ¶ 21; Baxter Decl. ¶ 30; Jasinowski Decl. ¶¶ 10, 13, "In highly competitive business environments, a company's investment in building effective HRM systems is a pivotal source of competitive advantage over other companies." McKay Decl. ¶ 22. Companies' competitive advantage is diminished when competitors are able to use the blueprint of the EEO-1 reports to replicate the aspects of a workforce that make it a strategic resource (i.e., valuable, rare, difficult to imitate and non-substitutable).  McKay Decl. ¶ 22; Hodge Decl. ¶ 21.a.

- Disclosure of headcount, across job categories and over five years, can provide information about human resource management effectiveness, labor productivity, and

forecasting.  Barcon Decl. ¶ 19; Sobieski Decl. ¶ 30; McKay Decl. ¶ 15.  Monitoring a company's staffing patterns and prior staffing patterns can be used by a competitor to inform its own human resource and strategic planning.  McKay Decl. ¶ 15; Hodge Decl. ¶ 21.b.

- Competitors could discern an organization's turnover rate, which could signal a poorly functioning human resource management system.  A competitor could use this knowledge to calibrate its own moves in the labor market with lower risk, and it could recruit employees from companies with high turnover rates.  McKay Decl. ¶¶ 17-18; Barcon Decl. ¶ 20.

- Especially with smaller companies, competitors could use the workforce data and trends to evaluate the strength or vulnerability of a company, and even their likely labor cost structure for specific contracts, and make strategic decisions based on this information that could undercut the company's commercial success.  Sobieski Decl. ¶¶ 31-32.

- The release of these reports will create a wealth of data that can be used by companies looking to recruit a diverse workforce. The dataset will focus would-be recruiters on those companies and job categories that may have larger supplies of desired talent, and provide a roadmap for where to find minority or female candidates to fill specific jobs. Barcon Decl. ¶ 28; Baxter Decl. ¶ 31; Roberson Decl. ¶ 26.

- Disclosure would threaten the privacy interests of some employees.  Roberson Decl. ¶ 26. Even in large companies, some of the data points contain small numbers—even as low as one—such that individual employees may be identifiable.  Barcon Decl. ¶ 22.  In small companies, the potential for exposure of individuals' identities and status is even greater. This undermines employee trust in their employers, who pledged to keep this information confidential, and potentially undermines the effectiveness of the EEO-1 report.  Hodge Decl. ¶ 21.e.  This can also lead to targeting poaching of diverse employees because it identifies viable talent pools, provides readily available access to potential candidates to companies that may not have an alternative talent sourcing strategy, and reduces the costs of hiring.  Roberson Decl. ¶ 26

Third, disclosure would foreseeably harm a number of governmental interests.  Federal contractors submit the EEO-1 reports to the government in reliance on assurances of confidentiality.  *See supra* Part V.A.2.  Disclosure of these reports destroys this expectation of confidentiality, and going forward, submitters will be reasonably concerned that future submissions may be subject to public release.  At the same time, contractors understand that if they are not federal contractors, the same data will be protected from disclosure.  Accordingly, DOL reasonably foresees that some companies will cease to serve as federal contractors so that their EEO-1 reports will not be shared with OFCCP and subject to disclosure. Hodge Decl. ¶ 26; Baxter Decl. ¶ 29.  In addition to negatively impacting the efficiency of the federal government by reducing the pool of potential contractors, this will decrease the number of entities who will be subject to OFCCP's jurisdiction and its nondiscrimination and equal opportunity obligations, and will undermine OFCCP's mission of protecting workers, promoting diversity, and enforcing the law.

Finally, DOL also reasonably foresees that disclosure of the reports will negatively impact contractors' cooperation with OFCCP's information collection efforts, which will interfere with or delay its enforcement actions and other agency activities.  At the same time that it oversees and enforces compliance with nondiscrimination laws, OFCCP seeks to cultivate cooperative relationships with federal contractors to encourage voluntary compliance, facilitate compliance reviews, and promote its various initiatives.  Hodge Decl. ¶ 24; Baxter Decl. ¶ 33.  Although the submission of EEO-1 reports is mandatory, OFCCP relies on the cooperation of its contractors to provide timely responses to its requests for additional information in connection with compliance evaluations.  From time to time, contractors resist OFCCP's efforts to collect information, compelling OFCCP to litigate time-consuming access cases to compel the production of information.  *See*, *e.g.*, *Entergy Services, Inc. v. U.S. Dept. of Labor*, No. 14-cv-1524, 2014 WL 8507568, at *4 (E.D. La. Dec. 15, 2014).  These cases interfere with OFCCP's productivity and efficiency, and ultimately its ability to accomplish its mission.  DOL reasonably foresees that the compelled disclosure of confidential EEO-1 reports would harm relations between OFCCP and the regulated community, undermine voluntary compliance and cooperative initiatives, and result in an increase in contractor resistance to its document collection efforts.  Hodge Decl. ¶¶ 24-25; Baxter Decl. ¶ 33; *see also Burroughs*, 501 F. Supp. at 375, 383 (compelled disclosure of EEO-1 reports and other documents "will have the effect of discouraging" contractors "from submitting to the government workforce data" and "will impair Defendants' ability to obtain information which is necessary for the future administration of the Executive Order program").

## VI.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment in its favor.

DATED: August 18, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

*/s/ Pamela T. Johann*
PAMELA T. JOHANN
Assistant United States Attorney

Attorneys for Defendant UNITED STATES
DEPARTMENT OF LABOR