1

2    UNITED STATES DISTRICT COURT

3    NORTHERN DISTRICT OF CALIFORNIA

4

5    THE CENTER FOR INVESTIGATIVE
     REPORTING and WILL EVANS,

6
                    Plaintiffs,
7
           v.
8
     UNITED STATES DEPARTMENT OF
9    LABOR,

10                 Defendant.

11

| | |
|---|---|
| ) Case No. 22-cv-07182-WHA | |
| ) | |
| ) | |
| ) **DECLARATION OF QUINETTA M.** | |
| ) **ROBERSON, Ph.D., IN SUPPORT OF** | |
| ) **DEFENDANT DEPARTMENT OF LABOR'S** | |
| ) **MOTION FOR SUMMARY JUDGMENT** | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

12         I, Quinetta M. Roberson, Ph.D., state as follows:

13   **I.     Qualifications**

14         1.     My name is Quinetta M. Roberson. I have been asked by the United States Attorney's

15   Office for the Northern District of California, on behalf of the U.S. Department of Labor, to provide an

16   expert declaration in the case of *Center for Investigative Reporting v. U.S. Department of Labor*, No. 22-

17   cv-07182-WHA.

18         2.     As the curriculum vita in Appendix A to this declaration attests, I received my Ph.D.

19   from University of Maryland in 1999 in management, joined the faculty of the Human Resource Studies

20   Department in the School of Industrial and Labor Relations at Cornell University that same year, and

21   was promoted to Associate Professor with tenure in 2005. I joined the faculty in the Management

22   Department in the School of Business at Villanova University as a full Professor of Management and

23   Operations in 2008 and became the Fred J. Springer Endowed Chair in Business Leadership in 2015. I

24   then joined the faculty at Michigan State University as the John A. Hannah Distinguished Professor of

25   Management and Psychology in 2020 and currently hold this position.

26         3.     Prior to obtaining my PhD, I earned a Bachelor of Science in finance and accounting

27   from the University of Delaware and a Master of Business Administration in finance and strategic

28   planning from the University of Pittsburgh. I also worked as a financial analyst at CoreStates Bank.

4.      As evidence of my standing in the scientific community, I have published over 40 peer-reviewed journal articles and book chapters and edited five books within the fields of management and applied psychology. While my research focuses broadly on the development of organizational capabilities and improved effectiveness through the strategic management of people, particularly diverse work teams, much of this work examines the financial impact of diversity, equity and inclusion in organizations. According to Google Scholar, my citation count is 6,306 and my h-index, which is a metric for evaluating the cumulative impact of an author's scholarly output and performance, is 24. I currently serve as Deputy Editor for the *Academy of Management Journal*, which is the top journal in its list of 50 journals used by the *Financial Times* in compiling their research rankings. I have also served as an Associate Editor for the *Journal of Applied Psychology*, which is also on the list. I am a Fellow of the Society for Industrial and Organizational Psychology, Association for Psychological Science and Academy of Management, the latter of which I also served as President. I also served as Program Director for the Science of Organizations program at the National Science Foundation.

5.      I have over 24 years of experience teaching courses and workshops globally on diversity, leadership, and talent management. Further, I regularly provide professional advice and guidance to for-profit and non-profit organizations on creating value and delivering on business strategy through diversity and inclusion. I am a two-time TEDx speaker and serve on the boards of the Michigan State University Federal Credit Union and Cinnaire Lending Corporation, including chairing the diversity committee for Cinnaire. I have filed expert reports in one employment discrimination case – Shirley Williams v. Sprint/United Management Company.

## II.      Scope of Work

6.      I was asked to comment on the information contained in EEO-1 reports. Accordingly, this declaration offers my best scientific judgement on three issues: (a) the commercial nature of EEO-1 diversity data; (b) companies' confidentiality practices regarding this information; and (c) and the potential harm of compelling the release of the data.

7.      To these ends, I discuss the findings of research that highlights diversity as a source of competitive advantage, the demonstrated economic value of diversity, firm utilization of diversity

metrics, and the sensitivity of diversity data. A list of the materials considered in developing this declaration is attached as Appendix B.

**III. Diversity as a Source of Competitive Advantage**

8.  Research provides evidence of the benefits of diversity in organizational workgroups (see Jackson, Joshi & Ehrhardt, 2003; Milliken & Martins, 1996; Williams & O'Reilly, 1998). Demographic differences bring about differences in people's backgrounds, experiences and perspectives, which they bring into their work. Diverse groups produce a wider variety of ideas, approaches and solutions, which increases the cognitive and informational resources available to groups and subsequently, their ability for critical analysis and problem-solving. In addition, the expression of alternative views in diverse groups lessens the likelihood of groupthink and enhances the group's attention to its decision-making processes. As a result, diversity in work teams results in more creative and higher quality decisions.

9.  These diversity benefits create business value for firms in various ways. Research suggests that the value of diverse workforces is driven by the effects on organizational processes and capabilities (Cox & Blake, 1991; Roberson, Holmes & Perry, 2017). Specifically, diversity is an organizational resource that translates into a competitive advantage for firms through a greater capacity for resource acquisition, market access, innovation and strategic flexibility.

10. The resource acquisition argument suggests companies with effective diversity programs will have an advantage in attracting, engaging and retaining talent. Empirical research supports this argument by showing that diversity positively influences minority seekers' attraction and feelings of compatibility to a company, and their overall image of the firm (see Perkins, Thomas & Taylor, 2000). Thus, diversity is argued to enhance a firm's ability to compete in the war for talent.

11. The market access argument is that diversity influences a firm's capability for entering and competing in specific markets. Given the specialized wants and needs of different consumer segments, workforce diversity ensures that these perspectives are represented and understood internally. Thus, matching workforce diversity with that of customers and clients provides firms with an ability to reach and better serve certain markets, which may subsequently improve market share and growth.

12. The innovation argument suggests that because differences in knowledge, expertise and experience can provide firms with useful resources for discovery, diversity can enhance a firm's

capability for improving upon and expanding product and service offerings in ways that are valued by consumers. Accordingly, firms will be better positioned to take advantage of market opportunities that result in premium pricing or increased margins. Consistent with this argument, research evidence shows firms with more diverse knowledge resources to be more innovative and able to exploit such resources in ways that foster research and development (Garcia-Vega, 2006; Quintana-Garcia & Benavides-Velasco, 2008).

13.     Strategic flexibility refers to a firm's capability for sensing and responding to environmental changes. It captures a capacity for adaptability, such that firms can devise ways of dealing with potential and/or unexpected market threats and challenges, as well as a concurrent capacity for speed, such that firms can adapt quickly to competitive changes in the market. Because diversity engenders less system standardization and greater system agility, diverse firms can respond to changes in their external environments more quickly and at lower costs. Some research evidence highlights diversity, particularly within leadership positions, as a means of overcoming the biases and barriers that generate strategic rigidity and developing decision systems for enhancing organizational competitiveness (Shimizu & Hitt, 2004).

14.     Research describes the value in diversity in firms, which is through the unique combination of knowledge, skills and competencies derived from diversity in organizational workforces (Cox, Lobel & McLeod, 1991). Workforces, particularly diverse workforces, create a socially complex and inimitable resource for firms that create value and may serve as a source of competitive advantage. This economic value is recognized more broadly as well. For example, in a letter to Fortune 100 companies on July 19, 2023, 21 U.S. Attorney Generals "recognize that, for private sector employers, diversity is an important, legitimate, and valid business interest, as well established by decades of research" (see Appendix C). This value statement is also consistent with the identified impact of DEI on team and company performance described by the World Economic Forum in its Global Parity Alliance Insight Report (https://www3.weforum.org/docs/WEF_Global_Parity_Alliance_2023.pdf).

15.     Overall, companies collect and track diversity data to realize its inherent commercial value. Specifically, such data are used to identify DEI opportunities and challenges, establish accountabilities for DEI progress, benchmark such progress, and make allocation decisions. Therefore,

1  companies that gather and use diversity data are better positioned to both understand the value for

2  diversity in their particular enterprise and extract such value.

3  **IV. Demonstrated Economic Value of Diversity**

4      16.     A body of research demonstrates a relationship between diversity at different levels of

5  organizations and firm performance (see Certo, Lester, Dalton & Dalton, 2006; Joshi, Liao & Roh,

6  2011; Menz, 2012; Roberson, Holmes & Perry, 2019). Among top management and leadership teams,

7  gender and racial diversity have been found to influence a firm's revenues, returns and valuation by

8  shareholders (Ren & Wang, 2011; Roberson & Park, 2007). At the managerial level, gender and racial

9  diversity are shown to be related to employee productivity, firm returns and market share (Andrevski et

10 al., 2014; Dwyer et al., 2003; Richard et al., 2004; Shrader et al., 1997). Studies show employee gender

11 and racial diversity to be correlated with a range of firm performance outcomes, including employee

12 productivity, revenues, earnings, returns and relative productivity compared to competitors (Frink et al.,

13 2003; Gonzalez & DeNisi, 2009; Hertenian & Gudmundson, 2000; Herring, 2009; Leonard et al., 2004;

14 Richard, 2000; Richard et al., 2006).

15     17.     It should be noted that the relationship between diversity and firm performance is often

16 contextually dependent, as the nature of the relationship may be influenced by firm characteristics, such

17 as business strategy, organizational culture and diversity management (Kochan et al., 2003; Richard,

18 2000; Richard, McMillan, Chadwick & Dwyer, 2003). Research has also shown the impact of diversity

19 on firm performance to vary by industry and geographic region (see Roberson et al., 2017).

20     18.     Studies across disciplines, including management and finance, also demonstrate

21 investors' reactions to companies' corporate social responsibility (CSR) or environmental, social and

22 governance (ESG) activities. As stockholders form impressions of firms based on their demonstrated

23 social values and performance, information on firm activities in these areas has been shown to impact

24 stock prices and valuation (see McWilliams & Siegel, 2000). Specific to diversity, evidence also shows

25 an impact of firm diversity reputation, including minority representation in the workforce and at

26 different managerial levels, the rate at which minority employees are hired and how managers are held

27 accountable for minority staffing and retention, on stock price valuation (see Roberson & Park, 2007;

28 Wright, Ferris, Hiller & Kroll, 1995).

19. Overall, research highlights the economic value of diversity and diversity data. With demonstrated relationships between the composition of organizational workforces and indicators of firm financial performance, including profitability, market share and valuation, such information may be considered financial in nature.

**V. Firm Utilization of Diversity Metrics**

20. Diversity data are used internally by firms for business purposes – specifically, to monitor human resource management effectiveness, including staffing, performance management, compensation, engagement and retention (see Buttner & Tullar, 2018). For example, many organizations use diversity metrics, such as that contained in EEO-1 reports, as a measurement analytic for workforce goal setting and planning. Such data indicate the extent to which racial/ethnic groups are represented within various job categories and at different levels and thus, indicates where targeted recruitment initiatives might be effective. For example, a study using data from EEO-1 compliance reports of 708 private-sector organizations for 1971–2002 showed that such plans increased the likelihood of White women and Black men being represented in management by 9% and 4%, respectively. It is important to note, however, that firms should interpret such information with caution as the results varied by industry. For example, the representation of Black women in management grew in service industries but declined in manufacturing sectors, such as technology and transportation; thus, highlighting the contextuality and sensitivity of such information.

21. Such data are also used to evaluate the effectiveness of employee staffing and development strategies, particularly in certain job categories. As research demonstrates race effects on the employee engagement-turnover relationship (Jones & Harter, 2005), workforce demographics can provide insight into how the workplace experiences of members of different racial/ethnic groups may differ. Tracking and analyzing diversity data allows firms to identify issues and processes that require intervention and make data-driven decisions about how to invest resources in such interventions (Jayne & Dipboye, 2004). Such metrics are useful for conducting scenario planning to explore the potential return on different enterprise-wide diversity interventions and the effectiveness of talent development strategies for employment categories of a firm's workforce.

22.    Another use of diversity data is the creation of accountability structures that assign responsibility for addressing workplace discrimination to specific groups. For example, some firms use such data to evaluate managers' performance and determine compensation based on how well diversity goals have been met. Research shows such usage of diversity data to correlate positively with managerial diversity , such that diversity-linked evaluations and compensation resulted in an increased representation of certain demographic groups in management (Kalev, Kelly & Dobbin, 2006; Richard, Roh & Pieper, 2013). Research also shows these effects to be amplified when performance and compensation systems linked to diversity data are combined with organization-level accountability structures. For example, a current study in the credit union industry examines the effects of establishing diversity goals and collecting and tracking diversity data on firm performance (Roberson & Preston, 2021). The results show that aligning diversity, equity and inclusion (DEI) with business activities via the development of a DEI strategic plan and establishment of a formal responsibility system for coordinating and monitoring DEI efforts, such as the appointment of a Chief Diversity Officer or formation of a DEI Council, help to drive performance impact.

23.    Overall, research shows that while diversity data can be important metrics for indicating the underrepresentation of certain demographic groups within firms and establishing a baseline against which progress can be measured, they are outcome metrics. To change the composition of workforces (and their experiences within organizations), policies, practices and interventions for addressing the particular structural and/or cultural issues within each firm need to be designed and implemented.

VI.    **Information Sensitivity**

24.    Although establishing meaningful metrics to evaluate the effectiveness of a firm's diversity initiative is critical to managing diversity effectively, researchers have noted the challenges associated with collecting and tracking diversity data. As a residual of the human resource function, which often is considered a cost-center with little demonstrated return on investment, many organizations do not collect the full scope of data required for meaningful evaluation and analysis (Jayne & Dipboye, 2004). Companies also fear that the disclosure of diversity data may open firms up to legal vulnerabilities by being interpreted as revealing systemic bias or discrimination.

25.    In the case of the information contained in EEO-1 reports, these vulnerabilities become particularly salient for several reasons. First, because information provided in the EEO-1 form is reported without context, there is the possibility for misinterpretation. For example, because firms' staffing pools are partially determined by the labor availability in their specific industry and operating regions, the diversity of such pool and subsequent workforce composition is likely to be influenced accordingly (Buttner & Tullar, 2018). While many organizations are more diverse at its lower levels, representation at higher levels may be due to the scarcity of talent within that occupational category. Ideally, the demographic distribution of employees at each level of a firm should resemble the demographic distribution of its relevant labor market. Yet, labor market availability may be influenced by the occupation, industry, or region from which talent is recruited. Thus, without taking into consideration the availability of labor within each job category listed on the EEO-1 form, the representativeness of such data may be inaccurate. Workforce composition may also be influenced by other factors, such as the nature of work, how employees view work, the specific skills needed with an organization, employees' non-work responsibilities, a firm's compensation strategy, etc. (https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/the-great-attrition-is-making-hiring-harder-are-you-searching-the-right-talent-pools). These  influences further limit companies' willingness to share EEO-1 and other diversity data.

26.    Second, although the EEO-1 form does not ask submitting companies to explain resource allocation across its segments, individuals can become identifiable at higher levels of the firm where they are less represented or in other job categories where there may be fewer employees (such as in smaller companies or underrepresented groups). For example, if a company reports one Hispanic female at the executive/senior officials and managers level, it would not be difficult for others (both internal and external to the firm) to identify that individual. While identification may not seem problematic, there is the potential for other firms interested in diversifying their leadership ranks to target that individual for poaching. In effect, it identifies viable talent pools and provides readily available access to potential candidates to companies that may not have a sourcing strategy. For the poaching organization, it reduces the time and resources needed to source and screen potential candidates, which accelerates the staffing process and reduces the costs of hiring. As such, it can generate a competitive advantage for that

1   organization. For the employee, there is the added challenge of being primarily valued for their

2   demographic group membership rather than for the unique knowledge, skills and abilities they

3   contribute to an organization (see Thomas & Ely; Ely & Thomas, 2001).

4        27.     Notably, demographic data is often not gathered outside of the U.S, as countries

5   experience similar concerns about collecting, tracking and interpreting information on employees across

6   racial and ethnic backgrounds. One key concern is the sensitivity of the data, especially privacy issues

7   associated with some groups disclosing their identity. It is feared that such data "may be misused to

8   maintain or deepen power relationships between majority and minority population groups", especially

9   those "who may have experience ethnic profiling, segregation, genocide and violence" and "in countries

10  where ethnicity-based data were used in the past to provide the basis for discriminatory policies"

11  (Balestra & Fleischer, 2009).Other concerns include the validity of the data, especially with variability

12  in the categorization of jobs, reporting sources and reporting time periods; and the reliability of the data,

13  especially given increases in the contingent nature of work and identity. Accordingly, international

14  standards organizations continue to debate diversity concepts, guiding principles and methodologies.

15       28.     Although some diversity data are publicly available, it should be noted that they are often

16  shared in aggregate. For example, *Fortune* magazine published an annual list of the best companies for

17  minorities based on a survey of the top 1,000 publicly traded companies plus the 200 largest privately

18  held firms in the U.S. on the representation of minorities in the workforce and at different managerial

19  levels, the rate at which minority employees are hired, and how managers are held accountable for

20  hiring, promotion and retention. The representation of Black, Hispanic, Asian and Native American

21  employees throughout firms were reported as percentages without any specification of level, job

22  category or business area.

23       29.     Some companies are willing to share their diversity data albeit in another format than that

24  included in EEO-1 reports. For example, companies use other metrics, such as annual percentage

25  changes in diversity goals, representation of underrepresented groups in recruitment pools or new hires,

26  yield from minority-serving institutions, diversity of hiring panels or employee retention across groups.

27  For those firms that are willing to share diversity information, including that contained in EEO-1

28  reports, it is often done within the context of a larger DEI initiative context (for an example, see United

Health Group: https://sustainability.uhg.com/reporting-data/eeo-data.html). To aid in data interpretation, firms will provide additional information on talent management efforts, such as staffing, development and engagement, for readers to understand the composition of their workforce and value for diversity in their organization. Yet, because many organizations may not have the staff, budget or other resources needed to build out a comprehensive DEI initiative or have relatively less robust DEI programs as compared to companies recognized for DEI "best practices", they may be reluctant to share diversity data.

30.    Finally, companies may fear sharing diversity data given the recent weaponization of DEI initiatives. While some speculate that corporate social actions can signal a desire to achieve social or environmental good (see Bansal & Kistruck, 2006; Barnett et al., 2020; Matten & Moon, 2008), others see the alignment of firm practices with social issues to be antithetical to organizations' business purposes (Warren, 2022). Critics of corporate social action, including diversity initiatives, have reproached organizations for engaging in such efforts to merely provide the appearance of socially conscious (i.e., "wokeness"). In fact, scholars, practitioners and the public have begun attacking the purposes and efficacy of organizational diversity efforts (see Mirzaei, Wilkie & Siuki, 2022; Vredenburg et al., 2020; Waldman & Sparr, in press). Consumer backlash, boycotts and lawsuits have motivated company leaders to retreat from DEI (https://www.forbes.com/sites/bryanrobinson/2023/07/01/as-supreme-court-erases-college-affirmative-action-new-reports-find-companies-refusing-to-deliver-on-dei-promises/?sh=7ca4c875a85b) . As a result, companies are increasingly reluctant to not only engage in diversity-related efforts but to communicate a commitment to DEI, in general.

31.    I am being compensated at my usual rate of $550 per hour for my services in connection with this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of August, 2023, at East Lansing, Michigan.

QUINETTA ROBERSON, PhD.

# Exhibit A

APPENDIX A

**QUINETTA M. ROBERSON**
**Curriculum Vita**

Broad College of Business
Michigan State University
632 Bogue Street, Room N475
East Lansing, MI 48824
quinetta@broad.msu.edu

**ACADEMIC POSITIONS:**

| | |
|---|---|
| 2020 – present | John A. Hannah Distinguished Professor in Management and Psychology<br>Eli Broad College of Business and College of Social Science<br>Michigan State University |
| 2015 – 2020<br>2008 – 2020 | Fred J. Springer Endowed Chair in Business Leadership<br>Professor, Department of Management & Operations<br>Villanova School of Business<br>Villanova University |
| June 2012 | Visiting Professor<br>Fundação Getulio Vargas - Escola de Administração de Empresas de São Paulo<br>São Paulo, Brazil |
| November 2010 | Visiting Research Fellow<br>Melbourne Business School<br>Melbourne, Australia |
| January – June 2008 | Visiting Associate Professor, Department of Management & Organization<br>Robert H. Smith School of Business<br>University of Maryland at College Park |
| March – June 2006 | Visiting Professor, Institute of Organizations and Information Systems<br>Bocconi University<br>Milan, Italy |
| 2005 – 2008<br>1999 – 2005 | Associate Professor<br>Assistant Professor<br>Human Resource Studies<br>School of Industrial and Labor Relations<br>Cornell University |

**EDUCATION:**

| | | |
|---|---|---|
| Ph.D. | 1999 | University of Maryland at College Park<br>Major: Organizational Behavior; Minor: Human Resource Management |
| M.B.A. | 1993 | University of Pittsburgh<br>Major(s): Finance, Strategic Planning |

B.S.          1992          University of Delaware
                           Major: Finance; Minor: Accounting

**AWARDS/HONORS:**
Trailblazer Award, Management Doctoral Student Association, The PhD Project, 2022
Outstanding Reviewer Award, Academy of Management Review, 2022
Fellow, Association for Psychological Science, 2021
Fellow, Academy of Management, 2020
#ThinklistAmplify, Centre for Business, Organisations and Society (CBOS), University of Bath, 2020
#Thinklist30, Centre for Business, Organisations and Society (CBOS), University of Bath, 2020
Sage Award for Scholarly Contributions, Gender and Diversity in Organizations Division, Academy of
       Management, 2020
Scientist-Practitioner Presidential Recognition, Society for Industrial and Organizational Psychology, 2019
Bright Idea Award, Stillman School of Business, Seton Hall University, 2018
Fellow, Society for Industrial and Organizational Psychology, 2016
Daniel J. O'Mara Business Faculty Award, 2015
Distinguished Doctoral Graduate, Robert H. Smith School of Business, University of Maryland, 2011
Best Paper Award, *Group and Organization Management*, 2007
Emerging Scholar, Diverse Issues in Higher Education, 2007
Faculty Research Award (with Tony Simons), School of Hotel Administration, Cornell University, 2004
General Mills Award for Innovation in Teaching, Cornell University, 2001-2002
James A. Perkins Prize for Interracial Understanding & Harmony Honorable Mention, Cornell University, 2002
Fraternity and Sorority Community Outstanding Faculty Award, Cornell University, 2001
Frank T. Paine Award for Academic Achievement, University of Maryland, 1999
Allen J. Krowe Teaching Award, University of Maryland, 1999
Student Academic Achievement Grant, University of Maryland, 1995-1999
Robert Morris Associates, Philadelphia Chapter, Best Paper Award, 1995
Beta Gamma Sigma, National Business Honor Society, 1993
Academic Scholarship, University of Pittsburgh, 1992-1993; University of Delaware, 1988-1992

**FUNDING:**
"Diversity as an Organizational Capability: A Multilevel Examination of Board Composition and Firm
       Effectiveness", National Science Foundation, $350,000, 2021-2024

**RESEARCH**
**Refereed Publications:**
Roberson, Q. M., Moore, O. A., & Bell, B. S. (In press). An active learning approach to diversity training.
       *Academy of Management Review*.

Roberson, Q., Ruggs, E., Pichler, S., & Holmes, O. (In press). LGBTQ systems: A framework and future research
       agenda. *Journal of Management*.

Roberson, Q. M., & Scott, W. (In press). Contributive justice: An invisible barrier to workplace inclusion. *Journal
       of Management*.

Avery, D. R., McKay, P. F., Roberson, Q. M., & Thomas, K. M. (2023). R.E.A.L. (Racialized experiences in
       academic life) talk: A curated conversation with four black fellows. *Journal of Business and Psychology*,
       38, 7-23.

       * Awarded a 2022 Editor Commendation, as one of the best papers published by the journal.

Roberson, Q. M. (2022). 2021 Presidential address: Meeting our moment. *Academy of Management Review*, 47, 206-209.

Roberson, Q. M., & Perry, J. L. (2022). Inclusive Leadership in Thought and Action: A Qualitative Study of Leader Perception and Behavior. *Group and Organization Management*, 47, 755-778.

Roberson, Q. M., Quigley, N., Vickers, K., & Bruck, I. (2021). Reconceptualizing leadership from a neurodiverse perspective. *Group and Organization Management,* 46(2), 399—423.

Roberson, Q. M. (2020). Access to justice as a human right, organizational entitlement, and precursor to diversity and inclusion. *Equality, Diversity, and Inclusion: An International Journal,* 20, 787-791.

Roberson, Q. M., King, E. B., & Hebl, M. (2020). Designing more effective practices to address workplace inequality. *Behavioral Science and Policy*, 6(1), 39-49.

Roberson, Q. M. (2019). Diversity in the workplace: A review, synthesis, and future research agenda. *Annual Review of Organizational Psychology and Organizational Behavior*, 6, 69-88.

Periac, F., David, A., & Roberson, Q. M. (2018). Clarifying the interplay between social innovation and sustainable development: A conceptual framework rooted in paradox management. *European Management Review*, 1(15), 19-35

Roberson, Q. M., Ryan, A. M., & Ragins, B. R. (2017). The evolution and future of diversity at work. *Journal of Applied Psychology*, 102(3), 483-499.

Roberson, Q. M., Holmes, O. H. & Perry, J. L. (2017). Transforming Research on Diversity and Firm Performance: A Dynamic Capabilities Perspective. *Academy of Management Annals*, 11(1), 189-216.

Roberson, Q. M., & Williamson, I. O. (2012). Justice in self-managing teams: The role of social networks in the emergence of procedural justice climates. *Academy of Management Journal*, 55, 685-701.

Hausknecht, J. P., Sturman, M. C., & Roberson, Q. M. (2011). Justice as a dynamic construct: Effects of individual trajectories on distal work outcomes. *Journal of Applied Psychology*, 96, 872-880.

Parks, G. P., & Roberson, Q. M. (2011). "Eighteen Million Cracks": Gender's Role in the 2008 Presidential Election. *William & Mary Journal of Women and the Law,* 17, 321-345.

Parks, G. P., & Roberson, Q. M. (2009, Winter). Michelle Obama: A contemporary analysis of race and gender discrimination through the lens of Title VII. *Hastings Women's Law Journal, 20*, 3-44.

Roberson, Q. M., Sturman, M. C., & Simons, T. L. (2007). Does the measure of dispersion matter in multilevel research? A comparison of the relative performance of dispersion indices. *Organizational Research Methods, 10*, 564-588.

Roberson, Q. M., & Park, H. J. (2007). Examining the link between diversity and firm performance: The effects of diversity reputation and leader racial diversity. *Group & Organization Management*, *32*, 548-568.

Roberson, Q. M. (2006). Are Justice Perceptions in Teams Contagious? The activation and role of sensemaking in the emergence of justice climates. *Organizational Behavior and Human Decision Processes*, 100, 177-192.

Roberson, Q. M.  (2006). A social comparison approach to justice in teams: The effects of interdependence and fairness on referent choice and justice climate strength. *Social Justice Research,* 19, 323-344.

Roberson, Q. M. (2006). Disentangling the meanings of diversity and inclusion in organizations. *Group & Organization Management, 31*, 212-236.

Roberson, Q. M., & Stevens, C. K. (2006). Making sense of diversity in the workplace: Organizational justice and language abstraction in employees' accounts of diversity-related incidents. *Journal of Applied Psychology,* 91, 379-391.

Roberson, Q. M., & Stewart, M. M. (2006). Understanding the motivational effects of procedural and informational justice in feedback processes. *British Journal of Psychology*, 97, 281-298.

Bagdadli, S., Roberson, Q. M., & Paoletti, F. (2006). The importance of organizational justice in promotion decisions. *Journal of Business and Psychology,* 21, 83-102.

Roberson, Q. M., Collins, C. J., & Oreg, S. (2005). The effects of recruitment message specificity on applicant attraction to organizations. *Journal of Business and Psychology, 19*, 319-339.

Roberson, Q., & Colquitt, J. A. (2005). Shared and configural justice: A social network model of justice in teams. *Academy of Management Review, 30*, 595-607.

Simons, T. L., & Roberson, Q. M. (2003). Why managers should care about fairness: The effects of aggregate justice perceptions on organizational outcomes. *Journal of Applied Psychology, 88*, 432-443.

Roberson, Q. M., Moye, N. A., & Locke, E. A. (1999). Identifying a missing link between participation and satisfaction: The mediating role of procedural justice perceptions.  *Journal of Applied Psychology, 84*, 585-593.

Barber, A. E., Wesson, M. J., Roberson, Q. M., & Taylor, M. S. (1999). A tale of two job markets: organizational size and its effects on hiring practices and job search behavior. *Personnel Psychology, 52*, 841-867.

**Other Publications:**

Massey, M., & Roberson, Q. M. (2022) Diversity in AI programming and the end-user experience. In King, E. B., Roberson, Q. M., & Hebl, M. R. (Eds.), *Research in Social Issues in Management: The Future of Scholarship on Race in Organizations*, Volume 3 (pp. 259-278). Information Age Publishing.

Chrobot-Mason, D., & Roberson, Q. M. (2021). Inclusive leadership (Chapter 12). In P. G. Northouse (Ed.), Leadership: Theory and Practice (9th edition, pp. 322-351). Thousand Oaks, CA: Sage.

Roberson, Q. M. (2018). Client diversity (Chapter 14). In C. R. Chaffin (Ed.), *Client Psychology*. Hoboken, NJ: John Wiley & Sons, Inc.

Roberson, Q. M. (2017). Diversity in the workplace. In S. G. Rogelberg (Ed.), *Encyclopedia of Industrial and Organizational Psychology* (2nd edition). Thousand Oaks, CA: Sage.

Avery, D. A., McKay, P. F., & Roberson, Q. M. (2012). Managing diversity means managing differently: A look at the role of racioethnicity in perceptions of organizational support. In L. M. Shore, J. A-M. Coyle-Shapiro

& L. E. Tetrick (Eds.), *Understanding the Employee-Organization Relationship: Advances in Theory and Practice*. London: Psychology Press/Taylor & Francis Group.

Roberson, Q. M. (2012). Managing diversity (Chapter 31). In S. W. J. Kozlowski (Ed)., *Oxford Handbook of Industrial and Organizational Psychology*. Oxford: Oxford University Press.

Roberson, Q. M., & Williamson, I. O. (2010). The Fairness of Difference: How Team Composition Affects the Emergence of Justice Climates. In M. A. Neale, E. A. Mannix, & E. Mullen (Eds.), *Research on Managing Groups and Teams: Fairness and Groups* (pp. 274-298). London: Emerald Publishing Group.

Roberson, Q. M., Bell, B., & Porter, S. C. (2008). The language of bias: A linguistic approach to understanding intergroup relations. In M. A. Neale, E. A. Mannix, & K. W. Phillips (Eds.), *Research on Managing Groups and Teams: Diversity in Groups* (Volume 11, pp. 267-294). London: Emerald Publishing Group.

Roberson, Q. M. (2006). Diversity in the workplace. In S. G. Rogelberg (Ed.), *Encyclopedia of Industrial and Organizational Psychology*. Thousand Oaks, CA: Sage.

Colquitt, J. A., Zapata-Phelan, C. & Roberson, Q. (2005). Justice in Teams: A Literature Review and Agenda for Future Research. In J. J. Martocchio (Ed.), *Research in Personnel and Human Resource Management* (Vol. 24, pp. 53-94). Oxford, UK: Elsevier.

Locke, E., Tirnauer, D., Roberson, Q., Goldman, B., Latham, M., & Weldon, E.  (2000). The importance of the individual in an age of groupism.  In M. Turner (Ed.), *Groups at Work:  Advances in Theory and Research* (pp. 501-528).  Hillsdale, NJ:  Lawrence Erlbaum.

**Books:**

King, E. B., Roberson, Q., & Hebl, M. R. (Eds.) (2023). *Research on Social Issues in Management: The Future of Scholarship on Diversity and Inclusion in Organizations* (Volume 4). Charlotte, NC: Information Age Publishing.

King, E. B., Roberson, Q., & Hebl, M. R. (Eds) (2022). *Research on Social Issues in Management: The Future of Scholarship on Race in Organizations* (Volume 3). Charlotte, NC: Information Age Publishing.

King, E. B., Roberson, Q., & Hebl, M. R. (Eds) (2020). *Research on Social Issues in Management: Perspectives on Gender at Work* (Volume 2). Charlotte, NC: Information Age Publishing.

King, E. B., Roberson, Q., & Hebl, M. R. (Eds) (2019). *Research on Social Issues in Management: Pushing our Understanding of Diversity in Organizations* (Volume 1). Charlotte, NC: Information Age Publishing.

Roberson, Q. M. (2013). *The Oxford Handbook of Diversity and Work*. Oxford: Oxford University Press.

**Invited Presentations:**

Roberson, Q. M. The science of building better boards. Invited presentation in BroadX sponsored by the Broad College of Business at Michigan State University. (2022)

Roberson, Q. M. What inclusive leaders do differently. Invited talk in the Positive Speaker Series sponsored by the Center for Positive Organizations in the Ross School of Business at University of Michigan. (2022)

Roberson, Q. M. Inclusive scholarship as a force for good. Presentation and panel discussion at the British Academy of Management conference in Manchester, England. (2022)

Roberson, Q. M. Unpacking the business case for diversity management: Strategic practice bundles and organizational performance. Research talk at Nova School of Business and Economics in Carcavelos, Portugal. (2022)

Roberson, Q. M., Avery, D. R., & Leigh, A. Lights, camera, action: Moving beyond performative diversity management to drive change. Research talk in the "Countering the Woke Organization: Managerial and Public Policy Implications" workshop sponsored by the Institute for Human Studies at George Washington University. (2022)

Roberson, Q. M. "Cultivating connection through inclusive leadership" and "Connecting DEI to our work". Invited presentation in the Innovation and Learning Lab (LILA) in the Harvard Graduate School of Education. (2022)

Roberson, Q. M. What are diversity 'best practices'? Exploring diversity management bundles and organizational performance. Research talk in the School of Management and Industrial Relations at Rutgers University. (2022)

Roberson, Q. M. Are there actually 'best practices'? Diversity management bundles and organizational performance. Invited speaker in the Interdisciplinary Committee on Organizational Studies (ICOS) Speaker Series at the University of Michigan. (2021)

Roberson, Q. M. Leading inclusive organizations and societies. Invited keynote lecture at 2021 annual conference of the Brazilian Academy of Management (Associação Nacional de Pós-Graduação e Pesquisa em Administração)

Roberson, Q. M. Activating your diversity and inclusion capabilities in the retail industry. Invited keynote speaker for the Symposium on Diversity and Inclusion in Retail hosted by the David Sobey Centre for Innovation in Retailing and Services at Saint Mary's University. (2021)

Roberson, Q. M. What is your capacity for impact? Exploring the significance of women in leadership. Invited keynote speaker at the 2018 Erasmus Centre for Women and Organisations (ECWO) Conference in the Rotterdam School of Management at Erasmus University in Rotterdam, Netherlands. (2018)

Roberson, Q. M. Beyond diversity: Are inclusive organisations truly attainable? Invited public lecture at the London School of Economics in London, England. (2018)

Roberson, Q. M. The confusion of inclusion. Invited keynote speaker at the 2018 Leadership Excellence and Gender in Organizations Research to Practice Conference at Purdue University in West Lafayette, IN.

Roberson, Q. M. Diversity in the workplace: A review, synthesis and future research agenda. Research presentation at Brunel University in London, England. (2018)

Roberson, Q. M. The evolution and future of diversity at work: Employing a capabilities perspective. Research presentation in 2017 University of Cincinnati Business and Law Partnership Program in Cincinnati, OH.

Roberson, Q. M. Diversifying diversity: Creating an integrative agenda for the evolution of diversity as a science and practice. Research presentation at the Chaire Management et Diversité International Symposium at the Université Paris – Dauphine in Paris, FR. (2015)

Roberson, Q. M. Understanding the value of diversity in organizations: A capability-based framework of heterogeneity and firm performance. Research presentation at the 2015 Michigan State University Symposium on Multicultural Psychology in East Lansing, MI.

Roberson, Q. M. Dealing with our diverse identities: An agenda for future equality, diversity and inclusion research. Keynote presentation at the 2015 Equality, Diversity and Inclusion conference in Tel Aviv, Israel.

Roberson, Q. M. The evolution of diversity theory and research: How far we've come and where we go from here. Research colloquium in the School of Social Work at the University of Southern California in Los Angeles, CA. (2015)

Roberson, Q. M. The evolution and future of diversity at work. Research presentation at the University of Utah in Salt Lake City, UT. (2014)

Roberson, Q. M. The evolution and future of diversity at work. Research presentation at Drexel University in Philadelphia, PA. (2014)

Roberson, Q. M. Exploring compositional forms of justice climate emergence in self-managing teams. Research presentation at Rutgers University in Newark, NJ. (2013)

Roberson, Q. M. Exploring compositional forms of justice climate emergence in self-managing teams. Research presentation at Georgia Institute of Technology in Atlanta, GA. (2013)

Roberson, Q. M. Motivating homo sapien commodities to deliver value … or "human resource management. Keynote presentation at the 2013 Dutch HRM Network International Conference in Leuven, BE.

Roberson, Q. M. Multiculturalism as a capability: Understanding the organizational value of diversity. Invited presentation at the 2013 International Colloquium at the Chateau de la Bretesche in Missillac, FR.

Roberson, Q. M. Diversifying diversity: Creating an integrative agenda for the evolution of diversity as a science and practice. Invited presentation at the University of Dauphine in Paris, FR. (2013)

Roberson, Q. M. Diversifying diversity: Creating an integrative agenda for the evolution of diversity as a science and practice. Invited presentation at the University of Sussex in Brighton, UK. (2013)

Roberson, Q. M. Adopting a configural approach to the study of fairness. Invited presentation to the Work and Organizational Research Centre (WORC) at Brunel University in Uxbridge, UK. (2013)

Roberson, Q. M. Capacity building through diversity: Moving from the business case to the value proposition. Research presentation at the University of Delaware in Newark, DE. (2012)

Roberson, Q. M. Addressing the crisis within our midst: An agenda for strengthening diversity research and practice. Keynote presentation at the 2009 Equality, Diversity and Inclusion conference in Istanbul, TU.

Roberson, Q. M. Is justice contagious? Understanding the emergence of team justice climates. Research presentation at Virginia Commonwealth University in Richmond, VA. (2009)

**Conference Presentations:**

Perry, J. L., & Roberson, Q. M. Separating the effects of power and status in groups. Paper presentation at the 2015 Equality, Diversity and Inclusion conference in Tel Aviv, Israel.

Roberson, Q. M. The science of inclusion. IGNITE presentation at the 2014 Society for Industrial and Organizational Psychology conference in Honolulu, HI.

Roberson, Q. M. The ties that bind: Exploring the roles of social networks in the emergence of inclusive climates. Paper presentation at the 2013 Equality, Diversity and Inclusion conference in Athens, Greece.

Roberson, Q. M., Tekleab, A. G., Williamson, I. O. & Gill, C. Directing fairness in self-managing teams: How team leadership moderates justice climates. Symposium presentation at the 2012 Academy of Management meeting in Boston, MA.

Roberson, Q. M., Avery, D. R. & McKay, P. F. Managing diversity means managing differently: A look at the role of diversity in perceptions of organizational support. Symposium presentation at the 2012 Society for Industrial and Organizational Psychology conference in San Diego, CA.

Moore, O., Bell, B. S. & Roberson, Q. M. Evaluating the effectiveness of diversity training: A longitudinal investigation of individual and situational influences. Symposium presentation at the 2012 Society for Industrial and Organizational Psychology conference in San Diego, CA.

Roberson, Q. M. Risky business: An exploratory study of diversity practice litigation. Paper presented at the 2009 Academy of Management meeting in Chicago, IL. Presentation in symposium,

Roberson, Q. M., Kehoe, R. A., & Collins, C. J. Winning isn't everything: The relationship between diversity reputation, practices, and firm performance. Paper presented at the 2008 Academy of Management meeting in Anaheim, CA.

Duguid, M. M., Roberson, Q. M., & Richard, O. C. A social networks approach to board composition and firm performance. Paper presented at the 2007 Academy of Management meeting in Philadelphia, PA.

Rheinhardt, R. A., Collins, C. J., & Roberson, Q. M. An investigation of the relationship between organizational diversity and firm performance. Paper presented at the 2007 Academy of Management meeting in Philadelphia, PA. (Honorable mention for Emerald Best Student Paper Award presented by Gender and Diversity in Organizations Division)

Bell, B. S., & Roberson, Q. M. Diversity training research: Current perspectives and future directions. Symposium organized and chaired at the 2006 Academy of Management meeting in Atlanta, GA.

Duguid, M., Roberson, Q. M., & Richard, O. C. A social network approach to board diversity and firm performance: The role of professional, social and voluntary memberships. Paper presented at the 2006 Academy of Management meeting in Atlanta, GA.

Batt, R., Kim, S., & Roberson, Q. M. A Multi-Level Study of Demographic Diversity, Group Heterogeneity and Performance. Paper presented at the 2005 Academy of Management meeting in Honolulu, HI.

Williamson, I. O, & Roberson, Q. M. Intra-Team Network Ties and Team Justice Climates. Paper presented at the 2005 Academy of Management meeting in Honolulu, HI.

Roberson, Q. M. The Effects of Interdependence and Fairness on Justice Climate Emergence. Paper presented at the 2005 Society for Industrial and Organizational Psychology Conference in Los Angeles, CA.

Roberson, Q. M., Collins, C. J., & Yeung, S. K. Diversity Information in Recruitment Advertisements and Organizational Attraction. Paper presented at the 2005 Society for Industrial and Organizational Psychology Conference in Los Angeles, CA.

Roberson, Q. M. Is Justice Contagious? The Role of Sensemaking in Justice Climate Emergence. Paper presented at the 2004 Academy of Management meeting in New Orleans, LA.

Roberson, Q. M., & Park, H. J. Diversity Reputation and Leadership Diversity as Sources of Competitive Advantage in Organizations. Paper presented at the 2004 Academy of Management meeting in New Orleans, LA.

Simons, T. L., & Roberson, Q. M. Examining the Relationships between Unit Size, Unit Demography and Justice Climate Strength. Paper presented at the 2004 Academy of Management meeting in New Orleans, LA.

Roberson, Q. M., & Smith, D. B. Disentangling Diversity and Inclusion. Paper presented at the 2002 Society for Industrial and Organizational Psychology Conference in Toronto, Canada.

Simons, T., & Roberson, Q. M. A True Look at "Organizational Justice": The effects of aggregate justice perceptions and organizational outcomes. Paper presented at the 2001 Academy of Management meeting in Washington, DC.

Roberson, Q. M. Moving beyond Individual Justice Perceptions: Exploring fairness in multilevel contexts. Symposium chaired at the 2001 Society for Industrial and Organizational Psychology Conference in San Diego, CA.

Roberson, Q. M. The leveraging effects of team contexts on fairness perceptions and reactions. Paper presented at the 2001 Society for Industrial and Organizational Psychology Conference in San Diego, CA.

Roberson, Q. M. An Interactional Model of Diversity Climate: A Lens for Interpreting Diversity-Related Incidents in Organizations. Paper presented at the 2000 Society for Industrial and Organizational Psychology Conference in New Orleans, LA.

Stewart, M. M., & Roberson, Q. M. Decoupling Elements of Negative Feedback: Credibility, Accuracy and Interactional Justice. Paper presented at the 2000 Society for Industrial and Organizational Psychology Conference in New Orleans, LA.

Roberson, Q. M., Stevens, C. K., & McDonald-Mann, D. An Exploratory Analysis of Employees Perceptions of Diversity-Related Incidents. Paper presented at the 1998 Academy of Management meeting in San Diego, CA.

Moye, N. A., Roberson, Q. M., & Locke, E. A. Insight into Participation Effects: The role of learning goals and justice perceptions. Paper presented at the 1998 Academy of Management meeting in San Diego, CA.

Barber, A. E., Wesson, M. J., Roberson, Q. M., & Taylor, M. S.  A Tale of Two Job Markets:  Comparing the hiring practices of large and small organizations.  Paper presented at the 1998 Academy of Management meeting in San Diego, CA.

Roberson, Q. M., Moye, N. A., & Locke, E. A.  Understanding the Complexity of Goal Orientation:  Performance implications beyond the two-factor model.  Paper presented at the 1998 Society for Industrial and Organizational Psychology meetings in Dallas, TX.

Stevens, C. K., McDonald-Mann, D., & Roberson, Q. M.  Recalibrating the Scales of Justice: Integrating Procedural Justice and Diversity Theory, Research and Practice.   Research Forum presented at the 1996 Academy of Management meeting in Cincinnati, OH.

**Manuscripts Under Review:**
Roberson, Q. M., Avery, D. R., & Leigh, A. Lights, Camera, Action: Moving beyond performative diversity management to driving sustainable change. Under third review at *Academy of Management Perspectives*.

Roberson, Q. M., Hoff, K., Pyram, R., & Holmes, J. A model of DEI in the career lifecycle. Revise-and-resubmit at *Journal of Vocational Behavior.*

**Work in Progress:**
Roberson, Q.M., Boora, L., & Hill, A. A comparative study of gender differences in CEO announcement narratives and the effects on stock prices.

Roberson, Q. M., Hill, A., & Wang, M. Understanding the effects of board member busyness on firm performance outcomes.

Roberson, Q. M., & Preston, M. Examining the effects of diversity, equity, and inclusion practices on credit union performance.

Roberson, Q. M., Young, H., & Zhou, C. Comparing approaches to, and perceptions of, inclusive leadership.

Awasty, N., & Roberson, Q. M. Exploring faith as a form of coping.

King, D., Stanley, L., Phetmisy, C., Massey, M., Buchanan, B., & Roberson, Q. M. An organizational resource model of employee resilience to identity threat.

Mitchell, R., Roberson, Q. M. & Briggs, C. A Comparative exploration of the purpose, operation and outcomes of employee resource groups.

Perry, J. L., & Roberson, Q. M. Understanding the enactment of inclusive leadership: Ideology, instrumentation and internalization.

<u>**WORK EXPERIENCE**</u>
- Research Fellow, Center for Excellence in Diversity, Equity and Inclusion, Filene Research Institute, 2020 – present.
- Program Officer, Science of Organizations, National Science Foundation, 2012-2013.
- Financial Analyst, Corestates Bank, Philadelphia, PA, 1993-1995.
- Consultant, Small Business Development Center, Pittsburgh, PA, 1992-1993.

SERVICE
**Editorial:**
- *Academy of Management Journal* (Deputy Editor, 2022-2025)
- Guest Editor, Special Issue on "Understanding Racism in the Workplace, *Journal of Applied Psychology* (2021-2022)
- *Academy of Management Journal* (Editorial Board, 2020-2022)
- *Journal of Applied Psychology* (Editorial Board, 2017-2020)
- *Journal of Management* (2014-2018)
- *Journal of Applied Psychology* (Associate Editor, 2008 – 2014)
- *Personnel Psychology* (Editorial Board, 2007–2008)
- *Academy of Management Review* (Editorial Board, 2005–2008)
- *Journal of Organizational Behavior* (Editorial Board, 2003–2006)

**Professional**:
- Past President, Academy of Management, 2021-2022.
- President, Academy of Management, 2020-2021.
- President-Elect, Academy of Management, 2019-2020.
- Vice President & Program Chair, Academy of Management, 2018-2019.
- Vice President-Elect & Professional Development Workshop Chair, Academy of Management, 2017-2018.
- Member, Awards Subcommittee, Society for Industrial and Organizational Psychology, 2016-2019.
- Panelist, Decision and Risk Management Program, National Science Foundation, 2016-2020.
- Representative-at-Large, Academy of Management Board of Governors, 2013-2016.
- Invited Faculty Participant, Doctoral Consortium, Academy of Management: Conflict Management (2012), Human Resources (2004-2006), Organizational Behavior (2012) Divisions.
- Invited Faculty Participant, Junior Faculty Consortium, Academy of Management: Conflict Management (2009), Gender and Diversity in Organizations (2012) Divisions.
- Panelist, "Reject, revise, resubmit: Editors' tips for responding to journal reviews" panel discussion at the 2011 Society for Industrial and Organizational Psychology conference in Chicago, IL.
- Chair, Diversity and Inclusion Theme Committee, Academy of Management, 2010-2011.
- Past Division Chair, GDO Division, Academy of Management, 2010-2011.
- Division Chair, GDO Division, Academy of Management, 2009-2010.
- Program Chair, GDO Division, Academy of Management, 2007-2008.
- Professional Development Workshop Chair, GDO Division, Academy of Management, 2006-2007.
- Chair, Best Student Paper Committee, HR Division, Academy of Management, 2004 & 2005.
- Treasurer, Gender & Diversity in Organizations Division, Academy of Management, 2003–2006.
- Executive Committee Member, Gender & Diversity Division, Academy of Management, 2002–2003.
- Membership Committee, Society for Industrial and Organizational Psychology, 2001–2004.

**University:**
- Member, Strategic Plan Research Implementation Group, Michigan State University, 2022.
- Member, Reappointment, Promotion and Tenure Committee, Broad College of Business, Michigan State University, 2021-present
- Member, Provost's Committee on New Faculty Advancing Inclusive Excellence, Michigan State University, 2021.
- Working Group Chair, Middle States Commission on Higher Education Self-Study, Villanova University, 2019-2020.
- Member, Faculty Research Awards Committee, Villanova University, 2018.

- Member, Research Grants Task Force, Villanova School of Business, Villanova University, 2016-2020.
- Member, University Institutional Review Board (IRB), Villanova University, 2016-2018.
- Member, Faculty Rights and Responsibilities Committee, Villanova University, 2016-2018.
- Member, Faculty Congress, Villanova University, 2016-2018.
- Member, Management and Organizations Department Standing Curricular Committee, Villanova University, 2016-2017.
- Member, Executive Education Task Force, Villanova School of Business, Villanova University, 2016-present.
- Member, University Rank & Tenure Committee, Villanova University, 2013-2016.
- Member, Villanova School of Business Dean Search Committee, Villanova University, 2011-2012.
- Member, Executive MBA and Executive Education Committee, Villanova School of Business, Villanova University, 2011-present.
- Member, MBA Admissions Committee, Villanova School of Business, Villanova University, 2011-2013.
- Member, University Advancement and Communications Committee, Villanova University, 2009-2013.
- Advisor, Multicultural Business Association, Villanova School of Business, Villanova University, 2011.
- Member, Villanova School of Business Strategy Team, Villanova University, 2009.
- Chair & Member, Research Standards Committee, Villanova School of Business, Villanova University, 2008-present.
- Grant Proposal Evaluator, Institute for Social Sciences, Cornell University, 2006-2007.
- Affirmative Action and Minority Education Committee, Cornell University, 2006.
- Advisory Council, School of Industrial and Labor Relations, Cornell University, 2005 – 2008.
- Computing Committee, School of Industrial and Labor Relations, Cornell University, 2000 – 2008.
- Teaching Committee, School of Industrial and Labor Relations, Cornell University, 2001 – 2002.

**Advising:**
- Christy Dodge, Education, Cornell University (Committee Member)
- Michelle Duguid, Organizational Behavior, Cornell University (Committee Member)
- Nadav Goldschmidt, Human Resource Studies, Cornell University (Committee Member)
- Jamie Perry, Rutgers University (Committee Member)
- Shanette Porter, Social Psychology, Cornell University (Committee Member)
- Oliver Sheldon, Management, Cornell University (Committee Member)
- Sabrina Volpone, Temple University (Committee Member)
- Lauren Collier-Spruill, Organizational Psychology, Michigan State University (Committee Member)
- Connor Eichenauer, Organizational Psychology, Michigan State University (Committee Member)
- Jooyoung Kim, Management, Michigan State University (Committee Member)
- Becca Mitchell, Management. Michigan State University (Committee Member)
- Courtney Bryant, Organizational Psychology, Michigan State University (Committee Member)
- Jo Alanis, Organizational Psychology, Michigan State University (Thesis Committee Member)
- Caitlin Briggs, Organizational Psychology, Michigan State University (Committee Member)
- Sarah Kuang, Organizational Psychology, Michigan State University (Committee Member)
- William Scott, Organizational Psychology, Michigan State University (Committee Chair)
- Rachael Pyram, Organizational Psychology, Michigan State University (Committee Chair)
- Kenneth Russell, Higher, Adult and Lifelong Education (HALE), Michigan State University (Committee Member)

**Board Memberships:**
- Michigan State University Federal Credit Union (2022 – present)
- Cinnaire, Inc. (2021-present)

- Reseda Group, Michigan State University Federal Credit Union (2021-2022)
- Better Up, Inc. – Science Advisory Board (2019 - present)
- YMCA of Greater Philadelphia (2018 – 2022)
- Ketchum, Inc. – Diversity, Equity & Inclusion Advisory Board (2018-2020)
- The American College State Farm Center for Women and Financial Services (2016-2018)
- Markets Matter, Inc. (2012-2020)

**Memberships/Associations:**
- Academy of Management
- Society for Industrial/Organizational Psychology
- Association for Psychological Science
- American Psychological Association
- Society for Organizational Behavior
- Personnel and Human Resources Research Group

Revised:  August 18, 2023

# Exhibit B

APPENDIX B

References

Andrevski, G., Richard, O. C., Shaw, J. D. & Ferrier, W. J. (2014). Racial diversity and firm performance: The mediating role of competitive intensity. *Journal of Management, 40,* 820-844.

Balestra, C., & Fleischer, L. (2018), Diversity statistics in the OECD: How do OECD countries collect data on ethnic, racial and indigenous identity?" *OECD Statistics Working Papers*, No. 2018/09, OECD Publishing.

Bansal, T., & Kistruck, G. (2006). Seeing is (not) believing: Managing the impressions of the firm's commitment to the natural environment. *Journal of Business Ethics, 67*, 165-180.

Barnett, M., Henriques, I., & Husted, B. W. (2020). Beyond good intentions: Designing CSR initiatives for greater social impact. *Journal of Management, 46*, 937-964.

Buttner, E.H., & Tullar, W.L. (2018). A representative organizational diversity metric: a dashboard measure for executive action. *Equality, Diversity and Inclusion, 37*, 219 -232.

Certo, S. T., Lester, R. H., Dalton, C. M., & Dalton, D. R. (2006). Top management teams, strategy and financial performance: A meta-analytic examination. *Journal of Management Studies, 43*, 813-839.

Cox Jr., T., & Blake, S. (1991). Managing cultural diversity: Implications for organizational competitiveness. *Academy of Management Executive*, *5*, 45–56.

Cox, T. H., Lobel, S., & McLeod, P. (1991). Effects of ethnic group cultural differences on cooperative and competitive behavior on a group task. *Academy of Management Journal, 34*, 827-847.

Dwyer, S., Richard, O. C., & Chadwick, K. (2003). Gender diversity in management and firm performance: The influence of growth orientation and organizational culture. *Journal of Business Research*, *56*, 1009-1019.

Ely, R. J., & Thomas, D. A. (2001). Cultural Diversity at Work: The Effects of Diversity Perspectives on Work Group Processes and Outcomes. *Administrative Science Quarterly*, *46*, 229–273.

Frink, D. D., Robinson, R. K., Reithel, B., Arthur, M. M., Ammeter, A. P., Ferris, G. R., Kaplan, D. M., et al. (2003). Gender demography and organization performance. *Group and Organization Management*, *28*, 127-147.

Garcia-Vega, M. (2006). Does technological diversification promote innovation? An empirical analysis for European firms. *Research Policy 35*, 230–246.

Gonzalez, J. A., & Denisi, A. S. (2009). Cross-level effects of demography and diversity climate on organizational attachment and firm effectiveness. *Journal of Organizational Behavior*, *30*, 21-40.

Hartenian, L. S., & Gudmundson, D. E. (2000). Cultural diversity in small business: Implications for firm performance. *Journal of Developmental Entrepreneurship*, *5*, 209-219.

Herring, C. (2009). Does diversity pay? Race, gender, and the business case for diversity. American Sociological Review, *74*, 208-224.

Jackson, S. E., Joshi, A., & Erhardt, N. L. (2003). Recent research on team and organizational diversity: SWOT analysis and implications. *Journal of Management, 29*, 801-830.

Jayne, M. E. A., & Dipboye, R. L. (2004). Leveraging diversity to improve business performance: Research findings and recommendations for organizations. *Human Resource Management, 43*, 409-424.

Jones, J. R., & Harter, J. K. (2005). Race Effects on the Employee Engagement-Turnover Intention Relationship. *Journal of Leadership & Organizational Studies*, *11*, 78–88.

Kalev, A., Kelly, E., & Dobbin, F. (2006). Best practices or best guesses? Assessing the efficacy of corporate affirmative action and diversity policies. *American Sociological Review, 71,* 589–617.

Kochan, T., Bezrukova, K., Ely, R., Jackson, S., Joshi, A., Jehn, K., Leonard, J., Levine, D. and Thomas, D. (2003). The effects of diversity on business performance: Report of the diversity research network. *Human Resource Management, 42*, 3-21.

Leonard, J. S., Levine, D. I., & Joshi, A. (2004). Do birds of a feather shop together? The effects on performance of employees' similarity with one another and with customers. *Journal of Organizational Behavior, 25*, 731-754.

Matten, D., & Moon, J. (2008). "Implicit" and "cxplicit" CSR: A conceptual framework for a comparative understanding of corporate social responsibility. *Academy of Management Review*, *33*, 404–424.

McWilliams, A., & Siegel, D. (2000). Corporate Social Responsibility and Financial Performance: Correlation or Misspecification? *Strategic Management Journal*, *21*, 603–609.

Menz, M. (2012). Functional top management team members: A review, synthesis, and research agenda. *Journal of Management, 38*, 45-80.

Milliken, F. J., & Martins, L. L. (1996). Searching for common threads: Understanding the multiple effects of diversity in organizational groups. *Academy of Management Review, 21,* 402–433.

Mirzaei, A., Wilkie, D. C., & Siuki, H. (2022). Woke brand activism authenticity of the lack of it. *Journal of Business Research, 139*, 1-12.

Quintana-Garcia, C. & Benavides-Velasco, C. A. (2008). Innovative competence, exploration and exploitation: The influence of technological diversification. *Research Policy, 37,* 492–507.

Ren, T., & Wang, Zheng. (2011). Female participation in TMT and firm performance: Evidence from chinese private enterprises. *Nankai Business Review International*, *2*, 140-140-157.

Richard, O. C. (2000). Racial diversity, business strategy, and firm performance: A resource-based view. *Academy of Management Journal, 43*, 164–177.

Richard, O. C., Barnett, T., Dwyer, S., & Chadwick, K. (2004). Cultural diversity in management, firm performance, and the moderating role of entrepreneurial orientation dimensions. *Academy of Management Journal*, *47*, 255-266.

Richard, O. C., Ford, D., & Ismail, K. (2006). Exploring the performance effects of visible attribute diversity: The moderating role of span of control and organizational life cycle. *The International Journal of Human Resource Management*, *17*, 2091-2109.

Richard, O. C., McMillan, A., Chadwick, K., & Dwyer, S. (2003). Employing an innovation strategy in racially diverse workforces: Effects on firm performance. *Group and Organization Management*, *28*, 107–126.

Richard, O. C., Roh, H., & Pieper, J. R. (2013). The link between diversity and equality management practice bundles and racial diversity in the managerial ranks: Does firm size matter? *Human Resource Management, 52,* 215–242.

Roberson, Q. M., Holmes, O. H. & Perry, J. L. (2017). Transforming Research on Diversity and Firm Performance: A Dynamic Capabilities Perspective. *Academy of Management Annals, 11*, 189-216.

Roberson, Q. M., King, E. B., & Hebl, M. (2020). Designing more effective practices to address workplace inequality. *Behavioral Science and Policy, 6*, 39-49.

Roberson, Q. M., & Park, H. J. (2007). Examining the link between diversity and firm performance: The effects of diversity reputation and leader racial diversity. *Group & Organization Management*, *32*, 548-568.

Roberson, Q., & Preston, M. (2021). DEI practice bundles & credit union performance: Results from Filene's DEI practices & policies survey (Report No. 550). Madison, WI: Filene Research Institute.

Shimizu, K., & Hitt, M. A. (2004). Strategic flexibility: Organizational preparedness to reverse ineffective strategic decisions. *Academy of Management Perspectives, 18*, 44-59.

Shrader, C. B., Blackburn, V. B., & Iles, P. (1997). Women in management and firm financial performance: An exploratory study. *Journal of Managerial Issues*, *9*, 355-372.

Thomas, D. A., & Ely, R. J. (1996). Making differences matter: A new paradigm for managing diversity. *Harvard Business Review, 74*, 79-90.

Vredenburg, J., Kapitan, S., Spry, A., & Kemper, J. A. (2020). Brands taking a stand: Authentic brand activism or woke washing? *Journal of Public Policy and Marketing*, 39, 444-460.

Waldman, D. A., & Sparr, J. L. (in press) Rethinking diversity strategies: An application of paradox and positive organization behavior theories. *Academy of Management Perspectives.*

Warren, D. E. (2022). "Woke" corporations and the stigmazation of corporate social intiatives. *Business Ethics Quarterly, 32*, 169-198.

Williams, K. Y., & O'Reilly, C. A. (1998). Demography and diversity in organizations: A review of 40 years of research. *Research in Organizational Behavior, 20*, 77-140.

Wright, P., Ferris, S. P., Hiller, J. S., & Kroll, M. (1995). Competitiveness through management of diversity: Effects on stock price valuations. *Academy of Management Journal*, *38*, 272-287.

# Exhibit C



AARON D. FORD
*Attorney General*

CRAIG A. NEWBY
*First Assistant Attorney General*

CHRISTINE JONES BRADY
*Second Assistant Attorney General*

TERESA BENITEZ-
THOMPSON
*Chief of Staff*

LESLIE NINO PIRO
*General Counsel*

HEIDI PARRY STERN
*Solicitor General*

## STATE OF NEVADA

### OFFICE OF THE ATTORNEY GENERAL

555 E. Washington Ave., Suite 3900
Las Vegas, Nevada 89101

July 19, 2023

Dear Fortune 100 CEOs,

We recently reviewed a letter sent to you by 13 state attorneys general, purporting to remind you of your obligations as an employer under federal and state law to refrain from discriminating on the basis of race. While we agree with our colleagues that "companies that engage in racial discrimination should and will face serious legal consequences," we are focused on actual unlawful discrimination, not the baseless assertion that any attempts to address racial disparity are by their very nature unlawful. We condemn the letter's tone of intimidation, which purposefully seeks to undermine efforts to reduce racial inequities in corporate America. As the chief legal officers of our states, we recognize the many benefits of a diverse population, business community, and workforce, and share a commitment to expanding opportunity for all.

We applaud the Fortune 100 for your collective efforts to address historic inequities, increase workplace diversity, and create inclusive environments.[1] These programs and policies are ethically responsible, good for business, and good for building America's workforce.[2] Importantly, these programs also comply with the spirit and the letter of state and federal law.

The letter you received from the 13 state attorneys general is intended to intimidate you into rolling back the progress many of you have made. We write to reassure you that corporate efforts to recruit diverse workforces and create inclusive work environments are legal and reduce corporate risk for claims of discrimination.[3] In fact, businesses should

---

[1] Cision PR Newswire, "New Data From Deloitte and the Alliance for Board Diversity (ABD) Reveals Continued Focus is Necessary for Fortune 500 Boards to be More Representative of the US Population," June 15, 2023, available at https://www.prnewswire.com/news-releases/new-data-from-deloitte-and-the-alliance-for-board-diversity-abd-reveals-continued-focus-is-necessary-for-fortune-500-boards-to-be-more-representative-of-the-us-population-301851560.html.

[2] Forbes, "Harnessing The Power Of Diversity For Profitability," Mach 3, 2022, available at https://www.forbes.com/sites/forbesbusinesscouncil/2022/03/03/harnessing-the-power-of-diversity-for-profitability/

[3] The U.S. Equal Employment Opportunity Commission advises that to reduce the risk of employment discrimination claims, businesses should, "[r]ecruit, hire, and promote with EEO principles in mind, by implementing practices designed to widen and diversify the pool of candidates considered for employment openings, including openings in upper level management." *See* U.S. Equal Employment Opportunity Commission, *"Best practices for employers and human resources/eeo professionals,"* available at https://www.eeoc.gov/initiatives/e-race/best-practices-employers-and-human-resourceseeo-professionals.

Page 2
July 19, 2023

double-down on diversity-focused programs because there is still much more work to be done.

## I.    Corporate Diversity Programs are Lawful and Serve Important Public and Business Purposes.

Many of your companies engage in a wide variety of programs meant to provide opportunities for success for historically underrepresented communities, including women, Black/African Americans, Latinos/Hispanics, Asian Americans and Pacific Islanders, Native Americans, people who identify as LGBTQ+, and others. These programs take on many forms, but all meet important business and workforce needs.

Efforts by private sector employers to foster and support diversity and address racial inequities are even more important in the aftermath of the United States Supreme Court's recent opinion in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, Case Nos. 20-1199, 21-707 (June 29, 2023) ("*SFFA*"). As recognized in *SFFA*, our nation's history is replete with instances of discrimination against disfavored minorities. And racial inequity is not only a problem of our country's distant past. Justice Thomas acknowledges in *SFFA* that he is "painfully aware of the social and economic ravages which have befallen my race and all who suffer discrimination[.]" *SFFA*, slip op. at 58 (Thomas, J., concurring). Justice Kavanaugh underscores that "racial discrimination still occurs and the effects of past racial discrimination still persist." *Id.* at 8 (Kavanaugh, J., concurring). Justice Jackson details historical and current racial disparities, emphasizing that "[g]ulf-sized race-based gaps exist with respect to the health, wealth, and well-being of American citizens. They were created in the distant past but have indisputably been passed down to the present day through the generations." *Id.* at 1 (Jackson, J., dissenting). Racial inequity is sadly both a problem from our nation's distant past and, as the above Justices recognize, a persistent problem today.

To be clear, *SFFA* does not directly address or govern the behavior or the initiatives of private sector businesses. *SFFA* held that two universities' admissions systems, which the Court characterized as "race-based," violated the Equal Protection Clause and Title VI of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000d et seq. *SFFA*, slip op. at 8, 21. Private sector employers continue to be subject to the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq., and 42 U.S.C. sec. 1981, as they always have been.[4] It is irresponsible and misleading to suggest that *SFFA* imposes additional prohibitions on the diversity, equity, and inclusion initiatives of private employers. In fact, following *SFFA*, the U.S. Equal Employment Opportunity Commission issued a statement clarifying that, "[i]t remains lawful for employers to implement diversity, equity, inclusion,

---

[4] Congress, in Title VI, 42 U.S.C. § 2000d-3, ensured that merely receiving federal financial assistance would not incidentally render an employer subject to the commands of Title VI rather than Title VII.

Page 3
July 19, 2023

and accessibility programs that seek to ensure workers of all backgrounds are afforded equal opportunity in the workplace."[5]

> **A.      Diversity, Equity, and Inclusion Efforts Remain Vital to the Well-being of Our Society, both Socially and Economically.**

As state attorneys general, we are responsible for protecting the well-being of our residents, especially those who face inequitable treatment and discrimination. Promoting diversity, equity, and inclusion is thus a top priority in our states. We also recognize that, for private sector employers, diversity is an important, legitimate, and valid business interest, as well established by decades of research.[6] Affirmative efforts by private sector businesses to diversify their workforces remain vital both morally—to address past and present discrimination—and economically—to achieve a healthy economy and productive workforce.

"[S]egregation by race was declared unconstitutional almost a century ago, but its vestiges remain . . . intertwined with the country's economic and social life." *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 528 (2015). As Justice Jackson explains in her dissent in *SFFA,* "[a]lthough formal race-linked legal barriers are gone, race still matters to the lived experiences of all Americans in innumerable ways." *SFFA,* slip op. at 25 (Jackson, J., dissenting). Indeed, race and racism continue to play a role in exacerbating inequities in health, housing, employment and business, and other areas of life.

Diversity initiatives in the workplace help combat these inequities. As a result of these efforts, corporate America has grown more diverse and more representative of American society. The economies of our states have likewise benefited from diversity and inclusion, as workers share their diverse beliefs, experiences, and ideas, becoming better informed, more creative, and ultimately, more productive. Diversity initiatives raise awareness of the value of collaborating with people of different cultures, backgrounds, perspectives, experiences, races, and ethnicities. They build diverse teams and a workforce that understands its customers—a business imperative. Companies' efforts to foster diversity in the workplace also help to expand markets and attract diverse talent to our states. Now more than ever, private sector employers play a crucial role in establishing and maintaining the societal and economic benefits of diversity. These are critically important business interests that help our economies thrive.

---

[5] U.S. Equal Employment Opportunity Commission, "Statement from EEOC Chair Charlotte A. Burrows on Supreme Court Ruling on College Affirmative Action Programs," June 29, 2023, available at https://www.eeoc.gov/newsroom/statement-eeoc-chair-charlotte-burrows-supreme-court-ruling-college-affirmative-action.

[6] *See, e.g, Global Parity Alliance: Diversity, Equity and Inclusion Lighthouses 2023*, World Economic Forum, https://www3.weforum.org/docs/WEF_Global_Parity_Alliance_2023.pdf.

Page 4
July 19, 2023

B.    *SFFA* **Does Not Prohibit, or Even Impose New Limits on, the Ability of Private Employers to Pursue Diversity, Equity, and Inclusion Initiatives.**

Properly read, *SFFA* provides no basis to conclude that a company's efforts to reach and recruit from a broad and diverse applicant pool is now prohibited. Private companies remain free to expand access to employment and contracting opportunities, subject to the same limitations under Title VII and Section 1981 that have applied to them for over half a century.

Leading companies have long set diversity-related goals and operated successful and lawful diversity, equity, and inclusion programs under the guidance of Title VII. Properly formulated and administered programs are not unconstitutional. *See, e.g., Iadimarco v. Runyon*, 190 F.3d 151, 164 (3d Cir. 1999) (finding that a memo outlining diversity goals is not prima facie evidence of discrimination and recognizing that "[a]n employer has every right to be concerned with the diversity of its workforce, and the work environment"); *Reed v. Agilent Techs, Inc.*, 174 F. Supp. 2d 176, 185-86 (D. Del. 2001) (rejecting plaintiff's contention that the defendant company's diversity policy was prima facie evidence of discrimination and stating that "evidence regarding the aspirational purpose of an employer's diversity policy, and its intent to ameliorate any underutilization of certain groups, is not sufficient" to establish a violation of Title VII). Private sector employers should continue to be aware of the demographics of their workforce and their contracting partners, and make efforts to recruit, attract, and retain diverse workforces, consistent with the strictures of Title VII and Section 1981.

C.    **Private Employers Retain Many Tools to Continue the Important Work of Diversifying Their Workforces.**

Irrespective of *SFFA*, hiring decisions made on the basis of race are prohibited under Title VII and have been for decades. Of course, consistent with Title VII, private employers can, should — and in some circumstances, *must* — identify arbitrary and unnecessary barriers to diversity, equity, and inclusion in the workplace and develop solutions to address those issues. Removing barriers does not constitute an act of racial discrimination. Companies remain free to remedy historic inequities by: (a) adjusting recruiting practices, (b) developing better retention and promotion strategies, and/or (c) furthering leadership development and accountability. Companies need not don a veil of ignorance and pretend that racial inequities do not exist.

No organization should hire an employee solely based on the individual's race. Private sector employers can and should, however, identify problems that have created racial and other disparities in the past and develop solutions to address them. Likewise, businesses can, consistent with the law, identify barriers to advancement in the employment and contracting pipelines and adjust recruiting, retention, and leadership accordingly. Such efforts are not only legal but constitute an appropriate moral and ethical response to the ongoing problem of racial inequity in our society. In short, businesses can

Page 5
July 19, 2023

improve their own bottom line and the experiences of their employees through mentoring, training, and leadership programs that include diversity, equity, and inclusion as goals. Such race-neutral programs—that improve outcomes for all—do not run afoul of the law.

In pursuing diversity efforts, we encourage businesses not to ignore the specific challenges that Black workers have faced and continue to face as the result of decades of past discrimination in many industries. Given that reality, race-neutral inclusion efforts are not properly characterized as improper "racial quotas" merely because they may lead to some benefit for Black workers. *SFFA* acknowledges that our society has a compelling interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, slip op. at 15. Decades of discrimination in the labor market, as well as in other areas of society, have led to a massive and persistent racial wealth gap between Black and white Americans, one that remains roughly the same today as it was two years before the Civil Rights Act was passed in 1964. *See* Fed. Reserve Bank of Cleveland, "What is Behind the Persistence of the Racial Wealth Gap?" (Feb. 28, 2019).[7] Given this large and persistent wealth and income gap, race-neutral efforts to address industry barriers are likely to enhance diversity, particularly among those who have been most marginalized in the past.

## D.    Improving Diversity Makes Good Business Sense.

The diversity efforts of private sector employers remain vital to a healthy economy and productive workforce. *See, e,g*, "The Other Diversity Dividend," Harvard Business Review, July–August 2018; "Why Diverse Teams Are Smarter," Harvard Business Review, November 4, 2016; "Diverse Teams Feel Less Comfortable–and That's Why They Perform Better," Harvard Business Review, September 22, 2016. Diverse teams are not just for appearances; they make bottom-line sense for businesses. In the venture-capital world, for example, research shows that "[d]iversity significantly improves financial performance on measures such as profitable investments at the individual portfolio-company level and overall fund returns." *See id.,* "The Other Diversity Dividend."

Efforts to improve diversity, equity and inclusion have been found to further important business objectives. For instance, JPMorgan Chase found that its intern pool became more diverse after it adopted the race-neutral approach of recruiting from a larger pool of schools. The bank found that diversity was a welcome benefit of focusing recruitment on "skills . . . previous experiences . . . [and] ability to articulate . . . competencies for the role, rather than . . . assuming them based upon the school" intern candidates attended. Hugh Son, "How JPMorgan Increased the Number of Black Interns in Its Wall Street Program by Nearly Two-Thirds", CNBC, (April 9, 2021) (quoting Rob Walke, global head of campus recruiting).[8] In short, JP Morgan Chase found that using race-neutral, relevant

---

[7] Available at https://www.clevelandfed.org/newsroom-and-events/publications/economiccommentaries/2019-economic-commentaries/ec-201903-what-is-behind-the-persistence-of-the-racialwealth-gap.aspx.

[8] CNBC, "How JPMorgan increased the number of Black interns in its Wall Street program by nearly two-thirds," April 9, 2021, available at https://www.cnbc.com/2021/04/09/jpmorgan-increased-the-number-of-black-interns-in-its-wall-street-program-by-nearly-two-thirds.html.

Page 6
July 19, 2023

criteria to recruit interns led to a remarkable increase in the percentage of Black and female interns selected.

## II.    Hollow Claims of Unlawful Discrimination Against White People at Fortune 100 Companies Do Not Change the Fact that Women and People of Color Continue to Face Barriers in the Workplace.

The July 13th letter claims that the existence of a few scattered articles evidences "commonplace," "overt," and "pervasive" discrimination by Fortune 100 companies against white people. We urge you not to allow these false claims to prevent you from continuing in your lawful efforts to foster diversity. The letter's attempts to equate these permissible diversity efforts with impermissible hiring quotas is a clear effort to block opportunities for women and people of color—especially Black people. Aspirational diversity goals and concerted recruitment efforts to increase the diversity of a company's workforce are not hiring quotas, which were already unlawful under Title VII of the Civil Rights Act of 1964, well before *SFFA*.

Since this nation's inception, racism has been a part of our policies, our institutions, and our communities—and businesses are no exception. Racial preferences are pervasive in both businesses and boardrooms, preferences that unequivocally and overwhelmingly favor white people, particularly white men. A 2021 Washington Post analysis of 50 of the world's most valuable companies revealed that only 8 percent had Black C-suite executives.[9] A 2023 Harvard Law School study analyzing 1,500+ executives at the 100 largest companies in the S&P 500 showed that only 23% of the C-Suite were Asian, Black, Hispanic, or Latino.[10] For too long, employment and leadership opportunities at many of your companies were reserved for white men. White men continue to dominate leadership roles in Fortune 100 companies. A 2022 report on the diversity of CEOs at Fortune 100 Companies found that only 12% were women, despite women representing more than 50% of the population of the United States; and only 14% were not white, despite more than 40% of the U.S. comprising of individuals who are not white.[11] Only 3% were Black, despite representing 14% of the U.S. population.

The impact this disparity has on women and communities of color cannot be overstated. A 2020 survey indicates that about 1 in 4 Black (24%) and Hispanic employees

---

[9] The Washington Post, "The striking race gap in corporate America," December 15, 2021, available at, https://www.washingtonpost.com/business/interactive/2021/black-executives-american-companies/.

[10] Harvard Law School Forum on Corporate Governance, "How To Fix The C-suite Diversity Problem," February 23, 2023, available at https://corpgov.law.harvard.edu/2023/02/25/how-to-fix-the-c-suite-diversity-problem/#:~:text=The%20headline%20finding%20is%20that,in%20most%20C%2Dsuite%20positions.

[11] Cision PR Newswire, "Diversity Stagnant Among Fortune 100 Leaders Despite Belief That DE&I Is a Key Contributor to Business Success, Reveals Heidrick & Struggles' Route to the Top 2022," November 17, 2022, available at Reporthttps://www.prnewswire.com/news-releases/diversity-stagnant-among-fortune-100-leaders-despite-belief-that-dei-is-a-key-contributor-to-business-success-reveals-heidrick--struggles-route-to-the-top-2022-report-301681143.html.

Page 7
July 19, 2023

(24%) in the U.S. report having been discriminated against at work in the past year.[12] Furthermore, 75% of the Black workers who reported being discriminated against indicated the discrimination they experienced was based on their race or ethnicity.

### III.    The July 13th Letter Is an Attempt to Intimidate the Businesses and Workers of America—And We Will Fight Back.

The July 13th letter is disguised as providing information regarding anti-discrimination law, but it in fact takes direct aim at efforts to broaden recruitment and address inequities meant to break down historic barriers—efforts that are consistent with controlling law. While the letter asks you to adhere to "race-neutral principles in your employment and contracting practices," the only employment and contracting practices the letter expresses concern about are those that advance opportunity for people of color. The very fact that many of your companies have expressed support for ending historic disparities through providing opportunities for people of color offends the authors of the July 13th letter. And, the 13 attorneys general reserve their greatest offense for the programs that provide opportunities for Black people.[13] We find this alarming, coming from state attorneys general who should be champions of civil rights and racial progress.

Rest assured that we are committed to fighting against discrimination and to expanding opportunities for all. We will vigorously oppose any attempts to intimidate or harass businesses who engage in vital efforts to advance diversity and expand opportunities for the nation's workforce.

Sincerely,

AARON D. FORD
*Attorney General*
*State of Nevada*

---

[12] Gallup, "One in Four Black Workers Report Discrimination at Work," January 12, 2021, available at https://news.gallup.com/poll/328394/one-four-black-workers-report-discrimination-work.aspx.

[13] The attorneys general cite news reports that raise such alarm for them, which include the titles, "Corporate America Looks to Hire More Black People" and "How JPMorgan Increased the Number of Black Interns in Its Wall Street Program by Nearly Two-Thirds"; additionally, they call out Microsoft's program to increase the number of Black-owned approved suppliers.

Page 8
July 19, 2023

KRIS MAYES
*Attorney General*
*State of Arizona*

ROB BONTA
*Attorney General*
*State of California*

PHILIP J. WEISER
*Attorney General*
*State of Colorado*

WILLIAM TONG
*Attorney General*
*State of Connecticut*

KATHY JENNINGS
*Attorney General*
*State of Delaware*

BRIAN SCHWALB
*Attorney General*
*District of Columbia*

ANNE LOPEZ
*Attorney General*
*State of Hawai'i*

KWAME RAOUL
*Attorney General*
*State of Illinois*

Page 9
July 19, 2023

AARON M. FREY
*Attorney General*
*State of Maine*

ANTHONY BROWN
*Attorney General*
*State of Maryland*

ANDREA CAMPBELL
*Attorney General*
*State of Massachusetts*

DANA NESSEL
*Attorney General*
*State of Michigan*

KEITH ELLISON
*Attorney General*
*State of Minnesota*

MATT PLATKIN
*Attorney General*
*State of New Jersey*

RAÚL TORREZ
*Attorney General*
*State of New Mexico*

LETITIA JAMES
*Attorney General*
*State of New York*

Page 10
July 19, 2023

**ELLEN ROSENBLUM**
*Attorney General*
*State of Oregon*

**PETER NERONHA**
*Attorney General*
*State of Rhode Island*

**CHARITY CLARK**
*Attorney General*
*State of Vermont*

**BOB FERGUSON**
*Attorney General*
*State of Washington*