1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS,

      Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
LABOR,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 22-cv-07182-WHA

**DECLARATION OF HELENE BAXTER IN
SUPPORT OF DEFENDANT DEPARTMENT
OF LABOR'S MOTION FOR SUMMARY
JUDGMENT**

I, Helene Baxter, state as follows:

1.    I am Vice President, Corporate Employment Counsel for Universal Services of America, LP d/b/a Allied Universal Security Services ("Allied Universal"). I submit this declaration in support of the United States Department of Labor's ("DOL's") Motion for Summary Judgment in the above-captioned matter. I have personal knowledge of the following facts and if called to testify, I could and would competently testify thereto.

2.    My position of Vice President, Corporate Employment Counsel involves the national oversight and handling of legal and compliance matters that affect Allied Universal's employees, employment practices, regulatory employment issues (including issues arising from Allied Universal's status as a federal contractor), and the handling of employee disputes. I previously worked for a company acquired by Allied Universal called G4S Secure Solutions where I worked in the position of Senior Counsel, which involved similar duties. I was elevated to Vice President soon after joining Allied Universal. Working in the position of Vice President, Corporate Employment Counsel for Allied Universal provides me with direct knowledge of and insight on Allied Universal's business and employment practices as well as the legal and practical issues and concerns relating to the potential disclosure of its EEO-1 Type 2 reporting via the Freedom of Information Act ("FOIA"), as well as

1    knowledge of and insight on the potential harms that would likely result from such disclosure.

2        3.        Allied Universal, which originally began doing business (under a prior corporate name)

3    in 1957, is the nation's largest provider of security guards and related services and is one of the largest

4    employers in the United States.  Allied Universal is headquartered in Irvine, California and services all

5    50 U.S. states in addition to maintaining global operations. Allied Universal is not a publicly traded

6    company. In addition to providing security guards and related services for commercial customers and

7    operations, Allied Universal further provides specialized security guards and related services for critical

8    sites and infrastructure, such as those involving aviation, aerospace and defense, chemical and

9    petrochemical, energy and utility, government, judicial, maritime, port authority, and financial sites and

10    operations throughout the country.

11        4.        Given its numerous and ongoing federal contracts with various agencies, Allied

12    Universal, as an employer, is subject to Executive Order 11246 and its implementing regulations. Allied

13    Universal (along with its acquired company, G4S Secure Solutions) maintained this status during the

14    period of 2016 to 2020, as well as in the years preceding and following this period.

15        5.        Allied Universal, having more than 50 employees, is required to submit EEO-1 reports on

16    an annual basis, including EEO-1 Type 2 reports. Notably, Allied Universal submitted EEO-1 Type 2

17    reports to the government during the years 2016 to 2020.

18        6.        In the Fall of 2022, Allied Universal was notified by the DOL's Office of Federal

19    Contractor Compliance Programs ("OFCCP") of the FOIA request involving its EEO-1 Type 2 reporting

20    that underlies the above-captioned litigation. As will be detailed, Allied considers its EEO-1 Type 2

21    reports, as well as the employment data underlying those reports, to constitute important commercial

22    information that it treats as strictly confidential.

23        Allied Universal's EEO-1 Reports are Commercial Information

24        7.        Allied Universal considers its EEO-1 Type 2 reports, as well as the employment data

25    underlying those reports, to be commercial information given the significant relation of the underlying

26    data to Allied Universal's business model, profitability, and strategic planning. As noted above, Allied

27    Universal is a significant security guard provider within the United States. Despite having a very large

28    workforce, Allied Universal does not manufacture any products nor does it engage in financial services

DECLARATION OF HELENE BAXTER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                    2

1    or banking. Instead, Allied Universal's business, and the business of most security guard providers, is

2    almost entirely focused on staffing. In other words, Allied Universal's primary "product" is the staff it

3    employs and mobilizes to provide security guard services at thousands of locations across the United

4    States. As a result, Allied Universal's human capital represents its core commercial asset and provides

5    the basis for its overall revenue and profitability as a business concern.

6          8.      The most important financial metric with respect to Allied Universal's security guard

7    business is the "guard hour," which equates to one (1) hour of security guard time on the customer's site.

8    Allied Universal's customer contracts are almost universally based on the provision of a certain number

9    of guard hours per day, week, and/or month. Allied Universal's ability to supply its product—guard

10   hours—is a direct function of the number of security guards it employs.  The guard hours are typically

11   multiplied by a negotiated "bill rate," with the product of this equation representing Allied Universal's

12   gross revenue per contract. The staffing of employees to work guard hours results in the vast majority of

13   Allied Universal's revenue. Likewise, the staffing costs Allied Universal expends per guard hour

14   represent Allied Universal's primary operating expense. Given these facts, Allied Universal's

15   headcount, staffing strategies, and adjustments to its employee headcounts in different job categories (in

16   order to minimize its overall labor costs per guard hour), constitute essential business factors affecting

17   nearly all of the commercial transactions that Allied Universal engages in.

18         9.      Given the nature of this business and commercial model, Allied Universal's relative skill

19   in staffing its security guards at different customer sites, hiring and efficiently maintaining the total

20   number of security guards needed to staff its customers' sites, and forecasting staffing fluctuations and

21   needs (both locally and nationally) are absolutely critical to Allied Universal's commercial profitability.

22         10.     Notably, the EEO-1 Type 2 reports separate employee headcount totals across ten (10)

23   job categories. Given that Allied Universal's primary business is the provision of security guards and

24   related services, a large majority of its employee headcount total is obviously comprised of individuals

25   working in security guard positions.[1] All of these security guard positions fall within EEO-1 job

26

27   ───────────────

28   [1] For the reasons discussed herein, Allied Universal cannot, in this publicly filed document, disclose the
     precise ratio of its total employees versus those working in security guard positions, as it treats such
     information as confidential commercial data.

DECLARATION OF HELENE BAXTER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                          3

1    category 9, "Service Workers," which means the disclosure of Allied Universal's headcount by job

2    category – as is detailed in its EEO-1 Type 2 reporting – would reveal this critical staffing metric.

3           11.     As noted above, security guard (EEO-1 job category 9, "Service Worker") positions are

4    those that directly produce most of Allied Universal's revenue based on guard hours worked. In this

5    structure, Allied Universal's employment of administrators (EEO-1 job category 6, "Administrative

6    Support"), managers (EEO-1 job category 2, "First/Mid. Officials & Managers"), and executives (EEO-

7    1 job category 1, "Executive/Sr. Officials & Managers") that administer, manage, and oversee its

8    security guard operations reflect Allied Universal's employment costs that are attributable to either

9    client support operations or overhead. Allied Universal's ability to staff these client support and

10   overhead positions in an efficient and strategic manner directly impacts on its profitability and staffing

11   methodologies. Such ratios are constantly monitored by Allied Universal and adjusted in a strategic

12   manner where necessary as they directly impact and reveal Allied Universal's profit potential and the

13   cost impact of its current staffing approach. As such, the ratios Allied Universal maintains between

14   security guard positions and client support and overhead positions constitutes key commercial

15   information in light of Allied Universal's business model.

16          12.     Diversity, inclusion, and equity are core values that are promoted and supported

17   throughout Allied Universal's organization. One of the key areas of focus for Allied Universal in this

18   area is the hiring, promotion, and advancement of women employees. Historically, women have been

19   significantly underrepresented in the security guard services industry.  To counteract this situation,

20   Allied Universal has spent a tremendous amount of time and resources on numerous initiatives,

21   programs, and efforts to recruit and advance women candidates into upper-level positions, both in local

22   areas and nationally. These efforts are reflected in the composition data in the EEO-1report and in the

23   year-to-year comparisons.  Allied Universal views such efforts as critical to its growth, its ability to

24   enter and succeed in emerging markets, and critical to its overall performance and strategic business

25   planning. Given this importance, Allied Universal, separate and apart from any requirement arising from

26   EEO-1 reporting obligations, tracks and monitors its headcounts of women and minority employees

27   across different job types and levels and considers this data to be key to its commercial success.  Such

28   information is key given that there is significant competition in the security services industry around the

1    recruiting and retention of women candidates, for which there is already a shortage in the industry.

2          13.     In the course of creating and maintaining its valuable commercial information, Allied

3    Universal keeps and tracks employee headcount information by job category for purposes other than

4    completing its required EEO-1 reporting. As outlined above, this staffing data is the most critical

5    component of Allied Universal's business model and is key to its revenues and profitability.  This data is

6    also used in allocating recruiting resources and in both local and national business planning efforts.

7    Likewise, given the central nature of employee diversity data to Allied Universal's core values, such

8    information directly underlies its overall business planning and strategy. Further, as noted, Allied

9    Universal would create and maintain data on employee race/ethnicity and sex by job category even if the

10   EEO-1 reporting requirement did not apply. For example, data on female headcount by job category is

11   an important metric that Allied Universal monitors in order to adjust its recruiting and outreach

12   strategies for women candidates, which are extensive.

13        Allied Universal Customarily and Actually Maintains the EEO-1 Reports as Confidential

14   Records

15         14.     Given that Allied Universal's EEO-1 Type 2 reports and the data underlying such reports

16   have significant commercial value to Allied Universal, the company takes numerous steps to maintain

17   their strict confidentiality.

18         15.     Some very general headcount information, such as the approximate number of its United

19   States employees is publicly confirmed by Allied Universal. However, Allied Universal does not make

20   its employee headcount by job category data public in any forum – this information is not disclosed

21   publicly by Allied Universal.

22         16.     I am further unaware of any other company in Allied Universal's industry that publishes

23   or voluntarily discloses its EEO-1 reports in any fashion, or that otherwise voluntarily publishes

24   employee headcount totals by job category. In my experience, information regarding staffing levels of

25   security guards and other critical positions is typically closely guarded within the security guard

26   industry.

27         17.     All of Allied Universal's "raw" employment-related data that underlies its EEO-1 reports

28   is stored in a highly-secure Human Resources Information System ("HRIS"). Access to the HRIS is

1    limited to specific designated users by the Company and can only be accessed with secure logins and

2    passwords that are maintained and issued by its IT staff. Such credentials include two-factor

3    authentication, regulated permission levels, and IT monitoring, as well as IT/cyber security initiatives.

4    These systems are subject to periodic IT security audits.

5        18.    The high-security storage used for the data underlying Allied Universal's EEO-1 reports

6    is maintained and monitored by Allied Universal's Shared Services department. There are only

7    approximately two (2) individuals in the Shared Services department with complete access to all levels

8    of employment data. Resulting reports and data compilations are restricted to the Vice President and

9    Executive levels of corporate management, which are individuals with defined "Level 8 - Higher Level"

10   security permissions.  Allied Universal further strictly limits employee access to the electronic account

11   through which its EEO-1 reports are uploaded and transmitted to the government to Executive-level

12   Human Resources officials.  All employees with access to these records understand that they are

13   confidential and must be treated as such.

14       19.    Allied Universal has also implemented numerous policies that serve to restrict the

15   disclosure of its confidential and proprietary commercial and informational assets, such as the

16   employment data underlying its EEO-1 reports. For example, the Company has issued an employee

17   handbook to its administrative workforce (the "Handbook") that contains numerous provisions regarding

18   the handling of confidential and/or proprietary Company information and data.

19       20.    The issue of confidentiality of Company information, such as EEO-1 data, is dealt with

20   extensively in the Handbook's section on "Maintaining Confidentiality." As stated therein,

21       All employees must treat any information relating to the business of Allied Universal®

22       and any of its activities, projects, or customers as confidential. Employees may not

23       divulge any of this information to non-employees, including family and friends, without

24       the prior written consent of the Regional President. All such information must be kept

25       completely confidential during, and subsequent to, employment with Allied Universal.

26       21.     Information subject to the above policy is defined to include "confidential information or

27   any other information of a secret, proprietary, or generally undisclosed nature *relating to the company,*

28   or its services, customers, *employees*, plans or procedures" (emphasis added). This definition is clearly

DECLARATION OF HELENE BAXTER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                                6

1  intended to include records that would reveal valuable commercial information, such as headcount data

2  by job category and employee diversity information by job category, in addition to the EEO-1 reports

3  that may result from such information. This is particularly true given Allied Universal's actual and

4  consistent practice of treating such information as strictly confidential pursuant to its policies.

5       22.    The Handbook further provides that, while employees are not restricted from sharing

6  information about their own employment and the terms and conditions thereof, "employees who have

7  access to confidential information about other employees or applicants as part of their essential job

8  functions cannot disclose this information to individuals who do not otherwise have access to it," unless

9  a legally protected ground for disclosure applies. "Such protected information includes . . . sensitive

10  employee information." "Sensitive employee information" inherently includes headcount data by job

11  category and employee diversity information by job category, in addition to the EEO-1 reports that may

12  be derived from such information.

13       23.    In order to aid its employees in understanding and abiding by its policies on confidential

14  information, the Handbook contains a list of required practices concerning "Maintaining Personnel

15  Records and Confidential Information." With respect to such records, the Handbook notes that the

16  "Company will *safeguard them from disclosure* and will divulge such information only as permitted or

17  required by any applicable federal or state law" (emphasis added). These records are further

18  characterized as "the property of the Company." Likewise, in its "Guidelines for Utilizing Social

19  Media," employees are directed to "not disclose any Company or Customer confidential or proprietary

20  information." Further, in the Handbook's section on "Voicemail, Email, and Computer Files,"

21  employees are instructed that "Company confidential or proprietary information should not be

22  transmitted via these systems outside the organization or even to Employees within the organization

23  unless such recipients are authorized to receive such information."

24       24.    Given these stringent confidentiality measures, policies, and its actual practices, Allied

25  Universal clearly treats its EEO-1 reports and the employee information underlying such reports as

26  strictly confidential. Such efforts have been successful thus far, as I am not aware of any instances of

27  such reports or data being improperly disclosed or made public.

28       <u>Allied Provided the EEO-1 Reports to the Government with Express and Implied Assurances of</u>

Confidentiality

25.    Allied Universal maintains that it has been provided with both express and implied assurances of confidentiality with respect to the information that Allied Universal has submitted in its EEO-1 reporting.

26.    When Allied Universal submitted the EEO-1 reports at issue in the above-captioned case, the Joint Reporting Committee advised Allied Universal that the data will be protected to the maximum extent permitted by law.  Specifically, at that time, the EEO-1 instruction booklet stated: "OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests that are made to obtain any of the data provided on the EEO-1 report and *will protect the confidentiality of EEO-1 data to the maximum extent possible* consistent with FOIA and the Trade Secrets Act" (emphasis added). Allied Universal has reasonably considered the OFCCP's promise that it will "protect the confidentiality of EEO-1 data to the maximum extent possible" as definitively expressing an assurance of confidentiality with respect to the EEO-1 reporting provided by Allied Universal. Allied Universal relies on this assurance when submitting its EEO-1 data.

27.    Further, Allied Universal has relied on the fact that Section 709(e) of Title VII of the Civil Rights Act of 1964 imposes criminal penalties and makes it unlawful for any officer or employee of the Equal Employment Opportunity Commission ("EEOC") to make the employment data derived from any of its compliance surveys public prior to the institution of any proceeding under the EEOC's authority involving such information. Allied Universal understands that the EEOC and OFCCP jointly collect the EEO-1 data through the EEO-1 Joint Reporting Committee. From Allied Universal's perspective, because the EEO-1 Joint Reporting Committee is housed at the EEOC, Allied Universal submits its EEO-1 reporting to the EEOC as a practical matter. These facts create a baseline assumption, on which Allied Universal has relied, that the employment data provided by employers in the EEO-1 process will be subject to protection from ultimate disclosure by the government as well as express and implied assurances of confidentiality to employers such as Allied Universal. The OFCCP's potential disclosure of such data via the FOIA process effectively upends this reasonable assumption.

28.    Moreover, under the DOL regulation at 29 CFR § 70.26, the OFCCP has engaged in a practice of informing EEO-1 submitters and providing them with an opportunity to object when such

1    reporting becomes subject to a FOIA request. This regulation and the OFCCP's practice further creates

2    an implied assurance of confidentiality from the OFCCP, as such notification is only required when the

3    agency believes that the information is protectable as confidential and would serve no purpose unless

4    there was some baseline assumption and assurance of confidentiality.

5           Allied Universal's Commercial and Economic Interests Would be Harmed by the Release of its

6    EEO-1 Type 2 Data

7           29.    As noted herein, Allied Universal is a federal contractor whose EEO-1 Type 2 data could

8    be subject to disclosure in this case. However, many other companies in the security guard industry,

9    both in local markets and nationally, are not federal contractors. As such, their EEO-1 Type 2 data

10   would remain protected and would not be subject to disclosure as a result of this case. If disclosure of

11   the EEO-1 Type 2 data is ordered in this case, such a ruling would create a patently unfair dynamic that

12   would impact Allied Universal, and potentially open its valuable commercial information up to its

13   competitors but would not impact its competitors that are not federal contractors. This would allow

14   competitors to unilaterally scrutinize and evaluate Allied Universal's workforce data. The end result of

15   this dynamic effectively creates an intra-industry penalty that would be borne as a result of Allied

16   Universal's decision to do business with the federal government. Such disincentives would have to be

17   taken into account in future business decisions involving federal contracting and could dissuade Allied

18   Universal from engaging in federal contracting in the future.

19          30.    As outlined herein, the employee headcount by job category and employee diversity

20   information by job category data as contained in Allied Universal's EEO-1 Type 2 data provides

21   valuable commercial insight into Allied Universal's primary profit center: its staffing of security guards

22   and how it structures its workforce, including key ratios between categories of employees. Allied

23   Universal's competitors could easily measure Allied Universal's total security guard staffing capability

24   and capacity, as well as its near-term security guard forecasting and strategy, from this information. This

25   is particularly true given that the "Service Workers" job category would effectively reveal, to a precise

26   degree, the total number and scale of Allied Universal's security guard workforce. Moreover, the EEO-1

27   Type 2 data would also reveal how Allied Universal balances its profit center employees with its client

28   support and overhead-related employment costs. Such ratios provides a key metric whereby a competitor

1   could easily ascertain or estimate Allied Universal's confidential internal business structures and cost

2   information.

3         31.    In addition, the disclosure of race/ethnicity and sex data by job category information

4   would also reveal Allied Universal's successes in the critically competitive area of female and minority

5   recruitment and advancement, particularly given the historical underrepresentation of such groups in the

6   security industry, and the resulting high level of competition for such candidates.

7         32.    The disclosure of Allied Universal's EEO-1 Type 2 reporting would further harm Allied

8   Universal given that such disclosure would effectively constitute the disclosure of Allied Universal's

9   valuable commercial trade secrets and other information protected by the Trade Secrets Act. Under 18

10  U.S.C. § 1905, the government's ability to disclose certain trade secret information is specifically

11  limited where such information

12      [C]oncerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to

13        the identity, confidential statistical data, amount or source of any income, profits, losses, or

14        expenditures of any person, firm, partnership, corporation, or association . . . .

15  *See* 18 U.S.C. § 1905. Based on the facts outlined herein, this definition clearly encompasses Allied

16  Universal's employee headcount information by job category and employee diversity information by job

17  category as expressed in its EEO-1 Type 2 reports. This is because such information is "confidential

18  statistical data" and because it also reveals the "amount or source of any income, profits, losses, or

19  expenditures of any person, firm, partnership, corporation, or association," given the importance of this

20  information to Allied Universal's revenue and profitability potential. Given that such information

21  constitutes a protected trade secret of Allied Universal for 18 U.S.C. § 1905, no disclosure should be

22  permitted.

23        33.    Finally, if the OFCCP is required to disclose the EEO-1 Type 2 reports that Allied

24  Universal provided as a federal contractor, such an action could strain potential cooperative ties between

25  Allied Universal and the agency in the future. In addition to regulatory compliance reviews and other

26  oversight interactions between the OFCCP and Allied Universal, the company has also previously

27  engaged in various programs, educational efforts, and related initiatives with the OFCCP on a voluntary

28  basis. The OFCCP routinely touts the availability and effectiveness of such measures, and Allied

1  Universal has had good results in its prior participation. Requiring the OFCCP to disclose Allied

2  Universal's EEO-1 reports would not further future voluntary interactions of this nature, and in fact may

3  dissuade Allied Universal from such voluntary participation in the future.

4       I declare under penalty of perjury under the laws of the United States that the foregoing is true

5  and correct.

6       Executed this 16th day of August, 2023, at Palm Beach County, Florida.

7

8  _____
    HELENE BAXTER

9