UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>　　　　Defendant. | Case No. 22-cv-07182-WHA<br><br>**DECLARATION OF JOSHUA BARCON IN SUPPORT OF DEFENDANT DEPARTMENT OF LABOR'S MOTION FOR SUMMARY JUDGMENT** |

I, Joshua Barcon, state as follows:

1.　　I am a Senior Legal Analyst, Labor & Employment, at DHL Global Business Services ("DHL"). I submit this declaration in support of the United States Department of Labor's Motion for Summary Judgment in the above-captioned matter. I have personal knowledge of the following facts and if called to testify, I could and would competently testify thereto.

2.　　As a Senior Legal Analyst, I am responsible for collecting data and filing DHL's annual EEO-1 Reports, handling small claims matters, investigating and responding to charges of discrimination, managing DHL's ADA and FMLA programing, and providing employment litigation support. I have been a Senior Legal Analyst at DHL for twelve years. I have personal knowledge of the facts in this declaration, as I am responsible for collecting data and filing DHL's annual EEO-1 Reports, and I am familiar with DHL's efforts to maintain the confidentiality of its EEO-1 Reports.

3.　　DHL is the leading global brand in the logistics services industry. DHL offers an unrivalled portfolio of logistics services ranging from national and international parcel delivery, ecommerce shipping and fulfillment solutions, international express, road, air and ocean transport to industrial supply chain management. DHL connects people and businesses securely and reliably,

1   enabling global sustainable trade flows.  DHL also provides specialized solutions for growth markets
2   and industries including technology, life sciences and healthcare, engineering, manufacturing & energy,
3   auto mobility and retail.

4      4.  DHL has over 600,000 employees worldwide, with approximately 18,000 employees in
5   the United States.  During 2016 to 2020, DHL was a federal contractor and submitted EEO-1 Reports
6   during those years.

7      5.  In August 2022, DHL was notified by the Office of Federal Contract Compliance
8   Programs ("OFCCP") that it received a Freedom of Information Act (FOIA) request for the disclosure of
9   all federal contractors' Type 2 EEO-1 Reports for the years 2016-2020.  DHL considers these
10  documents to be confidential, commercial documents and notified OFCCP in writing on October 18,
11  2022 that it objected to the release of its EEO-1 Reports.

12      6.  DHL's Type 2 EEO-1 Reports contain information regarding the size and specific
13  structure of DHL's workforce, and year-over-year data reveals its business evolution over the course of
14  five years.

15      7.  The organizational structure of DHL's workforce is private, commercially valuable
16  information that reveals the staffing levels DHL has determined are necessary to maintain and grow the
17  business. The Type 2 EEO-1 Reports provide a detailed breakdown of how DHL stratified its workforce,
18  including essential, unpublished details, such as how many Executive/Senior Level Officials and
19  Managers are required to oversee DHL's business functions. The comprehensive data in the Type 2
20  Reports also reflects how many First/Mid Level Officials and Managers, Professionals, Technicians,
21  Sales Workers, Administrative Support Workers, Craft Workers, Operatives and Service Workers are
22  required for DHL to operate efficiently and effectively.

23      8.  DHL has been constantly evolving to stay competitive and to be a leader in the logistics
24  services industry, and its workforce structure and composition has had to evolve along with it.  The way
25  DHL organizes its workforce year over year is a direct result of its substantial effort and innovation in
26  devising ways to make the company run effectively with the changing times.

27      9.  The organization-wide employment numbers contained in the Type 2 EEO-1 Reports tell
28  more than just the number of employees in each job category. They represent DHL's experience and

DECLARATION OF JOSHUA BARCON IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
No. 22-cv-07182-WHA                     2

expertise in the field of workforce structuring.  The way DHL staffed its operations during 2016-2020 is commercially valuable information.  It shows how DHL has determined it should structure its workforce to have a well-run, profitable, and efficient business.

10. The EEO-1 Report data is commercially valuable for DHL's recruitment and retention strategies, as the competition for recruiting and retaining talent is intense.  Having a diverse workforce is beneficial to DHL's commercial success, as it enhances the diversity of thought and perspectives in the organization, helps boost innovation, and leads to the attraction, recruitment, and retention of more diverse employees in the future.

11. DHL customarily keeps its EEO-1 information private, and closely holds it within the Company. DHL has not publicly disclosed its 2016-2020 EEO-1 Reports.  Given the competitive nature of the logistics services industry, DHL has taken necessary measures to protect its staffing strategies and its personnel activities during 2016-2020 to ensure that third parties do not have access to such confidential information in the normal course of business.

12. Access to DHL's 2016-2020 EEO-1 Reports is limited to individuals with a direct need to access the information in connection with their respective positions at the Company. Of the roughly 18,000 U.S. employees in the Company, only 20 employees have access to DHL's EEO-1 Reports (*i.e.*, only 0.1% of the workforce).  The limited individuals with access to EEO-1 Reports are those in Legal, Talent Acquisition, and HR leadership positions with a need to know the information. Each of these employees are aware and expressly informed of the confidential nature of the EEO-1 Reports.  For all other employees -- including DHL executives, officials and managers -- access to the EEO-1 data is blocked in the Company's HRIS system via a series of data protection security measures.

13. DHL has taken appropriate steps to protect this information and to ensure that third parties are not permitted to obtain such confidential information in the normal course of business. DHL has not publicly disclosed any EEO-1 Report submitted to OFCCP since 2016, nor has it otherwise released similar demographic information about its U.S. workforce publicly.

14. DHL has also made a promise of confidentiality to its employees. Employees are invited to voluntarily respond to self-identification forms inquiring about their gender, ethnicity and race. These employee communications expressly state that any information provided by the employee will be kept

confidential and "will only be used in ways that are consistent with the law," consistent with DHL's governmental recordkeeping and reporting requirements.

15. DHL goes to great lengths to maintain the privacy and trust of its employees. Once the employee provides this personal information -- with an understanding it will be used for government statistical and affirmative action efforts -- it is entered into the system of record and access to the information is strictly limited to the personnel described above.

16. DHL submits its EEO-1 Reports to the EEOC with the understanding that by law, they will not be disclosed to the general public. DHL is aware of and relies on the EEO-1 Report instruction booklet which states, "All reports and any information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-8(e), as amended (Title VII) and may not be made public by the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 Component 1 data. Any EEOC employee who violates this prohibition may be found guilty of a criminal misdemeanor and could be fined or imprisoned."

17. DHL likewise expects that OFCCP will treat the EEO-1 reports as confidential to the maximum extent permitted by law, and will only be used in connection with the administration of EO 11246 and Title VII. Consistent with this understanding, DHL was notified by OFCCP that it received a FOIA request for the disclosure of federal contractors' EEO-1 Reports and OFCCP provided DHL the opportunity to submit written objections to having its EEO-1 Reports disclosed. The notice specifically acknowledged that the requested information may include "confidential trade secret, commercial, or financial information that should be withheld pursuant to FOIA Exemption 4." Through that notice, OFCCP provided an additional assurance that DHL's EEO-1 Report information will be treated as confidential and withheld to the extent permissible and appropriate under the law.

18. DHL submits its EEO-1 Reports in reliance on the assurances of confidentiality made by the EEOC and OFCCP.

19. Disclosure of DHL's EEO-1 Reports will cause foreseeable harm to DHL's economic and business interests. The demographic details in those Reports would permit the Company's direct competitors to discern its workforce trends. With five (5) consecutive years of staffing data, competitors

would gain valuable insight into DHL's business strategy and the direction in which DHL is moving, resulting in competitive harm and disadvantage.

20. DHL's presence has expanded in recent years throughout the United States. If released publicly, the specific increase and/or decrease in headcounts from 2016 to 2020 would be available to the public and to its competitors. During the five years in question, DHL experienced year over year growth up to 35% and also experienced a decrease in headcount by over 15%. The released EEO-1 reports would reveal the job categories that experienced the most change from year to year, providing insight into DHL's business strategies and allocation of resources. The ability to discern macro trends about DHL's workforce composition necessitates that this information be kept closely held, as it could be used to gain a competitive advantage in the market.

21. The EEO-1 Reports reveal how DHL has determined it should structure its workforce to have a well-run, profitable and efficient business, and to respond to and anticipate developments in its industry. If made public, other companies and competitors could use the EEO-1 Report information as a guideline for their staffing strategies, thereby depriving DHL of the competitive advantage it has cultivated. Because the logistics services industry is quickly evolving, any advantage that DHL's competitors gain could have a substantial effect on the competitive positions of DHL in the industry.

22. The privacy of some DHL employees would also be threatened by potential disclosure of DHL's EEO-1 Reports. From 2016-2019, one of DHL's EEO-1 categories had 10 or fewer total employees, and the same is true for another EEO-1 category from 2017-2020, making it possible for colleagues, competitors, and the general public to discover the race and gender of specific employees, especially with the public information available on websites such as LinkedIn.

23. DHL would also suffer harm by release of the EEO-1 Reports because the report information could be misinterpreted and used in a way that undermines DHL's ability to recruit female and minority employees now and in the future. How DHL measures its diversity goals does not align with the limited format of the EEO-1 Reports, which categorizes employees into ten job categories created by EEOC. Armed with imprecise information, competitors and other stakeholders could make broad assumptions that do not accurately reflect DHL's diversity journey and which would undermine its efforts and reverse its progress.

24. For example, competitors or other critics could use DHL's EEO-1 Reports to infer or accuse DHL of not engaging in sufficient affirmative action and diversity, equity and inclusion ("DEI") efforts by referencing certain job categories that may -- on their face -- lack diversity. DHL's data may also be compared the EEOC's published EEO-1 aggregated statistics that summarize data collected for a variety of geographic areas and industries. DHL's employee demographic information contained in EEO-1 Reports can be analyzed against these aggregated statistics to compare how DHL fares against other businesses in its industry. Such analyses can be misleading without appropriate context, particularly since they represent employee populations at only a single point in time each year. They do not accurately represent either the efforts or progress that DHL made with regard to minority and female representation in its workforce.

25. DHL's EEO-1 Report could be similarly criticized and challenged for what is perceived as too much relative diversity in certain areas. DHL is aware of the letter issued to Fortune 100 companies by the Attorneys General from thirteen states last month, threatening "serious legal consequences" for companies whose DEI efforts ostensibly incorporate racially discriminatory elements. DHL is also aware of the response letter sent by the Attorneys General from twenty other states encouraging corporate efforts to recruit diverse workforces and create inclusive work environments. Through disclosure of its EEO-1 Reports, DHL risks facing unfounded criticism, negative press and getting caught in the crosshairs of the current political debate over the lawfulness of DEI efforts, where any diversity can be characterized as too much or too little, depending on the reader's point of view.

26. Unwarranted and unfounded criticism of DHL's DEI efforts could negatively impact its efforts to recruit and retain a diverse workforce and harm its relationships with its customers, especially its larger e-Commerce customers who face similar market pressure and challenges in the DEI space.

27. DHL has a strong commitment to diversity and inclusion and has made significant efforts to recruit and retain a talented, diverse workforce. Given the commercial and sensitive nature of its DEI information, DHL is in the best (and only) position to decide what information, if any, it would like to share with the public and to provide the necessary and important context for the data disclosures, based on its own workforce demographics and efforts.

28. A workforce with diversity is critical to the success of DHL's business and its work

community, and it is vital that the Company retain its minority and female employees. This is true even in job categories with large numbers of incumbents. Release of the EEO-1 Reports would show competitors where DHL's diverse and highly talented workforce is concentrated. Where DHL has a large number of minority and/or female employees in a particular type of job, the information would be helpful to competitors because it reveals the areas they can most readily target to poach talented minority or female employees with a particular skill set. Conversely, for the types of jobs where DHL has few minority and/or female employees, competitors will know which type of jobs to target to cause the greatest damage to DHL, it business, and its diversity representation.

29. Maintaining diversity in its workforce is not only important to DHL, but also to the Company's clients and business associates. Losing highly talented diverse staff that DHL has worked hard to hire, train and retain would be costly, could cause reputational harm that would affect DHL's commercial interests, and presents a competitive disadvantage to DHL.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th day of August, 2023, at Plantation, Florida.

*Joshua Barcon*
NAME