UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>  Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>  Defendant. | Case No. 22-cv-07182-WHA<br><br>**DECLARATION OF KAREN SOBIESKI IN SUPPORT OF DEFENDANT DEPARTMENT OF LABOR'S MOTION FOR SUMMARY JUDGMENT** |

I, Karen Sobieski, state as follows:

1. I am Senior Director of Contracting at Network Management Resources Inc. d/b/a NMR Consulting ("NMR" Consulting"). I submit this declaration in support of the United States Department of Labor's Motion for Summary Judgment in the above-captioned matter. I have personal knowledge of the following facts and if called to testify, I could and would competently testify thereto.

2. I have been an employee of NMR Consulting since January 2009, originally in Business Development, and assumed responsibility for the contracting department in 2011. As Senior Director of Contracting, my responsibilities include negotiation and maintenance of all contracting artifacts, as well as management of awarded contracts/subcontracts through their full life-cycle – initial negotiation, amendments and extensions, and contract/subcontract closeouts. I facilitate communications with NMR Finance and Program delivery teams to enable effective contract cost management and to ensure NMR is in full compliance with contract obligations. As NMR Consulting is a small business, employees often wear many hats. I support NMR's business development efforts, aiding in capture opportunities, and provide extensive proposal development support. The breadth of my roles and responsibilities has provided significant insight into the challenges of competing and winning in the federal marketplace, the

strategic value of competitive intelligence to successful bids, and the difficulties in protecting competitive-sensitive corporate information given the availability of so much information in the public domain through the federal government's FPDS-NG (the Federal Procurement Data System) that provides contract award information, industry news articles, and government contracting intelligence tools such as GovWin IQ, GovTribe, Bloomberg Government (BGov).

3. Headquartered in Huntsville, Alabama, NMR Consulting is a service disabled, veteran owned small business focused on providing information technology, infrastructure, and procurement services to the government and commercial entities. For example, NMR Consulting provides health information technology services, information technology professional services, and order level materials under the GSA Multiple Award Schedule.

4. As a federal contractor, NMR pursues business, almost exclusively in the federal sector, primarily with the Department of Defense and the Intelligence Community. We employ several strategies to staff our contracts – 1) where advantageous to do so, or required, we "flip" or hire incumbent staff performing the same work on the predecessor contract, 2) we recruit via the internet by posting job vacancies to our Jobvite website or other opportunity websites (e.g., Monster, CareerBuilder, ZipRecruiter) or via social media (e.g., LinkedIn), and 3) we leverage our employee referral program to compensate our employees for referring successful candidates. We may also offer positions to our subcontractors to fill. We typically do not use staffing firms given the cost.

5. During the relevant period of 2016-2020, NMR was a federal contractor with more than 50 employees. As such, NMR was required by law to submit EEO-1 reports, providing demographic and aggregated information about its workforce during that period.

6. In 2022, NMR learned that the Department of Labor ("DOL") had received a FOIA request seeking NMR's EEO-1 Type 2 reports from 2016 to 2020. NMR considers these documents to be commercial documents that are confidential.

7. On September 19, 2022, NMR notified DOL in writing that it objected to the release of its documents.

<u>The EEO-1 Reports are Commercial</u>

8. The EEO-1 Reports have material commercial value to companies in government

information technology industries, like NMR, and is used by our company for commercial purposes.

9. EEO-1 Reports disclose workforce totals across ten job categories. Although the purpose of these reports is to disclose diversity information, they also necessarily reveal other key information about NMR's commercial operations, such as total personnel numbers and workforce allocation across job types. This type of workforce data is fundamental commercial data.

10. Indeed, the EEO-1 Reports reveal the year-by-year results of deliberate commercial decisions about how to best structure and operate the company, including how NMR structures workforce (e.g. number of managers, number of professionals, number of sales workers, etc.).

11. As a contractor primarily performing service contracts, NMR's workforce is an important component of NMR's basic operations. The quantity of services that NMR provides is directly tied to the size of its workforce. The type of services that NMR provides is directly tied to its workforce allocation. Indeed, as a company that provides services to the federal government, the number and type of employees directly reflects the amount and type of services NMR can provide at any given time. NMR closely tracks these numbers as part of its commercial operations so that it has the ability to compete for and perform contracts. Put differently, NMR has a commercial interest in its headcount and its personnel allocation among different categories.

12. Beyond the numbers themselves, comparing the EEO-1 Reports year-over-year reveals other commercial information about NMR, showing fluctuations in total employees overall and within certain job categories. For a company as small as NMR, these fluctuations provide significant insight into NMR's staffing decisions on contracts and reflect labor costs and productivity. For example, a competitor could tie a recent contract award to an uptick in employees for the same period by comparing two years of EEO-1 data. Because in many years, NMR receives only one government contract, any meaningful change in employee data during that period could be fairly attributed to the new contract award. With that information, the competitor could conclude how many employees NMR's proposed as part of its successful staffing solution for that contract—the size and composition of the workforce is often a strategic decision unique to each company's proposal.

13. In addition, NMR consults the overall information about the size, diversity, and composition of its workforce when making commercial decisions, which means that type of information

is inherently commercial. NMR's management tracks this information because procurement decisions are based, in part, on workforce information.

14. For example, NMR understands that the Federal government—NMR's largest customer—considers diversity information, such as a contractor's compliance with EEO requirements under Executive Order 11246, when making responsibility determinations—a step taken on every federal contract awarded. Similarly, President Biden recently promulgated Executive Order 13985, which directs that agencies create plans to address "any barriers to full and equal participation in agency procurement and contracting opportunities[.]" The private sector is no different and NMR understands that more companies are starting to make procurement decisions based on diversity information.

15. Along those same lines, a diverse workforce allows it to be more responsive to customers. Numerous studies have shown that increased diversity boosts innovation and ensures consideration of different perspectives.

16. As a result, the information in the EEO-1 Reports is also commercially valuable as it relates to recruitment and retention. The competition for recruiting and retaining talent is intense. Like potential customers, current employees consider whether NMR has a diverse workforce across gender, ethnic, and racial identities. Moreover, a diverse workforce ensures that a wide variety of viewpoints contribute to NMR's decision-making and it helps to make our workplace welcoming and tolerant of employees of all identities and backgrounds. With this in mind, NMR uses its diversity data to allow management to determine areas of opportunity to increase diversity so it can leverage these advantages.

<u>NMR Customarily and Actually Maintains the EEO-1 Reports Confidential</u>

17. NMR does not release their EEO-1 Reports to the public and does not release data about its aggregate workforce by job type or demographics.

18. NMR's EEO-1 Reports are only accessible by the Human Resources Director, Human Resources Manager, IT Manager, and President. The EEO-1 Reports are kept within a secure site within NMR's Microsoft intranet that limits access to key individuals on a need-to-know basis. For non-key individuals, they must receive permission to access the information from a site administrator after the administrator has consulted with the data owner.

19. NMR employs extensive security controls to protect our proprietary corporate data during

storage, processing, and transmission. All communications with our systems and servers are encrypted using PKI certificates and the HTTPS protocol. Our data is stored within our local intranet web system, Microsoft SharePoint. Only NMR employees have access to this system. Employees are authenticated and authorized by our Microsoft Active Directory domain, integrated with SharePoint, to ensure only authorized employees can access any document or record based on the need to know. All documents and records are protected with explicit permissions based on individual user accounts or groups. Any documents stored on our Microsoft Windows file server are also integrated with and secured by our Active Directory, with file permissions set for the individual employee or group.

20. NMR employees receive regular training on the handling of company confidential and other sensitive information. To that end, NMR's employee handbook has a detailed section listing the type of data and communications that are considered confidential, such as personnel information which includes the type of information contained in the EEO-1 Reports.

21. Furthermore, NMR requires all employees to sign a non-disclosure agreement that prevents them from sharing confidential information, which includes personnel information such as the EEO-1 Reports and the data contained therein. Similarly, before engaging with any third parties, NMR requires those parties to execute non-disclosure agreements prohibiting the disclosure of any NMR information received during the engagement. Although NMR does not share EEO-1 Reports or diversity data with third parties, the third party would be prohibited from disclosing any such information. In order to release sensitive information to a third party, NMR requires authorization from the company's president.

22. To NMR's knowledge, its direct competitors also treat as private their employee demographic information of the type included in the EEO-1 Reports. NMR routinely conducts competitive intelligence research on publicly available information about its competitors, but has never come across that type of information.

23. NMR policy is to avoid participating in marketing surveys and press releases involving the information of the type contained in the EEO-1 Report, such as employee data demographics, salary data or information regarding pricing. NMR does not post its diversity data publicly for recruiting or procurement purposes. Before NMR releases any public facing document, the documents must be

reviewed internally for compliance with this policy. Likewise, NMR's contract documents require NMR's prior review and approval before another company can release NMR's information.

NMR Provided the EEO-1 Reports to the Government with Express and Implied Assurances of Confidentiality

24. When NMR submitted its EEO-1 Reports from 2016 to 2020, NMR understood that the government recognizes the sensitivity of the data in these reports and would maintain the confidentiality of that information. NMR relied on notices posted on the relevant agency websites, which indicated that this information would be kept confidential. In addition, NMR understood other notices on the relevant websites that the data would be transmitted using encryption as further evidence that NMR was providing non-public information and that the information's confidentiality would be maintained. Consistent with those notices, before receiving notice of the FOIA request at issue, neither OFCPP nor the Department of Labor ever told NMR that it might release its EEO-1 Report data or in any way suggested that it would not maintain the confidentiality of this sensitive, private information.

25. NMR submitted its EEO-1 data using the EEOC's secure site, which requires approved login user identification and password. Since the EEO-1 data we submit is required by regulatory mandate (based on both the employee size and contract dollar amounts), NMR understood and expected that data of this proprietary and competitive-sensitive nature would be kept confidential and not shared with the public.

26. In support of that expectation, NMR understands that the Trade Secrets Act prohibits government employees from releasing information that "concerns or relates to trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person." 18 U.S.C. § 1905.

27. NMR's EEO-1 Reports include information about NMR's operations (i.e., total employee count by job classification) and confidential statistical data (i.e., aggregated employee counts by various demographic and job classification)—both categories of information identified as protected by the Trade Secrets Act.

28. As a result, NMR believes that the Trade Secrets Act prohibits the government's release of its EEO-1 Reports.

NMR would be harmed by the release of the EEO-1 data.

29. The release of the EEO-1 data would harm NMR's commercial and financial interests in multiple ways.

30. Competitors or other companies could use the data to determine NMR's average number of employees on a year-to-year basis for the entire company as well as for particular job classifications. This information provides insights into NMR's productivity and their hiring patterns. As a service contractor, NMR's primary offering is its workers' skills and expertise and how much work NMR can perform is a function of how many workers NMR employees.

31. It can also be reverse engineered to allow competitors to form opinions about the work force and corporate vulnerability of a company. In other words, competitors could use this information to decide whether to bid on contracts against NMR, to solicit NMR as a teaming partner, to determine if NMR is well-positioned to bid on new opportunities, or to target NMR for a potential acquisition. NMR's EEO-1 Reports are particularly vulnerable to this type of analysis because as a company with around 100 employees, a shift of a modest number of employees either way (and even less in a particular category) represents a significant percentage change, while at a larger company, those shifts might be meaningless.

32. NMR's EEO-1 data also could be used to reverse engineer NMR's bidding methodology. NMR's resources are currently concentrated in a small number of prime contracts. For example, NMR was performing only one prime contract during the 2020 EEO-1 reporting year. It would be very easy to extrapolate contract staffing for a specific contract and from there, using widely available data, costs/pricing data during contract rebids. If a competitor could reasonably determine how many employees were assigned to a newly awarded task order, it could make reasonably strong assumptions about how NMR planned to staff the contract and could use competitive intelligence data about locality salary requirements and other sources about wage information (including Service Contract Act wage determinations). Again, this is especially true because NMR's small size and few contracts makes even modest changes to a particular category statistically meaningful. This would harm NMR's ability to compete for future contracts.

33. NMR's harm would be compounded by releasing five years of data. The wide swath of

data makes it more likely that a competitor could correlate NMR's employment data with publicly available contract award information, showing how NMR's employment numbers (in the aggregate and by category) track the award of contracts or task orders. Even worse, NMR understands that the public release of its EEO-1 information from the 2016-2020 period would likely expose the same data from other time periods to the same public release.

34. NMR also would suffer harm to its financial and commercial interests if its raw EEO-1 data was released because of the potential for that data to be misrepresented or taken out of context. For example, a newspaper organization could mischaracterize NMR's workplace and diversity culture, based on incomplete information, to support their narrative. Such negative publicity would harm NMR's ability to recruit and retain talent, negatively affect relationships with potential customers and teaming partners, or cause other harms with an impact on NMR's commercial efforts and financial interests.

35. Disclosure would also harm NMR's confidentiality interest in the data. NMR spends time and resources to ensure this information remains confidential. As detailed above, NMR goes to great lengths to secure this information and prevent its unauthorized disclosure, which underscores how much NMR values the confidentiality of this sensitive information. That confidentiality would be lost if the information in the EEO-1 reports were released.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th day of August, 2023, at Ellicott City, Maryland.

KAREN SOBIESKI