D. VICTORIA BARANETSKY (SBN 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th Street, Suite 200
Emeryville, CA 94608
Telephone:      (510) 982-2890
Facsimile:      (510) 849-6141
Email:      vbaranetsky@revealnews.org

THERESE Y. CANNATA (SBN 88032)
AARON R. FIELD (SBN 310648)
ZACHARY E. COLBETH (SBN 297419)
CANNATA O'TOOLE & OLSON LLP
100 Pine Street, Suite 350
San Francisco, CA 94111
Telephone:      (415) 409-8900
Facsimile:      (415) 409-8904
Email:      tcannata@cofolaw.com
            afield@cofolaw.com
            zcolbeth@cofolaw.com

Attorneys for Plaintiffs
THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>Defendant. | Case No. 3:22-cv-07182-WHA<br><br>**DECLARATION OF D. VICTORIA BARANETSKY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

I, D. VICTORIA BARANETSKY, declare:

1.      I am a member in good standing of the State Bars of California, New York and New Jersey and General Counsel at The Center for Investigative Reporting.  I am counsel of record for plaintiffs The Center for Investigative Reporting and Will Evans (hereafter "plaintiffs" or "CIR") in this action. I make this declaration of personal knowledge, and if called as a witness I could and would testify competently to the facts stated herein.

2.      Plaintiff CIR is a nonprofit, investigative news organization that publishes *Reveal*, an online news site, and has a weekly public radio show with approximately one million listeners per week. CIR and its journalists often make requests for records under the Freedom of Information Act, as well as other open records laws, in the interest of investigating matters of public concern and sharing newsworthy information about those matters with their readers and listeners. CIR made the FOIA requests at issue here to further this institutional goal.

3.      I represented the plaintiffs in *Ctr. for Investigative Reporting v. Dep't of Labor*, Case No. 3:18-cv-02008 (N.D. Cal.).  There, as here, the plaintiffs sought access to EEO-1, Type 2 Reports in five FOIA requests sent to DOL's OFCCP on August 9, 2017 through August 25, 2017. In that case, CIR sought EEO-1 Reports pertaining to specific federal contractors, including Reports for Oracle Corp., Hewlett-Packard Co., Salesforce, Splunk, Inc., Dropbox, Inc., Fitbit, Gilead Sciences, Inc., Github, Inc., Pandora Media, Inc, Slack Technologies, Inc., Tesla, VMWare, Synnex, PayPal, and Palantir. CIR did not receive a final response until January 29, 2018, when DOL denied the request by simply reciting, in an attachment, which companies had objected to disclosure, which companies had not objected to disclosure, and which companies had not submitted reports DOL deemed responsive. A true and correct copy of DOL's denial letter in that case is attached hereto as **Exhibit A**.  Rather than litigating the case, and despite the objection of some of the submitters, DOL voluntarily disclosed the requested EEO-1 Reports having done an internal review and settled CIR's claim of attorney's fees and costs. A true and correct copy of the stipulation of settlement between CIR and DOL is attached hereto as **Exhibit B**.

4.      I represented the plaintiffs again in a second lawsuit seeking access to EEO-1

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

2

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

1  Reports and data, *Ctr. for Investigative Reporting v. Dep't of Labor*, Case No. 4:19-cv-01843-

2  KAW (N.D. Cal.) ("*CIR I*"). There, once again, CIR requested EEO-1, Type 2 Reports from DOL

3  for 2016 regarding around 50 federal contractors. DOL again slow walked the request and failed

4  to provide a determination, instead sending correspondence that delayed any determination and

5  simply identified which contractors' reports it considered responsive, which had objected, and

6  which had not. A true and correct copy of correspondence DOL sent CIR to this effect is attached

7  hereto as **Exhibit C**. CIR then sued, DOL moved for summary judgment, and CIR cross-moved

8  for summary judgment. True and correct copies of DOL's motion for summary judgment, CIR's

9  opposition and cross-motion, DOL's reply and cross-opposition, and CIR's reply are attached

10  hereto as **Exhibit D**. I argued the matter for CIR, and, just as in CIR's briefing, the hearing

11  featured arguments by both sides regarding, among other issues, whether EEO-1, Type 2 Reports

12  contain "commercial" information within the meaning of FOIA Exemption 4, and whether DOL

13  had demonstrated that disclosure would cause foreseeable harm under the FOIA Improvement

14  Act of 2016. In a published decision, CIR's motion was granted, and DOL's motion was denied.

15  Importantly, DOL chose not to appeal. As a result, a third party, Synopsys, Inc., attempted to

16  intervene and appeal, only to have its appeal dismissed by the Ninth Circuit on procedural

17  grounds. Rather than challenging the ruling of another judge of this Court on appeal, DOL

18  accepted the result and disclosed all EEO-1 Reports in that case.

19       5.     Attached hereto as **Exhibit E** is a true and correct copy of one of the EEO-1

20  Reports disclosed by DOL to CIR.

21       6.     Attached hereto as **Exhibit F** is a true and correct copy of OFCCP's 2020 Federal

22  Compliance Contract Manual, which I obtained at https://shorturl.at/fipTU.

23       7.     Attached hereto as **Exhibit G** is a true and correct copy of the U.S. E.E.O.C.'s

24  2021 *EEO-1 Data Collection Instruction Booklet*, which I obtained at https://shorturl.at/wDOP6.

25       8.     Attached hereto as **Exhibit H** is a true and correct copy of a sample Employer

26  Information Report EEO-1 published by DOL's Joint Reporting Committee, which I obtained at

27  https://shorturl.at/qDES2.

28       9.     Attached hereto as **Exhibit I** is a true and correct copy of Freedom of Information

3

Act (FOIA) Frequently Asked Questions published by OFCCP in 2017, which I obtained at
https://shorturl.at/gnOSW.

       10.    Attached hereto as **Exhibit J** is a true and correct copy of CIR's January 10, 2019 FOIA request to OFCCP. Attached hereto as **Exhibit J-1** is a true and correct copy of OFCCP's initial July 18, 2019 response to the January 10, 2019 request. Attached hereto as **Exhibit J-2** is a true and correct copy of CIR's, through Mr. Evans, August 8, 2019 reply regarding CIR's January 10, 2019 request. Attached hereto as **Exhibit K** is a true and correct copy of CIR's March 25, 2019 FOIA request to DOL. Attached hereto as **Exhibit L** is a true and correct copy of CIR's September 11, 2020 FOIA request to OFCCP.

       11.    Attached hereto as **Exhibit M** is a true and correct copy of a consolidated response to Exhibits J-L that DOL sent to CIR on October 2, 2020.

       12.    Attached hereto as **Exhibit N** is a true and correct copy of CIR's reply to DOL's consolidated response, which CIR sent to DOL on October 30, 2020.

       13.    Attached hereto as **Exhibit O** is a further reply from DOL to CIR, which DOL sent to CIR on December 18, 2020.  In this correspondence, OFCCP did not provide an update on how it would move forward with processing CIR's requests nor did it provide a timeline on when the submitters would be notified of the requests.

       14.    In this matter, as in the cases before it, OFCCP failed to respond to CIR's inquiries for months after its December 18, 2020 response. On January 7, 2021, CIR sent another email to DOL requesting additional information on when OFCCP had provided notices to the submitters and how the data would be released for those submitters who had already consented to release or waived their opportunity to object. A true and correct copy of this e-mail is attached hereto as **Exhibit O-1.**

       15.    On May 10, 2021, CIR supplemented its requests, through Mr. Evans, to include all consolidated Type 2 EEO-1 Reports for all federal contractors for 2017 and 2018, as well as 2016.  A true and correct copy of CIR's supplement is attached hereto as **Exhibit P**.

       16.    On May 11, 2021, OFCCP acknowledged the update to CIR and consolidated all four of CIR's requests.  A true and correct copy of the acknowledgment is attached hereto as

**Exhibit Q**.

17.    On May 23, 2022, I sent a letter to the Solicitor of Labor and OFCCP Director that called attention to DOL's wrongful withholding of EEO-1 Reports and requested an immediate determination on CIR's FOIA requests. A true and correct copy of the letter is attached hereto as **Exhibit R**.

18.    On August 19, 2022, three years after CIR' initial FOIA request in this case, OFCCP published a notice in the Federal Register identifying CIR to all federal contractors and informing them of CIR's requests. DOL required any objections to disclosure by September 19, 2022, but then extended that deadline twice, without further regulation, first to October 2022, and then to March 2023.

19.    DOL informed CIR that it intended to publish non-objecting contractors' EEO-1 Reports and name the objectors, but provided no disclosure date.

20.    Having waited several years for DOL to finish processing CIR's FOIA requests and provide a determination on them that was final, let alone disclose the requested records, CIR concluded that a further lawsuit against DOL was needed to obtain the requested records, despite the result of CIR's earlier litigation against DOL. CIR accordingly filed this lawsuit on November 15, 2022.

21.    At a Case Management Conference in this matter on April 13, 2023, DOL provided an approximate timeline for the release of *some* EEO-1 Reports (from non-objecting contractors) and a tentative schedule for when determinations would be made for objecting contractors. DOL did not provide a list of objecting contractors, however. On April 17, 2023, OFCCP released all EEO-1 Reports for non-objecting federal contractors. This disclosure comprised, by DOL's count, 56,419 EEO-1 Reports from 19,289 federal contractors.

22.    CIR published a story with *USAToday* regarding the wealth of data disclosed on April 17, 2023: James Fraser, Nick Penzenstadler, USA TODAY and Will Evans, Reveal, *At mega-contractors like Raytheon, Moderna and Lockheed, diversity remains a challenge*, USA TODAY, April 19, 2023, https://shorturl.at/ijkH8. A true and correct copy of the article is attached hereto as **Exhibit T**. I obtained the article from the *USA Today* website. A CIR article

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

1   on the disclosures can be cited as follows: Will Evans, *We Forced the Government to Share*

2   *Corporate Diversity Data. It's Giving Companies an Out Instead*, Reveal.org, Aug. 29, 2022,

3   https://shorturl.at/ovCI7.  A true and correct copy of the CIR article, which I obtained from

4   CIR's website, is attached hereto as **Exhibit S**.

5         23.    To date, a significant number of responsive EEO-1 Reports are withheld (16,905

6   corresponding to 4,796 objecting contractors). OFCCP has stated that it is continuing to

7   withhold data from 16,755 reports, however, under Exemption 4. It has asserted that 621 reports

8   are nonresponsive.

9         24.    A true and correct copy of a 2008 Intel Workforce Demographics publication is

10  attached hereto as **Exhibit U**. The publication is still available online at:

11  http://web.archive.org/web/20081224004419/http:/www.intel.com/intel/diversity/divpractice.htm.

12  A true and correct copy of the article Murrey Jacobson, *Google finally discloses its diversity*

13  *record, and it's not good*, PBS NEWSHOUR, May 28, 2014,

14  https://www.pbs.org/newshour/nation/google-discloses-workforce-diversity-data-good, is

15  attached hereto as **Exhibit V**.  And, a true and correct copy of the article Laura Lorenzetti,

16  *Microsoft releases diversity stats: How the tech giant sizes up*, FORTUNE, Jan. 5, 2015,

17  https://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech/ is attached hereto as **Exhibit W**.

18  I obtained the article at the web address in the citation.

19        25.    A true and correct copy of the article Rebecca R. Hastings, *Diversity Annual*

20  *Reports Yield Business Benefits*, Soc'y Human Resource Mgmt., Oct. 10, 2012,

21  https://shorturl.at/nKY16 is attached hereto as **Exhibit X**.  A true and correct copy of the article

22  Will Evans & Sinduja Rangarajan, *Hidden figures: How Silicon Valley keeps diversity data*

23  *secret*, REVEALNEWS.ORG, Oct. 19, 2017, https://rb.gy/2d8q0 is attached hereto as **Exhibit Y**.

24  And, a true and correct copy of the article Jessica Guynn, *Apple leadership is more than 80%*

25  *white and male*, USA TODAY, Nov. 9, 2017, https://rb.gy/a6fgw is attached hereto as **Exhibit Z**.

26        26.    A true and correct copy of the article Jessica Guyun, *Barbara Lee calls on Apple,*

27  *tech holdouts to release diversity data*, USA TODAY, Aug. 4, 2015,

28  https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-federal-diversity-

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

dataapple/31128479/ is attached hereto as **Exhibit AA**. I obtained the article at the web address in the citation.

27.    A true and correct copy of a *Letter from Emanuel Cleaver II, Member of Congress, U.S. House of Representatives, to Alexander Acosta*, Secretary, U.S. Department of Labor (Mar. 6, 2019) https://cleaver.house.gov/sites/evo-subsites/cleaver-evo.house.gov/files/DOL_FOIA.pdf is attached hereto as **Exhibit AB.** I obtained the article from Congressman Cleaver's website.

28.    A true and correct copy of the article Will Evans and Jayme Fraser, *After history of discrimination, these federal contractors fought to hide diversity data*, USAToday.com, https://bitly.ws/Uu2M is attached hereto as **Exhibit AC**.  I obtained the article at the web address in the citation.

29.    A true and correct copy of DHL's Annual 2022 report, which lists the number of its employees, is attached hereto as **Exhibit AD**.

30.    Attached hereto as **Exhibit AE** are true and correct copies of the news articles Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNNMoney, Mar. 18, 2013, https://shorturl.at/ejDPT and Mike Swift, *Five Silicon Valley companies fought release of employment data, and won*, SAN JOSE MERCURY NEWS, Feb. 11, 2010, https://shorturl.at/pwyOR.  I obtained each article at the web addresses in its corresponding citation.

31.    Attached hereto as **Exhibit AF** is a true and correct copy of the Open Diversity Data website, http://opendiversitydata.org, as of October 18, 2023.

32.    Attached hereto as **Exhibit AG** is a true and correct copy of the publication Google, *Getting to work on diversity at Google*, GOOGLE BLOG, May 28, 2014, https://googleblog.blogspot.com/2014/05/getting-to-work-on-diversity-at-google.html.  Attached hereto as **Exhibit AH** is a true and correct copy of Thomas Bourveau, Rachel Flam, Anthony Le, *Behind the EEO-1 Curtain*, July 14, 2023, https://shorturl.at/gzGNQ.  And, attached hereto as **Exhibit AI** is a true and correct copy of the article *20 Best Companies for Diversity and Inclusion*, GLASSDOOR BLOGS, Oct. 4, 2018, https://shorturl.at/bjs36.  I obtained each publication at the web address in its corresponding citation.

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

7

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Executed in Berkeley, California on October 18, 2023.

4

5

6    _____

7    D. VICTORIA BARANETSKY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Center For Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

8

# EXHIBIT A

**U.S. Department of Labor**     Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



JAN 2 9 2018

Will Evans
The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 838133

Dear Mr. Evans:

This letter is our final response to your consolidated Freedom of Information Act (FOIA) request. Please refer to the FOIA tracking number 838133 in any future correspondence regarding this FOIA request.

Under FOIA, you requested the EEO-1 report from fifteen (15) companies. We have summarized the results of the consolidated request in Attachment A.

We consider you to be a "news media" type of requestor. As a "news media" requestor, you are charged for photocopying after the first 100 pages in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(4).

We believe we have been responsive to your FOIA request. Should you have questions regarding your request, please contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request, please do not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427. Alternatively, you may contact the Office of Government Information Services within the National Archives and Records Administration (OGIS) to inquire the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal,

please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

Attachment A

Companies with no data in OFCCP EEO-1 database

- Fitbit
- Slack Technologies

Companies with no qualifying federal contract during FY 2015

- Dropbox
- Github
- Tesla

Companies that objected to the release of their data on the grounds of FOIA Exemption 4

- Gilead Sciences
- HP
- Oracle
- Palantir
- Pandora Media
- PayPal
- Splunk Inc
- Synnex

Companies that did not object to the release of their data

- salesforce.com, inc.
- VMware

# EXHIBIT B

ALEX G. TSE (CABN 152348)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
DOUGLAS K. CHANG (HSBN 2922)
Assistant United States Attorney
  450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102
  Telephone: (415) 436-6985
  Facsimile: (415) 436-7169
  Email: Douglas.Chang@usdoj.gov

Attorneys for Defendant
U.S. Dept. of Labor

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, <br><br> Defendant. | Case No. 3:18-cv-2008 JCS <br><br> **STIPULATION OF SETTLEMENT AND DISMISSAL WITH PREJUDICE** |

Plaintiffs, The Center for Investigative Reporting ("CIR") and Will Evans, and Defendant, United States Department of Labor ("DOL"), hereby enter into this Stipulation of Settlement and Dismissal With Prejudice ("Stipulation"), and agree to settle and compromise the above-captioned matter under the following terms and conditions:

1.    Defendant shall pay $6,500.00 (six thousand five hundred dollars and no cents) to Plaintiffs in full and complete satisfaction of Plaintiffs' claim for attorneys' fees under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, in this case. Plaintiffs and Plaintiffs' counsel agree to cooperate with Defendant's counsel in promptly providing the information needed for

requesting payment and transmission of funds. This payment shall constitute full and final satisfaction of all of Plaintiffs' claims for attorneys' fees and litigation expenses in this case, and is inclusive of any interest. Payment of this money will be made by electronic funds transfer after entry of this Stipulation on the Court's docket and receipt of necessary information from Plaintiffs in order to effectuate the payment.

2.  Upon the execution of this Stipulation, Plaintiffs, having received the records it requested, hereby releases and forever discharges Defendant, its successors, the United States of America, and any department, agency, or establishment of the United States, and any officers, employees, agents, successors, or assigns of such department, agency, or establishment, from any and all claims and causes of action that Plaintiffs asserts or could have asserted in this case, or which hereafter could be asserted by reason of, or with respect to, or in connection with, or which arise out of, the FOIA request on which this action is based or any other matter alleged in the Complaint, including but not limited to all past, present, or future claims for attorneys' fees, costs, or litigation expenses in connection with the above-captioned matter.

3.  Execution of this Stipulation by counsel for Plaintiffs and counsel for Defendant shall constitute dismissal of this case with prejudice pursuant to Federal Rule of Civil Procedure 41(a).

4.  The parties acknowledge that this Stipulation is entered into solely for the purpose of settling and compromising any remaining claims in this action without further litigation, and it shall not be construed as evidence or as an admission on the part of Defendant, the United States of America, its agents, servants, or employees regarding any issue of law or fact, or regarding the truth or validity of any allegation or claim raised in this action, or as evidence or as an admission by the Defendant regarding Plaintiffs' entitlement to attorneys' fees or other litigation expenses under FOIA. This Stipulation shall not be used in any manner to establish liability for fees in any other case or proceeding involving Defendant.

5.  This Stipulation is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.

1       6.    If any provision of this Stipulation shall be held invalid, illegal, or unenforceable, the

2   validity, legality, and enforceability of the remaining provisions shall not in any way be affected or

3   impaired thereby.

4       7.    This Stipulation shall constitute the entire agreement between the parties, and it is

5   expressly understood and agreed that this Stipulation has been freely and voluntarily entered into by the

6   parties hereto.  The parties further acknowledge that no warranties or representations have been made on

7   any subject other than as set forth in this Stipulation.

8       8.    The persons signing this Stipulation warrant and represent that they possess full authority

9   to bind the persons on whose behalf they are signing to the terms of the Stipulation.

10      9.    This Stipulation may not be altered, modified or otherwise changed in any respect except

11  in writing, duly executed by all of the parties or their authorized representatives.

12      10.    This Stipulation may be executed in counterparts and is effective on the date of signature

13  of the last signatory to the Stipulation.  Facsimiles of signatures shall constitute acceptable, binding

14  signatures for purposes of this Stipulation.

15  SO STIPULATED AND AGREED.

16                              ALEX G. TSE

17                              United States Attorney

18  Dated:  December 19, 2018        By:   /s/  Douglas K. Chang

19                              DOUGLAS K. CHANG

20                              Assistant United Stated Attorney

                                Attorneys for Defendant

21

22

23                              THE CENTER FOR INVESTIGATIVE

                            REPORTING

24

25  Dated:  December 19, 2018        By:   /s/  D. Victoria Baranetsky*

26                              D. VICTORIA BARANETSKY, Esq.

                            Attorney for Plaintiffs

27

28

Stipulation of Settlement and Dismissal with Prejudice
Case No. 3:18-cv-2008 JCS

1  * I hereby attest that I have obtained the concurrence in the filing of this document from D. Victoria
2  Baranetsky.

3   /s/ Douglas K. Chang
   Douglas K. Chang

# EXHIBIT C

**U.S. Department of Labor**

Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



MAR 1 3 2018

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 848514

Dear Mr. Evans:

This letter is a first response to your Freedom of Information Act (FOIA) request submitted to the Office of Federal Contract Compliance Programs (OFCCP) on January 9, 2018. Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

Under FOIA, you requested copies of 2016 EEO-1 Consolidated Report (Type 2) for fifty-five companies. We are including the interim results in Attachment A.

We consider you to be a "news media" type of requestor. As a "news media" requestor, we charge you for photocopying after the first 100 pages in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(4). We believe we are being responsive to your FOIA request. Should you have questions regarding your request, please contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request please do not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427. Alternatively, you may contact the Office of Government Information Services within the National Archives and Records Administration (OGIS) to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial

request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

Attachment

Attachment A

| Companies not identified as federal contractors (19) | Companies to be discussed in a later response (36) |
|---|---|
| Align Technology | Advanced Micro Devices |
| Arista Networks | Agilent Technologies |
| Cloudflare | Applied Materials |
| Dropbox | Bloom Energy |
| Eventbrite | Box Inc. |
| Github | Cadence Design Systems |
| Lam Research Corporation | Docusign |
| Linear Technology | Equinix |
| Netflix | Fair Isaac |
| RingCentral | Fitbit |
| ShoreTel | Gilead Sciences |
| Stripe Inc. | Intuitive Surgical |
| SurveyMonkey | Juniper Networks |
| Symantec | KLA-Tencor |
| Tesla | Maxim Integrated Products |
| TiVo | Oracle Corporation |
| Twilio | Palantir Technologies Inc. |
| Workday | Palo Alto Networks |
| Yelp | Pandora Media |
| | PayPal, Inc. |
| | Penumbra |
| | ServiceNow |
| | Slack Technologies |
| | SolarCity |
| | Splunk Inc. |
| | Sunpower |
| | Synnex |
| | Synopsys |
| | Trimble Navigation |
| | Varian Medical Systems |
| | Verifone |
| | VMware |
| | WageWorks |
| | Xilinx |
| | Yahoo Inc. |
| | Zendesk |

**U.S. Department of Labor**     Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



APR 18 2018

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 848514

Dear Mr. Evans:

This letter is a second response to your Freedom of Information Act (FOIA) request submitted to the Office of Federal Contract Compliance Programs (OFCCP) on January 9, 2018. Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

Under FOIA, you requested copies of 2016 EEO-1 Consolidated Report (Type 2) for 55 companies. The results so far are found in Attachment A.

We consider you to be a "news media" type of requestor. As a "news media" requestor, we charge you for photocopying after the first 100 pages in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(4).

We believe we are being responsive to your FOIA request. Should you have questions regarding your request, please contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request please do not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427. Alternatively, you may contact the Office of Government Information Services within the National Archives and Records Administration (OGIS) to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

Attachment

Attachment A

| Companies not identified as federal contractors (19) | Companies that objected to the release of their data on the grounds of FOIA Exemption 4 (14) | Companies to be discussed in a later response (22) |
|---|---|---|
| -------------------------- | -------------------------- | -------------------------- |
| Align Technology | Agilent Technologies | Advanced Micro Devices |
| Arista Networks | Applied Materials | Bloom Energy |
| Cloudflare | Docusign | Box Inc. |
| Dropbox | Fitbit | Cadence Design Systems |
| Eventbrite | Juniper Networks | Equinix |
| Github | Maxim Integrated Products | Fair Isaac |
| Lam Research Corporation | Oracle Corporation | Gilead Sciences |
| Linear Technology | Palantir Technologies Inc. | Intuitive Surgical |
| Netflix | Pandora Media | KLA-Tencor |
| RingCentral | Splunk Inc. | Palo Alto Networks |
| ShoreTel | Synopsys | PayPal, Inc. |
| Stripe Inc. | Verifone | Penumbra |
| SurveyMonkey | Xilinx | ServiceNow |
| Symantec | Zendesk | Slack Technologies |
| Tesla | | SolarCity |
| TiVo | | Sunpower |
| Twilio | | Synnex |
| Workday | | Trimble Navigation |
| Yelp | | Varian Medical Systems |
| | | VMware |
| | | WageWorks |
| | | Yahoo Inc. |

**U.S. Department of Labor**

Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



AUG 1 4 2018

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request – Tracking No. 848514

Dear Mr. Evans:

This letter is a third response to your Freedom of Information Act (FOIA) request submitted to the Office of Federal Contract Compliance Programs (OFCCP) on January 9, 2018. Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

Under FOIA, you requested copies of 2016 EEO-1 Consolidated Report (Type 2) for 55 companies. Attachment A reflects our results so far. We will email all files released under this FOIA.

We believe we have been responsive to your FOIA request. Should you have questions regarding your request, please contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov.

If you need any further assistance or would like to discuss any aspect of your request please do not hesitate to contact this office or the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427. Alternatively, you may contact the Office of Government Information Services within the National Archives and Records Administration (OGIS) to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked

"Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

Attachments

Attachment A

| Companies not identified as federal contractors (19) | Companies that did not object to the release of their data (15) | Companies to be discussed in a later response (20) |
| --- | --- | --- |
| Align Technology | Advanced Micro Devices | Agilent Technologies |
| Arista Networks | Bloom Energy | Applied Materials |
| Cloudflare | Cadence Design Systems | Box Inc. |
| Dropbox | Fair Isaac | Docusign |
| Eventbrite | Palo Alto Networks | Equinix |
| Github | PayPal, Inc.[1] | Gilead Sciences |
| Lam Research Corporation | Penumbra | Fitbit |
| Linear Technology | ServiceNow | Intuitive Surgical |
| Netflix | Slack Technologies | Juniper Networks |
| RingCentral | SolarCity | KLA-Tencor |
| ShoreTel | Synnex | Maxim Integrated Products |
| Stripe Inc. | Varian Medical Systems | Oracle Corporation |
| SurveyMonkey | VMware | Palantir Technologies Inc. |
| Symantec | WageWorks | Pandora Media |
| Tesla | Yahoo Inc. | Splunk Inc. |
| TiVo | | Sunpower |
| Twilio | | Synopsys |
| Workday | | Verifone |
| Yelp | | Xilinx |
| | | Zendesk |

| Companies removed from request (1) |
| --- |
| Trimble Navigation |

---
[1] PayPal has released this information publicly on their website.

# EXHIBIT D

1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2   SARA WINSLOW (DCBN 457643)
    Chief, Civil Division
3   ELLEN LONDON (CABN 325580)
    Assistant United States Attorney
4       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102
5       Telephone: (415) 436-7288
        Facsimile: (415) 436-6748
6       E-mail: ellen.london@usdoj.gov
7
    Attorneys for Defendant
8
9                   UNITED STATES DISTRICT COURT
10                 NORTHERN DISTRICT OF CALIFORNIA
11                         OAKLAND DIVISION
12
13  THE CENTER FOR INVESTIGATIVE            ) NO. 19 CIV. 01843 (KAW)
    REPORTING and WILL EVANS,              )
14                                          )
15          Plaintiffs,                     ) **MOTION FOR SUMMARY JUDGMENT;**
                                            ) **MEMORANDUM OF POINTS AND**
16      v.                                  ) **AUTHORITIES IN SUPPORT OF MOTION**
                                            )
17  UNITED STATES DEPARTMENT OF             )
    LABOR,                                  ) Date: November 7, 2019
18                                          ) Time: 1:30 p.m.
            Defendant.                       ) Location: To Be Determined
19                                          )
    _____)
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………...…………………………ii

NOTICE OF MOTION AND MOTION ....................................................................................1

RELIEF SOUGHT ....................................................................................................................1

ISSUE TO BE DECIDED .........................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................1

I.      INTRODUCTION ......................................................................................................1

II.     FACTS .......................................................................................................................3

        A.      The EEO-1 Reports ........................................................................................3

        B.      FOIA Requests and DOL Response ................................................................4

III.    ARGUMENT ..............................................................................................................6

        A.      Applicable Law ..............................................................................................6

                1.      Standard of Review.............................................................................6

                2.      Exemption 4 Standard ........................................................................7

        B.      The Information Is Exempt Under Exemption 4 ...........................................10

                1.      The Information is Commercial or Financial......................................10

                2.      The Information Is Customarily and Actually Treated as Private .......11

                3.      The Information Was "Provided to the Government Under An
                        Assurance of Privacy".......................................................................13

IV.     CONCLUSION.........................................................................................................16

# TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Department of Justice v. Landano*,
   508 U.S. 165 (1993)....................................................................................................... 9

*Food Marketing Institute v. Argus Leader Media*,
   139 S. Ct. (2019) ................................................................................................... passim

*GSA v. Benson*,
   415 F.2d 878 (9th Cir. 1969) ....................................................................................... 8

*Hamdan v. U.S. Dep't of Justice*,
   797 F.3d 759 (9th Cir. 2015) ....................................................................................... 6

*Hunt v. Central Intelligence Agency*,
   981 F.2d 1116 (9th Cir. 1992) ..................................................................................... 6

*Lahr v. NTSB*,
   569 F.3d 964 (9th Cir. 2009) ....................................................................................... 6

*Lane v. Dep't of the Interior*,
   523 F.3d 1128 (9th Cir. 2008) ..................................................................................... 6

*Lewis v. Internal Revenue Serv.*,
   823 F.2d 375 (9th Cir. 1987) ....................................................................................... 6

*Nat'l Archives & Records Admin. v. Favish*,
   541 U.S. 157 (2004)..................................................................................................... 6

*Nat'l Parks & Conservation Ass'n v. Morton*,
   498 F.2d 765 (D.C. Cir. 1974)................................................................................. 7, 8

*Pub. Citizen Health Research Group v. FDA*,
   704 F.2d 1280 (D.C. Cir. 1983)................................................................................. 10

*U.S. Dep't of State v. Ray*,
   502 U.S. 164 (1991)..................................................................................................... 6

Statutes

5 U.S.C. § 522 ..................................................................................................................... 5

5 U.S.C. § 551 ................................................................................................................... 10

5 U.S.C. § 552 ................................................................................................................. 1, 7

42 U.S.C. § 2000e-8(c) ....................................................................................................... 3

42 U.S.C. § 2000e-14........................................................................................................... 3

Rules

Federal Rule of Civil Procedure 56 ................................................................................. 1

Regulations

29 C.F.R. § 70 ................................................................................................................. 6

29 C.F.R. § 1602.7 .......................................................................................................... 3

29 CFR § 70.26 ................................................................................................... 4, 13, 14

41 C.F.R. § 60-1.7 ...................................................................................................... 3, 5

41 C.F.R. § 60-1.20 ....................................................................................................... 14

Other Authorities

81 Fed. Reg. 5113 ........................................................................................................... 3

*Fact Sheet for EEO-1 Survey Filers*, https://www.eeoc.gov/employers/eeo1survey/fact_sheet_filers.cfm. .......................................................................................................................... 3

Memorandum from EEO-1 Joint Reporting Committee, on *Computer Printed EEO-1 Reports- Required Format (Rev 3/2007)* to Multi-establishment Private Employers (July 2007) https://www.eeoc.gov/employers/eeo1survey/upload/compfiling-multi.pdf. ...................................... 3

*EEOC, Revision of the Employer Information Report (EEO-1) and Comment Request,* 81 Fed. Reg. 5113, 5114 (Feb. 1, 2016) ...................................................................................................... 3

*EEO-1 Instruction Booklet 7; EEOC, Key Terminology and Definitions, "Joint Reporting Committee," https://www.eeoc.gov/employers/eeo1survey/terminology.cfm.* ............................................. 3

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on November 7, 2019, at 1:30 p.m., or as soon thereafter as the matter may be heard at the United States District Courthouse, 1301 Clay Street, Oakland, CA 94612, before the Honorable Kandis A. Westmore, defendant UNITED STATES DEPARTMENT OF LABOR ("DOL"), pursuant to Federal Rule of Civil Procedure 56, will move the Court for an order granting summary judgment in favor of DOL and against plaintiffs The Center For Investigative Reporting and Will Evans (together "Plaintiffs," or "CIR").

This motion is brought on the ground that no material facts are in dispute and the Government is entitled to judgment as a matter of law. The motion is based on this notice, the ensuing points and authorities, the declarations of Tania Barros, Julie Crane, Kelly Kayser, Mirelle King, Sarah Lee, Nancy Lewis-Treolo, Dave Nickerson, Natalie Speno, Victoria Thrasher, Mollie Wong, and D. Lissette Geán filed herewith, the pleadings on file with the Court, any additional evidence the Court may allow, and any argument permitted at the hearing.

**RELIEF SOUGHT**

The Government asks that the Court grant summary judgment in its favor and against Plaintiffs.

**ISSUE TO BE DECIDED**

1. Did DOL properly withhold the documents at issue under FOIA Exemption 4?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

This case involves a request by CIR under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and DOL's withholding of commercial or financial information obtained from a person that is confidential. CIR requested the 2016 EEO-1 Consolidated Report (Type 2) for 55 named companies. DOL has produced only those EEO-1 Type 2 reports of the companies that did not object to the release of their reports.

DOL has properly withheld EEO-1 Consolidated Reports (Type 2) for the remaining companies under FOIA's Exemption 4. CIR challenges the agency's withholding of the reports, which contain the total number of each company's employees categorized by race/ethnicity, gender, and job category. DOL asserts that the exempt reports contain confidential commercial information. On June 24, 2019,

the Supreme Court decided *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2365 (2019) ("*Argus Leader*"), in which the Court re-assessed the legal standard for Exemption 4. In so doing, the Court noted that "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." 139 S. Ct. at 2366. The Court rejected the prior standard for Exemption 4, which required a showing of competitive harm or harm to the Government if the information were to be released, and held that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366.

DOL has submitted evidence that meets the standard set out in *Argus Leader*. First, the evidence establishes that each company customarily and actually treated as private the information at issue. The companies have submitted testimony describing the efforts taken to keep the information confidential; these efforts include limiting access to the relevant information even within the companies on a "need to know" basis. These efforts appear to have been successful, because there is no evidence that any of the documents at issue are publicly available. Further, to the extent that the Court requires a showing that the companies submitted this information to the Government under an assurance of privacy, DOL satisfies that as well. For example, the EEO-1 web portal expressly notifies submitters that the agencies receiving the information will keep the companies' EEO-1 data confidential to the extent permitted by law. Moreover, DOL has assured the companies that it will notify them of any FOIA requests for that information. Similarly, OFCCP regulations provide that, as a general practice, OFCCP does not release any data of a contractor when that contractor indicates that the data is confidential and sensitive and that the release of data would subject the contractor to commercial harm. The companies have relied on these various forms of assurance that the information will be kept private, in addition to the agency's actions over the years. For all of these reasons, DOL has appropriately withheld the information under Exemption 4, and respectfully requests that the Court grant summary judgment in its favor.

//

//

//

## II. FACTS

### A. The EEO-1 Reports

Companies with 50 or more employees that contract with the federal government must submit annual reports using Standard Form 100, commonly known as "EEO-1 report," to the Joint Reporting Committee, defined below. 41 C.F.R. § 60-1.7(a). Companies that do business at two or more physical addresses (i.e. establishments) must file an EEO-1 Consolidated Report (Type 2) to that web portal. *Fact Sheet for EEO-1 Survey Filers*, https://www.eeoc.gov/employers/eeo1survey/fact_sheet_filers.cfm. EEO-1 Type 2 reports require companies to report the total number of employees across all their establishments by race/ethnicity, gender, and job category. Memorandum from EEO-1 Joint Reporting Committee, on *Computer Printed EEO-1 Reports- Required Format (Rev 3/2007)* to Multi-establishment Private Employers (July 2007) https://www.eeoc.gov/employers/eeo1survey/upload/compfiling-multi.pdf. These reports help OFCCP monitor the contracting companies' compliance with Executive Order No. 11,246 which prohibits employment discrimination by government contractors. Declaration of D. Lissette Geán ("Geán Decl.") at 5.

The Equal Employment Opportunity Commission ("EEOC") collects similar data, through the Joint Reporting Committee ("JRC").[1] 42 U.S.C. § 2000e-8(c) and 29 C.F.R. § 1602.7. To avoid duplication of efforts and reduce the administrative burden on companies, the EEOC and the Office of Federal Contract Compliance Program ("OFCCP") jointly promulgated the EEO-1 Report. *See* 41 C.F.R. § 60-1.7(a)(1) and 42 U.S.C. § 2000e-14. The agencies formed the JRC to administer the EEO-1 reporting system in a manner that establishes a single data collection to meet the statistical needs of both agencies. *See EEOC, Revision of the Employer Information Report (EEO-1) and Comment Request,* 81 Fed. Reg. 5113, 5114 (Feb. 1, 2016) and *EEO-1 Instruction Booklet 7; EEOC, Key Terminology and Definitions, "Joint Reporting Committee,"* https://www.eeoc.gov/employers/eeo1survey/terminology.cfm. While conceptually the EEO-1 data is jointly collected, as a practical manner the JRC web portal is managed by the EEOC. *EEOC, Revision*

---

[1] The EEOC's regulations require employers with 100 or more employees to file the EEO-1 Report with the EEOC. 29 C.F.R. § 1602.7.

*of the Employer Information Report (EEO-1) and Comment Request,* 81 Fed. Reg. at 5118.  Thus, in practice, the EEOC collects the data and then refers to OFCCP federal contractor reports subject to OFCCP's jurisdiction.  *Id.*

**B.     FOIA Requests and DOL Response**

On January 4, 2018, plaintiffs submitted, via electronic mail, a FOIA request to DOL seeking: "The EEO-1 Consolidated Report (Type 2), for 2016" for a list of 55 companies. Geán Decl. ¶ 13.

Previously, in April 2017, Plaintiffs submitted several FOIA requests seeking 2015 EEO-1 Type 2 reports for several companies including some of those objecting in this case. Geán Decl. ¶ 10.  DOL also initially withheld the information under Exemption 4.  Plaintiff sued DOL at that time, and the parties settled the matter.  Geán Decl. ¶ 11.  As part of that settlement, DOL agreed to release the 2015 EEO-1 Type 2 reports for six companies, despite the companies' objections, relying on the legal standard at that time.  Geán Decl. ¶ 12.  *See The Center for Investigative Reporting and Will Evans v. United States Department of Labor*, 3:18-cv-2008-JCS.

On January 17, 2018, D. Lissette Geán, on behalf of DOL, sent plaintiffs a letter acknowledging the request at issue in this case and assigning tracking number 848514.  Geán Decl. ¶ 17.  In that letter, DOL also notified plaintiffs that when requests for EEO-1 data is made:

> [i]n accordance with 29 CFR § 70.26, OFCCP is required to notify submitters that their business information has been requested under the FOIA in order to give them an opportunity to object in writing to disclosure of any specified portion of the requested info1mation. We will send a final response to your request for EEO-1 data after the deadline expires for the submitters to object. Any objections to the release of the requested EEO-1 data will be evaluated by OFCCP on a case-by-case basis.

Geán Decl. ¶ 14.

On March 13, 2018, Ms. Geán informed plaintiffs that OFCCP identified only 36 of the named 55 companies as federal contractors subject to OFCCP's jurisdiction.  Geán Decl. ¶ 15.  On March 14, 2018, Ms. Geán, notified those 36 federal contractors of the plaintiffs' FOIA request for their EEO-1, Type 2 information.  Geán Decl. at ¶ 16.  The notice was sent out pursuant to the notice requirement for confidential commercial information as described in DOL's duly promulgated regulation.  29 C.F.R. §

70.26. Geán Decl. at ¶ 16.  The letters informed the submitters that they had 30 days from receipt of the letter to object and provided, in relevant part, that:

> EEO-1 Reports are filed with the EEO-1 Joint Reporting Committee, which provides EEO-1 data to OFCCP. We believe the requested EEO-1 data may be released; however in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.26, OFCCP is required to notify submitters of its intent to release business information. We are therefore giving you the opportunity to present objections to the disclosure of the requested EEO-1 data on grounds that specific information contained therein is exempt from mandatory disclosure such as Exemption 4 of the FOIA. Exemption 4 of the FOIA at 5 U.S.C. § 522 (b)(4) protects "...trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."

Geán Decl. ¶ 17.

The letters further provided that the written objection must include answers to questions posed in the letter.  Geán Decl. at ¶ 18.  As the letters pre-date the Supreme Court's decision in *Argus Leader*, the statements and the questions in the letter related to the FOIA Exemption 4 standard before the decision. Geán Decl. at ¶ 18.  The March 14, 2018 letter also informed submitters that if they fail to provide a written objection within the 30- day period, DOL will release their EEO-1, Type 2 data to the plaintiff-FOIA requesters.  Geán Decl. at ¶ 19.

In response to the March 14, 2018 letter, 14 of the 36 companies submitted written objections to OFCCP.  Geán Decl. at ¶ 22.  Thereafter, on April 18, 2018, Ms. Geán sent a second notice to submitters who had not objected by then.  Geán Decl. at ¶ 20. The April 18, 2018 letters referenced the March 14, 2018, letters and informed those submitters that if they failed to object by close of business on May 31, 2018, their EEO-1 Type 2 data will be released to the plaintiff-requesters.  Geán Decl. at ¶ 21.  Also on April 18, 2018, Ms. Geán separately informed Plaintiffs that as of the date of that letter 14 companies objected to the release of their data on the grounds of FOIA Exemption 4.  Geán Decl. at ¶ 22.

By May 31, 2018, a total of 20 of the 36 companies submitted written objections to DOL.  Geán Decl. at ¶ 23.  Subsequently, on April 18, 2018, and on July 15, 2018, DOL sent each of the 20 objecting submitters a letter informing them that DOL "concurred with their assertions that their EEO-1 reports were exempt from mandatory disclosure pursuant to Exemption 4 of FOIA." Geán Decl. at ¶ 24.  As such, DOL informed these objectors that it would not release their EEO-1 Type 2 data to CIR.  Geán Decl. at ¶ 24.

On August 14, 2018, Ms. Geán, sent a letter to the Plaintiffs confirming that one of companies in the original FOIA request, Trimble Navigation, had been removed from the request. Geán Decl. ¶ 25. In addition, by the date of the letter, Ms. Geán informed Plaintiffs that 15 submitters had not objected to the release of their EEO-1 Type 2 data. Geán Decl. ¶ 26. Subsequently, on August 16, 2018, via e-mail, OFCCP released the EEO-1 Type 2 data for those 15 submitters who failed to timely object to the release of their EEO-1 data by May 31, 2018. Geán Decl. ¶ 27.

On February 22, 2019, OFCCP informed plaintiffs that they would delay issuing a final response to this FOIA pending the outcome of the Supreme Court decision in *Argus Leader*. Geán Decl. ¶ 28.

On March 1, 2019, Plaintiffs submitted an administrative appeal pursuant to 29 C.F.R. § 70. Geán Decl. ¶ 29. On March 21, 2019, DOL acknowledged receipt of their appeal. Geán Decl. ¶ 30. On April 9, 2019, plaintiffs filed this action. Geán Decl. ¶ 31. Subsequent to that filing, additional companies decided to release the information. Geán Decl. ¶ 32. This motion is submitted in support of DOL's decision to withhold the EEO-1 Type 2 data for the following companies: Xilinx, Applied Materials, Inc. ("Applied Materials"), Equinix, Gilead Sciences, Inc. ("Gilead"), Synopsys, Inc. ("Synopsys"), Docusign, Inc. ("DocuSign"), Agilent Technologies ("Agilent"), Box, and Oracle America, Inc ("Oracle"), and Fitbit, Inc. ("Fitbit").

## III.   ARGUMENT

### A.   Applicable Law

#### 1.   Standard of Review

In a FOIA case, while the agency invoking an exemption in order to withhold requested records "bears the burden of demonstrating that the exemption properly applies to the documents," *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009), the agency meets its burden when it submits declarations that "contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption." *Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quoting *Lewis v. Internal Revenue Serv.*, 823 F.2d 375, 378 (9th Cir. 1987). Declarations submitted by an agency to demonstrate the adequacy of its FOIA response are entitled to a presumption of good faith. *See, e.g.*, *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015) ("Affidavits submitted by an agency to demonstrate the adequacy of its FOIA response are presumed to be in good faith.") (citation omitted);

*see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("there is a presumption of legitimacy accorded to the Government's official conduct") (citing *U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991)).  Thus, where declarations give reasonably detailed justifications for withholding and appear to be in good faith, "the inquiry ends and the nondisclosure is upheld."  *Hamdan*, 797 F.3d at 773 (citing *Hunt v. Central Intelligence Agency*, 981 F.2d 1116, 1119 (9th Cir. 1992)).

### 2.	Exemption 4 Standard

"FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement."  *Argus Leader*, 139 S. Ct. 2356, 2366 (2019) (internal citations, quotation marks and brackets omitted).  One of those exemptions is set forth in 5 U.S.C. § 552(b)(4) (Exemption 4).

"Exemption 4 shields from mandatory disclosure 'commercial or financial information obtained from a person and privileged or confidential.'"  *Id.* at 2362 (quoting 5 U.S.C. § 552(b)(4)).  When Congress enacted FOIA in 1966, "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'"  *Id.* at 2363 (quoting Webster's Seventh New Collegiate Dictionary 174 (1963)).  In *Argus Leader*, the Supreme Court explained that the term "confidential" has two meanings.  "In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it."  *Id.* (citations omitted).  "In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret.  *Id.* (quoting 1 Oxford Universal Dictionary Illustrated 367 (3d ed. 1961) ("spoken or written in confidence"); Webster's New World Dictionary 158 (1960) ("told in confidence")).

The central issue in *Argus Leader* was whether the "so-called 'competitive harm' test"—which the Eighth Circuit and "several other courts of appeals . . . [have] engrafted onto Exemption 4"—was appropriate.  *Id.* at 2360.  The Court held it was not, finding it "inconsistent with the terms of the [FOIA]," *id*, and the result of a "casual disregard of the rules of statutory interpretation" and "selective tour through the legislative history" by the D.C. Circuit in *National Parks*, which a number of courts of appeals eventually adopted "[w]ithout much independent analysis."  *Id.* at 2364 (citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767 (D.C. Cir. 1974).  The Court found that the "*National Parks*' . . . approach is a relic from a bygone era of statutory construction"; that "[u]nsurprisingly,

*National Parks* has drawn considerable criticism over the years"; and that "[e]ven the D.C. Circuit has distanced itself from the decision." *Id.* (internal quotation marks and citations omitted). The Supreme Court concluded that the dissent's argument that "it would be a good idea to require a showing of *some* harm" finds no support in the statutory text, and instead "boils down to a policy argument about the benefits of broad disclosure." *Id.* at 2366 (emphasis in original). Because Congress already made this policy determination when it enacted FOIA and sought a "workable balance" between disclosure and privacy, *id.*, it was not for the courts to reconsider. The Court emphasized that exemptions that seek to ensure this privacy, including Exemption 4, "are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Id.*

Rejecting the competitive harm test, the Court instead held that Exemption 4 requires that the information in question have been kept confidential by the entity submitting it. The Court noted that "there's no need to resolve" whether Exemption 4 also requires the government to have given an assurance that the information would be maintained in confidence—*i.e.*, whether "privately held information *lose[s]* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private"—because the assurance was not in dispute. *Id.* (emphasis in original). Accordingly, the Court held that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366.

The Supreme Court in *Argus Leader* expressly did not decide whether Exemption 4 requires the government to give an assurance that it will maintain the information in confidence. Even assuming that Exemption 4 requires such an assurance, however, neither *Argus Leader* nor the authority it cites requires an express (as opposed to implied) promise of confidentiality by the government. To the extent the Supreme Court in *Argus Leader* discussed the "assurance" question, it quoted approvingly the Ninth Circuit's "conclu[sion] that Exemption 4 would 'protect information that a private individual wishes to keep confidential for his own purposes, but reveals to the government under the express *or implied* promise' of confidentiality." *Argus Leader*, 139 S. Ct. at 2363 (citing *GSA v. Benson*, 415 F.2d 878, 881 (9th Cir. 1969)) (emphasis added).

Although the Court's opinion in *Argus Leader* did not elaborate on what circumstances would indicate an "'implied promise' of confidentiality" when applying Exemption 4, *see* 139 S. Ct. at 2363, the Court's jurisprudence in the Exemption 7(D) context provides a useful analytical framework.  In *Department of Justice v. Landano*, the Court provided for an objective test to assess whether "an implied assurance of confidentiality fairly can be inferred," based on "generic circumstances" surrounding the communication between the informant and the government that would "characteristically support an inference of confidentiality."  508 U.S. 165, 177, 179 (1993).

When analyzing Exemption 4's protections, looking to objective factors reflecting how the information is customarily treated outside of the government should guide the analysis of the company's expectations of continued confidentiality once that information is shared with the government (assuming such separate analysis is necessary).  Just as "the nature of the crime and the source's relationship to it" provides an objective indication of whether an informant would assume confidentiality when relaying information touching on those subjects to the government, *see Landano*, 508 U.S. at 179, the question of whether a company typically holds information in confidence or secret is likewise an objective factor in determining whether the company would assume confidentiality when sharing that information with the government.

The submission of such confidential information to the government does not automatically strip it of its confidential status because, "[i]n common usage, confidentiality is not limited to complete anonymity or secrecy."  *Landano*, 508 U.S. at 173.  So long as the context in which the information is provided does not indicate that the government would act any differently than the party from whom it obtained the information by publicly disseminating it, the information remains confidential under Exemption 4.  That ordinary understanding of the term is reflected in the committee reports on FOIA as enacted in 1966.  These reports emphasize that Exemption 4 protects "the confidentiality of information obtained by the Government" when it "would not customarily be made public by the person from whom it was obtained."  H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966) ("House Report"); *accord* S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).

If a person provides information to the government in the context of government statements or actions that are reasonably understood to show that the government will not publicly disclose it, such

information is "communicated in confidence" and thus "confidential."  Exemption 4's protective scope

therefore "include[s] information which is *given to an agency in confidence*," and embodies the fairness-

based principle that "where the Government has obligated itself in good faith not to disclose documents

or information which it receives, it should be able to honor such obligations."  House Report at 10

(emphasis added).

As discussed below, assuming Exemption 4 requires the government to show that the withheld

information was both confidential and submitted with an assurance it would be kept confidential, the

information withheld in this case—as in *Argus Leader*—satisfies both conditions.

**B.      The Information Is Exempt Under Exemption 4**

For information to be covered by Exemption 4, it must be "(1) commercial or financial, (2)

obtained from a person, and (3) privileged or confidential."  *See Pub. Citizen Health Research Group v.*

*FDA*, 704 F.2d 1280, 1291 (D.C. Cir. 1983).  FOIA defines a person to include an "individual,

partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C.

§ 551(2).  This second requirement is not likely to be disputed, and the first and third requirements are

satisfied in this case.

**1.      The Information is Commercial or Financial**

Courts define "commercial" broadly and consider information to be commercial if it relates to

business or trade and the submitter has a commercial interest in the data.  *See Pub. Citizen Health*

*Research Group*, 704 F.2d at 1290.  The declarations for each of the companies show that the EEO-1

reports relate to the business of the companies and are treated as commercial information that if

released, could cause financial harm to the companies.  For example, Julie Crane from Applied

Materials explains that the "information contains valuable and confidential business information

concerning its labor strategy, demographics, recruiting, and allocation of resources across its segments."

Declaration of Julie Crane ("Crane Decl.") ¶ 6.  For this reason, Ms. Crane explains, "Applied Materials

considers this information confidential commercial information, and has not customarily disclosed that

data to the public in any way."  *Id.* ¶ 6.  Kelly Kayser from Equinix elaborates that disclosure of the

information would "provide [the company's] competitors insights into its strategy, operations,

recruiting, and labor costs"; these insights would be increasingly problematic "if EEO-1 information

1  were regularly released, as it would allow competitors to discern shifts and strategies for the business

2  going forward, in a highly competitive field."  Declaration of Kelly Kayser ("Kayser Decl.") ¶ 6.  The

3  declarants from the other companies make similar statements.  *See* Declaration of Tania Barros ("Barros

4  Decl.") ¶ 4; Declaration of Mirelle King ("King Decl.") ¶ 4 (the information "ties directly into Gilead's

5  business strategy"); Declaration of Nancy Lewis-Treolo ("Lewis-Treolo Decl.") ¶ 6 ("The report also

6  includes crucial information about the diversity of DocuSign's workforce, which competitors could use

7  to target the Company's talent."); Declaration of Dave Nickerson ("Nickerson Decl.") ¶ 6; Declaration

8  of Natalie Speno ("Speno Decl.") ¶ 6; Declaration of Victoria Thrasher ("Thrasher Decl.") ¶ 5 (the

9  reports "communicate Oracle's experience and expertise in the field of how to structure the workforce to

10  have a well-run, profitable, and efficient company"); Declaration of Mollie Wong ("Wong Decl") ¶ 7

11  ("Fitbit considers its EEO-1 reports to be commercial information because they contain information

12  regarding its workforce patterns and workforce profiles . . .").  The information may also be used for

13  diversity initiatives, further demonstrating the business purpose of the data.  *See* Declaration of Sarah

14  Lee ("Lee Decl.") ¶ 9 (explaining that the data is "made available internally within the company on a

15  limited basis to Human Resources employees, designated Legal Department employees, senior level

16  management and employees who work on our diversity initiatives").

17        It would not make sense for the companies to undertake the extensive efforts described below to

18  maintain the confidentiality of the reports if these companies did not believe that the data was directly

19  related to various aspects of their business.  The testimony described above and in the declarations

20  satisfies the broad definition of "commercial information."

21                 **2.**　　**The Information Is Customarily and Actually Treated as Private**

22       *Argus Leader* holds that information is exempt from disclosure under Exemption 4 if it was

23  "customarily and actually treated as private by its owner."  *Argus Leader*, 139 S. Ct. at 2366.  In *Argus*

24  *Leader*, this standard was met because the owners of the information "customarily do not disclose" the

25  information "or make it publicly available 'in any way,'" and "[e]ven within a company, . . . only small

26  groups of employees usually have access to it."  *Id.* at 2363.  The evidence shows that same treatment of

27  the EEO-1 reports in this case.

28

The declarants, who are human resources professionals, have testified in detail as to the fact that the information at issue is not only kept confidential, but that the companies take significant steps to ensure that it remains so.  For example:

> Oracle maintains its employees' confidential information in a secure database.  Oracle has detailed policies regarding access to confidential information.  Access to the database is granted on a strict need-to-know basis.  In addition, Oracle regularly reviews who has been granted access to the database to ensure those individuals have a continuing need for such access.  If the individual no longer requires access to the database, Oracle will remove that access.  Oracle does this to limit access to this information due to confidentiality concerns and to ensure that other Oracle employees and managers do have access to the EEO survey data.

Thrasher Decl. ¶ 9.  Most of the companies limit the number of people even within their own business who can access this information.  For example, at DocuSign, only 17 of 3,500 employees have access to the data, and 13 of the 17 "received additional training on the need to control access and maintain confidentiality over this sensitive data."  Lewis-Treolo Decl. ¶ 8; *see also* Crane Decl. ¶ 5 ("The vast majority of Applied Materials employees do not have access to this information."); King Decl. ¶ 5; Kayser Decl. ¶ 5; Lee Decl. ¶ 9; Nickerson Decl. ¶ 6 11; Speno Decl. ¶ 5; Wong Decl. ¶ 5.  One company notes that it "requires employees to sign confidentiality and non-disclosure agreements, which precludes public disclosure of personnel information contained within EEO-1 reports."  Barros Decl. ¶ 5.  And one company noted that it has denied requests from the company's shareholders for the information.  King Decl. ¶ 5.

Part of why the confidentiality of the reports is taken so seriously is because when the companies collect the demographic information from potential employees in order to obtain the relevant data for the reports, they provide assurances to these individuals that the information will be held in confidence; the companies do not want to breach the trust with their employees.  *See* Lee Decl. ¶¶ 5-8; *id.* at ¶ 6 ("Synopsys treats its employees' self-identification as voluntary and confidential.  Synopsys informs all of its employees that their self-identification data will be maintained in confidence, and Synopsys makes good on this commitment.").  The companies also keep the information confidential because of a concern that competitors will be able to use the information against them.  *See* Barros Decl. ¶ 4; Crane Decl. ¶ 6; Kayser ¶ 6; King ¶ 4; Lewis-Treolo Decl. ¶ 6; Nickerson Decl. ¶ 6; Speno Decl. ¶ 9; Thrasher

Decl. ¶¶ 4-5; Wong Decl. ¶¶ 7-9. DOL is not required to show a likelihood of substantial competitive harm under Exemption 4 as a result of *Argus Leader*; however, the witnesses' testimony that they remain concerned about this issue is relevant to illustrate the importance of the confidentiality that is being protected by Exemption 4. In addition, one of the companies expressed a concern as to potential harm to individual privacy if the information were to be released. *See* Lee Decl. ¶ 8. Finally, another company mentioned a concern regarding reputational harm from the release of the information. *See* Nickerson Decl. ¶ 21 ("Data in Agilent's EEO-1 Report may be mischaracterized to damage Agilent's reputation.").

In sum, there is no question that each of the companies at issue is invested in keeping the information confidential, for a variety of reasons. And, as shown above and in the declarations, the numerous steps taken to assure that it is and remains confidential have been effective because the reports at issue are not in fact publicly available. The evidence meets the standard set out in *Argus Leader* that the information be customarily and actually kept confidential.

### 3. The Information Was "Provided to the Government Under An Assurance of Privacy"

To the extent that the Court considers whether the commercial or financial information was "provided to the government under an assurance of privacy," *Argus Leader*, 139 S. Ct. at 2366, the record demonstrates that it was.

EEO-1 submitters with federal contracts are assured that their reports will be treated as confidential commercial information to the maximum extent permitted by law. Geán Decl. at ¶ 34. Submitters are repeatedly notified of this assurance on the JRC website. Geán Decl. at ¶ 35. The JRC website states that "OFCCP will notify contractors of any Freedom of Information Act (FOIA) requests that are made to obtain any of the data provided on the EEO-1 report, and will protect the confidentiality of EEO-1 data to the maximum extent possible consistent with FOIA and the Trade Secrets Act." *EEO-1 Joint Reporting Committee, EEO-1, Frequently Asked Questions and Answers, (About the EEO-1 Survey, Question No. 2)*, *available at* https://www.eeoc.gov/employers/eeo1survey/faq.cfm; *EEO-1 Joint Reporting Committee, EEO-1 Instruction Booklet 1, Page 4.* https://www.eeoc.gov/employers/eeo1survey/upload/instructions_form.pdf. The statement "will protect

the confidentiality of the EEO-1 data to the maximum extent possible consistent with FOIA" is a clear

expression of an assurance; indeed, it is hard to imagine what more an agency could say on this front.

And federal agencies are only required to follow the notification process when they believe that a FOIA

request is seeking confidential commercial information. *Exec. Order No. 12,600*, 52 FR 23781 § 2(a)

(June 23, 1987) and 29 C.F.R. § 70.26. In accordance with Executive Order 12,600, DOL's duly

promulgated regulations describe the notice procedures DOL departments must take when they receive a

FOIA request for potentially confidential commercial information. 29 C.F.R. § 70.26. OFCCP

determined that EEO-1 reports including the multi-establishment Type 2 reports should be treated as

confidential commercial information such that companies that complete these reports are entitled to

notice of a FOIA request for their report and provided a right to object to the release of their report under

FOIA Exemption 4. 29 C.F.R. § 70.26. Geán Decl. at ¶ 33. In this case, OFCCP followed the

submitter notice requirements under 29 C.F.R. § 70.26 when it received the plaintiffs' FOIA request for

EEO-1 Type 2 data. Geán Decl. at ¶ 16.

　　　　The companies at issue relied on DOL's statements when submitting their information to the

government. As Ms. Crane explains, "Applied Materials is aware of and relies on the instruction

booklet concerning the EEO-1 Reports published by the [EEOC]," and specifically "relies on the

instruction booklet's assurance that the government 'will protect the confidentiality of EEO-1 data to the

maximum extent possible,' both when asking its employees to disclose sensitive information about their

identity, and when submitting the data to the government.'" Crane Decl. ¶¶ 8, 10; *see also* Barros Decl.

¶ 7; Kayser Decl. ¶¶ 8-10; King Decl. ¶ 7; Lee Decl. ¶ 10; Lewis-Treolo ¶¶ 13-14; Nickerson Decl. ¶¶

14-15; Speno Decl. ¶ 11; Thrasher Decl. ¶ 10; Wong Decl. ¶ 12. They also relied on the notice

procedures for confidential commercial information contained in the regulations and in the EEO-1

instructional booklet. *See* Barros Decl. ¶ 8; Crane Decl. ¶¶ 8-9; Kayser Decl. ¶ 11; King Decl. ¶ 7; Lee

Decl. ¶ 11; Lewis-Treolo ¶ 15; Nickerson Decl. ¶ 16; Speno Decl. ¶ 11; Thrasher Decl. ¶¶ 10-11; Wong

Decl. ¶ 13. Contractors are also assured that even when they are subject to a compliance evaluation,

OFCCP will protect their confidential data from public disclosure as much as possible. *See* 41 C.F.R.

§ 60-1.20(g); Geán Decl. at ¶ 36.

In addition, there was an implied assurance of privacy arising from the overall history of the agency maintaining the records as confidential. This takes several forms. First, certain companies have had prior experiences with FOIA requests in which the agency withheld the same EEO-1 data at issue here pursuant to Exemption 4. King Decl. ¶ 9. Second, several of the declarants noted the many years during which they have observed that the information has been kept confidential. For example, Ms. Crane explained, "Applied Materials has been submitting EEO-1 forms to the government for at least 25 years, including all years I have been at the company. I am not aware of and do not believe that any of those reports have become public or been released through a FOIA request. This longtime practice reflects that the information is confidential and is a form of government assurance that such information will remain generally confidential." Crane Decl. ¶ 7; *see also* Kayser Decl. ¶ 7 (14 years of submitting reports). Third, some of the declarants describe being aware of publicly available information as to the agency's practice of seeking to maintain the information as confidential. *See* King Decl. ¶ 8 ("Gilead also is aware of OFCCP's past practices of withholding confidential EEO-1 data in response to FOIA requests. For example, Gilead has been aware of publicity, like the article in the *San Jose Mercury News* on February 11, 2010, that the OFCCP has not released confidential EEO-1 reports in response to FOIA requests."); Nickerson Decl. ¶¶ 17-18; Speno Decl. ¶ 12; *see also* Barros Decl. ¶¶ 9-12 (describing the same article as well as other instances of publicity regarding requests for these reports). The fact that documents were released last year as part of a settlement of litigation does not change this long-running practice, both because it was one example in many years and because it was based on the prior legal standard in place.

The evidence submitted by the companies supports the conclusion that the reports were submitted with both explicit and implicit assurances of confidentiality. That, combined with the substantial evidence demonstrating that the information customarily and actually was maintained as confidential, justifies a finding that the agency is properly withholding the information under Exemption 4.

//

//

//

1   **IV.    CONCLUSION**

2         For all of the aforementioned reasons, Defendant respectfully requests that the Court grant

3   summary judgment in its favor.

4

5                                    Respectfully submitted,

6                                    DAVID L. ANDERSON
                                 United States Attorney

7

8   Dated: August 23, 2019                     _/s/ *Ellen London*_       .

9                                 ELLEN LONDON
                               Assistant United States Attorney

10                               Counsel for Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  D. Victoria Baranetsky (Cal. Bar No. 311892)
   THE CENTER FOR INVESTIGATIVE
2  REPORTING
   1400 65th St., Suite 200
3  Emeryville, CA 94608
   vbaranetsky@revealnews.org
4  Telephone: (510) 982-2890
5
6  Attorney for Plaintiffs
7
8
9              UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                   OAKLAND DIVISION

12  THE CENTER FOR INVESTIGATIVE            )   Case No. 4:19-cv-01843-KAW
    REPORTING and WILL EVANS,               )
13                                          )   **OPPOSITION TO DEFENDANT'S**
                         Plaintiffs,        )   **MOTION FOR SUMMARY JUDGMENT**
14                                          )   **AND**
          v.                                )
15                                          )   **NOTICE OF CROSS MOTION AND**
    UNITED STATES DEPARTMENT OF             )   **CROSS MOTION FOR SUMMARY**
16  LABOR,                                  )   **JUDGMENT; MEMORANDUM OF**
                                            )   **POINTS AND AUTHORITIES IN**
17                       Defendant.         )   **SUPPORT OF CROSS MOTION FOR**
                                            )   **SUMMARY JUDGMENT**
18                                          )
19                                          )
                                            )   Date:  November 21, 2019
20                                          )   Time: 1:30 p.m.
                                            )
21                                          )
                                            )
22                                          )
                                            )
23                                          )
                                            )
24                                          )
25  _____
26
27
28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................................iii

NOTICE OF MOTION AND MOTION.................................................................viii

MEMORANDUM OF POINTS AND AUTHORITIES .........................................1

I.    INTRODUCTION ...............................................................................................1

II.   STATEMENT OF FACTS...................................................................................3

   A.   DOL Requires Federal Contractors to Submit Diversity Reports to Ensure Compliance with Anti-Discrimination Laws...................................................3

   B.   Diversity Reports Are Not Confidential. .........................................................4
      1.   OFCCP makes Diversity Reports available to the public. ............................4
      2.   OFCCP previously released nearly identical records from a different calendar year to CIR. .............................................................................................5
      3.   Publishing Diversity Reports is a growing industry custom......................6

   C.   The Public Has a Strong Interest in Diversity Reports.....................................7

   D.   CIR's FOIA Request and Administrative Appeal ...........................................9

III.   ARGUMENT .....................................................................................................11

   A.   The Freedom of Information Act and the Standard of Review .....................11

   B.   CIR is Entitled to Summary Judgment Because the Government Has Improperly Withheld Agency Records Under Exemption 4 ........................................11
      1.   Diversity Reports are improperly withheld under Exemption 4 because they are not commercial. .....................................................................................12
      2.   Diversity Reports are improperly withheld under Exemption 4 because they are not confidential. ...................................................................................15
          (a)   Diversity Reports are not confidential because they are customarily published.. 15
          (b)   Diversity Reports are not confidential because companies actually treat them as public information...............................................................................17
          (c)   Diversity Reports are identified as confidential as a pretense, impermissible under Exemption 4. ...................................................................................19
          (d)   OFCCP gives no assurance of confidentiality because Diversity Reports are federally required...........................................................................20

   C.   CIR is Entitled to Summary Judgment Because the Government Has Failed to Meet the Foreseeable Harm Standard...........................................................22
      1.   Even if Exemption 4 applies in this case, the government has not shown that Exemption 4's protected interests will be harmed by the disclosure.............23
      2.   Even if protected interests could be harmed by disclosure, such a harm is not "reasonably foreseeable." .............................................................................24

   D.   It Is Unclear Whether OFCCP Conducted A Proper Search for Records..................25

IV.   CONCLUSION.................................................................................................25

-ii-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

**TABLE OF AUTHORITIES**

**CASES**

*Ali v. Gilead Sciences, Inc.*, No. 5:18-cv-00677 (N.D. Cal. Jan 31, 2018).....................................21

*CIR v. DOL, (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018)..............................................5

*Citizens Comm'n on Human Rights v. Food & Drug Admin., Eli Lilly & Co.*, No. 92-CV-5313, 1993 WL 1610471 (C.D. Cal. May 10, 1993)...........................................................................12

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ....................................................................11

*Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2365 (2019)....................2, 15, 19, 21, 23

*Food Marketing Inst. v. Argus Leader Media*, 889 F.3d 914 (9th Cir. 2019), *cert granted*, 2019 WL 166877 (U.S. Jan. 11, 2019) (No. 18-841) .................................................................................10

*Frazier v. Agilent Tech., Inc.*, No. 5:16-cv-05729 (N.D. Cal. Oct 06, 2016) ................................20

*GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109 (9th Cir. 1994) ...............................15

*Gen. Elec. Co. v. U.S. Nuclear Regulatory Comm'n*, 750 F.2d 1394 (7th Cir. 1984)....................20

*Hoffman v. Agilent Technologies, Inc.*, No. 2:11-cv-03303 (E.D. Pa. May 20, 2011)....................20

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019) ....................23

*Kentucky v. King*, 563 U.S. 452 (2011) ........................................................................................24

*Lahr v. NTSB*, 569 F.3d 964 (9th Cir. 2009)................................................................................11

*Lane v. Dep't of the Interior*, 523 F.3d 1128 (9th Cir. 2008) .......................................................11

*Machado Amadis v. Dep't of Justice*, 388 F. Supp. 3d 1 (D.D.C. 2019).......................................23

*Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700 (N.D. Cal. Nov. 24, 1993). 20

*Merit Energy Co. v. U.S. Dep't of Interior*, 180 F.Supp.2d 1184 (D. Colo. 2001) ........................13

*Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086 (C.D. Cal. 2005)...................25

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)........................................13

*Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686 F.Supp.2d 80 (D.D.C. 2010) ..............................13, 14

*Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976) ...............................15

*Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)..............................12

- iii -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43 (1st Cir. 2015) ...................................................................................................................................... 13, 14

*People for the Ethical Treatment of Animals v. United States Dep't of Health & Human Servs.*, 901 F.3d 343 (D.C. Cir. 2018) ......................................................................................... 4

*Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280 (D.C. Cir. 1983). .... 11, 12, 14, 23

*Pub. Citizen v. United States Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81 (D.D.C. 2013) ........................................................................................................................................... 13

*Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176 (D. Del. 2001)................................................. 20

*Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018) ................................. 23, 24

*Sakamoto v. Envtl. Prot. Agency*, 443 F. Supp. 2d 1182 (N.D. Cal. 2006) .................................. 25

*Schmid v. Gilead Sciences, Inc.*, No. 2:15-cv-01547 (W.D. Pa. Nov 24, 2015) ............................ 21

*Sears Roebuck & Co. v. Gen. Servs. Admin.*, 509 F.2d 527 (D.C. Cir. 1974) .................................. 5

*Skybridge Spectrum Found. v. Fed. Commc'ns Comm'n*, No. 10-01496, 2012 WL 336160 (D.D.C. 2012) .......................................................................................................................................... 13

*Thompson v. Agilent Technologies*, Inc., No. 1:14-cv-00737 (W.D. Tex. Aug 07, 2014) .............. 20

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) .................................... 20

*Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189 (9th Cir. 2011) .......... 11, 12, 13

**STATUTES**

5 U.S.C. § 552 ...................................................................................... viii, 1, 3, 10, 12, 22, 23

**REGULATIONS**

41 C.F.R. § 60-1.26..................................................................................................................... 4

41 C.F.R. § 60-1.7 ...................................................................................................................... 3

## OTHER AUTHORITIES

Alexa Liautaud, *Fitbit Counts on Women as Customers Just Not Board Members*, BLOOMBERG NEWS, June 18, 2015, https://www.bloomberg.com/news/articles/2015-06-18/fitbit-counts-on-women-as-device-buyers-just-not-board-members ................................................................. 20

Applied Materials, *Applied Materials Diversity and Inclusion Report 2017*, 5, http://www.appliedmaterials.com/files/diversity_inclusion_report_2017_final.pdf ................... 18

Brief for AI Now Inst. et. al. as Amici Curiae Supporting Respondents, Food Marketing Inst. v. Argus Leader Media, 139 S. Ct. 2356 (2019) (No. 18-481) ...................................................... 15

Brief for Reporters' Comm. for Freedom of the Press & 36 Media Organizations as Amici Curiae Supporting Plaintiff-Appellant, Machado Amadis v. Dep't of Justice, 388 F. Supp 3d 1 (D.D.C. 2019) (No. 1:16-cv-2230) ......................................................................................................... 24

Dan Schulman, *Our Commitment to Diversity and Inclusion at PayPal*, PAYPAL STORIES (blog), Oct. 11, 2017, https://www.paypal.com/stories/us/our-commitment-to-diversity-and-inclusion-at-paypal (updated April 28, 2018) ........................................................................................... 17

EEOC, *EEO-1 Frequently Asked Questions*, https://www1.eeoc.gov/employers/eeo1survey/faq.cfm?renderforprint=1 [https://bit.ly/2Z0FSo1] ................................................................................................................................................. 3

EEOC, *EEO-1 Instruction Booklet* (2018), http://bit.ly/2ySvqzB ................................................. 4

Email from Ellen London, Assistant U.S. Attorney, to Victoria Baranetsky, General Counsel, CIR (June 18, 2019, 10:04 AM PST) ................................................................................................. 17

Email from OFCCP FOIA Team, to Will Evans, Reporter, CIR (Sep. 6, 2019, 10:09 PM PST) 6, 10

Emily Moore, *20 Best Companies for Diversity and Inclusion*, GLASSDOOR BLOGS, Oct. 4, 2018, https://www.glassdoor.com/blog/20-best-companies-for-diversity-inclusion ............................ 19

Equinix, *2018 Corporate Sustainability Report*, https://www.equinix.com/resources/infopapers/corporate-sustainability-report/ ....................... 18

Glass Ceiling Comm'n, *A Solid Investment: Making Full Use of the Nation's Human Capital*, 42, Nov. 1, 1995, https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1117 &context=key_workplace) ............................................................................................................. 8

Google, *Getting to work on diversity at Google*, GOOGLE BLOG, May 28, 2014, https://googleblog.blogspot.com/2014/05/getting-to-work-on-diversity-at-google.html ............ 16

Intel, *Workforce Demographics*, 2008, http://web.archive.org/web/20081224004419/http:/www.intel.com/intel/diversity/divpractice.ht m ................................................................................................................................................... 6

- v -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

Jessica Guynn, *Apple leadership is more than 80% white and male*, USA TODAY, Nov. 9, 2017, https://www.usatoday.com/story/tech/2017/11/09/apple-leadership-more-than-80-white-and-male/850206001/ ................................................................................................................ 8

Jessica Guyun, *Barbara Lee calls on Apple, tech holdouts to release diversity data*, USA TODAY, Aug. 4, 2015, https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-federal-diversity-data-apple/31128479/ ................................................................................. 9

Jonathan Eisen, *Agilent – where men are thought leaders*, DR. JONATHAN EISEN'S LAB (blog), July 8, 2016, https://phylogenomics.me/2016/07/08/agilent-where-men-are-thought-leaders/ ......... 20

Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNNMONEY, Mar. 18, 2013, https://money.cnn.com/2013/03/17/technology/diversity-silicon-valley/index.html .............. 5, 22

Juniper Networks, *2017 Employer Information Report Consolidated Report Type 2*, https://www.juniper.net/assets/us/en/local/pdf/additional-resources/2017-eeo-1-report.pdf ........ 7

Laura Lorenzetti, *Microsoft releases diversity stats: How the tech giant sizes up*, FORTUNE, Jan. 5, 2015, https://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech/ ....................................... 7

Letter from Emanuel Cleaver II, Member of Congress, U.S. House of Representatives, to Alexander Acosta, Secretary, U.S. Department of Labor, Mar. 6, 2019, https://cleaver.house.gov/sites/cleaver.house.gov/files/DOL_FOIA.pdf ................................... 9

Letter from Jason Glenn, Legal Director – Employment, PayPal Holdings, Inc., to Bruce G. Anderson, National Office FOIA Coordinator, OFCCP, U.S. Department of Labor (Jan. 29, 2018) ................................................................................................................................... 17

Mike Swift, *Five Silicon Valley companies fought release of employment data, and won*, SAN JOSE MERCURY NEWS, Feb. 11, 2010, https://www.mercurynews.com/2010/02/11/five-silicon-valley-companies-fought-release-of-employment-data-and-won/ .................................................... 5, 22

Murrey Jacobson, *Google finally discloses its diversity record, and it's not good*, PBS NEWSHOUR, May 28, 2014, https://www.pbs.org/newshour/nation/google-discloses-workforce-diversity-data-good ........................................................................................................................................... 7

New York City Office of the Comptroller, *2017 Shareholder Initiatives: Postseason Report*, at 12, https://comptroller.nyc.gov/wp-content/uploads/documents/2017_Shareowner_Initiatives_Postseason_Report.pdf ................... 17

OFCCP, *About Us*, https://www.dol.gov/ofccp/aboutof.html ......................................................... 4

OFCCP, *Federal Contract Compliance Manual* Oct. 2014), https://www.dol.gov/ofccp/regs/compliance/fccm/FCCM_FINAL_508c.pdf [https://bit.ly/2Z3lkeI] ............................................................................................................... 3

OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions*, https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm .................................................... 5

-vi-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

OPEN DIVERSITY DATA, http://opendiversitydata.org (last accessed Sept. 12, 2019)............7, 16, 19

Pandora, *2017 Employer Information Report Consolidated Report Type 2*,
    https://pandora.com/static/careers/Pandora_EE0-1_2017.pdf .................................................... 7

Rebecca R. Hastings, *Diversity Annual Reports Yield Business Benefits*, SOC'Y HUMAN RESOURCE
    MGMT, Oct. 10, 2012, https://www.shrm.org/resourcesandtools/hr-topics/behavioral-
    competencies/global-and-cultural-effectiveness/pages/diversity-annual-reports-yield-business-
    benefits.aspx ....................................................................................................................... 8

Salvador Rodriguez, *Jesse Jackson Gives Uber a Diversity Deadline*, INC.COM, Jan. 5, 2017,
    https://www.inc.com/salvador-rodriguez/uber-diversity-jesse-jackson.html............................... 9

Scott Pham, Sinduja Rangarajan, Bethney Bonilla & Will Evans, *Silicon Valley diversity data:
    Who released theirs, who didn't*, REVEALNEWS.ORG, June 25, 2018,
    https://apps.revealnews.org/silicon-valley-diversity-list/ (last accessed Sept. 12, 2019)............ 16

Splunk, *2017 Employer Information Report Consolidated Report Type 2*,
    https://www.splunk.com/pdfs/fact-sheets/eeo-1-splunk17.pdf .................................................... 7

Symantec, *2015 Corporate Responsibility Report*,
    https://www.symantec.com/content/en/us/about/media/pdfs/2015-corporate-responsibility-
    report-en-us.pdf ................................................................................................................. 18

Trillium Asset Management, *Xilinx, Inc. – Workplace Diversity (2019)*,
    https://trilliuminvest.com/shareholder-proposal/xilinx-inc-workplace-diversity-2019/.............. 18

Will Evans & Sinduja Rangarajan, *Hidden figures: How Silicon Valley keeps diversity data secret*,
    REVEALNEWS.ORG, Oct. 19, 2017, https://www.revealnews.org/article/hidden-figures-how-
    silicon-valley-keeps-diversity-data-secret/................................................................................... 8

-vii-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

# NOTICE OF MOTION AND MOTION

TO DEFENDANT AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 21, 2019, at 1:30 p.m., or as soon thereafter as the matter may be heard at United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612 before the Honorable Kandis A. Westmore, the plaintiffs The Center for Investigative Reporting and Will Evans (together "Plaintiffs" or "CIR") will, and hereby do, cross move the Court for an order granting summary judgment in Plaintiffs' favor and against Defendant United States Department of Labor ("DOL"), Office of Federal Contract Compliance Programs ("OFCCP").

Pursuant to Federal Rule of Civil Procedure 56, CIR respectfully asks that this Court issue an order requiring the government to release all records, including any necessary redactions, improperly withheld from the public under the Freedom of Information Act ("FOIA") and which is explicitly allowed under the relevant statute defendant cites for exemption pursuant to 5 U.S.C. § 552(b)(4). This cross motion is based on this notice of cross motion and motion, the memorandum of points and authorities in support of this cross motion, the Declaration of D. Victoria Baranetsky ("Baranetsky Decl.") and attached exhibits, the Declaration of Reverend Jesse Jackson ("Jackson Decl."), the Declaration of Matthew W. Patsky ("Patsky Decl."), the Declaration of Jamillah Bowman Williams ("Williams Decl."), all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

**RELIEF SOUGHT BY PLAINTIFF**

Plaintiffs seek an order summarily dismissing Defendant's claims and granting summary judgment in Plaintiffs' favor.

**ISSUES TO BE DETERMINED**

Did Defendant improperly withhold government records under FOIA Exemption 4?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This is an action under the Freedom of Information Act, 5 U.S.C. § 552, seeking disclosure of (55) fifty-five EEO-1 Type 2 Consolidated Reports ("Diversity Reports") from 2016 calendar year, which contain compulsory employment diversity statistics from 55 federal contractors based in Silicon Valley.  To date, CIR has received (26) twenty-six Diversity Reports as a result of this lawsuit.  Government's Brief at 6, Dkt. No. 24 ("Gov. Br.").  Defendant withholds (9) nine Diversity Reports for federal contractors that continue to object to the release and (19) nineteen Diversity Reports for companies that are purportedly not federal contractors.  OFCCP has moved for summary judgment, asking the Court to approve its decision to withhold the remainder of the material withheld pursuant to 5 U.S.C. § 552(b)(4).

OFCCP unjustifiably withholds the government records from public view by claiming that the Diversity Reports contain confidential business information which is exempt under FOIA Exemption 4.  Exemption 4 is inapplicable for four reasons.  As a threshold issue, Diversity Reports—in nature and in practice—do not meet the definition of commercial or financial business records.  The Diversity Reports simply contain the "total number of each company's employees categorized by race/ethnicity, gender, and job category."  Gov. Br. at 1.  The information is

anonymized and does not contain more granular business data. Unlike financial plans or business accounting records, these documents cannot genuinely be described as "commercial" under FOIA.

Second, Diversity Reports are not confidential because they are not customarily or actually treated as private by these companies and most companies at large. OFCCP relies on the Supreme Court's recent decision in *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2365 (2019) ("*Argus Leader*") which held that information was "confidential" under Exemption 4 "where commercial or financial information is *both* customarily and actually treated as private by its owner and provided to the government under an assurance of privacy." *Id.* at 2366 (emphasis added). Withholding Diversity Reports is unjustified even under *Argus Leader*'s relaxed Exemption 4 standard because it is a growing industry custom to publish Diversity Reports. All but one of the companies that objects to disclosure publish most or at least *some* diversity data contained in the Diversity Reports online. The records are not actually confidential because they contain no high-level business data or personally identifying information. And companies do not elect to provide Diversity Reports to the government under an assurance of privacy, instead they are required by law to provide this information.

Third, Exemption 4 is inapplicable where it is used as a pretext to shield embarrassing information. Rather than legitimately withholding the Diversity Reports to shield proprietary information, these documents appear to be withheld from the public to protect private actors from possible embarrassment, incrimination, or exposure to further litigation. But those reasons do not justify withholding under Exemption 4.

Lastly, Diversity Reports must be disclosed as their withholding does not meet the "foreseeable harm" requirement. In 2016 Congress included in the OPEN FOIA Amendment an additional requirement that agencies seeking to withhold records under FOIA must fulfill, even where an exemption otherwise applies. Under this "foreseeable harm" standard, an agency must

- 2 -

show disclosure of the documents would result in "foreseeable harm" to an interest the relevant

exemption seeks to protect, or that "disclosure is [otherwise] prohibited by law." 5 U.S.C. § 552

(a)(8)(A). Disclosure of the Diversity Reports would not harm Exemption 4's intended interest in

protecting confidential business information nor is the disclosure otherwise prohibited by law.

Instead, disclosure would be beneficial to industry and the public interest.

Because the DOL has failed to meet its burden and show 5 U.S.C. § 552(b)(4) applies, this

Court should deny the government's motion for summary judgment and grant CIR's cross motion

for summary judgment. CIR respectfully requests entry of an order compelling the DOL to

disclose the improperly withheld records.

## II.    STATEMENT OF FACTS

### A.    DOL Requires Federal Contractors to Submit Diversity Reports to Ensure Compliance with Anti-Discrimination Laws.

Each year, all large companies who qualify as federal contractors under DOL regulations

are required to submit two forms to DOL containing their employees' demographic information.

41 C.F.R. § 60-1.7. These companies are required by law to submit both forms, including a more

granular report for each of their worksites, called the EEO-1 Report, as well as the more simplified

EEO-1 Type 2 Consolidated Report (the Diversity Report). *See* OFCCP, *Federal Contract*

*Compliance Manual: October 2014,*

https://www.dol.gov/ofccp/regs/compliance/fccm/FCCM_FINAL_508c.pdf [https://bit.ly/2Z3lkeI]

(Baranetsky Decl. Ex. 1); the Equal Employment Opportunity Commission ("EEOC"), *EEO-1*

*Frequently Asked Questions,*

https://www1.eeoc.gov/employers/eeo1survey/faq.cfm?renderforprint=1 [https://bit.ly/2Z0FSo1]

(Baranetsky Decl. Ex. 2).

-3 -

The Diversity Report is a one-page form that anonymously tallies employees across all worksites categorized by race, gender and job category. *Id.* Diversity Reports do not contain any sensitive information, such as wage data. *Cf. People for the Ethical Treatment of Animals v. United States Dep't of Health & Human Servs.*, 901 F.3d 343, 354 (D.C. Cir. 2018) (allowing withholding of granular supply chain data under Exemption 4 since competitors "could easily use this information to target and disrupt"). Diversity Reports also do not disclose more particularized data, such as the office-by-office demographics that are reported on more granular EEO-1 Reports.

The Diversity Report must be filed with *both* the EEOC and OFCCP in order to ensure that federal contractors comply with anti-discrimination laws. *Id.*; *see also* EEOC, *EEO-1 Instruction Booklet* (2018), https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm [http://bit.ly/2ySvqzB] (Baranetsky Decl. Ex. 3). OFCCP is the component of DOL that is responsible for enforcing nondiscrimination and affirmative action requirements imposed on federal contractors under Executive Order 11246, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and Section 503 of the Rehabilitation Act. OFCCP, *About Us*, https://www.dol.gov/ofccp/aboutof.html (Baranetsky Decl. Ex. 4) (stating OFCCP's mission is to "protect workers" and "promote diversity"). OFCCP uses Diversity Reports to fulfill its mission by ensuring that federal contractors "comply[] with the legal requirement to take affirmative action and not discriminate." *Id.* OFCPP may initiate enforcement proceedings against federal contractors who refuse to provide either report. 41 C.F.R. § 60-1.26.

**B.       Diversity Reports Are Not Confidential.**

**1.       OFCCP makes Diversity Reports available to the public.**

Diversity Reports are not treated as confidential business information by OFCCP. Unlike the EEOC, OFCCP is permitted to disclose Diversity Reports under Title VII of the Civil Rights Act of

-4-

1964.  As OFCCP explains on its website: "[C]ourts have ruled that the Title VII prohibition against disclosure does not apply to OFCCP's collection of EEO-1 data."  OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions* ( "*OFCCP FOIA FAQ*"), https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm (citing *Sears Roebuck & Co. v. Gen. Servs. Admin.*, 509 F.2d 527, 529 (D.C. Cir. 1974) as one such ruling) (Baranetsky Decl. Ex. 5).

Individuals may submit a FOIA request to OFCCP to obtain copies of Diversity Reports.  OFCCP, *FOIA FAQ*.  Once a request is submitted, OFCCP contacts federal contractors, in accordance with agency guidelines, to notify them of the request for disclosure, and OFCCP is required to make a separate determination as to whether any Exemptions apply. *Id.* (stating "OFCCP engages in a case specific analysis when determining whether or not to release information that a company asserts is protected by Exemption 4 of the FOIA.").  OFCCP has previously released Diversity Reports in response to FOIA requests to CIR and other media outlets, including CNN and the *San Jose Mercury News*.  *See* Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNNMONEY, Mar. 18, 2013, https://money.cnn.com/2013/03/17/technology/diversity-silicon-valley/index.html (Baranetsky Decl. Ex. 6); Mike Swift, *Five Silicon Valley companies fought release of employment data, and won*, SAN JOSE MERCURY NEWS, Feb. 11, 2010, https://www.mercurynews.com/2010/02/11/five-silicon-valley-companies-fought-release-of-employment-data-and-won/ (Baranetsky Decl. Ex. 7).

### 2. OFCCP previously released nearly identical records from a different calendar year to CIR.

Last year, OFCCP disclosed Diversity Reports for the 2015 calendar year to Plaintiffs for some of the companies included in the Request at issue here.  *See CIR v. DOL, (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018).  On November 29, 2018, after Plaintiffs filed a FOIA lawsuit

-5-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

for 2015 Diversity Reports, OFCCP released records for at least six of the employers whose 2016 reports were sought herein.[1]  Dkt. No. 1-4.  In that case, as here, OFCCP initially cited Exemption 4 as justification for withholding Diversity Reports, but reversed position after "supplemental review" and disclosed the records over company objections.[2]  *Id.*  Only *after* OFCCP released Diversity Reports did CIR settle the lawsuit because CIR possessed the requested records and so summary judgment motion practice was moot.  *Id.*  Similarly, in response to the present FOIA Request, OFCCP released Diversity Reports for the 2016 calendar year for sixteen of the fifty-five employers,[3] Dkt. No. 1-3, and subsequently released Diversity Reports for ten additional employers after the commencement of these proceedings.[4]  Email from OFCCP FOIA Team, to Will Evans, Reporter, CIR (Sep. 6, 2019, 10:09 PM PST) (Baranetsky Decl., Ex. 8).

**3.  Publishing Diversity Reports is a growing industry custom.**

Publishing Diversity Reports and duplicative diversity data on company websites is a growing standard among businesses, particularly within the technology industry.  Intel proactively began posting Diversity Reports online in 2008.  Intel, *Workforce Demographics*, 2008, http://web.archive.org/web/20081224004419/http:/www.intel.com/intel/diversity/divpractice.htm (Baranetsky Decl., Ex. 8).  Google began posting its data in 2014 after a similar FOIA lawsuit, and Microsoft followed suit in 2015.  *See* Murrey Jacobson, *Google finally discloses its diversity record, and it's not good*, PBS NEWSHOUR, May 28, 2014,

---

[1] These employers are: Gilead Sciences, Oracle, Pandora Media, Palantir Technologies, Splunk, Inc., and Synnex.
[2] Synnex dropped its initial objection and OFCCP subsequently released its Consolidated Type 2 Report for 2015.
[3] These employers are: Advanced Micro Devices, Bloom Energy, Cadence Design Systems, Fair Isaac, Palo Alto Networks, PayPal, Penumbra, ServiceNow, Slack Technologies, SolarCity, Synnex, Varian Medical Systems, Verifone, VMware, WageWorks, and Yahoo Inc. Trimble sent its Diversity Report to CIR directly, and CIR thus requested that it be removed from the Request.
[4] These employers are: Intuitive Surgical, Juniper Networks, KLA-Tencor, Maxim Integrated Products, Palantir Technologies, Pandora Media, Splunk, Inc., and Sunpower.

https://www.pbs.org/newshour/nation/google-discloses-workforce-diversity-data-good (Baranetsky

Decl., Ex. 10); Laura Lorenzetti, *Microsoft releases diversity stats: How the tech giant sizes up*,

FORTUNE, Jan. 5, 2015, https://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech/

(Baranetsky Decl., Ex. 11).

Because publishing this information promotes diversity and transparency, numerous

companies publish some form of diversity statistics, including many of the companies that continue

to object to disclosure in this case. *See infra* Section III.B.2(b). Additionally, companies are

increasingly publicly posting their Diversity Reports in full. *See* OPEN DIVERSITY DATA,

http://opendiversitydata.org (last accessed Sept. 27, 2019) (listing companies that have released

EEO-1 and other diversity data, including Github and Oracle) (Baranetsky Decl., Ex. 12). Even

employers whose reports requested herein were initially objected to under Exemption 4—Juniper

Networks, Pandora Media, and Splunk—have subsequently posted their Diversity Reports online

in full. *See* Juniper Networks, *2017 Employer Information Report Consolidated Report Type 2*,

https://www.juniper.net/assets/us/en/local/pdf/additional-resources/2017-eeo-1-report.pdf

(Baranetsky Decl., Ex. 13); Pandora, *2017 Employer Information Report Consolidated Report Type

2*, https://pandora.com/static/careers/Pandora_EE0-1_2017.pdf (Baranetsky Decl., Ex. 14); Splunk,

*2017 Employer Information Report Consolidated Report Type 2*,

https://www.splunk.com/pdfs/fact-sheets/eeo-1-splunk17.pdf (Baranetsky Decl., Ex. 15).

**C.     The Public Has a Strong Interest in Diversity Reports.**

Disclosure of Diversity Reports has beneficial results for building trust between companies

and the public and ensuring a diverse workforce. *See, e.g.*, Rebecca R. Hastings, *Diversity Annual

Reports Yield Business Benefits*, SOC'Y HUMAN RESOURCE MGMT., Oct. 10, 2012,

https://www.shrm.org/resourcesandtools/hr-topics/behavioral-competencies/global-and-cultural-

effectiveness/pages/diversity-annual-reports-yield-business-benefits.aspx (Baranetsky Decl., Ex.

-7-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

16) (quoting expert who found that publishing diversity reports "provides useful information, conveys commitment and business purpose, and helps build the organization's reputation."); Williams Decl. ¶¶ 26-28 (listing benefits to disclosure including "positive reputational effects" and "ensuring compliance with anti-discrimination laws"). Shareholders of large companies are increasingly demanding access to this diversity data to create corporate trust. Patsky Decl. ¶ 27. Various news outlets, including CIR, have used these reports as the foundation for numerous news articles that have informed the public about lack of diversity in Silicon Valley and the technology industry overall. *See, e.g.*, Will Evans & Sinduja Rangarajan, *Hidden figures: How Silicon Valley keeps diversity data secret*, REVEALNEWS.ORG, Oct. 19, 2017, https://www.revealnews.org/article/hidden-figures-how-silicon-valley-keeps-diversity-data-secret/ (Baranetsky Decl., Ex. 17); Jessica Guynn, *Apple leadership is more than 80% white and male*, USA TODAY, Nov. 9, 2017, https://www.usatoday.com/story/tech/2017/11/09/apple-leadership-more-than-80-white-and-male/850206001/ (Baranetsky Decl., Ex. 18).

Various public advocates and members of Congress have also called for public access to Diversity Reports. The Federal Glass Ceiling Commission, created by the Civil Rights Act of 1991, stated in its 1995 report that the government should "explore the possibility of mandating public release of EEO-1 forms for Federal contractors and publicly-traded corporations." Glass Ceiling Comm'n, *A Solid Investment: Making Full Use of the Nation's Human Capital*, 42, Nov. 1, 1995, https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1117&context=key_workplace (Baranetsky Decl., Ex. 19). In recent years, civil rights activist Rev. Jesse Jackson has called on companies in the industry "to release diversity statistics, including . . . EEO-1 reports," and many companies have responded positively. Jackson Decl. ¶¶ 9-10; *see also* Salvador Rodriguez, *Jesse Jackson Gives Uber a Diversity Deadline*, INC.COM, Jan. 5, 2017, https://www.inc.com/salvador-rodriguez/uber-diversity-jesse-jackson.html (Baranetsky Decl., Ex.

20). Members of Congress have called for greater access to Diversity Reports, via companies' proactive disclosures and via OFCCP's disclosures under FOIA. *See, e.g.*, Jessica Guyun, *Barbara Lee calls on Apple, tech holdouts to release diversity data*, USA TODAY, Aug. 4, 2015, https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-federal-diversity-data-apple/31128479/ (Baranetsky Decl., Ex. 21). In March 2019, a member of Congress wrote to the DOL stating that Diversity Reports should not be withheld under Exemption 4, as they "enumerate the diversity of firms accepting the taxpayer money." Letter from Emanuel Cleaver II, Member of Congress, U.S. House of Representatives, to Alexander Acosta, Secretary, U.S. Department of Labor (Mar. 6, 2019) https://cleaver.house.gov/sites/cleaver.house.gov/files/DOL_FOIA.pdf (Baranetsky Decl., Ex. 22).

### D.      CIR's FOIA Request and Administrative Appeal

On January 4, 2018, Mr. Evans, on behalf of CIR, submitted a FOIA request to OFCCP (hereinafter "the Request") for 2016 Diversity Reports for 55 companies. Dkt. 1-1. On January 9, 2018 the agency acknowledged the request. *Id.* On March 13, 2018, April 18, 2018, and August 14, 2018, the agency sent interim responses and agreed to release Diversity Reports for 15 companies in its August response. Dkt. 1-3. For several months, the agency provided no further response.

On November 29, 2018, OFCCP released Diversity Reports for the 2015 calendar year in response to CIR's separate FOIA lawsuit. Dkt. 1-4. CIR settled that lawsuit because OFCCP disclosed the requested records, but the agency continued to assert Exemption 4 as to this Request. *Id.* In January 2019, Mr. Evans contacted the OFCCP FOIA officer by email for an update on this Request, given the disclosure of nearly identical records. Dkt. 1-2. In a subsequent phone call with CIR's counsel, OFCCP officials represented that the agency would be sending a final correspondence within a week, but CIR received no response for several weeks. *Id.*

On February 22, 2019, CIR notified OFCCP by phone that it would be filing a lawsuit, after which OFCCP represented that it would be putting a stay on the request to await the Supreme Court decision in *Food Marketing Inst. v. Argus Leader Media*, 889 F.3d 914 (9th Cir. 2019), *cert granted*, 2019 WL 166877 (U.S. Jan. 11, 2019) (No. 18-841) regarding Exemption 4. Dkt 1-5. That same day, DOL issued an interim response amounting to a constructive denial of the Request (hereinafter "the Denial"). *Id.* The Denial reiterated that the OFCCP was putting a stay on the request pending the decision in *Argus Leader*, which it stated "include[d] the appropriate definition of 'confidential' in the Freedom of Information Act's Exemption 4," and "whether the 'substantial competitive' harm test …will be retained or altered.'" *Id.* The Denial did not explain why Exemption 4 or the questions at issue in *Argus Leader* applied. *Id.*

On March 1, 2019, CIR sent an administrative appeal letter to OFCCP. Dkt. 1-6. CIR asserted that the Diversity Reports cannot be withheld under Exemption 4, regardless of the outcome of *Argus Leader*. *Id.* It explained that Diversity Reports do not contain trade secrets or commercial information and are not confidential, argued that the agency made no separate determination from the companies because it failed to disclose all segregable portions, and emphasized the public interest in disclosure. *Id.* OFCCP failed to make a final determination as to the Request and the administrative appeal within 20 working days, as required under 5 U.S.C. § 552(a)(6)(A)(ii). Having exhausted all administrative remedies, Plaintiffs filed suit on April 5, 2019 seeking the immediate processing and release of all records responsive to its FOIA request. Dkt. 1.

On September 6, 2019, OFCCP released nine additional companies' Diversity Reports to CIR, Email from OFCCP FOIA Team, to Will Evans, Reporter, CIR (Sep. 6, 2019, 10:09 PM PST) (Baranetsky Decl., Ex. 8), only *after* did CIR learn from the Government's brief that these companies were no longer objecting. Gov. Br. at 6. The government remains silent as to whether it searched for the Diversity Reports for the nineteen companies claimed not to be federal contractors. DOL

-10-

only argues in favor of withholding the remaining ten companies that continue to object to disclosure (Agilent Technologies, Applied Materials, Box Inc., DocuSign, Equinix, Fitbit, Gilead Sciences, Oracle, Synopsys, and Xilinx). *Id.* By stipulation dated March 29, 2018, the parties agreed to submit their dispute regarding this issue to the Court for resolution. Dkt. No. 20.

## III.    ARGUMENT

### A.    The Freedom of Information Act and the Standard of Review

FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976) (internal citations and quotation marks omitted). In a FOIA case, the agency invoking an exemption in order to withhold requested records "bears the burden of demonstrating that the exemption properly applies to the documents," *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009). While the agency may meet its burden with declarations that "contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption." *Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quotation omitted), "conclusory and generalized allegations . . . are unacceptable and cannot support an agency's decision to withhold requested documents.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983) ("*Pub Citizen*"); *see also Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1195 (9th Cir. 2011).

### B.    CIR is Entitled to Summary Judgment Because the Government Has Improperly Withheld Agency Records Under Exemption 4

Under FOIA Exemption 4, an agency may only withhold information if it proves disclosure would release (1) trade secrets or commercial or financial information that is (2) obtained from a person and (3) is privileged or confidential. 5 U.S.C. § 552(b)(4). The purpose of this exemption

is to "balance the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information." *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768-69 (D.C. Cir. 1974). OFCCP cannot meet its burden here.[5] Diversity Reports are not commercial or financial information and they are not privileged or confidential[6]—even under the more lenient *Argus Leader* standard.

### 1. Diversity Reports are improperly withheld under Exemption 4 because they are not commercial.

Diversity Reports cannot justly be described as commercial or financial records. Courts "have consistently held that the terms 'commercial' and 'financial' in the exemption [4 context] should be given their ordinary meanings." *Pub. Citizen*, 704 F.2d at 1290; *accord Watkins*, 643 F.3d at 1194. In the context of FOIA Exemption 4, "financial" applies to information related to an organization's finances, such as "actual sales data," *Argus Leader*, 139 S. Ct. at 2361, whereas "commercial" only applies to information that is actually "of a commercial nature" or "serves a commercial function." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002), and not simply any information *related to* a business. *Cf.* Gov. Br. at 10. The government argues only that this information is "commercial," and not "financial." *See generally* Gov. Br.

Courts have held records are "of a commercial nature" only where they are related to the commercial activity of a business. For instance, in *Watkins*, the Ninth Circuit found information

---

[5] CIR does not contest the second part of the test - that the records were obtained from a person.
[6] The government concedes that Diversity Reports are not trade secrets because DOL does not address this point in its brief. *See generally* Gov. Br. To the extent the government does still asserts this position assertion, EEO-1 reports cannot qualify as trade secrets because they cannot legitimately be described as revealing a valuable plan, formula, process or device; they merely describe diversity statistics of the company. Courts have limited the definition of trade secrets under FOIA. *Pub. Citizen*, 704 F.2d at 1289 (stating records must be related to "the productive process itself"); *see also Citizens Comm'n on Human Rights v. Food & Drug Admin., Eli Lilly & Co.*, No. 92-CV-5313, 1993 WL 1610471 at *7 (C.D. Cal. May 10, 1993), *aff'd in part and remanded in part on other grounds*, 45 F.3d 1325 (9th Cir. 1995).

about the importation process of counterfeit goods was "commercial" because it was directly connected to the *commercial activity* of importing goods. *Watkins*, 643 F.3d at 1194. In contrast, records that simply describe the work force or extraneous fact about a company are not commercial in in nature. *See, e.g.*, *Pub. Citizen v. United States Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81, 103 (D.D.C. 2013) (information provided by pharmaceutical companies to the HHS, consisting of name, title, and responsibilities of any person determined to be ineligible person, is not commercial in nature). In such cases, while the records could be used to gain "insight into the nature of a company's business dealings," the courts find that does not "not convert the [records] into commercial information." *Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686 F.Supp.2d 80, 86-7 (D.D.C. 2010).

Documents that "serve a commercial function" are even more limited, as courts find they only relate to records documenting the finances of a company. Courts have held that information about revenue, service pricing, and checking accounts are commercial because these records serve a commercial function. *See, e.g.*, *Skybridge Spectrum Found. v. Fed. Commc'ns Comm'n*, No. 10-01496, 2012 WL 336160 at *12 (D.D.C. 2012); *Merit Energy Co. v. U.S. Dep't of Interior*, 180 F.Supp.2d 1184, 1188 (D. Colo. 2001); *New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 47 (1st Cir. 2015). Generally, information about personnel and employees does not serve a sufficiently commercial function to qualify as commercial. *See, e.g., id.* (holding that an organization's personnel policies are not commercial in nature.).

The government has failed to show how Diversity Reports qualify as commercial under either category. Cf. *Watkins*, 64 F. 3d at 1194; *Skybridge*, 2012 WL 336160 at *12. The government provides declarations with only conclusory statements recounting how Diversity Reports are somehow related to the companies' businesses, but without explaining or describing how Diversity Reports reveal anything about the companies' actual commercial activities. The

-13-

declarations are mute as to how Diversity Reports reveal the companies' financial information like payment data or serve *any* commercial function. *See* Declaration of Dave Nickerson ¶¶ 38-39, Dkt. No. 24-7 ("Nickerson Decl.") (stating in no specific terms that disclosing Diversity Reports "would reveal strategic planning and compromise Agilent's competitive advantage in recruiting"). Instead, it appears these records merely exist to serve a government function—ensuring the demographics of the workforce comply with the law. And to the extent that Diversity Reports even offer mere "insight into the nature of a company's business dealings," that is not enough. *Nat'l Bus. Aviation Ass'n*, 686 F.Supp.2d at 86-7. Ultimately, DOL cannot overcome the fact that records describing a workforce are insufficient to qualify as "commercial." *New Hampshire Right to Life.*, 778 F.3d at 49.

Lastly, employing DOL's expansive definition of "commercial" would undermine FOIA. DOL argues that the definition of "commercial" is generally held to be "broad[]" by citing to *Pub. Citizen*, 704 F.2d at 1290 (dealing with clearly commercial records, including "sales statistics" and "profits and losses."). To employ this definition and render Diversity Reports as "commercial" risks bloating the term in a way that could swallow much of FOIA, as an increasing number of government activities are executed by federal contractors. Because *any* business records can technically "relate to" a company, this definition would place far too many government records out of the public's view for accountability.[7]

---

[7] *See* Brief for AI Now Inst. et. al. as Amici Curiae Supporting Respondents, Food Marketing Inst. v. Argus Leader Media, 139 S. Ct. 2356 (2019) (No. 18-481), 2 ("Because the government so often relies on private vendors or contractors to carry out core governmental functions, it is impossible to adopt an expansive interpretation of Exemption 4 without doing violence to FOIA's core purpose.") (Baranetsky Decl., Ex. 23)

**2.   Diversity Reports are improperly withheld under Exemption 4 because they are not confidential.**

Previously, courts held information was "confidential" if disclosure of the information would likely cause substantial harm to the competitive position of the company from which the information was obtained. *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994).  In *Argus Leader*, the Supreme Court simplified the Exemption 4 test and held that "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." 139 S. Ct. at 2366.[8]  Despite the more lenient standard, an agency may still not simply offer the court "conclusory and generalized allegations" to obfuscate reality.  *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C. Cir. 1976).  Instead, it must provide "specific factual or evidentiary material to support [its] claim." *Id.* at 679.  Here, the government cannot meet its burden to show that the information is confidential.

**(a)   Diversity Reports are not confidential because they are customarily published.**

Diversity Reports are not "customarily" treated confidential, as various companies have repeatedly published these records—indeed, it is becoming industry standard to post Diversity Reports on company websites. *See supra* Section II.B.3.  Multiple companies that objected to release of the Diversity Reports in years prior have since released Diversity Reports online, and have even attested to the benefits of disclosure.  For example, Google, which opposed release of its Diversity Reports to the *San Jose Mercury News* in 2008, later published its data in 2014 along with an explanation of the benefits of doing so: "We now realize we were wrong, and that it's time to be candid about the issues . . . . [I]t's hard to address these kinds of challenges if you're not

---

[8] While no court has interpreted this language, it is not clear from the Court's decision whether all factors must be satisfied for the material to qualify as confidential.

prepared to discuss them openly, and with the facts."  Google, *Getting to work on diversity at Google*, GOOGLE BLOG, May 28, 2014, https://googleblog.blogspot.com/2014/05/getting-to-work-on-diversity-at-google.html (Baranetsky Decl., Ex. 24).  To date, over thirty major technology companies have published their forms online to promote diversity, including but not limited to Adobe, Airbnb, Amazon, Apple, Cisco Systems, Dell, eBay, Facebook, Google, Hewlett Packard, Microsoft, Facebook, Intel, LinkedIn, Lyft, Palo Alto Networks, PayPal, Pinterest, Twitter, Uber, Yahoo, and Yelp.  If anything, it appears publishing Diversity Reports is the growing custom.  *See supra* Section II.B.3; *see also* Patsky Decl. ¶ 16; OPEN DIVERSITY DATA, (Baranetsky Decl., Ex. 11); Scott Pham, Sinduja Rangarajan, Bethney Bonilla & Will Evans, *Silicon Valley diversity data: Who released theirs, who didn't*, REVEALNEWS.ORG, June 25, 2018, https://apps.revealnews.org/silicon-valley-diversity-list/ (last accessed Sept. 27, 2019) (Baranetsky Decl., Ex. 25).

Several companies that initially opposed OFCCP disclosing their Diversity Reports to Plaintiffs in this litigation have since withdrawn their objections and have published their reports online, also undermining any claim that these records are customarily held secret.  PayPal, for instance, which in January 2018, in response to Plaintiffs' prior FOIA for Diversity Reports from 2015, wrote to OFCCP that disclosing this data "would cause substantial competitive harm to PayPal," Letter from Jason Glenn, Legal Director – Employment, PayPal Holdings, Inc., to Bruce G. Anderson, National Office FOIA Coordinator, OFCCP, U.S. Department of Labor (Jan. 29, 2018) (Baranetsky Decl., Ex. 26), posted three years of Diversity Reports online just three months later. Dan Schulman, *Our Commitment to Diversity and Inclusion at PayPal*, PAYPAL STORIES (blog), Oct. 11, 2017, https://www.paypal.com/stories/us/our-commitment-to-diversity-and-inclusion-at-paypal (updated April 26, 2018) (Baranetsky Decl., Ex. 27).  Similarly, at least three companies that previously objected to disclosure of their data *in this case*—Juniper Networks,

Splunk, and Pandora Media—have now posted their Diversity Reports online. *See supra* Section II.B.3. In total, ten of the twenty companies that initially objected to disclosure at the time Plaintiffs filed this litigation have since removed their opposition.[9]

<div align="center">

**(b)**      **Diversity Reports are not confidential because companies actually treat them as public information.**

</div>

Diversity Reports are not actually treated as confidential. Nine of the ten federal contractors that continue to object to disclosure in this case have published content contained in the Diversity Reports or other diversity statistics on their own websites. Gilead, for example, published its 2016 Diversity Report data—the very data requested here—in an annual report online. *See* Gilead, *Year in Review: 2016*, 24 http://investors.gilead.com/static-files/33588c5a-7f81-437a-b35a-379514d49eff*[10]* (Baranetsky Decl., Ex. 28). Symantec began posting similar data in 2015. Symantec, *2015 Corporate Responsibility Report*, https://www.symantec.com/content/en/us/about/media/pdfs/2015-corporate-responsibility-report-en-us.pdf (posting report including EEO-1 data) (Baranetsky Decl., Ex. 29). Equinix, Agilent, and Applied Materials, have also published detailed workforce diversity statistics for the past several years. *See, e.g.*, Equinix, *2018 Corporate Sustainability Report*, 13-16,

---

[9] These companies are: Verifone (which released its data to Plaintiffs in June 2019 (Email from Ellen London, Assistant U.S. Attorney, to Victoria Baranetsky, General Counsel, CIR (June 18, 2019, 10:04 AM PST)) (Baranetsky Decl., Ex. 32), Intuitive Surgical, Juniper Networks, KLA-Tencor, Maxim Integrated Products, Palantir, Pandora Media, Splunk Inc, Sunpower, and Zendesk. *See also* Gov. Br. at 6 ("Subsequent to that filing, additional companies decided to release the information.")

[10] Defendant indicates that Gilead "has denied requests from the company's shareholders for the information." Govt Br. at 12. But Gilead began including such detailed EEO-1 data in its annual reports in response to a shareholder resolution in 2017. *See* New York City Office of the Comptroller, *2017 Shareholder Initiatives: Postseason Report*, at 12, https://comptroller.nyc.gov/wp-content/uploads/documents/2017_Shareowner_Initiatives_Postseason_Report.pdf (Baranetsky Decl., Ex. 33) ("Following engagement on the NYC Funds' shareowner proposals, Gilead Sciences agreed to provide more comprehensive EEO-1 data than the diversity data it was previously disclosing").

<div align="center">

-17-

</div>

1   https://www.equinix.com/resources/infopapers/corporate-sustainability-report/ (Baranetsky Decl.,

2   Ex. 30); Agilent, *2016 Corporate Citizenship Report*, 15, 56,

3   https://www.agilent.com/cs/library/periodicals/public/5991-7988EN.pdf (providing detailed

4   statistics about workers' sex, contract type, and level of seniority) (Baranetsky Decl., Ex. 31);

5   Applied Materials, *Applied Materials Diversity and Inclusion Report 2017*, 5,

6   http://www.appliedmaterials.com/files/diversity_inclusion_report_2017_final.pdf (providing

7   detailed statistics about workers' ethnicity across three fiscal years) (Baranetsky Decl., Ex. 34).[11]

9   Xilinx, responding to calls from shareholders to be more transparent about diversity, has agreed to

10   publish "comprehensive workforce composition data by gender and EEO race/ethnicity categories"

11   in its annual report for 2019.  Trillium Asset Management, *Xilinx, Inc.: Workplace Diversity*

12   *(2019)*, https://trilliuminvest.com/shareholder-proposal/xilinx-inc-workplace-diversity-2019/

13   (Baranetsky Decl., Ex. 35).  Indeed, shareholders are increasingly demanding this data be made

14   public.  *See* Patsky Decl. ¶¶ 27-28 ("Trillium is part of a quickly growing group of . . . investors

16   that call on companies to be transparent regarding this kind of data.").  While the government

17   makes general conclusory remarks about the confidentiality of Diversity Reports, that companies

18   are *actually* posting this information online wholly undermines any argument that these records are

19   confidential.

21          Still, DOJ argues these companies actually treat Diversity Reports as confidential because

22   they are stored in encrypted servers and only select employees can access them.  *See* Gov. Br. at 12

---

[11] In a subsequent SEC filing, Applied Materials wrote that shareholder feedback to this report "was universally positive, with the view that the report demonstrated our commitment to diversity and inclusion, transparency in disclosing data and accountability in working towards our goals. Shareholders also expressed appreciation of our continuing efforts to explore the disclosure of additional data regarding the diversity of our workforce." *See* Applied Materials, *2019 Proxy Statement*, 14, https://www.sec.gov/Archives/edgar/data/6951/000119312519015977/d681918ddef14a.htm (Baranetsky Decl. 36)

(citing company declarations stating records are "sensitive data"). But these companies admittedly only hold the Diversity Reports under secure measures because they store them with personally identifying employee information, as stated in the company declarations. *See, e.g.*, Declaration of Sarah Lee ¶ 6, Dkt. No. 24-5 (stating "Synopsys informs all of its employees that their self-identification data will be maintained in confidence.") Diversity Reports themselves do not contain any identifying information, let alone employees' "self-identification data." *Id.* Nothing about Diversity Reports is secret or confidential. Any claim to the contrary is undermined by the fact that nearly all of these companies post some form of diversity data online. *Cf. Argus Leader*, 139 S. Ct. 2356, 2363 (2019) (stating that "the Institute's retailers customarily do not disclose store-level SNAP data or make it publicly available 'in any way'" and "[e]ven within a company . . . only small groups of employees usually have access to it"). Moreover, the public can turn to sites like Open Diversity Data or Glassdoor.com where employees post about the diversity of various companies is discussed. *See* OPEN DIVERSITY DATA; Emily Moore, *20 Best Companies for Diversity and Inclusion*, GLASSDOOR BLOGS, Oct. 4, 2018, https://www.glassdoor.com/blog/20-best-companies-for-diversity-inclusion (Baranetsky Decl., Ex. 37).

### (c) Diversity Reports are identified as confidential as a pretense, impermissible under Exemption 4.

Given that Diversity Reports are not actually treated as confidential, it appears that any remaining objections to disclosure used are a pretense to avoid embarrassment. As multiple Circuits and this Court have previously agreed "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 564 (D.C. Cir. 2010); *Gen. Elec. Co. v. U.S. Nuclear Regulatory Comm'n*, 750 F.2d 1394, 1402-03 (7th Cir. 1984) ("[T]he competitive harm that attends any embarrassing disclosure is not the sort of thing that triggers exemption 4."); *Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700, at *2 (N.D. Cal. Nov. 24, 1993) (although "information could

-19-

damage plaintiff's reputation, this is not the type of competitive harm protected by the confidential commercial information exemption to FOIA.").

Agilent indicated, for example, that part of its objection stemmed from desire to avoid potential "damage [to] Agilent's reputation." Nickerson Decl. ¶ 21. Some of objecting companies have also endured public criticisms over lack of diversity. Fitbit, for instance, has faced withering critiques over its paucity of female leadership. *See, e.g.*, Alexa Liautaud, *Fitbit Counts on Women as Customers Just Not Board Members*, BLOOMBERG NEWS, June 18, 2015, https://www.bloomberg.com/news/articles/2015-06-18/fitbit-counts-on-women-as-device-buyers-just-not-board-members (Baranetsky Decl., Ex. 38). Agilent too has been criticized on the basis of the lopsided demographics of its "Thought Leaders" program. *See* Jonathan Eisen, *Agilent—where men are thought leaders*, DR. JONATHAN EISEN'S LAB (blog), July 8, 2016, https://phylogenomics.me/2016/07/08/agilent-where-men-are-thought-leaders/ (estimating that 90 percent of invited grantees for Agilent's 'Thought Leaders Program were male) (Baranetsky Decl., Ex. 39). Indeed, employees have sued these companies for alleged lack of diversity or discrimination.[12] But Exemption 4 does not apply where injury "might flow from…the embarrassing publicity." *Pub. Citizen*, 704 F.2d at 1291.

### (d) OFCCP gives no assurance of confidentiality because Diversity Reports are federally required.

The only other justification DOL asserts for withholding the Reports as confidential is that they were submitted under the government's assurance of privacy. *See Argus Leader*, 139 S. Ct. at

---

[12] *See generally Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176 (D. Del. 2001) (employee sued for alleged racial discrimination); *Frazier v. Agilent Tech., Inc.*, No. 5:16-cv-05729 (N.D. Cal. Oct 06, 2016) (employee sued over alleged ADA discrimination); *Thompson v. Agilent Technologies*, Inc., No. 1:14-cv-00737 (W.D. Tex. Aug 7, 2014) (employee sued for alleged age discrimination); *Hoffman v. Agilent Technologies, Inc.*, No. 2:11-cv-03303 (E.D. Pa. May 20, 2011) (employee sued over alleged sex discrimination and harassment); *Ali v. Gilead Sciences, Inc.*, No. 5:18-cv-00677 (N.D. Cal. Jan 31, 2018) (racial and disability discrimination claim); *Schmid v. Gilead Sciences, INC.*, No. 2:15-cv-01547 (W.D. Pa. Nov 24, 2015) (age discrimination claim).

-20-

2366 (stating proprietary information *could* be withheld under Exemption 4 if the government provides an assurance of privacy). DOL cleverly states that federal contractors submitting diversity data "are assured that their reports will be treated as confidential information *to the maximum extent permitted by law*." Gov. Br. at 13 (emphasis added). But the law does not permit Diversity Reports be treated as confidential and more importantly, OFCCP gives no assurance of privacy. While the EEOC is prohibited from disclosing EEO-1 Reports under Title VII of the Civil Rights Act of 1964, this restriction explicitly does not apply to OFCCP. *See supra* Section II.B.1. OFCCP and EEOC clearly state that records may be released on their websites and in EEO-1 material. *Id.*

This lack of assurance is further supported by the agency's actual practice. OFCCP has previously overruled objections by companies and released nearly identical Diversity Reports in response to FOIA requests. First, OFCCP released Diversity Reports for 2015 to Plaintiffs for many of the employers at issue here as recently as last year. Dkt. No. 1-4. OFCCP has also released Diversity Reports to other media outlets in recent years, including CNN and the *San Jose Mercury News. See* Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNNMONEY, Mar. 18, 2013, https://money.cnn.com/2013/03/17/technology/diversity-silicon-valley/index.html (Baranetsky Decl., Ex. 6); Mike Swift, *Five Silicon Valley companies fought release of employment data, and won*, SAN JOSE MERCURY NEWS, Feb. 11, 2010, https://www.mercurynews.com/2010/02/11/five-silicon-valley-companies-fought-release-of-employment-data-and-won/ (Baranetsky Decl., Ex. 7). Thus, while the objecting companies state in their declarations that they rely on the OFCCP's assurance that it will protect Diversity Reports to the "maximum extent possible," Gov. Br. at 13, any such reliance is not reasonable given there is no promise explicit or implied. Even in this case, OFCCP has wavered, quickly agreeing with

-21 -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*all* of the companies that chose to disclose *as well as* all of the companies that chose to withhold the information.

Unlike circumstances where companies file information with the government under an assurance of privacy in order to obtain something in return, here, the Diversity Reports are required. Federal contractors cannot opt-out. Because there is no assurance of confidentiality and the government has actually released records in the past, companies were not reasonable to rely on any purported assurance.

### C. CIR is Entitled to Summary Judgment Because the Government Has Failed to Meet the Foreseeable Harm Standard

In 2016, the OPEN FOIA Amendment added an additional and independent hurdle that heightens the requirements for withholding under FOIA called the "foreseeable harm" test.[13] Under this test, an agency may withhold information only if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A). The agency bears "the burden of justifying any withholding" under the foreseeable harm standard, *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019), a burden which the government cannot meet in this case. In addition to its failure to meet the requirements of the foreseeable harm standard, OFCCP's position is undermined by the fact that news media outlets, including CIR, previously acquired and published Diversity Reports from OFCCP, and no harm resulted. Moreover, many federal contractors willingly publish Diversity Reports or other similar statistics, *see supra* Section III.B.2(b), without foreseeable harm to the companies, and even yielding benefits. *See* Jackson Decl. ¶¶ 17-19 (summarizing research

---

[13] The government stays mute on this requirement, but the foreseeable harm standard, "codif[ies] a presumption of openness for agencies to follow when they respond to FOIA requests." 114 Cong. Rec. S1494 (Mar. 15, 2016), https://www.congress.gov/114/crec/2016/03/15/CREC-2016-03-15-senate.pdf [https://perma.cc/KQW7-655R] (statement of Sen. Grassley) (Baranetsky Decl., Ex. 40).

suggesting there are benefits to companies disclosing EEO-1 data); Williams Decl. ¶¶ 26-28

(listing reputational benefits of disclosure of diversity data).

        **1.**     **Even if Exemption 4 applies in this case, the government has not shown that Exemption 4's protected interests will be harmed by the disclosure.**

      The foreseeable harm standard can only be met with a showing that a specific harm a

particular exemption seeks to prevent will result from the disclosure. *Machado Amadis v. Dep't of*

*Justice*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019). Because Exemption 4 seeks to protects "trade

secrets and commercial or financial information" that is "privileged or confidential," 5 U.S.C. §

552(b)(4), as well as "assurances about the treatment of . . . proprietary" information, *Argus*

*Leader*, 139 S. Ct. at 2366, the foreseeable harm standard requires OFCCP to show a foreseeable

harm to proprietary confidential information will occur by disclosing Diversity Reports. It also

requires the agency to do so in a concrete, particularized manner. *Rosenberg v. U.S. Dep't of Def.*,

342 F. Supp. 3d 62, 78 (D.D.C. 2018).

      Here, no Exemption 4 interests would be harmed by disclosure. First, there are no

proprietary interests in the requested records. Diversity Reports cannot be characterized as

"proprietary information," nor are they commercial or financial in nature. *See supra* Section

III.B.1. Unlike "sales statistics" or "profits and losses," *Pub. Citizen*, 704 F.2d at 1290, the

diversity statistics at issue do not deal with the companies' commercial activities, but with the

general composition of the workforce. In this case, OFCCP has alleged that there may be

"potential harm to individual privacy" or "reputational harm" to the companies who have protested

the release of their Diversity Reports. Gov. Br. at 17. *See also* Nickerson Decl. ¶¶ 41-42. As

previously discussed, it is impossible for anonymous aggregate data to create individual harms.

*See supra* Section III.B.2(b). Moreover, these are not the commercial and proprietary interests

Exemption 4 seeks to protect, therefore the government has not met its burden under the

foreseeable harm standard.

-23-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

OFCCP has also failed to allege any harm in a concrete manner, alleging only vague potential harms. Gov. Br. at 17. The declarations offered by OFCCP similarly discuss speculative harms: one contractor stated that "disclosing the EEO-1 information would provide its competitors insight into its strategy, operations, recruiting, and labor costs[.]" Declaration of Kelly Kaiser ¶ 21, Dkt. No. 24-3. But an agency may not "perfunctorily state" that disclosure would cause foreseeable harm, and must "explain the foreseeable harm." *Rosenberg*, 342 F. Supp. 3d at 78-79.

### 2. Even if protected interests could be harmed by disclosure, such a harm is not "reasonably foreseeable."

The statutory phrase "reasonably foreseeable" in the FIA indicates that harm resulting from disclosure of otherwise exempt information must be foreseeable from an *objective* standpoint. Brief for Reporters' Comm. for Freedom of the Press & 36 Media Orgs. as Amici Curiae Supporting Plaintiff-Appellant, Machado Amadis v. Dep't of Justice, 388 F. Supp 3d 1 (D.D.C. 2019) (No. 1:16-cv-2230) (Baranetsky Decl., Ex. 41); *see also Kentucky v. King*, 563 U.S. 452, 464 (2011) ("Legal tests based on reasonableness are generally objective[.]"). Therefore, in order to withhold the EEO-1 reports, OFCCP would need to also show that resultant harm is objectively foreseeable.

Even if OFCCP had alleged the abovementioned harms in a more concrete manner, and even if they were the type of harms Exemption 4 sought to guard against, such harms are not objectively foreseeable. The increasing willingness of various companies to make their own Diversity Reports public, *see supra* Section II.B.3, suggests any harm is not be objectively foreseeable. While Declarations offered by OFCCP suggest other harms, such as impact on "managerial control," Declaration of Mirelle King ¶¶ 21-23, Dkt. No. 24-4, and revealing the "expertise in the field of how to structure the work-force to have a well-run, profitable, and

efficient company," Declaration of Victoria Thrasher ¶¶ 26-27, Dkt. No. 24-9, it is not clear how diversity data would provide insight on these matters.

**D.     It Is Unclear Whether OFCCP Conducted A Proper Search for Records.**

An agency is required to perform a reasonably adequate search for records, and the burden is on the agency to establish that the search was adequate. *Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086, 1089 (C.D. Cal. 2005); *Sakamoto v. Envtl. Prot. Agency*, 443 F. Supp. 2d 1182, 1198 (N.D. Cal. 2006).  Ninth Circuit courts have held that an agency must "explain[] the process and specifics of the searches it conducted." *McCash v Cent. Intelligence Agency*, No. 5:15-CV-02308-EJD, 2016 WL 6650389, at *5 (N.D. Cal. Nov. 10, 2016).  Searches are found to be inadequate when an agency fails to "provide sufficiently detailed, nonconclusory statements, which . . . would allow the Court to assess whether the documents were properly withheld." *Nat'l Res. Def. Council*, 388 F. Supp. 2d at 1089.  Here, it is unclear whether OFCCP fulfilled its obligation.  OFCCP stated that 19 of the 55 companies were not federal contractors, but did not clarify why it did not consider them to be federal contractors, whether and how it conducted a search for those records, and whether those records exist despite any federal contractor categorization.  Having failed to provide "detailed, nonconclusory statements" as to the search, *id.*, OFCCP has failed to meet its burden to establish that an adequate search was conducted.

**IV.     CONCLUSION**

For the foregoing reasons, the government's motion for summary judgment should be denied, and CIR's cross motion for summary judgment should be granted.

DATED: September 30, 2019          Respectfully submitted,

D. Victoria Baranetsky
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

1    DAVID L. ANDERSON (CABN 149604)
     United States Attorney
2    SARA WINSLOW (DCBN 457643)
     Chief, Civil Division
3    ELLEN LONDON (CABN 325580)
     Assistant United States Attorney
4        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102
5        Telephone: (415) 436-7288
         Facsimile: (415) 436-6748
6        E-mail: ellen.london@usdoj.gov
7
     Attorneys for Defendant
8
9                         UNITED STATES DISTRICT COURT
10                      NORTHERN DISTRICT OF CALIFORNIA
11                              OAKLAND DIVISION
12
13   THE CENTER FOR INVESTIGATIVE        )   NO. 19 CIV. 01843 (KAW)
     REPORTING and WILL EVANS,           )
14                                       )
                                         )
15          Plaintiffs,                  )   **OPPOSITION TO CROSS-MOTION FOR**
                                         )   **SUMMARY JUDGMENT; REPLY IN SUPPORT**
16      v.                               )   **OF MOTION FOR SUMMARY JUDGMENT**
                                         )
17   UNITED STATES DEPARTMENT OF         )
     LABOR,                              )   Date: November 21, 2019
18                                       )   Time: 1:30 p.m.
            Defendant.                    )   Location: To Be Determined
19                                       )
     _____)
20
21
22
23
24
25
26
27
28

## I. INTRODUCTION

This case involves a request by CIR under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and DOL's withholding of nine EEO-1, Type 2 Consolidated Reports. Plaintiffs have opposed DOL's request for summary judgment as to the propriety of withholding the reports pursuant to Exemption 4 of the FOIA, and have cross-moved for summary judgment. However, the evidence submitted demonstrates that the information falls within the broad category of documents covered by Exemption 4, as recently re-defined by the United States Supreme Court in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2365 (2019) ("*Argus Leader*").

Plaintiffs offer several arguments in their cross motion, none of which justify their request for the Court to grant summary judgment in their favor. First, the documents meet the broad definition of "commercial" in the context of Exemption 4. While Plaintiffs seek to narrow the scope of what is covered, the declarations show that the data being withheld is more than a mere listing of personnel but is in fact a reflection of business strategy. Second, Plaintiffs' arguments that the documents are not kept confidential are based on the fact that other companies release the reports and that certain of the companies release certain subsets of similar diversity statistics; however, these arguments do not change the fact that the companies in this matter keep the reports at issue here confidential. Nor are Plaintiffs correct that there was no assurance of privacy by the government, given the clear language on which the submitters relied and the agency's history of treating the reports as confidential. The *Argus Leader* standard is satisfied in this case. Next, Plaintiffs argue that there is no foreseeable harm that could arise from the release of the reports, but this argument also fails in light of the testimony offered by the companies about the concerns that they have about such a release. Finally, it is unclear if Plaintiffs are asserting an argument as to the adequacy of the agency's search, but any such argument should be rejected in light of the fact that Plaintiffs have never raised this argument before and because the search was adequate. Accordingly, the Court should hold that DOL has properly withheld the reports.

## II. ARGUMENT

### A. The Information is Exempt Under Exemption 4

"Exemption 4 shields from mandatory disclosure 'commercial or financial information obtained from a person and privileged or confidential.'" *Argus Leader*, 139 S. Ct. at 2366. The evidence

1 submitted by the Government satisfies what Plaintiffs describe as "*Argus Leader*'s relaxed Exemption 4

2 standard," Pls.' Mot. at 2, and indeed, *Argus Leader* sets forth an entirely new analysis for Exemption 4.

3 Plaintiffs' arguments as to why that standard is not met here, discussed below, are without merit because

4 there is unrebutted testimony as to how the documents were treated by the submitters and by the

5 government.

### 1. The Information is Commercial

7      Plaintiffs assert that the documents are not commercial, but this assertion is based on an overly

8 narrow reading of the case law and the evidence that has been submitted. The declarations from the

9 submitters explain that the information in the reports is not limited to a mere listing of personnel, but

10 also that it reveals the broader categories of strategy, recruiting, allocation of resources, diversity

11 initiatives. *See* Defs.' Mot. at 10-11 (describing the evidence). Such information relates to the

12 submitters' ability to be competitive in the market and necessarily to their commercial interests.

13      Plaintiffs appear to assert that the definition of a commercial interest under Exemption 4 is so

14 narrow as to only apply to information regarding revenue and net worth or income. Pls.' Mot. at 13.

15 Courts have specifically rejected such a narrow interpretation of the term commercial, finding instead

16 that information is covered where the submitter has a commercial interest in it. *See Pub. Citizen Health*

17 *Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (rejecting the notion that

18 commercial information is limited to only information that directly reveals commercial operations).

19 Information that is instrumental to a commercial interest is sufficiently commercial for the purpose of

20 Exemption 4. *See 100Reporters LLC v. United States Dep't of Justice*, 248 F. Supp. 3d 115, 137

21 (D.D.C. 2017) (discussing the broad scope of the term "commercial," and holding, *inter alia*, that

22 compliance materials are commercial because they "include information that is instrumental to [the

23 company's] operations"). The various job categories as well as the number of people hired in each

24 category contained in the EEO-1, Type 2 reports is instrumental to each submitter's ability to carry out

25 its commercial interests. Businesses cannot engage in commerce without the sufficient personnel in

26 specified job categories, which is thus related to the businesses' commercial enterprise.

27      Plaintiffs incorrectly claim that information can only be commercial if it is directly connected to

28 commercial activity. Pls.' Mot. at 12. In support of this claim, Plaintiffs rely on *Watkins v. U.S. Bureau*

*of Customs & Border Prot*. 643 F.3d 1189, 1195 (9th Cir. 2011).  Pls.' Mot. at 12-13.  *Watkins* involved

a FOIA request for the Notices of Seizure of Infringing Merchandise issued by the U.S. Bureau of

Customs and Board Protection.  However, the court directly rejected such a narrow definition, finding

that the information withheld was "plainly commercial" because it disclosed intimate aspects of the

business.  *Watkins* 643 F.3d at 1195 (9th Cir. 2011) (finding that Notices of Seizure contain commercial

information because they reveal information about a business' supply chains and fluctuations of demand

for merchandise).  Similarly, EEO-1, Type 2 reports contain information that reveal details about the

types of jobs at each of the companies, and the number of employees in each of the job categories, even

if they are further broken down by race, gender or ethnicity.  Over time, the reports provide insight into

the submitters' business strategy, as well as the fluctuations in demand for their services or merchandise.

*See also Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv*., 742 F. Supp. 2d 76, 81 (D.D.C.

2010) (holding that information about lump-sum bonuses and salary increases based on individual, unit,

and corporate performance indicators devised by the Postal Service constituted commercial information

in the context of another statute and within the "common understanding of the word" because it reflected

the agency's efforts to "improve customer service, generate revenue, manage costs and enhance a

performance-based culture").  Thus, the information contained in EEO-1, Type 2 reports falls well

within the definition of commercial information, subject to Exemption 4.[1]

### 2.    The Information is Customarily and Actually Kept Confidential

The Government has provided testimony from representatives of each of the companies as to the

steps taken to maintain the confidentiality of the reports within the companies, as well as the fact that

these reports are not made public.  Defs.' Mot. at 11-13.  Plaintiffs do not actually dispute this testimony

---

[1] The following cases cited by the Plaintiffs either contradict or fail to support Plaintiffs' assertions that the definition of commercial information should be construed narrowly.  *Skybridge Spectrum Found. v. Fed Commc'ns Comm'n*, No. 10-01496, 2012 WL 336160, at *12 (D.D.C. 2012) (holding that commercial information should be defined more broadly than just records that reveal basic commercial operations but should include information that serves a "commercial function"), *citing Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C.Cir.2002); *Merit Energy Co. v. US. Dep't of Interior*, 180 F.Supp.2d 1184, 1188 (D. Colo. 2001) ("For the purposes of FOIA, characterizing information as 'commercial'…does not require the invocation of a shibboleth—the words should be given their ordinary meanings."), *citing Pub. Citizen Health Research Group*, 704 F.2d at 1290; and *New Hampshire Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 49–50 (1st Cir. 2015) (finding that a non-profit can own commercial information but not otherwise addressing the definition of "commercial").

(nor could they), but rather argue that in spite of these facts the Court should nonetheless conclude that the information is not kept confidential. The Court should decline to do so.

First, Plaintiffs argue that the reports are not customarily kept confidential because other companies have released the reports. Pls.' Mot. at 15-17. Yet the standard articulated in *Argus Leader* was specific to the party to whom the information belongs. *See Argus Leader*, 139 S. Ct. at 2363, 2366 ("In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, *by the person imparting it*."; "it is hard to see how information could be deemed confidential if *its owner* shares it freely"; "At least where commercial or financial information is both customarily and actually treated as private *by its owner* and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4.") (emphases added). This makes sense, because different companies may treat the same information differently, based on a variety of unique factors. The Court should reject Plaintiffs' request that it add to the Exemption 4 standard the requirement that companies be viewed in the context of a purported industry standard.

To the extent that Plaintiffs are arguing that the fact that some of the companies at issue in this case disclosed the reports in the previous litigation is dispositive of the issue of confidentiality, that argument also should be rejected. *See* Pls.' Mot. at 5-6 (stating, "Last year, OFCCP disclosed Diversity Reports for the 2015 calendar year to Plaintiffs for some of the companies included in the Request at issue here," under the section heading "Diversity Reports Are Not Confidential"). It would not be fair to use compliance with the previous stricter standard as an indication that the companies are not in compliance with the standard set out in *Argus Leader*.

Second, Plaintiffs assert that the companies have not kept the reports confidential because "nearly all of these companies post some form of diversity online." Pls.' Mot. at 19. This does not change the fact (supported by unrebutted testimony) that the reports that are themselves at issue are actually kept confidential. *See Seife v. FDA*, No. 17-CV-3960 (JMF), 2019 WL 1382724, at *2 (S.D.N.Y. Mar. 27, 2019) (explaining that in order for "the exception to Exemption 4 for publicly available information" to apply, "[t]he publicly available information must be 'identical.'"). Plaintiffs assert that "Gilead, for example, published its 2016 Diversity Report data—the very data requested

1   here—in an annual report online." Pls.' Mot. at 17. In fact, what Gilead posted was just a sliver of the

2   information contained in the full EEO-1, Type 2 report. The EEO-1, Type 2 report contains

3   approximately 200 data points with the numbers broken down by gender within each racial classification

4   while the annual report provides only 28 data points for three job categories with no breakdown of the

5   gender numbers by racial classification. Supplemental Declaration of D. Lissette Geán ("Supp. Geán

6   Decl.") at ¶¶ 14-15. Accordingly, the exact data has not been made public and the exemption applies.

7              **3.      The Information Was "Provided to the Government Under An Assurance of Privacy"**

8          Plaintiffs contend that there was no assurance of confidentiality because the language that

9   constituted part of the government's assurance stated that the reports would be kept confidential "to the

10  maximum extent of the law," implying that this is merely a clever ploy to manufacture an assurance.

11  Pls.' Mot. at 21. That is not correct. As an initial matter, the government cannot make assurances

12  beyond what the law allows, and it is unclear why Plaintiffs would critique the government for noting

13  that it would comply with the law when providing an assurance to private companies. As the Supreme

14  Court has explained in the context of FOIA Exemption 7, which is a helpful framework for the *Argus*

15  *Leader* test,[2] "[i]n common usage, confidentiality is not limited to complete anonymity or secrecy."

16  *Dep't of Justice v. Landano*, 508 U.S. 165, 173 (1993). The Court elaborated, "[a] statement can be

17  made 'in confidence' even if the speaker knows the communication will be shared with limited others,

18  as long as the speaker expects that the information will not be published indiscriminately." *Id.* Here,

19  DOL submitted testimony from each of the submitters that they relied on this language, and there is thus

20  unrebutted evidence of an assurance of privacy. Defs.' Mot. at 14-15.

21         An assurance need not be explicit, and there is ample evidence of an implied assurance in this

22  case. *See Argus Leader*, 139 S. Ct. at 2363 (noting that an interpretation of Exemption 4 recognizing

23  express or implied promises is "consistent" with the definition of confidentiality); *see also* OIP

24  Guidance. The agency's actual practice—as experienced by the submitters per their sworn testimony—

25  was to maintain the records as confidential. Defs. Mot. at 15. While Plaintiffs argue that there is no

---

27         [2] *See* Office of Info. Policy, Exemption 4 after the Supreme Court's Ruling in *Food Marketing*
28  *Institute v. Argus Leader Media* (Oct. 4, 2019), *available at* https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media

1   pattern of the agency maintaining confidentiality, they point to the prior release of the 2015 reports,

2   which was done pursuant to the prior Exemption 4 standard before the *Argus Leader* decision.  Pls.'

3   Mot. at 21 ("OFCCP released Diversity Reports for 2015 to Plaintiffs for many of the employers at issue

4   here as recently as last year.").  Plaintiffs also cite to two news articles for the proposition that "OFCCP

5   has also released Diversity Reports to other media outlets in recent years," Pls.' Mot. at 21; however,

6   these news articles in fact show that the government has been consistent in withholding the records for

7   those companies that assert that release would cause harm.  *See* Baranetsky Decl., Ex. 6 (describing

8   contractors that "successfully petition[ed] the Department of Labor for their data to be excluded on the

9   basis that doing so would cause 'competitive harm'"); Ex. 7 ("[T]he Labor Department accepted

10  arguments filed by lawyers for Google, Apple, Oracle and Applied Materials that release of the

11  information would cause commercial harm.").

12      Finally, Plaintiffs note that the agency "quickly agree[d] with *all* of the companies that chose to

13  disclose *as well as* all of the companies that chose to withhold the information."  Pls.' Mot. at 21-22

14  (emphases in original).  But this shows nothing more than that different companies take different

15  approaches to confidentiality and have different views perspectives regarding the harm from release.  As

16  Plaintiffs themselves assert, it would not be proper for the government to withhold documents when the

17  submitter does not foresee any harm from release, Pls.' Mot. at 22-25, and the agency should not be

18  penalized for appropriately considering this issue.

19          **4.       The Government is Not Withholding the Reports to Avoid Embarrassment**

20      Plaintiffs claim that "it appears that any remaining objections to disclosure used are a pretense to

21  avoid embarrassment," relying solely on a single line from one of the declarations (from Agilent) and

22  the fact that some of the companies have faced public criticism over their lack of diversity.  Pls.' Mot. at

23  19-20.  This accusation is not supported in the record.  Even as to Agilent, the statement described a

24  concern about the company's reputation, which could include a concern that the report could be taken

25  out of context in a way that would be damaging.  *See* Declaration of Dave Nickerson ("Nickerson

26  Decl.") at ¶ 21 ("Data in Agilent's EEO-1 Report may be mischaracterized to damage Agilent's

27  reputation.").  Moreover, the Agilent declaration listed other reasons why it objects to the release.  *Id.* at

28  ¶ 20 ("Disclosure of the EEO-1 Report would reveal confidential strategic planning and compromise

Agilent's competitive advantage in recruiting, as well as provide competitors with insight into Agilent's operations and financial status."). Accordingly, Plaintiffs' request that the Court assign an impermissible motive to the government should be rejected.

### 5. The Foreseeable Harm Standard is Satisfied

Plaintiffs appear to be seeking to re-impose a competitive-harm or other significant harm requirement under Exemption 4 through the FOIA Improvement Act of 2016 ("FIA"). That argument is without merit and would render *Argus Leader* meaningless; nor has the government been "mute" on this requirement, Pls.' Mot. at 22 n.13, as explained below. The FIA, as relevant, merely requires agencies to release records that are covered by a FOIA exemption if release would not "reasonably harm an exemption-protected interest." *Rosenberg v. Dep't of Defense*, 342 F. Supp. 3d 62, 73 (D.D.C. 2018). In other words, a purely technical application of the exemption may not be sufficient to justify withholding. *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 101 (D.D.C. 2019).

*Argus Leader* redefined the scope of Exemption 4, which the FIA did not change. *See Seife*, 2019 WL 1382724, at *1 n.1 (reserving decision in light of Argus Leader in spite of the fact that the information in *Argus Leader* was not covered by the FIA because of the "similarity of the FOIA statute pre- and post-amendment"); *Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336, 355 (D.D.C. 2018) (noting the Government's assertion that the FIA "does not alter the scope of the information covered by the exemption").

To establish the harm to the exemption-protected interest resulting from disclosure, the Government may address the information categorically, as long as it is not done in a perfunctory fashion. *See Rosenberg*, 342 F. Supp. 3d at 79; *see also Sorin v. DOJ*, 758 Fed. App'x 28, 33 (2d Cir. 2018) (rejecting an argument that the agency failed to comply with the FIA because the agency provided "sound reasons for withholding" the information). Moreover, the Government may rely on declarations to show the exemption-protected harm. *See Judicial Watch*, 375 F. Supp. 3d at 101; *Cause of Action*, 330 F. Supp. 3d at 355; *Sorin v. DOJ*, 280 F. Supp. 3d 550, 566-67 (S.D.N.Y. 2017), *aff'd*, 758 Fed. App'x 28. Here, there is a sufficient showing on the record before the Court that release of the relevant information would harm several interests of the submitters. *See* Defs.' Mot. at 12-13 (describing

1    concerns about competitors using the information against them, harm to individual privacy, and, as

2    discussed above, potential reputational harm).

3            **B.**      **The Search Was Adequate**

4          An agency's search for records is "adequate" if it used "methods which can be reasonably

5    expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C.

6    Cir. 1990); *Lahr v. Nat'l Transportation Safety Board*, 569 F.3d 964, 986 (9th Cir. 2009). The issue "is

7    not whether there might exist any other documents possibly responsive to the request, but rather whether

8    the search for those documents was adequate." *Citizens Comm'n on Human Rights v. Food & Drug*

9    *Admin*., 45 F.3d 1325, 1328 (9th Cir. 1995) (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir.

10    1985)). The agency need not conduct an exhaustive search of every record system, but it must make a

11    good faith, reasonable search of those systems of records likely to possess the requested records.

12    *Oglesby*, 920 F.2d at 68.

13          An agency can establish the adequacy of its search by submitting a reasonably detailed, non-

14    conclusory affidavit describing its efforts, setting forth the search procedures. *Zemansky*, 767 F.2d at

15    573. "Agency affidavits enjoy a presumption of good faith" that a plaintiff must rebut. *See Ground*

16    *Saucer Watch v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). An agency's "failure to turn up a particular

17    document, or mere speculation that as yet uncovered documents might exist, does not undermine the

18    determination that the agency conducted an adequate search for requested records." *Wilbur v. CIA*, 355

19    F.3d 675, 678 (D.C. Cir. 2004) (per curiam). An agency is entitled to summary judgment if it

20    "demonstrates that it has conducted a reasonable search for relevant documents." *Garcia v. U.S. Dep't*

21    *of Justice*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).

22          In this case, after receiving Plaintiffs' request, OFCCP determined that it was appropriate for it

23    to search for the EEO-1 reports of federal contractors, because OFCCP's jurisdiction is limited to federal

24    contractors. Supp. Geán Decl. at ¶ 7. Over the course of a year, OFCCP informed Plaintiffs of this

25    decision in three letters, after which Plaintiffs never challenged OFCCP's search in response to the

26    FOIA request. Supp. Geán Decl. at ¶¶ 8-11. Nor did Plaintiffs raise this issue in its administrative

27    appeal. Supp. Geán Decl. at ¶ 12. Given the agency's reasonable response to the request, and Plaintiffs'

28    failure to alert the agency at any earlier point of any concerns, the Court should not now order the

1 government to conduct further searches.

2 **III.    CONCLUSION**

3       For all of the aforementioned reasons, Defendant respectfully requests that the Court grant

4 summary judgment in its favor.

5

6                                              Respectfully submitted,

7                                              DAVID L. ANDERSON
                                               United States Attorney

8

9 Dated: October 28, 2019
                                               ___/s/ *Ellen London*_____.

10                                             ELLEN LONDON
                                               Assistant United States Attorney

11                                             Counsel for Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D. Victoria Baranetsky (Cal. Bar No. 311892)
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>　　　　　　　　　Defendant. | Case No. 4:19-cv-01843-KAW<br><br>**SURREPLY TO DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**AND REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Date: December 5, 2019<br>Time: 1:30 p.m. |

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  ARGUMENT .................................................................................................... 3

   A.  Diversity Reports Are Not Exempt from Disclosure Under Exemption 4. ........................... 3

     1.  Diversity Reports Are Not Commercial. ........................................................... 3

     2.  Diversity Reports Are Not Confidential. ........................................................... 6

     3.  Diversity Reports Are Withheld to Avoid Embarrassment. ......................................... 12

   B.  The Foreseeable Harm Standard is Not Satisfied .................................................. 13

   C.  It Is Unclear Whether Defendant Conducted A Proper Search for Records. ......................... 14

III.  CONCLUSION .............................................................................................. 15

- ii -

Opp. to Def's Mot. Summ. J.; Rep. in Supp. of Cross Mot. Summ. J.

# TABLE OF AUTHORITIES

**CASES**

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 742 F. Supp. 2d 76 (D.D.C. 2010) ...... 5

*Am. Small Bus. League v. U.S. Dep't of Defense*, C 18-01979 WHA, 2019 WL 4416613 (N.D. Cal. Sept. 15, 2019) ................................................................................................................. 8, 13

*Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504 (D.C. Cir. 2011) .................. 14

*Army Times Pub. Co. v. U.S. Dep't of Air Force*, 998 F.2d 1067 (D.C. Cir. 1993) ......................... 7

*Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336 (D.D.C. 2018) ...................... 14

*CIR v. U.S. Dep't of Labor (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018) ...................... 7, 15

*Citizens Comm'n on Human Rights v. Food & Drug Admin.*, 45 F.3d 1325 (9th Cir. 1995) .......... 14

*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987) ....................................................... 10

*Davin v. U.S. Dep't of Justice*, 60 F.3d 1043 (3d Cir. 1995) ........................................................... 5

*Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ................................... passim

*Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759 (9th Cir. 2015) ..................................................... 15

*Inner City Press/Community on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239 (2d Cir. 2006) ............................................................................................................................ 10

*Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964 (9th Cir. 2009) ..................................................... 12

*Machado Amadis v. U.S. Dep't of Justice*, 388 F. Supp. 3d 1 (D.D.C. 2019) ................................ 13

*Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700 (N.D. Cal. Nov. 24, 1993). 13

*Mokhiber v. U.S. Dep't of Treasury*, 335 F. Supp. 2d 65 (D.D.C. 2004) ........................................ 7

*N.H. Right to Life v. U.S. Dep't of Health & Human Servs.*, 976 F. Supp. 2d 43 (D.N.H. 2013) . 4, 5

*N.H. Right to Life v. U.S. Dep't of Health and Human Servs.*, 778 F.3d 43 (1st Cir. 2015) ............. 5

*News Grp. Boston, Inc. v. Nat'l R.R. Passenger Corp.*, 799 F. Supp. 1264 (D. Mass. 1992) ........... 5

*Oglesby v. U.S. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990) ....................................................... 14

*Pub. Citizen Health Research Grp. v. Dep't of Health, Ed. & Welfare*, 477 F. Supp. 595 (D.D.C. 1979) ........................................................................................................................................... 6

*Seife v. FDA*, No. 17-CV-3960 (JMF), 2019 WL 1382724 (S.D.N.Y Mar. 27, 2019) ............... 10, 14

-iii-

OPP. TO DEF'S MOT. SUMM. J.; REP. IN SUPP. OF CROSS MOT. SUMM. J.

*Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548 (D.C. Cir. 1994) ................................... 15

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) .......................................................... 12

*Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189 (9th Cir. 2011) ................. 4, 10

*Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681 (9th Cir. 2012). ........................... 15

*Zemansky v. EPA*, 767 F.2d 569 (9th Cir. 1985) ................................................... 14, 15


**STATUTES**

5 U.S.C. § 552(a)(3)(C) .................................................................................. 14

5 U.S.C. § 552(a)(4)(B) .................................................................................. 12

5 U.S.C. § 552(a)(8)(A) .......................................................................... 2, 13, 14

5 U.S.C. § 552(b)(4) ..................................................................................... 3


**OTHER AUTHORITIES**

Dep't of Justice, *Exemption 4 After the Supreme Court's Ruling in* Food Marketing Institute v. Argus Leader Media, https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media ........................................................... 8, 9

Dep't of Justice, *Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA*, https://www.justice.gov/oip/step-step-guide-determining-if-commercial-or-financial-information-obtained-person-confidential .................................................................. 9

EEOC, *EEO-1 Instruction Booklet*, https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm ......................................... 11

Megan Rose Dickey, *The Future of Diversity and Inclusion in Tech*, TᴇᴄʜCʀᴜɴᴄʜ, June 17, 2019, https://techcrunch.com/2019/06/17/the-future-of-diversity-and-inclusion-in-tech/ ................... 13

OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions*, https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm ............................................ 11, 12

Oᴘᴇɴ Dɪᴠᴇʀsɪᴛʏ Dᴀᴛᴀ, http://opendiversitydata.org ........................................................ 9

Will Evans & Sinduja Rangarajan, *Oracle and Palantir Said Diversity Figures Were Trade Secrets. The Real Secret: Embarrassing Numbers*, Rᴇᴠᴇᴀʟ, Jan. 7, 2019, https://www.revealnews.org/article/oracle-and-palantir-said-diversity-figures-were-trade-secrets-the-real-secret-embarrassing-numbers/ ................................................................ 12

-iv -

Oᴘᴘ. ᴛᴏ Dᴇꜰ's Mᴏᴛ. Sᴜᴍᴍ. J.; Rᴇᴘ. ɪɴ Sᴜᴘᴘ. ᴏꜰ Cʀᴏss Mᴏᴛ. Sᴜᴍᴍ. J.

**REGULATIONS**

29 C.F.R. § 70.2(g)(5) ............................................................................................................ 7

Exec. Order No. 12,600, 3 C.F.R. § 1987 .............................................................................. 7

-v -

Opp. to Def's Mot. Summ. J.; Rep. in Supp. of Cross Mot. Summ. J.

## I.    INTRODUCTION

This case involves a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") for EEO-1, Type 2 Consolidated Reports ("Diversity Reports") submitted by Plaintiffs, The Center for Investigative Reporting and its reporter, Will Evans ("CIR"). Defendant, the Department of Labor ("DOL"), withholds these reports pursuant to 5 U.S.C. § 552(b)(4) ("Exemption 4") by asserting the Diversity Reports are confidential business information. Plaintiffs submitted a cross motion explaining how Diversity Reports are neither commercial nor secret, and therefore that the FOIA exemption does not apply.

In its response to Plaintiffs' Cross-Motion, Defendant exaggerates its already hyperbolic claim that Diversity Reports are "confidential commercial information" by claiming they reflect secret "business strateg[ies]." Government's Reply Brief, Dkt. No. 34 ("Gov. Reply Br."), at 1. That assertion is not only far-fetched, but completely untethered from the law. Diversity Reports are standard forms submitted to the government to account for a company's compliance with federal anti-discrimination laws. This aggregate demographic information does not qualify as "commercial" or "confidential" according to well-established FOIA law. Still, DOL pushes the bounds of reason by hiding behind repeated citations to *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ("*Argus Leader*") without sufficient accompanying analysis. Even the broad new Supreme Court ruling does not support a holding that would find Diversity Reports reveal secret corporate strategies properly withheld under Exemption 4.

DOL's claim that Diversity Reports are commercial is undermined by the fact that none of the records reveal *any* information about commercial aspects of the companies at issue. Nothing is disclosed about the companies' products, production, finances, bottom lines, economic efficiency or anything else that could fairly be defined as "commercial." To expand Exemption 4 beyond what *Argus Leader* holds, and characterize information pertaining to employee demographics (submitted to the government on standardized forms) as "commercial" threatens to expand the term so far as to render it meaningless. Under DOL's bloated definition, ostensibly *any* records related to a corporation would be "commercial," hiding many important public records from public view.

The claim that Diversity Reports are "confidential" is even more astounding. Previously, DOL has disclosed nearly identical records to CIR and other FOIA requesters. In response to this very request, days before DOL submitted its opening brief, DOL's Office of Federal Contract Compliance Programs ("OFCCP") released additional companies' Diversity Reports to CIR. Moreover, all but one of the companies that continue to object to disclosure of the records *already publish* much of the information contained within Diversity Reports on their company websites. Together, and even separately, these facts are fatal to Defendant's claim that the records are secret.

Additionally, Defendant fails to meet the foreseeable harm requirement introduced in the 2016 FOIA Improvement Act, 5 U.S.C. § 552(a)(8)(A) ("FIA"). DOL lists no exemption-protected harm or injury that would result from disclosure, because it cannot. Through this FOIA suit, CIR seeks records that would not only not cause a foreseeable harm, but would provide immense public benefit. Academics, members of Congress, and other officials have attested to the public benefit that would result from disclosure of the Diversity Reports, and have called for greater public access to these records. *See* Plaintiffs' Opening Brief, Dk. No. 29 ("Pls. Br.") at 16-17.

Defendant further fails to offer anything new to support its claim that the government performed a sufficient search for all of the requested Diversity Reports. Despite Defendant's production of a supplemental declaration, the additional declaration only reiterates that some of the companies for which Diversity Reports were requested are not federal contractors. This declaration altogether fails to remark on what search was conducted or whether the documents exist. While agencies are not required to do extensive searches, they are required at a bare minimum to provide affidavits demonstrating that a reasonable search was conducted, usually by describing the scope of the search as well as terms used. Here, none of these were provided.

Overall, Defendant's declarations are replete with generalizations, conclusory statements, and circular logic. Because Defendant has failed to meet its burden under FOIA, the Court should deny its Motion for Summary Judgment and grant CIR's Cross-Motion. If the Court has any questions about the withholdings, CIR respectfully requests that the Court review all disputed material *in camera* and order Defendant to immediately disclose all improperly withheld records.

## II.     ARGUMENT

### A.  Diversity Reports Are Not Exempt from Disclosure Under Exemption 4.

Here, the government has failed to meet its burden to show Diversity Reports are exempt, even under the modified *Argus Leader* standard.  139 S. Ct. at 2366.  The reports are not commercial.  The reports are neither "customarily" nor "actually" treated as confidential.  They are also not provided to the government under an assurance of privacy, and seem to be withheld at least in part due to concerns about corporate embarrassment (impermissible under Exemption 4).  While even one of these factors would be fatal, altogether they make clear that Diversity Reports should be disclosed.  *Cf.* 5 U.S.C. § 552(b)(4) (stating "commercial or financial information" provided to the government may be withheld if "privileged or confidential").

### 1.  Diversity Reports Are Not Commercial.

DOL fails to provide the requisite specificity to show Diversity Reports are commercial.  In the opening statement of its Reply Brief, Defendant asserts that it has fulfilled its burden by claiming the records reveal "business strateg[ies]."  Gov. Reply Br. at 2.  However, the proffered declarations do not state that the records reflect business strategies.  Only one declaration claims that the records "*tie[] directly into* Gilead's business strategy."  Declaration of Mirelle King, Dkt. No. 24-4, ¶ 4 (emphasis added).  But tying into a business strategy is not the same as reflecting or revealing a business strategy.  In any event, the declarations do not show or explain how or in what way the material is a business strategy or otherwise show that Diversity Reports qualify as "commercial" with the requisite specificity.  Instead, the declarations use broad and conclusory language.  *See, e.g.*, Government's Opening Brief, Dkt. No. 24, at 11 (citing Declaration of Julie Crane, Dkt. No. 24-2, ¶ 6 (simply stating "Applied Materials considers this information confidential commercial information"); Declaration of Mollie Wong, Dkt. No. 24-10, ¶ 7 ("Fitbit considers its EEO-1 reports to be commercial information because they contain

information regarding its workforce patterns and workforce profiles")).  Stating records are commercial in order to prove they are commercial is unsatisfactory circular logic, insufficient to fulfill the government's burden.

DOL's inability to demonstrate that these records are commercial stems from the fact that this task is Sisyphean.  It is impossible to prove EEO-1, Type 2 reports are commercial, where the standardized government forms are single page grids containing categories of jobs, genders, and race to prove compliance with federal anti-discrimination laws.  *Cf. Argus Leader,* 139 S. Ct. at 2361 (withholding "actual sales data").  The subject headings that are allegedly "categories of strategy," Gov. Reply Br. at 2, are simply columns that have demographic subject headings like "Male" or "Female," as well as "White," "Asian," and "Black or African American."  *See* Juniper Networks, *2017 Employer Information Report Consolidated Report Type 2,* http://www.juniper.net/assets/us/en/local/pdf/additional-resources/2017-eeo-1-report.pdf (Dkt. No. 29-5, Ex. 13, at 71).  The headings the Defendant alleges reveal "recruiting" strategies are categories of generic job titles, such as "Executive/Sr. Officials & Mgrs," "Sales Workers," "Laborers & Helpers."  *Id.*  Nothing about any of these categories alone or in combination reveals a commercial strategy or economic efficiency at the company.  Rather, the form is a tally of employee demographics in terms of race and gender, listed by generic job title that reveals only the diversity of a company's workforce, as Diversity Reports were intended to do.  *See, e.g.*, *N.H. Right to Life v. Dep't of Health & Human Servs.*, 976 F. Supp. 2d 43, 57 (D.N.H. 2013) (personnel policies which identify "disciplinary, improvement and termination issues" are not commercial).

In addition to the bare facts, DOL fails on the law.  DOL tries to rely on *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1195 (9th Cir. 2011), but that case weighs in Plaintiffs' favor.  There, the Court found that CBP's "Notices of Seizure" contained commercial information only because they revealed information about a business's *product supply chains* and

fluctuations in demand for *merchandise*. *Id.* Essentially, in *Watkins* the court found information

was commercial because it related to the company's merchandise. *Id.* But here, the information

relates to the demographics of *employees*, which is entirely divorced from the companies' products.

DOL also attempts to rely on *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 742 F.

Supp. 2d 76, 81 (D.D.C. 2010) (holding that information about lump-sum bonuses and salary

increases constituted commercial information). However, once again, that case leans in Plaintiffs'

favor. The information at issue in that case was commercial only insofar as it related to the

company's finances by revealing salaries and was only incidentally related to the employees,

unlike non-commercial information such as an employee's race or gender. The government cannot

earnestly say these cases support its argument, since Diversity Reports have nothing to do with the

*products* or the *finances* of the companies. *See Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1050

(3d Cir. 1995) (requiring the government to demonstrating a "logical connection" between the

information and the claimed exemption).

Other case law the government fails to mention even more strongly support Plaintiffs'

position, given that in many cases courts have found limits to the bounds of what qualifies as

"commercial" under FOIA, and the records in those cases are more analogous to Diversity Reports.

*See, e.g.*, *N.H. Right to Life v. U.S. Dep't of Health & Human Servs.*, 976 F. Supp. 2d 43, 57

(D.N.H. 2013)[1] (personnel policies which "identify hours of work, compensation and benefit rates,

benefit eligibility criteria, employee orientation, insurance policy limits, and disciplinary,

improvement and termination issues" are not commercial); *News Grp. Boston, Inc. v. Nat'l R.R.*

*Passenger Corp.*, 799 F. Supp. 1264, 1269 (D. Mass. 1992) (Amtrak salary information is not

---

[1] While the government mentions the appellate case, *N.H. Right to Life v. U.S. Dep't of Health and Human Servs.*, 778 F.3d 43, 49-50 (1st Cir. 2015), which affirmed the district court decision, Gov. Reply Br. at 4, n.1, it does not address the facts more comprehensively laid out in the district court decision.

commercial); *Pub. Citizen Health Research Grp. v. U.S. Dep't of Health, Ed. & Welfare*, 477 F.

Supp. 595, 605 (D.D.C. 1979) (health-related studies are not commercial).

### 2. Diversity Reports Are Not Confidential.

DOL has also failed to meet its burden to show that Diversity Reports are confidential

under *Argus Leader*, as it is unable to show that the records are customarily *or* actually treated as

confidential. *See* 139 S. Ct. at 2366 (requiring government to show "*both* customarily and

actually") (emphasis added). DOL argues that because the objecting companies do not post the

reports in full and "take steps to maintain the confidentiality of the reports within the companies,"

Gov. Reply Br. at 3, that the records are confidential under *Argus Leader*. But the consistent and

repeated disclosure of Diversity Reports and identical data by the government, the objecting

companies, and the industry as a whole entirely undercut this claim.

### a. Diversity Reports are not customarily treated as confidential.

Diversity Reports are not "customarily" treated as confidential by any entity, including the

objecting companies, the government, or other industries. While the government would like to

delimit the "customarily" inquiry to what the objecting companies attest to be their own custom,

Gov. Reply Br. at 5, that narrow interpretation is not aligned with the common meaning of the

word "custom" nor is it the enumeration of the actual test. *Argus Leader*, agency guidelines, and

the Department of Justice's own guidance all direct courts to consider the surrounding

circumstances, including the government's actions and industry standards, to determine "custom."

Accordingly, Diversity Reports cannot be deemed "customarily" confidential. But even if the

Court were to follow the government's more cramped understanding, the companies' own

disclosures are fatal to the finding the Diversity Reports are customarily treated as confidential.

First, under FOIA, the government's actions are strongly probative to determining what is

"customarily" considered as confidential. The statute and agency guidelines both underscore that

the *government* ultimately wields the power to withhold information and also bears the burden to show that the requested documents are customarily withheld in accordance with the law. *See generally Mokhiber v. U.S. Dep't of Treasury*, 335 F. Supp. 2d 65, 69 (D.D.C. 2004) (citing *Army Times Pub. Co. v. U.S. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993)); Exec. Order No. 12,600, 3 C.F.R. § 1987 (requiring that the agency make its own independent determination about whether the information can be withheld under Exemption 4, which can override a company's objection, requiring only that an agency provide notice to the company); 29 C.F.R. § 70.2(g)(5) (DOL guidelines stating the same). For years, the government has disclosed Diversity Reports. Just last year, OFCCP disclosed Diversity Reports to CIR. *See CIR v. U.S. Dep't of Labor (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018). Similarly, in response to the present action, OFCCP released Diversity Reports for sixteen of the fifty-five employers,[2] Dkt. No. 1-3, and subsequently released Diversity Reports for ten additional employers after the commencement of these proceedings. Dkt. No. 29-5, Ex. 8, at 51. These repeated releases strongly lean in favor of the court finding Diversity Reports are not customarily treated as secret.

Second, and most importantly, all but one of the objecting companies discloses data within the Diversity Reports, which is fatal to finding the records are "customarily" treated as confidential, according to *Argus Leader*. *See* 139 S. Ct. at 2363 (stating that "the Institute's retailers customarily do not disclose store-level SNAP data or make it publicly available 'in *any* way'" and "[e]ven within a company . . . only small groups of employees usually have access to it") (emphasis added). Indeed, this Court, in one of the only cases applying the *Argus Leader* standard, found that information was not "customarily" kept confidential because a company had

---

[2] These employers are: Advanced Micro Devices, Bloom Energy, Cadence Design Systems, Fair Isaac, Palo Alto Networks, PayPal, Penumbra, ServiceNow, Slack Technologies, SolarCity, Synnex, Varian Medical Systems, Verifone, VMware, WageWorks, and Yahoo Inc. Trimble sent its Diversity Report to CIR directly, and CIR thus requested that it be removed from the Request.

made repeated selective disclosures of this *type* of information in the past. *Am. Small Bus. League v. U.S. Dep't of Defense*, C 18-01979 WHA, 2019 WL 4416613, at *3 (N.D. Cal. Sept. 15, 2019). Similarly, here, the objecting federal contractors have, by the Government's own admission, made "selective disclosures of supposed confidential information" by regularly publicly posting this type of data (*i.e.* workforce diversity data). *Id.* Rather than not disclosing *any* material in *any way*, *cf. Argus Leader*, 139 S. Ct. at 2363, here not only the same *type* but portions of *identical* data have been publicly posted on company websites. So even if the "customarily" inquiry required a court to focus on the practices of the particular company, as DOL suggests, the government cannot meet its burden.

Courts must also look to industry standards to determine what qualifies as "customarily" confidential. In *Argus Leader*, the majority concluded that the information at issue was "customarily kept private" because, on an industry-wide level, FMI's "retailers customarily d[id] not disclose store-level SNAP data." 139 S. Ct. at 2363. In examining retail stores participating in SNAP *as a whole*, the Court indicated that an industry-wide inquiry is appropriate. *Id.* Indeed, despite its position in this case, the Department of Justice has explained (in its own guidance interpreting *Argus Leader*) that industry standards are probative evidence of whether information is customarily treated as confidential. *See* Dep't of Justice, *Exemption 4 After the Supreme Court's Ruling in* Food Marketing Institute v. Argus Leader Media, https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media ("as *Argus Leader* itself demonstrates, industry representatives can provide the *necessary* information regarding the customary treatment of such information") (emphasis added) (Declaration of D. Victoria Baranetsky ("Baranetsky Decl."), Ex. 1); *see also* Dep't of Justice, *Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA*, https://www.justice.gov/oip/step-step-

guide-determining-if-commercial-or-financial-information-obtained-person-confidential (stating that whether "the submitter customarily keep[s] the information private . . . . may in appropriate contexts be determined from industry practices concerning the information.") (Baranetsky Decl., Ex. 2).

Here, it is undisputed that posting Diversity Reports is a growing industry standard, which is likely why the government tries to downplay its importance. To date, over thirty major technology companies have published their forms online to promote diversity. *See* Pls. Br. at 15 (citing OPEN DIVERSITY DATA, http://opendiversitydata.org (Dkt. 29-5, Ex. 12, at 66-69)). CIR has also offered unrebutted testimony from an "industry representative" who offered evidence that posting Diversity Reports is an industry custom, Declaration of Matthew Patsky, Dkt. No. 29-3, ¶¶ 5, 16, evidence that comports with DOJ's own guidance about determining whether information is "customarily" kept confidential. Dep't of Justice, *Exemption 4 After the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media* (Baranetsky Decl., Ex. 1). As such, Plaintiffs do not ask the Court to "add to the Exemption 4 standard" as the government alleges, Gov. Reply Br. at 5, but merely ask it to apply the test set forth in *Argus Leader*, which would find Diversity Reports are not customarily confidential according to industry standards, let alone the companies' own customs and other relevant factors like the government's past disclosures.

### b. Diversity Reports are not actually treated as confidential.

Similarly, Diversity Reports are not *actually* treated as confidential by the companies at issue. Nine of the ten federal contractors who continue to object to disclosure post some of the identical diversity statistics on their company websites. DOL tries to diminish the significance of these disclosures by detailing how one company's public diversity report contains only "28 data points," Supplemental Declaration of D. Lissette Geán, Dkt. No. 34-1 ("Supp. Geán Decl."), at ¶ 15, compared to the "more than 200 data points" found in its Diversity Report. *Id.* at ¶ 14. While

it is true that not *every data point* has been made public, Gov. Reply Br. at 5, most have been—and even this partial disclosure (of facts that are observable to all employees within the companies) is enough to show Diversity Reports do not contain *actual* secrets according to *Argus Leader.*

*Argus Leader* is clear that records in that case were secret because the retailers "d[id] not disclose store-level SNAP data" or "make it publicly available 'in any way'" and "[e]ven within a company . . . only small groups of employees usually ha[d] access to it." 139 S. Ct. at 2363. Similarly, courts have repeatedly held in other FOIA cases that when *some* information contained in requested records is made public, the information should not be withheld under FOIA. *See Inner City Press/Community on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 248 (2d Cir. 2006); *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987) ("To the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality"); *Watkins v. U.S. Bureau of Cust. & Border Protec.*, 643 F.3d 1189, 1196 (9th Cir. 2011) (same, quoting *CNA Fin. Corp.*). While DOL tries to claim the publicly available information must be "identical" to all the information contained in the withheld records for the records to be disclosed under Exemption 4, Gov. Reply Br. at 4 (citing *Seife v. FDA*, No. 17-CV-3960 (JMF), 2019 WL 1382724 (S.D.N.Y Mar. 27, 2019)), that claim is incorrect.[3]

Applying the *Argus Leader* principle to this case, it is clear that DOL should disclose the withheld records. *Argus Leader* makes clear once retailers disclose *any* information, or make it "publicly available in 'any way,'" a company cannot argue that it actually treats the records as confidential. 139 S. Ct. at 2362. Given that all but one of these companies make available a variety of the data points on their public websites, much of which is duplicative in the withheld

---

[3] In fact, *Seife v. FDA* supports Plaintiffs' position. There, the court found that the FDA's redactions were overly broad, where the objecting company "conceded that over half of the sample pages . . . contained improper redactions[,]" *id.* at *2, and thus ordered the FDA and objecting company to "re-review" and "re-redact," since *some* of the information in the documents was publicly available and therefore could not be withheld under Exemption 4. *Id.*

Diversity Reports, these records are not actually treated as secret, and so must be disclosed.

Additionally, unlike data that is stamped as confidential, or accessible to only a small subset of employees, this information can be observed in real time by many at the company and is available to all members of the public through public company websites. To withhold in full data that has *actually been published* by these companies and is not "actually" confidential, Gov. Reply. Br. at 2, would defy the law as well as reason.

### c. Diversity Reports are not provided to the government under an assurance of secrecy.

DOL asserts that "there is ample evidence of an implied assurance of confidentiality in this case," by pointing to declarations in which company representatives state they relied on a statement made by the government that the information would be kept confidential "to the maximum extent of the law." Gov. Reply Br. at 6. But that statement purportedly creating reliance is posted on the EEOC's, and not the OFCCP's, website. EEOC, *EEO-1 Instruction Booklet*, https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm (Dkt. No. 29-5, Ex. 3, at 24). In addition to the fact that this statement was not made by the relevant agency, OFCCP clearly states on its website and elsewhere that disclosure of Diversity Reports by OFCCP is possible, so once again FOIA does not permit withholding.

While the EEOC is forbidden from disclosing Diversity Reports in response to FOIA requests under Title VII of the Civil Rights Act of 1964, *see id.*, this restriction does not apply to OFCCP. Instead, OFCCP's website clearly states that the records are subject to FOIA. OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions*, https://www.dol.gov/ofccp/regs/compliance/faqs/foiafaqs.htm (stating records may be disclosed) (Dkt. No. 29-5, Ex. 5, at 39-40). While the government is correct in noting that, under *Argus Leader*, "an assurance need not be explicit," Gov. Reply Br. at 5, OFCCP cannot justifiably claim that any assurance exists, even an implicit one, where OFCCP's website *explicitly* states that it

cannot as a policy withhold Diversity Reports in response to FOIA requests.  OFCCP, *FOIA Frequently Asked Questions* (stating OFCCP "engages in a case specific analysis when determining whether or not to release information that a company asserts is protected by Exemption 4 of the FOIA.") (Dkt. No. 29-1, Ex. 5, at 40).

The government further tries to sidestep the fact that OFCCP provides no assurance where it reversed course and agreed with all companies that assented to disclosure.  It states that this about-face "shows nothing more than that different companies take different approaches to confidentiality and have different views [and] perspectives regarding the harm from release."  Gov. Reply Br. at 6.  But this explanation ignores the fact that the agency is tasked with making determinations as to whether information can properly be withheld under a FOIA exemption.  5 U.S.C. § 552(a)(4)(B); *see also Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)), and here the agency repeatedly chose to disclose Diversity Reports.  While it is unclear whether OFCCP engaged in the required "case-specific analysis" in this case, OFCCP, *FOIA Frequently Asked Questions*, it is patently obvious that the agency has made no assurances of confidentiality—implied or express.

### 3. Diversity Reports Are Withheld to Avoid Embarrassment.

Given Diversity Reports are neither commercial, nor are they actually or customarily confidential, and no assurance of confidentiality exists, Plaintiffs questioned why else records may be withheld.  The declarations and revelations from the public domain show that the disclosure may likely lead to public embarrassment for the objecting companies.  *See* Pls. Br. at 28; *see also* Will Evans & Sinduja Rangarajan, *Oracle and Palantir Said Diversity Figures Were Trade Secrets. The Real Secret: Embarrassing Numbers*, REVEAL, Jan. 7, 2019, https://www.revealnews.org/article/oracle-and-palantir-said-diversity-figures-were-trade-secrets-the-real-secret-embarrassing-numbers/ (stating that Synnex also expressed concerns about "public

relations harms" if their Diversity Reports were disclosed) (Baranetsky Decl., Ex. 3); Megan Rose

Dickey, *The Future of Diversity and Inclusion in Tech*, TECHCRUNCH, June 17, 2019,

https://techcrunch.com/2019/06/17/the-future-of-diversity-and-inclusion-in-tech/ (describing

diversity scandals at technology companies and noting "[c]ompanies are treating it as a PR crisis")

(Baranetsky Decl., Ex. 4).

Defendant does not address these points and merely counters that Plaintiffs rely on only one

company's declaration for this proposition.  Gov. Reply Br. at 6.  But the public domain is replete

with insight suggesting the objecting companies are solely concerned with reputational damage.

This Court has disapproved of attempts to use Exemption 4 to withhold documents because they

will subject a company to embarrassment, *Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993

WL 1483700, at *2 (N.D. Cal. Nov. 24, 1993), and has recently expressed wariness of disclosures

"only when it ma[kes] [a company] look good."  *Am. Small Bus. League v. U.S. Dep't of Def.*, C

18-01979 WHA, 2019 WL 4416613, at *2 (N.D. Cal. Sept. 15, 2019).

### B.  The Foreseeable Harm Standard is Not Satisfied

DOL has failed to show that foreseeable harm is satisfied in this case, as is required by the

FIA.  *Machado Amadis v. U.S. Dep't of Justice*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019).  The

government does not mention a single commercial or proprietary interest that would be harmed by

disclosure, Gov. Reply Br. at 7-8, but nonetheless says it has established the requisite particularity

to meet the foreseeable harm standard.  *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78

(D.D.C. 2018).  Instead, DOL restates other harms alleged by the companies, such as "harm to

individual privacy," improbable in this case since Diversity Reports contain no personally

identifiable information, and "potential reputational harm," a harm Exemption 4 is not intended to

guard against.  *See supra* Section II.A.3.  Because the alleged harms will not relate in any way to

exemption-protected interests in this case, DOL has failed to meet the its burden under FIA.

The government tries to avoid its obligation under the foreseeable harm standard by contending that the FIA did not alter "the scope of Exemption 4," Gov. Reply Br. at 7, but the cases it cites for this novel proposition do not support its claim. In *Seife v. FDA*, the court deemed it "prudent" to await the decision in *Argus Leader* before making its determination on FIA and Exemption 4 issues. 2019 WL 1382724, at *1 n.1. In staying the proceedings, the court in that case simply allowed for the *possibility* that *Argus Leader* could impact its analysis, but it did not hold that FIA would not apply in Exemption 4 cases. Moreover, *Argus Leader* ultimately did not impact the FIA standard, because that case concerned a pre-FIA request.[4] The case law cited by the government does not support its position, and the government fails to meet the requirements of FIA by failing to provide any cognizable harm, an independent and additional burden an agency must meet where an Exemption applies.

### C. It Is Unclear Whether Defendant Conducted A Proper Search for Records.

The government has failed to satisfy its burden to show it conducted an adequate search for the requested records. FOIA requires an agency responding to a request to "demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985); *see* 5 U.S.C. § 552(a)(3)(C). The adequacy of the agency's search is "judged by a standard of reasonableness." *Citizens Comm'n on Human Rights v. Food & Drug Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995). While there is "no requirement that an agency search every record system," the agency must conduct a good faith search of those systems likely to possess requested records. *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) ("An agency is required to perform more than a perfunctory search…"). To that end, the

---

[4] Similarly, DOL cites an additional case in which the government agency argued that the FIA "does not alter the scope of the information covered by . . . exemption [4]," but the court in that case did not accept the government's argument, resolving the matter on other grounds. *Cause of Action Inst. v. Dep't of Justice*, 330 F. Supp. 3d 336, 355 (D.D.C. 2018).

responding agency typically submits affidavits that describe the scope and methods employed; these showings must be "'reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Zemansky*, 767 F.2d at 571.

Here, no declaration shows that DOL performed an adequate search, let alone a reasonable one. The new declaration merely states that the companies "were not federal contractors in 2016." Supp. Geán Decl. ¶ 8. While a perfect search is not required, here, it seems the government did not even perform a perfunctory one for the companies it claims are not contractors. *Cf. Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015) ("the Plaintiffs were entitled to a reasonable search for records, not a perfect one. *And a reasonable search is what they got*") (emphasis added). Courts find that an agency's failure "to describe in *any* detail what records were searched, by whom, and through what process[]" is fatal to its request for summary judgment. *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994) (same). Moreover, the lack of records for these "non-contractors" is surprising, considering that the OFCCP previously disclosed Diversity Reports for some of these companies for other calendar years. *See CIR v. U.S. Dep't of Labor (OFCCP)*, No. 3:18-cv-1008-JCS (N.D. Cal. 2018).

While Defendant tries to evade its burden by stating that Plaintiffs waived their argument as to the search, here Plaintiffs did not have full opportunity to do so, as the Defendant's responses were all preliminary, not final determinations. *See* Dkt. Nos. 1-3, 1-4, 1-5. Regardless, courts are generally unwilling to grant these, particularly where all arguments were brought before the district court. *Yonemoto v. U.S. Dep't of Veterans Affairs*, 686 F.3d 681, 692 (9th Cir. 2012).

**III.    CONCLUSION**

For the foregoing reasons, the government's motion for summary judgment should be denied, and CIR's cross motion for summary judgment should be granted.

DATED: November 12, 2019                    Respectfully submitted,

D. Victoria Baranetsky
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

# EXHIBIT E

co= ES43564
u= ES43564

# EQUAL EMPLOYMENT OPPORTUNITY
## 2017 EMPLOYER INFORMATION REPORT
## CONSOLIDATED REPORT - TYPE 2

## SECTION B - COMPANY IDENTIFICATION

1. PANDORA MEDIA INC
   2100 FRANKLIN STREET
   SUITE 700
   OAKLAND, CA 94612

2.a. PANDORA MEDIA INC
   2100 FRANKLIN STREET
   SUITE 700
   OAKLAND, CA 94612
   ALAMEDA COUNTY

c. Y

## SECTION C - TEST FOR FILING REQUIREMENT
1-Y 2-N 3-Y DUNS NO.:131637105 EIN :943352630

## SECTION E - ESTABLISHMENT INFORMATION

## SECTION D - EMPLOYMENT DATA

| JOB CATEGORIES | HISPANIC OR LATINO | | NOT-HISPANIC OR LATINO | | | | | | | | | | | | OVERALL TOTALS |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | \*\*\*\*\*\*\*\*\*\*\*\* MALE \*\*\*\*\*\*\*\*\*\*\*\* | | | | | | \*\*\*\*\*\*\*\*\*\*\*\* FEMALE \*\*\*\*\*\*\*\*\*\*\*\* | | | | | | |
| | MALE | FEMALE | WHITE | BLACK OR AFRICAN AMERICAN | NATIVE HAWAIIAN OR PACIFIC ISLANDER | ASIAN | AMERICAN INDIAN OR ALASKAN NATIVE | TWO OR MORE RACES | WHITE | BLACK OR AFRICAN AMERICAN | NATIVE HAWAIIAN OR PACIFIC ISLANDER | ASIAN | AMERICAN INDIAN OR ALASKAN NATIVE | TWO OR MORE RACES | |
| EXECUTIVE/SR. OFFICIALS & MGRS | 1 | 1 | 23 | 0 | 1 | 3 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 38 |
| FIRST/MID OFFICIALS & MGRS | 16 | 4 | 177 | 6 | 0 | 36 | 1 | 11 | 132 | 9 | 1 | 30 | 1 | 6 | 430 |
| PROFESSIONALS | 43 | 45 | 346 | 28 | 1 | 132 | 0 | 36 | 306 | 33 | 6 | 99 | 1 | 25 | 1101 |
| TECHNICIANS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SALES WORKERS | 10 | 13 | 83 | 4 | 0 | 6 | 1 | 3 | 161 | 6 | 1 | 2 | 0 | 11 | 301 |
| ADMINISTRATIVE SUPPORT | 7 | 11 | 10 | 2 | 0 | 7 | 0 | 0 | 16 | 7 | 0 | 7 | 0 | 1 | 68 |
| CRAFT WORKERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OPERATIVES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LABORERS & HELPERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SERVICE WORKERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 77 | 74 | 639 | 40 | 2 | 184 | 2 | 50 | 624 | 55 | 8 | 138 | 2 | 43 | 1938 |
| PREVIOUS REPORT TOTAL | 95 | 83 | 793 | 55 | 2 | 205 | 1 | 60 | 724 | 47 | 8 | 165 | 3 | 60 | 2301 |

## SECTION F - REMARKS

## SECTION G - CERTIFICATION

DATES OF PAYROLL PERIOD:   11/20/2017   THRU   12/03/2017

CERTIFYING OFFICIAL:            ADELMISE WARNER
EEO-1 REPORT CONTACT PERSON:   Milly McInnis
EMAIL: mmcinnis@pandora.com

TITLE: LEAD COUNSEL EMPLOYMENT
TITLE: Sr People operations manager
TELEPHONE NO: 5107420432

CERTIFIED DATE|EST|:02/26/2018 11:56 PM

# EXHIBIT F



# Federal Contract Compliance Manual (FCCM)



www.dol.gov/agencies/ofccp

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

**CHAPTER 1 DESK AUDIT** ..............................................................................................**3**

1A     INTRODUCTION .........................................................................................................3
       1A00   TYPES OF COMPLIANCE EVALUATIONS ........................................................3
       1A01   CONTENTS OF CHAPTER ..................................................................................5
       1A02   PURPOSE OF THE DESK AUDIT .......................................................................5
       1A03   PRINCIPLES AND FOCUS OF DESK AUDITS ..................................................5
       1A04   USE OF THE STANDARD COMPLIANCE EVALUATION REPORT .............6
       1A05   CASE MANAGEMENT SYSTEM .........................................................................7
       1A06   CONFIDENTIALITY OF INFORMATION ..........................................................8
       1A07   NOVEL ISSUES .....................................................................................................8
       1A08   CORPORATE MANAGEMENT COMPLIANCE EVALUATIONS ....................9
       1A09   FUNCTIONAL AFFIRMATIVE ACTION PROGRAMS ....................................9
       1A10   PREAWARD COMPLIANCE EVALUATIONS .....................................................9
       1A11   EDUCATIONAL INSTITUTION EVALUATIONS ...............................................9

1B     PRE-DESK AUDIT ACTIONS .....................................................................................11
       1B00   INITIAL CONTACT WITH THE CONTRACTOR ...............................................11
       1B01   PREPARATION AND MAINTENANCE OF THE CASE CHRONOLOGY
              LOG ........................................................................................................................12
       1B02   CREATION AND MAINTENANCE OF THE CASE FILE .................................13
       1B03   SENDING THE SCHEDULING LETTER AND ITEMIZED LISTING .............16
       1B04   FOLLOW-UP CONTACT WITH CONTRACTOR AND JURISDICTION
              CHALLENGES .......................................................................................................16
       1B05   CONTACTING EEOC, VETS AND OTHER AGENCIES ...................................17
       1B06   INFORMATION ON COMPLAINTS FILED WITH OR BY OTHER
              AGENCIES .............................................................................................................18
       1B07   RELATIONSHIP OF OFCCP COMPLIANCE ACTIVITIES TO LITIGATION
              OR COURT ORDERS ............................................................................................19
       1B08   REVIEW OF COMMUNITY RESOURCE FILES ...............................................19
       1B09   REVIEW OF PREVIOUS COMPLIANCE ACTIONS .........................................19

1C     RECEIPT OF AAPs AND ITEMIZED LISTING DATA FOR DESK AUDIT ...............20
       1C00   NONRECEIPT OF AAPs .......................................................................................20
       1C01   NONRECEIPT OF ITEMIZED LISTING DATA .................................................20
       1C02   REGULATORY CITATIONS FOR RECORDKEEPING ....................................21
       1C03   EVALUATION PERIOD ........................................................................................23
       1C04   ADDITIONAL DATA REQUESTS ......................................................................23

1D     REVIEW OF AAPs: OVERVIEW ................................................................................24

1E    REVIEW OF ALL AAPs AND ITEMIZED LISTING DATA TO ENSURE
      SUBMISSIONS INCLUDE REQUIRED CONTENT......................................................25
      1E00   ACTION WHEN AAP IS NOT CURRENT ..........................................................25
      1E01   INCLUSION ..........................................................................................................25
      1E02   MISSING AAP ELEMENTS ...............................................................................25
      1E03   MISSING ITEMIZED LISTING DATA...............................................................28

1F    REVIEW OF AN EXECUTIVE ORDER AAP AND ITEMIZED LISTING
      DATA FOR ACCEPTABILITY ...................................................................................28
      1F00   ORGANIZATIONAL PROFILE...........................................................................29
      1F01   JOB GROUPS.......................................................................................................30
      1F02   EXECUTIVE ORDER UTILIZATION ANALYSIS ...........................................32
      1F03   PLACEMENT GOALS ........................................................................................34
      1F04   ADDITIONAL REQUIRED ELEMENTS OF AN EXECUTIVE
             ORDER AAP ......................................................................................................34
      1F05   REVIEW OF EXECUTIVE ORDER ITEMIZED LISTING DATA FOR
             ACCEPTABILITY ...............................................................................................36

1G    REVIEW OF A SECTION 503 AAP AND ITEMIZED LISTING DATA FOR
      ACCEPTABILITY .......................................................................................................40
      1G00   ITEMS INCLUDED .............................................................................................40
      1G01   POLICY STATEMENT ........................................................................................40
      1G02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES..............................41
      1G03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL
             QUALIFICATIONS ............................................................................................41
      1G04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL
             LIMITATIONS.....................................................................................................42
      1G05   HARASSMENT ...................................................................................................43
      1G06   EXTERNAL DISSEMINATION OF EEO POLICY...........................................43
      1G07   OUTREACH AND POSITIVE RECRUITMENT................................................43
      1G08   INTERNAL DISSEMINATION OF EEO POLICY ...........................................44
      1G09   AUDIT AND REPORTING SYSTEM .................................................................44
      1G10   OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION...........................44
      1G11   TRAINING TO ENSURE AAP IMPLEMENTATION.......................................45
      1G12   DATA COLLECTION ANALYSIS.....................................................................45
      1G13   UTILIZATION GOAL ANALYSIS FOR INDIVIDUALS WITH
             DISABILITIES ...................................................................................................45

1H    REVIEW OF A VEVRAA AAP AND ITEMIZED LISTING DATA FOR
      ACCEPTABILITY .......................................................................................................46
      1H00   ITEMS INCLUDED .............................................................................................46
      1H01   POLICY STATEMENT ........................................................................................46
      1H02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES..............................47
      1H03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL
             QUALIFICATIONS ............................................................................................48
      1H04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL
             LIMITATIONS.....................................................................................................48

1H05  HARASSMENT ...............................................................49
1H06  EXTERNAL DISSEMINATION OF EEO POLICY ...........................49
1H07  OUTREACH AND POSITIVE RECRUITMENT .......................49
1H08  INTERNAL DISSEMINATION OF EEO POLICY ...........................50
1H09  AUDIT AND REPORTING SYSTEM ...............................50
1H10  OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION........50
1H11  TRAINING TO ENSURE AAP IMPLEMENTATION......................51
1H12  DATA COLLECTION ANALYSIS......................................51
1H13  VEVRAA HIRING BENCHMARK ....................................51

1I    SUMMARY OF ACCEPTABILITY PROBLEMS WITH AAPs AND
      ITEMIZED LISTING DATA ...............................................53

1J    ANALYSIS OF SECTION 503 AAP: REVIEW OF ONLINE APPLICATION
      PROCESS ...................................................................53

1K    ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: OVERVIEW OF
      ITEMIZED LISTING DATA, EEO TRENDS, WORKFORCE STRUCTURE
      AND PERSONNEL PRACTICES ...........................................54
      1K00  EEO-1 TREND ANALYSIS ...........................................54
      1K01  WORKFORCE STRUCTURE AND PERSONNEL PRACTICES...........55

1L    ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP:  GOALS PROGRESS
      AND GOOD FAITH EFFORTS ............................................56
      1L00  ANALYSIS OF GOALS PROGRESS .................................56
      1L01  EVALUATION OF GOOD FAITH EFFORTS .......................57
      1L02  PLAN FOR EVALUATION OF GOOD FAITH EFFORTS..............57

1M    BASIS FOR POTENTIAL DISCRIMINATION ANALYSES .................58

1N    ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: AUDIT OF
      ORGANIZATIONAL PROFILE...........................................58
      1N00  UNDERREPRESENTATIONS AND CONCENTRATIONS...........59
      1N01  DETERMINING THE RELEVANT WORKFORCE SECTOR AND JOB
            AREAS ..............................................................59
      1N02  ANALYSIS BASED ON A PARTICULAR RACE OR ETHNICITY ...............61

1O    ANALYSIS OF EXECUTIVE ORDER 11246 EMPLOYMENT ACTIVITY
      DATA ......................................................................62
      1O00  CONDUCTING STATISTICAL ANALYSES OF EXECUTIVE
            ORDER 11246 EMPLOYMENT ACTIVITY DATA ....................62
      1O01  SPECIFIC RACE AND ETHNIC GROUP ANALYSIS ................63
      1O02  PROPER USE OF PRELIMINARY STATISTICAL RESULTS.............63
      1O03  STATISTICAL ANALYSIS SUMMARY.............................63

1P    COMPENSATION ANALYSIS .............................................65
      1P00  GENERAL PRINCIPLES OF COMPENSATION DATA ANALYSIS .............66
      1P01  ITEMIZED LISTING DATA ON COMPENSATION......................67
      1P02  DESCRIPTIVE ANALYSIS OF COMPENSATION.......................67

1P03    SYSTEMIC STATISTICAL ANALYSIS OF COMPENSATION AT DESK
        AUDIT ......................................................................................................68
1P04    CONCLUDING DESK AUDIT COMPENSATION ANALYSIS ......................69

1Q    SCER SUMMARY OF POTENTIAL DISCRIMINATION AREAS AND
      ONSITE INVESTIGATIVE PLAN (ALL LAWS)...........................................69

1R    CONCLUSION OF THE DESK AUDIT .............................................................70
      1R00    DOCUMENTS FOR CLOSING COMPLIANCE EVALUATION AFTER
              THE DESK AUDIT ..................................................................................70
      1R01    REASONS TO PROCEED WITH ON-SITE REVIEW .....................................71
      1R02    COMPLETING APPROPRIATE SCER PAGES ................................................71

CHAPTER 2 ON-SITE REVIEW ..........................................................................................72

2A    INTRODUCTION .................................................................................................72

2B    DETERMINING THE NEED FOR AN ON-SITE REVIEW...........................73

2C    ON-SITE REVIEW PREPARATION...................................................................74
      2C00    PROHIBITION AGAINST RETALIATION...........................................................74
      2C01    USE OF THE STANDARD COMPLIANCE EVALUATION REPORT AND
              INFORMATION MANAGEMENT...........................................................................75
      2C02    HISTORICAL DATA AND COMPLAINT HISTORY .....................................76
      2C03    ON-SITE PLAN...............................................................................................77
      2C04    NOTICE OF THE ON-SITE DATE AND REQUESTS FOR ADDITIONAL
              INFORMATION...................................................................................................77

2D    ON-SITE PROCESS..............................................................................................78
      2D00    ENTRANCE CONFERENCE..............................................................................78
      2D01    FACILITY INSPECTION .................................................................................79
      2D02    COLLECTING INFORMATION: ACCESS TO CONTRACTOR RECORDS ..80
      2D03    MANAGEMENT AND NONMANAGEMENT INTERVIEWS .......................81
      2D04    EXIT CONFERENCE ......................................................................................82
      2D05    RETURN ON-SITE REVIEW AND DENIAL OF ACCESS..............................82

2E    COLLECTING INFORMATION FOR ANALYSIS ...........................................82
      2E00    TYPES OF EVIDENCE .................................................................................83
      2E01    PERSONNEL ACTIVITY AND SELECTION PROCESS.................................84
      2E02    SELECTION PROCEDURES AND TESTING ..................................................85
      2E03    COMPENSATION ...........................................................................................86

2F    INTERVIEWS ........................................................................................................89
      2F00    GENERAL INTERVIEW PRINCIPLES AND PROCEDURES ........................89
      2F01    MANAGEMENT INTERVIEWS .....................................................................93
      2F02    EMPLOYEE INTERVIEWS.............................................................................93
      2F03    ISSUES THAT ARISE DURING THE ON-SITE REVIEW..............................94

2G    EXECUTIVE ORDER 11246 AAP REQUIREMENTS....................................94

2G00   EXECUTIVE ORDER 11246 AAP AND ITEMIZED LISTING DATA
PROBLEMS ................................................................................................94
2G01   DESIGNATION OF RESPONSIBILITY FOR THE AAP...................................95
2G02   IDENTIFICATION OF PROBLEM AREAS: WHERE IMPEDIMENTS TO
EQUAL EMPLOYMENT OPPORTUNITY EXIST ..........................................95
2G03   ACTION-ORIENTED PROGRAMS TO CORRECT PROBLEM AREAS ........96
2G04   EVALUATION OF GOOD FAITH EFFORTS....................................................96
2G05   INTERNAL AUDIT AND REPORTING SYSTEM TO MEASURE
EFFECTIVENESS OF TOTAL AFFIRMATIVE ACTION PROGRAM...........99

2H     SECTION 503 AAP AND ADDITIONAL REQUIREMENTS ........................99
2H00   SECTION 503 AAP AND ITEMIZED LISTING DATA SUBMISSIONS .......100
2H01   AVAILABILITY OF AAP FOR INSPECTION................................................104
2H02   INVITATION TO SELF-IDENTIFY AS AN INDIVIDUAL WITH A
DISABILITY ..............................................................................................104
2H03   DISABILITY-RELATED INQUIRIES, MEDICAL EXAMS, AND
CONFIDENTIALITY OF DISABILITY INFORMATION ..............................106

2I     VEVRAA AAP AND ADDITIONAL REQUIREMENTS ...........................107
2I00   VEVRAA AAP AND ITEMIZED LISTING DATA SUBMISSIONS ..............108
2I01   AVAILABILITY OF AAP FOR INSPECTION................................................112
2I02   INVITATION TO SELF-IDENTIFY AS A PROTECTED VETERAN ...........112

2J     RELIGION AND NATIONAL ORIGIN REQUIREMENTS .......................114
2J00   CONTRACTOR POLICY AND IMPLEMENTATION...................................114
2J01   RELIGIOUS ACCOMMODATION ..............................................................114
2J02   POTENTIAL HARASSMENT AND DISCRIMINATION .............................115
2J03   COMMUNITY CONTACTS .......................................................................116

2K     COMPLIANCE WITH SEX DISCRIMINATION REGULATIONS ...........116
2K00   DISCRIMINATION ON THE BASIS OF PREGNANCY ...............................117
2K01   REVIEW OF CONTRACTOR POLICIES AND
IMPLEMENTATION..................................................................................117
2K02   LEAVE AND FRINGE BENEFITS...............................................................119
2K03   SEXUAL HARASSMENT...........................................................................121

2L     EQUAL OPPORTUNITY CLAUSES AND OTHER REQUIREMENTS....................121
2L00   EQUAL OPPORTUNITY CLAUSES AND OTHER REQUIREMENTS OF
EXECUTIVE ORDER 11246, VEVRAA AND SECTION 503 .......................122
2L01   EXECUTIVE ORDER 13496 REQUIREMENTS............................................125
2L02   RECORDKEEPING ..................................................................................126

2M     EMPLOYMENT ACTIVITY DATA REQUIREMENTS..............................126
2M00   ANALYZING THE SELECTION PROCESS..................................................127
2M01   DISTINGUISHING OBJECTIVE FROM SUBJECTIVE SELECTION
CRITERIA ...............................................................................................128
2M02   ANALYSIS OF OBJECTIVE CRITERIA.......................................................129
2M03   ANALYSIS OF OBJECTIVE CRITERIA FOR ADVERSE IMPACT.............130

2M04  ANALYSIS OF SUBJECTIVE CRITERIA AND DETERMINATION OF ADVERSE IMPACT ......................................................................130
2M05  JUSTIFICATION OF SELECTION PROCEDURES WHEN ADVERSE IMPACT IS IDENTIFIED.................................................................131

2N     LINKAGE AGREEMENTS..............................................................................132
2N00  LINKAGE OBJECTIVES ........................................................................132
2N01  LINKAGE REQUIREMENTS...................................................................132
2N02  IMPLEMENTATION UNDER EXECUTIVE ORDER 11246 ........................132
2N03  WHERE LINKAGE AGREEMENTS ARE NOT REQUIRED (EXECUTIVE ORDER 11246 Only)...................................................133
2N04  LINKAGE AGREEEMENTS FOR INDIVIDUALS WITH DISABILITIES AND PROTECTED VETERANS.......................................................133
2N05  CONFIRMATION OF LINKAGE AGREEMENT ..........................................134

2O     ON-SITE REVIEW SUMMARY OR REPORT WRITING...........................................134
2O00  SUMMARY OF FINDINGS ....................................................................134

**CHAPTER 3 CONSTRUCTION INDUSTRY COMPLIANCE PROGRAM.....................136**

3A     INTRODUCTION ...........................................................................................136

3B     COVERAGE AND CONTRACT CLAUSES...............................................................136
3B00  REGULATIONS APPLICABLE TO CONSTRUCTION CONTRACTORS....137
3B01  REQUIRED BID SOLICITATION NOTICE AND CONTRACT SPECIFICATIONS FOR CONSTRUCTION CONTRACTS ...........................137
3B02  REQUIRED EQUAL OPPORTUNITY CONTRACT CLAUSES FOR CONSTRUCTION CONTRACTS.................................................................138
3B03  SUPPORT FROM OTHER AGENCIES RELATED TO CONSTRUCTION CONTRACTORS .................................................................................139
3B04  MEGA CONSTRUCTION PROJECTS...........................................................140

3C     GENERAL PRINCIPLES APPLICABLE TO THE CONSTRUCTION INDUSTRY ..............................................................................................141
3C00  EXECUTIVE ORDER GOALS ...............................................................141
3C01  PRECONSTRUCTION CONFERENCES.......................................................142
3C02  NOTICE OF SUBCONTRACT AWARDS .....................................................142

3D     THE COMPLIANCE REVIEW PROCESS..................................................................143

3E     PRE-REVIEW PREPARATION: SCHEDULING AND COORDINATION WITH OTHER AGENCIES .............................................................................144
3E00  INITIAL CONTACT WITH THE CONTRACTOR AND SCHEDULING ......144
3E01  PREPARATION AND MAINTENANCE OF THE CASE CHRONOLOGY LOG .......................................................................144
3E02  CREATION AND MAINTENANCE OF THE CASE FILE............................145
3E03  CONTACTING EEOC, VETS AND OTHER AGENCIES ..............................146
3E04  INFORMATION ON EEO COMPLAINTS FILED WITH OR BY OTHER AGENCIES.....................................................................................147

    3E05   REVIEW OF COMMUNITY RESOURCE FILES ...........................................148
    3E06   REVIEW OF OFCCP COMPLIANCE ACTIONS............................................148
    3E07   INTERAGENCY COORDINATION FHWA....................................................148

3F      ON-SITE REVIEW PROCESS OVERVIEW ..................................................................149

3G     ENTRANCE CONFERENCE .........................................................................................149

3H     EXECUTIVE ORDER 11246 REVIEW OF RECORDS ...............................................150
    3H00  PAYROLL RECORDS.......................................................................................150
    3H01  EMPLOYMENT ACTIVITY RECORDS ..........................................................151
    3H02  COLLECTIVE BARGAINING AGREEMENT ..................................................151
    3H03  INCLUSION OF THE EQUAL OPPORTUNITY CLAUSE IN
           SUBCONTRACTS .................................................................................................151
    3H04  REVIEW OF PERSONNEL POLICIES FOR SEX DISCRIMINATION..........152

3I      EVALUATION OF IMPLEMENTATION OF AFFIRMATIVE ACTION STEPS
     SET FORTH IN 41 CFR 60-4.3(a) PARAGRAPH 7.......................................................153
    3I00    EVALUATION OF RECRUITMENT PRACTICES .........................................154
    3I01    EVALUATION OF TRAINING ...........................................................................156
    3I02    EVALUATION OF EEO POLICY IMPLEMENTATION ................................157
    3I03    EVALUATION OF PERSONNEL OPERATIONS ..........................................160
    3I04    EVALUATION OF CONTRACTING ACTIVITY ..........................................162

3J      INTERVIEWS ......................................................................................................................163

3K     PHYSICAL INSPECTION OF CONTRACTOR WORKSITES...................................163
    3K00  INVESTIGATION OF COMPLIANCE...............................................................164
    3K01  COMPLIANCE WITH EXECUTIVE ORDER 13496 .....................................164

3L      COMPLIANCE WITH SEX DISCRIMINATION REGULATIONS ...........................165

3M    COMPLIANCE WITH RELIGION AND NATIONAL ORIGIN GUIDELINES .........165

3N     COMPLIANCE WITH VEVRAA AND SECTION 503 ................................................165

3O     IDENTIFICATION AND RESOLUTION OF EMPLOYMENT
     DISCRIMINATION ..........................................................................................................167

3P      EXIT CONFERENCE ........................................................................................................167

3Q     STANDARD CONSTRUCTION COMPLIANCE EVALUATION REPORT .............167
    3Q00  PURPOSE AND CONTENT OF THE SCER.....................................................167
    3Q01  SUMMARY OF FINDINGS ...............................................................................169

3R      NOTIFICATION OF COMPLIANCE REVIEW RESULTS AND RESOLUTION
     OF VIOLATIONS ..............................................................................................................170

3S      EXAMPLES OF COMMON VIOLATIONS..................................................................170

3T      REVIEW COMPLETION LETTER .............................................................172

3U      REFERRAL FOR ENFORCEMENT.............................................................172

**CHAPTER 4 CORPORATE MANAGEMENT COMPLIANCE EVALUATIONS ..........173**

4A      INTRODUCTION ......................................................................................173
        4A00   PURPOSE OF CMCEs........................................................................173
        4A01   SCOPE OF CMCE.............................................................................174
        4A02   CONFIDENTIALITY.........................................................................175

4B      PRE-DESK AUDIT ACTIONS....................................................................176
        4B00   FOLLOW-UP CONTACT WITH CONTRACTOR ............................176
        4B01   CORPORATION BACKGROUND RESEARCH ...............................176
        4B02   SEARCH FOR PUBLISHED REPORTS ..........................................176
        4B03   RETRIEVAL OF "FORM 10-K" REPORTS.....................................177
        4B04   RETRIEVAL OF EEO-1 REPORTS.................................................177
        4B05   OFCCP COMPLIANCE HISTORY REPORTS .................................179
        4B06   CONTACTING EEOC, VETS AND OTHER AGENCIES .............179
        4B07   FOLLOW-UP AND USE OF INFORMATION ON COMPLAINTS FILED
               WITH OR BY OTHER AGENCIES ................................................179
        4B08   RELATIONSHIP OF OFCCP COMPLIANCE ACTIVITIES TO EEO
               LITIGATION OR COURT ORDERS................................................180
        4B09   REVIEW OF COMMUNITY RESOURCE FILES.............................180
        4B10   REVIEW OF PAST OFCCP COMPLIANCE ACTIONS ..................180
        4B11   EVALUATION AND ANALYSIS OF CORPORATE INFORMATION .........181
        4B12   EVALUATION OF EEO-1 REPORTS..............................................183

4C      RELATIONSHIP TO THE STANDARD DESK AUDIT ...........................183

4D      DESK AUDIT – REVIEW OF THE ORGANIZATIONAL PROFILE, JOB
        GROUP ANALYSIS AND UTILIZATION ANALYSIS ............................184
        4D00   ANALYSIS OF NONFAVORED GROUPS' MANAGEMENT LEVEL
               PARTICIPATION ..........................................................................184
        4D01   ANALYSIS OF FUNCTIONAL AREAS ........................................186

4E      DESK AUDIT: AAP AND EMPLOYMENT ACTIVITY INFORMATION
        DURING A REVIEW OF SELECTION PROCESSES AND
        DEVELOPMENTAL PROGRAMS................................................................188

4F      NOTICE OF ON-SITE REVIEW AND FOLLOW-UP DATA REQUESTS.................189

4G      ON-SITE REVIEW ......................................................................................190
        4G00   ENTRANCE CONFERENCE...........................................................190
        4G01   CORPORATE CULTURE ...............................................................191
        4G02   INTERVIEWS ................................................................................192

4H      ON-SITE: FILLING OF MANAGEMENT JOBS ........................................193
        4H00   GENERAL QUALIFICATION STANDARDS.................................193

4H01   EXTERNAL HIRES ........................................................................195
4H02   SOURCES OF APPLICANTS AND CANDIDATES ........................195
4H03   SAMPLE QUESTIONS AND ANALYSIS FOR VARIOUS SEARCH
SOURCES................................................................................196
4H04   INTERNAL DEVELOPMENT .....................................................198
4H05   MANAGEMENT TRAINING AND EXECUTIVE DEVELOPMENT.............209
4H06   MENTORING AND NETWORKING...............................................210

4I       ON-SITE: RETENTION .......................................................................212
4I00   OVERVIEW OF TOTAL COMPENSATION PACKAGES............................212
4I01   RECOGNITION:  AWARDS AND HONORS..................................216

4J       ON-SITE: TERMINATIONS..................................................................217

4K       COMPLETION OF COMPLIANCE EVALUATION: EXIT CONFERENCE,
REPORT WRITING AND NOTICE OF EVALUATION .............................217
4K00   NOTICE OF EVALUATION COMPLETION ..................................217

**CHAPTER 5 FUNCTIONAL AFFIRMATIVE ACTION PROGRAM
COMPLIANCE EVALUATIONS ........................................................219**

5A       INTRODUCTION ................................................................................219
5A00   APPLICABILITY OF CHAPTER ...............................................219
5A01   PURPOSE OF THE FAAP............................................................219
5A02   THE FAAP AGREEMENT.........................................................219
5A03   FAAP COMPLIANCE EVALUATIONS .......................................220
5A04   COMPLETING THE SCER .......................................................220
5A05   OFCCP PARTICIPANTS IN FAAP COMPLIANCE EVALUATIONS ...........220

5B       PRE-DESK AUDIT ACTIONS.............................................................221
5B00   CREATION AND MAINTENANCE OF THE CASE FILE.............................221
5B01   SENDING THE SCHEDULING LETTER AND ITEMIZED LISTING...........221
5B02   FOLLOW-UP CONTACT WITH CONTRACTOR .........................222
5B03   OFCCP COMPLIANCE HISTORY REPORTS...............................222
5B04   CONTACTING EEOC, VETS AND OTHER AGENCIES .............................222

5C       DESK AUDIT.......................................................................................223
5C00   REVIEW OF SECTION 503 AND VEVRAA AAPs ........................224

5D       ON-SITE...............................................................................................224

5E       COMPLIANCE EVALUATION COMPLETION.........................................225

**CHAPTER 6 COMPLAINT INVESTIGATION ...................................................226**

6A       INTRODUCTION ................................................................................226

6B       BASES OF COMPLAINT ALLEGATIONS...........................................226
6B01   EXECUTIVE ORDER 11246 ALLEGATIONS...............................226
6B02   VEVRAA AND SECTION 503 ALLEGATIONS............................227

6B03   RETALIATION, INTIMIDATION, AND INTERFERENCE
ALLEGATIONS .................................................................................228
6B04   EXECUTIVE ORDER 13496 INVESTIGATIONS ...........................229

6C     COMPLAINT RECEIPT AND PERFECTION ................................................229
6C00   RECEIPT OF COMPLAINTS.............................................................229
6C01   WHO MAY FILE A COMPLAINT ....................................................229
6C02   PROVIDING CONTRACTOR THE 10-DAY NOTICE LETTER ...................230
6C03   COMPLAINT PERFECTION ...............................................................230

6D     INVESTIGATING THE COMPLAINT...........................................................232
6D01   TIMELY COMPLETION OF INVESTIGATION...............................232
6D02   CORRESPONDENCE.............................................................................232
6D03   NOTIFYING THE CONTRACTOR AND COMPLAINANT THAT
OFCCP WILL INVESTIGATE THE COMPLAINT...........................233
6D04   COUNSEL OR OTHER REPRESENTATION .....................................233
6D05   CASE FILE ...............................................................................................234
6D06   OFCCP CMS ............................................................................................237

6E     TYPES OF COMPLAINT ALLEGATIONS .................................................237
6E00   APPROACH TO INVESTIGATING COMPLAINT ALLEGATIONS.............237
6E01   INVESTIGATIVE FRAMEWORK .....................................................238
6E02   SYSTEMIC ALLEGATIONS ................................................................238
6E03   HARASSMENT .......................................................................................239
6E04   RETALIATION AND INTERFERENCE..............................................239
6E05   ALLEGATIONS SPECIFIC TO EXECUTIVE ORDER 11246 .......................240
6E06   ALLEGATIONS SPECIFIC TO DISABILITY COMPLAINTS .......................240
6E07   ALLEGATIONS SPECIFIC TO VEVRAA (NONDISABILITY)
COMPLAINTS ......................................................................................244
6E08   EQUAL OPPORTUNITY CLAUSE AND RECORDKEEPING
REQUIREMENTS...................................................................................245
6E09   NOVEL ISSUES.......................................................................................245

6F     INVESTIGATIVE PLAN.....................................................................................246

6G     INTERVIEWING THE COMPLAINANT BEFORE ON-SITE
INVESTIGATION...................................................................................................246

6H     OBTAINING DOCUMENTARY EVIDENCE AND RECORDS PRIOR TO
ON-SITE INVESTIGATION ...............................................................................247
6H00   HISTORICAL DOCUMENTATION...................................................248
6H01   POLICIES AND PRACTICES.................................................................248
6H02   OTHER DOCUMENTS RELEVANT TO THE COMPLAINT
ALLEGATIONS......................................................................................248

6I     ON-SITE INVESTIGATIONS...........................................................................249
6I00   NOTIFYING THE CONTRACTOR OF THE ON-SITE INVESTIGATION....249
6I01   ON-SITE INVESTIGATION: ROAD MAP ......................................249

6I02    INTERVIEW PROCEDURES ............................................................251
6I03    GATHERING RELEVANT DATA AND CONDUCTING INTERVIEWS .....254
6I04    REVIEW OF RECORDS ..................................................................265

6J      CONDUCTING ANALYSES AND THE INVESTIGATIVE REPORT ......................265

6K      USE OF A NOTIFICATION OF RESULTS OF INVESTIGATION ...........................266
6K00   SIGNATURES AND PROCEDURES ..................................................266
6K01   NOTICE TO LABOR UNION OF A VIOLATION FINDING.........................266

6L      RESOLUTION OF THE COMPLAINT .......................................................266
6L00   SETTLEMENT BEFORE COMPLETION OF INVESTIGATION..................267
6L01   PRIOR TO ISSUING A NO VIOLATION NORI ...............................267
6L02   CLOSURE OF COMPLAINT WITH NO VIOLATION NORI.........................268
6L03   CLOSURE OF COMPLAINT AND ISSUANCE OF "NOTICE OF
        RIGHT-TO-SUE" UPON REQUEST ...............................................268
6L04   NOTICE ISSUED UPON ADMINISTRATIVE CLOSURE ............................269
6L05   CLOSURE OF COMPLAINT WITH VIOLATION NORI AND
        CONCILIATION ....................................................................269

6M      ENFORCEMENT .........................................................................271

CHAPTER 7 EMPLOYMENT DISCRIMINATION REMEDIES......................................272

7A      INTRODUCTION ..........................................................................272
7A00   APPLICABILITY ....................................................................272
7A01   LIABILITY PHASE ..................................................................272
7A02   PROCESS FOR REMEDY............................................................272
7A03   APPLICABLE LAW ..................................................................272

7B      TIMELINESS AND CONTINUING VIOLATION ........................................273
7B00   CONTINUING VIOLATION .........................................................273

7C      TYPES OF REMEDIES ..................................................................274
7C00   DESIGNING THE REMEDY ........................................................275
7C01   CORRECTIVE REMEDIES ..........................................................275
7C02   MAKE-WHOLE RELIEF ............................................................275
7C03   FRONT PAY ........................................................................276
7C04   RETROACTIVE SENIORITY........................................................276
7C05   OTHER REMEDIES AFFECTING A UNION AGREEMENT.........................278
7C06   BACK PAY ..........................................................................278
7C07   TIME LIMITS FOR RELIEF .........................................................280
7C08   CALCULATION OF BACK PAY IN INDIVIDUAL OR NONSYSTEMIC
        CASES ................................................................................281
7C09   CALCULATION OF REMEDIES IN SYSTEMIC DISCRIMINATION
        CASES ................................................................................282
7C10   CALCULATING VICTIM-SPECIFIC REMEDIES .................................282
7C11    CALCULATING FORMULA RELIEF .............................................283
7C12   NONMONETARY RELIEF............................................................284

7D NOTIFICATION TO CLASS MEMBERS ........................................................................285

7E LIABILITY OF SUCCESSOR EMPLOYER....................................................................285

**CHAPTER 8 RESOLUTION OF NONCOMPLIANCE ......................................................287**

8A    INTRODUCTION ...............................................................................................287
      8A00   APPLICABILITY..................................................................................287
      8A01   REMEDIES.............................................................................................287
      8A02   PREPARATION OF DOCUMENTS....................................................287
      8A03   COMPUTATION OF TIME..................................................................288
      8A04   ORGANIZATION OF THIS CHAPTER..............................................288

8B    OVERVIEW OF RESOLUTION AND ENFORCEMENT PROCEDURES AND
      DOCUMENTS.......................................................................................................288
      8B00   GENERAL USE OF AN SCN...............................................................289
      8B01   USE OF AN SCN AT THE DESK AUDIT ...........................................289
      8B02   DOCUMENTS USED IN THE ON-SITE AND OFF-SITE PHASES OF
             COMPLIANCE EVALUATIONS (Supply & Service and Construction)..........292
      8B03   DOCUMENTS USED IN COMPLAINT INVESTIGATIONS.....................296
      8B04   DOCUMENTS USED IN MONITORING CAs .....................................300

8C    NOTICE TO THE LABOR UNION OF A PROPOSED REMEDY .............................302
      8C00   WHEN TO USE A NOTICE TO THE LABOR UNION....................302
      8C01   CONTENTS OF THE LABOR UNION NOTICE...............................302
      8C02   WHO RECEIVES THE LABOR UNION NOTICE ...........................303
      8C03   SIGNATURE AUTHORITY...................................................................303
      8C04   UNION'S RESPONSE TO THE NOTICE .........................................303

8D    SHOW CAUSE NOTICE ....................................................................................303
      8D00   APPLICABILITY..................................................................................304
      8D01   WHEN AN SCN IS REQUIRED .........................................................304
      8D02   CIRCUMSTANCES WHEN AN SCN IS NOT REQUIRED ...........305
      8D03   CONTENTS OF AN SCN......................................................................305
      8D04   WHEN TO USE AN AMENDED SHOW CAUSE NOTICE ...........305
      8D05   WHO RECEIVES AN SCN OR ASCN ...............................................306
      8D06   SIGNATURE AUTHORITY...................................................................306
      8D07   CONTRACTOR'S RESPONSE............................................................306
      8D08   RESCISSION OF AN SCN ...................................................................307

8E    PREDETERMINATION NOTICE .........................................................................307
      8E00   USE OF A PDN.......................................................................................308
      8E01   CONTENTS OF A PDN..........................................................................308
      8E02   WHO RECEIVES A PDN.......................................................................309
      8E03   SIGNATURE AUTHORITY...................................................................309
      8E04   CONTRACTOR'S RESPONSE TO A PDN.........................................309

8F    NOTICE OF VIOLATION......................................................................................310
      8F00   WHEN TO USE AN NOV .....................................................................310

     8F01  CONTENTS OF AN NOV ...................................................................310
     8F02  WHO RECEIVES THE NOV ...........................................................311
     8F03  SIGNATURE AUTHORITY................................................................311
     8F04  CONTRACTOR'S RESPONSE TO AN NOV ...............................311

8G    CONCILIATION .....................................................................................311
     8G00  BACKGROUND .............................................................................312
     8G01  GENERAL......................................................................................312

8H    CONCILIATION AGREEMENTS.......................................................312
     8H00  WHEN TO USE A CA ...................................................................312
     8H01  CONTENTS OF A CA ...................................................................313
     8H02  TERMINATION DATE ...................................................................314
     8H03  SIGNATURE AUTHORITY................................................................314

8I     POST CA ACTIONS ..............................................................................314
     8I00    RETENTION OF EVIDENCE OF VIOLATIONS............................315
     8I01    EVALUATION OF PROGRESS REPORTS....................................315
     8I02    VIOLATION OF A CA .....................................................................316

8J     THE 15-DAY NOTICE ..........................................................................317
     8J00    WHEN TO USE A 15-DAY NOTICE ...........................................317
     8J01    PROCEDURES WHERE NO IRREPARABLE INJURY EXISTS ..................317
     8J02    PROCEDURE WHERE IRREPARABLE INJURY EXISTS ..........................317
     8J03    WHO RECEIVES THE 15-DAY NOTICE ........................................318
     8J04    SIGNATURE AUTHORITY................................................................318
     8J05    CONTRACTOR'S RESPONSE TO THE 15-DAY NOTICE ..........................318

8K    ENFORCEMENT RECOMMENDATIONS ........................................318
     8K00  WHEN TO MAKE OR SEEK APPROVAL OF AN ENFORCMENT
            RECOMMENDATION ..................................................................319
     8K01  CONTENTS OF A COMPLIANCE EVALUATION FILE .............319
     8K02  CONTENTS IN A COMPLAINT INVESTIGATION .......................320
     8K03  WHO RECEIVES THE ENFORCEMENT RECOMMENDATIONS.............320
     8K04  SIGNATURE AUTHORITY................................................................321

8L     PRE AND POST REFERRAL ISSUES RESULTING IN ENFORCEMENT
     PROCEEDINGS .....................................................................................321
     8L00  PRE-REFERRAL TO RSOL.............................................................321
     8L01  POST-REFERRAL TO RSOL ........................................................321

8M   TYPES OF ENFORCEMENT PROCEEDINGS ................................322
     8M00 ADMINISTRATIVE ENFORCEMENT PROCEEDINGS ................322
     8M01 JUDICIAL ENFORCEMENT PROCEEDINGS ............................322

KEY WORDS AND PHRASES.....................................................................323

GLOSSARY OF ABBREVIATIONS ............................................................365

APPENDICES A-1 – A-13 ............................................................................... 369
     APPENDIX A-1:   U.S. DEPARTMENT OF LABOR OFFICE OF FEDERAL
                     CONTRACT COMPLIANCE PROGRAMS SUPPLY AND
                     SERVICE STANDARD COMPLIANCE EVALUATION
                     REPORT (SCER) ........................................................................ 370
     APPENDIX A-2:   STANDARD COMPLIANCE EVALUATION REPORT
                     (SCER) INSTRUCTIONS ............................................................. 394
     APPENDIX A-3:   INDEX FOR A SUPPLY AND SERVICE REVIEW .................... 401
     APPENDIX A-4:   SAMPLE ON-SITE REVIEW PLAN ............................................ 403
     APPENDIX A-5:   INDEX FOR A CONSTRUCTION REVIEW .............................. 404
     APPENDIX A-6:   STANDARD COMPLIANCE EVALUATION  REPORT
                     (CONSTRUCTION) ..................................................................... 405
     APPENDIX A-7:   SPECIAL REMEDIAL CONSIDERATIONS APPLICABLE
                     TO STOCK .................................................................................. 406
     APPENDIX A-8:   INDEX FOR A COMPLAINT FILE ............................................. 408
     APPENDIX A-9:   RETALIATION AND INTERFERENCE: COMPLAINT
                     PROCESSING OUTLINE AND CHECKLIST ............................ 410
     APPENDIX A-10:  INVESTIGATIVE REPORT ........................................................ 414
     APPENDIX A-11:  INFORMATION RELATED TO FILING SUIT UNDER
                     TITLE VII OF THE CIVIL RIGHTS ACT, TITLE I OF THE
                     ADA AND THE EQUAL PAY ACT ........................................... 415
     APPENDIX A-12:  "MACMILLAN" FACTORS CONCERNING SUCCESSOR
                     EMPLOYER LIABILITY .............................................................. 417
     APPENDIX A-13:  TRANSMITTAL MEMORANDUM FOR AN
                     ENFORCEMENT RECOMMENDATION ................................... 418

FIGURES 1 – 6 ............................................................................................... 423
     FIGURE F-1:    COMPLIANCE CHECK CONTROL SHEET ................................ 424
     FIGURE F-2:    CASE CHRONOLOGY LOG (CC-53) ........................................ 426
     FIGURE F-3:    COMBINED SCHEDULING LETTER AND ITEMIZED
                   LISTING ...................................................................................... 427
     FIGURE F-4:    SCHEDULING LETTER AND ITEMIZED LISTING FOR
                   SECTION 503 FOCUSED REVIEW ........................................... 434
     FIGURE F-5:    FORM FOR COMPLAINT INVOLVING EMPLOYMENT
                   DISCRIMINATION BY FEDERAL GOVERNMENT
                   CONTRACTORS OR SUBCONTRACTORS ............................... 437
     FIGURE F-6:    STANDARD TEXT FOR CONCILIATION AGREEMENT .......... 438

LETTERS L-1 – L-41 ..................................................................................... 439
     LETTER L-1:    SAMPLE ADMINISTRATIVE CLOSURE LETTER  FOR
                   SUPPLY & SERVICE AND CONSTRUCTION
                   COMPLIANCE EVALUATIONS ................................................... 441
     LETTER L-2:    SAMPLE INQUIRY LETTER FOR REQUESTING
                   COMPLAINT DATA FROM EEOC AND STATE AND
                   LOCAL FEPS ............................................................................... 442

Federal Contract Compliance Manual (FCCM)

LETTER L-3:      SAMPLE LETTER FOR REQUESTING JOB LISTING FROM
                 EMPLOYMENT SERVICE DELIVERY SYSTEMS
                 (INCLUDING AMERICAN JOB CENTERS) ................................443
LETTER L-4:      SAMPLE INQUIRY LETTER FOR REQUESTING
                 INFORMATION ON PENDING REVIEW FROM VETERANS
                 EMPLOYMENT AND TRAINING SERVICE ...............................444
LETTER L-5:      NOTICE OF CLOSING: COMPLIANCE EVALUATION
                 (NO VIOLATIONS FOUND) ...........................................................445
LETTER L-6:      NOTICE OF CLOSING: VIOLATIONS FOUND AND
                 RESOLVED ......................................................................................446
LETTER L-7:      SUPPLY & SERVICE ON-SITE CONFIRMATION LETTER .......447
LETTER L-8:      SAMPLE LINKAGE LETTER .......................................................449
LETTER L-9:      CONSTRUCTION COMPLIANCE EVALUATION NOTICE .......451
LETTER L-10:     CONSTRUCTION OUTREACH LETTER FOR NEW
                 PROJECTS .......................................................................................455
LETTER L-11:     10-DAY NOTICE TO EMPLOYER/CONTRACTOR....................457
LETTER L-12:     10-DAY NOTICE TO COMPLAINANT .........................................459
LETTER L-13:     LETTER TO EEOC (FULL OR PARTIAL TRANSFER OF
                 COMPLAINT)...................................................................................461
LETTER L-14:     AUTHORIZATION FOR RELEASE OF MEDICAL
                 INFORMATION................................................................................462
LETTER L-15:     LETTER NOTIFYING CONTRACTOR OF
                 INVESTIGATION.............................................................................463
LETTER L-16:     LETTER NOTIFYING COMPLAINANT OF
                 INVESTIGATION.............................................................................465
LETTER L-17:     INQUIRY LETTER TO U.S. DEPARTMENT OF JUSTICE OR
                 THE U.S. DEPARTMENT OF STATE ...........................................466
LETTER L-18:     CONFIRMATION OF SCHEDULING OF ON-SITE
                 INVESTIGATION.............................................................................467
LETTER L-19:     LETTER TO CONTRACTOR CONFIRMING COMPLAINT
                 RESOLUTION ................................................................................468
LETTER L-20:     LETTER TO COMPLAINANT CONFIRMING COMPLAINT
                 RESOLUTION ................................................................................469
LETTER L-21:     NOTIFICATION OF RESULTS OF INVESTIGATION: NO
                 VIOLATION.....................................................................................470
LETTER L-22:     NOTIFICATION OF RESULTS OF INVESTIGATION AND
                 NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA
                 OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964:  NO
                 VIOLATION (Dual filed)..................................................................472
LETTER L-22A:    ENCLOSURE: NOTICE OF RIGHT-TO-SUE UNDER
                 TITLE I OF THE ADA OR TITLE VII OF THE CIVIL
                 RIGHTS ACT OF 1964....................................................................474
LETTER L-23:     NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA
                 OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
                 (Issued Upon Request)....................................................................475

Federal Contract Compliance Manual (FCCM)

LETTER L-24:    NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE
                ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
                (Administrative Closure) ....................................................477
LETTER L-25:    NOTIFICATION OF RESULTS OF INVESTIGATION:
                VIOLATION........................................................................479
LETTER L-26:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT EXECUTIVE
                ORDER 11246, SECTION 503 OR VEVRAA AAP(S)...................481
LETTER L-27:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT
                ACCEPTABLE EXECUTIVE ORDER 11246, SECTION 503
                OR VEVRAA AAP(S) .......................................................483
LETTER L-27A:   SAMPLE ENCLOSURE TO LETTER L-27 ....................................485
LETTER L-28:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT
                EMPLOYMENT ACTIVITY OR COMPENSATION DATA
                FOR DESK AUDIT..........................................................486
LETTER L-29:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT
                CORRECTED EMPLOYMENT ACTIVITY AND/OR
                COMPENSATION DATA ....................................................488
LETTER L-30:    SHOW CAUSE NOTICE: UNRESOLVED VIOLATIONS ............490
LETTER L-30A:   SAMPLE ENCLOSURE TO LETTER L-30............................492
LETTER L-31:    SHOW CAUSE NOTICE: UNRESOLVED VIOLATIONS............494
LETTER L-32:    AMENDED SHOW CAUSE NOTICE FOR UNRESOLVED
                VIOLATIONS ...................................................................495
LETTER L-33:    SHOW CAUSE NOTICE FOR DENIAL OF ACCESS ..................497
LETTER L-34:    RESCISSION OF AN ERRONEOUSLY ISSUED SHOW
                CAUSE NOTICE................................................................499
LETTER L-35:    PREDETERMINATION NOTICE ..................................................500
LETTER L-36:    NOTICE OF VIOLATION................................................................502
LETTER L-37:    15-DAY NOTICE: VIOLATION OF A CONCILIATION
                AGREEMENT....................................................................504
LETTER L-37A:   SAMPLE ENCLOSURE TO LETTER L-37 ....................................505
LETTER L-38:    RESCISSION OF THE 15-DAY NOTICE ......................................506
LETTER L-39:    PROGRESS REPORT RESPONSE LETTER ..................................507
LETTER L-40:    CLOSURE LETTER FOR SUBSTANTIVE VIOLATIONS ...........509
LETTER L-41:    CLOSURE LETTER FOR SUBSTANTIVE VIOLATIONS ...........510

Federal Contract Compliance Manual (FCCM)

# INTRODUCTION

At the Office of Federal Contract Compliance Programs (OFCCP), we protect workers, promote diversity through equal opportunity and enforce the law.  We hold those who do business with the federal government – contractors and subcontractors – to the fair and reasonable standard that they take affirmative action and not discriminate based on race, color, religion, sex, sexual orientation, gender identity, national origin, disability or status as a protected veteran.  Additionally, we ensure that contractors and subcontractors do not discriminate against applicants or employees for inquiring about, discussing or disclosing their compensation or, in certain circumstances, the compensation of others.

Among the ways OFCCP protects employees of companies doing business with the federal government, and educates these companies about their rights and obligations, is conducting quality compliance evaluations and complaint investigations.

The Federal Contract Compliance Manual (hereafter referred to as the "FCCM" or the "Manual") does not establish substantive agency policy.  Therefore, if there is an inconsistency between material in the Manual and OFCCP's policies and its implementing regulations, the latter two are controlling.  OFCCP continues to use directives and other issuances to communicate substantive policy guidance, procedures and agency enforcement priorities to its compliance officers (COs) and covered contractors and subcontractors.  This Manual is subject to change without public notice.  The FCCM does not create new legal rights or requirements, or change current legal rights or requirements for federal contractors.  The official sources for contractors' compliance obligations remain Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; the Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA) of 1974, as amended; OFCCP's regulations at 41 Code of Federal Regulations (CFR) Chapter 60; and applicable case law.

This revised FCCM provides new and experienced COs with the procedural framework for executing quality and timely compliance evaluations and complaint investigations.  It provides procedural and technical guidance on compliance issues based on current agency procedures and processes, and improves efficiency and consistency across the agency's regional and field offices.  It may also provide covered contractors and subcontractors more transparency, certainty, and clarity about basic OFCCP procedures and processes.  That said, there might be slight differences between regions and offices because some discretion remains with COs and their supervisors as to the best way to manage individual compliance evaluations and investigations within the framework created by the Manual.  Remember, these differences should be minor and should occur infrequently because one of the goals of the Manual is standardization.  All references to the terms "compliance officer" and CO in this Chapter and throughout the Manual include any OFCCP employee that is responsible for the tasks or activities described.

The Manual has eight chapters, a list of key words and phrases, a glossary and several attachments, including sample forms and letters.  The chapters cover how OFCCP's COs, and others responsible for conducting the activities covered in the Manual, conduct a desk audit, an on-site review, a construction industry compliance evaluation, a corporate management compliance evaluation and a complaint investigation.  It also covers the agency's functional affirmative action program (FAAP), the various types of discrimination remedies and ways to resolve noncompliance issues.

Federal Contract Compliance Manual (FCCM)

The national office wishes to acknowledge the contributions of our regional and field staff during the development of this revised Manual.  Their insight and experience greatly enriched this Manual.  The agency is dedicated to providing its COs with ongoing support and training because we believe that a well-trained workforce is an effective workforce.  We will continue supplementing the processes and procedures in this Manual with uniform staff training and by providing other appropriate resources.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 1
# DESK AUDIT

## 1A    INTRODUCTION

The regulations implementing Executive Order 11246, as amended, authorize OFCCP to conduct compliance evaluations of federal contractors.[1] Compliance evaluations determine whether federal contractors maintain nondiscriminatory hiring and employment practices.  OFCCP also uses them to determine whether contractors are taking affirmative action to ensure that applicants and employees are treated without regard to race, color, religion, sex, sexual orientation, gender identity or national origin.  These evaluations also enable OFCCP to assess whether contractors treat applicants and employees in a manner that does not discriminate against them for asking about, talking about, or sharing information about pay with other employees or applicants.  Other regulations permitting OFCCP to conduct compliance evaluations are 41 CFR 60-300.60 implementing provisions of VEVRAA, as amended, 38 U.S.C. 4212; and the regulations at 41 CFR 60-741.60 implementing Section 503, as amended, 29 U.S.C. 793.  These evaluations are to determine whether federal contractors are complying with their obligations to ensure nondiscrimination.  They also determine whether contractors are taking affirmative action to employ, promote, train, retain and provide reasonable accommodation to certain protected veterans and individuals with disabilities, respectively.

### 1A00   TYPES OF COMPLIANCE EVALUATIONS

OFCCP may conduct a compliance evaluation that consists of one, or any combination of, the following investigative procedures:

- Compliance review;

- Off-site review of records;

- Compliance check; and

- Focused review.

Each of the investigative procedures is discussed in this chapter;[2] the first is compliance review procedures.  A compliance review is a comprehensive analysis and evaluation of the employment practices of the contractor, including the contractor's written affirmative action program (AAP), and the results of the contractor's affirmative action efforts.  A compliance review may proceed in three stages:

- Desk audit;

---

[1]   41 CFR 60-1.20.  The term "contractor" as used in the Manual includes "subcontractors" unless otherwise noted.
[2]   The investigative procedures discussed in this chapter may apply to both construction and supply and service contractors.

Federal Contract Compliance Manual (FCCM)

- On-site review; and

- Off-site analysis.

However, the regulations do not require an on-site review or off-site analysis in all cases. Depending on the circumstances or the results of the desk audit, a compliance review may:

- Close after the desk audit;

- Continue with an on-site review; or

- Continue with an off-site analysis of the information gathered during or pursuant to the on-site review.

An off-site review of records is an analysis and evaluation of all or some portion of the contractor's AAPs and supporting documentation, and other documents related to the contractor's personnel policies and employment actions that may be relevant to a determination of whether the contractor complied with the requirements of Executive Order 11246, Section 503 and/or VEVRAA, as appropriate. COs must use the desk audit procedures outlined in this chapter when conducting an off-site review of records.

A compliance check is an examination to determine whether a contractor maintained certain records as required by the regulations at 41 CFR 60-1.12, 41 CFR 60-300.80, and 41 CFR 60-741.80. The contractor has the option of providing the documents either on-site or off-site. Therefore, COs[3] must contact the contractor to determine whether the requested records will be provided on-site or off-site. COs will also need to contact the contractor during the review if they need specific issues clarified. A compliance check need not include an on-site review. If a contractor provides records off-site, but a CO finds that it may be appropriate to conduct a physical, on-site inspection, the CO must discuss the matter with his or her supervisor.[4]

Finally, a focused review is an on-site review focused on one or more components of the contractor's organization, or one or more aspects of the contractor's employment practices. OFCCP may conduct a focused review to determine the contractor's compliance with a particular legal authority or may conduct a focused review of a particular employment practice under all of the laws OFCCP enforces.[5] For example, in a Section 503 focused review, the CO would review policies and practices of the contractor related solely to Section 503 compliance. OFCCP will identify the subject of the focused review and inform the contractor before the start of the review.

---

[3] All references to the terms "compliance officer" and CO in this Chapter and throughout the Manual include any OFCCP employee that is responsible for the tasks or activities described.

[4] See Chapter 2 – On-Site Review. That chapter covers on-site review procedures, including any required supervisory approvals.

[5] See Directive 2018-04, "Focused reviews of contractor compliance with Executive Order 11246 (E.O.), as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; and Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended." In the focused reviews anticipated by this Directive, OFCCP would go on-site and conduct a comprehensive review of the particular authority or employment practice at issue.

## 1A01   CONTENTS OF CHAPTER

This chapter outlines the procedures COs use to conduct a desk audit during a compliance evaluation, whether it is conducted in the office or on-site.  The elements of this chapter also apply when COs are conducting compliance evaluations using the investigative procedures for the off-site review of records.  Additionally, this chapter references the relevant sections of the Standard Compliance Evaluation Report (SCER) that COs must complete during the desk audit stage of compliance evaluations.

## 1A02   PURPOSE OF THE DESK AUDIT

By conducting a desk audit of the contractor's AAPs and supporting documentation provided by contractors, a CO begins to determine whether a contractor is complying with all relevant provisions of 41 CFR Chapter 60, specifically:

- Applicable nondiscrimination provisions; and

- Applicable affirmative action provisions.

## 1A03   PRINCIPLES AND FOCUS OF DESK AUDITS

A desk audit typically enables COs to review a contractor's compliance with its affirmative action and equal opportunity obligations at a particular establishment.  COs must conduct desk audits following these general principles:

a.   *Equal Employment Opportunity (EEO)*.  A contractor's personnel policies and practices must not have the purpose or effect of discriminating because of race, color, religion, sex, sexual orientation, gender identity, national origin, disability or status as a protected veteran, or because they discussed, inquired about, or disclosed their pay or, in certain circumstances, the pay of other employees.  Contractors must eliminate and remedy discrimination that, for example, limits a job applicant's or an employee's ability to engage in open and fair competition for a job or position, or that results in paying employees differently based on race, sex or membership in other protected classes.

b.   *Affirmative Action Program*.  An AAP is a management tool.  The written AAP includes diagnostic and self-monitoring components as well as a set of specific and result-oriented policies and procedures designed to achieve EEO.

c.   *Inclusion and Acceptability*.  An AAP is assessed for "inclusion" and "acceptability."  This chapter discusses these concepts more fully in sections 1E – 1H of this chapter.

When conducting the desk audit, COs focus on a review of the following areas:

a.   *Workforce Structure, Personnel Policies and Procedures*.  COs examine a contractor's personnel policies and procedures to determine if they warrant in-depth investigation, such as an on-site review.  Likewise, an examination of a contractor's basic organizational or workforce structure may reveal irregularities that merit investigating.

b. *Problem Areas and Action-Oriented Programs.*  COs examine whether a contractor identified any problem areas, and, if so, whether the contractor developed and executed action-oriented programs designed to correct the problem areas.  In doing so, COs should seek to determine at least these specific things:

- Whether there are any areas with a lack of progress toward established goals;

- Whether further information is needed in any area; and

- Whether an on-site visit is needed to evaluate the contractor's efforts to develop and implement AAPs designed to improve opportunities for minorities, women, people with disabilities and protected veterans.

c. *Potential Discrimination.*  COs must be aware of the signs of potential discrimination.  Being aware of and alert to these signs allows a CO to assess when further investigation is required.  Below are examples of signs of potential discrimination.

- Individuals in a particular race, sex, or ethnicity are significantly overrepresented or underrepresented in a particular area of the workforce.

- Indications exist that an employment practice or procedure has adversely affected individuals based on their race, sex, or ethnicity.

- Compensation practices of a contractor result in differences in pay that appear to be based on race, sex, or ethnicity.

- Indications exist that leave for family caregiving is applied differently for men and women.

- The contractor has policies that could adversely affect employees with disabilities, such as a "no leave" policy or a policy requiring 100% recovery before allowing an employee to return to work.

## 1A04    USE OF THE STANDARD COMPLIANCE EVALUATION REPORT

The SCER is a tool used by COs to conduct and document desk audits.  The SCER and its instructions, found in Appendices A-1 and A-2, establish a framework for conducting the desk audit and assisting in the development and implementation of the on-site investigative plan.  COs use the SCER, either in whole or in part, when conducting a compliance evaluation using the compliance review, off-site review of records or focused review investigative procedures discussed in subsection 1A00 of this chapter.  Compliance checks require the completion of the Compliance Check Control Sheet, rather than the SCER.[6]

The SCER begins with a Contractor Information section in which the CO records basic information about the contractor, including address, company contacts, type of industry, contract coverage, and workforce composition.  After the Contractor Information section, there is a Case Summary and

---

[6]   See Figure F-1 – Compliance Check Control Sheet.

Recommendations section that serves as the final assessment of the compliance evaluation, listing all findings. These two sections are then followed by three main parts.[7]

a. *Part A: Preparation*. Part A includes general information gathered by the CO during the preparatory stages of a compliance evaluation, such as the contractor's problems in prior compliance evaluations, information on known complaints or enforcement proceedings, and any collaboration with or referrals to other agencies during the compliance evaluation.

b. *Part B: Desk Audit.* Part B records the results of the CO's desk audit. It documents the CO's initial review of the contractor's AAPs and Itemized Listing data for inclusion and acceptability, and summarizes any problems the CO finds regarding the acceptability of the AAPs and Itemized Listing data, and provides resolutions for those problems. Part B also provides for analysis of Executive Order 11246 affirmative action progress and identifies any areas where a CO needs additional information to determine the extent of a contractor's good faith efforts. This Part also includes an assessment of a contractor's Section 503 utilization analysis and outreach assessment, as well as the VEVRAA outreach assessment. The CO also records results of the analyses performed on the employment activity provided by the contractor (*e.g.,* terminations, compensation) and notes any other problems for an on-site investigation. For any problem unresolved at the conclusion of the desk audit, the SCER requires the development of an On-Site Plan.[8]

c. *Part C: On-Site Review*. Part C records the results of an on-site review. It provides for the CO to document verification of the contractor's implementation of certain equal opportunity clause requirements (*e.g.,* posting current required EEO notices), implementation of the regulations prohibiting discrimination on the basis of sex, and implementation of the guidelines on discrimination based on national origin and religion. The CO also records the on-site review findings for any potential systemic or individual discrimination that was identified during the desk audit or discovered during the on-site review. These findings include a discussion of the nature of the problem(s), relevant evidence collected and reviewed, actions (if any) taken to resolve the problem, and whether and how the problem was resolved.

## 1A05   CASE MANAGEMENT SYSTEM

The Case Management System (CMS) is the data collection component of the OFCCP Information System (OFIS) COs use to record basic information about the contractor, to track major events encountered throughout the evaluation, and to summarize any violations found and remedies obtained. COs must ensure that all relevant dates, information, and occurrences are promptly entered into CMS, beginning with the initial scheduling of the compliance evaluation and ending with the closure of the review, including the Conciliation Agreement (CA) monitoring period, if applicable. COs should refer to the CMS Manual for further instruction on how and when to enter case status information. The reporting component of OFIS is the Executive Information System (EIS), used by COs in combination with historical records to research past OFCCP compliance evaluations.

---

[7]   The SCER also has another part (Part D) used only when a CO conducts a Corporate Management Compliance Evaluation. See Chapter 4 for more on this type of compliance evaluation.

[8]   FCCM 2C03 – On-Site Plan.

Federal Contract Compliance Manual (FCCM)

## 1A06   CONFIDENTIALITY OF INFORMATION

Under current law and regulations, OFCCP is required to comply with the Freedom of Information Act (FOIA), 5 U.S.C. 552; the Trade Secrets Act, 18 U.S.C. 1905; the Privacy Act, 5 U.S.C. 552a; and Executive Order 12600.[9]  These laws govern the disclosure of confidential information, as well as sensitive information, such as personnel records, medical information and salary data.  During a compliance evaluation, a CO will handle contractor information that is not available to the general public and that may be sensitive (*e.g.,* social security number, date of birth, employee-level salary data) or nonsensitive (*e.g.,* first and last name, business address, email address) in nature.  The CO must treat all information obtained during a compliance evaluation as confidential and protect the security of records to avoid any unauthorized disclosure.  The CO is also responsible for the proper handling of Personally Identifiable Information (PII) under the U.S. Department of Labor's 9 DLMS 1200 (Safeguarding Sensitive Data Including Personally Identifiable Information).

Under FOIA, members of the public may request the release of agency records.  If a CO receives a request for disclosure of any records obtained from a contractor, the CO must immediately refer the request to OFCCP's designated regional or national FOIA coordinator, as appropriate.  The FOIA coordinator must evaluate the request to determine whether any exemptions from disclosure apply or if the agency is required to release records that OFCCP received from a federal contractor.  Before releasing any records provided by the contractor, the FOIA coordinator will notify the contractor of its opportunity to object to a release of records.

For instance, OFCCP will notify contractors of any FOIA request for their EEO-1 data.  If a contractor objects to disclosure, then OFCCP will not disclose the records if OFCCP determines that the contractor's objection is valid.  FOIA exemption 4 recognizes the confidentiality of this data and, in combination with FOIA exemption 3 and the Trade Secrets Act, provides the necessary tools to protect it from public disclosure, if appropriate.

## 1A07   NOVEL ISSUES

Novel issues are those that are unfamiliar, unique or fall outside the norm.  Periodically, the national office will identify certain novel issues and develop specific procedures to address them.  COs may encounter novel issues in a compliance evaluation.  When this occurs, they must, in coordination with their supervisor and regional office, contact the Division of Program Operations (DPO) in the national office to determine the approach to use, data to obtain and analyses to conduct before recommending a finding of compliance or noncompliance.  Novel issues include those not routinely addressed, like a publicly announced contractor preference in employment to Indians and Native Americans living on or near an Indian or Native American Reservation.[10]  Novel issues could also include compliance evaluations that involve coordination with the Expert Services Branch in DPO on issues like testing, multi-establishment contractors, and complex or unusual compensation issues.  Chapter 6 of this Manual includes a brief discussion of novel issues in the context of complaint investigations.

---

[9]   See 41 CFR 60-1.20(g), 60-300.81, 60-741.81.

[10]   In this instance, the CO and supervisor would coordinate with the Director of OFCCP's Indian and Native American Employment Rights Program (INAERP) to address the impact of the contractor's use of a publicly announced preference in employment to Indians and Native Americans.

**1A08   CORPORATE MANAGEMENT COMPLIANCE EVALUATIONS**

Under the regulations at 41 CFR 60-2.30 on corporate management compliance evaluations (CMCEs), COs may conduct a CMCE to ascertain whether individuals are encountering artificial barriers to advancement into mid-level and senior corporate management.  The desk audit procedures outlined in this chapter apply to CMCEs.  We discuss CMCEs in Chapter 4 of this Manual.

**1A09   FUNCTIONAL AFFIRMATIVE ACTION PROGRAMS**

Under the regulations at 41 CFR 60-2.1(d)(4), a contractor can seek the agency's agreement to develop and use an AAP that is based on a functional or business unit instead of an establishment.  This type of AAP is called a functional AAP or FAAP.  The desk audit procedures outlined in this chapter apply to both traditional and functional AAPs.  We discuss FAAPs in Chapter 5 of this Manual.

**1A10   PREAWARD COMPLIANCE EVALUATIONS**

Under the regulations at 41 CFR 60-1.20(d), 60-1.29, 60-300.60(d), and 60-741.60(c) on preaward compliance evaluations, an agency is required to notify OFCCP and request a preaward evaluation before a nonconstruction contract or first tier subcontract of $10 million or more is awarded.  Within 15 calendar days of the notice, OFCCP will inform the awarding agency of its intent to conduct a preaward compliance evaluation.  If OFCCP informs the agency of its intent to conduct a preaward evaluation, OFCCP is allowed an additional 20 calendar days after that date to provide a conclusion relative to the contractor's compliance.

**1A11   EDUCATIONAL INSTITUTION EVALUATIONS**

If an educational institution holds a federal contract, it may be scheduled for a compliance evaluation.  While the desk audit procedures and principles in this chapter apply to educational institution evaluations, the CO should consider the unique nature of these contractors.  Educational institutions have the same obligation as other contractors to prepare and maintain AAPs and submit them along with Itemized Listing data when scheduled for a compliance evaluation.  However, the data submitted by an educational institution may be structured differently and include identification of employment practices that are unique to them.  Despite any differences in the nature of educational institutions compared to other contractors, the CO will evaluate the contractor's compliance with all applicable regulations and conduct required analyses, such as impact ratio, compensation, selection process, and selection criteria analyses.

a.  *Institution type and organizational structure*.  When evaluating an educational institution, the CO should identify the institution type and its organizational structure, identifying autonomous components and individuals who have the authority to make personnel decisions.  Educational institutions fall generally into four types: universities, senior colleges, vocational colleges and junior/community colleges.  The structure varies not only based on the type and size of the institution but also on whether it is a public or private entity.  This may impact how personnel data is grouped and how employment practices are analyzed.

b.  *Employment data and workforce composition*.  In educational institution evaluations, the CO will examine data regarding the educational institution's workforce composition, tenure

Federal Contract Compliance Manual (FCCM)

requirements, and practices on hiring, promotion, termination, and compensation.  Unlike other contractors, the labor force of educational institutions is tracked through a reporting system called the Integrated Postsecondary Education Data System (IPEDS).[11]  The CO may start with the IPEDS categories to identify similarly situated employee groups but if they are too broad, the CO will narrow down the categories to more appropriate job groups to conduct meaningful analyses.  Educational institution workforces generally include instructional staff and noninstructional staff.[12]  The instructional staff workforce includes nontenure track, tenure track, and tenured instructional staff while the noninstructional staff workforce includes executive, administrative, professional, technical, clerical, and all other nonteaching services at the institution.  Whereas instructional staff are typically grouped by department or school, noninstructional staff may overlap or spread across the educational institution.

c.  *Hiring, terminations and promotion practices*.  Evaluating employment practices applicable to noninstructional staff is similar to that conducted in other compliance evaluations.  However, evaluating employment practices concerning instructional staff may present a unique challenge requiring the CO to tailor inquiries, data requests and the required analyses.  For example, instructional staff vacancies may be filled by departmental committees that are formed to recruit and screen for a vacant position.  Candidates deemed qualified by the committees are submitted to the Dean or Provost for selection.  Academic policies and procedures regulate who will be on the committees, where to advertise and the organizations from which to solicit candidates; and procedures and criteria to follow in instructional staff selection.

In addition to the hiring, termination and promotion practices, the granting of tenure to instructional staff and applicable tenure requirements and data should be examined by the CO.  Tenure is protected academic status intended to grant instructional staff permanent appointments.  Promotion for tenure track instructional staff usually follows a line of progression such as assistant professor, to associate professor, to professor.  Comparable to hiring, the decision to grant tenure to an instructional staff member is made by a departmental committee.  Some of the common criteria considered for granting tenure include: teaching ability and effectiveness; research and publications; professional services; and services to the institution or community.  Not granting tenure or revoking tenure is an adverse employment action that may further result in the termination of the instructional staff member.  As with hiring, termination, and promotion practices, it may be necessary to request data on tenure decisions.

d.  *Compensation*.  Educational institutions typically operate separate pay systems for each workforce, *e.g.*, instructional staff and noninstructional staff.  There are also different pay systems to reflect the different workforces when the educational institution is a public institution.  The CO must obtain written policies and procedures on employee compensation, including policies on determining base salary, pay incentives, pay increases, bonuses and other

---

[11]   IPEDS is a system of interrelated surveys conducted annually, which gathers information from every college, university, and technical and vocational institution in the United States and other jurisdictions (such as Puerto Rico) that participates in the federal student financial aid programs.

[12]   OFCCP will use the terms instructional staff and noninstructional staff to distinguish between the two workforces. Instructional staff refers to faculty members and others in a teaching capacity.  Noninstructional staff refers to all other employees who are not in a teaching capacity.

factors impacting compensation such as union status and payment for additional responsibilities at the institution.  In addition to base salary and bonuses, the CO should gather data on factors that may affect compensation such as the national ranking of the educational institution, field of study, scholarship, research, publications, honors and awards.

## 1B    PRE-DESK AUDIT ACTIONS

This section discusses the various steps and actions that COs must take before starting a compliance evaluation of a contractor establishment.  These steps include:

- Contacting the contractor;

- Setting up appropriate case files and logs; and

- Obtaining relevant information about the contractor from other EEO and U.S. Department of Labor (DOL) enforcement agencies.

### 1B00   INITIAL CONTACT WITH THE CONTRACTOR

This subsection covers information that COs gather through their initial contact with the contractor, including contact information for the contractor and the contractor's representative, and any information that may preclude the evaluation (*e.g.,* establishment is closed, the establishment is part of an approved FAAP agreement, or OFCCP has completed a review of the establishment in the past 24 months).  If the contractor contests OFCCP's jurisdiction or provides any information that may preclude the evaluation, the CO would follow the process outlined in subsection 1B04 below.

a.  *Contractor Information*.  Before issuing a Scheduling Letter and Itemized Listing, COs must verify the following information:

- The name of the highest-ranking management official at the establishment;

- The legal name of the company;

- The name and email of the person responsible for the preparation and implementation of the contractor's AAPs; and

- The correct mailing address for the establishment.

If an establishment is part of a larger entity, the CO must obtain the name of the corporate chief executive officer (CEO), the name of the corporate person responsible for EEO and affirmative action matters and the correct corporate mailing address.  COs enter this basic identifying information in the Contractor Information section of the SCER.

b.  *Representation*.  A contractor's statement about representation can come during the initial contact or at some later point.  When a contractor indicates that it is or will be represented by counsel or a consultant company, a CO must ask the contractor to provide written confirmation of the representation, including:

Federal Contract Compliance Manual (FCCM)

- The contact information for the representative that includes the representative's name, address, email, and phone number; and

- The scope of the representative's authority, including whether the authority granted to the representative extends to negotiating a settlement, if necessary, on behalf of the contractor.

A CO must also ask the contractor to clarify in writing as a part of the representation confirmation whether:

- All contacts, including routine ones to make appointments or to clarify data or other information, should be made through the representative; and

- All correspondence should be provided only to the representative or if a copy is to be provided to the contractor.

The CO obtains the same written confirmation if a person indicates to the CO or another representative of OFCCP that he or she represents the contractor. After receiving written confirmation of representation, a CO must handle contacts and correspondence according to its terms for the duration of the evaluation. The handling of contacts and correspondence will change if the contractor specifies a different period or subsequently alters its instructions. Alterations of representation instructions must be in writing.

COs provide the contractor's highest-ranking management officials copies of all substantive documents that they mail. For these purposes, we define substantive documents as documents that this Manual requires a CO to mail. This would include, for example, any Predetermination Notice (PDN), Notice of Violation (NOV), Show Cause Notice (SCN), and CA.

## 1B01   PREPARATION AND MAINTENANCE OF THE CASE CHRONOLOGY LOG

COs must prepare and maintain a Case Chronology Log for each compliance evaluation. This log is an integral part of the case file and is an invaluable tool in tracking the progress and the status of the case.[13] It is, therefore, important that COs keep the Case Chronology Log current. A Case Chronology Log includes:

- Event summaries that begin with the initial contact with the contractor and continue through to the approval of case closing documents.

- Documentation of all telephone conversations, emails, correspondence and meetings associated with the evaluation, indicating the date, nature of the contact, person contacted, a summary of discussion or actions taken, and the CO's name.

Records of telephone calls in the log should include the time of the call. All meetings must include the date, location, and names of the people in attendance. In addition, COs must record in the log all requests for data and records, and the dates the CO received these items. COs must record all events and actions as they occur.

---

[13]   Figure F-2 – Case Chronology Log (CC-53).

Federal Contract Compliance Manual (FCCM)

Many COs print a hardcopy of the Case Chronology Log to facilitate their ability to write in the day-to-day events and activities as they occur. This practice is acceptable as long as the final Case Chronology Log included in the case file is typed, legible and maintained electronically.

## 1B02   CREATION AND MAINTENANCE OF THE CASE FILE

COs must create and maintain a case file for each scheduled compliance evaluation. The case file generally consists of various folders. To set up a case file, COs must create individual folders using the below headings.[14]

- Folder 1: Standard Compliance Evaluation Report (SCER) and Data Pertaining to SCER Findings

- Folder 2: Case Chronology Log, Correspondence and Meeting Notes

- Folder 3: Collective Bargaining and Other Agreements, and Miscellaneous Items

- Folder 4: Solicitor of Labor (SOL) Opinions, Joint Review Committee (JRC)[15] Memoranda and Post-SCER Update

- Folder 5: Progress Reports

- Folder 6: Historical Review Results

- Folder 7: AAP and Itemized Listing Data

COs must add information and documents to the appropriate folder throughout the compliance evaluation. If enforcement becomes necessary, COs provide the compliance evaluation case file to the Solicitor's Office for further action. It is critically important that all information obtained, observed or reported be part of the case file and remain there through case closure.

Once again, maintaining these files is crucial. This maintenance includes labeling the folder and any additional folders or subfolders needed (*e.g.,* Folder 1A, 1B). Labeling is especially useful when the material in a folder is voluminous. COs must arrange the documents in each folder by date, with the most recent document on top unless directed otherwise. COs are required to attach certain documents in each folder to the left or right side of the folder, as indicated below. When there are 10 or more separate documents in a folder, the CO must prepare an index and place it in the front of that folder.

A complete and thorough case file is critically important, especially if enforcement becomes necessary. Therefore, COs must be sure that the case file contains all documents obtained or generated during the compliance evaluation, not just the material that supports the conclusions

---

[14]   Though the case file folder numbers and titles do not change, the case file contents may vary based upon the investigative procedures used in the compliance evaluation, and the availability and existence of specific documents.

[15]   The Joint Review Committee (JRC) is a committee – consisting of district office staff members working on the complaint, regional office staff members and representative(s) of the Solicitor's Office – that discusses the complaint investigation and findings. National office staff may also participate in these discussions.

Federal Contract Compliance Manual (FCCM)

reached.  For example, the file should include both evidence that supports the CO's violation findings, as well as evidence that supports the contractor's rebuttal.  The case file must contain all contractor records and unaltered copies of all email correspondences in paper or electronic format.  Drafts of OFCCP memoranda are not included in the case file.  COs retain only final versions of agency memoranda.

If a CO is submitting a case for enforcement, a Transmittal Memorandum, as discussed in Chapter 8 of this Manual on the resolution of noncompliance, must accompany the case file.  A complete copy of at least one contract or subcontract establishing coverage during the entire period at issue is also required, continuing to the present, if available.  Additionally, the enforcement submission must include copies of all relevant analyses, properly labeled, in electronic format.  Remember to keep a copy of all files submitted for enforcement in the appropriate field office.   Below is a list of the folders and their content.[16]

> *Folder 1: Standard Compliance Evaluation Report (SCER) and Data Pertaining to SCER Findings*.  This folder contains the SCER and data pertaining to SCER findings, such as:

- CO notes, worksheets and analyses, including any regression analyses;

- Witness statements that are appropriately labeled;

- Contractor records; and

- Other information and records pertinent to the issues investigated.

COs should organize the material according to the relevant SCER issue, and tabs and labels them accordingly.  Documents must cross-reference other folders, as appropriate.  For example, if a SCER document in Folder 1 also involves or is relevant to a union contract matter, the document in Folder 1 will refer to the union contract placed in Folder 3.  COs are required to attach certain documents to the left side of this folder.  The CMS Form CC-100A should be placed on top and the following items should be placed underneath:

- Any contract coverage information provided by DPO or copies of contracts;

- CMS forms associated with the review;

- EEO-1 reports;

- Contractor extension requests for the AAPs and OFCCP responses, including extensions of time frames in a consent decree; and

- Preaward Clearance Request letter and other related materials.

> *Folder 2: Case Chronology Log, Correspondence and Meeting Notes*.  This folder contains all emails and other correspondence, both internal and external, as well as meeting notes associated

---

[16] See Appendix A-3 – Index for a Supply and Service Review.

Federal Contract Compliance Manual (FCCM)

with the review.  File these items chronologically.  COs must preserve all communications related to the compliance evaluation or complaint investigation in this folder, including data and record submissions, information gathering and interviews, and any material resulting from contacts with third parties such as other government agencies or local interest groups.

For ease of reference, the folder must have a tab for the closure document.  One closure document is a CA.  This document is the written agreement entered into by the contractor and OFCCP that identifies the violations found by the agency and what actions the contractor will undertake to resolve them or prevent the violations from recurring.  In the absence of violations, a closure letter is the closure document.  Place a copy of the closure document in Folder 6, Historical Review Results.

COs must attach a typed copy of the Case Chronology Log to the left side of this folder.

*Folder 3: Collective Bargaining and Other Agreements, and Miscellaneous Items*.  This folder contains a copy of any collective bargaining agreements, fringe benefits and leave policy booklets, employee handbooks, apprenticeship or training agreements and any other similar contractor documents relevant to the establishment reviewed.  COs place into this folder relevant documents that do not fit the description of documents contained in other folders.

*Folder 4: SOL Opinions, JRC Memoranda and Post-SCER Update*.  This folder contains Solicitor's Opinions and JRC memoranda associated with the review.  It also contains any material, other than progress reports, generated after a CO submits the review report such as transmittal memoranda and additional conciliation efforts.  For example, a record of any later conciliation efforts by the district office, regional office and national office, as appropriate, along with the results of those efforts, would be filed in this folder.

*Folder 5: Progress Reports*.  This folder contains progress reports the contractor submitted under a CA, along with OFCCP's evaluation of those reports.  COs enter the results of these evaluations on the "Summary of Progress Reports" form.  After entering the last report, COs place a copy of the referenced summary in Folder 6, Historical Review Results.  COs also log all progress reports in the Case Chronology Log and include consent decrees or other court orders.

*Folder 6: Historical Review Results*.  This folder contains a copy of closure letters and documents, including any previous CAs generated by any past reviews of this establishment, as well as a copy of the closure letter and document for the current review.  If a contractor must file progress reports under a current CA, when the CO evaluates the last report, the CO will add a copy of the "Summary of Progress Reports" to this folder on top of the CA for the current review.

It is important that the field office retains the historical folder consistent with OFCCP's records management schedule.  If OFCCP schedules another review of this establishment before this case file is retired and archived, the field office will pull the historical folder from the old case file and move it to the new one.

*Folder 7: AAP and Itemized Listing Data.*  This folder contains the contractor's AAPs and Itemized Listing data evaluated in this review.  Place this material at the end only because it is often the most voluminous.

## 1B03   SENDING THE SCHEDULING LETTER AND ITEMIZED LISTING

OFCCP uses the Scheduling Letter and Itemized Listing to schedule a compliance evaluation and request AAPs and Itemized Listing data from the contractor.[17]  The Scheduling Letter and Itemized Listing are reauthorized for the agency's use every three years by the Office of Management and Budget (OMB) if not earlier, should the agency seek it.  Therefore, COs must review the most recently authorized Scheduling Letter and Itemized Listing to ensure that they are familiar with the documents and information requested from the contractor.

COs will use a separate version of the Scheduling Letter and Itemized Listing for a focused review.  For example, the Scheduling Letter and Itemized Listing for Section 503 focused reviews is in Figure F-4.

The most recently OMB-approved Scheduling Letter and Itemized Listing is sent by certified mail, return receipt requested, to the highest ranking official at the contractor's establishment or functional unit, with a copy to the CEO at the contractor's corporate headquarters unless the establishment and corporate headquarters are the same.  The appropriate field office official signs the Scheduling Letter.  The letter must include the name and telephone number of the CO who will receive the AAPs, and Itemized Listing data or the CO's appropriate supervisor.

## 1B04   FOLLOW-UP CONTACT WITH CONTRACTOR AND JURISDICTION CHALLENGES

COs must contact the contractor within 15 calendar days after sending the Scheduling Letter and Itemized Listing to ensure that the contractor or the contractor's representative, or both, fully understand the requests contained in the letter.  If the contractor has questions, COs will provide technical assistance to clarify the contractor's obligations and the compliance evaluation process.  The CO should establish himself or herself as the primary point of contact for the compliance evaluation, provide an overview of what to expect during the evaluation, and explain the allowable one-time 30-day extension for submission of Itemized Listing[18] information as well as the SCN process for failure to meet deadlines for submitting the AAPs and Itemized Listing information.

The contractor may challenge OFCCP's authority to schedule it for a compliance evaluation.  For instance, the contractor could assert that the establishment is closed, the establishment is part of an approved FAAP agreement, or it does not have a large enough federal contract or the requisite number of employees to trigger OFCCP's AAP requirements.  The contractor might also inform the CO that it has been less than 24 months since it received a closure letter from OFCCP for a prior compliance evaluation or since the end of the monitoring period for a CA or consent decree it entered with OFCCP to remedy violations uncovered during a prior evaluation.

---

[17]   See Figure F-3 – Scheduling Letter and Itemized Listing.
[18]   See Directive 2018-08, "Transparency in OFCCP Compliance Activities."  OFCCP will provide a 30-day extension for contractors to provide supporting data related to the Executive Order 11246, VEVRAA and Section 503 AAPs, provided that: 1) the contractor requests the extension any time before the initial 30-day due date for the AAPs and 2) the contractor timely submits the basic Executive Order 11246, Section 503 and VEVRAA AAPs within the initial 30-day period after receiving the Scheduling Letter and Itemized Listing.

If the contractor challenges the agency's jurisdiction for any reason, the CO must elevate the issue to the attention of DPO, in coordination with his or her supervisor and regional office. DPO will use a number of resources, including the System for Award Management (SAM),[19] to verify whether OFCCP has jurisdiction over the scheduled contractor. If jurisdiction is then established, yet the contractor continues to dispute OFCCP's jurisdiction, the CO will recommend issuance of an SCN. Chapter 8, Section D explains the use of SCNs. If jurisdiction is not established, then the CO would administratively close the compliance evaluation.[20]

SAM includes information on whether a contractor has declared that it maintains AAPs for all of its establishments. The information is under Representations and Certifications; Affirmative Action Compliance (Federal Acquisition Regulation 52.222-25). COs may find it beneficial to check SAM to determine whether the contractor made this declaration in SAM before making the 15-day call.

If a region schedules a compliance evaluation of an establishment that is covered by a functional or business unit, the regional office and CO must contact the FAAP branch to verify if the establishment is covered within an approved functional or business unit. The FAAP branch will advise the regional office and CO whether to administratively close the evaluation.

## 1B05   CONTACTING EEOC, VETS AND OTHER AGENCIES

Simultaneous with the mailing of the Scheduling Letter, COs will seek information regarding the employment policies and practices of the contractor being scheduled from the Equal Employment Opportunity Commission (EEOC), Veterans Employment and Training Service (VETS), and other EEO and labor law enforcement agencies. Such information provides a better understanding of the contractor's workforce and operations, and may indicate potential problem areas.

a.  *EEOC and State and Local Fair Employment Practices (FEP) Agencies*. The CO sends an inquiry letter simultaneous with the mailing of the Scheduling Letter.[21] The inquiry letter goes to the appropriate district office of the EEOC, and to the appropriate state and local FEP agencies. It requests information on discrimination complaints filed against the contractor and any other information that may be pertinent to assessing the contractor's EEO posture. After 15 calendar days, COs must follow up by telephone with any agency that failed to respond or from which additional information is needed.

OFCCP has a Memorandum of Understanding (MOU) with EEOC that includes provisions about information sharing, complaint referrals, coordination and consultation. COs are urged to become familiar with the provisions of this MOU.

b.  *Veterans Employment and Training Service, Employment Service Delivery System and DOL Enforcement Agencies*. COs must contact the VETS regional office and local employment service delivery systems (ESDS) in writing to request any information that could be pertinent to the pending review, including information regarding the contractor's compliance with the mandatory job listing requirements of the equal opportunity clause at 41 CFR 60-300.5(a), and

---

[19]  The System for Award Management is located at *https://www.sam.gov/* (last accessed August 2019). For OFCCP's current jurisdictional thresholds, see *https://www.dol.gov/ofccp/taguides/jurisdiction.htm* (last accessed August 2019).
[20]  Letter L-1 – Sample Administrative Closure Letter.
[21]  Letter L-2 – Sample Inquiry Letter for Requesting Complaint Data from EEOC and State and Local FEPs.

complaints.[22]  When conducting compliance evaluations and complaint investigations, COs must query the VETS-4212 database online to verify that a federal contractor completed the annual reporting requirements for the appropriate reporting year.  COs must then record the results of these inquiries in Part B.I of the SCER.  Moreover, the information in this database, in combination with data provided under 41 CFR 60-300.44(k), may be useful when analyzing an employer's recruitment and hiring practices.  OFCCP provides a periodic report to VETS of contractors who have not filed the VETS-4212.[23]

Additionally, COs should check the DOL Enforcement Database at https://enforcedata.dol.gov/ for closed complaints and compliance evaluations of the contractor's establishment, and may reach out to other DOL agencies such as the Wage and Hour Division (WHD) or the Occupational Safety and Health Administration (OSHA) for information on the compliance history of the establishment.  For example, the WHD may have filed Family and Medical Leave Act (FMLA) violations related to the contractor that is the subject of a compliance evaluation.

## 1B06   INFORMATION ON COMPLAINTS FILED WITH OR BY OTHER AGENCIES

COs must carefully examine all information regarding EEO complaints against a contractor that they receive from federal, state, and local agencies in response to a letter of inquiry.  COs enter basic information about these complaints in Part A of the SCER, including:

- The agency with which the complaint was filed;

- The jurisdictional or legal basis (*e.g.,* race, sex) of the complaint;

- The current status of the complaint; and

- The area of the contractor's workforce involved in the complaint.

COs will note any patterns in the types of complaints filed and any discrimination findings made on them.  For example, there may be a clustering of complaints filed by employees in certain job areas, or by applicants or employees from a particular race, religion, ethnic group or sex; by covered veterans; or by individuals with disabilities.  As the review progresses, COs must cross-reference complaints to any potential problem areas they identify.  There may be, for example, indications of a lack of good faith efforts, statistical indicators of discrimination, or concentration or underrepresentation in areas where complaints were filed.

When appropriate, COs will contact the appropriate EEOC office or state or local FEP agency to arrange the review of relevant discrimination complaint files as part of the compliance evaluation.  This review can be particularly useful when, based on the result of the desk audit, a CO identifies potential systemic problems in complaint areas.

---

[22]  Sample letters are in this Manual, including Letter L-3, Sample Letter For Requesting Job Listing From Employment Service Delivery Systems, and L-4, Sample Inquiry Letter for Requesting Information on Pending Review from Veterans Employment and Training Service.

[23]  41 CFR 60-300.60(c).

Upon receipt of the AAPs and Itemized Listing data, COs must compare any information a contractor provides concerning current or past complaints to the information received from other agencies. COs will note discrepancies and information not provided by the contractor for possible further investigation during the review, and will seek an explanation and additional information from the contractor.

## 1B07   RELATIONSHIP OF OFCCP COMPLIANCE ACTIVITIES TO LITIGATION OR COURT ORDERS

If, during the conduct of a compliance evaluation, a CO finds that the contractor is involved in litigation or is under a court order on EEO matters, then the CO must identify:

- The EEO issues involved;

- The court and the parties; and

- The case name and number.

The CO must bring the matter to the attention of his or her supervisor. The field office, in consultation with the regional Solicitor of Labor (RSOL), will determine whether the litigation or court order imposes limitations on the compliance evaluation.

## 1B08   REVIEW OF COMMUNITY RESOURCE FILES

Each field office must maintain resource files on the communities within its geographic area. For each community, these files should identify local organizations that represent or provide services to protected groups. These entities would include groups and organizations representing or servicing women, racial and ethnic minorities, veterans, individuals with disabilities, and individuals who identify as lesbian, gay, bisexual, or transgender. Some COs may not be knowledgeable about the local organizations in the area. In these instances, the COs must review the resource files and introduce themselves to representatives from the various organizations. The Communications Team in the national office and Regional Office Outreach Coordinators (ROCs) may also be useful resources.

If a contractor is located near an Indian and Native American Reservation with a Tribal Employment Rights Organization (TERO) or other employment organization on the reservation, COs must contact these organizations. Chapter 2 of this Manual discusses the importance of linkages and how a CO can establish relationships with local organizations representing covered group members.

## 1B09   REVIEW OF PREVIOUS COMPLIANCE ACTIONS

COs must determine whether another OFCCP office recently reviewed or is reviewing the same contractor when scheduling contractor establishments for compliance evaluations. If another OFCCP office is currently reviewing a contractor proposed for an evaluation, the CO or the supervisor must contact the supervisor of the other OFCCP office to discuss what issues, if any, are present in their ongoing case. This is particularly important for detecting company-wide practices

that result in discrimination. An example of this issue may be a test that is not validated and has an adverse impact on specific groups.

COs may also examine closed case files or OFIS to identify issues relevant to the current evaluation. COs should also note the terms of any CA or consent decree, including back pay, hires and other remedial measures contained in the CA or consent decree. In addition, COs must determine whether a contractor has been subject to an OFCCP complaint investigation and, if so, review the complaint file for any violations or problems identified.[24] Any violations found in these past compliance actions must be recorded in Part A of the SCER. While the existence of a past problem is not considered evidence of the existence of present problems, COs must be alert to any indications that past problems remain unresolved, have recurred or that similar problems have arisen.

## 1C    RECEIPT OF AAPs AND ITEMIZED LISTING DATA FOR DESK AUDIT

The desk audit begins with receipt of the AAP(s). The appropriate field office should receive copies of a contractor's current Executive Order 11246 AAP within 30 calendar days of the contractor's receipt of the Scheduling Letter and Itemized Listing. The office should also receive separate or combined AAPs for Section 503 and VEVRAA within this same timeframe.[25] If the field office does not receive the current AAPs or Itemized Listing information within this timeframe, the CO must call the contractor to determine the status.

### 1C00   NONRECEIPT OF AAPs

If the contractor fails to request an extension, if the request is denied, or if the contractor fails to submit any of the AAPs it is required to maintain within the established timeframe, the CO must recommend issuance of an SCN. The CO's supervisor has the discretion only under extraordinary circumstances to grant the contractor a reasonable extension if the contractor does not submit the AAPs on time. This discretion should be exercised within the parameters set by the national office.[26] Additionally, the regulations at 41 CFR 60-1.26(b)(1), 60-300.65, and 60-741.65 give the director of OFCCP the discretion to immediately refer the matter to the Solicitor for administrative enforcement when a contractor refuses to submit an AAP and efforts to conciliate the matter are unsuccessful.

### 1C01   NONRECEIPT OF ITEMIZED LISTING DATA

If, in response to the Scheduling Letter and Itemized Listing, a contractor does not meet its deadline to submit all the Itemized Listing records requested, including employment activity data, the CO must immediately begin the process to issue an SCN.[27] This process also applies to contractors who receive the one-time, 30-day extension for submitting Itemized Listing information explained in 1B04. Examples of incomplete information include not submitting data for one or more personnel

---

[24] See subsection 1B06 – Information on EEO Complaints Filed with or by Other Agencies.
[25] The contractor has the option to prepare a combined Section 503 and VEVRAA AAP or to prepare separate Section 503 and VEVRAA AAPs.
[26] See Directive 2018-08, "Transparency in OFCCP Compliance Activities."
[27] Procedures for issuing an SCN are in Chapter 8 – Resolution of Noncompliance.

activity elements, such as applicant flow, hires, compensation, promotions or terminations.  As with all correspondence, conversations, emails, or other communication, this contact must be meticulously recorded in the Case Chronology Log, in the event OFCCP goes to litigation.

## 1C02   REGULATORY CITATIONS FOR RECORDKEEPING

If a contractor fails to submit data because it did not maintain appropriate records, one or more of the following regulatory sections may be applicable for COs to cite in the SCN or other closure document.

- Executive Order 11246 Recordkeeping and Related Requirements, 41 CFR 60-1.12 and 60-2.17(b) and 60-2.17(d).  These two sections set forth requirements that necessitate recordkeeping of employment and personnel records.

  - Section 60-1.12 sets forth the required document retention periods and identification requirements for all employment and personnel records and AAPs.  Generally, a contractor must retain these records for two years unless it has less than 150 employees or does not have a federal contract of at least $150,000, in which case the period is one year.

  - Section 60-2.17(b) requires that an AAP identify problem areas and Section 60-2.17(d) requires that an AAP include internal audit and reporting systems.  COs may cite these requirements in conjunction with recordkeeping violations because they cannot be appropriately implemented without maintaining and analyzing basic data on employment activity as required by 41 CFR 60-3.4 and 60-3.15.

  - General Data Requirements under the Uniform Guidelines on Employee Selection Procedures (UGESP), 41 CFR Part 60-3.  These guidelines were designed to provide a framework for determining the proper use of tests and other selection procedures used as a basis for employment decisions.  Section 60-3.4 requires contractors to maintain records that show the impact such selection procedures have on the employment opportunities of persons by identifiable race, sex, and ethnic groups.  The race and ethnic groups are defined by 41 CFR 60-3.4B as Black, Hispanic, Asian, American Indian, and White other than Hispanic.  However, OFCCP also permits contractors to keep their records concerning impact by using the race and ethnic categories on the Equal Employment Opportunity Standard Form 100, Employer Information Report EEO-1 series (EEO-1 report).

    i. *Recordkeeping Requirements under UGESP for Contractors with 100 or More Employees*.  41 CFR 60-3.15A(2) requires contractors with 100 or more employees to maintain and have available records or other information for each job showing whether the total selection process for that job has an adverse impact based on race, sex, or ethnic group as defined by 41 CFR 3.5B, described above.  Contractors must have records on adverse impact determinations for each protected group that constitutes at least 2% of the labor force in the relevant labor area or 2% of the applicable workforce.  Where the total selection process has an adverse impact, the CO may request validity evidence for each component of that process which has an

adverse impact.  Different types of validity evidence that may be maintained by contractors are explained in 41 CFR 60-3.15A(3).

ii. *Recordkeeping Requirements under UGESP for Contractors with less than 100 Employees*.  41 CFR 60-3.15 A(1) requires contractors with less than 100 employees to maintain and have available records for each job on all applicants, hires, promotions, terminations and any other selection decisions by sex and, where appropriate, by race and national origin.  Contractors should maintain these records for any race or national origin group constituting more than 2% of the labor force in the relevant labor area.  However, it is not necessary to maintain records by race and national origin if one race or national origin group in the relevant labor area constitutes more than 98% of the labor force in that area.  If a CO has reason to believe a contractor's selection procedure has an adverse impact, the CO may request evidence of validity for that procedure.

- Section 503 Recordkeeping Requirements, 41 CFR 60-741.80, 60-741.44(f)(4) and 60-741.44(k).  Section 60-741.80 provides the general recordkeeping requirements for Section 503 while Sections 60-741.44 (f)(4) and (k) explain the retention requirements for the assessment of external outreach and recruitment efforts, and the data collection analysis, respectively.

  o Section 60-741.80 sets forth the required document retention periods and identification requirements for all employment and personnel records, including, but not limited to, hires, requests for reasonable accommodation, terminations, the results of any physical examination, post-offer invitations to self-identify and any subsequent invitations to employees to self-identify.  Generally, a contractor must retain these records for two years, unless it has fewer than 150 employees or does not have a federal contract of at least $150,000, in which case the period is one year.

  o Sections 60-741.44(f)(4) and (k) require contractors to maintain certain records for three years.  Such records include documentation of all activities contractors undertake to disseminate their affirmative action policies externally, and to conduct and assess outreach and positive recruitment.  The three-year retention period also applies to documentation of the computations and comparisons performed by contractors to analyze applicant and hire data for individuals with disabilities.

- VEVRAA Recordkeeping Requirements, 41 CFR 60-300.80, 60-300.44(f)(4), 60-300.44(k), and 60-300.45(c).  Section 60-300.80 provides the general recordkeeping requirements for VEVRAA while Sections 60-300.44(f)(4) and (k) explain requirements for external outreach and recruitment efforts, and the data collection analysis, respectively.  Finally, Section 60-300.45(c) provides the requirement for documenting the annual VEVRAA hiring benchmark.

  o Section 60-300.80 sets forth the required document retention periods and identification requirements for all employment and personnel records, including, but not limited to, hires, requests for reasonable accommodation, terminations, results of any physical examination, and post-offer invitations to self-identify.  Generally, a contractor must

retain these records for two years unless it has fewer than 150 employees or does not have a federal contract of at least $150,000, in which case the period is one year.

o  Sections 60-300.44(f)(4) and (k) require contractors to maintain certain records for three years.  Such records include documentation of all activities contractors undertake to disseminate their affirmative action policies externally and to conduct and assess outreach and positive recruitment.  The three-year retention period also applies to documentation of the computations and comparisons performed by contractors to analyze applicant and hire data on protected veterans, including data gathered from invitations to self-identify for applicants and those applicants who have been hired.

o  Section 60-300.45(c) requires contractors to document the hiring benchmark that they establish each year, along with the factors they considered and their relative significance, and to retain the documentation for three years.  In reviewing this documentation, the CO must determine whether the contractor used the five-factor method for establishing the VEVRAA hiring benchmark or if the contractor set its benchmark to equal the national percentage of veterans in the civilian labor force.  If the contractor used the five-factor method, the CO must examine the relative significance of each factor considered by the contractor in setting its benchmark.

## 1C03   EVALUATION PERIOD

COs must evaluate the contractor's AAPs and Itemized Listing data for at least the last full AAP year.  COs must also examine the current year data if the contractor is six months or more into its current AAP year.  For current year data of six months or more, the CO must examine the underlying records if the contractor cannot or has not yet computed the data.  For example, if the contractor establishes its AAPs on a calendar year basis (January – December) and the compliance evaluation is scheduled in August, a CO would evaluate the contractor's data from January through December of the prior year.  In addition, the CO would examine the data or underlying records at least from January through June of the current year.

## 1C04   ADDITIONAL DATA REQUESTS

A CO should not request any supplemental data during the desk audit after the contractor has responded to the Scheduling Letter and Itemized Listing <u>unless</u>:

- The contractor's submission is incomplete; or

- The CO needs to clarify information provided by the contractor for the desk audit.

If the contractor does not make a complete submission in response to the Scheduling Letter and Itemized Listing,[28] then the CO must follow the procedures in 1C00 or 1C01, as appropriate.

The CO may find an indicator of discrimination at desk audit and need to request additional data to perform refined analysis before going on-site.  This supplemental records request must include the

---

[28]  FCCM 1E discusses what must be included in the contractor's submission.  FCCM 1F, 1G and 1H explain how to evaluate whether the content submitted is acceptable.

basis for the request, be reasonably tailored to the areas of concern, and allow for a reasonable time to respond.

Special circumstances or exceptions may also exist that warrant a CO extending the analysis of a contractor's AAPs, personnel activity, policy implementation and supporting documentation to cover a period beginning two years before the date the contractor received the Scheduling Letter. The appearance of potential discrimination and missing records are examples of such special circumstances or exceptions. To fully investigate and understand the scope of potential violations, the CO may also need to examine records created after the date of the Scheduling Letter to determine, for example, if indicators of these potential violations appear or whether the situation or factors resulting in the indicators have been remedied. This assumes, however, that the CO, in conjunction with DPO, can establish coverage for the entire period. If the CO believes it is necessary to request information related to periods after the date of the Scheduling Letter, the CO must discuss the issue with his or her supervisors. The CO will request data relevant to the potential discrimination issues identified at the desk audit to determine how far into the evaluation period the violation extends and whether the violation continues to the present day. This information is necessary to ensure that any discriminatory practices have ended and to ensure that all victims of discrimination receive appropriate remedies.

## 1D    REVIEW OF AAPs: OVERVIEW

After receiving a contractor's AAPs and Itemized Listing data, COs must ensure that they are complete and acceptable. There are three types of determinations that a CO must make: inclusion, missing items, and acceptability; each is described below.

- *Inclusion*. Immediately review the material to ensure that the contractor provided all of the materials identified in the Scheduling Letter and accompanying Itemized Listing. Figure F-3 contains the current Scheduling Letter and Itemized Listing.

- *Missing Items*. Create an inventory list of every document that the contractor provided, including the date requested, if any, and date received. Also record on the list the items requested but not provided by the contractor.

- *Acceptability*. Determine whether the AAPs and Itemized Listing data are current, complete and acceptable.

The results of this initial review for inclusion and acceptability, as outlined below in sections 1E through 1H, are documented on Part B.I of the SCER. Each specific problem a CO identifies is described in Part B.II of the SCER, along with the corrective actions the CO plans to take to resolve them. To minimize duplication of work as well as the time it takes to complete a desk audit, COs should begin to analyze supporting data only after determining that the AAPs and supporting data are complete and acceptable.

# 1E    REVIEW OF ALL AAPs AND ITEMIZED LISTING DATA TO ENSURE SUBMISSIONS INCLUDE REQUIRED CONTENT

This Section covers CO actions and responses when AAPs and Itemized Listing submissions are not current or are missing information requested in the Scheduling Letter and Itemized Listing. The first subsection, 1E00, is devoted to AAPs that are not current while 1E01 and 1E02 cover the issue of inclusion and the actions that can be taken when AAP submissions are missing data. Subsection 1E03 discusses the review of Itemized Listing data to ensure all required data is included in the contractor's submission.

## 1E00    ACTION WHEN AAP IS NOT CURRENT

After receiving the desk audit submission, a CO first determines whether the AAP is current, that is, whether the AAP was effective as of the date of the Scheduling Letter. If it is not, the CO will contact the contractor and request immediate submission of the current AAP. If the contractor fails to submit the AAP, the CO must recommend the issuance of an SCN.[29]

## 1E01    INCLUSION

If the contractor's AAPs are current, the CO will review the AAPs and Itemized Listing data to determine whether the contractor's submissions include all requested information. To do so, the CO must first determine whether the contractor submitted all materials requested in the Scheduling Letter and Itemized Listing. Next, the CO must determine if the AAPs contain all the elements required by the regulations.

The elements of the required Executive Order AAP are listed in 41 CFR 60-2.10(b) while the required contents of Section 503 and VEVRAA AAPs are found in 41 CFR 60-741.44 and 60-300.44, respectively.

## 1E02    MISSING AAP ELEMENTS

Actions that must be taken when an AAP is missing or inadequate under the legal authorities enforced by OFCCP are discussed in this subsection. First is the discussion of the Executive Order AAP, followed by AAPs under Section 503 and VEVRAA.

a. *Executive Order AAP.* If one or more of the below listed Executive Order AAP elements is missing, COs must automatically consider the submission unacceptable.

- Organizational Profile (workforce analysis or organizational display);

- Job group analysis, including a list of the job titles that compose each job group;

- The percentage of minorities and the percentage of women employed in each job group;

---

[29]    See Chapter 8, Section D.

Federal Contract Compliance Manual (FCCM)

- Utilization analysis, including its component parts of job group formation, availability estimates and, as appropriate, identification of underutilization;

- Comparison of incumbency to availability;

- Placement goals at least equal to the availability figure derived for women or minorities, as appropriate for job groups where the number of minorities or women employed is less than would be reasonably expected, given their availability;

- Designation of a responsible official;

- Identification of problem areas;

- Action-oriented programs designed to correct any problem areas; or

- Internal audit and reporting system.

A CO must contact the contractor and request that it immediately provide the information. The CO should also provide the contractor with compliance assistance, if needed. If the contractor does not comply, the CO must suspend the desk audit and recommend the issuance of an SCN. If the contractor includes all of these elements, the CO will then evaluate them for acceptability.

b. *Section 503 AAP and Utilization Goal.* If one or more of the below listed Section 503 AAP and utilization goal elements is missing, COs must automatically consider the submission unacceptable.

- Equal employment opportunity policy statement;

- Review of personnel processes to ensure careful, thorough and systematic consideration of individuals with disabilities for job vacancies, promotion and training opportunities;

- Schedule for the periodic assessment of physical and mental job qualifications, to the extent they screen out individuals with disabilities, to ensure they are job-related and consistent with business necessity;

- Reasonable accommodation to physical and mental limitations, including copies of any reasonable accommodation policies, and documentation of any accommodation requests received and their resolution;

- Procedures to ensure that employees are not harassed on the basis of disability;

- External dissemination of the contractor's EEO policy;

- Description of outreach and positive recruitment efforts, and annual assessment from the evaluation of the effectiveness of those efforts;

- Internal dissemination of the contractor's EEO policy;

- Description of the contractor's audit and reporting system, including documentation of all actions taken to comply with the audit and reporting system requirements;

- Designation of responsible official;

- Policy to train all personnel involved in the recruitment, screening, selection, promotion, disciplinary and related processes to ensure that the commitments in the contractor's AAP are implemented;

- Data collection on applicants and hires, including documentation of the computations or comparisons of applicant and hire data;

- Analysis of contractor's utilization of individuals with disabilities;

- Identification of problem areas; or

- Action-oriented programs designed to correct any problem areas.

A CO must contact the contractor and request that it immediately provides the missing information.  The CO may provide the contractor with compliance assistance, if needed.  If the contractor does not comply, the CO must suspend the desk audit and recommend the issuance of an SCN.  If the contractor includes all of these elements, the CO will then evaluate them for acceptability.

c. *VEVRAA AAP and Hiring Benchmark.*  If one or more of the below listed VEVRAA AAP and hiring benchmark elements is missing, COs must automatically consider the submission unacceptable.

- Equal employment opportunity policy statement;

- Review of personnel processes to ensure careful, thorough and systematic consideration of protected veterans for job vacancies, promotion and training opportunities;

- Schedule for the periodic review of physical and mental job qualifications to ensure they are job-related and consistent with business necessity;

- Reasonable accommodation to physical and mental limitations;

- Procedures to ensure that employees are not harassed because of their status as a protected veteran;

- External dissemination of the contractor's EEO policy;

- Description of outreach and positive recruitment efforts, and results from the evaluation of the effectiveness of those efforts;

- Internal dissemination of the contractor's EEO policy;

- Description of the contractor's audit and reporting system, including documentation of all actions taken to comply with the audit and reporting system requirements;

- Designation of responsible official;

- Policy to train all personnel involved in the recruitment, screening, selection, promotion, disciplinary and related processes to ensure that the commitments in the contractor's AAP are implemented;

- Data collection on applicants and hires, including documentation of the computations or comparisons of applicant and hire data; or

- Documentation of the annual hiring benchmark established by the contractor.

A CO must  contact the contractor to request that the contractor provide any missing elements immediately.  The CO should provide the contractor with compliance assistance, if needed.  If the contractor does not comply, the CO must suspend the desk audit and recommend issuance of an SCN.  If the contractor included all of these elements, the CO will then evaluate them for acceptability.

### 1E03   MISSING ITEMIZED LISTING DATA

The Itemized Listing requests various data related to all three of OFCCP's legal authorities with varying time parameters.  For instance, contractors are required to submit the last three years of their Employer Information Reports (EEO-1 reports).  For employment activity data, including employee-level compensation data, they are required to submit the data only for the immediately preceding AAP year unless they are at least six months or more into their current AAP year, in which case they would submit the current AAP year data or the underlying records if the contractor cannot or has not computed the current year data as well.  The Itemized Listing must be reauthorized by OMB at least every three years, so it is subject to change.  Figure F-3 contains the current Itemized Listing.

As explained in subsection 1C01, the CO must recommend the issuance of an SCN if the contractor fails to submit Itemized Listing data.  After confirming receipt of the Itemized Listing data, the CO must ensure that the submission is complete.  If one or more of the items is missing, the CO considers the submission incomplete.  A CO must contact the contractor to request any missing items immediately and should provide the contractor with compliance assistance if needed.  If the contractor does not comply, the CO must suspend the desk audit and recommend the issuance of an SCN.  If the contractor included all of the items, the CO will then evaluate them for acceptability.

## 1F     REVIEW OF AN EXECUTIVE ORDER AAP AND ITEMIZED LISTING DATA FOR ACCEPTABILITY

The next three sections discuss a CO's review of a contractor's AAPs for acceptability.  Because the requirements for acceptability are not the same under all of the laws that OFCCP enforces, the acceptability requirements for the Executive Order AAP, Section 503 AAP and VEVRAA AAP are reviewed separately.  FCCM section 1F reviews the acceptability requirements for the Executive

Order AAP and Itemized Listing data.  Section 1G discusses the acceptability requirements for the Section 503 AAP and Itemized Listing data, and section 1H discusses the acceptability requirements for the VEVRAA AAP and Itemized Listing data.

The regulations at 41 CFR 60-2.10 through 60-2.17 list the required elements of an Executive Order AAP and specify what a contractor must include in a written AAP.  Once a CO determines that the contractor's submission includes the elements necessary to proceed with the desk audit, the desk audit proceeds with an evaluation of the acceptability of each required element.  Specifically, the CO examines the AAP to determine if the information the contractor provided in each element is sufficient to satisfy the regulatory requirements.  The determination of the *acceptability* of the items listed in Part B.II of the SCER is limited to the evaluation that the CO can conduct during the desk audit.  The CO may identify items in the part of the SCER that need further review on-site.  This process is different from an evaluation of a contractor's *implementation* of its AAP and regulatory requirements which, in most instances, the CO cannot determine without further investigation on-site.  On-site reviews are discussed in Chapter 2.

We address the acceptability assessment of each required element below.

**1F00   ORGANIZATIONAL PROFILE**

An organizational profile is a depiction of the staffing pattern within an establishment.  Contractors must use either a workforce analysis or an organizational display as its organizational profile.

a.  *Workforce Analysis*.  Under 41 CFR 60-2.11(c), a workforce analysis is acceptable if it:

- Contains a listing of each job title as it appears in applicable collective bargaining agreements or payroll records within each department or other similar organizational unit including the unit supervisor, ranked from the lowest-paid to highest-paid (or highest to lowest); and

- Provides a separate listing for each work unit or line of progression including the unit supervisor when there are separate work units or lines of progression within the department or organizational unit.

In addition, the workforce analysis must include information by job title, wage rate, department and/or organizational unit and lines of progression.  Below is a description of each of these elements.

- *Information by Job Title*.  Each job title listed shows the total number of people in the job title, the total number of men and women, and the total number of men and women in each of the races and ethnic groups identified in 41 CFR 60-2.11 or in the current EEO-1 report.[30] The list must include all job titles, including managerial job titles.  Upper management positions located in the establishment must be included in an establishment's workforce

---

[30]  See OFCCP Directive 2008-02, "Federal contractors' obligation to maintain and analyze the race and ethnicity data of applicants and employees in Affirmative Action Programs prepared under Executive Order 11246, as amended."  This guidance indicates that OFCCP will accept AAPs and supporting records that reflect the race, ethnicity and job categories outlined in either 41 CFR Part 60-2 or the current EEO-1 Report.  Also, for purposes of complying with OFCCP requirements, contractors choosing to follow the current EEO-1 categories may count applicants and employees identifying as "two or more races" as minorities.

analysis, even though the managers may have been chosen by those outside the establishment and included for goal-setting purposes in a corporate or mid-level AAP.[31]

- *Wage Rate.* The wage rate or salary range for each job title must be provided, although this information may be coded. Titles must be listed from the lowest-paid to highest-paid. Contractors must provide the key to wage rate or salary range codes if they are used. The codes must be consistent across department or unit lines. For example, a job with a salary code 1157 in Department A pays the same as one coded 1157 in Department B. The codes must also be consistent in wage rate or salary range order within each department or other similar organization unit. Finally, the contractor's submission should include a list of the codes used in wage and salary order with the lowest and highest codes labeled appropriately.

- *Departments or Organizational Units.* The departments or organizational units, or both, used in the workforce analysis must be identifiable and should reflect the contractor's organizational structure. If the contractor provides an organizational chart as part of the supporting documentation, the CO will compare it to and match it with the units used in the workforce analysis.

- *Lines of Progression.* Lines of progression or usual promotional sequences show the order of jobs in the line through which an employee moves to reach the top of the line. Lines of progression or promotional sequences can be identified from collective bargaining agreements, as well as from organizational charts. If the CO determines that lines of progression exist but adequate information is not provided at the desk audit, the CO will contact the contractor to request a prompt submission of the information.

b.  *Organizational Display.* An acceptable organizational display is one that meets the requirements of 41 CFR 60-2.11(b). It must contain the following elements for each unit:

- Name of the unit;

- Job title, gender, race and ethnicity of the unit supervisor (if the unit has a supervisor);

- Total number of male and female employees in the unit; and

- Total number of male and female employees by racial or ethnic groups.

## 1F01   JOB GROUPS

A job group analysis is acceptable if it meets the requirements of 41 CFR 60-2.12. Each job group must be a group of jobs and/or job titles within a particular establishment having similar content, wage rates and opportunities.

a.  *List of Titles in Each Group.* In order for COs to assess job group acceptability, the AAP must include, for each job group, a listing of the job titles that make up that group. If a contractor did

---

[31]   41 CFR 60-2.11(c)(4).

Federal Contract Compliance Manual (FCCM)

not provide the lists, the CO must immediately contact the contractor and request that the lists be promptly provided for the desk audit.

b. *Criteria for Acceptability.*  The following criteria are to be used in assessing the acceptability of job groups:

- *Similar Work Content.*  Similarity of work "content" refers to the duties and responsibilities of the job titles that make up the job group.

  o *Appropriate EEO Category.*  The CO will review the establishment's job titles that make up each of the job groups to verify they are within the proper EEO-1[32] job categories. Job titles in each job group must, as a general rule, be within the same EEO-1 job category.[33]

  o *Use of Occupational Information Network (O\*NET).*  The CO may refer to the U.S. Department of Labor's Employment and Training Administration's O\*NET database, as well as collective bargaining agreements, organizational charts and other data provided by the contractor to evaluate how the contractor formulated its job groups.  O\*NET lists standard job titles for most positions and codes them based on their duties, requirements and other factors.  O\*NET also gives descriptions of job duties and commonly required qualifications.

- *Similar Rates of Pay.*  COs must review pay rates in conjunction with job content.  Large apparent differences in pay among job titles within a job group or different locations within an organization, or both, suggest an unacceptable job grouping.  They may also indicate areas where compensation or job assignment practices need further review.

- *Similar Opportunities.*  "Opportunity" refers to the ability to take advantage of training opportunities, transfers, promotions, mobility to desirable wage or salary situations and other employment benefits.  Most often, it refers to upward mobility.  Ideally, each job within a job group should offer the same opportunities as any other job within that job group.

  o *Jobs in Separate Unions.*  Jobs groups should not group together jobs from separate unions or jobs from different departments where interdepartmental mobility is not available.  For example, job groups should not normally group together nonunion clerical jobs and clerical jobs that are covered by a collective bargaining agreement.

  o *Jobs in Lines of Progression.*  Contractors should separate jobs that are in lines of progression from those that are not.  When transferring or hiring into jobs above entry level is rare, COs must analyze each line of progression separately.  When there are lines of progression governed by strict seniority, the contractor should consider the job titles in the progression as a single job group.

---

[32] Higher education institutions are required to submit the IPEDS.
[33] Contractors that employ fewer than 150 employees are permitted to use the job categories listed in OFCCP's regulations or the current EEO-1 job categories which subdivide the Officials and Managers category into two categories: Executive/Senior Level Officials & Managers, and First/Mid-Level Officials & Managers.

c. *Job Groups Must Not Obscure Underutilization*.  Job groups that combine jobs with different content, wages or opportunities may obscure underutilization and OFCCP does not accept them.

d. *Effect of Size of Contractor's Workforce*.  While assessing the acceptability of a contractor's job groups, COs must remember that the size of the contractor's workforce is a major factor in determining how well the contractor meets the three criteria for the acceptability of job groups.

- *Job Groups Must Permit Meaningful Analyses*.  Job groups should have enough incumbents to permit meaningful utilization analyses and goal setting.  Optimally, when COs identify underutilization in a job group, the job group should be large enough so that a goal of at least one whole person can be established.  No minimum size is established for this purpose because the goal is dependent on the size of the job group, and the percentage and the number of minorities or women already in the job group.

- *Job Groups Should Not Normally Cross EEO-1 Job Categories*.  A contractor's job groups should not ordinarily cross EEO-1 job categories.  This means, for example, that a job group should not consist of a mixture of job titles from the "Professional" category and the "Technicians" category.  COs should note that larger contractor establishments may have multiple job groups that fall into the same EEO-1 job category.  Also, COs should note that smaller establishments (fewer than 150 employees) may use the EEO-1 job categories as their job groups.

e. Relationship Between Job Groups and Availability.  The organization of jobs into groups should allow contractors to tie specific jobs to availability statistics to assess the degree to which their workforce representation approximates availability.

## 1F02   EXECUTIVE ORDER UTILIZATION ANALYSIS

The utilization analysis is a series of separate but interrelated analyses COs use to identify whether a contractor employs minorities or women in the workforce at a rate that would be expected based upon their availability for employment.  Contractors must perform a utilization analysis that includes the placement of the contractor's employees into job groups, the determination of the availability for the employment of minorities and women, and a comparison of their incumbency in the job groups to their availability.  If a contractor's utilization analysis reveals the underutilization of minorities or women, or both, in any of the job groups, the contractor must establish placement goals designed to cure the underutilization.

a. *Placement of Incumbents in Job Groups*.  Having combined the job titles for the job group analysis, the contractor must separately state the percentage of minorities and the percentage of women employed in each job group.

b. *Determining Availability*.  After aggregating individual job titles into job groups, the contractor must determine the availability of women and minorities for those job groups.  "Availability" is a percentage estimate of the women and minorities in the reasonable recruitment area who have the skills required to perform the jobs within the job groups compared to all.  When determining availability, the contractor must separately determine the availability of minorities and women for each job group, and consider at least the following factors:

Federal Contract Compliance Manual (FCCM)

- The percentage of minorities and women with the requisite skills in the "reasonable recruitment area," sometimes referred to by COs as "external availability."  We define "reasonable recruitment area" as the geographical area from which the contractor usually seeks, or reasonably could seek, workers to fill the positions in question.  When selecting the reasonable recruitment area, the contractor must not select an area in such a way that it would exclude minorities or women.  For each job group, the contractor must identify and provide a brief explanation of the rationale for the selection of that recruitment area.

- The contractor should utilize the most current and discrete statistical information available to derive availability figures (such as census data, data from local job service offices, colleges and other training institutions).  When evaluating the contractor's availability information, COs must utilize the most recent EEO Tabulation (EEO Tab).[34]

- The percentage of minorities and women among those promotable, transferable or trainable within the contractor's organization, is sometimes referred to by COs as "internal availability."  The contractor must not define the pool of promotable, transferable and trainable employees in such a way as to exclude minorities or women.  For each job group, the contractor must identify the pool of promotable, transferable and trainable employees, and provide a brief explanation of the reason for the selection of that pool.

- Though not required, some contractors assign a percentage or "weight" for availability rates of employees recruited into the job group.  For example, if there are several job titles in the job group, and the job titles have differing availability rates, the contractor may weight each job title differently when determining the availability for the job group as a whole.  In that instance, the sum of the weighted availability estimates for all job titles in the job group must be the composite availability for the job group.[35] A contractor may also choose to determine availability by weighing the internal and external availability for a particular job group.  In that example, the availability would be a sum of the external availability and internal availability rates.

c.  *Comparing Incumbency to Availability*.  The contractor must compare the utilization of minorities and women in each job group with their estimated availability, and identify job groups where the percentage employed is less than would be reasonably expected, given their availability.

We use the term "underutilization" to refer to the presence of fewer minorities or women in a particular job group than would reasonably be expected, given their availability.  Contractors use a number of methods to determine whether the representation rates of minorities and women are lower than would be reasonably expected.  Some contractors declare underutilization when

---

[34]  The EEO Tab is a custom tabulation of demographic data about the civilian workforce compiled every five to 10 years by the U.S. Census Bureau.  It is sponsored by a consortium of federal agencies consisting of OFCCP, the EEOC, the Department of Justice and the Office of Personnel Management.  The EEO Tab is derived from American Community Survey (ACS) data, and includes information about the race, sex, ethnicity, age, educational attainment, earnings and citizenship status of individuals in the civilian workforce, by geography, occupation and industry.  The current EEO Tab may be accessed on OFCCP's website, at *https://www.dol.gov/ofccp/regs/compliance/Census.html* (last accessed Oct. 2019).

[35]  41 CFR 60-2.14(g).

there is any difference between the availability percentage and the utilization percentage, while others conclude that underutilization exists when the number of minority or women incumbents in a particular job group is at least one whole person lower than the number predicted by the availability percentages.  Other contractors use a general "80%" rule and declare underutilization only when the representation of minorities or women is less than 80%of availability (which is the expected representation).  Still others test whether the difference between the actual and expected representation of minorities and women is statistically significant.

While contractors may choose any of these methods for comparing incumbency and availability, they must uniformly apply the same standard to all job groups, as appropriate.  Occasionally, a different method may be more appropriate to determine underutilization.  For example, in some instances it may not be reasonable for contractors to use the two standard deviation method.  No matter the method used, the contractor should be able to explain why it selected that method. Contractors should not use more than one method so as to mask underutilization.

The contractor must establish a placement goal if the percentage of women or minorities, or both, employed in a specific job group is less than would be reasonably expected, given their availability percentage in that particular job group.

## 1F03   PLACEMENT GOALS

Regardless of the method employed to determine underutilization, the contractor must establish a placement goal for each job group where minorities or women, or both, are underutilized.[36]  The placement goal established must be at least equal to the availability percentage of the underutilized minorities and women for the specific job group.[37]  The contractor may establish a goal higher than required under the Executive Order.  Placement goals are not rigid and are not quotas.

Contractors are generally required to set a single goal for all minorities when minorities as a whole are underutilized.  However, in the event of a substantial disparity in the utilization of a particular minority group, or the utilization of men or women of a particular minority group, the contractor may be required to establish separate goals for those groups.[38]

## 1F04   ADDITIONAL REQUIRED ELEMENTS OF AN EXECUTIVE ORDER AAP

This subsection, focusing on 41 CFR 60-2.17, covers the designation of responsibility for the AAP, identification of problem areas, creation of action-oriented programs, reporting system and internal audit, and reviewing the results of the report.

*a.  Designation of Responsibility.*  Under 41 CFR 60-2.17(a), contractors must provide for the implementation of EEO obligations and the AAP by assigning responsibility and accountability to an official of the organization.  These officials must have sufficient authority and resources, and must also have the support of, and access to, top management to ensure the effective implementation of the contractor's EEO obligations and AAP.  To be acceptable, the AAP

---

[36]  41 CFR 60-2.15.
[37]  41 CFR 60-2.16(b).
[38]  41 CFR 60-2.16(d).

should contain, at a minimum, a narrative description of the positions or job titles, or both, that the contractor designates to direct or manage its AAP and a description of the incumbent's duties.

b. *Identification of Problem Areas*.  41 CFR 60-2.17(b) requires that contractors perform an in-depth analysis of their total employment process to determine whether or where impediments to EEO exist.  They must evaluate the following.

- *Organizational Structure*.  The contractor must examine its workforce by organizational unit and job group to determine whether there are problems of minority or female utilization, or of minority or female distribution.

- *Personnel Activity*.  The contractor must examine applicant flow, hires, recruitment, referral, terminations, promotions, transfers and other personnel activities to determine whether there are selection and termination disparities.

- *Compensation*.  The contractor must determine whether there are gender, race or ethnicity disparities in its compensation system.

- *Personnel Procedures*.  The contractor must determine whether its selection, recruitment, referral, and other procedures result in disparities in the employment or advancement of minorities or women and their resulting pay.

- *Other Areas*.  The contractor must evaluate any other areas that might affect the success of the AAP.  Examples include seniority practices, leave policies, time off policies, policies regarding part-time work, the conduct of company-sponsored social events, apprenticeship program practices, workforce environment, and compliance with posting and union notification requirements.

c. *Action-Oriented Programs*.  41 CFR 60-2.17(c) requires that contractors develop and execute action-oriented programs designed to correct problem areas and to attain established goals and objectives.  To be effective, contractors must ensure that their action-oriented programs consist of more than following the same procedures that previously produced inadequate results.  Action-oriented programs should be "specific" and "result-oriented."

By "specific," OFCCP requires that the programs describe in some detail what action the contractor will take, who is responsible for taking the action and when the action will be accomplished.  "Result-oriented" programs are those where proper execution of the program will likely lead to an increase in minority or female participation, or both, in the department, job group, training program or other identified problem area.  The action-oriented programs must be sufficient, if successfully implemented, to achieve their stated objectives.  Contractors must describe these programs in the AAP.

For example, if a contractor identifies a lack of women in a job as a problem area, the contractor should also identify the reasons for the absence of women.  The reasons identified could include the rigid work hours, the impact or application of leave policies, the lack of recruitment, the lack of training, the absence of a career path or ladder leading to the job, a working environment hostile to women or hiring discrimination.  To remedy an identified problem area, the contractor

should establish action-oriented programs to eliminate or minimize the reasons women are adversely affected. The action-oriented programs, when fully implemented, should result in an increase in the representation of women in the job identified as a problem area.

d. *Internal Audit and Reporting System*. 41 CFR 60-2.17(d) requires contractors to design and implement an internal auditing system that periodically measures the effectiveness of its total AAP. This system must be detailed in the AAP, and the internal audit and reporting system must:

- *Monitor Records*. The internal audit and reporting system must monitor records of all personnel activity, including referrals, placements, transfers, promotions, terminations and compensation, at all levels.

- *Require Internal Reporting*. The contractor produces an internal report on the effectiveness of the AAPs on a regularly scheduled basis. While the regulations do not specify a particular time period, the reports must be produced on a scheduled basis.

- *Review Report Results*. Top management is advised of the program's effectiveness and any deficiencies, and management at all levels reviews the results of these reports.

The AAP should contain a narrative description of every aspect of the internal audit and reporting system. This description should specify the frequency of reports and audits. It should also state that, as problems are discovered, the contractor is taking the necessary corrective actions. The description should also designate the contractor officials responsible for taking these corrective actions. Lastly, the contractor should state how and when it reviews program results and effectiveness with management at all levels of the company.

## 1F05   REVIEW OF EXECUTIVE ORDER ITEMIZED LISTING DATA FOR ACCEPTABILITY

Contractors must submit data and information on the results of their immediately preceding AAP, as well as submit data and information on their current year AAP if they are six months or more into the current year by the time they receive their Scheduling Letter.[39]

COs request the AAP data and information using the Itemized Listing that accompanies the Scheduling Letter. Several items on the Itemized Listing specify that if the contractor is six months or more into its current AAP year when the listing is received the contractor will provide OFCCP with updated data for the current AAP year. For each of these items, the contractor should provide OFCCP with as much current AAP year data as it has. This means, for example, that if the contractor is six months into its current AAP year, it should provide six months of additional data; if the contractor is seven months into its current AAP, it should provide seven months of data; and if the contractor is 10 months into its current AAP, it should provide 10 months of data.

The Itemized Listing requests data and information indicating the numerical and other results of contractors' affirmative action goals for each job group for the current and preceding AAP years, as well as employment activity data (*i.e.*, applicants, hires, promotions and terminations) and employee-

---

[39]   41 CFR 60-1.12(b).

level compensation data. It also requests copies of the contractor's EEO-1 reports for the last three years and a copy of the contractor's collective bargaining agreement, if applicable, including documents that implement, explain or otherwise elaborate on the provisions of the collective bargaining agreement.

a. *Data on Affirmative Action Goals.* As noted above, the contractor must provide information indicating the numerical results of affirmative action goals set for each job group in their immediately preceding AAP and, where applicable, results on goals set for their current AAP. For each goal not attained, or not currently being attained, contractors must describe the good faith efforts they have undertaken to achieve the goal. Provided they make good faith efforts, contractors will not be held in violation for failure to achieve the goal. Contractors should always submit goal data for the immediately preceding AAP unless they were not federal contractors covered by 41 CFR Part 60-2 during the preceding AAP year.

- *Information on Job Groups with Goals.* COs, in order to measure the results of goals, must first know whether a contractor established goals for its job groups and what the goals are. The contractor's current AAP submitted for desk audit will have this information for the current year. The contractor's report on whether it attained the goals set in the immediately preceding AAP should specifically state the goals for that prior year; however, when it does not, the CO must request a copy of the goals section of the contractor's immediately preceding AAP.

- *Information on Placements into Job Groups with Goals.* Since contractors establish annual goals in terms of a percentage placement rate, evaluation of progress toward the goals requires knowledge of the total number of placements into the job groups (hires, promotions and transfers) and the number of minority and female placements, as appropriate. If a contractor's progress report does not include this information or if it includes incomplete information (*e.g.,* the number of minorities and females but not total placements), the CO will determine if the missing information can be obtained from the contractor's submission of personnel activity data. If the information cannot be obtained from the personnel activity data, the CO must ask the contractor to forward a copy of the report on the progress made toward its goals as prepared under its internal audit and reporting system.[40] If the contractor employs 100 or more people, a copy of the underlying data it used for its adverse impact determinations on hires, promotions and any other placements into job titles within the job group should be requested.[41]

- *Good Faith Efforts.* When a contractor's goals report does not describe its good faith efforts to achieve the goals that it failed to meet, or does not describe those efforts in sufficient detail for a CO to evaluate their adequacy, the CO must request additional information to review during the desk audit.[42] The CO must also include this request for more information in the On-Site Plan for evaluation of good faith efforts. Even if the contractor corrects the

---

[40] FCCM 1F04(d) – Additional Required Elements of AAPs: Internal Audit and Reporting System.
[41] FCCM 1F05 – Review of Executive Order Itemized Listing Data for Acceptability.
[42] Record findings on Part B.IV of the SCER.

goals report, the closure letter may identify the incorrect or incomplete report as a technical violation that was corrected during the review.[43]

b.  *Review of Employment Activity Data for Acceptability*

- *Data Format*.  To be acceptable for the desk audit, the contractor must present Itemized Listing data either by job group or by job title.  For example, data by total workforce is not acceptable; nor is data by EEO-1 job category, unless a category legitimately constitutes a job group at the particular establishment or the contractor has fewer than 150 employees.

- *Information Included*.  For each job group or job title, Itemized Listing data in each major personnel activity area (*e.g.,* applicant flow, hires, promotions and terminations) must at least include the total number of actions, the total number of actions for women and the total number of actions for minorities.  For example, applicant flow for a job group or job title must include at least the total applicants, total female applicants and total minority applicants; hires for a job group or job title must include at least the total hires, total female hires and total minority hires.

- *Evaluation Period Covered*.  It is generally better to have the longest possible period because the data are more likely to reflect the contractor's usual way of operating.  At a minimum, however, the Itemized Listing data must cover the immediately preceding AAP year and, if the contractor is six months or more into its current AAP year when it receives the Scheduling Letter, the current AAP year.  If there are indicators of a violation, the evaluation period will extend to cover the two years before the contractor's receipt of the Scheduling Letter, as long as the contractor was covered by 41 CFR Part 60-2 during that period.  To fully investigate and understand the scope of potential violations, the CO may need to examine information relating to periods after the date of the Scheduling Letter to determine, for example, if violations are continuing or have been remedied.  If the CO believes it is necessary to request information for periods after the date of the Scheduling Letter, the CO must discuss the issue with his or her supervisor.

- *Source of Applicant Data*.  COs must determine if a contractor used the internet to recruit for any job group(s).  When the AAP does not readily specify the applicant pool for job groups in which individuals applied through the internet, the CO must contact the contractor to request the criteria used by the contractor in defining applicants for the job position(s) in question.  The contractor's submission should address the following four questions:

  o  Did the individual express an interest in employment through the internet or related electronic data technologies?

  o  Did the contractor consider the individual for employment in a particular position?

  o  Did the individual's expression of interest indicate that the individual possesses the basic qualifications for the position?

---

[43]  Letter L-5 – Notice of Closing: Compliance Evaluation (Violations Found and Resolved).

- o  Did the individual at any point in the contractor's selection process, before receiving an offer of employment from the contractor, remove him or herself from further consideration or otherwise indicate that he or she was no longer interested in the position?

To be acceptable, the contractor must identify the electronic data technologies used to collect expressions of interest, the specific job positions for which the contractor considered applications through the internet and the basic qualifications for these positions. COs will note unacceptable submissions in Part B.II of the SCER, and investigate during the on-site review.

c.  *Review of Employee-Level Compensation Data.*  The Itemized Listing requests data regarding the contractor's compensation, including employee-level compensation information and policies related to compensation practices.

- *Data Format.*  The contractor should electronically submit all of the compensation data requested, if the data is computerized. The data must also be contained within a single file.

- *Information Included.*  The CO must review the data to ensure it includes compensation, gender, and race/ethnicity information, and hire date for each employee, as well as job title, EEO-1 category and job group. Compensation includes base salary and/or wage rate, and hours worked in a typical workweek. Other compensation or adjustments to salary such as bonuses, incentives, commissions, merit increases, locality pay or overtime should be identified separately for each employee. Data should be present for all employees, including full-time, part-time, contract, per diem or day labor, and temporary employees, as of the date of the workforce analysis in the contractor's AAP.

  Additional data that may be included are data on factors used to determine employee compensation such as education, experience, duty location, performance ratings, department or function, and salary level/band/range/grade. Documentation and policies related to compensation practices of the contractor should also be included in the submission, particularly those that explain the factors and reasoning used to determine compensation.

- *Time Period of Data.*  The CO must verify that the "snapshot date" for employee-level compensation data is the same as the date for the organizational display or workforce analysis submitted by the contractor.

d.  *Action When Data Are Unacceptable.*  If employment activity or compensation data are submitted but not acceptable, COs must call the contractor and request that the appropriate changes are promptly made and the data resubmitted within the timeframe specified by the OFCCP field office. If, at the end of the allotted timeframe, the data are not received in an acceptable form, COs will recommend issuing an SCN specifying the regulatory sections the contractor violated.

Examples of unacceptable data submissions include, but are not limited to, instances where the data are in aggregations larger than job group or are not provided by sex, or by racial or ethnic category.

Federal Contract Compliance Manual (FCCM)

# 1G    REVIEW OF A SECTION 503 AAP AND ITEMIZED LISTING DATA FOR ACCEPTABILITY

As with the Executive Order AAP, the determination of the *acceptability* of items listed in Part B.I of the SCER for the Section 503 AAP is limited to an evaluation conducted at the desk audit. This is different from an evaluation of the contractor's *implementation* of these items, which usually is reviewed on-site if it is determined during the desk audit that an on-site is needed. Additionally, the Section 503 regulations require the contractor to take a number of actions, even though the contractor does not address them in the AAP. Part C.I of the SCER covers the additional requirements that are reviewed on-site.

## 1G00   ITEMS INCLUDED

To be acceptable, a contractor's Section 503 AAP must include the items listed in 41 CFR 60-741.44 and 41 CFR 60-741.45.[44] It is the responsibility of COs to determine whether the contractor included all of the required items in the contractor's Section 503 AAP. Those items are listed in section 1E02 of the FCCM, and the acceptability assessment of each item is described below.

## 1G01   POLICY STATEMENT

Contractors are required to take affirmative action to employ and advance in employment qualified individuals with disabilities. The contractor must affirm its commitment to this affirmative action requirement by incorporating it in a policy statement included in its AAP.[45] The contractor must also post this policy statement on company bulletin boards. Applicants and employees with disabilities must be provided the policy statement in a format that is accessible and understandable such as Braille or large print versions of the notice.

At a minimum, to be acceptable, the policy statement must include:

- A statement indicating the top United States executive's support for the EEO policy;

- A statement identifying the EEO official responsible for the implementation of the AAP;

- A statement that the contractor hires, recruits, trains and promotes without regard to disability;

- A statement providing for an audit and reporting system;

---

[44]  The final two sections of Subpart C of the Section 503 regulations, 41 CFR 60-741.46 and 60-741.47, do not address elements that need to be included in every AAP. Section 60-741.46 states that contractors have the option of voluntarily developing and implementing training or employment programs focused on the specific needs of people with certain disabilities and that, if a contractor implements such a program, it must include it in its AAP. Section 60-741.47 explains that a contract with a sheltered workshop is not a form of affirmative action that replaces the employment and advancement of qualified individuals with disabilities in the contractor's own workforce. The regulation provides that the contractor may include a contract with a sheltered workshop in its AAP if the sheltered workshop trains employees who must be hired by the contractor at full compensation once they become "qualified individuals with disabilities."

[45]  See 41 CFR 741.44(a).

- A statement that the contractor will ensure that all employment decisions are based only on valid job requirements; and

- A statement that employees and applicants will not be subjected to harassment, intimidation, threats, coercion or discrimination because they engaged or may engage in filing a complaint, or assisted in a review, investigation or hearing related to any federal, state or local law requiring EEO for individuals with disabilities; or because they opposed any act deemed unlawful by any of the above-referenced laws; or because they exercised any other right under Section 503.

## 1G02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES

An AAP, to be acceptable, must affirm that the contractor reviews its personnel processes periodically.  These processes must provide for the careful, thorough and systematic consideration of the job qualifications of applicants and employees with known disabilities for job vacancies filled either by hiring or promotion, and for all training opportunities offered or available.  A contractor's AAP must describe the review, include the date the review was performed, and describe actions taken or changes made as a result of the review.[46]

a.  *Adequacy of Present Procedures.*  Contractors may assert that their present personnel procedures are adequate and indicate that modifications to the procedures are unnecessary.  COs must determine whether the information received during the desk audit supports that assertion to determine acceptability.  COs must request additional information during the desk audit or on-site review if they are unable to make an acceptability determination.

b.  *Adverse Stereotyping.*  Part of the contractor's review must be to ensure that its personnel processes are not stereotyping individuals with disabilities in a manner that limits their access to jobs for which they are qualified.

c.  *Access to Personnel Processes*.  The contractor must also ensure that applicants and employees with disabilities have equal access to personnel processes, including those implemented through information and communication technologies.  Ensuring equal access to personnel processes includes providing any necessary reasonable accommodation to ensure that qualified applicants and employees with disabilities are able to apply, and are fully considered, for vacancies, promotions, and training opportunities.  Appendix A to 41 CFR Part 60-741 provides guidelines for contractors on their duty to provide reasonable accommodations.  With respect to the application process, an example of appropriate accommodation could be the provision of information on vacancies in a form accessible to those with vision or hearing impairments who have requested an accommodation.  Though Section 503 and its implementing regulations do not require contractors to make their information and communication technology publicly "accessible," contractors are encouraged to do so.

## 1G03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL QUALIFICATIONS

An AAP must contain the contractor's schedule for the periodic review of all physical and mental job qualification standards to ensure that, to the extent they tend to screen out qualified individuals

---

[46]   This information is requested in the Itemized Listing, under 41 CFR 741.44(b).

with disabilities, they are job-related and consistent with business necessity.  To be acceptable, the AAP must affirm that the contractor completed a review of the physical and mental job qualification standards.  Also, the contractor's desk audit submission must contain the most recent assessment including the date the assessment was performed, and any actions taken or changes made as a result of the assessment.[47]  If the CO is evaluating a newly covered contractor, the AAP must provide a specific and reasonable time by which the contractor will review the physical and mental job qualifications.

The contractor must ensure that any inquiries or medical examinations regarding an applicant's or employee's medical condition made by, or at the behest of, the contractor are conducted following relevant laws, including the regulation at 41 CFR 60-741.23.  All medical information the contractor obtains as a result of such inquiries or exams must be treated as confidential and maintained on separate forms and medical files, except as otherwise provided for in 41 CFR 60-741.23(d).  The CO may consult the EEOC's *Enforcement Guide: Preemployment Disability-Related Questions and Medical Examinations* (https://www.eeoc.gov/policy/docs/preemp.html) for more information on pre-employment medical examinations and inquiries.

## 1G04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL LIMITATIONS

As a matter of nondiscrimination, contractors must make reasonable accommodation to physical and mental limitations when requested by qualified individuals with disabilities unless contractors can demonstrate that such accommodation would impose an undue hardship.  In assessing undue hardship, contractors may consider factors such as financial costs and interference with the ability of other employees to do their jobs.  As a matter of affirmative action, if an employee with a known disability is having significant difficulty performing his or her job and it is reasonable to conclude that the performance problem may be related to the disability, then the contractor must confidentially notify the employee of the performance problem and inquire whether it is related to the employee's disability.  If the answer is yes, the contractor must also confidentially inquire whether the employee needs a reasonable accommodation.

At the desk audit stage, the CO must review copies of reasonable accommodation policies, and documentation of any accommodation requests received and their resolution, if any.[48]  Here are three examples of areas in which reasonable accommodations may be necessary: (1) accommodations in the application process; (2) accommodations that enable employees with disabilities to perform the essential functions of the position held or desired; and (3) accommodations that enable employees with disabilities to enjoy equal benefits and privileges of employment as are enjoyed by employees without disabilities.

Once an individual with a disability has requested a reasonable accommodation, the employer must determine the appropriate accommodation.  Sometimes the appropriate accommodation will be obvious or included in the accommodation request, *e.g.,* a request for a sign language interpreter.  When it is not, the contractor should use a problem-solving approach to determine the appropriate accommodation.  This approach may include initiating an interactive process with the

---

[47]   This information is requested in the Itemized Listing, under 41 CFR 741.44(c).
[48]   This information is requested in the Itemized Listing.  Note that contractors are encouraged but not required to have written procedures for processing requests for reasonable accommodations.  See 41 CFR 60-741.44(d)(2).

accommodation requester that may entail: 1) analyzing the particular job involved and determining its purpose and essential functions; (2) consulting with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation; (3) identifying potential accommodations and assessing the effectiveness each would have in enabling the individual to perform the essential functions of the position; and (4) considering the preference of the individual to be accommodated, and selecting and implementing the accommodation that is most appropriate for both the employee and the employer.

Appendix A to the Section 503 regulations at 41 CFR Part 60-741, *Guidelines on a Contractor's Duty to Provide Reasonable Accommodation*, provides additional information about the scope of the "undue hardship" defense and examples of reasonable accommodations, among other things. Though not required, OFCCP encourages contractors to develop and use written procedures to process requests for reasonable accommodations. Guidance on how to develop written procedures is in Appendix B to the Section 503 regulations at Part 60-741, *Developing Reasonable Accommodation Procedures*.

## 1G05   HARASSMENT

Contractors must develop and implement procedures to ensure that their employees are not harassed because of their disability status. A contractor should include a copy of these procedures in the AAP. This statement may be part of a broader anti-harassment policy that also prohibits harassment on other bases such as race and sex.

## 1G06   EXTERNAL DISSEMINATION OF EEO POLICY

Under 41 CFR 60-741.44(f), the contractor must send written notification of the company policy related to its affirmative action efforts to all subcontractors, including subcontracting vendors and suppliers, requesting appropriate action on their part. COs should look for a description of the company's process for sending these notifications in the AAP and verify that the contractor sent the notifications if an on-site review is conducted.

## 1G07   OUTREACH AND POSITIVE RECRUITMENT

An acceptable AAP must affirm that the contractor engages in outreach and recruitment efforts reasonably designed to effectively recruit qualified individuals with disabilities. The contractor may engage in activities such as job fairs, recruitment activities with educational institutions and organizations that focus on job training and development for persons with disabilities, and posting of job opportunities with specialized organizations.[49] Contractors may also develop their own outreach programs. The scope of the contractor's efforts will depend upon circumstances, including the contractor's size and resources, and the extent to which existing employment practices are adequate.

The AAP must include documentation of the contractor's assessment of its outreach and recruitment efforts that it made over the previous 12 months. This assessment is two-fold in that the contractor must evaluate the effectiveness of each effort and it must conclude whether the totality of its efforts

---

[49]   See 41 CFR 60-741.44(f)(2) for more examples of outreach and recruitment activities in which a contractor may engage.

has been effective in identifying and recruiting individuals with disabilities. When evaluating the effectiveness of each effort, the contractor must document its determination and, at a minimum, it must include the criteria used to make the determination. One of the criteria that must be included is the data collected under 41 CFR 60-741.44(k) discussed below in subsection 1G11. If, when looking at the totality of its efforts, the contractor concludes that outreach and recruitment efforts were not effective, it must identify alternative efforts that it will implement to fulfill its affirmative action obligations. COs must also ensure that the conclusion is reasonable for the AAP to be acceptable. COs must record results in Part B.V of the SCER.

## 1G08   INTERNAL DISSEMINATION OF EEO POLICY

An acceptable AAP must address the contractor's procedures to disseminate its EEO policy internally. The policy must be included in the contractor's policy manual or otherwise made available to employees. Also, if the contractor is a party to a collective bargaining agreement, it must provide notice to union officials and/or employee representatives of the EEO policy and request their cooperation. The procedures must be designed to foster understanding, acceptance and support among the contractor's employees, and to encourage employees to take actions to aid the contractor in meeting this obligation. The regulations at 41 CFR 60-741.44(g)(3) provide examples of the types of activities contractors may undertake to enhance their efforts to employ and to advance in employment individuals with disabilities. For example, contractors may schedule periodic employee meetings to discuss the policy or conduct meetings with executive, managerial and supervisory personnel to explain the intent of the policy, and to delineate individual responsibility for its implementation.

## 1G09   AUDIT AND REPORTING SYSTEM

An acceptable AAP contains a narrative description of the contractor's internal audit and reporting system. The system must be designed to perform and document the following actions:

- Measure the overall effectiveness of the AAP;

- Indicate any need for remedial action;

- Determine the degree to which the contractor's objectives have been attained;

- Determine whether known individuals with disabilities have had the opportunity to participate in all company-sponsored educational, training, recreational, and social activities; and

- Measure the contractor's compliance with the AAP's specific obligations.

Documentation of these actions must be retained as employment records and submitted in response to the Scheduling Letter. An acceptable AAP will also specify the frequency of reports and audits, and describe the actions taken to address deficiencies identified by the audit and reporting system.

## 1G10   OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION

An acceptable AAP must identify the official assigned responsibility for implementing the contractor's affirmative action activities for individuals with disabilities, and describe that official's

responsibilities. The contractor must give this official the necessary senior management support and staff to manage the implementation of the program. The AAP should also describe the responsibilities of line management in carrying out the program.

## 1G11   TRAINING TO ENSURE AAP IMPLEMENTATION

Contractors are required to train their personnel involved in recruitment, screening, selection, promotion, disciplinary and related processes about the company's EEO obligations and, if appropriate, about the contractor's affirmative action commitments under Section 503. This section of the AAP should document that these personnel have been trained to ensure that the commitments in the AAP are implemented.

## 1G12   DATA COLLECTION ANALYSIS

Contractors are required to document the below information on an annual basis as part of their AAP, maintaining the data for three years, under 41 CFR 60-741.44(k).

- The total number of job openings and total number of jobs filled. Job openings include those that may be externally and internally filled;

- The total number of applicants for all jobs;

- The number of applicants who self-identified as individuals with disabilities or who are otherwise known to be individuals with disabilities;

- The total number of applicants hired; and

- The total number of applicants with disabilities hired.

When reviewing the AAP for acceptability, the CO must verify that the contractor provided documentation of computations or comparisons of the above information, as requested in the Itemized Listing. These computations or comparisons are criteria used to evaluate the effectiveness of the contractor's outreach and positive recruitment efforts. The data may also be used to analyze applicant trends to inform the contractor's review of personnel practices and self-audit.

## 1G13   UTILIZATION GOAL ANALYSIS FOR INDIVIDUALS WITH DISABILITIES

The Section 503 AAP regulation at 41 CFR 60-741.45 requires that contractors annually analyze their utilization of individuals with disabilities against the 7% aspirational goal established by OFCCP. This goal serves as an equal opportunity objective that should be attainable by taking the affirmative actions required in the Section 503 regulations. For an AAP to be considered acceptable, it must include the annual utilization goal analysis.

In the utilization analysis, contractors with more than 100 employees must evaluate the representation of individuals with disabilities within each job group of their workforce. For this analysis, contractors must use the same job groups that they use to evaluate utilization under Executive Order 11246. Like the Executive Order job group analysis, contractors with a total workforce of fewer than 150 employees may use the EEO-1 categories as job groups. A contractor

with 100 or fewer employees has the option to measure the representation of individuals with disabilities in its entire workforce.

If the percentage of individuals with disabilities in one or more job groups, or a contractor's entire workforce for smaller companies, is less than the 7% utilization goal, the contractor must determine whether and where barriers to EEO exist. To identify any such problems, contractors must assess personnel processes, the effectiveness of its outreach and recruitment efforts, the results of its AAP self-audit, and any other areas that might influence the success of the AAP. When a contractor finds problem(s), it must develop and implement action-oriented programs to correct them such as modifying personnel processes or taking a different approach for outreach and recruitment. For example, if the contractor finds the totality of its outreach and recruitment efforts was not effective in identifying and recruiting qualified individuals with disabilities for employment, the contractor should take action to identify recruitment sources that are not working and search for sources that yield better results, or introduce new outreach measures to increase the number of qualified applicants with disabilities. Several examples of outreach and recruitment activities are listed at 41 CFR 741.44(f)(2).

When reviewing the AAP for acceptability, the CO must closely examine the contractor's AAP to ensure it describes the utilization goal analysis, identifies any barriers to equal opportunity employment, and includes a description of action-oriented programs that the contractor has designed to address any barriers identified. If a contractor is six months or more into its current AAP year when it receives the Scheduling Letter and Itemized Listing, it must also submit the information that shows its current year progress toward meeting the utilization goal. Record results in Part B.V of the SCER.

## 1H    REVIEW OF A VEVRAA AAP AND ITEMIZED LISTING DATA FOR ACCEPTABILITY

As with Executive Order and Section 503 AAPs, the determination of the *acceptability* of items listed in Part B.I of the SCER for the VEVRAA AAP is limited to an evaluation conducted at the desk audit. This is different from an evaluation of the contractor's *implementation* of these items, which usually is reviewed on-site if it is determined during the desk audit that an on-site is needed. Additionally, the VEVRAA regulations require the contractor to take a number of actions even though the contractor does not address them in the AAP. Part C.I of the SCER covers the additional requirements, which are reviewed on-site.

### 1H00   ITEMS INCLUDED

To be acceptable, a contractor's VEVRAA AAP must include the below items listed in 41 CFR 60-300.44 and 41 CFR 60-300.45. It is the responsibility of COs to determine whether the contractor included all of the required items in the contractor's VEVRAA AAP. Those items are listed in Section 1E02 of the FCCM, and the acceptability assessment of each item is described below.

### 1H01   POLICY STATEMENT

Contractors are required to take affirmative action to employ and advance in employment qualified protected veterans. The contractor must affirm its commitment to this affirmative action

requirement by incorporating it in a policy statement included in its AAP.[50]  The contractor must also post this policy statement on company bulletin boards.  Applicants and employees who are disabled veterans must be provided the policy statement in a format that is accessible and understandable such as Braille or large print versions of the notice.

At a minimum, to be acceptable, the policy statement must include:

- A statement indicating the top United States executive's support for the EEO policy;

- A statement identifying the EEO official responsible for the implementation of the AAP;

- A statement that the contractor hires, recruits, trains and promotes without discrimination on the basis of status as a protected veteran;

- A statement providing for an audit and reporting system;

- A statement that the contractor will ensure that all employment decisions are based only on valid job requirements; and

- A statement that employees and applicants will not be subjected to harassment, intimidation, threats, coercion or discrimination because they engaged or may engage in filing a complaint, or assisted in a review, investigation or hearing related to any federal, state or local law requiring EEO for protected veterans; or because they opposed any act deemed unlawful by any of the above referenced laws; or because they exercised any other right under VEVRAA.

## 1H02   CONTRACTOR REVIEW OF PERSONNEL PROCESSES

An AAP, to be acceptable, must affirm that the contractor reviews its personnel processes periodically.  These processes must provide for the careful, thorough and systematic consideration of the job qualifications of applicants and employees who are known protected veterans for job vacancies either filled by hiring or promotion, and for all training opportunities offered or available.  A contractor's AAP must describe the review, include the date the review was performed, and describe actions taken or changes made as a result of the review.[51]

a.  *Use of Appendix C.*  Though not required, contractors may utilize the procedures described in Appendix C to 41 CFR Part 60-300 to fulfill this requirement.  These procedures describe how contractors annotate applications or personnel forms of protected veterans when considering them for employment opportunities.

b.  *Adequacy of Present Procedures.*  Contractors may assert that their present personnel procedures are adequate and indicate that modifications to the procedures are unnecessary.  COs must determine whether the information received during the desk audit supports that assertion to

---

[50]   See 41 CFR 300.44(a).
[51]   This information is requested in the Itemized Listing, under 41 CFR 60-300.44(b).

determine acceptability.  COs must request additional information during the desk audit or on-site review if they are unable to make an acceptability determination.

c.  *Relevancy of Military Records*.  Contractors must rely only on the portion of a protected veteran's military record that is relevant to the requirements of the opportunity for which the veteran is being considered.  The contractor should confirm compliance with this requirement in the AAP.

d.  *Adverse Stereotyping*.  Part of the contractor's review must be to ensure that its personnel processes are not stereotyping protected veterans in a manner that limits their access to jobs for which they are qualified.

## 1H03   CONTRACTOR REVIEW OF PHYSICAL AND MENTAL QUALIFICATIONS

An AAP must contain the contractor's schedule for the review of all physical and mental job qualification standards to ensure that, to the extent they tend to screen out qualified disabled veterans, they are job-related and consistent with business necessity.  To be acceptable, the AAP must affirm that the contractor completed a review of the physical and mental job qualification standards.  The contractor's desk audit submission must also contain the most recent assessment, including the date the assessment was performed, and any actions taken or changes made as a result of the assessment.[52]  If the CO is evaluating a newly covered contractor, the AAP must provide a specific and reasonable time by which the contractor will review the physical and mental job qualifications.

The contractor must ensure that any inquiries or medical examinations regarding an applicant's or employee's medical condition made by, or at the behest of, the contractor are conducted following relevant laws, including 41 CFR 60-300.23.  All medical information the contractor obtains as a result of such inquiries or exams must be treated as confidential and maintained on separate forms and medical files, except as otherwise provided for in 41 CFR 60-300.23(d).  The CO may also consult the EEOC's *Enforcement Guide: Preemployment Disability-Related Questions and Medical Examinations* (https://www.eeoc.gov/policy/docs/preemp.html) for more information on pre-employment medical examinations and inquiries.[53]

## 1H04   REASONABLE ACCOMMODATION TO PHYSICAL AND MENTAL LIMITATIONS

As a matter of nondiscrimination, contractors must make reasonable accommodation to the physical and mental limitations when requested by qualified disabled veterans unless they can demonstrate that such accommodation would impose an undue hardship.  In assessing undue hardship, contractors may consider factors such as financial costs and interference with the ability of other employees to do their jobs.  As a matter of affirmative action, if an employee who is a known disabled veteran is having significant difficulty performing his or her job and it is reasonable to conclude that the performance problem may be related to the disability, then the contractor must confidentially notify the employee of the performance problem and inquire whether it is related to

---

[52]  This information is requested in the Itemized Listing, under 41 CFR 300.44(c).
[53]  See also 41 CFR 60-300.23(d).

the employee's disability.  If the answer is yes, the contractor must also confidentially inquire whether the employee needs a reasonable accommodation.

Appendix A to the VEVRAA regulations at 41 CFR Part 60-300, *Guidelines on a Contractor's Duty to Provide Reasonable Accommodation,* provides additional information about the scope of the "undue hardship" defense and examples of reasonable accommodations, among other things. Though not required, COs should encourage contractors to develop and use written procedures to process requests for reasonable accommodations.  For more on reasonable accommodation, please refer to Section 1G04 of the FCCM.

## 1H05  HARASSMENT

Contractors must develop and implement procedures to ensure that employees are not harassed because of their status as a protected veteran.  A contractor should include a copy of these procedures in the AAP.  This statement may be part of a broader anti-harassment policy that also prohibits harassment on other bases such as race and sex.

## 1H06  EXTERNAL DISSEMINATION OF EEO POLICY

Under 41 CFR 60-300.44(f), the contractor must send written notification of the company policy related to its affirmative action efforts to all subcontractors, including subcontracting vendors and suppliers, requesting appropriate action on their part.  COs should look for a description of the company's process for sending these notifications in the AAP and verify that the contractor sent the notifications if an on-site review is conducted.

## 1H07  OUTREACH AND POSITIVE RECRUITMENT

An acceptable AAP must affirm that the contractor engages in outreach and recruitment efforts reasonably designed to effectively recruit qualified protected veterans.  The contractor may engage in activities such as job fairs, recruitment activities with educational institutions and organizations that focus on job training and development for veterans, and posting of job opportunities with specialized organizations.[54]  Contractors may also develop their own outreach program.  The scope of the contractor's efforts will depend upon circumstances including the contractor's size and resources, and the extent to which existing employment practices are adequate.

The AAP must include documentation of the contractor's assessment of its outreach and recruitment efforts that the contractor made over the previous 12 months.  This assessment is two-fold in that the contractor must evaluate the effectiveness of each effort, and conclude whether the totality of its efforts has been effective in identifying and recruiting individuals with disabilities. When evaluating the effectiveness of each effort, the contractor must document its determination and, at a minimum, include the criteria used to make the determination.  One of the criteria that must be included is the data collected under 41 CFR 60-300.44(k) discussed below in subsection 1H12.  If, when looking at the totality of its efforts, the contractor concludes that outreach and recruitment efforts were not effective, it must identify alternative efforts that it will implement to

---

[54]  See 41 CFR 60-300.44(f)(2) for more examples of outreach and recruitment activities in which a contractor may engage.

fulfill its affirmative action obligations.  COs must also ensure that the conclusion is reasonable for the AAP to be acceptable.  Record results in Part B.VI of the SCER.

## 1H08   INTERNAL DISSEMINATION OF EEO POLICY

An acceptable AAP must address the contractor's procedures to disseminate its EEO policy internally.  The policy must be included in the contractor's policy manual or otherwise made available to employees.  Also, if the contractor is a party to a collective bargaining agreement, the contractor must provide notice to union officials and/or employee representatives of the EEO policy and request their cooperation.  The procedures must be designed to foster understanding, acceptance and support among the contractor's employees, and to encourage employees to take actions to aid the contractor in meeting this obligation.  The regulations at 41 CFR 60-300.44(g)(3) provide examples of the types of activities contractors may undertake to enhance their efforts to employ protected veterans and to advance them in employment.  For example, contractors may schedule periodic employee meetings to discuss the policy or conduct meetings with executive, managerial and supervisory personnel to explain the intent of the policy, and to delineate individual responsibility for its implementation.

## 1H09   AUDIT AND REPORTING SYSTEM

An acceptable AAP contains a narrative description of the contractor's internal audit and reporting system.  The system must be designed to perform and document the following actions:

- Measure the overall effectiveness of the AAP;

- Indicate any need for remedial action;

- Determine the degree to which the contractor's objectives have been attained;

- Determine whether known protected veterans have had the opportunity to participate in all company-sponsored educational, training, recreational, and social activities; and

- Measure the contractor's compliance with the AAP's specific obligations.

Documentation of these actions must be retained as employment records and submitted in response to the Scheduling Letter.  An acceptable AAP will also specify the frequency of reports and audits, and describe the actions taken to address deficiencies identified by the audit and reporting system.

## 1H10   OFFICIAL RESPONSIBLE FOR AAP IMPLEMENTATION

An acceptable AAP must identify the person assigned responsibility for implementing the contractor's affirmative action activities for protected veterans and describe his or her responsibilities.  The contractor must give this official the necessary senior management support and staff to manage the implementation of the program.  The AAP should also describe the responsibilities of line management in carrying out the program.

## 1H11   TRAINING TO ENSURE AAP IMPLEMENTATION

Contractors are required to train their personnel involved in recruitment, screening, selection, promotion, disciplinary and related processes about the company's EEO obligations and, if appropriate, about the contractor's affirmative action commitments under VEVRAA.  This section of the AAP should contain documentation that these personnel have been trained to ensure that the commitments in the AAP are implemented.

## 1H12   DATA COLLECTION ANALYSIS

Contractors are required to document the below information on an annual basis as part of their AAP, and maintain the data for three years under 41 CFR 60-300.44(k).

- The total number of job openings and total number of jobs filled.  Job openings include those that may be externally and internally filled;

- The total number of applicants for all jobs;

- The number of applicants who self-identified as protected veterans or who are otherwise known as protected veterans;

- The total number of applicants hired; and

- The total number of protected veteran applicants hired.

When reviewing the AAP for acceptability, the CO must verify that the contractor provided documentation of computations or comparisons of the above information, as requested in the Itemized Listing.  These computations or comparisons are criteria used to evaluate the effectiveness of the contractor's outreach and positive recruitment efforts.  The data may also be used to analyze applicant trends to inform the contractor's review of personnel practices and self-audit.

## 1H13   VEVRAA HIRING BENCHMARK

The VEVRAA regulations at 41 CFR 60-300.45 require contractors to establish a hiring benchmark every year to use for measuring their progress toward achieving EEO for protected veterans.  The regulation also includes recordkeeping requirements related to documenting the hiring benchmark.

Contractors must use one of two methods to establish their benchmarks.  Contractors may choose to establish a benchmark equal to the national percentage of veterans in the civilian labor force which is published and annually updated on OFCCP's website.[55]  Alternatively, as described in 41 CFR 60-300.45(b)(2) and discussed below, contractors may establish their benchmarks by taking into account certain data from the Bureau of Labor Statistics (BLS) and Veterans' Employment and Training Service/Employment and Training Administration (VETS/ETA) that is also

---

[55]   See "Annual VEVRAA Benchmark Effective Dates," at
*http://www.dol.gov/ofccp/regs/compliance/AnnualVEVRAABenchmarkEffectiveDates.htm*
(last accessed September 2019).

Federal Contract Compliance Manual (FCCM)

published on the OFCCP website, as well other factors that reflect the contractor's own data and unique hiring circumstances.[56]

When reviewing an AAP for acceptability, COs must first review documentation provided by the contractor to determine which method the contractor used to establish a hiring benchmark.  If the contractor used the five factors described in 41 CFR 60-300.45(b)(2), then the CO must review the methodology used by the contractor to adopt its hiring benchmark.  The benchmark represents the percentage of protected veterans that the contractor seeks to hire during the AAP year.[57]  The CO must assess whether the contractor met its hiring benchmark using the hiring data submitted by the contractor.

To set a benchmark using the five-factor method, contractors must consider all of the five factors listed below.

- The average percentage of veterans in the civilian labor force for the state where the establishment is located for the previous three years.  The DOL, BLS, calculates this information regarding the general availability of veterans for employment for each state.  This data is provided in two different formats on OFCCP's website.  One format displays annual data for every state, by year.  While the other format shows three years of data for each individual state, by state.  (Note: This data is not available for Puerto Rico, the U.S. Virgin Islands, American Samoa, the Northern Mariana Islands, Wake Island or Guam.  Contractors in Puerto Rico or the U.S. Virgin Islands should select Florida data.  Contractors in American Samoa, the Northern Mariana Islands, Wake Island and Guam should select Hawaii data.)

- The number of veterans who participated in the ESDS in the State where the establishment is located over the previous four quarters.  The U.S. DOL's VETS tabulates this data regarding the number of veterans seeking jobs.  This data is provided on OFCCP's website for the most recent four quarters, as well as for previous periods.  (Note: This data is not available for American Samoa, the Northern Mariana Islands, Wake Island or Guam.  Contractors in those locations should select Hawaii data.)

- The applicant ratio and hiring ratio for the establishment for the previous year.  To make these computations, contractors use the data they have collected to comply with 41 CFR 60-300.44(k), which should also be included in the AAP.  To calculate the applicant ratio, compare the number of protected veteran applicants to the total number of applicants.  To calculate the hiring ratio, compare the number of protected veterans hired to the total number of hires.

- The most recent assessment of the effectiveness of the contractor's outreach and recruitment efforts.  This information is included in the AAP.

---

[56] See "VEVRAA Benchmark Database," at *https://ofccp.dol-esa.gov/errd/VEVRAA.jsp* (last accessed September 2019).

[57] The VEVRAA regulations do not require the contractor to conduct a hiring benchmark analysis.  However, a contractor may conduct such an analysis using data it has collected.  Also, the VEVRAA hiring benchmark may be used by contractors as one of the criteria to measure the effectiveness of their outreach and recruitment efforts.

- Any other factor, such as the nature of the job openings or the facility's location, which would tend to affect the availability of qualified protected veterans. This factor provides contractors with the flexibility to consider any other pertinent factors about your establishment or the nature of your business that might affect the availability of qualified protected veterans as part of the process of establishing the hiring benchmark.

Contractors using this individualized method have the discretion to weigh the various factors in a manner that is reasonable in light of their unique circumstances. However, they must document each factor considered and explain the methodology and rationale used to arrive at the benchmark selected.

Contractors with multiple establishments that choose the five-factor option may establish individualized benchmarks for each of their establishments or may choose, instead, to adopt the national percentage of veterans in the civilian labor force as the benchmark for one or more of their establishments. Contractors with multiple establishments may utilize only one benchmark option per establishment.

## 1I     SUMMARY OF ACCEPTABILITY PROBLEMS WITH AAPs AND ITEMIZED LISTING DATA

COs identify problems with the completeness and acceptability of a contractor's AAPs under Executive Order 11246, Section 503 and VEVRAA, and Itemized Listing data in Part B.II of the SCER. For each problem, COs must use Part B.II of the SCER to describe the specific problems and actions taken at the desk audit to resolve them, and actions planned for an on-site review. Any findings from on-site reviews are also recorded in this part of the SCER.

A CO may resolve some problems with the AAPs and Itemized Listing data at the desk audit after additional contact with the contractor. For example, if the CO cannot evaluate job group acceptability because there is no information on what job titles are in each group, that CO may be able to resolve the problem by obtaining the missing information from the contractor. The CO will note this follow-up contact and receipt of the additional information on the SCER. Such a notation could be written like this: "Called J. Smith May 1, 2011 and asked him to send a list of titles in each group. List received May 8, 2011."

If a CO determines that an Executive Order, Section 503, or VEVRAA AAP does not meet one or more of the standards for acceptability as discussed previously in this chapter, the CO must recommend suspension of the desk audit and issuance of an SCN, as appropriate.

## 1J     ANALYSIS OF SECTION 503 AAP: REVIEW OF ONLINE APPLICATION PROCESS

The contractor is required to provide necessary reasonable accommodation to ensure applicants and employees with disabilities receive equal opportunity in the operation of personnel processes, including an equal opportunity to apply and be considered for employment. Therefore, in addition to reviewing a contractor's Section 503 AAP as part of the desk audit, COs must review the contractor's online application system (electronic or web-based) to ensure that it provides a means for contacting the contractor, other than through the online system, to request a reasonable

accommodation to apply for the job.  Applicants may need this contact information if they cannot use the online application system because of a disability.  At a minimum, this information must include the name and phone number or email address of the person (or office) to whom a request for an accommodation should be made.  The contact information need not mention the words "reasonable accommodation," though it is a best practice to do so.  COs will document the results of this analysis in the Case Summary and Recommendations section of the SCER.  Contractors are also encouraged to make their information and communication technologies generally accessible.  This is so even in the absence of a reasonable accommodation request.  Doing so will minimize, but may not eliminate, the need to make individual reasonable accommodations.


# 1K     ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: OVERVIEW OF ITEMIZED LISTING DATA, EEO TRENDS, WORKFORCE STRUCTURE AND PERSONNEL PRACTICES

The review of the personnel activity data such as hires, promotions and terminations provides a broad framework for the detailed review by job group of affirmative action progress or placement goals, and the assessment of any potential discrimination in employment activity.  COs will review personnel activity data to gain an understanding of the specific kinds of employment activity that took place during the contractor's current and immediately preceding AAP years.  COs must use Part B of the SCER to describe the specific problems and actions taken at the desk audit to resolve issues with the contractor's Itemized Listing data.

## 1K00   EEO-1 TREND ANALYSIS

COs must make an initial assessment of a contractor's workforce and utilization trends by reviewing the contractor's EEO-1 reports in Part B.III of the SCER.

a. *Long-Term and Short-Term Trends*.  A CO must compare data from the contractor's most recent EEO-1 Report to data from its earlier EEO-1 reports.  For example, if the contractor provides EEO-1 reports for 2015, 2016 and 2017, then the CO compares the 2017 data to the 2015 data to look at the long-term trends, and compares the 2017 and 2016 data for short-term trends.  This information provides an overview of:

- The distribution of jobs within the contractor's workforce (white-collar, blue-collar, predominant EEO job categories);

- The direction of change in the total workforce and particular workforce categories (expanding, contracting, stable); and

- The increases and decreases in minority and female representation in various areas.

b. *Changes Due to Reclassifications.*  If a CO observes significant changes in the size of EEO-1 job categories with little or no corresponding personnel activity, the CO must investigate further to determine if the changes are due to the reclassification of jobs with concentrations of minorities or women from one EEO-1 job category to another.  For example, suppose the total number of positions in the Craft category increases from one year to the next and indicates an increase in the number of women.  Over the same period, however, both the total number of

Operative positions and the total number of women listed as Operatives decreases by nearly the same amount. The CO may then infer that the increase in Crafts may have resulted from the contractor changing the EEO-1 job category of the women's jobs, rather than from genuine hires or promotions.

c.  *EEO Category Patterns*.  EEO trend analysis allows COs to identify broad areas where minorities and women have been persistently underrepresented or concentrated, setting a framework for the detailed review of the workforce analysis for potential discrimination problems and the review of the contractor's goals progress by job group.

d.  *Particular Minority Group*.  This analysis permits the CO to identify any substantial disparity in the representation of a particular race or ethnic group when compared with the distribution of those same groups in the contractor's labor area and possible internal feeder categories. The disparity may exist in the contractor's workforce as a whole or certain categories. When a CO identifies such a disparity, the CO must plan to conduct an Impact Ratio Analysis (IRA) of the particular group, at least in those workforce areas where the disparity exists and for the type of activity most likely to have created the disparity.

For example, if Hispanics are well represented in the labor area but have historically been absent from the contractor's workforce, the CO will plan to conduct hiring IRAs separately for Hispanics. If Blacks have historically been concentrated in the Laborers category, but poorly represented in Operatives and Crafts, the CO's review of the workforce analysis should focus on the types of jobs held by Blacks and any structural impediments to upward mobility from those jobs. In addition, the CO's IRA of blue-collar job groups, particularly for promotions and hires into jobs above Laborers, should be conducted separately for blacks. Section 1O of the FCCM further discusses separate employment activity data analyses for particular groups. The CO will also note if the investigation of such a disparity does not show discrimination. The CO will consider whether goals and/or specific affirmative action steps for the particular group are warranted.

## 1K01  WORKFORCE STRUCTURE AND PERSONNEL PRACTICES

In the initial review of the AAP and Itemized Listing data, COs evaluate the organizational display or workforce analysis for acceptability. As a result, they have a basic understanding of the contractor's organization and operations. For example, a workforce analysis should show:

- Whether the contractor organizes the facility by department or other unit (*e.g.,* division);

- Whether lines of progression exist; and

- How the contractor structures pay and other characteristics that may prove useful for subsequent analyses of both affirmative action and potential discrimination issues.

Other Itemized Listing data that the contractor may provide with the AAP, such as copies of labor agreements, should contain additional information such as pay rates, work performed, organizational structure and rules for internal mobility. COs must enter this information, to the extent that it is available during the desk audit, in Part B.VIII of the SCER.

# 1L    ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP:  GOALS PROGRESS AND GOOD FAITH EFFORTS

The effectiveness of a contractor's overall AAP is not measured by whether the contractor met all its goals, but rather by whether the contractor made good faith efforts to do so.  Generally, if the contractor met properly determined goals in a job group, further examination of good faith efforts for that job group is unnecessary.  Determining whether a contractor demonstrated good faith efforts to meet its affirmative action obligations is separate from the determination of whether the contractor discriminated.  Therefore, to focus the investigation on good faith efforts, COs must take the following steps:

- Measure the degree of progress in job groups where the contractor established goals and opportunities occurred;

- Evaluate the contractor's resulting overall goals performance; and

- Identify areas where specific additional information is needed to evaluate good faith efforts.

COs will evaluate both prior year and current year, if applicable, and address any goal issues in Part B.IV of the SCER.

## 1L00   ANALYSIS OF GOALS PROGRESS

As noted earlier, to be acceptable, AAP Itemized Listing data must include a report of progress on immediately preceding AAP year goals.  In addition, the contractor should include a report of progress on current goals if the contractor is at least six months into its current AAP year when it receives the Scheduling Letter.  COs will use this progress report to analyze goals progress.

a. *Data Needed*.  To conduct this analysis, COs must first identify the job groups for which the contractor established goals at the beginning of the period under review.  Second, COs must determine the percentage placement goal for each job group and the protected class to which it applies.  Third, for each such job group, the number of total placements including hires and promotions, and the number of minority and/or female placements must be determined.  If a contractor does not submit this information at the desk audit, COs will conduct the analysis below at whatever point in the review they obtain sufficient information.

b. *Analysis*.  The analysis takes into consideration the number of opportunities the contractor provided in relation to the goal.  More specifically, to determine how many minorities or women the contractor would have placed if the goal were met, COs multiply the percentage placement goal by the number of placements that occurred.  The CO then compares this result with the number of minorities or women placed.

If a contractor established a goal for a particular race or ethnicity, or men or women of a particular race or ethnicity, then the CO evaluates progress on that goal in the same fashion as in the above example.

Federal Contract Compliance Manual (FCCM)

## 1L01   EVALUATION OF GOOD FAITH EFFORTS

An evaluation of good faith efforts includes a review of the contractor's overall performance toward goals, the identification of areas requiring additional examination, and ensuring that adequate information is available to determine good faith.  Each is discussed in this subsection.

a.  *Overall Performance*.  In evaluating a contractor's good faith efforts, COs must first make an overall assessment of the contactor's goals and affirmative action performance, and record results in Part B.IV of the SCER.  For example, were there areas where goals were established but not met?  This evaluation should also take into account the fulfillment of AAP commitments and the quality of those commitments in terms of creative problem-solving to remove any impediments to minority and female utilization.

b.  *Goal Areas Needing Further Examination for Good Faith Efforts*.  COs must identify goal areas needing further evaluation for good faith efforts.  For each such goal area, the COs will review any contractor description of good faith efforts pertinent to the area.  This should be included as part of the contractor's report on goals.  COs will also use the AAP and Itemized Listing data to identify the reasons for lack of progress and the type of AAP action items that would be pertinent.  Below are some examples of the types of inquires a CO could pursue.

- Do the Itemized Listing data on employment activity show that the jobs were filled predominantly by hires or by promotions?  If by hires, was there low applicant flow?

- What AAP commitments did the contractor make about recruitment efforts?  Is there any evidence they were fulfilled?

- Was there an adequate representation of minorities and women in probable feeder groups if the contractor filled jobs primarily by promotion?

- What AAP commitments did the contractor make concerning the promotion process (*e.g.,* job posting, encouraging bidding, training)?  Is there any evidence the contractor fulfilled these commitments?

## 1L02   PLAN FOR EVALUATION OF GOOD FAITH EFFORTS

For each goal area without sufficient information to determine good faith efforts, the CO will list the additional information needed on SCER Part B.IV.  For example, the contractor did not meet its goal for minorities in the Clerical I job group.  However, in reviewing the data, it appears that low applicant flow is the cause.  The AAP may state that the contractor will use a particular agency with a significant minority clientele to aid in the recruitment of minority applicants for the Clerical 1 job group.  The additional information needed here may include contact with the agency to confirm its use by the contractor, as well as other actions such as identifying additional recruitment sources while on-site.

# 1M    BASIS FOR POTENTIAL DISCRIMINATION ANALYSES

It is OFCCP's policy, in conducting analyses of potential discrimination under the Executive Order, to follow the principles of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, which the EEOC enforces.

In general, when COs observe a disparity in the representation of a particular race or ethnic group, they conduct standard desk audit potential discrimination analyses for that group.[58]

a.  *Guidelines on Discrimination Because of Religion or National Origin.*  These Guidelines, at 41 CFR Part 60-50, are not a required AAP element under 41 CFR 60-2.10.  Therefore, COs must evaluate the contractor's implementation of them on-site.  Chapter 2, Section 2J provides detailed guidance on conducting this aspect of the on-site review.

b.  *Sex Discrimination Regulations.*  These regulations, at 41 CFR Part 60-20, are not a required AAP element under 41 CFR 60-2.10.  The contractor's implementation of them, therefore, must be evaluated on-site.  Chapter 2, Section 2K provides detailed guidance on conducting this aspect of the on-site review.

c.  *Desk Audit Observation.*  While the implementation of these regulations and guidelines can only be evaluated on-site, COs must pay particular attention to any problem area identified during the desk audit for women, or religious or national origin minorities.  Additional information should be gathered on-site and directed to issues that are not addressed elsewhere in the regulations; for example, leave for religious purposes and maternity leave.

# 1N    ANALYSIS OF AN EXECUTIVE ORDER 11246 AAP: AUDIT OF ORGANIZATIONAL PROFILE

The organizational profile depicts the contractor's staffing pattern to assist contractors in identifying organizational units where women or minorities are underrepresented or concentrated.  Contractors have the option to use either an organizational display or a workforce analysis to satisfy the regulatory requirement for having an organizational profile in their Executive Order AAP.  The organizational display is a detailed graphic or tabular chart, text, spreadsheet or similar presentation of the contractor's organizational structure, whereas the workforce analysis is a listing of each job title from lowest to highest-paid within each department or organizational unit, including supervisors.  The organizational profile must identify the makeup of each unit by gender, race, and ethnicity.  If a workforce analysis is used, the wage rate or salary range for all job titles must be given.[59]

COs must closely examine patterns of minority and female employment in each department or work unit to identify disparities for further investigation on-site.  One example of a disparity that may warrant further investigation is departments or job titles where women or minorities are either significantly overrepresented or underrepresented based on their representation in the overall

---

[58]  FCCM 1O01 – Specific Race/Ethnic Group Analysis.
[59]  See 41 CFR 60-2.11 for more details about the differences between the requirements for an organizational display versus a workforce analysis.

workforce.  COs must pay particular attention to departments and work units where minorities or women are absent or make up nearly the entire department or unit, and look for indicators of job steering or other discriminatory placement practices.

## 1N00   UNDERREPRESENTATIONS AND CONCENTRATIONS

When examining the organizational profile, COs look for evidence of concentration and underrepresentation, as such evidence could indicate that women, for instance, are steered into lower-paying positions.

a.  *Concentration.*  The term *concentration* refers to any job titles where there are significantly higher representations of a minority group or women than would be expected in consideration of their overall representation in the contractor's workforce or in a relevant unit of that workforce.

b.  *Underrepresentation.*  The term *underrepresentation* is the opposite of "concentration."  It exists when a minority group or women are found in a particular department, job group or job title in numbers significantly lower than would be expected in light of their overall representation in the contractor's workforce or in a relevant unit of that workforce.

It is important to note that the identification of a concentration or underrepresentation does not mean that there is discrimination.  It is only an indicator that further investigation is warranted.  COs must document areas of underrepresentation and concentration on Part B.VIII of the SCER and investigate further.

## 1N01   DETERMINING THE RELEVANT WORKFORCE SECTOR AND JOB AREAS

COs must review a contractor's organizational profile to identify the concentration and underrepresentation of minorities and women.  Under certain conditions, COs may reasonably expect that the contractor would evenly employ minorities or females throughout a particular job area.  A "job area" is a sub-unit (*e.g.,* department, job group, line of progression) of the blue-collar or white-collar sectors of the contractor's workforce.  The conditions for such a "reasonable expectation" are that:

- The jobs in the area have similar entry-level qualification requirements; and

- The jobs above entry-level are filled primarily by promotion.

Where these conditions exist, COs may use the Job Area Acceptance Range (JAAR) analysis to measure job area distribution patterns.  The JAAR assesses the representation of minorities and women in a particular job area in comparison with the relevant base workforce sector.  A workforce sector is the total workforce of a particular job area.  For example, if a contractor has 1,000 employees at an establishment and its production division is composed of four departments with a total workforce of 400 employees, then the production division is the job area and 400 employees is the workforce sector.  In order for COs to conduct this analysis appropriately, they must determine the relevant workforce sectors or job areas to analyze.

a.  *Relevance of Other Information*.  To determine the relevant workforce sector and job areas for the JAAR, COs are guided by the findings of the desk audit.  For example, the information a CO

Federal Contract Compliance Manual (FCCM)

obtains from the earlier analysis of EEO-1 trends may show persistent minority or female representation above or below comparable availability; or a CO may identify a substantial disparity in the representation of a particular minority group.  Information the CO derives from the review of the organization of the contractor's workforce and personnel practices (*e.g.*, internal mobility, pay structure) informs the CO's analysis of workforce sector and job areas.

The CO must also conduct analyses on the employment activity and compensation data provided by race, ethnicity, and gender, as is discussed in Sections 1O and 1P.

b.  *Workforce Sector and Job Area*.  When conducting a JAAR, COs must determine the appropriate sector of the contractor's workforce with which to compare minority group and female representation in the particular job(s) being examined (*e.g.,* blue-collar, white-collar, clerical, the entire workforce, job group).  To do so, COs must remember that there is a reasonable expectation that, absent discrimination, minorities and women will be more or less evenly distributed among the job areas within the sector.  This expectation is highest when;

- Entry-level jobs in the sector require similar qualifications; and

- The contractor primarily fills jobs above entry-level in the sector by promotion.

The expectation may be lower if entry-level jobs in the sector are more differentiated in skill requirements.  In this case, it may become more likely that minority or female availability will differ, or the contractor fills jobs above entry-level predominantly by hires.

c.  *Applying the JAAR to a Particular Contractor*.  An appropriate definition of the workforce sector depends on the particular contractor's structure, and legitimate skill needs and personnel practices.  In general, a JAAR that focuses on where minorities and women are located organizationally,[60] and a JAAR that focuses on the level at which minorities and women are employed,[61] tend to identify potential promotion problems.  Such promotion problems may be related to placement.  Examples of how to use the JAAR to identify problems in placement, concentration or underrepresentation of employees include the following.

- *Comparing Workforce Representation to Departmental Representation*.  When there are departments or organizational units with largely similar qualifications for entry-level positions (*e.g.,* unskilled and, to a more limited extent, semi-skilled, in blue-collar; undifferentiated trainee jobs in white-collar), COs must compare the representation of women and minorities in each department with representation in the total workforce of all such departments.

- *Comparing Workforce Representation to Representation in Lines of Progression*.  When there are lines of progression or usual promotional sequences that cut across department lines and have similar entry-level requirements, COs may compare the representation of minorities and women in each line of progression with representation in the total workforce of all lines of progression.

---

[60]  Examples include which departments, units or lines of progression tend to identify potential placement problems.
[61]  Examples include concentrations in lowest level jobs within a line of progression department.

- *Comparing Departmental Representation to Representation in Lines of Progression within the Department.* When there are separate lines of progression and/or usual promotional sequences within a department or similar organizational unit, COs may compare representation in each line of progression with the representation in the department as a whole.

- *Comparing Department to Jobs within the Department.* In the absence of lines of progression or usual promotional sequences, and where jobs within a department are usually filled by promotion from within or might reasonably be filled in such a manner based on the nature of the jobs and the training the contractor could reasonably be expected to offer, COs may compare representation in particular jobs within that department with representation in the department as a whole.

- *Comparing EEO-1 Job Category to Type of Job or Job Title.* It can be useful to compare representation in an EEO-1 job category or job group to the distribution within specific titles in that category or group, or both. For example, in an Office and Clerical category, women may be concentrated in General Clerical positions, but underrepresented in Production and Material Control clerical jobs.

- *Comparing Lines of Progression to Jobs in Lines of Progression.* The CO may also treat a line of progression or usual promotional sequence, particularly one with a large number of incumbents, as a comparative workforce sector. Minority or female, or both, representation in the line of progression can be compared with their representation in jobs at different levels in the line of progression.

- *Comparing Job Title to Job Title within Department(s).* When a job title, particularly one with a large number of total incumbents, appears in several departments, COs can compare representation in the title as a whole with representation in the title in each department.

d. *Applicability to Both White-Collar and Blue-Collar Jobs.* COs can apply these analyses to white-collar and blue-collar situations. In all cases, COs must ensure that the sector of the contractor's workforce that they use as a basis for comparison with a particular job area is, in fact, relevant. Particularly in the white-collar area, differences concerning factors such as the need for specialized education or skills may make establishing a basis for comparison difficult.

e. *Determining Whether the Concentration or Underrepresentation is "Substantial."* Once COs select the job area and the relevant workforce sector, the next step is to perform the analysis and identify those job areas which have "substantially" more or fewer minorities and women than would reasonably be expected by their representation in the workforce sector selected. The COs will investigate these job areas in addition to any other indicators identified, statistical or otherwise, on-site.

## 1N02   ANALYSIS BASED ON A PARTICULAR RACE OR ETHNICITY

If a CO's review of the contractor's EEO-1 job category data shows substantial disparities in the representation of a particular race or ethnic group in the workforce as a whole, or in their distribution among job categories, the review of the workforce analysis should include a focus on that race or ethnic group especially in those job areas where a CO observed disparity.

For example, if category data show that whites and Hispanics were concentrated in the Laborers category, poorly represented in Operatives and absent in Crafts, the CO's review of the workforce analysis must:

- Specifically identify the types of blue-collar jobs in which whites and Hispanics are employed; and

- Determine whether these jobs fall into lines of progression, or departments or units, or both, that tend to inhibit progression to Operatives and Crafts, etc.

Even when a CO does not observe these disparities in the initial category screen, the CO must be alert for indications of potential problems in the distribution of the particular racial or ethnic groups while reviewing the organizational profile. This diligence is especially necessary if the labor area has high representation of more than one race or ethnic group, or the general employment patterns in the industry involved differ among specific race or ethnic groups. It is worth noting that both situations may exist simultaneously and could give rise to indicators of a potential problem.

# 1O    ANALYSIS OF EXECUTIVE ORDER 11246 EMPLOYMENT ACTIVITY DATA

During the desk audit, a CO will analyze the employment activity data the contractor provides in response to the Scheduling Letter and Itemized Listing[62] to determine whether there are any statistical indicators that the contractor's selection practices are not neutral. In particular, the CO will examine hiring, promotion, termination, and placement practices to conduct various analyses permitted by UGESP,[63] including the IRA and standard deviation analysis.

## 1O00   CONDUCTING STATISTICAL ANALYSES OF EXECUTIVE ORDER 11246 EMPLOYMENT ACTIVITY DATA

COs must ensure that contractors submit employment activity data as specified in the Itemized Listing of the Scheduling Letter to conduct statistical analyses to identify any potential indicators of discrimination.

Generally, statistical analysis assists the CO in identifying the number of individuals selected from different groups (*e.g.,* men versus women) compared to the number expected to be selected for each group, based on each group's proportion in the relevant applicant or employee pool. In a hiring analysis, the relevant pool is usually based on applicants for each job group or job title. If, for example, the hires are significantly less than the expected hires for women based on an IRA, standard deviation analysis[64] or any other analysis permitted by the UGESP, the CO has an indicator that the contractor's selection practice may be having an adverse impact on women. At a minimum, further analyses would be warranted. This analysis could include requesting additional

---

[62] This data is described in subsection 1F05.
[63] 41 CFR Part 60-3.
[64] The standard deviation represents the distribution of the responses or data around the mean, and is often used to measure the amount of confidence in statistical conclusions. COs may run standard deviation analyses to determine whether and what types of additional information they may need to establish potential discrimination.

data at desk audit or on-site from the contractor about its selection practices and policies, refining data for further statistical analysis based on information obtained from the contractor, and consulting with statistical experts in the DPO.

## 1O01   SPECIFIC RACE AND ETHNIC GROUP ANALYSIS

In testing the contractor data on selection practices to determine whether they are race-neutral, COs must analyze the data by individual racial or ethnic categories.  Usually, COs analyze the categories specified in the EEO-1 report or the racial and ethnic categories specified at 41 CFR 60-3.4.  However, if the contractor provides more detailed data, the CO may conduct an analysis based on that case-specific grouping.  As explained above, the CO must examine the availability of racial and ethnic groups in the geographic area or applicant pools and use statistical analysis to compare the selection rates of racial and ethnic groups to the rates that would be expected if the selection practices were neutral.  COs must consider whether selection rates or identified shortfalls for each individual racial or ethnic group indicate discrimination, based on statistical or other analysis, or any other case-specific evidence.

If, during the desk audit or at a later point in the evaluation, the CO determines that multiple groups are affected by the same discriminatory policy or practice, or that multiple groups are favored by selection practices, the CO must consider whether to combine individual groups to determine the affected class or comparators.  However, a CO must never combine racial and ethnic groups when the effect is to dilute the statistical indicator of discrimination for a particular racial or ethnic group.  COs must also consult with their RSOL and DPO before determining whether to combine groups to ensure that doing so is consistent with applicable legal standards and best practices for statistical analysis.

## 1O02   PROPER USE OF PRELIMINARY STATISTICAL RESULTS

It is important to remember that statistical results that identify preliminary indicators of a potential discrimination problem do not themselves prove discrimination or the existence of an affected class.  For example, a CO may compute an adverse IRA in a job group using an insufficiently refined candidate pool.  Further statistical analysis and further investigation on-site can determine whether discrimination has occurred.

## 1O03   STATISTICAL ANALYSIS SUMMARY

When COs identify evidence of disparity against members of a protected group, they must request additional data from the contractor for further analysis.  If the analysis confirms that the statistical disparities exist and further investigation is needed, COs must describe the problem on SCER Part B.VII and indicate that the matter needs further investigation on-site to determine whether there is discrimination.

a.   *Contractor Adverse Impact Determinations (Contractors with 100 or More Employees).*

- *Maintenance of Records.*  As noted earlier in the discussion of the recordkeeping requirements in 1C02, the UGESP requires contractors with more than 100 employees to maintain specific records by job title that are sufficient to disclose whether their selection

Federal Contract Compliance Manual (FCCM)

procedures have an adverse impact on the employment opportunities of each sex, and each race or ethnic group, or both.[65]

- *Analysis of Impact.*  The UGESP also requires that contractors with more than 100 employees analyze this data annually to determine whether the total selection process for each job is having any adverse impact.  These determinations are required by sex and for each race and ethnic group that constitutes 2% or more of the labor force in the relevant labor area, or 2% or more of the applicable workforce for jobs filled internally.

b. *Requesting Contractor Determinations*.  When a CO identifies a job group with evidence of adverse impact and the contractor employs more than 100 people, the CO will ask the contractor to furnish the adverse impact determinations prepared during the review period as a part of its in-depth analyses for the job titles that fall within the job group.  This assumes, of course, that the contractor has not already provided this information.  For example, if the CO finds an adverse IRA for female hires into a Professionals job group, the contractor should submit its adverse impact determinations for the hiring of women in each title within the Professionals group.  This action will assist the CO in determining whether the IRA and other statistical analyses need to be refined before investigating further.  A CO may also request the contractor's adverse impact analyses in other areas.  For example, a review of the workforce analysis showed a concentration or underrepresentation suggesting a potential placement problem.  The contractor provided personnel activity data by job group and it does not show placements into the titles of concern.  In response, a CO must request the contractor's adverse impact analyses for hires, promotions and transfers into the job titles at issue.  When appropriate, the CO may also ask to review the contractor's adverse impact analyses and/or may ask the contractor to identify those jobs where its analyses showed an adverse impact.

c. *Need for Information about the Selection Process*.  When the hiring, promotion or termination analysis for a job group or job title indicates that further investigation is needed, the CO must ask the contractor to provide a description of how the employment selections are made for positions in the job group or job title at issue.  The description should include the steps in the process.  The contractor should provide the following data for each selection step: the decision-makers, the criteria used, a description of how the criteria are used, and the records maintained.  In addition, when a job group is under investigation, the CO should ask whether the selection process, as a whole or individual steps, applies to all of the job titles in the job group, and whether the process was the same throughout the entire duration of the review period.  It is also helpful for the CO to know whether the process applies to other job groups or titles in addition to the group or title at issue.  Steps may include, for example, review of application forms by the human resources representative, written tests, formal or informal interviews, physical examinations and on-the-job tests.  The CO will plan to verify the contractor's statements through review of records, interviews with applicants and employees, and, if possible, observation of the process by which applicants are screened and selected.

d. *Multi-Component Selection Processes - Contractor Obligations.*

---

[65]  The racial and ethnic groups are defined by 41 CFR 60-3.4B as Black, Hispanic, Asian, American Indian, and white other than Hispanic.  However, OFCCP also permits contractors to keep their records concerning impact by using the racial and ethnic categories on the EEO-1 report.

- *Adverse Impact in Total Selection Process*.  When the contractor submits its adverse impact analyses for desk audit and if the analyses shows an adverse impact in the total selection process for a job group or job title, the UGESP requires the contractor to evaluate the individual components of the total selection process for an adverse impact.  Therefore, in a multi-step and/or multi-criterion selection process with an adverse impact, the CO must plan to request the contractor's records showing at what step(s) and/or by what criteria members of the nonfavored race, ethnic group or sex the contractor is disproportionately screening out, as well as any validity studies the contractor conducted of its selection procedures.

- *No Adverse Impact in Total Selection Process*.  Generally, if the total selection process for a job does not have an adverse impact, a contractor will not usually be expected to evaluate the individual components for an adverse impact or to validate those individual components, and enforcement action will not usually be warranted based on a component.

There are, however, several exceptions: when enforcement appears warranted and with individual complaints of discrimination.

- *Exception 1: When Enforcement May Be Warranted.*  In some circumstances, even though there is no adverse impact in the total selection process, further investigation and, possibly, enforcement action may nonetheless be appropriate when an individual component has an adverse impact (*e.g.,* height and weight requirements or criminal background checks), and its use is not justified as job-related and consistent with business necessity.

- *Exception 2: Individual Complaints of Discrimination.*  The "bottom line" standard – that a contractor need not evaluate the individual components of a selection process if the process as a whole does not result in adverse impact – does not preclude the investigation of complaints alleging race, ethnicity or sex discrimination caused by a component of a selection process.[66]

## 1P    COMPENSATION ANALYSIS

Under Executive Order 11246 and its implementing regulations, contractors may not discriminate in rates of pay or other forms of compensation, and must review, evaluate, and monitor their compensation systems to determine whether there are disparities based on sex, race, or ethnicity.[67]  OFCCP enforces the ban on compensation discrimination using a flexible, fact-specific approach to proof.  This approach involves factual investigation, and data and legal analyses which allow OFCCP to identify and remedy all forms of compensation discrimination.  The CO should tailor the compensation investigation and analytical procedures to the facts of the case.

---

[66]  See Questions and Answers Nos. 25 and 26 in Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, available at *https://www.eeoc.gov/policy/docs/qanda_clarify_procedures.html* (last accessed August 10, 2019).

[67]  41 CFR 60-1.4; 41 CFR 60-2.17(b)(3).  Contractors are also prohibited from discriminating against employees and applicants in rates of pay or any other form of compensation based on disability or status as a protected veteran under Section 503 and VEVRAA, respectively, and their implementing regulations.  See 41 CFR 60-741.20(c) and 41 CFR 60-300.20(c).

Federal Contract Compliance Manual (FCCM)

At the desk audit stage, the CO must analyze the contractor's compensation data.[68]  The CO must also review whether the AAP indicates that the contractor conducted the required evaluation of compensation to identify disparities based on sex, race or ethnicity; developed action-oriented programs to address any identified pay disparities or barriers to pay equity; and reported results to management.[69]

In addition to identifying potential discrimination at the desk audit stage, the CO must review the AAP and other submitted documents to ensure that the contractor does not have a policy to discharge or otherwise discriminate against applicants or employees for inquiring about, discussing, or disclosing their own compensation or the compensation of other employees.

## 1P00  GENERAL PRINCIPLES OF COMPENSATION DATA ANALYSIS

Compensation is defined as any payments made to, or on behalf of, an employee or offered to an applicant as remuneration for employment, including, but not limited to, salary, wages, overtime pay, shift differentials, bonuses, commissions, vacation and holiday pay, allowances, insurance and other benefits, stock options and awards, profit sharing, and retirement.[70]  As stated, the definition is not exhaustive and can include other forms of compensation, such as paid family leave.  OFCCP can investigate and seek remedies for discrimination in any form of compensation.  In every review of potential compensation discrimination, there are three key questions to be addressed:

- Is there a measurable difference in compensation on the basis of sex, race or ethnicity?

- Are the differently compensated groups of employees comparable under the contractor's wage or salary system?

- Is there a legitimate, nondiscriminatory explanation for the difference?

    o *Measurable difference.*  When statistical analysis is used, a measurable difference generally means a statistically significant difference - two or more standard deviations - consistent with Title VII principles.  When nonsystemic comparisons of small groups are conducted, there must be a measurable difference in compensation plus sufficient other evidence (often in the form of anecdotal evidence).

    o *Comparable employees.*  OFCCP follows the Title VII standard of comparing similarly situated workers to establish a case of compensation discrimination.  The definition of "similarly situated" is a case-specific legal standard.  In the compensation discrimination context, "similarly situated" means that employees are similar in all the ways that are relevant in the contractor's compensation system.  Relevant factors in determining similarity may include tasks performed, skills, effort, level of responsibility, working conditions, job difficulty, minimum qualifications, and other objective factors. Employees may be similarly situated where they are comparable on the factors relevant to the investigation, even if they are not comparable on others.

---

[68]  OFCCP Directive 2018-05, "Analysis of Contractor Compensation Practices During a Compliance Evaluation."
[69]  41 CFR 60-2.17(b)(3); 41 CFR 60-2.17(d).
[70]  41 CFR 60-1.3.

    o  *Legitimate, nondiscriminatory explanation for the difference.*  OFCCP considers all relevant factors offered by the contractor on a case-by-case basis to determine whether the factors are implemented fairly and consistently applied, whether they should be incorporated into a statistical analysis, and whether, as a whole, they provide a legitimate explanation for any pay disparities.

During a compliance review, the CO must examine all employment practices that appear to lead to compensation disparities.  For example, there may be differences in employee access to opportunities affecting compensation such as higher-paying positions, job classifications, work assignments, training, preferred or higher-paid shift work, and other opportunities.  The CO should also examine policies and practices that unfairly limit a group's opportunity to earn higher pay, such as "glass ceiling" issues, and access to overtime hours, pay increases, incentive compensation, and higher commission or desired sales territories.  The CO may investigate any observed differences in pay, other earnings or benefits, job assignment/placement, training/advancement opportunities, differences in opportunities to increase compensation, or other unexplained differences.

## 1P01   ITEMIZED LISTING DATA ON COMPENSATION

The Itemized Listing requires a contractor to submit employee-level (*i.e.*, individual) data on compensation.  Upon receipt of a contractor's AAP and supporting compensation data, the CO must review the submitted compensation data to ensure that it satisfies all of the requirements from the Itemized Listing, as explained above.[71]  If the CO determines that the submission does not satisfy the requirements of the Itemized Listing data request, the CO must contact the contractor to discuss the discrepancies.  Additionally, the CO must send a written request to the contractor seeking production of the compensation data within seven business days of receipt of the letter.  The CO must recommend the issuance of an SCN if the contractor fails to comply.[72]

## 1P02   DESCRIPTIVE ANALYSIS OF COMPENSATION

The CO may begin the desk audit analysis of compensation once the contractor's compensation data submission is complete and acceptable.  What constitutes an acceptable submission is discussed in Section 1F05.  Analysis should begin with an examination of the descriptive statistics related to the data.  Descriptive statistics are fact-based statistics such as mean, median, modes, or other distributional measures.  The CO may use preliminary tools, tests, or broad indicators of potential compensation issues at the desk audit to identify pay practices or issues needing further review.  In most cases, it is insightful to use nonsystemic comparative analysis to compare the treatment of similarly situated individuals or small groups of employees.  In familiarizing themselves with the data, the CO should ascertain whether groupings, ratings, rankings, labels, and other employer-assigned attributes are differentially distributed by gender, race, or national origin.  As with the systemic analysis of compensation, the CO must ensure that similarly situated employees are being compared and must assess whether any explanatory factors the contractor offers are implemented fairly, consistently applied, and relevant to the contractor's compensation system.  This data exploration stage also includes an assessment of the pay analysis groups for reasonableness and statistical sufficiency.  Considering these questions in consultation with supervisors, RSOL and

---

[71]  FCCM 1C01 and 1F05.
[72]  See Chapter 8: Resolution of Noncompliance.

Federal Contract Compliance Manual (FCCM)

Branch of Expert Services (BES) will allow the CO to determine whether initial indicators warrant further systemic analysis and on-site investigation.

## 1P03   SYSTEMIC STATISTICAL ANALYSIS OF COMPENSATION AT DESK AUDIT

Regression analysis is the statistical method of analysis most often used by OFCCP to analyze systemic patterns in compensation. Regression analysis builds upon descriptive statistics and anecdotal evidence by further isolating the comparability of the workers at issue. OFCCP compares similarly situated employees by forming pay analysis groups and controlling for relevant factors influencing their pay.

a. *Similarly Situated Employee Group (SSEG).* A similarly situated employee group (SSEG), is a group of employees who are comparable for purposes of analyzing a contractor's pay practices. Note that OFCCP also uses the term "pay analysis group" and views the SSEG and pay analysis group, or PAG, as equivalent terms. An SSEG may be limited to a single job or title, and regression analysis may be performed separately on distinct units or categories of workers. Alternatively, an SSEG may aggregate employees from multiple job titles, units, categories and/or job groups to perform a regression analysis, with statistical controls added as necessary to ensure workers are similarly situated. For example, an SSEG could cover an entire unit or division of the organization but control for job title or pay grade to ensure that the analysis compares similarly situated workers. Statistical testing for practices that impact pay such as job assignment may require a different analytic grouping than testing for pay differences within a single job.

At the desk audit stage, the CO forms preliminary SSEGs by considering the industry, the types of jobs and compensation at issue, the contractor's actual compensation practices and the available data. If a contractor provides its compensation hierarchy and job structure with its Itemized Listing submission, the CO must attempt to design its pay analysis based on that structure. In the absence of information about a contractor's compensation system, the CO should conduct its desk audit analysis using AAP job groups as SSEGs, provided they are reasonable,[73] meet the requirements of 41 CFR 60-2.12, and are of a sufficient size to conduct a meaningful systemic statistical analysis. If those conditions are not met, the CO should use EEO-1 job categories as SSEGs. Salary structures and levels or stacking lines of progression (*e.g.,* Accountant 1, Accountant 2, etc.) may also be viable options for SSEGs. Working with BES, the CO must control further for sub-job groupings, functions, units, or titles, as appropriate. During the desk audit analysis, OFCCP will also control for tenure and full-time status as well as other factors, as appropriate.

b. *Statistically Controlling for Factors.* In a statistical analysis of compensation, using controls is a way of ensuring comparison of similarly situated workers and accounting for potential explanations of pay differences. Controlling for education, for instance, accounts for the effect of education on any differences in pay. OFCCP can control for observable employee factors such as education, tenure or performance, as well as institutional factors such as department or job title. It is only appropriate to control for factors in a statistical model if they

---

[73]  FCCM 1F01.

have been implemented fairly and consistently applied and are relevant to the contractor's compensation practices. At the desk audit stage, the CO should utilize a variety of desk audit tools and consult with the regional BES expert to decide on which factors to include in the preliminary analytical model.

For example, if a contractor awards bonuses based on performance, employees may be similarly situated if their performances are assessed according to the same process and criteria, and if they have similar performance ratings. Considering these facts, a statistical analysis of bonuses could compare similarly situated employees by grouping together all employees who are subject to the same performance evaluation process into one pay analysis group, and then statistically controlling for individual differences in performance ratings, as well as any other relevant factors. In some instances, the pay analysis group appropriate for an analysis of bonus pay may differ from the pay analysis group used to assess base pay.

## 1P04    CONCLUDING DESK AUDIT COMPENSATION ANALYSIS

At the conclusion of the desk audit, the CO must notify the contractor in writing of the general nature of any preliminary compensation disparities that warrant further information requests or on-site review. For example:

- Compensation issues for women in the Engineers and Project Architects SSEGs.

- Compensation policies and practices for the Engineers SSEG for Blacks and Hispanics, and the Technicians SSEG for females.

When conducting further review of a contractor's compensation practices, the CO must seek additional information to understand the contractor's compensation system, the elements that drive compensation decisions, and the job structure/hierarchy. Based on these facts, the CO may broaden or narrow the SSEGs and subsequent data requests to conform the analysis closely to the contractor's compensation system and practices, where appropriate. Chapter 2 contains information on conducting a further review of potential compensation discrimination.[74]

# 1Q    SCER SUMMARY OF POTENTIAL DISCRIMINATION AREAS AND ONSITE INVESTIGATIVE PLAN (ALL LAWS)

All potential discrimination problems that a CO identifies during the desk audit must be summarized, as appropriate, in Part A (Preparation), Part B.VII (Employment Activity Data Analyses), and Part B.VIII (Other Problems Identified for On-site Investigation) of the SCER. These summaries must include any problems the CO identifies while reviewing compliance history, the contractor's AAPs, and any problems the CO identifies during the review and analyses of Itemized Listing data.

---

[74]   See Directive 2018-05 for compensation modeling guidance beyond the desk audit.

For each potential discrimination problem a CO identifies, an on-site investigative plan must be developed. If the CO finds indicators of what appears to be a single potential discrimination problem through more than one analysis, such as an area of minority concentration with statistical indicators of discrimination for minority promotions out of the area, the CO only needs to describe the problem once in the On-Site Plan. The On-Site Plan should be as specific as possible and will set priorities for the documents to be gathered.[75]

# 1R    CONCLUSION OF THE DESK AUDIT

If a CO completes the desk audit and finds no problem areas, no outstanding questions and no violations, then the evaluation is closed at the desk audit stage. If the CO found nonsubstantive problems such as an unacceptable AAP element, the CO may close the compliance evaluation after all the identified problems are adequately resolved.

To close the compliance evaluation after the desk audit, the CO must ensure that no outstanding substantive issues exist. As previously noted, the CO may need to request additional materials from the contractor for review during the desk audit.

When the contractor submits the AAP with the support data, the desk audit should generally be completed in 45 days from receipt of the requested information. If, however, OFCCP provides an additional 30 days for the contractor to submit the support data using the one-time, 30-day extension for Itemized Listing information, the desk audit should be completed in 75 days.

## 1R00   DOCUMENTS FOR CLOSING COMPLIANCE EVALUATION AFTER THE DESK AUDIT

When closing a compliance evaluation after a desk audit, the CO will use one of the following closure documents:

a.   A finding of no violations leads to the issuance of a closure letter;[76] or

b.   A finding of violations, but no indicators of potential discrimination, leads to the issuance of either a closure letter that references any violations and their resolutions[77] or the issuance of an NOV.[78]

Whether to issue a closure notice that lists remedied violations or an NOV to be remedied by a CA is made on a case-by-case basis depending on the type and severity of the violation. Potential discrimination must be investigated further.

The appropriate supervisor must sign the closure document (*e.g.,* District Director or designee) and send the letter to the contractor by first-class mail.

---

[75]  FCCM 2C03 – On-Site Plan.
[76]  Letter L-5 – Notice of Closing Compliance Evaluation: No Violations Found.
[77]  Letter L-6 – Notice of Closing: Violations Found and Resolved. This letter is used if an NOV is not being issued.
[78]  See Chapter 8, Resolution of Noncompliance for procedures on issuing an NOV.

**1R01   REASONS TO PROCEED WITH ON-SITE REVIEW**

When appropriate, the CO should promote early and efficient corporate-wide compliance by examining whether it is possible to resolve indicators of discrimination and other material violations uncovered at the desk audit before proceeding to an on-site investigation.[79]  If early resolution is not possible, the CO must proceed with an on-site review if:

- The contractor provided insufficient data to conclude the review at the desk audit stage;

- There are indicators of potential discrimination, failure to provide a completed AAP, complaints or problems that merit an on-site review; or

- The contractor has been identified for a complete compliance review following OFCCP selection procedures.

In instances where problems are resolved through a document submission during the desk audit, the CO's on-site review may consist of technical assistance to ensure that the contractor is aware of its obligations.[80]

**1R02   COMPLETING APPROPRIATE SCER PAGES**

COs must complete as much of the SCER as possible for every compliance evaluation.  The CO must also sign the SCER.  The stage at which the compliance evaluation is closed and the type of investigative procedures used in the compliance evaluation will determine which sections of the SCER COs must complete.

---

[79]   See Directive 2019-02, "Early Resolution Procedures."
[80]   FCCM 2L – Equal Opportunity Clause and Other Requirements.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 2
# ON-SITE REVIEW

## 2A    INTRODUCTION

This chapter describes the procedures COs follow when conducting the on-site review of a compliance evaluation for a supply and service contractor.  During an on-site review, COs gather data and information from the contractors, employees, applicants and others to better assess the contractor's compliance with the regulations implementing Executive Order 11246, VEVRAA and Section 503,[81] and with any other appropriate mandates.[82]  This chapter provides guidance to COs on how to prepare for, conduct and conclude an on-site review.

The nature and scope of the on-site review in each instance will vary depending on the type of compliance evaluation a CO is conducting and whether the CO has already identified potential problems.  As noted in Chapter 1, Desk Audit, a compliance evaluation may consist of any one or any combination of the following investigative procedures.[83]

- Compliance Review.  A comprehensive analysis and evaluation of the hiring and employment practices of the contractor, the written AAP, and the results of their affirmative action efforts.  This procedure may proceed in three stages: desk audit, on-site review, and off-site analysis.

- Off-Site Review of Records.  An analysis and evaluation of the AAP, or any part thereof, and supporting documentation.

- Compliance Check.  A determination of whether the contractor maintained appropriate records consistent with 41 CFR 60-1.12, 41 CFR 60-300.80 and 41 CFR 60-741.80.  At the contractor's option, the contractor may provide the documents on-site or off-site.

- Focused Review.  An on-site review that is restricted to one or more components of the contractor's organization, or one or more aspects of the contractor's employment practices.

Of the four options, the compliance review is the most common and is typically the most comprehensive.  For this reason, this chapter focuses on the specific procedures COs follow when conducting an on-site review as a part of a compliance review.[84]  There are generally four major tasks in an on-site review:

---

[81]  The regulations implementing Executive Order 11246 applicable to supply and service contractors are at 41 CFR Part 60-1, Obligations of Contractors and Subcontractors; 41 CFR Part 60-2, Affirmative Action Programs; and 41 CFR Part 60-3, Uniform Guidelines on Employee Selection Procedures.  Part 60-20 contains the regulations specifically covering Discrimination on the Basis of Sex; and Part 60-50 contains the Guidelines on Discrimination Because of Religion or National Origin.  VEVRAA implementing regulations are at 41 CFR Part 60-300, and the regulations implementing Section 503 are at 41 CFR Part 60-741.

[82]  When on-site, OFCCP is responsible for assessing a contractor's compliance with Executive Order 13496, if applicable.

[83]  41 CFR 60-1.20, 41 CFR 60-300.60 and 41 CFR 60-741.60.

[84]  In light of their more limited scope, focused reviews and compliance checks may not always include all of the elements discussed in this chapter.

- Investigating potential problem areas the CO identified at a desk audit;

- Verifying the contractor's implementation of its AAP(s) or its assertions regarding its personnel activity and employment practices, or both;

- Investigating matters that cannot be fully examined at the desk audit; and

- Initiating resolution of identified violations.

The on-site review principles discussed in this chapter also provide guidance for performing an on-site review as part of other types of reviews. If the compliance evaluation is of a contractor that maintains a FAAP, then the evaluation will essentially be the same as the other processes. A possible addition is on-site visits to more than one location to address all of the components of the FAAP. Chapter 5 discusses FAAP reviews in more detail.

A preaward compliance evaluation covers the contractor's compliance with Executive Order 11246, Section 503, and VEVRAA, and occurs primarily on-site unless it is converted to a postaward review.[85] The purpose of a preaward compliance evaluation is to determine whether a prospective prime contractor or known first-tier subcontractor will be able to comply with the provisions of the equal opportunity clauses for Executive Order 11246, Section 503, and VEVRAA. For preaward reviews, the desk audit is normally part of the on-site review at the contractor's establishment. COs conduct a postaward review in the same manner as a compliance review under 41 CFR 60-1.20(a)(1), 41 CFR 60-300.60(a)(1) and 41 CFR 60-741.60(a)(1), and they must cover a contractor's compliance with Executive Order 11246, Section 503 and VEVRAA.

Complaint investigations include an on-site review that responds to the specific allegations raised in the complaint unless OFCCP converts a complaint into a full compliance review. Complaint investigations are discussed in detail in Chapter 6, Complaint Investigations.

## 2B     DETERMINING THE NEED FOR AN ON-SITE REVIEW

When OFCCP schedules a contractor for a compliance evaluation, the compliance evaluation may consist of one or a combination of investigative procedures, including a compliance review, an off-site review of records, a focused review or a compliance check. Though the majority of compliance reviews do not involve going on site, on-site reviews are a part of each full compliance review and each focused review. COs determine whether to conduct an on-site review in conjunction with an off-site review of records or a compliance check, based on the circumstances of the evaluation and the outcome of the initial review.

Typically, the CO may determine to conduct an on-site review if the desk audit reveals indicators of discrimination. However, even if a desk audit initially reveals discrimination indicators, an on-site review may not be necessary. In a portion of compliance evaluations, potential discrimination

---

[85]   A preaward compliance evaluation is subject to specific timeframes and is conducted before the award of a nonconstruction contract of $10 million or more. See 41 CFR 60-1.20(d), 41 CFR 60-300.60(d) and 41 CFR 60-741.60(c). The preaward review requirement applies to prospective contractors and their known first-tier subcontractors with subcontracts of $10 million or more.

indicators will be resolved after the desk audit concludes but before OFCCP conducts an on-site review, during the "pre-on-site."  One example of this is when the desk audit findings show that the required AAPs are acceptable, and then the contractor provides sufficient supplemental data during the pre-on-site stage to resolve desk audit discrimination indicators.  In those cases, the CO may conclude the compliance evaluation after the desk audit with the approval of a supervisor.  When sufficient explanation of any such disparities is not provided by the contractor, the CO must coordinate with the supervisor to prepare for an on-site review.

## 2C    ON-SITE REVIEW PREPARATION

When conducting an on-site review, COs are neutral fact-finders and official representatives of the federal government.  Consequently, COs must be unbiased in the identification and examination of all data and information that contributes to the full understanding of the contractor's employment practices and affirmative action efforts.  COs must attempt to verify assertions made by the contractor regarding its affirmative action efforts, employment activity data and employment practices.

Before going on-site, COs must review a contractor's compliance evaluation and complaint history, develop an On-Site Plan, and provide advance notice of the on-site review to the contractor.  A part of a CO's preparation includes sound information management and an awareness of employee concerns surrounding retaliation.  The subsections below discuss these and other preparatory steps.

### 2C00   PROHIBITION AGAINST RETALIATION

COs must be concerned with gaining information that makes the on-site review useful to answering the question of whether the contractor complied with its obligations.  If employees are afraid of cooperating for fear of retaliation, the on-site review could be compromised.  COs should, therefore, take specific actions to notify and protect employees.

COs, when on-site, must inform the contractor's managers, employees and applicants that individuals exercising their rights under OFCCP's laws have protections from retaliation.  Specifically, the regulations implementing Executive Order 11246, Section 503 and VEVRAA prohibit interference and intimidation of any individual exercising his or her rights under OFCCP's laws.  The CO must give this notice to the contractor at the entrance and exit conferences, and include it as a part of any interview conducted during the on-site review.

The prohibition against interference and intimidation includes threats, coercion, harassment and discrimination.  Retaliation may take the form of adverse employment actions such as termination, demotion, failure to hire and harassment.  As with interference and intimidation, contractors may not retaliate against an individual for exercising his or her rights under the laws enforced by OFCCP.  Specific activities protected from contractor interference, intimidation and retaliation include:

- Filing a complaint;

- Assisting or participating in an investigation, compliance evaluation, hearing, or any other activity related to the administration of the Executive Order 11246, Section 503 and VEVRAA or other EEO laws;

- Opposing any act or practice that violates any of these EEO laws; and

- Exercising any other right afforded them by these laws.

## 2C01   USE OF THE STANDARD COMPLIANCE EVALUATION REPORT AND INFORMATION MANAGEMENT

a.  *The Standard Compliance Evaluation Report*.  The SCER documents the scope, progress and results of an on-site review.[86]  It also includes notes confirming that a contractor met its obligations or describing any problem areas the CO identified during the desk audit, on-site review, and off-site analysis.  A CO may not be able to complete the desk audit portion of the SCER because the quality of the desk audit data is inadequate or was insufficient.  In that situation, the CO's initial task during the on-site review is to complete the desk audit portion of the SCER.  You will find a copy of the SCER and instructions for completing it in Appendices A-1 SCER and A-2 SCER Instructions.

With a full understanding of the contractor's employment practices and affirmative action efforts, a CO may identify new problems or find that the contractor resolved previously identified problems.  COs must describe problems identified during the on-site review and record any recommendations for corrective actions to resolve problems.

b.  *Obtaining and Maintaining Records*.  All communications and information COs gather during the compliance evaluation must remain in the case file.  Examples of information or data a CO might gather are data and record submissions by the contractor; information gathered from other sources such as applicants and employees; and interviews with contractor officials, employees and others.  This includes all information obtained during the on-site review.  In addition, COs must document their activities and communications in connection with the on-site review in the compliance evaluation or Case Chronology Log.[87]

These are several of the general principles for properly maintaining records:

- Every document collected during the review, even if it does not support the ultimate finding, is included in the case file.  These documents include those in both paper and electronic formats.

- All email and other written communications must be dated, identify the individuals participating in the communication, and accurately reflect any agreed commitments.  For example, the emails in a CO and contractor email exchange discussing possible dates for the on-site review would reflect the CO's name and position, the name and position of the

---

[86]   COs will not use all the pages of the SCER in every evaluation. Rather, which sections of the SCER are appropriate to each review will depend on the type of compliance evaluation.  However, COs must complete all relevant SCER pages and sections.
[87]   See FCCM 1B01 – Preparation and Maintenance of the Case Chronology Log; 1B02 – Creation and Maintenance of the Case File and Figure F-2 Case Chronology Log for additional information regarding the case file and Case Chronology Log.

Federal Contract Compliance Manual (FCCM)

contractor's representative, the dates proposed and the dates for the on-site review that were agreed upon.

- Original documents submitted by contractors or otherwise obtained by COs must not be altered. Alterations, including notes made by a CO, should be made on working copies.

- Interview statements, whether obtained by a CO in person or by telephone, must remain in the case file. These statements must include the name and position of the person conducting the interview, the name of the person interviewed and his or her title or position, the date and time of the interview, and the location of the interview. COs must also note if other people were present during the interview such as the legal counsel or a personal representative. Interviewees should review and sign the CO's interview notes and typed statement indicating that they are accurate. Section 2M of this chapter provides specific information on interviews.

- Information obtained during interviews and a CO's observations must be reduced to writing as soon as feasible. The CO must type handwritten notes, using MS Word, before placing them in the case file.

- Supporting evidence must be in a clearly labeled section of the case file. Supporting evidence may include the CO's notes, worksheets, contractor data and any other material related to specific problem areas identified by the CO.

## 2C02   HISTORICAL DATA AND COMPLAINT HISTORY

At desk audit, COs check the electronic CMS and the EIS to obtain a list of prior compliance evaluations of the establishment and identify any issues found in the previous OFCCP reviews. This information must be updated and reviewed when determining what to include in an On-Site Plan. As an example, if OFCCP obtained a CA in a prior review, the CO must use the on-site visit to confirm that the contractor took and maintained the required corrective actions. If the purpose of the on-site review is to address questions that arose as part of the monitoring of a CA, the CO must develop an Investigative Plan that addresses those specific questions.

If COs do not have current information regarding discrimination complaints filed against the contractor with other agencies, they must contact the EEOC and the appropriate state or local FEP agencies to ascertain the existence, nature, scope and status of any complaints. COs must include the replies or information obtained from these agencies in the case file and incorporate them, as appropriate, into the On-Site Plan.[88] In addition, COs should check the DOL's Enforcement Database[89] or reach out to other DOL agencies, such as the WHD or OSHA, for information on the compliance history of the establishment.

---

[88] See Letters L-2 for a sample letter requesting complaint data from EEOC and state and local FEPS.
[89] See *https://enforcedata.dol.gov/* (last accessed September 10, 2019). FCCM 1B05 and 1B06 also include discussions on gathering information from the EEOC and other agencies.

## 2C03   ON-SITE PLAN

An On-Site Plan is an important step and COs must develop one before each on-site review. Although the scope of the on-site review may change as a result of the on-site observations and evidence, the On-Site Plan serves as the initial outline or "road map" for conducting the on-site review.  In some cases, it may be helpful to involve staff from the regional solicitor and DPO in devising the On-Site Plan.  For contractors with complex compensation systems (such as education, information technology, finance, or healthcare sectors), attorneys and DPO statistical experts may help ensure that appropriate information, documents and data are obtained.[90]

The On-Site Plan must include each problem area identified during a desk audit and described on the SCER in Part B.  For each problem area, the On-Site Plan must identify or describe the data and records the CO will obtain and review, interviews that the CO will conduct, and any other known relevant materials the CO will review while on-site.  For example, additional information may include materials related to the desk audit findings such as personnel records, payroll records, applications and resumes, and materials not included in the original submission such as employment advertisements and position descriptions.  In addition to individuals who are interviewed as a routine matter (for example, the human resources manager), interviewees should include individuals relevant to the investigation of any indicators of discrimination identified at the desk audit stage (for example, selection officials, employees and applicants).

The On-Site Plan must also include a list of technical items, such as the posting of the *Equal Employment Opportunity Is the Law* poster ("EEO is the Law" poster) and the required supplement, that the CO will verify while on-site.  Additionally, the plan must identify field office staff who will participate in the on-site review, and their roles and responsibilities.  The On-Site Plan must also include the projected dates for the on-site review, as discussed with the contractor.

If a CO is going on-site as part of a focused review, the On-Site Plan will reflect the more limited scope of this type of review.  Similarly, if a CO is going on-site to conduct a compliance check, the On-Site Plan will be narrower because the plan will not encompass all of the elements of an On-Site Plan that the CO would develop for a comprehensive compliance review.  When going on-site for a compliance check, COs must use the Compliance Check Control Sheet to record whether the contractor maintained the appropriate records or whether the contractor needs to provide additional information and documentation.[91]

## 2C04   NOTICE OF THE ON-SITE DATE AND REQUESTS FOR ADDITIONAL INFORMATION

In preparation for the on-site review, the CO must contact the contractor, or the contractor's representative, to schedule the on-site review.  The CO must make any additional data requests beyond what the contractor provided at the desk audit during this pre-on-site stage, to refine indicators and prepare for a potential on-site visit.  Supplemental information requests must include the basis for the request, be reasonably tailored to the areas of concern, and allow for a reasonable time to respond.

---

[90]   See Appendix A-4 for a sample On-Site Plan.
[91]   See Figure F-1 – Compliance Check Control Sheet.

Federal Contract Compliance Manual (FCCM)

Receipt of supplemental data may result in resolving the indicator(s) of potential violation(s) and, as such, no further investigation may be warranted.  If problem areas remain, the CO will identify the contractor officials who will need to be available during the on-site review.  The CO must also inform the contractor that he or she may need additional information and interviews related to identified problem areas as the on-site review progresses.  Having such a discussion before the on-site visit provides the contractor with time to locate and make available requested information and interviewees.

The CO must provide the contractor with written confirmation of the on-site date(s) and time(s) at least three business days before the on-site visit.[92]  This confirmation must also include a summary of the preliminary indicators of potential violations, requests for access to interviewees, as well as data and information that the CO is aware of needing at that time.  The confirmation is sent to the contractor by certified mail, return receipt requested; however, a courtesy copy may be sent by email or facsimile.[93]

## 2D    ON-SITE PROCESS

The on-site review typically progresses in several phases, including entrance conference, facility inspection, collecting contractor records, interviews, and exit conference.  COs should make every effort to gather all necessary records and conduct all personnel interviews during the on-site review.  However, it may be possible to conduct a return on-site visit if the CO identifies some change in the facts or circumstances that supports collecting additional data or conducting personnel interviews.  One example of a change is when a contractor submits new information in response to a PDN, NOV, SCN, or during conciliation, and the CO needs to explore the new information further on-site.

Each phase of the on-site process has its unique challenges for COs and an overview of the phases is provided in the following subsections.  Collecting contractor records and interviews are also discussed in more detail in sections 2E and 2F.  After completing the on-site review and any needed return on-site visit, COs will analyze the information obtained on-site and record findings using the SCER.[94]

### 2D00   ENTRANCE CONFERENCE

The on-site review typically begins with an entrance conference with the CEO or highest ranking official in charge of the facility, his or her representative and senior officials who are responsible for implementing the AAP(s).  The entrance conference will provide general information to the CEO and explain the purposes of the compliance evaluation.  During this conference, a CO will, at a minimum, provide:

- A summary of the contractor's obligations under the programs administered by OFCCP;

---

[92]   However, OFCCP reserves the right to waive the three-day advance notice if providing it could result in irreparable injury to the employment rights of affected employees or applicants.
[93]   See L-7, Supply & Service On-Site Confirmation Letter.
[94]   FCCM 2O, Investigation Summary or Report Writing.

- A description of the scope of the on-site review and the length of time that the CO anticipates being on-site; and

- A description of the information needed while on-site.

A CO must advise the contractor of the need to conduct confidential employee interviews. This includes informing the contractor that it does not have the right to have its representative present during an employee interview as either an observer or the employee's representative. It is possible that an employee could request the presence of the contractor's representative during the interview. Should this happen, the CO must determine whether the request is freely made and is not the result of a threat or coercion. The CO makes this determination based on speaking privately with the employee outside of the presence of the contractor's representative.

A CO may want to interview a management employee in some capacity other than as a manager for the contractor, for example, as a potential complainant or victim. This management employee is not required to have the contractor's representative present for the interview if he or she is not speaking on behalf of the contractor. The CO must make it clear to the contractor that nothing said by the management employee will be binding on the contractor. The determination of whether the management employee is a potential complainant or victim and whether the contractor's representative can be present is fact-specific. Therefore, COs should consult with the RSOL and the national office before engaging in these types of interviews.

During the conference, the CO will inform the CEO of the need to meet again to discuss tentative findings of the investigation, and any outstanding requests for data and information.[95]

## 2D01   FACILITY INSPECTION

The facility inspection is an opportunity for COs to observe and evaluate the working conditions in departments or other organizational units of a contractor's establishment. It is also an opportunity to observe the composition and concentration of groups by sex, race, ethnicity, and disability. COs also use the inspection process to observe work performed in different job titles, and to conduct brief focused interviews with supervisors and employees to obtain information about the facility and the work performed there. The CO will also conduct more formal interviews of supervisors, employees and the top union official, as appropriate, during the on-site visit.

By observing how employees complete their work, particularly in any job titles identified as problem areas, COs develop a better understanding of the functions and conditions of the job positions. This understanding contributes to a CO's ability to make decisions and assess matters such as the relationship of certain job criteria for selecting individuals for certain jobs. For example, if females are underrepresented in a particular job title for which "the ability to lift 50 pounds" is a selection criterion, a CO may observe that the job is done with mechanical equipment doing the lifting rather than the employee. Further, the CO may observe that employees rarely lift 50 pounds without assistance from another employee. This observation allows the CO to question the contractor regarding:

---

[95]   See also 2C00 – Prohibition Against Retaliation.

- The timing and nature of the development of the selection criterion;

- The assessment that the criterion is job-related and consistent with business necessity;

- The changes in the selection process since the criterion's development;

- The point in the selection process when the selection criterion is applied; and

- The contractor's assessment of the validity of the selection criterion as a measure of whether an applicant can perform the job.

A facility inspection also allows COs to make observations regarding possible physical accessibility issues for employees with known disabilities.  The presence of physical barriers does not mean that disability discrimination exists.  Rather, a CO may use this opportunity to provide compliance assistance on providing reasonable accommodation to individuals with disabilities, including disabled veterans.  The CO may also ask about the contractor's process for receiving and handling requests for accommodation.

During the inspection, COs must visually confirm the display of EEO posters and AAP policy statements required under Section 503 and VEVRAA.  Contractors are required to conspicuously display the "EEO is the Law" poster, the required supplement and the notice of employee rights under the National Labor Relations Act (NLRA) required by Executive Order 13496.[96]  Additionally, COs must observe and question, as appropriate, how the contractor provides notice to employees of the location and hours of availability of VEVRAA and Section 503 AAPs.[97]  A CO must take notes during the inspection to record his or her observations, or record the observations immediately following the inspection.  The CO must type handwritten notes, using MS Word, before placing them in the case file.  During the inspection or during off-site analysis, the CO may verify electronic postings.  The CO must document his or her observations and findings in the SCER.

In appropriate circumstances, COs may also take photographs.  However, if a contractor objects to the CO taking photographs, the CO must stop taking photographs and notify the district office of the contractor's concern.

## 2D02   COLLECTING INFORMATION: ACCESS TO CONTRACTOR RECORDS

The agency's regulations require contractors to provide COs access to the contractor's books, records and accounts to determine the contractor's compliance with the laws administered by OFCCP.[98]  When a CO knows that he or she will likely need to obtain copies of materials, the CO must initiate a discussion with the contractor regarding the need to obtain copies of materials before the on-site review.  Working out the logistics for obtaining copies of requested materials before the on-site review may help the CO avoid conflicts.  This may also be useful when scheduling the time

---

[96]  FCCM 2L – Equal Opportunity Clauses and Other Requirements.
[97]  41 CFR 60-300.41 and 41 CFR 60-741.41.
[98]  For a fuller discussion of the types of information that a CO might collect during an on-site review, see FCCM 2E – Collecting Information for Analysis

needed to obtain copies of the requested materials.  If requested materials are available electronically, in a compatible format, the CO must accept the materials in electronic form.  The CO must ensure that all requested data is present within the various materials.

Some of the types of records a CO will request and obtain before or during the on-site visit include:

- Job applications for every applicant for the jobs at issue;

- Personnel files;

- Relevant payroll and human resources information system (HRIS) data;

- Labor agreements;

- Policy and compensation manuals;

- Directives;

- Federal contracts, purchase orders and subcontracts;

- Company newsletters; and

- Externally and internally posted job opening announcements.

COs must photocopy, digitize, transcribe or summarize pertinent information, as appropriate.  If summarizing, the CO must describe the source documents in detail and describe the summarizing process.  Photocopied originals are preferable to document summaries.

If a contractor objects to providing photocopying facilities or if, for any other reason, the CO must use an off-site copying facility, the CO will take appropriate precautions to preserve, securely handle and maintain any personally identifiable information contained in these documents when removing original documents from the premises.  COs must assure the contractor that the originals will be returned in a timely manner.  It may also be helpful for COs, in coordination with a contractor official, to make a written inventory of the documents and materials that are being provided by the contractor for copying.

If the contractor refuses to provide access to materials or denies the CO the ability to copy requested materials, the CO will contact his or her supervisor to discuss the denial of access concerns.  It may be necessary to prepare an SCN for denial of access following this discussion.  Chapter 8, Resolution of Noncompliance, is a source of additional information on this particular point.

## 2D03   MANAGEMENT AND NONMANAGEMENT INTERVIEWS

One of the most important activities that COs perform during an on-site review is interviews with management and nonmanagement employees.  When conducting the interviews, COs verify employment practices, policies, and procedures, and gain an understanding of the workplace EEO culture.  It is imperative for COs to interview both management and nonmanagement employees to

ensure that they have multiple perspectives on how the contractor's affirmative action and nondiscrimination obligations have been implemented. A more detailed discussion covering interviews is in Section 2F below.

## 2D04   EXIT CONFERENCE

Upon completion of the necessary on-site review and evaluation of all information obtained, COs will discuss the tentative findings of the compliance evaluation with the contractor at the on-site exit conference. The on-site exit conference should be held with the contractor's CEO or designee. The CO will reiterate to the contractor that Executive Order 11246, Section 503 and VEVRAA prohibit intimidation of, or retaliation against, anyone assisting or participating in the investigation.[99]  An exit conference does not mean that the on-site review is complete; therefore, COs should avoid making any statements that could lead the contractor to believe that the CO is no longer able to request a follow-up on-site or to seek additional information.

COs must schedule the exit conference for the final day of the on-site review. At this conference, the CO must be prepared to describe the aspects of the investigation and to discuss the tentative findings of the compliance evaluation in general terms. The CO will inform the CEO, or designee, of the next steps in the compliance evaluation process, of any outstanding or additional requests for information, and of the possibility that a PDN or NOV could be issued.

## 2D05   RETURN ON-SITE REVIEW AND DENIAL OF ACCESS

COs should make every effort to gather all necessary records and conduct all personnel interviews during the on-site review. If, however, the CO identifies the need for additional contractor records or personnel interviews after the on-site review ends, a return on-site review may be necessary. The CO must discuss this possibility with his or her supervisor.

When a second on-site visit is needed, the CO will follow the on-site procedures as described in this chapter. However, if the contractor can timely submit additional data or information without an on-site visit, the CO does not need to conduct a return on-site review, unless the contractor fails to provide the information.

If the contractor refuses to provide the requested data or information, or does not allow a follow-up on-site review, the CO will prepare an SCN for denial of access. More information on this issue is in Chapter 8, Resolution of Noncompliance.

## 2E    COLLECTING INFORMATION FOR ANALYSIS

During the on-site review, the CO must obtain all available records necessary to secure a full understanding of the contractor's employment practices and processes, particularly how they apply to any employment actions, practices or processes that the CO is examining. It is likely that the CO will need to review and analyze the information after the on-site review, during the off-site analysis part of the compliance review. For example, the CO may need to conduct analyses to determine whether disparate treatment and/or disparate impact have occurred using information gathered on-

---

[99]   See also 2C00 – Prohibition Against Retaliation.

site on both favored and nonfavored groups being investigated.  This off-site analysis must commence immediately after the on-site review is complete.

Generally, the review period begins two years before the contractor's receipt of the Scheduling Letter and ends when the violations that were identified are corrected and remedied.  This, of course, assumes that coverage is established for the full review period.  The CO may need updated records and data for the period following the start of the review to update the information initially submitted by the contractor or to investigate issues first identified on-site.  For example, the CO must request data relevant to the potential discrimination issues identified at the desk audit to determine how long any such violation extends.  Such information is necessary for the CO to ensure that the contractor stops any identified discrimination and to determine what remedies victims need if they are to be made whole.  The CO may also need to review information relating to periods more than two years before the contractor's receipt of the Scheduling Letter where the potential for continuing violations exists.

The data collected should include, but not be limited to, applications for all applicants, test results, all interview notes, personnel files, policies and procedures, employment data and other contractor documentation relevant to the issues being examined by the CO during the on-site review.  The CO must also request employment data that the contractor had not previously submitted.  For example, if a review of information indicates that the contractor did not include its entire workforce in its AAP(s),[100] the CO should request data and information regarding this determination.  The CO will examine whether the contractor's determination not to include these workers as employees was correct or whether that decision improperly omitted or misclassified workers.  If the contractor misclassified the workers or otherwise should have included them in the contractor's AAP(s), the CO must consider the employment data for these employees in the analyses.

To ensure the CO obtains all needed information, he or she makes a list, in advance, of the data and other information needed from the contractor, before departure from the on-site review.  The CO must update this list, adding new items as the CO becomes aware of them, and recording when he or she received the requested or needed items.

## 2E00   TYPES OF EVIDENCE

The CO will obtain, review and analyze employment data, documents, policies, procedures, interview statements and observations throughout the review.  An example of an observation that might be significant is the absence of women working on the loading dock.  The CO will examine all the information to assess whether sufficient evidence exists to determine whether prohibited discrimination or other violation occurred during the review period.  If either did occur, the CO must determine whether the discrimination or other violation is ongoing.

There are two broad types of evidence: direct evidence and circumstantial evidence.  Direct evidence is evidence that, if true, directly proves a fact.  For example, an email from the contractor's director instructing supervisors not to hire women into certain jobs or a statement by a

---

[100]   For example, a contractor may have excluded temporary workers and independent contractors from its AAP. Temporary workers who were employees as of the contractor's AAP date should be accounted for in the AAP.  It is permissible for the contractor to exclude independent contractors from its AAP, as long as they are properly classified as independent contractors and not employees.

manager that "we don't hire women here" would constitute direct evidence of discrimination against women. In contrast, circumstantial evidence is evidence that relies on an inference to prove a fact. For example, three standard deviations in the selection rates for similarly situated blacks and whites within the laborer job group is circumstantial evidence of discrimination against blacks. The statistics do not *directly* prove discrimination but can raise an inference of discrimination.

The CO may use direct evidence and circumstantial evidence, either alone or in combination, to prove discrimination. The key question when determining if the contractor has engaged in discrimination is assessing whether the evidence, direct or circumstantial or both, satisfies the appropriate burden of proof of discrimination.

OFCCP performs statistical analyses during its compliance evaluations and also seeks a variety of other types of nonstatistical evidence. Anecdotal evidence, a type of nonstatistical evidence, often supports statistical evidence of discrimination in systemic cases. Anecdotal evidence, which may be either direct or circumstantial, may consist of first-hand accounts of personal experiences with discrimination by the contractor at issue that brings "the cold numbers convincingly to life." *International Brotherhood of Teamsters v. United States,* 41 U.S. 324, 339 (1977). Documents the contractor submits may contain anecdotal evidence, or COs may obtain anecdotal evidence from interviews with managers, employees, or applicants. In determining which cases to pursue, OFCCP will be less likely to pursue a matter where the statistical data are not corroborated by nonstatistical evidence of discrimination unless the statistical evidence is exceptionally strong. In some cases, OFCCP may find systemic discrimination based only on anecdotal evidence that directly supports a pattern or practice of discrimination.

For example, the company president sends an email to managers stating his concern that women are unable to lift heavy objects and that, if women are hired for stockroom positions, there will be a higher risk of on the job injuries that will impact the company's profitability. This anecdotal evidence could support a finding of discrimination against women applicants for stockroom positions at that establishment.

## 2E01   PERSONNEL ACTIVITY AND SELECTION PROCESS

During the on-site review, it is imperative the CO must develop an understanding of the contractor's employment procedures and practices. This activity includes obtaining copies of selection policies and procedures related to areas where the CO identified potential discrimination during the desk audit. The CO can also garner crucial information from interviews of human resources personnel, selecting officials, employees (*e.g.,* hired, promoted or terminated during the review period) and other individuals identified as participating in or being affected by the selection process, such as those who were applicants or candidates for open positions but were not hired or promoted. The CO must also gather contact information for potentially knowledgeable individuals no longer employed by the contractor, if applicable.

The type of information the CO will gather depends on issues identified at the desk audit. Some examples are provided below.

- *Hiring Data.* This includes job group and/or job title identification, copies of personnel files, payroll records, job applications, job announcements, staffing requisitions, advertisements (internal and external postings), job descriptions, job status (*e.g.,* permanent, temporary, full or

part-time), minimum qualifications, preferences, applicant flow data, documentation created at each stage of the selection process (*e.g.,* selecting officials' interview notes or computerized screening of internet applicants), phone screen procedures and testing information.

- *Promotions*.  This includes identification of lines of promotion, copies of personnel files, payroll records, promotion policies and procedures, internal advertisements and bid sheets, candidate flow data for eligible candidates, payroll data, documentation created at each stage of the promotion process (*e.g.,* officials' interview notes), phone screen procedures and testing information.

- *Terminations.*  This includes job group and/or title identification, copies of personnel files, payroll records, information regarding voluntary and involuntary terminations, termination policies and procedures, documentation of the reason for termination, exit interview notes and documentation, termination letters and contact information for terminated employees.

## 2E02   SELECTION PROCEDURES AND TESTING

As noted in subsection 2L05 below, the UGESP at 41 CFR 60-3.3A states that using any facially neutral selection procedure or criterion resulting in an adverse impact on hiring, promoting or other employment opportunities of members of any race, sex or ethnic group is discriminatory unless the contractor proves that its use is justified.  Information that the CO will obtain to assess whether the contractor's selection procedures or criteria have an adverse impact may include:

- A written description of the selection steps and criteria applied;

- A copy of the job description(s);

- A copy of all records the contractor created to implement the selection procedures or criteria during the review period.  Examples of these records include test results, individual test scores, instruction manuals related to testing or selection procedures, interview forms and interview results.  When the selection process includes a battery of tests, the CO must be sure to collect the scores for each part of the battery, as well as the composite or overall scores, and learn how the contractor determined them.  If the contractor is administering a test at a specific location, it is often helpful to see the testing location;

- Signed interview statements from the contractor representatives who administered the selection procedure during the review period.  The interviews need to include information about how the contractor administered the selection procedure, when they initiated the procedure, whether the contractor made any changes to the procedure, and when and why the changes were made.  Additional information would include whether the contractor validated the selection procedure[101] and whether there were any efforts to minimize the adverse impact.  If efforts were made, COs must determine what those efforts were;

- A copy of all job analyses or job information describing how the contractor established job requirements; and

---

[101]   Validation means demonstrating that using the selection procedure met the validation standards of the UGESP.

- Copies of any validation studies conducted by the contractor.

Example interview questions the CO will ask may include these areas of inquiry:

- What are the selection procedures and criteria?

- How does the contractor administer the selection procedures?  Are interviews and tests conducted in similar settings?  Are the interviews and tests conducted by multiple individuals?  Who administers each procedure?  Who is the decision maker for each procedure?

- How did the contractor score or rate each selection procedure or criterion, or both?  Is there a passing score set for each one?  Is the score weighted?  How was it weighted and why?  Does the contractor score or rate the candidates cumulatively?  If so, how?

- How does the contractor select or "pass" candidates on the selection procedure (*e.g.,* total test score, based on performance during an interview)?

- How did the contractor come to use the selection procedure?  If the procedure was a test, did the contractor develop it internally or was it developed by an external contractor or vendor?  Did the contractor purchase a pencil and paper test?

- If the CO has identified adverse impact at any stage of the selection process, is the use of the procedure or criterion responsible for that impact justified by business necessity?  What has the contractor done to consider alternative procedures with less impact?  What actions did the contractor take to validate the selection procedure or test?  Are there any validation reports or studies?  Did the contractor consider such reports or studies, or both?

## 2E03   COMPENSATION

Investigation of potential compensation discrimination presents complex and nuanced issues.  This subsection discusses approaches COs may take to analyze a contractor's compensation policies and practices, as well as the pay transparency provision that contractors must follow to ensure that applicants and employees can freely inquire about, discuss and disclose their compensation.

*a.  Analyzing Compensation.*  The choice of the best approach for a case depends upon the underlying facts, the available data, and the contractor's compensation system and practices.  As such, OFCCP takes a case-by-case approach to analyze compensation issues.  In every case, there are three key questions to be addressed and the on-site review may provide data or information necessary to answer them:

- Is there a measurable difference in compensation on the basis of sex, race or ethnicity?[102]

---

[102]  In situations where there are sufficient data and analytic power to use regression analysis, a measurable difference generally means a statistically significant difference, two standard deviations.  In the situation of disparities in small groups and/or individual compensation, a measurable difference and sufficient evidence will be determined in conformance with Title VII principles.

- Is the difference in compensation between employees who are comparable under the contractor's wage or salary system?

- Is there a legitimate, nondiscriminatory explanation for the difference?

An on-site review may include analysis of workforce data and contractor compensation policies and practices; interviewing personnel and employees; examining payroll and HRIS data; and any other information necessary to understand or analyze compensation data or practices. In conducting the on-site review, COs examine all employment practices that have the potential to lead to compensation disparities. Prior desk audit results may assist the CO in identifying particular practices or issues to investigate.

Compensation means any payments made to, or on behalf of, an employee or offered to an applicant as remuneration for employment. Compensation may include, but is not limited to, salary, wages, overtime pay, shift differentials, bonuses, commissions, vacation and holiday pay, allowances, insurance and other benefits, stock options and awards, profit sharing and retirement. Compensation discrimination includes unexplained and unmerited differences in how employees earn, or contractors distribute, compensation in these areas based on sex, race or ethnicity. In examining compensation issues, COs must be mindful to include how the contractor treats fringe benefits. For example, if the contractor is not providing equal fringe benefits and/or not making equal contributions to insurance plans or pensions for men and women, this may constitute discrimination.

The compensation a group of employees or an individual employee receives may be negatively affected by the denial of equal access to certain earnings opportunities. COs must examine employee access to opportunities affecting compensation such as higher-paying positions, job classifications, work assignments, training, preferred or higher-paid shift work, and other such opportunities. COs should also examine policies and practices that unfairly limit a group's opportunity to earn higher pay such as "glass ceiling" issues and access to overtime hours, pay increases, incentive compensation, and higher commission or desired sales territories. Differences may be observed in these and other areas including:

- Base salary;

- Job assignment or placement;

- Opportunities to receive training, promotions, and other opportunities for advancement;

- Earnings opportunities; and

- Access to salary increases or add-ons such as bonuses.

COs must focus the on-site review on the information and practices relevant to the employer, industry, and types of workers. For example, overtime issues are relevant to hourly and nonexempt workforces, while high-level salaried positions may involve substantial bonuses, stock options and other incentive compensation. For sales employees, both commission and account or territory assignment practices may be relevant.

In addition to reviewing potential evidence of systemic pay discrimination, COs may use on-site reviews to determine if there is sufficient evidence to support an inference that individual or cohort pay differences are due to discrimination. Absolute pay differences between comparators, without any other evidence of pretext or possible discrimination, generally are not sufficient to support an individual disparate treatment analysis.

For purposes of evaluating compensation differences, employees are similarly situated where it is reasonable to expect they should be receiving equivalent compensation absent discrimination. Relevant factors in determining similarity may include tasks performed, skills, effort, level of responsibility, working conditions, job difficulty, minimum qualifications and other objective factors. In some cases, employees are similarly situated where they are comparable on some of these factors, even if they are not similar on others. For example, when evaluating a job assignment issue, workers are similarly situated when their qualifications are comparable, even if they are assigned to jobs at different levels. Who are similarly situated for purposes of an individual analysis or review of a single specific employment decision may be determined based on different criteria than when conducting a systemic discrimination analysis. On-site reviews allow COs to make assessments of similarly situated employees or jobs by observing, by conducting interviews, and by reviewing documents.

OFCCP will evaluate, on a case-by-case basis, information from the contractor regarding the factors the contractor considered in making compensation decisions. A factor is an element that the contractor offers to explain differences in employee compensation under its compensation system and practices. Factors may include internal and external elements potentially affecting compensation. A factor may be a qualification or skill that the worker brings to the position such as education or experience. It may also be an employment element such as position, level or function, tenure in position or performance ratings.

COs will use information gathered at the on-site review to evaluate whether factors identified by the contractor actually explain compensation, whether they are implemented fairly and consistently, whether data regarding the factors are accurate and whether the factors should be incorporated into the CO's compensation analysis.

The CO must also confirm that the amount of compensation offered to individuals with disabilities (including veterans with disabilities) is not reduced due to them receiving a reasonable accommodation or any disability income, pension or other benefit received from another source. To verify compliance with this requirement, the CO will request the files of identified individuals with disabilities and/or disabled veterans, along with those of people without disabilities in the same job titles, and compare their compensation.

b. *Pay Transparency.* During the on-site review, the CO must evaluate whether the contractor has any policies that forbid applicants or employees from inquiring about, discussing or disclosing their compensation.[103] COs must verify that applicants and employees are not disciplined, discharged or in any way discriminated against for discussing their compensation by reviewing company policies and practices, and by interviewing employees and managers. COs must also determine whether the contractor has disseminated the Pay Transparency Nondiscrimination

---

[103]  See 41 CFR 60-1.4(a)(3).

Provision either by electronic posting or by posting hard copies of the provision in conspicuous places available to employees and applicants.[104]

Even employees whose essential job functions include access to the compensation of other employees or applicants, such as payroll personnel, are protected from discharge or other forms of discrimination when discussing or disclosing their *own* compensation. However, contractors can restrict these employees from disclosing the compensation of *other* applicants or employees when they have a duty to protect that compensation information. Still, there are some circumstances when employees with such essential job functions may disclose the compensation of other employees or applicants. For example, they may disclose compensation data of other employees and applicants to a CO during an OFCCP compliance evaluation. They may also disclose the compensation of other employees or applicants in response to a formal complaint or charge, in furtherance of an investigation, proceeding, hearing or action, including an investigation conducted by the employer, or if the disclosure is consistent with the contractor's legal duty to furnish information. Further, these employees may disclose the compensation of other applicants or employees based on information that they received through means other than essential job functions access. Similarly, these employees may pursue their own possible compensation discrimination claim or discuss possible disparities involving the compensation of other employees to a management official with the contractor or while using the contractor's internal complaint process.

## 2F    INTERVIEWS

Based on the results of the desk audit, the CO will develop an On-Site Plan that includes interviews of contractor management, employees (current and former) and applicants, as appropriate. The CO must meet with the contractor's staff members who are knowledgeable about employment policies and practices. During these interviews, the CO will clarify any questions he or she may have regarding the contractor's organization, structure, corporate culture and other issues identified during the desk audit. This is also the CO's opportunity to become more familiar with the contractor's informal or unwritten policies and practices, and to compare these to written materials and practices outlined in the AAP. Interviews with employees and applicants may provide further information regarding the application of the contractor's procedures.

If reasonable accommodation for an interviewee is necessary, the CO will arrange for the interviewee to receive the accommodation. Additionally, if the interviewee needs a translator, the CO will arrange for this in advance of the interview or schedule the interview to ensure translation services are present.

### 2F00   GENERAL INTERVIEW PRINCIPLES AND PROCEDURES

Interviews may be informal or formal. An informal interview may occur during the facility inspection while a formal interview occurs during a scheduled meeting with a pre-planned interview outline or list of questions.

---

[104]   For more on the Pay Transparency Nondiscrimination Provision posting requirements, see FCCM 2M00(b).

Federal Contract Compliance Manual (FCCM)

As the on-site review proceeds, there will be continuing discussions between COs and contractor personnel. COs must document in writing the content of these discussions as soon as possible. It is necessary for COs to review their notes of these discussions with the interviewee to ensure the notes accurately reflect the interviewee's statements.

a. *Reason for Interview.* CO-initiated interviews are conducted with an identified purpose or goal. Reasons for interviews may include:

- Gaining understanding of contractor policies and procedures;

- Obtaining relevant general information;

- Corroborating information received from other sources; and

- Identifying additional areas for investigation.

Depending on the results of the desk audit, the CO will pay specific attention to the contractor's employment practices including compensation, hiring, termination and promotion practices. The CO will also conduct interviews with managers and employees that focus on contractor practices concerning EEO under the laws OFCCP enforces.

b. *Interview Plan.* As a part of the On-Site Plan, the CO must develop appropriate interview outlines and/or questions and identify specific individuals to interview regarding each identified potential problem area or compliance issue. Each planned interview or group of interviews should have an Interview Plan that lists the topics the interview needs to address, including specific questions, if appropriate. Interview Plans will vary depending on whether the interviewee is a manager, other employee, or an unsuccessful candidate for hire, among other considerations. If there is an individual that the CO identified for an interview but did not interview, the CO will make a note in the case file as to why the interview did not take place.

c. *Informing the Interviewee.* The CO will tell each interviewee at the outset of a formal interview that:

- The CO will show the interviewee his or her statement containing the answers to the questions asked during the interview; and

- The CO will ask the interviewee to sign his or her statement.

The CO will inform each interviewee that knowingly providing false or inaccurate information is unlawful and will explain that the following phrase is included in the interview notes where the interviewee signs:

"I have read the above and it is true and accurate to the best of my knowledge."

In addition, the CO must inform interviewees that the interview is kept confidential to the maximum extent possible. The CO must also inform all interviewees, regardless of their position with the contractor, that it is unlawful for the contractor to intimidate them or take retaliatory action against them for participating in an interview.

d.  *Contractor Representative Present at Interviews*.  When the CO conducts on-site interviews with nonmanagement personnel, the contractor does <u>not</u> have the right to have a representative present.  However, when the CO conducts interviews with upper-level managers and directors that speak for, or make decisions on behalf of, the company, the contractor may have an attorney or another representative present.  If the contractor wants a representative present during management interviews, the CO must first obtain written confirmation of the representation, including the contact information for the representative and the scope of the representative's authority.[105]

A management employee is not required to have the contractor's representative present for the interview if he or she is not speaking on behalf of the contractor.  An example may be when the manager is a member of a potentially affected group speaking about the potential discrimination, or his or her personal experience; or acting as a whistleblower.  In that situation, the CO may need to contact the employee directly after the on-site review to conduct the interview off-site without the contractor's representative present.  The CO must make it clear to the contractor that nothing said by the management employee will be binding on the contractor.  The determination of whether the management employee is a potential complainant or victim and whether the contractor's representative can be present is fact-specific.  Therefore, COs should consult with the RSOL and the national office before engaging in these types of interviews.

e.  *Employee Representative Present at Interviews*.  An employee may request that a personal representative, such as a union representative or personal legal counsel, accompany him or her during the interview.  Subject to the limitations described below, such a request is generally acceptable.  However, the CO must discuss the presence of the representative with the interviewee privately to determine whether there may be a conflict of interest or whether the interviewee feels pressured into having the person present.  When the employee wants a personal representative present during the interview, the CO must first obtain written confirmation of the representation including the contact information for the representative and the scope of the representative's authority, if the CO does not already have the written confirmation.

The contractor does <u>not</u> have the right to have one of its representatives present during an employee interview – either as an observer or as the employee representative.  If a nonmanagement employee wants a representative present, including a member of management, then the CO must honor the request.  The CO can and should meet with the employee alone for the limited purpose of confirming that he or she was not coerced into asking for a management representative.  The CO must consult with RSOL if there are any questions about the impact of the presence of a third party on confidentiality or privileges.

f.  *Preparing Formal Interview Statements*.  After a formal interview, the CO must ask each interviewee to read, sign and date an interview statement.  Immediately, at the conclusion of the interview, the CO will review the questions asked and the answers given, and obtain confirmation that any direct quotes are accurate and that all paraphrases convey the interviewee's intended meaning.  The CO will promptly type the handwritten interview notes

---

[105]  See FCCM 1B00 for more details on what to request in the written confirmation of representation. If the CO already has written confirmation of the representative from the desk audit phase, there is no need to ask for it again.

using MS Word in order to provide the interviewee with a formal interview statement to sign as soon as possible after the interview.  The CO must enter the following phrase above the space where the interviewee will sign on the formal interview statement:

"I have read the above and it is a true and accurate to the best of my knowledge."

If the CO cannot print a copy of the interview statement during the on-site review, the CO must ask the interviewee to sign and date the CO's interview notes.  The CO will mail or email the typed interview statement as soon as possible after the on-site review for the interviewee to sign and date.  If the interviewee wants corrections made, the CO must incorporate the corrections and re-send the statement for the interviewee to sign.  The CO maintains records of interview notes and each version of the interview statement in the case file.  If an interviewee refuses to sign an interview statement, the CO will record this and the reason(s) for refusal to sign, if known.

g.  *Contact Information.*  At the conclusion of every interview, the CO must obtain the interviewee's personal mailing address, contact telephone number, and email address.  The CO must also provide each interviewee with his or her office contact information in the event the interviewee wants to add anything to his or her statement.

h.  *Informal (Unplanned) Interviews.*  At any point in the on-site review process, a potential witness may approach the CO to provide information related to the review.  The CO must make every effort to meet or otherwise interview the potential witness.  The CO will follow the interview procedures described in this section.

If, however, the potential witness is unwilling to be interviewed and only wants to provide the information, the CO must document the conditions under which the employee provided the information in a memorandum.  For example, the CO records that the employee provided the CO with a document, briefly describes and attaches the document to the memorandum, and indicates in the memorandum that he or she was unwilling to be interviewed.  The CO must then use other means to verify the credibility of the information provided in this manner.

i.  *Location of Interviews.*  COs normally conduct interviews during the on-site review phase of the compliance evaluation.  However, the CO may conduct interviews via telephone, as appropriate.  There may be situations when a contractor refuses to allow on-site interviews of nonmanagerial employees, when the CO needs to interview former employees, or when employees want their interviews conducted away from the establishment.  When possible, the CO will attempt to explore alternatives with the contractor or the employee, as appropriate.  One possible alternative is conducting interviews during meal breaks.  Other options might include interviewing an employee on-site before the start of work shifts, or at the end of his or her shift.  A CO may also conduct interviews at an off-site location.

j.  *Telephone Interviews.*  COs conduct telephone interviews only when it is not feasible to conduct the interview in person since the CO cannot observe the interviewee's demeanor during a telephone interview, making credibility determinations more difficult.  However, when telephone interviews of employees or applicants are necessary, the CO must type the resulting notes and send a copy to the interviewee for review, revisions, as appropriate, and signature.  As with in-person interviews, COs will ask whether there is anyone else present with the interviewee to address any concerns this may create, as described above.

k. *CO is Unable to Conduct Interview*.  If the CO is unable to conduct an interview, he or she should add a memorandum to the file explaining who was supposed to be interviewed, and why the interview did not occur.

## 2F01   MANAGEMENT INTERVIEWS

COs must identify the managers that played a role in making employment decisions that the COs determine, through the desk audit review or other on-site analysis, need clarification.  Examples of the types of questions that COs should ask and include in the Interview Plan are below.

- How did the contractor make the personnel or other decision?  What procedures were used?  Are these procedures customarily used?  Are exceptions made to these procedures?  If so, under what circumstances or when are exceptions made?

- How were the qualification criteria evaluated?

- What was the decision process?  What was your role in the process or personnel action?  Were you the sole decision-maker or part of a team of decision-makers?  On what did you base the decision and what information did you have when making the decision?

- Is the contractor making efforts to reach out to or establish linkages with groups representing veterans, individuals with disabilities, women and minorities?  Describe those efforts.

COs should always be alert to opportunities to ask necessary follow-up questions and pursue unexpected avenues of inquiry that open up during the interview.

## 2F02   EMPLOYEE INTERVIEWS

When on-site, COs must interview current employees including those identified as possible members of an adversely affected class and members of the favored group.  The COs must also interview other individuals who may have information that is relevant to potential problem areas.  Examples of the types of information that COs should plan to obtain during the interview are below.  COs should always be alert to opportunities to ask necessary follow-up questions and pursue unexpected avenues of inquiry that open up during the interview.

- Do you know whether management uniformly applies [describe the practice or procedure under investigation]?  Does management make exceptions to the process? If so, under what circumstances or when are exceptions made?

- Do you have first-hand experience with the practice or procedure?  If so, explain when and under what circumstances?

- What are the duties associated with the job at issue?  Are the qualifications for the job necessary or related to job performance?

- Are you aware of company policies and procedures related to EEO?  Do any of them prohibit the discussion of compensation?

- Are you aware of any instances where the company violated EEO policies?

- Do you know anyone else who might have knowledge about this practice or procedure?

## 2F03   ISSUES THAT ARISE DURING THE ON-SITE REVIEW

During the on-site review, or while interviewing employees and managers, issues may arise that were not identified during the desk audit review.  If this happens, the CO must appropriately follow up on the new issues.  If the issue concerns a possible systemic violation by the contractor or is relevant to the compliance evaluation in progress, the CO must include the matter in the ongoing investigation.  If the matter is one alleging an individual instance of discrimination, or if someone files a complaint during the ongoing compliance review, the CO must discuss the matter with his or her supervisor to determine how to best proceed.[106]

# 2G     EXECUTIVE ORDER 11246 AAP REQUIREMENTS

This section discusses the on-site review of identified problems related to the Executive Order 11246 AAP and Itemized Listing data, as well as the contractor's evaluation of its total employment process, identification of problem areas, development of action-oriented programs, and internal audit and reporting system.[107] During an on-site review, COs can also review more in-depth whether the contractor has made good faith efforts to remove identified barriers to EEO.  For each of the Executive Order 11246 AAP elements, COs must indicate on the corresponding SCER section any problem areas identified during the on-site review and confirmation of any corrective actions taken by the contractor.

The SCER will also include references to relevant evidence COs obtained during the on-site review and recommendations for any appropriate corrective action.  It is important to note that COs may need to conduct an off-site analysis of evidence gathered during the on-site review to ensure a full understanding of the contractor's personnel activities and practices, and to appropriately identify problem areas that may constitute a violation requiring corrective action.

## 2G00   EXECUTIVE ORDER 11246 AAP AND ITEMIZED LISTING DATA PROBLEMS

During the desk audit, a CO examines the contractor's AAP and Itemized Listing data to determine completeness or whether the contractor included all the required elements, and whether the Executive Order AAP and support data are acceptable.  Part B of the SCER is used to report any problems in these elements. Before going on-site, the CO develops an On-Site Plan that reflects how the CO will address the identified problem areas during the on-site review.[108]

As part of the on-site review, COs must assess the contractor's implementation of its AAP(s).  Often, the entrance conference will include a discussion of unresolved AAP deficiencies, especially if the official responsible for preparing and implementing the AAP(s) is present.  During this discussion, the CO also explains which aspects of the program are unacceptable and why they are

---

[106]   See also FCCM Chapter 6 – Complaint Investigations.
[107]   FCCM 1F – Review of Executive Order AAP and Itemized Listing Data for Acceptability.
[108]   See FCCM 2C03 – Onsite Plan.

unacceptable. The CO will also request that the contractor provide any additional information or documentation that the CO needs that the contractor did not provide before the on-site review.

## 2G01  DESIGNATION OF RESPONSIBILITY FOR THE AAP

The contractor's appointment of a person to be responsible for implementing the AAP must be an executive who has the authority and resources to ensure that the AAP is put into practice. COs must obtain a copy of the responsible official's position description to ensure that it includes implementing the AAP. During the interview, the official responsible for the AAP's implementation must describe how the specific provisions of the AAP are implemented. The roles of the interviewed officials in developing and implementing the AAP must be the same as specified in the written AAP. If they are not the same, COs must ask the contractor for an explanation.

## 2G02  IDENTIFICATION OF PROBLEM AREAS: WHERE IMPEDIMENTS TO EQUAL EMPLOYMENT OPPORTUNITY EXIST

The contactor's in-depth analysis of its total employment process in its AAP should indicate whether and where impediments to EEO exist based on its utilization, personnel activity (*e.g.,* applicant flow, hires, terminations, promotions, other personnel actions), compensation analysis, and selection procedures. In evaluating these employment processes, COs determine whether there are any disparities based on race, sex or ethnicity.

During interviews with individuals who contributed to the development and implementation of the AAP, and individuals who are involved in the hiring or selection process, COs must discuss the contractor's identified problem areas to determine how the contractor identified each problem, the scope of the problem, what solutions the contractor implemented and the effectiveness of the actions taken.

COs must also specifically examine records on the contractor's employment activity, and selection criteria and processes to understand the contractor's total employment process, and verify whether the contractor identified all of the impediments to EEO. Questions that may be useful to COs are provided below.

- Did the contractor review its selection criteria?

- Did the contractor apply the criteria in a nondiscriminatory manner and determine whether the selection criteria might have an adverse impact?

- Did the contractor perform validity studies on any criteria found to have an adverse impact, and did the contractor properly determine the criteria to be job-related and consistent with business necessity?

- How frequently does the contractor review selection criteria?

- How does the contractor document the review?

- Do the contractor's efforts comply with the UGESP at 41 CFR Part 60-3?

- Did the contractor ensure that the officials and managers responsible for applying selection criteria and procedures are familiar with, and are implementing, the contractor's EEO policies?  Does the contractor provide training?  If so, how frequently is training provided?

In its AAP, the contractor should identify concentrations and absences of any specific protected group within its workforce.  During the on-site review, COs must seek to identify any job titles for which there are significantly high or low representations of any protected group.  COs must incorporate questions regarding these circumstances into the interviews with the contractor's supervisors and employees.

COs must remember to record either their confirmation or description of problem areas identified in Part B of the SCER.  The SCER must also include a description of any identified or implemented problem resolutions.

## 2G03   ACTION-ORIENTED PROGRAMS TO CORRECT PROBLEM AREAS

Contractors are required to design action-oriented programs to address any specific barriers to EEO that are identified during the contractor's in-depth analysis of its total employment process.  The programs should specifically describe who is responsible for implementing the program, what actions the contractor will take, and when and how the program will work.

For the programs to be effective, contractors must ensure that they are doing more than following the same procedures that previously produced inadequate results.  COs must use the on-site review to gather the information they need to determine whether the contractor identified all the impediments to EEO.

The on-site review often illustrates the contractor's compliance with this requirement when COs investigate other issues.  For example, in requesting copies of position descriptions and discussing them with personnel, a CO can determine how recently the contractor reviewed the descriptions; if the descriptions are accurate; and if the contractor's selection process screens for the knowledge, skills and abilities related to the position descriptions.  If the descriptions are not accurate, this may be indicative of a problem area.  Additionally, when the CO questions interviewees like the contractor officials, employees and third parties about the contractor's recruitment and outreach efforts, the CO can obtain information related to the action-oriented nature and relative success of these efforts.

## 2G04   EVALUATION OF GOOD FAITH EFFORTS

During an on-site review, COs have the opportunity to evaluate whether the contractor made good faith efforts to remove identified barriers to EEO, expand employment opportunities and produce measurable results.  COs must assess good faith efforts on a case-by-case basis, taking into account all of the relevant facts and circumstances.  However, in most situations, good faith efforts will produce positive, measurable results.  When a contractor's efforts have not produced such results, COs must ask the contractor to explain the following:

- Why did the efforts undertaken not produce positive, measurable results?

- Did the contractor make additional or alternative efforts?

- If the contractor took additional or alternative efforts, and they did not produce positive, measurable results – why?

During the desk audit, COs evaluate the contractor's past goal attainment and progress on meeting current goals, and identify any goal areas requiring further evaluation of good faith efforts.  To make informed judgments about the quality of the contractor's good faith efforts, COs must be familiar with the local area's community resources, a list of which is maintained in each field office.  COs should also be familiar with the Employment Referral Resource Directory (ERRD) maintained on the OFCCP website.[109]  The list of community resources may include nonprofit groups, EEO organizations, faith-based groups and caregiver support groups that can assist contractors in attaining their goals.

During the on-site review, COs explore the contractor's good faith efforts to address all identified problem areas through interviews with contractor officials, employees and other pertinent parties.[110]  For each of the activities listed below, COs must identify and obtain documentation that provides evidence of the extent of the contractor's good faith efforts.

a.   *Good Faith Efforts* – Internal Placements.  For internal placements through actions like hiring and promoting current employees, good faith may include the contractor's efforts to address barriers to opportunities for women and minorities.  Possible areas of inquiry on this point are listed below.

- *Disseminating Information about Internal Opportunities.*  Are job openings posted?  If so, are they posted where all potentially eligible employees would see them?  Are all jobs posted, or only certain jobs or classes of jobs?  Why?  Are jobs posted promptly?  Is there adequate time to apply?

- *Providing Training Opportunities.*  Does the contractor provide apprenticeship programs?  On-the-job training?  Tuition reimbursement?  If so, for which employees are these opportunities available?  Are training opportunities provided without regard to sex, race or ethnicity?  Do participation rates vary by sex, race and/or ethnicity and, if so, why?

- *Providing Counseling and Encouraging Employees to Apply for Internal Openings.*  How does this occur?  How often?  What is included in the counseling or encouragement?  Does the contractor periodically assess whether its efforts are successful?  Are counseling and encouragement available for caregivers without regard to sex, race or ethnicity?

- *Recruiting Externally into Feeder Job Groups.*  What recruitment efforts is the contractor making?  What resources is the contractor using?

- *Reviewing Selection Criteria and Selection Procedures.*  Did the contractor review its selection criteria and determine whether it is applying them in a nondiscriminatory manner?  Do the selection criteria have a disparate impact?  How does the contractor document the review?  Did the contractor ensure that the officials and managers responsible for applying

---

[109]   The ERRD is available at *https://ofccp.dol-esa.gov/errd/* (last checked September 10, 2019).  Also, see FCCM 1B08 for a discussion of community resources.

[110]   See also FCCM 1L – Analysis of E0 11246 AAP: Goals Progress and Good Faith Efforts.

selection criteria and procedures are familiar with, and are implementing, the contractor's EEO policies?  Is the contractor providing training?  How frequently?

b.  *Good Faith Efforts* – External Placements.  For external placement opportunities, evaluation of the contractor's good faith efforts may include exploring the below areas.

- *Recruitment Sources in the AAP.*  Does the contractor use the recruitment sources listed in its AAP to ensure that its recruitment will reach minorities and women?  If so, when and how?  How does the contractor track the results that each recruitment source yields? This inquiry includes the CO contacting at least some of the listed organizations to confirm and assess the contractor's use of the organization as a recruitment source.

- *Using Other Recruitment Sources.*  Does the contractor use other recruitment sources that are not listed in its AAP to ensure that its recruitment will reach minorities and women? How does the recruitment source provide assistance and support regarding caregiver issues? What are the recruitment sources?  How useful have they been?

- *Using the Media.*  How are job openings advertised?  Among its advertisements, does the contractor advertise in publications or other media that are targeted to minorities and women?  If so, which ones?

- *Recruiting at Schools and Universities.*  Does the contractor's recruitment at high schools, colleges, and universities include those that enroll large numbers of minorities and women? If so, which ones?

c.  *Good Faith Efforts – Applicant Flow Data.*  Applicant flow data may provide useful documentation about the effectiveness of the contractor's good faith efforts, as can internal bid lists and applications for posted job openings.

- *Increased Representation Rate.*  Does either the applicant flow data or the bid lists, or both, show an increase in previously underrepresented groups in the applicant pool?  If so, for what positions did this occur?

- *Decreased Representation Rate.*  If there are no changes, or there are decreases in representation, what alternative actions have the contractor taken or proposed to take in the future?

COs must record findings on the contractor's good faith efforts in Part B of the SCER, and include supporting documentation and other relevant evidence in the case file.  This evidence includes materials such as copies of correspondence, job orders, bid lists for posted job openings, contractor recruiting manuals, relevant pages from labor agreements, employee manuals, and summaries of conversations and interviews with contractor representatives, employees, applicants and recruitment source contacts.

**2G05   INTERNAL AUDIT AND REPORTING SYSTEM TO MEASURE EFFECTIVENESS OF TOTAL AFFIRMATIVE ACTION PROGRAM**

The contractor must design and implement internal audit and reporting systems that measure the effectiveness of the total AAP.  During an on-site review, COs must ask appropriate officials, including management, how the contractor conducts its audits and request documentation of how the contractor reports the results of internal EEO and affirmative action audits.  COs must request documentation in the form of copies of reports or copies of minutes of meetings.

Below are several examples of relevant questions COs should ask contractors about their auditing and reporting system.

- How does the contractor audit its personnel activity to ensure the nondiscrimination policy is carried out?

- Who is responsible for conducting the audit?

- What is involved in the audit?

- How frequently does the contractor conduct the audit?

- What is the schedule for the contractor's report on whether and to what degree EEO and organizational objectives are obtained?

- When and how is the report reviewed by each level of management?  Do the CEO and other high ranking officials receive the report?

- What types of recommendations have been made to improve when the report indicates that the total AAP is ineffective?

# 2H   SECTION 503 AAP AND ADDITIONAL REQUIREMENTS

As discussed in Chapter 1, covered contractors must prepare, maintain and update on an annual basis, an AAP for individuals with disabilities.  COs use the on-site review to investigate problem areas they identified during the desk audit, to gather further information regarding the AAPs and their implementation, and to learn more about the contractor's employment activities and personnel practices.  To gather information related to the Section 503 AAP obligations, COs must interview contractor officials, employees and others, as appropriate.  They must also identify and obtain documentation that evidences the contractor's compliance efforts.  This information is recorded in the SCER Parts B and C.

If the contractor opts to prepare a combined Section 503 and VEVRAA AAP, the CO must ensure that the combined AAP includes all the elements required under each law.  When reviewing a combined AAP, COs should pay particular attention to the differences in the laws to ensure the contractor's combined AAP captures all the required elements.

For example, Section 503 requires an annual analysis of the contractor's utilization of individuals with disabilities and, where the contractor does not meet its goal, it must determine whether and where there are barriers to equal employment and develop action-oriented programs to correct any identified problem areas.  VEVRAA, however, does not require a utilization analysis; it requires contractors to establish an annual hiring benchmark by which they can measure their progress toward achieving EEO for veterans.  Under VEVRAA, there is not a requirement to identify problem areas or develop action-oriented programs.  As this example illustrates, even though there is some overlap between Section 503 and VEVRAA AAPs, there are some differences that a CO must consider when reviewing Section 503 and VEVRAA AAPs for compliance.

## 2H00   SECTION 503 AAP AND ITEMIZED LISTING DATA SUBMISSIONS

During the desk audit, COs examine the Section 503 AAP and Itemized Listing data to ensure the submission includes the required content and determines whether the AAP and support data are acceptable.  During the on-site review, COs interview contractor officials and others regarding the development and implementation of the AAP, and obtain documentation evidencing the same.  COs record any problems identified during the desk audit in the SCER Part A.  Any problems COs identify during the on-site review are noted in the SCER Parts B and C, as appropriate.  COs must examine whether the contractor satisfied the following elements that are required parts of Section 503 AAP.

a.  *Equal Opportunity Policy Statement.*  COs must verify that the policy statement is clearly posted on bulletin boards in an accessible location.  COs must examine the policy statement to determine if it is current, noting whether the person responsible for implementing the AAP is named.[111]

b.  *Review of Personnel Processes.*  COs may need to ask several questions to confirm a contractor's review of personnel processes that include, but are not limited to, those stated below.

- Does the contractor periodically review personnel processes to ensure that the qualifications of individuals with disabilities for jobs, training and promotion are fully considered, and that individuals with disabilities have equal access to the personnel processes to apply for such opportunities?  How often is this done?

- What procedures has the contractor designed to facilitate the periodic review?

- How does the contractor document its review of personnel processes and any actions it takes?  How is that review conducted and by whom?

- Have there been requests to modify personnel practices as a reasonable accommodation?  How did the contractor respond to the requests?

COs must obtain and review all relevant documentation, including procedures, reports and personnel files.  COs must also determine whether the contractor's personnel processes provide for the careful, thorough and systematic consideration of the job qualifications of applicants and

---

[111]  FCCM 1G01.

Federal Contract Compliance Manual (FCCM)

employees with known disabilities for job vacancies, either for hire or promotion, and for all training opportunities.

c. *Review of Physical and Mental Job Qualifications*.  The contractor is obligated to periodically review the physical and mental qualifications of its jobs, and to eliminate those qualifications that tend to screen out qualified individuals on the basis of disability and are not job-related and consistent with business necessity.  The Section 503 AAP must contain a schedule for this periodic review.  While on-site, the CO must request samples of any mental or physical job qualification standards and interview individuals responsible for their periodic review.

To assess the contractor's review of its physical and mental job qualifications, COs should consider the following questions:

- When did the contractor write or last update the job descriptions?  Do the job descriptions accurately reflect the duties of the job?  Do the job descriptions require the employee or applicant to perform duties in a specific way?  If so, and those requirements tend to screen out qualified individuals on the basis of disability, is there a business necessity for performing the duties in this way or are there alternate ways the duties can be performed satisfactorily?

- Are there job qualifications that would tend to screen out individuals based on disability?  For example, an unassisted lifting requirement may screen out individuals with disabilities even though employees are not required to lift unassisted.

- Are those job qualifications based on business necessity?  If not, are there alternative qualifications that the contractor can use?

- Are there positions that do not have written job descriptions?  If so, how does the contractor identify and review job qualifications?

d. *Provide Needed Reasonable Accommodation to Physical and Mental Limitations*.  Contractors must provide needed reasonable accommodation to the known physical and mental limitations of qualified individuals with disabilities unless the accommodation would cause an undue hardship.  Accommodations may include, but are not limited to:

- Modifying work places and making work places and other contractor facilities used by employees accessible;

- Restructuring of nonessential functions of jobs;

- Allowing essential functions to be performed in a different way;

- Assigning nonessential functions of the job to other employees;

- Providing readers, sign language interpreters or assistive devices;

- Providing part-time work, flexible hours, or telework; and

Federal Contract Compliance Manual (FCCM)

- Reassigning employees to a vacant position.

COs should inquire whether there is a process in place by which individuals can request needed accommodations, how requests for accommodations are processed, and whether the contractor has provided accommodations as a matter of affirmative action. COs must also determine whether officials responsible for implementing the accommodation obligation are appropriately trained to address requests for accommodation. COs must also review the contractor's accommodation request records that were not already reviewed at the desk audit to assess whether the contractor responds to requests promptly and appropriately. All accommodations made by the contractor must be effective. Generally, this means the contractor must provide the person who needs the accommodation the ability to perform essential job duties. In the case of an applicant, reasonable accommodation could include, for example, providing an alternate means for applying and being considered for employment other than through an online application system. If requests for accommodation were denied, COs must obtain documentation reflecting these decisions and the basis for the decisions to ensure that the denials were proper.

e. *Develop and Implement Procedures to Prevent Harassment*. COs must confirm that the contractor developed and implemented procedures to ensure that employees are not harassed because of their disability status. COs should request a copy of these procedures, interview the official responsible for implementation, and review reports or internal investigations of alleged harassment based on disability status and the contractor's response.

f. *Disseminate EEO Policy Externally and Perform Outreach and Positive Recruitment*. While on-site, COs must request documentation showing that subcontractors were notified of the contractor's affirmative action policy, requesting appropriate action on the part of the subcontractors. Additionally, COs must verify during the on-site review that the contractor engaged in outreach and positive recruitment activities, evaluated the effectiveness of each outreach or recruitment activity, and assessed the total effectiveness of all of its efforts combined. While on-site, the CO must request documentation for all its outreach activities and assessments for the three years prior to the AAP year, as well as any documentation of efforts during and after the AAP year. If the documentation and assessments show that the contractor's efforts were not effective, the CO must determine whether the contractor has implemented alternative efforts to identify qualified individuals with disabilities.[112] COs may also refer contractors to OFCCP's ERRD or other community resource databases that could serve as a recruitment resource.

g. *Disseminate EEO Policy Internally*. The AAP should clearly describe the methods the contractor used to disseminate its EEO policy internally. During the on-site review, COs must verify that the contractor actually implemented these measures.[113] COs must obtain documentation and verify through interviews that the internal dissemination activities identified in the AAP occurred.

---

[112] For examples of outreach and recruitment activities, see 41 CFR 60-741.44(f)(2).
[113] 41 CFR 60-741.44(g).

h. *Design and Implement an Audit and Reporting System.*  COs must confirm that the contractor has an audit and reporting system that, among other requirements, measures the overall effectiveness of its AAP.  To do this, the CO must request documentation of the contractor's actions to implement the audit and reporting system, as described in the AAP.  COs should obtain documentation of past audit(s), any remedial actions taken and their effectiveness.  The COs may conduct interviews with responsible officials and employees.

i. *Designate an Official to Implement the AAP.*  While on-site, COs may seek an interview with the official named in the AAP to determine their specific responsibilities and the authority assigned to that individual, and how the official assesses the implementation of the AAP.  COs must obtain documentation, such as a copy of the individual's position description, copies of reports the individual has prepared and supporting documentation for any assessments the official conducted.

j. *Train Personnel to Ensure that the Contractor Implements EEO and AAP Commitments*.  COs must interview contractor staff, managers and officials to confirm that the contractor's personnel involved in the recruitment, screening, selection, promotion, discipline and related processes have been trained to ensure that the commitments in the AAP are implemented.  Questions relevant to this determination include:

- Does the contractor provide training to personnel?  What type of training does the contractor provide?  When, how frequently, and by whom is this training provided?

- What are the trainer's qualifications?

- Did the trainer use training materials?  What were they?

If the trainer used written training materials, the CO must request a copy.

k. *Analyze Data Collected on Applicants and Hires with Disabilities*.  If, during the desk audit or on-site review, COs identify problems related to the contractor's Section 503 affirmative action obligations, COs must request the total number of applicants and hires for all jobs, total number of applicants and hires with known disabilities, total number of job openings and total number of jobs filled, going back three years from the beginning of the contractor's current AAP year.[114]  For a contractor that is six months or more into the current AAP year, COs may also request records the contractor collected after the beginning of its current AAP year so that the CO can calculate the totals of applicants, hires, job openings, and jobs filled.  In some instances, the contractor may have already computed these totals.  These requests must also be made to verify accuracy if COs detect data integrity problems at the desk audit or during the on-site review.

COs may use these data to inform their determinations on the effectiveness of the contractor's outreach and positive recruitment activities, and whether the contractor's personnel processes allow for the careful, systematic and thorough consideration of the job qualifications of qualified individuals with disabilities.  Some relevant questions might include:

---

[114]  41 CFR 741.44(k).

- How does the contractor use the totals of applicants, hires, job openings and jobs filled as a criterion when determining the effectiveness of its outreach efforts?

- If the totality of its outreach efforts were not effective in identifying and recruiting individuals with disabilities, what alternative efforts did the contractor implement (see examples at 41 CFR 60-741.44(f)(2))?

- Does the data indicate any potential problem with the personnel processes utilized by the contractor when considering job qualifications of applicants and employees with disabilities for job vacancies filled either by hiring or promotion?

## 2H01   AVAILABILITY OF AAP FOR INSPECTION

COs must confirm that the contractor posted a notice, available to both employees and applicants for employment, stating that the Section 503 AAP is available to any employee or applicant for employment to inspect, upon request.  When the contractor conducts personnel-related business through the Internet, such as recruiting and disseminating employment notices, COs should strongly encourage the contractor to post the AAP notice electronically.  The notice must include the location and hours during which the AAP may be obtained.  An example of possible acceptable language is, "The AAP is available in the personnel office during regular business hours."  Confidential information or information that would allow for the identification of individuals with disabilities must not be made available for inspection as part of the Section 503 AAP.[115]

## 2H02   INVITATION TO SELF-IDENTIFY AS AN INDIVIDUAL WITH A DISABILITY

Contractors must offer each applicant the opportunity to self-identify as an individual with a disability under Section 503 at both the pre-offer and post-offer phases of the hiring process.[116]  Within the first year of being subject to Section 503, contractors must also extend the invitation to self-identify to all of its employees and at five-year intervals thereafter.  In the intervening years, contractors are required to remind employees, at least once, that they may voluntarily update their disability status at any time.[117]  This data on applicants and employees with disabilities will be used by contractors to perform other components in their AAPs, such as the utilization analysis and the annual assessment of the effectiveness of outreach and positive recruitment efforts.  Contractors are required to keep all information on self-identification confidential and maintain it in a data analysis file, rather than in the medical or personnel files of individual employees.[118]

a. *Voluntary Self-Identification of Disability Form.*  Under Section 503, the invitation to self-identify must be made by the contractor using the Voluntary Self-Identification of Disability form (Form CC-305) that is authorized by the OMB.[119]  Some contractors may prefer to create an electronically fillable version of the form used to invite self-identification.  Electronically

---

[115]   41 CFR 60-741.41.
[116]   See 41 CFR 741.42 (a-b).
[117]   See 41 CFR 741.42 (c).
[118]   See 41 CFR 741.42 (e).
[119]   The form, with OMB Control Number 1250-0005, is available in several languages at
        http://www.dol.gov/ofccp/regs/compliance/sec503/Self_ID_Forms/SelfIDForms.htm (last checked September 10, 2019).

Federal Contract Compliance Manual (FCCM)

fillable versions are permitted, provided that the electronic version meets certain requirements. The e-form must:

- Display the OMB number and expiration date;

- Contain the text of the form without alteration;

- Use a sans-serif font, such as Calibri or Arial; and

- Use at least 11-pitch for font size (with the exception of the footnote and burden statement, which must be at least 10-pitch in size).

OFCCP specifies the minimum size and type of font to ensure the consistency of appearance, ease of reading and the general accessibility of the form. By using the OMB number and date, job applicants and employees know that the form is an officially approved government form.

Some contractors may find that it is necessary to make nonsubstantive changes to the self-identification form to ensure that the form is accessible to employees and job applicants with disabilities. Contractors seeking to ensure that the form they use is accessible are allowed to alter the margins of the form, change the color of the section headings, remove or change the color of the border surrounding the text of the form, or make other similar nonsubstantive changes. Contractors may also use HTML to make the form accessible. However, contractors may NOT:

- Alter the content (*i.e.*, text or wording) of the form;

- Alter the order of the content on the form; or

- Alter the form or make changes that diminish the general accessibility of the form.

b. *On-site Verification of Contractors' Invitations to Self-Identify.* During an on-site review, COs must request a sample of completed self-identification invitations to verify that the contractor uses the OMB-approved form. COs also must review any memoranda, emails or other form of communication that contractors use to invite employees and applicants to self-identify, or that contractors use to discuss or encourage self-identification. In examining these documents, COs must determine whether the contractor's invitation to self-identify is completely voluntary, and whether the contractor is following the required process to invite applicants at the pre-offer and post-offer phases of the hiring process. In addition, COs must determine whether the contractor extended this invitation to employees within the first year of being subject to Section 503 and at least every five years thereafter, with a reminder notice at least once during the years between employee invitations.

Recognizing that contractors may have different practices and information technology capabilities, OFCCP permits a range of options for documenting compliance with the invitation to self-disclose disability requirement.

- *Paper Invitations.* A contractor that invites voluntary self-identification of disability by using paper copies of the OFCCP self-identification form must retain either the hard copies

Federal Contract Compliance Manual (FCCM)

of the completed self-identification forms or electronic copies (*e.g.,* pdf, scanned, etc.) of the completed paper forms.  The contractor must also retain any log, spreadsheet or database that it may have developed to record the data from the self-identification forms.

- *Electronic Invitations*.  A contractor that electronically invites voluntary self-identification of disability must either:

  o  Retain electronic copies (*e.g.,* pdf, scanned, etc.) of the electronically completed self-identification forms, as well as any log, spreadsheet or database it may have developed to record the data from the self-identification forms;

  o  Retain hard copies of the electronically completed self-identification forms, as well as any log, spreadsheet or database it may have developed to record the data from the self-identification forms; or

  o  Retain a detailed log, spreadsheet or database of the data collected from each electronically completed form, without copies of each individually completed form, if the electronic system does not store completed forms.  However, the contractor must also be able to demonstrate how they delivered and/or displayed the voluntary invitation to self-identify.  This demonstration allows COs to verify that contractors met their obligation to use the OMB-approved form.

Depending on the focus of the on-site review, COs may examine the application or personnel file, or both, of each individual who self-identifies as having a disability; and review employment data indicating whether the contractor hired these individuals and, if not, the reason for nonselection.  COs will also examine whether the individual requested a reasonable accommodation for application or employment and, if so, review the appropriate accommodation records to determine whether the contractor handled the accommodation request appropriately.  If the contractor denied an accommodation request, COs must determine whether the denial was proper and whether, if needed, the contractor provided a suitable alternative accommodation without undue delay.  If any concerns are identified, COs will also interview the affected applicants, employees and others, as appropriate.

## 2H03   DISABILITY-RELATED INQUIRIES, MEDICAL EXAMS, AND CONFIDENTIALITY OF DISABILITY INFORMATION

a.  *Disability-Related Questions and Medical Examinations*.  Aside from disability inquiries undertaken as a matter of affirmative action pursuant to federal, state, or local law, such as the invitation for voluntary self-identification, Section 503 prohibits contractors from asking applicants disability-related questions or questions that are likely to elicit information about a disability prior to a conditional offer of employment.  The law also prohibits contractors from conducting or requiring medical examinations of applicants *until after a conditional job offer is made*.  Once the contractor makes a conditional job offer, the contractor may ask disability-related questions and require medical examinations, regardless of whether they are related to the job, as long as this is done for all entering employees in the same job.  COs must determine whether the contractor improperly made disability-related inquiries or inquiries likely to elicit information about a disability on the job application itself or during the selection process, and whether the contractor administered medical examinations prematurely.  On-site, a CO must

obtain a copy of the application and forms related to the application process.  COs should also ask whether the application process includes medical exams, at what stage the exams are used, and how the exams are used.

Mandatory disability-related inquires and medical examinations of *employees*, such as return to work exams and periodic physicals, are permissible only when, and to the extent that, they are job-related and consistent with business necessity.  The CO may ask the contractor whether, under what circumstances, and how it uses exams to determine whether an employee is fit for duty to return to work.  The contractor may not use information obtained as a result of such a lawful inquiry or exam in a way that discriminates on the basis of disability.  Drug tests for the illegal use of drugs are not medical exams.

b.  *Confidentiality Requirement.*  The contractor must keep any information about disability (other than completed voluntary self-identification forms) or information related to medical exams in a separate, confidential medical file and not with personnel or data analysis files.[120]  However, government officials investigating compliance with EEO laws may have access; the contractor may inform supervisors and managers of necessary restrictions or needed reasonable accommodations, and the contractor may inform first aid and safety personnel of any needs.  COs must make an assessment of acceptability of the contractor's system for maintaining confidentiality of medical information, including inspecting where the records are kept, who has access to the records and why, and measures that ensure confidentiality of the records.

## 2I    VEVRAA AAP AND ADDITIONAL REQUIREMENTS

As discussed in Chapter 1, contractors must prepare, maintain and update on an annual basis, an AAP for protected veterans under VEVRAA.  COs use the on-site review to investigate problem areas they identified during the desk audit, to gather further information regarding the AAPs and their implementation, and to learn more about the contractor's employment activities and personnel practices.  To gather information related to the VEVRAA AAP obligations, COs must interview contractor officials, employees and others, as appropriate.  They must also identify and obtain documentation that evidences the contractor's compliance efforts.  This information is recorded in the SCER Parts B and C.

If the contractor opts to prepare a combined Section 503 and VEVRAA AAP, the CO must ensure that the combined AAP includes all the elements required under each law.  When reviewing a combined AAP, COs should pay particular attention to the differences in the laws to ensure the contractor's combined AAP captures all the required elements.

For example, Section 503 requires an annual analysis of the contractor's utilization of individuals with disabilities and, where the contractor does not meet its goal, it must determine whether and where there are barriers to equal employment and develop action-oriented programs to correct any identified problem areas.  VEVRAA, however, does not require a utilization analysis.  It requires contractors to establish an annual hiring benchmark by which they can measure their progress toward achieving EEO for veterans.  Under VEVRAA, there is not a requirement to identify

---

[120]   Self-identification information must be kept in a separate data analysis file.  41 CFR 60-741.42(e).

problem areas or develop action-oriented programs.  As this example illustrates, even though there is some overlap between Section 503 and VEVRAA AAPs, there are some stark differences that a CO must consider when reviewing Section 503 and VEVRAA AAPs for compliance.

## 2I00    VEVRAA AAP AND ITEMIZED LISTING DATA SUBMISSIONS

During the desk audit, COs examine the VEVRAA AAP and support data to ensure it includes the required content, and determines whether the AAP and support data are acceptable.  During the on-site review, COs interview contractor officials and others regarding the development and implementation of the AAP, and obtain documentation evidencing the same.  COs record any problems identified during the desk audit and any problems identified during the on-site review in the SCER Parts B and C, as appropriate.  COs must examine whether the contractor satisfied the following elements that are required parts of VEVRAA AAP:

a.  *Equal Opportunity Policy Statement.*  COs must verify that the policy statement is clearly posted on bulletin boards, and that the contractor has ensured that the notice is provided in a form that is accessible and understandable to disabled veterans.  COs must examine the policy statement to determine if it is current, noting whether the person responsible for implementing the AAP is named.[121]

b.  *Review of Personnel Processes.*  COs may need to ask several questions to confirm a contractor's review of personnel processes that include, but are not limited to:

- Does the contractor periodically review personnel processes to ensure that the qualifications of protected veterans for jobs, training and promotion are fully considered, and that it relies only on the portion of a protected veteran's military record that is relevant to the requirements of opportunity for which the veteran is being considered?  How often is this done?

- What procedures has the contractor designed to facilitate the periodic review?

- How does the contractor document its review of personnel processes and any actions it takes?  How is that review conducted and by whom?

- Have there been requests from disabled veterans to modify personnel practices as a reasonable accommodation?  How did the contractor respond to the requests?

COs must obtain and review all relevant documentation, including procedures, reports and personnel files.  COs must also must determine whether the contractor's personnel processes provide for the careful, thorough and systematic consideration of the job qualifications of applicants and employees who are known to be protected veterans for job vacancies, either for hire or promotion, and for all training opportunities.

c.  *Review of Physical and Mental Job Qualifications*.  The contractor is obligated to periodically review the physical and mental qualifications of its jobs and to eliminate those qualifications that tend to screen out qualified disabled veterans, and are not job-related and consistent with

---

[121]  See Chapter 1H01.

business necessity.  The VEVRAA AAP must contain a schedule for this periodic review.
While on-site, the CO must request samples of any mental or physical job qualification
standards and interview individuals responsible for their periodic review.

To assess the contractor's review of its physical and mental job qualifications, COs should
consider the following questions:

- When did the contractor write or last update the job descriptions?  Do the job descriptions
  accurately reflect the duties of the job?  Do the job descriptions require the employee or
  applicant to perform duties in a specific way?  If so, and those requirements tend to screen
  out qualified disabled veterans, is there a business necessity for performing the duties in this
  way, or are there alternative ways the duties can be satisfactorily performed?

- Are there job qualifications that would tend to screen out disabled veterans?  For example,
  an unassisted lifting requirement may screen out individuals with disabilities even though
  employees are not required to lift unassisted.  Are those job qualifications based on business
  necessity?  If not, are there alternative qualifications that the contractor can use?

- Are the contractor's job qualifications based on business necessity?  If not, are there
  alternative qualifications that the contractor can use?

- Are there positions that do not have written job descriptions?  If so, how does the contractor
  identify and review job qualifications?

d.  *Provide Needed Reasonable Accommodation to Physical and Mental Limitations*.  Contractors
    must provide needed reasonable accommodation to the known physical and mental limitations
    of qualified disabled veterans unless the accommodation would cause an undue hardship.
    Accommodations may include, but are not limited to:

- Modifying work places and making work places and other contractor facilities used by
  employees accessible;

- Restructuring of nonessential functions of jobs;

- Allowing essential functions to be performed in a different way;

- Assigning nonessential functions of the job to other employees;

- Providing readers, sign language interpreters or assistive devices;

- Providing part-time work, flexible hours, or telework; and

- Reassigning employees to a vacant position.

COs should inquire whether there is a process in place by which individuals can request needed
accommodations and how requests for accommodations are processed.  COs must also
determine whether officials responsible for implementing the accommodation obligation are
appropriately trained to address requests for accommodation.  COs must also review the

contractor's accommodation request records that were not already reviewed at the desk audit to assess whether the contractor responds to requests promptly and appropriately. All accommodations made by the contractor must be effective. Generally, this means the contractor must provide the person who needs the accommodation the ability to perform essential job duties. In the case of an applicant, reasonable accommodation could include, for example, providing an alternate means for applying and being considered for employment other than an online application system. If requests for accommodation were denied, COs must obtain documentation reflecting these decisions and the basis for the decisions to ensure that the denials were proper.

e. *Develop and Implement Procedures to Prevent Harassment*. COs must confirm that the contractor developed and implemented procedures to ensure that employees are not harassed because of their status as a protected veteran. COs request a copy of these procedures, interview the official responsible for implementation, and review reports or internal investigations of alleged harassment based on protected veteran status and the contractor's response.

f. *Disseminate EEO Policy Externally and Perform Outreach and Positive Recruitment*. While on-site, COs must request documentation showing that subcontractors were notified in writing of the contractor's affirmative action policy, requesting appropriate action on the part of the subcontractors. Additionally, COs must verify during the on-site review that the contractor engaged in appropriate outreach and positive recruitment activities, evaluated the effectiveness of each outreach or recruitment activity, and assessed the total effectiveness of all of its efforts combined. While on-site, the CO must request documentation for all the contractor's outreach activities and assessments for the three years prior to the AAP year, as well as any documentation of efforts during and after the AAP year. If the documentation and assessments show that the contractor's efforts were not effective, the CO must determine whether the contractor has implemented alternative efforts to identify qualified protected veterans.[122] COs may also refer contractors to OFCCP's ERRD or other community resource databases that could serve as a recruitment resource.

g. *Disseminate EEO Policy Internally*. The AAP should clearly describe the methods the contractor used to disseminate its EEO policy internally. During the on-site review, COs must verify that the contractor actually implemented the required measures in 41 CFR 60-300.44(g)(2), and investigate whether the contractor additionally disseminated the policy in other ways, such as those suggested in 41 CFR 60-300.44(g)(3). They must also obtain documentation and verify through interviews that the internal dissemination activities identified in the AAP occurred.

h. *Design and Implement an Audit and Reporting System.* COs must confirm that the contractor has an audit and reporting system that, among other requirements, measures the overall effectiveness of its AAP.[123] To do this, the CO must request documentation of the contractor's actions to implement the audit and reporting system, as described in the AAP. COs should obtain documentation of past audit(s), any remedial actions taken and their effectiveness. The COs may conduct interviews with responsible officials and employees.

---

[122] For examples of outreach and recruitment activities, see 41 CFR 60-300.44(f)(2).
[123] 41 CFR 60-300.44(h).

Federal Contract Compliance Manual (FCCM)

i. *Designate an Official to Implement the AAP.*  While on-site, COs may seek an interview with the official named in the AAP to determine their specific responsibilities and the authority assigned to that individual, and how the official assesses the implementation of the AAP.  COs must obtain documentation, such as a copy of the individual's position description, copies of reports the individual has prepared, and supporting documentation for any assessments the official conducted.

j. *Train Personnel to Ensure that the Contractor Implements EEO and AAP Commitments*.  COs must interview contractor staff, managers and officials to confirm that the contractor's personnel involved in the recruitment, screening, selection, promotion, discipline and related processes have been trained to ensure that the commitments in the AAP are implemented.  Questions relevant to this determination include:

- Does the contractor provide training to personnel?  What type of training does the contractor provide?  When, how frequently and by whom is this training provided?

- What are the trainer's qualifications?

- Did the trainer use training materials?  What were they?

If the trainer used written training materials, the CO must request a copy.

k. *Analyze Data Collected on Applicants and Hires Who Identified as Protected Veterans*.  If, during the desk audit or on-site review, COs identify problems related to the contractor's VEVRAA affirmative action obligations, COs must request the total number of applicants and hires for all jobs, total number of applicants and hires who are known protected veterans, total number of job openings and total number of jobs filled, going back three years from the beginning of the contractor's current AAP year.[124]  For a contractor that is six months or more into the current AAP year, COs may also request the contractor's records from  the beginning of the current AAP year so that the CO can calculate the totals of applicants, hires, job openings and jobs filled.  In some instances, the contractor may have already computed the totals.  These requests must also be made to verify accuracy if COs detect data integrity problems at the desk audit or during the on-site review.

COs may use these data to inform their determinations on the effectiveness of the contractor's outreach and positive recruitment activities, and whether the contractor's personnel processes allow for the careful, systematic and thorough consideration of the job qualifications of qualified protected veterans.  Some relevant questions might include:

- How does the contractor use the totals of applicants, hires, job openings and jobs filled as a criterion when determining the effectiveness of its outreach efforts?

- If the totality of its outreach efforts were not effective in identifying and recruiting protected veterans, what alternative efforts did the contractor implement (see examples at 41 CFR 60-300.44(f)(2))?

---

[124]  41 CFR 60-300.44(k).

- Does the data indicate any potential problem with the personnel processes utilized by the contractor when considering job qualifications of applicants and employees who are known protected veterans for job vacancies filled either by hiring or promotion?

*l.* *Verifying the VEVRAA Hiring Benchmark.* The VEVRAA regulations require contractors to establish a hiring benchmark every year to use for measuring their progress toward achieving EEO for protected veterans. Contractors must use one of two methods to establish their benchmarks. Contractors may choose to establish a benchmark equal to the national percentage of veterans in the civilian labor force, which is published and annually updated on OFCCP's website. Alternatively, contractors may establish their own benchmarks by taking into account certain data from the BLS and VETS/ETA that is also published on the OFCCP website, as well as other factors that reflect the contractor's own data and unique hiring circumstances.[125]

During the on-site review, COs must request the data and methodology used by the contractor to set its benchmark during the on-site review if the contractor sets its own hiring benchmark instead of using the benchmark provided by OFCCP. COs will use the underlying data to verify the contractor's hiring benchmark, if this verification was not completed during the desk audit.

## 2I01   AVAILABILITY OF AAP FOR INSPECTION

COs must confirm that the contractor posted a notice, available to both employees and applicants for employment, stating that the VEVRAA AAP is available to any employee or applicant for employment to inspect, upon request. When the contractor conducts personnel-related business through the Internet, such as recruiting and disseminating employment notices, COs should strongly encourage the contractor to post the AAP notice electronically. The notice must include the location and hours during which the AAP may be obtained. An example of possible acceptable language is, "The AAP is available in the personnel office during regular business hours." Confidential information or information that would allow for the identification of protected veterans must not be made available for inspection as part of the VEVRAA AAP.[126]

## 2I02   INVITATION TO SELF-IDENTIFY AS A PROTECTED VETERAN

Contractors must offer each applicant the opportunity to self-identify as a protected veteran under VEVRAA at both the pre-offer and post-offer phases of the hiring process.[127] This data on applicants will be used by contractors to perform other components in their AAPs, such as the annual assessment of the effectiveness of outreach and positive recruitment efforts. The information is also used by the contractor to complete the annual VETS-4212 form. Contractors are required to keep all information on self-identification confidential.[128]

COs must confirm that the invitation for applicants to self-identify as protected veterans under VEVRAA is voluntary. The contractor must not use an applicant's refusal to self-identify to subject the applicant to any adverse treatment.

---

[125]   41 CFR 60-300.45.
[126]   41 CFR 60-300.41.
[127]   See 41 CFR 300.42 (a-b).
[128]   See 41 CFR 300.42 (e).

Federal Contract Compliance Manual (FCCM)

Unlike Section 503, contractors do not have a requirement to invite employees to self-identify under VEVRAA. Also, the VEVRAA regulations do not mandate that contractors use a prescribed form for self-identification purposes. Even though there is not a mandated form, invitations to identify as a protected veteran must contain the following components:

- A statement that the company is a federal contractor required to take affirmative action to employ and advance in employment protected veterans pursuant to VEVRAA;

- A summary of the relevant portions of VEVRAA and the contractor's AAP;

- A statement that the information is being requested on a voluntary basis;

- A statement that the information will be kept confidential;

- A statement that refusal to provide the information will not subject the applicant to adverse treatment; and

- A statement that the information will not be used in a manner inconsistent with VEVRAA.

An acceptable form for the invitation to self-identify is provided in the regulations and contractors may opt to use it.[129]

During an on-site review, COs must request a copy of the invitation used by contractors if it was not provided in the AAP, as well as request a sample of completed self-identification invitations. COs also must review any communication that contractors use to invite self-identification. In examining these documents, COs must determine whether the contractor's invitation to self-identify is completely voluntary, and whether the contractor is following the required process to invite applicants to self-identify at the pre-offer and post-offer phases of the hiring process.

Depending on the scope of the on-site review, COs may examine the application or personnel file, or both, of each individual in the sample of completed self-identification invitations. For disabled veterans, this examination would include ensuring that the self-identification information is kept separately from personnel and medical files. COs may also review employment data indicating whether the contractor hired these individuals and, if not, the reason for nonselection. COs will also examine whether the individual requested a reasonable accommodation for application or employment as a disabled veteran and, if so, review the appropriate accommodation records to determine whether the contractor handled the accommodation request appropriately. If the contractor denied an accommodation request, COs must determine whether the denial was proper and whether, if needed, the contractor provided a suitable alternative accommodation without undue delay. If any concerns are identified, COs will also interview the affected applicants, employees and others, as appropriate.

VEVRAA has the same restrictions on disability-related inquiries and medical examinations as Section 503 explained earlier in FCCM Chapter 2H03.

---

[129] See Appendix B to Part 60-300 – Sample Invitation to Self-Identify.

## 2J    RELIGION AND NATIONAL ORIGIN REQUIREMENTS

COs must include assessment of the contractor's compliance with the *Guidelines on Discrimination Because of Religion or National Origin* as a part of the on-site review.[130]  Although the Executive Order AAP does not require that the contractor include a reference to these guidelines, the contractor must still comply with them.  COs must examine the contractor's policy statement to ensure that it references the contractor's obligation to provide EEO without regard to religion and national origin.  COs must also interview contractor officials and employees regarding implementation of the policy, including the provision of accommodation for religious observances and practices.  COs include this information obtained during the on-site review in the SCER in Part C.

### 2J00    CONTRACTOR POLICY AND IMPLEMENTATION

A contractor must review its employment practices to determine whether individuals receive fair consideration for job opportunities without regard to religion or national origin.  COs must ask the contractor whether it conducted a review of its employment practices for this purpose and, if so, when, how and whether it documented the review.  If the contractor undertook a review, the CO must verify the results and the sufficiency of any corrective actions that the contractor implemented.  In making this assessment, the CO will keep in mind that the scope of the contractor's efforts depends on a review of all circumstances, including the nature and extent of any problem areas, as well as the size and resources of the contractor.  COs must take into consideration that contractors are not required to collect data on applicants' and employees' religious affiliation or national origin.  Therefore, a contractor's self-analysis will not use employment records to identify employees' religious affiliations or national origins.  If the contractor did not conduct a review, the contractor must take corrective action.

COs must verify that the contractor communicated the nondiscrimination policy to contractor officials, human resources personnel, employees and applicants, and that procedures implementing the policy are in place.  A CO will also verify that the contractor has participated in recruitment and outreach efforts.  A CO will review employment policies regarding nondiscrimination based on religion and national origin, and the provision of religious accommodations.  During interviews with contractor officials, employees and applicants, a CO will ask about requests for religious accommodations and how the contractor responded to these requests.  COs must obtain documentation regarding recruitment and outreach, and other affirmative action efforts.

### 2J01    RELIGIOUS ACCOMMODATION

The contractor must accommodate the religious observances and practices of its employees and prospective employees unless it can demonstrate that it cannot reasonably accommodate a religious observance or practice without undue hardship on its business.[131]  In determining the extent of the contractor's obligation to provide reasonable accommodations on religious grounds, COs must consider:

- Business necessity;

---

[130]  41 CFR Part 60-50.
[131]  See 41 CFR 60-50.3.

- Financial costs and expenses; and

- Resulting personnel problems.

The agency follows Title VII legal principles on religious accommodations.[132]  COs should note that Title VII standards for religious accommodation are not the same as Section 503 standards for reasonable accommodation.  COs must ask the contractor whether and how it has made accommodation to the religious observances and practices of its employees and prospective employees.[133]  COs must also ask whether the contractor denied any religious accommodation requests.  If so, the CO will seek documentation and verification of the reasons for denial and ensure that they were proper.  In reviewing employee files, COs must be alert for any pattern of discipline or terminations based on refusal to work on certain days based on religious observances.  If the contractor reports that no requests were made, COs must review procedures available for evaluating such requests.

## 2J02   POTENTIAL HARASSMENT AND DISCRIMINATION

While conducting interviews and review of records, COs may obtain information regarding potential harassment or discrimination based on religion or national origin, or both.  Like harassment based on race, sex, sexual orientation, gender identity, disability, or veteran status, harassment based on religion or national origin may take a number of forms.  Examples include name calling, negative treatment, or derogatory speech directed at individuals of a specific religion or national origin.  If a CO obtains information about potential harassment or discrimination, the CO must investigate further to determine whether the:

- Discrimination occurred in the past or is ongoing;

- Contractor knew or should have known of the discrimination;

- Contractor has internal discrimination and harassment complaint procedures in place;

- Contractor's internal discrimination and harassment complaint procedures are known to the employees; and

- Contractor has done anything to address the problem.

Additional information regarding harassment and hostile environment on the bases of race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status is discussed in Chapter 6, Complaint Investigation.

Additionally, if the CO finds indicators of disparate treatment or disparate impact,[134] or both, the CO must fully investigate the issue.  The CO must obtain copies of any documents reflecting these concerns or indicating how the contractor dealt with the concern.  The CO must also interview people knowledgeable about the matter.  If the investigation identifies issues specific to

---

[132]   See Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(j).
[133]   See 41 CFR 60-50.3 and *http://www.eeoc.gov/laws/types/religion.cfm* (last accessed September 2019).
[134]   Definitions for these terms are included in the Key Words and Phrases section of the Manual.

religious or national origin discrimination that the *Guidelines on Discrimination Because of Religion or National Origin* do not address, the CO must follow Title VII principles in determining whether a violation may have occurred.

## 2J03   COMMUNITY CONTACTS

As part of the on-site review, COs may identify organizations representing the interests of various nationalities and religious groups located in the labor area serving the contractor's facility.  COs may find it useful to contact such groups for information about possible employment problems experienced by their members who have applied for employment with the contractor.

# 2K     COMPLIANCE WITH SEX DISCRIMINATION REGULATIONS

It is unlawful for a contractor to discriminate against any employee or applicant for employment because of sex.[135]  The term sex includes, but is not limited to, pregnancy, childbirth, or related medical conditions; gender identity;[136] transgender status; and sex stereotyping.[137]  In general, the contractor may not make any distinction based on sex in recruitment, hiring, firing, promotion, compensation, hours, job assignments, training, benefits or other terms, conditions or privileges of employment.[138]

Discrimination on the basis of sex may occur, for example, when the contractor makes a distinction between married and unmarried persons that is not applied equally to men and women, or denies women with children an employment opportunity that is available to men with children.  Other examples[139] of unlawful disparate treatment include:

- Steering women into lower-paying or less desirable jobs on the basis of sex;

- Maintaining seniority lines on the basis of sex; or

- Distinguishing on the basis of sex in apprenticeship or other formal or informal training programs.

Employment policies or practices that have an adverse impact on the basis of sex, and are not job-related and consistent with business necessity, also violate Executive Order 11246.  Some policies or practices that exemplify such unlawful disparate impact on the basis of sex include:[140]

- Relying on recruitment or promotion methods, such as "word-of-mouth" recruitment or "tap-on-the-shoulder" promotion, that have an adverse impact on women where the contractor cannot establish that they are job-related and consistent with business necessity; or

---

[135]  See 41 CFR Part 60-20.
[136]  Gender identity is also covered as an independent protected category by EO 11246.
[137]  41 CFR 60-20.2(a).
[138]  41 CFR 60-20.2(b).  The exception is where sex is a bona fide occupational qualification reasonably necessary to the normal operation of a contractor's particular business or enterprise.  See Section 2K01.
[139]  For a longer list of examples of unlawful sex-based disparate treatment, see 41 CFR 60-20.2(b).
[140]  41 CFR 60-20.2(c).

- Height and/or weight restrictions that are not necessary to the performance of the job and that negatively impact women substantially more than men.

## 2K00  DISCRIMINATION ON THE BASIS OF PREGNANCY

COs are also reminded that discrimination on the basis of pregnancy, childbirth, or related medical condition, including childbearing capacity, is a form of unlawful sex discrimination.[141]  A few examples of unlawful pregnancy discrimination are:

- Refusing to hire pregnant women or women of childbearing capacity, or subjecting these women to adverse employment treatment because of their pregnancy or their capacity to bear children;

- Firing female employees or requiring them to go on leave because they become pregnant or have a child;

- Limiting pregnant women's job duties based solely on the fact that they are pregnant, or requiring a doctor's note in order for a pregnant woman to continue working;

- Providing employees with health insurance that does not cover hospitalization and other medical costs for pregnancy, childbirth, and related medical conditions to the same extent that hospitalization and other medical costs are covered for other medical conditions; and

- Denying alternative job assignments, modified duties, or other accommodations to an employee who is temporarily unable to perform some of her job duties because of pregnancy, childbirth, or related medical conditions when:

  o Such assignments, modifications, or other accommodations are provided to other employees whose abilities or inabilities to perform some of their job duties are similarly affected;

  o The denial of the accommodations imposes a significant burden on employees affected by pregnancy, childbirth or related medical conditions; and

  o The contractor's asserted reason for denying accommodations to the worker does not justify that burden.

## 2K01  REVIEW OF CONTRACTOR POLICIES AND IMPLEMENTATION

When conducting an on-site review, COs must request copies of the contractor's policies covered by 41 CFR Part 60-20 and examine whether the contractor implemented its employment activities and decisions in a manner consistent with Part 60-20.  COs must interview contractor officials and employees regarding the implementation of the contractor's policies, and investigate for any evidence of sexual harassment or other types of discrimination based on sex.  The CO must include information obtained during the on-site review in the SCER in Part C.

---

[141]  41 CFR 60-20.5.

The discussion below addresses six of the areas for which COs must review the contractor's policies: conditions of employment, distinctions based on sex stereotypes (*e.g.,* caregiving responsibilities), bona fide occupational qualifications (BFOQs), employment exclusions, compensation discrimination and employment advertising.

a. *Conditions of Employment*.  COs must examine whether contractor policies make prohibited distinctions in conditions of employment based on sex, including on the basis of pregnancy, childbirth or related medical conditions, or on the basis of sex-based stereotypes.  Examples of such unlawful disparate treatment include steering women into less desirable jobs on the basis of sex and maintaining seniority lists on the basis of sex.  Contractors also must not make employment decisions based on stereotypes about how males and females are "supposed" to look, speak or act.  Such employment decisions are a form of sex discrimination prohibited by Executive Order 11246, as amended.  For example, a contractor must not deny opportunities to women with children based on the sex-stereotyped belief that women with children should not or will not work long hours.  In addition, COs must examine whether the contractor's facially neutral policies and practices have an adverse impact on the basis of sex and, if they do, whether they are job-related and consistent with business necessity.  For example, it is unlawful sex discrimination to impose height or weight qualifications that are not necessary to the performance of the job and that negatively impact women substantially more than men.

COs must also examine written policies and conduct interviews with contractor staff and employees regarding the implementation of policies and practices to identify whether distinctions between married and unmarried people apply equally to both sexes, including distinctions between single parents and married parents based on sex.  Even if the policies are facially neutral, COs must examine whether such policies have an adverse impact on the basis of sex and, if they do, whether those policies are job-related and consistent with business necessity.

b. *Distinctions Based on Sex-Based Stereotyping*.[142]  As noted above, differential treatment for an employment-related purpose based on sex-based stereotypes is a violation of Executive Order 11246.  COs must assess contractor policies and practices to ensure that sex-based stereotypes are not written into the policies.  For example, it is prohibited to deny fathers access to family-friendly policies like workplace flexibility that employers provide to mothers, based on stereotypes about fathers' roles in caregiving.  Similarly, it is prohibited to deny opportunities to mothers based on the sex-stereotyped belief that women with children should not or will not work long hours.

c. *BFOQs*.  Contractors may not hire or employ individuals on the basis of sex unless sex is a BFOQ reasonably necessary to the normal operation of the contractor's particular business or enterprise.[143]  As a part of most on-site reviews, COs examine job qualifications as stated by the contractor.  Under Title VII, sex has been found to be a BFOQ in extremely rare instances.  Among them are:

- *Authenticity.*  Jobs involving a need for authenticity or genuineness, such as actors or models.

---

[142]  41 CFR 60-20.7.
[143]  41 CFR 60-20.3.

Federal Contract Compliance Manual (FCCM)

- *Personal Privacy.*  Jobs where the performance of essential job elements would entail substantial invasion of personal privacy (*e.g.,* a permanent restroom attendant).  This is limited to situations where the normal operation of the contractor's business depends on the employee being the same sex as its employees or customers and there is no other way to ensure privacy.  This is different from customer preference.  For example, a contractor cannot refuse to hire female salespeople in the belief that male customers will not accept them.

d.  *Employment Exclusions.*

- *Hazardous Jobs.*  Contractors may not exclude women from jobs they may believe are dangerous or unsuitable for women to perform unless sex is a BFOQ.

- *Reproductive Hazards.*  OFCCP follows Title VII principles when determining whether a policy excluding women from a job because of a concern about reproductive hazards is discriminatory.  If a question relating to reproductive hazards arises during a compliance evaluation, COs must discuss the issue with their supervisors.

e.  *Compensation Discrimination.*  COs must examine possible compensation discrimination issues.  Compensation discrimination encompasses discrimination regarding salary, wages, overtime pay, shift differentials, bonuses, commissions, vacation and holiday pay, allowances, insurance and other benefits, stock options and awards, profit sharing, and retirement. Contractors may not make distinctions in compensation or access to earnings opportunities or better paying job opportunities based on sex.  Contractors also may not implement compensation practices that have an adverse impact on the basis of sex and are not shown to be job-related and consistent with business necessity.  Whether because of the desk audit analysis of compensation data or a focused review of compensation practices, if COs identify areas for investigation, they must gather additional information and conduct interviews regarding the contractor's compensation policies and practices.  Section 2E03 has additional information on compensation.

f.  *Employment Advertising.*  COs must examine the contractor's advertisements in newspapers, online and in other media.  The advertisements must not recruit or advertise for individuals for certain jobs on the basis of sex.  Use of sex-specific terms for jobs (such as "linemen") is suspect but is not automatically a violation of Executive Order 11246.  Where sex-specific language is used in conjunction with prominent language that clearly indicates the contractor's intent to invite applications without regard to applicants' sex, COs should not find a violation.

## 2K02  LEAVE AND FRINGE BENEFITS

During the on-site review, COs gather information and conduct interviews to determine whether the contractor discriminates on the basis of sex in the provision of leave and fringe benefits in violation of OFCCP's regulations at 41 CFR Part 60-20.  COs should also be familiar with the FMLA, discussed below, as well as understand how the application of policies or the absence of policies may result in discrimination and harassment.

a.  *FMLA.*  The FMLA was enacted in 1993.[144] In part, the purpose of FMLA is to address the needs of families and caregivers as affected by the demands of the workplace, specifically addressing leave issues.  OFCCP and the Department's WHD, which enforces FMLA, entered into an MOU.[145]  Under this MOU, OFCCP incorporates an FMLA inspection into its compliance evaluation and complaint investigation procedures, as discussed below.

b.  *Family Leave and Pregnancy and Disability Leave.*  The CO will examine the contractor's policy regarding leave in light of the prohibition of discrimination based on sex, including pregnancy and FMLA.

   - *Family Leave Required under the FMLA.*  During the course of a routine compliance evaluation or complaint investigation, the CO will determine whether the FMLA notice is posted and whether written guidance about the provisions of FMLA is provided in accordance with 29 CFR 825.300.  Incidents of suspected noncompliance with these provisions are referred to WHD.  In addition, the CO may examine the application or use of these policies by the contractor for any adverse treatment of, or adverse impact on, any specific group protected by OFCCP's legal authorities.  This is distinct from enforcing violations of family leave requirements.

      The FMLA requires employers of 50 or more employees to provide up to 12 weeks of unpaid, job-protected leave for qualified workers for a worker's pregnancy or own serious health condition, or when a worker becomes a new parent.  Covered employers are also required to provide FMLA leave to employees caring for a covered family member with a serious health condition (*e.g.,* a mother caring for a child with cancer).  Additionally, various states have their own family and medical leave laws that may provide additional leave or additional coverage.

   - *Pregnancy Disability Leave.*  The CO must examine whether the contractor has a sick leave or disability leave policy (written or unwritten), and leave for conditions associated with childbirth.[146]  The CO must also examine whether the contractor's leave policy, or lack thereof, has an adverse impact on employees of one sex and is not justified by business necessity.  These requirements apply regardless of whether the contractor is a covered contractor under the FMLA or whether the employee qualifies for FMLA leave.

c.  *Fringe Benefits.*  OFCCP's regulations state that it is unlawful for a contractor to discriminate on the basis of sex with regard to fringe benefits.  The term "fringe benefits" is defined in 41 CFR 60-20.6 as including medical, hospital, accident, life insurance and retirement benefits; profit-sharing and bonus plans; leave; and other terms, conditions and privileges of employment.  The greater cost of providing a fringe benefit to members of one sex is not a defense to a contractor's failure to provide benefits equally to members of both sexes.  COs must, therefore, obtain information to determine whether a contractor is providing equal employee benefits for men and women, regardless of cost.

---

[144]  Family and Medical Leave Act, Pub. L. 103-3 (29 U.S.C. chapter 28).
[145]  The MOU between OFCCP and WHD was signed in September 1993.
[146]  "Leave" as used here includes but is not limited to eligibility for leave, duration of leave, accrual of seniority and reinstatement rights.

## 2K03  SEXUAL HARASSMENT

Sexual harassment, as well as harassment based on race, color, religion, sexual orientation, gender identity or national origin, is a violation of the nondiscrimination provisions of Executive Order 11246.  During the on-site review, COs must be alert for any indications of sexual harassment.[147]  OFCCP follows Title VII principles when determining whether sexual harassment has occurred.  Unwelcome sexual advances, requests for sexual favors, offensive remarks about a person's sex, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

- Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.[148]

# 2L    EQUAL OPPORTUNITY CLAUSES AND OTHER REQUIREMENTS

Contractors have an obligation to meet certain requirements in the equal opportunity contract clauses pertinent to each OFCCP-enforced law, such as notices and postings requirements.  Some of these requirements are extremely important and crucial to ensuring that contractors meet EEO obligations and that failure to meet these obligations does not result in discrimination.  Additionally, the contractor may have posting and other requirements under Executive Order 13496.

While COs may have adequately confirmed some of these requirements during the desk audit, they verify all the requirements during the on-site review.  COs can provide compliance assistance to the contractor at any time during the review process in order to expedite resolution of identified problems.  However, the contractor's failure to comply with an equal opportunity clause or other regulatory requirement constitutes a violation.

If the contractor asserts that it has fully corrected all identified problems, COs must seek to confirm this assertion.  For example, if a required posting under Executive Order 11246 or Executive Order 13496 was missing and the contractor agreed to correct this problem, the CO must conduct a visual inspection to determine that the required posting is now present.  The CO must include any other outstanding technical violations in the NOV.[149]

---

[147]  See 41 CFR 60-20.8.
[148]  41 CFR 60-20.8(a).  Harassment based on sex also includes harassment based on pregnancy, childbirth or related medical conditions; and harassment that is not sexual in nature but that is because of sex or sex-based stereotypes. 41 CFR 60-20.8(b).
[149]  See Chapter 8 – Resolution of Noncompliance.

## 2L00   EQUAL OPPORTUNITY CLAUSES AND OTHER REQUIREMENTS OF EXECUTIVE ORDER 11246, VEVRAA AND SECTION 503

In addition to requiring that covered contractors not discriminate against, and take affirmative action on behalf of, covered group members, the laws enforced by OFCCP contain a number of other requirements that COs must verify the contractor has met.  COs must inspect the appropriate contractor records and obtain copies of them, as needed.  COs must record their observations and whether the requirements were met in the SCER in Part C.

*a.   Requirements Applicable to Executive Order 11246, Section 503 and VEVRAA.*

- Contractors must advise subcontractors, including vendors who are subcontractors, of their obligation to comply with nondiscrimination obligations and develop an AAP if they meet coverage thresholds by including the equal opportunity clause in all covered contracts and subcontracts (including purchase orders).  The clause may be included by reference under Executive Order 11246.  Under Section 503 and VEVRAA, the clause shall be made a part of the contract by citation to 41 CFR 60-741.5(a) and 41 CFR 60-300.5(a), respectively, and inclusion of specific language, in bold text, after the citations.[150]  Contractors may combine all of their required equal opportunity clauses into a single "incorporation by reference" clause, provided that the entire combined clause is set in bold text and the prescribed content of the veteran and disability equal opportunity "incorporation by reference" clauses is preserved.  The following example provides one illustration of how this might be done for a supply and service contractor:

  o **This contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a).  These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, national origin, and for inquiring about, discussing or disclosing compensation.  Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

  In the absence of the clause in covered documents, it is applicable by operation of law.  COs must question contractor officials as to how and when such notification occurs, and must review a sampling of subcontracts to determine whether they include the required clause.

- Contractors must post notice of their EEO and affirmative action obligations in conspicuous places, available and accessible to both employees and applicants for employment whether by physical or electronic posting.  "EEO is the Law" posters (and required supplements) should be in break rooms, common areas for employees and areas frequented by applicants for employment.  COs must conduct a visual inspection to confirm the required posting.  Until the "EEO is the Law Poster" is updated to reflect all of OFCCP's protected bases, COs must

---

[150]  See 41 CFR 60-300.5(d) and 41 CFR 741.5(d) for the specific required language under the implementing regulations for VEVRAA and Section 503.

inspect the contractor's premises to ensure the "EEO is the Law" poster supplement is also displayed.  The most current versions of the "EEO is the Law" poster and supplement are available at http://www.dol.gov/ofccp/regs/compliance/posters/ofccpost.htm (last checked September 9, 2019).

- Contractors must inform any labor unions or worker representative organizations with which they have a collective bargaining agreement or other agreement of the contractor's EEO and affirmative action commitments under the regulations.  COs must obtain documentation that indicates the contractor provided this notice and will confirm receipt of notice with union representatives.

- Advertisements and solicitations for employment must state that the contractor will consider all qualified applicants, regardless of the protected bases.  For contractors only covered by Executive Order 11246, it is acceptable to use the phrase "Equal Opportunity Employer" or list out all the bases.  However, for those covered by Section 503 or VEVRAA, the tagline should at a minimum state "disability" and "vet."  For example, a contractor could satisfy all three laws by stating in job solicitations that "all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran."  It could also use the abbreviation "Equal Opportunity Employer – vets, disability" on its job advertisement taglines.  COs will review a sample of such advertisements and solicitations during the on-site review.

- Contractors must develop and maintain an AAP for each establishment, making them available for inspection as required by the regulations.  COs must confirm that the contractor is meeting this obligation.

b.  *Requirements Applicable Only to Executive Order 11246.*

- Contractors must notify subcontractors, including vendors who are subcontractors, of their obligation to file an EEO-1 Report annually.  COs must confirm that the contractor met this obligation.

- Contractors must disseminate the Pay Transparency Nondiscrimination Provision to employees and applicants for employment.  COs must review the contractor's employee manual or handbook to determine whether the Pay Transparency Nondiscrimination Provision is included.[151]  COs must also determine whether the contractor has disseminated the provision either by electronic posting or by posting hard copies of the provision in conspicuous places available to employees and applicants.[152]  This provision provides applicants and employees notice that the employer will not discriminate against them for inquiring about, discussing or disclosing their pay or, in certain circumstances, the pay of their co-workers.  Because OFCCP believes that uniform use of the nondiscrimination provision is necessary to ensure consistency and clarity in the information provided to applicants and employees, contractors must, at a minimum, use the language provided in the

---

[151]   See 41 CFR 60-1.35(c)(1).
[152]   See 41 CFR 60-1.35(c)(2).

provision at https://www.dol.gov/ofccp/PayTransparencyNondiscrimination.html to satisfy both dissemination requirements. Nothing limits a contractor from providing additional information to their employees about their rights and obligations.

c.  *Requirements Applicable Only to VEVRAA.*

- *VETS-4212 Report.* The contractor is required to submit a VETS-4212 Report to the DOL's VETS annually. The report includes the numbers of protected veterans in the contractor's workforce by job category and hiring location. Contractors must also collect data indicating the total number of employees and covered veterans hired during the reporting period. COs must confirm that the contractor has filed the VETS-4212 Report for the evaluation period.[153] If the contractor did not file the VETS 4212 Report, COs will indicate in the CMS that it wasn't filed. Though OFCCP does not cite contractors for failure to file a VETS-4212 Report, OFCCP reports nonfilers to VETS.

- *Mandatory Job Listing.* When a company becomes a federal contractor subject to VEVRAA, it must advise the ESDS in each state where the company has establishments that the company is a federal contractor and that it desires priority referrals of protected veterans for job openings within the state.[154] Contractors must also include the contact information for the job listings that they send to the ESDS.[155] The contractor must also immediately list all employment openings which exist at the time of the execution of the federal contract with the appropriate ESDS where the opening exists, and provide the name and location of each hiring location and the contact information for the contractor official responsible for hiring at each location.[156] In providing the listing of employment openings, contractors must provide the listing information in a manner and format permitted by the delivery system, so that it can access and use the information to make the job listings available to job seekers. The form and format used by employment service delivery systems can vary from state to state. However, using the appropriate form and format helps increase the likelihood that the job listing will actually be posted by the ESDS. Doing so also allows the services to provide priority referral of veterans protected by VEVRAA. CO must remember that job "listing" is the act of delivering information about job openings to the state workforce agency or local ESDS. Job "posting" is the act of a state workforce agency or ESDS making the job listing visible or public for jobseekers to access and use.

  In addition to that initial notification, contractors must list employment openings with the appropriate ESDS when openings occur throughout the performance of the contract. This can be accomplished by listing openings directly with the state workforce agency job bank or with the local ESDS where the opening occurs. Also, some contractors may provide their listing information to a privately-run job service or exchange which, in turn, provides the

---

[153]  COs and others, as appropriate, may access the VETS-4212 database to verify whether the contractor submitted the report, as well as request copies of the submitted forms from the contractor.

[154]  The term "employment service delivery system" is defined at 41 CFR 60-300.2(j). In general, the term refers to local American Job Centers (one-stop centers) and state workforce agencies.

[155]  See 41 CFR 60-300.5(a)4.

[156]  Immediately listing of employment openings with the appropriate ESDS means listing the job *at least* concurrently with the use of any other recruitment sources or effort. See 41 CFR 60-300.5(a)3.

listing information to the appropriate ESDS.  These private arrangements also satisfy the contractor's listing requirement as long as the privately-run service provides the information to the delivery system in a manner and format that allows the delivery system to provide priority referral of protected veterans.  These privately-run services can typically provide COs with reports of job listings on behalf of their client contractors.  These reports can go by different names, depending on which the privately-run service provider was used by the contractor.[157]  Nonetheless, ensuring that the required job listing documentation is maintained is ultimately the responsibility of each contractor.

Contractors must list all employment openings except for executive and senior management positions, positions that will be filled internally, and jobs lasting three days or less.  If possible, COs will contact the ESDS used by the contractor in advance of the on-site review and request confirmation that the contractor has listed its employment openings with that office.  COs must obtain from the delivery system a listing of the job orders the contractor placed, by job title and date.  COs must then compare this list with the list of jobs the contractor has filled through new hires, identify any jobs not listed with the employment office and determine whether they should have been listed.[158]

## 2L01   EXECUTIVE ORDER 13496 REQUIREMENTS

Pursuant to Executive Order 13496 and its implementing regulations, 29 CFR Part 471, federal contractors and subcontractors must notify employees about their rights under the NLRA.  Contractors with covered contracts must meet their obligations under Executive Order 13496.[159]

Executive Order 13496 requires that covered contractors post notices specifying employee rights under the NLRA.  The NLRA guarantees employees the right to organize and bargain collectively with their employer, and to be free from retaliation for so doing.  Contractors must post the notice conspicuously in and around their establishments, work sites, and offices so that it is prominent and employees who are covered by the NLRA and directly or indirectly (*e.g.,* maintenance, repair, personnel, payroll work) engaged in contract-related activity can readily see it.  COs must inspect employee bulletin boards and areas frequented by applicants and employees, such as break rooms, personnel offices and common areas, for the required poster.  If the contractor customarily posts employee notices regarding the terms and conditions of employment electronically, then the contractor must also post the Executive Order 13496 notice electronically.  COs must verify the contractor's compliance.

---

[157]  Two common job listing reports COs may encounter are the "VetCentral Job Order Ad Hoc Compliance Report" and the "NLx Return Receipt Report."  There are, however, other types of reports.  OFCCP does not make endorsements or recommendations concerning privately-run job service providers.

[158]  The ETA and OFCCP jointly issued the Training and Employment Notice (TEN) directing State Workforce Administrators, State and Local Workforce Agencies and State Workforce Liaisons that they must provide the listings to OFCCP at no cost.  (TEN 15-14).  A copy of TEN 15-14 is available at *http://wdr.doleta.gov/directives/corr_doc.cfm?DOCN=3490*.  A Sample letter the CO can use to request the listings is included as Letter L-3.

[159]  See OFCCP Directive 2010-01, "Verification Procedures under E.O. 13496, Notification of Employee Rights under Federal Labor Laws, and the Department of Labor's Implementing Regulations at 29 C.F.R.  Part 471."

Federal Contract Compliance Manual (FCCM)

Executive Order 13496 also requires that covered contractors ensure that each subcontract and purchase order related to their federal contract(s) contains a notice of this posting obligation. COs must review a sampling of subcontracts and purchase orders to ensure that a covered contractor complies with this requirement.

There are exceptions to the posting requirements so COs must consult with the RSOL, their supervisors or the national office if there are questions about coverage under Executive Order 13496.[160] If a violation of Executive Order 13496 is not corrected, the Director of OFCCP, or a designee, refers the matter to the Director of Office of Labor-Management Standards (OLMS), who may take enforcement action under 29 CFR 471.13, as appropriate.

## 2L02   RECORDKEEPING

COs must verify that the contractor has complied with all regulatory requirements regarding personnel records.[161] If the contractor's recordkeeping is not in conformance with 41 CFR 60-1.12, 41 CFR Part 60-3, 41 CFR 60-300.80, or 41 CFR 60-741.80, the CO must record the recordkeeping violations in the SCER in Part C. Failure to preserve complete and accurate records as required by these regulations constitutes noncompliance with the contractor's obligations. If the contractor has destroyed or failed to preserve records, the CO may presume that the information would have been unfavorable to the contractor. Additionally, if a contractor's case file has multiple citations for recordkeeping violations and there is evidence of a recurrence, the CO will treat it as a repeat violation.[162]

# 2M    EMPLOYMENT ACTIVITY DATA REQUIREMENTS

The CO's objective as a neutral fact finder is to gather data and information during the investigation to determine whether there are violations of the laws OFCCP enforces and, if so, what caused them. Once gathered, the CO must analyze the information. The CO will do this using any or all of a variety of methods, as appropriate. While the CO may choose to perform some analysis during the on-site review, much of the analysis will likely be performed off-site.

If the employment activity analyses conducted by the CO during the desk audit[163] indicate potential discrimination, there is a need for further analyses and investigation. Based upon any additional data obtained during the desk audit or the on-site review, the CO may refine the employment activity analyses. If the analyses indicate evidence of disparate treatment or adverse impact, or both, resulting from the employment process, personnel activity or application of selection criteria, the CO must determine whether the problem constitutes unlawful discrimination. The CO does this by examining all of the relevant information gathered during the compliance evaluation (*e.g.,* employment data, the CO's observations, anecdotal evidence obtained during interviews) and

---

[160]    See Executive Order 13496 Frequently Asked Questions, *http://www.dol.gov/ofccp/regs/compliance/EO13496_faqs.htm* (last accessed Sept. 10, 2019).
[161]    See Chapter 1C02 – Regulatory Citations for Recordkeeping.
[162]    FCCM Chapter 8 – Resolution of Noncompliance.
[163]    FCCM 1O – Analysis of EO 11246 AAP.

applying the appropriate discrimination proof model to the facts of the case. The CO will record on-site investigative findings related to potential discrimination in Part C of the SCER.

## 2M00   ANALYZING THE SELECTION PROCESS

a. *Identifying and Mapping the Employment Process*. The CO must determine how the contractor's selection process for the job or opportunity under examination works, including identifying all of the steps and decision points involved. The employment process usually consists of decisions and actions an employee or applicant must take such as applying for the job, as well as qualification points such as passing a test or interview in order to move to the next stage of the process. Once the CO identifies the employer's process, he or she may find it helpful to "map" or create a diagram representing the process and the points or steps in the process where the contractor can eliminate an employee or applicant from further consideration. In addition to mapping the process, the CO will need to gather information to understand when the process was instituted, why, by whom, whether there have been changes in the process and, if so, when and why.

b. *Identifying Pass/Fail Points*. If an individual must successfully navigate a certain step(s) in the process before proceeding on to the next, that step(s) is a "pass/fail point." Ideally, the CO can examine each pass/fail point to see if the contractor is disproportionately screening out members of any specific group. However, if the contractor does not eliminate individuals at separate steps throughout the process, but instead weighs their performance at each step to formulate a final decision, then the CO evaluates the process as a whole. To do this, the CO must ask the contractor to explain the importance and weight of each step in the selection decision. If an analysis of the entire selection process shows that the contractor disproportionately screens out members of a specific group, the CO must attempt to determine the particular criteria that are the source of the problem.

c. *Lack of Data*. If the contractor failed to maintain adequate data as required by 41 CFR Part 60-3, the CO must cite the contractor for this violation. If the contractor's lack of data hinders the CO's ability to determine the step or criterion that disproportionately eliminated members of the nonfavored group, then the CO must conduct the analysis based upon the "bottom line effect" or the existence of an adverse impact due to the total selection process. However, under such circumstances, the CO must obtain as much information as possible about the process and make every effort to identify the step or criterion causing the problem. Below is a very basic example of the concept.

> *Example*. A selection process consists of: 1) completing an application; 2) having a high school diploma; 3) taking a written test; and 4) participating in an interview during which the contractor accepts or rejects the applicant. In this example, applicants must demonstrate they have a high school diploma before taking the test, and must pass the test before participating in an interview. For each applicant, the CO must determine the applicant's race, ethnicity and sex, whether the applicant had a high school diploma, the test results, and the results of the interview including the interviewer's notes, if any. This information is used when determining the number of members within each group eliminated at each step of the process. The CO must conduct an adverse impact analysis at each stage of the selection process to determine whether adverse impact occurs.

If the contractor's application process, or any part of the process, involves Internet applicants, the CO must obtain applicant data and information regarding the basic criteria used in determining applicants for the job.[164]  The CO must discuss with his or her supervisor the appropriate analyses for Internet applicants.

d.  *Relevant Pools*.  The relevant pool for each step of the contractor's selection process includes the individuals who made it *to that step* in the selection process compared with those who made it *through to the next step*.  In the example in (c), above, if the CO is analyzing disparity in hiring rates, he or she would first consider the pool of all applicants to determine whether the high school diploma requirement is the source of the adverse impact.  If the high school diploma requirement does not fully explain the disparity in hiring, the CO would next determine whether the test disproportionately eliminated members of the nonfavored group.  Finally, the relevant pool for evaluating the effect of the interview would be all applicants who have a high school diploma and passed the test.  Therefore, any difference in their selection rates would be attributable to the interview.

## 2M01   DISTINGUISHING OBJECTIVE FROM SUBJECTIVE SELECTION CRITERIA

The contractor's selection criteria fall into two broad categories: "objective criteria" and "subjective criteria."

a.  *Objective Criteria*.  The central characteristic of an objective criterion is that it can be independently verified. With objective criteria, different people measuring the criteria will reach the same results because they are clearly defined or quantifiable in nature.  For example, whether or not the individual earned a certain diploma or degree is an independently verifiable fact.

b.  *Subjective Criteria*.  Subjective criteria require judgment in their application.  Therefore, people can differ in opinion on whether a particular candidate possesses and meets such a criterion.  For example, two selecting officials may easily have differing opinions on whether a candidate "has good leadership skills."  In this example, if disparities exist in the application of the subjective criteria between groups, the CO would gather information to determine if the contractor applied the subjective criteria based on bias or stereotypes.  An example of this might be a statement made by hiring official that men commonly display leadership qualities that women do not.

In most cases, the CO will first analyze a contractor's use of objective criteria and the resulting impact, followed by an analysis of the contractor's use of subjective criteria and the resulting impact.  Decisions based on subjective criteria involve the use of "judgment calls" by the contractor.  Clearly, it can be difficult to assess whether subjective criteria are applied equally to all similarly situated applicants or candidates, or whether the application of subjective criteria is tainted by bias or stereotyping.  Generally, when the CO cannot attribute an adverse impact to objective criteria, it is likely attributable to the use of subjective criteria.  This situation is most likely where the CO finds that the reasons for the decision are undocumented or the contractor characterizes the decision in a subjective manner like saying that the applicant was "a good fit."

---

[164]   See FCCM 1F05– Review of Executive Order Itemized Listing Data for Acceptability.

In some instances, the CO will find that the contractor used multiple criteria when making the hiring decision. When this occurs, the CO must determine if the person selected was required to meet each criterion individually or whether the contractor balanced the criteria (*e.g.,* assigns weight to each criterion) in reaching a decision. If meeting each criterion was a requirement, the CO must perform the appropriate analysis for each one. If the criteria are weighted, the CO must establish how they were weighted in order to determine how to conduct an analysis.

For example, a contractor gives each criterion a specific weight but one criterion is not met by a candidate. The contractor, however, selects that candidate. The CO must analyze <u>each</u> criterion independently to, among other things, determine the relevance of each criterion in the selection process. If, however, a contractor gives each criterion a score, and it is the <u>cumulative</u> score that determines whether a candidate is selected, the CO would analyze the cumulative criteria. The contractor may also refer to criteria as "minimum" or "preferred." Minimum qualifications are usually treated as "pass/fail" whereas preferred qualifications are those that the contractor may prefer but are not necessarily required. The CO must determine whether, and how, the contractor is using this criterion in making employment decisions.

## 2M02   ANALYSIS OF OBJECTIVE CRITERIA

The first step in analyzing the contractor's use of objective selection criteria is to verify that the criteria were actually used to make selections, and that they were applied uniformly to all members of the favored and nonfavored groups. COs only need to consider the contractor's stated legitimate objective criteria.

a.  *Single Criterion*. To examine the application of the criterion, the CO must determine whether the same criterion was applied to each individual and that data reflecting the application of the criterion are available for all individuals in the relevant pool.

b.  *Multiple Criteria*. When there are multiple criteria, or there is no summary record available to determine whether the people selected met the criteria, the CO will need to create a summary record. The CO can do this by creating a spreadsheet or a database that contains all relevant data for each individual applicant or candidate, or both. Based on the example in subsection 2M01(a) above, the spreadsheet data for each applicant would include race, ethnicity, sex, high school diploma or no diploma, test result and interview result. The spreadsheet will allow the CO to analyze the data more readily and determine whether the multiple criteria were applied uniformly to each applicant and the result of their application (*e.g.,* the applicant or candidate was either selected or not selected).

c.  *Interpreting the Results of Criteria Verification.*

   - When the review of individuals selected is complete, the CO must review the spreadsheet data to see if each selectee actually met the criteria. The CO may conclude that the contractor used the criteria if everyone selected met the criteria.

   - If a substantial number of individuals selected do not meet a particular criterion, the CO may discount the contractor's statement that the criterion was the basis for the decision.

- If the contractor used the criterion in a nonuniform manner, the CO must determine whether the contractor applied the criterion differently to members of the favored group when compared to the nonfavored group.  This comparison will reveal any disparate treatment.

- If the contractor applied the criterion uniformly to members of the nonfavored group and favored group, then the CO must analyze the effect of the application of the criterion for adverse impact.

## 2M03   ANALYSIS OF OBJECTIVE CRITERIA FOR ADVERSE IMPACT

a.  *Pool of Individuals Used for Statistical Calculation*.  In an adverse impact calculation, the CO compares the number of individuals from each group (by race, ethnicity, and sex) who were assessed using the criterion at issue with the number from each group who met the criterion.  This yields a "pass rate" or "selection rate" for each group, and the CO then tests the difference in pass rates between the groups for adverse impact.

b.  *Performing the Adverse Impact Calculation*.  First, the CO must determine whether each objective criterion is a pass/fail requirement, (*i.e.*, it eliminates an individual from further consideration if it is not met), or whether it is considered along with other criteria in making a final decision.

- For each pass/fail criterion, the CO must determine whether the difference in pass rates for members of each group (by race, ethnicity, and sex) shows adverse impact.

- When the criteria are not considered singly but are considered together in reaching a decision, the CO must determine how the contractor weighted each criterion to make a selection.  Using the weights used by the contractor, the CO must determine whether this is causing the adverse impact.  If it is not possible to isolate the contribution of the individual criterion to the bottom line effect, the CO will calculate the cumulative effect of all the criteria.  This calculation may be appropriate when the contractor did not keep records of the effects of the individual criteria.

c.  *Measurement of Statistical Significance*.  Measurement of the statistical significance of a difference in selection rates, whether by standard deviations or another method, indicates the probability that a particular disparity in those rates could or could not have occurred by chance.  The greater the disparity between the percentage of a specific group (*e.g.,* women) actually selected and the percentage of the group expected, the more likely the variation did not happen by chance but was a result of the selection factor used to screen.  When there is a significant probability that the disparity in selection rates for members of a nonfavored group could not have happened by chance, this is strong evidence of adverse impact.

## 2M04   ANALYSIS OF SUBJECTIVE CRITERIA AND DETERMINATION OF ADVERSE IMPACT

The CO will generally undertake an analysis of subjective criteria only after first determining the effects of any objective qualifications used by the contractor.  Subjective criteria are analyzed in essentially the same way as objective criteria: namely, the CO first makes a determination as to whether the contractor is actually using the stated subjective criteria (verification) and then whether

the contractor is applying them to members of all groups (if not, disparate treatment may have occurred). If the contractor applied subjective criteria to all groups, then use of subjective criteria will be analyzed for adverse impact.

The CO determines this by comparing the selection rates of members of favored and nonfavored groups who met the subjective requirements to determine whether statistically significant differences exist. If the disparity in these selection rates is not significant, then it is highly unlikely that discrimination resulted from the use of the subjective criteria. If the disparity is significant, then adverse impact exists and disparate impact discrimination may have occurred. The adverse impact analysis here is the same as the analysis described in 2M03 for the objective criteria analysis.

## 2M05   JUSTIFICATION OF SELECTION PROCEDURES WHEN ADVERSE IMPACT IS IDENTIFIED

According to the UGESP, the use of any selection procedure or criterion that has an adverse impact on hiring, promoting or other employment opportunities of members of any race, ethnic group, or sex is discriminatory unless the procedure is shown to be validated or otherwise job-related and consistent with business necessity.[165]

It is the contractor's responsibility to provide validity evidence sufficient to justify each selection procedure or criterion found to have adverse impact. Validation is the demonstration of job-relatedness by showing the relationship between the selection procedure and job performance. If, in conducting the analyses of the contractor's selection procedures, COs find that a selection procedure or criterion had an adverse impact, they must ask the contractor to provide all available information regarding its validation of the criterion in question. The contractor should provide information regarding the following:

- Development of the procedure and criterion, including, if the procedure is a written test, whether the contractor developed it internally or purchased it from a vendor;

- Validity studies it conducted, including the correlation coefficient (criterion and construct validation), or how the selection criterion or test content is linked with job requirements, that is, content validation;[166]

- Job analysis in the case of content validity studies and job information that describes how and why the selection criterion was chosen for criterion-related validity studies;[167] and

- Consideration given to alternative selection criterion, the reason for rejecting the alternatives considered, and any efforts made by the contractor to lessen the adverse impact.[168]

COs must analyze this information, along with the analysis finding adverse impact caused by the use of the selection procedure and any other relevant evidence, in accordance with UGESP. Further

---

[165]  41 CFR 60-3.3A.
[166]  41 CFR 60-3.5, 3.14 and 3.15.
[167]  41 CFR 60-3.14A; 60-3.14B(2) and (3).
[168]  41 CFR 60-3.3B.

analysis of the selection procedure or criterion at issue, or both, and their validation, will be coordinated between the regional office and the national office.[169]

## 2N    LINKAGE AGREEMENTS

COs are required to make contact with community organizations and recruitment resources as part of their assessment of a contractor's recruitment efforts. This requires that the CO have knowledge of the resources available in the community to provide assistance to contractors in resolving employment deficiencies. OFCCP encourages and facilitates such "linkage" relationships between contractors and community recruitment resources.

### 2N00    LINKAGE OBJECTIVES

OFCCP's online ERRD may provide sources of potential linkages. The following are OFCCP's objectives with respect to facilitating and encouraging linkages:

- To increase employment opportunities available to minorities, identified racial and ethnic groups, women, individuals with disabilities and protected veterans;

- To enhance the effectiveness of OFCCP's compliance activities by providing contractors with additional recruitment sources;

- To assist federal contractors in meeting their affirmative action hiring and promotion goals; and

- To increase cooperation between private sector employers and community recruitment resources.

### 2N01    LINKAGE REQUIREMENTS

COs must seek to develop new linkages between community recruitment and referral sources and contractors that have made insufficient recruitment efforts to generate applicants that satisfy their affirmative action objectives. Before a CO urges contractors to use the resources, the CO must identify and contact organizations to affirm that they can be of assistance, and to explain what is expected of both parties.

### 2N02    IMPLEMENTATION UNDER EXECUTIVE ORDER 11246

When linkage is needed, a CO must take the following actions to establish linkage agreements during the course of the compliance evaluation:

*a.* Identify those job groups in the contractor's workforce where goals were established and there was employment activity, but the goals were not met.

---

[169]    See OFCCP Directive 2005-01, "Investigative Procedures When a Test(s) is One Cause of Adverse Impact in Hiring"

b.  Evaluate the contractor's good faith efforts to identify possible recruitment sources for those underutilized job groups.

c.  Contact appropriate linkage resources to obtain specific information on availability of potential applicants and potential trainees for positions in the areas of underutilization.  If possible, the CO must arrange a meeting between the resource organization(s) and the contractor.

d.  When a resource appears to be a likely source of applicants or trainees, the CO will seek to include the contractor's commitment to utilize the linkage source, along with other actions in a CA, if a CA is used to resolve violations related to outreach and positive recruitment.[170]

e.  If a linkage agreement is included in a CA, the CA must require progress reports at least semi-annually.  With respect to linkages, these reports should contain:

- Total hire activity by job group, broken out by sex, race, ethnicity, and other relevant covered group status; and

- Total hire activity and number of people referred from each linkage source agreed to in the CA, and any other appropriate source, broken out by sex, race, ethnicity, and other relevant covered group status.

## 2N03  WHERE LINKAGE AGREEMENTS ARE NOT REQUIRED (EXECUTIVE ORDER 11246 Only)

The establishment of new linkages is not required if a CO finds that the contractor's utilization approximates availability for the given job group.  If this is true, utilization does not appear to be a problem.  Additionally, if it is determined that a current recruitment and referral source with which there is an existing linkage is no longer able to provide the needed assistance, it may be appropriate to discontinue the existing linkage.  The CO will assist the contractor in establishing replacement linkages if they are needed.

## 2N04  LINKAGE AGREEEMENTS FOR INDIVIDUALS WITH DISABILITIES AND PROTECTED VETERANS

Linkage arrangements involving recruitment or referral sources for individuals with disabilities and protected veterans may be particularly useful when either or both of the following exist:

- A review of employee records, job applications and applicant flow data shows that there are few applicants who are members of these covered groups; or

- The annual assessment of outreach and recruitment for individuals with disabilities and/or protected veterans shows that the contractor's efforts have not been effective.

---

[170]  See FCCM Chapter 8 – Resolution of Noncompliance.

If the contractor needs new linkage relationships, the CO will follow the same steps to establish appropriate linkages for these groups as he or she would when establishing linkages to meet affirmative action goals for other groups.

## 2N05   CONFIRMATION OF LINKAGE AGREEMENT

At the conclusion of the compliance evaluation, the CO will provide written notices to all of the linkage resources or partners in the agreement with the contractor.  A sample of a linkage letter is at Letter L-8 – Sample Linkage Letter.  The contractor must be provided a copy of the letter.  The CO must document the notifications in the case file.

# 2O    ON-SITE REVIEW SUMMARY OR REPORT WRITING

The CO will use the SCER Part C to record potential discrimination issues that the CO identified and reviewed on-site.  The CO will also use the SCER worksheets to specify:

- Whether a particular issue or problem needs analysis as an individual case or a systemic case; and

- Whether the particular issue or problem requires a disparate treatment analysis, a disparate impact analysis, or both.

After concluding the on-site review, the CO must complete any required analyses of the data and other information that was gathered.  The CO must investigate problem areas and issues until the case file contains sufficient evidence to establish whether discrimination did or did not occur.  The case file should retain all evidence the CO obtained and documents the CO created, including any evidence that does not support the CO's conclusions.

## 2O00   SUMMARY OF FINDINGS

After completing the compliance evaluation, including all on-site and off-site analyses of the information obtained during the on-site review and recorded in the SCER Part C, the CO must compile a summary of findings to include in the Case Summary and Recommendations section of the SCER.  This summary includes the findings of the case, the bases for the findings, and the CO's recommendations.  The summary of findings should also include the:

- Name and description of the facility;

- Problem area(s) identified, if applicable;

- Description of the selection or other process or practice examined (*e.g.,* for a hiring case, the steps in the application process);

- Results of any analyses conducted such as IRAs, comparative (cohort) analysis, and regression analysis;

- Summary of any interviews conducted;

- Relevant anecdotal evidence obtained;

- Description of any violations and their bases;

- Recommended corrective actions, where the CO has identified violations; and

- Recommended next steps.

The summary should logically lead to the CO's conclusion about whether or not a violation occurred.  The CO submits the completed SCER to his or her supervisor for approval.

Depending upon the circumstances of a particular case, it may be a good practice to conduct a follow-up meeting or teleconference with the contractor.  Below is an example of why this is a good practice.

- The CO held an exit conference with the contractor at the conclusion of the on-site review. However, following off-site analysis, the CO found additional issues that need to be discussed with the contractor.  More specifically, at the conclusion of the on-site, the CO told the contractor that it would be cited for failing to track the race, ethnicity, and sex of job applicants passing through various phases of the selection process.  However, during off-site analysis, it became clear to the CO that the contractor also discriminated in its termination activity.

After advising the contractor of its compliance evaluation findings, the CO must provide formal notification through a PDN when there are preliminary indicators of discrimination.  COs use certified mail, return receipt requested, to provide this notice to the contractor.  If requested by the contractor, a courtesy copy is sent by email or facsimile.  We discuss the various forms of notice in more detail in Chapter 8, Resolution of Noncompliance.

If, prior to the issuance of the notice of compliance, the contractor provides new evidence, the CO must conduct any necessary investigation and analyses to determine if the new evidence changes any of the initial findings and to ensure that the final findings are fully supported.  A basic part of any additional investigation is verifying the credibility of the new evidence.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 3
# CONSTRUCTION INDUSTRY COMPLIANCE PROGRAM

## 3A     INTRODUCTION

This chapter contains procedures for conducting compliance reviews of construction contractors and subcontractors, including those involved in federally assisted construction projects.  The purpose of the reviews is to determine whether contractors are complying with requirements prohibiting discrimination, and requiring affirmative action to ensure equal employment opportunity without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or protected veteran status.  Additionally, federal contractors and subcontractors are prohibited from, under certain circumstances, taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or the pay of their co-workers.  This chapter also contains procedures specific to Mega Construction Projects.[171]

## 3B     COVERAGE AND CONTRACT CLAUSES

Federal construction contractors, if they have a construction contract of the requisite amount with a federal agency,[172] are covered by Executive Order 11246, as amended; VEVRAA, as amended; and Section 503, as amended.  These authorities also cover construction contractors if they have a contract or subcontract with a nonconstruction contractor or another construction contractor, and the:

- Contract or subcontract is necessary in whole or in part to the performance of the covered contract; or

- Contractor or subcontractor performs, undertakes or assumes any portion of the contractor's obligation under a covered contract.

Federally assisted construction contracts and subcontracts are covered by the Executive Order but are not covered by Section 503 or VEVRAA.[173]

The following subsections provide COs additional guidance on the requirements of these legal authorities.

---

[171]   Mega Construction Projects are defined as a construction project spanning more than one year, with a value of at least $25 million.
[172]   For current jurisdiction thresholds for OFCCP coverage, see *https://www.dol.gov/ofccp/taguides/jurisdiction.htm*.
[173]   EO 11246, as amended, Sec. 301.

**3B00    REGULATIONS APPLICABLE TO CONSTRUCTION CONTRACTORS**

Regulations applicable to the affirmative action requirements of construction contractors and federally assisted construction contractors under Executive Order 11246 are published primarily in 41 CFR Part 60-4.  Specific provisions in other parts of 41 CFR Chapter 60 are also applicable to federal and federally assisted construction contractors.[174]  The regulations implementing Section 503[175] and VEVRAA[176] apply to contractors and subcontractors with a federal construction contract or subcontract covered under those laws.  As mentioned earlier, the regulations implementing Section 503 and VEVRAA do not apply to federally assisted construction contracts and subcontracts.

**3B01    REQUIRED BID SOLICITATION NOTICE AND CONTRACT SPECIFICATIONS FOR CONSTRUCTION CONTRACTS**

Bid solicitations for all federal and federally assisted construction contracts in excess of $10,000 must include the "Notice of Requirement for Affirmative Action to Ensure Equal Employment Opportunity (Executive Order 11246)" found at 41 CFR 60-4.2(d) and the "Standard Federal Equal Employment Opportunity Construction Contract Specifications (Executive Order 11246)" found at 41 CFR 60-4.3(a).

The "Notice of Requirement for Affirmative Action to Ensure Equal Employment Opportunity (Executive Order 11246)" (referred to in this chapter as the "Notice") sets forth the goals for minority and female participation in construction trades in covered areas, identifies the covered areas and requires that contractors provide OFCCP with written notice about construction subcontracts in excess of $10,000 that are awarded in connection with the covered contract.  In addition, the Notice must be included in:

- Grants, contracts, subcontracts, loans, insurance or guarantees involving federally assisted construction covered by Part 60-4 as a condition of these agreements; and

- Construction contracts and subcontracts that are necessary in whole or in part to the performance of a covered nonconstruction contract.

The "Standard Federal Equal Employment Opportunity Construction Contract Specifications (Executive Order 11246)" (referred to in this chapter as the "Specifications") describe the affirmative action obligations and detail the specific affirmative action steps construction contractors must implement to ensure equal employment opportunity.  The Specifications must be in:

- Solicitations for offers and bids on all federal and federally assisted construction contracts in excess of $10,000 in accordance with 41 CFR 60-4.6;

---

[174]  41 CFR Parts 60-1, 60-3, 60-20, 60-40, and 60-50.
[175]  41 CFR Part 60-741.
[176]  41 CFR Part 60-300.

Federal Contract Compliance Manual (FCCM)

- Grants, contracts, subcontracts, loans, insurance or guarantees involving federally assisted construction covered by 41 CFR Part 60-4, as a condition of these agreements;

- Federal and federally assisted construction contracts in excess of $10,000 in accordance with 41 CFR 60-4.6; and

- Construction subcontracts in excess of $10,000 that are necessary in whole or in part to the performance of nonconstruction federal contracts and subcontracts.[177]

By operation of the Executive Order, the Notice and the Specifications discussed in this section are deemed to be incorporated in every solicitation and every covered contract and subcontract. This is true whether or not they are expressly incorporated in the solicitation or contract, and whether or not the contract is written.[178]

## 3B02   REQUIRED EQUAL OPPORTUNITY CONTRACT CLAUSES FOR CONSTRUCTION CONTRACTS

The equal opportunity clauses may be expressly included in construction contracts and subcontracts, or incorporated by reference.[179]  The clauses are, however, a part of the construction contracts even if the contractor does not physically incorporate them into the contract document.[180] If a contractor fails to include the required clauses in covered subcontracts and purchase orders, either in their entirety or by reference, a CO shall cite this omission as a violation in the closure document.

a.  *Federal Construction Contracts.*  Each federal contracting agency must include the equal opportunity clauses found at 41 CFR 60-1.4(a), 60-300.5 and 60-741.5, in all covered prime construction contracts.  And, each federal contractor and subcontractor must include the equal opportunity clauses in its covered construction subcontracts – either in their entirety or by reference.[181]  An example of an acceptable way to incorporate all three equal opportunity clauses by reference is found below.  Note that the example is in bold typeface for compliance with Section 503 and VEVRAA regulations.  If a contractor incorporates the clauses by reference, but does not use the appropriate language or style for Section 503 and VEVRAA equal opportunity clauses, then a CO shall cite the failure as a violation in the closure document.

> **This contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a).  These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, national origin,**

---

[177]   41 CFR 60-4.3(a).
[178]   41 CFR 60-4.9.
[179]   41 CFR 60-1.4(d), 60-300.5(d) and 60-741.5(d).
[180]   41 CFR 60-4.9, 41 CFR 60-300.5(e) and 60-741.5(e).
[181]   41 CFR 60-1.4(a) and (b) at paragraph (7); 60-1.4(c); 41 CFR 60-300.5, paragraph 11; and 41 CFR 60-741.5, paragraph 11.

> **or for inquiring about, discussing, or disclosing compensation. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

b.  *Federally Assisted Construction Contracts.*  Applicants for federal assistance involving a construction contract are required to include the equal opportunity clause found at 41 CFR 60-1.4(b) in all covered federally assisted construction contracts.  Moreover, each administering agency must include this clause as a condition of any grant, contract, loan, insurance or guarantee involving federally assisted construction.  Federally assisted construction contractors and subcontractors are to incorporate only the Executive Order equal opportunity clause in subcontracts – either in its entirety or by reference.  An example of an acceptable way to incorporate the equal opportunity clause by reference is found below.

> **This contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(b).  These regulations prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, national origin, or for inquiring about, discussing or disclosing compensation.  Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity or national origin.**

c.  *Nonconstruction Contractors.*  Nonconstruction contractors must include the appropriate clauses in construction subcontracts that are necessary, in whole or in part, to the performance of a covered nonconstruction contract.  The clauses may be expressly included in the contract or incorporated by reference, in the same manner as described above.  The clauses are, however, a part of the construction contracts even if the contractor does not physically incorporate them into the contract document.

## 3B03   SUPPORT FROM OTHER AGENCIES RELATED TO CONSTRUCTION CONTRACTORS

The CO must identify the contract(s) on which the contractor's obligations are based.  The CO records this information in the case file and related correspondence.  Information on contract awards may be obtained from other federal agencies.

Various federal, state and local government contracting offices may be able to provide notice of contract awards and help ensure that the contractors include equal opportunity and affirmative action clauses in construction contracts.  For example, OFCCP has an MOU with the General

Services Administration (GSA) that provides for information sharing on construction contract awards.[182]

Other agencies within the DOL may also have information not available from the contractor. For example, the WHD may be able to provide the number of employees of the contractor by reviewing payroll records certified under the Davis-Bacon Act. Other sources of interagency cooperation may include the ETA funded agencies such as Job Corps, Office of Apprenticeship, and YouthBuild, and the Women's Bureau.

## 3B04   MEGA CONSTRUCTION PROJECTS

A mega construction project is a construction project spanning more than a year, with a value of at least $25 million. OFCCP developed its Mega Construction Project Program to facilitate construction contractors' access to a pipeline of diverse talent for some of this nation's largest construction projects. The focus of this program is first and foremost on providing compliance assistance and facilitating relationships that connect contractors with jobs to qualified people seeking jobs.

The program includes providing intensive compliance assistance to participating construction contractors, and facilitating connections between contractors and job training and recruiting sources, unions, local or community based organizations, and federal, state and local governments. Through this approach, the expectation is that there will be an increase in the representation of women and minorities in the construction trades. While contractor participation in the mega construction program is not required, it is encouraged.

On mega construction projects, COs can monitor the solicitations, offers and bid documents to ensure the funding and contracting agencies include the Notice.[183] Additionally, COs coordinate with the funding agency to ensure incorporation of the Specifications and appropriate equal opportunity clauses into prime contracts and subcontracts.[184] Once the solicitation is made public, the District Director or Assistant District Director should participate in as many pre-bid conferences as feasible that the federal funding agency and the entity receiving federal assistance may schedule with prospective bidders. Once the prime contract is awarded, the District Director or Assistant District Director should contact[185] the prime contractor for two purposes:

- To offer the prime contractor the opportunity to participate in the program, so as to receive extensive compliance assistance and support; and

- To explain the prime contractor's role and responsibilities if it participates in the program.

---

[182] See "U.S. Department of Labor and U.S. General Services Administration: Memorandum of Understanding on Mega Construction Projects," signed June 2013.
[183] See FCCM 3B01.
[184] 41 CFR 60-1.4(a) or (b), 41 CFR 60-4.3, 41 CFR 60-300.5, and 41 CFR 60-741.5.
[185] See Letter L-10 – Construction Outreach for New Projects.

If a mega construction project is located on or near an Indian reservation, the CO should contact OFCCP's Indian and Native American Employment Rights Program (INAERP) before contacting tribal officials, TEROs or Indian and Native American community based organizations. INAERP will work with the CO to ensure the proper tribal officials are notified about the project and determine their level of involvement based on their resources and tribal infrastructure. INAERP will also conduct introductory meetings via conference call and assist with providing a list of resources for contractors and subcontractors to use in the creation of linkages with tribal entities and Indian and Native American community based organizations. The INAERP staff is available throughout the course of a review to assist COs.

## 3C    GENERAL PRINCIPLES APPLICABLE TO THE CONSTRUCTION INDUSTRY

The equal opportunity clauses prohibit discrimination based on race, color, religion, sex, sexual orientation, gender identity, national origin, disability and protected veteran status.[186] Additionally, the clauses prohibit contractors from, under certain circumstances, taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or the pay of their co-workers. They also require that contractors take affirmative action to ensure equal employment opportunity. This section covers the use and application of the goals for the participation of minorities and females in the construction workforce, preconstruction conferences and notice of subcontract awards. The Section 503 Utilization Goal and the VEVRAA Hiring Benchmark are addressed in Section 3N.

### 3C00   EXECUTIVE ORDER GOALS

Goals serve as reasonably attainable objectives and allow contractors to measure progress toward achieving equal employment opportunity. They are not quotas. Failure to meet any goal, in and of itself, does not constitute a violation of the Executive Order. Contractors must demonstrate good faith efforts toward meeting their minority and female participation rate goals contained in the bid solicitation. These goals are determined by the Director of OFCCP and are issued in accordance with 41 CFR 60-4.6 by geographic area.

The participation rate goals are expressed as a percentage of the hours a contractor's aggregate workforce worked in each trade on all construction work performed in the geographic area. A covered construction contractor must apply the participation rate goals on all of its federal, federally assisted, and nonfederal construction work. If a covered construction contractor performs work in multiple geographic areas, the contractor must make good faith efforts to achieve the goals for women and minorities in each geographic area where work is being performed.

---

[186]   41 CFR 60-1.4(a) and (b), 41 CFR 60-300.5 and 41 CFR 60-741.5.

a. *Goals for Women.*  The current goal for the utilization of women is 6.9 percent of work hours and applies to all of a contractor's construction sites, regardless of where the federal or federally assisted contract is performed.[187]

b. *Minority Group Goals.*  The current goals for the utilization of minorities are formulated in terms of work hours performed in a specific Standard Metropolitan Statistical Area (SMSA) or non-SMSA.[188]  For example, ABC Company has a federal contract for construction work in SMSA X.  The goals for SMSA X apply to all of ABC's construction work in SMSA X, both the federally involved and the nonfederally involved construction work.  In addition, if ABC Company performs construction work in SMSA Y, it would apply the SMSA Y goals to all its construction work in SMSA Y, whether or not it had a federal or federally assisted contract in SMSA Y.

## 3C01   PRECONSTRUCTION CONFERENCES

Contracting and administering agencies may use preconstruction conferences to discuss any aspect of the contractual requirements of a project including EEO.  OFCCP regional, district or area office staff may participate in these conferences at the invitation of the contracting agency.  The contracting agency reviews the construction contractor's nondiscrimination and affirmative action obligations, including applicable minority and female participation rate goals for the geographical area in which work is to be performed, and the contractor's reporting and recordkeeping requirements necessary to demonstrate compliance.  COs may also send out a letter to summarize EEO obligations enforced by OFCCP and to offer compliance assistance for new construction contractors.[189]

## 3C02   NOTICE OF SUBCONTRACT AWARDS

The Notice explained in Section 3B01[190] requires the contractor to notify the Director of OFCCP of the name, address, telephone number and employer identification number of each subcontractor; the name, phone number, and email address of the contractor representative submitting the notification; the prime contract number; the estimated dollar amount of the subcontract; its estimated starting and completion dates; and the geographical area (SMSA or non-SMSA) in which the work is to be performed.  This notice must be in writing and provided within 10 business days of the award of a subcontract in excess of $10,000.

---

[187]  This goal was originally published in the Federal Register of April 7, 1978, 43 FR 14899, 14900, as Appendix A.  This goal was extended indefinitely based on a notice published in the Federal Register on December 30, 1980.  See 45 FR 85750, 85751 (Dec. 30, 1980).
[188]  45 FR 65979, 65984, Appendix B-80 (Oct. 3, 1980).
[189]  See Letter L-10 – Construction Outreach for New Projects.
[190]  See 41 CFR 60-4.2(d).

Federal Contract Compliance Manual (FCCM)

# 3D    THE COMPLIANCE REVIEW PROCESS

COs will find that several stages are involved in a compliance review of a construction contractor.  The four major stages are listed below and are discussed in detail in Sections 3E through 3R of this chapter.

1.  Pre-Review Preparation (FCCM 3E)

2.  On-site Review (FCCM 3F)

- Entrance Conference (FCCM 3G)

- Review of Records (FCCM 3H)

- Evaluation of Policies, Practices and Procedures (FCCM 3I)

- Interviews (FCCM 3J)

- Worksite Inspections (FCCM 3K)

- Identification and Investigation of Discrimination (FCCM 3O)

- Exit Conference (Section 3P)

3.  Compliance Review Report (Section 3Q)

4.  Notification of Compliance Review Results (Chapter 8)

The major focus of a review of a construction contractor is the contractor's construction employees who are engaged in on-site construction, including those construction employees who work on a nonfederal or nonfederally assisted construction site within a particular geographical area.  However, unless coverage is based solely on a federally assisted construction contract, the contractor's entire workforce may be the subject of the review under Executive Order 11246, Section 503 and VEVRAA.  As noted at FCCM 3B, federally assisted construction contracts are subject only to Executive Order 11246.  In evaluating a contractor's compliance with the equal opportunity clauses in nontrade as well as trade occupations, COs must focus on any indications of potential discrimination and lack of affirmative action.

If the contractor has a covered federal contract (not federally assisted) and 50 or more employees, the compliance review will also include implementation of the Section 503 and VEVRAA AAP(s).[191]

---

[191]    For current jurisdictional thresholds, see *https://www.dol.gov/ofccp/taguides/jurisdiction.htm*.

# 3E     PRE-REVIEW PREPARATION: SCHEDULING AND COORDINATION WITH OTHER AGENCIES

This section discusses the various steps and actions that COs must take prior to starting a compliance evaluation of a contractor establishment.

## 3E00   INITIAL CONTACT WITH THE CONTRACTOR AND SCHEDULING

The CO should notify the senior official at the contractor's establishment by telephone of the scheduled review. The telephone contact will include a discussion of where the review will take place, set a date for the review to begin, indicate the need for an on-site work area and confirm the location and availability of books and records that contain relevant information on the contractor's aggregate workforce in the covered area.

The CO must provide the contractor with written confirmation of the date and time of the review at least three business days prior to the on-site unless there are exigent circumstances. The letter is sent certified mail, return receipt requested, to the senior official at the contractor's establishment with a copy to the CEO at the corporate address.[192] Mailing to both addresses is required unless the establishment and corporate offices are the same. The notification includes an enclosure that specifies items that the contractor is to make available for inspection and copying during the review.

## 3E01   PREPARATION AND MAINTENANCE OF THE CASE CHRONOLOGY LOG

COs must prepare and maintain a Case Chronology Log for each compliance evaluation. This log is an integral part of the case file and is an invaluable tool in tracking the progress and the status of the case.[193] It is, therefore, important that COs keep the Case Chronology Log current. A Case Chronology Log includes:

*a.* Event summaries that begin with the initial contact with the contractor and continue through to the approval of case closing documents.

*b.* Documentation of all telephone conversations, e-mails, correspondence and meetings associated with the evaluation, indicating the date, nature of the contact, person contacted, summary of discussion or actions taken, and the CO's name.

Records of telephone calls in the log should include the time of the call. All meetings must include the date, location and names of the people in attendance. In addition, record in the log all requests for data and records, and the dates the CO received these items. COs must record all events and actions as they occur.

Many COs print a hardcopy of the Case Chronology Log to facilitate their ability to write in the day-to-day events and activities as they occur. This practice is acceptable, as long as the final,

---

[192]   Letter L-9 – Construction Compliance Evaluation Notice and Enclosure.
[193]   See FCCM 1B02 – Creation and Maintenance of the Case File; Figure F-2 – Case Chronology Log (CC-53).

Federal Contract Compliance Manual (FCCM)

official Case Chronology Log included in the case file is typed, legible and maintained electronically.

## 3E02   CREATION AND MAINTENANCE OF THE CASE FILE

COs must create and maintain a case file for each scheduled compliance evaluation.  The case file generally consists of various folders so, in order to create a case file, COs must create individual folders using the below headings.[194]

*a.*   Folder 1: Construction SCER Findings (See FCCM 3Q)

*b.*   Folder 2: Case Chronology Log, Correspondence and Meeting Notes

*c.*   Folder 3: Employment Handbooks, Collective Bargaining and Other Agreements, and Miscellaneous Items

*d.*   Folder 4: SOL Opinions, JRC Memoranda and Post-Construction SCER Update

*e.*   Folder 5: Progress Reports

*f.*   Folder 6: Historical Review Results

*g.*   Folder 7: Monthly Employment Hours and Pre-Construction Conference Materials

COs add information and documents to the appropriate folder throughout the course of the compliance evaluation.  If enforcement becomes necessary, COs provide the compliance evaluation case file to the Solicitor's Office for further action.  It is critically important that all information obtained, observed or reported be part of the case file and remain there through case closure.

Once again, maintaining these files is crucial and includes labeling the folder and any additional folders or subfolders needed (*e.g.,* Folder 1A, 1B).  Labeling is especially useful when the material in a folder is voluminous.  COs must arrange the documents in each folder by date, with the most recent document on top.  COs are required to attach certain documents in each folder to the left or right side of the folder, as indicated below.  Generally, whenever there are ten or more separate documents in a folder, the CO must prepare an index and place it in the front of that folder.

A complete and thorough case file is critically important, especially in the event that enforcement becomes necessary.  Therefore, COs must be sure that the case file contains all documents obtained or generated during the compliance evaluation, not just the material that supports the conclusions reached.  This means, for example, that the file includes both evidence that supports the CO's violation findings, as well as evidence that supports the contractor's rebuttal.  The case file must contain all contractor records and unaltered copies of all e-mail

---

[194]   Though the case file folder numbers and titles do not change, the case file contents may vary based upon the investigative procedures used in the compliance evaluation, and the availability and existence of specific documents.

correspondences in paper or electronic format.  Drafts of OFCCP memoranda are not included in the case file; COs retain only final versions of agency memoranda.

If a CO is submitting a case for enforcement, a Transmittal Memorandum, as discussed in Chapter 8 of this Manual on the resolution of noncompliance, must accompany the case file.  A complete copy of at least one contract or subcontract establishing coverage during the period at issue, continuing to the present, is also required.  Additionally, the enforcement submission includes copies of all relevant analyses, properly labeled, in electronic format.  Remember to keep a copy of all files submitted for enforcement in the appropriate field office.[195]

### 3E03   CONTACTING EEOC, VETS AND OTHER AGENCIES

Simultaneous with the mailing of the on-site confirmation letter, COs will seek information regarding the employment policies and practices of the contractor being scheduled from the EEOC, VETS (if appropriate) and other EEO and labor law enforcement agencies.  Such information provides a better understanding of the contractor's workforce and operations, and may indicate potential problem areas.[196]

a.   *EEOC and State and Local FEP Agencies.*  The CO sends an inquiry letter[197] simultaneous with the mailing of the Construction Compliance Evaluation Notice.  The inquiry letter goes to the appropriate district office of the EEOC, and to the appropriate state and local FEP agencies.  It requests information on discrimination complaints filed against the contractor, and any other information that may be pertinent to assessing the contractor's EEO posture.  After 15 calendar days, COs must follow up by telephone with any agency that failed to respond or from which additional information is needed.

OFCCP has an MOU with EEOC that includes provisions about information sharing, complaint referrals, coordination and consultation.  COs are urged to become familiar with the provisions of this MOU.

b.   *VETS, ESDS and DOL Enforcement Agencies*.  Unless jurisdiction is based solely on federally assisted construction contracts, COs must contact the regional VETS office and the appropriate local ESDS to request any information that could be pertinent to the pending review, including information regarding the contractor's compliance with the mandatory job listing requirements of 41 CFR 60-300.5(a).[198]  When conducting compliance evaluations and complaint investigations, COs must query the VETS-4212 database to verify that a federal contractor completed the annual reporting requirements for the appropriate reporting year.  Moreover, the information in this database, in combination with data provided pursuant

---

[195]  See Appendix A-5 – Index for a Construction Review.
[196]  COs would not contact VETS for information if jurisdiction is based solely on federally assisted construction contracts.
[197]  A sample of this letter is in this Manual as Letter L-2, Sample Inquiry Letter for Requesting Complaint Data from EEOC and State and Local FEPs.
[198]  Sample letters are in this Manual, including Letter L-3, Sample Inquiry Letter for Requesting Job Listing Requirements from Employment Service Delivery Systems, and L-4, Sample Inquiry Letter for Requesting Information on Pending Review from Veterans' Employment and Training Service.

to 41 CFR 60-300.44(k), may be useful when analyzing an employer's recruitment and hiring practices.  OFCCP provides a periodic report to VETS of contractors who have not filed the VETS-4212.[199]

Additionally, COs should check the DOL Enforcement Database at https://enforcedata.dol.gov/ for closed complaints and compliance evaluations of the contractor's establishment, and contact other DOL enforcement agencies to identify the number, types and status of any complaints filed against the contractor.  For example, the WHD may have filed FMLA violations related to the contractor that are the subject of a compliance evaluation.

## 3E04   INFORMATION ON EEO COMPLAINTS FILED WITH OR BY OTHER AGENCIES

COs must carefully examine all information regarding complaints against a contractor that they receive from federal, state and local agencies in response to a letter of inquiry.  COs enter basic information about these complaints in I. Background of the Construction SCER, including:

- The agency with which the complaint was filed;

- The jurisdictional or legal basis (*e.g.,* race, sex) of the complaint;

- The current status of the complaint; and

- The area of the contractor's workforce involved in the complaint.

COs will note any patterns in the types of complaints filed and any discrimination findings made on them.  For example, there may be a clustering of complaints filed by employees in certain trades, or by applicants or employees from a particular race, religion, ethnic group or sex; by covered veterans; or by individuals with disabilities.  As the review progresses, COs must cross-reference complaints to any potential problem areas they identify.  There may be, for example, indications of a lack of good faith efforts, statistical indicators of discrimination, or concentration or underrepresentation in areas where complaints were filed.

When appropriate, COs will contact the appropriate EEOC office or state or local FEP agency to arrange to review relevant discrimination complaint files as part of the compliance evaluation.  This can be particularly useful when a CO identifies potential systemic problems in complaint areas.

On-site, COs must compare any information a contractor provides with respect to current or past complaints to the information received from other agencies.  COs will note discrepancies and information not provided by the contractor for possible further investigation during the review, and will seek an explanation and additional information from the contractor.

---

[199]   41 CFR 60-300.60(c).

## 3E05   REVIEW OF COMMUNITY RESOURCE FILES

Each field office must maintain resource files on the communities within its geographic area. For each community, these files should identify local organizations that represent or provide services to protected groups.  These would include groups and organizations representing or servicing women, racial and ethnic minorities, veterans, individuals with disabilities, and individuals who identify as lesbian, gay, bisexual or transgender.  Some COs may not be knowledgeable about the local organizations in the area.  In these instances, they must review the resource files and introduce themselves to representatives from the various organizations.  The Communications Team in the national office and ROCs may also be useful resources.

If a contractor is located near an Indian and Native American Reservation with a TERO or other employment organization on the reservation, the CO must contact INAERP before making contact with these organizations.  Chapter 2 of this Manual discusses the importance of linkages and how a CO can establish relationships with tribal communities, and Indian and Native American community-based organization located near construction projects.

## 3E06   REVIEW OF OFCCP COMPLIANCE ACTIONS

COs must determine whether another OFCCP office recently reviewed or is reviewing the same contractor when scheduling a compliance review.  If another OFCCP office is currently reviewing the selected contractor, the CO or the supervisor must contact the supervisor of the other OFCCP office to discuss what issues, if any, are present in their ongoing case.  This is particularly important for detecting company-wide practices that result in discrimination.

COs may also examine closed case files, or OFIS, to identify issues relevant to the current evaluation.  They will also note the terms of any CA or consent decree, including back pay, hires and other remedial measures contained in the CA or consent decree.  In addition, COs must determine whether a contractor has been subject to an OFCCP complaint investigation and, if so, review the complaint file for any violations or problems identified.  Any violations found in these past compliance actions must be recorded in the Construction SCER at I. Background Information.  While the existence of a past problem is not considered evidence of the existence of present problems, COs must be alert to any indications that past problems remain unresolved, have recurred or that similar problems have arisen.

## 3E07   INTERAGENCY COORDINATION FHWA

If the administering agency is the Federal Highway Administration, at DOT, a DOL-DOT MOU requires that DOT be notified of the scheduled review.[200]

---

[200]   See "Interim Memorandum of Understanding Between the Department of Labor and the Department of Transportation" signed 1979.

## 3F    ON-SITE REVIEW PROCESS OVERVIEW

The second major stage in a compliance review of a construction contractor is the on-site review. The purpose of the on-site review is to determine if the contractor complied with the requirements of Executive Order 11246 and, as applicable, Section 503 and VEVRAA.  During this review, COs will examine personnel activity, compensation data and work hours.  In addition, they will evaluate the contractor's affirmative action efforts to comply with the Executive Order, Section 503 and VEVRAA, if applicable.  There are several activities that take place during the on-site review process and they include:

- Entrance conference (FCCM 3G);

- Review of records such as personnel activity, compensation and work hours (FCCM 3H);

- Evaluation of policies, practices and procedures assessing compliance with the Executive Order 11246 affirmative action specifications (FCCM 3I);

- Evaluation of compliance with Section 503 and VEVRAA obligations (FCCM 3N);[201]

- Employee and supervisor interviews (FCCM 3J);

- Physical inspection of the contractor's worksites (FCCM 3K);

- Identification and investigation of discrimination (FCCM 3O); and

- Exit conference (FCCM 3P).

Each of the activities of the on-site review process are discussed in FCCM 3G through 3P.


## 3G    ENTRANCE CONFERENCE

The entrance conference should be attended by the contractor's CEO or designee.  The entrance conference is intended to provide information to the CEO and explain the purpose of the compliance review.  During this conference, a CO may, as appropriate:

- Provide a brief explanation of the compliance review process;

- Provide information on OFCCP policies, practices, rules and regulations;

- Provide an estimate of the amount of time the on-site review will require;

---

[201] Compliance with Section 503 and VEVRAA obligations does not occur if the contractor is working only on federally assisted construction contracts.

- Confirm the availability and location of the contractor's records and documentation of compliance with the affirmative action specifications and obligations;

- Request cooperation for employee and supervisory interviews;

- State the need for and arrange to inspect federal and nonfederal worksites; and

- Establish a tentative date for the exit conference.

## 3H    EXECUTIVE ORDER 11246 REVIEW OF RECORDS

During the process of reviewing records as a part of the on-site review, the CO must record any matters that appear questionable. The CO should follow up on these matters by gathering additional documentation, interviewing employees and interviewing any other relevant people.

In this section are discussions on the review of various contractor records, including items such as payroll records, employment activity records, collective bargaining agreements and personnel policies.

### 3H00  PAYROLL RECORDS

In reviewing the contractor's payroll records, the CO should determine at least three things:

- The number of months of payroll activity to review in order to evaluate progress toward work hour participation rate goals;

- The existence of uniformity in the assignment of employees to various project sites; and

- The equity or lack thereof in allowing or granting overtime and other benefits.

a.  *Number of Months to Review.*  Review the contractor's payroll records for at least a six-month period. This review is to evaluate progress toward attaining work hour participation rate goals for minorities and women in each trade. CO's must review payroll records to determine the percentage of work hours by minorities and women out of the total hours worked by the contractor's employees in each trade.

b.  *Uniformity of Assignment.*  Evaluate the records to determine whether there is uniformity in the assignment of employees to various project sites (federal and nonfederal; commercial and residential; urban and rural). COs will determine whether certain types of projects pay more than others and, if so, whether women and minorities are provided equal opportunities for assignment to the better paying jobs.

c.  *Equitable Overtime.*  Evaluate the records to determine whether overtime, incentives, bonuses and other job benefits (*e.g.,* holiday bonuses, pay advances, loans, and profit sharing) are provided without regard to race, color, or sex.

Federal Contract Compliance Manual (FCCM)

## 3H01  EMPLOYMENT ACTIVITY RECORDS

COs must determine how the contractor processes applications, union referrals and walk-in applicants.  They must determine if the contractor is disproportionately rejecting qualified minorities and women.  COs must also determine the contractor's reasons for the rejections. When selection procedures are found to have an adverse impact, COs must refer to the procedures discussed in FCCM Chapter 1 for additional guidance.[202]

Like supply and service evaluations, COs will analyze the contractor's hiring, promotions and separations, as well as conduct a compensation analysis when reviewing the contractor's employment activity.  For guidance on conducting the compensation analysis, see FCCM 1P. The findings of the analyses must be included in the Narrative Summary of the Construction SCER, with supporting documents attached.

If the project is located on or near an Indian reservation, the CO should, during a review of employment activity records, inquire if the contractor has extended a publicly announced preference in employment to Indians living on or near the Indian reservation.  This hiring preference is permitted under Executive Order 11246.  However, contractors and subcontractors extending such a preference shall not discriminate among Indians on the basis of religion, sex, or tribal affiliation, and use of such a preference does not excuse a contractor from complying with the other requirements in 41 CFR Chapter 60.[203]

## 3H02  COLLECTIVE BARGAINING AGREEMENT

When a contractor asserts that hiring is controlled through a union hiring hall in accordance with a collective bargaining agreement, the CO must review the agreement to verify the assertion.  If the collective bargaining agreement is not clear, the CO should contact the union hall to determine the process.  If the collective bargaining agreement does not support the contractor's claim, the CO must evaluate the contractor's good faith efforts without considering its relationship with the union hiring hall.[204]

## 3H03  INCLUSION OF THE EQUAL OPPORTUNITY CLAUSE IN SUBCONTRACTS

COs will examine solicitations, purchase orders and subcontracts to ensure inclusion of the appropriate clauses as described in FCCM 3B01 and 3B02 above.  In addition, COs will examine the contractor's notification to its unions of its commitments under Executive Order 11246, Section 503 and VEVRAA.[205]

---

[202]  COs should be aware, however, that the adverse impact guidance discussed in FCCM 2M, is based on the UGESP recordkeeping requirements for contractors with 100 or more employees.  As most construction contractors have smaller workforces, they would instead be subject to the simplified recordkeeping requirements at 41 CFR 60-3.15(A)(1) that apply to contractors with less than 100 employees.

[203]  41 CFR 60-1.5(a)(7).

[204]  See Standard Federal Equal Employment Opportunity Construction Contract Specifications (Executive Order 11246), paragraph 5, set forth at 41 CFR 60-4.3(a).

[205]  41 CFR 60-1.4(a), 41 CFR 60-1.4(b), 41 CFR 60-300.5(a), and 41 CFR 60-741.5(a).

## 3H04   REVIEW OF PERSONNEL POLICIES FOR SEX DISCRIMINATION

As in a supply and service compliance evaluation, COs will examine the contractor's personnel policies and practices.  COs will determine whether contractor policies make prohibited distinctions in the conditions of employment based on sex. Below are some areas of inquiry for COs.

a.  *Conditions of Employment.*  COs must examine whether contractor policies make prohibited distinctions in conditions of employment based on sex.  Contractors must not make employment decisions based on stereotypes about how males and females are "supposed" to look or act.  Such employment decisions are a form of sex discrimination prohibited by Executive Order 11246, as amended.

b.  *Distinctions Based on Marital Status or Caregiver Responsibilities.*  A CO should examine written policies and conduct interviews with contractor staff and employees regarding the implementation of policies and practices to identify whether distinctions between married and unmarried people apply equally to both sexes, including distinctions between single parents and married parents based on gender.  In addition, the CO should assess contractor policies and practices to ensure that sex-based stereotypes about actual and perceived caregiving responsibilities are not in effect.

c.  *BFOQ.*  Contractors may not hire or employ employees on the basis of sex unless sex is a BFOQ reasonably necessary to the normal operation of the contractor's particular business or enterprise.  As a part of most on-site visits, the CO will examine job qualifications as stated by the contractor.  Under Title VII, sex has been found to be a BFOQ in extremely rare instances.  Among them are:

- *Authenticity.*  Jobs involving a need for authenticity or genuineness, such as actors or models.

- *Personal Privacy.*  Jobs where the performance of essential job elements would entail substantial invasion of personal privacy.  This is limited to situations where the normal operation of the contractor's business depends on the employee being the same sex as its employees or customers and there is no other way to ensure privacy.  This is different from customer preference.

d.  *Employment Opportunities.*  Contractors may not exclude individuals from jobs they believe are dangerous or unsuitable for women to perform unless sex is a BFOQ.  OFCCP follows Title VII principles when determining whether a policy excluding women from a job because of a concern about reproductive hazards is discriminatory.  If a question relating to reproductive hazards arises during a compliance evaluation, the CO should discuss the issue with his or her supervisor.

e.  *Compensation Discrimination.*  The CO will also examine possible compensation discrimination issues.  Compensation discrimination encompasses discrimination salary, wages, overtime pay, shift differentials, bonuses, commissions, vacation and holiday pay, allowances, insurance and other benefits, stock options and awards, profit sharing, and

retirement.  Contractors cannot make distinctions in compensation on the basis of sex.
FCCM 1M provides additional information on this issue.

*f.   Employment Advertising.*  The CO will examine the contractor's advertisements in
newspapers online and in other media.  The advertisements must not recruit or advertise for
individuals for certain jobs on the basis of sex.  Use of sex-specific terms for jobs (such as
"linemen") is suspect but is not automatically a violation of Executive Order 11246.  Where
sex-specific language is used in conjunction with prominent language that clearly indicates
the contractor's intent to invite applications without regard to applicants' sex, COs should not
find a violation.

Several examples of the types of issues that COs may encounter related to a review of personnel
policies are provided in 2K, Compliance with the Sex Discrimination Regulations.

## 3I      EVALUATION OF IMPLEMENTATION OF AFFIRMATIVE ACTION STEPS SET FORTH IN 41 CFR 60-4.3(a) PARAGRAPH 7

In evaluating a contractor's compliance with the affirmative action steps, COs must verify that
the records, interviews and other information provided by the contractor demonstrate the
contractor's compliance.  The CO's evaluation of the contractor's compliance is based on the
contractor's effort to achieve maximum results from its actions.  For compliance review
purposes, the affirmative action specifications in 41 CFR 60-4.3(a) paragraph 7 are grouped into
the following five major evaluation categories:

- Recruitment practices;

- Training;

- EEO policy and implementation;

- Personnel operations; and

- Contracting activity.

Each of these evaluation categories is discussed in subsections 3I00 through 3I04, below.

These categories correspond to the organization of the Form CC-40 Standard Compliance
Evaluation Report (or the Construction SCER).[206]  The CO will evaluate the VEVRAA and
Section 503 affirmative action requirements from Part III.H of the Construction SCER.  The
discussion below provides instructions on completing the Construction SCER.

---

[206]   See Appendix A-6 Standard Compliance Evaluation Report (Construction).

## 3I00    EVALUATION OF RECRUITMENT PRACTICES

The following subsections pertain directly to Part III.A of the Construction SCER and set forth the procedures for evaluating the contractor's recruitment practices.[207]

a. *Recruitment Sources.*  The contractor must establish and maintain a current list of recruitment sources, including sources for minorities and women.  The contractor must provide written notification to these recruitment sources and to community organizations when it or its union(s) has employment opportunities available.  The contractor must maintain a record of recruitment source responses.  See Item III.A.l. of the Construction SCER.  To evaluate the contractor's compliance with this specification, the CO will:

- Determine whether the contractor maintains a current list of recruitment sources.

- Determine whether the list is current (has been updated within the last year); whether it contains an adequate number of active, available sources; and whether the recruitment sources listed are in operation, *i.e.*, active.

- Contact referral sources to verify that they received recruitment letters and emails, and to determine whether they actually made referrals.

- Interview employees involved in recruiting applicants and hiring supervisors to determine whether they use the list when vacancies occur.

- Review correspondence with recruitment sources.  This review should:

  o Verify that the contractor sent and the recruitment sources received the letters, and that the contractor made follow-up contact.

  o Ensure that the letters contained a statement of the contractor's EEO policy and the nature of the employment opportunity.

  o Review the contractor's files, telephone logs or other evidence to determine if the contractor maintained copies or records of responses. Determine if the contractor followed-up on responses.

b. *Applicant Records.*  In addition to preserving any personnel and employment record as described at 41 CFR 60-1.12, the contractor should maintain a current file of the names, addresses, telephone numbers, sex, race and ethnicity of each minority and female walk-in applicant or referral from a union, recruitment source or community organization, and of the action taken with respect to each individual.[208]  If an individual was sent to the union hiring hall for referral and was not referred back to the contractor by the union or, if referred, was not employed by the contractor, the documentation in the file should include the reason why

---

[207]  Refer to 41 CFR Part 60-20, Discrimination on the Basis of Sex; 41 CFR Part 60-50, Religion/National Origin Guidelines; and 41 CFR 60-4.3(a) paragraph 7 steps b, c, d, i and j for more information.
[208]  41 CFR 60-4.3(a) paragraph 7 step c, 60-1.12(c), and 60-3.15A.

the individual was not hired (or referred) and any action the contractor took.[209]  The CO should fully investigate any indications of possible discriminatory practices.  To evaluate the contractor's compliance with this specification, the CO should:

- Determine whether the contractor maintains a current file that lists the names, addresses, telephone numbers, sex, race and ethnicity of each walk-in applicant and each referral from a union or community source.

- Evaluate the file for active construction recruitment sources such as unions and community referral organizations.

- Interview supervisors responsible for hiring to determine the general hiring procedure and any specific procedures they use to recruit workers, including minorities and women.

- Determine what sources the contractor uses to obtain job applicants.  Sources may include, for example, walk-ins, union hiring hall, newspaper advertisements, word of mouth, and recruitment and training programs.

c.  *Failure of Union to Refer.*  The regulations require the contractor to immediately notify the Director, in writing, when a union(s) with which it has a collective bargaining agreement has not referred to the contractor a minority or woman sent by the contractor or when the contractor has other information that the union referral process has impeded the contractor's efforts to meet its contractual EEO obligations.[210]

> To evaluate the contractor's compliance with this specification, the CO should determine whether the contractor took any other actions to facilitate hiring the individual such as additional written contact with the union specifically requesting referral of that individual, or attempting to hire the individual directly, without union referral.  Whenever the contractor states in writing that the union has not referred minorities and women or that other union actions have impeded its affirmative action efforts; there are allegations that the union has committed unlawful discrimination; or the CO becomes aware that union actions impede or threaten to impede the contractor's affirmative action efforts, the CO should discuss the matter with his or her supervisor as soon as possible.

d.  *Directing Recruitment Efforts.*  In accordance with regulations, the contractor is required to engage in recruitment efforts that reach out to all demographic groups in the recruitment area, including minority, women's and community organizations, and schools with minority and female students; and engage in recruitment efforts that reach out to recruitment and training organizations for minorities and women serving the contractor's recruitment area and employment needs.[211]

Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, the contractor should send written

---

[209]  See Item III.A.2. of the Construction SCER.
[210]  41 CFR 60- 4.3(a) paragraph 7, step d.  See Item III.A.3. of the Construction SCER.
[211]  41 CFR 60-4.3(a) paragraph 7, step i.

notification to organizations in the recruitment area, describing the openings, screening procedures and test(s) to be used in the selection process. (See Item III.A.4. of the Construction SCER.)

To determine whether the contractor is in compliance with this specification, the CO should:

- Request written documentation of the contractor's efforts to recruit applicants for training and employment opportunities.

- Review documentation that the contractor provided timely notice to recruitment sources, including minority, women's and community organizations, at least one month prior to acceptance of applications for apprenticeship or training opportunities. The CO should also verify that appropriate sources have been contacted.

e. *Employee Referrals.* The regulations require the contractor to encourage employees, including present minority and female employees, to recruit others for employment openings.[212] When reasonable to do so, as required by the regulations, the contractor must provide after-school, summer and vacation employment to minority and female youth both on the worksite and in other areas of its workforce. To evaluate the contractor's compliance with this specification, the CO should:

- Interview minority and female employees to determine whether the contractor has encouraged them to recruit other minority individuals and women to apply for employment.

- Interview supervisors, minority and female employees to determine whether the contractor provides after-school, summer and vacation employment to minority and female youth.

- Review personnel records to verify employment of minority and female youths in after-school, summer and vacation job opportunities.

## 3I01    EVALUATION OF TRAINING

The contractor shall develop on-the-job training opportunities and participate in training programs that are relevant to the contractor's employment needs and are intended to upgrade the skills of its workers. These programs and opportunities must expressly include minorities and women.[213] Examples of possible programs and opportunities include apprenticeships and trainee programs relevant to the contractor's employment needs, especially those programs the U.S. Department of Labor funded or approved.[214]

To evaluate the contractor's compliance with this specification, COs must:

---

[212]  41 CFR 60-4.3(a) paragraph 7, step j.
[213]  41 CFR 60-4.3(a) paragraph 7, step e.
[214]  See Item III.B.1. of the Construction SCER. Refer to 41 CFR Part 60-20, 41 CFR 68-4.3(a) paragraph 7, step e and Part III.B of the Construction SCER.

- Determine whether the contractor has developed and conducted any training programs and, if so, whether it has provided notice of these programs to its recruitment sources. Obtain copies of any letters informing recruitment sources or schools of training programs, including those to minority and women sources. Get the names of applicants that the contractor referred to the programs. Determine whether the contractor has employed and trained anyone below the journey level. If it has, describe what was done.

- Determine which trades are covered by formal apprenticeship programs (typically found in projects utilizing union labor) or other types of formal training programs not associated with trade unions. When either type of program is in place, a CO must determine the participation rate of minorities and women.

- When there are no formal programs for a particular trade, determine what, if anything, the contractor has done to provide on-the-job training, and the extent to which that training was made available to minorities and women.

- If the contractor provides on-the-job training, determine whether minorities and women have equal access to training in all trades. Determine whether minorities and women are performing all aspects of their trade or if the contractor is repeatedly assigning them to the same task.

- Determine whether the contractor has records of cash contributions, equipment supplied or contractor personnel provided as instructors for Office of Apprenticeship approved, or U.S. Department of Labor funded, or other training programs.

- Determine whether the contractor has records of specific hiring and training of workers from such programs. The CO should also determine the results of the contractor's efforts (*e.g.,* number of workers trained identified by race, ethnicity and sex, hours worked, hours trained, relative compensation, trade) and record the results in the report.

## 3I02   EVALUATION OF EEO POLICY IMPLEMENTATION

This subsection draws from 41 CFR Part 60-20; 41 CFR Part 60-50; 41 CFR 60-4.3(a) paragraph 7 steps g, h, l and p; and Part III.C of the Construction SCER. It covers five areas:

- Development of and dissemination of EEO policy;

- Review of EEO policy;

- External dissemination of EEO policy;

- Promotion policy; and

- Supervisory performance.

a. *Development and Dissemination of Policy.* The contractor shall develop and disseminate its EEO policy by providing notice of its policy to unions and training programs and by

Federal Contract Compliance Manual (FCCM)

requesting their help in meeting its EEO obligations.  The contractor shall also include its EEO policy in any policy manual and collective bargaining agreement and publicize it in the company newspaper or annual report, if any.  The contractor shall also specifically review the policy with all employees at least once each year and post it on bulletin boards accessible to all employees and applicants at each location where construction work is performed.[215]

To evaluate the contractor's compliance with this specification, COs must determine whether the EEO policy contains at least the following items:

- A statement that the contractor will not discriminate against employees and applicants for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin, and that it will take affirmative action to ensure that employees and applicants for employment will be employed and treated during employment, without regard to race, color, religion, sex, sexual orientation, gender identity or national origin;

- The name, telephone number and means of access to the contractor's EEO Officer;

- An assurance that this policy will be followed in all personnel actions; and

- The signature of the CEO and date.

COs must also determine whether the EEO policy is posted in conspicuous places available to employees and applicants.  Several places may be appropriate for posting the EEO policy and some examples include company offices, project sites and project trailers, if applicable.[216]

In addition to determining whether the EEO policy is posted, the CO will determine if the Pay Transparency Nondiscrimination Provision is posted physically or electronically for employees and applicants and incorporated into employee handbooks and manuals.[217]

Interviews of employees are important for determining if the contractor reviewed EEO policy at least annually with all employees and personnel responsible for hiring, assignments and other personnel actions.  Other actions COs must take to evaluate the contractor's compliance include:

- Determining whether unions, where applicable, and training programs have been notified and provided with a copy of the EEO policy.  Obtain copies of correspondence, or other documentation of such notification; and

- Reviewing as applicable, policy manuals, collective bargaining agreements, company newspapers and/or annual reports for inclusion of the contractor's EEO policy.

b.  *Review of Policy.*  The contractor shall review, at least annually, the company's EEO policy and affirmative action obligations with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions, including specific review of

---

[215]  See Item III.C.l. of the Construction SCER.
[216]  41 CFR 60-1.4(a) paragraph 1; 41 CFR 60-1.4(b) paragraph 1.
[217]  41 CFR 60-1.35(c); see, 41 CFR 60-1.4(a) paragraph 3 and 41 CFR 60-1.4(b) paragraph 3.

Federal Contract Compliance Manual (FCCM)

these items with all on-site supervisory personnel prior to the initiation of work at any job site. The contractor must maintain a written record of the time and place of these meetings, people attending, subject matter discussed and disposition of the subject matter.[218] Disposition of the subject matter may include any further action to be taken by attendees and participants. In evaluating the contractor's compliance with this specification, COs should:

- Substantiate through examination of meeting notes or other such documents that the contractor has conducted, at least annually, a review of the contractor's EEO policy and affirmative action obligations with all employees having any responsibility for hiring, job assignment, layoff, termination or other personnel decisions, including the transferring of employees to different job sites;

- Identify each job site at which the contractor has initiated work within the 12-month period prior to the start of the compliance review. Verify the date prior to the commencement of work at each such job site on which the contractor met with on-site supervisory personnel to discuss the contractor's EEO policy and affirmative action obligations; and

- Review the actions taken by the contractor to resolve any problems identified.

c. *External Dissemination of Policy.* The contractor shall disseminate its EEO policy externally by including it in any advertising in the media, including media directed at minorities and women. In addition, the contractor shall provide written notification to, and shall discuss its EEO policy with, other contractors and subcontractors with which it does or anticipates doing business.[219] In evaluating the contractor's compliance with this specification, the CO should:

- Review copies of advertisements to determine whether the contractor included its commitment to its EEO policy (*e.g.,* the EEO tag line as described in Chapter 2, 2M00(a)) and whether advertisements appeared in media announcements that reach all demographic groups in the recruiting area;

- Determine whether the contractor's written notification to other contractors and subcontractors with which it does or anticipates doing business is accurate and timely (at least at the start of each major contract); and

- Review and verify documentation such as telephone logs, file notes, etc., on the contractor's discussion(s) with other contractors and subcontractors to determine whether the contractor's EEO policy was discussed.

d. *Promotion Policy.* At least annually, the contractor shall inventory and evaluate all current minority and women employees for promotional opportunities.[220] The contractor shall encourage these employees to seek or to prepare for promotional opportunities through

---

[218]  See Item III.C.2., of the Construction SCER.
[219]  41 CFR 60-4.3(a)7h and Construction SCER Item See Item III.C.3..
[220]  41 CFR 60-4.3(a) paragraph 7, step l and Construction SCER Item III.C.4.

Federal Contract Compliance Manual (FCCM)

appropriate training.[221] To evaluate the contractor's compliance with this specification, COs must:

- Review the contractor's policies and personnel procedures regarding upgrading and promotion; determine how first-line and other supervisors are selected and how collective bargaining agreements impact company policies;

- Review all promotions and the employees whom the contractor could have or should have considered;

- Obtain documentation of the contractor's annual inventory and evaluation of all employees for promotional opportunities; and

- Verify through interviews and a review of documentation that the contractor encouraged all employees, including minorities and women, to seek or prepare for promotional opportunities through appropriate training.

e.  *Supervisory Performance*.  The contractor shall conduct a review, at least annually, of all supervisors' adherence to and performance under its EEO policies and affirmative action obligations.[222]  To evaluate the contractor's compliance with this specification, the CO should review letters, reports, performance evaluations, EEO training courses and materials and minutes of meetings.  Interviews of supervisory personnel should be conducted.

## 3I03    EVALUATION OF PERSONNEL OPERATIONS

The CO should consider four areas during an evaluation of personnel operations: work environment, validation, effects of personnel practices and nonsegregation of facilities and activities.[223]  This subsection draws from 41 CFR 60- 4.3(a)7, a, k, m and n and Part III. D of the Construction SCER.  Each is discussed in turn in this section.

a.  *Working Environment*.  The contractor must ensure and maintain a working environment free of harassment, intimidation and coercion at all sites and in all facilities at which the contractor's employees are assigned to work.[224]  Harassment, intimidation and coercion can take many forms on the job site.  These actions may be directed toward employees or applicants on any protected bases.  They may consist of verbal, visual or written abuse, such as insults, graffiti, posters, suggestive comments and demands, racial slurs, leering or pressure for sexual activity.  They may also include physical aggressiveness such as touching, pinching, patting and shoving, or the hiding or sabotaging of tools and equipment.  Whatever the action, it can create a stressful working atmosphere which impairs job

---

[221]  ibid.
[222]  41 CFR 60-4.3(a) paragraph 7, step p. and Construction SCER Item III.C.5.
[223]  Refer to 41 CFR Part 60-20; 41 CFR Part 60-50; 41 CFR 60-4.3(a) paragraph 7, steps a, k, m and n; and Part 1II.D of the Construction SCER for more information.
[224]  41 CFR 60-4.3(a) paragraph 7, step a, if unlawful harassment is identified, it is a violation of the equal opportunity clauses found at 41 CFR 60-1.4(a) and 41 CFR 60-1.4(b), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a).

performance and work relationships and often results in the victim quitting the job.  During the physical inspection of the contractor's worksites, the CO should:

- Look for any physical evidence of intimidation, harassment, or coercion;

- Interview female and minority employees to determine whether there have been any incidents of harassment, intimidation or coercion;

- Determine whether such incidents were reported to the supervisor and if so, what action was taken to resolve the problem;

- Interview supervisory staff to determine whether they are aware of the contractor's obligation under this specification;

- Review contractor files (minutes of meetings, memoranda, etc.) to determine whether the contractor has discussed this specification with supervisors; and

- Review discharges and terminations and, where possible, interview minorities and women recently terminated, to determine if harassment or intimidation was a factor in their leaving the job.

  Where possible, the contractor will assign at least two women to each construction project.[225]  The contractor shall specifically ensure that all supervisory personnel are aware of, and carry out, its obligation to maintain such a working environment, with specific attention to minorities and women working at such sites or in such facilities.[226]

b. *Validation.*  The contractor must validate all tests and other selection requirements where there is an obligation to do so under 41 CFR Part 60-3.[227]  COs should also refer to the discussion in Chapter 2 and to the "Questions and Answers to the Uniform Guidelines on Selection Procedures."[228]  Procedures for identifying adverse impact resulting from employee selection procedures are in Chapter 1 and Chapter 2.

c. *Effect of Personnel Practices.*  Contractors must ensure that seniority practices, job classifications, work assignments, opportunities for overtime and other personnel practices do not have a discriminatory effect on minorities and women by monitoring all personnel and employment related activities to ensure that the specifications are being carried out.[229]  In evaluating the contractor's compliance with this specification, COs will:

---

[225]  41 CFR 60-4.3(a) paragraph 7 step a.
[226]  See Item III.D.l., of the Construction SCER.
[227]  See Item III.D.2 of the Construction SCER. Under 41 CFR 60-3.15, contractors with 100 or fewer employees are not required to make adverse impact determinations or maintain validity evidence.
[228]  See 44 FR 11996, 12009 (Mar. 2, 1979) supplemented by 45 FR 29350 (May 2, 1980).
[229]  41 CFR 60-4.3(a)7.m.  See Item III.D.3. of the Construction SCER.

Federal Contract Compliance Manual (FCCM)

- Determine whether the contractor's personnel policies and practices have a discriminatory effect; and

- Review personnel policies and practices such as transfers that create employment opportunities, seniority practices, job classifications, work assignments (*e.g.,* minorities and women sent only to federally or state funded projects), layoff procedures, project locations, wage rates,[230] overtime hours for discriminatory effects.

*d. Nonsegregated Facilities and Activities.* The contractor must ensure that all job sites, facilities and company activities are nonsegregated, except for separate or single user toilets and changing facilities where necessary to assure privacy between the sexes.[231] In evaluating the contractor's compliance, during the worksite inspection, the CO should:

- Determine whether the contractor provides and maintains adequate toilet and changing facilities to ensure privacy between the sexes; and

- Interview management and employees to determine whether announcements of company social/recreational activities have been posted and are made available to all employees.

## 3I04    EVALUATION OF CONTRACTING ACTIVITY

One element of a good faith commitment to equal employment opportunity is the use of small disadvantaged businesses or disadvantaged business enterprises as subcontractors.[232] These efforts must be documented. This subsection draws from 41 CFR 60-4.3(a) paragraph 7, step o and Part III.E of the Construction SCER; COs should refer to these provisions for more information. Records of all solicitations of offers for subcontracts from construction contractors and suppliers that are small disadvantaged businesses or business enterprises, including circulations of solicitations to minority and women's contractor associations, must be maintained and produced upon request.[233] In assessing the contractor's efforts in this regard, the CO should:

- Determine whether there are solicitations to small disadvantaged businesses or disadvantaged business enterprises, and minority and female contractor associations;

- Verify that the solicitations to small disadvantaged businesses or disadvantaged business enterprises are made on the same basis as those to larger contractors.

---

[230]  COs are reminded that wage rates may be specified in Collective Bargaining Agreements.

[231]  41 CFR 60-4.3(a) paragraph 7, step n. See Item III.D.4. of the Construction SCER.

[232]  41 CFR 60-4.3(a) paragraph 7, step o. Regulations in place as of the time of the publication of this version of the FCCM refer to solicitation of offers from minority and female construction contractors and suppliers. Affirmative action programs in federal procurement are, however, no longer reserved for minority and women-owned businesses. The Small Business Administration and the Department of Transportation procurement programs are for small disadvantaged business disadvantaged business enterprises, including minority and women-owned businesses. Accordingly, the terms "small disadvantaged business" and "disadvantaged business enterprises" are used in this section.

[233]  Both 41 CFR 60-4.3(a)7.o and Part III.E of the Construction SCER provide related information.

## 3J    INTERVIEWS

Conducting interviews is the fourth activity in a construction on-site review.  Interviews typically take place during the CO's worksite inspection of the contractor's federal and nonfederal projects.  COs should prepare interview outlines and/or questions in advance of the on-site, referencing FCCM 2F, Interviews.  COs should conduct sufficient interviews of employees and supervisors to resolve any outstanding issues or questions.  This includes interviewing these key groups:

- Supervisors, to determine if they are aware of and adhere to the affirmative action specifications.  Supervisory personnel are often the individuals to whom applicants speak concerning employment opportunities, and they are likely to make job and overtime assignments;

- Current employees (nonminority males, as well as minorities and women);

- Union officials, if applicable;

- Applicants (nonminority males, as well as minorities and women); and

- Former employees (nonminority males, minorities and women) to determine how the contractor and co-workers treated them on the job.

If the contractor has only a few women or minorities in its construction workforce, COs will make every effort to interview each one.  If all the women and minority employees cannot be interviewed, COs should select a representative sampling from each trade for interview.  These interviews should probe for any evidence of discrimination, including harassment, and other indicators of noncompliance.

COs will refer any complaints received from employees during these interviews related to the Davis-Bacon Act wage rates to the DOL's WHD.

## 3K    PHYSICAL INSPECTION OF CONTRACTOR WORKSITES

The purpose of conducting an inspection of worksites is to obtain additional information regarding the contractor's compliance with the requirements, including requirements that must be implemented at such sites (*e.g.,* posting of policy, EEO poster).  In addition, a CO can document the type of work performed, the conditions under which it is performed and the makeup of the workforce performing that work, through the on-site inspection.

The CO should inspect at least one federal or federally assisted construction worksite that is related to the construction contract as a part of the compliance review and, whenever possible, nonfederally involved worksites should be inspected as well.  COs must include information on the worksites inspected (*e.g.,* project name, location, and funding) in Part IV of the Construction SCER.

Federal Contract Compliance Manual (FCCM)

## 3K00   INVESTIGATION OF COMPLIANCE

a.  *Equal Opportunity Clause and Other Requirements.*  The CO should review bulletin boards maintained on-site to ensure that the contractor's EEO policy is posted and that the required notices at 41 CFR 60-1.35(c) and 41 CFR 60-1.42 are also posted.[234]  For contractors subject to the VEVRAA and Section 503 AAP requirements of 41 CFR 60-300 and 41 CFR 60-741, the CO should determine whether notice of the location and hours of availability of the written AAP(s) are also posted.[235]

b.  *Working Conditions*.  The CO should review working conditions to determine whether there is evidence of harassment, intimidation or coercion, for example, a substantial difference in the conditions available to women or minorities.  When feasible, at least two women should be assigned to the project(s).  Also ensure that all facilities are nonsegregated, and that, where appropriate, the contractor provided separate or single-user toilet and changing facilities to ensure privacy between the sexes.

## 3K01   COMPLIANCE WITH EXECUTIVE ORDER 13496

Pursuant to Executive Order 13496 and its implementing regulations, 29 CFR Part 471, federal contractors and subcontractors (but not federally assisted construction contractors) must notify employees about their rights under the NLRA.  Contractors with covered contracts must meet their obligations under Executive Order 13496.[236]

Executive Order 13496 requires that covered contractors post notices specifying employee rights under the NLRA.  The NLRA guarantees employees the right to organize and bargain collectively with their employer, and to be free from retaliation for so doing.  Contractors must post the notice conspicuously in and around their establishments, worksites and offices so that it is prominent and employees who are covered by the NLRA and directly or indirectly (*e.g.,* maintenance, repair, personnel, payroll work) engaged in contract-related activity can readily see it.  COs must inspect employee bulletin boards and areas frequented by applicants and employees, such as break rooms, personnel offices and common areas, for the required poster. If the contractor customarily posts employee notices regarding the terms and conditions of employment electronically, then the contractor must also post the Executive Order 13496 notice electronically.  COs must verify the contractor's compliance.

Executive Order 13496 also requires that covered contractors ensure that each subcontract and purchase order related to their federal contract(s) contains a notice of this posting obligation. COs must review a sampling of subcontracts and purchase orders to ensure that a covered contractor complies with this requirement.

---

[234]  Required notices include the Pay Transparency Nondiscrimination Provision, Equal Employment Opportunity is the Law poster and any required poster supplements.  If the Pay Transparency Nondiscrimination Provision is not physically posted, it must be posted electronically.

[235]  See 41 CFR 60-300.41, and 41 CFR 60-741.41.

[236]  See OFCCP Directive 2010-01, "Verification Procedures under E.O. 13496, Notification of Employee Rights under Federal Labor Laws, and the Department of Labor's Implementing Regulations at 29 C.F.R.  Part 471."

There are exceptions to the posting requirements so COs must consult with the RSOL, their supervisors or the national office if there are questions about coverage under Executive Order 13496.[237]  If a violation of Executive Order 13496 is not corrected, the Director of OFCCP, or a designee, refers the matter to the Director of OLMS, who may take enforcement action, as appropriate, under 29 CFR 471.13.

## 3L    COMPLIANCE WITH SEX DISCRIMINATION REGULATIONS

All construction contractors, whether involved in federal or federally assisted construction work, must be able to demonstrate compliance with 41 CFR Part 60-20, *Discrimination Based on Sex*. COs will refer to FCCM Chapters 2 and 6, as appropriate, for procedures to follow in reviewing for compliance with these regulations.  The contractor's compliance with these regulations must be described in Section III.F. of the Construction SCER.

## 3M    COMPLIANCE WITH RELIGION AND NATIONAL ORIGIN GUIDELINES

All construction contractors, whether involved in federal or federally assisted construction work, must be able to demonstrate compliance with 41 CFR Part 60-50, *Guidelines on Religion and National Origin*.  The CO will refer to Chapter 2 for procedures to follow in reviewing for compliance with these requirements; they must describe the contractor's compliance with these guidelines in Section III.G. of the Construction SCER.

## 3N    COMPLIANCE WITH VEVRAA AND SECTION 503

Construction contractors with a covered federal contract or subcontract must comply with the requirements of Section 503 and VEVRAA and their implementing regulations.[238]

The general requirements of these regulations require that federal contractors not discriminate based on protected veteran status or disability.  Contractors must provide needed reasonable accommodations to the known physical and mental limitations of qualified individuals with disabilities unless the accommodation would cause an undue hardship.  In addition, federal contractors must engage in affirmative action to employ and advance in employment protected veterans and qualified individuals with disabilities.  Among other obligations, covered federal contractors must post required notifications for employees and applicants, notify each labor organization with which it has a collective bargaining agreement, incorporate the equal opportunity clauses into subcontracts and include the tag line in all job advertisements.[239]  A few

---

[237]  See Executive Order 13496 Frequently Asked Questions, *http://www.dol.gov/ofccp/regs/compliance/EO13496_faqs.htm* (last accessed Sept. 11, 2019).

[238]  41 CFR Part 60-300 and 41 CFR Part 60-741.  OFCCP maintains current thresholds for covered contractors at *https://www.dol.gov/ofccp/taguides/jurisdiction.htm*.

[239]  See 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a).

examples of acceptable combined job advertisement tag lines are "Equal Opportunity Employer – disability and vet," and "EOE including disability and vet."[240]  Federal contractors covered by VEVRAA must also list employment openings with the appropriate ESDS where the opening occurs.

Under VEVRAA, covered federal contractors with 50 or more employees must invite applicants to self-identify as a protected veteran at both the pre-offer stage of employment and at the post-offer stage.  Additionally, they must develop a written VEVRAA AAP.  The AAP includes a policy statement, review of personnel processes, review of physical and mental job qualifications, reasonable accommodation to physical and mental limitations, procedures to prevent harassment, external and internal dissemination of policy, outreach and positive recruitment, an audit and reporting system, designation of responsibility for implementation, training, data collection and analysis, and establishment of a hiring benchmark.  Federal contractors are required to make the AAP, absent the data metrics required by 41 CFR 60-300.44(k), available to applicants and employees, and post notice of the availability.[241]  COs will analyze the AAP, following the guidance in FCCM 1H and FCCM 2I.

Under Section 503, covered federal contractors with 50 or more employees must invite applicants and employees to self-identify as a person with a disability using the OMB-approved "Voluntary Self-Identification of Disability form" (Form CC-305).  Federal contractors must offer the form to applicants at pre-offer and post-offer stages of employment.  Federal contractors must also offer the form to employees in the first year the contractor becomes subject to the self-identification requirement and at five-year intervals thereafter.  In addition, they must remind their employees at least once during the years between invitations that employees may voluntarily update their disability status.  Covered federal contractors with 50 or more employees must also develop a written Section 503 AAP.  The AAP includes a policy statement, review of personnel processes, review of physical and mental job qualifications, reasonable accommodation to physical and mental limitations, procedures to prevent harassment, external and internal dissemination of policy, outreach and positive recruitment, an audit and reporting system, designation of responsibility for implementation, training, data collection and analysis, and a utilization goal and analysis.  Federal contractors are required to make the AAP, absent the data metrics required by 41 CFR 60-741.44(k), available to applicants and employees, and to post notice of the AAP's availability.[242]  CO's will analyze the AAP, following the guidance in FCCM 1G and FCCM 2H.

COs must describe in detail the federal contractor's compliance with VEVRAA and Section 503 implementing regulations in Section III.H. of the Construction SCER.

---

[240]  For a contractor covered by Section 503, VEVRAA and EO 11246, an example of an acceptable combined tag line may be "EOE race/color/sex/sexual orientation/gender identity/disability/vet."
[241]  41 CFR 60-300.41
[242]  41 CFR 60-741.41

# 3O    IDENTIFICATION AND RESOLUTION OF EMPLOYMENT DISCRIMINATION

The CO may identify potential individual or systemic discrimination during the compliance review.  Chapter 2 of this Manual contains a detailed description of the procedures the CO should use for gathering and analyzing facts to determine whether employment discrimination exists.  These procedures are directed primarily at supply and service compliance evaluations, but the CO may adapt them for use in construction compliance reviews.  The theoretical bases for proving discrimination are equally applicable to employment discrimination identified in construction compliance reviews.  Remedies for employment discrimination are also found in Chapter 7 of this Manual.

# 3P    EXIT CONFERENCE

The exit conference is the final activity in an on-site review.  Following the general guidelines outlined in FCCM 22D04, the CO should conduct an exit conference for the construction firm's CEO, or designee, at the conclusion of the on-site review.  During this conference, the CO should:

- Outline the preliminary results of the review;

- Identify any violations and the corrective actions necessary to resolve the violations;

- Inform the contractor that it will receive a written notice summarizing the violations and remedies required; and

- Inform the contractor that he or she may resolve the violations with a CA.

If the contractor disputes the violation finding, the CO should assure the contractor that OFCCP will consider any pertinent additional evidence submitted within a specified time before determining its compliance status.

# 3Q    STANDARD CONSTRUCTION COMPLIANCE EVALUATION REPORT

The Construction SCER is a tool used by COs to document the findings of the compliance evaluation.  It also establishes a framework for conducting the on-site and documents the results of the evaluation.  The current version of the Construction SCER is in Appendix A-6.

### 3Q00   PURPOSE AND CONTENT OF THE SCER

COs must use the Construction SCER when conducting a construction compliance evaluation to report compliance evaluation results.  The Construction SCER aims to provide objective measures of a contractor's efforts to implement the required affirmative action obligations specified in the regulations.  The CO uses the Construction SCER worksheets to specify:

- Whether a particular issue or problem needs analysis as an individual case or a systemic case; and

- Whether the particular issue or problem requires a disparate treatment analysis, a disparate impact analysis, or both.

The SCER includes a narrative summary of findings that should be organized as described below.

a.  *Scope of Review*.  The CO should briefly state those items covered in the pre-review, the on-site review and the project interviews.

b.  *Analysis*.  The CO must present an analysis of pertinent materials for each area examined including any indicators he or she identified from analyses of personnel activity and compensation.  The CO must identify sources of information (*e.g.,* interviews conducted, records examined, worksites inspected and community contacts made).  If a CO finds deficiencies, the explanation must be sufficient to permit a person who is unfamiliar with the case to understand the basis for each deficiency determination.  The CO will also provide detailed narrative information on problem areas identified during the review of the contractor's below activities.

- Recruitment Practices;

- Training;

- EEO/AA Policy and Implementation;

- Personnel Operations and Leave Policies;

- Contracting Activity;

- Discrimination Violations;

- Implementation of Discrimination on the Basis of Sex regulations;[243]

- Implementation of Guidelines on Discrimination Because of Religious or National Origin;[244]

- Implementation of Section 503; and

- Implementation of VEVRAA.

c.  *Conclusions*.  The CO must make a final assessment of the findings and how these relate to the contractor's compliance status.

---

[243]  41 CFR Part 60-20.
[244]  41 CFR Part 60-50.

d. *Resolution.*  If the CO identifies violations, the CO must describe the corrective action necessary to consider the contractor in compliance.  Both parties must agree to specific corrective actions that the CO will include in a CA, as appropriate.  Otherwise the CO must issue an SCN.[245]

e. *Recommendations.*  The CO must recommend that the contractor be found either in apparent compliance or noncompliance.  Evidence to support the CO's recommendation must be documented in the case file.

After concluding the on-site review, the CO must complete any required analyses of the data and other information that was gathered.  The CO must investigate problem areas and issues until the case file contains sufficient evidence to establish whether discrimination did or did not occur.  The case file should retain all evidence the CO obtained and documents the CO created, including any evidence that does not support the CO's conclusions.

## 3Q01   SUMMARY OF FINDINGS

After completing the compliance evaluation, including all on-site and off-site analyses of the information obtained and recorded in the Construction SCER, the CO must compile a summary of findings to include in the narrative summary of findings.  This summary includes the findings of the case, the bases for the findings and the CO's recommendations.  The summary of findings should also include the:

- Name and description of the facility;

- Problem area(s) identified, if applicable;

- Description of the selection or other process or practice examined (*e.g.,* for a hiring case, the steps in the application process);

- Results of any analyses conducted, such as IRAs, comparative (cohort) analysis, and regression analysis;

- Summary of any interviews conducted;

- Relevant anecdotal evidence obtained;

- Description of any violations and their bases;

- Recommended corrective actions, where the CO has identified violations; and

- Recommended next steps.

---

[245]   41 CFR 60-4.8.

The summary should logically lead to the CO's conclusion about whether or not a violation occurred.  The CO submits the completed SCER to his or her supervisor for approval.  The final SCER must be signed.

Depending upon the circumstances of a particular case, it may be a good practice to conduct a follow-up meeting or teleconference with the contractor.  Below is an example of why this is a good practice.

- The CO held an exit conference with the contractor at the conclusion of the on-site review.  However, following off-site analysis, the CO found additional issues that need to be discussed with the contractor.  More specifically, at the conclusion of the on-site, the CO told the contractor that it would be cited for failing to track the race, ethnicity and gender of job applicants passing through various phases of the selection process.  However, during off-site analysis, it became clear to the CO that the contractor also discriminated in its termination activity.

After advising the contractor of its compliance evaluation findings, the CO must provide formal notification through a PDN or NOV.  COs use certified mail, return receipt requested, to provide this notice to the contractor.  If requested by the contractor, a courtesy copy is sent by email or facsimile.  We discuss the various forms of notice in more detail in Chapter 8, Resolution of Noncompliance.

If, prior to the issuance of the notice of compliance, the contractor provides new evidence, the CO must conduct any necessary investigation and analyses to determine if the new evidence changes any of the initial findings and to ensure that the final findings are fully supported.  A basic part of any additional investigation is verifying the credibility of the new evidence.

## 3R    NOTIFICATION OF COMPLIANCE REVIEW RESULTS AND RESOLUTION OF VIOLATIONS

When no violations are found, a CO prepares a letter of no apparent violations, to be issued and signed by the District Director.[246]  However, when violations are found, a PDN or an NOV is prepared.[247]  Both are issued and signed by the District Director.

The PDN includes full details of each deficiency and violation, including appropriate citations to the regulations and the needed corrective actions.  Contractors may voluntarily resolve violations through a CA.  See below for a discussion of this resolution document.

## 3S    EXAMPLES OF COMMON VIOLATIONS

Below is a list of common violations that may be resolved in a CA, if possible:

---

[246]  See Letter L-5 – Notice of Closing: Compliance Evaluation (No Violation Found).
[247]  See FCCM Chapter 8 – Resolution of Noncompliance.

Federal Contract Compliance Manual (FCCM)

- *List of Recruitment Sources.*  Failure to maintain a list of recruitment sources that includes recruitment sources for women and minorities, and failure to provide written notice to these sources and community organizations regarding job opportunities, and to maintain records of their responses.[248]

- *List of Applicants.*  Failure to maintain a file of the names, addresses and telephone numbers of each walk-in applicant and union referral, identified by sex, race and ethnicity, and the actions the contractor took.[249]

- *Referrals to Unions.*  If applicants are sent to a union for referral and not referred back or employed, failure to document results of this referral and any additional action taken.[250]

- *Impeding Affirmative Action Efforts.*  Failure to notify OFCCP that a union is impeding the contractor's affirmative action efforts.[251]

- *Direction of Recruitment Efforts.*  Failure to direct its recruitment to all demographic groups in the recruitment area, including women and minorities, community organizations, schools and training organizations.[252]

- *Training Programs.*  Failure to develop on-the-job training opportunities and participate in training programs that expressly include minorities and women.[253]

- *Annual Review of Specifications.*  Failure to review, at least annually, the obligations under the specifications with all employees having responsibility for employment decisions.[254]

- *Annual Review of Equal Opportunity/Affirmative Action Performance.*  Failure to conduct an annual review of its supervisors' adherence to and performance under Equal Opportunity/Affirmative Action obligations.[255]

- *Annual Inventory.*  The contractor's failure to conduct an annual inventory and evaluation of at least the currently employed women and minorities for promotional opportunities.[256]

- *Intimidation or Harassment.*  Evidence of intimidation, harassment or coercion.[257]

---

[248]  41 CFR 60-4.3(a) paragraph 7, step b.
[249]  41 CFR 60-4.3(a) paragraph 7, step c.
[250]  41 CFR 60-4.3(a) paragraph 7, step c.
[251]  41 CFR 60-4.3(a) paragraph 7, step d.
[252]  41 CFR 60-4.3(a) paragraph 7, step i.
[253]  41 CFR 60-4.3(a) paragraph 7 step e.
[254]  41 CFR 60-4.3(a) paragraph 7, step g.
[255]  41 CFR 60-4.3(a) paragraph 7, step p.
[256]  41 CFR 60-4.3(a) paragraph 7, step l.
[257]  41 CFR 60-4.3(a) paragraph 7 step a.

- *Validation.*  Failure to validate tests and other selection procedures when required under 41 CFR Part 60-3.[258]

- *Monitoring Personnel Activities.*  Failure to monitor all personnel and employment activities to ensure they do not have a discriminatory effect.[259]

- *Segregated Facilities.*  Evidence of segregated facilities except where separate facilities are necessary to provide privacy between sexes.[260]

- *Discrimination.*  All investigations in which there is evidence of employment discrimination.


## 3T     REVIEW COMPLETION LETTER

Letter L-5 provides a format for a Notice of Review Completion for the CO to use when he or she finds no violations.  When the CO finds a violation, the CO refers to the sample letters that are in Chapter 8.  OFCCP uses Letter L-40 or Letter L-41 when major violations were voluntarily resolved in a CA.  If OFCCP issued an SCN the CO should use Letter L-40.  If no SCN was issued, use Letter L-41.


## 3U     REFERRAL FOR ENFORCEMENT

If the contractor and OFCCP cannot resolve the violations through a CA, OFCCP will issue an SCN[261] and will recommend the case for enforcement, where appropriate.

---

[258]  41 CFR 60- 4.3(a) paragraph 7, step k.
[259]  41 CFR 60-4.3(a) paragraph 7, step m.
[260]  41 CFR 60-4.3(a) paragraph 7, step n.
[261]  41 CFR 60-4.8.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 4
# CORPORATE MANAGEMENT COMPLIANCE EVALUATIONS

## 4A    INTRODUCTION

This chapter outlines the procedures for COs conducting CMCEs of multi-establishment contractors[262] subject to Executive Order 11246, as amended, Section 503, as amended, and VEVRAA, as amended.  The CMCE includes all aspects of a standard compliance evaluation but focuses predominantly on the corporate headquarters.  It is important to note that OFCCP can "request relevant data from any and all areas within the corporation to ensure compliance with Executive Order 11246."[263]  In addition, the CMCE specifically evaluates a contractor's selection, development and retention practices that affect advancement into middle and senior-level corporate management.

### 4A00   PURPOSE OF CMCEs

The purpose of a CMCE, as described at 41 CFR 60-2.30(a), is to determine whether individuals are encountering artificial barriers to advancement into middle and senior-level corporate management.  During CMCEs, COs pay special attention to components of a contractor's employment process that affect advancement or promotion into middle and senior-level positions.

As in other compliance evaluations, the CMCE focuses on a contractor's efforts to ensure a discrimination-free workplace.  To ensure a thorough analysis of EEO compliance, CMCEs focus not only on personnel activity data at the corporate headquarters, but also on affirmative action policies and procedures that ensure EEO leading to advancement throughout the organization.

Therefore, during a CMCE COs begin their analysis of middle and senior-level management positions by focusing on two areas:

- Potential discrimination; and

- Affirmative action.

a.   *Potential Discrimination.* When focusing on the potential for discrimination, COs are typically seeking answers to two questions:

- Does unlawful discrimination exist in the selection processes and practices for middle and senior-level management positions?

---

[262]   Unless otherwise noted, the term "contractor" includes subcontractors.
[263]   41 CFR 60-2.30(b).

- Does unlawful discrimination exist in employee performance review procedures or in employee developmental assignments?

  In addition to these questions, COs are also seeking to determine whether individuals currently in these positions are treated in a nondiscriminatory manner in all aspects of their employment, including assignments, total compensation, development opportunities, reasonable accommodation and any other benefits or privileges associated with their positions.

b. *Affirmative Action.* The obligation to ensure EEO extends to all levels of a contractor's activities, including the recruitment, development and selection processes for middle and senior-level management positions. The contractor's efforts are particularly important when evaluating higher-level positions. This is so because the selection criteria for these positions often become more subjective. Moreover, the selection criteria at these levels are closely related to corporate culture and values. COs, therefore, must evaluate whether and to what extent the contractor:

- Examines its development and selection criteria and practices for middle and senior-level management positions;

- Identifies EEO problems or potential barriers to equal opportunity; and

- Devises and implements effective strategies to address identified problems within the context of its own particular corporate environment.

## 4A01   SCOPE OF CMCE

A CMCE is always a full review. COs use the SCER, with the addition of the CMCE-specific Part D which addresses those elements unique to a CMCE.[264] The evaluation of a corporate headquarters includes a review of the written AAPs to ensure that they include all jobs for which the headquarters has decision-making authority, regardless of where those jobs are physically located. For example, jobs for which the corporate headquarters retains decision making or approval and disapproval authority usually include senior managers of the various corporation establishments. Such jobs are often important contributors to feeder pools for middle and senior-level corporate management positions.

Corporate wide policies will also be examined as part of the CMCE, including those pertaining to protected veterans with disabilities, individuals with disabilities, and the sharing of compensation information. A CMCE can be expanded beyond the corporate headquarters if, during the course of the CMCE, the CO becomes aware that problems exist at establishments outside the corporate headquarters.[265] In this instance, the CO should discuss with his or her supervisor[266] whether it would be appropriate to expand the compliance evaluation beyond the headquarters. If they decide to expand the evaluation, the CO should contact the contractor,

---

[264]  FCCM 4B – Pre-Desk Audit Actions.
[265]  41 CFR 60-2.30(b).
[266]  The regional and national offices are consulted when determining whether to expand the scope of a CMCE.

explain the reasons for and scope of the expansion, and request appropriate records and other evidence regarding the additional issues(s) to be investigated.

For example, the CMCE may need to include an analysis of feeder pools at subordinate establishments.  In determining whether to include such an analysis, the CO should consider the degree to which the contractor has historically and recently filled corporate headquarters management positions from elsewhere in the corporation, and the degree to which corporate headquarters tracks and monitors the progress of key personnel in subordinate establishments. COs should refer to FCCM 4H04, Cross-Establishment Movement, for additional information on feeder pools and related issues.

Likewise, the highest-level management positions held by members of nonfavored groups may be outside the corporate headquarters.  Therefore, when doing a CMCE, the CO must request data from the contractor related to other establishments, when necessary, to determine the existence and extent of a "glass ceiling" within the corporation.

## 4A02   CONFIDENTIALITY

Some of the data examined during a CMCE, such as human resource development plans and total compensation packages for higher management levels, may be considered particularly sensitive by the contractor.  COs must consult with the appropriate OFCCP managing officials to ensure that the appropriate steps are taken to ensure confidentiality of these data.  In many cases, this will include consultation with the District Director.

If the contractor's representatives express concerns about confidentiality, the CO must advise the representative that OFCCP is required to "treat information obtained in the compliance evaluation as confidential to the maximum extent the information is exempt from public disclosure under the FOIA, 5 U.S.C. 552."[267]  Exemption 4 of the FOIA at 5 U.S.C. 552 (b)(4) protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  DOL's FOIA regulations require OFCCP to notify the contractor of a FOIA request for confidential business information to give the contractor an opportunity to object to the disclosure under exemption 4.[268]  When submitting data and records to OFCCP, contractors should clearly identify all trade secrets and commercial or financial information it believes are exempt from disclosure.  Moreover, the CO may advise the contractor that, under the Trade Secrets Act, 18 U.S.C. 1905, it is a criminal offense for a government employee to release trade secrets and other forms of confidential commercial and financial information to another business or to the public unless the law authorizes such disclosure.

Other information may be exempt from disclosure, *e.g.,* personnel files under Exemption 6 of the FOIA.[269]  For additional information regarding the agency's treatment of confidential information, review 41 CFR 60-1.20(f) and 41 CFR 60-1.20(g).

---

[267]  41 CFR 60-1.20(g).
[268]  29 CFR 70.26.
[269]  29 CFR Part 70.

## 4B     PRE-DESK AUDIT ACTIONS

Although several steps of the CMCE are common to all reviews, the actual execution and information gathering are unique to a CMCE.  The Supply and Service Scheduling Letter, with the attached Itemized Listing, is used to notify the contractor of the evaluation.  The Scheduling Letter should include the name and telephone number of the CO receiving the AAPs and supporting data or the appropriate supervisor if the supervisor is receiving this information.

This discussion is focused on providing notice of a CMCE.  The following subsections review other matters related to preparing for the desk audit.

### 4B00   FOLLOW-UP CONTACT WITH CONTRACTOR

Generally, within 15 calendar days after the Scheduling Letter is sent, COs must contact the contractor's head of human resources to inform him or her that the compliance evaluation will be a CMCE and to explain what is involved in the evaluation.  In addition, this initial contact should include:

- The identification of the CO who will be involved in the evaluation;

- The establishment of the lines of communication between the contractor and OFCCP;

- The answers to any questions the contractor may have about the information OFCCP requested in the Scheduling Letter; and

- The answers to any questions regarding the differences between a standard compliance evaluation and a CMCE.

COs should offer any technical assistance the contractor needs to ensure the efficient and effective completion of the evaluation.  This may include advising the contractor of its recordkeeping requirements during the course of the evaluation.

### 4B01   CORPORATION BACKGROUND RESEARCH

Before starting the evaluation, the CO should gather appropriate background information about the corporation he or she will evaluate.  Using an array of data sources, including the Internet, the CO should try to learn as much as possible about the corporation's operations, personnel procedures and EEO compliance history in order to facilitate the process of the CMCE.  Other important information that may impact the evaluation includes the history of the corporation and its product/service line(s), the corporate leadership and business trends (with specific focus on how that may impact corporate employment).

### 4B02   SEARCH FOR PUBLISHED REPORTS

COs should learn as much about the contractor and its industry as possible.  There are several resources available but only a few are listed below.

- Industry resources such as Hoover's, Standard and Poor's, and Moody's provide comprehensive industry information, company profiles, key contact data, financial research and analysis, and news.

- Publications such as the "International Directory of Company Histories" and the "Reference Book of Corporate Managements" are sources of information on corporate histories and the backgrounds, executive leadership, labor and management actions, NAICS codes, key dates, ticker symbol, principal subsidiaries, principal divisions, principal operating units, principle competitors and other significant milestones.

- Articles on the corporation within the past two years in business oriented newspapers and periodicals such as *The Wall Street Journal*, and *Forbes* and *Fortune* magazines.

- Corporate websites may contain the most current information regarding the changes in corporate management or other pertinent information.

- Public records, including court documents on discrimination lawsuits, settlements and findings.

FCCM 4B11, Evaluation and Analysis of Corporate Information, provides details on how to use this and other research information.  If a CO does not have ready access to this or other research materials, he or she may email a Request for Literature Search to the DOL Library at library@dol.gov or call the library for assistance at (202) 693-6600.

## 4B03   RETRIEVAL OF "FORM 10-K" REPORTS

In addition to the publication search, COs must retrieve the latest "Form 10-K" for corporations that are required to file.  The Securities and Exchange Commission (SEC) requires all publicly held corporations to file a "Form 10-K" report annually.  Domestic corporations must make their filings on EDGAR, SEC's Electronic Data Gathering, Analysis and Retrieval system.

Filings maintained on EDGAR are found at the web address listed below.

http://www.sec.gov/edgar/searchedgar/webusers.htm (last accessed Sept. 2015)

Use of this information is discussed in FCCM 4B11, Evaluation and Analysis of Corporate Information.

## 4B04   RETRIEVAL OF EEO-1 REPORTS

As discussed elsewhere in the Manual, EEO-1 reports are required of all private employers who are:

- Subject to Title VII, as amended, and have 100 or more employees excluding state and local governments, primary and secondary school systems, institutions of higher education, Indian tribes and tax-exempt private membership clubs other than labor organizations; or

Federal Contract Compliance Manual (FCCM)

- Subject to Title VII and have fewer than 100 employees if the company is owned by or affiliated with another company, or there is centralized ownership, control or management so that the group legally constitutes a single enterprise, and the entire enterprise employs a total of 100 or more employees.

All federal contractors who are private employers file the report if they are not exempt under 41 CFR 60-1.5, have 50 or more employees,[270] and:

- Are prime contractors or first-tier subcontractors, and have a contract, subcontract or purchase order amounting to $50,000 or more; or

- Serve as a depository of Government funds in any amount; or

- Are financial institutions that are issuing and paying agents for U.S. Savings Bonds and Notes.

The filing deadline is set by EEOC and is generally in September each year. Only those establishments located in the District of Columbia and the 50 states are required to submit an EEO-1. No reports are filed for establishments in Puerto Rico, the Virgin Islands or other U.S. Territories.

COs must retrieve a contractor's two most recent EEO-1 reports from the Equal Employment Data System (EEDS). The EEDS is designed to provide information annually on the EEO characteristics of supply and service contractors and other employers. The system contains five years of EEO-1 data. The EEO-1 report includes the three report types below detailing various aspects of multi-establishment corporations.[271]

- *Type 2 report.* A consolidated report that covers all employees corporate-wide, including those at headquarters and those in establishments too small to require a separate establishment report.

- *Type 3 report.* A headquarters report covering employees at the corporate headquarters location.

- *Type 4 report.* A separate report for each establishment employing 50 or more people.

---

[270]  With the September 29, 2016 modification of the EEO-1 Report form to include the collection of compensation information, all private employers with l00 or more employees will report summary pay data, including hours worked, by sex and ethnicity or race, by EEO-1 job category. As of the publication of this 2019 version of the FCCM, the first employer compensation data reporting must occur by September 30, 2019. Federal contractors and subcontractors with 50-99 employees and other private employers with 100 or more employees will continue to report the number of individuals they employ by job category and by sex and ethnicity or race, consistent with established practice.

[271]  A single-establishment company is required to submit only one EEO-1 data report - a Type 1 EEO-1 Report.

FCCM 4B12, Evaluation of EEO-1 Reports, reviews the possible uses of this information. If the EEO-1 information is not available through the EEDS system, a CO should request this data from the contractor directly.

## 4B05   OFCCP COMPLIANCE HISTORY REPORTS

The CO must check the electronic CMS and EIS to obtain a list of prior compliance evaluations of the contractor's corporate headquarters and other establishments, and to identify any issues in the reviews. This may be useful for identifying information that the CO should obtain or examine during the on-site review. If this task was a part of a previous related desk audit, the CO should review this information as part of the preparation for the on-site. If a CA was obtained in a prior review, the on-site review should provide an opportunity to confirm that the contractor took and appropriately maintained the corrective action. FCCM 5B03, OFCCP Compliance History Reports, reviews the use of this information.

## 4B06   CONTACTING EEOC, VETS AND OTHER AGENCIES

Before starting the evaluation, a CO must also seek information regarding the employment policies and practices of the contractor from the EEOC, VETS and other EEO and labor law enforcement agencies. This information provides the CO with a better understanding of the contractor's workforce and operations, and may indicate potential problem areas.

a.   *EEOC and State and Local FEP Agencies*. Simultaneous with the sending of the Scheduling Letter, a CO must send the standard inquiry letter to the appropriate district office of the EEOC, and to the appropriate state and local FEP agencies.[272] This letter requests information regarding discrimination complaints filed against the contractor and any other information that may be pertinent to assess the contractor's EEO posture. After 15 calendar days, the CO will follow-up by telephone with any agency that failed to reply or from which the CO needs additional information.

b.   *VETS, ESDS, and DOL Enforcement Agencies*. The CO must also check the VETS-4212 database and contact the VETS regional office, and the appropriate local ESDS to request any information that could be pertinent to the pending review.[273] Additionally, the CO must check the DOL Enforcement Database for closed complaints and compliance evaluations of the contractor's establishments, as well as contact other DOL enforcement agencies, such as OSHA and the WHD to identify the number, types and status of any complaints that have been filed against the contractor.

## 4B07   FOLLOW-UP AND USE OF INFORMATION ON COMPLAINTS FILED WITH OR BY OTHER AGENCIES

A CO must examine all the information regarding complaints against the contractor that he or she receives from federal, state and local agencies in response to the standard inquiry letter and

---

[272]   Letter L-2 – Sample Inquiry Letter for Requesting Complaint Data from EEOC and State and local FEPs.
[273]   Sample letters are in this Manual, including Letter L-3, Sample Letter For Requesting Job Listing From Employment Service Delivery Systems, and L-4, Sample Inquiry Letter for Requesting Information on Pending Review from Veterans Employment and Training Service.

enter the information on the SCER.  Any complaints involving management jobs or "glass ceiling" issues should also be addressed in the SCER.

If the response does not provide enough information to determine whether a complaint involves a management job or "glass ceiling" issue, the CO should contact the responding agency for additional information.

When needed, the CO should contact the appropriate EEOC office or state or local fair employment practices agency to arrange to review relevant discrimination complaint files as part of the compliance evaluation.  This action can be particularly useful when, as a result of the desk audit, the CO identifies potential systemic problems in complaint areas.

After receiving the AAPs and supporting data, any information the contractor provided with respect to current or past complaints must be compared with the information received from the agencies.  The CO will note discrepancies and information that the contractor did not provide for possible further investigation during the review, if warranted.  The contractor should be asked to explain discrepancies and to provide additional information.  In conducting the desk audit, the CO should pay particular attention to any indication of a potentially broader problem in the type of activity and management area/level that was an issue in previous complaints.

## 4B08   RELATIONSHIP OF OFCCP COMPLIANCE ACTIVITIES TO EEO LITIGATION OR COURT ORDERS

If, during the conduct of a compliance evaluation, a CO finds that the contractor is involved in litigation or is under a court order for EEO matters, he or she should identify the EEO issues involved, the court, the parties, the case name and number and bring the matter to the attention of his or her supervisor.  The field office, in consultation with the RSOL, will determine whether the litigation or court order should impose any limitations on the conduct of the compliance evaluation.

## 4B09   REVIEW OF COMMUNITY RESOURCE FILES

If a CO is not knowledgeable about the local organizations in the area in which the corporate headquarters is located, he or she should review the field office's community resource files to become familiar with local community groups, and introduce himself or herself to the various organizations.  If the corporate headquarters is located near an Indian reservation, the CO should contact OFCCP's INAERP to discuss recommendations for contractor outreach and recruitment. Chapter 2 discusses how COs can establish relationships with local organizations representing members of covered groups.[274]

## 4B10   REVIEW OF PAST OFCCP COMPLIANCE ACTIONS

Based upon the information gathered in FCCM 4B, Pre-Desk Audit Actions, the CO should review the contractor's compliance history to identify cases with violations involving a corporate-wide policy or practice.  Examples would be violations for prior discriminatory acts,

---

[274]   See Chapter 2K – Linkage Agreements.

failure to conduct a self-audit, discriminatory benefits or testing practices, or unlawful medical screening practices.  As appropriate, a CO can contact the OFCCP office that conducted the evaluation or investigation to obtain further information on the violations, their resolution and whether they applied to management jobs.  The purpose of obtaining this information is not to revisit closed compliance actions, but to determine whether the same problem could exist corporate-wide.  If the information indicates a potentially corporate-wide problem, especially one that could affect management jobs, the CO should include a review of that area in the On-site Plan.

## 4B11   EVALUATION AND ANALYSIS OF CORPORATE INFORMATION

After conducting research on the contractor as described in subsections 4B01 through 4B10 and receiving the results, COs must sort and analyze the material.  Particular emphasis should be given to areas that could be relevant to the evaluation.  For example, a recent acquisition or merger could have significant impact on feeder pools for management positions.  While reviewing and sorting the data, COs should place the information into one of three categories:

- Corporate Organization;

- Corporate History and Trends; or

- Backgrounds of Top Corporate Officials.

The scope and purpose of each of these categories are described below.

a.  *Corporate Organization*.  This category includes information related to the organization of the entire corporation, rather than just the corporate headquarters facility.  If a contractor uses an Organizational Display, as described at 41 CFR 60-2.11(b), as part of its AAP, COs should be able to compare the Organizational Display to the current corporate organizational chart.  Industry directories and handbooks can provide an overview of this information, with detail often provided in the corporation's Annual Report and portions of its "10-K" filed with the SEC.  Information and data related to the below questions will normally be in this category.

- What are the corporation's major components or businesses, groups and divisions; and its subsidiaries, both domestic and foreign?

- What are the components' major functions and/or products?

- Where are the corporation's major components located?

- What percentage of total corporate personnel does each component employ (*e.g.,* the ADC Products Group accounts for about 40% of total corporate personnel)?

This information will be helpful in identifying such factors as potential feeder pools for rotational assignments and headquarters management jobs.  Also, information on the corporate

organization will help OFCCP determine the degree to which willingness to relocate may impact advancement.

After receiving the contractor's desk audit submission, COs will compare the corporate structure, as shown in this information, with that shown in any published corporate organization charts.

b.  *Corporate History and Recent Trends*.  There are several sources for this information, including industry directories and handbooks, particularly Hoover's Directories, at www.hoovers.com; specialized publications such as the "International Directory of Company Histories;" annual corporate reports and SEC submissions; newspapers and periodicals; and the corporation's website.  COs should review these and other appropriate resources to gather information that answers these and other relevant questions.

- When was the corporation founded?

- What was its initial primary business?  How has this changed over time?

- Has the corporation undergone a recent merger or acquisition?

- What are its most and least profitable components over the last several years?

- Has the corporation recently undergone, or is it projecting, substantial growth or cutbacks in particular areas of its business?  If so, what are they?

- Has the corporation recently been awarded or lost major contracts?  What business area(s) did the award or loss affect and how?

- What are its long-range projections for areas of business growth?

This information is relevant to a preliminary understanding of the business and economic context within which the corporation operates, and also will assist in evaluating particular corporate management issues.  For example, recent mergers or major acquisitions may have caused a substantial change in the overall business mix of the corporation and in top management.  Such changes may correspondingly impact corporate culture, and the skills mix that the corporation seeks in middle and senior-level management staff.

Sources of current profitability usually influence allocation of bonus pools among different business components and often indicate where growth in management opportunities is likely to occur.

c.  *Background of Top Officials*.  The corporation's website, annual report, Form 10-K or other sources, such as the "Reference Book of Corporate Managements," may provide information on the backgrounds of top corporate officials.  This information usually includes education, background, time with the corporation and the positions held.

Such information can help verify past corporate practices like the degree to which the contractor traditionally filled top positions internally versus externally.  It also may help identify shifts in the type of background that top management may value like differences in

the backgrounds, experiences, educational fields and/or levels of more recent entries to top management versus others.

The CO should summarize the information in the appropriate section in the SCER.

## 4B12   EVALUATION OF EEO-1 REPORTS

EEO-1 reports are valuable sources of information on changes in the workforce.  Therefore, COs must review the total corporate-wide employment shown in the latest consolidated (Type 2) EEO-1 report.  A CO should compare this with the corporate-wide employment in the preceding consolidated report to determine whether total employment is stable, growing or declining.  This review also helps determine which EEO-1 categories have changed the most.

COs should use the corporate headquarters EEO-1 reports, *i.e.*, the Type 3 reports, to conduct EEO trend analyses on the direction of headquarters employment generally, and by EEO-1 category, including changes in groups determined to be unfavored through other analyses.

Comparisons of the participation of nonfavored groups in the two Officials and Managers (O&M) categories and the Professional category on the Type 3 report, with their representation in the same categories on the Type 2 report, should also be conducted by COs.

COs should review the latest individual establishment reports to identify major facility locations. A major facility is one that contains 150 or more employees, or in the case of smaller corporations where no individual facility reaches the 150 employees mark, a facility where the number of employees is at least 33% higher than the average of all facilities.  COs will compare the participation of nonfavored group members in the two O&M categories and the Professional category on the headquarters' Type 3 report, with their representation in the same categories on the individual Type 4 reports, for the selected establishments.  The COs will also compare individual establishments and note any significant differences in the participation of members of nonfavored groups in specific categories between establishments, as well as within a given establishment from one year to the next.

COs should discuss any areas of potential concern or interest resulting from these analyses in the appropriate section of the SCER.

## 4C    RELATIONSHIP TO THE STANDARD DESK AUDIT

After receiving the contractor's corporate headquarters facility AAPs, COs should review and analyze the AAPs and their Itemized Listing data using the desk audit procedures outlined in Chapter 1.  If the contractor does not provide AAPs and/or Itemized Listing data on time, COs should follow the procedures outlined in FCCM 1C.  However, in addition to the standard desk audit, the primary focus in a CMCE desk audit is analyzing professional and management level job groups to identify any nonfavored groups, determine their representation, and assess the impact of policies and procedures on these groups.  For example, COs must assess or determine:

- Whether there is a level(s) at which there is a marked decline in participation; and

- If there is such a level(s) of decline, the types of jobs at that level(s), both generally and by major functional area (*e.g.,* vice-president, director, senior analyst, finance, legal, sales).

Consideration is also given to the types of jobs held by nonfavored group members below that level at which there is a marked decline in participation. Whether nonfavored group members are located in likely feeder pools for the upper level jobs should also be determined. For example, COs may find that women are concentrated in office and clerical job groups. Two other areas of interest include:

- The employee development and selection policies and practices regarding jobs at the level at which participation declines, and the jobs in their probable feeder pools; and

- The nature and amount of employment activity in job groups around that level.

The following sections discuss each of these considerations in detail. When conducting the analyses, it is important for the CO to remember that these considerations apply corporate-wide, not just to headquarters positions.

## 4D    DESK AUDIT – REVIEW OF THE ORGANIZATIONAL PROFILE, JOB GROUP ANALYSIS AND UTILIZATION ANALYSIS

The CO should review these items to determine which, singly or in combination, will best provide the necessary data for the analyses described in FCCM 4D00 and FCCM 4D01 below.

In addition to addressing them under the appropriate regular areas of the SCER, the CO should also discuss results of the analyses conducted under this section in the "Focus Level and Areas" element of Part D of the SCER.

### 4D00   ANALYSIS OF NONFAVORED GROUPS' MANAGEMENT LEVEL PARTICIPATION

A CO should determine whether there is a marked decline in the participation of specific groups of individuals. This section covers conducting an analysis and determining the participation rates for nonfavored groups in top and middle management.

As a general rule, a corporation selected for a CMCE should be large enough to have job groups extending beyond the standard EEO-1 categories. Therefore, the top management level may be immediately evident from a scan of the job group analysis. When this is not the case, actual job titles, in conjunction with reporting relationship to the CEO, are usually reliable indicators of the top management level.

Typical titles at top levels include Executive Vice-President, Senior Vice-President, Comptroller, Chief Financial Officer and Vice-President. Reporting relationships are usually reflected in the corporation's organizational charts. The very top level consists of individuals reporting directly to the CEO; the second level consists of those individuals who report directly to the top-level

managers. While the number of reporting levels regarded as "top management" varies with the size and structure of the particular corporation, more than three levels down at the headquarters establishment is usually considered middle management. People at that middle corporate level may, in turn, be top management at subordinate establishments.

Middle management is different. Again, the job group analysis may be the easiest way of determining what positions large corporations classify as middle management. However, when that is not the case, salary may be a more reliable determinant than title. It may be best for COs to use salary level, range or grade as reflected in the workforce analysis or organizational display to identify where nonfavored group participation declines.

When management levels are still unclear, COs must obtain more information before proceeding by contacting corporate human resources and making a request for clarification. Assuming management levels are defined, COs would move to their analysis of nonfavored group participation at these levels.

a.  *Analyzing Nonfavored Group Participation*. In addition to analyzing and utilizing the normal EEO trend data, COs must conduct a breakout analysis specifically of the O&M categories. COs should total the number of O&M jobs by grade, race, ethnicity, sex and disability status across department lines. In doing so, they must keep track of the departments in order to examine the functional distribution of jobs at a later stage. FCCM 4D01, Functional Areas, may be a useful supplement to this discussion.

b.  *Identify Marked Decline*. COs must identify whether there is a level at which there is a marked decline in any group's participation. A marked decline is the highest level with proportionately fewer nonfavored group members than the level immediately below but, except in rare cases, not the level without any nonfavored group members. There may be a single level at which there is a marked decline for one or more nonfavored groups, or there may be multiple levels at which a marked decline exists for different groups (*e.g.,* there may be one level at which there is a marked decline of the participation of Hispanics, another level where there is a sharp decline in the participation of females, and a third at which there is a marked decline of individuals with disabilities). Marked declines also may differ by various functional areas.

The determination that there is a marked decline in nonfavored group member management participation will focus further CMCE investigation in two areas:

- At and above the grade or level where nonfavored group participation declines. At this level, the focus should be on whether the incumbent nonfavored group members are treated in a nondiscriminatory manner in all aspects of their employment.

- Below the grade or level where nonfavored group participation declines. At this level, the focus will be on why nonfavored group members have not advanced further. Specifically, areas to explore or questions to ask are:

  o  Whether unlawful discrimination kept group members from advancing beyond that grade, either because of discrimination in the selection practice itself or because of

discrimination in employee development practices, or in assignment to career paths or feeder pools for higher-graded positions.

o    Whether the contractor identified and removed any impediments to EEO in selection procedures for higher-level positions. Such impediments might include management review procedures or contractor actions regarding formal or informal career paths and feeder pools.

## 4D01   ANALYSIS OF FUNCTIONAL AREAS

Functional analysis is essentially analyzing whether career paths and feeder pools are determined by participation in specific functional lines. Absences of a particular group, observed in EEO categories, can often be a direct result of a functional line progression that has barriers to employment at early stages of career development (*e.g.,* at a major aircraft manufacturing contractor, upper management may almost exclusively come from the engineering functions where there may traditionally have been fewer women). A functional analysis may also reveal more general issues, such as hiring/placement disparities into certain professional categories. To conduct the appropriate analyses COs must:

- Identify major functional areas;

- Identify absences and concentrations in functional areas of certain groups;

- Determine whether the major functional areas are "line" or "staff;"

- Identify feeder pools;

- Compare feeder pools to higher-level jobs; and

- Examine the disparity between nonfavored and favored groups.

a.  *Identify Major Functional Areas*.  COs should return to the workforce analysis or organizational display and review departmental data to determine "major functions."

What is a "major function" will vary within a given corporate structure. However, a major function is usually headed by a manager who has either a "direct" or "second level" reporting relationship to the CEO, and typically includes or covers several departments.

Common "major functions" at a corporate headquarters include: Finance (under a Comptroller or Chief Financial Officer), Legal (under a General Counsel or similar title), Personnel or Labor Relations (under a Vice President for Human Relations or similar title), and Marketing, Sales and Research.

b.  *Absence and Concentrations in Functional Areas*.  In each major functional area, COs should analyze participation in exempt jobs (managerial, professional and, as applicable, sales) to

Federal Contract Compliance Manual (FCCM)

determine if particular groups are excluded or concentrated.[275]  They should also analyze exempt jobs in any other functional areas where members of one sex, race or ethnic group are absent, underrepresented or concentrated.

c.   *"Line" versus "Staff."*  COs must identify whether the major functional areas are "line" or "staff."  A line area is one that directly contributes to the corporation's profitability and generally focuses on a specific area; a staff area is one that primarily supports line functions.

Line jobs will vary a great deal depending on the corporation's product or service, but will include jobs and functional areas that are essential to producing and selling the product or service.

For example, at a consumer products firm, manufacturing, marketing and sales would be major line functions; at a consulting firm, the consultants would be line jobs; and at a high-tech firm, research and engineering would be line functions.  Staff functions typically include personnel, labor relations, purchasing, finance, legal and facilities management.

While line and staff jobs are often at the same base salary, line jobs are more likely to be eligible for significant bonuses making their total compensation considerably higher.  Also, the corporation is generally more likely to have promoted top management from line positions, although it is not unusual for top managers to have experience in line and staff positions.

COs must analyze the proportion of line versus staff exempt jobs in the workforce, and determine whether there is a significant difference in the workforce composition of the line and staff functions.  COs should note as an area requiring further investigation any concentration of a particular race, ethnicity or sex in staff functions.  At the on-site review, the CO should then review personnel files and conduct interviews to ensure that the presence of any concentrated groups in staff positions, despite having education/experience pertinent to the corporation's line functions, is not resulting from "steering" either at or after hiring.[276]  Similarly, COs should note any concentration of individuals with disabilities or protected veterans in staff functions, and ensure during the on-site review that such concentration is not the result of "steering" at or after hiring.

d.   *Identification of Feeder Pools*.  COs should examine the utilization analysis and the raw personnel activity data from the AAPs to determine the most likely feeder pools for the jobs at and above the grades/levels where participation by one or more nonfavored groups declines.  However, it is important to remember that potential feeder pools are not necessarily limited to the headquarters workforce.  Therefore, COs may need to request additional data.

The likely feeder pools are not limited to subordinate management jobs, but may include professional jobs and/or other positions at comparable exempt grades.  Likewise, feeder pools are not necessarily restricted to the functional area in which a particular management

---

[275]   Generally, exempt jobs are jobs or positions that are exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act.

[276]   See FCCM 4H – Onsite: Filling of Management Jobs.

job is located, but they are most often related to them. For example, it is generally more common for someone in finance to move to a financial management position than it is for someone in engineering to do so. Consequently, for desk audit purposes, in each major functional area, COs should identify the:

- Number of jobs by favored and nonfavored group members at and above the grades or levels where the participation of nonfavored group members declines; and

- Number of exempt jobs by favored and nonfavored group members below that level.

e. *Comparison of Feeder Pool to Higher-Level Jobs*. If clustering of members of one sex, race or ethnicity appears at lower grade levels, COs should try to determine whether:

- *Nonfavored Group Members Hold Jobs with More Limited Advancement Potential*. There are several areas of inquiry or questions that are useful for COs when examining limited advancement potential issues. For example, COs should seek to determine whether nonfavored group members are concentrated in functional areas that have fewer higher-graded jobs than those they hold. Are they underrepresented in functional areas with higher-graded jobs? If so, there may be a placement problem.

- *Nonfavored Group Members Hold Jobs with Advancement Potential, but Do Not Advance at a Rate Comparable with their Peers*. There are several areas of inquiry or questions that are useful for COs to pursue when examining this apparent disparity. For example, COs should seek to determine whether nonfavored groups are in functional areas that have a grade distribution comparable to that in other functional areas. If so, COs will need to investigate further to determine the reason why proportionally more nonfavored group members are in lower-graded jobs than their peers.

COs should also seek to determine whether the reason for the disparity is attributable to some legitimate nondiscriminatory factor such as developmental programs, performance appraisals, assignments or other factors that are related to promotions.

f. *Disproportion or Disparity*. As a general rule, COs should first examine the functional areas where there is the greatest disparity between the participation of nonfavored group members above the grade where nonfavored group member participation declines, as well as below the grade where nonfavored group member participation declines.

## 4E     DESK AUDIT: AAP AND EMPLOYMENT ACTIVITY INFORMATION DURING A REVIEW OF SELECTION PROCESSES AND DEVELOPMENTAL PROGRAMS

COs must review the contractor's written AAPs to find information on the selection processes that may apply to positions above and below the grades/levels where participation by nonfavored groups declines. As an example, a CO would look for information on the contractor's promotion policy. If the policy is to limit management jobs to internal candidates, the corporation should also have policies and procedures for making these job openings known to potential internal

candidates within corporate headquarters and outside of headquarters. Other instances where policies may indicate a problem might include the absence of employee development programs that apply to positions above and below the grades/levels where nonfavored group member participation declines. The absence of outreach efforts designed to improve access to management positions for nonfavored group members could also be a problem.

COs must also use personnel activity data from the contractor's AAP to identify the employment activities that include jobs above and below the level where nonfavored group member participation declines. This is in addition to conducting analyses on employment activity data. The CO must identify the number of hires and applicants at, above and below the grade where nonfavored group member participation declines. Based on the available data, the CO will determine how jobs at and above that level are filled (*e.g.,* hired from the outside, or promoted or transferred from within). Proper analysis may require requesting additional data and gathering information during the on-site review. Useful information related to this section is in FCCM 4F, Notice of On-site Review and Follow-up Data Requests and FCCM 4H, On-site: Filling of Management Jobs.

Now the CO must next compare the number of hires, promotions and transfers at, above and below the grade where nonfavored group representation declines. The CO must also identify terminations of nonfavored group members above and below the grade where their participation declines.

Once this is complete, COs must address all areas of potential concern in the SCER.

## 4F    NOTICE OF ON-SITE REVIEW AND FOLLOW-UP DATA REQUESTS

At the conclusion of a desk audit, COs should contact the contractor to schedule the on-site review and discuss any additional material they need for further analysis. The COs should include any unresolved issues identified during the desk audit in the SCER.

The CO will prepare a letter to the contractor reiterating that the evaluation is a CMCE, confirming the on-site date and listing any additional data needed. The notice will state that the on-site review will begin with an entrance conference to discuss those issues with the CEO or appropriately designated corporate officials.

The notification letter to the contractor should identify the additional information needed. When the needed information is regarding the jobs filled at or above the level where nonfavored group participation drops, the data requested should be sufficient to identify the specific jobs filled and how they were filled (*e.g.,* by hire, by promotion, by transfer). COs should note in the data request that if the contractor filled such jobs by promotion or transfer from subordinate establishments within the corporation, the contractor should identify the originating establishment. As pertinent, COs should request any other needed activity data (such as applicant flow and terminations) and general information (*e.g.,* jobs in subordinate establishments included in the corporate AAP).

The notification letter must also provide a high-level summary of any preliminary indicators of discrimination identified during the desk audit. COs should note in the letter, however, that the list is not exhaustive, nor does it limit the scope of OFCCP's authority to confirm compliance with other requirements or investigate other potential violations that it discovers during the course of the compliance review.

# 4G   ON-SITE REVIEW

A CMCE on-site review follows the same process as the standard on-site review:

- Conduct entrance conference to discuss purpose of on-site review and areas of concern;

- Review of documents provided by the contractor and interviews with employees and management to eliminate, revise and confirm identified areas of concern;

- Identify additional information still needed for further review on areas remaining unresolved; and

- Conduct closing conference to address any unresolved areas of concern and discuss "next steps" in the evaluation process.

COs should review Chapter 2 for specific guidance on on-site reviews. One primary difference between the CMCE and standard on-site review is that a Regional Director may lead the opening and exit conferences in a CMCE on-site review. Another difference is that the main focus is on corporate management positions, though the scope may be broader than just the corporate headquarters facility.

## 4G00   ENTRANCE CONFERENCE

COs must coordinate the entrance conference with top corporate officials and with the appropriate OFCCP regional office. Coordination with the regional office gives the Regional Director, or designee, the opportunity to attend the meeting. During the entrance conference, COs must obtain any clarification needed from the corporate organization (*e.g.,* any organization charts not obtained to date) and any missing corporate background information the corporation may be able to provide (*e.g.,* annual reports) prior to the on-site review. For example, corporate officials should be asked to explain and provide any documentation regarding:

- What the contractor values in candidates for middle and senior-level management positions;[277] and

- Whether the contractor has developed any special EEO programs that it would like for OFCCP to consider as part of its corporate evaluation.

---

[277]   See FCCM 4G01 – Corporate Culture and FCCM 4H00 – General Qualification Standards.

Federal Contract Compliance Manual (FCCM)

As in any other evaluation, COs should address any questions contractors have concerning the on-site and any other part of the evaluation process. COs must remind contractors that the on-site closing conference will be only an informal, preliminary discussion and that a formal exit conference will be scheduled when OFCCP is prepared to discuss evaluation findings, after having conducted off-site analysis.[278]

## 4G01   CORPORATE CULTURE

Each corporation has distinct characteristics, not only in terms of how it conducts its major business and the skill backgrounds it needs, but also in terms of its management style and the behaviors it tends to foster and reward among its employees. The CO should gather information that indicates or describes the contractor's corporate culture. This information may help the CO understand how the corporation makes management selection decisions. While some of this information may be found through research, including corporate self-descriptions, a CO will usually get a better picture during the on-site review, including through interviews and observations made while visiting on-site.

a.  *Corporate Business*. The nature of a corporation's business will tend to determine which corporate components are most essential to its profitability. For example, at a corporation that produces a fairly simple consumer product, marketing and sales are likely to be most central to profitability. On the other hand, in a corporation engaged in advanced research, engineering or scientific expertise is likely to be central to profitability. As a general rule, employees in those functional areas (which are also usually line rather than staff positions) will have better advancement potential.

b.  *Other Factors*. There are usually meaningful differences in predominant management style and valued employee behavior between different corporations, even in the same industry. For example, one employer may value somewhat egalitarian management, while another prefers a more authoritarian approach. Or, one employer may value employee initiative and creativity, while another may place a higher value on mastery of standard procedures. Or, one employer may require rotational assignments (with or without frequent relocations or international stints) to develop a broad knowledge of the business, while another may more heavily weigh depth of expertise in the business area to be managed. Such differences also can extend to matters such as acceptable dress, expectations concerning uncompensated overtime, socializing outside work hours, etc.

These and other differences are not necessarily conscious ones. However, the degree of "fit" between what a corporation values and what an employee values or learns to value can influence whether a person will advance to management and, if so, what management level he or she is likely to reach. The importance of such "fit" usually increases with management level.

---

[278]   See FCCM 4K – Completion of Compliance Evaluation: Exit Conference, Report Writing and Notice of Evaluation; also, FCCM 2D04 – Exit Conference.

## 4G02  INTERVIEWS

As with any review, a prime source of information will be interviews of both management and employees.  Consistent with the guidance in Chapter 2, contractor representatives, including internal or external attorneys or external consultants, may be present during interviews of management and supervisory employees.[279]  However, if a CO is interviewing a management or supervisory employee who is also a complainant or potential complainant, or is being interviewed in his or her capacity as an employee rather than a management official, the CO must conduct the interview in private.  The determination of whether the management employee is a potential complainant or victim and whether the contractor's representative can be present is fact-specific.  Therefore, COs should consult with the RSOL and the national office prior to engaging in these types of interviews.

As always, there will be some common questions.  In addition, COs should tailor interviews to the specific areas of concern being investigated.  Likewise, a CO must take care to select individuals for interviews who have knowledge or experience in the relevant areas of concern.  In all cases, a CO should start with key corporate personnel and human resources officials to discuss and develop an understanding of corporate policies and practices in the following major areas:

- The contractor's middle and senior-level management positions and how the contractor fills them;[280]

- The use of outside hiring to fill middle and senior management positions and how the contractor locates and screens candidates;[281]

- The use of internal hiring for these positions;

- The "pool" or pools for these positions;[282]

- The mechanisms the contractor uses to identify and develop candidates for those positions, both at corporate headquarters and at subordinate establishments;[283] and

- The reward systems, both monetary and nonmonetary, the contractor uses to retain key personnel.[284]

The CO should also ask for all documentation, whether written or electronic, of policies and practices relevant to these areas that the contractor has not already provided.  This includes any personnel and human resource manuals, supervisory and employee handbooks, and any other internal publications that might be relevant.

---

[279]  FCCM 2F – Interviews.
[280]  FCCM 4D00 – Analysis of Nonfavored Groups' Management Level Participation.
[281]  FCCM 4H01 – External Hires.
[282]  FCCM 4D01 – Functional Areas; Subsection 5H02- Internal Development.
[283]  FCCM 4H04 – Internal Development.
[284]  FCCM 4I – Onsite: Retention.

## 4H     ON-SITE: FILLING OF MANAGEMENT JOBS

As previously indicated, COs will have requested data on the hires, promotions and transfers into jobs at, above and below the level where the participation of nonfavored group members declines.  COs will review this data to determine which methods the corporation used to fill jobs at each grade/level during the data period and then conduct the appropriate analysis.  Although the process of analysis is essentially the same as for any review, there are certain elements that are unique to CMCEs.  The following subsections discuss the CMCE-specific factors COs may need to incorporate into the analysis.  These factors apply whether the contractor fills the positions in question externally or internally.

The basics of conducting a hire or promotion analysis are not re-addressed here.  However, where additional clarification is needed, these subsections include sample questions and analytical guidance.  These sample questions should be viewed as guides for COs on information to research and consider for inclusion in the interview outline or used as actual questions to be asked of the contractor and its employees.

### 4H00   GENERAL QUALIFICATION STANDARDS

Corporate officials may cite any number of factors in describing what background and characteristics they look for in candidates for management positions.  Among the factors may be a degree in a particular subject area or having an advanced degree, tenure with the corporation, successful profit and loss experience, international stints, and broad knowledge of the business or corporation.  Whatever factors the contractor cites, COs must ask sufficient follow-up questions during interviews to thoroughly define the factors and to determine why the corporation believes the factors are important to the specific jobs, and how the corporation believes people acquire or could acquire such characteristics.  Below are some follow-up lines of questions for several common factors contractors use.  This is not an exhaustive list of questions or lines of inquiry and should only be used as a guide to develop a comprehensive Interview Plan tailored to each witness.

- If the contractor views advanced or specialized degrees as important for a specific management position or level of management, COs could ask follow-up questions in these areas:

    o   What level or in what field(s) must the degree be?  For which position(s)?  Why?

    o   How important is a specific college or university?  Why?

    o   Can a person earn an advanced degree while employed?  After hours only?  Are there any corporate sponsored degree or continuing education programs?  How do these programs operate?

- If the contractor views time with the corporation as important, COs could ask follow-up questions in these areas:

Federal Contract Compliance Manual (FCCM)

- o How much corporate service is typical for employees at and above the management level where nonfavored group participation declines?

- o Do employees usually earn this corporate service in a specific sector(s) of the corporation? If so, why?

- If successful profit and loss responsibility is important, COs could ask follow-up questions in these areas:

  - o Why is it important to the particular management job or group of jobs?

  - o Are there particular areas of the business in which one is most likely to gain that experience? Least likely?

  - o At what management level does one usually gain it? Does this differ among business areas?

  - o Is the number of profit and loss centers increasing, decreasing or remaining about the same?

- If international stints are important, COs could ask follow-up questions in these areas:

  - o What is the value of having a previous international assignment? Are the number of these assignments and their duration factors?

  - o How are people selected for these opportunities?

- If the contractor views exposure to different facets of the business as critical, COs could ask follow-up questions in these areas:

  - o Why is it important?

  - o Does this requirement encompass particular business sectors and does the contractor consider exposure to certain sectors more valuable than others? How much "exposure" is required? Why?

  - o How do employees learn that such exposure is important to advancement?

  - o How do employees obtain such exposure?

Likewise, interviewed employees may cite any number of factors as important to advancement, which may or may not match the factors cited by management. When disparities exist, COs must consider additional sources of information, such as personnel files of individuals actually promoted into the position(s) in question. Beyond basic elements such as advanced degrees, COs should explore how employees acquire the characteristics needed to become managers, with particular attention to any corporate practices that may be informal, such as mentoring, networking, high visibility special projects or rotational assignments.

Whether formal or informal, COs must also consider selection procedures for these programs as part of the analysis. Again, COs must be sure to ask for any documentation regarding the qualification standards for the jobs he or she is examining, and any continuing education, mentoring or similar corporate program. This documentation may include, but is not limited to, personnel handbooks, job announcements, memos, participant lists and emails.

## 4H01   EXTERNAL HIRES

When externally filling management jobs, particularly higher level management jobs, contractors frequently opt not to use conventional recruitment sources such as newspaper or trade publication advertising, but rather use executive search firms or informal referrals from current executive level employees, or both.

While filling a job by hire, including by using search firms or informal referrals, rather than by promotion or transfer, does not in itself violate any of the laws OFCCP enforces, COs must be alert to any evidence or external hiring patterns that indicate that the decision to hire from the outside discriminates on the basis of a prohibited factor.

## 4H02   SOURCES OF APPLICANTS AND CANDIDATES

Contractors may use various sources for hiring middle and senior-level managers. These sources may include executive search firms and referrals from employees.

a.  *Executive Search Firms*.  As part of the CMCE, COs must determine the sources of the applicants and candidates for the managerial position(s) they are evaluating, and examine the relationship the contractor has with these sources.

- *Types of Search Firms*.  A contractor may maintain several different types of arrangements with executive search firms.  Below are just three examples.

    o *Firm on retainer*.  In this arrangement, the employer usually has a contract with the search firm under which the contractor pays the firm a basic fee for its services, with that fee supplemented for each referral hired.  This type of arrangement is more common for professional or entry-management positions where the employer anticipates a continuing need for hires in certain fields, or at certain levels where there is a skills shortage internally, externally or both.

    o *Firm on contingency*.  In this arrangement, the firm is usually paid a fee only if a candidate it refers is hired.  This type of arrangement is more common for middle to upper-level management jobs and contractors may prefer this when they only occasionally hire from outside.

    o *Unsolicited Referrals*.  Contractors may sometimes hire from among unsolicited referrals from an executive search firm.  In this arrangement, the firm is paid a fee only if the candidate is hired.

- *EEO and Affirmative Action Obligations in Referrals*.  Contractors, under the equal opportunity clauses in their contracts, retain responsibility for ensuring that solicitations

for employees placed on its behalf by a search firm or other referral source comport with all of the contractor's EEO and affirmative action obligations.

Consistent with those clauses, as well as with its obligation to incorporate the equal opportunity clauses in its subcontracts, the contractor is urged to notify the search firm of its EO obligations including that the firm, in seeking candidates on its behalf, must actively seek to include qualified members of diverse groups among those recruited and referred for listed jobs.

- *Monitoring Referrals*.  Contractors using search firms must monitor referrals received by sex, minority group and, when possible, protected veteran and disability status as part of its internal auditing and reporting systems under 41 CFR 60-2.17(d), 60-300.44(h) and 60-741.44(h).  A contractor should ask its search firm how it locates and selects candidates if the search firm fails to refer women, minorities, individuals with disabilities or protected veterans.

  A contractor is not relieved of its obligations related to recruitment by using a search firm; it must ensure that any firm acting as its agent carries out the contractor's affirmative action and nondiscrimination obligations.

b. *Employee Referrals*.  Contractors may use employee referrals as a source for new hires.  However, as with search firms, the use of employee referrals does not relieve a contractor of its obligations related to recruitment.  For example, if a contractor has established a goal for a job group and the contractor relies on employee referrals to recruit that group, the contractor could make clear to employees that it desires referrals of a diverse group of qualified candidates.  The contractor might also supplement employee referrals with other sources of qualified applicants for the jobs involved, such as by seeking referrals from organizations that focus on providing services to minorities, women, individuals with disabilities or protected veterans.

A contractor's exclusive use of employee referrals may be discriminatory where there is evidence that the intent behind that reliance is to exclude underrepresented group members from consideration for certain jobs.  Reliance on employee referrals may also be discriminatory when such reliance has an adverse impact on a particular sex, race or ethnic group, and is not job-related and consistent with business necessity.

## 4H03   SAMPLE QUESTIONS AND ANALYSIS FOR VARIOUS SEARCH SOURCES

If, in the course of a CMCE, a CO finds that a particular search firm may be discriminating in its recruitment or referral practices, he or she must inform his or her supervisor.  As appropriate, OFCCP coordinates with EEOC to investigate the executive search firm under Title VII, as amended and Title I of the Americans with Disabilities Act of 1990 (ADA), as amended.  These laws cover the referral and employment practices of employment agencies.  Moreover, if a contractor knowingly uses a search firm that discriminates, the contractor will be found in violation of the applicable law(s) enforced by OFCCP.

Federal Contract Compliance Manual (FCCM)

A CO engaged with a contractor using an executive search firm may want to ask several questions to understand that relationship. Some sample question areas for the contractor are below.

- Have you used executive or other search firms? When and how often? Which firms do you use most? Identify the positions or types of positions (*e.g.,* fields, levels) for which you have used search firms?

- Have you informed those firms of your EEO/Affirmative Action policy? How? When?

- Who is responsible for monitoring search firm referrals to ensure that the firm complies with EEO and affirmative action requirements? How is monitoring accomplished?

- What is the demographic composition (race, ethnicity, sex, disability and protected veteran status) of those who the contractor hired from among search firm referrals? What efforts did the search firm make to ensure a diverse candidate pool?

COs must conduct an analysis of the information and data received from contractors on their sources of applicants and candidates. For each job filled with a referral from a search firm, the CO should determine, when possible:

- The qualifications the search firm used to refer a candidate;

- The extent to which the contractor approved these qualifications or the amount of input the contractor had in the process to refer a candidate;

- The total pool of candidates who met the requirements to be referred, by race, ethnicity, sex, disability and protected veteran status, and the total number of applicants actually referred by race, ethnicity, sex, disability and protected veteran status;

- The status of the selectee as a member of an underrepresented group;

- The presence of members of underrepresented groups among the referrals made by the search firm;

- The existence of members of underrepresented groups as applicants for the job from other external sources; and

- The existence of internal candidates for the job identified by race, ethnicity, sex, disability and protected veteran status.

A CO engaged with a contractor using employee referrals may want to ask several questions to understand that process. Some sample question areas for the contractor are below.

- How much, or to what degree, do you rely upon employee referrals for middle and senior-level management positions? Is this practice formal or informal?

Federal Contract Compliance Manual (FCCM)

- What is the typical relationship between the employee making the referral and the person being referred (*e.g.,* used to work together, went to the same school, met through a professional association, belong to the same club, a neighbor, a relative, a personal friend)?

- Do you receive employee referrals for members of diverse groups?  How many were referred by race, sex, ethnicity, disability and protected veteran status?  To whom were the members of diverse groups referred?  Were any of the individuals referred hired?

- Do you inform employees that the corporation is actively interested in referrals of underrepresented individuals?  How are they informed?  When are they informed?

- Do you provide a reward or bonus for referring a candidate that is ultimately hired?

When collecting and analyzing employee referral data, COs must remember that information on whether a person was an employee referral will not necessarily be in an applicant log.  If no referrals are shown on a log, the CO needs to examine a sample of the files of people hired at the same level involved.  Information on the employment application and interview notes may provide an indication of the source of the applicant or candidate.  The CO may also be able to obtain relevant information through interviews of successful candidates (*e.g.*, those hired or promoted into the job title at issue).

## 4H04   INTERNAL DEVELOPMENT

If not already provided, the CO must request documents on the contractor's promotion, training, and transfer policies and procedures.  With this information, the CO should discuss the procedures with human resources and other appropriate corporate officials.  In particular, the CO must clarify how the procedures apply to headquarters positions at, above and below the management level where nonfavored group member participation declines.  The CO must also clarify how these procedures apply to movement from subordinate establishments to corporate headquarters and vice versa.

For most corporate management positions, particularly at the higher senior levels, placement through internal movement like promotions and transfers, rather than by new hire, is generally the rule.  Therefore, in order to conduct a proper analysis, it is important that the CO fully understand the various elements that can affect internal placement, particularly those unique to a CMCE, such as succession plans.  Further, the higher the management level, the less likely it is that the contractor will include the jobs in any formal job announcement system the contractor may have, and the more likely it is that the contractor includes the jobs in some kind of formal or informal succession planning.[285]  Below are several sample question areas that COs may find helpful.

---

[285]   See FCCM 4H04 – Succession Planning.

- How do you make promotion and transfer opportunities known to potential candidates? Is the process the same in all functional areas? Are there differences in the process for positions at the upper management levels?

- Do you make openings at corporate headquarters known to employees in subordinate establishments as well as to employees at headquarters? How? How do employees at subordinate establishments express an interest in being considered for an opening at corporate headquarters?

- Do you make openings at subordinate establishments known to employees at corporate headquarters? Who is responsible for doing so? How is it done? What is the process by which employees at the corporate headquarters express an interest in being considered for openings at subordinate establishments?

- How many employees applied for positions at the corporate headquarters? Identify these employees by race, sex, ethnicity, disability and protected veteran status, and identify how many were hired?

The CO should review promotion and transfer actions for conformity with the corporation's stated policies and practices. The CO should also interview the contractor's current, former and new employees regarding their understanding of, and experiences with, the corporation's promotion and transfer practices at the corporate, regional and subordinate establishment levels.

The CO should examine personnel files of managers at and above the level where nonfavored group member participation declines.

a. *Succession and Related Planning*

The vast majority of corporations engage in some form of planning for future management and personnel needs. These plans go under many different names, such as "human resource development plans," "succession plans," "business plans," "management reviews," "replacement tables," "developmental needs assessment," "high-potentials," "fast-track" and "promotion rosters." The scope and detail of the plans may vary considerably. Areas where there may be the greatest variance include:

- The depth of the plan or how deep into the organizational structure the plan reaches;

- The degree of centralization or the degree of control exercised by corporate headquarters compared to the regional headquarters or subordinate establishments;

- The degree of formality involved with the plan (*e.g.,* the existence of a written plan, the use of regular plan reviews); and

- The degree the plan is affected by standard performance appraisal or other personnel processes.

Federal Contract Compliance Manual (FCCM)

When succession planning is explicit or more formal, there may be more specificity and several contingent options when implementing the plan. For example, an explicit plan may specify that a specific person is ready to step into the job or position as a permanent replacement for the incumbent, if necessary. It will also have contingencies should that person be unable or unavailable to assume the position. If no one is currently ready to assume the position permanently, most formal plans still provide a way forward by:

- Designating a person who could take over until a permanent replacement is developed; or

- Designating one or more persons who could be a permanent replacement, given additional developmental experiences or training, or both. The plan would also identify needed training and experiences, how long it will take and other appropriate detail.

In addition, to this level of specificity, a corporation may identify:

- A pool of employees (either specific, named individuals or a description of an employee group such as the number of employees currently in feeder jobs) the contractor considers to have a high-potential to develop into middle to senior-level managers; and

- A broader pool of employees the contractor considers promotable (either specific, named individuals or a description of an employee group such as the number of employees currently in feeder jobs).

The identification of employees, whether for a particular job or generally, is usually fluid, *i.e.*, people may move onto or off of lists depending on shifting business needs, changes in personnel or individual job performance.

COs may want to ask specific questions about succession planning to determine if all qualified candidates are considered, and whether employees with potential have access to training and other developmental opportunities. Several sample question areas are below.

- Does the corporation have a succession plan to fill particular management positions should there be one or more vacancies?

- Which management jobs or management levels are covered by a succession plan?

- What does the corporation's plan cover? Does the succession plan include both short and long-term planning, *i.e.*, for people who are currently ready to assume the position, and for those who may be ready after further developmental experiences and training?

- Are candidates in regional headquarters or other subordinate establishments considered when designating possible successors? If so, how are nonheadquarters and headquarters candidates identified?

- Are there written materials describing the plan and offering guidance on selection and development of candidates? Who developed the plan? Are employees advised of the plan?

Federal Contract Compliance Manual (FCCM)

- If the succession plan identifies specific individuals as potential successors for certain jobs, does the permanent successor most often come from among those identified? What are some examples?

- When is the plan reviewed and modified?  Who is responsible for the review?

- What is the representation by race, sex, ethnicity, disability and protected veteran status among those identified as potential permanent successors?

- How does the representation of members of protected groups who are identified as potential permanent successors for management jobs compare to their representation in the total candidate pool (*e.g.,* in feeder jobs) for those jobs?

  o If the proportion of one or more of these groups in the succession plan is well below their proportion in the total candidate pool, what is the reason for this discrepancy?

  o What steps do you take to rectify the problem and recruit and/or prepare more group members to be manager successors?  Who (by group member status) has graduated from a succession planning system into management?

- What, if any, developmental experiences does the corporation require or prefer (*e.g.,* on-site training, off-site training, rotational assignments, special projects)?  Are there any individual development plans?

- Does the corporation have any policies or practices for identifying people below the management level with a high potential for advancement?

  o How does the process work?  How are the individuals identified?  What factors are used?  Does a person need to be "sponsored" by a current manager?  Why or why not?

  o What is the lowest level at which an employee will be considered for succession?

  o Are there any written materials describing the process, offering guidance on selecting and developing participants?

  o How closely and how often does corporate headquarters monitor the process?  Does the monitoring include ensuring that affirmative actions are taken to guarantee EEO in all aspects of succession planning and management development?

  o What is the representation by race, sex, ethnicity, disability and protected veteran status among those identified as "high-potential" versus those eligible to be so identified?

  o If the proportion of representation by race, sex, ethnicity, disability and protected veteran status is well below their proportion of those eligible, what, if any, analysis was done and what were the findings?

Federal Contract Compliance Manual (FCCM)

When the contractor has succession planning programs and there is a disparity in the proportions of representation by race, sex, ethnicity, disability and protected veteran status included in the candidate pool, COs must determine the reasons for the disparity.  In order to do so, COs must explore several areas and follow-up including:

- If there is EEO monitoring and an explanation is offered for a disparity, COs should verify the explanation in the course of examining data and files concerning internal mobility, and through interviews with selected employees and managers.

- If there is no EEO monitoring or no explanation is offered for a disparity, COs should analyze the disparity based on the information provided concerning the scope of the program and the criteria for inclusion.  A few examples may be:

  o Where there is multi-establishment participation in the succession planning program, do any establishments have a particularly large gap between the percentage representation by race, sex, ethnicity, disability and protected veteran status in the program, as compared with the percentage of identified group members eligible for inclusion (*e.g.,* in feeder jobs)?

  o Were the selection criteria for inclusion in the program uniformly applied?

b. *Movement Within Headquarters*

- *Transfers within Headquarters*.  As with lateral cross-establishment moves, transfers within headquarters may represent planned rotational assignments.  Based on information already gathered, COs should identify those moves within headquarters that appear to meet that definition.  Also, if the data permits, COs should identify instances in which people transferring were subsequently promoted.  When those transfers or promotions are into the level at, above or below the level where nonfavored group participation declines, COs should incorporate the information into the analysis, and interview the employees and selecting officials involved to confirm the reason(s) for each move and how it was initiated.

- *Promotions within Headquarters*.  When beginning to determine the frequency, types and paths to internal promotions within headquarters, COs must first make several determinations:

  o What is the typical grade increment involved (*e.g.,* one grade increase, two)?

  o To what extent do promotions tend to remain within broad functional areas (*e.g.,* finance, engineering, personnel)?

  o To what extent do promotions cross functional areas (*e.g.,* from engineering into personnel)?

  o Are there any patterns that stand out regarding functional or cross-functional promotions (*e.g.,* promotions are functional up to a certain level, then switch to cross-functional, or vice versa)?

Federal Contract Compliance Manual (FCCM)

When there is considerable cross-functional movement, a refined IRA, or other analysis, may be useful for focusing the investigation. For example, if employees typically progress in one grade increments, promotions by favored and nonfavored group status at each relevant grade may be compared with incumbency by favored and nonfavored group status in the next lower grade.

When movement is predominantly within function, the COs should identify functions where promotions occurred. COs should evaluate whether nonfavored group members were not promoted even though there was good participation of nonfavored group members in the source grade. COs should pay particular attention to any functional areas they identified at the desk audit with the greatest disproportion between the participation of nonfavored group members above and below the grade where their participation declines in the workforce as a whole.

When some functions have concentrations of favored or nonfavored group members and other functions have underrepresentation of favored or nonfavored group members, these employees are likely to stay in these positions. This scenario is most likely when movement is primarily within function. COs should examine a sample of the contractor's files on nonfavored group members in the concentrated personnel areas to identify any placement problems.

For example, if nonfavored group members are heavily concentrated in staff positions in a "high-tech" firm, the contractor should determine whether any of them have technical backgrounds that would have qualified them for line functions. If so, did they start in staff positions or move into staff positions later? In either case, did the contractor determine why nonfavored group members are heavily concentrated?

- *Average Time in Grade or Corporate Service*. One way for COs to evaluate whether nonfavored group members are progressing in the managerial ranks is to look at the average time they spend in their current pay grade in comparison to members of the favored group in the same grade. COs can also extend this comparison to corporate service or tenure. COs should refine the focus of their inquiry if nonfavored group members spend considerably more time in the same grade than their counterparts. To do so, COs may focus on the possible reasons for the differences. For example, they can seek to determine whether nonfavored group members hold the type of jobs that limit opportunities, or whether the contractor passes over nonfavored group members for promotion. Alternatively, the analysis may show that nonfavored group members have less time in a grade than their peers. If this is the case, service time may be an explanatory factor for nonfavored group members not advancing to higher positions.

- *"Typical" Career Paths*. COs should ask whether promotions show repetitive patterns that appear to represent "typical" career paths within major functional areas. For example, in the functional area of purchasing, COs may want to explore whether promotions tend to be from being a Buyer, to becoming a Purchasing Supervisor, and then to a Purchasing Manager. In sales, COs may want to determine whether the typical career path is from Account Executive III to II to I, to Area Sales Manager, and then to District Sales Manager. When these progressions appear, COs should compare the

representation of nonfavored and favored group members with the feeder titles of the composition of those promoted.

c.  *Cross-Establishment Movement*

- *Movement to Headquarters from Subordinate Establishments.*  Early in the corporate management evaluation, COs must determine the degree to which the contractor fills management openings at corporate headquarters by promotion or transfer from subordinate establishments, rather than from within headquarters itself.  This balance may vary depending on the management level or functional area.  For example, at lower management levels, promotions or transfers may be predominantly within headquarters, while at higher levels, they may come predominantly from outside headquarters.

  Such information will assist COs in identifying feeder pools for management jobs and, therefore, may influence whether COs expand the evaluation to include one or more subordinate establishments.[286]

- *Movement from Headquarters to Subordinate Establishments.*  Promotions and transfers out of headquarters to subordinate establishments also may be relevant, particularly in situations where the contractor views exposure to different operating business components as important to advancement to or above the level where nonfavored group member participation declines.

- *Rotational Assignments.* Cross-establishment transfers, whether into or out of headquarters, or between nonheadquarters establishments, may represent planned rotational assignments as a part of a formal or informal development program.

  As with the choice to fill a job by hire or promotion, the choice to fill it by transfer rather than promotion, or from a subordinate establishment rather than within headquarters, is itself a selection decision.  While that decision may appear to be EEO neutral, COs should be alert for any pattern that suggests a correlation with a prohibited factor.  Sample question areas that may be helpful on this and related points are below.

- Is work experience in subordinate establishments important to advancing to corporate management positions?  In what fields?  Is working at corporate headquarters important to advancing to senior management at subordinate establishments?

- When is a cross-establishment move generally made during an employee's career?

- Are cross-establishment moves ever part of a formal career planning process?  How does this fit into long-term succession planning?

---

[286]  See FCCM 4A01 – Scope of CMCEs.

- Are rotations through the corporation's overseas locations a 'preferred' or 'required' qualification for moving into senior management positions, either officially or unofficially?

- What happens if an employee refuses a job offer requiring relocation? Are the effects of refusing to relocate on career prospects the same for all employees who refuse to relocate?

  COs must review any written material on corporate policies related to promotions and transfers, as well as the data requested earlier on promotions and transfers to management jobs at, above and below the level where nonfavored group member participation declines. At a minimum, the data in the analysis should include:

- The date of each promotion or transfer;

- Race, ethnicity and sex information of each selectee;

- Disability and protected veteran status of the selectee, when known; and

- The job title, grade and department, as well as the establishment from which and to which the promotion or transfer occurred, if it is not within corporate headquarters.

d. *Promotions and Transfers into Headquarters versus within Headquarters*. COs must determine the extent to which feeder pools for headquarters positions are internal and external to headquarters. COs must separate promotions from subordinate establishments into headquarters from promotions within headquarters. COs should do the same with transfers.

COs should ask or seek to determine how, at given grades or types of functions, the volume of promotions and transfers into headquarters compares with the volume within headquarters.

e. *Promotions and Transfers into Headquarters from Subordinate Establishments*. If subordinate establishments are an important feeder pool, COs must examine the participation of nonfavored group members in this pool. For promotions and transfers from subordinate establishments into headquarters, COs must note the grade level and originating establishment.

COs should address several question areas related to promotions and transfers into headquarters to identify potential problems:

- How does the majority of the movement into headquarters occur? Is it from only a few establishments? Are these establishments part of a particular intermediate business group?

- How does the participation of nonfavored group members in exempt positions in establishments from which promotions or transfers, or both, occurred compare to their participation in exempt positions in other establishments?

Federal Contract Compliance Manual (FCCM)

*f.   Performance Appraisals.*  Performance appraisals are an important and essential management tool.  This tool can inform promotion and other decisions.  The vast majority of corporations have a formal performance appraisal process for exempt staff.  These processes differ in a number of ways, among them:

- The frequency with which performance appraisals are conducted, although most are conducted annually.[287]

- The degree to which the employee being appraised contributes to the process.  For example, in some instances, the process begins with the employee giving a written self-evaluation of his or her progress against performance goals established in the last appraisal cycle.  Sometimes this evaluation includes indicating what his or her goals are for the coming year.

- The manner in which the appraisers express the evaluation ratings.  Some appraisers use only numeric values and others may use a narrative.[288]

- The requirement that employees sign their appraisals and whether employee comments are permitted.

- The level of the individual responsible for reviewing the appraisal.

Corporations link appraisals to salary increases, bonuses and promotions.  Section 4H touches on issues related to promotions and Section 4I reviews issues related to salaries and bonuses.  COs will want to know whether the corporation gives employees in the same grade level who receive a given rating the same percentage raise.  COs will also want to know when a formula is used for determining raises and bonuses, and how heavily the rating is weighted.  COs may find the below sample questions on performance appraisals useful.

- What is the corporation's performance appraisal process for exempt staff?  Does the corporation use the same appraisal process for all exempt staff?  Is the process different for the various levels or grades in the company?

- Does the corporation use a numeric or narrative appraisal rating?  If neither of these is used, how is the rating method described?

---

[287]  If a regular appraisal cycle is supplemented by a "benchmark", a longer-term career assessment process such as career reviews at the third and seventh years of employment may take place.  The career assessment processes may be a component of succession planning.  More on succession planning is in FCCM 4H04.

[288]  For example, an "outstanding" rating may be valued at four points or assigned the number four, while an "unacceptable" rating may value at zero.  A narrative rating would consist of a brief overview summarizing an employee's level of performance and accomplishments to substantiate a particular rating.  Still, other corporations may use both numeric and narrative forms of evaluation.  Be aware that appraisal factors for supervisors and managers typically differ from those for professionals and, the higher level the manager, the less likely it is that the appraisal is only numeric.

Federal Contract Compliance Manual (FCCM)

- What are the highest and lowest scores for the corporation's numeric rating system? What is the range of acceptable scores? How is the range of acceptable scores established? When was the range established and when was it last modified?

- What score or performance rating does an employee generally need for promotion?

- Are there any written guidelines or training on how to administer the appraisal? Describe the guidelines the corporation provides to the rating official. Is reference made to EEO? If so, explain.

- How often are your employees appraised? Who appraises them and who approves the ratings? What is the degree of employee input?

- Is career planning included in your process? Is this planning short term, long term or both?

- Are "benchmark" or career interval appraisals used?

- Does the corporation monitor appraisal results for EEO? If so, how? What have been the results?

- Are raises, including bonuses and promotions, based on appraisals? If so, what is the relationship?

After gaining a better understanding of the appraisal system and the use of employee ratings, COs should analyze this information. For example, if a CO learns that a numeric system is used, the CO should determine the average rating for the nonfavored group at the grade level just below where nonfavored group member representation declines. If the average appraisal rating is substantially lower for nonfavored group members, the CO must determine if the contractor's EEO audit offers any reasons or explanations. Other areas of inquiry include determining:

- What, if any, actions the contractor took to eliminate the disparity; and

- Whether the disparity is traceable to certain functional areas.

If the corporation uses a narrative system, then the CO would explore any differences in the tone between appraisals of nonfavored and favored group members.

g.   *Visibility.*  One element of career advancement can be the amount and type of exposure to senior corporate management through assignment to special projects, task forces, corporate committees or through appointment to special assistant and executive assistant type positions.

Being assigned special projects and working on teams and groups are ways employees gain increased visibility within the corporation. There is considerable variation in the degree to which corporations use special projects, working groups and teams. Some projects may be more desirable than others in terms of opportunities for skills development and visibility. In some industries, this difference will be fairly clear simply because of the nature of the

industry, or the corporation may have a formalized structure.  For others, COs may need to rely on employee and management interviews, as well as any group award program maintained by the contractor, that may reflect projects that were particularly desirable.[289]

COs will want to compare the nonfavored and favored group composition of special project teams and task forces with the nonfavored and favored group composition of the jobs or functional areas from which members were or reasonably could be drawn.  Below are several sample questions that can result in useful information on opportunity and participation of nonfavored group members on teams and groups.

- Does the corporation make use of special projects, and teams and working groups?  If so, in what areas of the business?

- How are members selected and by whom?

- What special projects, teams and working groups are currently operating?  What is the favored and nonfavored group composition of each?

- Are selections monitored to ensure equal opportunity for all eligible nonfavored group members?  If so, by whom?  Have there been any cases where a concern was raised and, if so, how was it handled?

h.  *Corporate Committees*.  Most boards of directors appoint standing committees to monitor and keep the board informed on a specific subject area.  In many cases, these committees may simply reflect functions.  The appointment to these committees is usually nondiscretionary and based solely on position.  It can be useful for COs to know the composition of such committees in order to understand the nonfavored group composition corporate-wide of such positions.

There may also be special purpose committees that draw from a wider range of positions and levels within the corporation.  Serving on these committees often provide members career enhancing opportunities through exposure to corporate leadership, networking, mentoring relationships and broadening knowledge of the corporation.  COs should examine nonfavored group member participation.  COs should compare the membership for each committee with those eligible for such membership.  For functional and position-based committees, COs should ensure that all qualifying employees are included as members and determine the reasons for any discrepancies.

i.  *Special Assistants and Executive Assistants*.  People holding such positions, particularly ones reporting directly to senior corporate management regardless of actual title, may be on a "fast-track" to middle management positions by offering the incumbent enhanced developmental opportunities.  In some cases, there may not be formal guidance on the creation or appointment of employees to these positions.  In such cases, interviews can be critical to gathering useful information.

---

[289]  FCCM 4I01 – Recognition: Awards and Honors.

In addition to other sources of information on these positions, COs should review the organizational profile for any special assistant and executive assistant type of positions. Note that if such titles are nonexempt, or relatively low-level exempt, the incumbents may be in support staff rather than "fast track" positions.

*j.* *Assignments in Particular Industries and Lines of Work.* In some industries, a number of people may share the same or very similar titles and yet differ substantially in the career growth potential offered by their assignments. For example, in sales positions, some product lines may offer higher commission potential than others. Some territories may have been worked extensively, and thus offer primarily opportunities for renewal or upgrade of orders. Others may be relatively unworked and thus offer a greater opportunity for new business. For account managers, the dollar volume and growth potential of accounts managed are important to advancement.

After identifying distinctions between favorable and less favorable assignments, COs should determine if nonfavored group members are underrepresented in the former and concentrated in the latter. COs should determine how the corporation makes assignments, particularly for the most and least valuable. They should ask if these assignments are monitored to ensure equal opportunity for all eligible employees. It is also important to know if there is a formal structure that defines the value of these assignments.

## 4H05   MANAGEMENT TRAINING AND EXECUTIVE DEVELOPMENT

A CMCE should cover both management training and executive development programs. The success of new and high potential employees is influenced by how quickly they learn people-oriented management skills that complement their expert or technical knowledge. Management training is a source of the key skills, best practices and behaviors of effective managers like leadership, delegation, motivation, empowerment, communication and vision. Possessing these skills and traits increase the likelihood of being promoted or transferred into corporate management or other leadership positions. If a corporation offers any management training, COs must determine how it is delivered, who is eligible to participate, who makes the decisions, and how the decisions are made by the corporation. Other relevant question areas are:

- Is the training a requirement for a management position? Has the corporation placed any people directly into management without such training? If so, what is their nonfavored or favored group status?

- How does an employee learn of the training? How is an employee selected for it?

- Who monitors participation in training to ensure equal opportunity for all eligible employees?

- What is the composition of the nonfavored and favored groups based on the individuals participating in training over the last year (or evaluation period)?

- How does that composition compare with the nonfavored and favored group composition of those eligible to participate in training?

- If there is a substantial difference between the proportion of nonfavored group members eligible and those participating, what cause was found?

- Does the training include any segments on EEO or diversity management? Up to what level do managers attend?

Executive development programs can be internal, external or both. These programs represent a substantial investment by the corporation in the development of people viewed as potential senior executives. They generally prepare middle-management executives to become more effective leaders and change agents within the company. Because the number of participants is typically small, it may be most useful to look at who participated at some point in their career, rather than only those who participated during the evaluation period. COs may want to ask questions in areas like those below.

- What level manager is eligible? Are there, or have there been, any exceptions to the eligibility level (*e.g.,* have managers below the designated level ever been able to participate in the program)? If so, who authorized those exceptions and why?

- How are people selected for executive development programs? By whom? Are selections monitored to ensure equal opportunity for all eligible employees? Have there been any cases where someone raised a concern and, if so, how did the corporation handle it?

- Among the eligible managers, can you identify who participated in the executive development program by sex, race and ethnicity? If there is a nonfavored group, the CO should ask whether members of the nonfavored group participate, were their training programs comparable in type, school, duration and other relevant areas to those attended by their favored group peers?

- If there is a nonfavored group, the CO should ask managers of that group whether there are plans for members of the nonfavored group to participate in executive development programs? Did their predecessor participate? At what point in his or her career?

## 4H06  MENTORING AND NETWORKING

In addition to formal management development programs, many senior managers report having had mentors at some point in their career who served as role models, translators of corporate culture or advocates. Because these relationships are generally informal, and may be initiated by either the potential mentor or "mentee," interviews may be the only way to determine if:

- Mentoring exists at the management levels under review;

- Mentoring is an informal or formal program with policies and guidelines; and

- Mentoring carries weight or is value-added in the career advancement process.

Federal Contract Compliance Manual (FCCM)

COs should also find ways to determine if there are any potential concerns regarding participation of nonfavored group members.

In addition to examining the role and importance of mentoring in career advancement, COs must also consider networking. As used here, networking is the establishment of contacts beyond one's immediate work setting or level, or both, that confer a business benefit. Some corporations have established groups that provide a formal opportunity for managers at a given level to network across division and often establishment lines. If the corporation has such a group, COs should determine the level of managers eligible to join, and ensure that any nonfavored group member managers at that level or above are offered membership on the same basis as their peers. Other networking opportunities may be found in outside professional associations and/or social clubs. If the corporation supports membership in such outside organizations, COs should ensure that eligible nonfavored group member managers receive such support on the same basis as their peers.

Unlike formal networking, informal networking is generally interacting across establishment or functional lines with peers and higher level managers. If a corporation does not formally disseminate information on job openings or does so only up to a certain level, networking may be the prime source of information about job openings, particularly those at other establishments. Also, contacts established over time can contribute to career enhancing assignments on work projects involving other departments or establishments.

Although the general assumption is that informal networking is a matter of employee initiative, some corporations affirmatively encourage the development of such contacts among groups not currently well represented in management jobs by, for example, sponsoring meetings or establishing committees that bring together group members from different functions, establishments or management levels.

COs do have certain things to consider when evaluating the role of networking, such as:

- Do internal formal networking groups exist? How and by whom are they administered?

- Who is eligible for membership? How and by whom is membership extended or approved? Who monitors membership to ensure equal opportunity for all eligible employees?

- Have there been any potential concerns regarding participation of nonfavored group members? If so, how were the concerns handled?

- Does the corporation encourage or sponsor participation in external networking groups? If so, which ones and what form does the corporate 'support' take?

- Does the corporation ensure that all eligible employees know about this option? How?

- Who monitors the program(s) to ensure all eligible employees have equal opportunity to participate and receive the same support? Have there been any potential concerns regarding eligible nonfavored group members? If so, how were the concerns handled?

Federal Contract Compliance Manual (FCCM)

- Does the corporation promote informal networking opportunities? How? Are there specific target groups?

# 4I    ON-SITE: RETENTION

A major way a corporation retains key personnel at all levels of its workforce is by paying a competitive salary for the type of work involved and offering benefits at least comparable to those offered by other corporations in its industry. Corporations may additionally have honor and award systems to recognize, reward and thereby encourage high performance.

## 4I00    OVERVIEW OF TOTAL COMPENSATION PACKAGES

Fair pay is a critical issue for workers and their families, and a cornerstone of OFCCP's equal employment protections. As such, identifying and remedying compensation discrimination has long been an important goal of OFCCP compliance efforts. The Executive Order and the implementing regulations specifically require contractors to ensure pay equity. They place federal contractors under affirmative duties to maintain data, conduct internal review and monitor pay practices for potential discrimination, and prohibit discrimination in the paying of wages, salaries and other forms of compensation.[290] Nevertheless, BLS data and numerous research studies indicate that unexplained disparities in compensation on the basis of sex and race continue to exist. COs should also be mindful that the implementing regulations of both Section 503 and VEVRAA similarly prohibit compensation discrimination on the bases of disability or protected veteran status, and require contractors to ensure pay equity.

OFCCP follows Title VII principles in investigating and analyzing compensation discrimination. While the approach set forth in Chapters 1 and 2 for analyzing compensation applies, there are additional complexities in typical corporate compensation programs for high level jobs. As in any other compensation analysis, the objective is to determine whether employees receive compensation and benefits to the same extent, and under the same standards, as their similarly situated peers, without regard to sex, race or ethnicity. If not already provided, the first step should be to request any formal policies the corporation has regarding each type of compensation. In addition to reviewing the policies, the CO will probably need to use interviews to determine at what level employees become eligible to receive each type and what, if any, exceptions the corporation has made for people below the specified level.

When investigating compensation cases at the corporate management level, COs must have an understanding of the compensation structure. As management level increases, it is likely that total compensation goes well beyond the base salary typically reflected in a workforce analysis.

Similarly, COs will find that benefits go well beyond what is standard for other employees. At higher management levels, base salary is often supplemented or, for top managers, exceeded by other forms of compensation such as cash bonuses, stock awards and stock options. Standard benefits are usually supplemented by what are often referred to as perquisites or "perks." Perks are numerous and varied. Examples include the use of corporate cars, concierge service that

---

[290]  41 CFR. 60-1.4; 60-1.12; 60-2.17(b)-(d).

Federal Contract Compliance Manual (FCCM)

offers discounted services, free trips, access to the corporate plane, and housing subsidies or allowances.

Upper level management compensation, benefits and perks can be specialized and can be closely held within some corporations. Therefore, it is usually necessary to interview the person in charge of compensation and benefits at the corporate level, identify who maintains the data and, if necessary, interview an official who has recordkeeping responsibility for the corporation.

a. *Bonuses.* As used here, bonuses refer to those that are predominantly exclusive to the management level. An addition to base salary, bonuses may be granted in cash, stock or in some combination thereof. Corporations most often distribute bonuses annually, usually soon after the end of a corporation's fiscal year or performance appraisal cycle. Corporations may distribute bonuses as a lump sum or over a specified period of time, in which case, COs should consider the totality of the award in the analysis. In a multi-establishment corporation, it is fairly typical for the bonus "pot" to be allocated to component business groups in some proportion to their contribution to corporate profitability over the bonus period. Those business groups, in turn, may similarly allocate their bonus "pot" to their component establishments. Bonuses thus provide an incentive for managers to improve profitability. This incentive tends to increase as a larger proportion of a manager's compensation comes from bonuses rather than from base salary or other forms of compensation.

Cash bonuses are most often a percentage of base salary. When reviewing potential compensation issues where cash bonuses are involved, some areas COs should consider include:

- The level or salary grade at which employees become eligible for cash bonuses;

- The history of bonuses being granted to employees below this level;

- The role of corporate headquarters in allocating cash bonuses;

- The role of intermediate headquarters and subordinate establishments in allocating bonuses;

- The standard the corporation uses to determine whether an employee receives a cash bonus;

- The individuals, including their specific roles, determining who is eligible, what standards to apply and the amount of the bonus;

- The levels of review and approval in the process; and

- The existence of safeguards that ensure that all eligible employees are given equal consideration in the allocation of cash bonuses.

Federal Contract Compliance Manual (FCCM)

In addition to exploring these areas, COs should ask questions to gather information on the consideration and representation of members of nonfavored groups during the bonus process. Below are a few sample questions.

- What proportion of those eligible, separated by nonfavored and favored group status, received a cash bonus?

- If there is a nonfavored group with respect to bonus allocation, did the contractor review bonus allocation to ensure nondiscrimination? What were the findings or results?

- What is the average cash bonus separated by nonfavored and favored group status?[291]

- If there is a nonfavored group with respect to average bonus amount allocated, did the contractor review allocation to ensure nondiscrimination? What were the findings or results?

b. *Stock*. Corporate stock plans can be a particularly strong incentive to improve corporate performance, since such improved performance usually increases the stock's share price and thus increases the value of any given number of shares of corporate stock an employee holds.

Employers may sometimes use company stock as a bonus but may also use it as a way to retain key employees or to provide an incentive for a given action. The corporation also may offer employees the option to purchase corporate stock on favorable terms. If the corporation has not already provided it, COs should request any written policies and procedures regarding use of stock as a management incentive.

- *Stock Awards – One-time Bonuses*: Corporations occasionally pay bonuses, in whole or in part, in corporate stock. This may be an outright grant, usually annual, of a certain number of shares of stock at the market value at the time of the grant. More often, however, a stock award is vested over a number of years.

- *Stock Awards – Vested*. The term "vested" is more commonly associated with time-in-company required to begin accruing retirement and/or health benefits; it can also be applicable in this context.

  A stock award is vested when an employee, instead of immediately receiving a given number of shares, receives those shares after a given number of years (the "vesting period"). For example, the corporation may award a person 300 shares of stock, with 100 shares allocated immediately, and the remaining 200 to be allocated at the end of three years. Such vested stock awards provide an incentive for the recipient to remain with the corporation since he or she will not receive the remaining stock if he or she leaves.

  Vesting also may be for a specific limited purpose. For example, a stock award may be conditional on an employee action, such as completing a particular project by a given

---

[291]  This may be expressed as the average percentage of base salary.

Federal Contract Compliance Manual (FCCM)

date. In this case, the stock is "awarded" but it is not allocated unless the employee completes the project by the due date.

- *Stock Options.* This noncash form of compensation offers the employee the ability to choose to buy or not to buy a given number of shares of stock at a specified price within a specified period of time. Stock options are issued as a private contract between the employer and employee. Because the stock options cannot be exercised immediately, employers use them as a way to retain employees. The option to purchase stock may have conditions or limitations, such as limited transferability and vesting requirements. Unless the company performs poorly, employees generally expect to sell the stock at a higher market price and make a profit.

  For example, an employee is offered an option to buy 100 shares of corporate stock at $30 a share (its current market price) at any time within the next five years. If the stock goes down, the employee simply does not exercise the option to buy. If it goes up, however, say to $50 a share, and the employee exercises his or her option, the employee has an immediate profit of $20 a share or $2,000.

When evaluating stock as a part of compensation, there are several things to consider. For any area of potential compensation concern where stock appears to be a factor, COs must determine, for each year:

- The form in which the corporation gave the stock;

- The eligibility criteria;

- The extent the same form of stock was given to all eligible employees in the same manner, at the same time and with the same value;

- The change in stock type between years; and

- The consistency, or lack thereof, in the change in stock type for all eligible employees.

In addition to the above considerations, COs must ask specific questions when reviewing stock given during the last award cycle:

- What proportion of those eligible, by race, ethnicity and sex, received stock?

- If there is a nonfavored group with respect to receipt of stock awards, the CO should ask: Did the contractor review the stock awards to ensure nondiscrimination? What were the findings or results?

- What is the average stock award by nonfavored and favored group status?

- If there is a nonfavored group with respect to average amount of stock awarded, did the contractor review stock awards to ensure nondiscrimination? What were the findings or results?

Finally, if there is a favored group, and the corporation awarded vested stock to keep favored group members with the corporation, COs should review data on terminations to determine if there were any nonfavored group members in similar positions who left the corporation around the same time.  If so, COs should determine whether the nonfavored group received vested stock.  If not, COs should then determine whether they should have under the corporation's criteria for receiving such stock.  When there is a finding of discrimination in the awarding of stock, there are some special considerations to be applied to the remedy.  These are identified in Appendix A-7, Special Remedial Considerations Applicable to Stock.

c. *Perquisites*.  Called "perks," these are privileges that corporations may provide employees as they reach a certain management level.  "Perks" generally are benefits that have cash value, like a corporate car; that save time, like accounting or tax services; that offer a convenience, like the use of corporate plane; and that protect key personnel, like paid medical exams.

As with other compensation elements, COs must determine whether the corporation offers perks, what they offer, how it decides who is eligible for a given perk, and if the proportion of eligible employees receiving each perk differ based on sex, race or ethnicity.  COs must also ask if the corporation reviews its allocations of perks to ensure nondiscrimination, and obtain the findings or results of the reviews.

## 4I01   RECOGNITION:  AWARDS AND HONORS

Corporations may offer any number of incentive awards or honors, with or without accompanying money.  Often, these are for meritorious achievement, whether individually or as part of a team on a particular project during a year.  They can also be for superior performance generally, and be granted in conjunction with an annual performance appraisal.  In the latter case, when people have reached the top of the salary range for their jobs, cash awards may be used instead of a permanent increase to base salary to reward high performance.

There are several things to consider when reviewing awards and honors.  If not already provided, COs must request written policies and procedures covering all such programs.  For each existing program, COs must determine:

- Who is eligible to receive an award or honor, or both?  What eligibility criteria were used?

- Who, listed by race, sex and ethnicity, received an award or honor? What are the reasons each person received the award or honor?  If there is a disparity by race, sex or ethnicity, were any nonfavored group members recommended for an award or honor, or both, who did not receive one?  Why?

- If there is a nonfavored group with respect to receipt of the honor or award, did the contractor review awards to ensure nondiscrimination?  What were the findings or results?

- If the award was accompanied by money, and the amount of money varied by race, sex and/or ethnicity, what were the average amounts received by the favored group and the

nonfavored group(s)?  Did the corporation review these awards to ensure nondiscrimination?  What were the findings or results?

## 4J     ON-SITE: TERMINATIONS

Generally, the higher the job level, the less likely it is that a person's separation from the corporation is recorded as an involuntary termination, regardless of the circumstances surrounding his or her departure.  Above a certain management level, if a corporation determines that an employee is not performing as expected, he or she may be offered the opportunity to resign.  Therefore, it would not be unexpected to find that the records show all middle and senior-level management terminations as voluntary.

Many terminations, of course, will be genuinely voluntary; some for reasons such as "better job opportunity," or "to spend more time with my family."  Such departures, however, may have been influenced by any number of factors, such as a perception of lack of promotion prospects that may or may not have EEO implications.

Even absent statistical disparity, COs should review involuntary terminations of managers, as well as a sample of voluntary ones.  COs must conduct the analysis itself in the same manner as any termination analysis, complete with interviews.

## 4K     COMPLETION OF COMPLIANCE EVALUATION: EXIT CONFERENCE, REPORT WRITING AND NOTICE OF EVALUATION

In a CMCE, the Regional Director or Deputy Regional Director, or both, will conduct an exit conference with top corporate officials.  The purpose of the meeting is to:

- Present and discuss any violation findings and required remedies to be incorporated in an NOV; and

- Identify and discuss any particularly creative or innovative efforts the corporation made to ensure equal opportunity for women and minorities to advance to middle and senior-level management positions.

As noted in FCCM 4A00, a CMCE includes all elements of a standard compliance evaluation, but with a special emphasis on the issues discussed in this chapter.  Accordingly, COs must complete the SCER to document their evaluation findings, but they must pay particular attention to the CMCE-specific section of the SCER that addresses issues unique to a CMCE.

### 4K00   NOTICE OF EVALUATION COMPLETION

As in any other compliance evaluation when no violations are found, COs send the corporation a notice of compliance evaluation completion, using the evaluation completion notices and

Federal Contract Compliance Manual (FCCM)

procedures found at Letter L-5, Notice of Closing Compliance Evaluation (No Violations Found).

Note that if the CO finds violations and an agreement that addresses a corporate-wide issue is necessary to bring the corporation into compliance, that agreement should require that the corporation implement the appropriate remedial action at all corporate establishments.[292]  If, during an evaluation of a subordinate establishment conducted after the effective date of that agreement, OFCCP discovers that this establishment has not fully implemented the agreement, a follow-up of the corporate evaluation may be necessary.

---

[292]   See FCCM Chapter 8 – Resolution of Noncompliance.

# CHAPTER 5
# FUNCTIONAL AFFIRMATIVE ACTION PROGRAM COMPLIANCE EVALUATIONS

## 5A    INTRODUCTION

The regulations at 41 CFR 60-2.1(d)(4) permit federal supply and service contractors to develop AAPs organized around distinct business functions or lines of business, rather than AAPs based on the contractor's establishments.  A contractor is permitted to develop AAPs for its functional or business units, referred to as FAAPs, only after reaching a FAAP agreement with OFCCP.[293]  This chapter provides guidance on evaluating a contractor's compliance with its nondiscrimination and affirmative action obligations when the contractor has entered into a FAAP agreement.[294]

### 5A00   APPLICABILITY OF CHAPTER

This chapter applies only to contractors with FAAP agreements approved by the OFCCP Director, or designee.  Ongoing compliance evaluations of establishments will not be affected by a contractor's request to enter into a FAAP Agreement.  Contractor establishments scheduled for a compliance evaluation during the FAAP agreement application process, or prior to the implementation of its FAAPs following the approval of a FAAP agreement effective date, will be completed as establishment-based evaluations if the scheduling letter was received by the contractor prior to the FAAP agreement's effective date.

### 5A01   PURPOSE OF THE FAAP

FAAPs are designed to provide contractors the option of creating AAPs that better fit their business needs.  Any supply and service contractor subject to AAP requirements may request an agreement with OFCCP that allows for the development and use of FAAPs.  Some contractors may find it appropriate to develop only FAAPs, while others may elect to use a combination of FAAPs and establishment-based AAPs.  Participation in the FAAP program is voluntary for contractors.  The FAAP Agreement cannot be construed to limit or restrict how OFCCP conducts its compliance evaluations.

### 5A02   THE FAAP AGREEMENT

The FAAP agreement is a written agreement between the contractor and OFCCP, approving the contractor to use FAAP(s) in lieu of, or in combination with, establishment-based AAPs.  The agreement is issued for a five-year term and outlines the contractor's legal obligations and the procedures for maintaining the FAAP agreement.  The FAAP agreement includes an addendum that identifies all of the contractor's approved functional or business units, including a

---

[293]  A FAAP agreement addresses only the development of AAPs along functional lines.  It does not address how OFCCP will conduct its compliance evaluations.
[294]  For further guidance, see OFCCP Directive 2013-01 Revision 2, "Functional Affirmative Action Programs."

description of each unit, contact information for each unit and the employee count for each unit.[295]  If a contractor maintains both functional and establishment-based AAPs, the FAAP agreement will include an "Addendum B" that identifies all of the establishments that will maintain establishment-based AAPs.  In the FAAP agreement, the contractor also agrees that, during a FAAP compliance evaluation, they will submit personnel activity in a readable and usable electronic format when requested to do so.  FAAP agreements are maintained by OFCCP's national office and become effective on the date of the OFCCP Director's, or designee's, final signature.  Contractors will have up to 120 calendar days following the effective date to implement its FAAPs, and they must notify OFCCP when the FAAPs are implemented.  A FAAP must include the components that are prescribed in 41 CFR Part 60-2 and, if appropriate, Subpart C of 41 CFR 60-300 and Subpart C of 41 CFR 60-741.

## 5A03   FAAP COMPLIANCE EVALUATIONS

A FAAP compliance evaluation is a full compliance review that includes all aspects of a standard compliance evaluation.  However, all AAP components are based on the functional or business unit that is the subject of the AAP, rather than an establishment.  If OFCCP selects a corporate headquarters unit under a FAAP Agreement for review, the FAAP compliance evaluation may be designated a CMCE.  The CO responsible for conducting FAAP compliance evaluations must follow the procedures in Chapter 1 of this Manual on the procedures for conducting a desk audit, Chapter 2 on conducting an on-site review and Chapter 4 on conducting a CMCE, but with only a few differences.  These differences are explained below in Sections 5B through 5E.

## 5A04   COMPLETING THE SCER

The CO must complete all applicable sections of the SCER to identify the functional or business unit under review, include the results of the desk audit, findings from the on-site review, and off-site analysis.  Some sections of the SCER may not be applicable in every compliance evaluation.[296]

## 5A05   OFCCP PARTICIPANTS IN FAAP COMPLIANCE EVALUATIONS

OFCCP conducts FAAP compliance evaluations under the national office's direction and oversight.  The national office's FAAP Branch sends the Scheduling Letter for all FAAP compliance evaluations, and then transfers the evaluations to the appropriate regional office.  Contractors send their FAAPs directly to the regional office identified in the Scheduling Letter.  The regional office has full responsibility for completing the FAAP compliance evaluation with assistance from the national office, as needed.  The national office can assist the regional office in coordinating on-site reviews that need to occur at multiple facilities or within other regions.

---

[295]   The employee count specified in the FAAP agreement represents the employees that were present when the FAAP request was submitted as a part of the agreement application process.  The employee count in the FAAP agreement may differ from the number of employees reported when the FAAP is submitted during a compliance evaluation due to staff departures, hires or promotions.
[296]   See Appendices A-1: SCER and A2: SCER Instructions.

## 5B    PRE-DESK AUDIT ACTIONS

Before the CO begins the FAAP compliance evaluation, the FAAP Branch will provide the CO with a Case Chronology Log, a copy of the FAAP agreement and a copy of the Scheduling Letter.  The CO assigned to the compliance evaluation will prepare for the desk audit by:

- Creating a case file;

- Obtaining compliance history reports;

- Following up with the contractor within 15 days after the Scheduling Letter is sent;

- Reviewing community resource files;

- Contacting the EEOC and DOL enforcement agencies, such as WHD and the OSHA, as appropriate; and

- Coordinating with the FAAP Branch to obtain any other information about the contractor and the functional or business unit to prepare for the desk audit.  The following sections review these steps.

### 5B00    CREATION AND MAINTENANCE OF THE CASE FILE

The FAAP Branch will create an electronic Case Chronology Log for each FAAP evaluation.[297] The evaluation is transferred to the regional office when the Scheduling Letter is issued.  At that time, the FAAP Branch will provide the electronic Case Chronology Log to the CO who will maintain and complete it as directed in FCCM 1B01.

The CO must create and maintain a case file for each scheduled compliance evaluation.  The case file should generally consist of the items detailed in FCCM 1B02 on creating a case file. For a FAAP compliance evaluation, the case file should also include a copy of the approved FAAP Agreement, as signed by the Director of OFCCP, or designee.  The FAAP Branch will provide the CO a copy of the most recently approved FAAP agreement upon the scheduling of a new compliance evaluation.  This information should be included in the case file in Folder 1.

### 5B01    SENDING THE SCHEDULING LETTER AND ITEMIZED LISTING

The Chief of the FAAP Branch signs the Scheduling Letter and Itemized Listing for a FAAP compliance evaluation and sends it by certified mail to the managing official of the functional or business unit selected for a compliance evaluation.[298]  The FAAP Branch Chief also mails a copy of the Scheduling Letter and Itemized Listing to the corporate contact person identified in the FAAP agreement.  Should a Scheduling Letter be received during the review and approval stages (*i.e.*, after submission of the FAAP request but before the effective date of the agreement) the evaluation will be completed as an establishment-based evaluation.  A contractor receiving a

---

[297]  Figure F-2 – Case Chronology Log.
[298]  Figure F-3 – OFCCP Scheduling Letter and Itemized Listing.

Federal Contract Compliance Manual (FCCM)

Scheduling Letter during the 120 calendar day FAAP implementation period may have its scheduled establishment-based compliance evaluation administratively closed.

The Itemized Listing requests only data supporting the functional or business unit selected for review. Prior to sending the Scheduling Letter notifying a functional or business unit of a scheduled compliance evaluation, the FAAP Branch will contact the corporate contact person to verify that the functional or business unit still exists, and to verify the name, title, mailing address and phone number of the managing official.

It is important to note that the contractor may also have standard establishment-based AAPs covering the remainder of its workforce. OFCCP will schedule compliance evaluations in accordance with the standard scheduling system for parts of a contractor's workforce that are covered by establishment-based AAPs. If a region schedules a compliance evaluation of an establishment that is covered by a functional or business unit, the regional office and CO must contact the FAAP Branch to verify if the establishment is covered within an approved functional or business unit. The FAAP branch will advise the regional office and CO whether to administratively close the evaluation.

## 5B02   FOLLOW-UP CONTACT WITH CONTRACTOR

When OFCCP sends the Scheduling Letter and Itemized Listing to the contractor, the FAAP Branch will provide a copy to the regional office. The contractor will submit its FAAP directly to the regional office identified in the Scheduling Letter. Within 15 calendar days after the Scheduling Letter and Itemized Listing are sent, the CO must contact the corporate contact person to ensure that the contractor understands the requirements outlined in these items. If there are questions, the CO will provide technical assistance to clarify the requirements and the compliance evaluation process.

## 5B03   OFCCP COMPLIANCE HISTORY REPORTS

The CO must check OFCCP's CMS and EIS to obtain a list of prior compliance evaluations of the functional or business unit, corporation and its other related functions or establishments. If the FAAP Branch has other historical information on the functional or business unit under review, the branch will provide this information to the region upon initiation of the FAAP review. Checking to determine if the prior evaluations identified any issues is an important preparatory step. If issues are identified in the historical files, the CO must review the record to determine how they were resolved. These previously identified issues may provide useful information and possible indicators of current problem areas. Any violations found in past compliance actions must be recorded in Part A of the SCER. If a prior review of this unit resulted in a CA, the on-site review should provide an opportunity to confirm that the contractor took, and appropriately maintained, the required corrective action.

## 5B04   CONTACTING EEOC, VETS AND OTHER AGENCIES

As discussed in Chapter 1, it is the agency's practice to contact the EEOC, VETS, state employment services, and EEO and labor enforcement agencies upon the initiation of a

compliance evaluation. Such information helps to provide a better understanding of the contractor's workforce and operations, and may indicate potential problem areas.

However, because of the nature of a FAAP compliance evaluation, the job groups and titles that are under review may be located at multiple locations throughout the country. Therefore, for FAAP reviews, contact with these government agencies is not made upon the initial mailing of the Scheduling Letter. Rather, the CO should contact these agencies after reviewing the desk audit findings to determine which locations would have information relevant to assessing the contractor's nondiscrimination and affirmative action efforts.

## 5C    DESK AUDIT

Initially, the CO will determine whether the FAAP submission is for the functional or business unit identified in the Scheduling Letter. Additionally, the CO must refer to the FAAP agreement for a description of the functional or business unit and verify contact information for the corporate contact person.

If the CO conducting the FAAP compliance evaluation finds problems, he or she should contact the corporate contact person for clarification or additional information before proceeding with the desk audit. If the CO identifies significant changes to the functional or business unit, such that the functional or business unit scheduled for review no longer exists or has substantially decreased or increased in size, the CO should notify his or her supervisor and contact the FAAP Branch Chief to discuss the issue.

The CO will conduct the desk audit as described in FCCM 1C through FCCM 1R with the exception that the CO will analyze the data by functional or business units. In some instances, during a FAAP compliance evaluation, the CO will not have sufficient data to perform an EEO-1 trend analysis in accordance with FCCM 1K. However, they should conduct all other analyses required in a desk audit. Even though the CO may not have sufficient data to conduct the EEO-1 trend analysis, they may be able to use the JAAR analysis as described in FCCM 1N01. This analysis can prove meaningful in analyzing how employees are placed and may show when limited opportunities exist for specific groups throughout the functional or business unit. This analysis can be conducted by job group despite the possibility of job groups being spread across many different locations. The CO should complete all applicable sections of the SCER and further investigate identified problem areas and indicators of adverse impact during the on-site review.

In conducting analyses of employment decisions like hiring, terminations, promotions and compensation, the CO should examine the data by function and business unit, and job group and job title, or any combination thereof. If indicators of discrimination are identified during the desk audit, the CO, in conjunction with their manager, must consult with the Branch Chief of Expert Services to identify the best methods for analyzing the data.

**5C00   REVIEW OF SECTION 503 AND VEVRAA AAPs**

Contractors with approved FAAP agreements must continue to comply with Section 503 and VEVRAA obligations by: (a) creating and maintaining Section 503 and VEVRAA FAAPs for the same functional or business units that are covered by their Executive Order 11246 FAAPs; or (b) creating and maintaining establishment-based Section 503 and VEVRAA AAPs for each of their establishments.  Contractors must inform OFCCP which method they will use to comply with its Section 503 and VEVRAA affirmative action obligations during the FAAP negotiation or certification process.  The method chosen by the contractor will be recorded in the FAAP Agreement.  Under either arrangement, contractors must make their VEVRAA or Section 503 establishment-based AAPs or FAAPs available for review by employees at each of their establishments.

When contractors with approved FAAP agreements are scheduled for compliance evaluations, they must also submit their Section 503 and VEVRAA FAAPs for the functional or business unit under review.  If a contractor uses establishment-based AAPs to comply with Section 503 and VEVRAA, it must submit to OFCCP its AAPs for all establishments within the functional or business unit under review.  The CO will review all Section 503 and VEVRAA establishment-based AAPs as described in FCCM Chapters 1 and 2.

During the review, the CO must ensure that all employees covered by the functional or business unit are included in the Section 503 and VEVRAA AAP submissions.  A contractor using a FAAP for Section 503 and VEVRAA should apply the Section 503 utilization goal on a job group basis, using the job groups in their Executive Order 11246 FAAP.  The contractor may apply the VEVRAA hiring benchmark, at its discretion, to each of its job groups or to the functional unit as a whole.  A contractor using establishment-based AAPs for Section 503 and VEVRAA, even though it has an Executive Order 11246 FAAP, should apply the Section 503 utilization goal to job groups created in accordance with 41 CFR 60-2.12 or, if it has a total workforce of 100 or fewer employees, by applying the goal to its workforce as a whole, if it chooses to do so.  The contractor may apply the VEVRAA hiring benchmark, at its discretion, to each of its job groups or to the establishment as a whole.

## 5D   ON-SITE

When conducting a FAAP compliance evaluation, it may be necessary to conduct on-site reviews at more than one location to evaluate the business functions or lines of business under review.  In such circumstances, the CO and his or her supervisor will determine the on-site visits that will be conducted and the composition of each on-site team.  Contractors with approved FAAP agreements agree to make personnel and employment records available at the location designated by OFCCP.  If it is determined that an on-site review needs to occur outside of the CO's region, the FAAP Branch can coordinate an on-site review within another OFCCP region.  The CO will conduct the on-site review as described in FCCM Chapter 2 using the SCER to record investigative findings and conclusions.

Federal Contract Compliance Manual (FCCM)

# 5E    COMPLIANCE EVALUATION COMPLETION

If the off-site analysis of the data that the CO obtained during the desk audit and on-site review result in no violations being found, the CO should close the FAAP compliance evaluation. However, if there are findings of discrimination or other violations, the CO should proceed in accordance with Chapter 8 and the issuance of a PDN or NOV, as warranted.[299]

The CO must follow FCCM Chapter 8 in each FAAP compliance evaluation that results in a finding of a violation.  If the CO issues a CA to correct identified violations, then the CA, closing documents and letters must clearly reflect that the CO conducted a compliance evaluation of a FAAP and Itemized Listing data, and indicate the limited scope of the evaluation.[300]  As previously noted, the contractor may also have an establishment-based AAP(s) covering the remainder of its workforce and employment actions that OFCCP did not review as a part of the FAAP review.

---

[299]    See FCCM Chapter 8: Resolution of Noncompliance.
[300]    See FCCM Chapter 7 – Employment Discrimination Remedies, and FCCM Chapter 8 – Resolution of Noncompliance.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 6
# COMPLAINT INVESTIGATION

## 6A    INTRODUCTION

This chapter outlines the procedures for processing and conducting investigations of complaints alleging discrimination in employment by federal contractors.  Preparing for and investigating a complaint differs from conducting a compliance evaluation.  The difference is that this investigation is primarily focused on the specific allegations in the complaint.  This chapter includes the general principles of complaint processing and investigation planning.  It, therefore, focuses on the CO's responsibilities related to investigating and resolving complaints.  It describes the CO's responsibility to evaluate the allegations in a complaint to determine the legal and analytical framework for addressing each allegation, to identify data and information to obtain during an investigation, to conduct appropriate analyses, and to develop and provide notification of findings.  The chapter also discusses conciliation efforts and enforcement actions.

## 6B    BASES OF COMPLAINT ALLEGATIONS

Employees and applicants may file complaints with OFCCP under any of the laws OFCCP enforces, including complaints alleging discrimination or alleging other violations of OFCCP's laws and regulations.  OFCCP processes and investigates some complaints in coordination with the EEOC.

### 6B01   EXECUTIVE ORDER 11246 ALLEGATIONS

OFCCP accepts complaints alleging discrimination based on any of the protected bases listed in Executive Order 11246,[301] and it may refer or jointly investigate some of the complaints with the EEOC.  The Executive Order 11246 regulation at 41 CFR 60-1.24(a) states that OFCCP may refer appropriate complaints to the EEOC for processing under Title VII, as amended.  In keeping with a MOU[302] between OFCCP and the EEOC, OFCCP will generally refer individual complaints alleging employment discrimination based on race, color, religion, sex or national origin to the EEOC.  COs should refer complaints alleging harassment or retaliation to EEOC, unless the basis for the complaint is sexual orientation or gender identity, or the harassment or retaliation is related to a prior OFCCP complaint or investigation.

---

[301]   If a complainant does not allege discrimination, but alleges other violations of EO 11246, such as affirmative action violations, OFCCP may conduct a compliance evaluation using one or any combination of its investigative procedures, such as a focused review.  See 41 CFR 60-1.20.

[302]   The MOU between OFCCP and the EEOC was first entered into on May 20. 1970, it was revised in 1974, and revised again in 1981 as published at 46 FR 7435 (Jan. 23, 1981).  The 1981 MOU was revised in 1999 as published at 64 FR.17664 (Apr. 12, 1999), and most recently updated in November 2011 as published at 76 FR 71029 (Nov. 7, 2011).

Generally, OFCCP retains individual complaints against federal contractors alleging employment discrimination based on sexual orientation or gender identity,[303] and individual complaints alleging discrimination because applicants or employees have inquired about, discussed or disclosed their compensation or that of others.  OFCCP may also retain complaints based on a violation of Executive Order 11246 to avoid duplication and ensure effective law enforcement (*e.g.,* when OFCCP is entering a CA with the same contractor to remedy violations found during a compliance evaluation).  Finally, OFCCP retains complaints alleging *class or systemic* discrimination on any basis protected by Executive Order 11246.

Whenever a complainant files a complaint of employment discrimination with OFCCP under Executive Order 11246 and the allegations in the complaint also fall within the jurisdiction of Title VII, the Title VII portion of the complaint is deemed dual filed with the EEOC.  OFCCP acts as EEOC's agent for the purposes of receiving, investigating and processing the Title VII component of dual filed complaints.  OFCCP processes dual filed complaints in a manner consistent with Title VII principles of liability and relief.

## 6B02   VEVRAA AND SECTION 503 ALLEGATIONS

Like Executive Order 11246, complainants filing under Section 503 or VEVRAA may allege employment discrimination, or other violations of the law or its implementing regulations.[304] For example, a complainant could allege affirmative action or recordkeeping violations, as well as discrimination under Section 503 or VEVRAA.

a.  *Complaints filed under VEVRAA.*  For VEVRAA complaints, OFCCP retains and investigates all complaints over which OFCCP establishes jurisdiction, regardless of whether they are individual or class complaints.  Since none of the laws enforced by EEOC include veteran status as a protected basis, VEVRAA complaints are not dual filed with EEOC. However, if a VEVRAA complaint also contains allegations of age discrimination, OFCCP will bifurcate the complaint, retaining the VEVRAA allegations for investigation, and referring the other allegations to EEOC.  In another example, if a VEVRAA complaint also contains allegations of individual discrimination based on race, color, religion, sex or national origin, OFCCP could decide to bifurcate the complaint, retaining the VEVRAA allegations for investigation, and referring the other allegations to EEOC.  OFCCP could also opt to retain all the allegations in the complaint for investigation.  Finally, OFCCP generally retains and does not bifurcate VEVRAA complaints that also contain allegations of disability discrimination, so long as the disability allegations fall within the jurisdiction of Section 503.

b.  *Complaints filed under Section 503.*  In contrast to VEVRAA complaints, complaints filed under Section 503 often also fall within EEOC's jurisdiction under Title I of the ADA, as amended and are, thus, dual filed.  OFCCP generally retains and investigates all Section 503 complaints over which OFCCP establishes jurisdiction, regardless of whether they are

---

[303]   See Directive 2015-01, "Handling Individual and Systemic Sexual Orientation and Gender Identity Discrimination Complaints," stating that OFCCP analyzes these complaints "to determine whether the alleged discrimination occurred on the basis of sexual orientation or gender identity, as well as on the basis of sex, and will coordinate with, and refer complaints to, EEOC on a case-by-case basis."
[304]   See 41 CFR 60-300.61(a) and 60-741.61(b).

individual or class complaints.  OFCCP acts as EEOC's agent when receiving, investigating and processing complaints that are dual filed under the ADA.

However, OFCCP may choose to bifurcate complaints that allege discrimination based on disability in addition to individual discrimination based on race, color, religion, sex, national origin or age.  If the decision is to bifurcate the allegations, OFCCP retains and investigates any disability discrimination and Section 503 affirmative action allegations while referring allegations of individual discrimination based on race, color, religion, sex, national origin or age to EEOC.  If the complaint alleges Section 503 affirmative action violations in addition to systemic discrimination based on race, color, religion, sex or national origin, OFCCP would retain the entire complaint and not bifurcate it.

For Section 503 complaints, OFCCP uses legal standards for determining liability, as well as damages and remedies, consistent with those applied under the ADA in determining whether a contractor committed an unlawful employment practice.  OFCCP also follows ADA principles when investigating Section 503 discrimination allegations that are not dual filed.

## 6B03   RETALIATION, INTIMIDATION, AND INTERFERENCE ALLEGATIONS

Individuals or groups may also file complaints alleging retaliation or interference under any of the laws enforced by OFCCP.  OFCCP's anti-retaliation regulations prohibit intimidation, threats, coercion, harassment and discrimination against any individual because he or she has engaged in "protected activity."  An individual has engaged in protected activity when he or she has:

- Filed a complaint;

- Assisted or participated in any activity related to the administration of any federal, state or local law requiring equal opportunity (*e.g.,* provided information to a CO conducting a compliance evaluation);

- Opposed practices made unlawful by equal opportunity laws (whether those practices were aimed at the person filing the complaint or at another person); or

- Exercised any other rights under OFCCP's laws, or any other federal, state or local law requiring equal opportunity.

Allegations of retaliation may be included in the same complaint with allegations of discrimination or may be filed separately.  Retaliation complaints that implicate a Title VII or ADA basis are considered dual filed with EEOC.  OFCCP will refer dual filed individual complaints of retaliation to EEOC <u>unless</u>:

- The complainant's protected activity was related to the complainant's participation in the administration of an OFCCP law (*e.g.,* participation in an OFCCP compliance evaluation or complaint investigation); or

- The complainant alleges retaliation because of a complaint previously filed and investigated by OFCCP.

This is a specific example of when OFCCP would retain a retaliation complaint that is related to a discrimination complaint: The complainant alleges discrimination based on gender identity and retaliation. If OFCCP retains the underlying discrimination component of the complaint, it would also retain the retaliation portion of the complaint.

### 6B04    EXECUTIVE ORDER 13496 INVESTIGATIONS

OFCCP also investigates complaints of noncompliance with Executive Order 13496, which requires contractors to provide notice to their employees of their rights under the NLRA, and include a similar notice in subcontracts and purchase orders. OFCCP and the OLMS share enforcement authority for Executive Order 13496.[305]


## 6C    COMPLAINT RECEIPT AND PERFECTION

OFCCP's regional offices are responsible for "perfecting" complaints and ensuring that a notice is sent to the employer against whom a complaint is filed with the date, place and circumstances of the alleged unlawful employment practice.[306] As such, all complaints received by OFCCP are sent to the appropriate regional office.

### 6C00    RECEIPT OF COMPLAINTS

Whenever any OFCCP field office receives a complaint, the office must immediately stamp the date of receipt on the complaint, and enter the date and time of receipt into office records. The receiving office, if not a regional office, must immediately send the complaint to the regional office that has geographic jurisdiction over the employer or employer's establishment. COs responsible for complaint perfection use the receipt date to determine whether the complaint was filed on time. Complainants filing under VEVRAA may also file through the DOL's VETS or through the Local Veterans' Employment Representative (LVER) at the local employment service office, who will transfer the complaint to OFCCP.[307]

### 6C01    WHO MAY FILE A COMPLAINT

Any individual or group may file a complaint. A third party (*e.g.,* a family member, personal representative, or union representative) may also file a complaint on behalf of an individual or a group. As explained in subsection 6D04, a third party may represent the complainant or complainants during the investigation with proper documentation. When a third party files a

---

[305] See Directive 2010-01, "Verification Procedures under E.O. 13496: Notification of Employee Rights under Federal Labor Laws." This directive explains the investigation procedures for complaints alleging noncompliance with Executive Order 13496.

[306] The regulations at 41 CFR 60-1.21 to 60-1.24; 60-300.61; 60-741.61 and 60-742.5 address timeliness issues and the initial processing of a complaint.

[307] If the complainant files with VETS or the LVER and alleges discrimination prohibited by VEVRAA, OFCCP will use the date the complaint arrived at that office to determine timeliness.

complaint, the complaint need not identify by name the person(s) on whose behalf the complaint is filed.  However, the third party must then separately provide OFCCP the name, address and telephone number of the person on whose behalf the complaint is filed, in addition to any other information required by OFCCP's regulations, such as documentation of protected veteran status. OFCCP will make every effort to obtain this information during the complaint perfection time frame.

## 6C02   PROVIDING CONTRACTOR THE 10-DAY NOTICE LETTER

Within 10 calendar days of receiving a complaint, the regional office must also ensure that a letter is sent to the employer against whom the complaint is filed explaining the date, location and circumstances of the allegations (also known as the "10-Day Notice Letter").[308]  This letter is sent regardless of whether the perfection process is complete.  The particular wording of the letter will depend on whether the complaint has been perfected, whether OFCCP is investigating part or all of the complaint allegations, and whether OFCCP is referring the complaint in whole or in part to EEOC.[309]  If the complainant has already filed a Section 503 or Executive Order 11246 complaint with the EEOC or if EEOC has transferred the complaint to OFCCP, no 10-Day Notice Letter is required because EEOC sends a similar 10-day notice for complaints it receives.

The regional office must also ensure that the complainant is notified that the 10-Day Notice Letter was sent to the employer,[310] and that EEOC is notified when OFCCP is referring a complaint, in whole or in part.[311]

## 6C03   COMPLAINT PERFECTION

The regional office will ensure the complaint is perfected within 15 calendar days of receiving the complaint unless good cause is show for an extension.  During complaint perfection, the CO determines the timeliness of the complaint; contract coverage;[312] whether the allegations are covered by any of the laws OFCCP enforces; whether to retain, refer or bifurcate the complaint; and whether all the required elements of a complaint are present.

Complaints alleging discrimination based on race, color, religion, sex, sexual orientation, gender identity, national origin, or based on compensation inquiries, discussions or disclosures, must be filed within 180 days from the date of the alleged discrimination unless the time for filing is extended for good cause.  If the complaint alleges a violation based on disability or status as a protected veteran, it must be filed within 300 days unless the time for filing is extended for good

---

[308]  FCCM 6D02 describes procedures for corresponding with the employer and complainant.
[309]  See Letter L-11 – 10-day Notice to Employer/Contractor.
[310]  See Letter L-12 – 10-day Notice to Complainant.
[311]  See Letter L-13 – Referral Letter to EEOC (Full or Partial Transfer of Complaint).
[312]  To view OFCCP's jurisdictional thresholds, see *https://www.dol.gov/ofccp/taguides/jurisdiction.htm*.

cause.  When determining whether to extend the time for filing for good cause, the CO must consult with his or supervisor. [313]

The CO should encourage complainants to complete and sign the OFCCP complaint form authorized by the OMB, Form CC-4, "Complaint Involving Employment Discrimination by a Federal Contractor or Subcontractor" ("Complaint Form").[314] When completed, the Complaint Form contains all the required components of a complaint.  However, a complainant is not required to use the Complaint Form in order to file a written complaint, as long as whatever document the complainant submits to OFCCP includes the components described below.

During complaint perfection, COs must ensure the following components are included in the written complaint:

- Name, address and telephone number or email address of the complainant;

- Name and address of the employer allegedly committing the discrimination;

- Description of the alleged discriminatory acts, including the basis or bases of discrimination; and

- Signature of the complainant or the complainant's representative.

Additionally, VEVRAA requires the alleged victim to submit evidence that he or she is a protected veteran.  Evidence will usually be a copy of the veteran's "DD-214" form, which is issued by the Defense Department to each veteran upon their separation from the military.[315]  If any medical information is needed during perfection or the investigation of the complaint, the CO must request that the complainant sign an authorization to release medical information.[316]

If a CO, after reviewing a complaint, needs clarification or additional information from the complainant to perfect the complaint, they should contact the complainant immediately.  Upon completion of complaint perfection, the regional office will determine whether OFCCP will retain and investigate all or part of the complaint allegations for investigation, refer the entire complaint to EEOC, or close the complaint administratively.[317]

---

[313] A few of the possible examples of what might be good cause include, the existence of some extraordinary circumstance that prohibited the complainant from filing before the deadline such as a significant health issue, military deployment, incarceration or possibly being unaware of the discrimination.

[314] See Figure F-5 – Complaint Form. Complainants can find the Complaint Form on the OFCCP website where it is available in several languages.

[315] The DD-214 is the veteran's report of separation from the military and contains information such as the date of release from active duty, type of separation, *e.g.,* honorable, reason for separation and any decorations, medals, badges or campaign awards.  See *http://dd214.us/* for more information about the DD-214.

[316] See Letter L-14 – Authorization for Release of Medical Information.

[317] See FCCM 6L04 for procedures on closing complaints administratively.

# 6D    INVESTIGATING THE COMPLAINT

If the regional office decides to retain and investigate complaint allegations, it will assign the complaint to the field office located in the jurisdiction of the establishment or construction site where the alleged discrimination occurred. When transmitting a complaint to a field office for investigation, the regional office will include all attachments to the complaint, all correspondence sent during complaint perfection and a transmittal memorandum.  The transmittal memorandum and the complaint will indicate under which law(s) the complaint is filed (*i.e.*, Executive Order 11246, Section 503 and/or VEVRAA) and the basis or bases for the complaint (race, color, religion, sex, sexual orientation, gender identity, national origin, disability, status as a protected veteran, retaliation, or inquiring about, discussing or disclosing pay).[318]

After receiving the assignment, the CO will begin to investigate the complaint.

## 6D01   TIMELY COMPLETION OF INVESTIGATION

The field office must take all necessary steps to complete the complaint investigation within 60 calendar days of receiving the assignment from the regional office.  The Regional Director may grant an extension of this period if the field office shows good cause.  The extension, if granted, should not exceed 60 days; this results in a total of no more than 120 calendar days to complete the complaint investigation.  Examples of good cause include, but are not limited to, complex legal issues, unavailability of witnesses, untimely responses from the contractor or the number of complainants.  The regional office must document the request for extension as well as the disposition of that request.

## 6D02   CORRESPONDENCE

The CO should address all letters, including the 10-Day Notice Letter, concerning a complaint to the senior official at the appropriate contractor establishment, or to the contractor's authorized representative,[319] with a copy for the CEO at the corporate address, except when the contractor is a single location establishment.  The CO should send the letters by certified mail, return receipt requested and retain the documentation certifying receipt of the correspondence.

For the complainant or the complainant's authorized representative, the CO will send correspondence related to the complaint via certified mail, return receipt requested, facsimile or email.  If by facsimile or email transmission, the CO should take steps to ensure confidentiality. The CO should maintain documentation that certifies the correspondence was received.

---

[318]   If the complaint alleges noncompliance with EO 13496, the CO should follow the procedures described in Directive 2010-01, "Verification Procedures under E.O. 13496, Notification of Employee Rights under Federal Labor Laws, and the Department of Labor's Implementing Regulations at 29 C.F.R.  Part 471,"  June 15, 2010.
[319]   See FCCM 6D04.

## 6D03   NOTIFYING THE CONTRACTOR AND COMPLAINANT THAT OFCCP WILL INVESTIGATE THE COMPLAINT

At the beginning of the investigation, the CO will provide the contractor notice that the complaint is being investigated by OFCCP and include a full copy of the complaint with the notice, except to the extent it contains the types of information described below.[320]  The CO must also notify the complainant that OFCCP is investigating the complaint and include a copy of the redacted complaint that was provided to the contractor.[321]

The CO will redact the following information so that the remaining text reads as smoothly as possible.

- The name and other information that would easily identify someone other than the complainant who might suffer retaliation, be construed as an informer, or suffer embarrassment or other unwarranted invasion of privacy.

- Obscene or inflammatory language, unless it is relevant to the allegations.

- Names and allegations against more than one company.  The CO should delete the name and allegations against company #1 from the complaint copy provided to company #2, and vice versa.

- Identifying characteristics of individuals in a third-party complaint (*e.g.,* description of unique characteristics, unique job title or position) if the individual has not signed the complaint or authorized release of his or her identity.

However, if the necessary redactions are so extensive as to make the complaint incomprehensible, the CO may prepare a complaint summary to forward to the contractor.

## 6D04   COUNSEL OR OTHER REPRESENTATION

A contractor or complainant may designate an attorney or other representative as his or her contact person with OFCCP prior to or during a complaint investigation.  Such designation shall be at the initiation of the contractor or complainant being represented.

*a. Written Designation.*  The designation of a representative must be in writing by the contractor or complainant to an OFCCP District or Regional Director.  Either the complainant or the senior official of the contractor must sign the written designation letter.  If the field office receives notification of the designation in a form other than in writing, the CO should contact the requester (contractor or complainant) and advise them of the necessary written designation letter.  The correspondence should provide the name, address and telephone number of the representative.  In addition, the correspondence should clearly describe the extent of the representative's authority, specifically:

---

[320]   See Letter L-15, Letter Notifying Contractor of Investigation.
[321]   See Letter L-16, Letter Notifying Complainant of Investigation.

Federal Contract Compliance Manual (FCCM)

- If all contacts, including routine contacts to make appointments or to clarify submitted data or other information, should go through the representative;

- If the representative has the authority to negotiate settlements for the contractor or complainant; and

- If the CO should mail correspondence to the representative only, or if he or she should mail copies to the contractor or complainant as well.

The CO should send to the highest-ranking management official of the company a courtesy copy of all substantive documents that this Manual requires to be mailed to the contractor, even if the contractor designates a representative.

b. *Duration of Designation*.  Unless the contractor or complainant indicates otherwise in the written designation letter, the designation shall only be for the duration of the complaint investigation and any applicable enforcement period.

## 6D05   CASE FILE

Upon receiving a complaint to investigate, a CO establishes a case file.  COs should maintain all documents, correspondence, interview notes and records of contact, including emails and telephone calls, pertaining to the complaint in this file. When the investigation is complete, the case file should contain sufficient documentation to support either an enforcement recommendation based on a finding of a violation(s) or a decision to close the complaint investigation based on a finding of no violation.

a. *Maintenance of the Case File.*  Regarding the maintenance of records, COs should follow the general principles below:

- Date all telephone, email and written communications; identify who participated in the communication by name and position; and accurately reflect any agreed upon commitments.

- Keep all documents from the complainant, contractor or others in their original condition. COs should make copies and label documents as copies if they need to make alterations to or notes on a document.

- Use the case file to document and maintain all interview statements, whether the interview is conducted in person or by telephone, or some other electronic means.  COs should record statements or observations as soon as possible after the conclusion of the interview or observation.  The interview statement must note the name and title or position of the person conducting the interview, the name and position of the person interviewed, when and where the interview took place and the names of any other people who may have been present (*e.g.,* legal counsel, a personal representative or interpreter).

- Record newly obtained information or observations in clearly legible writing or, preferably, in an electronic format.  COs should type handwritten notes for the case file.

- Create and clearly label a section in the case file for all evidence, including evidence that supports conclusions the CO draws regarding the complaint allegations. Supporting evidence may include CO notes, worksheets, contractor data or documents and any other materials relating to an allegation.

- Keep all records and information regarding a complaint investigation confidential.

b. *Case File Contents.* The case file will contain seven separate files labeled as follows and containing the listed contents.[322] COs should cross reference the files, as appropriate. Only the final versions of documents created by the CO or other OFCCP staff should be included in the case file, not drafts of documents.

1. *Complaint and Data Submitted by the Complainant.* This file will contain the complaint (*e.g.,* the completed CC-4 form) and any documentation or information the complainant submitted, including the envelope used to mail the complaint. Documents may include, for example, any informal letter of complaint, list of witnesses, and supporting documents. These items should be on the right side of the file folder.

   On the left side of the file folder, the CO should place a copy of the complaint report sheet for the establishment that he or she obtained from CMS (*i.e.*, the CC-58 report). Underneath this form, the CO should include any CMS extensions requested during the investigation and responses.

2. *Case Chronology, Correspondence and Meeting Notes.* This file contains all correspondence and any attachments. This includes, for example, any materials from contacts with the contractor, union, witnesses, and consultants. It may also include memos to file, but not investigative notes the CO prepared and used in reaching factual and legal determinations. Correspondence should be in chronological order with the most recent on top.

   The Case Chronology Log (*i.e.*, the CC-53 form) will be attached to the left side of the file and placed on top. The CO shall maintain the Case Chronology Log electronically, as described in FCCM 1B01.[323]

3. *Investigative Material.* This file will contain the investigative materials. The CO should index and tab the materials. The file should contain the following materials:

   - The Investigative Plan;

   - The Investigative Report;

   - All interview statements;

   - The CO's investigative notes;

---

[322] See Appendix A-8 – Index for a Complaint File.
[323] See Figure F-2 – Case Chronology Log.

- Any statistical evidence;

- Any comparative evidence; and

- Any anecdotal evidence.

These materials may be voluminous.  If so, the CO may appropriately label, tab and index separate folders to contain the materials.

4. *Medical/Veteran Documentation*.  This file, organized with an index and tabs, will contain any necessary protected veteran status documentation and pertinent medical documentation, if any.  The documents should have labels clearly stating the source of the information (*e.g.,* complainant, contractor third party).  The CO must label and treat File 4 Medical/Veteran Documentation as "confidential." The file should contain, where appropriate:

- Medical releases (these will not be needed in most cases);

- Proof of protected veteran status under VEVRAA, if VEVRAA allegations are present (such as the DD-214);

- Proof of disability or of limitations due to a disability, if pertinent to the case; and

- Work restrictions.

5. *Legal*.  This file will contain any documents related to legal activity, including:

- Notice of Investigation Report (place on top);

- CA (on top of report, when complete);

- Solicitor's Opinion;

- JRC meeting notes and reports;

- FOIA and Privacy Act determinations;

- Enforcement recommendations; and

- Jurisdictional and contract coverage information (on the bottom).

6. *Employment Handbooks, Collective Bargaining Agreement (if applicable) and Miscellaneous*.  On the right side of this file, organized by an index and tabs, will be copies of any relevant collective bargaining agreements, employee handbooks, benefits and leave policy materials, and any similar contractor materials.  The CO should place any items that are not otherwise listed and contained in other case file sections here.

7. *Historical Review Results*. This file will contain copies of any available closure letters and documents from previous complaint investigations of this establishment. The CO should note pertinent information regarding compliance evaluations of the establishment here, as well as include the closure letter for the current investigation.

The district office should maintain the historical file indefinitely. If the district office conducts another investigation of the establishment, this file becomes a part of the new investigative file. If the district office is going to retire the case file, the district office should remove and retain the historical file while filing the remainder of the case file.

## 6D06   OFCCP CMS

The CMS tracks and monitors the processing of complaints filed with OFCCP. COs have specific responsibilities for entering data and information into the automated system. These responsibilities begin with the receipt of the complaint by the regional office and end when the CO closes the complaint file. The COs can find specific instructions in the CMS Manual.

# 6E     TYPES OF COMPLAINT ALLEGATIONS

This section generally discusses the types of complaint allegations that OFCCP may receive and the investigative approach to take. The CO must first determine the investigative framework (*e.g.,* legal theory of discrimination to apply, data to obtain, interviews to conduct, records to review, analyses to perform) to use in addressing the complaint allegations in order to develop the Investigative Plan and interview questions, which are discussed in FCCM 6F – Investigative Plan.

## 6E00   APPROACH TO INVESTIGATING COMPLAINT ALLEGATIONS

In conducting a complaint investigation, the CO is a neutral fact finder. A complaint is essentially a statement of allegations of discrimination or other violations. The CO conducts an investigation to determine if there is sufficient pertinent evidence to support that a violation occurred or not, in light of the allegations in the complaint. In preparing for and conducting the investigation, the CO must exercise objectivity and thoroughness. The CO must conduct each investigation in an atmosphere of open mindedness and fairness to both parties. The CO should display professional conduct at all times.

a. *Relationship to Compliance Evaluations*. The CO may complete a complaint investigation with or without a compliance evaluation. If, upon evaluating the complaint allegations, or at any time during the investigation of the complaint, the CO obtains information that class, systemic or other issues may be more appropriately addressed by conducting a compliance evaluation (full review, focused review or compliance check), the CO should discuss this issue with his or her supervisor, and obtain national office review and approval prior to expanding the investigation into a compliance evaluation.

b. *Investigative Priority*. The CO should act expeditiously on any complaint that alleges immediate and irreparable harm. For example, a complaint alleging the threat of termination

in retaliation for filing a complaint with OFCCP (or for assisting in an OFCCP compliance evaluation, complaint investigation or enforcement action) requires immediate action.

## 6E01   INVESTIGATIVE FRAMEWORK

The CO will assess the specific allegation accepted by OFCCP for investigation to determine the framework appropriate for investigating and resolving each allegation.  This assessment may require different approaches for each allegation.  If there are multiple allegations, the CO will need to determine which framework is appropriate to use in investigating, analyzing and resolving each specific allegation.  The CO should develop the Investigative Plan, including interview questions, to reflect each specific allegation and the approach to investigating and resolving it.

When assessing the complaint allegations under any of OFCCP's laws, COs should determine whether the complainant or complainants are being treated less favorably because of a protected basis (*i.e.*, disparate treatment), or whether they are being adversely impacted by a facially neutral policy or procedure that is unjustified (*i.e.*, disparate impact).

a.  *Disparate Treatment*.  Disparate treatment discrimination occurs when a contractor treats individuals or groups less favorably because of a protected basis.  It is necessary to prove intent to discriminate under this theory of employment discrimination.  Disparate treatment complaints may include allegations of less favorable treatment regarding employment actions such as hiring, terminations, promotions, compensation, application of selection criteria, family and pregnancy leave issues, or the denial of equal benefits and opportunities, or possibly both.

b.  *Disparate Impact*.  Disparate impact occurs when a facially neutral policy or procedure, including selection procedures, has an adverse impact on a particular group, and it is not justified by business necessity and its relationship to the job.  For example, a complainant may allege discrimination because a contractor has strength, agility, or other physical requirements that exceed the actual requirements necessary to perform the job in question and the requirements negatively impact women substantially more than men.  Similarly, a complainant may allege that a contractor's use of criminal records to screen applicants negatively impacts applicants because of their race.[324]

The CO must also determine whether a complaint is individual or systemic in nature.  Once these fundamental questions have been answered, the CO will delve into the particular types of allegations raised, such as termination, nonpromotion, demotion, harassment, denial of accommodation and retaliation.  The fundamentals for some of these allegations, and more, are described below.

## 6E02   SYSTEMIC ALLEGATIONS

Under the three nondiscrimination laws OFCCP enforces, a complaint may raise allegations of systemic discrimination, that is, discrimination that affects groups or classes of individuals.  The

---

[324]  See OFCCP Directive 2013-02, "Complying with Nondiscrimination Provisions: Criminal Record Restrictions and Discrimination Based on Race and National Origin."

complaint may state these allegations in terms of disparate treatment (a pattern or practice of discrimination that is intentional) or disparate impact (a facially neutral policy or practice that has an adverse impact on a protected group, and is not justified by business necessity and job-relatedness). Also, systemic discrimination may be alleged by an individual or by a class of complainants. COs should note that the allegations may warrant examination using both the disparate treatment and the disparate impact frameworks.

## 6E03   HARASSMENT

Harassment is a form of discrimination that may take a variety of forms, including offensive remarks about an individual, derogatory speech or actions that are directed at a specific individual or group of individuals, and other unwelcome communication, action or physical conduct. Harassment based on a protected characteristic is illegal when it is so frequent or severe that it creates a hostile or offensive work environment, or when it results in an adverse employment decision (such as constructive discharge or demotion of the victim of harassment). The harasser may be the victim's supervisor, a supervisor in another area, a co-worker or a third party (such as a client or customer).

Sexual harassment is a type of harassment on the basis of sex prohibited by Executive Order 11246. Unwelcome sexual advances, requests for sexual favors, offensive remarks about a person's sex, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

- Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

- Submission or rejection of such conduct by an individual is used as the basis for employment decisions against the individual; or

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.[325]

## 6E04   RETALIATION AND INTERFERENCE

Retaliation occurs when a contractor takes an adverse action against an individual because he or she engaged in protected activity, *e.g.,* filing a complaint of discrimination or providing information to a CO during a compliance evaluation. Adverse action includes employment actions such as termination, demotion or failure to hire. Other types of actions affecting employment may also be adverse actions. These include threats, including threats to take an adverse action; unjustified negative evaluations or references; or actions such as physical assault, or unfounded civil or criminal charges that are likely to deter a reasonable person from pursuing

---

[325]  See 41 CFR 60-20.8. Harassment based on sex also includes harassment based on pregnancy, childbirth or related medical conditions; and harassment that is not sexual in nature but that is because of sex or sex-based stereotypes.

their rights.  Adverse actions do not include petty slights and annoyances, such as stray negative comments that are justified by poor performance or history, or "snubbing" a colleague.

A complaint of discrimination may contain an allegation that retaliation or interference occurred, or the allegation may arise during the course of an investigation, or even after the investigation has concluded.  The complainant may be an applicant, employee, former employee or person closely associated with an individual who filed a discrimination complaint, opposed an act of discrimination or participated in a protected activity.  If a complainant makes an allegation of retaliation in addition to another allegation of discrimination, a finding that the underlying discrimination did not occur will not defeat the allegation of retaliation.  The CO must investigate any allegation of retaliation or interference and make an independent finding as to whether sufficient evidence supports it.

OFCCP applies the same concepts, standards and analyses as EEOC when assessing possible retaliation.[326]  Although Title VII's retaliation provision does not expressly prohibit intimidation, harassment and interference as OFCCP's regulations do, EEOC has interpreted retaliation to include these concepts.  The ADA and its implementing regulations expressly prohibit such conduct.

## 6E05   ALLEGATIONS SPECIFIC TO EXECUTIVE ORDER 11246

Executive Order 11246 prohibits employment discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity or national origin.  In addition, Executive Order 11246 prohibits employment discrimination against applicants or employees because they inquired about, discussed or disclosed their compensation or that of others, subject to certain limitations.  When OFCCP finds contract coverage, the regional office assigns Executive Order 11246 complaints involving class or systemic issues to a field office for investigation.  The regional office also assigns individual complaints alleging discrimination based on sexual orientation or gender identity, and individual complaints alleging discrimination for asking about, discussing or disclosing pay to the field for investigation.[327]  Executive Order 11246 complaints may include individual disparate treatment claims (*e.g.*, a claim that an individual was unlawfully terminated, demoted, not hired, not promoted, harassed), allegations of systemic discrimination, or denial of accommodation for religious observances or practices.  The regional office will generally refer individual complaints alleging employment discrimination based on race, color, religion, sex or national origin to EEOC pursuant to the EEOC and OFCCP MOU.

## 6E06   ALLEGATIONS SPECIFIC TO DISABILITY COMPLAINTS

Section 503 prohibits employment discrimination on the basis of disability.  Complaints may include a variety of allegations that require determination of the legal and analytical approaches to be used in conducting the complaint investigation.  Allegations may include individual disparate treatment claims (*e.g.,* a claim that an individual was unlawfully terminated, demoted, not hired, not promoted, harassed); issues of systemic discrimination; denial of reasonable accommodation; and/or the use of medical inquiries, examinations, and mental and physical job

---

[326]   Appendix A-9 – Retaliation and Interference: Complaint Processing Outline and Checklist.
[327]   See FCCM 6B.

qualification standards.  In examining complaint allegations filed by a disabled veteran, the CO should determine if the complaint also raises issues under VEVRAA.[328]  Complainants filing under Section 503 or VEVRAA based on disability may also allege any violation of the law or its implementing regulation unrelated to discrimination.[329]  Disability complaints may be "dual filed" under both Section 503 and the ADA.[330]

a.  *Not Making Reasonable Accommodation*.  An issue unique to disability complaints (and complaints from disabled veterans) relates to the provision of reasonable accommodation. Section 503 requires that a contractor provide reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability unless the contractor can demonstrate that doing so would impose an undue hardship on the operation of the business.  As a matter of affirmative action, if an employee with a known disability is having significant difficulty performing his or her job, and it is reasonable to conclude that the performance problem may be related to the disability, the contractor must confidentially notify the employee of the problem, and inquire whether the problem is related to the disability and, if so, whether the employee needs a reasonable accommodation.  A reasonable accommodation can include changes in the work environment, work processes or procedures so that a qualified individual with a disability or disabled veteran can apply for a job, perform the essential functions of a job or enjoy the benefits and privileges of employment. Reasonable accommodation may include a variety of modifications, including making the workplace accessible for an individual with mobility impairment and providing a reader or interpreter for someone who is blind or hearing impaired.

During the course of an investigation of a failure to accommodate claim, a contractor may assert that it did not provide a reasonable accommodation because significant difficulty or expense would have been incurred if it did so.  When determining whether the contractor has proved that providing an accommodation would have caused it undue hardship, the CO will consider several factors:

1.  The nature and net cost of the accommodation needed, taking into consideration the availability of tax credits and deductions, and/or outside funding.

2.  The overall financial resources of the facility or facilities involved in the provision of the accommodation, the number of persons employed at such facility, and the effect on expenses and resources.

3.  The overall financial resources of the contractor, the overall size of the contractor's business with respect to the number of its employees, and the number, type and location of its facilities.

---

[328]  COs should note that in offering employment or opportunities to individuals with disabilities and protected veterans, it is unlawful for a contractor to reduce the amount of compensation offered because of any income based upon a disability-related pension or other disability-related benefit the applicant or employee receives from another source.

[329]  See FCCM 6E07 – Allegations Specific to VEVRAA (Non-Disability) Complaints.

[330]  See FCCM 6B and 41 CFR 60-742.5 - Processing of Complaints Filed with OFCCP.

4. The type of operation or operations of the contractor, including the composition, structure and functions of the work force of the contractor; and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the contractor.

5. The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

If the CO concludes that the contractor has proved that a specific accommodation would impose an undue hardship, the CO must examine whether there are other potential accommodations available that would not have caused undue hardship.

b. *Medical Examinations and Inquiries.* Aside from offering applicants the opportunity to voluntarily self-disclose as a person with a disability, Section 503 generally prohibits contractors from asking applicants disability-related questions or questions that are likely to elicit information about a disability prior to a conditional offer of employment. The law also prohibits contractors from conducting or requiring medical examinations of applicants until after a conditional offer of employment is made. For example, job applications may not contain medical inquiries or questions about disability, including whether an applicant will need a reasonable accommodation if hired. Disability-related inquiries and medical examinations of employees, such as return-to-work exams and periodic physicals, are prohibited unless they are job-related and consistent with business necessity. A complainant may allege that a contractor asked an unlawful disability-related question or conducted an unlawful medical exam whether or not he or she has a disability. Exceptions to these general prohibitions are listed below.

1. *Invitation to self-identify.* Contractors are required to invite applicants and employees to self-identify as an individual with a disability for affirmative action purposes, following the regulatory procedures specified in 41 CFR 60-741.42.

2. *Acceptable pre-employment inquiry.* Contractors may make pre-employment inquiries into the ability of all applicants to perform job-related functions. They may also ask all applicants to describe or demonstrate how – with or without reasonable accommodation – they will be able to perform job-related functions. Other inquiries could also be made if they are for the purpose of taking affirmative action to recruit and hire individuals with disabilities.

3. *Employment entrance examination.* Contractors may require a medical examination and/or ask disability-related questions after making a conditional offer of employment to a job applicant and before the applicant begins his or her employment duties, as long as this is done for all entering employees in the same job.

   Such entrance examinations or inquiries do not have to be job-related and consistent with business necessity. However, if a contractor uses the results of the exam or inquiries to screen out applicants on the basis of disability, the contractor must demonstrate:

- That the exclusionary criteria used are job-related and consistent with business necessity; and

- That the standard cannot be met nor performance of the essential job functions accomplished, even with reasonable accommodation.[331]

4. *Examination of employees*.  Contractors may require medical examinations and/or disability-related inquiries of employees only if they are job-related and consistent with business necessity.

5. *Voluntary medical examinations and inquiries*.  Contractors may conduct voluntary medical examinations and activities, including voluntary medical histories, which are part of an employee health program available to employees at the work site.  These voluntary exams and activities do not have to be job-related and consistent with business necessity.

c. *Confidentiality of Medical Information*.  A complainant may allege that the contractor breached confidentiality of medical information.  Whenever a contractor inquires about an applicant's or employee's medical condition, or conducts a medical examination, the contractor must keep all resulting information in a separate, confidential medical file.  The confidential medical records must be maintained separately from information on self-identification, which is kept in a data analysis file.  For instance, if an employee voluntarily informs a contractor that he or she has a disability and requires a reasonable accommodation, this information must be kept confidential in the employee's medical file, whereas the employee's response to the invitation to self-identify (*i.e.*, Form CC-305) would be maintained in the contractor's data analysis file.

The contractor must keep the medical information confidential with three exceptions:

- Supervisors and managers may be informed regarding necessary restrictions on the work or duties of applicants and employees and necessary accommodations.

- First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment.

- Government officials engaged in enforcing OFCCP's laws or the ADA shall be provided information relevant to an investigation or compliance evaluation on request.

d. *Mental and Physical Job Qualification Standards*.  Contractors subject to Section 503 or VEVRAA may not use qualification standards, employment tests or other selection criteria that exclude an individual with a disability or class, or individuals with disabilities on the basis of disability, or individuals on the basis of their status as protected veterans, unless the selection criteria are job-related and consistent with business necessity.  Selection criteria

---

[331] If the contractor withdrew a job offer from an individual who satisfied only the "regarded as" prong of the definition of "disability" (*i.e.*, the individual did not also have an actual disability or a record of disability), the individual would not be entitled to receive reasonable accommodation and therefore would have to be able to perform all job functions without reasonable accommodation.  See 41 CFR 60-741.2(s)(4).

that concern only the performance of a marginal function would not be consistent with business necessity, and the contractor may not exclude a qualified individual with a disability simply because a disability prevents him or her from performing a marginal function.  A selection criterion that concerns an essential function may not be used to exclude an individual with a disability if the individual could satisfy the criterion with a reasonable accommodation.[332]  In such a situation, the contractor should provide the reasonable accommodation needed unless it can show that doing so would impose an undue hardship.

It is also unlawful for contractors to use a qualification standard, employment test or other selection criterion based on an individual's uncorrected vision unless the standard, test or criterion is shown to be job-related and consistent with business necessity.  Individuals wishing to challenge a contractor's use of a standard, test or criterion based on uncorrected vision do not need to have a disability.  These individuals only need to show that they were adversely affected by the application of the standard, test or other criterion.[333]

e.  *Relationship or Association with an Individual with a Disability*.  A complainant may allege that the contractor discriminated against him or her because of the known disability of an individual with whom the complainant has a relationship or association.  Anyone can raise this claim; a complainant making such an allegation need not have a disability or allege that the contractor regarded him or her as having a disability.  Rather, the complainant need only allege that he or she was denied an EEO or benefit because of his or her relationship with one or more persons who have a disability. Most often, the individual with whom the complainant has a relationship will be a family member, such as a child, spouse or parent, but the law applies equally to business, social and other types of relationships.

## 6E07   ALLEGATIONS SPECIFIC TO VEVRAA (NONDISABILITY) COMPLAINTS

VEVRAA prohibits employment discrimination on the basis of one's status as a protected veteran.  The regulations specify the specific protected categories of veterans: disabled veterans, recently separated veterans, active duty wartime or campaign badge veterans, and Armed Forces service medal veterans.  In reviewing a complaint filed under VEVRAA and in discussing it with the complainant, the CO should clearly distinguish whether the complainant believes the alleged discrimination was based on his or her status as a disabled veteran, or based on one of the other specific categories of protected veterans.  If the allegation is based on the complainant's status as a disabled veteran, the CO should follow the procedures for a disability complaint.[334]  The complaint may contain allegations of individual disparate treatment (*e.g.,* a claim that an individual was unlawfully terminated, demoted, not hired, not promoted or harassed) or systemic discrimination based on the complainant's status as a protected veteran.  Complainants filing under VEVRAA may also allege any violation of the law or its implementing regulations unrelated to discrimination.  For instance, under VEVRAA, contractors must list employment

---

[332]  41 CFR 60-300.21(g) and 60-741.21(a)(7).  In addition to this nondiscrimination requirement which applies to all types of selection criteria, contractors subject to the affirmative action requirements of Section 503 or VEVRAA have an obligation to periodically evaluate the impact of any mental and physical job qualification(s) to determine if their use tends to screen out qualified individuals with disabilities or disabled veterans.  See 41 CFR 60-300.44(c) and 60-741.44(c).

[333]  41 CFR 60-741.21(a)(7)(ii).

[334]  See FCCM 6E06 – Allegations Specific to Disability Complaints.

openings with the appropriate ESDS where the openings occur.[335]  Contractors must list all employment openings except for executive and senior management positions, positions that will be filled internally, and jobs lasting three days or less.  Typically, the location of a job opening, or the location to which the employee must report for work is where the opening "occurs." However, when a vacancy announcement indicates that the opening is for a remote job to be performed entirely by telework, there is no fixed place where the job "occurs." The contractor may, therefore, satisfy the job listing requirement for a remote job by listing the opening with an ESDS in any area where qualified candidates might be found. Where the vacancy announcement indicates that the job may be performed either from a specified duty station or remotely, the contractor must list the job with the ESDS where the duty station is located, but may also list the opening with any other ESDS it determines is appropriate.  A complainant may allege that the contractor is not complying with this mandatory job listing requirement.

Complaints alleging discrimination on the basis of status as a protected veteran may also include veteran-related issues that OFCCP is unable to address.  When perfecting the complaint, the regional office will refer these allegations to the appropriate enforcement office.  If the complainant raises these allegations at a later point in the process, the CO may refer the complaint allegations to the appropriate office or work in coordination with the other enforcement office, as appropriate.[336]  For example, a complainant may indicate that he or she has a re-employment issue that falls under the Uniformed Services Employment and Reemployment Rights Act (USERRA), which is administered by the DOL's VETS.

### 6E08   EQUAL OPPORTUNITY CLAUSE AND RECORDKEEPING REQUIREMENTS

During the course of a complaint investigation, a CO may find that the contractor has not met its Executive Order 11246, Section 503 or VEVRAA equal opportunity contract clause obligations other than nondiscrimination (*e.g.,* failing to post required notices), or that recordkeeping or other regulatory violations exist.  If so, the CO should conduct appropriate inspections and examine records to discuss these concerns with the contractor.  If the contractor does not correct these violations, the CO should prepare a CA to address these violations.[337]

### 6E09   NOVEL ISSUES

Novel issues are those that are unfamiliar, unique or fall outside the norm.  Periodically, the national office will identify certain novel issues and develop specific procedures to address them. COs may encounter novel issues in the course of complaint investigations, as well as during compliance evaluations.[338]  When reviewing complaint allegations, the CO should identify whether the complaint raises any novel issues.  In these instances, the CO should discuss the identified novel issues with his or her supervisor before proceeding.

---

[335]  41 CFR 60-300.5.
[336]  See "Memorandum of Understanding: Office of Federal Contract Compliance Programs and the Veterans' Employment and Training Service," dated May 20, 1997, that addresses the agencies' coordinated efforts in serving veterans.
[337]  See FCCM Chapters 1 and 2 for discussions on the equal opportunity contract clause and recordkeeping requirements.
[338]  See FCCM 1A07 – Novel Issues.

Federal Contract Compliance Manual (FCCM)

# 6F    INVESTIGATIVE PLAN

Once the CO identifies the analytical framework needed to investigate the complainant's allegations, the CO must develop the Investigative Plan.  The Investigative Plan will serve as a checklist or "road map" for the investigation.  While the Investigative Plan may not identify every step along the way, it should contain the major actions to take.  The Investigative Plan should incorporate the investigative framework for each allegation, list the data to obtain and identify the interviews to conduct (and specific questions to ask).  The Investigative Plan should reflect the logistics for the on-site investigation, such as the OFCCP staff members who will participate in the on-site review and the dates for the on-site review.

The Investigative Plan should include a complete list of the allegations in the complaint and a summary list of all interviewees, interview questions, and data and information needs.  Specific to each allegation, the elements the CO should include in the Investigative Plan are below.

- Statement of the allegations and the nature of the allegations (*e.g.,* systemic, individual disparate treatment in promotional opportunity, denial of reasonable accommodation, harassment);

- Interview of the complainant regarding the specifics of the allegations;

- Interviews of management officials (listed by name or position) and the issues to address;

- Interviews of nonmanagement individuals (listed by name or position) and the issues to address;

- Interviews of witnesses the complainant has identified and the issues to address;

- Specific records and materials to review and analyze;

- Analyses to conduct;

- On-site investigation (agreed upon date); and

- Contact with third parties, when appropriate.

# 6G    INTERVIEWING THE COMPLAINANT BEFORE ON-SITE INVESTIGATION

After reviewing the written complaint, the CO must discuss it in depth with the complainant to ensure that he or she has sufficient information to understand the complaint allegations. Before proceeding with the on-site investigation, the CO should contact each complainant to establish a mutually agreeable time and place to conduct an interview.  The CO should conduct the interview in person, either in the OFCCP office or at an off-site location, unless compelling circumstances preclude doing so.  In these instances, the CO may conduct the interview by telephone.  If the complainant resides outside the area covered by the field office, the CO and his

or her supervisor should coordinate with the regional office where the complainant is located. If no personal interview takes place at any time during the investigation, the CO should record this fact and the reason for it. The CO must follow the procedures for conducting interviews, explained below in FCCM 6I02.

The CO should prepare an Interview Plan containing specific questions tailored to obtain detailed information regarding the allegations and to identify sources of evidence necessary to support or refute the complainant's allegations. In addition to the types of allegation-specific questions discussed in FCCM 6I03, some examples of the types of information to consider are:

- Name(s) of contractor official(s) who participated in the alleged discrimination, and those who were decision makers involved in the alleged adverse action;

- Name(s) of employee(s) or others who may have witnessed the alleged act(s) of discrimination;

- Detailed circumstances surrounding the act(s) (*e.g.*, dates, locations, description of actions taken or failure to take action when needed, possible witnesses);

- Description of the contractor's personnel policies and practices related to the employment action at issue;

- Explanation of why the complainant believes that the act(s) was discriminatory;

- Explanation from the contractor to the complainant for any action taken by the contractor;

- Documentation related to the allegations of discrimination, such as personnel policies, job advertisements, job descriptions, written disciplinary warnings, performance appraisals; and

- Data and documents necessary to conduct appropriate comparative or statistical analyses.

After conducting this interview, the CO will assess the complaint allegations to determine the sufficiency of the information provided by the complainant to support the complaint allegations (*e.g.,* is the complainant protected, is there evidence that discrimination may have occurred, was the contractor aware of the complainant's protected status, was there an adverse action). Because each complaint is based on a unique set of factual circumstances, the CO should gain an understanding of the nature of each allegation and why the complainant(s) believes that discrimination occurred.

## 6H    OBTAINING DOCUMENTARY EVIDENCE AND RECORDS PRIOR TO ON-SITE INVESTIGATION

In the initial stage of the complaint investigation, the CO should take steps to gather information about the contractor's complaint and compliance evaluation history, and other documents.

## 6H00   HISTORICAL DOCUMENTATION

The CO should query the EIS to determine if there have been any prior compliance or complaint investigations of the contractor establishment.  The CO will need to obtain and review copies of any investigative reports, closure letters, CAs, or other documentation generated as a result of such compliance or complaint investigation.

The CO should also contact and make a written request to the EEOC, the Departments of Justice and State, [339]  VETS in the DOL, and state and local FEP agencies that are responsible for enforcing state and local nondiscrimination laws.  The inquiries would be to determine whether there are any complaints against the contractor.  If obtained, the CO should include this information in the case file and incorporate it, as appropriate, in the Investigative Plan.

If the complainant indicates that he or she has filed an EEO grievance or complaint with the contractor or union, the CO should obtain a copy of the grievance or complaint from the complainant.  Upon making a data request of the contractor, the CO should request any documentation related to the grievance/complaint, complaint investigation and, if applicable, contractor findings and remedy.

If the CO finds that the EEOC is conducting an ongoing investigation, the CO should obtain adequate information to determine whether the EEOC has exercised jurisdiction over some or all of the allegations over which OFCCP would also have jurisdiction and is proceeding with an investigation of the same.  Upon verifying this information, the CO should discuss this with his or her supervisor.

## 6H01   POLICIES AND PRACTICES

The CO should obtain copies of all documents that explain any policy or practice bearing on the allegations in the complaint.  If a practice at issue is not in writing or the written material is not current, the CO should request that the contractor provide a written statement of facts or conditions currently in effect, or identify a manager or supervisor who can discuss the practice.

## 6H02   OTHER DOCUMENTS RELEVANT TO THE COMPLAINT ALLEGATIONS

The CO should obtain copies of any written materials that are relevant to the complaint.  The nature of the complaint allegations will determine the nature of the documents the CO needs to obtain.  For example, in a complaint alleging discriminatory discharge on the basis of disability, which the contractor states was due to poor performance, the CO would obtain documents such as the following: copies of policies and procedures for performance evaluations and terminations; material related to any reasonable accommodation requests and their disposition; any documentation showing whether the poor performance is attributable to the denial of a reasonable accommodation; a copy of the complainant's personnel file, including his or her performance evaluations; and copies of other similarly situated employees' files and performance evaluations, in order to conduct a comparative analysis.  A similarly situated

---

[339]   See Letter L-17, Inquiry Letter to U.S. Department of Justice or the U.S. Department of State.

employee could be a nondisabled individual who received a poor performance rating and was, or was not, subject to discharge.

# 6I     ON-SITE INVESTIGATIONS

Before going on-site, the CO should ensure that he or she has fully reviewed the complaint and the contractor's compliance history and developed an Investigative Plan. The CO should provide written notice of the on-site investigation to the contractor. During the on-site investigation, the CO and other OFCCP staff members should follow the Investigative Plan. However, the CO should make appropriate changes to the Investigative Plan and implement these changes if he or she learns new information during the investigation indicating that other issues may exist. For example, a complainant may raise an allegation of retaliation during the course of the investigation that was not in the original complaint. If the CO has any concerns about making changes to the Investigative Plan or approach, the CO should discuss these concerns with his or her supervisor.

## 6I00     NOTIFYING THE CONTRACTOR OF THE ON-SITE INVESTIGATION

When the Investigative Plan is complete, the CO should arrange with the contractor for the on-site investigation. Generally, the on-site investigation should, at a minimum, consist of a lead CO and another CO to assist in fact finding. The CO should telephone the contractor and speak with the individual who will represent the contractor during the on-site investigation. The CO should advise the representative that:

- An entrance conference with the facility's senior officer or designee will take place in order for the CO to outline the investigative process, to explain what will be done on-site and to estimate how many days the on-site investigation may take;

- Identified records should be available for review and should be as specific as possible; and

- Management employees, by name and position or title, should be made available for interviews.

The CO should establish a mutually agreeable date for beginning the on-site investigation. A letter confirming the on-site investigation date or dates must be sent.[340]

## 6I01     ON-SITE INVESTIGATION: ROAD MAP

a.   *General*. The CO must conduct the on-site investigation in a manner that conveys the objectivity and fact finding intent of the CO. The focus of the CO's activity must be on the complainant's allegations and any contractor actions that gave rise to them. The interviews and review of records should provide information clearly related to the issues raised in the complaint. The CO will make note of any other compliance concerns that he or she observes

---

[340]   See Letter L-16 – Confirmation of Onsite Investigation.

or is aware of, as discussed below.

For each on-site investigation, the CO will use the appropriate framework to address the allegations by gathering data and by conducting interviews. The Investigative Plan should reflect the data to obtain and the interviews to conduct. The CO should follow this "road map" to conduct the on-site investigation.

b.  *Entrance Conference*. The entrance conference with the facility's senior official or designee sets the stage for the entire investigation. It is important for the CO – as a neutral fact finder – to be well organized and nonjudgmental. The CO should discuss: the investigative process (including what will actually occur on-site), an estimate of the length of the visit, and a mutually agreeable date and time for an exit conference. Since the CO previously provided the contractor with a copy of the complaint and informed the contractor of the relevant law(s), there may be no need for the CO to repeat that information. However, the CO should be prepared to respond to any questions regarding the complaint allegations and should ensure that the contractor understands the allegations.

The CO should inform the contractor that Executive Order 11246, Section 503 and VEVRAA implementing regulations prohibit interference and intimidation including threats, coercion, harassment and discrimination of any individual in the exercise of his or her rights protected under OFCCP enforced laws. Such protected rights include filing a complaint; assisting or participating in an investigation, compliance evaluation, hearing or any other activity related to the administration of Executive Order 11246, Section 503 and VEVRAA or other EEO laws; opposing any act or practice that violates any of these EEO laws; or exercising any other right afforded them by these laws. During the entrance conference, the CO must also advise the contractor of the need to conduct confidential employee interviews. In that discussion, the CO must make it clear that contractor representatives are not permitted to be present during nonmanagement interviews or during management interviews when it is determined that the manager is not speaking on behalf of the company.

c.  *Facility Inspection*. If appropriate, the CO should conduct an inspection of the contractor's establishment during the early stages of the on-site investigation. By inspecting the establishment/facility, the CO will be able to observe, among other things, the layout of the facility, what work employees may perform in the location, whether there may have been possible witnesses to an event, whether there is any display of graffiti, and whether there is inappropriate material displayed. The CO should note, and possibly diagram, any physical setting/location identified in the complaint. The CO should also note other observations, as appropriate. For example, in investigating a class complaint alleging discrimination on the basis of sex, the CO should note the presence or absence of women in the work area or job positions at issue. When appropriate, the CO may photograph the location he or she is inspecting. If the contractor objects to the CO taking photographs, the CO should discuss the matter with his or her supervisor.

d.  *Required Notices and Postings (Executive Order 11246 and Executive Order 13496)*. During the on-site investigation of a complaint, the CO also has the opportunity to verify that the contractor is in compliance with required notices and postings. Executive Order 11246 requires that the contractor conspicuously display the "EEO is the Law" poster, and any

required supplements to that poster.  The Pay Transparency Nondiscrimination Provision must also be disseminated to employees and applicants, either by electronic posting or by posting copies in conspicuous places.  All of these postings notify applicants and employees that federal law protects applicants and employees from various kinds of discrimination.  Executive Order 13496 requires that the contractor post notice of employee rights under the NLRA.  The NLRA guarantees employees the right to organize and bargain collectively with their employer.  The CO should inspect such areas as break rooms, personnel offices, common areas and employee bulletin boards for the required postings.

e.  *Information Gathering.*  The CO's primary responsibility during an on-site investigation is gathering information by conducting interviews with appropriate management officials and witnesses, and requesting relevant contractor records.  This part of the on-site investigation is explained in more detail below in FCCM 6I03.

f.  *Exit Conference.*  Upon completing the on-site investigation, the CO should conduct an exit conference with the facility's senior official or designee (preferably the same person who was at the entrance conference).  At this meeting, the CO should present a summary of any observed violations and should document any rebuttal arguments made by the contractor.  The CO should emphasize that the *findings discussed during the exit conference are preliminary*, are not binding on OFCCP, and that OFCCP will not draw final conclusions until the CO can complete analyses of all the data and can affirm or refute each allegation.  The CO should inform the contractor of the approximate length of time it will take to complete the off-site analysis, prepare the Investigative Report and issue the Notice of Results of Investigation (NORI) (see FCCM 6K).  The CO should also remind the contractor that the law prohibits retaliation and interference.  COs should also inform contractors that the exit conference is not necessarily the end of the fact-finding and that more information may be requested, if necessary.

## 6I02    INTERVIEW PROCEDURES

a.  *General.*  This section reflects current OFCCP policies regarding the mechanics of the interview process, but it does not teach COs how to interview witnesses.  Throughout the investigation, including interviewing, the CO must maintain a high degree of objectivity and professionalism.

b.  *Interview Plan.*  As a part of the On-Site Plan, the CO must develop appropriate interview questions and identify specific individuals to interview regarding each identified potential problem area or compliance issue.  Each planned interview or group of interviews should have an Interview Plan that indicates the topics the interview will address and spells out the initial questions the CO plans to ask.  Interview Plans will vary depending on whether the interviewee is a manager, other employee, or unsuccessful candidate for hire, among other considerations.  If there is an individual that the CO identified for interview but did not interview, the CO will make a note in the case file as to why the interview did not take place.

c.  *Informing the Interviewee.*  The CO will tell each interviewee, at the outset of an interview, that:

- The CO will show the interviewee his or her statement containing the answers to the questions asked during the interview; and

- The CO will ask the interviewee to sign his or her statement.

The CO will inform each interviewee that knowingly providing false or inaccurate information is unlawful and will explain that the following phrase is included in the interview notes where the interviewee signs:

"I have read the above and it is true and accurate to the best of my knowledge."

In addition, the CO must inform interviewees that the interview is kept confidential to the maximum extent possible.  The CO must also inform all interviewees, regardless of their position with the contractor, that it is unlawful for the contractor to intimidate them or take retaliatory action against them for participating in an interview.

d.  *Contractor Representative Present at Interviews*.  When the CO conducts interviews with nonmanagement personnel, the contractor does <u>not</u> have the right to have a representative present.  However, when the CO conducts interviews with upper level managers and directors that speak for or make decisions on behalf of the company, the contractor may have an attorney or other representative present.  If the contractor wants a representative present during management interviews, the CO must first obtain written confirmation of the representation, including the contact information for the representative and the scope of the representative's authority.[341]  The exception to this practice is when the manager is not speaking for management.  An example may be when the manager is a member of a potentially affected group speaking about the potential discrimination or his or her personal experience, or acting as a whistleblower.  In that type of situation, the CO may need to contact the employee directly after the on-site investigation to conduct the interview off-site without the contractor's representative present.  COs should consult with the RSOL and the national office prior to engaging in these types of interviews.

e.  *Employee Representative Present at Interviews*.  An employee may request that a personal representative, such as a union representative or personal legal counsel, accompany him or her during the interview.  Subject to the limitations described below, this is generally acceptable.  However, the CO must discuss the presence of the representative with the interviewee privately to determine whether there may be a conflict of interest or whether the interviewee feels pressured into having the person present.  When the employee wants a personal representative present during the interview, the CO must first obtain written confirmation of the representation, including the contact information for the representative and the scope of the representative's authority, if the CO does not already have the written confirmation.

The contractor does <u>not</u> have the right to have one of its representatives present during an employee interview, either as an observer or as the employee representative.  If a

---

[341]  See FCCM 6D04 for more details on what to request in the written confirmation of representation.  If the CO already has written confirmation of the representative, there is no need to ask for it again.

nonmanagement employee wants a representative present, including a member of management, then OFCCP must honor the request. The CO can and should meet with the employee alone for the limited purpose of confirming that he or she was not coerced into asking for a management representative. The CO must consult with RSOL if there are any questions about the impact of the presence of a third party on confidentiality or privileges.

f.  *Preparing Formal Interview Statements*. After a formal interview, the CO must ask each interviewee to read, sign and date an interview statement. Immediately, at the conclusion of the interview, the CO will review the questions asked and the answers given, and obtain confirmation that any direct quotes are accurate and that all paraphrases convey the interviewee's intended meaning. The CO will promptly type the handwritten interview notes using MS Word in order to provide the interviewee with a formal interview statement to sign as soon as possible after the interview. The CO must enter the following phrase above the space where the interviewee will sign on the formal interview statement:

"I have read the above and it is true and accurate to the best of my knowledge."

If the CO cannot print a copy of the interview statement during the on-site investigation, the CO must ask the interviewee to sign and date the CO's interview notes. The CO will mail or email the typed interview statement as soon as possible after the on-site investigation for the interviewee to sign and date. If the interviewee wants corrections made, the CO must incorporate the corrections and resend the statement for the interviewee to sign. The CO maintains records of interview notes and each version of the interview statement in the case file. If an interviewee refuses to sign an interview statement, the CO will record this and the reason(s) for refusal to sign, if known.

g.  *Contact Information*. At the conclusion of every interview, the CO must obtain the interviewee's personal mailing address, contact telephone number and email address. The CO must also provide each interviewee with the CO's office contact information in the event the interviewee wants to add anything to his or her statement.

h.  *Informal (Unplanned) Interviews*. At any point in the on-site investigation process, a potential witness may approach the CO to provide information related to the review. The CO must make every effort to meet or otherwise interview the potential witness. The CO will follow the interview procedures described in this section.

If, however, the potential witness is unwilling to be interviewed and only wants to provide the information, the CO must document the conditions under which the employee provided the information in a memorandum. For example, the CO records that the employee provided the CO with a document, briefly describes and attaches the document to the memorandum, and indicates in the memorandum that he or she was unwilling to be interviewed. The CO must then use other means to verify the credibility of the information provided in this manner.

i.  *Location of Interviews*. COs normally conduct interviews during the on-site investigation. However, the CO may conduct interviews via telephone, as appropriate. For instance, the CO may need to interview a former employee. There may also be situations when a

contractor refuses to allow on-site interviews of nonmanagerial employees or where such employees want their interviews conducted away from the establishment. When possible, the CO will attempt to explore alternatives with the contractor or the employee, as appropriate. One possible alternative is conducting interviews during meal breaks. Other options might include interviewing an employee on-site prior to the start of work shifts, or at the end of his or her shift. A CO may also conduct interviews at an off-site location.

*j.  Telephone Interviews.*  COs conduct telephone interviews only when it is not feasible to conduct the interview in person since the CO cannot observe the interviewee's demeanor during a telephone interview, making credibility determinations more difficult. However, when telephone interviews of current employees, former employees or applicants are necessary, the CO must type the resulting notes and send a copy to the interviewee for review, revisions, as appropriate, and a signature. As with in person interviews, COs will ask whether there is anyone else present with the interviewee to address any concerns this may create, as described above.

*k.  CO is Unable to Conduct Interview.*  If the CO is unable to conduct an interview, he or she should add a memorandum to the file explaining who was supposed to be interviewed and why the interview did not occur. For example, the complainant may identify a potential witness to the alleged harassment, but the potential witness indicates to the CO that he or she was, in fact, not a witness to the alleged conduct and does not want to submit to an interview.

## 6I03    GATHERING RELEVANT DATA AND CONDUCTING INTERVIEWS

The nature of the specific allegations to be investigated will determine the information the CO should gather. Certain data will be common to most investigations, such as applicable personnel policies, collective bargaining agreement, data regarding the employment practice in question, and the personnel files of the complainant and comparators. The CO's Investigative Plan should identify what information the CO will need to address each allegation. However, the CO may identify additional information, documentation or records to obtain.

In addition to gathering specific data and documents, the CO will also need to develop a list of possible interview questions to gain an understanding of the allegations and issues, corroborate or verify what was said by other witnesses, what other witness may have said about the allegations, identify other possible witnesses, and generally gather additional information. In order to gain an understanding of the allegations and issues, the CO should prepare open-ended questions to ask interviewees (*e.g.,* ask interviewee to explain and describe their observations and experiences related to the issues). The CO should listen closely to the interviewee's answers and use them to formulate direct follow-up questions, as appropriate. The Investigative Plan should include a structure (*e.g.,* a list of interview questions or an interview outline) for the interviews the CO will conduct with contractor officials, the complainant and witnesses. The CO should develop interview questions that will elicit responses to explain the factual circumstances surrounding the allegations (*e.g.,* who was involved and who witnessed the actions, what actions were taken, where the events occurred, how decisions were reached and why specific actions were taken). The CO should develop interview questions to ensure that he or she identifies and obtains all relevant documentation. The CO should always be alert to opportunities to ask

necessary follow-up questions and pursue unexpected avenues of inquiry that may open up during the interview.

The CO should also confirm and verify information obtained in interviews. For example, the CO may interview two witnesses and each witness provides a similar description of an incident that occurred in the break room, while a supervisor provides a different description of the incident. One of the interviewee's statements indicated that some employees were clocking out at the time of the incident. Employees enter the break room to clock out. The CO should review sign-out forms for the day and time in question in order to identify other possible witnesses. The CO should then interview these possible witnesses and review any documentation that may provide confirmation.

Provided below, by type of allegation, are general guidelines for data gathering.

a. *Harassment.* The CO should gather copies of relevant policies and procedures, and make observations of environmental conditions (*e.g.,* if the location of an incident is identified, observe the location and determine whether there may have been possible witnesses to the incident). The CO should request copies of any internal grievance(s) or complaint(s) on file regarding the alleged harassment or other incidents of alleged harassment, and any documentation indicating how the contractor responded to any incidents. If it is alleged that the contractor took action against the complainant, the CO should also review the complainant's personnel records and other pertinent documents.

The CO should develop questions to assist in understanding the specifics of the alleged incident(s), applicable policies and all relevant documentation, other similar incidents, possible witnesses to the alleged discriminatory action(s), contractor response to alleged harassment, etc.

For example: The complainant alleged that a drawing, including a derogatory depiction and remark that made fun of a physically impaired person, was posted on a wall in the break room. The complainant observed the drawing during his lunch break. The CO should ask the complainant to identify possible witnesses to interview, but should also make a random selection of other employees to interview who may have had the opportunity to observe the drawing. The CO should develop questions for possible witnesses and contractor staff members to gather information confirming or disaffirming whether the drawing was posted; whether the poster contributed to a hostile environment; whether anything else happened to contribute to a hostile work environment; whether it was the only time such a derogatory depiction was posted on the work site and, if not, how often; what the remark said; and whether the contractor knew or should have known about the depiction. If the contractor did know, did it take immediate and appropriate action to remedy the identified harm, and to prevent future harassment and, if so, what were those actions?

COs should note that in conducting interviews and recording the information obtained during an investigation of an allegation of harassment, COs should fully and accurately document any harassing or derogatory remarks, statements or actions. This documentation is necessary to ensure that the CO can make a determination whether the words or actions were severe or pervasive enough to constitute harassment. The CO must not rephrase the interviewee's

Federal Contract Compliance Manual (FCCM)

statements or make use of euphemisms. It is also important to note that witnesses may provide statements that are in direct conflict with each other. When the statements are given confidentially, it is important to make sufficient efforts to confirm and verify testimony whenever possible, while maintaining confidentiality.

b. *Retaliation and Interference.*  In conducting a complaint investigation, the CO should inform contractor officials, employees and applicants, as well as other people who may be a part of the investigation, that the law prohibits the contractor from retaliating because of their involvement in the process.[342]

The CO should gather data and develop questions regarding the activity that the complainant alleges was the cause for the retaliation.[343]  Because a retaliatory action can include any number of actions, including harassment, the CO will need to identify the policies and procedures at issue, and obtain these for review.  The CO may also need data to conduct a comparative analysis if the complainant alleges that the retaliatory act was an adverse employment action (*e.g.,* terminated, demoted, not hired) or the contractor treated the complainant less favorably than other individuals.

The CO should develop questions to determine whether the complainant engaged in protected activity, whether the complainant was subjected to adverse action or treatment, or whether there is a connection between the protected activity and the adverse action or treatment (*e.g.,* close proximity in time or other evidence such as the complainant was treated less favorably than others in a similar situation).  The CO should examine contractor assertions for credibility.  If the contractor makes an assertion that there is a legitimate, nondiscriminatory reason for any adverse action, the CO should examine the action accordingly.  For example, the CO finds evidence supporting that the complainant participated in a protected activity (*e.g.,* filed an EEO complaint) and the complainant was subjected to adverse action (*e.g.,* demotion) shortly after the complainant's supervisor received notice of the complaint.  The contractor asserts that the complainant was demoted because of poor performance and not because of having filed the complaint.

For this example, the CO should review any pertinent policy regarding demotions, review the complainant's personnel record to determine whether the complainant's work performance was rated poorly and whether the complainant received any required notice that he or she would be subject to demotion.  The CO should also examine other employees' personnel files to determine if similarly situated employees who did not engage in protected activity were treated in the same or similar manner.  The CO should interview the supervisor who took the adverse action, interview other contractor officials regarding the policy governing demotions and applicable procedures, and interview witnesses, as appropriate.

c. *Specific Claims under Executive Order 11246.*  Under Executive Order 11246, a complainant may have been terminated, harassed, demoted, denied employment or denied benefits provided by a contractor, among other potential discriminatory acts.  The CO should gather data and tailor interview questions according to the particular facts of the allegations and the

---

[342]  See FCCM 6B03, and 41 CFR 60-1.32, 60-300.69 and 60-741.69.
[343]  See Appendix A-9 – Retaliation and Interference: Complaint Processing Outline and Checklist.

protected basis.  For example, a claim of termination based on gender identity will involve a different set of questions than a complaint alleging termination for discussing a co-worker's compensation.

Below are a few examples of different types of discrimination that are intended to illustrate the types of allegations that a CO may investigate under Executive Order 11246.  These examples are not exhaustive; they are only intended to illustrate some of the types of data requests and interview questions a CO would include in the Investigative Plan for allegations that are specific to Executive Order 11246.  The CO should interview employees, former employees and management officials, as appropriate to the case, developing questions that address policies and procedures related to the alleged discriminatory action, as well as questions that address the specific factual scenario that gave rise to the alleged discriminatory act.

1.  *Not Making Accommodation to Religious Observance.*  If a complaint raises an allegation of denial of religious accommodation, the CO should ask the contractor whether and how it makes accommodation to the religious observances and practices of its employees, whether and how the complainant was accommodated, and obtain any relevant policies and records.  If the contractor denied an accommodation, the CO should ask whether the complainant requested a religious accommodation and how the contractor responded.  If the contractor denied a religious accommodation, the CO should ask why.[344]  If the contractor reports that no one requested an accommodation, the CO should review procedures available for evaluating such requests.  The CO should review employee files and be alert for any pattern of discipline or terminations based on refusal to work on certain days for religious observances.  Allegations of national origin discrimination may sometimes be closely linked to discrimination on the basis of religion.  The CO should examine the factual situation to determine whether it gives rise to both forms of discrimination.

2.  *Claims on Basis of Sexual Orientation.*  If, for example, a complaint alleges sexual orientation discrimination because the complainant was denied a noncompetitive promotion shortly after announcing her plan to marry her same-sex partner, the CO should ask the complainant and the contractor for information regarding the promotion opportunity and its denial.  The CO also should ask the complainant details about her wedding announcement (*e.g.,* whether and when the supervisor or others in the workplace were informed, and whether and when the announcement was published in the local newspaper), and ask her supervisor whether and when he was aware of the complainant's sexual orientation.  The CO should obtain information regarding any policies or procedures that apply to noncompetitive promotions; review the personnel record and performance evaluations of the complainant to confirm when her performance evaluation occurred; determine whether the evaluation was conducted in conformance with policy and procedures, and whether prior performance evaluations were similar or significantly

---

[344]  A contractor must accommodate the religious practices and observances of employees or prospective employees, unless it is unable to reasonably accommodate the observance or practice without undue hardship on the conduct of the employer's business.  "Undue hardship" in religious accommodation complaints is interpreted differently by courts than the undue hardship standard in disability cases under the ADA.  See FCCM 2J01.

Federal Contract Compliance Manual (FCCM)

different and, if so, for what reason.  The records and performance evaluations of similarly situated employees of other sexual orientations should be reviewed to determine whether noncompetitive promotions were awarded for any individuals and any noted reasons for differences in performance ratings.  The CO should also conduct interviews of individuals who were present when the complainant announced her plan to marry and question whether anyone observed the supervisor's (or other management) reaction to the announcement or expression of an opinion regarding the announcement.  The CO should also, through interviews, gather information about the workplace environment or corporate culture, including whether there have been other similar incidents or allegations of discrimination on the basis of sexual orientation.

3. *Claims on the Basis of Gender Identity.*  If, for example, a complainant alleges that he was fired when he told his boss that he was planning to receive transition-related medical services to facilitate the adoption of a sex other than his designated at birth, the CO should obtain information through interviews and record reviews to determine whether the complainant was treated less favorably or was subjected to a policy that, on its face, discriminates on the basis of gender identity.  The CO should first ask the contractor and review documentation as to the reason the contractor terminated the complainant.  Then, the CO should review any pertinent policies and procedures applicable to termination actions to determine if the policies are nondiscriminatory on their face, and in their application.  This process would include reviewing a sample of personnel files for terminated employees for comparative purposes.  The CO should review the complainant's personnel record to determine whether the record does or does not support the termination or indicates a reason for termination, and whether such reason is in conformance with existing nondiscriminatory policy.  The CO must also interview the complainant, supervisor, and any other individuals who have knowledge of the termination action, and, among other things, ask why the complainant was terminated and whether the complainant's gender transition played any role in the decision to terminate. The CO should conduct interviews of other employees and supervisors to determine the workplace environment or corporate culture promoted by the contractor, and review any anti-discrimination training provided by the contractor.

4. *Pay Transparency Claims.*  If, for example, a complainant alleges that she was demoted after discussing with other female colleagues how much their male co-worker makes, the CO would obtain information through interviews and reviews of contractor records to determine the particular circumstances of the pay discussion and her demotion, as well as the particulars of the complainant's job functions.  The CO must determine whether the contractor had knowledge that such a discussion took place and whether there appears to be a connection between demotion and the contractor's knowledge of the discussion (*e.g.,* a sudden negative change in how the complainant's work was perceived after the contractor learned of the discussion).  It is important to understand the situation surrounding the discussion in the event the contractor raises a workplace rule defense, claiming that the complainant was demoted for violating a consistently and uniformly applied company policy.  Also, in the event that the contractor raises the essential job functions defense, the CO must determine whether the complainant had access to the compensation information of other employees or applicants as part of her essential job functions and whether she was discussing the compensation of colleagues with other

employees who do not have access to compensation information as a part of their essential job functions. Determining whether one of these contractor defenses applies is an important part of the CO's investigation and will require review of the complainant's personnel records, including position description. Also, it is important for the CO to interview witnesses to the discussion of pay that prompted the complainant's demotion, as well as the complainant's supervisor and other company officials, to determine whether the contractor maintains a written or unwritten pay secrecy policy.

5. *Not Making an Accommodation for Pregnancy.* Complainants may allege that a contractor denied them light duty as an accommodation when they were unable to perform some of their job duties because of pregnancy. In these types of complaints, the CO should obtain documentation of the complainants' accommodation requests, their written job descriptions, the limitations of any nonpregnant employees currently or previously provided with light duty similar to that requested by the complainant, light duty requests from nonpregnant employees and the dispositions of all such requests, the contractor's leave and light-duty policies, and records showing how the contractor handled other light duty requests. This documentation must be analyzed to determine whether the contractor only denied light duty as an accommodation to employees affected by childbirth, pregnancy or related medical conditions. It should also be analyzed to assess whether the employer's policies impose a significant burden on pregnant workers, for example, whether the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers. The CO should also review the medical files of any employees for whom light duty was granted as an accommodation and the written job description of those employees. This documentation will help the CO determine whether the employees who received light duty as an accommodation were similar to the complainants in their ability or inability to perform their job duties. Other employees should be interviewed about the contractor's light duty practices. The CO should ask the contractor its reasons for denying the light duty as an accommodation for pregnancy.

d. *Disability Complaints.* Under Section 503, a complaint may contain allegations of individual discrimination (*e.g.,* termination, nonselection, harassment and termination) or systemic discrimination based on disability, or retaliation. Additionally, Section 503 allows any individual to file a complaint alleging violations of the Section 503 regulations (*e.g.,* violation of the confidentiality or medical examination provisions). The CO should gather data and develop interview questions for the Investigative Plan accordingly. Below are several examples of types of complaints that OFCCP may receive under Section 503. The examples include the types of data and interview questions that should be included in an Investigative Plan.

1. *Not Making Reasonable Accommodation.* If, for example, a complainant alleges that she was denied an accommodation needed to enable her to perform the essential functions of her job, the CO should ascertain how and to whom the request for accommodation was made, whether the contractor requested documentation of the existence of the disability (or the limitation needing accommodation) and, if so, the documentation provided by the complainant in response. If a request was made but no accommodation was provided, the CO should ask the contractor its reasons for denying the request and for any

documentation supporting its reasons.  The CO should also inquire as to whether the contractor engaged the complainant in an interactive process to determine an appropriate accommodation.  (Though not a requirement, whether the contractor engaged in an interactive process with the complainant to determine an appropriate accommodation is relevant to the question of damages in a dual filed complaint, should a failure to accommodate be found.)  If the contractor asserts that an accommodation different from the one requested was provided, the CO should verify that accommodation was provided and determine whether the accommodation provided was effective, that is, did it enable the complainant to perform the essential functions of her job?  In making this determination, the CO may need to gain a clear understanding of the job or position in question and the differences between the requested and provided accommodations.  The CO should obtain a written job description, information regarding the processing of the complainant's and others' requests for reasonable accommodation, any written accommodation procedures or practices, and information to confirm whether the contractor provided the reasonable accommodation in a timely and appropriate manner.

When a contractor defends itself against an allegation that it did not make a reasonable accommodation by claiming that the specific reasonable accommodation caused undue hardship, the contractor must prove that providing that accommodation would have caused significant difficulty or expense.  When investigating such a complaint, the CO should obtain information to determine whether a contractor's assertion that an accommodation would impose an undue hardship is valid, and whether it was valid at the time the contractor denied the accommodation.  In examining the contractor's assertion, the CO should review the undue hardship factors listed in 41 CFR 60-300.2(aa) and 60-741.2(aa).  If the evidence supports that providing a specific accommodation would have imposed an undue hardship, the CO should determine whether the contractor considered alternative accommodations, and whether an alternative accommodation existed that would have been effective, but would not have imposed an undue hardship.  If such an alternative existed, the contractor would be obligated to provide it.[345]

The CO should develop interview questions regarding the functions of the job or position in question, the requested accommodation (and the provided accommodation, if any), whether the complainant can perform the essential functions of the job with accommodation and the contractor's response to the request for accommodation.  The CO should interview the complainant as to his or her physical or mental impairment, the major life activity or activities substantially limited by the impairment, the need for an accommodation and the accommodation(s) requested.  The CO should interview contractor officials as to whether the contractor provided the requested reasonable accommodation or an effective alternative accommodation.  The CO should also question whether and how the contractor responded to other similar requests for accommodation.

2.  *Requiring and Using Medical Examinations or Disability-Related Inquiries.*  For all complaints related to a contractor's use of medical examinations or disability-related inquiries, the CO needs to determine at what stage of the employment process (*i.e.*, pre-

---

[345]  Also, see FCCM Section 6E06.

offer, post-offer or during employment) the examination or inquiry was made and the contractor's stated justification for requiring the examination or making the inquiry. The CO should initially determine whether making the inquiry or requiring the medical examination was unlawful (*e.g.,* the complainant was an applicant and the exam was conducted pre-offer or the complainant was an employee and the exam was not job-related and consistent with business necessity). If the information obtained from the exam or inquiry was used in an adverse manner against the complainant (*e.g.,* a job offer was withdrawn or the complainant was terminated), the CO should also consider whether the adverse action discriminated against or screened out the complainant on the basis of disability. Depending on the nature of the complaint, the CO may also need to determine the contractor's process for administering the exam or making the inquiry, and if the exam or inquiry is administered to all similarly situated applicants or employees.

The CO should interview contractor officials to determine applicable policies and procedures, including how and when the contractor makes and records medical inquiries. The CO should also question how and when the provider conducts medical examinations and how the contractor uses the information obtained from the examination. The CO should interview the providers of any medical examinations required by the contractor to verify instructions the contractor gave to them and identify how they reported results. The CO must obtain a copy of the report, including any recommendations provided to the contractor. In addition, when a complainant alleges that, as an employee, he or she was unlawfully required to take a medical exam, the CO would ask questions related to whether the exam was job-related and consistent with business necessity. For example, if a contractor required a "fitness for duty" return-to-work exam for the complainant who was on leave because of cancer treatments, the CO would ask the contractor to explain the complainant's job duties. Additionally, the CO would ask the contractor how the exam relates to the performance of the complainant's job duties and why the exam is necessary for the operation of its business.

3. *Confidentiality Issues.* Anyone may file a complaint alleging that the contractor violated its obligations under the confidentiality provisions in Section 503 or VEVRAA, regardless of whether they have a disability or are a disabled veteran. In investigating these complaints, the CO should examine the contractor's policy and practices regarding records that are to be kept confidential. The CO may need to review records and inspect the location of the records to determine if there was a breach of confidentiality. Interviews may be necessary to determine whether the contractor breached confidentiality by inappropriately sharing medical information with other employees, or unlawfully commingles confidential medical records with the employee's personnel file or the contractor's data analysis file on self-identification.

4. *Qualification Standards, Tests and Other Selection Criteria.* The CO should determine whether the application of a qualification standard, test or other selection criterion excluded the complainant from an employment opportunity on the basis of his or her disability. If so, the CO should gather information to determine whether the challenged selection criterion is job-related and consistent with business necessity. The CO should obtain a written job description, an explanation from the contractor and any supporting documentation as to how the criterion relates to the job, and factual information about

Federal Contract Compliance Manual (FCCM)

how the job is actually performed.  If the criterion relates to health or safety, the CO should gather information to determine whether the criterion is necessary to avoid the existence or creation of a direct threat, or is required by federal law.  Should the CO determine that the criterion is job-related and consistent with business necessity, the CO should obtain information to assess whether the complainant could satisfy the selection criterion with the provision of a reasonable accommodation.

With this type of complaint, an individual or group of individuals would likely allege that they have been screened out by a qualification standard because of a disability.  The CO would ask the contractor for specifics on whether the complainant was not selected because the qualification standard screened him or her out because of his or her disability; whether the qualification standard is job-related and consistent with business necessity; whether the qualification standard is consistently applied to all similarly situated employees, including incumbent employees; what the job functions for the position are; whether the selection criterion only concerns a marginal job function; and whether there would be an accommodation that would enable the complainant to meet the qualification standard.

5. *Relationship or Association with an Individual with a Disability.*  The data gathered and questions asked will vary depending upon the specific nature of the allegation.  For example, if the complaint alleges that the contractor denied the complainant equal access to the contractor's health insurance plan because he or she has a child with a disability, the CO should obtain copies of the contractor's policies and procedures related to health insurance, records related to the complainant's application for insurance and records related to the processing of that application.  If the complaint alleges that the contractor did not hire or promote the complainant because of his or her association with a person with a disability, the CO would gather information and data related to the selection process, the other applicants for the job at issue (including the applicant selected) and the reasons for the nonselection of the complainant.

The CO should interview the complainant to determine that he or she has a relationship or association with an individual with a disability and the reason(s) for his or her belief that the contractor discriminated against him or her because of that relationship or association.  The CO should also determine whether the contractor was aware that the complainant had a relationship with an individual with a disability and obtain an explanation from the contractor regarding the reason for the employment action or decision that is the subject of the complaint, and information regarding any relevant policies or practices.  If the contractor denies knowledge of the complainant's relationship with an individual with a disability, the CO should examine the credibility of the statements made and seek possible witnesses who could confirm or disaffirm whether the contractor knew of the complainant's relationship.

e. *Complaints from Protected Veterans (Non-Disability).*  Under VEVRAA, a complaint may contain allegations of individual discrimination (*e.g.,* termination, nonselection, harassment and termination) or systemic discrimination based on protected veteran status, or retaliation. The regulations specify the specific protected categories of veterans: disabled veterans, recently separated veterans, active duty wartime or campaign badge veterans, and Armed

Federal Contract Compliance Manual (FCCM)

Forces service medal veterans.  In reviewing a complaint filed under VEVRAA and in discussing it with the complainant, the CO should clearly distinguish whether the complainant believes the alleged discrimination was based on his or her status as a disabled veteran, or based on one of the other specific categories of protected veterans.  If the allegation is based on the complainant's status as a disabled veteran, the CO should follow the procedures for gathering data and developing interview questions for a disability complaint.[346]

Additionally, VEVRAA allows any individual, whether or not they are a protected veteran, to file a complaint alleging violations of the VEVRAA regulations (*e.g.,* failure to list jobs with the appropriate ESDS).  The CO should gather data and develop interview questions for the Investigative Plan accordingly.

1. *Protected Veteran Status*.  If a complaint alleges discrimination based on protected veteran status, the CO should obtain from the complainant documentation proving his or her status as a protected veteran (*e.g.,* DD-214).  If the complaint raises class issues, the CO should obtain documentation to prove that affected class members are protected veterans.  As with other types of discrimination, the CO would gather data and tailor interview questions according to the particular facts of the allegations, with a specific focus on employment practices or acts that the might indicate that the complainant or complainants' veteran status was taken into consideration in a manner that resulted in discrimination.

   For example, if the complainant alleges that he or she was terminated because of his or her status as a protected veteran, the CO should gather data through a review of records, and conduct interviews with company officials, the complainant and select employees.  The CO should analyze information, from the time period in question, to include: termination data indicating whether any employees have self-identified or were otherwise known to be protected veterans; personnel records for terminated employees who were also protected veterans, including the complainant; a comparative sample of personnel records of similarly situated nonprotected veteran employees who were terminated, and records for similarly situated employees who were retained; written policies regarding terminations; and descriptions of programs designed to retain protected veterans.  The CO would also interview the officials involved in the termination to find out, among other things, if they knew the complainant was a protected veteran, the policies governing their decision to terminate, the reason for termination, the particular information the officials relied on to make the decision, and the names and circumstances of any other employees who had been terminated during the time period in question.

2. *Job Listing Requirement*.  If a complaint alleges a violation of the job listing requirement, the CO should request job listings from the contractor and contact the ESDS that the contractor used.  The CO should request confirmation that the contractor listed its employment openings with the ESDS in a manner or format permitted by the ESDS.  The CO should obtain from the ESDS a listing of the job orders that the contractor placed by job title and date.  The CO should then compare this list with a list of vacancies the

---

[346] See FCCM 6I03(i) – Gathering Relevant Data and Conducting Interviews.

contractor has filled through new hires, identify any such jobs not listed with the employment office, and determine whether the jobs should have been listed. The CO should also determine whether the contractor informed the ESDS that it is a federal contractor and provided the ESDS with contact information for each of the contractor's hiring locations in the state. The job listing requirement is unique to VEVRAA and ESDSs have special responsibilities regarding protected veterans.[347] The local ESDS offices usually have a representative who deals primarily with veterans' matters. The CO should contact the LVER in the office nearest the contractor's establishment for any pertinent information regarding the contractor or the complainant.

f.  *Other Equal Opportunity Clause and Recordkeeping Requirements*.  As explained above, the CO should conduct appropriate inspections and examine records to determine whether other equal opportunity clause or recordkeeping violations exist.[348]  The CO should conduct interviews of contractor officials responsible for meeting its regulatory obligations, such as posting workplace posters, and for creating and maintaining records.  Interview questions should seek to determine who is responsible for meeting these obligations, whether there are policies applicable to the obligation and whether there were deviations from the policy.  If the contractor did not comply with an obligation, the CO should question responsible parties to determine why the contractor did not meet the obligation.

Provided below is general guidance for creating questions based on the applicate legal framework for providing types of discrimination:

a.  *Systemic Disparate Treatment*.  The CO will gather data and develop interview questions regarding the specific employment action (*e.g.,* use of a selection procedure), or the loss of benefit or opportunity at issue, in order to conduct analyses to determine whether systemic disparate treatment occurred, that is, whether similarly situated individuals outside the complainant's protected group received more favorable treatment.  The type of data needed will depend on the specific allegation.  If a complainant indicates that there is an EEO grievance or complaint on file, the CO should request these records.  Additionally, the CO should request copies of any grievances others have filed that raise similar issues.  The CO will need other data and information, including copies of any applicable policies and procedures.

Data related to employment actions may include, but is not limited to, applicant flow, hiring, termination, promotion, and compensation.  In examining selection procedures, the CO may also need to analyze data that reflects the application of specific selection criteria (*e.g.,* a structured interview).  In addition to hiring or promotion data (who was hired or promoted and who was not), the CO should also include data such as whether the selection procedure is pass/fail or a score is used (cut-off score or weighted), and the results of the selection procedure (*i.e.*, who advanced from the interview and who did not).

The CO should ask interview questions designed to determine established policies and procedures, and any deviations that may have occurred in the application of the policies and procedures.  In addition, the interview questions should seek to identify people who were

---

[347]  41 CFR 60-300.84.
[348]  See FCCM 2I: Technical Requirements.

similarly situated to the complainant but may have been treated differently. Interview questions should also cover the criteria used at each selection stage and the people who applied them at each stage.

b. *Systemic Disparate Impact*. The CO should develop interview questions and examine employment data (*e.g.,* applicant flow, hiring, termination, promotion, compensation data), as appropriate, to the allegations. Additionally, the CO should obtain and review any policies applicable to the action in question (*e.g.,* written policies regarding eligibility for promotion or increases in compensation). The CO will examine data regarding the specific employment action or use of selection procedure to determine by statistical analysis whether the policy or procedure has the alleged adverse impact. The CO may also need to analyze data that reflects the application of a specific selection procedure. For example, if the complaint alleges that a pencil and paper test used as a selection criterion has a disparate impact, the data needed will include not only hiring or promotion data such as who was hired or promoted and who was not, but also data and information relevant to whether the contractor validated the selection procedure and how, and a description of how the selection procedure was applied to applicants and employees, as appropriate. A copy of the validation study should also be included.

If the complaint alleges that a specific policy or practice has an adverse impact, the CO should develop questions for appropriate contractor officials to gain an understanding of the development and application of the policy or practice in question (*e.g.,* a compensation policy with an adverse impact on women in a particular job group). The questions should help the CO evaluate whether the policy or practice is job related and consistent with business necessity.

c. *Individual Disparate Treatment*. Many of the Section 503, VEVRAA and Executive Order 11246 complaints that OFCCP investigates will allege that the contractor treated the individual filing the complaint less favorably because of a protected basis. These individual disparate treatment claims may allege less favorable treatment in employment actions, such as hiring, harassment, terminations, promotions, compensation or application of selection criteria, among others.

## 6I04    REVIEW OF RECORDS

The CO should review all of the records submitted by or obtained from the complainant and contractor relevant to the allegations in the complaint. FCCM 6I03 addresses the types of records that the CO should obtain during the on-site investigation and FCCM 6H discusses the types of documentary evidence a CO should attempt to obtain prior to the on-site investigation. The nature of the allegations and the applicable legal theories will determine the types of analyses the CO should conduct using the data obtained during the on-site visit.

## 6J    CONDUCTING ANALYSES AND THE INVESTIGATIVE REPORT

The CO must write an Investigative Report in all instances in which the CO has conducted an investigation. See Appendix A-10 – Investigative Report for the format of this report. In writing this report, the CO should not express personal opinions and should not include matters unrelated to the issues of the complaint or to issues that arose during the course of the investigation. Upon

completing the investigation, the CO will analyze all data and information that explains, describes or clarifies the incident, or the application of the policy, procedure or practice at issue. The CO will analyze all comparative and statistical data using the appropriate analytical framework for addressing the allegations.  The results of the analyses and a description of any direct, circumstantial and anecdotal evidence, either refuting or supporting the allegations, will be included in the Investigative Report.  The CO will make factual findings and cite the support for the findings with regard to each allegation.  The CO will also make a determination of whether there is sufficient evidence to support that discrimination occurred.  The Investigative Report should also include a discussion of the contractor's defenses and the CO's assessment of the merits of those defenses.


# 6K     USE OF A NOTIFICATION OF RESULTS OF INVESTIGATION

The CO prepares a NORI to report the results of OFCCP's investigation of the complaint allegations.  If the investigation does not result in a finding of discrimination, OFCCP issues a no violation NORI, as explained below in FCCM 6L02.  If the investigation results in a finding of discrimination, the CO issues a violation NORI explained below in FCCM 6L05.

## 6K00   SIGNATURES AND PROCEDURES

The CO should prepare the NORI for the signature of the Regional Director, or designee.  After being signed, the original NORI will remain in the case file.  The CO will send copies of the NORI to the complainant and the contractor with a letter of transmittal, sent certified mail, return receipt requested.  The CO will provide copies of the NORI to the regional office.  The CO should annotate the Case Chronology Log to reflect the transmission and, as appropriate, the receipt of the document.

## 6K01   NOTICE TO LABOR UNION OF A VIOLATION FINDING

When the remedy for a finding of a violation would require a change in or otherwise affect a collective bargaining agreement between the contractor and a union, or require the award of retroactive seniority where seniority is governed by a collective bargaining agreement, the union will be notified of the particular violation and will be invited to participate in its conciliation.[349]


# 6L     RESOLUTION OF THE COMPLAINT

This is the final stage of the complaint process.  Complaint resolution includes issuing the NORI, formulating remedies, and complaint conciliation efforts.  This stage should be completed in no more than 60 days.

---

[349]   See FCCM Chapter 8 – Resolution of Noncompliance.

Federal Contract Compliance Manual (FCCM)

## 6L00   SETTLEMENT BEFORE COMPLETION OF INVESTIGATION

a.  *Initiating Settlement*.  The CO should be prepared to discuss settlement at any stage of the investigation, with the intent for the settlement to provide a just resolution of the violations. Before engaging in settlement discussions, the CO should advise the contractor that there is no prejudice to the position of the contractor for participating in settlement sessions prior to completion of the investigation, or for not participating in the discussions; and the contractor should not construe the government's participation in settlement sessions as a waiver of the government's right to proceed to a formal NORI if the settlement discussions are unsuccessful.  The CO should provide his or her supervisor with all relevant information to assist in determining whether it is appropriate to enter settlement discussions.

b.  *Complainant Notification of Resolution*.  If, at any time prior to the completion of an investigation, the CO receives notification that the contractor and complainant have resolved the complaint to the complainant's satisfaction, and the CO has not received any data or information indicating unresolved compliance concerns, the OFCCP may close the case.  The CO should confirm that the contractor and complainant have resolved all of the complaint allegations, and that no one has forced or coerced the complainant into stating that the complaint is resolved.[350]

## 6L01   PRIOR TO ISSUING A NO VIOLATION NORI

a.  *Contact with the Complainant*.  If the complaint investigation results in a proposed finding of "no violation," the CO must contact the complainant prior to the issuance of a NORI.  The CO will inform the complainant of the no violation finding, the factual findings, the types of records reviewed, and whether all of the witnesses the complainant and OFCCP identified were interviewed.  The discussion regarding witnesses and witness statements should be in general terms without identifying specific witnesses or their statements.  This contact will give the complainant an opportunity, prior to the completion of the investigation, to introduce new or previously unconsidered evidence.  If new evidence is introduced, the contractor must be given the opportunity to respond.  Such contact with the complainant or contractor may be in person or by telephone, but the CO must document when and how he or she made the contact.  The documentation must also identify the issues discussed, the complainant's response and any additional investigation the CO conducted as a result of this contact.  If needed, the compliance officer may give the complainant 10 business days to provide additional material before issuing the NORI.

b.  *Request for Release of Documents*.  The CO must not release to any party any documents provided by any other party, the internal Investigative Report or interview transcripts.  Based on Exemption 7(A) of the FOIA (5 U.S.C. 552(b)(7)(a)), OFCCP does not release records from an open investigation other than those provided by the requesting party itself.

---

[350]  See Letter L-19 – Letter to the Contractor Confirming Complaint Resolution and Letter L-20 – Letter to the Complainant Confirming Complaint Resolution.

**6L02   CLOSURE OF COMPLAINT WITH NO VIOLATION NORI**

a. *Complaint Not Dual Filed under ADA and/or Title VII.* If a complaint involves only Executive Order 11246, Section 503 and/or VEVRAA allegations that are not dual filed under the ADA and/or Title VII, and there is a no violation finding, the CO will issue the NORI to the complainant and contractor upon completion of the investigation.[351]

b. *Complaints Dual Filed Under Section 503/ADA and Executive Order 11246/Title VII.* If a complaint is dual filed under Section 503 and the ADA or under Executive Order 11246 and Title VII, and there is a no violation finding, the CO will issue a no violation NORI to the complainant and contractor upon completion of the investigation, along with a Notice of Right-to-Sue.[352] Each NORI for dual filed complaints will also include the document entitled, Information Related to Filing Suit under Title VII and the ADA.[353]

**6L03   CLOSURE OF COMPLAINT AND ISSUANCE OF "NOTICE OF RIGHT-TO-SUE" UPON REQUEST**

If a complainant requests a Notice of Right-to-Sue in writing <u>before</u> 180 calendar days have passed since the filing of the complaint, and the Regional Director, or designee, can foresee that the investigation will extend beyond the 180th day, the Regional Director, or designee, will issue the Notice within 10 calendar days to the complainant. The Regional Director, or designee, should send copies to the complainant's attorney (if any), the contractor and the appropriate EEOC field office. If a complaint investigation remains open <u>after</u> 180 calendar days from the complaint filing date, and the complainant requests a Notice of Right-to-Sue in writing, the Regional Director will issue the Notice within 10 calendar days to the complainant. The Regional Director, or designee, should send copies to the complainant's attorney (if any), the contractor and the appropriate EEOC field office.[354]

Consistent with the Title VII and ADA procedures set forth at 29 CFR 1601.28, issuance of a Notice of Right-to-Sue upon request immediately terminates further OFCCP processing of the Title VII/ADA component of the complaint, unless it is determined at that time or at a later time that it would effectuate the purposes of Title VII/ADA to further process the Title VII/ADA component of the complaint. Upon issuance of the Notice, the Regional Director, or designee, can continue the complaint investigation or close the complaint without issuing a finding, noting his or her decision on the Notice of Right-to-Sue in the appropriate check box.

---

[351]   See Letter L-21 – Notification of Results of Investigation: No Violation (EO 11246, Section 503, or VEVRAA Complaint (Not Dual Filed – no Notice of Right-to-Sue)).

[352]   See Letter L-22 – Notification of Results of Investigation: No Violation (Dual Filed). The CO must include the L-22 Enclosure, Notice of Right-to-Sue under Title I of the ADA or Title VII of the Civil Rights Act of 1964: No Violation, with the no violation NORI.

[353]   See Appendix A-11 – Information Related to Filing Suit under Title VII and Title I of the ADA.

[354]   See Letter L-23 – Notice of Right-to-Sue under Title I of the ADA or Title VII (Issued on Request). Appendix A-11 – Information Related to Filing Suit under Title VII and Title I of the ADA must also be included with L-23.

## 6L04   NOTICE ISSUED UPON ADMINISTRATIVE CLOSURE

Any time that OFCCP administratively closes a dual filed complaint, a Notice of Right-to-Sue must be issued.[355]  Administrative closures may occur at the conclusion of complaint perfection or during the complaint investigation.  With dual filed complaints that are administratively closed, the Regional Director, or designee, will issue the Notice of Right-to-Sue to the complainant and send copies of the Notice to the contractor and the appropriate EEOC field office.

OFCCP administratively closes complaint investigations for several reasons, including:

- Even if proven to be true, the allegations raised in the complaint would not be a violation of the laws enforced by OFCCP;

- Complainant did not file within the applicable timeframes  and good cause was not shown for an extension of the filing period;

- Complainant failed to provide requested necessary information, failed to appear or refused to be available for necessary interviews or conferences, or otherwise refused to cooperate to the extent that OFCCP is unable to complete its investigation of the complaint; or

- The CO cannot locate or complainant failed to respond to a notification sent to last known address within reasonable timeframe.

## 6L05   CLOSURE OF COMPLAINT WITH VIOLATION NORI AND CONCILIATION

If the CO's investigation results in a finding of discrimination, a violation NORI must be issued.[356]  In dual filed cases under Section 503/ADA or Executive Order 11246/Title VII, if OFCCP issues a violation NORI, it will not issue a Notice of Right-to-Sue.  A violation NORI invites the contractor to resolve the violations found through conciliation by informal means. The CO should telephone the contractor within five business days of its receipt of the NORI to arrange the conciliation meeting.

*a. Conciliation Meeting.*  The conciliation meeting is the method by which OFCCP attempts to obtain voluntary compliance.  The complainant is not a party to the conciliation.  However, the CO should keep the complainant informed of the progress of any discussions and meetings, in order to gather further input and to discuss proposed settlements.

---

[355]    See Letter L-24 – Notice of Right-to-Sue under Title I of the ADA or Title VII (Administrative Closure). Appendix A-11 – Information Related to Filing Suit under Title VII and Title I of the ADA must also be included with L-24.
[356]   See Letter L-25 – Notification of Results of Investigation: Violation.

Federal Contract Compliance Manual (FCCM)

b.  *Reasonable Conciliation Agreement*.  If the field office believes it has arrived at a reasonable CA, which the complainant accepts, the contractor will acknowledge its responsibility by signing a CA.[357]

If the complainant will not accept what the field office considers to be a reasonable conciliation, the field office may cease its efforts on behalf of the complainant, but must nevertheless obtain from the contractor correction of any policies or practices which caused the discrimination.  The steps in accomplishing this are as follows:

1.  Request that the contractor submit, in writing, a full statement of its terms for conciliation to be maintained in the case file;

2.  Notify the complainant, in writing, of the full details of the CA and request a written reply accepting or rejecting the conciliation terms;

3.  If the complainant rejects the terms of conciliation and the field office considers the terms to be reasonable, the office will provide the complainant an opportunity to reconsider the conciliation terms; and

4.  If the field office considers the offered conciliation terms to be reasonable and the complainant persists in refusing to accept them, the office will cease its efforts on behalf of the complainant and close the case file, providing the complainant with a Notice of Right-to-Sue.[358]  The office will obtain from the contractor a CA resolving all discriminatory policies and practices.[359]

c.  *Seeking Compensatory and Punitive Damages as EEOC's Agent*.  In accordance with 41 CFR Part 60-742 and the MOU with the EEOC, OFCCP will act as EEOC's agent for obtaining relief for all aggrieved people covered by a dual filed Section 503/ADA complaint or an Executive Order 11246/Title VII complaint, respectively.  The field office will attempt conciliation to obtain relief for victims who have suffered pecuniary losses and intangible injuries.  The Regional Director shall be involved in the conciliation process for cases involving potential compensatory and punitive damages.  When potential punitive damages are involved, the Regional Director must consult with the RSOL and the Director of Program Operations.  OFCCP may seek compensatory and punitive damages as EEOC's agent during conciliation, but OFCCP may not seek such damages when it files a complaint.

---

[357]  See FCCM Chapter 8 – Resolution of Noncompliance.
[358]  See Letter L-24 – Notice of Right-to-Sue (Administrative Closure).  Appendix A-11 – Information Related to Filing Suit under Title VII and Title I of the ADA must also be included with the Notice of Right-to-Sue.
[359]  See FCCM Chapter 8 – Resolution of Noncompliance.

Federal Contract Compliance Manual (FCCM)

## 6M    ENFORCEMENT

If any matter raised in the violation NORI cannot be resolved through conciliation with the contractor, the CO must make a recommendation to the RD concerning referring the matter for enforcement.[360]

---

[360]    See Chapter 8 – Resolution of Noncompliance.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 7
# EMPLOYMENT DISCRIMINATION REMEDIES

## 7A    INTRODUCTION

This chapter contains methods for designing remedies for employment discrimination.  It does not address the investigative steps of a compliance evaluation or complaint investigation.  The process for investigating potential discrimination is set out in the preceding chapters of this Manual.

### 7A00   APPLICABILITY

This chapter is applicable to designing employment discrimination remedies under Executive Order 11246, as amended; Section 503, as amended; and the VEVRAA, as amended.

### 7A01   LIABILITY PHASE

During the investigative phase of the compliance evaluation and complaint investigation, the CO completes the appropriate report, such as the SCER Parts B and C, for a supply and service compliance evaluation.  Once the CO completes the investigation and has analyzed all the information gathered, the CO determines, in consultation with his or her supervisor, whether there are findings of discrimination.  This phase is sometimes referred to as the liability phase.  The CO records liability findings in the appropriate SCER for compliance evaluations or, for complaint investigations, the Investigative Report.  The findings are then communicated to the contractor as described in FCCM Chapter 8.

### 7A02   PROCESS FOR REMEDY

When the CO concludes that there was employment discrimination in violation of one or more of the laws OFCCP enforces, the CO, in consultation with his or her supervisor, will offer to conciliate a settlement with the contractor.  Prior to this offer, the CO will design a remedy to present during the conciliation meeting and obtain approval from the Regional Director before presenting it to the contractor.[361]  If the contractor and CO, in coordination with his or her supervisor, cannot reach agreement, OFCCP may recommend enforcement.

### 7A03   APPLICABLE LAW

COs must design employment discrimination remedies for Executive Order 11246 violations in a manner consistent with Title VII principles and Executive Order 11246, and the implementing regulations for Executive Order 11246.  Remedies for discrimination against individuals with disabilities, including veterans with disabilities, will be consistent with ADA principles and

---

[361]   As appropriate, the Regional Director may need to review the proposed remedy with the RSOL, national office or others.

Section 503, and their implementing regulations.  Remedies of discrimination against protected veterans will be consistent with VEVRAA and its implementing regulations.


# 7B    TIMELINESS AND CONTINUING VIOLATION

As a general rule, one seeking to remedy a discriminatory act must assert his or her rights within the periods established by the laws establishing the rights.  Under OFCCP procedures, for an act of discrimination discovered during a compliance evaluation to be remedied as a violation of Executive Order 11246, Section 503 or VEVRAA, it must have taken place within two years prior to the date of the Scheduling Letter (Figure F-3 Scheduling Letter), unless the violation is part of a continuing violation.  Complaints filed under Executive Order 11246 are timely if the complainant filed it within 180 calendar days of the alleged discriminatory act, except for good cause shown, in which case the Director of OFCCP may waive the filing deadline.[362]  Complaints filed under VEVRAA and Section 503 are timely if the complainant filed it within 300 calendar days of the alleged discriminatory act, except for good cause shown, in which case the Director may waive the filing deadline.[363]


## 7B00   CONTINUING VIOLATION

The courts developed the continuing violation concept to address the fact that some employment practices are not discrete incidents, beginning and ending at particular points in time.  For example, a policy or practice of paying lower wages to women rather than to men for the same or similar work is discriminatory and the contractor repeats the violation each time the contractor pays the women.  When evaluating such violations, the courts will consider the entire time period during which the violations occurred or the time period since the effective date of the law, whichever is later.  For example, a continuing violation which is grounded in racial discrimination is actionable from the date the continuing practice began or the effective date of Executive Order 11246 (September 1965), whichever is later.  This is provided, of course, that the other requirements of coverage are met.

In compensation cases, contractors will be in violation of Executive Order 11246 any time they pay wages, benefits or other compensation that result, in whole or in part, from application of any discriminatory decision or practice.

a.  *Application of Continuing Violation Theory*.  OFCCP applies the continuing violation theory in compliance evaluations and complaint investigations.  The theory is applicable to the following situations:

1.  *Series of Individual Discriminatory Acts.*  A continuing violation may occur when the discrimination involves a series of closely related acts.  The acts must be sufficiently related to form a pattern of discrimination.  The last of these acts must have occurred within the two-year period preceding the date of the Supply and Service Scheduling

---

[362]   41 CFR 60-1.21.
[363]   41 CFR 60-300.61, 41 CFR 60-741.61.

Letter or the Construction Compliance Evaluation Notice; or, in the instance of a complaint investigation, within the complaint filing period (*i.e.*, 180 or 300 days).

2. *Maintenance of a Discriminatory Policy or System.*  A continuing violation may occur when a contractor maintains a discriminatory policy or practice into the two-year, 180-day period or 300-day period.  The violation may focus on one particular employment practice, such as promotions or compensation; or it may deal with discrimination in a series of areas, including initial placement, promotions, transfers and salary.  It is not necessary under this approach for OFCCP to show that a discrete act applying the alleged discriminatory policy occurred during the two-year period, 180-day period or 300-day period.  It is sufficient to show that the policy or system continued into the period and that, if there had been a personnel action, the policy or system would have been applied in the alleged discriminatory manner.

b. *Remedies Under a Continuing Violation.*  Once the CO establishes that there is a continuing violation by showing a series of related acts, one of which occurred within the liability period, or a continuing employment policy that extended into the liability period, then the contractor must remedy all acts that are part of the continuing violation since the effective date of the law under which relief is sought or from the start of the violation, whichever is later.  This is so whether they occurred within or outside of the 180-day or 300-day filing period (complaint investigation), or two-year (compliance evaluation) period.

## 7C    TYPES OF REMEDIES

Remedy represents a separate and distinct phase of the investigation.  While the CO should be thinking about remedy throughout the investigation and obtaining the information (*e.g.,* wage rates, hours worked, earnings additions, start and termination dates of hires) necessary to determine the appropriate remedy, the CO should reserve conclusions about the final determination of remedy until he or she has sufficient information to make a finding that there has been discrimination.  The final determination of remedy normally does not occur until after the CO presents the contractor with the preliminary findings, the contractor submits its response and the CO determines that the contractor's response does not adequately explain the alleged discrimination.  The issues of the remedy phase of an investigation are very different from the issues of the violation phase.  After establishing discrimination, the CO should begin identifying specific remedies.  The remedy must address how to:

- Make the discrimination victims whole;

- Stop the violation; and

- Prevent the violation from recurring.

The remedy for a discrimination finding is in the CA.  See Chapter 8 of this Manual for a discussion of the specific elements of a CA.

## 7C00   DESIGNING THE REMEDY

There is flexibility in designing remedies; the CO frequently develops remedies through negotiation and compromise.  General guidelines for designing remedies are specified in Directive 2013-04, "Calculating Back Pay as a Part of Make-Whole Relief for Victims of Employment Discrimination."  The CO should always seek a complete remedy.  A complete remedy will correct the causes of the discrimination and make the victims of discrimination whole.

## 7C01   CORRECTIVE REMEDIES

Part of a complete remedy is the corrective remedy.  Corrective remedies stop the violation and protect against its recurrence.[364]  For example, to correct hiring discrimination caused by treating applicants differently during a subjective interview, corrective remedies could include stopping the use of the discriminatory interviews, substituting legitimate objective criteria (*i.e.*, objective criteria with no unjustified adverse impact) and establishing a monitoring system to ensure that the contractor applies the criteria in a nondiscriminatory fashion.

If an unvalidated or invalid test has an adverse impact, then corrective action would include eliminating the use of the test, continued use of the test in a manner that eliminates its adverse impact (*e.g.,* changing the cut-off score) or validating the test in compliance with the UGESP, thereby demonstrating its job-relatedness.

## 7C02   MAKE-WHOLE RELIEF

*a.   General Principles*.  Make-whole relief means simply that the contractor restores the victim of discrimination to the position, both economically and in terms of status, that he or she would have occupied had the discrimination not occurred.  This relief usually involves placing the person in his or her rightful place, meaning placing the person in the job the person would have occupied with the seniority he or she would have had if not for the discrimination.  For example, if the contractor discriminated against women in hiring for an entry-level maintenance position, make-whole relief would include placing a certain number of class members into entry-level maintenance positions as they become available.  If the discrimination resulted in termination from employment, the affected class members should be reinstated to their prior positions.  In addition to rightful placement, make-whole relief includes all economic benefits the victim would have received had the discrimination not occurred.  These benefits would normally include things such as back pay with interest, retirement contributions, vacation credits, sick leave credits, payment for medical expenses that would have been paid by the employer's medical plan, missed training and any other employment benefits denied to the victim as a result of the discrimination.

---

[364]   See also FCCM 7C12 – Nonmonetary Relief.

Federal Contract Compliance Manual (FCCM)

b.  *Case Law Precedent*.  In construing what constitutes make-whole relief, OFCCP follows Title VII principles.[365]

## 7C03   FRONT PAY

Front pay is appropriate whenever the contractor cannot place the victim immediately into his or her rightful place, or the position the victim would have been in if not for the discrimination. Front pay is the difference between the victim's current pay and the pay associated with his or her rightful place.  There are a number of circumstances that can prevent immediate achievement of rightful place, including the absence of a vacancy, training required before beginning in the position, etc.  When front pay is appropriate, the victim must start receiving the earnings associated with his or her rightful place from the date the CA is signed until a certain time in the future that is set by the CA or final order (usually when the contractor places him or her in the position at issue, or his or her position pay is equal to the rate it should be in his or her rightful place).

## 7C04   RETROACTIVE SENIORITY

a.  *Seniority as an Element of Make-Whole Relief*.  Seniority is often a critical component of relief.  Without seniority, an individual who the contractor hires or promotes as a remedy for past discrimination may not have the level of protection against layoff or demotion to which he or she is entitled.  If the contractor had hired or promoted him or her at the time the discriminatory act occurred, he or she would have had additional years of seniority and would be less vulnerable to layoff as a result.  Therefore, requiring hiring or promotion as a remedy without also requiring an adjustment of seniority does not really make the victim whole.  Similarly, in many situations, employers award promotions in whole or in part based upon the bidder's seniority.  Merely placing a victim in the workforce without the seniority to which he or she is entitled will delay his or her attainment of his or her rightful place. Victims should receive all relevant seniority they have lost as a result of the discrimination, such as job seniority where relevant, in addition to company seniority.

b.  *Competitive and Noncompetitive Seniority*.  There are two types of seniority: competitive and noncompetitive.  Competitive seniority may include seniority for the purposes of shift preference, vacation schedules, promotions, job bidding, layoffs, raises or training.  When retroactive competitive seniority is fashioned as a form of relief, the employees who were not victims could effectively lose out in bidding for jobs or be in greater danger of layoff, etc., than those who received retroactive seniority.  On the other hand, there are some types of noncompetitive seniority matters (*e.g.,* accrued leave, retirement computation) that, when remedied for individual victims, do not create the same concerns as remedying for competitive seniority issues.  COs should consider the benefits and drawbacks of both types of seniority in their particular case when fashioning a remedy.

c.  *Nonunion Seniority*.  Some nonunion contractors operate under a system in which seniority is used in both the competitive and noncompetitive context.  In other words, even without a

---

[365]  Generally, OFCCP follows Title VII principles except in those finding unique to Section 503, such as those involving reasonable accommodation or qualification standards.  In those instances, then OFCCP follows ADA principles.

union contract, promotions and layoffs, etc., are decided on the basis of seniority.  In these situations, the victim is clearly entitled to obtain retroactive competitive seniority.

d.  *Union Involvement*.  When part of the remedy includes retroactive seniority, and a union agreement governs seniority, it is important to involve the union in the conciliation discussions on seniority.  Although OFCCP generally does not have jurisdiction over unions, if the union consents to retroactive seniority in the CA, the agreement will be enforceable.  If the union is not involved in the conciliation efforts or does not consent, the seniority relief may not be enforceable.  If the union refuses to participate in the conciliation process or agree to seniority relief, the CO and his or her supervisor, in coordination with their regional office, should consult their RSOL.

e.  *Procedures When Union is Involved*.

1.  *Union Participates and Consents*.  OFCCP will invite the union to participate in conciliation of a violation that requires a retroactive seniority remedy.  The CO will make every effort to involve the union in the conciliation process and get its consent to the award of retroactive seniority.  If the union participates and agrees to the seniority remedy, then OFCCP can enforce the remedy.  If the CO invites the union to participate in the conciliation of seniority issues, its role is limited to those issues.  The union should not be involved in other remedy areas (*e.g.,* in determining back pay, changing the selection process).

2.  *Union Refuses to Participate or Consent*.  If the union declines to participate in conciliation or otherwise does not consent to an award of retroactive seniority, OFCCP may not be able to enforce any retroactive seniority relief.  OFCCP should seek to lay the groundwork to defend its insistence upon seniority relief.  In other words, OFCCP should not agree to the usual boilerplate language that says that the contractor does not admit to violating one or more of the provisions in Executive Order 11246, Section 503 or VEVRAA.  Instead, the CA should recite the factual bases for OFCCP's findings of violation.  Under these circumstances: (a) the nonadmissions clause is not included in the CA, and (b) paragraph 1 of the General Provisions of the CA will note that the union was invited to participate, but declined to do so or to otherwise consent to an award of retroactive seniority, as applicable.

3.  *Contractor Refuses to Sign*.  If a contractor refuses to sign a CA for any reason, including the fact that the CA does not contain the nonadmission language, OFCCP should inform the contractor that this failure to conciliate could result in referral for enforcement.[366]

f.  *Other Methods for Addressing Retroactive Seniority*

1.  *Bifurcation*.  One method to avoid union objection is to bifurcate the competitive and noncompetitive seniority issues.  Since the union most likely will not object to the award of noncompetitive seniority, this may be a viable option for resolution.

---

[366]   See Chapter 8 – Resolution of Noncompliance.

2. *Cash Buyouts.*  To address competitive seniority issues, some contractors propose a cash buyout of employee seniority rights.  In other words, the contractor offers a lump sum payment to identified victims of discrimination (*i.e.*, those who are not hired) in exchange for a waiver of their entitlement to competitive seniority.  Seniority buyouts are technically possible, but the CO must carefully craft and review such proposals' fairness.  The CO, in coordination with his or her supervisor and RSOL, must forward offers of seniority buy-outs to the national office, DPO, for review and approval.

## 7C05   OTHER REMEDIES AFFECTING A UNION AGREEMENT

The CO should use the procedures described in FCCM 7C04 immediately above for other remedies (besides retroactive seniority) that require a change in or otherwise affect a union agreement.

## 7C06   BACK PAY

OFCCP seeks back pay as a part of a make-whole remedy resolving discrimination violations under Executive Order 11246, Section 503 and VEVRAA.  Back pay serves to remedy lost earnings that the victims would have received absent discrimination.  OFCCP's Directive 2013-04, "Calculating Back Pay as a Part of Make-Whole Relief for Victims of Employment Discrimination," provides additional guidance on calculating back-pay.

a. *Back Pay Required*.  Back pay is normally part of any make-whole remedy.  The U.S. Supreme Court stated in *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 421 (1975) that, under Title VII, "given a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  Given this stringent standard, it would be rare for the victim not to receive back pay.

b. *Elements of Back Pay*.  Back pay should reflect total compensation lost by the victim due to the discriminatory employment action, practice or procedure.  Many elements of compensation, in addition to salary or wages, are normally part of a back-pay award (*e.g.*, overtime and premium pay, incentive pay, raises, bonuses, sales commissions, cost-of-living increases, tips, medical and life insurance, fringe benefits, pensions, stock options and awards).

c. *Benefits*.  For the benefits portion of the back pay, the CO should gather information about when the benefits became effective (*e.g.,* what is the waiting period?) and the monetary value of the benefits.  With sufficient information, benefits may sometimes be calculated as a monetary figure (*e.g.,* employer paid premiums, plus employer contributions to a retirement account, to X per year) or as a percentage of wages or salary (*e.g.,* 20 percent of the total compensation package).  Where the employer's cost is unknown, survey data related to the cost of benefits, such as the Employer Costs for Employee Compensation survey published by the BLS, should be used to generate an estimate of fringe benefits as a percent of wages.

Federal Contract Compliance Manual (FCCM)

d.  *Deductions and Offsets*.

1.  *Interim Earnings*.  If a victim earned money from employment elsewhere during the interim, this amount is deductible from total back pay.  Not all financial compensation received by the victim during the back pay period, however, constitutes "interim earnings."  For example, if an employee had both earnings from a full-time job and a part-time job, and could have continued in the part-time job even absent the discrimination, the earnings from the part-time job are not deemed interim earnings and are not subtracted from back pay.  Additionally, payments from social safety net systems such as unemployment and workers compensation programs are considered a "collateral source" and do not constitute interim earnings.

2.  *Mitigation*.  Mitigation refers to the duty of the victim to use reasonable diligence in seeking alternative employment during the back pay period.  Contractors may seek to reduce back pay awards by the amount the victims could have earned with reasonable diligence, less expenses reasonably incurred in looking for alternative employment (*e.g.,* cost to prepare a resume, gas and parking fees incurred when going for an interview).  Reasonable diligence does not mean that the person had to be successful in obtaining other employment, only that he or she must make a reasonable effort.  The victim only needs to accept employment that is substantially equivalent to that sought or held with the contractor.  The victim does not need to relocate to accept alternative employment.

3.  *Burden of Proof*.  The contractor bears the burden of proving the amount of interim earnings and the failure of the victim to take reasonable steps to mitigate back pay loss.

e.  *Periods of Unavailability*.  Back pay awards do not include periods when the victim would not have been employed even without discrimination (*e.g.,* during periods of unpaid leave or incarceration).

f.  *Interest on Back Pay*.

1.  *Purpose and Rate of Interest*.  The purpose of applying interest on back pay awards is to compensate the victim(s) for the loss of the use and purchasing power of their income.  Interest on back pay is calculated at the same percentage rate as the Internal Revenue Service's (IRS) underpayment formula.  Interest on back pay must be compounded quarterly under the laws OFCCP enforces.

2.  *Rate Adjustments*.  The IRS may adjust its rate on a quarterly basis.  The interest rates applicable to various periods are available on the IRS website at https://apps.irs.gov/app/picklist/list/federalRates.html.

g.  *Withholding of Taxes*.  Contractors must withhold all applicable federal, state and local income taxes; Federal Insurance Contributions Act (FICA) (social security and Medicare); and Federal Unemployment Tax Act (FUTA) (unemployment insurance) taxes from employment discrimination settlement payments.  The contractor's payments of back pay, front pay and lump sum payments made in place of lost fringe benefits are "wages" subject to such tax withholding.  Contractors are increasingly asking victims to complete a W-4 form as

a condition of the settlement. This is not a settlement requirement and IRS guidance currently exists that states that an employer can assume a single deduction in the absence of a W-4 form.[367] The contractor must supply the victim(s) with a Form W-2 showing the wage component of the settlement and the amount of taxes withheld. Note, however:

1. *FICA*. FICA requires an employer, as well as an employee, contribution. The employer should not pay its FICA obligation out of a settlement; the employer share must be paid on top of the negotiated back pay.

2. *FUTA*. In almost all states, FUTA (unemployment insurance) taxes are an expense paid only by the employer (*i.e.*, there is no matching employee contribution). Therefore, the employer should not take an offset or deduction for FUTA when computing back pay awards unless the particular state where the affected party was or would have been employed required employers to withhold FUTA taxes from employees' wages or salaries during the time period for which the employer is calculating a back pay award.

3. *Interest*. Interest included in a settlement, if separately stated, is not subject to either FICA or FUTA. While interest is taxable as income to the recipient, just as interest on a bank savings account would be taxable, it is not subject to withholding by the employer. The contractor, however, must supply the victims with the Form 1099 stating the interest component of the settlement.

4. *Benefits*. Since employer contributions to most fringe benefits, such as the employer paid portion of health insurance premiums or pension funds, are not taxable (whether retroactive or not), they are not subject to withholding.

5. *Tax offsets*. In individual cases, a tax offset may be needed to restore the economic position of the victim. If a back pay award causes an individual to be pushed into a higher tax bracket or the cash value of tax-deductible benefits is high, it may be appropriate to include in the remedy a tax offset to make the victim whole. DPO can assist with estimating an appropriate offset amount.

## 7C07   TIME LIMITS FOR RELIEF

a. *Two-Year Limit*. The victim can obtain back pay for a period beginning two years prior to the date the Scheduling Letter was sent to the contractor via return receipt mail, or two years before the victim filed the complaint. If the discriminatory acts took place less than two years before the Scheduling Letter was sent or the filing of the complaint, back pay is due from the date of violation. Back pay continues from these events until a CA or other voluntary correction stops the discriminatory actions, or until the contractor makes a bona fide offer of the position denied or rectifies the pay disparity. Total back pay can, therefore, be for more than two years.

b. *Bona Fide Offer*. Under appropriate circumstances, the victim's rejection of a bona fide offer of the position previously denied by the contractor terminates the further accrual of back pay

---

[367]   See 26 CFR 31.3402(f)(2)-1(a).

liability.  However, interest continues to accrue until settlement on the back pay losses prior to the bona fide offer.  A bona fide offer does not require the victim to waive any rights or remedies to which he or she is entitled.  For example, the parties may disagree on whether retroactive seniority is appropriate.  However, as long as the contractor offers to place the victim in the same job (including shift and location) that was previously denied by the contractor, and do so without requiring that the victim waive any right to seniority, the offer is bona fide.  Under these circumstances, the parties can agree to litigate or arbitrate the seniority issue at a later date.  If the victim accepts the offer, back pay is still due up to acceptance and front pay continues to accrue for losses suffered as a result of missed promotional opportunities or increased risk of layoff.  If the victim rejects a bona fide offer, he or she is not disqualified from receiving back pay; back pay merely cuts off at the date of the offer.

c.  *Liability Continuing Beyond the Review Period*.  Unless the contractor produces evidence that it has stopped discrimination during the conciliation phase of a compliance evaluation, OFCCP will calculate remedies on the assumption that the discrimination persists and that the liability continues until the contractor enters into a CA or otherwise provides relief to the victims.

d.  *Continuing Violation*.  If the CO finds a continuing violation,[368] the contractor should provide remedies for the entire period of the violation, but not earlier than the effective date of Executive Order 11246, Section 503 or VEVRAA, as appropriate.  However, victims affected by a continuing violation can only recover back pay for the effects of the violation that occur within the period beginning two years prior to the scheduling notice, even when the specific act affecting them occurred outside the two-year period.

## 7C08   CALCULATION OF BACK PAY IN INDIVIDUAL OR NONSYSTEMIC CASES

In some cases, it may be feasible to calculate individual back pay awards.  When it is not, the formula relief method will be used as described in FCCM 7C11.  When individual relief is feasible, the CO determines the amount of back pay the contractor will award to victims by calculating, as accurately as possible, the pay the victims would have received if not for the discrimination.  The most common way to reconstruct pay is to identify members of the favored group for comparison with affected members of the nonfavored group (or an individual without a disability in a Section 503 case).  Proper comparators are those who were hired, promoted, etc., at about the same time the victims of the discrimination should have been hired, promoted, etc.  The CO then traces comparators' pay history.

In promotion and compensation cases, the difference between the pay received by the victims and that by the comparators within the appropriate time frame constitutes the back pay due the victims.  For hiring cases, the difference between the pay received by the comparators and that by the victims if they exercised reasonable diligence to find alternative employment within the appropriate time frame constitutes back pay due the victims.  If there are gaps in the comparators' employment during the back pay period (*e.g.,* the comparators quit, had a lengthy

---

[368]   See FCCM 7B00.

illness), the CO should make a reasonable estimate of the amount of wages the comparators would have made without the break in service.

## 7C09    CALCULATION OF REMEDIES IN SYSTEMIC DISCRIMINATION CASES

There are two models used to calculate remedies in systemic discrimination cases:

- Victim-specific or individual remedies for identified individual victims of discrimination ("victim-specific remedies"), explained below in FCCM 7C10; and

- Formula relief designed to remedy a class of discrimination victims whereby everyone in the class receives the same remedy ("formula relief"), explained below in FCCM 7C11.

The initial step in fashioning relief is to determine which remedy model to use.  Generally, OFCCP will not interchange the elements of the two approaches when providing relief.

## 7C10    CALCULATING VICTIM-SPECIFIC REMEDIES

a.  *Approach*.  The victim-specific model, which provides make-whole relief for identified victims of the discrimination, is used infrequently by OFCCP in systemic discrimination cases.  Individualized relief should be sought when it is feasible to identify individual victims, and to calculate their personal losses, interim earnings, mitigation efforts, tax implications and other relevant factors.

b.  *Remedy Phases*.  There are two stages to the remedy phase: (1) identifying the specific class members entitled to relief and (2) determining the exact remedy to which each victim is entitled.

1.  *Identifying Victims*.  The first step in the process is to identify potential victims of the discriminatory policy or practice.  In other words, the CO must define the group or class of individuals for whom he or she is seeking relief.  Examples include: all blacks who failed an invalidated pass-fail test; all Hispanics who were eligible for supervisory positions, but were not promoted; or all women who were denied reinstatement following maternity leave.  In defining the group at this point, the CO should at least refer to what he or she has determined to be the minimum objective qualifications the contractor actually imposed.  The CO should not evaluate comparative ("relative") qualifications at the remedy phase as the class consists of all who met the minimum objective qualifications.

2. *Computing Lost Earnings*.  The CO should gather information to compute each individual's specific losses.  The type of information gathered depends on the nature of the violation, *e.g.,* failure to hire; wrongful termination; failure to promote, or discriminatory compensation.  The information will include, but is not limited to, wages, interim raises, promotion potential, overtime and shift differentials, and any other compensation such as bonuses, stock options and benefits.  The CO should also gather information supporting appropriate nonmonetary relief for the victims that may include such relief as priority promotions, and training, counseling and EEO counseling for supervisors.

c.  *Contractor's Response.*  The CO must inform the contractor of the name of each individual for whom the CO is seeking individualized relief, and the amount of back pay and other forms of make-whole relief necessary to fully remedy each individual.  All identified individuals are entitled to relief unless the contractor provides a reason that the individual is not a victim, such as the individual applied outside of the scope of the period at issue. Individuals who are not qualified should have been eliminated from the class at the liability phase.  Each person the contractor cannot eliminate from the group of individuals entitled to relief is considered to be an actual, identified victim of discrimination.  Even if the contractor cannot eliminate an individual from the group entitled to relief, it may raise defenses to reduce an individual's claim to relief.

d.  *Individual Remedies*.  The CO must then determine make-whole relief for each individual victim of discrimination.  The CO should tailor the precise remedy to the situation of each victim.  The CO should be sure to consider all the different types of harm that the victim has suffered.  For example, the passage of time since the violation may mean that victims are less interested in reinstatement or hiring because they have built new careers.  On the other hand, if very little time has passed since the violation occurred and monetary damages are small, reinstatement or preferential hiring may be a viable remedy.

## 7C11   CALCULATING FORMULA RELIEF

a.  *Definition*.  Formula relief is a mechanism by which the CO determines the compensation for the loss suffered by a particular class and then divides the financial compensation (usually, though not necessarily, pro rata) among all the members of that class.  Under a formula, it is possible that some individuals will receive less than their total losses and some will receive more.  This outcome is the consequence of approximating losses in a situation where it is unrealistic to precisely compute individual losses.

b.  *When to Use*.  OFCCP will pursue formula relief wherever it is impossible or impractical to determine individual relief; that is, when the number of actual victims of discrimination is large, their identities are unknown or the variables and information needed to calculate individual relief are not available.  Sometimes the CO knows the identity of the victims, but it is so difficult to trace their losses and mitigation earnings that the CO can only estimate them.  One common situation when the CO uses a formula to determine relief are when the number of class members exceeds the number of vacancies and when it is impossible to determine the class members who would have been selected absent discrimination because the minimum objective qualifications are easily met.

c.  *Measuring Losses*.  To determine the losses, the CO must take into consideration the components listed below.

1.  *Shortfall Method*.  When the number of class members exceeds the total number of opportunities, a "shortfall vacancies" approach is appropriate for computing the amount of back pay for the class.  For example, assume a situation where there are 50 black and 50 white applicants, all of whom possess the required qualifications, seeking 20 jobs. Nineteen whites and one black were hired.  The difference between the actual number of blacks hired (1) and the expected number of black hires (10) represents the shortfall (9).

Shortfall vacancies do not limit the number of individuals entitled to relief. Instead, the contractor distributes the amount of money attributable to those vacancies to the whole class. In this example, the earnings attributable to the nine shortfall positions will be distributed to the 49 qualified black applicants. Shortfall vacancies are utilized as part of an approximation of class-wide loss.

2. *Averaging Method*. Not all formulas require the CO to look at shortfalls. There are other reasons to use a formula other than the fact that there are more victims than vacancies. For example, suppose there is a case in which the major claim is that the contractor placed the hired men and women into sex-segregated departments. In such a situation, the CO may want to compare the average salary earned by men with a given level of seniority to the average salary earned by women with the same seniority. The difference in average salary defines the measure of back pay to be awarded to each woman in that seniority group. The formula devised should be designed to address the particular violation found.

3. *Computing Lost Earnings*. Because the formula approach represents a compromise, it is extremely important to account fully for all the earnings attributable to a particular vacancy in computing losses such as interest, interim raises, promotion potential (*i.e.*, the earnings associated with all of the promotions the persons would have received had they not been discriminated against in the first place), overtime and shift differential, and any other additions to wages or salary such as bonuses or benefits.

d. *Contractor's Response*. The CO must inform the contractor of the name of each member of the class for whom the CO is seeking formula relief. All affected class members are entitled to relief unless the contractor provides a reason that the class member is not a victim. For example, the class member applied outside of the scope of the period at issue or occurs multiple times in the class list as a duplicate. Individuals who were not qualified should have been eliminated from the class at the liability phase. Each class member the contractor cannot eliminate from the class will receive his or her share of the formula relief. Even if the contractor cannot eliminate an individual from the group entitled to relief, it may raise defenses to reduce an individual's claim to relief.

e. *Distribution of Remedy*. When using the formula approach, the agreed upon remedy is shared by all members of the class. The CO divides the amount of money that represents the group's lost wages among the members of the class either on a pro rata basis or some other equitable basis. The CO may decide on a method of distribution based upon the facts of the case. For example, if the CO identified an incumbent class that was denied promotions or assigned to lower paying jobs, the contractor controlled their interim earnings. In that situation, a distribution based upon the number of months in the employer's workforce might be most appropriate. With a rejected applicant class, the CO might decide that a simple per capita distribution makes more sense.

## 7C12   NONMONETARY RELIEF

As mentioned above, nonmonetary relief includes corrective actions that stop the policy, practice or procedure that caused the discrimination. Additionally, the CO should, as appropriate, require

nonmonetary remedies, such as preferential hiring or promotion goals or special training programs and EEO counseling for supervisors. With formula relief, it is difficult to provide reinstatement or retroactive promotion because, by using the formula, no individual is tied to any particular opportunity. However, the CO may create a preferential hiring or promotion list consisting of the members of the class, and from which the contractor must make all selections to fill existing vacancies until the number of class members hired is equal to the shortfall or the class member list is exhausted. The contractor must hire class members before nonclass members.

## 7D   NOTIFICATION TO CLASS MEMBERS

The CA or other settlement document must guarantee that all class members are aware of their rights under the agreement and specify the procedures through which those rights will be protected, including counseling, when appropriate. Normally, the contractor must notify all class members of their rights. That notice must include the terms and conditions under which the contractor is tendering an employment offer, including the specific amount of back pay, the retroactive seniority, as well as all other appropriate benefits.

## 7E   LIABILITY OF SUCCESSOR EMPLOYER

In determining whether a successor employer is liable for the discriminatory acts of its predecessor, OFCCP considers whether imposing liability on the successor would be equitable and in keeping with federal policy. OFCCP judges such liability on a case-by-case basis considering the *MacMillan* factors identified in *EEOC v. MacMillan Bloedel Containers, Inc*., 503 F.2d 1086, 1094 (6th Cir. 1974). The nine MacMillan factors are:

- Whether the successor company had notice of the charge;

- The ability of the predecessor to provide relief;

- Whether there has been a substantial continuity of business operations;

- Whether the new employer uses the same plant;

- Whether the employer uses the same or substantially the same work force;

- Whether the employer uses the same or substantially the same supervisory personnel;

- Whether the same jobs exist under substantially the same working conditions;

- Whether the employer uses the same machinery, equipment and methods of production; and

- Whether the employer produces the same product.

Federal Contract Compliance Manual (FCCM)

The CO should direct requests for a determination of successor liability to RSOL and DPO in the national office.  The request should include the contractor's responses, with supporting documentation, to the *MacMillan* factors described in Appendix A-12.

Federal Contract Compliance Manual (FCCM)

# CHAPTER 8
# RESOLUTION OF NONCOMPLIANCE

## 8A    INTRODUCTION

This chapter outlines the procedures and documents OFCCP uses to resolve violations COs find during compliance evaluations and complaint investigations.  These procedures and documents cover both affirmative action and discrimination violations and apply to all three of the laws OFCCP enforces: Executive Order 11246, as amended; Section 503, as amended; and VEVRAA, as amended.

### 8A00   APPLICABILITY

COs should consult this chapter whenever they find noncompliance.  Unless otherwise specified, the guidelines in this chapter apply to both supply and service and construction contractors.

### 8A01   REMEDIES

If a CO identifies violations during a compliance evaluation or complaint investigation, the CO must secure remedies or sanctions, or both, to bring the contractor into compliance.  COs design remedies for three reasons: to correct the violation, to prevent recurrence of the violation, and to make the victims whole.  For a complete discussion of remedies and sanctions, see Chapter 7 of this Manual.  Distinctions between remedies and sanctions are discussed below.

a.  *Remedy.*  Remedies are legally required actions to eliminate the effects of discrimination that include, for example, back pay or reinstatement.  Remedies may also be taken or imposed to rectify noncompliance with affirmative action standards.  Remember, remedies are corrective, not punitive, and are established in a CA.

b.  *Sanctions.*  In contrast to remedies, sanctions may be appropriate when a contractor fails to agree to acceptable remedies or fails to implement acceptable remedies for noncompliance.  Examples of sanctions may include termination of a contract or debarment.  Sanctions may also be appropriate when a violation is egregious or repetitive, or both.  Sanctions can only be imposed after an opportunity for a hearing.[369]

### 8A02   PREPARATION OF DOCUMENTS

COs are responsible for preparing all the documents in this chapter for their compliance evaluations or complaint investigations.  To initiate the resolution process, a CO must review the findings and the bases for each of the findings with his or her immediate supervisor.  The CO then submits the recommendation and draft documents to the supervisor for review and, using established OFCCP procedures, to the appropriate agency official for approval and signature.[370]

---

[369]   EO 11246 secs. 208(b), 303(c); 41 CFR 60-1.26(b), 41 CFR 60-300.66(d), 41 CFR 60-741.66(d).

[370]   See the "Signature Authority" section for each document for the official designated authority to sign specific documents. Information on signature authority for CAs is also in FCCM 8H03.

Most notices discussed in this chapter must be sent by certified mail, return receipt requested, in addition to sending a courtesy copy by email or facsimile.

## 8A03   COMPUTATION OF TIME

When computing the contractor's response date, the CO should begin counting from the day after the date on the return receipt requested form.  If the response is received on a Saturday, Sunday or federal holiday, the actual date of receipt would be the next business day.  If a CO does not receive a return receipt within five calendar days of mailing, the CO should contact the contractor to confirm the date of receipt and count the days from that date.

## 8A04   ORGANIZATION OF THIS CHAPTER

This chapter contains 13 sections, Sections A through M. Section A provides basic terms that may be useful and Section B is the first substantive section in this chapter.  Section B is an overview of the application of SCNs at various steps in compliance evaluations and complaint investigations, and the documents used to notify contractors and issue an SCN.  Section B also reviews the notices used when a CO finds a violation during a compliance evaluation such as a PDN and an NOV.  The Manual reviews documents used during complaint investigations, such as a NORI and a Notification of Right-to-Sue, in this section.  Among the other documents reviewed here are CAs, documents needed during the monitoring of CAs and the notice to labor unions when a CA affects a Collective Bargaining Agreement.

Section C specifically focuses on the notice to unions, while Section D is dedicated to a full discussion of SCNs.  Section E is on PDNs, Section F addresses NOVs, Section G is devoted to conciliation.  The remaining sections, K though M are on CAs, post-CA actions, using the 15-day notice, enforcement recommendations, pre and post referral issues resulting from enforcement proceedings and, finally, the types of enforcement proceedings.

# 8B    OVERVIEW OF RESOLUTION AND ENFORCEMENT PROCEDURES AND DOCUMENTS

This section contains flow charts showing the normal sequence of documents COs use in compliance evaluations and complaint investigations.  A chart is included for each of the following topics:

- Use of an SCN at Desk Audit (Supply & Service Compliance Evaluations);

- Use of documents in the On-site and Off-site Phases of Compliance Evaluations (Supply & Service, and Construction);

- Use of documents in Complaint Investigations; and

- Use of documents in Monitoring CAs.

The text accompanying these charts references the sections of this Manual where there are detailed discussions of the particular types of violations and of the relevant notices or resolution documents.  This includes the location of the sample letters, notices or documents.

## 8B00   GENERAL USE OF AN SCN

As used in this section, the term SCN includes, as appropriate, an Amended Show Cause Notice (ASCN).  An ASCN is used when a CO issues an SCN to the contractor and later finds additional unresolved violations, or finds that some but not all violations were cited in error.  The ASCN identifies all the unresolved or current violations.[371]

Also, be aware that if a contractor properly asserts in response to an SCN or ASCN that the CO erroneously issued the notice, the CO must send a letter to the contractor or its representative rescinding the SCN or ASCN.[372]

## 8B01   USE OF AN SCN AT THE DESK AUDIT
## (Supply & Service Compliance Evaluations)

COs must recommend issuance of an SCN, as described in Section 8D, at the desk audit stage if the contractor:

- Fails to submit an AAP required by one or more of the laws enforced by OFCCP: Executive Order 11246, Section 503 or VEVRAA;[373]

- Fails to submit an AAP that substantially complies with the regulatory requirements under one or more of the laws enforced by OFCCP: Executive Order 11246, Section 503 or VEVRAA;[374]

- Fails to submit employment activity data or other information requested in the Scheduling Letter;[375] or

- Fails to submit corrected data after providing employment activity data or compensation data, or both, that are incomplete or inaccurate.[376]

---

[371]   See FCCM 8D04 – When to Use an Amended Show Cause Notice.
[372]   See FCCM 8D08 – Rescission of a Show Cause Notice.
[373]   See FCCM 1C – Receipt of AAPs and Itemized Listing Data, FCCM 8D01 – When a Show Cause Notice is Required, and Letter L-26 – Show Cause Notice: Failure to Submit EO 11246, Section 503 or VEVRAA AAPs.
[374]   See FCCM 8D01– When a Show Cause Notice is Required, FCCM 1F -1I on the acceptability of AAPs and Itemized Listing Data, and Letters L-27 – Show Cause Notice: Failure to Submit an Acceptable EO 11246, Section 503 or VEVRAA AAP, and L-27a – Sample Enclosure to Letter L-27.
[375]   See FCCM 1C – Receipt of AAPs and Itemized Listing Data for Desk Audit, FCCM 8D01 – When a Show Cause Notice is Required, and Letter L-28 – Show Cause Notice: Failure to Submit Employment Activity and/or Compensation Data for Desk Audit.
[376]   See FCCM 1F - 1I on the acceptability of AAPs and Itemized Listing Data, FCCM 8D01 – When a Show Cause Notice is Required, and Letter L-29– Show Cause Notice: Failure to Submit Corrected Employment Activity and/or Compensation Data for Desk Audit.

The SCN allows the contractor 30 calendar days from receiving the notice to resolve the violation. Specific actions will be taken by the CO, as described below, depending on whether the contractor resolves the violations.

- *Contractor Does Not Resolve Violation.* If the violation is not resolved within the 30-day show cause period, or during a reasonable extension, the CO should recommend enforcement. Enforcement is discussed in detail in Section 8K, Enforcement Recommendation.

- *Contractor Resolves Violation.* If the contractor resolves the violations within the 30-day show cause period by, for example, submitting a reasonable Executive Order 11246, Section 503 or VEVRAA AAP, the review continues with a review of the AAP or moves to the on-site phase. Upon completion of the review, the CO must state the violations identified and for which the contractor has agreed upon a remedy in a CA.[377] Technical violations resolved by the contractor during the course of the review need not be included in the CA, but can be documented in a letter of closure.

---

[377] See FCCM 8D07(b) – Contractor Response: Resolution in CA.

Federal Contract Compliance Manual (FCCM)

# USE OF SHOW CAUSE NOTICE AT DESK AUDIT
(Supply and Service Compliance Evaluation)



## 8B02   DOCUMENTS USED IN THE ON-SITE AND OFF-SITE PHASES OF COMPLIANCE EVALUATIONS (Supply & Service and Construction)

Based on the nature of the issue or violation in the on-site and off-site phases, in both Supply & Service and construction evaluations, COs will use different forms or documents. Below is a review of the use of SCNs, PDNs, NOVs and notices to labor unions in various situations.

a.  *Denial of Access*. If a contractor denies access to its premises, records or other information necessary to conduct an on-site or off-site review, the CO must issue an SCN or proceed directly to an enforcement recommendation.[378]

b.  *Interference with OFCCP*. If a contractor's representative harasses or intimidates a representative of OFCCP during the course of an on-site or off-site review, or unreasonably interferes with the review process, the CO must issue an SCN or proceed directly to an enforcement recommendation.[379]

c.  *Finding of a Violation.* If the CO identifies a violation under any of OFCCP's three laws during an on-site or off-site review, the type of notice the CO must issue depends on the nature of the violations.

-   *Discrimination Violation.* If the CO identifies employment discrimination, the following notices are appropriate:

    o   *PDN.* A CO first issues a PDN to the contractor that describes the indicators of discrimination, as well as any other violations found, and offers the contractor the opportunity to respond.[380] The CO must consult with RSOL, BES, and other appropriate agency personnel in the national office prior to issuing the PDN.

    o   *NOV.* If the contractor does not adequately respond to the PDN, a CO issues an NOV after consulting with RSOL, BES, and appropriate agency personnel in the national office.[381] This notice incorporates both the discrimination finding and any other violation, and invites the contractor to participate in the conciliation process.

-   *Other Violations*. If a CO identifies no discrimination violations but identifies other violations, such as those involving affirmative action obligations, the CO does not use a PDN. Rather, the CO gives the contractor an initial written notice of the findings in an NOV.

d.  *Notice to Labor Union*. If a proposed remedy for a violation requires a change in or otherwise affects a provision of a CBA between the contractor and a labor union, or requires the award of retroactive seniority where the CBA governs, the CO must notify the union of

---

[378]  See FCCM 8D01– When a Show Cause Notice is Required.
[379]  See FCCM 8D02 – When a Show Cause Notice is Not Required.
[380]  See FCCM 8E – Predetermination Notice; Letter L-35– Predetermination Notice.
[381]  See FCCM 8F – Notice of Violation; Letter L-36 – Notice of Violation.

the violation and invite the union to participate in the conciliation.[382]  If the contractor wants to conciliate after receiving the NOV, the CO must notify the union at that point.  Otherwise, the CO must notify the union when the SCN is issued.

e.  *Unresolved Violation.*  If, after issuing an NOV, reasonable conciliation efforts to resolve all violations fail, the CO issues an SCN for the unresolved violations.[383]  The SCN allows the contractor 30 calendar days from receipt of the notice to resolve the violations.

- *Contractor Does Not Resolve Violation.*  If the contractor does not resolve the violations within the 30-day show cause period, or with a reasonable extension, the CO must recommend enforcement.

- *Contractor Resolves Violation.*  A CA must include resolution of any material violations of any of the three laws OFCCP enforces.[384]  When a contractor executes a CA, the CO closes the review with a letter.  If the CO issued an SCN and the contractor later entered into a CA, the CO uses Letter L-40, Closure Letter for Substantive Violations (where an SCN was issued).  If a contractor executes a CA without the CO issuing an SCN beforehand, the CO uses Letter L-41, Closure Letter for Substantive Violations (no SCN issued).

---

[382]  See FCCM 8C – Notice to Labor Union.
[383]  See FCCM 8D01– When a Show Cause Notice is Required, Letter L-30 – Show Cause Notice: Unresolved Violations, and Letter L-30a – Sample Enclosure to Letter L-30.
[384]  See FCCM 8H – Conciliation Agreements.

Federal Contract Compliance Manual (FCCM)

# DOCUMENT ISSUANCES DURING ONSITE/OFFSITE COMPLIANCE EVALUATION PHASES
### (Supply and Service and Construction)



Federal Contract Compliance Manual (FCCM)

# DOCUMENT ISSUANCES DURING ONSITE/OFFSITE COMPLIANCE EVALUATION PHASES

(Supply and Service and Construction)

(continued)



Federal Contract Compliance Manual (FCCM)

## 8B03   DOCUMENTS USED IN COMPLAINT INVESTIGATIONS

Based on the nature of the issue or violation in a complaint investigation, COs will use different forms or documents. Below is a review of the use of SCNs, NORIs, Notifications of Right-to-Sue and notices to labor unions in various situations.

a. *Denial of Access.* If a contractor denies access to its premises, records or other information necessary to conduct an investigation of a complaint, OFCCP may issue an SCN.[385]

b. *Interference with OFCCP.* If a contractor's representative intimidates or harasses a representative of OFCCP during the course of a complaint investigation, or unreasonably interferes with the investigation, a CO may issue an SCN or proceed directly to an enforcement recommendation.

c. *Transmittal of Investigation Findings.* COs transmit the findings of a complaint investigation to the complainant and the contractor through the NORI. The contractor and complainant are issued a NORI-Violation if a complaint investigation results in a finding of a violation and the complaint is not resolved.[386] In this notice, OFCCP offers to meet with the contractor to attempt to resolve the violations through conciliation. If the CO finds "no violation," he or she issues the contractor and complainant a NORI-No Violation.[387]

d. *Notification of Right-to-Sue.* If a complaint is dual filed under Section 503 and the ADA, as amended; or under Executive Order 11246, as amended, and Title VII, as amended; and there is no violation finding, the Notice of Right-to-Sue accompanies the notification of closure.[388] In addition, if a complainant requests a Notice of Right-to-Sue in writing before 180 calendar days passes, and the Regional Director, or designee, can foresee that the investigation will extend beyond the 180th day, the Regional Director, or designee, will issue the notice within 10 calendar days to the complainant.[389]

e. *Notice to Labor Union.* If make-whole relief for the complainant requires a change in or otherwise affects a provision of a CBA between the contractor and a labor union, COs notify the union of the violation and invite the union to participate in the conciliation.[390] An example of make-whole relief that might require a change in the CBA is an award of retroactive seniority.

---

[385]   See FCCM 8D01 and 8D02.
[386]   See FCCM 6K and Letter L-25– Notification of Results of Investigation: Violation.
[387]   See FCCM 6L; and Letter L-21 – Notification of Results of Investigation: No Violation (Complaint Not Dual Filed), Letter L-22 – Notification of Results of Investigation: No Violation (Dual Filed), and Letter L-22 Enclosure–Notice of Right-to-Sue Under Title 1 of the ADA or Title VII of the Civil Rights Act of 1964: No Violation. Appendix A-11 – Information Related to Filing Suit under Title VII and Title I of the ADA must also be included with L-22.
[388]   See FCCM 6L02 – Closure of Complaint with No Violation.
[389]   See FCCM 6L03 – Closure of Complaint and Issuance of "Notice of Right-to-Sue."
[390]   See Section 8C – Notice to Labor Union.

*f.* *CA.*  This binding agreement is the result of negotiations between the CO and contractor to resolve findings of noncompliance.

- *Conciliation Successful.*  The contractor must resolve, in a CA, any finding of violation in a complaint investigation, whether individual or class, under any of the three laws OFCCP enforces.

- *Conciliation Unsuccessful.*  If, after reasonable time and effort, OFCCP and the contractor cannot agree to the resolution of the identified violation, the CO must issue an SCN.  If the contractor and OFCCP do not reach a settlement within the 30-calendar-day show cause period, or reasonable extensions thereof, the CO must recommend enforcement.[391]

---

[391]   See FCCM 8K – Enforcement Recommendations.

# COMPLAINT INVESTIGATION

(EO 11246 & Section 503)

See

Chapter 6: Complaints
Section L: Resolution of the Complaint



Federal Contract Compliance Manual (FCCM)

# COMPLAINT INVESTIGATION
## (VEVRAA)



**8B04   DOCUMENTS USED IN MONITORING CAs**

Once executed, a CA is monitored by the CO and the contractor submits progress reports for review.  This subsection reviews the documents involved in monitoring a CA, such as a 15-Day Notice.

a.  *Contractor Does Not Submit a Progress Report.*  If a contractor fails to submit a progress report due under a CA within five days following the due date (unless a reasonable extension has been requested), or if the CO's review of such a report shows a violation of the CA, the contractor has violated or breached the CA.  The following actions are taken:

  • *No Irreparable Injury.*  In a no irreparable harm case, the CO issues the contractor a 15-Day Notice.  The Notice provides 15 calendar days for the contractor to respond.  The notice states the violations and summarizes the supporting evidence.  The CO sends the notice by certified mail, return receipt requested; however, email or facsimile are permissible if confirmation of delivery and/or transmission is documented.[392]

  • *Irreparable Injury.*  When irreparable injury would result from the 15-day delay, the CO does not issue a 15-Day Notice.  Rather, the appropriate Regional Director, after obtaining appropriate approval, verbally informs the contractor of OFCCP's intent to proceed immediately to enforcement.  This verbal notice is then followed by a written confirmation the CO sends by certified mail, return receipt requested; however, email or facsimile are permissible if confirmation of delivery and/or transmission is documented.[393]

b.  *Enforcement Recommendation.*  If the contractor does not demonstrate in writing that it is in compliance with the CA, or if contractor does not resolve the breach within the 15-calendar-day period or reasonable extensions thereof, the CO must recommend the matter for enforcement.  In such a situation, there is no need for the CO to issue an SCN.  Also, in enforcement proceedings alleging a breach of CA, the agency seeks enforcement of the terms of the CA and is not required to present proof of the original violations that led to the CA.

---

[392]  See FCCM 8J01– Procedure Where No Irreparable Injury Exists.
[393]  See FCCM 8J02 – Procedure Where Irreparable Injury Exists.

Federal Contract Compliance Manual (FCCM)

# CONCILIATION AGREEMENT (CA) MONITORING



## 8C    NOTICE TO THE LABOR UNION OF A PROPOSED REMEDY

This section reviews when a notice to the labor union of a remedy that affects a CBA is required and the timing for COs providing that notice. It also provides COs information and tools related to the:

- Content of the notice;

- Addressees for the notice;

- Signatory on the notice; and

- Union responses to the notice.

The first subsection reviews the use of a notice to the union.

### 8C00    WHEN TO USE A NOTICE TO THE LABOR UNION

Notice to a labor union is required when a CO proposes a remedy that affects the CBA. When a CO proposes a remedy for a violation that is identified in the course of a compliance evaluation or complaint investigation that requires a change in or otherwise affects a CBA between the contractor and a labor union, the CO must notify the union in writing of the violation and invite the union to participate in the conciliation process. A remedy affecting a CBA is one requiring the modification, deletion or exception to an existing provision, or the addition of a new provision. The following are examples of some remedies that may impact the terms of a current CBA:

- Retroactive seniority;

- Temporary suspension of promotion or transfer provisions, or both; or

- Institution of or modification to a job posting process that applies to a workforce, job group or position covered by the CBA.

In a compliance evaluation, the CO sends this notice to the union if the contractor indicates that it wants to conciliate after receiving the NOV. Otherwise, the CO sends notice to the union when it issues the SCN. In a complaint investigation, the CO sends the notice to the union at the same time he or she sends the NORI to the contractor.

### 8C01    CONTENTS OF THE LABOR UNION NOTICE

If the proposed remedy affects a CBA, a CO's written notice to the union will:

- State the violation;

- Describe the portions of the proposed remedy which may affect the CBA; and

- Invite the union to participate in negotiation of the portion(s) of the proposed remedy that may impact the CBA.

## 8C02   WHO RECEIVES THE LABOR UNION NOTICE

The CO sends the notice to the president of the applicable union local by certified mail, return receipt requested; however, email or facsimile are permissible if confirmation of delivery and/or transmission is documented.  A copy of the notice is also sent to the contractor.

## 8C03   SIGNATURE AUTHORITY

The Regional Director, or designee, has signature authority for the notice to the union.

## 8C04   UNION'S RESPONSE TO THE NOTICE

FCCM 7C04 and 7C05 provide further background and guidance on union involvement in the conciliation process.[394]  Although subsection 7C04 deals specifically with retroactive seniority as a remedy affecting a CBA, the description of procedures there are equally applicable to other remedies affecting a CBA.  Below are the two typical union responses in the conciliation context:

a.   *Union Participation in Conciliation.*  If the union agrees to participate in conciliation, then it may participate on issues affecting the CBA.  If conciliation is successful, the CO should ask the president of the union local to sign the CA.[395]

b.   *Union Refuses to Participate or Refuses to Sign CA.*[396]  If the union refuses to participate in conciliation, or participates but will not agree to the proposed relief affecting the CBA by signing the CA, the CO will not include the nonadmissions clause in the CA.  The nonadmissions clause is in paragraph 3 of the standard CA text, as described in FCCM 8H0l.  Under such circumstances, the CO shall amend paragraph 1 of the standard CA text to reference that the union was invited to participate and its refusal to participate or to sign.[397]

## 8D      SHOW CAUSE NOTICE

An SCN is a letter issued to the contractor ordering it to show cause why enforcement proceedings should not be instituted.  The SCN requires the contractor to come into compliance within 30 calendar days or the CO will recommend the commencement of enforcement proceedings.

---

[394]   COs may also find it helpful to consult their RSOL on these issues.
[395]   See FCCM 8H03 – Signature Authority.
[396]   Also see FCCM 7C04(f) – Other Methods for Addressing Retroactive Seniority.
[397]   See FCCM 8H0l – Contents of a Conciliation Agreement.

Federal Contract Compliance Manual (FCCM)

**8D00   APPLICABILITY**

SCNs pertain to violations of Executive Order 11246,[398] Section 503,[399] and VEVRAA.[400]

**8D01   WHEN AN SCN IS REQUIRED**

As a general rule, COs must issue an SCN whenever a contractor violates Executive Order 11246, Section 503, VEVRAA or their implementing regulations in order to proceed with an enforcement action.  In certain circumstances, OFCCP may proceed directly to enforcement without issuing an SCN.  This practice is discussed later in FCCM 8D02, When a Show Cause Notice is Not Required.

COs issue SCNs in all cases after conciliation fails.  However, SCNs can be issued to a supply and service contractor at the desk audit stage.  COs issue an SCN at the desk audit stage when the contractor fails to provide the records, information or data requested in the Scheduling Letter. For example, a CO must issue an SCN when a contractor:

- Fails to submit an AAP required by one or more of the laws enforced by OFCCP: Executive Order 11246, Section 503 or VEVRAA;[401]

- Fails to submit an AAP that substantially complies with the regulatory requirements under one or more of the laws enforced by OFCCP: Executive Order 11246, Section 503 or VEVRAA;[402]

- Fails to submit employment activity data or other information requested in the Scheduling Letter;[403] or

- Fails to submit corrected data after providing employment activity data or compensation data, or both, that are incomplete or inaccurate.[404]

---

[398]  See 41 CFR 60-1.28, 60-2.2(c) and 60-4.8.
[399]  See 41 CFR 60-741.64.
[400]  See 41 CFR 300.64.
[401]  See FCCM 1C – Receipt of AAPs and Itemized Listing Data, FCCM 8D01 – When a Show Cause Notice is Required, and Letter L-26 – Show Cause Notice: Failure to Submit EO 11246, Section 503 or VEVRAA AAPs.
[402]  See FCCM 8D01– When a Show Cause Notice is Required, FCCM 1F -1I on the acceptability of AAPs and Itemized Listing Data, and Letters L-27 – Show Cause Notice: Failure to Submit an Acceptable EO 11246, Section 503 or VEVRAA AAP, and L-27a – Sample Enclosure to Letter L-27.
[403]  See FCCM 1C – Receipt of AAPs and Itemized Listing Data for Desk Audit, FCCM 8D01 – When a Show Cause Notice is Required, and Letter L-28 – Show Cause Notice: Failure to Submit Employment Activity and/or Compensation Data for Desk Audit.
[404]  See FCCM 1F - 1I on the acceptability of AAPs and Itemized Listing Data, FCCM 8D01 – When a Show Cause Notice is Required, and Letter L-29– Show Cause Notice: Failure to Submit Corrected Employment Activity and/or Compensation Data for Desk Audit.

COs also issue an SCN when a contractor refuses to provide access to its premises for an on-site review, or refuses to provide access to records or other information necessary to conduct an on-site or off-site review.[405]

## 8D02   CIRCUMSTANCES WHEN AN SCN IS NOT REQUIRED

OFCCP may proceed directly to an enforcement recommendation without issuing an SCN in certain situations, such as when a contractor intimidates or harasses an OFCCP agent, or unreasonably interferes with a complaint investigation or compliance review.  If the CO believes that the circumstances warrant moving directly to an enforcement recommendation without issuing an SCN, his or her District Director must seek the approval of the Regional Director. The Regional Director, prior to approving this action, should consult with RSOL.

A CO is not required to issue an SCN when a contractor violates a CA.  Under such circumstances, OFCCP issues a 15-Day Notice.[406]

## 8D03   CONTENTS OF AN SCN

An SCN, including an ASCN, may have two parts, the notice and an enclosure.

a.  *Notice.*  The Notice itself which states the consequences under the regulations of not coming into compliance.

b.  *Enclosure.*  An enclosure states the violation and the required remedies.  The statement of the violation should include appropriate regulatory citations.  This approach also applies to the nondiscrimination and affirmative action provisions of the appropriate equal opportunity clauses.  The appropriate format of an SCN will depend on the particular situation.  FCCM 8D01 lists violations for which COs should issue an SCN and includes references to the letters that provide the format for each type of violation.

## 8D04   WHEN TO USE AN AMENDED SHOW CAUSE NOTICE

When a CO issues an SCN and subsequently identifies additional violations, the CO must issue an ASCN incorporating all violations, including the original ones.  An ASCN must also be issued when the first SCN included violations in error.  The CO may issue more than one ASCN.

For example:

- *Supply and Service Contractors.*  If a CO issues an SCN at desk audit for failure to submit an Executive Order 11246 AAP, and the contractor then submits an unreasonable Executive Order 11246 AAP, the CO may issue an ASCN citing both the initial failure to submit and the subsequent unreasonable submission.  If the contractor then submits a reasonable Executive Order 11246 AAP, but the CO identifies additional violations during the on-site review, the CO may issue a second ASCN citing all violations to date.

---

[405]   See Letter L-33 – Show Cause Notice: Denial of Access.
[406]   See FCCM 8J –The 15-Day Notice.

Just as an ASCN includes all violations, including those the CO cited in the original SCN, the CO uses a single CA to resolve all outstanding violations, regardless of when in the review the CO identified a particular violation.

A sample ASCN is provided in Letter L-32. An ASCN is sent to the same people as an SCN, has the same signature authority as the original SCN unless the Regional Director delegates otherwise, and follows the same procedures concerning contractor responses.[407]

## 8D05   WHO RECEIVES AN SCN OR ASCN

COs send the SCN, or ASCN, to the top official at the establishment under review, or the top official of the construction company in the economic area being reviewed. A copy of the SCN is sent to the CEO if the establishment or construction company is part of a larger corporation. If the contractor submits a written request that the CO provide a copy of the review or investigation correspondence to an outside representative such as an outside counsel or consultant, the CO will also send a copy to the designated representative. When the CO provides a copy to a corporate CEO, other contractor official or a designated representative, the CO should include a "cc:" line on all copies indicating the people to whom he or she sent the Notice.

COs must always send SCNs or ASCNs by certified mail, return receipt requested. An additional copy may also be sent by email or facsimile.

## 8D06   SIGNATURE AUTHORITY

The Regional Directors, or their designees, have signature authority for an SCN and ASCN.

## 8D07   CONTRACTOR'S RESPONSE

This subsection covers the period of time the contractor has to respond to an SCN and ASCN, and resolution of the violations through a CA.

a.  *Period for Response.*  The contractor has 30 calendar days from the date it receives the SCN or ASCN to either adequately respond to or resolve the violations the CO specified in the SCN or ASCN.

b.  *Resolution in CA.*  Because violations generating an SCN or ASCN are usually significant, a CA is used to show how the violations were resolved. This is the case unless the contractor is able to demonstrate that it is exempt from OFCCP's requirements or that OFCCP's allegations are incorrect. The contractor may, therefore, take any of the following actions in response to an SCN or ASCN:

- *Contractor Resolves the Violation.*  The contractor may resolve a violation by:

---

[407]   See FCCM 8D05, 8D06, and 8D07.

- o   Entering into a written CA that remedies the violation, including the provision of make-whole relief for any victims of discrimination;[408]

- o   Demonstrating that it is exempt from OFCCP's requirements; or

- o   Demonstrating that OFCCP's allegations are incorrect.

- *Contractor Does Not Resolve the Violation.*  If the contractor does not resolve all of the violations stated in the SCN or ASCN, the CO will normally recommend the initiation of enforcement proceedings as described in Section 8K of the chapter.  Under these circumstances, the Regional Director must authorize any decision not to refer the contractor for enforcement and must document the reason for the decision in the case file.

## 8D08   RESCISSION OF AN SCN

This subsection reviews when a CO can rescind an SCN, the contents of the rescission, who signs the notices and who should receive them.  Each item is reviewed below.

a.   *When to Use an SCN Rescission Letter.*  An SCN will not be rescinded merely because the contractor agrees to comply in the future or corrects violations.  See 41 CFR 60-1.20(b), 60-4.8 and *Castillo v. Usery*, 14 Fair Empl. Prac. Cas. 1240, 1247 (N.D.Ca1. 1976).  A CO may rescind an SCN or ASCN only if the SCN or ASCN was issued erroneously.  For example:

- The contractor demonstrates that it is exempt from OFCCP's requirements; or

- The contractor demonstrates that each of OFCCP's allegations in the SCN is incorrect.

b.   *Contents.*  The notice rescinding the SCN or ASCN acknowledges that the SCN or ASCN was issued and the date it was issued, the authority under which it was issued, and that it was subsequently determined that the SCN or ASCN was erroneously issued and is being rescinded for one of the above reasons, or other appropriate reason.  Letter L-34 provides a sample format for rescinding an SCN or ASCN.

c.   *Who Receives the Rescission Letter.*  COs send the letter rescinding an SCN or ASCN to the same people who received the original notice.

d.   *Signature Authority.*  The Regional Director signs the letter rescinding an SCN or ASCN.  This authority may not be delegated without express approval from the national office.

# 8E    PREDETERMINATION NOTICE

A PDN is the letter a CO must use to notify the contractor of the preliminary finding that the contractor engaged in individual or systemic discrimination.  The PDN states the basis for the preliminary findings and offers the contractor the opportunity to respond.  This section covers

---

[408]   See FCCM 7B.

when COs use a PDN, the contents of the notice, who receives the notice and who has signature authority for issuing the notice.

## 8E00   USE OF A PDN

COs must use a PDN in discrimination cases following compliance evaluations conducted under Executive Order 11246, Section 503 and/or VEVRAA.[409] The PDN must describe the indicators of discrimination and any other violations found, affording the contractor the opportunity to respond.  COs should not use a PDN in cases in which there are only recordkeeping or affirmative action deficiencies, such as a failure to meet the standards for AAP acceptability. [410] The CO must consult with RSOL, BES, and other appropriate agency personnel in the national office prior to issuing the PDN.

After a CO identifies preliminary indicators of discrimination, the CO must notify the contractor through a PDN before issuing an NOV.

## 8E01   CONTENTS OF A PDN

The PDN typically has three parts: a description of any indicators of discrimination, a list of any other unresolved violations, and an offer of an opportunity to respond to the PDN with additional information or evidence.  These three parts are described in more detail below.  Letter L-35, Predetermination Notice, is a sample form letter for a PDN.

a.  *Description of the Discrimination.*  In this, the first part of the PDN, a CO describes all discrimination findings.  This description will include identification of the discrimination victim(s), *e.g.,* the affected class or individual(s); the employment action(s) giving rise to the preliminary findings; and the basis for the liability determination (*e.g.,* disparate treatment in the selection of minority technicians).  The PDN should also include facts and the results of analyses that support the preliminary determination and recommended remedies.  Typically, the PDN includes the magnitude of the impact in terms of shortfalls or pay disparities and the measure of statistical certainty (*e.g.,* standard deviation).

b.  *Other Unresolved Issues.*  After describing the discrimination findings, a CO identifies and addresses other unresolved deficiencies, such as affirmative action deficiencies that did not result in an "acceptable AAP" finding.  A CO also identifies and addresses recordkeeping and technical violations, such as the contractor's failure to post required notices.

c.  *Offer the Contractor the Opportunity to Respond.*  The PDN offers the contractor an opportunity to respond in writing within 15 calendar days.

If, after the receipt of a PDN, the contractor does not respond by the indicated date or obtain an extension, the CO will issue an NOV incorporating the preliminary findings after consultation with RSOL, BES, and other appropriate agency personnel in the national office.[411]  The NOV

---

[409]  See Letter L-35 – Predetermination Notice.
[410]  See FCCM 8E – Predetermination Notice; Letter L-35– Predetermination Notice.
[411]  See FCCM 8F.

will indicate that the contractor did not respond and/or did not rebut the discrimination issue (or any other issues raised in the PDN).

## 8E02   WHO RECEIVES A PDN

COs address PDNs to the top official at the establishment under review or the top official of the construction company in the economic area being reviewed.  A copy is sent to the CEO of the corporation if the establishment or construction company is part of a larger corporation.  If the contractor has submitted a written request that the CO provide a copy of the review or investigation correspondence to an outside representative such as an outside counsel or consultant, the CO will also send a copy to the designated representative.  If the contractor requests that the CO provide the representative with the document, the CO should send a copy to the top official at the establishment and the CEO.  When the CO provides copies to a corporate CEO, another contractor official or a designated representative, the CO will include a "cc:" line on all copies indicating the people to whom the PDN was sent.

COs always send a PDN by certified mail, return receipt requested, and email or facsimile.

## 8E03   SIGNATURE AUTHORITY

The Regional Director, or designee, has signature authority for a PDN.

## 8E04   CONTRACTOR'S RESPONSE TO A PDN

If the contractor does respond to the PDN, the CO should review the presented information.  If there are issues requiring further investigation, the CO should request and analyze the additional information, as needed.  The CO may conduct further investigation on-site or through an off-site review of records.  The CO should determine whether the contractor's response satisfactorily rebuts some or all of the allegations of discrimination in the PDN.  For example, does the PDN response provide a legitimate, nondiscriminatory explanation (that is, an explanation that is not a pretext for discrimination) for alleged disparate treatment? The CO should also determine whether the contractor's response satisfactorily rebuts any other violation findings made in the PDN.  In evaluating the response, the CO should remember that unsupported contractor assertions, or assertions that the CO previously fully considered, are not sufficient to rebut findings of discrimination.

A contractor may respond to the PDN in one of three ways: with a full rebuttal of all the issues, with a partial rebuttal or with an inadequate rebuttal.

a.  *Contractor Adequately Rebuts.*  If the contractor's response adequately rebuts all of the preliminary findings in the PDN and there are no other remaining issues, the CO will acknowledge acceptance of the response and issue an appropriate closure document.[412]

b.  *Some Issues Rebutted.*  If the contractor's response adequately rebuts some, but not all, of the preliminary findings in the PDN, the CO should issue an NOV accepting the response in

---

[412]   See Letter L-5 – Notice of Closing: No Violation Found.

those areas where it was sufficient.  The CO should address the remaining findings of violations with recommended corrective actions.

c.  *All Issues Inadequately Rebutted.*  If the contractor's response does not rebut any of the preliminary findings in the PDN, the CO should acknowledge the response.  The acknowledgment should also explain that the contractor's response did not sufficiently rebut the preliminary findings and give an appropriate explanation.  The CO should incorporate the PDN's findings and recommended corrective actions into an NOV.

# 8F    NOTICE OF VIOLATION

An NOV is a letter to a contractor notifying it that, during a compliance evaluation, a CO found violations of one or more of the laws enforced by OFCCP; specifically, Executive Order 11246, Section 503 or VEVRAA.  The NOV also notifies the contractor that it must take corrective actions to resolve the violations.  The CO must include all violations requiring corrective action, including findings of discrimination and violations of affirmative action obligations or other requirements, along with the recommended corrective actions.  The NOV will indicate the reasons for each finding and, if appropriate, note the contractor's failure to adequately justify its actions.

## 8F00   WHEN TO USE AN NOV

The NOV letter identifies the violations and describes the recommended corrective actions.  COs issue an NOV whenever discrimination or other significant violations are found, unless an SCN or ASCN informing the contractor of the violations found and the corrective actions needed was previously issued.

a.  *NOV for Findings of Discrimination.*  An NOV is issued when OFCCP determines, based on its investigation, that sufficient evidence to find discrimination exists and a PDN has been issued.  The CO proceeds to an NOV where the contractor does not respond to the PDN or its response does not substantially alter a CO's preliminary determination of employment discrimination.  Before issuing an NOV in a systemic discrimination case, the CO must consult with RSOL.

b.  *NOV for Other Violations.*  An NOV is issued when a CO identifies other, nondiscrimination violations.  Examples of other violations include lack of appropriate outreach and recruitment efforts or a failure to comply with recordkeeping requirements.

## 8F01   CONTENTS OF AN NOV

NOVs, issued by COs, initiate the conciliation and resolution process.  The NOV should request that the contractor contact the appropriate field office within 5 business days of receipt of the NOV.  The NOV should identify the CO or other OFCCP representative who the contractor should contact and provide the contact information, including telephone numbers.  Letter L-36, Notice of Violation, is a sample form letter for an NOV.  NOVs issued by COs must:

1. *State the Violation(s)*.  State the violation(s) and, if a PDN was previously issued, indicate any modifications to the violation(s) resulting from the contractor's response.  Include specific facts and, where applicable, the results of analyses that support the violation(s).

2. *Analyze the Response.*  If a PDN was previously issued and the contractor responded to it, analyze the contractor's response, giving the reasons why it did not fully rebut OFCCP's preliminary determination.

3. *Describe the Corrective Action and Remedy.*  Describe the corrective action and any proposed remedy.  Include the scope of relief (*e.g.,* all minorities rejected for Technician positions since (date) will be made whole by providing), the type of relief (*e.g.,* job offers, back pay) and, when relevant, the time period involved (*e.g.,* back pay from date of application to date of settlement).

4. *Cease Discrimination.*  If discrimination was found, specifically require termination of the identified discriminatory practice(s) if the contractor has not already terminated the practice.

5. *Require CA.*  Indicate that a CA must incorporate the resolution of the violation(s) cited in the NOV.

## 8F02   WHO RECEIVES THE NOV

COs address an NOV to the top official at the establishment under review, or the top official of the construction company in the economic area being reviewed.  A copy is sent to the CEO of the corporation, if the establishment or construction company is part of a larger corporation.  If the contractor has requested in writing that the CO provide a copy of the review or investigation correspondence to an outside counsel or consultant, the CO will also send a copy to the designated representative.  When the CO provides copies to a corporate CEO, other contractor official, or a designated representative, the CO will include a "cc:" line on all copies indicating the people to whom the CO sent the NOV.

The CO always sends an NOV via email or facsimile, and certified mail, return receipt requested.

## 8F03   SIGNATURE AUTHORITY

The Regional Director, or designee, has signature authority for an NOV.

## 8F04   CONTRACTOR'S RESPONSE TO AN NOV

If the contractor responds to the NOV, the CO should review and evaluate the response.  See 8E04 for further guidance on evaluating the contractor's response.  If any unresolved violations remain, the CO will initiate conciliation.

# 8G    CONCILIATION

Conciliation is a negotiation between a CO and a contractor to resolve findings of noncompliance.  The CO will take a collaborative approach with contractors during the exchange

of information to promote a shared understanding of the issues and to promote resolution. The CO will work with the contractor to find innovative remedies, make good faith efforts to engage the contractor, and consistently apply transparency principles with all contractors. This section provides general information on conciliation while Section H provides COs specific information on CAs.

## 8G00  BACKGROUND

A compliance evaluation is complete when the CO issues a closure letter to the contractor. Of course, if the CO found violations, the contractor must correct the violations before a CO can issue a closure letter. COs use the conciliation process to resolve violations with the contractor.

## 8G01  GENERAL

After a CO issues an NOV, he or she will attempt to reach an acceptable resolution of the violation findings through voluntary conciliation efforts with the contractor. Conciliation discussions may involve various methods of communication, including the exchange of letters and emails, telephone conferences and in-person meetings. If these negotiations are successful, the CO will document the terms of the settlement in a formal CA. However, if, in the opinion of the CO, the contractor fails to agree to a reasonable settlement, fails to do so in a timely fashion or fails to negotiate in good faith, OFCCP may recommend the case for enforcement. In such circumstances, the CO must prepare a "recommendation to refer for enforcement" package and submit it to the regional office.

# 8H    CONCILIATION AGREEMENTS

The CO uses CAs to resolve material or substantive violations of any of the three laws OFCCP enforces. Figure F-6, Standard Text for CA, provides sample CA language.[413]  Figure F-7[414] provides sample language for notice documents that would be attached to a CA remedying compensation discrimination and Figure F-8[415] provides sample language for notice documents that would be attached to a CA for hiring or other discrimination based on a contractor's selection procedures.

## 8H00  WHEN TO USE A CA

The CO must use a CA whenever he or she properly issues an SCN or ASCN, or in the following circumstances:

1. If the CO finds in a compliance evaluation or complaint investigation that the contractor discriminated, either on an individual or systemic basis.

---

[413]  See Figure F-6, Standard Text for Conciliation Agreement.
[414]  See Figure F-7, Model Attachments for Compensation Conciliation Agreement.
[415]  See Figure F-8, Model Conciliation Agreement Attachments for Hiring and Other Issues.

2. If a supply and service contractor did not submit an AAP as required by one or more of the three laws OFCCP enforces.

3. If a supply and service contractor's Itemized Listing data, provided based on a desk audit request, or the AAP is not acceptable.

4. If any contractor failed to demonstrate good faith effort, including situations where a supply and service contractor deviates substantially from its Executive Order 11246 AAP,[416] or materially violates its Section 503 and/or VEVRAA obligations.[417]  It also includes situations where a federal construction contractor materially violates its Section 503 or VEVRAA obligations, or where a construction contractor fails to adequately document its implementation of its Executive Order 11246 affirmative action obligations and refuses to remedy those violations. [418]

## 8H01   CONTENTS OF A CA

All CAs use the format described in this section.  It consists of a section captioned "Heading" followed by nine parts:

- Part I contains the Preliminary Statement

- Part II contains the General Terms and Conditions

- Part III contains the Violations

- Part IV contains the Financial Remedy

- Part V contains the Additional Individual Relief

- Part VI contains the Modifications of Employment Practices and Other Nonmonetary Relief

- Part VII contains the Notice Process

- Part VIII contains the OFCCP Monitoring Period

- Part IX contains the Signatures

CAs may be modified under certain circumstances and with certain prior approvals.  OFCCP uses a standard template for CAs that is available to all COs on the agency's intranet.

---

[416]  See 41 CFR 60-2.2(c).
[417]  See 41 CFR 60-741.62 and 60-300.62.
[418]  See FCCM Chapter 3– Construction Industry Compliance Program.

## 8H02   TERMINATION DATE

CAs shall have termination dates based on the minimum time necessary for contractors to correct all violations and for OFCCP to verify such correction.

The period provided in a CA should be sufficient to ensure that the contractor can accomplish all of the corrective actions.  While full correction of all violations should be possible within one or two years under most CAs, some remedies may require more time.  For example, if the CA requires make-whole relief for discrimination and that relief includes extending job offers as openings occur, the CA termination date could be extended until the contractor has made all the job offers and has paid all the back pay or front pay, or both.

## 8H03   SIGNATURE AUTHORITY

The following people must sign and date a CA:

- The contractor's top establishment official, however, if the establishment is a corporate or intermediate headquarters, the contractor's top official's designee may sign; and any additional contractor officials that the contractor wishes;

- The union local's top official and any additional union officials the union wishes, if the union is a party to the CA;

- The CO who conducted or led the compliance evaluation or complaint investigation;

- The Assistant District Director, if applicable;

- The District Director; and

- The Regional Director, unless the authority is otherwise delegated.

a.  *Delegation of Regional Director's Authority.*  Regional Directors have the authority to sign all CAs.  However, a Regional Director may delegate signature authority to a District Director or other designee for CAs involving only affirmative action issues, individual discrimination issues, systemic discrimination claims in which the class does not exceed ten people and back pay does not exceed $25,000, or a combination of these issues.

b.  *Notice of Review Completion.*  After the required signatures are obtained on the CA, the CO will issue the contractor a "Notice of Review Completion – Major Violations Resolved in a Conciliation Agreement."  If the CO issued an SCN, the CO should use sample form Letter L-40.  If the CO did not issue an SCN, the CO should use Letter L-41.

# 8I     POST CA ACTIONS

This section reviews the actions required after all the parties properly execute a CA.  The CO and contractor have continuing obligations and duties, including maintaining all evidence of the

violations in the CA, and evaluating and reporting on progress. These and other responsibilities are discussed in the following subsections.

## 8I00    RETENTION OF EVIDENCE OF VIOLATIONS

COs must retain all evidence regarding violations resolved in a CA in the case file so that it can be readily retrieved and used if it is needed for enforcement proceedings. See FCCM 8H0l(g)(1), Contractor Retention of Data, for the contractor's obligation to retain records pertinent to violations and to reports submitted.

## 8I01    EVALUATION OF PROGRESS REPORTS

COs have different responsibilities if a required progress report is not received when compared to when a report is received from the contractor.

a.  *Progress Report Not Received by a CO.*  If a CO does not receive a required progress report when due, the CO will contact the contractor to determine if it is en route. If it is en route, the CO allows five calendar days for it to arrive. If the CO does not believe it is en route or if it does not arrive within five calendar days, the CO will issue a 15-Day Notice for violation of the CA.[419]

b.  *Progress Reports Received by a CO.*  When a CO receives a progress report, the CO must evaluate the contents of the report and determine whether the report is acceptable or whether the CO needs additional information. The CO normally evaluates a progress report within 15 calendar days of receiving it from the contractor. This evaluation must include an assessment of the report's completeness, as well as the analysis of the received items. If the CO needs additional information, the CO, in consultation with his or her supervisor, will determine how to best obtain the information (*e.g.,* by phone, mail, an on-site visit or review) and will so notify the contractor. The CO records the results of the evaluation and prepares a letter, using Letter L-39, notifying the contractor of the results.

c.  *Questions Raised by a Progress Report Evaluation.*  If the evaluation of a progress report raises questions about the contractor's implementation of the provisions of a CA, OFCCP may contact the contractor to obtain clarification of the report or schedule an on-site review, or both. If the on-site review is limited to the evaluation of the implementation of a CA issue, the CO will prepare a narrative report describing the results of the investigation and recommending whether the contractor is in violation of the CA. If the contractor is in violation of the CA, the CO may conduct a follow-up compliance evaluation, the scope of which depends on the nature of the violation. A full compliance review would only occur in rare circumstances. For any follow-up compliance evaluation, the CO will prepare a SCER (see Appendix A-1 and A-2, or A-6, as appropriate) with special emphasis on findings and recommendations on the CA implementation question. If the on-site review is proposed as the result of identifying possible new violations resulting from evaluating the implementation

---

[419]  See FCCM 8J and Letter L-37 and L-37a.

of the CA, the CO should contact his or her supervisor and consult with RSOL and the national office, the Division of Program Operations, before engaging in the evaluation.

d. *Contractor Maintenance of Records.*  In response to an inquiry or during an on-site review, the contractor must be prepared to furnish the underlying records or information on which the contractor based the report.  If a CO requests copies of this data, the contractor may provide the copies, allow the CO to use its equipment to make the copies, loan the documents to the CO for off-site copying or make other appropriate arrangements with the CO.  A failure to maintain or furnish this data is a violation of the CA.[420]

e. *Notification of Results.*  If, after obtaining and evaluating contractor evidence relevant to fulfillment of CA commitments, a CO concludes that the contractor did not violate the provisions of the CA, the CO will notify the contractor in writing.  This Notice can be included in the applicable standard close-out letter.  If, however, OFCCP concludes that the contractor violated the CA, see FCCM 8I02, Violation of a Conciliation Agreement.

f. *Retention of Progress Reports and Evaluations.*  The CO will retain progress reports and a copy of his or her corresponding analysis and evaluations in the case file.  Copies of correspondence sent to the contractor acknowledging the report must be filed in the case file.

## 8I02   VIOLATION OF A CA

The violation of a CA may occur during the term of the agreement or after the expiration of the agreement.

a. *Violation During the Term of a CA.*  If a CO determines that a contractor violated the provisions of a CA prior to the expiration of the CA, the procedures set out at 41 CFR 60-1.34, 41 CFR 60-300.63 and 41 CFR 60-741.63 require the CO to send the contractor a 15-Day Notice.[421]  The Regional Director, or designee, signs the 15-Day Notice.  Prior to issuing a 15-Day Notice, the CO must obtain appropriate approval.

b. *Repetition of Violation.*  If the CO finds that the contractor repeats the same violation after the CA has expired, the CO should discuss the available options with RSOL.

- If the CO finds during the course of a new compliance evaluation (opened after the expiration of the two-year grace period following the expiration of a CA) that the contractor repeated any of the violations addressed in a prior CA, the CO should discuss the option of pursuing an enforcement action rather than a second CA.

- If the CO and RSOL decide to remedy these violations, along with any new violation, through a second CA, the CA will have a minimum term of four years or longer if it is necessary to ensure full implementation of remedy or in unusual circumstances.  It will

---

[420] See FCCM 8J02 – Procedure Where Irreparable Injury Exists.
[421] See FCCM 8J; however, where irreparable injury is involved, see specific procedures in FCCM 8J02.

also have at least one compliance evaluation before the CA expires to ensure that the contractor is fulfilling or has fulfilled its terms.

## 8J    THE 15-DAY NOTICE

This section reviews the proper use of a 15-Day Notice, the different procedures used when irreparable injury and no such injury exist, who signs and who receives the Notice, and how contractors respond to the Notice.

### 8J00    WHEN TO USE A 15-DAY NOTICE

When a CO finds that the contractor violated the CA, the CO should issue a 15-Day Notice to the contractor unless such a delay would result in irreparable injury to the employment rights of affected employees or applicants.  In the case of irreparable harm, the response is as described in FCCM 8J02 below.

### 8J01    PROCEDURES WHERE NO IRREPARABLE INJURY EXISTS

The 15-Day Notice in this instance includes a cover letter and an enclosure citing the provisions of the CA the contractor violated and the bases for the findings.[422]  The Notice will give the contractor 15 calendar days from receipt of the Notice to demonstrate, through a written presentation of facts and evidence, that the contractor is in compliance with the provisions cited in the CA.[423]

### 8J02    PROCEDURE WHERE IRREPARABLE INJURY EXISTS

Irreparable injury may occur when a violation of a CA is either in progress or expected, and the employment rights of affected employees or applicants will be irreparably harmed if the violation is not prevented or corrected during the 15-day response time normally allowed. Examples of such cases are when:

- Employees are experiencing severe harassment or retaliation; or

- The contractor has a CA commitment to offer a victim of discrimination a unique job (one unlikely to open again in the foreseeable future), such an opening occurs and the contractor is about to fill it with someone other than the victim.

When irreparable injury would result from the delay, the CO will not issue a 15-Day Notice. Instead, after obtaining RSOL clearance, the Regional Director shall attempt to notify the top establishment official by telephone that OFCCP intends to proceed directly to enforcement.[424]

After oral notice of breach of the CA and irreparable injury, the CO must immediately send a confirmation letter, cleared by RSOL, that cites the provisions of the CA the contractor violated,

---

[422]  See Letter L-37 and L-37a.
[423]  41 CFR 60-1.34(a); 41 CFR 60-741.63; and 41 CFR 60-300.63.
[424]  See 41 CFR 60-1.34(a), 41 CFR 60-741.63(a)(1), and 41 CFR 60-300.63(a)(1).

the bases for the findings, the reason for the irreparable injury allegation and OFCCP's intent to proceed directly to enforcement.

### 8J03    WHO RECEIVES THE 15-DAY NOTICE

The CO addresses a 15-Day Notice and the letter of confirmation referenced in FCCM 8J02 to the top official at the establishment under review, or the top official at the construction company in the economic area being reviewed.  A copy is sent to the CEO of the corporation if the establishment or construction company is part of a larger corporation.  If the contractor requested in writing that the CO provide a copy of the review or investigation correspondence to an outside representative such as an outside counsel or consultant, the CO will also send a copy to the designated representative.  If the CO provides copies to a corporate CEO, other contractor official and/or a designated representative, the CO will include a "cc:" line on all copies indicating the people to whom the CO sent the Notice.

The CO always sends a 15-Day Notice via certified mail, return receipt requested.  Email and facsimile are also permissible options.

### 8J04    SIGNATURE AUTHORITY

The Regional Director has signature authority for a 15-Day Notice and may not further delegate this authority.  District Directors will send a proposed 15-Day Notice to the Regional Director, along with a copy of the CA that the contractor has violated and documentation pertaining to the CA provisions violated.  Unless the contractor demonstrates that the CO's findings are incorrect, the CO refers the matter to RSOL for enforcement as described in FCCM 8K on Enforcement.

### 8J05    CONTRACTOR'S RESPONSE TO THE 15-DAY NOTICE

The contractor has 15 calendar days from the date it receives the 15-Day Notice to respond.  If the contractor does not respond within the 15-day period, or reasonable extensions thereof, the CO refers the case for enforcement.

If the contractor does respond, OFCCP will evaluate whether the response shows that the CO erroneously issued the 15-Day Notice or otherwise explains the violations.  If so, the CO will either rescind the 15-Day Notice or otherwise resolve the matter with the contractor.  If not, the CO will formally refer the case to RSOL.  RSOL, with the CO's assistance, will attempt to negotiate a consent decree that includes all appropriate remedies.  If the contractor is unwilling to enter into a consent decree, RSOL will treat the case as a normal enforcement referral, as described in Section 8L on enforcement proceedings.

## 8K    ENFORCEMENT RECOMMENDATIONS

Making an enforcement recommendation means seeking approval to refer the case to RSOL for either administrative or judicial enforcement.  Before a case can move to enforcement, certain administrative and procedural actions must occur.  The Regional Office working in collaboration with RSOL will consider whether a contractor has acted consistently and in good faith with an Opinion Letter, Directive, FAQ, Help Desk answer, or other OFCCP guidance in determining

whether to proceed with an enforcement recommendation in a given matter. This chapter reviews those steps and procedures.

## 8K00  WHEN TO MAKE OR SEEK APPROVAL OF AN ENFORCMENT RECOMMENDATION

COs should make an enforcement recommendation when the contractor, with or without an SCN:

- Refuses to submit required AAPs and support data under one or more of the following: Executive Order 11246, Section 503 or VEVRAA;

- Refuses to provide access to its premises for an on-site review;

- Refuses to provide access to necessary information; or

- Harasses or intimidates a CO or agent of OFCCP (*e.g.,* an OFCCP or SOL employee acting on behalf of the agency).

An enforcement recommendation should also be made in other situations, including when:

- An SCN is not resolved within 30 calendar days, or reasonable extensions thereof;

- A settlement negotiation fails to resolve violations specified in the NORI within 15 calendar days, or reasonable extensions thereof, in a complaint investigation;

- A contractor is not negotiating in good faith, and it is unlikely a CA will be reached;

- A 15-Day Notice of violation of the CA with no irreparable injury involved is not resolved within 15 calendar days, or reasonable extensions thereof; or

- A violation of a CA involves irreparable injury.

## 8K01  CONTENTS OF A COMPLIANCE EVALUATION FILE

a.  *General.*  A compliance evaluation case file that OFCCP submits for enforcement consists of a brief cover memorandum, a Transmittal Memorandum and the standard compliance evaluation case file. The case file must contain every document OFCCP collected and/or generated in the course of the evaluation, including all emails; statistical analyses, including spreadsheets properly labeled and dated; nonstatistical/anecdotal evidence; mitigation data; interview statements and detailed descriptions of the employment processes or practices at issue. The case file must include a table of contents or index that identifies all of the contents and their location within the file, tabs and labels. The case file OFCCP submits to RSOL for enforcement should be an exact copy of the original case file and contain all of the

documents in the original case file.[425]  The file is sent to the RO for transmittal to the RSOL. If needed, the RO can create and maintain a copy of the file at this point.  The original file will remain in the field office responsible for conducting the compliance evaluation.

b.  *Cover Memorandum*.  The cover memorandum is typically one page.  It contains a brief statement of all the violations at issue, and indicates which violation(s) were at impasse when the conciliation process terminated (*e.g.,* jurisdiction, denial of access, whether there was a violation, the amount of back pay).

c.  *Transmittal Memorandum*.  Appendix A-13 describes the contents of the Transmittal Memorandum.  The Transmittal Memorandum must be a stand-alone document that contains all of the information supporting why RSOL and DPO should ultimately approve the enforcement recommendation.  It should include any strengths or weaknesses the CO uncovered during the course of the investigation or review, citations to relevant supporting documentation in the case file, contractor's response to the alleged violations, OFCCP's assessment of those responses and a history of the conciliation efforts, including any offers the CO and contractor exchanged.  It should not be a Memorandum that consists solely of conclusory statements or summary information, but instead be a report explaining why RSOL should pursue the case for enforcement.  Every fact in the Transmittal Memorandum must contain a reference to the location of the back-up information or documents in the case file that verify the fact.

## 8K02   CONTENTS IN A COMPLAINT INVESTIGATION

a.  *General.*  A complaint investigation case file that OFCCP submits for enforcement consists of a cover memorandum and the standard complaint investigation case file.  The case file must include a table of contents or index identifying all of the contents and their location within the file, tabs and labels.  RSOLs are provided an exact copy of the original case file.

b.  *Cover Memorandum.*  The cover memorandum is typically one page.  It must request enforcement, briefly state the law under which the victim filed the complaint, state the allegations and basis for the complaint, and state the violation(s) and the results of conciliation efforts.  This includes the issues at impasse when conciliation terminated.

c.  *Transmittal Memorandum.*  The Transmittal Memorandum for a complaint investigation is similar in content to the Transmittal Memorandum description above.

## 8K03   WHO RECEIVES THE ENFORCEMENT RECOMMENDATIONS

The regional office submits the enforcement recommendation and case file simultaneously to RSOL and DPO.  It must contain all of the documents in the original case file, including applications.  The CO sends a copy of the cover memorandum and the transmittal memorandum to DPO, as well as the completed SCER (compliance evaluations) or Investigative Report (complaint investigations).  Upon receipt, DPO is responsible for forwarding a copy of the

---

[425]   In addition, a copy of the enforcement memo and list of supporting documents and tabs will be sent to DPO when the file is referred to RSOL.

enforcement recommendation and supporting documents to the national Office of the Solicitor of Labor (NSOL); specifically, the Associate Solicitor, Civil Rights and Labor-Management Division, Office of the Solicitor, U.S. Department of Labor, Room N-2474, 200 Constitution Ave., N.W., Washington, D.C. 20210.

If DPO uncovers deficiencies during its preliminary review of an enforcement recommendation, it rejects the enforcement referral and returns it to the appropriate regional office for further action or to correct the deficiencies, or both. Examples of deficiencies that may result in rejection include lack of jurisdiction, no evidence of consultation with RSOL prior to referral and incorrect citation of a violation. DPO concurrently informs NSOL to notify the appropriate RSOL of this action. Furthermore, should RSOL or NSOL, or both, have any concerns regarding the merits of the enforcement referral, the appropriate SOL office will notify the regional office to discuss the issues associated with the referral. If SOL rejects an enforcement referral, it must explain in writing the reasons for the rejection.

## 8K04   SIGNATURE AUTHORITY

The applicable Regional Director has signature authority for an enforcement recommendation and cannot delegate this authority further. The originating district office will prepare the cover memorandum and transmittal memorandum, as appropriate, for the Regional Director's signature.

# 8L      PRE AND POST REFERRAL ISSUES RESULTING IN ENFORCEMENT PROCEEDINGS

This section reviews pre and post-referrals to the RSOL as ways of stopping an enforcement action.

## 8L00   PRE-REFERRAL TO RSOL

Efforts to reach a voluntary resolution of the noncompliance should continue up until the time the CO refers the matter to RSOL. Settlement negotiations, however, may not unduly delay an enforcement recommendation. For example, an enforcement recommendation is appropriate as soon as it becomes clear that the contractor is not negotiating in good faith.

## 8L01   POST-REFERRAL TO RSOL

Once a CO refers a matter to RSOL for enforcement, settlement negotiations between the contractor and the CO must end. The RSOL will conduct all further negotiations with input from the CO and other agency officials. When, as a result of negotiations between RSOL and the contractor, they reach an agreement, RSOL may incorporate the agreed-upon remedies in a consent decree and file the consent decree simultaneously with an administrative complaint if it was not already done. An Administrative Law Judge (ALJ) must approve the terms of the consent decree. The ALJ's Order approving the consent decree is the final administrative order in the case. The contractor will send progress reports that the consent decree requires to the

appropriate field office working with RSOL to evaluate the contractor's compliance with the consent decree.

## 8M    TYPES OF ENFORCEMENT PROCEEDINGS

Once a CO refers a case to RSOL for enforcement, RSOL determines whether the case is litigation-worthy and, in the process of doing so, may seek additional information on the case from the CO. The RSOL also makes a recommendation to the Director of OFCCP on whether an enforcement proceeding should be administrative or judicial.

### 8M00  ADMINISTRATIVE ENFORCEMENT PROCEEDINGS

RSOL normally initiates administrative enforcement proceedings unless circumstances warrant referral to the U.S. Department of Justice (DOJ) for judicial proceedings. The RSOL's filing of an Administrative Complaint with the Office of Administrative Law Judges (ALJ) initiates administrative enforcement proceedings. An ALJ conducts an administrative hearing on the Complaint under the procedures set forth in 41 CFR Part 60-30. Section 503 and VEVRAA use the same administrative hearing procedures as Executive Order 11246 pursuant to 41 CFR 60-741.65 and 41 and CFR 60-300.65, respectively.

### 8M01  JUDICIAL ENFORCEMENT PROCEEDINGS

The Solicitor for the U.S. Department of Labor may refer a case to the DOJ for judicial enforcement proceedings when circumstances so warrant and the Director of OFCCP concurs. For example, RSOL may need an injunction against a sole source contractor since cancellation of federal contracts may not be practical or the Director of OFCCP may request that the Solicitor for the U.S. Department of Labor make a referral to DOJ of a case for judicial enforcement.

The Solicitor for the U.S. Department of Labor may make referrals to the DOJ for judicial enforcement at any stage in the enforcement process without proceeding through conciliation efforts.[426] DOJ initiates judicial enforcement proceedings when the Attorney General files a complaint on behalf of the DOL in Federal District Court. As with any other federal court case, the losing party may appeal to the Circuit Court of Appeals, and the losing party in the court of appeals may request review by filing a "writ of certiorari" with the U.S. Supreme Court.

---

[426]  See 41 CFR 60-1.26(c)(1).

## KEY WORDS AND PHRASES

*Accommodation*

See "Reasonable Accommodation (Disability/Disabled Veteran)," "Reasonable Accommodation (Pregnancy)" and "Religious Accommodation."

*Active Duty Wartime or Campaign Badge Veteran*

A veteran who served on active duty in the U.S. military, ground, naval or air service during a war, or in a campaign or expedition for which a campaign badge has been authorized, under the laws administered by the U.S. Department of Defense.  See 41 CFR 60-300.2(b).

*Administering Agency*

Any department, agency or establishment in the executive branch of the government, including any wholly owned government corporation, which administers a program involving federally assisted construction contracts.  See 41 CFR 60-1.3.

*Administrative Complaint*

A document filed by the Office of the Solicitor on behalf of OFCCP with the Office of Administrative Law Judges that begins an administrative enforcement proceeding under Executive Order 11246, Section 503 and/or VEVRAA.

*Administrative Law Judge (ALJ)*

The presiding official at an administrative enforcement proceeding under Executive Order 11246, Section 503 and/or VEVRAA.  See 41 CFR Part 60-30, 41 CFR 60-1.26(b), 60-300.65(b) and 60-741.65(b).

*Administrative Procedure Act*

A law enacted by Congress in 1946 that establishes an administrative process that OFCCP and other federal government agencies must follow.  It includes standards for rulemaking, for certain formal adjudications and for court reviews of certain administrative actions.  See 5 U.S.C. 500 *et seq*.

*Adverse Impact*

An adverse impact occurs when a contractor's use of a facially neutral policy or selection procedure (*e.g.*, a test, an interview, a degree requirement, leave or hours policy) disqualifies members of a protected class at a substantially higher rate than others.

Though the terms "adverse impact" and "disparate impact" are sometimes used interchangeably, the Uniform Guidelines on Employee Selection Procedures (UGESP)

Federal Contract Compliance Manual (FCCM)

outlined at 41 CFR 60-3.16B use only the term "adverse impact" and define it as a substantially different rate of selection in hiring, promotion, transferring, training or other employment decision which works to the disadvantage of the members of a race, sex or ethnic group identified in 41 CFR 60-3.4.  See "Disparate Impact."

### Affected Class

A group of people sharing common traits or characteristics (*e.g.,* the same race, sex, or ethnicity) who are the victims of systemic discrimination by a particular contractor during a specific timeframe.

### Affirmative Action

Actions, policies, and procedures to which a contractor commits itself that are designed to achieve equal employment opportunity.  Affirmative action obligations entail thorough, systematic efforts to prevent discrimination from occurring and to detect it and eliminate it as promptly as possible.  Affirmative action obligations also require contractors to ensure equal opportunity in their recruitment and outreach efforts.

### Affirmative Action Program (AAP)

A management tool designed to ensure equal employment opportunity.  The requirements for affirmative action programs that satisfy Executive Order 11246, Section 503 and VEVRAA, are outlined in 41 CFR Part 60-2, 41 CFR Part 60-741, Subpart C, and 41 CFR Part 60-300, Subpart C, respectively.  These include requiring a contractor to annually detail the affirmative steps it has taken and will take in the future to ensure equal employment opportunity.

### American Indian/Alaskan Native (not Hispanic or Latino)

As defined by the Office of Management and Budget's (OMB's) *Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity,* a person with origins in any of the original peoples of North and South America (including Central America), and who maintains cultural identification through tribal affiliation or has community recognition as an American Indian or Alaskan Native.

### Americans with Disabilities Act, as amended (ADA)(Title I)

Title I of the ADA (42 U.S.C. 12101 *et seq.*) prohibits private employers with 15 or more employees, state and local governments, employment agencies, joint labor-management committees, and labor unions from discriminating against qualified individuals on the basis of disability in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions and privileges of employment.  Section 503 of the Rehabilitation Act and its implementing regulations apply the ADA's nondiscrimination standards to federal contractors.

***Amended Show Cause Notice (ASCN)***

A letter from OFCCP issued to a contractor to modify a Show Cause Notice (SCN) that OFCCP has previously issued to the contractor as part of the same investigation or compliance evaluation.  An ASCN is used when OFCCP later finds either additional unresolved violations during the investigation or compliance evaluation, or finds that some but not all violations were initially cited in the SCN in error.  The ASCN identifies all the unresolved or current violations.

***Anecdotal Evidence***

Nonstatistical evidence of discrimination that can help bring "the cold numbers convincingly to life," *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 (1977), by illustrating actions or behavior that support a statistical indicator or allegation of discrimination.  The type of facts and information that may constitute anecdotal evidence is varied and broad.  For example, it may include first-hand accounts of employees' personal experiences with discrimination.  It may also include inconsistent use of rejection reasons by the contractor to the detriment of applicants from particular groups, or evidence of rejected applicants' excellent qualifications, as compared to mediocre qualifications of hired applicants.  Anecdotal evidence is often contrasted to statistical evidence.  See also "Nonstatistical Evidence" and "Statistical Evidence."

***Applicant***

A person who has indicated an interest in being considered for hiring, promotion or other employment opportunity.  This interest may be expressed in different ways, such as by completing an application or through an oral statement, depending upon the contractor's practice.  An employee of a company may also be an "applicant" when he or she has indicated an interest in being considered for another job, promotion or employment opportunity within the company.  See Question and Answer 15 in the Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the UGESP, available online at https://www.eeoc.gov/policy/docs/qanda_clarify_procedures.html. See also "Internet Applicant."

***Applicant Flow Data (Log)***

A chronological compilation of applicants (including internet applicants) for employment or promotion showing each individual, categorized by race, sex and ethnic group, who applied for each job title (or group of jobs requiring similar qualifications) during a specific period.  See also "Internet Applicant."

***Apprenticeship (Contractor or Industry Specific)***

A system of agreement, written or implied, that uses practical experience to train a person in a recognized trade or craft following specified standards.

***Armed Forces Service Medal Veteran***

Any veteran who, while serving on active duty in the U.S. military, ground, naval or air service, participated in a U.S. military operation for which an Armed Forces Service Medal was awarded under Executive Order 12985 (61 FR 1209). 41 CFR 60-300.2(c).

***Asian (not Hispanic or Latino)***

As defined by OMB's *Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity* (1997), a person with origins in any of the original peoples of the Far East, Southeast Asia or the Indian subcontinent. This area includes, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam. Under the regulations at 41 CFR Part 60-2, the category is called "Asian/Pacific Islander." Under the regulations at 41 CFR 60-4.3(a)1.d(iii), the category is called "Asian and Pacific Islander."

***Availability***

As described in 41 CFR 60-2.14, an estimate of the number of qualified minorities or women available for employment in a given job group, expressed as a percentage of all qualified people available for employment in the given job group. The purpose of the availability determination is to establish a benchmark against which the demographic composition of the contractor's incumbent workforce can be compared to determine whether barriers to equal employment opportunity may exist within particular job groups.

***Back Pay***

The portion of a make-whole remedy that represents the lost earnings caused by a contractor's discriminatory employment action, practice or procedure. Lost earnings include, but are not limited to, compensation or salary, overtime, premium pay and shift differentials, incentive pay, raises, bonuses, lost sales commissions, cost-of-living increases, tips, medical and life insurance, fringe benefits, pensions, stock options and awards.

***Basic Qualifications (Internet Applicant)***

Basic qualifications is a key concept in the definition of an Internet Applicant. To be considered an Internet Applicant, an individual's expression of interest in a position must indicate that "the individual possesses the basic qualifications for the position." As used in the context of the Internet Applicant defined at 41 CFR 60-1.3.

1. "Basic qualifications" mean qualifications:

(a)     That the contractor advertises (*e.g.,* posts on its website in a description of the job and the qualifications involved) to potential applicants that they must possess to be considered for the position; or

(b)     For which the contractor established criteria in advance by making and maintaining a record of such qualifications for the position before considering any

expression of interest for that particular position if the contractor does not advertise for the position but, instead uses an alternative device to find individuals for consideration (*e.g.,* through an external resume database); and

2.  That meets all of the following three conditions:

(a)  The qualification must be noncomparative features of a job seeker. For example, three years of experience in a particular position is a noncomparative qualification; a qualification that an individual has one of the top five years of experience among a pool of job seekers is a comparative qualification.

(b)  The qualifications must be objective; they do not depend on the contractor's subjective judgment. A qualification is objective if a third party, with the contractor's technical knowledge, would be able to evaluate whether the job seeker possesses the qualification without more information about the contractor's judgment. For example, "a bachelor's degree in accounting" is objective while "a technical degree from a good school" is not.

(c)  The qualifications must be relevant to the performance of the particular position and enable the contractor to accomplish business-related goals.

### Black or African American (Not Hispanic or Latino)

As defined by OMB's *Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity* (1997), an individual, not of Hispanic origin, with origins in any of the black racial groups of Africa.

### Bona Fide Occupational Qualification (BFOQ)

A defense to the general prohibition of discrimination in employment on the basis of sex, religion or national origin that permits an employer to limit a particular job to members of one sex, religion or national origin group. Race cannot be used as a BFOQ.

The BFOQ defense is very narrow but has been successfully used in the sex discrimination context when privacy concerns are implicated. For example, a women's prison may be able to demonstrate that being female is a BFOQ for the hiring of a guard to perform body searches of female prisoners.

### Bona Fide Seniority, Merit or Incentive System

An employer may lawfully compensate employees differently on the basis of a bona fide seniority, merit or incentive system. A seniority system rewards employees according to the length of their employment. A merit system rewards employees for exceptional job performance. An incentive system provides compensation on the basis of the quality or quantity of production. To be a bona fide system, it must not have been adopted with discriminatory intent, it must be based on predetermined criteria, it must have been communicated to employees, and it must have been applied consistently and even-handedly to all similarly situated employees.

Federal Contract Compliance Manual (FCCM)

**Business Necessity**

A defense used by an employer in a disparate impact case, *i.e.*, when it uses an employment policy or practice, such as a selection criterion, that is facially neutral and consistently applied, but that excludes members of one group (*e.g.,* women or African-Americans) at a substantially higher rate than members of other groups. The employer must prove that a policy or practice that has an adverse impact is job-related and consistent with business necessity. Business necessity may also have to be proven when an employer uses a qualification standard that screens out an individual because of his or her disability. OFCCP uses Title VII, UGESP and ADA standards, as appropriate, when evaluating a contractor's assertion of a business necessity defense.

**Caregiver Discrimination**

Being a working parent or another type of caregiver is not a protected characteristic under Title VII, the ADA or the laws enforced by OFCCP. However, there are circumstances in which discrimination against caregivers may constitute unlawful disparate treatment or disparate impact based on a protected characteristic such as sex or race. Discrimination against a caregiver due to his or her association with an individual with a disability may be a violation of Section 503.

**Case Management System (CMS)**

An OFCCP system used to track and monitor compliance evaluations and complaint investigations of establishments and functional units. Field offices have specific responsibilities to add information into this automated system. Specific instructions are found in the online CMS Manual.

**Circumstantial Evidence**

Also referred to as inferential or indirect evidence. Comparative or other evidence that gives rise to an inference of discrimination. Circumstantial evidence typically involves an extra (inferential) step to conclude whether discrimination has occurred. It may include statistical evidence, suspicious or ambiguous timing, statements or behavior, or any other evidence that individually or collectively support an inference of discrimination. Compare "Direct Evidence of Discrimination."

**Class Complaint**

A complaint brought on behalf of multiple applicants or employees who have a common claim against a federal contractor.

**Coercion**

The practice of forcing or pressuring another party to behave in an involuntary manner (whether through action or inaction) by use of threats, intimidation, or other form of pressure or force.

### Cohort Analysis

A nonstatistical comparison of the treatment of similarly situated individuals, or small groups of applicants or employees.

### Collective Bargaining Agreement

Also referred to as "bargaining agreement" and sometimes known as a "labor-management agreement" or "union contract." These terms refer to an agreement between an employer and a union establishing wages, hours, and other terms and conditions of employment for employees in the bargaining unit represented by the union.

### Compensation

Any payments made to, or on behalf of, an employee or offered to an applicant as remuneration for employment, including, but not limited to, salary, wages, overtime pay, shift differentials, bonuses, commissions, vacation and holiday pay, allowances, insurance and other benefits, stock options and awards, profit sharing and retirement. See 41 CFR 60-1.3.

### Compensation Information

The amount and type of compensation provided to employees or offered to applicants, and information affecting the amount and type of compensation provided or offered, including, but not limited to:

- The desire of the contractor to attract and retain a particular employee for the value the employee is perceived to add to the contractor's profit or productivity;

- The availability of employees with like skills in the marketplace;

- Market research about the worth of similar jobs in the relevant marketplace;

- Job analysis, descriptions and evaluations;

- Salary and pay structures; salary surveys;

- Labor union agreements; and

- Contractor decisions, statements and policies related to setting or altering employee compensation.

### Complaint

An allegation in writing and submitted to OFCCP in writing by, or on behalf of, one or more employees (including former employees) or applicants that alleges the individual or individuals have been victims of discrimination or retaliation that is prohibited by the laws enforced by OFCCP, (*i.e.*, Executive Order 11246, Section 503 or VEVRAA), or

Federal Contract Compliance Manual (FCCM)

that the contractor is violating of one or more of these laws, or their implementing regulations.

### Compliance Check

A compliance evaluation procedure that involves a determination of whether the contractor has maintained appropriate records consistent with the regulations at 41 CFR 60-1.12, 60-300.80 and 60-741.80.

### Compliance Evaluation

The investigation and review process used by OFCCP to determine whether a federal contractor is complying with the nondiscrimination and affirmative action employment obligations outlined in 41 CFR Chapter 60.  A compliance evaluation consists of any one, or any combination of, the following investigative procedures: compliance review, off-site review of records, compliance check or focused review.  See 41 CFR 60-1.20(a), 60-300.60(a) and 60-741.60(a).

### Compliance Officer (CO)

An OFCCP employee whose primary duties typically include conducting compliance evaluations of federal contractors, investigating discrimination complaints filed against federal contractors, providing compliance assistance to federal contractors, and educating community groups and the public about the laws OFCCP enforces.  As used in this Manual, all references to the term CO include any OFCCP employee that is responsible for the tasks or activities described.

### Compliance Review

A compliance review is a comprehensive analysis and evaluation of the hiring and employment practices of the contractor, any written affirmative action programs the contractor is required to maintain, and the results of the contractor's affirmative action efforts.

### Conciliation

Efforts between OFCCP and a contractor to resolve findings of noncompliance or discrimination, usually through a conciliation agreement.  See "Conciliation Agreement."

### Conciliation Agreement (CA)

A binding written agreement between a contractor and OFCCP that details specific contractor commitments, actions or both to resolve the violations outlined in the agreement.

***Construction Contract***

Any federal or federally assisted contract for the construction, rehabilitation, alteration, conversion, extension, demolition or repair of buildings or highways, or other changes or improvements to real property, including facilities providing utility services.

***Construction Site***

The general physical location of any building, highway or other change or improvement to real property which is undergoing construction, rehabilitation, alteration, conversion, extension, demolition or repair; and any temporary location or facility at which a contractor, subcontractor, or other participating party meets a demand or performs a function relating to the contract or subcontract. 41 CFR 60-1.3 (defining "Site of construction").

***Construction Work***

The construction, rehabilitation, alteration, conversion, extension, demolition or repair of buildings or highways; or other changes or improvements to real property, including facilities providing utility services. The term also includes the supervision, inspection and other on-site functions incidental to the actual construction. 41 CFR 60-1.3.

***Constructive Discharge***

The involuntary resignation of an employee as a result of a contractor's making the employee's working conditions so intolerable that a reasonable person would have felt compelled to resign. OFCCP will find that an employee was constructively discharged in violation of Executive Order 11246, Section 503 or VEVRAA when it finds that: 1) a reasonable person in the employee's position would have found the working conditions so intolerable as to compel resignation; 2) the contractor's conduct created the intolerable conditions and was motivated by retaliation; or based on race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran; or because the individual disclosed, discussed or inquired about compensation; and 3) the employee's involuntary resignation resulted from the intolerable working conditions.

***Continuing Violation***

A continuing violation may be found to exist when it is determined that multiple related actions constitute a single act of discrimination, *e.g.,* a hostile work environment, pay discrimination, or a discriminatory policy or system. A continuing violation exists where: 1) at least one of the actions occurred within the liability period and the other actions are related or so similar in nature as to show a pattern or practice of employment discrimination, or 2) the contractor maintains a discriminatory policy or practice into the liability period. Continuing violations may be, but do not have to be, systemic.

*Contract*

> See "Government Contract," "Subcontract," "Construction Contract," and "Federally Assisted Construction Contract."

*Contract Cancellation*

> The termination of a federal contract before its expiration date by order of the appropriate government authorities. Contract cancellation is one of the sanctions authorized, in appropriate cases, for violation of Executive Order 11246, Section 503 or VEVRAA. Compare with "Debarment" and "Contract Suspension."

*Contract Suspension*

> The temporary interruption of a federal contract by order of the appropriate government authorities. Contract suspension is one of the sanctions authorized, in appropriate cases, for violation of Executive Order 11246, Section 503 or VEVRAA. Compare with "Contract Cancellation" and "Debarment."

*Contracting Agency*

> Any department, agency, establishment or instrumentality of the U.S. (under Executive Order 11246, limited to the Executive branch), including any wholly-owned government corporation, that enters into a government contract subject to the laws enforced by OFCCP. 41 CFR 60-1.3, 60-300.2, and 60-741.2.

*Contractor*

> Unless otherwise indicated, a "prime contractor" or "subcontractor." "Prime contractor" means any person holding a contract, or who has held a contract subject to Executive Order 11246, Section 503 or VEVRAA. "Subcontractor" means any person holding a subcontract, or who has held a subcontract subject to Executive Order 11246, Section 503 or VEVRAA. The term "first-tier subcontractor" refers to a subcontractor holding a subcontract with a prime contractor. 41 CFR 60-1.3. See "Government Contract," "Subcontract," "Construction Contract," and "Federally Assisted Construction Contract."

*Corrective Remedy*

> Corrective remedies, also called "injunctive relief," stop the violation and protect against its recurrence. Corrective remedies vary based on the facts of each case and may include, for example, stopping the use of a discriminatory policy or practice, substituting a nondiscriminatory policy or practice, and establishing a monitoring system to ensure the nondiscriminatory policy or practice is properly implemented. Corrective remedies will, typically, be part of any complete remedy.

Federal Contract Compliance Manual (FCCM)

***Covered Area***

The geographical area, the Standard Metropolitan Statistical Area (SMSA) or non-SMSA where a federal or federally assisted construction project is being performed.  See 45 FR 65976, 65984 and Appendix B-80, October 3, 1980.

***Criteria Identification (also referred to as Criteria Verification)***

The process of obtaining the contractor's stated criteria for a selection decision(s) (usually through interviewing selection officials and examining any relevant contractor documents) and then determining whether the stated criteria account for or sufficiently explain the actual selection decisions.

***Davis-Bacon Act***

The Davis-Bacon Act is enforced by the Wage and Hour Division of the U.S. Department of Labor.  As amended, the Act requires that each contract over $2,000 to which the U.S. or the District of Columbia is a party for the construction, alteration or repair of public buildings or public works shall contain a clause setting forth the minimum wages to be paid to various classes of laborers and mechanics employed under the contract.  Under the provisions of the Act, contractors and their subcontractors are to pay workers employed directly upon the site of the work no less than the locally prevailing wages and fringe benefits paid on projects of a similar character.  The Davis-Bacon Act directs the Secretary of Labor to determine such local prevailing wage rates.

***Debarment***

A declaration that a contractor is ineligible for the award of future contracts.  Debarment is one of the sanctions authorized, in appropriate cases, for violation of Executive Order 11246, Section 503 or VEVRAA.  Compare with "Contract Cancellation" and "Contract Suspension."

***Deficiency***

Any failure to fulfill a requirement of the Executive Order 11246, Section 503 or VEVRAA, including any failure to comply with the implementing rules, regulations and orders of OFCCP.  See "Violation."

***Direct Evidence of Discrimination***

Proof of a discriminatory reason for an employment decision that does not use inference or presumption.  Direct evidence of discrimination is not required for OFCCP to find that discrimination occurred.

Federal Contract Compliance Manual (FCCM)

### Director

The Director of the Office of Federal Contract Compliance Programs (OFCCP). The head of OFCCP was formerly referred to as the Deputy Assistant Secretary for Federal Contract Compliance; this previous designation still appears in some OFCCP regulations.

### Disability

With respect to an individual:

1. A physical or mental impairment that substantially limits one or more of an individual's major life activities,

2. A record of such an impairment; or

3) Being regarded as having such an impairment.

See 41 CFR 60-741.2(g) and related definitions.

### Disability-Related Question or Inquiry

It is a violation of Section 503 for a contractor to ask disability-related questions of an applicant at the pre-offer stage of the employment process, and such questions may only be asked of employees if they are job-related and consistent with business necessity. See 41 CFR 60-741.23. A disability-related question or inquiry is one that is likely to elicit information about the existence, nature or extent of a disability. This includes directly asking whether an applicant has a disability, as well as asking questions that are closely related to disability, *e.g.,* "Do you have a disability?" "Are you able to stand and walk?" and "Will you need a reasonable accommodation to perform this job?" However, an application may ask applicants, pre-offer, to inform the contractor if an accommodation is needed for the *application process*. As part of the contractor's affirmative action obligations, the contractor shall also invite applicants, pre- and post-offer, and employees to inform the contractor whether they believe that they are individuals with disabilities as defined in 41 CFR 60-741.2(g)(1)(i) or (ii).

### Disabled Veteran

"Disabled Veteran" means:

1) A veteran of the U.S. military, ground, naval or air service who is entitled to compensation (or who, but for the receipt of military retired pay, would be entitled to compensation) under laws administered by the Secretary of Veterans Affairs; or

2) A person who was discharged or released from active duty because of a service-connected disability.

See 41 CFR 60-300.2(i).

Federal Contract Compliance Manual (FCCM)

### Disadvantaged Business Enterprise

As defined by the Small Business Administration, disadvantaged business enterprises are for-profit small businesses where socially and economically disadvantaged individuals own at least 51% interest and control management and daily business operations.  African Americans, Hispanics, Native Americans, Asian-Pacific and Subcontinent Asian Americans, and women are presumed to be socially and economically disadvantaged.  Other individuals can also qualify as socially and economically disadvantaged on a case-by-case basis.

### Discrimination

See the definitions of "Disparate Impact," "Disparate Treatment," "Harassment" and "Retaliation."  Discrimination may also include failure to provide "Religious Accommodation" or "Reasonable Accommodation."

### Disparate Impact

A theory of employment discrimination that focuses on the effect of a practice or policy.  Disparate impact discrimination occurs when a contractor's use of a facially neutral policy or practice (*e.g.,* a test, an interview, a degree requirement, a leave or hours policy) disqualifies members of a protected class at a substantially higher rate than others and is not justified by business necessity and job-relatedness (or it is justified by business necessity but there are less-discriminatory alternatives available that would meet the contractor's need).  It is not necessary to prove intent to discriminate under this theory of employment discrimination.  The disparate impact theory may be used to analyze both objective and subjective selection standards.  Compare "Disparate Treatment."  See also "Adverse Impact."

### Disparate Treatment

Disparate treatment discrimination occurs when a contractor treats an individual or group less favorably on the basis of a prohibited factor (race, color, religion, sex, sexual orientation, gender identity, national origin, disability,  status as a protected veteran, or because the individual or group of individuals has disclosed, discussed or inquired about compensation).  It is necessary to prove intent to discriminate under this theory of employment discrimination, which is sometimes referred to as "intentional discrimination."  Disparate treatment may be proven using direct evidence, circumstantial evidence or a combination of both.

### Economic Area

Geographical areas, defined along county lines by the Bureau of Economic Analysis of the U.S. Department of Commerce, that are centers of commerce and generally cover areas that include the places of work and residence for most workers.  EA is an umbrella term for the Standard Metropolitan Statistical Areas (SMSA) and non-SMSAs.  See "Covered Area."

**EEO Policy**

> A written statement made by the contractor to commit to the principles of equal opportunity employment.

**EEO-1 Report**

> The *Employer Information Report EEO-1*.  An annual report filed with the Joint Reporting Committee (composed of OFCCP and the Equal Employment Opportunity Commission) by certain employers, including federal contractors with 50 or more employees and a prime contractor first-tier subcontract of $50,000 or more, subject to Executive Order 11246.  This report details specific information, such as the sex, race and ethnic composition of an employer's workforce by job category.  This form is also known as Standard Form 100.

**EEO-3 Report**

> The *Local Union Report EEO-3*.  A biennial survey conducted in the even-numbered years that collects labor force data from Referral Unions subject to Title VII of the Civil Rights Act of 1964, as amended, with 100 or more employees within 50 U.S. states and District of Columbia.  The report collects information on employment totals and employees' job category, and sex and race/ethnic groups as of December 31 of the preceding year of the survey year.

**EEO-4 Report**

> The *State and Local Government Report EEO-4*.  A biennial report filed in the odd-numbered years that collects information from State and local governments.  All States and all other political jurisdictions with 100 or more employees must file this report.

**EEO-5 Report**

> The *Elementary-Secondary Staff Information Report EEO-5*.  A biennial report conducted in the even-numbered years that collects information from all public elementary and secondary school districts with 100 or more employees in the U.S.  The EEO-5 Report is a joint requirement of the EEOC and the Office for Civil Rights of the U.S. Department of Education.

**Employee (using the "common-law agency test")**

> OFCCP generally uses the "common-law agency test" for determining who is an employee under the laws OFCCP enforces.  The "common-law agency test" examines the individual worker's relationship to the contractor by assessing the following factors derived from a 1992 U.S. Supreme Court decision, *Nationwide Mutual Insurance Co. v. Darden*:
>
> - The contractor's right to control when, where and how the individual performs the job;

Federal Contract Compliance Manual (FCCM)

- The skill required for the job; the source of the instrumentalities and tools;
- The location of work;
- The duration of the relationship between the parties;
- Whether the contractor has the right to assign additional projects to the individual;
- The extent of the individual's discretion over when and how long to work;
- The method of payment; the contractor's role in hiring and paying assistants;
- Whether the individual's work is part of the regular business of the contractor;
- Whether the individual is in business; and
- The provision of employee benefits to the individual.

While no one factor will necessarily be decisive, the factors that indicate the extent to which the contractor controls the manner and means of the individual's performance of his or her work will typically be most important in the *Darden* analysis. The Equal Employment Opportunity Commission also relies on this test to determine whether individuals are employees for Title VII and ADA purposes.

### Employment Agency

Any person or entity that, with or without compensation, regularly works to procure employees for a contractor or to procure for individuals opportunities to work for a contractor. It also includes an agent of such a person or entity.

### Employment Offer

A contractor's offer of employment to an individual, usually for a specific job.

### Employer Identification Number (EIN)

A nine-digit number assigned to a company by the Internal Revenue Service for tax and other identification purposes.

### Employment Service Delivery System (ESDS)

The Wagner-Peyser Act of 1933 established a nationwide system of public employment offices known as the "Employment Service." As amended in 1998, the Act makes the Employment Service part of the One-Stop delivery system. The One-Stop delivery system, also known as American Job Centers, provides universal access to an integrated array of labor exchange services so that workers, job seekers and businesses can find the services they need in one stop and frequently under one roof in easy-to-find locations. The U.S. Department of Labor's Employment and Training Administration oversees Wagner-Peyser.

### Enforcement

This term typically refers to an administrative or judicial action to compel compliance with Executive Order 11246, Section 503 or VEVRAA and their implementing regulations, or to compel performance of a conciliation agreement or consent decree.

***Equal Employment Opportunity Commission (EEOC)***

A federal agency responsible for enforcing federal laws that make it illegal to discriminate in employment against a job applicant or an employee because of the person's race, color, religion, sex, national origin, age (40 or older), disability, genetic information or participation in protected activity (*e.g.,* filing a complaint of discrimination).

***Equal Opportunity Clause***

The contract clauses published at 41 CFR 60-1.4(a) and (b), 41 CFR 60-300.5(a), and 41 CFR 60-741.5(a) that are required to be included in every covered federal contract and subcontract. The equal opportunity clauses outline contractors' responsibilities under Executive Order 11246, Section 503 and VEVRAA. The applicable equal opportunity clauses are considered to be a part of every covered contract and subcontract whether or not they are incorporated or referenced in the contract, and whether or not there is a written contract between the federal agency and the contractor. See 41 CFR 60-1.4(e), 41 CFR 60-300.5(e), 41 CFR 741.5(e).

***Essential Functions (Section 503 or VEVRAA)***

For purposes of Section 503 and VEVRAA "essential functions" are fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position. A job function may be considered essential for any of several reasons, including, but not limited to, the following:

- The function may be essential because the reason the position exists is to perform that function;

- The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

- The function may be highly specialized so that the incumbent in the position is hired for his or her expertise, or ability to perform the particular function.

Evidence of whether a particular function is essential includes, but is not limited to:

- The contractor's judgment as to which functions are essential;

- Written job descriptions prepared before advertising or interviewing applicants for the job;

- The amount of time spent on the job performing the function;

- The consequences of not requiring the incumbent to perform the function;

Federal Contract Compliance Manual (FCCM)

- The terms of a collective bargaining agreement;

- The work experience of past incumbents in the job; and/or

- The current work experience of incumbents in similar jobs.

See 41 CFR 60-741.2(i) (Section 503) and 41 CFR 60-300.2(l) (VEVRAA).

### Essential Job Functions (pay secrecy)

Essential job functions mean the fundamental job duties of the employment position an individual holds for purposes of evaluating a contractor's "essential job functions defense" to an allegation that it discriminated against an employee because the employee discussed, disclosed or inquired about compensation (see 41 CFR 60-1.35(b)), "essential job functions" means the fundamental job duties of the employment position an individual holds.

A job function may be considered essential if:

(i)  The access to compensation information is necessary to perform that function or another routinely assigned business task; or

(ii) The function or duties of the position include protecting and maintaining the privacy of employee personnel records, including compensation information.

This definition of "essential job functions" may not be used in other contexts under any of the laws enforced by OFCCP.  See 41 CFR 60-1.3.

### Establishment

A facility or unit that produces goods or services, such as a factory, office, store or mine. In most instances, the unit is a physically separate facility at a single location.  In appropriate circumstances, OFCCP may consider as an establishment several facilities located at the same site or two or more sites when the facilities are in the same labor market or recruiting area.  The determination as to whether it is appropriate to group facilities as a single establishment will be made by OFCCP on a case-by-case basis.

### Executive Order 11246

One of the three legal authorities enforced and administered by OFCCP.  Executive Order 11246 applies to federal contractors with contracts or subcontracts of more than $10,000. It prohibits these contractors from discriminating in employment based on race, color, religion, sex, sexual orientation, gender identity, or national origin; or because an applicant or employee has disclosed, discussed or inquired about compensation.  The Executive Order also and requires that these contractors take affirmative action to ensure equal employment opportunity.

### Executive Order 13496

Executive Order 13496 (74 FR 6107) (February. 9, 2009) requires covered contractors and subcontractors to post a notice informing employees of their rights under the National Labor Relations Act (NLRA). The notice to employees informs employees about:

- Their rights under the NLRA to form, join and assist a union and to bargain collectively with their employer;

- Provides examples of unlawful employer and union conduct that interferes with those rights; and

- It indicates how employees can contact the National Labor Relations Board, the federal agency that enforces those rights, with questions or to file complaints.

OFCCP assists the U.S. Department of Labor's Office of Labor-Management Standards in enforcing Executive Order 13496.

### Exempt Contract

Any government contract or subcontract that is not subject to some or all obligations under one or more of the laws enforced by OFCCP. Most contracts meeting specified dollar thresholds are covered, but there are a few exemptions and waiver provisions. See 41 CFR 60-1.3, 60-1.5 (coverage and exemptions under Executive Order 11246); 41 CFR 60-300.4 (coverage and waivers under VEVRAA); 41 CFR 60-741.4 (coverage and waivers under Section 503).

### Exempt Jobs

Jobs that are exempt from the minimum wage and overtime requirements of the Fair Labor Standards Act. The exemptions cover executive, administrative, professional, computer and outside sales employees. To qualify for an exemption, employees generally must meet certain tests regarding their job duties and be paid a prescribed minimum salary.

### Facially Neutral

An employment practice or policy is facially neutral if it does not reference a protected characteristic such as sex or race. Even if a contractor's policy or practice (*e.g.,* excluding applicants from employment based on certain criminal conduct or lack of a high school degree) is facially neutral, if it disproportionately impacts individuals on a prohibited basis, it violates the law unless it is shown to be job-related and consistent with business necessity (disparate impact discrimination).

### Family and Medical Leave Act (FMLA)

The FMLA provides eligible employees with up to 12 workweeks of unpaid, job-protected leave a year, and requires continuation of group health insurance coverage

under the same terms and conditions as if the employee had not taken leave.  The FMLA is enforced by the U.S. Department of Labor's Wage and Hour Division.

### Favored Group

The group with the highest selection rate when calculating the impact ratio or level of statistical disparity or both.  When calculating the impact ratio of unfavorable actions such as layoffs or terminations, the favored group is the group with the lowest selection rate.

### Federal Contractor Selection System (FCSS)

OFCCP's FCSS is a neutral selection system that identifies federal contractor establishments that may be selected for compliance evaluations.  The FCSS process uses multiple information sources such as federal acquisition and procurement databases, EEO-1 employer information reports, Dun & Bradstreet data, Census data and statistical thresholds such as industry type and employee counts of federal contractor establishments.

### Federally Assisted Construction Contract

Any agreement - or modification thereof  - for construction work which is paid for at least in part with funds obtained from the federal government or borrowed on the credit of the federal government under any federal program involving a grant, contract, loan, insurance or guarantee; or undertaken under any federal program involving such grant, contract, loan, insurance or guarantee; or any application or modification thereof approved by the federal government for a grant, contract, loan, insurance or guarantee under which the applicant for funds itself participates in the construction work.  See 41 CFR 60-1.3.  For example, highways and bridges that are constructed, repaired or renovated using funds from the U.S. Department of Transportation are federally assisted construction contracts.

### Field Office

Any OFCCP office outside of the national office and its divisions that is responsible for the tasks or activities described in the Federal Contractor Compliance Manual (FCCM or Manual).

### Fifteen-Day Notice

See "Notice of Violation of a Conciliation Agreement."

### First-Tier Subcontractor

A subcontractor holding a subcontract with a prime contractor.

Federal Contract Compliance Manual (FCCM)

**Focused Review**

> An on-site review restricted to one or more components of the contractor's organization, or one or more aspects of the contractor's employment practices.  See 41 CFR 60-1.20(a)(4),  60-300.60(a)(4), and 60-741.60(a)(4).

**Formal Training**

> A structured program designed to develop an individual's job-related skills and abilities.  Typically, classroom training, as well as on-the-job training, falls into this category.

**Formula Relief**

> A method used in systemic discrimination cases for calculating a total amount of back pay for an affected class of discrimination victims that is then divided (pro rata or otherwise) among all members of that class.  *Compare with* "Individual Relief."

**Fringe Benefits**

> Benefits that an employer provides to employees in addition to paying their wages or salary.  Examples include, but are not limited to:

- Profit-sharing and bonus plans;

- Leave (*e.g.,* annual vacation days, personal days, sick leave);

- Stock options or awards;

- Medical, hospital, accident and life insurance;

- Long-term and short-term disability benefits;

- Severance benefits;

- Pension or other retirement benefits and early retirement incentives; and

- Other terms, conditions and privileges of employment.

**Front Pay**

> Compensation for estimated future economic loss; generally, calculated based on the difference between the discrimination victim's current pay and the pay associated with his or her rightful place had discrimination not occurred.  Front pay runs from the time of the settlement (*e.g.,* the date of the conciliation agreement), or final administrative or court order), to a certain time in the future (usually when the victim attains his or her rightful place) that is set by the settlement or final order.

### Functional Affirmative Action Program (FAAP)

An AAP based on a clearly distinct functional or business unit within a corporate structure as opposed to an AAP based solely on an establishment's physical location.  A contractor wishing to develop a FAAP must first reach an agreement with OFCCP allowing it to do so.  See *Functional Affirmative Action Programs (FAAP),* Dir 2013-01, Revision 2(06/20/2019).

### Gender-Based Discrimination

See "Sex Discrimination."

### Gender Identity

One's internal sense of one's own gender.  It may or may not correspond to the sex assigned to a person at birth and may or may not be made visible to others.

### Geographical Area

The Standard Metropolitan Statistical Area (SMSA) or non-SMSA, as designated in the Federal Register by the Secretary of Labor, where a federal or federally assisted construction project is being performed.  See 45 FR 65976, 65984 and Appendix B-80, October 3, 1980.

### Goals for Minorities and Women, Supply and Service Contractors (Placement Goals)

Placement goals that contractors must establish under Executive Order 11246 for those job groups where minorities or women, or both, are underutilized.  The placement goal established must be at least equal to the availability percentage of the underutilized minorities and women for the specific job group.  41 CFR 60-2.16(c); see also 41 CFR 60-2.14, 60-2.15.

### Goals for Minorities and Women, Construction Contractors (Participation Goals)

Participation goals for minorities and women under Executive Order 11246, expressed as percentages of the hours worked by the contractor's aggregate workforce, by trade, in the geographic area(s) where a federal or federally assisted construction project is located.  See 41 CFR 60-4.6.

### Goal for Qualified Individuals with Disabilities (Utilization Goal)

The regulations implementing Section 503 establish a utilization goal of 7% for the employment of qualified individuals with disabilities for each job group in the contractor's workforce.  Supply and service contractors use the same job groups that they use for the establishment of placement goals for minorities and women, and covered construction contractors apply the goal to the same trades they use when applying their participation goals under Executive Order 11246.  Contractors with 100 or fewer

Federal Contract Compliance Manual (FCCM)

employees have the option of using their entire workforce instead of job groups or trades. See 41 CFR 60-741.45.

### Good Faith Efforts

A contractor's appropriate efforts to meet its Executive Order 11246 goals by removing identified barriers, expanding employment opportunities and producing measurable results. See 41 CFR 60-2.16(a), 60-2.17(c) and 60-4.2(d)(2).

### Government Contract (or Federal Contract)

A government contractor is an agreement or modification thereof between any contracting agency and any person for the purchase, sale or use of personal property or nonpersonal services between a contracting agency and a person. Personal property includes supplies and contracts for the use of real property (*e.g.,* as lease arrangements), unless the contract for the use of real property itself constitutes real property (*e.g.*, easements). Nonpersonal services include, but are not limited to: utility, construction, transportation, research, and fund depository.

Government contracts do not include:

1) Agreements in which the parties stand in the relationship of employer and employee; and

2) Federally assisted construction contracts.

### Harassment

Harassment is unwelcome conduct that is based on a protected characteristic (race, color, religion, sex, sexual orientation, gender identity, national origin, disability, status as a protected veteran, or because an individual disclosed, discussed or inquired about compensation). Harassment becomes illegal if it is so frequent or severe that it creates a hostile or offensive work environment or if it results in an adverse employment decision (such as the victim being fired or demoted). Examples of harassment include slurs, graffiti, offensive or derogatory comments, or other verbal or physical conduct. Sexual harassment may include unwelcome sexual advances, requests for sexual favors and other conduct of a sexual nature. OFCCP's regulations prohibit harassment, intimidation, threats or discrimination because the person filed a complaint, participated in an investigation or compliance evaluation, opposed discrimination or exercised a right protected by OFCCP's regulations.

### Hispanic or Latino

As defined by OMB's *Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity* (1997), a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.

### Impact Ratio Analysis (IRA)

A method for identifying personnel activity that should be investigated further.  The IRA is a comparison of the selection rates of different racial, ethnic and sex groups within an identified applicant or candidate pool.  If the selection rate for one group is less than 80% of that of the group with the highest rate, then the IRA is considered adverse and further investigation or analysis is needed.

### Individual Relief

The assessment of make-whole relief for identified victim(s) of discrimination on an individualized basis.  This method is generally used to calculate back pay and other make-whole relief, such as reinstatement and rightful seniority, in the individual or small group discrimination cases where the victims of discrimination, and the losses they incurred, can be determined with specificity.  Compare with "Formula Relief."

### Individual with a Disability

A person with a disability.  See "Disability."

### Injunctive Relief

See "Corrective Remedy."

### Internet Applicant

Any individual as to whom the following four criteria are satisfied:

- The individual submits an expression of interest in employment through the internet or related electronic data technologies;

- The contractor considers the individual for employment in a particular position;

- The individual's expression of interest indicates the individual possesses the basic qualifications for the position; and,

- The individual does not remove him or herself from further consideration or otherwise indicates that he or she is no longer interested in the position.

### Invitation to Self-Identify

An invitation by the contractor, extended to employees and applicants for employment, to voluntarily identify their race, sex, ethnicity, disability, and/or protected veteran status.  All information obtained in response to invitations to self-identify as an individual with a disability or protected veteran must be kept in a confidential data analysis file under 41 CFR 60-300.42 and 60-741.42.

Federal Contract Compliance Manual (FCCM)

**Job Area**

Any sub-unit of a workforce sector (*e.g.,* department, job group, job title, line of progression).

**Job Area Acceptance Range (JAAR)**

An analytical tool used to analyze the distribution of employees in a workforce by comparing the actual percentage of minorities and women in a job area to their percentage in the relevant segment of the contractor's workforce.

**Job Categories**

The 10 designated categories of the EEO-1 report:

- Officials and managers (divided into executive/senior level and mid/first level),
- Professionals,
- Technicians,
- Sales workers,
- Office and clerical,
- Craft workers (skilled),
- Operatives (semi-skilled),
- Laborers (unskilled), and
- Service workers.

**Job Description**

A written statement detailing the duties of a particular job title.

**Job Group**

One or more group(s) of jobs having similar content, wage rates and opportunities.  If a contractor has a total workforce of fewer than 150 employees, it may use the EEO-1 categories as its job groups.  See 41 CFR 60-2.12.

**Journey Worker**

One who has completed an apprenticeship program or otherwise possesses the full skills and licenses of workers in his or her trade.  Historically referred to as "journeyman."

**Labor Area**

The Geographic area used in calculating availability. The area may vary from local to nationwide.

**Layoff**

The process by which workers are removed from the active payroll to the inactive payroll.

**Let or Let a Contract**

The awarding of a contract to the prime contractor.

**Line of Progression**

A series of related jobs in a promotional sequence, generally starting with lower-paying jobs with less responsibility and progressing to higher-paying jobs with greater responsibility. Often, the lower-level jobs provide required training for movement to the higher-level jobs.

**Linkage**

A relationship between a contractor and an appropriate recruitment or training source. Linkages may assist the contractor in its outreach and recruitment efforts, and aid in compliance with its affirmative action obligations.

**Local Veterans' Employment Representative**

Local veterans' employment representative staff performs outreach to local businesses and employers to advocate for the hiring of veterans.

**Major Life Activities**

A key term used in the definition of "disability." Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working. A major life activity also includes the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine and reproductive functions. See 41 CFR 60-741.2(m).

**Make-Whole Relief**

Remedy for discrimination that restores the victim of discrimination to his or her rightful place, both economically and in terms of employment status, and benefits and privileges that he or she would have had had the discrimination not taken place. Common elements

of make-whole relief include, but are not limited to, as appropriate to the facts of the case, instatement, reinstatement, back pay with interest and retroactive seniority.

***Mandatory Job Listing (MJL)***

A VEVRAA affirmative action obligation that requires covered contractors to list their employment openings (with limited exceptions) with the state workforce agency job bank or with the local employment service delivery system (ESDS) where the opening occurs. Contractors must provide information about the job vacancy in a manner and format permitted by the appropriate ESDS which will allow that system to provide priority referral of veterans protected by VEVRAA for that job vacancy. With their initial listing, contractors must also provide the ESDS with certain information prescribed in the regulations. See 41 CFR 60-300.5(a)2-6.

***Maternity Leave***

A woman's childbirth-related absence from work that does not directly depend on her medical condition. The term includes leave for nonmedical related care and nurturing following the birth of a child.

***Mega Construction Project***

A large construction project spanning more than one year with a value of $25 million or more.

***Minorities***

Minorities include individuals who are Black, Hispanic, Asian or Pacific Islander, American Indian or Alaskan Native. As used in this Manual, the term may mean members of these groups in the aggregate or members of an individual group. See 41 CFR 60-2.11(b)(3) and 41 CFR 60-4.3(a)1d.

***Minority-Owned Business Enterprise (MBE)***

As defined by the Small Business Administration, a minority-owned business enterprise is a for-profit business, regardless of size, physically located in the U.S. or its trust territories, which is owned, operated and controlled by minority group members. Minority ownership must be at least 51% to qualify, whether the business is publicly or privately held. If publicly held, at least 51% of its stock must be held by minority group members.

***MOU (Memorandum of Understanding)***

A written agreement between two or more entities, which often serves to memorialize the intent and purpose of the parties' working relationship.

Federal Contract Compliance Manual (FCCM)

### National Origin

National origin includes:

- Actual or perceived birthplace, ancestry, culture, accent or linguistic characteristics common to a specific ethnic group;

- Marriage or association with persons of a national origin group;

- Membership or association with specific ethnic promotion groups;

- Attendance or participation in schools, churches, temples or mosques generally associated with a national origin group; or

- A surname associated with a national origin group.

### Native Hawaiian/Other Pacific Islander

As defined by OMB's *Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity* (1997), a person with origins in any of the original peoples of Hawaii, Guam, Samoa or other Pacific Islands. Under the regulations at 41 CFR 60-2.11(b)(3) and 41 CFR 60-4.3(a)1.d(iii), Pacific Islanders are combined with Asians. See "Asian (not Hispanic or Latino)."

### New Hire

A worker added to an establishment's payroll for the first time. Compare with "Rehire."

### Noncompliance

A contractor's failure to adhere to the conditions set out in the contract's equal opportunity clauses or the regulations implementing those clauses (41 CFR Chapter 60), or failure to correct violations.

### Nonstatistical Evidence

Nonstatistical evidence may include testimony about biased statements, remarks, attitudes, or acts based upon membership in a protected class; differential treatment through review of comparators, cohorts, or summary data reflecting differential selections, compensation and/or qualifications; testimony about individuals denied or given misleading or contradictory information about employment or compensation practices; testimony about the extent of discretion or subjectivity involved in making employment decisions; or other anecdotal or supporting evidence. See also "Anecdotal Evidence" and "Statistical Evidence."

*Nonfavored Group*

The race, ethnic or sex group(s) with the lower selection rates as compared to the group with the highest selection rate when calculating the impact ratio or the level of the statistical disparity.  When calculating the impact ratio of unfavorable actions such as terminations, the nonfavored groups are those with higher selection rates.  See 41 CFR 60-3.4D.

*Normal Business Hours*

For purposes of access to a contractor's premises, the hours during which employees to be interviewed are at work, regardless of the time of day or night.  Also used to indicate the hours during which documents, such as AAPs, are available for inspection by employees and applicants for employment.

*North American Industry Classification System (NAICS)*

The standardized system used by federal agencies in classifying businesses for the collection, analysis and publication of statistical data related to the business economy of the U.S.  NAICS was developed under the auspices of the Office of Management and Budget, and adopted in 1997 to replace the Standard Industrial Classification (SIC) system.

*Notice of Results of Investigation (NORI)*

A letter from OFCCP notifying the contractor of the results of a complaint investigation, including whether the agency found any violations of Executive Order 11246, Section 503 or VEVRAA.  If violations were found, the NORI details those violations and invites the contractor to join the agency in resolving the complaint through conciliation.

*Notice of Violation (NOV)*

A letter from OFCCP notifying the contractor that the agency has found violations of Executive Order 11246, Section 503 and/or VEVRAA during a compliance evaluation, identifying the remedies that are required to resolve those violations, and inviting the contractor to engage in conciliation to resolve them.

*Notice of Violation of a Conciliation Agreement (15-Day Notice)*

A letter from OFCCP informing the contractor that the agency believes the contractor has violated the terms of a Conciliation Agreement and that enforcement proceedings may be initiated unless the contractor demonstrates within 15 calendar days from its receipt of the letter that it has not violated its commitments under the agreement.

**O\*NET (Occupational Information Network)**

> An electronic database maintained by the U.S. Department of Labor's Employment and Training Administration  that classifies occupations in the U.S. economy based on their duties and commonly required qualifications.

**Objective Criterion**

> A selection criterion is objective if it is fixed and measurable (*e.g.,* the requirement of a high school degree rather than a "good education").  The central characteristic of an objective criterion is that it can be independently verified, *i.e.*, different people measuring objective criteria will reach the same results.  Compare with "Subjective Criterion."

**Off-Site Review of Records**

> An analysis and evaluation, conducted off the contractor's premises, of the AAP(s), or any part thereof, and supporting documentation; and other documents related to the contractor's personnel policies and employment actions that may be relevant to a determination of whether the contractor has complied with the requirements of Executive Order 11246, Section 503 and/or VEVRAA.  See 41 CFR  60-1.20(a)(2), 60-300.60(a)(2) and 60-741.60(a)(2).

**On-The-Job Training (OJT)**

> An employer-sanctioned training program, usually at the employer's worksite, in which a trainee works under close supervision or with assistance, designed to teach and qualify an individual to perform a job or element(s) of a job.

**Organizational Unit**

> A department, division, branch, section or other organizational entity of a contractor that operates as a single unit under a common head.

**Pacific Islander (not Hispanic or Latino)**

> See "Native Hawaiian/Other Pacific Islander."

**Parental Leave**

> Absence from work by a parent to care for a child.

**Pattern or Practice Discrimination**

> Discrimination resulting from a practice or acts that are repeated, routine or of a generalized nature, for example*,* a practice of not interviewing male applicants for positions that involve working in small spaces.  Methods of proving such discrimination vary from case to case, but often include, at least in part, statistical evidence.

### Perfection (of a Complaint)

Perfection is the initial process used to determine whether OFCCP has jurisdiction over a complaint filed with the agency and should retain it for investigation. Perfection includes assessing whether a complaint is complete, whether it was filed within established timeframes and whether the allegation(s) fall within the agency's jurisdiction (meaning that the company is a federal contractor or subcontractor and that the allegations assert a violation under the laws enforced by OFCCP). Once a complaint is perfected, it is assigned to a CO for investigation.

### Person

Any natural person, corporation, partnership, unincorporated association, state or local government; and any agency, instrumentality or subdivision of such a government. 41 CFR 60-1.3. The term also includes joint ventures under the regulations implementing VEVRAA (41 CFR 60-300.2(n)(5)) and Section 503 (41 CFR 60-741.2(k)(5)).

### Person of Two or More Races (Not Hispanic or Latino)

As defined by the EEOC, for purposes of EEO-1 reports, any person who identifies with more than one race category.

### Personal Representative

A complainant may choose to have a personal representative file a complaint on their behalf or act on their behalf during the complaint process. A personal representative may, but is not required to, be an attorney. A family member, friend, co-worker, union steward or other advocates may also be a personal representative.

### Personnel Practices

Practices or actions taken by management related to decisions regarding their employees (*e.g.,* hiring, firing, layoff, promotion, transfer, demotion, compensation, salary increase, salary decrease, work assignments, benefits).

### Physical and Mental Job Qualifications

Physical and mental standards that an employer requires an employee or applicant to meet to qualify for the job.

### Physical or Mental Impairment

Physical or mental impairment means:

(a) Any physiological disorder, condition, cosmetic disfigurement or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin and endocrine; or

(b) Any mental or psychological disorder, such as an intellectual disability (formerly termed mental retardation), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

See 41 CFR 60-741.2(o).

### Placement

In this Manual, placement is often used in the context of the selection or assignment of individuals for a particular job.  Also see "Goals for Minorities and Women, Supply and Service Contractors (Placement Goals.)"

### Predetermination Notice (PDN)

A letter in which OFCCP notifies the contractor of its preliminary finding that the contractor has engaged in discrimination.  The PDN states the basis for the preliminary findings and offers the contractor the opportunity to respond.

### Pregnancy Accommodation

See "Reasonable Accommodation (Pregnancy)."

### Pregnancy Discrimination

Discrimination based on pregnancy, childbirth or related medical conditions, including childbearing capacity, which constitutes unlawful sex discrimination under Executive Order 11246.  Contractors must treat people of childbearing capacity and those affected by a pregnancy, childbirth or related medical conditions the same for all employment-related purposes, including receipt of benefits under fringe-benefit programs, as other persons not so affected, but similar in their ability or inability to work.  See 41 CFR 60-20.5.

### Pretext

Professed legitimate reason or motive articulated by a contractor as a cover for a discriminatory reason or motive.

### Prima Facie Case

A legal term that refers to a party's production of enough evidence to meet its burden of proof or raise a presumption unless disproved or rebutted.

### Problem Areas

Aspects of the contractor's employment decisions, policies or practices that raise questions regarding the contractor's compliance with Executive Order 11246, Section 503 or VEVRAA.

***Progression Line Charts***

> Written listings of a contractor's lines of progression.  See "Line of Progression."

***Prohibited Basis or Prohibited Factor***

> A basis or factor prohibited by law from being used in making employment decisions.  Under Executive Order 11246, as amended, the prohibited bases or factors:

- Race,

- Color,

- Religion,

- Sex,

- Sexual orientation,

- Gender identity, and

- National origin.

Under Section 503, the prohibited basis or factor is a disability.  Under VEVRAA, the prohibited basis or factor is status as a protected veteran.

***Promotable or Transferable***

> In the context of estimating internal availability, those employees who are currently employed in a job group or groups that serve, or could serve, as a source from which selections are, or could be, made for other job groups.

***Promotion***

> Any personnel action resulting in, for example, the movement to a position affording higher pay, greater rank, change in job title, or increase in job grade; an increase in pay, requiring greater skill or responsibility; or the opportunity to attain such.  A promotion may be either competitive or noncompetitive.

***Protected Group or Category***

> The bases on which applicants and employees are protected from discrimination in employment under the laws enforced by OFCCP (also referred to as "prohibited factors" or "prohibited bases"): race, color, religion, sex, sexual orientation, gender identity, national origin, disability and status as a protected veteran.

### Protected Veteran

Any veteran who is protected by VEVRAA.  To be a "protected veteran," a veteran must meet the criteria of one or more of the following four categories:

- Disabled veteran;

- Recently separated veteran;

- Active duty wartime or campaign badge veteran; and

- Armed Forces service medal veteran.

See 41 CFR 60-300.2(q) and related definitions.

### Qualified Individual (with a Disability)

An individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position the individual holds or desires, and who with or without reasonable accommodation can perform the essential functions of such position.  See 41 CFR 60-741.2(r).  For exceptions to this definition, see 41 CFR 60-741.3.

### Race or Color

Race or color includes personal characteristics associated with a particular race, such as hair texture, certain facial features, and skin color and complexion.  Race or color may also include marriage to or association with a person of a certain race or color, or association with an organization or group that is generally associated with people of a certain race or color.

### Reasonable Accommodation (Disability/Disabled Veteran))

A contractor must make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability.  A contractor is not required to provide reasonable accommodation to an individual who satisfies only the "regarded as" prong of the definition of disability, and does not have a disability or a record of a disability.

The term reasonable accommodation means modifications or adjustments:

- To a job application process that enables a qualified applicant with a disability to be considered for the position the applicant desires;

- To the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that   enable a qualified individual with a disability to perform the essential functions of that position; or

- That enables the contractor's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by the contractor's other similarly situated employees without disabilities.

See 41 CFR 60-741.2(s)(1).  For the comparable definition under VEVRAA, see 41 CFR 60-300.2(t)(1).  For examples of reasonable accommodations, see 41 CFR 60-741.2(s)(2) and 41 CFR 60-300.2(t)(2).

### Reasonable Accommodation (Pregnancy)

Alternative job assignments, modified duties or other accommodations needed by employees who are unable to perform some of their job duties because of pregnancy, childbirth or related medical conditions.  Contractors may be required to provide such accommodations.  See 41 CFR 60-20.5(c).

### Reasonable Accommodation (Religion)

See "Religious Accommodation."

### Reasonable Recruitment Area

The geographic area from which the contractor usually seeks, or reasonably could seek, workers to fill jobs within a particular job group.

### Recall

The process or action by which workers are returned to active employment from layoff.

### Recently Separated Veteran

Any veteran during the three-year period beginning on the date of such veteran's discharged or released from active duty in the U.S. military, ground, naval or air service in the last three years.  See 41 CFR 60-300.2(u).

### Recruitment Source

Any person, organization or agency used to refer or provide workers for employment.

### "Regarded As" Having an Impairment

This is one of the three prongs of the definition of "disability."  An individual is "regarded as" having a physical or mental impairment when the individual is subjected to a discriminatory action because of an actual or perceived physical or mental impairment that is neither transitory (*i.e.*, has an actual or expected duration of six months or less) nor minor - whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity.  See 41 CFR 60-741.2(v).  An individual who satisfies only the "regarded as" prong of the definition of "disability" (*i.e.*, does not also have an actual

disability or a record of a disability) is not entitled to receive reasonable accommodation. See 41 CFR 60-741.2(s)(4).

### Regression Analysis

A statistical analysis used to evaluate the interrelated effects of independent variables (such as education, prior experience) on a dependent variable (such as hire, compensation).  Regression analyses frequently are a significant element of OFCCP's proof used in systemic discrimination cases.

### Rehire

To employ a formerly employed worker after a complete break in employment status. Compare with "Recall."

### Relevant Labor Area

See the definition of "Labor Area."

### Religious Accommodation

A nondiscrimination obligation of a contractor to accommodate the sincerely held religious observances and practices of its current and prospective employees.  Typical religious accommodations include, but are not limited to, permitting the wearing of religious head coverings and other religious dress at the workplace, swapping employee shifts or permitting work breaks or time off to allow for religious observance, and modifying an employee's work schedule to permit observance of the employee's Sabbath.  A contractor does not have to accommodate an employee's religious observances or practices if doing so would cause it undue hardship.  See the definition of "Undue Hardship (Religious Accommodation)."

### Requisite Skills

Those minimum skills needed to perform a job satisfactorily.

### Retaliation

Any adverse action by a contractor against an applicant or employee because he or she:

- Filed a complaint of discrimination;

- Opposed any act made unlawful under any of the laws enforced by OFCCP;

- Assisted or participated in an investigation, compliance evaluation, hearing or any other activity related to the administration or enforcement of any of the laws enforced by OFCCP; or

Federal Contract Compliance Manual (FCCM)

- Exercised any other rights under OFCCP's laws or any other federal, state or local law requiring equal opportunity.

Adverse actions include employment actions such as termination, demotion or failure to hire.  Other actions that are likely to deter a reasonable person from pursuing their rights, including threats and unjustified negative evaluations or references, may also be adverse actions.

### Rightful Place

The position, both economically and in terms of employment status (usually job position and seniority), that the victim of discrimination would have held if the discrimination had not occurred.  See "Make-Whole Relief."

### Section 503

Section 503 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 793.  One of the three legal authorities enforced and administered by OFCCP.  Section 503 applies to federal contractors with a contract or subcontract of more than $15,000.  However, it does not apply to federally-assisted construction contracts.  Section 503 prohibits covered federal contractors from discriminating in employment on the basis of disability and requires that they take affirmative action to ensure equal employment opportunity. Covered federal contractors and subcontractors with 50 or more employees and a contract of $50,000 or more have additional affirmative action obligations that include the development of a written affirmative action program.

### Seniority

Length of employment as determined by the employer's policies or the applicable collective bargaining agreement.  Seniority may be defined in various terms (*e.g.,* company seniority, facility seniority, departmental seniority).  Employees may have different types of seniority for different purposes (*e.g.,* job bidding rights governed by department seniority and leave accrual rights governed by company seniority).

### Sexual Orientation

An individual's physical, romantic and/or emotional attraction to people of the same and/or opposite gender.  Examples of sexual orientations include straight (or heterosexual), lesbian, gay and bisexual.

### Shortfall

The difference between the actual number of persons in the nonfavored group who were selected for the employment opportunity at issue (hires, promotions, etc.) and the number expected to have been selected in proportion to their representation in the pool of qualified candidates, absent discrimination.  This concept does not generally apply to compensation discrimination cases, which revolve around wage-setting decisions, not decisions involving job opportunities.

***Show Cause Notice (SCN)***

A letter from OFCCP to the contractor ordering it to provide evidence demonstrating why enforcement proceedings should not be instituted. The Show Cause Notice provides that the contractor must come into compliance within 30 calendar days or OFCCP may recommend the commencement of enforcement proceedings.

***Similarly Situated***

Employees are similarly situated when they are comparable on the factors relevant to the investigation or analysis, even if they are not comparable on others. Relevant factors in determining similarity may include tasks performed, skills, effort, level of responsibility, working conditions, job difficulty, minimum qualifications or other objective factors. The determination of which employees are similarly situated is case specific. Thus, employees who are similarly situated for one purpose may not be similarly situated for another.

***Similarly Situated Employee Group (SSEG)***

SSEGs are used in examining potential compensation discrimination. SSEGs are sometimes referred to as a pay analysis groups and are viewed by the agency as equivalent terms. An SSEG is a group of employees (potentially from multiple job titles, units, categories and/or job groups) who are comparable for purposes of analyzing a contractor's pay practices, based on: (a) job similarity (*e.g.,* tasks performed, skills required, effort, responsibility, working conditions and complexity); and (b) other objective factors such as minimum qualifications or certifications.

***Standard Deviation***

As an alternative to probability values, statisticians often express the divergence between actual and expected outcomes in units called standard deviations. The larger the difference in standard deviations, the smaller the probability that the difference is due to random chance factors alone. See also "Statistically Significant."

***Standard Form 100***

See "EEO-1 Report."

***Standard Metropolitan Statistical Area (SMSA)***

Statistical area that refers to a geographical region with a relatively high population density at its core and close economic ties throughout the area.

***Statistical Evidence***

*Statistical evidence* means hypothesis testing, controlling for the major legitimate, nondiscriminatory measureable parameters and variables used by employers (including, as appropriate, other demographic variables, test scores, geographic variables,

Federal Contract Compliance Manual (FCCM)

performance evaluations, years of experience, quality of experience, years of service, quality and reputation of previous employers, years of education, years of training, quality and reputation of credentialing institutions, etc.), related to the probability of outcomes occurring by chance and/or analyses reflecting statements concluding that a difference in employment selection rates or compensation decisions is statistically significant by reference to any one of the following equivalent statements: 1) the disparity is two or three times larger than its standard error (*i.e.*, a standard deviation of two or more); 2) the Z statistic has a value greater than two or three; or 3) the probability value is less than 0.05 or 0.01.  See also "Anecdotal Evidence" and "Nonstatistical Evidence."

### Statistically Significant

The results of statistical analyses (statistical evidence) are "statistically significant" if the probability the results occurred by chance is so small that chance can reasonably be ruled out as the cause.  When the difference between actual and expected values is greater than 1.96 standard deviations, the probability the disparity occurred by chance is less than 5%. In employment discrimination cases, courts generally consider a difference of two or more standard deviations to be "statistically significant" and allow a valid statistical inference of discrimination to be drawn.

### Subcontract

Any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee):

- For the purchase, sale or use of personal property or nonpersonal services which, in whole or in part, is necessary to the performance of any one or more government contracts; or

- Under which any portion of the contractor's obligation under one or more government contracts is performed, undertaken or assumed.

See 41 CFR 60-1.3, 41 CFR 60-300.2(x), and 41 CFR 60-741.2(x).

### Subcontractor

Any person holding a covered subcontract and, for enforcement purposes, this also includes any person who has held a subcontract subject to Executive Order 11246, Section 503 or VEVRAA.  See 41 CFR 60-1.3, 41 CFR 60-300.2(y) and 41 CFR 60-741.2(y).

### Subjective Criterion

An employment qualification, selection standard or process is subjective if it requires judgment in its application, such that different people applying the standard would not necessarily reach the same conclusion.  Whether an applicant is certified to operate a

particular machine is objective; whether an applicant has "good machine-handling skills and experience" is subjective. Compare with "Objective Criterion."

**Support Data**

Statistical data, documentation and other materials regarding a contractor's employment policies, practices and actions used in the development, support and justification of its affirmative action program(s), or used to assess the affirmative action program's effectiveness.

**Systemic Discrimination**

Systemic discrimination involves a pattern or practice, policy or class case where the alleged discrimination has a broad impact on an industry, profession, company or geographic area. Examples of systemic practices include: discriminatory barriers in recruitment and hiring, discriminatorily restricted access to management trainee programs and high-level jobs, exclusion of qualified women from traditionally male-dominated fields of work, and disability discrimination such as unlawful pre-employment inquiries. There is no specific numeric threshold used to define a systemic case.

**Termination of Employment**

Separation of an employee from the active and inactive payroll.

**Terms and Conditions of Employment**

All aspects of the employment relationship between an employee and his or her employer, including, but not limited to, hiring, compensation, fringe benefits, leave policies, job placement, work environment, work-related rules, work assignments, training and education, and opportunities for promotion.

**Third-Party Complaint**

A complaint filed by an individual or individuals on behalf of another individual or a group of people. See 41 CFR 60-300.61(b)(2) and 60-741.61(c)(2).

**Title VII of the Civil Rights Act of 1964 (Title VII)**

This law is enforced by EEOC and its principles generally apply to discrimination cases arising under Executive Order 11246. Title VII prohibits discrimination in employment on the basis of race, color, religion, national origin or sex. Title VII applies to private employers with 15 or more employees. It also generally applies to state and local government agencies, federal government agencies, employment agencies and labor unions that either operate a hiring hall or have at least 15 members.

*Tolling*

The suspension of the running of a statute of limitations for equitable reasons. Because the Title VII 180-day limit on filing a charge with the EEOC has been held to be a statute of limitations, there have been numerous court cases discussing tolling of that limit. By comparison, the regulations for the three laws OFCCP enforces provide for the filing of a complaint within 180 calendar days (or, for VEVRAA and Section 503, 300 calendar days) of the alleged violation unless the time for filing is extended by the Director for good cause shown. There is no similar good cause language in Title VII. The good cause authority allows the Director to waive the 180-day or 300-day limit without raising questions of tolling.

*Training Agency*

Any person, organization or agency whose purpose is to train workers.

*Transfer*

Movement (usually lateral) of an employee from one position or function to another.

*Underutilization (Executive Order 11246)*

When the percentage of minorities or women employed in a particular job group is less than would be reasonably expected given their availability percentage in the relevant labor pool. See 41 CFR 60-2.10(a)(1).

*Undue Hardship (Disability)*

"Undue hardship" is the only defense for failing to make a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability. The employer must demonstrate that the accommodation would cause it "significant difficulty or expense" in light of its particular resources and circumstances. Undue hardship refers not only to financial difficulty, but also to reasonable accommodations that are unduly extensive, substantial or disruptive, or those that would fundamentally alter the nature or operation of the business. See 41 CFR 60–300.2(aa) and 60-300 Appendix A, and 41 CFR 60-741.2(aa) and 60-741 Appendix A. Whether an accommodation would impose an undue hardship requires a case-by-case determination. See 41 CFR 60-300.2(aa)(2) and 60-741.2(aa)(2) for factors to be considered.

*Undue Hardship (Religious Accommodation)*

"Undue hardship" is the defense for not providing a needed religious accommodation. To demonstrate "undue hardship" in this context, a contractor must show that providing the proposed accommodation would pose "more than de minimis" cost or burden. Costs to be considered include not only direct monetary costs, but also the burden on the conduct of the employer's business. For example, courts have found undue hardship where the accommodation diminishes efficiency in other jobs, infringes on other

employees' job rights or benefits, impairs workplace safety, or causes co-workers to carry the accommodated employee's share of potentially hazardous or burdensome work.

### Uniformly Applied

Applying employment criteria or processes in the same manner to all similarly situated applicants or employees.

### Uniform Guidelines on Employee Selection Procedures (UGESP)

Guidelines developed by the EEOC, U.S. Department of Justice, U.S. Department of Labor and the Civil Service Commission (now the Office of Personnel Management) to provide a single set of principles that are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of federal law prohibiting employment practices that discriminate on grounds of race, color, religion, sex and national origin.  See 41 CFR Part 60-3.  Under Executive Order 11246, UGESP was promulgated as regulations with the force and effect of law.  UGESP does not apply to Section 503 or VEVRAA.

### Validation

The demonstration of job-relatedness by showing the relationship between the selection procedure and job performance.  To be validated in accordance with UGESP, the validation studies must meet the technical standards set out in 41 CFR Part 60-3.

### Veteran

A person who served in the active military, naval or air service of the U.S., and who was discharged or released therefrom under conditions other than dishonorable.  See 41 CFR 60-300.2(cc).

### VETS-4212 Report

Each contractor and subcontractor subject to VEVRAA is required to file the VETS-4212 report with the U.S. Department of Labor's Veterans' Employment and Training Service (VETS) on an annual basis.  The report details the number of protected veterans the contractor employs, or has newly hired, by hiring location and EEO-1 job category.  For more information on the VETS-4212 report, please visit: https://www.dol.gov/agencies/vets/programs/vets4212.

### VEVRAA

The Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212).  One of the three legal authorities enforced and administered by OFCCP.  VEVRAA applies to federal contractors with a contract or subcontract of $150,000 or more.  However, it does not apply to federally-assisted construction contractors.  VEVRAA prohibits covered federal contractors from discriminating in employment based on status as a protected veteran and requires that they take affirmative action to

ensure equal employment opportunity.  Federal contractors and subcontractors with 50 or more employees and a contract of $150,000 or more have additional affirmative action obligations, which include the development of a written affirmative action program.

### Victim Specific Relief

See "Individual Relief."

### Violation

Failure to fulfill a requirement of the Executive Order 11246, Section 503 or VEVRAA, or their implementing regulations.

### White (not Hispanic or Latino)

As defined by OMB's *Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity* (1997), an individual, not of Hispanic origin, with origins in any of the original peoples of Europe, North Africa or the Middle East.

### Work Assignment

A position or post of duty to which one is assigned or a task one is required to perform.

Federal Contract Compliance Manual (FCCM)

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AA | Affirmative Action |
| AAP | Affirmative Action Program |
| ACS | American Community Survey |
| ADA | Americans with Disabilities Act |
| ADD | Assistant District Director |
| ALJ | Administrative Law Judge |
| AmInd/AlNat | American Indian/Alaskan Native |
| AO | Area Office |
| APA | Administrative Procedure Act |
| ASCN | Amended Show Cause Notice |
| Asian/PI | Asian American/Pacific Islander |
| BFOQ | Bona Fide Occupational Qualification |
| BLS | Bureau of Labor Statistics |
| CA | Conciliation Agreement |
| CBA | Collective Bargaining Agreement |
| CEO | Chief Executive Officer |
| CFR | Code of Federal Regulations |
| CMCE | Corporate Management Compliance Evaluation |
| CMS | Case Management System |
| CO | Compliance Officer |
| CC-4 | Complaint Form titled "Complaint Involving Employment Discrimination by a Federal Contractor or Subcontractor" |
| CC-53 | Case Chronology Log |
| CY | Current Year |
| DD | District Director |

| | |
|---|---|
| DD-214 | U.S. Department of Defense form that identifies the veteran's condition of discharge - honorable, general, other than honorable, dishonorable or bad conduct |
| DO | District Office |
| DOJ | U.S. Department of Justice |
| DOL | U.S. Department of Labor |
| DOT | U.S. Department of Transportation |
| DPO | Division of Program Operations |
| EDGAR | Electronic Data Gathering, Analysis and Retrieval |
| EEDS | Equal Employment Data System |
| EEO | Equal Employment Opportunity |
| EEO Tab | EEO Tabulation |
| EEO-1 | Standard Form 100 – Employer Information Report |
| EEOC | Equal Employment Opportunity Commission |
| EIS | Executive Information System |
| ERRD | Employment Referral Resource Directory |
| ESDS | Employment Service Delivery System |
| ETA | Employment and Training Administration |
| FAAP | Functional Affirmative Action Program |
| FCCM | Federal Contract Compliance Manual |
| FCSS | Federal Contractor Selection System |
| FEP | Fair Employment Practices |
| FICA | Federal Insurance Contributions Act |
| FMLA | Family and Medical Leave Act |
| FOIA | Freedom of Information Act |
| FR | Federal Register |
| FUTA | Federal Unemployment Tax Act |
| GSA | General Services Administration |

Federal Contract Compliance Manual (FCCM)

| HRIS | Human Resources Information System |
|------|-----------------------------------|
| INAERP | Indian and Native American Employment Rights Program |
| IPEDS | Integrated Postsecondary Education Data System |
| IRA | Impact Ratio Analysis |
| IRS | Internal Revenue Service |
| JAAR | Job Area Acceptance Range |
| JRC | Joint Reporting Committee |
| LVER | Local Veterans' Employment Representative – See VWS |
| MJL | Mandatory Job Listing |
| MOU | Memorandum of Understanding |
| MSA | Metropolitan Statistical Area |
| NAICS | North American Industrial Classification System (replaced SIC) |
| NLRA | National Labor Relations Act |
| NORI | Notice of Results of Investigation |
| NOV | Notice of Violation |
| NSOL | National Solicitor of Labor |
| O*NET | Occupational Information Network |
| ODEP | Office of Disability Employment Policy |
| OFCCP | Office of Federal Contract Compliance Programs |
| OFIS | OFCCP Information System |
| OLMS | Office of Labor-Management Standards |
| OMB | Office of Management and Budget |
| OSHA | Occupational Safety and Health Administration |
| PDN | Predetermination Notice |
| PII | Personally Identifiable Information |
| PY | Prior Year |
| RD | Regional Director |

Federal Contract Compliance Manual (FCCM)

| | |
|---|---|
| RO | Regional Office |
| ROC | Regional Office Outreach Coordinator |
| RSOL | Regional Solicitor of Labor |
| S&S | Supply and Service |
| SAM | System for Award Management |
| SCER | Standard Compliance Evaluation Report |
| SCN | Show Cause Notice |
| SEC | Securities and Exchange Commission |
| Section 503 | Section 503 of the Rehabilitation Act of 1973 (29 U.S.C. 793), as amended |
| SMSA | Standard Metropolitan Statistical Area |
| SOL | Solicitor of Labor |
| SSEG | Similarly Situated Employee Group |
| TERO | Tribal Employment Rights Office |
| Title VII | Title VII of the Civil Rights Act of 1964, as amended |
| UGESP | Uniform Guidelines on Employee Selection Procedures |
| VETS | Veterans' Employment and Training Service |
| VEVRAA | Vietnam Era Veterans' Readjustment Assistance Act, as amended |
| WHD | Wage and Hour Division |

Federal Contract Compliance Manual (FCCM)

## APPENDICES A-1 – A-13

### Updated 2019

| Appendix Number | Appendix Title |
|:---:|:---|
| A-1 | Supply and Service Standard Compliance Evaluation Report (SCER) |
| A-2 | SCER Instructions |
| A-3 | Index for a Supply and Service Review |
| A-4 | Sample On-site Review Plan |
| A-5 | Index for a Construction Review |
| A-6 | SCER (Construction) |
| A-7 | Special Remedial Considerations Applicable to Stock |
| A-8 | Index for a Complaint File |
| A-9 | Retaliation and Interference: Complaint Processing Outline and Checklist |
| A-10 | Investigative Report |
| A-11 | Information Related to Filing Suit Under Title VII of the Civil Rights Act, Title I of the ADA and the Equal Pay Act |
| A-12 | "MacMillan" Factors Concerning Successor Employer Liability |
| A-13 | Transmittal Memorandum for an Enforcement Recommendation |

Federal Contract Compliance Manual (FCCM)

**APPENDIX A-1:  U.S. DEPARTMENT OF LABOR OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS SUPPLY AND SERVICE STANDARD COMPLIANCE EVALUATION REPORT (SCER)**

| CONTRACTOR INFORMATION | |
|---|---|
| **1. ESTABLISHMENT/FUNCTIONAL UNIT NAME & ADDRESS**<br><br><br><br>CMS Control # | **2. PARENT NAME & ADDRESS** |

**3. COMPLAINTS INVESTIGATED DURING REVIEW**

☑ =If resolved during the review, check box.

# _____ ☐   # _____ ☐   # _____ ☐   # _____ ☐   # _____ ☐

**4. CONTRACT COVERAGE**

Contract information included in CMS?     Yes ☐   No ☐

Does the contract information cover the entire evaluation period?     Yes ☐   No ☐

Fill in contract information below.

| AWARDING AGENCY | IF SUBCONTRACTOR, NAME OF PRIME CONTRACTOR | CONTRACT OR PURCHASE ORDER # | CONTRACT DOLLAR AMOUNT | BEGIN AND END DATES |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| **5. COMPANY CONTACTS** | | **Name** | **Title** | **Phone/E-mail** |
|---|---|---|---|---|
| Establishment/ Functional Unit | CEO/ Dir/Mgr. | | | |
| | EEO/AA | | | |
| Corporate | CEO | | | |
| | EEO/AA | | | |
| Outside Representative | | | | |

**6. BACKGROUND INFORMATION**
   Type of Industry:
   Specific Facility Function:

Federal Contract Compliance Manual (FCCM)

| CONTRACTOR INFORMATION |
|---|

**7. COMPLIANCE EVALUATION INFORMATION**

FAAP Review?  Yes ☐   No ☐      Focused Review? Yes ☐   No ☐

CMCE?  Yes ☐   No ☐   (If yes, complete SCER Part D)

| Date Scheduling Letter Received by Contractor | AAP Year | Prior Year Data Period | Current Year Data Period (if applicable) | Union | If unionized, % of unionized workforce | NAICS |
|---|---|---|---|---|---|---|
|  |  |  |  | Y / N | % |  |

Geographic Area:

| % Female | % Minority | % Black | % Hispanic | % Asian/PI | % AmInd/AlNat |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

Contractor's Employment Data

| Total # Employees | Total # Female | Total # Minority | Total # Black | Total # Asian/PI | Total # Hispanic | Total # AmInd/ AlNat | Total # Protected Veterans | Total # Ind. with Disabilities |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  | % Female | % Minority | % Black | % Asian/PI | % Hispanic | % AmInd/ AlNat | % Protected Veterans | % Ind. with Disabilities |

Federal Contract Compliance Manual (FCCM)

## CASE SUMMARY AND RECOMMENDATIONS

Provide an assessment of compliance. If there are findings of violation(s), list **all** findings in this section. For each one, provide a brief explanation of the supporting facts and evidence, briefly describe conciliation efforts and specify the recommended corrective action(s). For each finding, reference where it is discussed in the SCER. If there is no finding of a violation, and a closure letter is to be issued, provide a brief description of the basis for this action. Be sure to indicate all document(s) to be issued to the contractor (*e.g.,* Predetermination Notice, Notice of Violation, Show Cause Notice, Conciliation Agreement or closure letter).

On-site: Yes ☐ No ☐ If yes, state reason (*e.g.,* indicator, quality check, etc.).

Early Resolution Procedures? Yes ☐ No ☐

|  | COMPLIANCE OFFICER (CO) | ASSISTANT DISTRICT DIRECTOR (ADD) | DISTRICT DIRECTOR (DD) REGIONAL DIRECTOR (RD) |
|---|---|---|---|
| Signature |  |  |  |
| Date |  |  |  |

Federal Contract Compliance Manual (FCCM)

# PART A: PREPARATION

## PAST PROBLEMS, KNOWN COMPLAINTS OR ENFORCEMENT PROCEEDINGS, AND COLLABORATION WITH OTHER AGENCIES

| |
|---|
| **1. Past Problems.** If there were no prior OFCCP compliance reviews or investigations of the contractor, check here and go on to item 2 below. ( ) |
| **a. Past Problems?  Yes / No     Explain if yes and identify source materials.**<br><br><br><br>**b. Recurrence?  Yes / No    Explain if yes.**<br><br><br><br><br> |
| **2. Known Complaints or Enforcement Proceedings.**  If there are no complaints filed or pending with other agencies, *e.g.,* EEOC, WHD or OSHA, and no new or ongoing enforcement proceedings by any of these agencies, check here and go on to the next page. ( )<br><br>If there are complaints or enforcement proceedings, for each one, list the agency involved, the basis, issue, current status and the area of the contractor's workforce it appears to concern.  Add additional sheets as an attachment to the SCER, if needed.  If at any point in the review, you determine there is a related potential problem not investigated in the complaints or enforcement proceedings, complete part (b) below. |
| **a. List Known Complaints or Enforcement Proceedings.** |

| Agency | Basis | Issue | Status | Job Group/ Department (if available) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

| |
|---|
| **b. Related Problem Not Investigated in the Known Complaint or Enforcement Proceedings?  Yes/No Explain if yes.**<br><br><br><br> |
| **3. Explain any collaboration with, or referrals to, other agencies, *e.g.,* EEOC, WHD or OSHA, during the compliance evaluation.** List agency, basis for referral or collaboration and the issue(s).<br><br><br><br><br> |

Federal Contract Compliance Manual (FCCM)

# PART B: DESK AUDIT

## I. INITIAL REVIEW OF AAP AND SUPPORT DATA SUBMISSIONS

| EXECUTIVE ORDER 11246 | INCLUDED IN AAP? Indicate Y/N | ACCEPTABLE? (Text Only) Y/N | If NO, Include in PART B.II |
|---|---|---|---|
| ORGANIZATIONAL PROFILE (Organizational Display or Workforce Analysis) 41 CFR 60-2.11 | | | |
| JOB GROUP ANALYSIS 41 CFR 60-2.12 | | | |
| **EXECUTIVE ORDER 11246 UTILIZATION ANALYSIS** | | | |
| PLACEMENT OF INCUMBENTS IN JOB GROUPS 41 CFR 60-2.13 | | | |
| DETERMININATION OF AVAILABILITY 41 CFR 60-2.14 | | | |
| COMPARISON OF INCUMBENCY TO AVAILABILITY 41 CFR 60-2.15 | | | |
| PLACEMENT GOALS 41 CFR 60-2.16 | | | |
| **ADDITIONAL REQUIRED ELEMENTS** | | | |
| DESIGNATION OF RESPONSIBILITY 41 CFR 60-2.17(a) | | | |
| IDENTIFICATION OF PROBLEM AREAS 41 CFR 60-2.17(b) | | | |
| ACTION-ORIENTED PROGRAMS 41 CFR 60-2.17(c) | | | |
| INTERNAL AUDIT AND REPORTING SYSTEMS 41 CFR 60-2.17(d) | | | |
| **ITEMIZED LISTING SUPPORT DATA** | | | |
| EXECUTIVE ORDER 11246 | INCLUDED IN DESK AUDIT SUBMISSION? Indicate Y/N | ACCEPTABLE? (Text Only) Y/N | If NO, Include in PART B.II |
| COPIES OF EEO-1 REPORTS FOR LAST THREE YEARS | | | |
| COPY OF BARGAINING AGREEMENTS, IF APPLICABLE | | | |
| REPORT ON GOALS | | | |
| APPLICANT FLOW   Internet Applicant ☐ | | | |
| HIRES | | | |
| PROMOTIONS (including pool data) | | | |

Federal Contract Compliance Manual (FCCM)

| | INCLUDED IN AAP? Indicate Y/N | ACCEPTABLE? (text only) Indicate Y/N | If NO, include in Part B. II |
|---|---|---|---|
| TERMINATIONS (including incumbency data) | | | |
| LAYOFFS/RECALLS (if applicable) | | | |
| EMPLOYEE LEVEL COMPENSATION DATA | | | |
| **SECTION 503 AND VEVRAA** | **INCLUDED IN AAP?** Indicate Y/N | **ACCEPTABLE?** (text only) Indicate Y/N | **If NO, include in Part B. II** |
| EEO POLICY STATEMENT 41 CFR 60-300.44(a); 41 CFR 60-741.44(a) | | | |
| REVIEW OF PERSONNEL PROCESSES 41 CFR 60-300.44(b); 41 CFR 60-741.44(b) | | | |
| REVIEW OF PHYSICAL AND MENTAL JOB QUALIFICATIONS 41 CFR 60-300.44(c); 41 CFR 60-741.44(c) | | | |
| REASONABLE ACCOMMODATION 41 CFR 60-300.44(d); 41 CFR 60-741.44(d) | | | |
| HARASSMENT PREVENTION 41 CFR 60-300.44(e); 41 CFR 60-741.44(e) | | | |
| EXTERNAL DISSEMINATION OF AFFIRMATIVE ACTION POLICY 41 CFR 60-300.44(f)(1)(ii); 41 CFR 60-741.44(f)(1)(ii) | | | |
| ASSESSMENT OF EACH OUTREACH & POSITIVE RECRUITMENT ACTIVITY 41 CFR 60-300.44(f)(3); 41 CFR 60-741.44(f)(3) | | | |
| ASSESSMENT OF TOTALITY OF OUTREACH & POSITIVE RECRUITMENT EFFORTS 41 CFR 60-300.44(f)(3); 41 CFR 60-741.44(f)(3) | | | |
| INTERNAL DISSEMINATION OF EEO POLICY 41 CFR 60-300.44(g); 41 CFR 60-741.44(g) | | | |
| AUDIT AND REPORTING SYSTEM 41 CFR 60-300.44(h); 41 CFR 60-741.44(h) | | | |
| ESTABLISHMENT OF RESPONSIBILITY 41 CFR 60-300.44(i); 41 CFR 60-741.44(i) | | | |
| TRAINING TO ENSURE AAP IMPLEMENTATION 41 CFR 60-300.44(j); 41 CFR 60-741.44(j) | | | |
| DATA COLLECTION ANALYSIS 41 CFR 60-741.44(k); 41 CFR 60-300.44(k) | | | |
| SECTION 503 UTILIZATION GOAL AND ANALYSIS 41 CFR 60-741.45 | | | |
| VEVRAA BENCHMARK FOR HIRING 41 CFR 60-300.45 | | | |

Federal Contract Compliance Manual (FCCM)

| ITEMIZED LISTING DATA | | |
|---|---|---|
| **SECTION 503 AND VEVRAA** | **INCLUDED IN DESK AUDIT SUBMISSION?** Indicate Y/N | **ACCEPTABLE? Y/N IF NO, INCLUDE IN PART B.II** |
| COPIES OF ANY WRITTEN REASONABLE ACCOMMODATION POLICIES, AND DOCUMENTATION OF ANY REQUESTS RECEIVED AND THEIR RESOLUTION | | |
| MOST RECENT ASSESSMENT OF PERSONNEL PROCESSES | | |
| MOST RECENT ASSESSMENT OF PHYSICAL AND MENTAL QUALIFICATIONS | | |
| **OTHER VEVRAA CONSIDERATIONS** | **INDICATE Y/N** | **PROVIDE ANY RELEVANT COMMENTS OR OBSERVATIONS** |
| LISTED JOB OPENINGS WITH EMPLOYMENT SERVICE DELIVERY SYSTEM (41 CFR 60-300.5(A) | | |
| FILED CURRENT VETS-4212 REPORT (41 CFR 300.60(C)) | | |

Federal Contract Compliance Manual (FCCM)

## II. SUMMARY OF AAP ACCEPTABILITY

Summarize all AAP and support data problems identified during the desk audit and any actions taken or plans to resolve (if the action is to take place during or after on-site). If investigated on-site, provide an explanation of the findings, the type of problem (Executive Order 11246, Section 503, VEVRAA), whether and how the problem was resolved, and what remedial action(s) was taken. (Add additional sheets as an attachment to the SCER, if needed).

☐ Continued

| # | AAP AND ITEMIZED LISTING DATA ACCEPTABILITY PROBLEMS | On-site ☑ |
|---|---|---|
| 1 | **PROBLEM:**<br>**ACTION TAKEN:**<br>**FINDINGS:**<br>**RESOLUTION:** | ☐ |
| 2 | **PROBLEM:**<br>**ACTION TAKEN:**<br>**FINDINGS:**<br>**RESOLUTION:** | ☐ |
| 3 | **PROBLEM:**<br>**ACTION TAKEN:**<br>**FINDINGS:**<br>**RESOLUTION:** | ☐ |
| 4 | **PROBLEM:**<br>**ACTION TAKEN:**<br>**FINDINGS:**<br>**RESOLUTION:** | ☐ |
| 5 | **PROBLEM:**<br>**ACTION TAKEN:**<br>**FINDINGS:**<br>**RESOLUTION:** | ☐ |
| 6 | **PROBLEM:**<br>**ACTION TAKEN:**<br>**FINDINGS:**<br>**RESOLUTION:** | ☐ |

Federal Contract Compliance Manual (FCCM)

## III. EEO-1 WORKFORCE AND TREND ANALYSIS

☐ Continued

**EEO-1 Workforce Analysis.**  Identify whether there is a difference in the totals between the most recent EEO-1 report and AAP workforce totals before proceeding to more complex analyses on employment activity.  If there is a difference, review the personnel activity data to see if activities such as hires and terminations explain the difference.  If not, clarification is needed from the contractor to ensure the entire workforce is included in the AAP and to ensure that all personnel activity has been reported.

| Total # Employees from most recent EEO-1 report | Total # Employees from AAP |
|---|---|
| | |

Does personnel activity data (hires and terminations) reflect the difference in totals?

Yes _____  No _____ (if no, explain below)

If there is a difference in totals not accounted for by personnel activity data did contractor provide an acceptable explanation?

Yes _____  No _____Not applicable _____    (If no, explain below)


### EEO-1 TREND ANALYSIS RESULTS

**1.   Trends.**  Examine long-term and short-term trends of minority and female representation in: (a) the total workforce, (b) white-collar EEO-1 categories and (c) blue-collar EEO-1 categories.  If there are any negative trends, discuss below.  If there are no negative trends, check here and go on to number 2. ( )


**2.   Job Category Patterns.**  Determine if there are any negative trends of minority or female representation by EEO-1 job category.  If there were negative trends, explain below.  If there are no negative trends check here and go on to number 3. ( )


**3.   Particular Group.** Examine the EEO-1 report to see if personnel activity data reported as minority and nonminority could be potentially masking a particular minority group issue.  If the assessment is yes, collect personnel activity by race.  Determine if there are any substantial disparities in the trends of a particular minority group, or of men or women of a particular minority group, either in the workforce as a whole or in specific job groups.  If disparities exist, explain them below.

Federal Contract Compliance Manual (FCCM)

## IV. EVALUATION OF GOOD FAITH EFFORTS - EXECUTIVE ORDER 11246

Identify Executive Order 11246 goal areas where goals were established but not met. For each goal area not met, identify the job group; describe whether goals were for minorities, females or both for the prior and current year; and identify the expected goal and actual goal. If there is a difference between the expected and actual goals, provide the contractor's explanation for the difference and pertinent AAP commitments. Identify additional information that will be requested and whether the issue needs to be investigated on-site. Provide an explanation of any findings, indicating whether and how the problem was resolved, and what remedial action(s) was taken.

| # | GOAL AREA PROBLEMS | On-site ☑ |
|---|---|---|
| 1 | GOAL AREA (PY/CY): | |
| | EXPLANATION/COMMITMENTS: | ☐ |
| | ADDITIONAL INFO: | |
| | FINDINGS: | |
| | RESOLUTION: | |
| 2 | GOAL AREA (PY/CY): | |
| | EXPLANATION/COMMITMENTS: | ☐ |
| | ADDITIONAL INFO: | |
| | FINDINGS: | |
| | RESOLUTION: | |
| 3 | GOAL AREA (PY/CY): | |
| | EXPLANATION/COMMITMENTS: | ☐ |
| | ADDITIONAL INFO: | |
| | FINDINGS: | |
| | RESOLUTION: | |
| 4 | GOAL AREA (PY/CY): | |
| | EXPLANATION/COMMITMENTS: | ☐ |
| | ADDITIONAL INFO: | |
| | FINDINGS: | |
| | RESOLUTION: | |
| 5 | GOAL AREA (PY/CY): | |
| | EXPLANATION/COMMITMENTS: | ☐ |
| | ADDITIONAL INFO: | |
| | FINDINGS: | |
| | RESOLUTION: | |
| 6 | GOAL AREA (PY/CY): | |
| | EXPLANATION/COMMITMENTS: | ☐ |
| | ADDITIONAL INFO: | |
| | FINDINGS: | |
| | RESOLUTION: | |

### V. SECTION 503 UTILIZATION ANALYSIS AND OUTREACH ASSESSMENT

**Utilization Analysis.** Identify whether the contractor met the 7 percent disability utilization goal in each of its AAP job groups or, if the contractor has fewer than 100 employees, in the contractor's workforce as a whole. If the goal was not met, the contractor must take steps to determine whether and where impediments to equal employment opportunity exist. If any problem areas are identified, the contractor must develop and execute action-oriented programs designed to correct them. Identify the steps the contractor took to determine if impediments exist, and the action-oriented programs developed to correct any identified problem areas. Identify whether the issue needs to be investigated on-site. Provide an explanation of any findings, indicating whether and how the problem was resolved, and what remedial action(s) was taken. Also, explain any progress the contractor is making in the current year, if the contractor is six months or more into its current year AAP.

| # | UTILIZATION GOAL PROBLEM AREAS – MORE THAN 100 EMPLOYEES | On-site ☑ |
|---|---|---|
| | If contractor set goals by job group, did the contractor meet the 7% utilization goal in each job group? Yes ☐  No ☐  N/A ☐ <br><br> If no, identify the job group(s) where the goal was not met (including percent achieved by the contractor), the steps taken to identify problem areas and the action-oriented programs to correct identified problem areas. Add more rows as needed. | |
| 1 | JOB GROUP & PERCENT ACHIEVED: | |
| | STEPS TAKEN: | |
| | PROBLEM AREAS IDENTIFIED: | ☐ |
| | ACTION-ORIENTED PROGRAMS: | |
| | FINDINGS & RESOLUTION: | |
| | CURRENT YEAR PROGRESS: | |
| 2 | JOB GROUP & PERCENT ACHIEVED: | |
| | STEPS TAKEN: | |
| | PROBLEM AREAS IDENTIFIED: | ☐ |
| | ACTION-ORIENTED PROGRAMS: | |
| | FINDINGS & RESOLUTION: | |
| | CURRENT YEAR PROGRESS: | |
| 3 | JOB GROUP & PERCENT ACHIEVED: | |
| | STEPS TAKEN: | |
| | PROBLEM AREAS IDENTIFIED: | ☐ |
| | ACTION-ORIENTED PROGRAMS: | |
| | FINDINGS & RESOLUTION: | |
| | CURRENT YEAR PROGRESS: | |
| 4 | JOB GROUP & PERCENT ACHIEVED: | ☐ |
| | STEPS TAKEN: | |
| | PROBLEM AREAS IDENTIFIED: | |

Federal Contract Compliance Manual (FCCM)

| # | UTILIZATION GOAL PROBLEM AREAS – MORE THAN 100 EMPLOYEES | On-site ☑ |
|---|---|---|
| | **ACTION-ORIENTED PROGRAMS:** | |
| | **FINDINGS & RESOLUTION:** | |
| | **CURRENT YEAR PROGRESS:** | |
| 5 | **JOB GROUP  & PERCENT ACHIEVED:** | |
| | **STEPS TAKEN:** | |
| | **PROBLEM AREAS IDENTIFIED:** | ☐ |
| | **ACTION-ORIENTED PROGRAMS:** | |
| | **FINDINGS & RESOLUTION:** | |
| | **CURRENT YEAR PROGRESS:** | |

| UTILIZATION GOAL PROBLEM AREAS – FEWER THAN 100 EMPLOYEES | On-site ☑ |
|---|---|
| If contractor opted to set goal for entire workforce, did the contractor meet its 7% utilization goal?<br><br>Yes ☐   No ☐   N/A ☐   (if no, identify problem area(s))<br><br>If no, identify the percent achieved by the contractor for its workforce as a whole, the steps taken to identify problem areas and the action-oriented programs to correct identified problem areas. | |
| **PERCENT ACHIEVED:** | |
| **STEPS TAKEN:** | |
| **PROBLEM AREAS IDENTIFIED:** | ☐ |
| **ACTION-ORIENTED PROGRAMS:** | |
| **FINDINGS & RESOLUTION:** | |
| **CURRENT YEAR PROGRESS:** | |

Federal Contract Compliance Manual (FCCM)

**SECTION 503 Outreach Assessment.** Indicate whether the contractor evaluated the effectiveness of each outreach and positive recruitment effort, and whether the contractor concluded that the totality of its efforts were effective in identifying and recruiting qualified individuals with disabilities. Also, indicate whether the contractor's conclusion is reasonable and, if not, explain why. If the contractor concludes that its efforts were not effective, list the alternative efforts that it has identified. Identify any additional information that will be requested and whether the issue needs to be investigated on-site. Provide an explanation of any findings, indicating whether and how the problem was resolved, and what remedial action(s) was taken.

| SECTION 503 OUTREACH ASSESSMENT | On-site ☑ |
|---|---|
| Did the contractor evaluate the effectiveness of each outreach and positive recruitment effort it undertook, and draw a conclusion as to whether the totality of its efforts were effective in identifying and recruiting qualified individuals with disabilities? If not, explain in the Findings section below.<br><br>Yes ☐  No ☐ | ☐ |
| Was the contractor's conclusion reasonable? If no, explain why in the Findings section below.<br><br>Yes ☐  No ☐ | ☐ |
| Additional Information to be Requested: | ☐ |
| Findings: | ☐ |

Federal Contract Compliance Manual (FCCM)

## VI. VEVRAA OUTREACH ASSESSMENT

**VEVRAA Outreach Assessment.**  Indicate whether the contractor evaluated the effectiveness of each outreach and positive recruitment effort, and whether the contractor concluded that the totality of its efforts were effective in identifying and recruiting qualified protected veterans.  Also, indicate whether the contractor's conclusion is reasonable and, if not, explain why.  If the contractor concludes that its efforts were not effective, list the alternative efforts that it has identified.  Identify any additional information that will be requested and whether the issue needs to be investigated on-site.  Provide an explanation of any findings, indicating whether and how the problem was resolved, and what remedial action(s) was taken.

| VEVRAA OUTREACH ASSESSMENT | On-site ☑ |
|---|---|
| Did the contractor evaluate the effectiveness of each outreach and positive recruitment effort it undertook, and draw a conclusion as to whether the totality of its efforts were effective in identifying and recruiting qualified protected veterans?  If not, explain in the Findings section below.<br><br>Yes ☐   No ☐ | ☐ |
| Was the contractor's conclusion reasonable?  If no, explain why not in the Findings section below.<br><br>Yes ☐   No ☐ | ☐ |
| Additional Information to be Requested: | ☐ |
| Findings: | ☐ |

Federal Contract Compliance Manual (FCCM)

## VII. EMPLOYMENT ACTIVITY DATA ANALYSES

**Desk Audit Analyses.**  **S**ummarize any potential systemic or individual discrimination found under any legal authority during the desk audit from analyzing employment activity data, including compensation, hires, terminations and promotions (*e.g.,* statistical indicators showing disparate impact against minorities or women).  Include a discussion of the nature of any indicators of discrimination, relevant evidence collected and reviewed at desk audit, actions (if any) taken to resolve the indicators, and whether and how the problem was resolved.  If the discrimination indicator could not be resolved through additional data analysis during pre-on-site or early resolution procedures, check the box to indicate if the compliance evaluation will continue with an on-site investigation.

| EMPLOYMENT DATA ANALYSES RESULTS | On-site ☑ |
|---|---|
| **HIRING ANALYSIS RESULTS:** | ☐ |
| **TERMINATION ANALYSIS RESULTS.** | ☐ |
| **PROMOTION ANALYSIS RESULTS.** | ☐ |
| **COMPENSATION ANALYSIS RESULTS.** | ☐ |

Federal Contract Compliance Manual (FCCM)

## VIII. OTHER PROBLEMS FOR ON-SITE INVESTIGATION

Identify any other problems that require additional information and/or require an on-site review, such as a pay secrecy policy or minority and female representation, as applicable within departments/units; possible lines of progression (within department or across department lines); grade or salary levels; supervisory positions vs. those supervised, etc.  Provide an explanation of any findings, indicating how the problem was resolved and what remedial action(s) was taken.  If the problems could not be resolved through additional records requests during pre-on-site or early resolution procedures, check the on-site box.  Desk audit discrimination indicators are reported in Part B, VII.

| # | PROBLEM AREAS | On-site ☑ |
|---|---|---|
| 1 | PROBLEM AREA: | ☐ |
|   | ADDITIONAL INFO: |  |
|   | FINDINGS: |  |
|   | RESOLUTION: |  |
| 2 | PROBLEM AREA: | ☐ |
|   | ADDITIONAL INFO: |  |
|   | FINDINGS: |  |
|   | RESOLUTION: |  |
| 3 | PROBLEM AREA: | ☐ |
|   | ADDITIONAL INFO: |  |
|   | FINDINGS: |  |
|   | RESOLUTION: |  |
| 4 | PROBLEM AREA: | ☐ |
|   | ADDITIONAL INFO: |  |
|   | FINDINGS: |  |
|   | RESOLUTION: |  |
| 5 | PROBLEM AREA: | ☐ |
|   | ADDITIONAL INFO: |  |
|   | FINDINGS: |  |
|   | RESOLUTION: |  |

Federal Contract Compliance Manual (FCCM)

# PART C: ON-SITE INVESTIGATION

## I. IMPLEMENTATION: EQUAL OPPORTUNITY CLAUSE AND OTHER REQUIREMENTS
## UNDER EXECUTIVE ORDER 11246, SECTION 503, VEVRAA AND EXECUTIVE ORDER 13496

Determine whether the contractor complied with the following requirements (Yes/No). If "Yes," indicate how this was confirmed. If "No," explain the problem, whether it was resolved and, if resolved, indicate how. If requirements are not resolved, they must be included in the **Case Summary and Recommendations** section**.**

| Applicable under Executive Order 11246, Section 503 and VEVRAA |
|---|
| **INCLUDED EQUAL OPPORTUNITY CLAUSE IN SUBCONTRACTS AND PURCHASE ORDERS** (41 CFR 60- 1.4, 41 CFR 60-300.5, 41 CFR 60-741.5) |
| |
| **POSTED CURRENT NOTICES, INCLUDING THE "EEO IS THE LAW" POSTER AND ANY REQUIRED SUPPLEMENT IN CONSPICUOUS PLACES, ELECTRONICALLY WHERE REQUIRED** (41 CFR 60- 1.4, 41 CFR 60-300.5, 41 CFR 60-741.5) |
| |
| **NOTIFIED PARTIES WITH WHICH IT HAS A CBA OF ITS EEO OBLIGATIONS** (41 CFR 60- 1.4,  41 CFR 60-300.5, 41 CFR 60-741.5) |
| |
| **INCLUDED EEO LANGUAGE IN JOB ADVERTISEMENTS** (41 CFR 60-1.4, 41 CFR 60-300.5, 41 CFR 60-741.5) |
| |
| Applicable under Executive Order 11246 only |
| **POSTED PAY TRANSPARENCY NONDISCRIMINATION PROVISION (PHYSICALLY OR ELECTRONICALLY) AND INCLUDED IT IN CURRENT EMPLOYEE MANUALS AND HANDBOOKS** (41 CFR 60-1.35(c)) |
| |

Federal Contract Compliance Manual (FCCM)

| **Applicable under Section 503 and VEVRAA** |
|---|
| **MADE AAPS AVAILABLE FOR INSPECTION, AND POSTED LOCATION AND HOURS** (41 CFR 60-300.41, 41 CFR 60-741.41) |
| |
| **COMPLIED WITH REQUIREMENTS RELATED TO DISABILITY-RELATED QUESTIONS AND MEDICAL EXAMINATIONS** (41 CFR 60-300.23, 41 CFR 60-741.23) |
| |
| **COMPLIED WITH THE REQUIREMENTS RELATED TO CONFIDENTIALITY AND USE OF MEDICAL INFORMATION** (41 CFR 60-300.23(d), 41 CFR 60-741.23(d) |
| |
| **COMPLIED WITH REQUIREMENTS RELATED TO THE INVITATION TO SELF-IDENTIFY AS A PROTECTED VETERAN AND THE INVITATION TO SELF-IDENTIFY AS AN INDIVIDUAL WITH A DISABILITY (FORM CC-305)** (41 CFR 60-300.42, 41 CFR 60-741.42) |
| |

| **Applicable under Executive Order 13496 only** |
|---|
| **POSTED NOTICE OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT** (Required poster and electronic posting, if applicable) (29 CFR 471.2) |
| |
| **INCLUDED NOTICE OF EXECUTIVE ORDER 13496 OBLIGATIONS IN SUBCONTRACTS** (29 CFR 471, Subpart A, app.  A) |
| |

## II. IMPLEMENTATION OF REGULATIONS
## PROHIBITING DISCRIMINATION ON THE BASIS OF SEX

Verify the contractor's implementation of the regulations prohibiting discrimination on the basis of sex at 41 CFR Parts 60-1 and 60-20.  If the contractor is in compliance, describe below how this determination was made (*e.g.,* specifically reference documentation and other evidence reviewed that is relevant to the determination, and describe/summarize relevant interview statements).  If not, explain the problem, whether it has been resolved and, if so, how.  If you identify a potential discrimination problem, include the issue in Part C, V – Problems Identified During the On-site Investigation.

| SEX DISCRIMINATION REGULATIONS, 41 CFR PART 60-20 VIOLATION? YES / NO   EXPLAIN |
|---|
| **Discrimination Based on Pregnancy, Childbirth and Related Medical Conditions** (41 CFR 60-20.5) |
| Review the contractor's job policies and practices with regard to pregnancy, childbirth and related medical conditions.  Does the contractor treat employees and applicants affected by pregnancy, childbirth and related medical conditions the same as employees affected by other medical conditions who are similar in their ability or inability to work?  Examine the contractor's policies and practices related to: <br><br>    (a)  Health insurance; <br>    (b)  Job accommodations; and <br>    (c)  Leave <br><br>If such policies or practices are the same for pregnancy-related conditions and other medical conditions that are similar in their effect on employees' ability to work, examine whether such policies or practices have an adverse impact on the basis of sex and, if so, whether the contractor has shown that such policies or practices are job-related and consistent with business necessity. |
| **Sexual Harassment and Hostile Work Environments** (41 CFR 60-20.8) |
| Is there evidence of unwelcome sexual advances, requests for sexual favors, offensive remarks about a person's sex, or other verbal or physical conduct of a sexual nature under any of the following circumstances? <br><br>    1)  Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; <br>    2)  Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or <br>    3)  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance; or creating an intimidating, hostile or offensive working environment. |

## III. IMPLEMENTATION OF THE GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION OR NATIONAL ORIGIN

Verify the contractor's implementation of the regulations prohibiting discrimination on the basis of religion and national origin at 41 CFR Part 60-1, and the Guidelines on Discrimination Because of Religion or National Origin at 41 CFR Part 60-50. If the contractor is in compliance, describe below how this determination was made (*e.g.,* reference documentation and other evidence that was reviewed, and describe statements made during interviews). If not, explain the problem, whether it has been resolved and, if so, how. If you identify a potential discrimination problem, include the issue in Part C, V –Problems Identified During the On-site Investigation.

| GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION, 41 CFR PART 60-50 VIOLATION?  YES/ NO EXPLAIN |
|---|
| **Equal Employment Policy** (41 CFR 60-50.2) |
| 1.  Contractor does/does not discriminate on the basis of religion. If discrimination is found, please explain the problem in Part C, V – Problems Identified During the On-site Investigation, and describe any related violation findings in the Case Summary and Recommendations section. |
| 2.  Describe any outreach efforts made by the contractor, if required to address EEO disparities based on religion. |
| **Accommodations to Religious Observance and Practice** (41 CFR 60-50.3) |
| Contractor provides requested accommodations for religious observances and practices unless it can demonstrate that providing an accommodation would cause an undue hardship on the contractor's business. If accommodations were wrongly denied, please explain. |

| GUIDELINES ON DISCRIMINATION BECAUSE OF NATIONAL ORIGIN, 41 CFR PART 60-50 VIOLATION?  YES/ NO EXPLAIN |
|---|
| **Equal Employment Policy** (41 CFR 60-50.2) |
| 1.  Contractor does/does not discriminate on the basis of national origin. If discrimination is found, please explain the problem in Part C, V – Problems Identified During the On-site Investigation, and describe any related violation findings in the Case Summary and Recommendations section. |
| 2.  Describe any outreach efforts made by the contractor, if required to address EEO disparities based on national origin. |

### IV. INVESTIGATING POTENTIAL DISCRIMINATION
### IDENTIFIED DURING DESK AUDIT

**Discrimination Investigative Results.** Record the on-site investigative findings for any potential systemic or individual discrimination that was identified during desk audit and recorded in Part B, VII of the SCER (*e.g.,* statistical indicators showing disparate impact against minorities or women in hiring or compensation, evidence of disparate treatment). Include a discussion of the nature of the problem, relevant evidence collected and reviewed, actions (if any) taken to resolve the problem, and whether and how the problem was resolved. Also include any findings of violation in **Case Summary and Recommendations** section.

| SUMMARY OF PROBLEMS, ACTIONS TAKEN AND RESOLUTION<br>(Add additional sheets as an attachment to the SCER, if needed) |
| --- |
|  |
|  |
|  |

Federal Contract Compliance Manual (FCCM)

### V. PROBLEMS IDENTIFIED DURING THE ON-SITE INVESTIGATION

**Investigating Problems Identified On-site.**  Record the on-site investigative findings for any problems discovered during the on-site investigation (*e.g.,* anecdotal evidence describing discrimination or harassment against employees based on disability, protected veterans' status, sexual orientation or gender identity, or suggesting that the contractor prohibits employees from discussing their pay).  Include a discussion of the nature of the problem, relevant evidence collected and reviewed, actions (if any) taken to resolve the problem, and whether and how the problem was resolved.  Also include any findings of violation in **Case Summary and Recommendations** section.

| SUMMARY OF PROBLEMS, ACTIONS TAKEN AND RESOLUTION<br>(Add additional sheets as an attachment to the SCER, if needed) |
|---|
| |
| |
| |

Federal Contract Compliance Manual (FCCM)

# PART D: CORPORATE MANAGEMENT
# EVALUATION (CMCE) NARRATIVE
### (Only complete when conducting a CMCE)

When conducting a CMCE, this part of the SCER must be completed in addition to the Case Summary and Recommendations section; and Parts A, B and C. Compliance officers should use the Consolidated EEO-1 Report (Type 2) and Headquarters Report (Type 3) for completing the information related to corporate establishment representation.

This document must be attached to all CMCE SCERS. If using the Adobe format and the narrative extends beyond the space available on the form, then tab and file the document, and list the tab with the location in the space the question (*e.g.,* see Tab File 1-A – Hires). While this is a guide, all questions listed should be answered; however, you are not limited to only to the questions listed. See the FCCM, Chapter 4 and 41 CFR 60-2.30 for additional information.

| Introduction: | Describe the corporate background, structure, observations concerning corporate culture and values. Also, describe any previous OFCCP reviews or complaints, or complaints filed with other agencies that specifically address management jobs or "glass ceiling" issues. |
|---|---|
| AAP Development: | Did the contractor develop and maintain an AAP at each facility (yes/no). If "no" explain how employees are accounted for in the contractor's AAPs? |
| Corporate AAP: | List the positions at lower-level establishments that are rolled-up into the Corporate AAP? |
| Scope: | Did the evaluation only cover the corporate headquarters? Yes/No<br>If no because the evaluation was extended beyond the corporate headquarters to an intermediate headquarters or lower-level establishment, please explain the circumstances for the decision. |
| Focus Level and Areas: | Describe the company's pay and management structure. |

Federal Contract Compliance Manual (FCCM)

| | |
|---|---|
| **Outreach Efforts:** | Describe and assess the effectiveness of recruitment programs the company has in place at various levels.  For upper-level management, do they use executive search firms or informal referrals from current executive level employees, or both? If executive search firms, what type? Were they informed of EEO/AA policy? |
| **Jobs Filled at and above the Focus Level:** | Describe the representation at the focus levels and during the evaluation period.  Determine what jobs have been filled at the mid- and senior corporate management levels, and how were they filled (hire, promotion, transfer).  Describe external and internal opportunities. |
| **Internal Development - Specific Programs:** | Does the company have development programs/opportunities for top management positions in the following areas and, if so, describe the participation (minorities, women, individuals with disabilities and protected veterans) in the programs: 1) Succession and Related Planning, 2) Performance Appraisals, 3) Visibility (Special Projects/Task Forces, Committees, Special Assistants/Executive Assistants), 4) Management Training and Executive Development Programs, and 5) Mentoring and Networking.  Identify whether any of these programs/opportunities are designed for a particular group. During the review period, how many employees have gone through training and development programs?  How many of those employees are males, females, various races, individuals with disabilities and/or protected veterans.  How many have been promoted after completing the program?  Describe the benefits of the program and the relationship to promotions.  What happens if someone does not complete the program and their eligibility for future advancement? What is the contractor's policy and procedures on promotions, transfers and training opportunities? |
| **Total Compensation:** | Describe the compensation system, including any findings with regard to  1) Bonuses, 2) Stock, 3) Perks, and 4) Award and Honor Programs. What are the names of bonus/incentive plan(s)? Who is eligible? What are the criteria for eligibility, *e.g.,* length of service, minimum performance level, designation as a critical or high-potential employee? How is the final award determined, reviewed and approved? |
| **Terminations:** | Have there been any terminations among the mid- and senior level corporate management? What are the termination policies and practices? Are they evenhandedly applied? |

APPENDIX A-2:  STANDARD COMPLIANCE EVALUATION REPORT (SCER)
INSTRUCTIONS

**OVERALL SCER STRUCTURE**

This SCER is used to document the results of a compliance evaluation, including the findings of the desk audit review of the contractor's Affirmative Action Programs (AAP).

How much of the SCER is completed during each particular desk audit or on-site review, or both, will depend on the type of evaluation being performed, the extent of investigation required and the data submitted by the contractor.

The SCER provides space for the compliance officer (CO) to enter narratives describing any problems identified, action(s) taken to resolve the problems, any finding(s) of violation, the evidence examined and the basis for the finding(s), and recommended corrective action.

The specific parts of the SCER are: Contractor Information, Case Summary and Recommendations: Part A: Preparation, Part B: Desk Audit, Part C: On-site Investigation, Part D: Corporate Management Compliance Evaluation (CMCE) Narrative.

**INSTRUCTIONS**

At the top of each page described below, there may be a "continued" box.  Check it to indicate when additional pages have been inserted for the section.

**CONTRACTOR INFORMATION**

Item 1 – Establishment Name/Functional Unit, Address and Case Management System (CMS) Control #: Enter the name and address of the establishment or functional unit being reviewed. Also enter the CMS Control number assigned to this review.

Item 2 – Parent Name and Address: If the establishment or functional unit being reviewed is part of a larger firm, enter the name and address of the parent firm.

Item 3 – Complaints Investigated During Review: Enter the complaint number of each complaint you plan to investigate as part of the compliance evaluation, if any.  At the end of the evaluation, check [ ] those complaints that have been resolved.  If, during the course of a compliance evaluation, a complaint arises and is investigated, that information will be noted here.

Item 4 – Contract Coverage: Indicate whether contract information is in CMS and if it covers the entire evaluation period.  If the contract information is not in CMS or if you are conducting an on-site review and find more contracts, fill in the boxes with the following items: awarding agency, name of prime contractor if evaluation is being conducted of a subcontractor, the contract or purchase order number, dollar amount of the contract, and contract begin and end dates (or indicate if contract is indefinite).  There are spaces for at least three contracts.  More may be referenced on a separate page in the case file, if necessary.

Federal Contract Compliance Manual (FCCM)

Item 5 – Company Contacts and Outside Representation: List the name, title, phone number and e-mail address of the corporate and establishment Chief Executive Officer (CEO) (or other highest ranking executive), and the corporate and establishment contact persons for Equal Employment Opportunity and Affirmative Action (EEO and AA) matters. Also list the name, e-mail address and phone number of the outside representative (*e.g.,* attorney), if applicable.

Item 6 – Background Information: To the degree known, this item will include, but not be limited to, type of industry (*e.g.,* construction materials) and specific facility function (*e.g.,* manufacturing A-frames).

Item 7 – Compliance Evaluation Information: This item contains basic information pertinent to the start of a compliance evaluation. First, indicate if the evaluation is a Functional Affirmative Action Program (FAAP) review, Focused Review or CMCE. Then, fill in the charts with the requested information regarding important dates, whether the contractor is unionized and the North American Industrial Classification System (NAICS) code. After that, enter the geographic area in which the establishment or functional unit is located or, if it is not in a Metropolitan Statistical Area (MSA), enter the name of the appropriate labor area in which it is located. Then, enter the percent of the labor force within the named geographic area that is female and the percent that is minority (in the aggregate and by each minority group listed).

Charts are also provided for the CO to enter the contractor's workforce data, total and percentage, by race/ethnicity, veteran status and disability status. The charts allow for a rough sketch of the workforce composition for COs at the beginning of the compliance evaluation. They are not intended to replace the other analyses conducted during the compliance evaluation. To populate the charts, use data from AAP sources, such as the Executive Order 11246 organizational profile, VETS-4212 database and Section 503 utilization analysis. The data source(s) you choose should be noted on the SCER.

## CASE SUMMARY AND RECOMMENDATIONS

After the evaluation has been completed, provide a brief summary of the findings to include: all unresolved violations and the recommendations for corrective action. For findings of violation, include for each violation: the time period of the violation; applicable law and regulation; evidence obtained, reviewed and the analyses conducted; and recommended corrective action(s) and the documents that will be prepared (*e.g.,* Notice of Violation(s), and Conciliation Agreement (CA)). If there is no finding of a violation and a closure letter is to be issued, provide a brief description of the basis for this recommended action.

*On-site Box*: The CO will indicate whether an on-site occurred and, if so, the reason for the on-site.

*Early Resolution Procedures Box*: The CO will check "yes" if the contractor engaged in early resolution procedures.

*Signature Blocks:* The CO must sign and date the report in the space provided. Upon approval of the report, the Assistant District Director and District Director must also sign and date it.

Federal Contract Compliance Manual (FCCM)

**PART A: PREPARATION:** Past Problems, Known Complaints or Enforcement Proceedings, and Collaboration with Other Agencies

1.  Past Problems: Determine whether this establishment, or functional or business unit, has been subject to past compliance evaluations or OFCCP complaint investigations.  If there have been no prior evaluations or complaint investigations, check the box at the top of the page and skip to item 2 (Known Complaints or Enforcement Proceedings).  If a CA was issued in previous evaluations or investigations, attach a copy.  In addition, complete this Part with the following information:

    a.  Past Problems – Give the date of any past compliance evaluation or complaint investigation and list any major problems identified (*e.g.,* recordkeeping, etc.).

    b.  Recurrence – At whatever point in the evaluation you have evidence that a past problem has recurred, describe the problem and evidence of recurrence.  If you find that it did not recur, note "no" in this space.

2.  Known Complaints/Enforcement Proceedings: Review responses received from other agencies on any complaints filed or ongoing enforcement proceedings against this establishment.  If there are no such pending complaints or ongoing enforcement proceedings, state this and no further entries are needed in this part.  If there are such complaints or proceedings, complete this Part as follows:

    a.  List Known Complaints or Enforcement Proceedings – For each complaint or enforcement proceeding, indicate with what agency it was filed, its basis (including whether it is an individual or class complaint), issue, current status and the part of the workforce or establishment department it appears to concern (*e.g.,* clerical, professional, entry-level blue-collar, etc.).

    b.  Related Problem Not Investigated in Known Complaint or Enforcement Proceeding – As you review the responses from the agencies, be alert for any indications of potential systemic discrimination or individual disparate treatment problems (*e.g.,* discrimination based on sexual orientation or gender identity) that should be investigated.  Note those here.

3.  Collaboration or Referrals to other Agencies (*e.g.,* EEOC, WHD or OSHA): If collaboration occurred during the investigation, list agency and basis for collaboration, and describe the issue and collaboration.  If a referral was made to another agency, list agency, basis for referral the issue and the part of the workforce or establishment department it appears to concern.

**PART B:  DESK AUDIT**

I. INITIAL REVIEW OF AAPS AND SUPPORT DATA SUBMISSIONS

Complete this section once you have received and reviewed the contractor's initial

AAP and support data submissions, following instructions in the Federal Contract Compliance Manual.  Complete this section as follows:

*Included:*  Review the Executive Order, Section 503 and VEVRAA AAP(s), as applicable, and the itemized listing data for each, to ensure that all required elements are present (complete).  Beside each item, enter a "Y" for "yes" if it is included, or an "N" for "no" if it is missing.

*Acceptable:* Beside each listed element, enter a "Y" or "N" to indicate whether the AAP components and support data are acceptable.  This determination of acceptability is limited to the evaluation that COs can conduct during the desk audit.  If any item is not acceptable, list it in Part B. II of the SCER and describe the specific problem and actions taken.  For compensation data, ensure that the data includes all employees, including, but not limited to, full-time, part-time, contract, per diem or day labor, and temporary employees, as of the date of the organizational display or workforce analysis (*i.e.*, the organizational profile).

## II. SUMMARY OF AAP ACCEPTABILITY

The CO must provide a detailed explanation of each AAP and support data problem.  Each problem area must be described separately.  If the problem is not resolved at the desk audit and on-site verification of compliance is necessary, the on-site box must be checked.  The AAP and Supporting Data Problems description should include:

*Problem:* Provide a brief description of the identified problem and whether the problem concerns the Executive Order 11246, Section 503, VEVRAA AAPs, or support data.

*Action Taken:* The steps that were taken to resolve the problem, or the steps that will be taken (Plan to Resolve) if the action is to take place during or after an on-site review.

*Findings:* Indicate whether problems were identified based on an off-site analysis or whether an on-site review was conducted.  Note any finding(s) and briefly describe the basis for the finding(s).

*Resolution:* If the problem is resolved, explain how it was resolved.  If the problem is not resolved, the issue must be included in the Case Summary and Recommendations section of the SCER.

## III. EEO-1 WORKFORCE AND TREND ANALYSIS

The purpose of this preparation is to identify whether there is a difference in the totals between the most recent EEO-1 report and AAP workforce totals to determine if more information and clarification is needed before proceeding to more complex analyses.  If there is a difference, COs should look at personnel activity data to see if activities such as hires and terminations explain the difference.  If not, clarification is needed from the contractor to ensure the entire workforce is included in the AAP and to ensure that all personnel activity has been reported.

The EEO Trend Analysis is to examine employment trends and patterns in the contractor's workforce.  Specifically, the trend analysis identifies underrepresentations and concentrations of employees by EEO-1 category.  Provide a narrative of the results of the trend analysis.

Federal Contract Compliance Manual (FCCM)

## IV.  EVALUATION OF GOOD FAITH EFFORTS – EXECUTIVE ORDER 11246

Identify goal areas where Executive Order 11246 goals were established but not met and indicate if an on-site investigation is needed.  For each goal area that was not met, include the following:

*Goal Area:* Identify job group; indicate whether goals were for minorities, females or both; identify whether the goals were for the prior year (PY), the current year (CY) or both; and identify the expected goal and actual goal.

*Explanation and Commitments:* If there is a difference between the expected and actual goals, provide the contractor's explanation for the difference and pertinent AAP commitments.

*Additional Information:* Note any information that will be requested.  If an on-site is needed to obtain the information or to address the problem, check the on-site box.

*Findings:* Indicate whether problems were identified based on an off-site analysis or whether an on-site review was conducted.  Note any finding(s) and briefly describe the basis for the finding(s).

*Resolution:* If the problem is resolved, explain how it was resolved.  If the problem is not resolved and remedial action must be taken, include a description of the recommended action in the Case Summary and Recommendations section of the SCER.

## V. SECTION 503 UTILIZATION ANALYSIS AND OUTREACH ASSESSMENT

For the utilization analysis, identify whether the contractor established the seven percent utilization goal for each job group or, if fewer than 100 employees, for the entire workforce. Describe what steps were taken to determine whether impediments to equal opportunity exist, any problem areas identified, and the action-oriented programs designed to correct any problem areas.  If further investigation is needed on site, indicate by checking the box.  Also, provide an explanation of any findings, indicating whether the problem was resolved and what remedial action (s) was taken.  For contractors more than six months into the current AAP year, indicate any progress it has made toward meeting the seven percent goal.

For the outreach assessment, review the AAP to determine if the contractor evaluated the effectiveness of each outreach and positive recruitment effort it undertook.  Also, determine if the contractor drew a conclusion as to whether the totality of the efforts were effective in identifying and recruiting qualified individuals with disabilities.  If so, indicate whether the contractor's conclusion was reasonable.  If the conclusion was not reasonable, explain why not. Finally, list any additional information that you need to request from the contractor.

## VI. VEVRAA OUTREACH ASSESSMENT

For the outreach assessment, review the AAP to determine if the contractor evaluated the effectiveness of each outreach and positive recruitment effort it undertook.  Also, determine if the contractor drew a conclusion as to whether the totality of the efforts was effective in identifying and recruiting qualified veterans.  If so, indicate whether the contractor's conclusion

was reasonable.  If the conclusion was not reasonable, explain why not.  Finally, list any additional information that you need to request from the contractor.

## VII.  EMPLOYMENT ACTIVITY DATA ANALYSES

In this section, the compliance officer describes any potential systemic or individual discrimination found during the desk audit.  Using the employment activity data submitted by the contractor, discuss any indicators or relevant evidence uncovered at desk audit during the hiring analysis, termination analysis, promotion analysis and compensation analysis, and efforts to resolve the indicators before proceeding to an on-site investigation.  Indicate whether an on-site investigation is needed to resolve any identified issues.

## VIII.  OTHER PROBLEMS FOR ON-SITE INVESTIGATION

Indicate any other problems that require additional information and/or an on-site review, such as pay secrecy policies found at desk audit, problems in minority and female representation, as applicable within departments/units, possible lines of progression (within department or across department lines), supervisory positions vs. those supervised, etc.  Provide an explanation of any findings, indicating how the problem was resolved and what remedial action(s) was taken.  For each identified problem include the following:

*Problem Area:* Provide a brief description of the identified problem.

*Additional Information:* Note any information requested.  If an on-site was needed to obtain the information or to address the problem, check the on-site box.

*Findings:* Indicate whether problems were identified based on an off-site analysis or whether an on-site review was conducted.  Note any finding(s) and briefly describe the basis for the finding(s).

*Resolution:* Provide an explanation of any findings, indicating how the problem was resolved and what remedial action(s) was taken.  Indicators of discrimination are reported in Part B VII.

**PART C: ON-SITE INVESTIGATION**

## I.  IMPLEMENTATION: EQUAL OPPORTUNITY CLAUSE AND OTHER REQUIREMENTS UNDER EXECUTIVE ORDER 11246, SECTION 503, VEVRAA AND EXECUTIVE ORDER 13496

During the on-site review, evaluate whether the listed requirements under EO

11246, Section 503 and VEVRAA, and Executive Order 13496 have been met.  For each of these elements, indicate whether the action was taken by the contractor and how this was evidenced (*e.g.,* identify  or  summarize  the  CO's observation, review of the documentation and interview statements  that  are  responsive)  and  whether  any problems exist.  If problems exist, indicate how the problems were resolved.  If any requirements are not met despite attempts to resolve the problem, include the violation requiring corrective action in the Case Summary and Recommendations section.

Federal Contract Compliance Manual (FCCM)

## II. IMPLEMENTATION OF REGULATIONS PROHIBITING DISCRIMINATION ON THE BASIS OF SEX

During the on-site review, verify the contractor's implementation of the regulations prohibiting discrimination on the basis of sex. For each of the specified elements, indicate what action was taken by the contractor and how this was evidenced (*e.g.,* identify or summarize the documentation and interview statements that are responsive), and whether any problems exist. If problems exist, indicate how the problems were resolved. If there is a potential finding of discrimination, the information must be included in Part C IV of the SCER.

## III. IMPLEMENTATION AND GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION OR NATIONAL ORIGIN

During the on-site review, verify the contractor's implementation of the guidelines on discrimination based on religion and national origin. For each of the specified elements, indicate what action was taken by the contractor and how this was evidenced (*e.g.,* identify or summarize the documentation and interview statements that are responsive), and whether any problems exist. If problems exist, indicate how the problems were resolved. If there is a potential finding of discrimination, the information must be included in Part C IV of the SCER.

## IV. INVESTIGATING POTENTIAL DISCRIMINATION IDENTIFIED DURING DESK AUDIT

Record all identified potential areas of discrimination that have been resolved or that require corrective action in order to be resolved. Include a description of the potential discrimination identified, actions taken to resolve the problem (if any) and whether the problem was resolved. If the problem was not resolved and will require corrective action, the problem must be included in the Case Summary and Recommendations section of the SCER.

## V. PROBLEMS IDENTIFIED DURING THE ON-SITE INVESTIGATION

Record investigative findings for any problems discovered during the on-site investigation that were not previously identified during the desk audit (*e.g.,* anecdotal evidence describing discrimination or harassment against employees based on disability, protected veterans' status, sexual orientation or gender identity, or suggesting that the contractor prohibits employees from discussing their pay). Include a discussion of the nature of the problem, relevant evidence collected and reviewed, actions (if any) taken to resolve the problem, and whether and how the problem was resolved.

## PART D:  CMCE NARRATIVE

When conducting a CMCE, this part must be completed in addition to completing all other parts of the SCER. Supplement the Case Summary and Recommendations section with findings specific to a CMCE. For additional information regarding CMCEs, see Chapter 4 of the Federal Contract Compliance Manual.

Federal Contract Compliance Manual (FCCM)

**APPENDIX A-3:  INDEX FOR A SUPPLY AND SERVICE REVIEW**

**Remember to Index and Tab the Materials.**

**File 1: SCER and Data pertaining to SCER Findings:** This file contains the SCER and data pertaining to the findings.  This includes worksheets, interviews, contractor records, etc., pertinent to issues investigated.  Include all relevant material bearing either for or against the conclusions reached.  Cross reference other files, as applicable, for example: collective bargaining agreement in File 3.

Right Side of Folder

- SCER
- Worksheets
- Supporting documents
- Interviews
- Etc.

Left Side of Folder

- Form CC-100
- Extension requests and responses
- Contractor research form and supporting jurisdiction information

**File 2: Case Chronology, Correspondence and Meeting Notes:**  This file will contain all correspondence, including attachments submitted and meeting notes.  Correspondence includes any material resulting from contacts with the contractor, union, attorneys, consultants, Congress persons and memos to file (not investigative notes).  The closure document will be tabbed.  Note that a copy of the closure document is also placed in File 6.

Right Side: Correspondence – The correspondence must be in reverse chronological order (latest correspondence on top).  As applicable, cross reference other files.

Left Side: Case Chronology Log – CC-53 (in chronological order and legible).

**File 3: Employee Handbooks, Collective Bargaining Agreement and Miscellaneous:** This file will contain a copy of any employee handbooks, collective bargaining agreements, fringe benefit information, leave policy booklets, applications, personnel records and any other similar contractor documents.  Any documents that do not fit the description of materials to be included in any other file will be placed here.

**File 4: SOL Opinions, JRC Memoranda and Post-SCER Update:** This file will contain any Solicitor's (SOL) opinions and Joint Review Committee (JRC) memoranda associated with this review.

Federal Contract Compliance Manual (FCCM)

Also include in this file any material generated after the CO submits the review, for example: transmittal memoranda, additional conciliation efforts, etc.  These materials are other than progress reports (File 5).

**File 5: Progress Reports:** This file will contain:

Right Side: Any progress reports submitted under a conciliation agreement or consent decree, or other court order, and OFCCP's evaluation of the report and the summary of the reports submitted.

**File 6: Historical Review Results:** This file will contain a copy of any available closure letters and documents generated by reviews of this establishment, and a copy of the closure letter or document for the current review.  If reports are required under the conciliation agreement (CA), this file will also contain a copy of the Summary of Progress Reports.

NOTE: The historical file will be retained in the area office (AO) or district office (DO) pursuant to the agency's records management schedule.  If another review of this establishment is scheduled before this case file is retired, the historical file will be pulled from the old case file and moved to the new file.  If another review has not been scheduled, the historical file will be pulled and retained in the AO or DO when the rest of the case is retired.

**File 7: AAP and Itemized Support Data:** This file will contain the contractor's AAP (s) (Affirmative Action Program) and AAP support data evaluated in this review (including the EEO-1 Reports)

Federal Contract Compliance Manual (FCCM)

**APPENDIX A-4:   SAMPLE ON-SITE REVIEW PLAN**

PAGE INTENTIONALLY LEFT BLANK

Federal Contract Compliance Manual (FCCM)

**APPENDIX A-5:   INDEX FOR A CONSTRUCTION REVIEW**

PAGE INTENTIONALLY LEFT BLANK

Federal Contract Compliance Manual (FCCM)

**APPENDIX A-6:    STANDARD COMPLIANCE EVALUATION
REPORT (CONSTRUCTION)**

PAGE INTENTIONALLY LEFT BLANK

Federal Contract Compliance Manual (FCCM)

## APPENDIX A-7:  SPECIAL REMEDIAL CONSIDERATIONS APPLICABLE TO STOCK

**(Reference Section 4I00(b))**

When there is a finding of discrimination in the awarding of stock or stock options, the following considerations apply to remedy.

### I. STOCK AWARDS - VESTED

When the discrimination was in the awarding of vested stock and the vesting date has not yet occurred, the victim is simply awarded the number of shares he or she would have received, absent discrimination, with the same vesting date as other stock recipients.

> Example:  Absent discrimination, on June 1, 2021, the victim would have received 100 shares of stock with a vesting period of three years.  The remedy would be to immediately award the victim 100 shares of stock with a vesting date of June 1, 2021.

Where the vesting date has passed, the remedy will be calculated as indicated in II below, with the vesting date considered the date the victim would have received the stock, absent discrimination.

### II. STOCK AWARDS - ONE-TIME BONUS

1. Shares of Stock:

   a. Establish the number of shares (or additional number of shares) the discriminatee would have received, absent discrimination, and the date(s) he or she would have received them.

   b. Find the dollar value of that number of shares as of the date, absent discrimination, the discriminatee would have the shares and the current dollar value.  Take the higher of the two figures, expressed as the number of current shares.

   Example:  Absent discrimination, the discriminatee would have received 100 additional shares of stock.  On the date he or she should have received the stock, the share price was $20, for a total dollar value of $2,000.

   Scenario A:  The stock has gone down to $10 a share, so the 100 shares are now worth only $1,000.  The discriminatee should receive $2,000 worth of stock at the current price; *i.e.*, 200 shares of stock.

   Scenario B: The stock has gone up to $30 per share, so the 100 shares are now worth $3,000.  The discriminatee should receive 100 shares at the current price.

2. Dividends:

*a.* Determine the dollar amount of stock dividends (or additional stock dividends) the discriminatee would have received, absent discrimination, and add simple interest (see Appendix 7A).

Example:  Determine the dollar amount of dividends that would have been paid on the 100 shares of stock from the date the discriminatee should have received the stock to present and add simple interest.

## III. STOCK OPTIONS

When the discrimination was in the awarding of stock options, the remedy will include awarding the discriminatee the number of stock options he or she would have received, absent discrimination.  The period of time he or she would have had to exercise those options will be calculated from the date he or she actually receives the options.

Example:  On January 1, 2018, absent discrimination, the victim would have received an option to buy 100 shares of stock at any time over the following four years.  If settlement occurred on October 1, 2018, the victim would be able to exercise an option on the 100 shares of stock up until October 1, 2022.

CO's should consult with the national office for specific help and guidance on stock valuation.

**APPENDIX A-8:   INDEX FOR A COMPLAINT FILE**

**Remember to Index and Tab the Materials.**

**File 1: Complaint and Data Submitted by Complainant:** This file contains any information submitted by the complainant, including the envelope.  Materials include:

Right Side of Folder

- Complaint Form (CC-4) or letter of allegations
- Complainant's witness list
- Documents provided to support the allegation
- Interview of Complainant

Left Side of Folder

- CMS forms associated with the investigation
- Extension requests and responses

**File 2: Case Chronology, Correspondence and Meeting Notes:**  This file will contain all correspondence (e.g. letters and emails), including attachments submitted and meeting notes. Correspondence includes any material resulting from contacts with the contractor, union, witnesses, consultants and memos to file (not investigative notes).

Right Side: Correspondence – The correspondence must be placed in reverse chronological order (latest correspondence on top).  As applicable, cross reference other files.

Left Side: Case Chronology Log – CC-53 (in chronological order and legible).

**File 3: Investigative Material:** This file will contain all investigative material pertaining to complaint findings.  Such data may include:

- The Investigative Plan
- The Investigative Report (on top)
- Interview (witness) statements
- Investigative notes
- Applications
- Personnel records
- Statistical evidence
- Comparative evidence
- Anecdotal evidence

**File 4: Medical/Veterans Documentation:** This file will contain any medical/veterans documentation, only if applicable.  Such data may include:

- Medical release
- Medical and disabled veteran status (e.g. DD-214)

- Medical coverage information
- Diagnosis or medical description of disabling condition
- Work restrictions
- For veterans, other coverage information, as needed (e.g. Armed Forces campaign badge information)

**File 5: Legal:** This file will contain any documents related to legal activity including:

- Notice of Results Investigation (NORI) (on top unless there is a Conciliation Agreement)
- Conciliation Agreements (on top if completed)
- Solicitor's opinions
- Joint Review Committee meeting notes and/or report
- Freedom of Information Act and Privacy Act determinations
- Enforcement recommendations
- Jurisdictional and contract coverage information (on the bottom)

**File 6: Employee Handbooks, Collective Bargaining Agreement and Miscellaneous:**  On the right side, this file will contain copies of any employee handbooks, collective bargaining agreements, fringe benefit information, leave policy booklets and any other similar contractor documents.  Any documents that do not fit the description of materials to be included in any other file will be placed here.

**File 7: Historical Review Results:**  This file will contain copies of any available closure letters and documents generated during previous complaint investigations of this establishment.  The closure letter for the current investigation will also be included here.

**APPENDIX A-9:  RETALIATION AND INTERFERENCE: COMPLAINT PROCESSING OUTLINE AND CHECKLIST**

The OFCCP regulations implementing Executive Order 11246, Section 503 and VEVRAA, titled "Intimidation and Interference"[427] state that a contractor "shall not harass, intimidate, threaten, coerce or discriminate against any individual because the individual has engaged in or may engage in" a protected activity.  This not only encompasses protection against retaliation but it also provides protection against intimidation and interference that may not give rise to a retaliation claim.  As such, examine complaint allegations to determine whether Title VII principles regarding retaliation claims apply or the broader protection of OFCCP's regulations against intimidation and interference is applicable.

Additionally, there is a difference in available remedies.  Compensatory and punitive damages are not available under the laws OFCCP enforces but may be under Title VII and the ADA.  Complaints filed with OFCCP that could also be brought under Title VII or the ADA, as enforced by EEOC, are dual filed for the purpose of complaint processing.

## A. RETALIATION

When assessing possible retaliation under Executive Order 11246, Section 503 and VEVRAA, OFCCP applies the same concepts, standards and analyses as EEOC.  There are three essential elements of a retaliation claim: protected activity (opposition to discrimination or participation in the filing or investigation of a complaint, compliance evaluation, hearing or other activity), materially adverse action taken by the contractor, and causal connection between the protected activity and the materially adverse action.  Each of these three elements is discussed below.

1. **Protected Activity (participation in an EEO process or opposition to discrimination)**

   a.  Did the Complainant oppose discrimination?

   - Did the Complainant explicitly or implicitly communicate to the contractor or another covered entity a belief that its activity constituted unlawful discrimination under E.O. 11246, Section 503 or VEVRAA?

   - If the protest was broad or ambiguous, would the complainant's protest reasonably have been interpreted as opposition to such unlawful discrimination?

   - Did someone closely related to, or associated with, the Complainant oppose discrimination?

   b.  Was the manner of opposition reasonable?  Or was the manner of opposition done in so disruptive or excessive a manner as to be unreasonable?

---

[427] 41 CFR 60-1.32; 60-300.69; and 60-741.69.

- If the manner of opposition was not reasonable, the complainant is not protected under the anti-retaliation clauses.

c. Did the Complainant have a reasonable good faith belief that the opposed practice violated the anti-discrimination laws or could do so if repeated?

- If so, the complainant is protected against retaliation, even if he or she was mistaken about the unlawfulness of the challenged practices.

- If not, the complainant is not protected under the anti-retaliation clauses.

d. Did the Complainant participate in the complaint process or did the Complainant or someone closely related to or associated with the Complainant file a charge, or testify, assist, or participate in any manner in an investigation, proceeding, hearing, or lawsuit under the laws enforced by OFCCP?

- If so, the Complainant is protected against retaliation regardless of the validity or reasonableness of the original allegation of discrimination.

- The Complainant is protected against retaliation by a contractor for participating in the complaint process or other proceedings under the laws enforced by OFCCP even if that complaint involved a different contractor.

## 2. Materially Adverse Action

a. Did the contractor subject the Complainant to any kind of adverse treatment?

- Adverse actions undertaken after the Complainant's employment relationship with the contractor ended, such as negative job references, can be challenged.

- Although trivial annoyances are not actionable, more significant retaliatory treatment that is reasonably likely to deter protected activity is unlawful.  There is no requirement that the adverse action affect the terms, conditions or privileges of employment.

## 3. Causal Connection

The causation standard requires the evidence to show that "but for" a retaliatory motive, the contractor would not have taken the adverse action.  The but-for causation standard does not require retaliation to be the sole cause of the action.  There can be multiple but-for causes and retaliation need be only one of the but-for causes of the materially adverse action in order to establish unlawful retaliation.

a. Is there direct evidence that retaliation was a but-for cause of the adverse action?

i. Did the company official admit that it undertook the adverse action because of the protected activity?

Federal Contract Compliance Manual (FCCM)

    ii.  Did the company official express bias against the Complainant based on the protected activity?  If so, is there evidence linking that statement of bias to the adverse action?

- Such a link would be established if, for example, the statement was made by the decision-maker at the time of the challenged action.

b.  Is there circumstantial evidence that retaliation was a but-for cause of the adverse action?

c.  Is there evidence raising an inference that retaliation was a but-for cause of the adverse action?

- Such an inference is raised, for example, if the adverse action took place shortly after the protected activity, as long as the decision-maker was aware of the protected activity before undertaking the adverse action.

- If there was a long period of time between the protected activity and the adverse action, determine whether there is other evidence raising an inference that a but-for cause of the adverse action was retaliation.

d.  Has the contractor produced evidence of a legitimate reason for the adverse action unrelated to the protected activity?

e.  Is the contractor's explanation a pretext designed to hide retaliation?

- Did the contractor treat similarly situated employees who did not engage in protected activity differently from the Complainant?

- Did the contractor subject the Complainant to heightened scrutiny after he or she engaged in protected activity?

- If, on the basis of all of the evidence, the CO is persuaded that retaliation was for a but-for cause of the adverse action, then "cause" must be found.

f.  OFCCP must be able to show that the contractor would not have taken the same action, absent its retaliatory motive.  If it cannot demonstrate that, then causation has not been established.

## B. SPECIAL REMEDIES ISSUES

a.  Is it appropriate to seek temporary or preliminary relief pending final disposition of the complaint?

b.  Is there a substantial likelihood that the challenged action will be found to constitute unlawful retaliation?

c.  Will the retaliation cause irreparable harm to the Complainant and/or the OFCCP?

Federal Contract Compliance Manual (FCCM)

- Will the Complainant likely incur irreparable harm beyond financial hardship because of the retaliation?

- If the retaliation appears to be based on the Complainant's filing of a prior EEO complaint, will that retaliation likely cause irreparable harm to OFCCP's ability to investigate the Complainant's original complaint of discrimination?

- If there is a substantial likelihood that the challenged action will constitute retaliation and that retaliation will cause irreparable harm to the Complainant or the OFCCP, or both, contact the Regional Solicitor's (RSOL) office to ask about pursuing temporary or preliminary relief.

d. If the complaint is dually filed under Title VII or the ADA (or both), consult your RSOL to help determine whether compensatory and punitive damages are available and appropriate.

- Compensatory and punitive damages may be available for retaliation claims under all of the statutes enforced by the EEOC.

**APPENDIX A-10:   INVESTIGATIVE REPORT**

(Name of complainant) v. (CMS #)

(Name of contractor)

1. **Basis:** Insert one or more as appropriate: Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended; or the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended.
2. **Contractor:** Insert the company name and address, the name of contractor's representative and that individual's contact telephone number.
3. **Contract Coverage:** Insert the contract number, agency name, date of award, duration of contract period, and place of performance, and attach copy of the contract.
4. **On-site Investigation:** Insert the date or dates.

**For Each Allegation:**

5. **Allegation(s):** Provide a statement of the allegation(s) under OFCCP's authority based on what the complainant alleged happened to him/her.  Include the circumstances of the action as the complainant expressed them in the complaint and in the interview.
6. **Issue(s):** Identify the alleged discriminatory action(s) which gave rise to the complaint and the applicable regulatory citations.
7. **Rebuttal:** Include the contractor's explanation of what happened and why it happened, including the circumstances of the action.

8. **Findings of Fact:**
    a. Provide a description of contractor's relevant personnel policies and practices, and relevant union rules.  Reference case file location of copies;
    b. Provide the results of review of documentary evidence and records.  Reference case file location of copies;
    c. Summarize the relevant facts obtained from interviews of contractor officials.  Reference case file location of interview notes; and
    d. Summarize the relevant facts obtained from interviews of other witnesses.  Reference the case file location of interview notes.

9. **Analysis:** Provide an explanation of how and why the findings of fact confirm or refute the allegations.
10. **Conclusion:** Insert a statement as to whether the contractor has or has not committed a violation.  Include a citation to the appropriate regulation.
11. **Remedy:** Use this section when a violation by the contractor is found to:
    a. Describe all the remedies the complainant should receive; and
    b. Describe the corrective actions the contractor must take regarding its policies and practices.

Federal Contract Compliance Manual (FCCM)

**APPENDIX A-11:  INFORMATION RELATED TO FILING SUIT UNDER TITLE VII OF THE CIVIL RIGHTS ACT, TITLE I OF THE ADA AND THE EQUAL PAY ACT**

This information relates to filing suit in Federal or State court under Federal law.  If you also plan to sue claiming violations of State law, please be aware that time limits and other provisions of State law may be shorter or more limited than those described below.

**PRIVATE SUIT RIGHTS –   Title VII of the Civil Rights Act of 1964, as amended (Title VII) or the Americans with Disabilities Act of 1990, as amended (ADA)**

In order to pursue this matter further, you must file a lawsuit against the contractor(s) named in the complaint you submitted to the Office of Federal Contract Compliance Programs (OFCCP) **within 90 days of the date you receive the Notice of Right to Sue.**  Once this 90-day period is over, your right to sue based on the complaint covered by this Notice of Right to Sue will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice of Right to Sue.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing the Notice of Right to Sue is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in your complaint to OFCCP or, to the extent permitted by court decisions, matters like or related to the matters alleged in your complaint to OFCCP.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the contractor has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS – Equal Pay Act (EPA)**

EPA suits must be filed in court within two years (three years for willful violations) of the alleged EPA underpayment; back pay due for violations that occurred **more than two years (three years for willful violations) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from July 1, 2016 to December 1, 2016, you should file suit before July 1, 2018 (not December 1, 2018) in order to recover unpaid wages due for July 2016.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII or the ADA referred to above.  Therefore, if you also plan to sue under Title VII or the ADA, in addition to suing on the EPA claim, your suit must be filed within 90 days of the Notice of Right to Sue and within the two or three year EPA back pay recovery period.

Federal Contract Compliance Manual (FCCM)

**ATTORNEY REPRESENTATION – Title VII and the ADA**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do *not* relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND ASSISTANCE – All Statutes**

If you have any questions about your legal rights, including advice on which U.S. District Court can hear your case, you may contact an OFCCP representative at [*insert the name and phone number of OFCCP district or area office that investigated complaint*], who will coordinate with the Equal Employment Opportunity Commission (EEOC) to promptly obtain that information for you.  If you need help in finding a lawyer, we recommend contacting the bar association in your state and an OFCCP representative can also assist you with that in coordination with EEOC. If you need to inspect or obtain a copy of information in OFCCP's file on your complaint, please request it promptly in writing and provide the OFCCP complaint number (as shown on your Notice of Right to Sue).  If you file suit and want to review the OFCCP complaint file, **please make your review request within six months of the Notice of Right to Sue.**  (Before filing suit, any request should be made within the next 90 days.)

If you file suit, please send a copy of your Court complaint to [*insert the name and address of EEOC office to which a copy of the dually filed complaint was sent, and which was notified of issuance of Notice of Right-to-Sue*].

Federal Contract Compliance Manual (FCCM)

**APPENDIX A-12:   "MACMILLAN" FACTORS CONCERNING SUCCESSOR EMPLOYER LIABILITY**

Requests for a determination of successor liability should include responses to the factors listed below.  Responses should cite the source of the information and, where the source is written material, a copy of the relevant page(s) should be attached.  Information on these factors may be obtained from a number of sources, including the contractor, Standard and Poor's and other corporate guides, trade magazines, annual reports, collective bargaining agreements and the business section of local newspapers.

1.   Whether the Successor Company had Notice of the Charge.

     The date the alleged discriminatory act occurred, the date the complaint was filed and the dates concerning the transfer (announcement date, effective date of merger, acquisition, etc.).

2.   The Ability of the Predecessor to Provide Relief.

     Whether the predecessor continues to operate, and the extent and location of its new operations; whether the predecessor maintained any of its assets (what percentage and type); whether the transfer resulted from a bankruptcy action; and whether the predecessor could provide seniority, reinstatement, hiring, back pay, etc.

3.   Whether there has been a Substantial Continuity of Business Operations.

     The percentage of operating assets that were transferred to the successor; the status of the predecessor's patents, trademarks and operating name; whether there are corporate officers and members of the board of directors who are common to both the predecessor and the successor, etc.

4.   Whether the Successor Uses the Same Plant.

5.   Whether the Successor Uses the Same or Substantially the Same Workforce.

6.   Whether the Successor Uses the Same or Substantially the Same Supervisory Personnel.

7.   Whether the Same Jobs Exist Under Substantially the Same Working Conditions.

     Whether the organization of the departments, sections, etc., remain substantially the same; the percentage of old jobs maintained; whether personnel practices are substantially the same; and the status of any collective bargaining agreements, etc.

8.   Whether the Successor Uses the Same Machinery, Equipment and Methods of Production.

9.   Whether the Successor Produces the Same Product.

**APPENDIX A-13:    TRANSMITTAL MEMORANDUM FOR AN ENFORCEMENT RECOMMENDATION**

**(Compliance Evaluations)**

The memorandum transmitting a recommendation for enforcement arising from a compliance review will contain the following sections:

1. CONTRACTOR'S IDENTITY

   a. State the establishment's or functional unit's full name and mailing address, including the county in which it is located, and the names and titles of primary establishment, construction or functional unit contact persons (*i.e.*, top establishment or functional unit official, legal representative, EEO and Affirmative Action Coordinator).

   b. If the establishment or functional unit is part of a multi-establishment corporation, also state the corporate name and address, the names and titles of primary contact persons (as above), and describe the relationship between the establishment/functional unit and corporation, *e.g.,* unincorporated division or wholly owned subsidiary.  The description of this relationship is critical when the establishment/functional unit itself does not hold a federal contract.

   c. Give any known information on the ownership makeup of the business and its legal address in the state in which it is incorporated.  This information is often available in industrial directories and databases or from the Secretary of State's office (corporations).

2. CONTRACTOR'S BUSINESS

   Describe the contractor's main product(s), basic structure, total employment and major types of jobs.

3. PRIOR HISTORY

   Indicate whether and when the establishment or functional unit, or both, were previously reviewed or subjected to an OFCCP complaint investigation.  Also note the outcome of any such review or investigation.  Reference any relevant legal actions against the establishment or functional unit, or both (*e.g.,* pending Title VII suit, consent decree, etc.).

4. CONTRACT COVERAGE

   Describe the basis for OFCCP jurisdiction.  For basic coverage requirements, under the Executive Order (EO) 11246, see 41 CFR 60-1.5(a); under Section 503, see 41 CFR 60-741.4; and under VEVRAA, see 41 CFR 300.4.  If a violation asserted relates to a written AAP, for Executive Order 11246, see 41 CFR 60-2.1 (supply and service) and 41 CFR 60-4.1 (construction); for Section 503, see 41 CFR 60-741.40(b); and for VEVRAA, see 41 CFR 60-300-.40(a).

Federal Contract Compliance Manual (FCCM)

As used below, the term federal contracts means federal prime contracts, subcontracts and federally assisted construction contracts and subcontracts.

a.  Basic Contract Information (All Cases): List here (or in an attachment if voluminous) all known federal contracts held by the contractor during the review period and continuing to the present.  For each such contract, give the information requested on page 2, item 5 of the Supply and Service SCER plus the goods, services, lease arrangements, etc. provided under the contract and any available information on whether there was a break or modification during the period the contract was in effect.

b.  If coverage is based on contracts for indefinite quantities (for example, a blanket purchase order, a rate agreement, etc.) note: (1) the amounts ordered in each business year during the review period and continuing to the present, and (2) the identity and location of contracting officers and others who may be able to provide copies of invoices and other documents verifying coverage.

c.  Additional Contract Information Where Actual or Potential Coverage Dispute: If coverage is or is anticipated to become an issue, state the grounds on which the contractor claims not to be covered, and any grounds you believe the contractor might assert.  Then analyze the claim asserted and/or any potential claim.  If you have questions or need assistance, consult with your Regional Solicitor (RSOL).

    i.  Separate Entity Issue: If the contractor claims to be or not to be covered based on the fact it is a separate entity from the company holding the federal contract, it is critical to include information on the following factors concerning the relationship – whether:

        •  The entities have common ownership;

        •  The entities have common directors and/or officers;

        •  One entity has de facto day-to-day control over the other through policies, management or supervision of the entity's operations;

        •  The personnel policies of the entities emanate from a common or centralized source; and

        •  The operations of the entities are dependent on each other, *e.g.,* services are provided principally for the benefit of one entity by another and/or both entities share management, offices or other services.

    ii.  Subcontract Issue: If coverage is based on a subcontract relationship with a prime government contractor, include:

        •  The identity of the prime contractor, including the contracting agency and the goods or services involved in the prime contract;

        •  Information demonstrating that the prime contractor is covered; and

- An analysis of how the subcontract meets at least one of the two prongs of the regulatory definition of covered subcontract.

iii. Serious Jurisdictional Question: If a serious question about jurisdiction is present or anticipated, obtain a complete copy of at least one contract which establishes coverage for the review period and continuing to the present from the contracting agency or the contractor. RSOL will not approve an enforcement recommendation without this documentation. A copy of the contract(s) establishing coverage must be included in the case file.

5. SUMMARY OF EVENTS

Indicate how the company was selected for review, and then list major review events, including current status. Major events include, for example, the date the AAP was received; the dates of the on-site; the dates of any Predetermination Notice, Notice of Violation, Show Cause Notice and 15-Day Notice; the period during which conciliation was attempted; and the date conciliation was terminated. In the case of a denial of access claim, OFCCP must show that the contractor was selected in accordance with a neutral plan.

6. LIST OF VIOLATIONS FOR WHICH ENFORCEMENT IS SOUGHT

List each violation for which enforcement is being sought under the subheadings of "Affirmative Action" or "Discrimination."

7. ANALYSIS OF VIOLATIONS

For each violation for which enforcement is sought, give the following analysis, specifically referring to the case file location by file and page number of the relevant portions of documents and interviews.

Note, however, that violations may be grouped in such a way as to result in a clearer and more succinct presentation of the case. For example, many affirmative action violations are interrelated and can more easily be described together, *e.g.,* problems with job group formation usually result in problems with utilization analysis, underutilization determinations and goals.

a. Violation: State the practice or action that constitutes the violation and identify the sections of the regulations and/or laws violated. In the case of a systemic discrimination finding, state the specific group affected, job(s) at issue, level of disparity in standard deviations, if there is relevant statistical data, and any relevant shortfall. Also, in appropriate cases, identify the component(s) of the selection process that caused the adverse impact.

b. Facts: Summarize factual findings. Reference the file and page location of data such as worksheets, statistical analyses, cohort analyses, salary analyses, medical evidence and contractor documents which are the basis for each factual finding.

Federal Contract Compliance Manual (FCCM)

c. Analysis: Conduct an analysis to determine why the facts lead to a conclusion of violation. Where discrimination is the issue, analysis should be done using the appropriate theory and burden of proof.

Review the contractor's position and any data provided in support of its position (referencing file location), giving the reasons (referencing supporting documentation) for concluding that the contractor has not adequately responded to evidence of violation and/or that its position is a pretext for discrimination. Also determine if there are other contractor positions that could be raised in the future, and the overall strengths and weaknesses of the case.

d. Remedy: Describe the proposed remedy. Indicate the basis and support for the type of remedy proposed. Describe the contractor's position on remedy if this has been discussed with the contractor.

   i. Individually-based back pay: If a proposed remedy includes individually-based back pay, indicate the pay rate used (and, if from other than payroll records, its source), the method of computation and applicable interest rates. Include or attach a summary list of back pay due with the name of each affected class member, the period covered and amount due (referencing the file location of individual computation sheets).

   ii. Formula relief: If a proposed remedy includes a formula for relief, indicate the rationale for a formula approach, the basis for calculating the total amount due, including components of the calculations, and the method of allocating the total amount among class members.

e. SOL, JRC, RO and NO Opinions: If applicable, reference the tabbed file location of and summarize any Solicitor's, Joint Review Committee, regional and national office opinions and recommendations, and the action taken with respect to them.

8. CONCILIATION

Describe the conciliation efforts undertaken. Describe significant aspects of those efforts, *e.g.,* what was offered, by whom, rationale for rejecting and issues at impasse. Identify dates conciliation was attempted, the participant(s) and summarize the results, referencing the file location of meeting notes, pertinent correspondence, etc.

If, however, there has already been some discussion of conciliation with respect to particular violations earlier in the Transmittal Memorandum, (*e.g.,* the contractor's position on the violation/remedy, etc.), that discussion may be referenced in the memorandum section on conciliation efforts.

IMPORTANT: If conciliation sessions continue after the Transmittal Memorandum is prepared, it is critical that, at a minimum, an addendum be attached updating the status of negotiations (including any additional violations resolved (see item 10 below) and referencing the file location of pertinent meeting notes and correspondence. RSOL must receive all correspondence and other documents generated during these negotiations and be included in all settlement negotiations.

Federal Contract Compliance Manual (FCCM)

9. CONCLUSIONS/RECOMMENDATIONS

Indicate the action being recommended.

10. ATTACHMENT – VIOLATIONS FORMALLY CITED BUT RESOLVED

In an Attachment to the Transmittal Memorandum, list any violations cited in one or more of the following documents that have been resolved as of the date the Transmittal Memorandum is prepared: Predetermination Notice, Notice of Violation, Show Cause Notice, Amended Show Cause Notice and 15-Day Notice.

Briefly describe the resolution, referencing the file location of documents that provide more information on the issue and its resolution.

CONTACT PERSONNEL

List the contacts for the contractor and OFCCP.

## Figures 1 –6

| Figure Number | Figure Title |
|---|---|
| F-1 | Compliance Check Control Sheet |
| F-2 | Case Chronology Log (CC-53) |
| F-3 | Combined Scheduling Letter and Itemized Listing |
| F-4 | Scheduling Letter and Itemized Listing for Section 503 Focused Review |
| F-5 | Form for Complaint Involving Employment Discrimination by Federal Government Contractors or Subcontractors |
| F-6 | Standard Text for Conciliation Agreement |

Federal Contract Compliance Manual (FCCM)

**FIGURE F-1:   COMPLIANCE CHECK CONTROL SHEET**

**GENERAL INFORMATION**        **CMS Control #:**

**Establishment Name:**                        **Corporate Name:**

**Street Address:**                              **Street Address:**

**City, State, Zip Code:**                      **City, State, Zip Code:**

| Company Contacts | | Name | Title | Telephone Number |
|---|---|---|---|---|
| **Establishment** | CEO | | | |
| | EEO/AA | | | |
| **Corporate** | CEO | | | |
| | EEO/AA | | | |

| Outside Representation | Firm | Telephone Number |
|---|---|---|
| | | |

| Total Employees | Total Minority | Total Female |
|---|---|---|
| | | |

| **Type of Review** | **Multiple Facility** | **Last Review Date** |
|---|---|---|
| ___ Initial ___ Follow-Up | ____ Yes ____ No | /        / |

**DATES**

| Compliance Check Letter Mailed | On-site | Closure Letter Issued |
|---|---|---|
| /        / | /        / | /        / |

**FINDINGS**

**Inspected Items**                              Yes      No      N/A
- Information on prior year report          ___     ___     ___

- Job advertisements, including evidence of job listings with the appropriate employment service delivery system (the state workforce agency job bank or the local employment service delivery system where the opening occurs)          ___     ___     ___

- Accommodations for individuals with disabilities          ___     ___     ___

If an item is not applicable, indicate the reason here:

Federal Contract Compliance Manual (FCCM)

**RECOMMENDATION FOR CLOSURE**

- If no items missing, leave blank.

- If prior year report missing (unless contractor was not covered in prior year), check under column #1.

- If job listings information missing, check under column #2.

- If accommodations information missing, check under column #3.

- If contractor refuses to grant access, check appropriate space.

| | #1 Prior Year Report | #2 Job Listings | #3 Accommodations |
|---|---|---|---|
| **Recordkeeping** | | | |

(Checking one of the above spaces will place the contractor into a pool for further evaluation.)

| | |
|---|---|
| **Failure to Grant Access (Explain)** | |

(Checking the space above will indicate the contractor will be selected for another compliance evaluation method.)

**Technical Assistance Needed:** _Yes __No

**Additional Pertinent Information:**

| | Compliance Officer | ADD | DD |
|---|---|---|---|
| **Signature** | | | |
| **Date** | | | |

**FIGURE F-2:  CASE CHRONOLOGY LOG (CC-53)**

| NAME & ADDRESS OF CONTRACTOR/COMPLAINANT | | | CASE EVALUATION No. | |
|---|---|---|---|---|
| **NAME OF CHIEF EXECUTIVE OFFICER & PHONE NUMBER** | | **NAME OF EEO COORDINATOR & PHONE NUMBER** | | |
| **DATE** | **PERSON CONTACTED Name and Title (*as appropriate*)** | **CHRONOLOGY Summary of Discussion or Action** | | **OFCCP STAFF Name and Title (*as appropriate*)** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**FIGURE F-3:   COMBINED SCHEDULING LETTER AND ITEMIZED LISTING**

OMB NO. 1250-0003
Expires 03/31/2020

VIA CERTIFIED MAIL
(NUMBER)
RETURN RECEIPT REQUESTED

(Name of contractor official)
(Title of contractor official)
(Establishment Name)
(Street Address)
(City, State, Zip Code)

Dear (Name of contractor official):

The U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP), selected your _____ [**Insert:** establishment located at (address), functional unit (name or description of functional unit), or corporate headquarters located at (address)] for a _____ [**Insert:** compliance review, functional affirmative action program (FAAP) compliance review, or corporate management compliance evaluation (CMCE)]. We are conducting this _____ [**Insert:** compliance review, FAAP compliance review, or CMCE] under the authority of Executive Order (EO) 11246, Section 503 of the Rehabilitation Act of 1973 (Section 503), the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA) and their implementing regulations in 41 CFR Chapter 60.[428]  In addition to determining your compliance with these authorities, we will also verify your compliance with the regulations issued by the Veterans' Employment and Training Service (VETS) requiring contractors and subcontractors covered by VEVRAA to file an annual report on their employment and hiring of protected veterans.[429]

The compliance review may progress in three phases: a desk audit, an on-site review, and an off-site analysis.  OFCCP describes the phases of a compliance review in its regulations at 41 CFR Chapter 60.[430]  For the desk audit, please submit the following information:

---

[428] Executive Order 11246, 30 FR 12319, 3 CFR 339 (1964-1965), *as amended by* E.O. 11375, 32 FR 14303, 3 CFR, 1966-1970 Comp., p. 684, E.O. 12086, 43 FR 46501, 1978 Comp., p. 230 and E.O. 13279, 67 FR 77141, 3 CFR, 2002 Comp., p. 258, E.O. 13665, 79 FR 20749 and E.O. 13672, 79 FR 42971; Section 503 of the Rehabilitation Act of 1973, *as amended,* 29 U.S.C. § 793; Vietnam Era Veterans' Readjustment Assistance Act of 1974, *as amended,* 38 U.S.C. § 4212.

[429] 41 CFR Part 61-300 implements 38 U.S.C. § 4212(d), as amended by the Jobs for Veterans Act. The implementing regulations require covered federal contractors to submit, at least annually, a report on veterans' hiring and workforce representation to the Department of Labor. In addition, 41 CFR 60-300.60(c) provides that if a contractor has not complied with any such reporting requirement, OFCCP will notify VETS.

[430] 41 CFR 60-1.20(a), 60-300.60(a), and 60-741.60(a).

1. a copy of your current Executive Order Affirmative Action Program (AAP) prepared in accordance with the requirements of 41 CFR § 60-1.40, and 41 CFR § 60-2.1 through § 60-2.17;

2. a copy of your current Section 503 AAP prepared in accordance with the requirements of 41 CFR § 60-741.40 through § 60-741.47;

3. a copy of your current VEVRAA AAP prepared in accordance with the requirements of 41 CFR § 60-300.40 through § 60-300.45; and

4. the support data specified in the enclosed Itemized Listing.

Please submit your AAP(s) and the Itemized Listing support data to the address listed on page one of this letter as soon as possible, but no later than 30 days from the date you receive this letter. Pursuant to 41 CFR §§ 60-1.12(e), 60-300.80(c), and 741.80(c), failure to preserve complete and accurate records constitutes noncompliance with your obligations as a federal contractor or subcontractor. Once the evaluation begins, you are required to maintain all personnel and employment records described in the regulations enforced by OFCCP until the final disposition of the evaluation.[431]

We encourage you to submit your information in an electronic format to reduce the amount of time it takes to complete our evaluation of your [Insert establishment, functional unit, or corporate headquarters]. Should you opt to email your submissions, use email address _____.

You should be aware that OFCCP may initiate enforcement proceedings if you fail to submit AAPs and support data that represent a reasonable effort to meet the requirements of the regulations in 41 CFR Chapter 60.

Please also be aware that OFCCP may use the information you provide during a compliance evaluation in an enforcement action. We may also share that information with other enforcement agencies within DOL, as well as with other federal civil rights enforcement agencies with which we have information sharing agreements.

Finally, the public may seek disclosure of the information you provide during a compliance evaluation. Under current law and regulations, OFCCP is required to comply with Freedom of Information Act, the Trade Secrets Act, the Privacy Act, and the 1987 Executive Order governing the disclosure of confidential commercial information.[432]

Please contact _____ at _____ if you have any questions concerning the compliance evaluation.

---

[431] 41 CFR 60-1.12(a), 60-300.80(a), and 60-741.80(a).

[432] 41 CFR 60-1.20(g); 60-300.81; 60-741.81; Freedom of Information Act, *as amended*, 5 U.S.C. § 552 (2009).

Federal Contract Compliance Manual (FCCM)

Sincerely,


(Name of District Director)
District Director

Enclosure (1)
Itemized Listing

**ITEMIZED LISTING**

**Executive Order 11246**

1. An organizational display or workforce analysis prepared according to 41 CFR § 60-2.11.

2. The formation of job groups (covering all jobs) consistent with criteria given in 41 CFR § 60-2.12.

3. For each job group, a statement of the percentage of minority and female incumbents as described in 41 CFR § 60-2.13.

4. For each job group, a determination of minority and female availability that considers the factors given in 41 CFR § 60-2.14(c)(1) and (c)(2).

5. For each job group, the comparison of incumbency to availability as explained in 41 CFR § 60-2.15.

6. Placement goals for each job group in which the percentage of minorities or women employed is less than would be reasonably expected given their availability as described in 41 CFR § 60-2.16.

**Section 503**

7. Results of the evaluation of the effectiveness of outreach and recruitment efforts that were intended to identify and recruit qualified individuals with disabilities as described in 41 CFR § 60-741.44(f).

8. Documentation of all actions taken to comply with the audit and reporting system requirements described in 41 CFR § 60-741.44(h).

9. Documentation of the computations or comparisons described in 41 CFR § 60-741.44(k)for the immediately preceding AAP year and, if you are six months or more into your current AAP year when you receive this listing, provide the information for at least the first six months of the current AAP year.

10. The utilization analysis evaluating the representation of individual with disabilities in each job group, or, if appropriate, evaluating the representation of individuals with disabilities in the workforce as a whole, as provided in 41 CFR § 60-741.45.  If you are six months or more into your current AAP year on the date you receive this listing, please also submit information that reflects current year progress.

**VEVRAA**

11. Results of the evaluation of the effectiveness of outreach and recruitment efforts that were intended to identify and recruit qualified protected veterans as described in 41 CFR § 60-300.44(f).

Federal Contract Compliance Manual (FCCM)

12. Documentation of all actions taken to comply with the audit and reporting system requirements described in 41 CFR § 60-300.44(h).

13. Documentation of the computations or comparisons described in 41 CFR § 60-300.44(k)for the immediately preceding AAP year and, if you are six months or more into your current AAP year when you receive this listing, provide the information for at least the first six months of the current AAP year.

14. Documentation of the hiring benchmark adopted, the methodology used to establish it if using the five factors described in § 60-300.45(b)(2).  If you are six months or more into your current AAP year on the date you receive this listing, please also submit current year hiring data to measure against your benchmark.

**Support Data**

15. Copies of your Employer Information Report EEO-1 (Standard Form 100 Rev.) for the last three years.[433]

16. A copy of your collective bargaining agreement(s), if applicable.  Include any other documents you prepared, such as policy statements, employee notices or handbooks, etc. that implement, explain, or elaborate on the provisions of the collective bargaining agreement.

17. Information on your affirmative action goals for the immediately preceding AAP year and, where applicable (see below), progress on your goals for the current AAP year.[434]

    For the immediately preceding AAP year, this report must include information that reflects:

    a. job group representation at the start of the AAP year (*i.e.*, total incumbents, total minority incumbents, and total female incumbents);

    b. the percentage placement rates (percent goals) established for minorities and women at the start of the AAP year; and

    c. the actual number of placements (hires plus promotions) made during the AAP year into each job group with goals (*i.e.*, total placements, total minority placements, and total female placements).  For goals not attained, describe the specific good faith efforts made to remove identified barriers, expand equal employment opportunity, and produce measurable results.

If you are six months or more into your current AAP year on the date you receive this Scheduling Letter and Itemized Listing, please also submit information that reflects progress on

---

[433] 41 CFR 60-1.7.
[434] CFR 60-1.12(a), 60-2.1(c), and 60-2.16.

goals established in your current AAP year, and describe your implementation of action-oriented programs designed to achieve these goals.[435]

18. Data on your employment activity (applicants, hires, promotions, and terminations) for the immediately preceding AAP year and, if you are six months or more into your current AAP year when you receive this listing, provide the information in (a) through (c) below for at least the first six months of the current AAP year. You should present this data by job group (as defined in your AAP) or by job title.[436]

    a.  Applicants: For each job group or job title, this analysis must consist of the total number of applicants identified by gender and by race/ethnicity.[437]  For each job group or job title, applicants for whom race and/or gender is not known should be included in the data submitted.  However, if some of your job groups or job titles (most commonly, entry-level) are filled from the same applicant pool, you may consolidate your applicant data for those job groups or titles.  For example, where applicants expressly apply for or would qualify for a broad spectrum of jobs (such as "Production," "Office," etc.) that includes several job groups, you may consolidate applicant data.

    b.  Hires: For each job group or job title, this analysis must consist of the total number of hires identified by gender and race/ethnicity.

    c.  Promotions: For each job group or job title, provide the total number of promotions by gender and race/ethnicity.  Also, include a definition of "promotion" as used by your company and the basis on which they were compiled (e.g. promotions to the job group, from and/or within the job group, etc.).  If it varies for different segments of your workforce, please define the term as used for each segment.  If you present promotions by job title, include the department and job group from which and to which the person(s) was promoted.

    d.  Terminations: For each job group or job title, provide the total number of employee terminations by gender and race/ethnicity. When presenting terminations by job title, include the department and job group from which the person(s) terminated.

19. Employee level compensation data for all employees (including but not limited to full-time, part-time, contract, per diem or day labor, and temporary employees) as of the date of the organizational display or workforce analysis.  Provide gender and race/ethnicity information and hire date for each employee as well as job title, EEO-1 Category and job group in a single file.[438]  Provide all requested data electronically, if maintained in an electronic format.  See Note 1, below.

---

[435] 41 CFR 60-1.12 and 60-2.17(c).
[436] 41 CFR 60-1.12, 60-2.11-12, 60-2.17(b)(2)and(d)(1), 60-3.4, and 60-3.15.
[437] The term "race/ethnicity" as used throughout the Itemized Listing includes these racial and ethnic groups: African-American/Black, Asian/Pacific Islander, Hispanic, American Indian/Alaskan Native, and White. You also have the option of submitting the requested data using the race and ethnic categories on the EEO-1 survey.
[438] 41 CFR 60-2.17(b)(3) and (d).

a. For all employees, compensation includes base salary and or wage rate, and hours worked in a typical workweek. Other compensation or adjustments to salary such as bonuses, incentives, commissions, merit increases, locality pay or overtime should be identified separately for each employee.

b. You may provide any additional data on factors used to determine employee compensation, such as education, past experience, duty location, performance ratings, department or function, and salary level/band/range/grade.

c. Documentation and policies related to compensation practices of the contractor should also be included in the submission, particularly those that explain the factors and reasoning used to determine compensation.

20. Copies of reasonable accommodation policies, and documentation of any accommodation requests received and their resolution, if any.

21. Your most recent assessment of your personnel processes, as required by 41 CFR § 60-300.44(b) and § 60-741.44(b), including the date the assessment was performed, any actions taken or changes made as a result of the assessment, and the date of the next scheduled assessment.

22. Your most recent assessment of physical and mental qualifications, as required by 41 CFR § 60-300.44(c) and § 60-741.44(c), including the date the assessment was performed, any actions taken or changes made as a result of the assessment, and the date of the next scheduled assessment.

**NOTES**

Note 1: If any of the requested information is computerized, you must submit it in an electronic format that is complete, readable, and useable. Please use caution when submitting large electronic files. Check with the OFCCP Compliance Officer and your system administrator to ensure adherence to administrative and system guidelines.

Note 2: According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 1250-0003. We estimate that the average time required to complete this information collection is 27.9 hours per response, including the time for evaluating instructions, searching existing data sources, gathering and maintaining the data needed, and completing and evaluating the collection of information.

Send any comments concerning this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Office of Federal Contract Compliance Programs, Room C-3325, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

Federal Contract Compliance Manual (FCCM)

**FIGURE F-4:    SCHEDULING LETTER AND ITEMIZED LISTING FOR SECTION 503 FOCUSED REVIEW**

OMB No. 1250-0003
Expires 03/31/2020

Dear (Name of contractor official):

The U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP), selected your _____ [Insert: establishment located at (address), functional unit (name or description of functional unit), or corporate headquarters located at (address)] for a focused compliance review.  We are conducting this focused review under the authority of Section 503 of the Rehabilitation Act of 1973 (Section 503) and its implementing regulations in 41 CFR Chapter 60.[439]

A compliance evaluation may consist of any one or any combination of investigative procedures. OFCCP describes the phases of a compliance evaluation in its regulations at 41 CFR Chapter 60. For the purposes of this focused review desk audit, you are only required to submit the following information:

  1.  A copy of your current Executive Order 11246 Affirmative Action Program (AAP) prepared in accordance with the requirements of 41 CFR 60-1.40, and 41 CFR 60-2.1 through 60-2.17;

  2.  A copy of your current Section 503 AAP prepared in accordance with the requirements of 41 CFR 60-741.40 through 60-741.47;

  3.  The formation of job groups (covering all jobs) consistent with criteria given in 41 CFR 60-2.12;

  4.  Results of the evaluation of the effectiveness of outreach and recruitment efforts that were intended to identify and recruit qualified individuals with disabilities as described in 41 CFR  60-741.44(f);

  5.  Documentation of all actions taken to comply with the audit and reporting system requirements described in 41 CFR 60-741.44(h);

  6.  Documentation of the computations or comparisons described in 41 CFR 60-741.44(k)for the immediately preceding AAP year and, if you are six months or more into your current

---

[439] 41 CFR 60-741 – Affirmative Action and Nondiscrimination Obligations of Federal Contractors and Subcontractors Regarding Individuals with Disabilities

Federal Contract Compliance Manual (FCCM)

AAP year when you receive this listing, provide the information for at least the first six months of the current AAP year;

7.   The utilization analysis evaluating the representation of individual with disabilities in each job group, or, if appropriate, evaluating the representation of individuals with disabilities in the workforce as a whole, as provided in 41 CFR 60-741.45.  If you are six months or more into your current AAP year on the date you receive this listing, please also submit information that reflects current year progress;

8.   Copies of your Employer Information Report EEO-1 (Standard Form 100 Rev.) for the last three years;

9.   A copy of your collective bargaining agreement(s), if applicable.  Include any other documents you prepared, such as policy statements, employee notices or handbooks, etc. that implement, explain, or elaborate on the provisions of the collective bargaining agreement;

10.  Copies of reasonable accommodation policies, and documentation of any accommodation requests received and their resolution, if any;

11.  Your most recent assessment of your personnel processes, as required by 41 CFR 60-741.44(b), including the date the assessment was performed, any actions taken or changes made as a result of the assessment, and the date of the next scheduled assessment; and,

12.  Your most recent assessment of physical and mental qualifications, as required by 41 CFR 60-741.44(c), including the date the assessment was performed, any actions taken or changes made as a result of the assessment, and the date of the next scheduled assessment.

Please submit your AAP(s) and support data to the address listed on page one of this letter as soon as possible, but no later than 30 days from the date you receive this letter.  Pursuant to 41 CFR 60-1.12(e) and 741.80(c), failure to preserve complete and accurate records constitutes noncompliance with your obligations as a federal contractor or subcontractor.  Once the evaluation begins, you are required to maintain all personnel and employment records described in the regulations enforced by OFCCP until the final disposition of the evaluation.

We encourage you to submit your information in an electronic format to reduce the amount of time it takes to complete our evaluation of your [Insert establishment, functional unit, or corporate headquarters].  Should you opt to email your submissions, use email address _____.

You should be aware that OFCCP may initiate enforcement proceedings if you fail to submit AAPs and support data that represent a reasonable effort to meet the requirements of the regulations in 41 CFR Chapter 60.

Please also be aware that OFCCP may use the information you provide during a compliance evaluation in an enforcement action. We may also share that information with other enforcement agencies within DOL, as well as with other federal civil rights enforcement agencies with which we have information sharing agreements.

Federal Contract Compliance Manual (FCCM)

Finally, the public may seek disclosure of the information you provide during a compliance evaluation.  Under current law and regulations, OFCCP is required to comply with Freedom of Information Act, the Trade Secrets Act, the Privacy Act, and the 1987 Executive Order governing the disclosure of confidential commercial information.

Please contact _____ at _____ if you have any questions concerning the compliance evaluation.


Sincerely,


(Name of District Director)
District Director


Federal Contract Compliance Manual (FCCM)

**FIGURE F-5:   FORM FOR COMPLAINT INVOLVING EMPLOYMENT DISCRIMINATION BY FEDERAL GOVERNMENT CONTRACTORS OR SUBCONTRACTORS**

THE MOST CURRENT VERSION OF THE COMPLAINT FORM IS AVAILABLE ON THE OFCCP WEBSITE.

Federal Contract Compliance Manual (FCCM)

**FIGURE F-6:  STANDARD TEXT FOR CONCILIATION AGREEMENT**

PAGE INTENTIONALLY LEFT BLANK

Federal Contract Compliance Manual (FCCM)

## LETTERS L-1 – L-41

| Letter Number | Letter Title |
|---|---|
| L-1 | Sample Administrative Closure Letter for Supply & Service and Construction Compliance Evaluations |
| L-2 | Sample Inquiry Letter for Requesting Complaint Data From EEOC, and State and Local FEPs |
| L-3 | Sample Letter for Requesting Job Listing from Employment Service Delivery Systems |
| L-4 | Sample Inquiry Letter for Requesting Information on Pending Review from Veterans Employment and Training Service |
| L-5 | Notice of Closing: Compliance Evaluation (No Violations Found) |
| L-6 | Notice of Closing: Violations Found and Resolved |
| L-7 | Supply & Service On-site Confirmation Letter |
| L-8 | Sample Linkage Letter |
| L-9 | Construction Compliance Evaluation Notice |
| L-10 | Construction Outreach Letter for New Projects |
| L-11 | 10-Day Notice to Employer/Contractor |
| L-12 | 10-Day Notice to Complainant |
| L-13 | Letter to EEOC (Full or Partial Transfer of Complaint) |
| L-14 | Authorization for Release of Medical Information |
| L-15 | Letter Notifying Contractor of Investigation |
| L-16 | Letter Notifying Complainant of Investigation |
| L-17 | Inquiry Letter to U.S. Department of Justice or the U.S. Department of State |
| L-18 | Confirmation of Scheduling of On-site Investigation |
| L-19 | Letter to Contractor Confirming Complaint Resolution |
| L-20 | Letter to Complainant Confirming Complaint Resolution |
| L-21 | Notification of Results of Investigation: No Violation (Executive Order 11246, Section 503, or VEVRAA Complaint (Not Dual Filed - No Notice of Right to-Sue)) |
| L-22 | Notification of Results of Investigation and Notice of Right-to-Sue under Title I of the ADA or Title VII of the Civil Rights Act of 1964: No Violation (Dual Filed) |
| L-22A | Enclosure: Notice of Right-to-Sue Under Title I of the ADA or Title VII of the Civil Rights Act of 1964 |
| L-23 | Notice of Right-to-Sue Under Title I of the ADA or Title VII of the Civil Rights Act of 1964 (Issued Upon Request) |
| L-24 | Notice of Right-to-Sue Under Title I of the ADA or Title VII of the Civil Rights Act of 1964 (Administrative Closure) |
| L-25 | Notice of Results of Investigation: Violation |
| L-26 | Show Cause Notice: Failure to Submit Executive Order 11246, Section 503 or VEVRAA AAP(s) (Supply & Service) |

| Letter Number | Letter Title |
|---|---|
| L-27 | Show Cause Notice: Failure to Submit Acceptable Executive Order 11246, Section 503 or VEVRAA AAP(s) (Supply & Service) |
| L-27A | Sample Enclosure to Letter L-27 |
| L-28 | Show Cause Notice: Failure to Submit Employment Activity or Compensation Data for Desk Audit (Supply & Service Executive Order Compliance Evaluations) |
| L-29 | Show Cause Notice:  Failure to Submit Corrected Employment Activity and/or Compensation Data (Supply & Service Executive Order Compliance Evaluations) |
| L-30 | Show Cause Notice: Unresolved Violations (Compliance Evaluations) |
| L-30A | Sample Enclosure to Letter L-30 |
| L-31 | Show Cause Notice: Unresolved Violations (Complaint Investigations) |
| L-32 | Amended Show Cause Notice for Unresolved Violations (Compliance Evaluations) |
| L-33 | Show Cause Notice for Denial of Access (Compliance Evaluations & Complaint Investigations) |
| L-34 | Rescission of an Erroneously Issued Show Cause Notice |
| L-35 | Predetermination Notice |
| L-36 | Notice of Violation |
| L-37 | 15-Day Notice: Violation of a Conciliation Agreement |
| L-37A | Sample Enclosure to Letter L-37 |
| L-38 | Rescission of the 15-Day Notice |
| L-39 | Progress Report Response Letter |
| L-40 | Closure Letter for Substantive Violations (Where a Show Cause Notice was Issued) |
| L-41 | Closure Letter for Substantive Violations (No Show Cause Notice Issued) |

Federal Contract Compliance Manual (FCCM)

**LETTER L-1:   SAMPLE ADMINISTRATIVE CLOSURE LETTER
                FOR SUPPLY & SERVICE AND CONSTRUCTION COMPLIANCE
                EVALUATIONS**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Name of Establishment CEO or Construction Work Site CEO*]
[*Title of CEO*]
[*Establishment Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*Name of CEO*]:

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), recently scheduled a compliance evaluation of the equal employment opportunity policies and practices at your (*insert as appropriate:* establishment or construction work sites) located at (*insert establishment address or name of the geographic area for construction sites*).

This review has been administratively closed because (*insert reason for administrative closure such as "it has been less than 24 months since OFCCP completed its review of your establishment"*).

OFCCP appreciates the cooperation of you and your staff.

Sincerely,


(*insert name of district director*)
District Director

cc: [*insert name of the corporate CEO*]
    [*insert name of the designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-2:  SAMPLE INQUIRY LETTER FOR REQUESTING COMPLAINT DATA FROM EEOC AND STATE AND LOCAL FEPS**

[*Date*]

[*Name/Title*]
[*Agency or Organization Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear_____:

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), scheduled a compliance evaluation for (*insert name of contractor*).

Our evaluation will assess the contractor's compliance with Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 793; the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212; and the implementing regulations for these authorities.  These legal authorities prohibit employment discrimination and require affirmative action to provide equal employment opportunity without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran.  Additionally, Executive Order 11246 prohibits federal contractors and subcontractors from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, in certain circumstances, the pay of their co-workers.

Please forward any information you have concerning complaints, charges or litigation filed against this contractor.  We are also seeking any other information you may have concerning the EEO attitudes, policies and practices of the contractor that you believe we should consider during the compliance evaluation.

The evaluation will begin in approximately 30 calendar days.  Therefore, OFCCP would appreciate receiving your prompt response to this inquiry.  Please contact me at (*insert phone number*) should you have any questions or require additional information.

Sincerely,


(*insert name of compliance officer*)
Compliance Officer

Federal Contract Compliance Manual (FCCM)

**LETTER L-3:  SAMPLE LETTER FOR REQUESTING JOB LISTING FROM EMPLOYMENT SERVICE DELIVERY SYSTEMS (INCLUDING AMERICAN JOB CENTERS)**

[*Date*]

[*Name/Title*]
[*Agency or Organization Name*]
[*Street Address*]
[*City, State, Zip Code*]

Re: Request for Job Listings

Dear (*insert name*):

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), scheduled the below-listed company for a compliance evaluation under Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 793); and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (38 U.S.C. 4212); and the implementing regulations at 41 CFR chapter 60.

(*insert contractor's name and mailing address*)

As a part of the compliance evaluation, OFCCP must determine whether the company named above listed suitable job openings with the appropriate employment service delivery system, as required (this includes state workforce agencies and local American Job Centers).  To determine the contractor's compliance with the mandatory job listing requirements, we are requesting that you provide this office with the below information.

- The specific job orders placed with your office by the contractor for the past two years; and

- Confirmation that the contractor provided information about its openings in a manner and format that allowed your office to provide priority referral of veterans.

Also, provide us with any other information related to the contractor's compliance with its job listing obligations of which you may be aware.  Please contact me at (*insert phone number*) should you have any questions or require additional information.

Thank you for your cooperation.

Sincerely,


(*insert name of compliance officer*)
Compliance Officer

Federal Contract Compliance Manual (FCCM)

**LETTER L-4:  SAMPLE INQUIRY LETTER FOR REQUESTING INFORMATION ON PENDING REVIEW FROM VETERANS EMPLOYMENT AND TRAINING SERVICE**

[*Date*]

[*Name/Title*]
[*DOL VETS Regional Office*]
[*Street Address*]
[*City, State, Zip Code*]


Dear (*insert name*):

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), is conducting a compliance review of (*insert name of contractor*).

As a federal contractor, this company assumed obligations and responsibilities under the laws enforced by OFCCP requiring contractors to take affirmative action to employ protected veterans, and to list all employment openings as defined at 41 CFR 60-300.5 with the appropriate employment service delivery system.

Please provide any information you have concerning (*insert name of contractor*) compliance with its obligations including, but not limited to, information on complaints and job listings for the past year.  Your information should be sent to me at the above address or by email to (*insert email address*).

If you have any questions, please contact me at (*insert phone number*).  Thank you for your assistance in this matter.

Sincerely,


(*insert name of compliance officer*)
Compliance Officer

**LETTER L-5:  NOTICE OF CLOSING: COMPLIANCE EVALUATION (NO VIOLATIONS FOUND)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of CEO*]
[*Title of CEO*]
[*Establishment Name*]
[*Street Address*]
[*City, State, Zip Code*]


Dear (*insert name of contractor's official*):

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), recently completed a compliance evaluation of your equal employment opportunity policies and practices at (*insert name and location of the establishment, construction work sites in the economic area under review or functional unit reviewed*).

During the compliance evaluation process, we found no apparent violations of Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended; the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended; or Executive Order 13496.

[*If applicable, commend the contractor for meeting EEO goals or using best practices.  For example:* We would like to recognize and commend (*insert contractor name*) for exceeding the hiring benchmark for protected veterans and disability utilization goal.  Please accept the attached listing of local recruitment sources to utilize as you continue to conduct positive outreach and recruitment.]

OFCCP appreciates the cooperation of you and your staff during the conduct of the compliance evaluation.

Sincerely,


(*insert name of district director*)
District Director

cc: [*insert names*]

**LETTER L-6:  NOTICE OF CLOSING: VIOLATIONS FOUND AND RESOLVED**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of CEO*]
[*Title of CEO*]
[*Establishment Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear (*insert name of contractor's official*):

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), recently completed a compliance evaluation of your equal employment opportunity policies and practices at (*insert name and location of the establishment, construction work sites in the economic area under review or functional unit reviewed*).

During the compliance evaluation process, we identified and resolved the following violation(s): [*insert the technical violation(s) resolved during the compliance evaluation, including the appropriate regulatory citation and specific remedy*].  It is understood that this/these violation(s) will not recur.

There were no other apparent violations of Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended; or the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended; or Executive Order 13496.

OFCCP appreciates the cooperation of you and your staff during the conduct of the compliance evaluation.

Sincerely,

(*insert name of district director*)
District Director

cc: [*insert names*]

**LETTER L-7:  SUPPLY & SERVICE ON-SITE CONFIRMATION LETTER**

*Sent Certified Mail, Return Receipt Requested*

*[Date]*
*[Name of Contractor Official]*
*[Title]*
*[Street Address]*
*[City, State, Zip Code]*


RE: *[Name of company/facility]*

Dear *(contractor official)*:

This letter confirms that the U. S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) will begin the on-site phase of the compliance evaluation of your facility located at [*facility address*] on [*date*] at [*time*].

During a preliminary review of [*name of company/facility*]'s scheduling letter submission, OFCCP identified at least the following areas for further investigation:

(1) [*e.g.*, *Hiring practices in the Technician I job group*]; and

(2) [*e.g., Compensation policies and practices for women in the following job groups: Engineer I, Project Architect, and Principal*].

Please note that these areas of investigation are based on preliminary indicators of potential violations identified during the desk audit.  OFCCP has not determined that [*name of company/facility*] is in violation of any laws.  Identification of these preliminary indicators does not limit the scope of OFCCP's authority to confirm compliance with other requirements or investigate other potential violations that it discovers during this compliance evaluation.

The on-site will begin with an entrance conference.  At a minimum, this should be attended by the highest-ranking official at the facility as well as the human resources official and, if separate, the equal employment opportunity official.  Upon the conclusion of the on-site, an exit conference will be conducted with the same participants present at the entrance conference.

As explained by [*compliance officer*] the initial on-site will include a facility inspection, interviews with managers, company officials and employees, and the review and collection of records and documents.  A private area will be required for conducting interviews and reviewing records.  Specific individuals to be interviewed as well as records required for review are identified in the attachment to this letter.

Since all requested information will become part of the official case file, it is crucial that photocopies of the original documents be made available to us during the on-site investigation.  The only exception would be actual personnel files.  Provided documents

Federal Contract Compliance Manual (FCCM)

should not have been redacted or edited in any way, and all provided personnel files should be original and complete.

Please be aware that these requests are not intended to be all-inclusive and could be expanded.  Furthermore, due to the limited amount of time that will be spent on-site at the facility, it is crucial that all of the information be prepared before the commencement of the on-site and submitted in an organized manner.

If you have any questions, please contact [*compliance officer*] at [*telephone number*] or [*e-mail address*].


Sincerely,


[*signature block of signing official*]


Attachment [*Note: no template is being provided for attachment as the information is specific to each contractor*]

**LETTER L-8:  SAMPLE LINKAGE LETTER**

[*Date*]

[*Name of Resource Head or Contact*]
[*Title of Resource Head or Contact*]
[*Resource Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear (*insert name*):

(*Select either Paragraphs 1 and 3 or Paragraphs 2 and 3*)

*Paragraph 1:*

As we discussed on (*insert date*), the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) recommended and (*insert name and location of the establishment reviewed*) agreed to use your services to recruit applicants as part of their effort to meet their federal contractor affirmative action goals or needs as established under laws enforced by OFCCP. The specific job titles for which applicants are sought and the number of projected vacancies are listed below:

| Job Title | Projected Vacancies |
|---|---|
| (job title name) | (insert #) _____ |
| (job title name) | (insert #) _____ |

**OR**

*Paragraph 2:*

During a recent compliance review, the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) recommended and (*insert name and location of the establishment reviewed*) agreed to use your services to recruit applicants as part of their effort to meet their federal contractor affirmative action goals or needs as established under laws enforced by OFCCP.  The specific job titles for which applicants are sought and the number of projected vacancies are listed below:

| Job Title | Projected Vacancies |
|---|---|
| (job title name) | (insert #) _____ |
| (job title name) | (insert #) _____ |

*Paragraph 3:*

The company is a covered federal contractor that engages in affirmative action to ensure equal employment opportunity for all applicants and employees regardless of race, color, religion, sex, sexual orientation, gender identity, national origin, disability or protected veteran status.  All qualified applicants referred by you will be considered.

We hope that you will engage in a collaborative working relationship with (*insert name of the establishment reviewed*).  Ideally, this relationship should benefit the company seeking workers, as well as qualified individuals who are seeking meaningful work.  We request that you contact (*insert contact name*) with (*insert name of the establishment reviewed*) at (*insert phone number*) to discuss how you can assist with their employment needs.

Sincerely,


(*insert name of compliance officer*)
Compliance Officer

cc:  (*insert name of the OFCCP regional linkage coordinator*)
       (*insert name of the contractor*)

**LETTER L-9:  CONSTRUCTION COMPLIANCE EVALUATION NOTICE**

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

(*Date*)

(*Name of Senior Contractor Official*)
(*Title of Senior Contractor Official*)
(*Contractor Name*)
(*Street Address*)
(*City, State, Zip Code*)

Dear (*Name of Senior Contractor Official*):

The U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP), selected your construction projects located in the *(as appropriate, insert either 1) the name(s) of Standard Metropolitan Statistical Area(s) (SMSA)* **or** *2) the name of the non-SMSA(s))* for a compliance evaluation.  The purpose of this evaluation is to determine if your company is in compliance with its equal employment opportunity (EEO) obligations under Executive Order 11246, as amended.

As you are aware from your previous communications with OFCCP, the on-site compliance evaluation will begin on (*insert date*) at your (*insert address or other location*) and it covers your employment policies, practices and EEO activities during the review period of (*insert date*) through (*insert date*).  The compliance evaluation will cover all of your construction projects, *i.e.*, nonfederal, federal and federally assisted projects within the geographic area(s) described above.

While on-site, you should expect OFCCP to request to review and copy various documents, in the form in which you maintain them, related to your employment policies, practices and EEO activities.  This information is needed in order for OFCCP to assess your compliance with Executive Order 11246, including the affirmative action steps required to provide equal opportunity in each trade employed on your construction projects within the geographic area(s) described above. You can find more details about these affirmative action obligations at 41 CFR Part 60-4.  This evaluation will assess your efforts to prevent discrimination and take affirmative action, and the records you maintain to document these efforts.

[*INSERT THIS PARAGRAPH IF THE CONTRACTOR IS SUBJECT TO SECTION 503 and VEVRAA*] The evaluation will also assess the state of your company's compliance with its affirmative action and nondiscrimination obligations under Section 503 of the Rehabilitation Act of 1973, as amended (Section 503), and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA).  You can find more details about these obligations at 41 CFR Part 60-300 (VEVRAA) and 41 CFR Part 60-741 (Section 503).

You can facilitate the compliance evaluation process by making the personnel responsible for your employment processes, including assessing EEO compliance, and an officer of (*name of company*) available during our on-site review.  Provided with this letter is an attachment,

Federal Contract Compliance Manual (FCCM)

*Attachment A: Sample On-site Documents*.  This attachment is a nonexhaustive list of some of the documents OFCCP could request during the on-site portion of the compliance evaluation. Please do not generate, collect, copy and send any documents listed on this attachment to our office because the attachment is not a records production request.  It is, however, informational in that it should provide you some idea of what information OFCCP could request during the on-site review.

During the on-site visit, an OFCCP compliance officer will specifically request documents and records to review and copy, as necessary.  In addition, the compliance officer will visit one or more of your construction sites and interview some of your employees.  Additional records pertaining to the requirements of 41 CFR Chapter 60 may be requested at a later point in the compliance evaluation.

If you have any questions, please contact compliance officer (*insert name of the compliance officer*) in the (*insert name of field office*) office of OFCCP at (*insert telephone number*).

Sincerely,


(*Name of district director*)
District Director

Enclosure

Federal Contract Compliance Manual (FCCM)

**ENCLOSURE: SAMPLE ON-SITE DOCUMENTS**

1) Original payroll records for the specified review period.

   a) Payroll records that identify the total hours worked by each trade in the geographic area(s), either the Standard Metropolitan Statistical Area(s) (SMSA) or the non-SMSA(s), and include the sex, race and ethnicity of each employee.

   b) Payroll records that identify the overtime hours worked by each trade in the geographic area(s) described above, and include the sex, race and ethnicity of each employee.

2) Personnel records for the specified review period.

   a) Personnel records that list the apprentices working in the applicable geographic area(s) during the specified review period, including the name of each apprentice employee, job classification, sex, race and ethnicity of the employee.

   b) Personnel records that list applicants (including referrals from any source), hires, promotions, layoffs, recalls and terminations (voluntary or involuntary) of construction trade employees during the review period in the applicable geographic area(s). The list should also include the name, job classification, sex, race and ethnicity of each employee.

3) Documents demonstrating how the company implements each of the specific affirmative action steps outlined in 41 CFR 60-4.3(a) paragraph 7(a-p).

4) Subcontracts more than $10,000 for federal and federally assisted contracts for the review period.

5) EEO Policy statement used by your company.

6) Notifications sent to OFCCP of subcontract awards of more than $10,000.

7) Records of notices to the company's subcontractors about their EEO obligations.

8) EEO-1 Reports for the last two years.

9) A list of all construction projects (federal, nonfederal and federally assisted) by name and location in the applicable geographic area(s) during the specified review period, including identifying whether each project is commercial or residential. For each federally funded project, OFCCP may seek additional information such as:

   a) Funding agency;

   b) Amount of contract;

   c) Date of award;

   d) Date construction started;

   e) Percent completed; and

Federal Contract Compliance Manual (FCCM)

    f)   Estimated completion date.

10) Communications with unions and community organizations regarding the company's EEO obligations and recruitment efforts to hire women and minorities, qualified individuals with disabilities if the company is subject to Section 503 and protected veterans if the company is subject to VEVRAA.

11) Records identifying trade organization affiliations and unions that provide workers for the company's construction contracts, including a copy of any applicable collective bargaining agreements.

12) Written affirmative action programs for individuals with disabilities and protected veterans, if the company is subject to Section 503 and VEVRAA.

13) Copies of purchase orders.

14) Copies of employment advertisements.

**LETTER L-10:  CONSTRUCTION OUTREACH LETTER FOR NEW PROJECTS**

VIA REGULAR MAIL

[*Date*]

[*Name of Senior Contractor Official*]
[*Title of Senior Contractor Official*]
[*Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*Name of Senior Contractor Official*]:

Your company, [*insert name of company*], was awarded a contract or subcontract to work on the [*insert name of the construction project or location of the project*] construction project funded by the federal government.  As a result, your company falls under the enforcement jurisdiction of the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP).  This letter is to provide you information regarding your obligations as an employer working on federal contracts concerning equal employment opportunity (EEO) and affirmative action.

As a civil rights enforcement agency, OFCCP administers and enforces three equal employment opportunity laws that apply to federal contractors and subcontractors: Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 793 (Section 503); and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212 (VEVRAA).  These EEO laws prohibit federal contractors from discriminating on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, disability and status as a protected veteran.  Additionally, Executive Order 11246 prohibits federal contractors and subcontractors from taking adverse employment actions against applicants and employees for asking about, discussing or sharing information about their pay or the pay of their co-workers, subject to certain limitations.

You are required to retain personnel and employment records for a certain amount of time.  If requested, you must also grant OFCCP access to these records and your worksite. You must prominently post the *EEO is the Law* poster and supplement, and the *Employee Rights under the National Labor Relations Act* posters informing your applicants and employees of their rights.  In addition, you must post the *Pay Transparency Nondiscrimination Provision* either physically or electronically and include it in your employee handbook or manual.

Federal construction contractors are required to comply with affirmative action specifications for minorities and women related to outreach and recruitment, employee development and training.  These specifications can be found in the Code of Federal Regulations (CFR) at Title 41, Part 60-4.  Federal construction contractors with a contract that meets the coverage threshold requirements also have affirmative action obligations concerning protected veterans and qualified individuals with disabilities under VEVRAA and Section 503.  You can find more details about these obligations at 41 CFR Part 60-300 (VEVRAA) and 41 CFR Part 60-741 (Section 503).

Federal Contract Compliance Manual (FCCM)

In addition, our Help Desk (1-800-397-6251) and district offices are available to answer questions or to provide compliance assistance.  If you have any further questions, please contact our office at [*insert office phone number and address*] and please visit our website at https://www.dol.gov/ofccp/ .

Sincerely,


[*Name of district director*]
District Director

## LETTER L-11: 10-DAY NOTICE TO EMPLOYER/CONTRACTOR

[*Date*]

[*Name and address of employer*]

Complaint Reference Number: [*number*]

Dear [*insert name of Employer/Contractor Official*]:

This is to notify you that on [*insert date*] we received a complaint from [*insert as appropriate: name of complainant - or - authorized representative*] alleging a violation of [*insert: Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended (Section 503); or the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA)*].

[*Insert for Executive Order 11246 and/or Section503 complaints only: Under the provisions of a Memorandum of Understanding Between the Office of Federal Contract Compliance Programs (OFCCP) and the U.S. Equal Employment Opportunity Commission (EEOC) effective November 7, 2011, and/or regulations at 41 CFR Part 60-742*], the complaint is deemed simultaneously dual filed as a charge under [*insert as appropriate: Title VII of the Civil Rights Act of 1964, as amended (Title VII); and/or Title I of the Americans with Disabilities Act, as amended (ADA)*].

The complainant alleges that [*insert the name of the employer, and the alleged discriminatory actions or practices, including the date(s) of occurrence and relevant place and circumstances*].

[*Insert for Executive Order 11246 and/or Section 503 complaints only: Title VII and/or the ADA*] requires us to send you notice of the filing within 10 calendar days of our receipt of a complaint.

*Insert whichever of the following statements are applicable:*

- We have determined that OFCCP has jurisdiction to address the allegations of employment discrimination stated in the complaint and will proceed with an investigation.

- [*Insert for full transfer –EEOC better suited to investigate*] We have closed the complaint because it contains matters better suited to investigation and resolution by the EEOC under one or more of the laws it enforces. The complaint, in its entirety, has been transferred to the EEOC for investigation.

- [*Insert for full transfer – no jurisdiction*] We have closed the complaint because we are unable to establish jurisdiction. The complaint has been referred to the [*EEOC or other appropriate agency*] for consideration.

- [*Insert for partial transfer*] We have determined that OFCCP has jurisdiction over and will retain for investigation the following allegations: [*insert description of retained allegations and their bases*]. However, OFCCP has transferred to [*insert EEOC or other appropriate agency*] the following allegations: [*insert description of allegations being transferred*].

- We have not yet determined whether OFCCP has jurisdiction to investigate the complaint.  If we establish jurisdiction over the employer, OFCCP will investigate the complaint under [*insert: Executive Order 11246, Section 503 and/or VEVRAA; or, if complaint is dual filed, insert:  Executive Order 11246 and Title VII and/or Section 503 and the ADA*].  If we are unable to establish jurisdiction over all or part of the complaint, we will inform you.

Please be advised that both OFCCP and EEOC regulations require that you retain all records pertinent to this complaint and ensure that there is no retaliation because of this complaint.

In the event this complaint was filed with the EEOC under [*insert: Title VII and/or the ADA*], you may receive a similar 10-day notice from the EEOC.  If so, please contact [*name*] at [*telephone number*] immediately and we will resolve the matter with the EEOC.

Sincerely,


[*Name of regional director*]
Regional Director

**LETTER L-12:  10-DAY NOTICE TO COMPLAINANT**

[*Date*]

[*Name and address of
Complainant or
Authorized Representative*]

Complaint Reference Number: [*number*]

Dear [*insert Name of Complainant or Authorized Representative*]:

This is to acknowledge receipt of your complaint against [*insert: name of employer*] [*insert if appropriate: on behalf of (name of person)] alleging a violation of [insert: Executive Order 11246, as amended; and/or Section 503 of the Rehabilitation Act of 1973, as amended (Section 503); and/or Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA)*].

[*Insert for Executive Order 11246 and/or Section503 complaints only: Under the provisions of a Memorandum of Understanding Between the Office of Federal Contract Compliance Programs (OFCCP) and the U.S. Equal Employment Opportunity Commission (EEOC) effective November 7, 2011; and/or regulations at 41 CFR Part 60-742*], the complaint is deemed simultaneously dual filed as a charge under [*insert as appropriate:* Title VII of the Civil Rights Act of 1964, as amended (Title VII); and/or Title I of the Americans with Disabilities Act, as amended (ADA)].

[*Insert for Executive Order 11246 and/or Section 503 complaints only: Title VII and/or the ADA*] requires us to provide the employer against whom a complaint is filed with a notice of filing within 10 calendar days of our receipt of a complaint.  Enclosed is a copy of the notice forwarded to [name of employer] concerning your complaint.

*[Insert whichever of the following statements are applicable]*

- We have determined that OFCCP has jurisdiction to address all of the allegations of employment discrimination stated in your complaint and will proceed with an investigation.

- [*Insert for full transfer*] We have closed your complaint because [*the complaint alleges individual discrimination covered by Title VII; the complaint alleges a violation of the Age Discrimination in Employment Act; or the complaint alleges a violation of the ADA and individual discrimination covered by Title VII and/or the Age Discrimination in Employment Act; and/or the complaint alleges discrimination under Title II of the Genetic Information Nondiscrimination Act of 2008.*]  The complaint, in its entirety, has been transferred to the EEOC for investigation.

- [*Insert for full transfer*] We have closed your complaint because we are unable to establish jurisdiction.  Your complaint has been referred to the [*EEOC or other appropriate agency*] for consideration.

- [*For partial transfer*] We have determined that OFCCP has jurisdiction over and will retain for investigation the following allegations: [*insert description of retained allegations and their bases*].  However, OFCCP has transferred to [*insert EEOC or other appropriate agency*] the following allegations: [*insert description of allegations being transferred*].

- We have not yet determined whether OFCCP has jurisdiction to investigate your complaint.  We will notify you immediately if we establish jurisdiction over the employer.  OFCCP will investigate your complaint under [*insert: Executive Order 11246, Section 503, and/or VEVRAA; or, if complaint is dual-filed, insert:  Executive Order 11246 and Title VII and/or Section 503 and the ADA*].  If we are unable to establish jurisdiction over all or part of the complaint, we will inform you.

Please be sure to contact [*compliance officer*] at [*telephone number*] if you change your address or telephone number.

Sincerely,


[*Name of regional director*]
Regional Director

Enclosure: 10-Day Notice to Employer/Contractor

Federal Contract Compliance Manual (FCCM)

**LETTER L-13:   LETTER TO EEOC (FULL OR PARTIAL TRANSFER OF
COMPLAINT)**

[*Date*]

[*Name and Address of
Equal Employment Opportunity Commission Office*]

Complaint Reference Number: [*number*]

[*EEO Representative*]:

Enclosed for your consideration is a complaint filed under [*insert: Title VII of the Civil Rights
Act of 1964, as amended (Title VII); Title I of the Americans with Disabilities Act, as amended;
the Age Discrimination in Employment Act of 1967, as amended; and/or Title II of the Genetic
Information Nondiscrimination Act of 2008.*]

[*Insert for full transfer of complaint*] The Office of Federal Contract Compliance Programs
(OFCCP) has closed the complaint because [*Insert, as appropriate: we are unable to establish
jurisdiction or it is better suited to investigation and resolution by EEOC*]. With this letter,
OFCCP is transferring the complaint, in its entirety, to EEOC.

[*Insert for partial transfer of complaint*]: With this letter, OFCCP is transferring the following
complaint allegation(s) to EEOC for investigation and processing: [*insert: descriptions of each
allegation being transferred*].  OFCCP has retained and will investigate the following complaint
allegation(s) [*insert; descriptions of each allegation being retained.*]

We have enclosed, for your information, copies of the letters sent to the employer and the
complainant informing them of the transfer of [*insert: this matter or the referenced allegations*]
to your office.

If you have any questions, please call me at [*phone number*].

Sincerely,


[*Insert regional director or designee's name*]
Regional Director

Enclosures: Complaint Form CC-4
Notices to Complainant and Employer

Federal Contract Compliance Manual (FCCM)

**LETTER L-14:  AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION**

Re:   Complaint against [*insert name of contractor*]
       OFCCP CMS #

I hereby authorize the release to the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), of any medical information needed by OFCCP in its investigation of the complaint of discrimination which I filed on [*insert date*]) against the above-named contractor.

_____

PRINTED/TYPED NAME OF PATIENT

_____       _____

SIGNATURE OF PATIENT                    DATE

Federal Contract Compliance Manual (FCCM)

**LETTER L-15:   LETTER NOTIFYING CONTRACTOR OF INVESTIGATION**

*Certified Mail, Return Receipt Requested*

[*Date*]

[*Name of CEO*]
[*Title of CEO*]
[*Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear (*insert name of contractor official*):

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), received a complaint filed under the provisions of (*insert one or more of the appropriate legal authorities enforced by OFCCP*).  A copy of the complaint is enclosed.

This office has been assigned the complaint for investigation under the (*insert the name of one or more of the appropriate legal authorities enforced by OFCCP underlying the complaint*) and its implementing regulations at (*insert the appropriate CFR part and section citations for the complaint*).  The applicable regulations may be found on the U.S. Department of Labor's website at https://www.dol.gov/general/cfr/title_41 (see Chapter 60).  The laws and regulations enforced by OFCCP prohibit federal contractors and subcontractors from discriminating in employment because of race, color, religion, sex, sexual orientation, gender identity, national origin, disability or status as a protected veteran.  They also require federal contractors and subcontractors to take affirmative action to employ and advance in employment individuals from these particular groups.  In addition, contractors and subcontractors are prohibited from discriminating against applicants or employees because they inquired about, discussed or disclosed their compensation or that of others, subject to certain limitations.

As required by OFCCP's regulations, please retain full, accurate records relevant to this complaint and ensure that there is no harassment, intimidation, threat, coercion or discrimination against the complainant, or any participant in the investigation [*insert the appropriate citations:* 41 CFR 60-741.69 and 60-741.80-.81, 41 CFR 60-300.69 and 60-300.80-.81, 41 CFR 60-1.32 and 1.43].

This letter is a notice that OFCCP is investigating the complaint; it neither prejudges the issues nor implies that your company violated any law.  It is also a notice to retain information that will later permit an expeditious investigation and resolution of this matter.

You may wish to review and attempt to resolve this complaint internally and, if you are successful in resolving it to the satisfaction of the complainant, we will need verification from the complainant.  However, OFCCP reserves the option to conduct its own investigation if, in its judgment, the circumstances warrant.

If you do not wish to make an attempt to resolve this matter, or you are unsuccessful in doing so, you may wish to send us a statement of position or evidence concerning the complaint.  Any

material you submit will be included in the case file, and will be considered when the complaint is investigated. Please note that during our investigation, we may need to examine your current Affirmative Action Program required under 41 CFR [*insert appropriate citations:* 41 CFR 60-741, Subpart C; 41 CFR Part 60-300, Subpart C; 41 CFR Part 60-2].

If you have any questions, you may contact [*insert name of compliance officer*] at [*insert telephone number*].

Sincerely,


[*insert name of district director*]
District Director

Enclosure: Complaint of [*insert name of complainant and CMS#*]

Federal Contract Compliance Manual (FCCM)

## LETTER L-16:  LETTER NOTIFYING COMPLAINANT OF INVESTIGATION

*Certified Mail, Return Receipt Requested*

[*Date*]

[*Name of Complainant*]
[*Street Address*]
[*City, State, Zip Code*]

Re: Complaint against [insert name of company and CMS #]

Dear [*insert name of complainant*]:

This letter is to inform you that your complaint has been assigned to this office for investigation by the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). We have notified the contractor of your complaint, provided the contractor a copy of the complaint, and advised the contractor of the opportunity to attempt to resolve the complaint if it wishes to do so.  We also informed the contractor that our regulations require that all relevant records be retained; and that there be no harassment, intimidation, coercion or retaliation against you.

Please let us know immediately if the contractor and you resolve the complaint to your satisfaction, preferably in writing.  In the meanwhile, we will schedule your complaint for investigation.

Please be sure to keep us advised of any change in your address or telephone number.  If you have any questions, you may contact [*insert name of compliance officer*] at [*insert telephone number*].

Sincerely,


[*Name of district director*]
District Director

Enclosure: Copy of complaint for [*insert name of complainant and CMS#*] provided to the contractor

**LETTER L-17:   INQUIRY LETTER TO U.S. DEPARTMENT OF JUSTICE OR THE U.S. DEPARTMENT OF STATE**


[*Date*]

[*Name/Title*]
[*Agency or Organization Name*]
[*Street Address*]
[*City, State, Zip Code*]


Dear_____:

The U.S. Department of Labor' Office of Federal Contract Compliance Programs (OFCCP), recently received a complaint alleging employment discrimination based on (*insert protected basis*)  by (*insert name of contractor*).

OFCCP enforces Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 793; the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212.  These legal authorities prohibit employment discrimination and require affirmative action to provide equal employment opportunity without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran.  Additionally, Executive Order 11246 prohibits federal contractors and subcontractors from taking adverse employment actions against applicants and employees for asking about, discussing, or sharing information about their pay or, in certain circumstances, the pay of their co-workers.

Specifically, the complaint made the following allegations:

- (*Bullet out the allegations made by the complainant that OFCCP will investigate*).

Please forward any pertinent information you have concerning complaints, charges or litigation filed against this contractor. We are also seeking any other information you may have concerning the EEO attitudes, policies and practices of the contractor that you believe we should consider during the compliance evaluation.

OFCCP would appreciate receiving your prompt response to this inquiry.  Please contact me at (*insert phone number*) should you have any questions or require additional information.

Sincerely,


(*insert name of compliance officer*)
Compliance Officer

## LETTER L-18:   CONFIRMATION OF SCHEDULING OF ON-SITE INVESTIGATION

*Certified Mail, Return Receipt Requested*

[*Date*]

[*Name of Contractor Official*]
[*Title*]
[*Street Address*]
[*City, State, Zip Code*]

Re: Complaint of [*insert complainant's name and CMS #*]

Dear [*insert name of contractor official*]:

This letter confirms the telephone call of [*insert date*] between Compliance Officer [*insert name*] with the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) and [*insert name of contractor official*] scheduling the investigation of the above complaint filed under [*insert one or more of these authorities: Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended; or the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended*].

As agreed, the investigation is to begin on [*insert date*] at [*insert time and location*].  In the telephone call mentioned above, [*insert compliance officer's name and title*] requested that certain records and individuals be available during the visit.  These are listed in the attachment to this letter.

If you have any questions, please contact [*insert name of compliance officer*] at [*insert telephone number*].

Sincerely,


[*Name of district director*]
District Director

Attachment

**LETTER L-19:   LETTER TO CONTRACTOR CONFIRMING COMPLAINT**
**RESOLUTION**

*Certified Mail, Return Receipt Requested*


[*Date*]

[*Name of Contractor Official*]
[*Title*]
[*Street Address*]
[*City, State, Zip Code*]


Re: Complaint of [*insert name of complainant and CMS #*]

Dear [*insert name of contractor official*]:

On behalf of the U.S. Department of Labor, Office of Federal Contract Compliance Programs, this correspondence confirms [*insert as appropriate: your letter or our telephone conversation*] of [*insert date of the letter or telephone call*] in which you informed us that the above complaint was resolved to the satisfaction of the complainant.  We have been in contact with the complainant who acknowledges that the parties reached a satisfactory resolution of the complaint.

We appreciate your efforts in resolving this matter.

Sincerely,


[*Name of district director*]
District Director

**LETTER L-20:   LETTER TO COMPLAINANT CONFIRMING COMPLAINT
RESOLUTION**

*Certified Mail, Return Receipt Requested*

[*Date*]

[*Name of Complainant*]
[*Street Address*]
[*City, State, Zip Code*]

Re: Complaint against [*insert the name of company and CMS #*]

Dear [*insert name of complainant*]:

On behalf of the U.S. Department of Labor's Office of Federal Contract Compliance Programs,
this correspondence confirms [*insert as appropriate: your letter or our telephone conversation*]
of [*insert date*].  During the [*insert as appropriate: in your letter or during the call*] you stated
that your complaint against the above company was resolved to your satisfaction.

If you are satisfied with the resolution of your complaint, please sign on the line indicated below
and return this letter to us in the enclosed stamped envelope.

Sincerely,


[*Name of district director*]
District Director

Enclosure: Self-addressed stamped envelope

There has been a satisfactory resolution to my complaint filed against [*insert name of
contractor*].  I have not been forced or coerced by the contractor, or any of its agents, into
making this statement.

Signature _____

Date _____

**LETTER L-21:   NOTIFICATION OF RESULTS OF INVESTIGATION: NO VIOLATION**

**(Executive Order 11246, Section 503, or VEVRAA Complaint (Not Dual Filed - no Notice of Right-to-Sue))**

*Certified Mail, Return Receipt Requested*

[*Date*]

[*Complaint No.*]

<div align="right">COMPLAINANT</div>

[*Complainant's Name*]
[*Street Address*]
[*City, State, Zip Code*]

<div align="right">CONTRACTOR</div>

[*Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

On (*insert date*), the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) investigated the allegations of (*insert type of discrimination*) made in the complaint of (*insert name of the complainant*) filed on (*insert date*).  The investigation resulted in the following findings:

1. (*Insert name of contractor*) is a nonexempt government contractor subject to the requirements of (*insert one or more as appropriate:* Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended (Section 503); the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA)).

2. (*Insert name of complainant*) is (*insert description of the relevant protected basis, e.g., applicant, employee, African-American, protected veteran, individual with a disability, lesbian, transgender, etc.*) within the meaning of (*insert appropriate legal authority: Executive Order 11246, Section 503, VEVRAA*) and the regulations at (*insert as appropriate:* 41 CFR parts 60-1 to 60-50, 41 CFR part 60-300, 41 CFR part 60-741).

3. The complainant alleges the contractor violated its obligations under the nondiscrimination and/or affirmative action provisions of its federal contracts by (*insert description of employment action taken by contract: terminating, not promoting, not hiring, retaliation, disclosing pay, etc.*).

4. The contractor's position is that the complainant was (*insert description of employment action: terminated, not hired, not promoted, not retaliated against, etc.*) because (*insert description of the contractor's reasons or position*).

Federal Contract Compliance Manual (FCCM)

5. Our investigation indicates that the contractor (*insert description of findings/evidence related to contractor's employment actions*).

OFCCP's investigation found insufficient evidence that the contractor violated its obligations under the nondiscrimination and affirmative action provisions of (*insert one or more as appropriate:* Executive Order 11246, Section 503, VEVRAA). This determination concludes the processing of this complaint by OFCCP.

On behalf of the United States Department of Labor.


_____    _____
Regional Director                          Date


cc: (*insert name of complainant's attorney*)
    (*insert name of the contractor's attorney*)

Federal Contract Compliance Manual (FCCM)

**LETTER L-22:  NOTIFICATION OF RESULTS OF INVESTIGATION AND NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964:  NO VIOLATION (Dual filed)**

*Certified Mail, Return Receipt Requested*

U.S. DEPARTMENT OF LABOR
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

[*Complaint No.*]


[*Complainant's Name*]                                                              COMPLAINANT
[*Street Address*]
[*City, State, Zip Code*]


[*Contractor's Name*]                                                                CONTRACTOR
[*Street Address*]
[*City, State, Zip Code*]


On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) conducted an investigation of the allegation(s) of [*insert basis of complaint*] discrimination made in the complaint of [*insert name of complainant*], filed on [*insert date*] following procedures for complaints of employment discrimination filed against employers holding government contracts or subcontracts.  Here are the results of our investigation:

1.  [*Insert name of contractor*] is a nonexempt government contractor subject to the requirements of [*insert one or more as appropriate:* Executive Order 11246, as amended, and an employer of 15 or more persons subject to Title VII of the Civil Rights Act of 1964, as amended; Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA);  Section 503 of the Rehabilitation Act of 1973, as amended (Section 503) and an employer of 15 or more persons subject to Title I of the Americans with Disabilities Act of 1990, as amended (ADA)].

2.  [*Insert name of complainant*] is [*insert description of the relevant protected basis, e.g., applicant, employee, African-American, individual with a disability, lesbian, transgender, etc.*] covered or protected by [*insert one or more as appropriate:* Executive Order 11246 and Title VII; Section 503 and the ADA].

3.  The complainant alleges the contractor violated its obligations under the nondiscrimination and/or affirmative action provisions of its federal contracts and under the nondiscrimination provisions of [*insert as appropriate:* Title VII or the ADA] by [*insert a description of the adverse personnel action or practice of the employer:  terminating, not promoting, paying less, retaliation, etc.*].

4.  The contractor's position is that the complainant was [*insert description of the adverse personnel action or practice of the employer: terminated, not hired, etc.*] because [*insert a description of the contractor's position or defense*].

5.  Our investigation indicates that the contractor [*insert a description of what the contractor did or did not do*].

OFCCP's investigation found insufficient evidence that the contractor violated its obligations under the nondiscrimination and affirmative action provisions of [*insert one or more as appropriate:* Executive Order 11246 or Section 503] or under the nondiscrimination provisions of the [*insert one or more as appropriate:* Title VII or the ADA].  This determination concludes the processing of this complaint by OFCCP.

On behalf of the United States Department of Labor,


_____     _____
[Regional Director or Designee]                    [Date]


Enclosures: Information Related to Filing Suit under Title VII and the ADA
            Notice of Right to Sue

cc:    [*insert name of complainant's attorney*]
       [*insert name of contractor's attorney*]
       [*insert name of the EEOC field office contact*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-22A:  ENCLOSURE: NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF
THE ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

U.S. DEPARTMENT OF LABOR
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

TO: [Complainant's Name                   FROM: [OFCCP Office Name
        and Address]                               and Address]

[__] On behalf of a person whose          OFCCP Representative
identity is confidential
(29 CFR 1601.7(a))


Complaint Number:

**TO THE COMPLAINANT:**  You may file a lawsuit against the contractor under [*insert as
appropriate:* Title VII or ADA] in federal or state court.  **Your lawsuit must be filed within 90
calendar days of receipt of this notice or your right to sue will be lost.**  Please see the
enclosed information sheet on filing lawsuits for further information.

With the issuance of this Notice of Right-to-Sue, OFCCP is terminating its processing of your
complaint.

An information copy of this Notice has been sent to the below employer as named in your
complaint.

[*insert employer's name and address*]

On behalf of the United States Department of Labor,


_____     _____
[Regional Director or Designee]                    [Date]
[*insert appropriate OFCCP office address*]


Enclosures (2):   Information Related to Filing Suit under Title VII and the ADA
                      Copy of Complaint

cc: [*insert name of complainant's attorney*]
      [*insert name of the contractor's attorney*]
      [*insert name of the EEOC field office contact*]

**LETTER L-23:    NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA OR TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (Issued Upon Request)**

*Certified Mail, Return Receipt Requested*

U.S. DEPARTMENT OF LABOR
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

TO: [Complainant's Name            FROM: [OFCCP Office Name
     and Address]                              and Address]

[__] On behalf of a person whose        OFCCP Representative
identity is confidential
(29 CFR 1601.7(a))

Complaint Number:

**TO THE COMPLAINANT:  This is your NOTICE OF RIGHT-TO-SUE under [Title I of the Americans with Disabilities Act of 1990, as amended] [Title VII of the Civil Rights Act of 1964, as amended] in reference to the complaint number indicated above.  This Notice is issued at your request.  If you intend to file a lawsuit against the employer named in your complaint, YOU MUST DO SO <u>WITHIN 90 DAYS</u> OF YOUR RECEIPT OF THIS NOTICE.  OTHERWISE, YOUR RIGHT TO SUE IS LOST. (The time limit for filing suit based on a state claim may be different.)**

[Select all that apply]

[__]   More than 180 days have elapsed since you filed your complaint.

[__]   Less than 180 days have elapsed since you filed your complaint, but it has been determined that OFCCP will be unable to complete its processing within 180 days from the date you filed your complaint.  (Note:  This reason is not acceptable to federal courts within the District of Columbia.)

[__]   With the issuance of this Notice of Right-to-Sue, OFCCP is terminating its processing of your complaint.

[__]   OFCCP will continue to investigate the following allegations in your complaint which are uniquely within OFCCP jurisdiction: [*list any allegation(s) not subject to ADA or Title VII, which are still under investigation*].

An informational copy of this Notice has been sent to the below employer as named in your complaint.

[*insert employer's name and address*]

Federal Contract Compliance Manual (FCCM)

For the United States Department of Labor,

_____    _____
Regional Director or Designee        Date


Enclosures (2):   Information Related to Filing Suit under Title VII and the ADA
                  Copy of Complaint

cc: [*insert name of complainant's attorney*]
    [*insert name of contractor's attorney*]
    [*insert name of EEOC field office contact*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-24:   NOTICE OF RIGHT-TO-SUE UNDER TITLE I OF THE ADA OR
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (Administrative
Closure)**

*Certified Mail, Return Receipt Requested*

U.S. DEPARTMENT OF LABOR
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

TO: [Complainant's Name                    FROM: [OFCCP Office Name
      and Address]                                        and Address]

[\_\_] On behalf of a person whose          OFCCP Representative
identity is confidential
(29 CFR 1601.7(a))

Complaint Number:

**TO THE COMPLAINANT: This is your NOTICE OF RIGHT-TO-SUE under [Title I of
the Americans with Disabilities Act of 1990, as amended] [Title VII of the Civil Rights Act
of 1964, as amended] based on the above-numbered complaint.  It is issued because
OFCCP has dismissed your complaint for the following reason:**

[Select all that apply]

[\_\_]   OFCCP has closed your complaint because, even if proven to be true, the allegation(s)
raised in the complaint would not be a violation of the laws enforced by OFCCP.

[\_\_]   Your complaint was not filed in a timely manner.  [*Insert as applicable: Executive Order
11246 requires that a complaint be filed within 180 calendar days from the date of the alleged
discriminatory act or Complaints filed under VEVRAA and Section 503 must be filed within 300
calendar days from the date of the alleged discriminatory act to be timely.*]  [*Insert if an
extension had been requested: Your request for extension of the filing requirement and the
additional information provided did not meet the criteria necessary to allow an extension for
good cause for your delayed filing.*]  Accordingly, we have closed your complaint.

[\_\_]   You failed to provide requested necessary information, failed to appear or refused to be
available for necessary interviews or conferences; or otherwise refused to cooperate to the extent
that OFCCP is unable to complete its investigation of your complaint.

[\_\_]   You refused to enter into a conciliation agreement, the terms of which OFCCP determined
to be reasonable.

[\_\_]   OFCCP has made reasonable efforts to locate you and has been unable to do so.  You have
had at least 60 calendar days in which to respond to a notice sent to your last known address.
OFCCP has closed the complaint because we are unable to proceed without your cooperation.

The issuance of this NOTICE OF RIGHT-TO-SUE concludes OFCCP processing of your complaint.  If you wish to pursue your complaint further, you have the right to sue the employer named in your complaint in federal or state court.  IF YOU DECIDE TO SUE, YOU MUST DO SO <u>WITHIN 90 DAYS</u> OF YOUR RECEIPT OF THIS NOTICE.  OTHERWISE, YOUR RIGHT TO SUE IS LOST.  (The time limit for filing suit based on a state claim may be different.)

An informational copy of this Notice has been sent to the following employer named in your complaint:

[*insert employer's name and address*]


For the United States Department of Labor,


_____        _____
Regional Director or Designee          Date


Enclosures (2):   Information Related to Filing Suit under Title VII and the ADA
                  Copy of Complaint

cc: [*insert name of complainant's attorney*]
     [*insert name of contractor's attorney*]
     [*insert name of EEOC field office contact*]

Federal Contract Compliance Manual (FCCM)

## LETTER L-25:  NOTIFICATION OF RESULTS OF INVESTIGATION: VIOLATION

*Certified Mail, Return Receipt Requested*

[Complaint No.]

[*Complainant's Name*]                                                COMPLAINANT
[*Street Address*]
[*City, State, Zip*]

[*Company name*]                                                      CONTRACTOR
[*Street Address*]
[*City, State, Zip*]

On [*insert date*], the U.S. Department of Labor's the Office of Federal Contract Compliance Programs (OFCCP) investigated the allegation(s) of [*insert the type of discrimination*] discrimination made in the complaint of [*insert name of complainant*] filed on [*insert date*].  Our investigation has resulted in the following findings:

1.  [*Insert name of contractor*] is a nonexempt government contractor subject to the requirements of [*insert one or more as appropriate:* Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973, as amended (Section 503); Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA); Title VII of the Civil Rights Act of 1964, as amended (Title VII); Title I of the Americans with Disabilities Act of 1990, as amended (ADA)].

2.  [*Insert name of complainant*] is [*insert description of the relevant protected basis, e.g., applicant, employee, African-American, protected veteran, individual with a disability, lesbian, transgender, etc.*] within the meaning of [*insert one or more as appropriate:* Executive Order 11246, Section 503, VEVRAA, Title VII, the ADA] and the regulations at 41 CFR Part [*insert one or more, as appropriate:* 60-1 to 60-50, 60-300 and 60-741].

3.  The complainant alleges the contractor violated its obligations under the nondiscrimination and affirmative action provisions of its federal contracts by [*insert description of the actions the complaint describes that are attributed to the employer, e.g., terminating, not promoting, not hiring, retaliation, disclosing pay, etc.*].

4.  The contractor's position is that the complainant was [*insert the action taken against the complainant, e.g., terminated, not hired, etc.*] because [*insert a description of the contractor's position*].

5.  Our investigation indicates [*insert all specifics details relevant to the complainant's status and the contractor's actions*].

6.  The action(s) described in Paragraph 5 violated the contractor's obligations under the regulations as follows:

[*insert a list of the sections violated and describe violation*].

Federal Contract Compliance Manual (FCCM)

Under the regulations implementing [*insert as appropriate:* Executive Order 11246 at 41 CFR 60-1.24(c)(2) and Title VII at 29 CFR 1601.24, Section 503 at 41 CFR 60-741.62 and ADA at 29 CFR 1601.24, VEVRAA at 41 CFR 60-300.62], the U.S. Department of Labor's OFCCP invites [*insert name of contractor*] to resolve this matter through conciliation by informal means.  A compliance officer from this office will be in contact with [*insert name of contractor*] by [*insert date*] to begin the conciliation process.

On behalf of the United States Department of Labor,

_____        _____
Regional Director or Designee        Date


cc: [*insert name of the complainant's representative*]
    [*insert name of the contractor's representative*]

**LETTER L-26:   SHOW CAUSE NOTICE: FAILURE TO SUBMIT EXECUTIVE
ORDER 11246, SECTION 503 OR VEVRAA AAP(S)**

**(Supply & Service)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment CEO*]
[*Title of CEO*]
[*Establishment Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*Name of CEO*]:

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), by
letter dated [*insert date*], requested that you submit to this office within 30 calendar days a copy
of your [*insert as appropriate:* establishment's or functional unit's] Affirmative Action
Programs (AAPs) and itemized listing documentation prepared under our regulations
implementing:

- Executive Order 11246 , as amended (41 CFR Part 60-2)

- Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended (41 CFR Part
60-741)

- Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended
(41 CFR Part 60-300)

We have yet to receive your [*insert as appropriate:* Executive Order 11246, Section 503 or
VEVRAA] AAP(s).  Due to your organization's failure to submit the requested AAP(s) required
under [*insert as appropriate:* Executive Order 11246, Section 503, VEVRAA], we are issuing
this Notice to Show Cause.  Within 30 calendar days of receiving this Notice, you must either
submit the AAP(s) and itemized listing data specified in our original request or demonstrate, in
writing, why enforcement proceedings should not be initiated under [*insert as appropriate:*
Sections 208 and 209 of the Executive Order 11246, as implemented by 41 CFR 60-1.26; 41
CFR 60-741.65 (Section 503) and 41 CFR 60-300.65 (VEVRAA)].  A copy of our original
request is enclosed.

The submission of the AAP(s) and itemized listing data does not preclude the identification of
further violations, based either upon a finding during the desk audit or subsequent on-site review,
that your AAPs do not meet the requirements of 41 CFR Part 60-2, Part 60-741 or Part 60-300 or
that your [*insert as appropriate:* establishment or functional unit] is not in compliance with one or
more of the requirements of the Executive Order 11246, Section 503 or VEVRAA and their
implementing regulations.

Federal Contract Compliance Manual (FCCM)

Should you have any questions or wish to discuss a resolution to the issues raised herein, please contact [*insert name of compliance officer*] or [*insert appropriate pronoun: his or her*] supervisor, [*insert name of supervisor*], at [*insert telephone number*] to schedule a meeting or telephone conference.

Sincerely,


[*Name of regional or district director*]
Regional Director or District Director

Enclosure

cc: [*insert name of the corporate CEO*]
    [*insert name of the designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-27:   SHOW CAUSE NOTICE: FAILURE TO SUBMIT ACCEPTABLE
EXECUTIVE ORDER 11246, SECTION 503 OR VEVRAA AAP(S)**

**(Supply & Service)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment CEO*]
[*Title of CEO*]
[*Establishment Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*Name of CEO*]:

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), reviewed your Affirmative Action Program (AAP) and itemized listing documentation prepared under [*insert one or more as appropriate:* Executive Order 11246 (Executive Order 11246), as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended] and submitted for desk audit.  The results of this review indicate that your AAP does not meet the requirements of our regulations at [*insert one or more as appropriate:* 41 CFR Part 60-2, 41 CFR Part 60-300 Subpart C, 41 CFR Part 60-741 Subpart C].  Consequently, we are issuing this Notice to Show Cause why enforcement proceedings should not be initiated under [*insert one or more as appropriate:* 41 CFR 60-1.26, 41 CFR 60-741.65 (Section 503) and/or 41 CFR 60-300.65 (VEVRAA)].

The specific elements of your [*insert one or more as appropriate:* Executive Order 11246, Section 503, VEVRAA] AAP(s) which do not meet the regulatory requirements cited above are listed in the enclosure.  You are required to correct these violations, as indicated, within 30 calendar days of your receipt of this Notice or we shall recommend that enforcement proceedings be initiated.

Submission of a corrected [*insert one or more as appropriate:* Executive Order 11246, Section 503, VEVRAA] AAP(s) does not preclude the identification of further violations, based on a finding during the desk audit or subsequent on-site review, that your AAPs do not meet the requirements of [*insert one or more as appropriate:* 41 CFR Part 60-2, 41 CFR Part 60-300, 41 CFR Part 60-741] or that your [*insert as appropriate:* establishment or functional unit] is not in compliance with the requirements of the Executive Order 11246, Section 503 or VEVRAA and their implementing regulations.

Should you have any questions or wish to discuss a resolution to the issues raised herein, please contact [*insert name of compliance officer*] or [*insert appropriate pronoun: his or her*] supervisor, [*insert name of supervisor*], at [*insert telephone number*] to schedule a meeting or telephone conference.

Federal Contract Compliance Manual (FCCM)

Sincerely,


[*insert name of the regional or district director*]
Regional Director or District Director

Enclosure

cc: [*insert name of the corporate CEO*]
    [*insert name of designated representative*]

**LETTER L-27A:  SAMPLE ENCLOSURE TO LETTER L-27**

1. **Violation:** ABC Company's affirmative action program did not include an organizational profile required by 41 CFR 60-2.10(b)(1)(i).

   **Corrective Action:** Develop and include in the AAP an organizational profile that depicts staffing patterns within its establishment.

2. **Violation:** In four of the job groups identified in ABC Company's Executive Order 11246 utilization analysis as underutilized, ABC Company failed to set placement goals required by 41 CFR 60-2.15(b) or to explain why it did not do so.  The job groups are Design Engineers (minority and women), Health Scientists (minorities), Electronic Technicians (women), and Tool and Die Makers (minorities and women).

   **Corrective Action:** In the job groups specified above, either establish goals at least equal to the availability for minorities, women or both as noted, or explain in the AAP why such goals cannot be established.

Federal Contract Compliance Manual (FCCM)

**LETTER L-28:    SHOW CAUSE NOTICE: FAILURE TO SUBMIT EMPLOYMENT ACTIVITY OR COMPENSATION DATA FOR DESK AUDIT**

**(Supply & Service Executive Order Compliance Evaluations)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment CEO*]
[*Title of CEO*]
[*Establishment Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), by letter dated [*insert date*], requested that you submit the below listed [*insert as appropriate: employment activity or compensation*] data as support data for your Affirmative Action Program (AAP) prepared under Executive Order 11246, as amended.  The data was due to this office within 30 calendar days.

[*Specify the data that were not submitted for desk audit*]

The submission of this data is required by 41 CFR 60-1.12(c)(2).  Additionally, 41 CFR 60-2.17(b), (c) and (d) require that your AAP include an analysis of your employment process to identify and correct problem areas.  This obligation cannot be adequately fulfilled without maintenance of the referenced data.

We have not yet received the data we requested.  Consequently, we are issuing this Notice to Show Cause why enforcement proceedings should not be initiated.  You are required to submit the data as specified in our original request within 30 calendar days of your receipt of this Notice or we will recommend that enforcement proceedings be initiated under Sections 208 and 209 of the Executive Order 11246, as implemented by 41 CFR 60-1.26.  A copy of our original request is enclosed.

The submission of these support data does not preclude the identification of additional violations, based upon a finding during the desk audit or a subsequent on-site review, that your AAPs do not meet the requirements of 41 CFR Parts 60-2, 60-741 and/or 60-300, or that your [*insert as appropriate:* establishment or functional unit] is not in compliance with the requirements of the Executive Order 11246; Section 503 of the Rehabilitation Act, as amended; or the Vietnam Era Veterans' Readjustment Assistance Act, as amended, and their implementing regulations, as appropriate.

Should you have any questions or wish to discuss a resolution to the issues raised herein, please contact [insert name of compliance officer] or [*insert appropriate pronoun: his or her*]

supervisor, [*insert name of supervisor*], at [*insert telephone number*] to schedule a meeting or telephone conference.

Sincerely,


[*insert name of the regional or district director*]
Regional Director or District Director

Enclosure

cc: [*insert name of the corporate CEO*]
    [*insert name of the designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-29:   SHOW CAUSE NOTICE: FAILURE TO SUBMIT CORRECTED
EMPLOYMENT ACTIVITY AND/OR COMPENSATION DATA**

**(Supply & Service Executive Order Compliance Evaluations)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment CEO*]
[*Title of CEO*]
[*Establishment Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance
(OFCCP), contacted you by phone to request that you resubmit certain [*insert as appropriate:*
employment activity or compensation] data which we determined to be unacceptable during
the desk audit of your Affirmative Action Program (AAP).  The desk audit of your AAP was
prepared according to Executive Order 11246, as amended. We asked you to provide the
corrected data within 10 calendar days.  Further, we identified the unacceptable data, stated how
they are unacceptable, and specified the required correction(s).

To date, we have not received the corrected [*insert as appropriate:* employment activity or
compensation] data.  Consequently, we are issuing this Notice to Show Cause why enforcement
proceedings should not be initiated under 41 CFR 60-1.26.  You are required to submit the
corrected data, as specified above, within 30 calendar days of receiving this Notice or we will
recommend initiating enforcement proceedings following 41 CFR 60-1.26.

The submission of these data does not preclude the identification of further violations based upon
a finding during the desk audit, or subsequent on-site review, that your AAP(s) does not meet the
requirements of 41 CFR Parts 60-2, 60-741, or 60-300, or that your [*insert as appropriate:*
establishment or functional unit] is not in compliance or has failed to comply in the past with the
requirements of the Executive Order, Section 503 of the Rehabilitation Act of 1973, as amended
and/or the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, and their
implementing regulations.

Should you have any questions or wish to discuss a resolution to the issues raised herein,
please contact [insert name of compliance officer] or [*insert appropriate pronoun: his or her*]
supervisor, [*insert name of supervisor*], at [*insert telephone number*] to schedule a meeting or
telephone conference.

Sincerely,

[*insert name of the regional or district director*]

Federal Contract Compliance Manual (FCCM)

Regional Director

cc: [*insert name of the corporate CEO*]
    [*insert name of the designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-30:   SHOW CAUSE NOTICE: UNRESOLVED VIOLATIONS**

**(Compliance Evaluations)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) sent you a Notice of Violation based on the findings of our recent compliance evaluation of your [*insert as appropriate:* establishment or functional unit].

[*If the contractor did not respond to the NOV, include the sentence: "To date, you have not responded to that Notice or otherwise indicated your willingness to remedy those violations."*]

[If the contractor did respond to the NOV, include the next two sentences: "On [*insert date*], OFCCP met with [*insert name of contractor representative*] to conciliate a resolution of the violations(s) listed in that Notice.  Our conciliation efforts, however, failed to resolve the violation(s)."

Consequently, we are issuing this Notice to Show Cause. You have 30 calendar days from the date you receive this Notice to show why enforcement proceedings should not be initiated under [insert one or more as appropriate: Sections 208 and 209 of Executive Order 11246, as amended, as implemented by 41 CFR 60-1.26; Section 503 of the Rehabilitation Act of 1973, as amended, as implemented by 41 CFR 60-741.65; the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, as implemented by 41 CFR 60-300-65].

A list of the violations at issue is enclosed.  You are required to correct these violations, as indicated, within 30 calendar days of your receipt of this Notice or we shall recommend that enforcement proceedings be initiated.

Should you have any questions or wish to discuss a resolution to the issues raised herein, please contact [*insert name of compliance officer*] or [*insert appropriate pronoun: his or her*] supervisor, [*insert name of supervisor*], at [*insert telephone number*] to schedule a meeting or telephone conference.

Sincerely,


[*insert name of the regional or district director*]

Federal Contract Compliance Manual (FCCM)

Regional Director or District Director

Enclosure

cc: [*insert name of corporate CEO*]
    [*insert name of designated representative*]

**LETTER L-30A:   SAMPLE ENCLOSURE TO LETTER L-30**

1.  **Violation:**  In violation of 41 CFR 60-1.4(a)(1), ABC Company discriminated against
    qualified African American applicants in its hiring and selection procedures for the Laborer
    positions from January 1, 2018 through December 31, 2018.  During this period, the qualified
    pool of applicants for the Laborer positions consisted of 176 white applicants and 111
    African American applicants.  From that pool, 17 white applicants and no African American
    applicants were hired.  Comparison of the selection rates of white and African American
    applicants showed an adverse impact (0% African Americans hired) and a shortfall of six.
    The disparity in the selection rates is statistically significant, with a standard deviation of
    3.38.  Analysis of the steps in the selection process showed an adverse impact at each step in
    the process affecting African American applicants.  ABC Company did not demonstrate that
    the steps in its selection process that had an adverse impact were job-related and consistent
    with business necessity.  Absent discrimination, six African American applicants would have
    been selected given their representation in the qualified applicant pool.

    **Corrective Action:** ABC Company must agree to revise and maintain selection policies and
    procedures designed to eliminate unlawful disparate impact on African American applicants,
    and to ensure that all African American applicants are given an equal employment
    opportunity in its selection process.

    ABC Company must agree to provide make-whole relief to the 111 qualified African
    American applicants who applied for employment from January 1, 2018 through December
    31, 2018.  The relief covers the Laborer position and consists of employment opportunities
    for six qualified African American applicants, and monetary relief (including back pay,
    interest and benefits) to all African American applicants who can be located.

2.  **Violation:** In violation of 41 CFR 60-1.4(a)(1), ABC Company discriminated against two
    African American female applicants who applied for promotion into Inspection jobs.

    Specifically, ABC Company was unable to provide a legitimate, nondiscriminatory reason
    for rejecting Sandra Jones and Barbara Rogers (African American); both applicants were
    better qualified under ABC Company's stated selection criteria than two similarly situated
    white male applicants the company selected for Inspector positions on September 23, 2018.
    ABC Company's reason for rejecting Ms. Jones and Ms. Rogers was pretextual and the
    company did not equally apply it to the two white males promoted into Inspector positions.
    Ms. Jones and Ms. Rogers would have been promoted into Inspector positions on September
    23, 2018, but for being disparately treated.

    **Corrective Action:** ABC must make bona fide offers of employment to Ms. Rogers and Ms.
    Jones into the next two Inspector openings, and provide all wages, seniority and
    employment-related benefits they would have received had they not been subjected to
    discrimination.  Such relief shall be retroactive to the date each would have been promoted
    absent the discrimination and shall include: (a) back pay, plus interest; (b) retroactive
    seniority; (c) all employment benefits; and (d) any other appropriate make-whole relief,
    including all wages, seniority and employment-related benefits they would have received had
    they not been subjected to discrimination.  Additionally, ABC Company will provide Ms.

Rogers and Ms. Jones with front pay from the date this violation is resolved until they are promoted to Inspector positions or refuse bona fide promotion offers.

3. **Violation:** In violation of 41 CFR 60-2.17(c), ABC Company did not make good faith efforts to remove identified barriers, expand employment opportunities, and produce measurable results for females and minorities in underutilized job groups.

   **Corrective Action:** ABC Company must agree to make good faith efforts to remove identified barriers, expand employment opportunities, and produce measurable results for females and minorities in underutilized job groups. To accomplish this, ABC Company must agree to the following actions:

   a. ABC Company must agree to establish a working relationship with referral organizations by taking the following actions:

   - Provide regular job listings of vacancies which have not been filled internally for all underutilized job groups; and

   - Contact the referral organization within 45 calendar days of the execution of this Agreement. The purpose of the contact is to arrange for the referral of applicants, and to provide follow-up and feedback to the recruitment sources on the disposition of its referrals.

   b. ABC Company must agree to maintain documentation that demonstrates its good faith efforts.

4. **Violation:** In violation of 41 CFR 60-1.12(a), ABC Company failed to collect and maintain personnel and employment records for the appropriate period. ABC Company failed to collect and maintain documentation of the application process and selection decisions, and did not maintain all of the applications, interview notes and other applicant records.

   **Corrective Action:** ABC Company must agree to collect and maintain personnel and employment records for the appropriate period, including documentation of the application process and selection decisions.

5. **Violation:** ABC failed to list its jobs with the appropriate employment service delivery system, in violation of 41 CFR 60-300.5(a)(2) through (6).

   **Corrective Action:** ABC Company will list all suitable jobs with the Metropolis State Employment Service office. Reports to OFCCP on these listings will be required.

6. **Violation:** In violation of 41 CFR 60-300.44(f), ABC Company failed to take appropriate outreach and positive recruitment activities for protected veterans.

   **Corrective Action:** ABC Company must agree to take appropriate outreach and positive recruitment activities for protected veterans, and to document and evaluate the effectiveness of these activities under 41 CFR 60-300.44(f).

Federal Contract Compliance Manual (FCCM)

**LETTER L-31:   SHOW CAUSE NOTICE: UNRESOLVED VIOLATIONS**

**(Complaint Investigations)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance Programs sent you a Notice of Results of Investigation specifying violations found during our investigation of the complaint filed by [*insert complainant's name*] against your company.  On [*insert date*] we met with [*insert name of contractor representative*] to conciliate a resolution of those violations.  Our conciliation efforts, however, failed to resolve the violations.

Consequently, we are issuing this Notice to Show Cause (SCN).  You have 30 calendar days from the date that you received this SCN to show why enforcement proceedings should not be initiated under [*insert one or more as appropriate:* Sections 208 and 209 of Executive Order 11246, as amended, as implemented by 41 CFR 60-1.26; Section 503 of the Rehabilitation Act of 1973, as amended, as implemented by 41 CFR 60-741.65; and/or of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, as implemented by 41 CFR 60-300.65].

The violations at issue are listed in the enclosure.  You are required to correct these violations within 30 calendar days of your receipt of this Notice or we shall recommend the initiation of enforcement proceedings.

Should you have any questions or wish to discuss a resolution to the issues raised herein, please contact [*insert name of compliance officer*] or [*insert appropriate pronoun: his or her*] supervisor, [*insert name of supervisor*], at [*insert telephone number*] to schedule a meeting or telephone conference.

Sincerely,


[*insert name of the regional or district director*]
Regional Director or District Director

Enclosure

cc: [*insert name of corporate CEO*]
    [*insert name of designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-32:   AMENDED SHOW CAUSE NOTICE FOR UNRESOLVED
                 VIOLATIONS**

**(Compliance Evaluations)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance
Programs (OFCCP), issued your company a Notice to Show Cause which listed specific
violations of [*insert one or more as appropriate:* Executive Order 11246, as amended; Section
503 of the Rehabilitation Act of 1973 (Section 503), as amended; the Vietnam Era Veterans'
Readjustment Assistance Act of 1974 (VEVRAA), as amended] and offered you 30 calendar
days in which to show why enforcement should not be initiated.

We have completed our subsequent review of your company's equal employment
opportunity policies and practices.  [*Insert this sentence if the contractor is a construction
contractor:* "Our review was of your construction work sites in the [*insert name of
geographic area.*"]] Additional violations of the [*insert one or more as appropriate:*
Executive Order 11246, Section 503, VEVRAA] were identified.

Consequently, we are issuing this Amended Notice to Show Cause.  You have 30 calendar days
from the date you receive this Notice to show why enforcement proceedings should not be
initiated under [*insert one or more as appropriate:* Sections 208 and 209 of the Executive Order
11246, as implemented by 41 CFR 60-1.26; Section 503, as implemented by 41 CFR 60-741.65;
and/or VEVRAA, as implemented by 41 CFR 60-300.65].

The enclosure lists the most recently identified violations, along with those specified in the
[*insert date*] Notice to Show Cause. You are required to correct these violations, as indicated,
within 30 calendar days of your receipt of this Notice or we shall recommend that enforcement
proceedings be initiated.

Should you have any questions or wish to discuss a resolution to the issues raised herein,
please contact [*insert name of compliance officer*] or [*insert appropriate pronoun: his or her*]
supervisor, [*insert name of supervisor*], at [*insert telephone number*] to schedule a meeting or
telephone conference.

Federal Contract Compliance Manual (FCCM)

Sincerely,

[*insert name of the regional or district director*]
Regional Director or District Director

Enclosure

cc: [*insert name of corporate CEO*]
    [*insert name of designated representative*]

**LETTER L-33:  SHOW CAUSE NOTICE FOR DENIAL OF ACCESS**

**(Compliance Evaluations & Complaint Investigations)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

In our letter dated [*insert date*], the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP), requested that [*insert contractor or establishment name*]:

[*CHOOSE ONE OR BOTH OF THE FOLLOWING OPTIONS*]

(1) Submit to the on-site portion of a [*compliance evaluation or complaint investigation*] as described at [*insert one or more as appropriate:* 41 CFR 60-1.20(a)(1)(ii), 41 CFR 60-741.60, 41 CFR 60-300.60] at its [*facility or construction work site(s)*] located at [*street address, city, state*]. The on-site was to begin on [*insert date*].

 [*and/or*]

(2) Submit records requested by OFCCP, under [*insert one or more as appropriate:* 41 CFR 60-1.43, 41 CFR 60-300.81, and 41 CFR 60-741.81].

On [*insert date*], your representative, [*insert name*], responded to our request by denying access to [*the facility, construction work site(s) and/or records*].  Consequently, we are issuing this Notice to Show Cause why enforcement proceedings should not be initiated under [*insert one or more as appropriate:* Sections 208 and 209 of Executive Order 11246 , as amended, as implemented by 41 CFR 60-1.26; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended, as implemented by 41 CFR 60-741.64; the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended; as implemented by 41 CFR 300.65].

[*CHOOSE ONE OR BOTH OF THE FOLLOWING OPTIONS*]

(1) [*Insert contractor's name*] is required to allow OFCCP access to the [*facility or construction work site(s)*] so that we can conduct an on-site [*compliance evaluation or complaint investigation*] of your [*facility or construction work site(s)*] located at [*insert location*] within 30 calendar days of your receipt of this Notice or we shall recommend that enforcement proceedings be initiated in accordance with the above citations.  In those proceedings, you will have an opportunity to request a hearing before any sanctions are imposed.

[*and/or*]

(2) [*Insert contractor's name*] is [*also*] required to allow OFCCP access to records requested for purposes of its [*compliance evaluation or complaint investigation*].

Allowing OFCCP access to the [*facility, construction work site(s), or records and other information*] to conduct the [*compliance evaluation or complaint investigation*] does not preclude the identification of further violations, based either upon a finding during the desk audit or subsequent on-site review, that your AAPs do not meet the requirements of 41 CFR Part 60-2, Part 60-741 and Part 60-300, or that your establishment is not in compliance or has failed to comply in the past with the requirements of the Executive Order 11246, Section 503 and VEVRAA, and their implementing regulations.  We will not withdraw this Notice to Show Cause until all deficiencies cited in this Notice (or subsequently identified in an Amended Show Cause Notice incorporating any additional violations found during the desk audit or on-site review) have been fully and satisfactorily resolved in a written Conciliation Agreement.

We wish to avoid enforcement proceedings, if possible.  Therefore, you are asked to contact [*insert name of compliance officer*] at [*insert phone number*] within five business days of receipt of this Notice to arrange a mutually acceptable time to conciliate a resolution of this violation.

Sincerely,


[*Name of regional or district director*]
Regional Director or District Director

Enclosure

cc: [*insert name of corporate CEO*]
    [*insert name of designated representative*]

Federal Contract Compliance Manual (FCCM)

## LETTER L-34:  RESCISSION OF AN ERRONEOUSLY ISSUED SHOW CAUSE NOTICE

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear (*insert name of CEO*):

On (*insert date*), the U.S. Department of Labor's Office of Federal Contract Compliance Programs issued a (*insert as appropriate:* Notice to Show Cause or Amended Notice to Show Cause) to your company.  That Notice gave you 30 calendar days to show why enforcement proceedings should not be initiated under (*insert one or more as appropriate:* Sections 208 and 209 of Executive Order 11246, as amended, as implemented by 41 CFR 60-1.26; Section 503 of the Rehabilitation Act of 1973, as amended, as implemented by 41 CFR 60-741.65; the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, as implemented by 41 CFR 60-300.65).

After issuing the Notice, we subsequently determined that it was erroneously issued because (*insert as appropriate:* your company has demonstrated that it is exempt from our requirements or your company demonstrated that the allegations giving rise to the Notice are incorrect). Therefore, we are rescinding the (*insert as appropriate:* Notice to Show Cause or the Amended Notice to Show Cause).

Sincerely,


(*Name of regional director*)
Regional Director

cc: (*insert the name of the corporate CEO*)
    (*insert the name of the designated representative*)

Federal Contract Compliance Manual (FCCM)

**LETTER L-35:  PREDETERMINATION NOTICE**

*Note: To be mailed by certified mail, return receipt requested.*

[*Date*]

[*Name of CEO*]
[*Title of CEO*]
[*Company name*]
[*Street Address*]
[*City, State, Zip Code*]

Re:   Compliance Evaluation of (*insert name of contractor*)
      OFCCP No. _____

Dear [*insert name of CEO*]:

On (*insert date*), the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) began a compliance evaluation of (*insert name of contractor*) to review compliance with Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; and/or the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended; and their implementing regulations at 41 Code of Federal Regulations (CFR) Chapter 60.  (*Insert name of contractor*), hereinafter referred to as the "contractor," is a federal contractor under Executive Order 11246, Section 503 and/or VEVRAA, and their implementing regulations at 41 CFR Chapter 60.

The purpose of this Notice is to inform you of the findings which, if not adequately rebutted, will establish that discrimination occurred (or is occurring) at the contractor's establishment.

*(Present the evidence of discrimination.)*

*(If there are additional violations or deficiencies, including technical violations, present them here.)*

Please be advised that this is a preliminary determination based on available information.  You now have the opportunity to provide additional information or documentation that you believe we should consider before a final determination is made.

We ask that you respond to this Notice within 15 calendar days from receipt of this letter.  If you do not respond, we will incorporate the preliminary finding(s) made in this Notice into a final Notice of Violation (NOV).  You will receive the NOV by certified mail.  If you have any questions, please call Compliance Officer, (*insert name of compliance officer*), or his or her immediate supervisor, (*insert name of district director or assistant district director*), at (*insert district office or regional office phone number*).

Federal Contract Compliance Manual (FCCM)

Sincerely,

(*insert name of the district director or assistant district director*)
District Director

cc: [*insert name of the head of establishment/construction contractor official over the geographical area under review*]
    [*insert name of the designated representative*]

**LETTER L-36:  NOTICE OF VIOLATION**

*Note: To be mailed by certified mail, return receipt requested.*

[*Date*]

[*Name of CEO*]
[*Title of CEO*]
[*Company name*]
[*Street Address*]
[*City, State, Zip Code*]

Re:   Compliance Evaluation of (*insert name of contractor*)
         OFCCP No. _____

Dear [*insert name of CEO*]:

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) is reviewing [*insert name of contractor*] compliance with one or more of these authorities and their implementing regulations at 41 CFR Chapter 60:  Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; or the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended.

The review indicates that [*insert name of contractor*] is not in compliance with [*insert one or more of the following:* Executive Order 11246, Section 503, and/or VEVRAA.]  Consequently, we are issuing this Notice of Violation.  The violation(s) and corrective action(s) needed are set forth below:

**A.  VIOLATION(S):**

*(List and describe the violations)*

**B.  CORRECTIVE ACTION(S):**

*(After each violation describe the needed corrective actions)*

To come into compliance, [*insert name of contractor*] must enter into a binding Conciliation Agreement with OFCCP that encompasses all of the corrective actions described above.  It is our sincere desire to avoid enforcement proceedings.  Therefore, we ask that you contact (*insert assistant district director name here*], or compliance officer [*insert name here*], or me within five business days of receiving this letter at [*insert office phone number*] to begin conciliation and resolution of the specified violations.

Sincerely,

[*Name of district director*]
District Director

Federal Contract Compliance Manual (FCCM)

cc: [*insert name of the head of the establishment*]
    [*insert name of the designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-37:  15-DAY NOTICE: VIOLATION OF A CONCILIATION AGREEMENT**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), entered into a Conciliation Agreement (CA) with your company.  The CA sets forth your company's specific commitments to remedy violations found during a [*insert as appropriate:* compliance review or complaint investigation].

We completed a review of your compliance with the CA on [*insert date*] that indicates that your company failed to comply with commitments outlined in the CA.  The facts and circumstances of each violation of the CA are outlined in the enclosure.

Accordingly, under the CA referenced above [insert one or more as appropriate: and 41 CFR 60-1.34, 41 CFR 60-300.63 and 41 CFR 60-741.63], you have 15 calendar days from the date you received this Notice to demonstrate that you are in compliance with the specified provisions of the CA.  You may demonstrate your compliance through a written presentation of facts and evidence.  However, if you fail to do so within the specified period, we will recommend the initiation of enforcement proceedings under 41 CFR [*insert as appropriate:* 60-1.26, 60-300.65 or 60-741.65].  Should this matter proceed to enforcement, you will have an opportunity for a hearing before any sanctions are imposed.

Should you have any questions or wish to discuss this matter, please contact [*insert name of compliance officer*] or [*insert appropriate pronoun: his or her*] supervisor, [*insert name of supervisor*], at [*insert telephone number*].

Sincerely,


[*insert name of the regional director*]
Regional Director

Enclosure

cc: [*insert name of the corporate CEO*]
    [*insert name of the designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-37A:   SAMPLE ENCLOSURE TO LETTER L-37**

**Remedy:** Provide affected class members an opportunity to bid on any position in the Finishing Department, utilizing their company seniority.

**Facts and Circumstances:** An examination of bid postings and interviews with Finishing Department supervisors and affected class members indicates that the employees that were discriminated against were allowed to bid only on entry-level positions in the Finishing Department.  The company continues to use job seniority, instead of company seniority, when determining the successful bidders for positions above the entry-level.

Federal Contract Compliance Manual (FCCM)

**LETTER L-38:   RESCISSION OF THE 15-DAY NOTICE**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/ Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/ Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*Name of CEO*]:

On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance Programs issued your company a 15-Day Notice under [*insert as appropriate:* 41 CFR 60-1.34, Executive Order 11246, as amended; 41 CFR 60-741.63, Section 503 of the Rehabilitation Act of 1973, as amended; and 41 CFR 60-300.63, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended].  We received your written reply on [*insert date*] and it stated that the allegations giving rise to the Notice were incorrect.

We examined the evidence you presented and concluded that the allegations are, in fact, incorrect.  Therefore, we are rescinding the 15-Day Notice.

Sincerely,


[*Name of regional director*]
Regional Director

cc: [*insert name of corporate CEO*]
    [*insert name of designated representative*]

## LETTER L-39:  PROGRESS REPORT RESPONSE LETTER

[*Date*]

[*Name of CEO*]
[*Title of CEO*]
[*Company Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert name of CEO*]:

On [*insert date*], the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) received your progress report under a [*insert as appropriate:* Conciliation Agreement or insert the name of the report causing the progress report] entered into by [*insert name of contractor*] on [*insert date*].

The terms of the [*insert as appropriate:* Conciliation Agreement or the name of the appropriate report] require that [*insert name of contractor*] submit certain items as a part of its progress report.  Your submission must include [*list items required here*] and you provided the below listed items.

[*List items submitted*]

This office reviewed and conducted the appropriate analyses on [*insert the date analysis done*] on the items you submitted.  [*Explain whether the progress report is acceptable or whether the CO needs additional information.*]

[*Insert one of the below paragraphs as appropriate*]

#1: Use if it is a final progress report:

This is your final progress report.  However, as long as [*insert contractor name*] is a federal contractor, [*insert contractor name*] is required to comply with all regulatory provisions of Executive Order 11246, as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (VEVRAA), as amended; and implementing regulations at 41 CFR Chapter 60.

#2: Use if it is an interim progress report:

This is not a final progress report.  Therefore, we remind you that the next progress report is due on [*insert date*].  As long as [*insert contractor name*] is a federal contractor, [*insert contractor name*] is required to comply with all regulatory provisions of Executive Order 11246, Section 503, VEVRAA and implementing regulations at 41 CFR Chapter 60.

If you have any questions, please contact [*insert name of compliance officer*], compliance officer, at [*insert contact information*] to schedule a meeting or telephone conference.

Federal Contract Compliance Manual (FCCM)

Sincerely,

[*insert name of the District Director or Assistant District Director*]
District Director or Assistant District Director

cc: [*insert the name of the corporate CEO*]
    [*insert the name of the designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-40:  CLOSURE LETTER FOR SUBSTANTIVE VIOLATIONS**

**(Where a Show Cause Notice was Issued)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Date*]

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]

Dear [*insert the name of CEO*]*:*

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) recently completed a compliance evaluation of your equal employment opportunity policies and practices at [*insert as appropriate: establishment or construction work sites*] in the [*insert name of the geographic area*].

On [*insert date*], based on violations found during the evaluation, we issued your company a [*insert one or more as appropriate:* Notice to Show Cause or Amended Notice to Show Cause]. Based on this notice, you had 30 calendar days to show why OFCCP should not initiate enforcement proceedings under [*insert one or more as appropriate:* Sections 208 and 209 of Executive Order 11246, as amended, as implemented by 41 CFR 60-1.26; Section 503 of the Rehabilitation Act, as amended, as implemented by 41 CFR 60-741.65; or the Vietnam Era Veterans' Readjustment Assistance Act, as amended, as implemented by 41 CFR 60-300.65].

However, on [*insert date*], representatives of your company and this office reached a Conciliation Agreement that addresses each of the violations cited in the [*insert as appropriate:* Notice to Show Cause or Amended Notice to Show Cause].

Subject to the implementation of commitments detailed in the Conciliation Agreement dated [*insert date*], this office determined that no other apparent violations of the laws that OFCCP enforces exist.  The Conciliation Agreement is effective as of the day it is signed by the Regional Director.

This determination does not preclude a future determination of noncompliance based on a finding that the commitments in the Conciliation Agreement are insufficient to achieve compliance.

Sincerely,

[*Name of district director*]
District Director

cc: [*insert name of the corporate CEO*]
    [*insert name of designated representative*]

Federal Contract Compliance Manual (FCCM)

**LETTER L-41:  CLOSURE LETTER FOR SUBSTANTIVE VIOLATIONS**

**(No Show Cause Notice Issued)**

*Certified Mail, Return Receipt Requested AND Electronic Mail*

[*Name of Establishment/Construction Contractor CEO*]
[*Title of CEO*]
[*Establishment/Construction Contractor Name*]
[*Street Address*]
[*City, State, Zip Code*]


Dear [*insert name of CEO*]:

The U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) recently completed a compliance evaluation of the equal employment opportunity policies and practices at your (*insert as appropriate:* establishment or construction work sites) in the (insert name of the geographic area).

Subject to the implementation of commitments detailed in our Conciliation Agreement dated (*insert date*), this office determined that no other apparent violations of the regulations that OFCCP enforces exist.  The Conciliation Agreement is effective as of the day it is signed by the regional director.  If OFCCP takes no action to modify the Conciliation Agreement within the timeframe provided, the agreement is deemed approved.

This determination does not preclude a future determination of noncompliance based on a finding that the commitments in the Conciliation Agreement are insufficient to achieve compliance.

Sincerely,


(*Name of regional director*)
Regional Director

Enclosure

cc: [*insert name of the corporate CEO*]
    [*insert name of the designated representative*]

# EXHIBIT G



**U.S. Equal Employment Opportunity Commission**

EEOC Headquarters
131 M Street, NE
Washington, DC 20507
EEO-1 Component 1 Instruction Booklet

# 2019 and 2020 EEO-1 Component 1 Data Collection Instruction Booklet



Equal Employment Opportunity Commission
OMB Number 3046-0049 Exp: 06/30/2023

OMB Control No. 3046-0049
Expiration Date: June 30, 2023

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**COLLECTION OF 2019 AND 2020 EEO-1 COMPONENT 1 DATA**

**STANDARD FORM 100, Employer Information Report (EEO-1)**

**INSTRUCTION BOOKLET**

**The Employer Information Report (EEO-1 Component 1) (EEO-1 Report), Standard Form 100**, is collected annually under the authority of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq.*, as amended (Title VII).  All employers with 15 or more employees are covered by Title VII and are required to keep employment records as specified by Commission regulations.  Based on the number of employees and federal contract activities, certain employers are required to file an EEO-1 Component 1 Report on an annual basis under the Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor Office of Federal Contract Compliance Programs (OFCCP) regulations.

See the Appendix of this document for the applicable provisions of Section 709(c) of Title VII, and the applicable EEOC regulations, Sections 1602.7-1602.14, Chapter XIV, Title 29 of the Code of Federal Regulations (CFR). State and local governments, public school systems, educational institutions, and local referral unions are covered by other employment reports and are excluded from the Employer Information Report (EEO-1), Standard Form 100.

In the interests of consistency, uniformity and economy, Standard Form 100 has been jointly developed by the EEOC and OFCCP, as a single form which meets the statistical needs of both programs.

As stated above, the filing of the Employer Information Report (EEO-1), Standard Form 100, is required by law; it is not voluntary. Under Section 709(c) of Title VII, the Equal Employment Opportunity Commission may compel an employer to file this form by obtaining an order from the United States District Court.

Under Section 209(a) of Executive Order 11246, the penalties for failure by a federal contractor or subcontractor to comply may include termination of the federal government contract and debarment from future federal contracts.

---

**For ease of navigation,** this document includes hyperlinks to help navigate between the table of contents and each section. To visit a section of the document, click on the relevant title in the table of contents. You will be able to click the return to Table of Contents link at the top of each page to return to the table of contents.

# Table of Contents

Summary Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.  Who Must File . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.  How to File . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        a.  EEO-1 Component 1 Electronic Filing Requirement . . . . . . . . . . . . . . . . . . . . . . . . . 4

        b.  Single-establishment employers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        c.  Multi-establishment employers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    3.  When to File . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    4.  Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    5.  Requests for Information and Special Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    6.  Burden Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

EEO-1 Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Type of Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Single-Establishment Company – Required Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Multi-Establishment Company – Required Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Company Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Employers Who Are Required To File . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Employment Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Occupational Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Establishment Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Remarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Appendix 1 – Definitions Applicable to All Employers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Appendix 2 – Definitions Applicable Only to Government Contractors
        Subject to Executive Order 11246 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Appendix 3 – Responsibilities of Prime Contractors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Appendix 4 – Race, Ethnicity, and Sex Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Appendix 5 – Description of Job Categories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Appendix 6 – Legal Basis for Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Summary Information**

### 1. WHO MUST FILE

The Employer Information Report (EEO-1), Standard Form 100, Component 1, must be filed by –

(A) All private employers who are (1) subject to Title VII of the Civil Rights Act of 1964, as amended, with 100 or more employees EXCLUDING State and local governments, public primary and secondary school systems, institutions of higher education, American Indian or Alaska Native tribes and tax-exempt private membership clubs other than labor organizations; OR (2) subject to Title VII who have fewer than 100 employees if the company is owned or affiliated with another company, or there is centralized ownership, control or management (such as central control of personnel policies and labor relations) so that the group legally constitutes a single enterprise, and the entire enterprise employs a total of 100 or more employees.

AND

(B) All federal contractors who (1) are not exempt as provided for by 41 CFR 60-1.5; (2) have 50 or more employees; (3) are prime contractors or first-tier subcontractors; and (4) have a contract, subcontract, or purchase order amounting to $50,000 or more; OR serve as depositories of Government funds in any amount; or are financial institutions which are issuing and paying agents for U.S. Savings Bonds and savings notes.

Establishments located in the District of Columbia and the 50 states are required to submit Employer Information Report (EEO-1), Standard Form 100. No reports should be filed for establishments in Puerto Rico, the Virgin Islands, or other American Protectorates.

### 2. HOW TO FILE

#### a. EEO-1 Component 1 Electronic Filing Requirement:

EEO-1 Component 1 reporting is an electronic, online application. The EEOC requires that EEO-1 Component 1 Reports be submitted via the *EEO-1 Component 1 Online Filing System*. Data can be entered directly into the online application or submitted as an electronically transmitted data file.

#### b. Single-establishment employers, i.e., employers doing business at only one establishment complete a single EEO-1 Component 1 online data record.

#### c. Multi-establishment employers, i.e., employers doing business at more than one establishment must complete online: (1) a report covering the principal or headquarters office (Type 3 Report or Headquarters Report); (2) a separate establishment report (Type 4 Report) for **each** establishment employing 50 or more persons; and (3) a separate establishment report (Type 8 Report) for **each** establishment employing fewer than 50 employees, OR an "Establishment List" (Type 6 Report), showing the name, address, and total employment for **each** establishment employing fewer than 50 persons.  For the *EEO-1 Component 1 Online Filing System*, employers using "Establishment" List reports (Type 6 Report), must enter all employment data into the "Consolidated" Report (Type 2 Report). In

the *EEO-1 Component 1 Online Filing System*, all keyed employment data including data from the establishment Type 8 "Establishment" Reports will automatically transfer to populate the overall Consolidated Report (Type 2 Report).

The total number of employees indicated on the Headquarters Report, **PLUS** the establishment reports, **PLUS** the list of establishments employing fewer than 50 employees, **MUST** equal the total number of employees shown on the Consolidated Report.  Employment data for multi-establishment companies, including parent corporations and their subsidiary holdings, must report all employees working at each company establishment or subsidiary establishment. For the purposes of this report, the term **parent corporation** refers to any corporation which owns all or the majority stock of another corporation so that the latter relates to it as a subsidiary.

### 3.   WHEN TO FILE

The EEO-1 Component 1 Report for calendar years 2019 and 2020 must be filed no later than October 25, 2021. This filing deadline date is posted on the EEOC's dedicated website for its EEO data collections at www.EEOCdata.org, and on the EEOC's public website at www.eeoc.gov. For the workforce snapshot pay period, employment figures from any one pay period between October 1st and December 31st in the applicable calendar year may be used as the workforce snapshot pay period.

### 4.   CONFIDENTIALITY

All reports and any information from individual reports are subject to the confidentiality provisions of Section 709(e) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-8(e), as amended (Title VII) and may not be made public by the EEOC prior to the institution of any proceeding under Title VII involving the EEO-1 Component 1 data.  Any EEOC employee who violates this prohibition may be found guilty of a criminal misdemeanor and could be fined or imprisoned.  The confidentiality requirements allow the EEOC to publish only aggregated data, and only in a manner that does not identify any particular filer or reveal any individual employee's personal information.

### 5.   REQUESTS FOR INFORMATION AND SPECIAL PROCEDURES

Pursuant to 29 CFR § 1602.10, if an employer claims that the preparation or filing of the report would create undue hardship, the employer may apply to the Commission for an exemption. Employers must submit requests in writing to Filersupport@eeocdata.org. Requests for special reporting procedures or alternative reporting under 29 CFR § 1602.10 should also be submitted to the Commission in writing to Filersupport@eeocdata.org. Requests under 29 CFR § 1602.10 should be submitted to the Commission prior to the filing deadline for the report. For the 2019 and 2020 EEO-1 Component 1 data collection, the filling deadline is Monday, October 25, 2021.

### 6.   BURDEN ESTIMATE

Comments regarding this collection of information, including suggestions for reducing burden, can be sent at any time to:  Filersupport@EEOCdata.org and:

Paperwork Reduction Act (3046-0049)
Office of Management and Budget
Washington, DC 20503.

The full text of the OMB regulations on the Paperwork Reduction Act may be found at 5 CFR Part 1320.

**EEO-1 TERMS**

**Type of Report**

**Single-Establishment Company – Required Report**

(1) Single-establishment Report (Type 1 Report)

**Multi-Establishment Company – Required Reports**

(2) Consolidated Report (Type 2 Report)
(3) Headquarters Report (Type 3 Report)
(4) Establishment Report (Type 4 Report) (Establishments with 50 or more employees)
(8) Establishment Report (Type 8 Report) (Establishments with less than 50 employees (Option 1)
(6) Establishment List Report (Type 6 Report) (Establishments with less than 50 employees (Option 2)

**Company Identification**

Refers to the company name and address of the headquarters office of the multi-establishment company (Type 2 and Type 3 Reports); or the establishment name and address.

**Employers Who Are Required To File**

All employers required to file the EEO-1 Component 1 Report MUST answer these four questions in reference to the "workforce snapshot" pay period (i.e., employment figures from any pay period between October 1st and December 31st of the reference year):

1. Did the company or any of its establishments have 50 or more employees, have a federal contract, subcontract or purchase order amounting to $50,000 or more AND was not exempt as provided for by 41 CFR 60-1.5?

2. Did the company or any of its establishments have 50 or more employees, serve as depositories of Government funds in any amount; or are financial institutions which are issuing and paying agents for U.S. Savings Bonds and savings notes?

3. Did the company employ 100 or more employees?

4. Was the company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more?

If the answer is "Yes" to Questions 1 or 2, please provide the company's Dun and Bradstreet identification number. If the answer is 'Yes' to any of these questions, complete the EEO-1 Component 1 Report. Otherwise, the company is not required to file.  The online filing

system will indicate that the company is ineligible, and the filer will then be directed to the Certification page to certify that the company is indeed ineligible to file.

### Employment Data

Employment data must include ALL full-time and part-time employees **who were employed during the pay period selected by the employer between October 1 and December 31 of the reference year (i.e., workforce snapshot pay period)**, except those employees specifically excluded as indicated in the Appendix.  Employees must be counted by sex and race/ethnicity for each of the ten occupational categories. See Appendix for detailed explanation of the job categories and race and ethnicity identification.

Employers must report total employees in the workforce snapshot pay period for each job category. Additionally, each employee must be counted in only one of the race/ethnicity and sex combinations, and only in one of the ten job categories.

The total reported employees for each job category should equal the sum of each employee reported for that job category across the race/ethnicity and sex categories. Further, the total number employees for a particular race/ethnicity and sex category should equal the sum of that group across all of the job categories.

### Occupational Data

Employment data must be reported by job category. Report each employee in only one job category.  In order to simplify and standardize the method of reporting, all jobs are considered as belonging in one of the broad job categories shown in the EEO-1 Component 1 Report. A description of the EEO-1 job categories can be found in the 'Appendix' section of this document. You can also find information on the most recent SOC codes and a crosswalk between the older and newer versions of the SOC codes on the Census Bureau website (Standard Occupation Codes).

### Establishment Information

The major activity should be sufficiently descriptive to identify the industry and product produced or service provided. If an establishment is engaged in more than one activity, describe the activity at which the greatest number of employees work. Information about the industry codes can be found on the Census Bureau's website (https://www.census.gov/naics/) as well as a crosswalk between the 2012 and 2017 NAICS codes (Industry and Occupation Code Lists & Crosswalks).

The description of the major activity indicated on the Headquarters Report (Type 3 Report) must reflect the dominant economic activity of the company in which the greatest numbers of employees are engaged.

### Remarks

Include in this section any remarks, explanations, or other pertinent information regarding this report.

## Certification

Once all reports have been completed for the company, the name and contact information for the Certifying Official and the person to contact regarding the report should be entered. The Certifying Official should check the box on the screen verifying that the information is accurate and that all statements were prepared in accordance with these instructions.

## Appendix 1. DEFINITIONS APPLICABLE TO ALL EMPLOYERS

*a.* **"Commission"** refers to the Equal Employment Opportunity Commission.

*b.* **"OFCCP"** refers to the Office of Federal Contract Compliance Programs, U.S. Department of Labor, established to implement Executive Order 11246, as amended.

*c.* **"Employer"** under Section 701(b), Title VII of the Civil Rights Act of 1964, as amended, Means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include the United States, a corporation wholly owned by the government of the United States, American Indian or Alaska Native tribes, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5 of the United States Code), or a bona fide private membership club (other than a labor organization) which is exempt from taxation under Section 501(c) of the Internal Revenue Code of 1954; OR any person or entity subject to Executive Order 11246 who is a federal government prime contractor or subcontractor at any tier (including a bank or other establishment serving as a depository of federal government funds, or an issuing and paying agent of U.S. Savings Bonds and savings notes, or a holder of a federal government bill of lading) or a federally-assisted construction prime contractor or subcontractor at any tier.

*d.* **"Employee"** means any individual on the payroll of an employer who is an employee for purposes of the employers withholding of Social Security taxes except insurance sales agents who are considered to be employees for such purposes solely because of the provisions of 26 USC 3121 (d)(3)(B) (the Internal Revenue Code). Leased employees are included in this definition.

*e.* **"Leased Employee"**, for EEO-1 Component 1 reporting only, means a permanent employee provided by an employment agency for a fee to an outside company for which the employment agency handles all personnel tasks including payroll, staffing, benefit payments and compliance reporting. The employment agency shall include leased employees in its EEO-1 report. **For EEO-1 Component 1 reporting purposes only**, the term "employee" shall not include persons who are hired on a casual basis for a specified time, or for the duration of a specified job (for example, a person at a construction site whose employment relationship is expected to terminate with the end of the employee's work at the site); persons temporarily employed in any industry other than construction, such as temporary office workers, mariners, stevedores, lumber yard workers, etc., who are hired through a hiring hall or other referral arrangement, through an employee contractor or agent, or by some individual hiring arrangement, or persons (**EXCEPT** leased employees) on the payroll of an employment agency who are referred by such agency for work to be performed on the premises of another

employer under that employers direction and control.  These definitions are only for purposes of clarifying who reports these individuals on the EEO-1 and do not have legal ramifications as to the analysis of whether a particular individual is an employee or an independent contractor.  That is done under the factors enumerated by the Supreme Court in *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992).

f. **"Commerce"** means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

g. **"Industry Affecting Commerce"** means any activity, business or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry affecting commerce within the meaning of the Labor Management Reporting and Disclosure Act of 1959. Any employer of 15 or more persons is presumed to be in an industry affecting commerce.

h. **"Establishment"** is generally a single physical location where business is conducted or where services or industrial operations are performed (e.g., factory, mill, store, hotel, movie theater, mine, farm, airline terminal, sales office, warehouse, or central administrative office (definition adapted from the North American Industry Classification System, 2012).

Units at different physical locations, even though engaged in the same kind of business operation, must be reported as separate establishments. For locations involving construction, transportation, communications, electric, gas, and sanitary services, oil and gas fields, and similar types of physically dispersed industrial activities, however, it is not necessary to list separately each individual site, project, field, line, etc., unless it is treated by you as a separate legal entity. For these types of activities, list as establishments only those relatively permanent main or branch offices, terminals, stations etc., which are either:  (a) directly responsible for supervising such dispersed activities (where employees work from home, they should be reported as if working at the establishment where their supervisor is reported to work); or (b) the base from which personnel and equipment operate to carry out these activities. (Where these dispersed activities cross State lines, at least one such establishment should be listed for each State involved.)

i. **"Major Activity"** means the major product or group of products produced or handled, or services rendered by the reporting unit (e.g., manufacturing airplane parts, retail sales of office furniture) in terms of the activity at which the greatest number of all employees work. The description includes the type of product manufactured or sold or the type of service provided.  "Major Activity" is based on the industrial definitions developed by the federal government as adopted by the EEOC (For example, the *North American Industry Classification System*, 2017).

It is the opinion of the Commission that Section 702 of Title VII of the Civil Rights Act of 1964, as amended, does not authorize a complete exemption of religious organizations from the coverage of the Act or of the reporting requirements of the Commission.  The exemption for religious organizations applies to their employment of individuals of a particular religion

to perform work connected with the organization's activities. Therefore, since the Standard Form 100 does not provide for information as to the religion of employees, religious organizations must report all information required by this report.

### Appendix 2. DEFINITIONS APPLICABLE ONLY TO GOVERNMENT CONTRACTORS SUBJECT TO EXECUTIVE ORDER 11246

a) **"Order"** means Executive Order 11246, as amended.

b) **"Contract"** means any government contract or any federally-assisted construction contract.

c) **"Prime Contractor"** means any employer having a government contract or any federally-assisted construction contract, or any employer serving as a depository of federal government funds.

d) **"Subcontractor**" means any employer having a contract with a prime contractor or another subcontractor calling for supplies or services required for the performance of a government  contract or federally assisted construction contract.

e) **"Contracting Agency"** means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which enters into contracts.

f) **"Administering Agency"** means any department, agency and establishment in the executive branch of the government, including any wholly-owned government corporation, which administers a program involving federally-assisted construction contracts.

### Appendix 3. RESPONSIBILITIES OF PRIME CONTRACTORS

a) At the time of an award of a subcontract subject to these reporting requirements, the prime  contractor shall inform the subcontractor of its responsibility to submit annual EEO-1 Component 1 employment data in accordance with these instructions.

b) If prime contractors are required by their Contracting Officer or subcontractors by their prime contractors, to submit notification of filing, they shall do so by ordinary correspondence. However, such notification is not required by and should not be sent to the EEOC.

### Appendix 4. RACE, ETHNICITY, AND SEX IDENTIFICATION

Self-identification is the preferred method of identifying the race and ethnicity information necessary for the EEO-1 Component 1 report. Employers are required to attempt to allow employees to use self-identification to complete the EEO-1 Component 1 report.

As to the method of collecting data, the basic principles for ethnic and racial self-identification for purposes of the EEO-1 report are:

(1)Offer employees the opportunity to self-identify.

(2)Provide a statement about the voluntary nature of this inquiry for employees. For example, language such as the following may be used (employers may adapt this language):

"The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual."

If an employee declines to self-identify his or her race and/or ethnicity, employment records or observer identification may be used.  Where records are maintained, it is recommended that they be kept separately from the employee's basic personnel file or other records available to those responsible for personnel decisions.

Race and ethnicity designations as used by the Equal Employment Opportunity Commission for the EEO-1 Component 1 do not denote scientific definitions of anthropological origins.  In addition, such designations do not control who is protected by Title VII's prohibitions against employment discrimination based on race or national origin.

**Definitions of the EEO-1 race and ethnicity categories are as follows:**

**Hispanic or Latino** - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.

**White** - A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

**Black or African American**  - A person having origins in any of the black racial groups of Africa.

**Native Hawaiian or Other Pacific Islander** - A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

**Asian** - A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

**American Indian or Alaska Native** - A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

**Two or More Races** - All persons who identify with more than one of the above five races (White, Black or African American, Native Hawaiian or Other Pacific Islander, Asian, American Indian or Alaska Native). For the purposes of this group, identifying as Hispanic or Latino and only one of the listed 5 race groups does NOT qualify.

**Instructions for assigning employees into the race/ethnicity categories:**

**Hispanic or Latino** - Include all employees who answer "YES" to the question, "Are you Hispanic or Latino?" in the appropriate category for both males and females as indicated.

**White (Not Hispanic or Latino)** - Include all employees who identify as White and no other race, and who did not answer "YES" to the question "Are you Hispanic or Latino?" for both males and females as indicated in the appropriate category.

**Black or African American (Not Hispanic or Latino)** - Include all employees who identify as Black or African American and no other race, and who did not answer "YES" to the question "Are you Hispanic or Latino?" for both males and females as indicated in the appropriate category.

**Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)** - Include all employees who identify as Native Hawaiian or Other Pacific Islander and no other race, and who did not answer "YES" to the question "Are you Hispanic or Latino?" for both males and females as indicated in the appropriate category.

**Asian (Not Hispanic or Latino)** - Include all employees who identify as Asian and no other race, and who did not answer "YES" to the question "Are you Hispanic or Latino?" for both males and females as indicated in the appropriate category.

**American Indian or Alaska Native (Not Hispanic or Latino)** - Include all employees who identify as American Indian or Alaska Native and no other race, and who did not answer "YES" to the question "Are you Hispanic or Latino?" for both males and females as indicated in the appropriate category.

**Two or More Races (Not Hispanic or Latino)** - Include all employees who identify with more than one of the above five races, and who did not answer "YES" to the question "Are you Hispanic or Latino?" for both males and females as indicated in the appropriate category.

## Appendix 5. DESCRIPTION OF JOB CATEGORIES

The major job categories are listed below, including a brief description of the skills and training required for occupations in that category and examples of the job titles that fit each category. The examples shown below are illustrative and not intended to be exhaustive of all job titles in a job category. These job categories are primarily based on the average skill level, knowledge, and responsibility involved in each occupation within the job category.

The "Officials and Managers" category as a whole is to be divided into the following two subcategories: "Executive/Senior Level Officials and Managers," and "First/Mid-Level" Officials and Managers." These subcategories are intended to mirror the employers own well established hierarchy of management positions. Small employers who may not have two well-defined hierarchical steps of management should report their management employees in the appropriate categories.

***Executive/Senior Level Officials and Managers.*** Individuals who plan, direct and formulate policies, set strategy and provide the overall direction of enterprises/organizations for the development and delivery of products or services, within the parameters approved by boards

of directors or other governing bodies. Residing in the highest levels of organizations, these executives plan, direct or coordinate activities with the support of subordinate executives and staff managers. They include, in larger organizations, those individuals within two reporting levels of the CEO, whose responsibilities require frequent interaction with the CEO. Examples of these kinds of managers are: chief executive officers, chief operating officers, chief financial officers, line of business heads, presidents or executive vice presidents of functional areas or operating groups, chief information officers, chief human resources officers, chief marketing officers, chief legal officers, management directors and managing partners.

***First/Mid-Level Officials and Managers.*** Individuals who serve as managers, other than those who serve as Executive/Senior Level Officials and Managers, including those who oversee and direct the delivery of products, services or functions at group, regional or divisional levels of organizations. These managers receive directions from the Executive/Senior Level management and typically lead major business units. They implement policies, programs and directives of executive/senior management through subordinate managers and within the parameters set by Executive/Senior Level management. Examples of these kinds of managers are: vice presidents and directors, group, regional or divisional controllers; treasurers; human resources, information systems, marketing, and operations managers. The "First/Mid-Level Officials and Managers" subcategory also includes those who report directly to middle managers. These individuals serve at functional, line of business segment or branch levels and are responsible for directing and executing the day-to-day operational objectives of enterprises/organizations, conveying the directions of higher level officials and managers to subordinate personnel and, in some instances, directly supervising the activities of exempt and non-exempt personnel. Examples of these kinds of managers are: first-line managers; team managers; unit managers; operations and production mangers; branch managers; administrative services managers; purchasing and transportation managers; storage and distribution managers; call center or customer service managers; technical support managers; and brand or product managers.

***Professionals.*** Most jobs in this category require bachelor and graduate degrees, and/or professional certification. In some instances, comparable experience may establish a person's qualifications. Examples of these kinds of positions include: accountants and auditors; airplane pilots and flight engineers; architects; artists; chemists; computer programmers; designers; dieticians; editors; engineers; lawyers; librarians; mathematical scientists; natural scientists; registered nurses; physical scientists; physicians and surgeons; social scientists; teachers; and surveyors.

***Technicians.*** Jobs in this category include activities that require applied scientific skills, usually obtained by post-secondary education of varying lengths, depending on the particular occupation, recognizing that in some instances additional training, certification, or comparable experience is required. Examples of these types of positions include: drafters; emergency medical technicians; chemical technicians; and broadcast and sound engineering technicians.

***Sales Workers.*** These jobs include non-managerial activities that wholly and primarily involve direct sales. Examples of these types of positions include: advertising sales agents;

insurance sales agents; real estate brokers and sales agents; wholesale sales representatives; securities, commodities, and financial services sales agents; telemarketers; demonstrators; retail salespersons; counter and rental clerks; and cashiers.

***Administrative Support Workers.*** These jobs involve non-managerial tasks providing administrative and support assistance, primarily in office settings. Examples of these types of positions include: office and administrative support workers; bookkeeping; accounting and auditing clerks; cargo and freight agents; dispatchers; couriers; data entry keyers; computer operators; shipping, receiving and traffic clerks; word processors and typists; proofreaders; desktop publishers; and general office clerks.

***Craft Workers*** (formerly Craft Workers (Skilled)). Most jobs in this category include higher skilled occupations in construction (building trades craft workers and their formal apprentices) and natural resource extraction workers. Examples of these types of positions include: boilermakers; brick and stone masons; carpenters; electricians; painters (both construction and maintenance); glaziers; pipe layers, plumbers, pipefitters and steamfitters; plasterers; roofers; elevator installers; earth drillers; derrick operators; oil and gas rotary drill operators; and blasters and explosive workers. This category also includes occupations related to the installation, maintenance and part replacement of equipment, machines and tools, such as: automotive mechanics; aircraft mechanics; and electric and electronic equipment repairers. This category also includes some production occupations that are distinguished by the high degree of skill and precision required to perform them, based on clearly defined task specifications, such as: millwrights; etchers and engravers; tool and die makers; and pattern makers.

***Operatives*** (formerly Operatives (Semi-skilled)). Most jobs in this category include intermediate skilled occupations and include workers who operate machines or factory-related processing equipment. Most of these occupations do not usually require more than several months of training. Examples include: textile machine workers; laundry and dry cleaning workers; photographic process workers; weaving machine operators; electrical and electronic equipment assemblers; semiconductor processors; testers, graders and sorters; bakers; and butchers and other meat, poultry and fish processing workers. This category also includes occupations of generally intermediate skill levels that are concerned with operating and controlling equipment to facilitate the movement of people or materials, such as: bridge and lock tenders; truck, bus or taxi drivers; industrial truck and tractor (forklift) operators; parking lot attendants; sailors; conveyor operators; and hand packers and packagers.

***Laborers and Helpers*** (formerly Laborers (Unskilled)). Jobs in this category include workers with more limited skills who require only brief training to perform tasks that require little or no independent judgment. Examples include:  production and construction worker helpers; vehicle and equipment cleaners; laborers; freight, stock and material movers; service station attendants; construction laborers; refuse and recyclable materials collectors; septic tank servicers; and sewer pipe cleaners.

***Service Workers.*** Jobs in this category include food service, cleaning service, personal service, and protective service activities. Skill may be acquired through formal training, job- related training or direct experience. Examples of food service positions include: cooks; bartenders;

and other food service workers. Examples of personal service positions include: medical assistants and other healthcare support positions; hairdressers; ushers; and transportation attendants. Examples of cleaning service positions include: cleaners; janitors; and porters. Examples of protective service positions include: transit and railroad police and fire fighters; guards; private detectives and investigators.

**Appendix 6. LEGAL BASIS FOR REQUIREMENTS**

**SECTION 709(c), TITLE VII, CIVIL RIGHTS ACT OF 1964, AS AMENDED**

Execution, retention, and preservation of records; reports to Commission; training program records; appropriate relief from regulation or order for undue hardship; procedure for exemption; judicial action to compel compliance.

Every employer, employment agency, and labor organization subject to this subchapter shall: (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this title or the regulations or orders thereunder. The Commission shall, by regulation, require each employer, labor organization, and joint labor-management committee subject to this subchapter which controls an apprenticeship or other training program to maintain such records as are reasonably necessary to carry out the purposes of this subchapter, including, but not limited to, a list of applicants who wish to participate in such program, including the chronological order in which applications were received, and to furnish to the Commission upon request, a detailed description of the manner in which persons are selected to participate in the apprenticeship or other training program. Any employer, employment agency, labor organization, or joint labor-management committee which believes that the application to it of any regulation or order issued under this section would result in undue hardship may apply to the Commission for an exemption from the application of such regulation or order, and, if such application for an exemption is denied, bring a civil action in the United States District Court for the district where such records are kept. If the Commission or the court, as the case may be, finds that the application of the regulation or order to the employer, employment agency, or labor organization in question would impose an undue hardship, the Commission or the court, as the case may be, may grant appropriate relief. If any person required to comply with the provisions of this subsection fails or refuses to do so, the United States District Court for the district in which such person is found, resides, or transacts business, shall, upon application of the Commission, or the Attorney General in a case involving a government, governmental agency or political subdivision, have jurisdiction to issue to such person an order requiring him to comply.

**TITLE 29, CHAPTER XIV CODE OF FEDERAL REGULATIONS**

*Subpart B -- Employer Information Report*

**§1602.7 Requirement for filing of report.**

On or before September 30th of each year, every employer that is subject to Title VII of the

Civil Rights Act of 1964, as amended, and that has 100 or more employees, shall file with the Commission or its delegate executed copies of Standard Form 100, as revised (otherwise known as "Employer Information Report EEO-1"), in conformity with the directions set forth in the form and accompanying instructions. Notwithstanding the provisions of §1602.14, every such employer shall retain at all times at each reporting unit, or at company or divisional headquarters, a copy of the most recent report filed for each such unit and shall make the same available if requested by an officer, agent, or employee of the Commission under the authority of section 710 of Title VII. Appropriate copies of Standard Form 100 in blank will be supplied to every employer known to the Commission to be subject to the reporting requirements, but it is the responsibility of all such employers to obtain necessary supplies of the form from the Commission or its delegate prior to the filing date.

### §1602.8 Penalty for making of willfully false statements on report.

The making of willfully false statements on Report EEO-1 is a violation of the United States Code, Title 18, section 1001, and is punishable by fine or imprisonment as set forth therein.

### §1602.9 Commission's remedy for employers failure to file report.

Any employer failing or refusing to file Report EEO-1 when required to do so may be compelled to file by order of a U.S. District Court, upon application of the Commission.

### §1602.10 Employer's exemption from reporting requirements.

If an employer claims that the preparation or filing of the report would create undue hardship, the employer may apply to the Commission for an exemption from the requirements set forth in this part, according to instruction 5. If an employer is engaged in activities for which the reporting unit criteria described in section 5 of the instructions are not readily adaptable, special reporting procedures may be required. If an employer seeks to change the date for filing its Standard Form 100 or seeks to change the period for which data are reported, an alternative reporting date or period may be permitted. In such instances, the employer should so advise the Commission by submitting to the Commission or its delegate a specific written proposal for an alternative reporting system prior to the date on which the report is due.

### §1602.11 Additional reporting requirements.

The Commission reserves the right to require reports, other than that designated as the Employer Information Report EEO-1, about the employment practices of individual employers or groups of employers whenever, in its judgment, special or supplemental reports are necessary to accomplish the purposes of Title VII, the ADA, or GINA.  Any system for the requirement of such reports will be established in accordance with the procedures referred to in section 709(c) of Title VII, section 107 of the ADA, or section 207(a) of GINA and as otherwise prescribed by law.

*Subpart C--Recordkeeping by Employers*

### §1602.12 Records to be made or kept.

The Commission has not adopted any requirement, generally applicable to employers, that records be made or kept. It reserves the right to impose recordkeeping requirements

upon individual employers or groups of employers subject to its jurisdiction whenever, in its judgment, such records (a) are necessary for the effective operation of the EEO-1 reporting system or of any special or supplemental reporting system as described above; or (b) are further required to accomplish the purposes of title VII, the ADA, or GINA. Such recordkeeping requirements will be adopted in accordance with the procedures referred to in section 709(c) of title VII, section 107 of the ADA, or section 207(a) of GINA, and otherwise prescribed by law.

### §1602.13 Records as to racial or ethnic identity of employees.

Employers may acquire the information necessary for completion of items 5 and 6 of Report EEO-1 either by visual surveys of the work force, or at their option, by the maintenance of post-employment records as to the identity of employees where the same is permitted by State law. In the latter case, however, the Commission recommends the maintenance of a permanent record as to the racial or ethnic identity of an individual for purpose of completing the report form only where the employer keeps such records separately from the Employee's basic personnel form or other records available to those responsible for personnel decisions, e.g., as part of an automatic data processing system in the payroll department.

### §1602.14 Preservation of records made or kept.

Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the ADA, or GINA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. The term "personnel records relevant to the charge," for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

# EXHIBIT H

**Joint Reporting Committee**
- **Equal Employment Opportunity Commission**
- **Office of Federal Contract Compliance Programs (Labor)**

# EQUAL EMPLOYMENT OPPORTUNITY

## EMPLOYER INFORMATION REPORT EEO—1

Standard Form 100
REV. 01/2008

O.M.B.No. 3048-0007
FORM APPROVAL: www.reginfo.gov/public/do/PRAMain
100-214

---

### Section A—TYPE OF REPORT
Refer to instructions for number and types of reports to be filed.

1. Indicate by marking in the appropriate box the type of reporting unit for which this copy of the form is submitted (MARK ONLY ONE BOX).

    (1) ☐ Single-establishment Employer Report

Multi-establishment Employer:
    (2) ☒ Consolidated Report (Required)
    (3) ☐ Headquarters Unit Report (Required)
    (4) ☒ Individual Establishment Report (submit one for each establishment with 50 or more employees)
    (5) ☒ Special Report

2. Total number of reports being filed by this Company (Answer on Consolidated Report only) _____

| Section B—COMPANY IDENTIFICATION *(To be answered by all employers)* | OFFICE USE ONLY |
|---|---|

1. Parent Company

| a. Name of parent company (owns or controls establishment in item 2) omit if same as label | |
|---|---|
| | a. |
| Address (Number and street) | |
| | b. |
| City or town     State     ZIP code | |
| | c. |

2. Establishment for which this report is filed. (Omit if same as label)

| a. Name of establishment | |
|---|---|
| | d. |
| Address (Number and street)    City or Town    County    State    ZIP code | |
| | e. |
| b. Employer identification No. (IRS 9-DIGIT TAX NUMBER) | f. |

c. Was an EEO–1 report filed for this establishment last year? ☐ Yes ☐ No

### Section C—EMPLOYERS WHO ARE REQUIRED TO FILE *(To be answered by all employers)*

| ☐ Yes ☐ No | 1. Does the entire company have at least 100 employees in the payroll period for which you are reporting? |
|---|---|
| ☐ Yes ☐ No | 2. Is your company affiliated through common ownership and/or centralized management with other entities in an enterprise with a total employment of 100 or more? |
| ☐ Yes ☐ No | 3. Does the company or any of its establishments (a) have 50 or more employees <u>AND</u> (b) is not exempt as provided by 41 CFR 60–1.5, <u>AND</u> either (1) is a prime government contractor or first-tier subcontractor, and has a contract, subcontract, or purchase order amounting to $50,000 or more, or (2) serves as a depository of Government funds in any amount or is a financial institution which is an issuing and paying agent for U.S. Savings Bonds and Savings Notes?<br>If the response to question C–3 is yes, please enter your Dun and Bradstreet identification number (if you have one): ☐☐☐☐☐☐☐☐ |

NOTE: If the answer is yes to questions 1, 2, or 3, complete the entire form, otherwise skip to Section G.

## Section D-EMPLOYMENT DATA

Employment at this establishment – Report all permanent full- and part-time employees including apprentices and on-the-job trainees unless specifically excluded as set forth in the instructions. E and in all columns. Blank spaces will be considered as zeros.

| Job Categories | | Number of Employees (Report employees in only one category) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Race/Ethnicity | | | | | | | | | | | |
| | | Hispanic or Latino | | Not-Hispanic or Latino | | | | | | | | | |
| | | | | Male | | | | | | Female | | | |
| | | Male | Female | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian | American Indian or Alaska Native | Two or more races | White | Black or African American | Native Hawaiian or Other Pacific Islander | Asian |
| | | A | B | C | D | E | F | G | H | I | J | K | L |
| Executive/Senior Level Officials and Managers | 1.1 | | | | | | | | | | | | |
| First/Mid-Level Officials and Managers | 1.2 | | | | | | | | | | | | |
| Professionals | 2 | | | | | | | | | | | | |
| Technicians | 3 | | | | | | | | | | | | |
| Sales Workers | 4 | | | | | | | | | | | | |
| Administrative Support Workers | 5 | | | | | | | | | | | | |
| Craft Workers | 6 | | | | | | | | | | | | |
| Operatives | 7 | | | | | | | | | | | | |
| Laborers and Helpers | 8 | | | | | | | | | | | | |
| Service Workers | 9 | | | | | | | | | | | | |
| TOTAL | 10 | | | | | | | | | | | | |
| PREVIOUS YEAR TOTAL | 11 | | | | | | | | | | | | |

1. Date(s) of payroll period used: _____ (Omit on the Consolidated Report.)

### Section E - ESTABLISHMENT INFORMATION (Omit on the Consolidated Report.)

1.    What is the major activity of this establishment? (Be specific, i.e., manufacturing steel castings, retail grocer, wholesale plumbing supplies, title ins Include the specific type of product or type of service provided, as well as the principal business or industrial activity.)

### Section F - REMARKS

Use this item to give any identification data appearing on the last EEO-1 report which differs from that given above, explain major changes in compositio pertinent information.

### Section G - CERTIFICATION

Check one   1   ☐   All reports are accurate and were prepared in accordance with the instructions. (Check on Consolidated Report only.)
2   ☐   This report is accurate and was prepared in accordance with the instructions.

| Name of Certifying Official | Title | Signature | |
|---|---|---|---|
| Name of person to contact regarding this report | Title | Address (Number and Street) | |
| City and State | Zip Code | Telephone No. (including Area Code and Extension) | En |

All reports and information obtained from individual reports will be kept confidential as required by Section 709(e) of Title VII.
WILLFULLY FALSE STATEMENTS ON THIS REPORT ARE PUNISHABLE BY LAW, U.S. CODE, TITLE 18, SECTION 1001

# EXHIBIT I



**U.S. DEPARTMENT OF LABOR**

**Office of Federal Contract Compliance Programs**

# Freedom of Information Act (FOIA) Frequently Asked

1. Why is OFCCP providing FAQs on this topic?
2. What are EEO-1 Report data?
3. Are EEO-1 data protected from public disclosure?
4. Are EEO-1 data received by OFCCP subject to the provisions of the Freedom of Information Act (FOIA)?
5. What is FOIA Exemption 4?
6. How does OFCCP determine to release or withhold EEO-1 data?
7. What is the Executive Order12600 process?
8. Has OFCCP changed its policy with regard to the processing of FOIA requests for EEO-1 information?
9. What information regarding an employer can I request from OFCCP under Freedom of Information Act?

## Why is OFCCP providing FAQs on this topic?

OFCCP is committed to full compliance with the Freedom of Information Act (FOIA), including its exemptions. OFCCP is well aware that it possesses sensitive and confidential information from contractors, including confidential commercial and proprietary information that could be protected from disclosure by Exemption 4. OFCCP recognizes the importance of protecting such confidential commercial and proprietary information where permitted and is committed to doing so in accordance with applicable law. OFCCP is issuing these FAQs to make its process for considering requests to protect information under Exemption 4, and the information needed from contractors as part of that process, as transparent as possible. OFCCP believes it would be instructive to do so in the context of EEO-1 data, which can include such information and may be subject to protection under Exemption 4 under appropriate circumstances.

Back to Top

## What are EEO-1 Report data?

The EEO-1 Report is a compliance survey mandated by federal statute and regulations. The survey requires company employment data to be categorized by race/ethnicity, gender and job category.[1]

Back to Top

## Are EEO-1 data protected from public disclosure?

EEOC is prohibited by federal statute[2] from making public the employment data derived from any of its compliance surveys unless a Title VII charge has been filed. However, courts have ruled that the Title VII prohibition against disclosure does not apply to OFCCP's collection of EEO-1 data because such data is collected under the authority of Executive Order 11246.[3] Unlike Title VII, Executive Order 11246 has no language specifically prohibiting the disclosure of EEO-1 information, but other protections from disclosure may apply.

Back to Top

## Are EEO-1 data received by OFCCP subject to the provisions of the Freedom of Information Act (FOIA)?

OFCCP recognizes the importance of protecting confidential commercial and proprietary information of contractors where permitted and is committed to doing so in accordance with applicable law. OFCCP is committed to making its process for considering requests to protect information under Exemption 4, and the information needed from contractors as part of that process, as transparent as possible.

Back to Top

---

## What is the Executive Order 12600 process?

Executive Order 12600 established a formal, procedural structure for notifying persons who submit "confidential commercial information" to the United States when that information becomes the subject of a FOIA request. That term is defined in Executive Order 12600 as "records provided to the government by a submitter that arguably contain material exempt from release under Exemption 4 of the [FOIA], because disclosure could reasonably be expected to cause substantial competitive harm." Executive Order 12600 is based on the principle that companies are entitled to such notification and an opportunity to object to disclosure before an agency makes a possible disclosure determination.

The Executive Order 12600 process begins with a certified notification to the business. OFCCP grants the company 30 calendar days from the date of receipt of the notification to agree to the release of the EEO-1 data or to object. If a company objects to the release of the data, OFCCP responds confirming or rejecting the company's request after conducting an analysis (or requesting an independent review) on a case by case basis. If the company does not respond, OFCCP sends a second notification advising the company that the agency will release the EEO-1 data in 30 calendar days from the date of receipt of the second notification. OFCCP releases the data if the company does not respond to the second notification.

Back to Top

---

## Has OFCCP changed its policy with regard to the processing of FOIA requests for EEO-1 information?

No. As mentioned earlier, OFCCP continues to follow the procedures and standards required by Executive Order 12600, its regulations, and FOIA, including engaging in a case specific analysis when determining whether or not to release information that a company asserts is protected by Exemption 4 of the FOIA.

Back to Top

---

## What information regarding an employer can I request from OFCCP under Freedom of Information Act?

The U.S. Department of Labor (DOL) is required, under the Freedom of Information Act (FOIA), to disclose records requested in writing. However, OFCCP may withhold information pursuant to nine exemptions and three exclusions contained in the FOIA. Consult the Guide for Requesting FOIA Records and list of Individual Components & Responsible FOIA Officials for FOIA requests. Links to DOL's FOIA resources and other FOIA resources can be found at the DOL website.

Back to Top

---

[1] https://www.eeoc.gov/employers/eeo-data-collections

[2] Section 709(e) of Title VII of the Civil Rights Act of 1964, as amended.

[3] See, e.g., Sears Roebuck & Co. v. Gen. Servs. Admin., 509 F.2d 527, 529 (D.C. Cir. 1974)..

[4] https://www.archives.gov/federal-register/codification/executive-order/12600.html

10/18/23, 6:51 PM    Case 3:22-cv-07182-WHA    Document 39-1 Freedom Filed 10/18/23 (FOIA) Page 668 of 1025ons | U.S. Department of L

Site Map    |    Important Website Notices    |    Privacy & Security Statement

# EXHIBIT J

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

The Center for Investigative Reporting and Will Evans

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

D. Victoria Baranetsky, General Counsel, The Center for

## DEFENDANTS

U.S. Department of Labor

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 864 SSID Title XVI | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation–Transfer  ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Freedom of Information Act 5 U.S.C. 552

Brief description of cause:
Action under the Freedom of Information Act for injunctive and other appropriate relief.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE                    DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only) ☒ SAN FRANCISCO/OAKLAND  ☐ SAN JOSE  ☐ EUREKA-MCKINLEYVILLE

DATE 11/15/2022   SIGNATURE OF ATTORNEY OF RECORD   /s/ Victoria Baranetsky

Print    Save As...    Reset

# EXHIBIT J-1



Shawn Musgrave <smusgrave@revealnews.org>

---

## Fwd: Acknowledgment

**Will Evans** <wevans@revealnews.org>                                           Thu, Oct 14, 2021 at 2:38 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---

---------- Forwarded message ---------
From: **Karamoko, Arginia - SOL** <Karamoko.Arginia@dol.gov>
Date: Mon, Mar 25, 2019 at 1:32 PM
Subject: Acknowledgment
To: Will Evans <wevans@revealnews.org>
Cc: Oliver, Ramona - SOL <Oliver.Ramona@dol.gov>, OFCCP NO FOIA <OFCCP_NO_FOIA@dol.gov>

Hello:

Your request has been assigned to OFCCP with tracking number **875877**. When they begin processing it, you will be able to track its progress at www.dol.gov/foia. If you need to contact them about it for any reason, please submit your inquiry through ofccp_no_foia@dol.gov or phone 202-693-0101. In addition, it would be helpful to include the tracking number in the Subject line of any submission to the agency or to have it available at the time of a call.

Sincerely,

**Arginia Karamoko**

Government Information Specialist, Office of Information Services

Office of the Solicitor l Management & Administrative Legal Services

U.S. DEPARTMENT OF LABOR

200 Constitution Ave., N.W., N-2420 l Washington, DC  20210

T: (202) 693-5531 l F: (202) 693-5389 l  E: karamoko.arginia@dol.gov

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Monday, March 25, 2019 1:57 PM
**To:** FOIARequests <FOIARequests@dol.gov>
**Subject:** FOIA request - OFCCP

Dear FOIA Officer,

Under the Freedom of Information Act, I am requesting a copy of the following records from OFCCP:

**\* A spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2017.**

I am requesting this data in electronic format, by email. Fulfilling this request is not unduly burdensome because there is no need to notify federal contractors.

There is an exception to the notice requirements of 29 CFR 70.26 and Executive Order 12600 that applies here, as will be explained below. Notice to the contractors is not required.

Under 29 CFR 70.2(G)(5) and Executive Order 12600 Sec.8(e), the notice requirements **need not be followed** if the information has not been designated by the submitter, unless OFCCP "has reason to believe that disclosure of the information would result in substantial competitive harm."

Under 29 CFR 70.2(G)(6) and Executive Order 12600 Sec.8(f), the notice requirements **need not be followed** the designation made by the submitter "appears obviously frivolous."

There is no substantial reason to believe that disclosure of the information would result in competitive harm, so the information should be released without notice for any contractor. Even if a contractor has designated it as confidential, that designation should be considered "obviously frivolous," as OFCCP has already determined that Type 2 EEO-1 reports are not subject to Exemption 4 of the Freedom of Information Act. (see CIR v USDOL, Case No. 3:18-cv-2008 JCS)

I am a representative of the news media as a reporter with Reveal from The Center for Investigative Reporting, a non-profit investigative journalism organization. This request is made as part of news gathering and not for a commercial use. I respectfully ask that you waive fees related to this request. Please notify me of any charges before fulfilling this request.

Please contact me with any questions at 510-809-2209 or

wevans@revealnews.org

Thank you for your attention to this request.

Sincerely,
Will Evans
Reveal / The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608

--

Will Evans

reporter

o: 510-809-2209

www.revealnews.org

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
www.revealnews.org

# EXHIBIT J-2

**U.S. Department of Labor**  Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



JUL 18 2019

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request Acknowledgement – Tracking No. 872421

Dear Mr. Evans:

This letter is a follow-up to your Freedom of Information Act (FOIA) request submitted to the
Office of Federal Contract Compliance Programs (OFCCP). Please refer to the above-referenced
FOIA tracking number in any future correspondence regarding your FOIA request.

You requested a spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal
contractors for 2016. As you know from your earlier requests, in accordance with 29 CFR §
70.26, OFCCP is required to notify submitters that their business information has been requested
under the FOIA to give them an opportunity to object in writing to disclosure of any specified
portion of the requested information.

Though you request is reasonably described, we have determined that there are more than
100,000 responsive records. Reaching out to each of the companies affected by your voluminous
request would overwhelm the OFCCP FOIA unit for the foreseeable future, and the cost in
sending more than 100,000 letters would be unduly burdensome. If you wish to narrow the scope
of your request, please send a revised request to the address referenced above or send an e-mail
to OFCCP_NO_FOIA@dol.gov. In the event that we do not receive a response from you within
thirty (30) days from the date of this letter, we will administratively close your request.

Should you have questions regarding your request, please contact this office at (202) 693-0101
or by email at OFCCP_NO_FOIA@dol.gov. If you need further assistance or would like to
discuss any aspect of your request, please do not hesitate to contact the DOL FOIA Public
Liaison, Thomas Hicks, at (202) 693-5427.

Alternatively, you may contact the Office of Government Information Services within the
National Archives and Records Administration (OGIS) to inquire about the mediation services
they offer. The contact information for OGIS is as follows: Office of Government Information
Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD
20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-
5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

# EXHIBIT K



**Shawn Musgrave <smusgrave@revealnews.org>**

## Fwd: Acknowledgment

**Will Evans** <wevans@revealnews.org>                                    Thu, Oct 14, 2021 at 2:41 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **FOIARequests** <FOIARequests@dol.gov>
Date: Tue, Jan 15, 2019 at 2:35 PM
Subject: Acknowledgment
To: Will Evans <wevans@revealnews.org>
Cc: Oliver, Ramona - SOL <Oliver.Ramona@dol.gov>, OFCCP NO FOIA <OFCCP_NO_FOIA@dol.gov>

Hello:

Your request has been assigned to OFCCP with tracking number **872421**. When they begin processing it, you will be able to track its progress at www.dol.gov/foia. If you need to contact them about it for any reason, please submit your inquiry through ofccp_no_foia@dol.gov or phone 202-693-0101. In addition, it would be helpful to include the tracking number in the Subject line of any submission to the agency or to have it available at the time of a call.

Sincerely,

**Arginia Karamoko**

Government Information Specialist, Office of Information Services

Office of the Solicitor l Management & Administrative Legal Services

U.S. DEPARTMENT OF LABOR

200 Constitution Ave., N.W., N-2420 l Washington, DC  20210

T: (202) 693-5531 l F: (202) 693-5389 l  E: karamoko.arginia@dol.gov

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Thursday, January 10, 2019 7:13 PM
**To:** FOIARequests <FOIARequests@dol.gov>
**Cc:** Victoria Baranetsky <vbaranetsky@revealnews.org>
**Subject:** FOIA request - OFCCP

Dear FOIA Officer,

Under the Freedom of Information Act, I am requesting a copy of the following records from OFCCP:

**\* A spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2016.**

I am requesting this data in electronic format, by email.

There is an exception to the notice requirements of 29 CFR 70.26 and Executive Order 12600 that applies here, as will be explained below. Notice to the contractors is not required.

Under 29 CFR 70.2(G)(5) and Executive Order 12600 Sec.8(e), the notice requirements **need not be followed** if the information has not been designated by the submitter, unless OFCCP "has reason to believe that disclosure of the information would result in substantial competitive harm."

Under 29 CFR 70.2(G)(6) and Executive Order 12600 Sec.8(f), the notice requirements **need not be followed** the designation made by the submitter "appears obviously frivolous."

There is no substantial reason to believe that disclosure of the information would result in competitive harm, so the information should be released without notice for any contractor. Even if a contractor has designated it as confidential, that designation should be considered "obviously frivolous," as OFCCP has already determined that Type 2 EEO-1 reports are not subject to Exemption 4 of the Freedom of Information Act. (see CIR v USDOL, Case No. 3:18-cv-2008 JCS)

I am a representative of the news media as a reporter with Reveal from The Center for Investigative Reporting, a non-profit investigative journalism organization. This request is made as part of news gathering and not for a commercial use. I respectfully ask that you waive fees related to this request. Please notify me of any charges before fulfilling this request.

Please contact me with any questions at 510-809-2209 or

wevans@revealnews.org

Thank you for your attention to this request.

Sincerely,
Will Evans
Reveal / The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608

--

Will Evans

reporter

o: 510-809-2209



www.revealnews.org

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584

www.revealnews.org

# EXHIBIT L



**Dara Gray <dgray@revealnews.org>**

## Fwd: re FOIA 872421
1 message

**Will Evans** <wevans@revealnews.org>                                      Wed, Nov 9, 2022 at 3:34 PM
To: Dara Gray <dgray@revealnews.org>

---------- Forwarded message ---------
From: **Will Evans** <wevans@revealnews.org>
Date: Thu, Aug 8, 2019 at 1:10 PM
Subject: re FOIA 872421
To: Bruce Andersen - OFCCP <Andersen.Bruce@dol.gov>
Cc: Victoria Baranetsky <vbaranetsky@revealnews.org>

Dear FOIA Officer,
This is in regards to your July 18, 2019 letter requesting that I narrow my original request because it would be unduly
burdensome to notify all affected companies. The notification requirements, however, do not apply here because no
exemption applies. The agency, in fact, has previously determined that no exemption applies and has released Type 2
EEO-1 reports in response to previous FOIA requests. Because the agency does not need to notify any companies,
providing a spreadsheet is not unduly burdensome, and there is no need to narrow the request.
Thank you for your work on this request.
Best,
Will Evans
--
Will Evans
reporter
o: 510-809-2209



[www.revealnews.org](http://www.revealnews.org)

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
cell: 510-333-9584
[www.revealnews.org](http://www.revealnews.org)

 **OFCCP FOIA 872421.pdf**
478K

# EXHIBIT M



Shawn Musgrave <smusgrave@revealnews.org>

## Fwd: Acknowledgment
1 message

**Will Evans** <wevans@revealnews.org>         Fri, Oct 15, 2021 at 6:51 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **Karamoko, Arginia - SOL** <Karamoko.Arginia@dol.gov>
Date: Fri, Sep 18, 2020 at 12:50 PM
Subject: Acknowledgment
To: Will Evans <wevans@revealnews.org>
Cc: Oliver, Ramona - SOL <Oliver.Ramona@dol.gov>, OFCCP NO FOIA <OFCCP_NO_FOIA@dol.gov>

Hello:

Your request has been assigned to the Office of Federal Contract Compliance Programs (OFCCP) with
tracking number **897123**. When they begin processing it, you will be able to track its progress at
www.dol.gov/foia. If you need to contact them about it for any reason, please submit your inquiry through
ofccp_no_foia@dol.gov or phone 202-693-0101. In addition, it would be helpful to include the tracking
number in the Subject line of any submission to the agency or to have it available at the time of a call.

Sincerely,

**Arginia Karamoko**

Government Information Specialist, Office of Information Services

Office of the Solicitor | Management & Administrative Legal Services

U.S. DEPARTMENT OF LABOR

200 Constitution Ave., N.W., N-2420 | Washington, DC  20210

T: (202) 693-5531 | F: (202) 693-5389 |  E: karamoko.arginia@dol.gov

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Friday, September 11, 2020 8:26 PM
**To:** FOIARequests <FOIARequests@dol.gov>
**Subject:** FOIA request - OFCCP

Dear FOIA Officer,

Under the Freedom of Information Act, I am requesting a copy of the following records from OFCCP:

**\* A spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2018.**

I am requesting this data in electronic format, by email. Fulfilling this request is not unduly burdensome because there is no need to notify federal contractors.

There is an exception to the notice requirements of 29 CFR 70.26 and Executive Order 12600 that applies here, as will be explained below. Notice to the contractors is not required.

Under 29 CFR 70.2(G)(5) and Executive Order 12600 Sec.8(e), the notice requirements **need not be followed** if the information has not been designated by the submitter, unless OFCCP "has reason to believe that disclosure of the information would result in substantial competitive harm."

Under 29 CFR 70.2(G)(6) and Executive Order 12600 Sec.8(f), the notice requirements **need not be followed** the designation made by the submitter "appears obviously frivolous."

There is no substantial reason to believe that disclosure of the information would result in competitive harm, so the information should be released without notice for any contractor. Even if a contractor has designated it as confidential, that designation should be considered "obviously frivolous," **as federal contractor EEO-1s have been determined to be public records that must be disclosed, not confidential commercial information**. Please see the Dec. 10, 2019 ruling by Judge Kandis Westmore in U.S. District Court for the Northern District of California, 4:19-cv-01843-KAW (attached).

I am a representative of the news media as a reporter with Reveal from The Center for Investigative Reporting, a non-profit investigative journalism organization. This request is made as part of news gathering and not for a commercial use. I respectfully ask that you waive fees related to this request. Please notify me of any charges before fulfilling this request.

Please contact me with any questions at 510-809-2209 or

wevans@revealnews.org

Thank you for your attention to this request.

Sincerely,
Will Evans
Reveal / The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608



www.revealnews.org

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
www.revealnews.org

**U.S. Department of Labor**    Office of Federal Contract Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



October 2, 2020


Via Electronic Mail

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request Acknowledgement – Tracking No. 897123

Dear Mr. Evans:

This letter is to acknowledge receipt of your Freedom of Information Act (FOIA) request submitted to *foiarequest@dol.gov*. The Office of the Solicitor assigned your request to the Office of Federal Contract Compliance Programs (OFCCP) on September 18, 2020. Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

You requested a spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2018.

We consider you to be a representative of the news media as defined by the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(3), therefore, only reproduction costs will be assessed, excluding charges for the first 100 pages. You will receive written notification if the total estimated fee for processing your request exceeds $25.00.

OFCCP's National Office will process your request for EEO-1 data. Once we compile the data, we will send a letter to the submitters notifying them of the request for their EEO-1 data.

In accordance with 29 CFR § 70.26 and Executive Order 12600, because your request covers information that may be protected from disclosure under FOIA Exemption 4, OFCCP is required to notify submitters that their information has been requested under the FOIA to give them an opportunity to object in writing to disclosure of any specified portion of the requested information. For those submitters who do not object, we will provide the information with any necessary redactions consistent with FOIA. For those submitters who do object, OFCCP will evaluate any response provided by the submitter as to why the requested information should be withheld and make its own determination as to whether the specific facts and relevant law warrant disclosure or withholding of the requested information.

Due to the volume and complexity of the FOIA requests we have received, we anticipate that providing a full response will take longer than 20 business days to fulfill. Accordingly, OFCCP will take an additional 10 business days to fulfill your request as afforded by the FOIA at 5 U.S.C. § 552(a)(6)(B)(i). We will contact you if we are unable to fulfill your request in 30 business days.

We consider you a "news media" type of requestor. As a "news media" requestor, we charge you for photocopying after the first 100 pages in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(4). DOL's FOIA regulations at 29 CFR § 70.42(a) deem that the filing of a FOIA constitutes an agreement by the requester to pay all fees up to $25.00.

If you need further assistance or would like to discuss any aspect of your request, please do not hesitate to contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov. Alternatively, you may wish to contact the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427 or by email at hicks.thomas@dol.gov.

You may also contact the Office of Government Information Services (OGIS), within the National Archives and Records Administration (NARA), to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by email at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. In the appeal, you must state in writing the grounds for the appeal, and may include any supporting statements or arguments, but such statements are not required. To facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. Clearly mark "Freedom of Information Act Appeal" on the envelope and letter of the appeal. You must make any amendment to the appeal in writing and we must receive it prior to a decision. Address the appeal to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. You may submit your appeal by email to foiaappeal@dol.gov. The Department does not accept appeals submitted to any other email address.

Sincerely,

DORIS GEAN    Digitally signed
              by DORIS GEAN

Doris Lissette Geán
FOIA Manager

2

# EXHIBIT N

**U.S. Department of Labor**

Office of Federal Contract Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



October 2, 2020


Via Electronic Mail

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request Acknowledgement – Tracking No. 897123

Dear Mr. Evans:

This letter is to acknowledge receipt of your Freedom of Information Act (FOIA) request submitted to *foiarequest@dol.gov*.  The Office of the Solicitor assigned your request to the Office of Federal Contract Compliance Programs (OFCCP) on September 18, 2020.  Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

You requested a spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2018.

We consider you to be a representative of the news media as defined by the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(3), therefore, only reproduction costs will be assessed, excluding charges for the first 100 pages.  You will receive written notification if the total estimated fee for processing your request exceeds $25.00.

OFCCP's National Office will process your request for EEO-1 data.  Once we compile the data, we will send a letter to the submitters notifying them of the request for their EEO-1 data.

In accordance with 29 CFR § 70.26 and Executive Order 12600, because your request covers information that may be protected from disclosure under FOIA Exemption 4, OFCCP is required to notify submitters that their information has been requested under the FOIA to give them an opportunity to object in writing to disclosure of any specified portion of the requested information.  For those submitters who do not object, we will provide the information with any necessary redactions consistent with FOIA.  For those submitters who do object, OFCCP will evaluate any response provided by the submitter as to why the requested information should be withheld and make its own determination as to whether the specific facts and relevant law warrant disclosure or withholding of the requested information.

Due to the volume and complexity of the FOIA requests we have received, we anticipate that providing a full response will take longer than 20 business days to fulfill. Accordingly, OFCCP will take an additional 10 business days to fulfill your request as afforded by the FOIA at 5 U.S.C. § 552(a)(6)(B)(i). We will contact you if we are unable to fulfill your request in 30 business days.

We consider you a "news media" type of requestor. As a "news media" requestor, we charge you for photocopying after the first 100 pages in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(4). DOL's FOIA regulations at 29 CFR § 70.42(a) deem that the filing of a FOIA constitutes an agreement by the requester to pay all fees up to $25.00.

If you need further assistance or would like to discuss any aspect of your request, please do not hesitate to contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov. Alternatively, you may wish to contact the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427 or by email at hicks.thomas@dol.gov.

You may also contact the Office of Government Information Services (OGIS), within the National Archives and Records Administration (NARA), to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by email at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. In the appeal, you must state in writing the grounds for the appeal, and may include any supporting statements or arguments, but such statements are not required. To facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. Clearly mark "Freedom of Information Act Appeal" on the envelope and letter of the appeal. You must make any amendment to the appeal in writing and we must receive it prior to a decision. Address the appeal to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. You may submit your appeal by email to foiaappeal@dol.gov. The Department does not accept appeals submitted to any other email address.

Sincerely,

DORIS GEAN   Digitally signed
             by DORIS GEAN

Doris Lissette Geán
FOIA Manager

# EXHIBIT O



**Shawn Musgrave <smusgrave@revealnews.org>**

---

## Fwd: Freedom of Information Act Requests – Tracking Nos. 872421 and 897123

**Will Evans** <wevans@revealnews.org>                              Thu, Sep 30, 2021 at 10:30 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **Alexandra Gutierrez** <agutierrez@revealnews.org>
Date: Thu, Jan 7, 2021 at 9:13 AM
Subject: Re: Freedom of Information Act Requests – Tracking Nos. 872421 and 897123
To: Office of Federal Contract Compliance Programs <ofccp_no_foia@dol.gov>
Cc: Victoria Baranetsky <vbaranetsky@revealnews.org>, Will Evans <wevans@revealnews.org>, Hicks, Thomas - SOL <hicks.thomas@dol.gov>


VIA E-MAIL

Doris Lissette Geán
FOIA Manager
Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210
OFCCP_NO_FOIA@dol.gov


Re:  Freedom of Information Act Request Acknowledgement – Tracking No. 897123


Dear Ms. Geán,

We are following up on your December 18, 2020 e-mail. While we are considering are options as to the Department of Labor's current position as to our reporter's request, we seek answers to the following questions:

1. When did the Department provide E.O. 12600 notices to submitters?
2. Have any submitters responded, either objecting or consenting?
3. For those submitters who have consented or have waived their opportunity to object due to the passage of a reasonable amount of time, would the Department be able to provide their submitted reports on a rolling basis.

We appreciate your attention to these inquiries.

Sincerely,

Alexandra M. Gutierrez

cc:     D. Victoria Baranetsky, General Counsel, Center for Investigative Reporting
       Will Evans, Reporter, Center for Investigative Reporting
       Thomas Hicks, DOL FOIA Public Liaison

On Fri, Dec 18, 2020 at 9:32 AM Office of Federal Contract Compliance Programs <ofccp_no_foia@dol.gov> wrote:
   Via Electronic Mail

   Dear Ms. Gutierrez:

   We have received your December 11, 2020, e-mail inquiring about outstanding FOIA requests that,
   combined, seek two years (2016 and 2018) of EEO-1 consolidated (Type 2) reports for all federal
   contractors.

   As you are aware, we have complied with the district court's order and released the 2016 reports of the
   individual submitters who have not appealed the court's decision in the matter of *Ctr. for Investigative
   Reporting v. U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 779 (N.D. Cal. 2019). Your outstanding FOIA
   requests seek the EEO-1, Type 2 reports of well over 15,000, and possibly over 20,000 submitters from
   countless industries whose reports are not subject to that court order.

   We continue to be subject to Executive Order 12600 and are obligated to notify submitters of requests for
   their potentially confidential commercial information. *See* 29 C.F.R. § 70.26. Under Executive Order
   12600, we must afford submitters a reasonable period of time to object to the disclosure of any portion of
   the information and to state all grounds upon which disclosure is opposed. The submitters that are the
   subject of your request have not had the opportunity to demonstrate whether their EEO-1, Type 2 reports
   contain confidential commercial information. Moreover, while we do not believe that the Northern
   California's District Court's decision in *Center for Investigative Reporting* has precedential effect on all
   EEO-1, Type 2 reports, we note that this matter is currently on appeal before the U.S. Court of Appeals for
   the Ninth Circuit and there is still a chance that the district court's holding may be overturned.

   Sincerely,

   D. Lissette Geán

   FOIA Manager

--
Alexandra M. Gutierrez
First Amendment Fellow
**(c)** 907-209-1799



--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
www.revealnews.org

# EXHIBIT O-1

| | |
|---|---|
| **From:** | Alexandra Gutierrez |
| **To:** | Office of Federal Contract Compliance Programs |
| **Cc:** | Victoria Baranetsky; Will Evans; Hicks, Thomas - SOL |
| **Subject:** | Re: Freedom of Information Act Requests – Tracking Nos. 872421 and 897123 |
| **Date:** | Thursday, January 7, 2021 9:13:12 AM |

VIA E-MAIL

Doris Lissette Geán
FOIA Manager
Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210
OFCCP_NO_FOIA@dol.gov

Re:  Freedom of Information Act Request Acknowledgement – Tracking No.
897123

Dear Ms. Geán,

We are following up on your December 18, 2020 e-mail. While we are considering
are options as to the Department of Labor's current position as to our reporter's
request, we seek answers to the following questions:

   1. When did the Department provide E.O. 12600 notices to submitters?
   2. Have any submitters responded, either objecting or consenting?
   3. For those submitters who have consented or have waived their opportunity
   to object due to the passage of a reasonable amount of time, would the
   Department be able to provide their submitted reports on a rolling basis.

We appreciate your attention to these inquiries.

Sincerely,


Alexandra M. Gutierrez


cc:    D. Victoria Baranetsky, General Counsel, Center for Investigative Reporting
       Will Evans, Reporter, Center for Investigative Reporting
       Thomas Hicks, DOL FOIA Public Liaison

On Fri, Dec 18, 2020 at 9:32 AM Office of Federal Contract Compliance Programs
<ofccp_no_foia@dol.gov> wrote:

> Via Electronic Mail
>
> Dear Ms. Gutierrez:
>
> We have received your December 11, 2020, e-mail inquiring about outstanding FOIA
> requests that, combined, seek two years (2016 and 2018) of EEO-1 consolidated (Type 2)
> reports for all federal contractors.
>
> As you are aware, we have complied with the district court's order and released the 2016
> reports of the individual submitters who have not appealed the court's decision in the matter
> of *Ctr. for Investigative Reporting v. U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 779 (N.D.
> Cal. 2019). Your outstanding FOIA requests seek the EEO-1, Type 2 reports of well over
> 15,000, and possibly over 20,000 submitters from countless industries whose reports are not
> subject to that court order.
>
> We continue to be subject to Executive Order 12600 and are obligated to notify submitters
> of requests for their potentially confidential commercial information. *See* 29 C.F.R. § 70.26.
> Under Executive Order 12600, we must afford submitters a reasonable period of time to
> object to the disclosure of any portion of the information and to state all grounds upon which
> disclosure is opposed.  The submitters that are the subject of your request have not had the
> opportunity to demonstrate whether their EEO-1, Type 2 reports contain confidential
> commercial information.  Moreover, while we do not believe that the Northern California's
> District Court's decision in *Center for Investigative Reporting* has precedential effect on all
> EEO-1, Type 2 reports, we note that this matter is currently on appeal before the U.S. Court
> of Appeals for the Ninth Circuit and there is still a chance that the district court's holding
> may be overturned.
>
>
> Sincerely,
>
>
>
>
>
> D. Lissette Geán
>
> FOIA Manager

--
Alexandra M. Gutierrez
First Amendment Fellow
(c) 907-209-1799



# EXHIBIT P



**Shawn Musgrave <smusgrave@revealnews.org>**

---

## Fwd: amendment request

**Will Evans** <wevans@revealnews.org>                                      Thu, Sep 30, 2021 at 10:28 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **OFCCP NO FOIA** <OFCCP_NO_FOIA@dol.gov>
Date: Tue, May 11, 2021 at 9:05 AM
Subject: RE: amendment request
To: Will Evans <wevans@revealnews.org>

Dear Mr. Evans,

We have modified request 872421 to include a spreadsheet of the consolidated (Type 2) EEO-1 reports for all federal contractors for the years 2016 through 2018.

We will administratively close request 897123.

Cordially,

Bruce Andersen

The OFCCP FOIA Team

---

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Monday, May 10, 2021 1:02 PM
**To:** OFCCP NO FOIA <OFCCP_NO_FOIA@DOL.GOV>
**Subject:** amendment request

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

Dear FOIA Officer,

I would like to amend my FOIA request #872421 to include a spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2017 and 2018 as well as 2016.

If you agree to this amendment, I will withdraw my separate FOIA #897123 for the 2018 data.


Please let me know.
Thank you very much.
Best,

Will Evans
--

Will Evans

reporter

office: 510-809-2209

cell: 510-333-9584



[www.revealnews.org](http://www.revealnews.org)


--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
[www.revealnews.org](http://www.revealnews.org)

# EXHIBIT Q



**Dara Gray <dgray@revealnews.org>**

## Fwd: FOIA 872421 - Amendment
1 message

**Will Evans** <wevans@revealnews.org>                                      Wed, Nov 9, 2022 at 2:01 PM
To: Dara Gray <dgray@revealnews.org>

---------- Forwarded message ---------
From: **Office of Federal Contract Compliance Programs** <ofccp_no_foia@dol.gov>
Date: Fri, Jun 3, 2022 at 10:52 AM
Subject: RE: FOIA 872421 - Amendment
To: <wevans@revealnews.org>
Cc: <vbaranetsky@revealnews.org>


Dear Mr. Evans,

We have received your latest email. We will modify request 872421 to include both the 2019 and 2020 data. Your request
is now for the consolidated (Type 2) EEO-1 reports for all federal contractors for the years 2016 through 2020.

Cordially,

Bruce Andersen

The OFCCP FOIA Team


**From:** Will Evans wevans@revealnews.org
**Sent:** Thursday, June 2, 2022 4:45 PM
**To:** FOIARequests FOIARequests@dol.gov
**Cc:** OFCCP NO FOIA OFCCP_NO_FOIA@DOL.GOV
**Subject:** FOIA request- OFCCP


   CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding
   with sensitive information. Send suspicious email to spam@dol.gov.

Dear FOIA Officer,

Under the Freedom of Information Act, I am requesting a copy of the following records from OFCCP:



**\* A spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2019 and 2020.**



I am requesting this data in electronic format, by email.

I am a representative of the news media as a reporter with Reveal from The Center for Investigative Reporting, a non-profit
investigative journalism organization. This request is made as part of news gathering and not for a commercial use. I
respectfully ask that you waive fees related to this request. Please notify me of any charges before fulfilling this request.

Please contact me with any questions at 510-809-2209 or

wevans@revealnews.org

Thank you for your attention to this request.

Sincerely,
Will Evans
Reveal / The Center for Investigative Reporting

PO Box 8307

Emeryville, CA 94608

--

Will Evans

reporter

Reveal from The Center for Investigative Reporting

cell: 510-333-9584

www.revealnews.org


--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
cell: 510-333-9584
www.revealnews.org

# EXHIBIT R



Secretary of Labor Martin J. Walsh
Office of the Secretary of Labor
200 Constitution Ave, NW
Room C-2318
Washington, DC 20210

Solicitor of Labor Seema Nanda
Office of the Solicitor of Labor
200 Constitution Ave, NW
Washington, DC 20210

Director Jenny R. Yang
Office of Federal Contract Compliance Programs
200 Constitution Ave, NW
Room C–3325
Washington, DC 20210


May 23, 2022


VIA ELECTRONIC DELIVERY


**Re: FOIA Request No. 872421 and DOL's Wrongful Withholding of EEO-1 Type 2 Forms
That Should be Released and Published Prospectively**


To Whom It May Concern:

The Center for Investigative Reporting ("CIR") writes to object to the agency's
withholding of records requested under the Freedom of Information Act ("FOIA") by our
reporter, Mr. Will Evans. Mr. Evans's FOIA request, which has been pending for *more than
three years*, seeks disclosure of aggregate workforce diversity data submitted by federal
contractors to the Department of Labor ("DOL")'s Office of Federal Contract Compliance
Programs ("OFCCP"). This withholding is in contravention of legal authority.

According to OFCCP, the agency's extensive delay in responding to this request is due to
its need to consult with thousands of federal contractors to ascertain whether they object to

disclosure of their diversity data. It is unclear whether OCFPP has attempted to initiate that process. Nevertheless, CIR disputes that such consultation is appropriate or necessary in the first instance. The agency's withholding is in direct contravention of law in light of recent court decisions, including a federal district court ordering disclosure of diversity data, an opinion which the DOL did not appeal and which the U.S. Ninth Circuit Court of Appeals left undisturbed, as discussed below. These records should be disclosed immediately. Regardless, even if the agency wanted to formalize this disclosure process moving forward, by proactively publishing these records on its website, it could provide a broad notice to companies, instead of reaching out to federal contractors individually. According to agency rules, DOL has the authority to expedite its consultation process by publishing notices in the Federal Register.

In light of its obligations under FOIA, CIR demands DOL disclose the requested records and prospectively publish these records online. If DOL fails to act and continues to withhold these records, CIR will be required to file suit under FOIA, yet a third time.

## I. Background on EEO-1 Reports

Since 1966, certain federal contractors have been required to submit workforce demographic data to the U.S. Equal Opportunity Commission on an annual basis.[1] OFCCP uses these diversity reports, the EEO-1 Consolidated Reports (Type 2) ("EEO-1 Type 2 reports") to evaluate contractors' compliance with anti-discrimination laws, particularly Executive Order 11246.[2] For decades, momentum has been growing to make the diversity data in EEO-1 Type 2 reports accessible and keep federal contractors accountable to the public. As far back as 1974, courts have required EEO-1 Type 2 reports to be disclosed under FOIA.[3] Many companies now post their reports online as part of their own social responsibility commitments.[4] Members of

---

[1] *See* 41 C.F.R. § 60-1.7(a).

[2] *See* 30 Fed. Reg. 12,319 (Sept. 28, 1965).

[3] As OFCCP explains on its website, "[C]ourts have ruled that the Title VII prohibition against disclosure does not apply to OFCCP's collection of EEO-1 data." OFCCP, *Freedom of Information Act (FOIA) Frequently Asked Questions*, https://www.dol.gov/agencies/ofccp/faqs/foia (citing *Sears Roebuck & Co. v. Gen. Servs. Admin.*, 509 F.2d 527, 529 (D.C. Cir. 1974) as one such ruling).

[4] For example, Intel proactively began posting diversity reports online in 2008. Intel, *Workforce Demographics*, 2008, http://web.archive.org/web/20081224004419/http://www.intel.com/intel/diversity/divpractice.htm. Google began posting its diversity data in 2014 after a similar FOIA lawsuit, and Microsoft followed suit in 2015. Murrey Jacobson, *Google finally discloses its diversity record, and it's not good*, PBS NEWSHOUR, May 28, 2014, https://www.pbs.org/newshour/nation/google-discloses-workforce-diversity-data-good; Laura Lorenzetti, *Microsoft releases diversity stats: How the tech giant sizes up*, FORTUNE, Jan. 5, 2015, https://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech.

2

Congress[5] and legislative commissions,[6] civil rights activists,[7] and scholars have been calling for this data to be more accessible, including in response to CIR's reporting. In March 2019, after CIR sued DOL for diversity data the first time, Representative Emanuel Cleaver II wrote to the DOL stating this data should not be withheld under Exemption 4, as EEO-1 reports "enumerate the diversity of firms accepting the taxpayer money."[8]

As part of his reporting for CIR over the last decade, Mr. Evans has submitted numerous FOIA requests to OFCCP for EEO-1 Type 2 reports and data. In addition to the FOIA request addressed herein, Mr. Evans has previously requested EEO-1 Type 2 reports regarding specific companies and CIR has previously sued DOL twice over its refusal to release these reports on the basis of Exemption 4. The first of these lawsuits was voluntarily dismissed in 2018 after DOL reversed its prior determination that five companies' reports were exempt.[9] In the second lawsuit, the court granted summary judgment to CIR, ruling in December 2019, "the Government failed to make a showing that the demographic information contained in the EEO-1 reports is commercial.[10] As a result, the Government was not justified in applying Exemption 4 to the EEO-1 reports, and the court ruled they "must be produced unredacted."[11] The government chose not to appeal that ruling and the U.S. Ninth Circuit Court of Appeals recently

---

[5] Members of Congress have called for greater access to diversity reports, both via companies' proactive disclosures and via OFCCP's disclosures under FOIA. *See, e.g.*, Jessica Guyun, *Barbara Lee calls on Apple, tech holdouts to release diversity data*, USA TODAY, Aug. 4, 2015, https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-federal-diversity-data- apple/31128479.

[6] The Federal Glass Ceiling Commission, created by the Civil Rights Act of 1991, stated in its 1995 report that the government should "explore the possibility of mandating public release of EEO-1 forms for Federal contractors and publicly-traded corporations." GLASS CEILING COMM'N, *A Solid Investment: Making Full Use of the Nation's Human Capital* 42-43, Nov. 1, 1995, https://ecommons.cornell.edu/handle/1813/79349.

[7] For example, civil rights activist Rev. Jesse Jackson has called on companies to release diversity statistics. *See* Salvador Rodiguez, *Jesse Jackson Gives Uber a Diversity Deadline*, INC.COM, Jan. 5, 2017, https://www.inc.com/salvador-rodriguez/uber-diversity-jesse-jackson.html.

[8] Letter from Emanuel Cleaver II, Member of Congress, U.S. House of Representatives, to Alexander Acosta, Secretary, U.S. Department of Labor (Mar. 6, 2019), https://cleaver.house.gov/sites/cleaver.house.gov/files/DOL FOIA.pdf.

[9] *Ctr for Investigative Reporting v. Dep't of Labor*, No. 3:18-cv-02008 (N.D. Cal. Dec. 21, 2018).

[10] *Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771, 779 (N.D. Cal. Dec. 10, 2019).

[11] *Id.*

3

left it undisturbed following a belated challenge by the single holdout company whose data was at issue.[12]

OFCCP asserts that DOL regulations and Executive Order 12600 require notification to individual submitters to consult if this information qualifies as "confidential commercial information."[13]  First, the very same DOL regulations allow such notification "by posting or publishing notice reasonably likely to accomplish such notification" in cases where "notification to a voluminous number of submitters is required."[14]  Second, either time-consuming and burdensome notification process directly contradicts a federal court opinion requiring disclosure. Now that EEO-1 Type 2 reports have been ruled as outside the scope of Exemption 4, any such consultation is in contravention of a federal court decision.  The agency's own prior actions confirm this conclusion.  In a similar context, DOL released data online regarding workplace injuries and illnesses for tens of thousands of employers — without consulting with each company individually — after courts ruled this data is outside the scope of Exemption 4.[15]

## II.    Procedural History

Mr. Evans submitted the requested EEO-1 Type 2 data for all federal contractors more than three years ago, in January 2019.  He initially submitted three separate requests for annual data for the years 2016, 2017, and 2018.  *See* Exhibits A, B, and C.[16]  In May 2021, at OFCCP's request, Mr. Evans agreed to combine these requests into one FOIA request for all three years' worth of data.  *See* Exhibit D.  That combined request has been assigned OFCCP tracking number 872421.  *Id.*

On numerous occasions, OFCCP indicated that Mr. Evans's request required company-by-company consultation which posed logistical challenges due to the volume of federal contractors who might object to disclosure of their diversity data.  For example, in July 2019, the OFCCP FOIA office estimated that there were "more than 100,000 responsive records"

---

[12] *Evans v. Synopsys*, No. 20-16416 (9th Cir. May 12, 2022), https://cdn.ca9.uscourts.gov/ datastore/opinions/2022/05/12/20-16416.pdf (dismissing company's untimely appeal for lack of jurisdiction).

[13] 29 C.F.R. § 70.26; *see also* OFCCP FOIA website, *supra* note 3.

[14] 29 C.F.R. § 70.26(c); *see also* 29 C.F.R. § 70.26(j) ("Where notification of a voluminous number of submitters is required, such notification may be accomplished by posting and publishing the notice in a place reasonably calculated to accomplish notification.")

[15] DOL, *U.S. Department of Labor Releases Work-Related Injury and Illness Data*, Sept. 4, 2020, https://www.dol.gov/newsroom/releases/osha/osha20200904; *see also Ctr. for Investigative Reporting v. Dep't of Labor*, No. 4:18-cv-02414, 2020 WL 2995209 (N.D. Cal. June 4, 2020); *Public Citizen Foundation v. Dep't of Labor*, No. 1:18-cv-00117 (D.D.C. June 23, 2020).

[16] The FOIA request for the 2016 EEO-1 Type 2 data was submitted on January 10, 2019, and assigned tracking number 872421.  Ex. A.  The FOIA request for the 2017 data was submitted on March 25, 2019, and assigned tracking number 875877.  Ex. B.  The FOIA request for the 2018 data was submitted on September 11, 2020, and assigned tracking number 897123.  Ex. C.

4



pertaining to the 2016 data, and that "the cost in sending more than 100,000 letters would be unduly burdensome." *See* Exhibit E. Following the December 2019 ruling in CIR's favor, OFCCP suggested the court's ruling did not have any "precedential effect" and that it was obligated to consult individual federal contractors in response to Mr. Evans's request for aggregate data. *See* Exhibit F at 2. In December 2020, for example, OFCCP estimated that this request involved "the EEO-1, Type 2 reports of well over 15,000, and possibly over 20,000 submitters from countless industries." *Id.*

Since January 2021, OFCCP has not answered CIR's questions about what steps, if any, the agency has taken to date to consult with companies whose data is at issue in Mr. Evans's request. *Id.* at 1.

## III.  Discussion

The Freedom of Information Act seeks "to ensure an informed citizenry, vital to the functioning of a democratic society." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Under FOIA, "each agency . . . shall make the records promptly available." 5 U.S.C. § 552(a)(3)(A). "Congress underscored the importance it attached to prompt responses by allowing judicial recourse, bypassing administrative exhaustion, if an agency fails to meet statutory timetables for disclosure or to justify its delay in making nonexempt records available upon request." *Jud. Watch, Inc. v. Dep't of Homeland Sec.*, 895 F.3d 770, 775–76 (D.C. Cir. 2018). "[A]n agency's compliance with FOIA depends upon its good faith effort and due diligence to comply with all lawful demands for records in as short a time as is possible." *Id.* at 781 (cleaned up).

Here, more than *three years* after receiving Mr. Evans's initial request, OFCCP has failed to fulfill it. OFCCP has justified this extensive delay based on its suggestion that the federal court's decision in the Northern District of California did not have precedential effect and the difficulty of notifying thousands of companies whose data is at issue. Ex. F at 2. CIR asserts that this position is faulty and to remedy the circumstances the agency should: 1) immediately disclose the requested records and 2) proactively notify all companies moving forward that these records will be disclosed.

### A.  OFCCP is Bound by Court Decisions Requiring Disclosure of EEO-1 Type 2 Reports.

By continuing to withhold the long-overdue diversity data, OFCCP is acting outside the bounds of law. Contrary to the agency's suggestion, Judge Westmore's ruling that diversity data is outside Exemption 4 does, in fact, have "precedential effect," particularly since the Ninth Circuit left that decision undisturbed. The plain text of FOIA "vests jurisdiction in federal district courts to enjoin an 'agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant,'" and agencies must comply with court disclosure orders. *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 139 (1980) (quoting 5 U.S.C. § 552(a)(4)(B)). Under the "law of the circuit doctrine, a published decision of [a federal appellate] court constitutes binding authority which must be

1400 65th, Suite 200 Emeryville, CA 94608
PHONE 510 809 3160          TWITTER @CIRonline
WEB cironline.org

followed unless and until overruled by a body competent to do so." *In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017) (cleaned up).

Here, both the district court and the appeals court decisions create binding law on the agency. Just two years ago, Judge Westmore ruled on CIR's request for 2016 EEO-1 report data and concluded that the "Government was not justified in applying Exemption 4" to this information, requiring the EEO-1 reports to "be produced unredacted." *Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771, 779 (N.D. Cal. 2019). DOL elected not to appeal that decision, and subsequently the U.S. Ninth Circuit Court of Appeals found it lacked jurisdiction to disturb Judge Westmore's order. *Evans v. Synopsys*, No. 20-16416 (9th Cir. May 12, 2022). The December 10, 2019 order generally remains in effect, as the parties, including the Government, stipulated that it would only be stayed as to the "disclosure of the requested Synopsys information." *Ctr. for Investigative Reporting*, No. 4:19-cv-01843, ECF No. 87, ¶¶ 2-3 (N.D. Cal. July 28, 2020). Given that the December 10, 2019 order remains in force, that the Government chose not to appeal it, and that the Government opposed the company's attempt to intervene for the sole purpose of appealing it, CIR is perplexed by DOL's current plan of action as to FOIA Request No. 872421. According *Kissinger* and *In re Zermeno*, DOL must disclose the records and the agency has not presented any other to the contrary. We hope this clarifies any remaining confusion and that the agency will disclose the requested records immediately to avoid needless, repetitive litigation – for a third time.

### B. OFCCP Should Proactively Publish the Requested Records on Its Website.

The same DOL regulation OFCCP invokes to justify its delay also offers a solution for future requests involving EEO-1s: To mitigate the burden and expense of notifying a "voluminous number of submitters," OFCCP can notify all companies simultaneously by posting a notice on its website before proactively publishing these records on its website. 29 C.F.R. § 70.26(c); *see also* 29 C.F.R. § 70.26(j) ("Where notification of a voluminous number of submitters is required, such notification may be accomplished by posting and publishing the notice in a place reasonably calculated to accomplish notification.").

OFCCP has various options for notifying companies by publication. It could publish a notice in the Federal Register, as DOL previously did to alert companies about a FOIA lawsuit and underlying request.[17] Another agency with similar regulations about "voluminous" notifications recently published notices in the Federal Register.[18] Alternatively, OFCCP could

---

[17] 71 Fed. Reg. 20,732 (April 21, 2006), *available at* https://www.federalregister.gov/documents/2006/04/21/06-3795/freedom-of-information-act-notice-of-lawsuit (notice from the Occupational Health and Safety Administration regarding air sampling data). *See also Finkel v. Dep't of Lab.*, No. CIV A 05-5525, 2007 WL 1963163, at *2 (D.N.J. June 29, 2007).

[18] 81 Fed. Reg. 75,838 (Nov. 1, 2016), *available at* https://www.federalregister.gov/documents/2016/11/01/2016-26412/freedom-of-information-act-notice-of-lawsuit (notice from the U.S. Fish and Wildlife Service regarding FOIA request and lawsuit for data about import and export of wildlife specimens); 81 Fed. Reg. 85,255 (Nov. 25,

issue a press release, as DOL did regarding disclosure of its workplace injury data.[19]  Whatever the venue, DOL should avail itself of its regulatory authority to notify the "voluminous" number of companies – and begin to proactively publishing these records online, as other DOL components such as OSHA have done with comprehensive datasets after courts ruled that they could not be withheld.

## IV.    Conclusion

Rather than continue to delay Mr. Evans's long-overdue request for EEO-1 Type 2 data, DOL should disclose the requested records.  Moving forward it should exercise its authority to notify companies and begin proactive publication.  We request that OFCCP respond to this letter **within two weeks of receipt** to discuss any clarifying points and the agency's intended course of action to resolve this matter.  You may reach me at vbaranetsky@revealnews.org or (201) 306-4831.

Sincerely,

Victoria D. Baranetsky
General Counsel
The Center for Investigative Reporting

cc:     Will Evans, Senior Reporter and Producer, The Center for Investigative Reporting
        Shawn Musgrave, First Amendment Fellow, The Center for Investigative Reporting

---

2016), *available at* https://www.federalregister.gov/documents/2016/11/25/2016-28379/freedom-of-information-act-notice-of-lawsuit (same).  *See also* 43 C.F.R. § 2.27(b) ("If a voluminous number of submitters are involved, [a bureau of the Department of the Interior] may publish a notice in a manner reasonably calculated to reach the attention of the submitters (for example, in newspapers or newsletters, the bureau's Web site, or the Federal Register) instead of providing a written notice to each submitter.").
[19] *Supra* note 15.

7



# Exhibit A



**Shawn Musgrave <smusgrave@revealnews.org>**

---

## Fwd: Acknowledgment

**Will Evans** <wevans@revealnews.org>                                    Thu, Oct 14, 2021 at 2:41 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **FOIARequests** <FOIARequests@dol.gov>
Date: Tue, Jan 15, 2019 at 2:35 PM
Subject: Acknowledgment
To: Will Evans <wevans@revealnews.org>
Cc: Oliver, Ramona - SOL <Oliver.Ramona@dol.gov>, OFCCP NO FOIA <OFCCP_NO_FOIA@dol.gov>

Hello:

Your request has been assigned to OFCCP with tracking number **872421**. When they begin processing it, you will be able to track its progress at www.dol.gov/foia. If you need to contact them about it for any reason, please submit your inquiry through ofccp_no_foia@dol.gov or phone 202-693-0101. In addition, it would be helpful to include the tracking number in the Subject line of any submission to the agency or to have it available at the time of a call.

Sincerely,

**Arginia Karamoko**

Government Information Specialist, Office of Information Services

Office of the Solicitor I Management & Administrative Legal Services

U.S. DEPARTMENT OF LABOR

200 Constitution Ave., N.W., N-2420 I Washington, DC  20210

T: (202) 693-5531 I F: (202) 693-5389 I  E: karamoko.arginia@dol.gov

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Thursday, January 10, 2019 7:13 PM
**To:** FOIARequests <FOIARequests@dol.gov>
**Cc:** Victoria Baranetsky <vbaranetsky@revealnews.org>
**Subject:** FOIA request - OFCCP

Dear FOIA Officer,

Case 3:23-cv-07182-WHA Document 39-12 Filed 01/18/23 Page 717 of 1025

Under the Freedom of Information Act, I am requesting a copy of the following records from OFCCP:

**\* A spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2016.**

I am requesting this data in electronic format, by email.

There is an exception to the notice requirements of 29 CFR 70.26 and Executive Order 12600 that applies here, as will be explained below. Notice to the contractors is not required.

Under 29 CFR 70.2(G)(5) and Executive Order 12600 Sec.8(e), the notice requirements **need not be followed** if the information has not been designated by the submitter, unless OFCCP "has reason to believe that disclosure of the information would result in substantial competitive harm."

Under 29 CFR 70.2(G)(6) and Executive Order 12600 Sec.8(f), the notice requirements **need not be followed** the designation made by the submitter "appears obviously frivolous."

There is no substantial reason to believe that disclosure of the information would result in competitive harm, so the information should be released without notice for any contractor. Even if a contractor has designated it as confidential, that designation should be considered "obviously frivolous," as OFCCP has already determined that Type 2 EEO-1 reports are not subject to Exemption 4 of the Freedom of Information Act. (see CIR v USDOL, Case No. 3:18-cv-2008 JCS)

I am a representative of the news media as a reporter with Reveal from The Center for Investigative Reporting, a non-profit investigative journalism organization. This request is made as part of news gathering and not for a commercial use. I respectfully ask that you waive fees related to this request. Please notify me of any charges before fulfilling this request.

Please contact me with any questions at 510-809-2209 or

wevans@revealnews.org

Thank you for your attention to this request.

Sincerely,
Will Evans
Reveal / The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608

--

Will Evans

reporter

o: 510-809-2209



www.revealnews.org

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
www.revealnews.org

# Exhibit B



**Shawn Musgrave <smusgrave@revealnews.org>**

---

## Fwd: Acknowledgment

**Will Evans** <wevans@revealnews.org>                                    Thu, Oct 14, 2021 at 2:38 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **Karamoko, Arginia - SOL** <Karamoko.Arginia@dol.gov>
Date: Mon, Mar 25, 2019 at 1:32 PM
Subject: Acknowledgment
To: Will Evans <wevans@revealnews.org>
Cc: Oliver, Ramona - SOL <Oliver.Ramona@dol.gov>, OFCCP NO FOIA <OFCCP_NO_FOIA@dol.gov>

Hello:

Your request has been assigned to OFCCP with tracking number **875877**. When they begin processing it, you will be able to track its progress at www.dol.gov/foia. If you need to contact them about it for any reason, please submit your inquiry through ofccp_no_foia@dol.gov or phone 202-693-0101. In addition, it would be helpful to include the tracking number in the Subject line of any submission to the agency or to have it available at the time of a call.

Sincerely,

**Arginia Karamoko**

Government Information Specialist, Office of Information Services

Office of the Solicitor l Management & Administrative Legal Services

U.S. DEPARTMENT OF LABOR

200 Constitution Ave., N.W., N-2420 l Washington, DC  20210

T: (202) 693-5531 l F: (202) 693-5389 l  E: karamoko.arginia@dol.gov

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Monday, March 25, 2019 1:57 PM
**To:** FOIARequests <FOIARequests@dol.gov>
**Subject:** FOIA request - OFCCP

Dear FOIA Officer,

Under the Freedom of Information Act, I am requesting a copy of the following records from OFCCP:

**\* A spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2017.**

I am requesting this data in electronic format, by email. Fulfilling this request is not unduly burdensome because there is no need to notify federal contractors.

There is an exception to the notice requirements of 29 CFR 70.26 and Executive Order 12600 that applies here, as will be explained below. Notice to the contractors is not required.

Under 29 CFR 70.2(G)(5) and Executive Order 12600 Sec.8(e), the notice requirements **need not be followed** if the information has not been designated by the submitter, unless OFCCP "has reason to believe that disclosure of the information would result in substantial competitive harm."

Under 29 CFR 70.2(G)(6) and Executive Order 12600 Sec.8(f), the notice requirements **need not be followed** the designation made by the submitter "appears obviously frivolous."

There is no substantial reason to believe that disclosure of the information would result in competitive harm, so the information should be released without notice for any contractor. Even if a contractor has designated it as confidential, that designation should be considered "obviously frivolous," as OFCCP has already determined that Type 2 EEO-1 reports are not subject to Exemption 4 of the Freedom of Information Act. (see CIR v USDOL, Case No. 3:18-cv-2008 JCS)

I am a representative of the news media as a reporter with Reveal from The Center for Investigative Reporting, a non-profit investigative journalism organization. This request is made as part of news gathering and not for a commercial use. I respectfully ask that you waive fees related to this request. Please notify me of any charges before fulfilling this request.

Please contact me with any questions at 510-809-2209 or

wevans@revealnews.org

Thank you for your attention to this request.

Sincerely,
Will Evans
Reveal / The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608

--

Will Evans

reporter

o: 510-809-2209

www.revealnews.org

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
www.revealnews.org

# Exhibit C

Case 3:23-cv-07182-WHA Document 89-11 2 Filed 10/18/23 Page 724 of 1025



Shawn Musgrave <smusgrave@revealnews.org>

## Fwd: Acknowledgment
1 message

**Will Evans** <wevans@revealnews.org>                    Fri, Oct 15, 2021 at 6:51 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **Karamoko, Arginia - SOL** <Karamoko.Arginia@dol.gov>
Date: Fri, Sep 18, 2020 at 12:50 PM
Subject: Acknowledgment
To: Will Evans <wevans@revealnews.org>
Cc: Oliver, Ramona - SOL <Oliver.Ramona@dol.gov>, OFCCP NO FOIA <OFCCP_NO_FOIA@dol.gov>

Hello:

Your request has been assigned to the Office of Federal Contract Compliance Programs (OFCCP) with
tracking number **897123**. When they begin processing it, you will be able to track its progress at
www.dol.gov/foia. If you need to contact them about it for any reason, please submit your inquiry through
ofccp_no_foia@dol.gov or phone 202-693-0101. In addition, it would be helpful to include the tracking
number in the Subject line of any submission to the agency or to have it available at the time of a call.

Sincerely,

**Arginia Karamoko**

Government Information Specialist, Office of Information Services

Office of the Solicitor | Management & Administrative Legal Services

U.S. DEPARTMENT OF LABOR

200 Constitution Ave., N.W., N-2420 | Washington, DC  20210

T: (202) 693-5531 | F: (202) 693-5389 |  E: karamoko.arginia@dol.gov

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Friday, September 11, 2020 8:26 PM
**To:** FOIARequests <FOIARequests@dol.gov>
**Subject:** FOIA request - OFCCP

Dear FOIA Officer,

Under the Freedom of Information Act, I am requesting a copy of the following records from OFCCP:

**\* A spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2018.**

I am requesting this data in electronic format, by email. Fulfilling this request is not unduly burdensome because there is no need to notify federal contractors.

There is an exception to the notice requirements of 29 CFR 70.26 and Executive Order 12600 that applies here, as will be explained below. Notice to the contractors is not required.

Under 29 CFR 70.2(G)(5) and Executive Order 12600 Sec.8(e), the notice requirements **need not be followed** if the information has not been designated by the submitter, unless OFCCP "has reason to believe that disclosure of the information would result in substantial competitive harm."

Under 29 CFR 70.2(G)(6) and Executive Order 12600 Sec.8(f), the notice requirements **need not be followed** the designation made by the submitter "appears obviously frivolous."

There is no substantial reason to believe that disclosure of the information would result in competitive harm, so the information should be released without notice for any contractor. Even if a contractor has designated it as confidential, that designation should be considered "obviously frivolous," **as federal contractor EEO-1s have been determined to be public records that must be disclosed, not confidential commercial information**. Please see the Dec. 10, 2019 ruling by Judge Kandis Westmore in U.S. District Court for the Northern District of California, 4:19-cv-01843-KAW (attached).

I am a representative of the news media as a reporter with Reveal from The Center for Investigative Reporting, a non-profit investigative journalism organization. This request is made as part of news gathering and not for a commercial use. I respectfully ask that you waive fees related to this request. Please notify me of any charges before fulfilling this request.

Please contact me with any questions at 510-809-2209 or

wevans@revealnews.org

Thank you for your attention to this request.

Sincerely,
Will Evans
Reveal / The Center for Investigative Reporting
1400 65th, Suite 200
Emeryville, CA 94608



www.revealnews.org

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
www.revealnews.org

**U.S. Department of Labor**

Office of Federal Contract Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



October 2, 2020

Via Electronic Mail

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request Acknowledgement – Tracking No. 897123

Dear Mr. Evans:

This letter is to acknowledge receipt of your Freedom of Information Act (FOIA) request submitted to *foiarequest@dol.gov*. The Office of the Solicitor assigned your request to the Office of Federal Contract Compliance Programs (OFCCP) on September 18, 2020. Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

You requested a spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2018.

We consider you to be a representative of the news media as defined by the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(3), therefore, only reproduction costs will be assessed, excluding charges for the first 100 pages. You will receive written notification if the total estimated fee for processing your request exceeds $25.00.

OFCCP's National Office will process your request for EEO-1 data. Once we compile the data, we will send a letter to the submitters notifying them of the request for their EEO-1 data.

In accordance with 29 CFR § 70.26 and Executive Order 12600, because your request covers information that may be protected from disclosure under FOIA Exemption 4, OFCCP is required to notify submitters that their information has been requested under the FOIA to give them an opportunity to object in writing to disclosure of any specified portion of the requested information. For those submitters who do not object, we will provide the information with any necessary redactions consistent with FOIA. For those submitters who do object, OFCCP will evaluate any response provided by the submitter as to why the requested information should be withheld and make its own determination as to whether the specific facts and relevant law warrant disclosure or withholding of the requested information.

Due to the volume and complexity of the FOIA requests we have received, we anticipate that providing a full response will take longer than 20 business days to fulfill. Accordingly, OFCCP will take an additional 10 business days to fulfill your request as afforded by the FOIA at 5 U.S.C. § 552(a)(6)(B)(i). We will contact you if we are unable to fulfill your request in 30 business days.

We consider you a "news media" type of requestor. As a "news media" requestor, we charge you for photocopying after the first 100 pages in accordance with the U.S. Department of Labor FOIA regulations at 29 CFR § 70.40(c)(4). DOL's FOIA regulations at 29 CFR § 70.42(a) deem that the filing of a FOIA constitutes an agreement by the requester to pay all fees up to $25.00.

If you need further assistance or would like to discuss any aspect of your request, please do not hesitate to contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov. Alternatively, you may wish to contact the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427 or by email at hicks.thomas@dol.gov.

You may also contact the Office of Government Information Services (OGIS), within the National Archives and Records Administration (NARA), to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by email at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. In the appeal, you must state in writing the grounds for the appeal, and may include any supporting statements or arguments, but such statements are not required. To facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. Clearly mark "Freedom of Information Act Appeal" on the envelope and letter of the appeal. You must make any amendment to the appeal in writing and we must receive it prior to a decision. Address the appeal to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. You may submit your appeal by email to foiaappeal@dol.gov. The Department does not accept appeals submitted to any other email address.

Sincerely,

DORIS GEAN    Digitally signed by DORIS GEAN

Doris Lissette Geán
FOIA Manager

# Exhibit D



**Shawn Musgrave <smusgrave@revealnews.org>**

---

## Fwd: amendment request

**Will Evans** <wevans@revealnews.org>                                    Thu, Sep 30, 2021 at 10:28 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **OFCCP NO FOIA** <OFCCP_NO_FOIA@dol.gov>
Date: Tue, May 11, 2021 at 9:05 AM
Subject: RE: amendment request
To: Will Evans <wevans@revealnews.org>

Dear Mr. Evans,

We have modified request 872421 to include a spreadsheet of the consolidated (Type 2) EEO-1 reports for all federal
contractors for the years 2016 through 2018.

We will administratively close request 897123.

Cordially,

Bruce Andersen

The OFCCP FOIA Team

---

**From:** Will Evans <wevans@revealnews.org>
**Sent:** Monday, May 10, 2021 1:02 PM
**To:** OFCCP NO FOIA <OFCCP_NO_FOIA@DOL.GOV>
**Subject:** amendment request

CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding
with sensitive information. Send suspicious email to spam@dol.gov.

Dear FOIA Officer,

I would like to amend my FOIA request #872421 to include a spreadsheet of all consolidated (Type 2) EEO-1 reports for
all federal contractors for 2017 and 2018 as well as 2016.

If you agree to this amendment, I will withdraw my separate FOIA #897123 for the 2018 data.

Please let me know.
Thank you very much.
Best,

Will Evans
--

Will Evans

reporter

office: 510-809-2209

cell: 510-333-9584



[www.revealnews.org](www.revealnews.org)

--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
[www.revealnews.org](www.revealnews.org)

# Exhibit E

**U.S. Department of Labor**

Office of Federal Contract
Compliance Programs
200 Constitution Avenue, N.W.
Washington, D.C. 20210



JUL 18 2019

Will Evans
The Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

RE: Freedom of Information Act Request Acknowledgement – Tracking No. 872421

Dear Mr. Evans:

This letter is a follow-up to your Freedom of Information Act (FOIA) request submitted to the Office of Federal Contract Compliance Programs (OFCCP). Please refer to the above-referenced FOIA tracking number in any future correspondence regarding your FOIA request.

You requested a spreadsheet of all consolidated (Type 2) EEO-1 reports for all federal contractors for 2016. As you know from your earlier requests, in accordance with 29 CFR § 70.26, OFCCP is required to notify submitters that their business information has been requested under the FOIA to give them an opportunity to object in writing to disclosure of any specified portion of the requested information.

Though you request is reasonably described, we have determined that there are more than 100,000 responsive records. Reaching out to each of the companies affected by your voluminous request would overwhelm the OFCCP FOIA unit for the foreseeable future, and the cost in sending more than 100,000 letters would be unduly burdensome. If you wish to narrow the scope of your request, please send a revised request to the address referenced above or send an e-mail to OFCCP_NO_FOIA@dol.gov. In the event that we do not receive a response from you within thirty (30) days from the date of this letter, we will administratively close your request.

Should you have questions regarding your request, please contact this office at (202) 693-0101 or by email at OFCCP_NO_FOIA@dol.gov. If you need further assistance or would like to discuss any aspect of your request, please do not hesitate to contact the DOL FOIA Public Liaison, Thomas Hicks, at (202) 693-5427.

Alternatively, you may contact the Office of Government Information Services within the National Archives and Records Administration (OGIS) to inquire about the mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001. You can also reach that office by e-mail at ogis@nara.gov, by phone at (202) 741-5770, by fax at (202) 741-5769, or by calling toll-free at (877) 684-6448.

If you are not satisfied with the response to this request, you may administratively appeal by writing to the Solicitor of Labor within 90 days from the date of this letter. The appeal must state in writing the grounds for the appeal, and it may include any supporting statements or arguments, but such statements are not required. In order to facilitate processing of the appeal, please include your mailing address and daytime telephone number, as well as a copy of the initial request and copy of this letter. The envelope and letter of the appeal should be clearly marked "Freedom of Information Act Appeal." Any amendment to the appeal must be made in writing and received prior to a decision. The appeal should be addressed to the Solicitor of Labor, Division of Management and Administrative Legal Services, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N2420, Washington, DC 20210. Appeals may also be submitted by email to foiaappeal@dol.gov. Appeals submitted to any other email address will not be accepted.

Sincerely,

D. Lissette Geán
Special Assistant

# Exhibit F



**Shawn Musgrave <smusgrave@revealnews.org>**

---

## Fwd: Freedom of Information Act Requests – Tracking Nos. 872421 and 897123

**Will Evans** <wevans@revealnews.org>                                  Thu, Sep 30, 2021 at 10:30 PM
To: Shawn Musgrave <smusgrave@revealnews.org>

---------- Forwarded message ---------
From: **Alexandra Gutierrez** <agutierrez@revealnews.org>
Date: Thu, Jan 7, 2021 at 9:13 AM
Subject: Re: Freedom of Information Act Requests – Tracking Nos. 872421 and 897123
To: Office of Federal Contract Compliance Programs <ofccp_no_foia@dol.gov>
Cc: Victoria Baranetsky <vbaranetsky@revealnews.org>, Will Evans <wevans@revealnews.org>, Hicks, Thomas - SOL <hicks.thomas@dol.gov>

VIA E-MAIL

Doris Lissette Geán
FOIA Manager
Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210
OFCCP_NO_FOIA@dol.gov

Re:  Freedom of Information Act Request Acknowledgement – Tracking No. 897123

Dear Ms. Geán,

We are following up on your December 18, 2020 e-mail. While we are considering are options as to the Department of Labor's current position as to our reporter's request, we seek answers to the following questions:

1. When did the Department provide E.O. 12600 notices to submitters?
2. Have any submitters responded, either objecting or consenting?
3. For those submitters who have consented or have waived their opportunity to object due to the passage of a reasonable amount of time, would the Department be able to provide their submitted reports on a rolling basis.

We appreciate your attention to these inquiries.

Sincerely,

Alexandra M. Gutierrez

cc:     D. Victoria Baranetsky, General Counsel, Center for Investigative Reporting
        Will Evans, Reporter, Center for Investigative Reporting
        Thomas Hicks, DOL FOIA Public Liaison

On Fri, Dec 18, 2020 at 9:32 AM Office of Federal Contract Compliance Programs <ofccp_no_foia@dol.gov> wrote:
  Via Electronic Mail

  Dear Ms. Gutierrez:

  We have received your December 11, 2020, e-mail inquiring about outstanding FOIA requests that,
  combined, seek two years (2016 and 2018) of EEO-1 consolidated (Type 2) reports for all federal
  contractors.

  As you are aware, we have complied with the district court's order and released the 2016 reports of the
  individual submitters who have not appealed the court's decision in the matter of *Ctr. for Investigative
  Reporting v. U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 779 (N.D. Cal. 2019). Your outstanding FOIA
  requests seek the EEO-1, Type 2 reports of well over 15,000, and possibly over 20,000 submitters from
  countless industries whose reports are not subject to that court order.

  We continue to be subject to Executive Order 12600 and are obligated to notify submitters of requests for
  their potentially confidential commercial information. *See* 29 C.F.R. § 70.26. Under Executive Order
  12600, we must afford submitters a reasonable period of time to object to the disclosure of any portion of
  the information and to state all grounds upon which disclosure is opposed.  The submitters that are the
  subject of your request have not had the opportunity to demonstrate whether their EEO-1, Type 2 reports
  contain confidential commercial information.  Moreover, while we do not believe that the Northern
  California's District Court's decision in *Center for Investigative Reporting* has precedential effect on all
  EEO-1, Type 2 reports, we note that this matter is currently on appeal before the U.S. Court of Appeals for
  the Ninth Circuit and there is still a chance that the district court's holding may be overturned.


  Sincerely,



  D. Lissette Geán

  FOIA Manager


--
Alexandra M. Gutierrez
First Amendment Fellow
**(c)** 907-209-1799



--
Will Evans
reporter
Reveal from The Center for Investigative Reporting
office: 510-809-2209
cell: 510-333-9584
www.revealnews.org

# EXHIBIT S

Your donation helps protect democracy.        **DONATE**

**SILICON VALLEY DIVERSITY**

# We Forced the Government to Share Corporate Diversity Data. It's Giving Companies an Out Instead.

by **Will Evans**

August 29, 2022



10/18/23, 7:18 PM                                We Forced the Government to Share Corporate Diversity Data. It's Giving Companies an Out Instead. – Reveal

Case 3:22-cv-07182-WHA   Document 39   Filed 10/18/23   Page 741 of 1025

Jenny Yang, director of the Labor Department's Office of Federal Contract Compliance Programs, gave contractors 30 days to object to the release of their diversity reports. Credit: U.S. Department of Justice

The federal government is inviting thousands of companies to fight the public release of their diversity numbers, even after a judge ruled that the workplace demographics reports shouldn't be kept secret.

For years, Reveal from The Center for Investigative Reporting has battled in court to make public the diversity reports of companies that get government contracts, so that all journalists and the public can scrutinize the data. We won, but the fight isn't over.

Some companies – and the federal government – continue to push back against transparency, despite the court loss.

Government contractors must file diversity reports that show their overall workforce by race, gender and job category. Called EEO-1s, the reports offer a starting point for comparing diversity across similar companies and addressing inequality. Contractors, as recipients of taxpayer money to do work for the public, are required to meet a **higher standard** to guarantee equal opportunity and eliminate discrimination in their employment practices.

The U.S. Department of Labor refused to release most reports to Reveal even after **a federal judge ruled in 2019** that the reports weren't confidential business information. After we **threatened** to sue again earlier this year, it proactively offered contractors a 30-day window to argue for keeping their diversity data secret instead of releasing the records.

Civil rights **activists**, members of **Congress** and **scholars** have long called for the reports to be made public, and after many years of pressure, an increasing number of companies disclose them voluntarily. Reveal used those voluntary reports in a **series of stories** quantifying the severe lack of diversity in the tech industry, where **less than 2% of professionals at the largest companies were Black or Latina women** in 2016. Other **news organizations** have used the reports to hold companies accountable as well.

But the public still doesn't know how diverse the workforces are at the majority of companies that contract with the federal government. Reveal has requested diversity reports for all federal contractors from 2016 to 2020.

Jenny Yang, director of the Labor Department's Office of Federal Contract Compliance Programs, **published** a notice Aug. 19 that federal contractors have 30 days to object to the release of their diversity reports, giving them the opportunity to block their disclosure. The agency estimates that 15,000 companies could be affected.

Even though a federal judge **struck down** the department's previous attempt to keep such records secret, Yang's notice said the agency "has reason to believe that the information requested may be protected from disclosure" and has "not yet determined" whether it is. The agency set up a **portal** to accept objections from companies. The portal also made clear who made the request for the records: It names me and links to my bio page.

Reveal has been fighting for the release of diversity reports for five years, through various requests under the Freedom of Information Act, direct requests to companies and legal filings.

When we first requested the reports for Silicon Valley tech companies, several claimed their diversity numbers were trade secrets. Some of them **argued** that releasing the numbers would hurt their competitive position, leading to a "raiding of minority or female employees" or even "public relations harm."

The government sided with the companies, but after we sued, it **reversed course** and released the EEO-1 reports. It turned out companies' diversity stats were just **embarrassing**. Palantir, for example, had no female executives at the time and no women of color in management at all – particularly bad representation even for the tech industry.

When we asked for more recent data for the tech companies, the government **backtracked**, siding again with the companies that argued their diversity numbers were confidential commercial information. So we sued again.

A federal judge eventually **ruled** that the companies' objections didn't hold up, that EEO-1s are not confidential business information and that "the Government was not justified" in withholding them. The Labor Department didn't appeal the decision. A **tech company** did, but its appeal failed for procedural reasons.

Now, after years of dragging its feet, the government is sidestepping the court ruling, claiming it's still not clear whether the records should be public, inviting companies to object and offering them a list of points to address in requesting the government withhold the records.

Reveal general counsel D. Victoria Baranetsky **argued** in a letter to the agency that inviting companies to object goes against the court opinion and that the agency should publish all of the diversity data online. Baranetsky's proposal has precedent: The Labor Department **published** workplace injury data online, without consulting companies, after Reveal **won a ruling** that the records must be made public. Now that data is being used by other journalists and advocacy groups.

In this case, the agency **maintains** it has to give companies a chance to object. It could, of course, have started that process more than three years ago when we first requested the data.

Meanwhile, corporate lawyers and consultants who represent contractors are sounding the alarm to their clientele.

"If there is information in your EEO-1 Reports that you would prefer to keep out of your competitors' hands and the public eye, you should act quickly," **wrote one firm**.

"Employers have a number of reasons to fear their EEO-1 data becoming public," **wrote another**, including that Reveal "could use the data to call out employers who they believe have underperformed in their diversity efforts, or worse yet, engaged in discrimination."

A third **wrote** that the government's general notice was "woefully inadequate" and that failing to alert each individual company "sets concerning precedent."

The agency states that it will make an independent evaluation of companies' objections before deciding whether to disclose their diversity reports. In the past, it has often rubber-stamped those objections.

Years ago, when Reveal requested PayPal's diversity numbers, the company offered a common **objection**: "PayPal has taken great care to ensure the confidentiality of its EEO-1 Reports" and releasing them "would cause substantial competitive harm." The government immediately wrote back that it agreed with PayPal, in a **letter** dated the same day.

The day after Reveal wrote a **story about that**, PayPal posted its EEO-1s publicly online, and it **continues** to do so each year. By the time USA Today asked companies for EEO-1s in 2021, PayPal CEO Dan Schulman had become an advocate for disclosure, **saying**, "The more transparent we can be as a company, the more we can fix issues and the more we can inspire others to do the same."

The fact that some companies disclose their numbers without a problem shows that the arguments for secrecy don't hold up, said Joseph Bryant Jr., who leads the Rainbow PUSH Silicon Valley Diversity Project. The group's founder, the Rev. Jesse Jackson Sr., has been **pressuring** tech companies to share their EEO-1 numbers since 2014.

"Whatever the excuse may be has a lot to do with companies not wanting to be caught with their pants down," Bryant said. "I think there are some companies that are too embarrassed and too lazy to do any better. And it's easier to deflect than to adjust."

Asked how the government will handle objections going forward and how the public can trust its determinations, a spokesperson for the Office of Federal Contract Compliance Programs declined to comment.

But one thing is clear: It follows a long pattern of deference to private companies – unless faced with a lawsuit.

*This story was edited by Kate Howard and Andrew Donohue and copy edited by Nikki Frick. Will Evans can be reached at [wevans@revealnews.org](mailto:wevans@revealnews.org). Follow him on Twitter: [@willCIR](https://twitter.com/willCIR).*

## Related



**We sued the government for Silicon Valley diversity data**



**Judge backs Reveal's suit to end secrecy around Silicon Valley's diversity**



**How we analyzed Silicon Valley tech companies' diversity data**



**Here's the clearest picture of Silicon Valley's diversity yet: It's bad. But some companies are doing less bad**

© 2023 The Center for Investigative Reporting.

Proudly powered by Newspack by Automattic

# EXHIBIT T


USA TODAY

INVESTIGATIONS                                    **Workplace diversity**    Add Topic

# At mega-contractors like Raytheon, Moderna and Lockheed, diversity remains a challenge

**Jayme Fraser and Nick Penzenstadler, USA TODAY and Will Evans, Reveal**
Published 6:00 a.m. ET April 19, 2023 | **Updated 12:27 p.m. ET April 19, 2023**

Executives at companies that receive billions of dollars in federal contracts were less likely to reflect America's diversity than their employees, according to a first-ever analysis by USA TODAY and Reveal from The Center for Investigative Reporting. Some have been sued for workplace discrimination.

In 2020, 21 companies each were paid more than $3 billion by the federal government, including defense contracting giants like Lockheed Martin and pharmaceutical companies like Moderna, one of the pioneers of the COVID-19 vaccine.

People of color were underrepresented among executives at these corporations compared with the rest of their workforce, the analysis showed. And women were less likely than men to break into top ranks, particularly those of color.

Such disparities have long been documented by researchers and in the historically limited public information about demographics at American companies, including a USA TODAY database of S&P 100 corporations.

## Why does the diversity of companies receiving public dollars matter?

The disparities highlight how tax dollars can reinforce gaps in wealth and opportunity for women and people of color.

Dr. Joseph Bryant Jr., who leads the Rainbow PUSH Silicon Valley Diversity Project founded by the Rev. Jesse Jackson, said public money should advance equity in the country.

"Either the government should be giving more money to minority businesses or the government should be giving money to businesses that make diversity and inclusion a priority," he said.

Donald Tomaskovic-Devey, who runs the Center for Employment Equity, said making the data public allows people to compare companies and hold them accountable for their hiring practices. He said diversity, equity and inclusion officers also could use the data to benchmark their companies' performance against competitors.

"I hope that in the long run this empowers the DEI staff in these firms to push their firms to do better," said the sociology professor from the University of Massachusetts, Amherst.

Why is this the first time this information has been available about federal contractors?

The data is the largest trove of corporate diversity information ever made public after a yearslong legal battle by Reveal seeking the reports filed by government contractors each year to the Equal Employment Opportunity Commission. It includes more than 19,000 federal contractors. More than 4,000 others have objected, and their information remains in limbo pending further litigation.

The Department of Labor has argued it can't release contractor diversity reports without notifying each company. It has so far sided with companies that argue the reports should be considered confidential business information — even though a federal judge has ruled those records should be made public.

## Could this lead to more public information about company demographics?

Researchers say Monday's release could be a crucial step toward the public being able to see all summary diversity data collected on this federal form, not just the demographics of government contractors.

"This could be what breaks the logjam," Tomaskovic-Devey said. "If the vast majority of firms were willing to release these data, what does that say about the defense that this is a trade secret? "

**Progress stalls at the top:**Few white women and people of color lead S&P 100 companies.
**'If I can do it, I know you can:'**Meet the Black CEO fighting for diversity.

**Racial justice:** How George Floyd's murder could change corporate culture.

## What does the new data show about the diversity of federal contractors?

Many of the companies receiving the most money from federal contracts do work for the Department of Defense.

Topping that list in 2020 at more than $51 billion in public money is Lockheed Martin, the Washington, D.C.-based aerospace and security giant. That figure does not include its subsidiaries. For instance, Sikorsky Aircraft received $4.6 billion in federal contracts that year, ranking 11th.

Neither company appeared in the five years of data released Monday by federal officials. But Lockheed Martin has published a copy of its demographic report online since its 2020 filing. That document shows white, non-Hispanic men held 68% of executive jobs despite being 34% of the U.S. workforce. They had no executives who were Pacific Islander or American Indian. And Hispanic women held just two of the 356 executive jobs despite accounting for 7% of the U.S. workforce.

"At Lockheed Martin, we believe that our commitment to diversity and inclusion is a business imperative, helping to drive our innovation and global leadership," wrote company spokesman Richard Sant.

USA TODAY found similar trends — white men holding a disproportionate number of top jobs and women of color having the least representation — at other companies receiving billions of dollars, such as Boeing, Raytheon, Humana, General Electric and Honeywell.

A Texas father-daughter attorney team of Elizabeth "BB" and Brian Sanford represent employees suing major defense contractors.

Brian Sanford says the Pentagon should do more to audit employment relations from its largest contracts.

"Just hold them to the basic standard. It's our tax dollars — they should be following the law," Sanford said. "There is a lot of power in saying 'You don't get this $1 billion contract if you do this.' They'll listen to that."

## What do companies have to say about this release?

Few of the 21 companies that received the most federal contract money in 2020 returned a request for comment about their diversity track record.

Companies often argue that the reports must be kept secret because they could give competitors valuable information about their workforce, even allowing other firms to lure away diverse talent.

For example, Oracle has objected to the release of its data in the past by saying it could lead to a "raiding of minority or female employees," though the company posted a more recent copy of its federal report online.

*Contributing: Jessica Guynn. This article was produced in collaboration with Reveal from The Center for Investigative Reporting, a nonprofit investigative newsroom.*

*Have a tip? Reach Jayme Fraser at jfraser@gannett.com or on Twitter @jaymekfraser, Nick Penzenstadler at npenz@usatoday.com or @npenzenstadler, or on Signal at (720) 507-5273, Jessica Guynn at jguynn@usatoday.com, or Will Evans at wevans@revealnews.org or on Signal at (510) 255-0865.*

# EXHIBIT U

The Wayback Machine - http://web.archive.org/web/20081224004419/http://www.intel.co...



**Diversity at Intel**

Our Vision

Our Commitment

Our People

Community Connections

Workforce Demographics

Awards and Recognition

Home › About Intel › Diversity ›

# Workforce Demographics



Intel's efforts to be a workplace of choice and a good neighbor in our communities are driven by a combination of social responsibility and principles of ethical business practices. These policies and practices help our employees achieve their personal and professional goals, while supporting Intel initiatives that make technology more accessible for everyone.

## Equal employment opportunity

Intel respects and values the unique perspectives and opportunities that a diverse workforce provides. We also welcome diversity in our customers, our suppliers and the global marketplace.

Our Principles for Responsible Business reflect our commitment to provide equal employment opportunity for all applicants and employees without regard to non-job-related factors, such as:

- Age
- Disability
- Gender
- Gender identity
- Marital status
- National origin or ancestry
- Race or color
- Religion
- Sexual orientation

This policy applies to all areas of employment, including recruitment, hiring, training, promotion, compensation, benefits, transfer and social and recreational programs. Intel prohibits harassment of any individual on any of the bases listed above.

## Affirmative action objectives

As a government contractor, Intel is committed to ensuring that women, minorities, people with disabilities, Vietnam Era veterans and disabled veterans are appropriately represented in the workplace. Intel prepares an Affirmative Action Plan each year at each site. The plans assess the utilization of minorities and women in the workforce and set forth our commitment to make good faith efforts to overcome any under-representation that has been identified.

**Related resources**

Awards and News

Corporate Responsibility

Environment

Grants and Donations

Intel® Innovation in Education

Intel in Your Community

Supplier Diversity Program

Back to Top ^

# EXHIBIT V



**PBS NEWS HOUR**

# Google finally discloses its diversity record, and it's not good

Nation   May 28, 2014 6:00 PM EDT

## GOOGLE'S WORKFORCE — ⬤ PBS NEWSHOUR

| GLOBAL TOTALS | OVERALL | TECH | NON-TECH | LEADERSHIP |
|---|---|---|---|---|
| **MEN** | 70% | 83% | 52% | 79% |
| **WOMEN** | 30% | 17% | 48% | 21% |

| U.S. TOTALS | OVERALL | TECH | NON-TECH | LEADERSHIP |
|---|---|---|---|---|
| **WHITE** | 61% | 60% | 65% | 72% |
| **ASIAN** | 30% | 34 | 23% | 23% |
| **BLACK** | 2% | 1% | 3% | 1.5% |
| **HISPANIC** | 3% | 2% | 4% | 1% |
| **OTHER\*** | <1% | <1% | <1% | <1% |
| **TWO OR MORE\*\*** | 4% | 3% | 5% | 1.5% |

Source: Google Inc.

Totals and % denominators do not include unknown, null, or "decline-to-state" fields.
\* "Other" category includes: Native Hawaiian, Native American, and Pacific Islander.
\*\* "Two or more races" category includes all Googlers who identify with more than one race.

In an industry that has been famously guarded about its workplace diversity, Google on Wednesday disclosed its record when it comes to hiring women, African-Americans and Hispanics. The data reveals statistics that the company itself admits are too low and strikingly below other industry averages.

Women comprise just 17 percent of its global tech workforce, according to data Google published on its website and released exclusively to the PBS NewsHour. When it comes to leadership, women only account for 21 percent of the top positions in the company,

which has a workforce of just under 50,000 people.

Google, which has been under rising pressure along with other tech companies to release diversity data, also reported that blacks comprise just one percent of all tech employees in the U.S. Hispanics account for two percent of the tech workforce in the U.S. Asians account for 34 percent of the company's U.S. tech workforce.

When it came to its overall workforce around the world, 30 percent of Google's employees are women. But in the U.S., racial and ethnic data show that 61 percent of the workforce is white, 30 percent are Asian, three percent are Hispanic and two percent are black. Four percent are two or more races.

The data shows that Google trails others when it comes to the tech workforce in particular.

Hiring numbers are generally considered a closely guarded secret among Silicon Valley companies and **reliable numbers are hard to come by**, but prior reports have shown that fewer than six percent of tech engineers are either black or Hispanic. Other reports have found the industry's norm of women employed in the technical workforce are roughly 20 percent or a bit higher. When it comes to engineers, one survey of 133 startups done by an engineer at Pinterest found 12 percent of engineers were women.

"We're not where we want to be when it comes to diversity," Laszlo Bock, Google's senior vice president of "people operations," told the NewsHour in a statement prior to a broadcast interview Wednesday. "It is hard to address these kinds of challenges if you're not prepared to discuss them openly, and with the facts. All our diversity efforts, including going public with these numbers, are designed to ensure Google recruits and retain many more women and minorities in the future."

Google and other major tech companies have been the target of increasing pressure to hire more women and minorities — and to become far more transparent about whom they have hired until now. Companies with more than 100 employees are required to file that information with the U.S. Equal Employment Opportunity Commission but the EEOC says it is legally prohibited from making that data public. The employers are not under any obligation to make that data public in most cases.

Past efforts to obtain that data — including a **major effort by CNN** back in 2011 — have only yielded partial information about a handful of companies. When CNN tried to persuade leading tech companies to disclose its hiring numbers, 17 of them refused. Until Google's disclosure Wednesday, only a few major technology companies, including **Intel**, have publicly posted that information. Google's own record on this issue has been the focus of articles in the **New York Times** and the **San Jose Mercury News**, among others.

But public campaigns have stepped up the pressure — just this spring, **Jesse Jackson visited Google's shareholder meetings** in Silicon Valley. Google officials told the NewsHour that the company had been "working toward disclosing this for the better part of the year" and said Google invited Jackson to its meeting last month where the company promised for the first time to release the numbers.

The tech giant was praised for its new commitment to transparency but its record on diversity was criticized.



Most technology companies have guarded their hiring information but on Wednesday Google released its data for the first time. Photo by David Paul Morris/Bloomberg/Getty Images

Vivek Wadhwa, an entrepreneur and <u>vocal critic of the Silicon Valley's hiring practices</u>, said he was disappointed by Google's record and contends the company had "no excuses" for it.

"About a quarter of today's pool of highly experienced software developers is female, and a company such as Google — which has its pick of the crop of new graduates as well as experienced engineers — should have far greater diversity," Wadhwa wrote in a post for the NewsHour.

Telle Whitney, the president and CEO of the Anita Borg Institute, a not-for-profit that works to foster a more welcoming culture for women in tech, said Google's disclosure is a significant step.

But she told the NewsHour in a statement, the numbers themselves are below what they should be.

"We are delighted that Google and other companies are being more transparent about the percentage of women in their workforce," Whitney said. "That being said, the numbers are not good. Google's technical workforce is made up of only 17 percent women, which is lower even than the abysmal norm of 20-24 percent."

Wednesday's announcement comes amid other developments of late that are casting a harsher spotlight on how the tech sector deals with women and minorities. Companies are increasingly criticized for a culture that too frequently fails to recruit, promote and retain women, especially at the leadership levels. In some cases, companies have are being accused of fostering a kind of "bro culture" that is unwelcoming to women. And there are several high profile stories of late that paint a picture of workplaces where outright sexism and misogyny persist. Engineer Julie Horvath **accused Github of gender discrimination** and intimidation after announcing her resignation last month, triggering an internal investigation. Just last week, several female tech leaders posted an **open letter** blasting parts of the culture, citing the Github case and other offenses in the industry.

Google itself has not been publicly accused of any of those kinds of allegations. But it has been called to disclose more information about its hiring record and particularly what has happened to the role of women. Company officials say today's announcement is the first of a number of moves to attract and retain more female talent in tech and engineering.

Wadhwa says he believes Google's decision to disclose is another important chapter in a story that may be starting to move in a different direction.

"I think this will put pressure on other companies to release their gender data — which is good because it will lead to change," Wadhwa said. "Look at all the companies that are now adding women to their boards because they were shamed into it.Things are changing. Silicon Valley can be arrogant and insular, but at the end of the day, it does listen."

*PBS NewsHour's coverage online includes guest columns by both Vivek Wadhwa and Telle Whitney — along with an article about the state of STEM education, how the gender gap has grown and what approaches are being tested to reduce it.*

*By —* **Murrey Jacobson**

 **@MurreyJacobson**

# EXHIBIT W

# Microsoft releases diversity stats: How the tech giant sizes up

Microsoft's CEO Satya Nadella kept his promise and released the tech giant's federally-mandated diversity numbers to public scrutiny.

In mid-December, Microsoft (MSFT) quietly released its EEO-1 form, a federal filing that outlines employment data by race and gender according to job type. While Microsoft has diversity in its highest ranks, including an African-American board chairman, an Indian CEO and a female CFO, the overall statistics are less flattering: the company is 60.6% white and 71% male, according to its EEO-1 form.

Under the Civil Rights Act of 1964, every company is required to file file an EEO-1 form, listing employment data by race/ethnicity, gender and job category. The federal government is prohibited from making any of the compliance surveys public.

*Learn more about diversity in tech from Fortune's video team:*

A host of tech companies have revealed their diversity numbers in the last year, although some big name firms have remained stubbornly silent, including Amazon (AMZN), IBM (IBM) and Oracle (ORCL).

At Microsoft's annual meeting on Dec. 3, Nadella vowed to publicize EEO-1 numbers after Rev. Jesse Jackson called on the tech industry to improve its diversity. Microsoft had released only certain diversity data points since 2006.

So, how does Microsoft compare to other tech companies?

Fortune.com examined the data released so far, which includes 10 tech companies' federal EEO-1 filings, some company blog posts and annual corporate reports. That means there could be slight differences to how the information was collected and categorized. It's not an entirely parallel comparison, but it does provide some insights.

Here's how Microsoft stacks up.

## Not the most male-dominated

Overall, the Microsoft staff is heavily male, with just 29% of the staff female. But that is not the most male-dominated company. That award goes to Intel, which is 23% male. However, Microsoft's stat is still impressive (in a negative way), considering that the company has 128,000 employees worldwide.

"We have work to do at Microsoft and across the industry," wrote Nadella in an internal memo prior to the EEO-1 release. "These numbers are not good enough, especially in a world in which our customers are diverse and global."

## Few women at the top

Even getting more women in the door at tech companies doesn't mean they will advance into managerial roles within the firm. There are few women in leadership roles at companies like Google (GOOG), Microsoft and Facebook (FB).

Nadella and other tech CEOs have created various initiatives to hire more women and minorities, such as prioritizing diversity when recruiting and developing training programs to promote inclusion.

## Even fewer women in STEM jobs

The gender imbalance is even more pronounced when you examine the technical ranks; only 17% of programmers, coders and other engineering-type roles are held by women at Microsoft. Microsoft's standing -- though average for the industry -- is still better than Twitter's (TWTR) 10% female tech headcount.

In part, the problem starts long before the hiring process even begins, as women account for only 18.2% of computer science graduates, according to the National Science Foundation.

## An obvious racial and diversity gap

When it comes to overall racial and ethnic diversity, Microsoft falls toward the back of the pack, with 61% of employees identifying as Caucasian. Yahoo (YHOO) has a 50% Caucasian headcount, though Apple (AAPL) has a greater percentage of minority workers, especially among Hispanic (11%) and black (7%) employees.

## The diversity gap in the executive ranks

Microsoft does a bit better than its peers when it comes to having a racially and ethnically-diverse leadership. Whites hold 72.2% of all leadership roles at Microsoft, compared to about 78% at Yahoo.  Facebook also has a similar diversity gap, with about 74% of leadership identifying as white.

Tech companies know that their numbers aren't anything to be too proud of: Apple's stats, which were revealed in a blog post, came with a sort of apology from CEO Tim Cook: "As CEO, I'm not satisfied with the numbers on this page. They're not new to us, and we've been working hard for quite some time to improve them."

Execs at other tech companies issued similar statements with their diversity revelations. "Put simply, Google is not where we want to be when it comes to diversity," Laszlo Bock, Google's senior vice president of people operations, said.

Nadella also has acknowledged that Microsoft still has work to do: "I envision a company composed of more diverse talent. I envision more diverse executive staff and a more diverse Senior Leadership Team. Most of all, I envision a company that builds products that an expansive set of diverse and global customers love."

*Watch more about Microsoft from Fortune:*

[fortune-brightcove videoid=3921421258001]

# EXHIBIT X



**BETTER WORKPLACES**
**BETTER WORLD™**

# Diversity Annual Reports Yield Business Benefits

By Rebecca R. Hastings, SPHR

October 10, 2012

Few organizations have the resources available to publicize their diversity and inclusion efforts in a glossy, full-color diversity annual report, experts say. However, there are good business reasons for small employers to consider sharing their diversity story and ways to do so that won't break the bank.

Diversity annual reports are most common among *Fortune* 50 or other large organizations, according to Jennifer Brown, president and owner of a New York City-based leadership and diversity consultancy. That's because organizations must have a track record in diversity and inclusion, as well as commitment from the top, to produce such a document, Brown told *SHRM Online*. After all, such reports are "shared externally with the world," she said, and must therefore be produced and vetted like a marketing piece.

To justify the time and resources needed to produce a diversity annual report, an organization needs to be clear about the report's purpose.

Some companies use their diversity annual report to communicate their employment brand to prospective applicants. For example, on Aug. 28, 2012, Kellogg Company issued a news statement announcing the release of its third **diversity and inclusion report** (http://www.kelloggdiversityandinclusion.com/). The report, titled "Features," outlines "the company's efforts toward building a diverse workforce reflective of the consumers it serves and the communities in which it operates," according to the statement.

"Fostering diversity within our workforce and our supplier base is not just the right thing to do; it's critical for helping us achieve our strategic vision," said John Bryant, president and chief executive officer, Kellogg Company, in the statement announcing the report. "An actively inclusive, welcoming and respectful work environment promotes employee engagement, drives innovation, improves retention and boosts productivity—all of which contribute directly to our bottom line."

Similarly, on Dec. 7, 2011, Sodexo Inc., a global provider of "quality of daily life solutions," announced the release of its **diversity and inclusion annual report for North America** (http://viewer.zmags.com/publication/26069029#/26069029/1). The report "reveals the business rationale for Sodexo's commitment to diversity and inclusion by providing examples of how it drives the company's ability to attract, develop, and retain the best talent, foster an engaged and committed workforce, and deliver innovative quality of life solutions to their clients and customers," according to the news release.

Few companies achieve this level of clarity, however. "Most companies have not considered incorporating diversity into the development of their employer brand," according to a presentation posted on the *Employer Branding Today* website on Sept. 12, 2012. This is problematic, it added, because companies that do not manage part of their employment brand through diversity "will be at a disadvantage in the war for talent."

**Should You Produce a Diversity Annual Report?**

9/12/2019       Diversity Annual Reports Yield Business Benefits

Experts say there are a number of factors to consider before publicizing diversity results.

Eric C. Peterson, MSOD, manager of diversity & inclusion (D&I) for the Society for Human Resource Management (SHRM) said that an organization's decision to publish a diversity annual report—or to include D&I in its main annual report—will depend on whether the organization sees any inherent value in diversity and inclusion or has a good story to tell.

If the organization meets these criteria, "there's no reason to not put something out there," Peterson told *SHRM Online*. "If they have enough good stuff going on that can be backed up with data, it could make a real difference for consumers, job seekers, potential suppliers and members of the surrounding community," he explained.

If an organization's D&I story is not a good one, however, it's not going to tout it too strongly, he added.

Even if an organization does publish a report of some kind, "it doesn't mean that the story is a perfect one ... it's likely there's something that they aren't telling us," Peterson noted.

"The value of a diversity annual report depends upon the extent to which it complements the organization's overall diversity and inclusion strategic framework," Peter Bye, president of MDB Group Inc., a New Jersey-based diversity and intercultural consultancy, wrote *SHRM Online* in an e-mail. "To be effective, a diversity annual report should be part of an internal and external communication plan that is itself an integral part of the D&I strategy."

"It should communicate strategic goals, progress and accomplishments in all areas of focus in the strategy," Bye explained. "If, for example, a [D&I] strategy focuses on workforce diversity, supplier diversity, community relationships, philanthropy, investments and reputation, then these should be included in the report. Used in this strategic way the diversity annual report provides useful information, conveys commitment and business purpose, and helps build the organization's reputation."

**Deciding What to Include**

Diversity annual reports are fairly easy to find online. Some of the examples reviewed for this article include **Citi's 2011 Global Diversity Report** (http://www.citigroup.com/citi/citizen/people/diversity/annualreport.htm), **Warner, Norcross and Judd, LLP's 2011 Diversity and Inclusion Annual Report** (http://www.wnj.com/About-Us/Diversity/Diversity-Annual-Report) and **Deloitte's Diversity & Inclusion Annual Report** (http://www.deloitte.com/assets/Dcom-UnitedStates/Local%20Assets/Documents/DAR_sm%20FINAL.pdf).

Reports vary in length, though 24-36 pages is common.

The following are some of the elements found in various reports:

- The organization's business case or rationale for diversity and inclusion.
- A history of the organization's diversity journey.
- The diversity and inclusion vision, mission and strategy.
- Diversity goals and progress toward achieving those goals, often depicted in colorful tables or charts.
- A list of employee resource groups and how they are structured.
- A description of programs and events held that year.
- A list of internal diversity council members or external diversity advisory group members, or both.
- A list of outside groups with whom the organization partners, such as veteran support groups.
- Descriptions of programs that demonstrate a focus on either the local community or that have a direct link to the organization's purpose, such as health care.
- Information on the organization's efforts to support diverse suppliers or reach diverse market segments.
- A list of diversity-related awards and honors the organization received that year.

**Use Photos to Demonstrate Visible Diversity**

Feedback

Most diversity reports include photographs of employees, often accompanied by testimonials or stories and a statement by a top leader of the organization. Although the use of stock photos in annual reports is an accepted practice, experts suggest organizations select photographs carefully for diversity reports.

Joyce Bender, CEO of Bender Consulting Services Inc. and chair of the American Association of People with Disabilities' board of directors, encourages organizations to use photographs of employees or other people with disabilities, rather than able-bodied models posing as people with disabilities. In addition, she recommends the use of photographs of people who are blind or deaf, as well as those who live with epilepsy, autism or an intellectual disability. "I would also include veterans with disabilities," she wrote *SHRM Online* in an e-mail.

"If the company doesn't have personal photos of people that demonstrate different aspects of diversity you should get them," Brown added. "You should have a constant refresh of pictures."

**Add Numbers to Demonstrate Results**

Many diversity annual reports contain statistics on the workforce representation of individuals from various demographic groups. Some reports contain several years' worth of company data to show progress over time, while others compare the organization's results to national or global workforce demographics.

This presents a dilemma for some organizations, Brown noted, especially when the data shows that the organization hasn't made as much numerical progress as it would like. This might result in an attempt to downplay poor results and emphasize positive ones.

"Most annual reports are more of a public relations tool than a real measure of a company's diversity efforts and success," Dr. Denise Ajeto, principal of a Seattle-based diversity consultancy, wrote *SHRM Online* in an e-mail message. Thus, organizations can highlight a few areas in which they are doing well, even as they make relatively little progress in what she considers the "real measures" of diversity and inclusion, such as the representation of women and people of color in certain job classifications and higher levels of management, employee satisfaction survey scores and employee retention, she noted.

"Representation numbers are lagging indicators," Brown explained. "They show up after an inclusive environment is created. There are many things that need to be in place in order to move those representation numbers."

"It's like taking a snapshot of a moving target," she added.

Because there's an expectation that an annual report will include numbers, Brown suggested that organizations redefine the numbers they use and find different ways to measure success. For example, an organization can focus on the growth of employee resource groups or share promotion rates by group, rather than simply counting the number of people they have.

**Other Ways to Use a Diversity Annual Report**

Knowing that the organization will need to publish a diversity annual report summarizing a year's worth of work could motivate business leaders to use such a tool strategically. "Design your annual report a year ahead and use it as an aspirational tool—a starting point—for planning and accountability," Brown suggested. Ask "What don't we have organizationally that we need to put into place to achieve the results we want?" she added.

It's just as important for annual reports to capture where the company is going as it is to capture where the company has gone, Brown noted.

Organizations should not ignore the opportunity to recognize employee efforts, Brown said, such as acknowledging that a sale was made because a diverse group leveraged their network or **that a group made a notable contribution to a marketing campaign** (www.shrm.org/publications/hrnews/pages/60secondsofsilence.aspx).

In addition, organizations can use their report to help solve a particular problem, such as attracting recent college graduates. "Always keep the audience in mind," Brown said.

Feedback

Smaller companies might have to be a bit more creative, she acknowledged, because they'll have fewer resources to work with. In that case they might want to broaden the focus of the report by adding corporate social responsibility or innovation, she said.

"It's a clarifying exercise," she added. "It gets everyone together to ask 'What are we most proud of? What is most essential?'"

*Rebecca R. Hastings, SPHR, is an online editor/manager for SHRM.*

**Related Resources:**

**Creating a Strategic Diversity Management Plan**

(www.shrm.org/hrdisciplines/Diversity/Articles/Pages/StrategicDiversityManagementPlan.aspx)

**Mine Diversity Awards for Program Ideas** (www.shrm.org/hrdisciplines/Diversity/Articles/Pages/Mine-Diversity-Awards-for-Program-Ideas.aspx), *SHRM Online* Diversity Discipline,September 2012

**Quick Links:**

*SHRM Online* **Diversity page** (www.shrm.org/hrdisciplines/Diversity/Pages/default.aspx)

**SHRM Connect Diversity & Inclusion community** (http://community.shrm.org/SHRM/Communities/ViewCommunities/CommunityDetails/? CommunityKey=42bb115c-5dea-4fc7-ac40-616b4ebbafa1)

Keep up with the **latest Diversity news** (www.shrm.org/Publications/E-mailNewsletters/Pages/default.aspx).

# HR DAILY NEWSLETTER

News, trends and analysis, as well as breaking news alerts, to help HR professionals do their jobs better each business day.

Email Address

## CONTACT US (WWW.SHRM.ORG/ABOUT-SHRM/PAGES/CONTACT-US.ASPX) | 800.283.SHRM (7476)

© 2019 SHRM. All Rights Reserved

SHRM provides content as a service to its readers and members. It does not offer legal advice, and cannot guarantee the accuracy or suitability of its content for a particular purpose.

Disclaimer (www.shrm.org/about-shrm/Pages/Terms-of-Use.aspx#Disclaimer)

# EXHIBIT Y

Your donation helps protect democracy.     DONATE

INEQUALITY, SILICON VALLEY DIVERSITY, WORKED OVER

# Hidden figures: How Silicon Valley keeps diversity data secret

by **Will Evans** and **Sinduja Rangarajan**
October 19, 2017



As Silicon Valley struggles with inclusion and discrimination, most of the area's tech companies won't share raw numbers on workforce demographics with the public. Slack is one of 188 Silicon Valley tech companies surveyed by Reveal that have not released the numbers they report to the government on employee diversity. Instead, Slack and some other companies create their own diversity reports, such as the 2017 report pictured here. Credit: Photo illustration by Gabriel Hongsdusit/Reveal

When the popular messaging platform Slack won a fastest-rising startup award last year, the company sent four black female engineers to accept it.

Onstage at the TechCrunch awards show, one of the women praised Slack's diversity, **citing** a statistic from the company's **2016 diversity report**: 9 percent of Slack's engineering team were black, Latina or Native American women.

"THIS Is What Diversity In Tech Should Look Like," said one **HuffPost headline**.



At the 2016 TechCrunch awards in San Francisco, four black female engineers at Slack – from left to right, Megan Anctil, Erica Joy Baker, Kiné Camara (at microphone) and Duretti Hirpa – accept the award for fastest-rising startup. In her speech, Camara cited a number from a Slack employee diversity survey that the company later acknowledged was flawed. Credit: TechCrunch Credit: Reveal

It turns out that number came from an anonymous employee survey that Slack later acknowledged was flawed. While the company had said 6.9 percent of its technical team was black, for example, this year's **diversity report** admitted the number should have been 4.3 percent. No mention was made of women of color this year.

How many women of color do work at Slack? The answer is on a one-page form Slack and all companies with 100 or more employees send to the federal government each year. The forms – called **EEO-1 reports** – show

hard numbers of employees broken down by race, gender and job categories such as professionals, managers and executives. But Slack won't make it public.

Even as California's Silicon Valley struggles with diversity and discrimination, most of the area's tech companies won't share that basic data with the public. Reveal from The Center for Investigative Reporting sought the government-mandated **EEO-1 reports** from 211 of the biggest San Francisco Bay Area-based tech companies as part of an ongoing project examining diversity data in Silicon Valley.

The requests included the **top 150 publicly traded tech companies,** as compiled by The Mercury News in San Jose, and dozens of Bay Area "unicorns," or private companies worth at least $1 billion, as estimated by research firms **Crunchbase** and **CB Insights**. Of the 211 companies surveyed by Reveal, only 23 released their most recent reports. One of those 23, Clover Health, now says its report might be inaccurate.

Still, the 23 reports represent the **largest public collection** of EEO-1 figures that name Silicon Valley tech companies. A few private companies – **Pinterest**, **23andMe**, **View** and **Clover Health** – released their raw numbers for the first time. So did public companies **Square**, a payment processing platform, and **MobileIron**, which specializes in mobile security. Chipmaker **Nvidia** also released its latest report exclusively to Reveal.

Companies are under no legal obligation to release the reports, and the government keeps them confidential. But a recent push for transparency led some tech giants, including **Google** and **Facebook**, to share their raw numbers.

# Silicon Valley employees by race

**Professionals** | Managers/executives | All employees

Reveal from The Center for Investigative Reporting compiled data from 22* Silicon Valley tech companies that publicly released their government-mandated EEO-1 reports for 2016. "Underrepresented minorities" includes all employees, excluding those who are white or Asian. Reveal counted Asian employees separately because they tend to be more represented than other minority groups in Silicon Valley. Read more on Reveal's methodology.

Sort by:

Underrepresented minorities | Asian | White



Credit: Scott Pham, Sinduja Rangarajan, Bethney Bonilla and Will Evans/Reveal

Source: Reveal research

Note: Clover Health released its EEO-1 form, but a company spokeswoman said she thinks the company's data may be incorrect. We have excluded it from our charts.



Most others – including name brands such as Dropbox, Instacart, Netflix, PayPal, Pandora Media, Reddit and Tesla – still resist or put out basic pie charts that can be misleading, difficult to verify and impossible to compare. Three companies the federal government has accused of discriminatory hiring – **Oracle**, **Palantir Technologies** and **Splunk** – also failed to disclose their demographics.

Since 2004, Alex Karp has led Palantir Technologies, a data analysis company that paid nearly $1.7 million earlier this year to settle government claims that it discriminated against Asian applicants. Palantir is one of many tech companies that have not made their EEO-1 forms public. Credit: Alex Brandon/Associated Press Credit: Alex Brandon/Associated Press

For tech firms that did disclose, the numbers were particularly stark for executives. **Twitter**, **Square** and **23andMe** did not report a single black, Latino or multiracial executive in 2016. Female executives who were black, Latina or multiracial were nonexistent at eight of the 23 companies, including Adobe Systems, Google and Lyft.

The EEO-1 reports often are criticized for using clunky, outmoded categories. The multiracial option, for example, doesn't specify races. And the "professional" job category **includes** both tech workers such as software engineers and non-tech employees such as lawyers, accountants and human resources specialists. Still, the raw numbers are the only standardized way to compare companies.

Among professionals, Google and Apple had some of the lowest proportions of women, with 25 percent or less. Nvidia sat at the bottom, with 16 percent. Google **fired** an engineer in August over a memo arguing that biological differences make women less suited to tech or management. For all of the firms, the vast majority of female professionals – 80 percent or more – were white and Asian.

For black professionals, Hewlett Packard Enterprise had the highest proportion at 6.4 percent, compared with 1.7 percent at Apple and less than 1 percent at eBay. The online auction company also had the lowest proportion of Latino professionals. Underrepresented minorities — including black, Latino, Native American, Pacific Islander and multiracial employees — made up 8.7 percent of Uber's professional workforce, compared to 14.2 percent for Lyft.

Asian employees generally were much better represented among professionals than managers or executives, where the ranks were usually whiter.

**A tight hold on data**

**Read**

**Silicon Valley diversity data: Who released theirs, who didn't**

The battle over disclosing demographics is old news to veteran diversity advocates such as Erica Joy Baker. She argues that tech firms should share much more: promotions, departures, salaries and company ownership – all broken down by race and gender.

"We're still having a fight about step one, we're still having a fight about the bare minimum," she said.

Baker was onstage as a senior engineer at Slack when the company won the startup award last year. But she couldn't move up the ladder, she said.

"I started getting really demoralized and thinking maybe I shouldn't be a manager," she said.

Baker got several outside offers and ended up as a senior engineering manager at the startup Patreon.

"So, OK, it wasn't me," Baker said of hitting a ceiling at Slack. "Who else is involved in that equation?"

Slack declined to say how many of its employees or managers are women of color. Its EEO-1 report would answer that question.

"As we continue to understand and pursue best practices for advancing inclusive environments and reporting diversity data, we may consider publishing our EEO-1 reports in the future, but we are not planning to do so at this point," a Slack spokeswoman wrote in an email to Reveal.

Fast-growing startups rarely have good processes for fairly evaluating and promoting engineers, which can hit people of color hardest, said Leslie Miley, a former engineering director at Slack and former engineering manager at Twitter. It's important, though, for companies to share their raw numbers, he said.

"How can you get better unless you are truthful about what the situation is?" he said. "I don't understand why companies don't share those publicly."

Diversity numbers rarely generate positive headlines, but they can make companies confront reality.

"Internally, it's that, 'Oh man, our numbers are coming out again, how do we look?' " said Judith Williams, who was head of diversity at Dropbox and a diversity manager at Google. "It forces a conversation both externally and internally."

## Relying on percentages

If they disclose any numbers at all, most companies offer limited pie charts on diversity webpages or in corporate diversity reports. They say the government reports don't reflect how they view their own workforce. The firms invariably use percentages instead of raw numbers.

"I think they don't want people checking their math," Williams said.

Some companies won't disclose numbers because they're afraid they'll get sued, said Pat Gillette, who was a defense lawyer for decades and is now a San Francisco-based mediator and speaker on gender diversity.

"They feel like if they put it out there, they open themselves up to potential class actions based on the numbers," she said, "which probably means they have a problem."

Corporate diversity reports, she said, are easier to control than the EEO-1 form.

"They can massage their numbers by how they define things. Because that's our job, that's what we do," Gillette said. "A lawyer can make pretty much anything look pretty good."

The CEO of cybersecurity company Lookout said on the company's diversity webpage that its numbers were "**on par with our peers in the tech industry**." But its stated percentage of black employees, 0.4 percent, is lower than all 23 companies that disclosed their raw numbers to Reveal. Lookout removed the "on par with our peers" language after questions from Reveal.

Lookout's diversity page said the company was "making our diversity metrics public to keep ourselves accountable for change." But Lookout wouldn't provide the numbers it reports to the government, calling it sensitive information.

San Jose-based Synaptics called the aggregated, nameless statistics "personal and confidential information." The subject is so sensitive that one prominent startup wrote in an email: "Off the record, I can tell you (the company) is proud of it's (sic) inclusivity."

Oracle – which is facing **government allegations** that it favored Asian job candidates and paid white male employees more than others with the same job title – provides a **basic gender breakdown** of its workforce but ignores race. Palantir Technologies, which **paid nearly $1.7 million** earlier this year to settle charges that it discriminated against Asian applicants, has a **diversity webpage** without any numbers. Tesla, fighting suits over **sexual** and **racial** harassment, doesn't share basic demographics either.

Instead of releasing raw numbers, Varian Medical Systems pointed to a **company report** that included percentages for only its 2016 summer intern program, which it said was 42 percent female and "54% ethnically diverse."

San Francisco-based Sunrun referred to a solar industry **diversity report** – paid for in part by Sunrun – that said the company was building a "belonging culture" without any specific numbers.

Even companies that pat themselves on the back for diversity didn't want to talk about numbers. Workday, an HR software company, stated that it "views diversity as a business imperative" in **announcing** a new director of belonging and diversity in 2016. But a spokeswoman declined to provide Workday's EEO-1 report.

When asked for an interview about the company's diversity efforts, spokeswoman Allison Kubota said in an email: "We don't have the resources."

Two years ago, Udacity, which provides online courses, **announced** that it had commissioned a study to "determine how we stack up when it comes to diversity matters."

A **company blog post** in December 2015 said, "In our next post in our diversity series, we'll share with you the results of this study." Then the company has been silent for nearly two years: no new diversity posts, no study results.

Udacity spokeswoman Amy Lester said the company has been too busy: "We've had a ton of growth and many product launches over the past few years and had planned to post something sooner." This month, Lester wrote by email that Udacity would publish an update "in the next month or so."

The company wouldn't release its demographic numbers. "We don't believe the past EEO reports reflect the current state of the company at this time," Lester wrote.

**A blind eye to women of color**

**Read**

**How we analyzed Silicon Valley tech companies' diversity data**

Even when companies put out diversity reports, they almost always have a big blind spot: **women of color**. There's usually a pie chart for race and another for gender, but rarely anything mentioning the representation of nonwhite women. (GitHub is a **rare exception**.)

"Women of color experience the most bias and most marginalization," said Erica Joy Baker, of Patreon. "That's a good metric for people to see and know, especially if you're using those data points to see where you're going to work."

# Female employees in Silicon Valley by race

**Professionals** | Managers/executives | All employees

Corporate diversity reports usually leave out any mention of female employees of color. Reveal used EEO-1 data released by 22* Silicon Valley tech companies to show how these companies compare in their representation of female employees. Read more on Reveal's methodology.

Sort by:

| Underrepresented minorities | Asian | White |



Credit: Scott Pham, Sinduja Rangarajan, Bethney Bonilla and Will Evans/Reveal

Source: Company websites, submissions to Reveal

Clover Health released its EEO-1 form, but a company spokeswoman said she thinks the company's data may be incorrect. We have excluded it from our charts.

It's part of a larger problem with diversity programs, said Y-Vonne Hutchinson, founder of ReadySet, a diversity solutions firm in Oakland.

"Because they are not thinking of women of color, they are not addressing the problems they face," she said. "Disproportionately, the beneficiaries of these initiatives tend to be white women."

The government-mandated reports do account for women of color. But the reports have their own pitfalls. The only gender options are male and female, excluding those with a nonbinary gender identity. There's no accounting for diversity of age, sexual orientation or disability. And social media companies employ different kinds of professionals from chipmakers, ride-hailing companies or health startups. Clover Health, for example, employs nurses and social workers in addition to software engineers.

There's another fundamental hitch: The numbers include guesswork. For all employees who decline to fill out forms identifying their race and gender, the company has to guess by looking at them. Judith Williams, the former Dropbox and Google diversity manager, said she's occasionally been called on for input when someone can't decide what race to label an employee.

"It can be, 'I have a thousand people I have to identify, I have to get it done by the end of this week, I am just going through as quickly as I can,' " Williams said. "They may have a when-in-doubt-just-click-this-box kind of thing. The problem is you just don't know."

Even people who self-identify might check the wrong box as a joke or protest, though that happens rarely, Williams said.

As with any data, there may be errors. Clover Health reported to the government that more than half of its executives were black women. It turns out that 31 black female administrative support workers were accidentally classified as executives, according to a spokeswoman. Also, 10 professional male employees classified as Pacific Islander should have been labeled Asian.

Yet the official government numbers are the only reliable way to compare demographics across companies and years. Journalists have been **asking tech companies** for their numbers for years, but were mostly **rebuffed**. (Newsrooms have their **own problems** with **diversity**.)

Then, in 2013, a Pinterest software engineer named Tracy Chou **called for hard numbers** on female engineers and started a spreadsheet to track it, causing some companies to open up. The next year, the Rev. Jesse Jackson Sr. started showing up at Silicon Valley **shareholder meetings** and **writing letters** to major tech companies, demanding that they release their EEO-1 reports.

"My leader saw that letter and got nervous, because we know what Jesse can do when he gets organizing," said Rachel Williams, Yelp's head of diversity and inclusion. "He can embarrass an organization."

Yelp released its **EEO-1 report** in 2014, but hasn't done it since then. In a phone interview, Williams indicated that she would provide a more recent report, then failed to do so despite repeated follow-up requests.



She criticized the government-mandated numbers as out of date and "probably not very interesting." She said the government forms were invented by "mostly white men" and can "perpetuate a system." More important, she said, is whether people of color are "feeling as though they're included, that they belong."

Under the leadership of Jeremy Stoppelman, Yelp in 2014 made public its EEO-1 survey – an annual report to the federal government that shows hard numbers of employees broken down by race, gender and job categories. It hasn't released the report since. Credit: Eric Risberg/ Associated Press

Credit: Eric Risberg/ Associated Press, File

"We're missing a lot when we make people choose a particular box that's designated by the government," she said. "If you talk to real people who are part black, part Hispanic – whatever 'Hispanic' actually means – part Irish, what box do you think you're supposed to choose?"

Yet when Yelp put out a **diversity report** this month, the company used the same government categories – with a lot less detail. Like so many other Silicon Valley firms, Yelp didn't account for women of color at all.

Jackson, in an interview with Reveal, called Rachel Williams' criticisms of the EEO-1 report "nonsense." "That's a diversion," he said.

Some companies, Jackson said, have slipped backward instead of making progress since his initial campaign. "We'll have to intensify our actions," he said. "TBD."

***Editor's note:*** *The Center for Investigative Reporting receives funding from Google News Lab. All editorial decisions* ***are made independently****; donors receive no preferential coverage and do not influence the direction or findings of our reporting.*

*Journalism organizations have their own problems with diversity. CIR doesn't file an EEO-1 report because we have fewer than 100 employees, but you can find our demographics **here**. They were compiled as part of **a survey** by the American Society of News Editors on race and gender in the newsroom. We're also working to increase the ranks of investigative journalists of color through the **Reveal Investigative Fellows** program.*

*Data fellow Bethney Bonilla contributed to this story. It was edited by Ziva Branstetter and copy edited by Nadia Wynter and Nikki Frick.*

*Will Evans can be reached at **wevans**@**revealnews.org**, and Sinduja Rangarajan can be reached at **srangarajan**@**revealnews.org**. Follow them on Twitter: **@willCIR** and **@cynduja**.*

## Related



**How we analyzed Silicon Valley tech companies' diversity data**



**Tesla and beyond: Hidden problems of Silicon Valley**



**We sued the government for Silicon Valley diversity data**



**How we analyzed Silicon Valley tech companies' diversity data**

© 2023 The Center for Investigative Reporting.

Proudly powered by Newspack by Automattic

# EXHIBIT Z

# Apple leadership is more than 80% white and male



SAN FRANCISCO — Apple's leadership remains mostly white and male despite growing pressure on technology companies to diversify their workforces from the board room to the rank-and-file.

Some 81% of the company's senior officials are men and 82% of them are white, according to a 2016 government filing Apple released Thursday.

Of 107 leaders in the Silicon Valley company, 10 are Asian men, four are Asian women, two are black men, one is a black woman and two are Hispanic men. There are no Hispanic women in the Apple leadership, according to the EEO-1, an annual report that Apple makes to the federal government.

Apple has faced and rejected shareholder proposals to increase the diversity of its executives and board.

**More:**Congressional Hispanic Caucus calls out Apple, Google, Facebook for hiring practices

**More:**Silicon Valley's race gap is getting worse, not better, new research shows

**More:**It's called the 'Pao effect' — Asian women in tech are fighting deep-rooted discrimination

Less than a third — 33% — of its global workforce and 23% of its technical staffers are women, according to Apple's estimates. It says 9% of its technical staffers are African American and 13% of them are Hispanic.

Apple says it's making progress. Some 29% percent of its leaders are women, up one percentage point from July 2016 to July 2017, the company said.

And, Apple says half of all new hires are from historically underrepresented groups in tech: women, African Americans, Hispanics, Native Americans, and Native Hawaiian and Pacific Islanders.

These efforts aside, white and Asian men still make up the majority of Apple's workforce.

Major technology companies such as Apple, Facebook and Google release pie charts to illustrate the demographics of their workforces. They also release a form they file with the federal government called the EEO-1.

In a statement, Apple said "The EEO-1 has not kept pace with changes in industry or the American workforce over the past half century. We believe the information we report elsewhere on this site is a far more accurate reflection of our progress toward diversity."

Since 2014 when Google released its demographics for the first time, technology companies have pledged to close the gender and racial gaps in Silicon Valley yet the gaps have been stubborn.

In fact, black and Hispanic representation is declining in San Francisco Bay Area technology companies, according to research published last month by the non-profit Ascend Foundation, which advocates for Asians in business.

The employment data from 2007 to 2015 examined by the Ascend Foundation showed that people of color are being denied opportunities from the entry level to the executive suite and are losing ground in the tech industry.

Thursday's diversity report was the first released by Apple since Denise Young Smith was named vice president of diversity and inclusion in May. Previously she served as head of human resources.

Last month, Smith apologized for controversial remarks she made during a panel discussion in Colombia.

"I focus on everyone," Smith said at a summit in Bogota when asked about whether she would focus on black women at Apple.

"Diversity is the human experience," she continued. "I get a little bit frustrated when diversity or the term diversity is tagged to the people of color, or the women, or the LGBT."

"There can be 12 white, blue-eyed, blonde men in a room and they're going to be diverse too because they're going to bring a different life experience and life perspective to the conversation."

In an email to her team at Apple that was obtained by TechCrunch, Smith wrote: "I regret the choice of words I used to make this point. I understand why some people took offense. My comments were not representative of how I think about diversity or how Apple sees it."

# EXHIBIT AA

# Barbara Lee calls on Apple, tech holdouts to release diversity data



SAN FRANCISCO — Rep. Barbara Lee, D-Calif., called on holdouts among the nation's technology companies to release federal data on the diversity of their work forces.

Lee was in Silicon Valley this week with two other members of the Congressional Black Caucus to turn up the heat on the tech industry to hire more African Americans.

"We have asked them all to release the data," Lee said in an interview on Tuesday.

Asked about major tech companies that have not yet released the information such as Apple, Lee said: "If they believe in inclusion, they have to release the data so the public knows that they are being transparent and that they are committed to doing the right thing."

Major technology companies such as Facebook and Google release their federal diversity data along with pie charts that illustrate the demographics of their workforces and recently did so for the second straight year. Intel has been releasing its federal diversity data to the public for years.

Amazon.com, which did not respond to requests from USA TODAY to release its diversity data in December, has now released the data, said company spokesman Ty Rogers.

Apple, one of technology's most powerful companies, has refused to make public that data that it routinely supplies to the U.S. Department of Labor on the demographics of their workers.

In December Apple spokeswoman Kristin Huguet declined to comment on why Apple would not release the data.

Huguet did not respond to requests for comment on Apple's federal diversity data.

Apple's global human resources chief Denise Young Smith pledged last month that Apple's upcoming diversity report would have "more transparency" than last year and would show an increase in hiring of women, African-Americans and Latinos.

"We did have some movement in our hiring or women and hiring of minorities," Young Smith said during the Fortune Brainstorm Tech conference in July.

Black lawmakers met on Monday with Apple CEO Tim Cook. Joining Lee was the caucus' chairman G.K. Butterfield, D-N.C., and Rep. Hakeem Jeffries, D-N.Y. The three also met with executives from Intel, Google, Pandora and SAP to discuss how to improve the troubling hiring record of tech companies.

"Apple seems to be moving in the right direction. Tim Cook wants his company to look like the country and I think they are very committed to doing everything they can do," Lee said.

For years, technology companies fought sharing any demographic information about their employees, claiming the information was a trade secret. Only in the past year or so have the industry's top companies opened up about the lack of diversity in their ranks.

Civil rights leader Jesse Jackson is urging all companies including high-profile start-ups such as Uber, Square, Dropbox, Airbnb and Spotify to release the federal diversity data, saying the tech industry must usher in a new era of transparency.

"Last year, Rainbow PUSH challenged over 25 tech companies to release their workforce diversity data. The data showed an abysmal record where Blacks and Latinos typically comprised just 2% of the overall workforce," Jackson said.

American companies collect and report information about their work forces to the federal government each year in a form called the EEO-1.

The EEO-1 is a standard form that breaks down race, ethnicity and gender of work forces by job classification.

EBay, Yahoo, LinkedIn, Microsoft and Twitter are among the major technology companies that have made public their EEO-1s.

But other companies chose instead to provide less detailed broad strokes information such as the percentage of tech workers or company managers who are women or minorities. Chief among those companies is Apple.

*Follow USA TODAY senior technology writer Jessica Guynn on Twitter: @jguynn*

# EXHIBIT AB

EMANUEL CLEAVER, II
FIFTH DISTRICT, MISSOURI

FINANCIAL SERVICES COMMITTEE
HOUSING AND INSURANCE SUBCOMMITTEE
RANKING MEMBER

OVERSIGHT AND INVESTIGATIONS SUBCOMMITTEE

http://WWW.HOUSE.GOV/CLEAVER

TWITTER.COM/REPCLEAVER

FACEBOOK.COM/EMANUELCLEAVER II

## Congress of the United States
## House of Representatives

March 6, 2019

The Honorable Alexander Acosta
Secretary
United States Department of Labor
200 Constitution Avenue, NW
Washington, DC 20210

Dear Secretary Acosta:

The Freedom of Information Act (FOIA) provides that any person has a right, enforceable in court, to obtain access to federal agency records, except to the extent that such records are protected from public disclosure by exemption or by special law enforcement record exclusion.[1] The United States Supreme Court has affirmed that the purpose of the FOIA is to ensure an informed citizenry which is both vital to democracy and a necessary tool for those who wish to hold their government accountable.[2] As much of the government's work continues to be delegated to private contractors, it is important that the spirit of accountability through transparency prevails, and that citizens retain the right to access information related to the oversight and compliance of private contractors in whom the United States has bestowed the public's trust.

It has come to my attention that several government contractors have asserted that data regarding the racial and gender makeup of their workforces, information critical to contract oversight, qualifies as a trade secret and/or privileged commercial information under exemption 4 of the FOIA.[3] These reports tread on the heels of a long history of firms seeking to enshroud information of public concern into well-guarded vaults of secrecy. Often seeking to avoid public scrutiny, it is my concern that the government could fortify the efforts of relevant contractors through interpretations of the FOIA that favor the presumption of non-disclosure. Specifically, I write out of concern that required EEO-1 forms, which enumerate the diversity of firms accepting the taxpayer money, may potentially be denied disclosure under Department of Labor Office of Contract Compliance Programs interpretation of the FOIA.[4][5]

I am respectfully requesting the following information before April 1, 2019:

- The number of and precise instances where the Department of Labor has released an EEO-1 report following the objection of a federal contractor pursuant to 29 CFR § 70.26 since January 1, 2017.

---

[1] Department of Justice. "The Department of Justice & The Freedom of Information Act," Updated October 30, 2018. https://www.justice.gov/archives/open/foia

[2] *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)

[3] Williams, Jamillah Bowman. "Why Companies Shouldn't Be Allowed to Treat Their Diversity Numbers as Trade Secrets," February 15, 2019. https://hbr.org/2019/02/why-companies-shouldnt-be-allowed-to-treat-their-diversity-numbers-as-trade-secrets

[4] Evans, Will. "We Sued the Government for Silicon Valley Diversity Data," April 26, 2018. https://www.revealnews.org/blog/we-sued-the-government-for-silicon-valley-diversity-data/

[5] Rangarajan, Sinduja and Will Evans. "We Got the Government to Reverse its Longtime Policy to Get Silicon Valley Diversity Data," November 15, 2018. https://www.revealnews.org/blog/we-got-the-government-to-reverse-its-longtime-policy-to-get-silicon-valley-diversity-data/

PLEASE REPLY TO:

☐ 2335 RAYBURN HOB
WASHINGTON, DC 20515
(202) 225-4535 (PHONE)
(202) 225-4403 (FAX)

☐ 101 WEST 31ST STREET
KANSAS CITY, MO 64108
(816) 842-4545 (PHONE)
(816) 471-5215 (FAX)

☐ 211 WEST MAPLE AVENUE
INDEPENDENCE, MO 64050
(816) 833-4545 (PHONE)
(816) 833-2991 (FAX)

☐ 1923 MAIN STREET
HIGGINSVILLE, MO 64037
(660) 584-7373 (PHONE)
(660) 584-7227 (FAX)



PRINTED ON RECYCLED PAPER

- Copies of letters of objection submitted by relevant technology companies relating to The Center of Investigative Reporting's 2017 Freedom of Information Act requests to the Department of Labor's Office of Federal Contract Compliance Programs.
- Whether or not the Department of Labor has decisively determined that consolidated EEO-1 reports for multi-establishment employers demands the same protections under exemption 4 of 5 U.S. Code § 552 as do other required EEO-1 submissions.
- Any established case law, rules, or regulations the Department of Labor believes would exempt consolidated EEO-1 reports from public disclosure.

While the disclosure of specific information about internal business strategies and initiatives may be determined to be privileged, it is my strong conviction that neither the spirit or letter of commercial information protections, or regulation of trade secrets as defined in 18 U.S. Code § 1839, would prevent the Department of Labor from disclosing consolidated government contractor demographic data under the FOIA. Several companies in competitive industries have voluntarily released consolidated EEO-1 forms, or diversity reports, lending scrutiny to the oppositional idea that disclosure of such information would create a significant competitive disadvantage in the hands of competitors. Further, the idea that non-consolidated forms provide competitors with insight of value into other protectable information begs evidentiary demonstration of the actual possibility and likelihood of significant harm. Also demanding further evaluation are private-sector claims that the disclosure of diversity information on required EEO-1 forms would deter employees from voluntarily reporting such information, thereby inhibiting the governments ability to collect reliable information, which pivot on arguments of derisory impact and dubious assumptions.[6]

It is my hope that the public and private interests entitled by the FOIA are receiving the appropriate balance, and I look forward to continued dialogue on this important issue.

Sincerely,

Emanuel Cleaver, II
Member of Congress

---

[6] https://www.documentcloud.org/documents/5448961-Palantir-Objection-to-FOIA-838133.html

# EXHIBIT AC

# After history of discrimination, these federal contractors fought to hide diversity data

As the only woman on a 10-person sales team at Dell Inc., Marsha Cipollone said she was pushed down and pushed out while less-experienced men were handed the plum accounts.

Cipollone said she was denied the training and support her male colleagues received and was set up to fail. She was fired in 2017 and sued, alleging discrimination, according to court records. She said she settled with the company in 2018.

That same year, the U.S. Labor Department's anti-discrimination office also documented systemic inequality at the company, finding that women and Black employees earned less than men and white workers in similar positions.

"Dell has very much typically been a white guy company," Cipollone said.

**More:** Broken promises: Federal contractors made diversity pledges. They didn't keep them.

But exactly how diverse Dell is – how many women and people of color it employs at all levels of the organization and how that stacks up against other companies – remains obscured.

When the federal government released a historic data set last month detailing employee diversity at more than 19,000 of its contractors, Dell was one of more than 4,000 companies missing because they objected to the release. And the Labor Department's anti-discrimination office – the same one that found inequality at Dell – has so far allowed the objectors to keep their diversity data secret.

USA TODAY and Reveal from The Center for Investigative Reporting compared the new diversity data with federal contractors receiving at least a billion dollars in contracts in 2020, according to federal spending records. A majority of those companies were left out of the data release, indicating they objected, despite accounting for more than $180 billion in federal spending in 2020. That includes at least a dozen companies – collectively reaping more than $100 billion – that paid to settle Labor Department findings of job discrimination over the last decade.

Companies that receive taxpayer-funded contracts are supposed to be held to a higher standard, and they're subject to audits by the Labor Department office charged with making sure contractors provide equal employment opportunities.

Dell agreed to pay nearly $10 million in back wages after repeated government findings of discrimination. The company called itself a "leader in pay equity and inclusion" and retained its status as a major federal contractor, with at least $2 billion in federal contracts to Dell or its subsidiaries in 2020 alone.

Dell didn't respond directly to questions about why it objected to releasing its diversity numbers. The company pointed instead to its own curated diversity report, which says its "people leaders" are 72% male and 71% white and doesn't include the standardized data that would allow it to be compared to similar companies, such as Apple, HP, IBM or Intel, which didn't object. "We believe in fair treatment in the workplace, regardless of race, gender identity, sexual orientation or religion," the company said in an emailed statement.

# Secret Reports Stymie Comparison Across Industries

Unlike subjective reports that can be manipulated to present a rosier picture of diversity, the data that federal contractors are required to submit to the Equal Employment Opportunity Commission shows the actual numbers of employees broken down by race and gender, for broad job categories like executives, professionals and service workers. The numbers allow for standardized comparison. They also show, for example, how many women of color are employed at different levels of a company, which many companies leave out of their customized reports.

Until recently, most companies didn't share standardized numbers with the public. Some companies say the job categories on the reports are too broad or misleading, and their annual diversity reports better reflect their workforce. Others are reluctant to be cast in a negative light or invite litigation.

In 2019, when Reveal sued the government for diversity data submitted by a group of tech companies, some argued they'd be vulnerable to rivals learning sensitive information or luring away their diverse talent. A federal judge disagreed, ruling that the diversity reports known as EEO-1s are not confidential business information. The Labor Department released those tech company records but has chosen not to apply that ruling to requests for more data. Several of those companies, including fitness company Fitbit and software company DocuSign, no longer object to the data's release. Others, such as PayPal, initially fought the data release but now share the annual reports publicly.

**Corporate diversity database:** A USA TODAY investigative series inside the nation's most powerful companies

Last month, in response to more requests and a lawsuit from Reveal, the department released five years of diversity data from companies that didn't object. An analysis of the data by USA TODAY found that federal contractors are failing to live up to the promise of equal opportunity, with white men dominating their executive ranks. Companies that did not fight public disclosure include defense contractors Raytheon and Boeing, which ranked among the highest recipients of federal contract dollars in 2020, as well as familiar names like Moderna, Pfizer, A&E Television Network and Sherwin-Williams.

Labor Department spokesperson Edwin Nieves said the agency hasn't allowed any companies to opt out of providing their EEO-1 numbers. Instead, Nieves said the department is required to give all contractors a chance to object and is withholding their data while evaluating those objections. Reveal is still pushing in court for the release of all contractors' data.

While the government gave contractors repeated opportunities to object over several months, lawyers warned companies to object or face the potentially brand-damaging consequences of transparency.

Lawyers advising contractors on meeting government anti-discrimination requirements are often focused on minimum compliance, not transforming company culture, said Mary-Frances Winters, CEO of The Winters Group, which provides diversity consulting to companies.

And company lawyers often don't want to reveal anything that could put the company at risk. That can pit the diversity team against the legal team, Winters said.

"We fight with lawyers all the time," Winters said. "The DEI office is saying, 'Let's be transparent,' because for them, it's about, where are the opportunities to be better? The legal people, while they're not necessarily against that, they're saying, 'Let's not share our weaknesses.' "

# After Discrimination, Promises About Equity and Inclusion, But No Data

As they gobble government money, big federal contractors are at different points on their diversity and transparency journey. Some, such as engineering and construction company Bechtel and health care company McKesson, didn't respond to any questions. Government services contractor Amentum said it would disclose EEO-1 data at some point: "Target date is unknown," a spokesperson said. And the pharmaceutical company Merck objected because the company considers those numbers confidential and not representative of the firm's diversity efforts, said spokesperson Bob Josephson. But when asked about its objection, the company provided Reveal all five years of data anyway.

Lockheed Martin's data would have shown how many people of color the company employed at different levels back in 2017 and 2018, when the Labor Department's anti-discrimination office found the defense contractor had discriminated against Asian, Black and Latino or Hispanic job seekers. But Lockheed objected to the Labor Department's release.

In 2020, Lockheed denied wrongdoing and expressed its commitment to diversity, but agreed to pay $700,000 and hire 34 of the rejected applicants.

In an emailed statement, the company noted that it posted its 2021 EEO-1 report online and that "our commitment to diversity and inclusion is a business imperative, helping to drive our innovation and global leadership." Lockheed was awarded more than $51 billion in federal contracts in 2020, the biggest dollar figure to any single company.

A a Lockheed spokesperson didn't explain why the company objected.

Washington D.C.- based consulting firm Chemonics International did. Chemonics spokesperson Martha James said the company blocked releasing its own diversity data because it considers that confidential commercial information, said Chemonics spokesperson Martha James.

"Furthermore, we don't frame our diversity, equity and inclusion strategy or measure our progress through the lens of EEO-1 data, which lacks the additional variables and context that allow us to fully analyze our workforce data," James said in an email.

The company launched a diversity effort in 2017 after a Labor Department audit flagged a time when the firm rejected every single one of 124 Black applicants for entry-level professional jobs. Chemonics agreed to pay $482,000 to the rejected job seekers and to hire eight of them. James said the company has been in compliance with anti-discrimination regulations ever since.

Chemonics claims some progress: Its first diversity report says its ranks of people of color increased from 36% in 2017 to 40% in 2021, without a detailed breakdown. How many Black people does Chemonics employ and at what level in the company? The proof would be in EEO-1 numbers Chemonics wouldn't disclose.

Cipollone, the former Dell employee who sued for discrimination, said she didn't see a lot of diversity there, so she's not surprised Dell objected to releasing its numbers. But she thinks all companies should come clean and face the consequences.

"It's not 2000 anymore. It's 2023," she said. "You're just going to have to take the hit for it and you're going to have to get on board with everybody else."

*This article was produced in collaboration with Reveal from The Center for Investigative Reporting, a nonprofit investigative newsroom.*

*Contributing: Jessica Guynn, USA TODAY*

*Will Evans can be reached at wevans@revealnews.org. Follow him on Twitter: @WillCIR. Reach Jayme Fraser at jfraser@gannett.com or on Twitter @jaymekfraser. Reach Jessica Guynn at jguynn@usatoday.com.*

# EXHIBIT AD



# WE KEEP DELIVERING

2022 ANNUAL REPORT

**Deutsche Post DHL Group**

## Key figures

| | | 2018 | 2019 | 2020 adjusted |
|---|---|---|---|---|
| **Financial figures** | | | | |
| Revenue | €m | 61,550 | 63,341 | 66,716 |
| Profit from operating activities (EBIT) | €m | 3,162 | 4,128 | 4,847 |
| Return on sales[1] | % | 5.1 | 6.5 | 7.3 |
| EBIT after asset charge (EAC) | €m | 716 | 1,509 | 2,199 |
| Consolidated net profit for the period[2] | €m | 2,075 | 2,623 | 2,979 |
| Net cash from operating activities | €m | 5,796 | 6,049 | 7,699 |
| Free cash flow | €m | 1,059 | 867 | 2,535 |
| Capex[3] | €m | 2,648 | 3,617 | 2,999 |
| Equity ratio[4] | % | 27.5 | 27.6 | 25.5 |
| Net debt[5] | €m | 12,303 | 13,567 | 12,928 |
| Net gearing[6] | % | 47.0 | 48.2 | 47.9 |
| **Stock data** | | | | |
| Basic earnings per share[7] | € | 1.69 | 2.13 | 2.41 |
| Diluted earnings per share[8] | € | 1.66 | 2.09 | 2.36 |
| Cash flow per share[7,9] | € | 4.71 | 4.90 | 6.22 |
| Dividend per share | € | 1.15 | 1.15 | 1.35 |
| Dividend distribution | €m | 1,419 | 1,422 | 1,673 |
| Number of shares as at 31 December | millions | 1,236.5 | 1,236.5 | 1,239.1 |
| Year-end closing price | € | 23.91 | 34.01 | 40.50 |
| **ESG figures** | | | | |
| GHG emissions[12] | million tonnes of $CO_2$e | 35.63 | 33.20 | 33.64 |
| Realised Decarbonisation Effects | kilotonnes of $CO_2$e | – | – | – |
| Energy consumption (Scopes 1 and 2) | million kWh | 26,437 | 26,199 | 27,427 |
| of which from renewable sources[13] | million kWh | – | – | – |
| Number of employees[14] | headcount | 547,459 | 546,924 | 571,974 |
| Staff costs | €m | 20,825 | 21,610 | 22,234 |
| Employee Engagement: Approval rate in the annual survey | % | 76 | 77 | 83 |
| Share of women in middle and upper management | % | 22.1 | 22.2 | 23.2 |
| Lost time injury frequency rate (LTIFR)[15] | | 4.3 | 4.2 | 3.9 |
| Share of valid compliance-relevant training certificates[16] | % | – | – | – |
| Cybersecurity rating | points | – | – | – |

[1] EBIT/revenue.  [2] After deduction of non-controlling interests.  [3] Capex relating to assets acquired.  [4] Equity (including non-controlling interests)/total equity and liabilities.  [5] Calculation, ⟩ Comb... and equity (including non-controlling interests).  [7] The average weighted number of shares outstanding is used for the calculation.  [8] The average weighted number of shares outstanding is adjusted f... [9] Cash flow from operating activities.  [10] Proposal.  [11] Estimate.  [12] Well-to-wheel.  [13] Including consumption by electric vehicles.  [14] At year-end, including trainees.  [15] Work-related accidents pe... working day of lost time for the affected person following the accident.  [16] Middle and upper management.



# CONTENTS

4    **EDITORIAL**

6    **BOARDS AND COMMITTEES**
6    Members of and mandates held
     by the Board of Management
7    Members of and mandates held
     by the Supervisory Board

9    **REPORT OF THE SUPERVISORY BOARD**

13   **REPORTING PRACTICE**

14   **COMBINED MANAGEMENT REPORT**

14   **GENERAL INFORMATION**
14   Business model
24   Strategy
25   Research and development
26   Steering metrics

29   **REPORT ON ECONOMIC POSITION**
29   Forecast/actual comparison
29   Overall assessment
29   Economic parameters
30   Significant events
30   Results of operations
33   Divisions
40   Financial position
45   Net assets

46   **DEUTSCHE POST AG (HGB)**
46   Deutsche Post AG as parent company
46   Employees
46   Results of operations
47   Net assets and financial position
48   Expected developments, opportunities and risks

49   **NON-FINANCIAL STATEMENT**
49   Strategic orientation
53   Environment
56   Workforce
60   Corporate citizenship
61   Corporate governance
65   EU Taxonomy

70   **EXPECTED DEVELOPMENTS, OPPORTUNITIES AND RISKS**
70   Forecast period
70   Future economic prospects
71   Expected developments
72   Opportunity and risk management
75   Opportunity and risk categories
81   Internal control system
83   Overall assessment

84   **GOVERNANCE**
84   Annual Corporate Governance Statement
92   Disclosures required by takeover law

94   **CONSOLIDATED** **STATEMENTS**

94   **INCOME STATEMENT**

94   **STATEMENT OF**

95   **BALANCE SHEET**

96   **CASH FLOW STATEMENT**

98   **STATEMENT OF**

99   **NOTES TO THE** **STATEMENTS**
99   Company information
99   Basis of preparation
115  Segment reporting
118  Income statement
124  Balance sheet disclosures
144  Lease disclosures
145  Cash flow disclosures
146  Other disclosures

165  **RESPONSIBILITY**

165  **INDEPENDENT**

171  **INDEPENDENT**

174  **FINANCIAL CALENDAR**

174  **CONTACTS**

Deutsche Post DHL Group –

EDITORIAL

# We have demonstrated many times over that we can respond flexibly to challenges, and we see the **best conditions for further growth** in the coming years.

**Frank Appel**

**Dear Readers, our aspiration has always been to continue delivering reliably – even in volatile times. We managed this once again in 2022: in times of war, inflation and an energy crisis, Deutsche Post DHL Group stayed the course in remarkable fashion.**

This was made possible by our broad and well-balanced portfolio of international logistics services, which makes us resilient in the challenging environment. Our Strategy 2025 has bolstered us and equipped us for external crises: it safeguards our focus on the profitable core business as well as our status as an employer, provider and investment of choice.

We achieved outstanding results again in 2022: thanks to our strong international business, revenue improved to €94.4 billion, and Group EBIT reached a new record mark of €8.4 billion.

Accordingly, our finan[...]
us, among other thing[...]
gramme by up to €1 [...]
been increased to up t[...]

**De[...]**
**in vo[...]**

Of course, even we a[...]
developments: in the[...]
impact of the slowing[...]
continue to look ahea[...]
jection of €6.0 billion[...]
year makes it clear tha[...]
earnings at a new leve[...]


growth. We have demonstrated many times over that we can respond flexibly to challenges, and we see the best conditions for further growth in the coming years.

Our around 600,000 employees around the world are the foundation of our success. I would like to express my thanks to them in particular. Especially in an operational business like ours, it is our people who make the difference, which is why we are dedicated to ensuring a motivating, safe and inclusive working environment. I am pleased that, in 2022, DHL Express was named the best workplace worldwide for the second consecutive year in the Great Place to Work® annual list. In addition, Deutsche Post DHL Group as a whole received the distinction as a Top Employer in Europe at the beginning of 2023 for the first time. This honour was bestowed due to, amongst other factors, the importance of ethics and integrity in all divisions.

For us, business success also means that we make a positive contribution to the world with sustainable actions and a dedication to society and the environment. With our ESG Roadmap, we pursue ambitious and measurable targets for climate-friendly logistics as well as for social responsibility

and corporate governance. These are also reflected in the remuneration of the Board of Management and executives. Amongst other measures, we will invest a total of up to €7 billion through 2030 to significantly reduce our greenhouse gas emissions and thereby actively contribute to limiting global warming to 1.5 degrees Celsius. We made further progress on this journey in the year under review. Here are a few examples:

- We nearly doubled additional expenditure for decarbonisation measures compared to the previous year, and in doing so avoided around one million tonnes of $CO_2e$.
- After thorough examination, the independent Science Based Targets Initiative (SBTi) officially confirmed that our targets to reduce greenhouse gas emissions are aligned with the most recent climate science findings.
- With GoGreen Plus, our customers can make a conscious decision for sustainable transport solutions or the use of sustainable fuels.

We are a pioneer in the industry with our dedication to the environment, and we take on this role with full conviction – because climate change remains one of the greatest threats facing humanity.

For
also
p
the w
acti
societ

Finally, after more th
take this opportuni
for your trust and su
I will pass on respons
hands of my success
Deutsche Post DHL G
under his guidance.

Sincerely yours, Fran
Chief Executive Office

# BOARDS AND COMMITTEES

## Members of and mandates held by the Board of Management

### Members

**Dr Frank Appel**
Chief Executive Officer (until 4 May 2023)
Global Business Services (until 30 June 2022)
Born in 1961, nationality German
Board member since November 2002
CEO since February 2008
Appointed until May 2023

**Oscar de Bok**
Supply Chain
Born in 1967, nationality Dutch
Board member since October 2019
Appointed until September 2027

**Pablo Ciano**
eCommerce Solutions (since 1 August 2022)
Born in 1969, nationality Argentinian and US American
Board member since August 2022
Appointed until July 2025

**Nikola Hagleitner**
Post & Parcel Germany (since 1 July 2022)
Born in 1973, nationality Austrian
Board member since July 2022
Appointed until June 2025

**Melanie Kreis**
Finance
Born in 1971, nationality German
Board member since October 2014
Appointed until May 2027

**Dr Tobias Meyer**
Post & Parcel Germany (until 30 June 2022)
Global Business Services (since 1 July 2022)
Chief Executive Officer (from 4 May 2023)
Born in 1975, nationality German
Board member since April 2019
Appointed until March 2027

**Dr Thomas Ogilvie**
Human Resources
Born in 1976, nationality German
Board member since September 2017
Appointed until August 2025

**John Pearson**
Express
Born in 1963, nationality British
Board member since January 2019
Appointed until December 2026

**Tim Scharwath**
Global Forwarding, Freight
Born in 1965, nationality German
Board member since June 2017
Appointed until May 2025

### Left the company during the year under review

**Ken Allen**
eCommerce Solutions (until 31 July 2022)
Born in 1955, nationality British
Board member from February 2009 to July 2022

### Additional mandates

**Membership of statutory s**

**Dr Frank Appel**
Fresenius Management SE
Deutsche Telekom AG (Sup
(since 7 April 2022)

**Membership of comparabl**

**Pablo Ciano**
FarEye Technologies Privat

**Ken Allen**
Skysports Ltd., UK (Non-Ex
(since 8 March 2022)

You can find more information on our ⊙ **Website.**

## Members of and mandates held by the Supervisory Board

### Members

**Shareholder representatives**

**Dr Nikolaus von Bomhard** (Chair)
Chair of the Supervisory Board and former Chair of the Board of Management, Münchener Rückversicherungs-Gesellschaft AG (Munich Re)

**Dr Günther Bräunig**
(until 6 May 2022)
Former Chair of the Board of Management, KfW Bankengruppe

**Dr Mario Daberkow**
Member of the Managing Board of Volkswagen Financial Services AG (until 31 March 2023)
Head of Group Infrastructure, VW AG (from 1 April 2023)

**Ingrid Deltenre**
Member of various boards of directors, former Director General of the European Broadcasting Union

**Dr Heinrich Hiesinger**
Member of various supervisory boards, former Chair of the Board of Management, thyssenkrupp AG

**Prof. Dr Luise Hölscher**
(since 30 March 2022)
State Secretary, Federal Ministry of Finance

**Dr Jörg Kukies**
(until 9 March 2022)
State Secretary, Federal Chancellery

**Simone Menne**
Member of various supervisory boards, former member of the Board of Managing Directors of Boehringer Ingelheim GmbH

**Lawrence Rosen**
Member of various supervisory boards, former member of the Board of Management, Deutsche Post AG

**Dr Stefan Schulte**
Chair of the Executive Board of Fraport AG

**Prof. Dr-Ing. Katja Windt**
Member of the Managing Board of SMS group GmbH

**Stefan B. Wintels**
(since 6 May 2022)
Chair of the Board of Management, KfW Bankengruppe

**Employee representatives**

**Andrea Kocsis** (Deputy Chair)
Deputy Chair of ver.di National Executive Board and Head of Postal Services, Forwarding Companies and Logistics Department on the ver.di National Executive Board

**Jörg von Dosky**
Chair of the Group and Company Executive Representation Committee, Deutsche Post AG

**Gabriele Gülzau**
Chair of the Works Council, Deutsche Post AG, Hamburg Operations Branch

**Thomas Held**
Chair of the Central Works C

**Mario Jacubasch**
Chair of the Group Works Co

**Thorsten Kühn**
Head of Postal Services, Co-
National Postal Services Gro

**Ulrike Lennartz-Pipenbache**
Deputy Chair of the Central

**Yusuf Özdemir**
Deputy Chair of the Group V
Central Works Council, Deut

**Stephan Teuscher**
Head of Wage, Civil Servant
Services, Forwarding Comp
National Administration

**Stefanie Weckesser**
Deputy Chair of the Works C
Operations Branch

## BOARDS AND COMMITTEES

## Additional mandates

### Shareholder representatives

**Membership of statutory supervisory boards**

**Dr Nikolaus von Bomhard** (Chair)
Münchener Rückversicherungs-Gesellschaft AG (Munich Re) (Chair)

**Dr Günther Bräunig**
(until 6 May 2022)
Deutsche Pfandbriefbank AG (Chair)

Deutsche Telekom AG

**Dr Heinrich Hiesinger**
BMW AG

Fresenius Management SE

ZF Friedrichshafen AG (Chair)

**Prof. Dr Luise Hölscher**
(since 30 March 2022)
Deutsche Investitions- und Entwicklungsgesellschaft mbH

**Dr Jörg Kukies**
(until 9 March 2022)
KfW IPEX-Bank GmbH (until 14 February 2022)

**Simone Menne**
Henkel AG & Co. KGaA

**Lawrence Rosen**
Lanxess AG

Lanxess Deutschland GmbH[1]

**Prof. Dr-Ing. Katja Windt**
Fraport AG

**Stefan B. Wintels**
(since 6 May 2022)
Deutsche Telekom AG (since 7 April 2022)

**Membership of comparable bodies**

**Dr Nikolaus von Bomhard** (Chair)
Athora Holding Ltd., Bermuda (Board of Directors, Chair)

**Dr Mario Daberkow**
Softbridge-Projectos Tecnológicos S.A., Portugal (Board of Directors)[2]
(until 16 March 2023)

Volkswagen Participações Ltda., Brazil (Supervisory Board)[2]
(until 1 July 2022)

Volkswagen Financial Service France S.A., France (Supervisory Board)[2]
(until 30 June 2022)

VW Credit, Inc., USA (Board of Directors)[2] (until 16 March 2023)

Volkswagen Payments S.A., Luxembourg – renamed J.P. Morgan Mobility Payments Solutions S.A. on 17 October 2022
(Supervisory Board, Chair until 8 April 2022) (until 16 March 2023)

**Ingrid Deltenre**
Givaudan SA, Switzerland (Board of Directors)

Banque Cantonale Vaudoise SA, Switzerland (Board of Directors)

Agence France Presse, France (Board of Directors)
(until 20 April 2022)

Akara Funds AG, Switzerland (Board of Directors)
(until 12 August 2022)

SPS Holding AG, Switzerland (Board of Directors)
(since 13 April 2022)

**Simone Menne**
Johnson Controls International plc, Ireland (Board of Directors)

Russell Reynolds Associates Inc., USA (Board of Directors)

**Lawrence Rosen**
Qiagen N.V., Netherlands (Supervisory Board, Chair)

**Dr Stefan Schulte**
Fraport Ausbau Süd GmbH (Supervisory Board, Chair)[3]

Fraport Regional Airports of Greece A S.A., Greece
(Board of Directors, Chair)[3]

Fraport Regional Airports of
(Board of Directors, Chair)[3]

Fraport Regional Airports of
Greece (Board of Directors,

Fraport Brasil S.A. Aeroport
(Supervisory Board, Chair)[3]

Fraport Brasil S.A. Aeroport
(Supervisory Board, Chair)[3]

**Prof. Dr-Ing. Katja Windt**
Ford Otomotiv Sanayi A.S., T
(since 1 June 2022)

**Stefan B. Wintels**
(since 6 May 2022)
KfW Capital GmbH & Co. KG

### Employee representati

**Membership of statutory su**

**Jörg von Dosky**
PSD Bank München eG (Dep

**Stephan Teuscher**
DHL Hub Leipzig GmbH (De

**Membership of comparable**

**Andrea Kocsis**
KfW Bankengruppe (Board o

---

[1] Group mandate, Lanxess.   [2] Group mandates, Volkswagen.   [3] Group mandates, Fraport.   [4] Group mandate, KfW Bankengruppe.

You can find more information on our ⊕ **Website.**

# REPORT OF THE SUPERVISORY BOARD

## Dear Shareholders,

In spite of numerous challenges, the strong growth continued also in the year under review, and important supply chains around the world were maintained. The foundation of the company's success was its strong focus on the core business and the extraordinary dedication of the Board of Management and the employees.

The Board of Management and the Supervisory Board worked together in a spirit of trust and held in-depth discussions on the situation of the company in light of current developments on a regular basis. Necessary measures were taken swiftly and the Supervisory Board was kept up to date regarding the implementation of these measures. The members of the Supervisory Board were involved early on in all decisions of material importance.

### Attendance at plenary and committee meetings as well as investor talks

Attendance of the members of the Supervisory Board at the meetings of the plenary and of the committee is shown individually in the following table. The meetings took place in person, with individual members joining virtually depending on the situation.

All members of the Board of Management participated in the four plenary meetings and reported on the business performance in the divisions for which they are responsible. Meetings of the Supervisory Board were held without the Board of Management members, for example on matters regarding the Board of Management and to review the efficiency of the Supervisory Board's work.

The CEO and the members of the Board of Management responsible for the respective committee attended the 22 committee meetings. Executives from the tier immediately below the Board of Management and the auditors were also invited to attend for individual agenda items. The members of the Financial and Audit Committee and the auditor also discussed individual matters without the Board of Management members.

In the autumn of eral investors and pro included the require bers of the Superviso Audit Committee in pa qualifications of the in sented in a table in the going forward. The ac

### Attendance at plenary and committee meetings 2022

| Supervisory Board members | Supervisory Board meetings | | |
| --- | --- | --- | --- |
| | Attendance/meetings | Attendance % | Atte |
| Dr Nikolaus von Bomhard (Chair) | 4/4 | 100 | |
| Andrea Kocsis (Deputy Chair) | 4/4 | 100 | |
| Dr Günther Bräunig (until 6 May 2022) | 1/1 | 100 | |
| Dr Mario Daberkow | 4/4 | 100 | |
| Ingrid Deltenre | 4/4 | 100 | |
| Jörg von Dosky | 4/4 | 100 | |
| Gabriele Gülzau | 4/4 | 100 | |
| Thomas Held | 4/4 | 100 | |
| Dr Heinrich Hiesinger | 4/4 | 100 | |
| Prof. Dr Luise Hölscher (since 30 March 2022) | 3/3 | 100 | |
| Mario Jacubasch | 4/4 | 100 | |
| Thorsten Kühn | 4/4 | 100 | |
| Dr Jörg Kukies (until 9 March 2022) | 1/1 | 100 | |
| Ulrike Lennartz-Pipenbacher | 4/4 | 100 | |
| Simone Menne | 3/4 | 75 | |
| Yusuf Özdemir | 4/4 | 100 | |
| Lawrence Rosen | 4/4 | 100 | |
| Dr Stefan Schulte | 4/4 | 100 | |
| Stephan Teuscher | 3/4 | 75 | |
| Stefanie Weckesser | 4/4 | 100 | |
| Prof. Dr-Ing. Katja Windt | 4/4 | 100 | |
| Stefan B. Wintels (since 6 May 2022) | 3/3 | 100 | |

Financial and Audit Committee was a welcome development in the talks. The intention to convene the 2023 Annual General Meeting as an in-person meeting was also positively received by the investors.

**Key topics addressed in plenary meetings**
Discussions in all plenary meetings involved the company's financial position and business performance as well as reports on committee meetings.

The Supervisory Board discussed both the risks and opportunities for the company associated with environmental, social and governance (ESG) aspects, as well as the environmental and social impact of the company's own operations. The implementation of the sustainability strategy and the targets set regarding $CO_2$ emissions, the reduction of the lost time injury frequency rate, increasing the share of women in executive positions and employee engagement values, as well as strengthening the compliance standards, were additional significant topics in the year under review.

In March 2022, we discussed the annual and consolidated financial statements, including the management report and the non-financial statement. Following the report by the auditor regarding the findings of the audit, we approved the financial statements at the recommendation of the Finance and Audit Committee. We concurred with the Board of Management's proposed resolution on the appropriation of the net retained profit.

As successor to Ken Allen, who retired at the end of July 2022 after many years as a member of the Board of Management, we appointed Pablo Ciano to the Board of Management on the basis of the candidate interviews as the member responsible for eCommerce Solutions effective from 1 August 2022 to 31 July 2025 and determined the content of his employment contract. The Customer

Solutions & Innovation function was transferred to the responsibility of John Pearson.

In the same meeting, we discussed the updated finance strategy and approved the withdrawal of up to 50 million shares which will be bought back as part of the current share buy-back programme and not used for other purposes. Approval of the remuneration report, the report of the Supervisory Board to the Annual General Meeting and the proposed resolutions on the agenda items of the Annual General Meeting, including the election of Luise Hölscher and Stefan B. Wintels to the Supervisory Board for a four-year term, were also the subject of the meeting in March, as well as the determination of the annual bonus of Board of Management members on the basis of the degree of target achievement and corresponding recommendations of the Executive Committee.

In the meeting in June, we discussed the reports from the committees and the report on the situation of the Group and the divisions, and focused on the organisation and the challenges of Corporate Procurement.

In September, we approved the acquisition of a Dutch company which operates in the e-commerce fulfilment sector and offers its customers the integration of online platforms and web shops for logistics services. Without the presence of the Board of Management, we discussed at length the effectiveness and efficiency of our activities in the plenary meetings and in the committees. The subject of our discussion included collaboration with the members of the Board of Management, collaboration within the Supervisory Board, the skills profile of the Supervisory Board, the work in the committees and the strategic direction of the company. The latter was discussed in particular against the backdrop of growth opportunities, dealing with digitalisation and innovation, the state of IT and contingency planning. We concluded

that the Supervisory
advisory duties prop

In our final Super
in December, we app
2023 after intense dis
targets for the Board
addressed the Declar
dations of the Germa
this meeting.

**Key topics addresse**
The six committees
the discussions and c
meetings. They have a
decisions regarding a
property transactions
Management items of
vided by the auditor.
extensively in the plen
mittees. The composi
the ● Annual Corporate

The Executive Co
mainly with Board o
to succession planning
discussion of the rem
ondary activities, the
for the previous year
following year.

The Personnel C
cussions focused on
pandemic, promoting
Group-wide corpora
ment, recruiting and
the development of t
skilled workers.

The Finance and Audit Committee met eight times. It examined the financial statements and the combined management report for the company and the Group. The committee also discussed the half-yearly financial report following the review by the auditor and the quarterly financial statements with the CEO, the Board member for finance and the auditor prior to publication. In addition, it issued the audit engagement for the audit firm elected by the Annual General Meeting. Also covered at the meetings were the non-audit services provided by the audit firm, the accounting process, risk management, the findings of internal audits and the quality of the financial statement audit. Moreover, the committee also discussed the updated finance strategy and tax-related matters. It obtained detailed reports from the Chief Compliance Officer on important aspects of compliance and on updates to the compliance organisation and compliance management. The effectiveness and development of the internal control and risk management system were regular topics of discussion at the meetings.

The Strategy and Sustainability Committee met four times, primarily addressing the strategic positioning of the individual business units in their respective market segments and the implementation of our Strategy 2025, as well as the acquisition and sale of equity investments. In addition, the committee deals with the company's strategy with regard to ESG aspects and their implementation in detail and on an ongoing basis.

The Nomination Committee, which is comprised exclusively of shareholder representatives, held two meetings. Following in-depth deliberation regarding the available candidates for the Supervisory Board, the committee proposed Luise Hölscher in March to succeed Jörg Kukies – who stepped down on 9 March 2022 – on the Supervisory Board based on the skills profile it had defined. In December, the committee recommended Katrin Suder to the Supervisory Board to succeed Katja Windt as well as the reappointment of Mario Daberkow, each for a period of four years. Moreover, the committee recommended to declare to the Annual General Meeting that, in the estimation of the Supervisory Board, there are no personal and business relationships between Katrin Suder and Mario Daberkow, who have been proposed for appointment to the Supervisory Board, and Deutsche Post AG or its Group companies, the executive bodies of Deutsche Post AG or a shareholder holding a material interest in Deutsche Post AG that an objective shareholder would consider decisive for their vote.

The Mediation Committee did not meet in the year under review.

**Support of the members of the Supervisory Board**
The company supports the members of the Supervisory Board in their activities on an ongoing basis. Newly elected members of the Supervisory Board receive a customised introduction in the form of individual meetings with the members of the Board of Management and the Chair of the Supervisory Board; additional measures include the provision of informational materials, access to a digital data room specially designed for the Supervisory Board and the offer of reimbursement for the cost of attending selected external training events as well as for subscribing to industry publications. In addition, walk-throughs guided by Board of Management members at operating units of the company are offered. These provide Supervisory Board members with an in-depth look at operational workflows and conditions on the ground. Directors' Day, which takes place twice per year, also enables the members of the Supervisory Board to deepen their understanding of current topics and developments which are relevant to the company. In 2022, the agenda comprised the topic of data analytics at Deutsche Post DHL Group, an

additional presentation
Diligence Act *(Liefer*
EU Taxonomy and the
Directive (CSRD).

**Changes to the Board**
Tobias Meyer, who w
lowing the 2023 Ann
helm of the Global Bu
July 2022.

As his successor n
Nikola Hagleitner wa
ment effective from
company since 2005
in three of the five di
for example in opera
ness development.

Effective from 1
head of the Corpora
appointed as the suc
Management with res
He has also worked f
played a crucial role
2025, including the St

We are pleased t
tions were filled from
ified and internationa

**Changes to the Super**
With regard to shareh
with the end of his du
Ministry of Finance, ,
Supervisory Board ef
Bräunig resigned his
Annual General Meet

Deutsche Post DHL Group –

resignation from the KfW Banking Group. The Supervisory Board thanks both of them for their valuable support of the work of the Supervisory Board. Luise Hölscher, State Secretary in the Federal Ministry of Finance, and Stefan B. Wintels, CEO of KfW Banking Group, were appointed to the Supervisory Board on 6 May 2022 by the Annual General Meeting for a period of four years on the recommendation of the Supervisory Board. We will recommend to this year's Annual General Meeting that Katrin Suder be appointed to succeed Katja Windt and Mario Daberkow be reappointed, each for a period of four years. The main skills of the members of the Supervisory Board can be found in the qualification matrix in the ❯ **Annual Corporate Governance Statement.**

There were no changes to the employee representatives during the reporting period. The term of office for employee representatives on the Supervisory Board ends as scheduled following the Annual General Meeting planned for 4 May 2023.

An overview of current Supervisory Board members is provided in ❯ **Boards and committees.**

### Managing conflicts of interest

Supervisory Board members neither hold positions on the governing bodies of, nor provide consultancy services to, the Group's main competitors, nor do they maintain personal relationships with them. No conflicts of interest were reported in the year under review.

### Company in compliance with all recommendations of the German Corporate Governance Code

In December 2022, the members of the Board of Management and the Supervisory Board issued a statement declaring that all recommendations of the German Corporate Governance Code as amended on 16 December 2019 had

been complied with up to the issue of the last declaration of conformity in December 2021. This did not include the reserved partial limitation with regard to recommendation C.5. In future, all recommendations of the German Corporate Governance Code as amended on 28 April 2022 are to be complied with. Frank Appel is permitted to chair the Supervisory Board of Deutsche Telekom AG until the end of his term in May 2023. The statements from past years can be accessed on the company's website. Further information regarding corporate governance within the company can be found in the ❯ **Annual Corporate Governance Statement.**

### 2022 annual and consolidated financial statements examined

The auditors elected by the AGM, PricewaterhouseCoopers GmbH Wirtschaftsprüfungsgesellschaft (PwC), Düsseldorf, audited the annual and consolidated financial statements for the 2022 financial year, including the combined management report, and issued unqualified audit opinions. The German Public Auditor responsible for the engagement is Dietmar Prümm. PwC also conducted the voluntary review of the half-yearly financial report without issuing any objections. The joint remuneration report for the Board of Management and the Supervisory Board for the 2022 financial year was given an audit opinion in accordance with section 162(3) AktG.

After prior examination by the Finance and Audit Committee, occasionally without the Board of Management members, the Supervisory Board in its meeting today discussed the annual and consolidated financial statements, including the Board of Management's proposal on the appropriation of the net retained profit and the combined management report including the combined non-financial statement for the 2022 financial year in depth with the Board of Management. PwC reported on the results

of the audit before th
plenary meeting an
The Supervisory Boar
audit and approved t
statements for the 2
by the Finance and A
raised on the basis of
by the Supervisory B
mittee of the annual a
the combined manag
non-financial stateme
ation of the net retain

The Supervisory B
ment's proposal for th
and the payment of a

The Supervisory
all employees and B
their extraordinary e
special thanks also g
company upon the c
General Meeting, for
cessfully led the Gro
expertise. Under his
global leader in logis
kets and enables of g

Bonn, 8 March 2023
The Supervisory Boar

Nikolaus von Bomha
Chairman

# REPORTING PRACTICE

This publication contains both financial and non-financial information about the results for the 2022 financial year. It was published on 9 March 2023 in German and English and is available ⊚ **Online** and as a ⊚ **PDF.** The report sections that are subject to publication requirements are published in the company register, in due consideration of the European Single Electronic Format (ESEF).

### Applied reporting standards

As a listed company, Deutsche Post AG has prepared its consolidated financial statements in accordance with Section 315e *Handelsgesetzbuch* (HGB – German Commercial Code) in compliance with International Financial Reporting Standards (IFRSs) and the corresponding Interpretations of the International Accounting Standards Board (IASB) as adopted in the European Union.

The combined management report comprises the Group Management Report of Deutsche Post DHL Group and the Management Report of Deutsche Post AG. Unless otherwise noted, the information presented refers to the Group. Information pertaining solely to Deutsche Post AG is identified as such.

The combined management report also includes the combined non-financial statement for Deutsche Post AG and for the Group in accordance with Sections 289b(1) and 315b(1) HGB. The non-financial key performance indicators used for steering the Group were determined on the basis of their materiality in accordance with the German Commercial Code and the German Accounting Standards (GASs), ❯❯ **Steering metrics.** The Global Reporting Initiative (GRI) standards are taken as the framework for determining material topics, supplemented by HGB requirements. The non-financial statement also includes information aimed at facilitating sustainable investment (EU Taxonomy) in accord-

ance with Article 8 of Regulation 2020/852 of the European Parliament and of the European Council as well as Delegated Regulation 2021/2178 of the European Commission. In the interest of avoiding repetition, we refer to other sections of the management report for reporting on mandatory disclosures, provided that they already are explained in greater detail there. Information regarding employees applies to all of the Group's staff; exceptions are noted as such.

### Independent audit

The consolidated financial statements of Deutsche Post AG and its subsidiaries and the combined management report for the financial year from 1 January to 31 December 2022 were audited by PricewaterhouseCoopers GmbH Wirtschaftsprüfungsgesellschaft (PwC) in a reasonable assurance engagement, ❯❯ **Auditor's report.**

The combined non-financial statement was audited separately by PwC on behalf of the Supervisory Board in a limited and, for certain indicators, reasonable assurance engagement, ❯❯ **Practitioner's report.**

The contents of the ❯❯ **Annual Corporate governance statement** pursuant to Section 289f and 315d HGB have not been audited.

### Forward-looking statements

This report contains forward-looking statements which are not historical facts and which also include statements concerning assumptions and expectations based upon current plans, estimates and projections, and the information available to Deutsche Post AG at the time this report was completed. They should not be considered to be assurances of future performance and results contained therein. Instead, they depend on a number of factors and are subject to various risks and uncertainties (particularly those described in the "Expected developments, opportunities and risks" section) and are based on assumptions that may prove to be inaccurate. It is possible that actual performance and

results may differ fro[...]
made in this report [...]
obligation to update [...]
tained in this report [...]
If Deutsche Post AG u[...]
statements, no assum[...]
ment(s) in question [...]
will be updated regula[...]

### Disclosures unrelate[...]

The German Corporate [...]
sures related to the i[...]
system which go bey[...]
management report a[...]
auditor's review of the[...]
These disclosures are [...]
separate paragraphs [...]

### Additional informati[...]

❯❯ Refers to informatio[...]
⊚ Indicates a hyperli[...]
not part of this report[...]

### Separate remunerati[...]

According to Section [...]
(AktG), listed compan[...]
a joint remuneration [...]
and Supervisory Boar[...]
the ⊚ **Company's webs**[...]

### Translation

The English version of [...]
Post DHL Group con[...]
German version. Only[...]
ing, insofar as this do[...]
in other countries.

# GENERAL INFORMATION

## Business model

**An international service portfolio**

Deutsche Post AG is a listed German corporation domiciled in Bonn. Deutsche Post DHL Group unites two strong brands: DHL offers a comprehensive portfolio of services consisting of parcel shipment, international express delivery, freight transport, supply chain management and e-commerce solutions; Deutsche Post is Europe's leading mail and parcel provider. The Group is organised into five operating divisions: Express; Global Forwarding, Freight; Supply Chain; eCommerce Solutions; and Post & Parcel Germany. Each of the divisions is managed by its own divisional headquarters and subdivided into functions, business units or regions for reporting purposes.

Group management functions are centralised in the Corporate Center. The internal services that support the entire Group are consolidated in our Global Business Services unit. Customer Solutions & Innovation (CSI) is DHL's cross-divisional account management and innovation unit.

**Corporate structure as at 31 December 2022**



¹ ❯ Note 11 to the consolidated financial statements.

**Organisational changes**

Effective as of 1 July 2022, Nikola Hagleitner assumed responsibility on the Board of Management for Post & Parcel Germany from Tobias Meyer, who has since been responsible for Global Business Services.

Ken Allen left the company upon the expiration of his term of appointment on 31 July 2022. As a new member of the Board of Management, Pablo Ciano assumed responsibility for the eCommerce Solutions division as of 1 August 2022.

John Pearson has been responsible for CSI since 1 August 2022.

**A presence that spans the globe**

Our locations can be found in the ⊚ **List of shareholdings.** The following description of the divisions shows market shares and market volumes – where available and useful – in the most important regions.

**EXPRESS DIVISION**

**A global express network**



Around
**120,000**
employees

Around
**3**
million
customers

Around
**148,000**
service points

Arou
**3,5**
facili

**22**
hubs

**Time-definite international shipments**

In the Express division, we transport urgent documents and goods reliably and on time from door to door. International time-definite shipments are our core business. The division's main product is Time Definite International (TDI), a cross-border transport and delivery service. Our TDI services enable delivery at predefined times, and our expertise in customs clearance keeps shipments moving as a prerequisite in ensuring fast and reliable door-to-door service. We also provide industry-specific services to round out our TDI product. For example, our Medical Express transport solution, which is tailored specifically to companies in the life sciences and healthcare sector, offers various types of thermal packaging for temperature-controlled, chilled and frozen contents.

Around 296 million TDI shipments were transported worldwide in 2022. We estimate our market share at 43% on the basis of a recent survey (2021).

**Our virtual airline**

Our global air freight network is operated by multiple airlines, some of which are wholly owned by the Group. The combination of our own and purchased capacities allows us to respond flexibly to fluctuating demand. The following graphic illustrates how our available freight capacity is organised and offered on the market. Most of the freight capacity is used for TDI, our main product. If any cargo space remains on our own flights, we sell it to customers in the air freight sector. The largest buyer of remaining capacity is the DHL Global Forwarding business unit.

**Available capacity**



**Core**
Express TDI core product – capacity based upon average utilisation, adjusted on a daily basis

**BSA**
Block Space Agreement – guaranteed air cargo product

**ACS**
Air Capacity Sales, average total spare capacity that is not slated to be utilised for BSA or TDI core volumes

**Keeping our custom**

In order to keep our c
global network opera
changing requiremen
Customer Centric Cu
Promoter Approach.

At our quality c
across the globe and
required. All premium
delivered.

We conduct reg
compliance with star
facilities in co-opera
Approximately 415 l
Transported Asset Pr
us a leader in this are

Deutsche Post DHL Group –

## GLOBAL FORWARDING, FREIGHT DIVISION

**Air, ocean and overland freight**



More than
**250,000**
customers

Around
**200**
freight terminals

More than
**150**
countries and
territories

Around
**49,000**
employees

**Air, ocean and overla**

Air, ocean and overlan
core business. They in
as multimodal and se
customised industria
business model is bas
between customers a
of our network allows
modal transport optio
divisions, our operati

**Volumes in air freigh
market conditions**

Despite the somewha
we reached around 1.9
2.1 million tonnes) of

**Ocean freight marke**

With around 3.3 mil
ous year: around 3.1
increase the ocean f
cumstances of 2022,
acquisition of Hillebra

**Air and ocean freight market 2022: relevant volumes**

| | Asia Pacific | Americas | Middle East / Africa | Europe | Other | Global |
|---|---|---|---|---|---|---|
| Air freight (m tonnes)[1] | 10.7 | 5.8 | 1.0 | 6.0 | 0.8 | **24.3** |
| Ocean freight (m TEUs)[2] | 40.1 | 8.5 | 4.7 | 7.6 | 1.1 | **62.0** |

[1] Data based solely on export freight tonnes. Source: estimate by Seabury Consulting.   [2] Twenty-foot container units; estimated part of overall market controlled by forwarders. Data based solely on export volumes. Source: company estimates, Seabury Consulting.

**Weaker growth in the European road freight market**

After the European road freight market benefited from a significant increase in volumes in the previous year, the market developed more slowly in 2022. We recorded a decline in volumes by 4.8%. Capacity shortages, higher personnel costs, changes to commercial road freight and the significant rises in the diesel prices have led to a considerable increase in costs.

**Satisfied customers and the digitalisation roadmap**

We aim to design our services to be as user-friendly as possible. To do so, we systematically record customer feedback by calculating Net Promoter Scores and conducting annual satisfaction surveys. Based upon the information received, we define initiatives and actions aimed at steadily improving our products and services.

The global network of the Global Forwarding, Freight division meets the highest safety standards demanded by customers and authorities, including TAPA and CTPAT; we therefore have the most advanced ISO-certified business continuity management programme in the industry.

With a global Transport Management System, we laid the foundation for further scaling of global applications and processes in the Global Forwarding business unit. We further implemented a standardised Transport Management System in the Freight business unit as well. Meanwhile, we are continually registering new user groups in our myDHLi portal and see increasing activity on our digital customer interaction tools, such as Saloodo! – our digital marketplace for road freight – and the Freight Customer Portal which is successfully running in Sweden.

## SUPPLY CHAIN DIVISION

**Solutions that reduce customer supply chain complexity**



Around
**15**
million m² warehousing and operational space[1]

Analyses used to optimise supply chains

Around
**10,500**
vehicles

Around
**185,000**
employees

Most innovative
**3PL provider**
according to Gartner ranking

Active in more than
**50**
countries

[1] Includes owned and leased warehouses only and not customer-owned facilities operated by DHL.

**Tailor-made supply c**
Our core business con
and supply chain solu
ity for our customers a
a broad product portf
and transport as we
eFulfillment, omnicha
ment, Lead Logistics
Service Logistics and
customer's needs acr
offer modular solutio
ations to be more ag
changing supply chai

**Standardisation and**
We are constantly st
along the entire supp
isation and the use o
digital solutions are
our locations, for exa
robots and some 38
addition, we leverage
efficiencies and to en
are integrating physi


**Leading position in contract logistics**

The global contract logistics market is estimated at around €231.3 billion for the year 2021. DHL is the global market leader in the fragmented market of contract logistics with a market share of 6.0% (2021) and operations in more than 50 countries. The market share of the next leading providers is half as large.

**Meeting or exceeding customers' expectations**

With the globally consistent operating standards of our "Operations Management System First Choice", we ensure that we consistently either meet or exceed our customers' quality expectations and continuously improve.

Thanks to our systematic follow-up on customer feedback, our satisfaction values (Net Promoter Approach) remain on a high level.

**Contract logistics market 2021[1]**

€ billion

| | Asia Pacific | Americas | Middle East/Africa | Europe | Global |
|---|---|---|---|---|---|
| Contract logistics | 81.6 | 67.4 | 7.9 | 74.4 | **231.3** |

[1] Company estimate.


## ECOMMERCE SOLUTIONS DIVISION

**Domestic last-mile parcel delivery and non-TDI cross-border services**



More than
**20**
countries

More than
**1.5**
billion parcels

More than
**90,000**
service points

**8**
dedicated
aircraft

Around
**40,000**
employees

Around
**25,000**
vehicles

**Domestic and intern[...]
parcel delivery**

Our core business is [...]
in selected countries [...]
selected countries in A[...]
cross-border services [...]
as well as to and from [...]

The domestic las[...]
vided via our own and [...]
B2C and B2B custom[...]
cross-border service p[...]
to enable our custom[...]
cross-border trade, w[...]
speed, transparency a[...]
platform is our deliv[...]
especially for e-comm[...]
and B2C, which simpli[...]
ping with a harmonis[...]
features and local ser[...]

The B2C volume [...]
demic years, with th[...]
highest basis for com[...]
pattern came to be in[...]
second half of the yea[...]
in the first six months [...]

**Satisfied customers a[...]**
We focus on deliveri[...]
well as quality and se[...]
succeeded in achievin[...]
95.5% (previous year:

## POST & PARCEL GERMANY DIVISION

### Nationwide post and parcel network in Germany



Around
**192,000**
employees

Around
**25,000**
sales points

Around
**11,300**
Packstations

**82**
mail centres

**38**
parcel centres

Around
**108,400**
postboxes

Around
**48**
million letters
per working day

Around
**6.2**
million parcels
per working day

**The postal service fo**

As Europe's largest
is the transport, sort
goods. We maintain a
in Germany, which we
of digitalisation and s

Our products and
segment are targeted
customers and range
special products for th
tional services such as
insured items.

In the year under
communication for bu
€4.3 billion (previou
declining volumes, th
increases for some r
effective from 1 Janua
in the reporting perio
factors, the unusuall
German federal and
the market in which w
that operate as servic
ket – i.e. both compe
and consolidators pr
share increased slig
year (61.4%) due to g

**German mail commu
business customers,**

Market volume: around

| | |
|---|---|
| Deutsche Post | |
| Competition | |

Source: company estimate.

**Cross-channel dialogue**

On request, our Dialogue Marketing unit offers end-to-end solutions to advertisers – from address services and tools for design and creation to printing, delivery and evaluation. This supports cross-channel, personalised and automated dialogue so that digital and physical items with interrelated content are delivered according to a co-ordinated timetable and without any coverage waste.

The German advertising market grew by 4.4% in 2022 to come in at €29.9 billion, ultimately not growing as dynamically as in the previous year. Our share of this highly fragmented advertising market amounted to 5.7% (previous year: 5.9%).

**German advertising market[1] 2022**

Market volume: €29.9 billion

| | |
|---|---|
| Competition | 94.3% |
| Deutsche Post | 5.7% |

[1] Includes all advertising media with external distribution costs; the placement costs are shown as ratios.

Source: company estimate.

**DHL Parcel for companies and private individuals**

We maintain a dense network of parcel acceptance and drop-off points in Germany, which we expanded and digitalised in the reporting year.

We offer support to businesses to grow their online retail business. Along with the Supply Chain division, we are able to cover the entire logistics chain through to returns management on request.

Various services enable individualised and convenient parcel delivery for private customers: parcels can be delivered to an alternative address, a specific retail outlet or a Paketshop at short notice. Furthermore, registered customers can now have all items sent automatically to a Packstation or selected retail outlet. Additionally, the digital delivery notification for parcels introduced in the previous year is more transparent and more convenient.

The German parcel market continues to be subject to competition-driven structural changes, with established as well as new companies offering their services. In e-commerce, the delivery of a portion of shipments is handled by the merchant's own distribution networks.

There has been no interruption in the medium- and long-term growth trend in the number of online orders. In light of this as well, we will increase the number of Packstations to more than 15,000 in the coming years to make it even more convenient for customers all over Germany to send and receive parcels, and to create an environmentally friendly, traffic-reduced parcel delivery system. Following a successful pilot phase in 2021, we will also make progress in the expansion of Poststations.

**Reliable delivery in a**

According to surveys search institute, arou in Germany during da or before final collecti the year under review two days. This puts u 80% (D+1) and 95% (

These figures ca challenging enviro In the third year of the of illness amongst e uation on the German

Our approximat points were open for the year under review Consumers who use Deutsche Post retail are surveyed annual by "Kundenmonitor the high level of appr outlets: a total of 94. isfied with the qualit In addition, custome rating of 4.37 out of finder (previous year: and sales network ha vious year: around 34 Packstation network.

# Strategy

**Navigating safely through a volatile, fast-changing environment**

We announced Strategy 2025 in October 2019. It draws on the successful elements of Strategy 2015 and 2020, which established us as the world's leading logistics company. Building on this strong foundation, Strategy 2025 helps us to cement and grow that leading position as the pace of change in the world around us accelerates.

We defined our strategic goals in a comprehensive process in which we worked with relevant stakeholders including employees, customers, suppliers and investors. Our "Strategy House" graphic illustrates the most important elements of our strategy and how they are connected.

Strategy 2025 guided us safely through the volatile, fast-changing environment. As part of a yearly assessment, we undertook a detailed review of our corporate strategy and found it not only to be fundamentally sound, but that it had also made Deutsche Post DHL Group more resilient. That resilience is the result of disciplined and consistent execution of our Group strategy, with each and every element playing a key role.

**Strategic triad of purpose, vision and values**

Our purpose of "Connecting people, improving lives" has never been more important than it is today. In keeping with our vision of being THE logistics company for the world, Deutsche Post DHL Group strives to continue leading the industry – and doing so in an increasingly digital and sustainability-oriented world. Our core values "Respect & Results" are just as much a part of our strategy today as they have been in the past.

**Strategy House**



STRATEGY 2025
**Delivering excellence in a digital world**



**Our Purpose**
Connecting people, improving lives

**Our Vision**
We are THE logistics company for the world

**Our Values**
Respect & Results

Our Mission
**Excellence. Simply delivered.**
Along the three bottom lines i

Enabled by **Common DNA**

Our Business Unit focus
**Strengthening the profitable**

Supported by **Group functions**

**Digitalisation**

The triad of purpose, vision and values underpins the three building blocks of Strategy 2025: sustained execution excellence along the three bottom lines; becoming an employer, provider and investment of choice; a focus on our profitable core business and digital transformation. We have also cemented sustainability into every part of our business strategy through purpose and our own values. Respect and Results mean that we are committed to each other and together make a positive social contribution. Our purpose "Connecting people, improving lives" guides our efforts and sense of responsibility.

### Execution excellence along the three bottom lines

Our mission, "Excellence. Simply delivered.", is defined by the three bottom lines. We believe having motivated and skilled employees is the key to providing excellent service quality and achieving profitable growth.

At Deutsche Post DHL Group, when we speak of our common DNA we mean the set of behaviours, tools and programmes that we put into practice throughout the Group. Group-wide programmes such as Certified, First Choice and Safety First play an important part in building the common DNA by influencing what we do on a day-to-day basis. Irrespective of division, geographical region or function, our common DNA is an expression of who we are and how we do things at Deutsche Post DHL Group.

As an integral part of our strategy, sustainability is anchored along our three bottom lines. New policies and regulations across industries, increasingly changing buying habits and the growing focus on sustainable investments have motivated us to serve as a sustainability role model in our industry and to set ourselves ambitious targets. We therefore made sustainability a cornerstone of our Strategy 2025 and an essential element of our mission.

With our ESG Roadmap, we build on our past achievements and plot a course for future success. The roadmap will serve as guidance in the three areas of environment, social responsibility and corporate governance. Clear objectives were set for each of these areas. We strive for environmentally friendly logistics and aim to be a great place to work for all and a trustworthy company and partner.

We set transparent, time-bound targets and KPIs with which we make sustainability an integral component in the yearly planning and strategic cycle, with targets integrated into our decision-making process. One key target is to increase the pace of our company's planned decarbonisation, ❯ **Non-financial statement.**

### Divisions focus on profitable core business

Our divisions continue to focus relentlessly on their profitable core. In so doing, they ensure that our services and solutions can be provided reliably, even in unusual circumstances.

**Digital transformation**

Representing a signifi[...]
growth, digital trans[...]
strategy. We therefo[...]
improve the experie[...]
have with the compa[...]
ciency. Our digitalisat[...]
are upgrading the IT [...]
nologies throughout [...]
scaling business mod[...]

In our divisions, [...]
grammes in place to [...]
Excellence, we have c[...]
e.g. in the areas of a[...]
API, blockchain and t[...]
ing us to foster and b[...]
digital solutions acro[...]

## Research and [...]

As a service provider,[...]
engage in research a[...]
rower sense and ther[...]
report in this connec[...]

# Steering metrics

**Financial and non-financial key performance indicators**

Deutsche Post DHL Group uses both financial and non-financial performance indicators in its management of the Group. The monthly, quarterly and annual changes in these indicators are compared with prior-year data and forecast data to assist in making management decisions. The year-to-year changes in the financial and non-financial performance indicators described here also play an important role in the calculation of management remuneration. The Group's financial performance indicators are intended to preserve a balance between profitability, the efficient use of resources and adequate liquidity. How these metrics are computed is illustrated in the ❱ **Calculations graphic.** The performance of the financial key figures in the reporting year is described in the ❱ **Report on economic position.** As planned, the following non-financial key performance indicators were additionally introduced as management-relevant in the year under review: absolute logistics-related greenhouse gas (GHG) emissions, Realised Decarbonisation Effects, share of women in middle and upper management, lost time injury frequency rate (LTIFR) per 200,000 working hours and share of valid compliance-relevant training certificates in middle and upper management. Targets and results for these key performance indicators are described in the ❱ **Non-financial statement.**

Additional metrics that we will report beginning in 2023 are described and forecast in the ❱ **Expected developments, opportunities and risks section.**

**EBIT and EAC (EBIT after asset charge)**

The profitability of the Group's operating divisions is measured as profit from operating activities (EBIT).

EBIT after asset charge (EAC) is another key performance indicator used by the Group. EAC is calculated by subtracting the asset charge, a cost-of-capital component, from EBIT. Making the asset charge a part of business decisions encourages the efficient use of resources and ensures that our operational business is geared towards increasing value sustainably whilst improving cash flow.

The asset charge is calculated on the basis of the weighted average cost of capital, or WACC, which is defined as the weighted average net cost of interest-bearing liabilities and equity, taking into account company-specific risk factors in accordance with the Capital Asset Pricing Model.

A standard WACC of 8.5% is applied across the divisions. That figure also represents the minimum target for projects and investments within the Group. The WACC is generally reviewed once annually on the basis of the current situation on the financial markets. To ensure better comparability of the asset charge with previous figures, in 2022 the WACC used here was maintained at a constant level compared with the previous years.

The asset charge is calculated each month so that fluctuations in the net asset base can also be taken into account during the year. The ❱ **Calculations graphic** shows the composition of the Group's net asset base.

**Free cash flow facili**

Along with EBIT and E mance metric used I to maintain sufficient financial obligations fr addition to meeting pa Group's operations an using the cash flow st

Operating cash fl related directly to op parameter impacting management of net w

Free cash flow (FC from OCF. It is used a available to the compa ing debt at the end of

Deutsche Post DHL Group –

## Calculations

Revenue

- ⊕ Other operating income
- ⊕ Changes in inventories and work performed and capitalised
- ⊖ Materials expense
- ⊖ Staff costs
- ⊖ Depreciation, amortisation and impairment losses
- ⊖ Other operating expenses
- ⊕ Net income/loss from investments accounted for using the equity method

**EBIT**
**Profit from operating activities**



EBIT

- ⊖ Asset charge
  - ⊟ Net asset base
  - ⊗ Weighted average cost of capital (WACC)

**EAC**
**EBIT after asset charge**

Operating assets

- Intangible assets
- Property, plant and equipment
- Goodwill
- Trade receivables (included in net working capital)[1]
- Other non-current operating assets[2]

⊖ Operating liabilities

- Operating provisions
  (excluding provisions for pensions and similar obligations)
- Trade payables (included in net working capital)[1]
- Other non-current operating liabilities[2]

**Net asset base**

EBIT

- ⊕ Depreciation, amor
- ⊕ Net income/loss fro
- ⊕ Non-cash a
- ⊕ Change in provision
- ⊖ Change in other non
- ⊕ Dividends received
- ⊕ Income taxes paid
- **Operating cash flo**
  **in working capital**
- ⊕ Change in net work
- **Net cash from/use**
  **(operating cash flo**
- ⊕ Cash inflow/outflow
  plant and equipmen
- ⊕ Cash inflow/outflow
- ⊕ Cash outflow for lea
- ⊕ Net interest paid (e

**FCF**
**Free cash flo**



[1] Includes EBIT-related current assets and liabilities. Not included are assets and liabilities related to taxes, financing and cash and cash equivalents, for example.
[2] Includes EBIT-related other non-current assets and liabilities. Not included are assets and liabilities related to taxes or bonds, for example.

**Managing and reducing greenhouse gas emissions**

We aim to reduce the greenhouse gas (GHG) emissions produced by our operations, as well as our dependency on fossil fuels, in order to mitigate the impact of our operations on the global climate.

As planned, we introduced new key performance indicators in the year under review: the absolute logistics-related GHG emissions as a medium- and long-term target and Realised Decarbonisation Effects. We use the latter KPI to measure the emissions that we were able to avoid through the use of energy from renewable sources and sustainable technologies compared with conventional energy and technologies.

The calculation methodology for GHG emissions is based on recognised international standards such as the Greenhouse Gas Protocol, DIN EN 16258 and the Global Logistics Emissions Council Framework. For Realised Decarbonisation Effects, we also take the guidelines of the Smart Freight Centre for insetting and emissions calculation from sustainable aviation fuels into account.

As part of our reporting, we show the logistics-related GHG emissions including the upstream chain from fuel production (well-to-wheel) and include the GHG emissions caused or avoided by our transport subcontractors (Scope 3). We record the GHG emissions from categories 3, 4 and 6 in the calculation of Scope 3 emissions. The legally required blending of sustainable fuels is not included in the Realised Decarbonisation Effects.

**Employee engagement as a factor for success**

Motivated and committed employees contribute to the success of the company. In the annual Group-wide survey, all employees have the opportunity to anonymously rate the company's strategy and values as well as its working conditions. We derive the Employee Engagement key performance indicator from these results.

**Increase share of women in middle and upper management**

We use the performance indicator of share of women in middle and upper management to measure the success of our diversity measures. As part of this measurement, executives working part-time are counted on a per-person basis.

**Reduce LTIFR**

We measure the effect of workplace accidents based on the lost time injury frequency rate (LTIFR), which is determined using the number of work-related accidents per 200,000 working hours which lead to at least one day of missed work for the affected person following the accident.

**Conduct compliance-relevant training**

Our aspiration is to be a reliable and trustworthy partner in all business relationships. When conducting day-to-day business, our managers serve an important function as role models to the employees and business partners, which is why corresponding training is of such importance for executives. We measure success in this area on the basis of the share of valid training certificates at the middle and upper management levels.


# REPORT ON ECONOMIC POSITION

## Forecast / actual comparison

| Targets for 2022 | Results for 2022 | Targets for 2023 |
|---|---|---|
| **EBIT**[1] | **EBIT** | **EBIT** |
| • Group: around €8.4 billion | • Group: €8.4 billion | • Group: between €6.0 billion and €7.0 billion |
| • DHL divisions: around €7.5 billion | • DHL divisions: €7.6 billion | • DHL divisions: between €5.5 billion and €6.5 billion |
| • Post & Parcel Germany division: around €1.35 billion | • Post & Parcel Germany division: €1.3 billion | • Post & Parcel Germany division: around €1.0 billion |
| • Group Functions: around €−0.45 billion | • Group Functions: €−0.45 billion | • Group Functions: around €−0.45 billion |
| **EAC** | **EAC** | **EAC** |
| • Slight decline if asset charge increases as forecast | • Slight decline to €5.1 billion due to asset charge increases | • Slight decline if asset charge increases as forecast |
| **Cash flow**[1] | **Cash flow** | **Cash flow** |
| • Free cash flow[2] amounts to more than €4.2 billion | • Free cash flow[3] amounts to €4.6 billion | • Free cash flow amounts to around €3.0 billion |
| **Capital expenditure (capex)** | **Capital expenditure (capex)** | **Capital expenditure (capex)** |
| • Investment spending (excluding leasing): around €4.2 billion | • Investment spending (excluding leases): €4.1 billion | • Investment spending (excluding leasing): €3.4 billion to €3.9 billion |
| **Dividend distribution** | **Dividend distribution** | **Dividend distribution** |
| • Dividend payout of 40% to 60% of net profit | • To be proposed: dividend payout of 41.1% of net profit | • Dividend payout of 40% to 60% of net profit |

[1] Forecast adjusted several times during the year.   [2] Calculation excluding acquisitions / divestitures.   [3] Calculated excluding acquisitions / divestures; including acquisitions / divestures: €3.1 billion.

For reasons of clarity, targets and results for the non-financial key performance indicators used for managing the Group are described in the ❯ **Non-financial statement.**

## Overall assess

In the 2022 financial y
ated EBIT of €8.4 billi
environment, the divis
encing factors. Declin
in the Express, eCom
Germany divisions to
revenue increases in
Global Forwarding, F
growth. The decrease
due in particular to th
Free cash flow exclud
to a record figure of
growth in the core b
nomic environment w

## Economic para

The following data o
stem from S&P Glob
formerly IHS Markit).

**Global economy exp
crisis and inflation**
The nascent post-pa
suffered a marked de
the war in Ukraine. T
countries against Rus
to most Russian natu
severe curtailment of
have boosted inflatio
banks like the US Fede

Bank tightened monetary policy substantially from mid-2022 onwards in order to prevent high energy and food prices from leading to a sustained boost to general inflation expectations.

Global GDP growth has halved from 6.0% in 2021 to 3.0% in 2022. Growth in advanced industrialised countries declined from 5.4% to 2.6%, whilst growth in emerging markets fell from 7.1% to 3.5%. The main contributors to this decline were the United States with a drop in GDP growth from 5.9% to 2.0% and China with a decline from 8.4% to 2.8%. China's economy was hit additionally by the consequences of its zero-COVID policy. The below-average recovery in the eurozone in 2021 (5.3%) limited the degree of moderation, leading to a growth pace of 3.4% in 2022. This was especially true for Germany, where average GDP growth slowed down from 2.6% to 1.9%.

**Trade flows reflect global economic cool-down**

Global industrial production, which is relevant for the logistics sector, reflects the overall economic cool-down: Following growth of 7.4% in 2021, this figure weakened over the course of 2022 to 2.9%. Global trade also underwent less significant growth in the year under review at 6.8%, compared with 10.8% in the previous year. For Deutsche Post DHL Group, this slowdown in industrial demand manifests itself in the revenue and earnings trends of the DHL divisions during the year. Whilst global trade was still relatively well supported at the beginning of the year, the growth trend slowed with increasing clarity over the course of the year. Accordingly, on account of

lessened demand and increased inventories, the typical seasonal rise in volumes in the second half of the year was not visible in ocean freight nor in air freight. At the same time, the restrictions in place during the pandemic gradually cleared up in the ocean freight fleets as well as in cargo capacities in passenger flights. In light of this, the market capacities for transport services – which had been very heavily utilised until then – eased, resulting in the expected normalisation in air, ocean and road freight rates in the second half of 2022.

**E-commerce normalises at a high level**

As expected, 2022 was also shaped by a normalisation of consumer behaviour. Compared with the prior-year growth, which was significantly accelerated by the pandemic, e-commerce-based volumes thus declined, in particular in the first half of 2022. However, the remainder of the year confirmed that the pandemic caused a sustained acceleration of the structural growth trend in e-commerce-based business. Although consumer behaviour was held back by continued high inflation during the Christmas season, e-commerce-based volumes remained significantly above pre-pandemic levels.

**Legal environment**

In view of our leading market position, many of our services are subject to sector-specific regulation under the *Post-gesetz* (PostG – German Postal Act). Further information regarding this issue and legal risks is contained in ❯ **Note 45 to the consolidated financial statements.**

**Significant ev**

In August 2021, Deuts
ment to acquire the J.F.
the responsible antitru
purchase price of €1,4
March 2022, all share
the acquisition was co
in goodwill of €1,211

As at 31 Decembe
the amount of €1,015 d
of the 2022–2024 sh
ruary 2023, the Board
the current share buy
to 105 million treasur
of now up to €3 billio

**Results of ope**

**Changes to the portf**

In January, we sold th
relating to the produc
to ODIN Automotive,

In March, the sub
rated into the Global

The third quarter
of the Australia-base
road freight and contr
integration into the S

The acquisition of a majority holding in the Netherlands-based Monta B.V. was completed in October. With its e-fulfilment services, Monta will also support the Supply Chain division.

### Selected indicators for results of operations

| | | 2021 | 2022 |
|---|---|---|---|
| Revenue | €m | 81,747 | 94,436 |
| Profit from operating activities (EBIT) | €m | 7,978 | 8,436 |
| Return on sales[1] | % | 9.8 | 8.9 |
| EBIT after asset charge (EAC) | €m | 5,186 | 5,118 |
| Consolidated net profit for the period[2] | €m | 5,053 | 5,359 |
| Earnings per share[3] | € | 4.10 | 4.41 |
| Dividend per share | € | 1.80 | 1.85[4] |

[1] EBIT/earnings.    [2] After deduction of non-controlling interests.    [3] Basic earnings per share.    [4] Proposal.

### Consolidated revenue up 15.5%

In the 2022 financial year, consolidated revenue rose from €81,747 million to €94,436 million, also benefiting from positive currency effects in the amount of €2,957 million. Hillebrand has generated revenue of €1,640 million since April 2022. The proportion of revenue generated abroad rose from 73.6% to 76.8%. In the fourth quarter of 2022, revenue increased by 1.7% from the prior-year period to €23,776 million, supported by positive currency effects in the amount of €356 million.

Higher income from currency translation in particular caused other operating income to increase by €634 million to €2,925 million.

### Increase in materials expense

Materials expense climbed significantly from €43,897 million to €53,473 million, primarily as a result of higher trans-port costs and increased kerosene prices, as well as currency effects in the amount of €2,272 million and the initial consolidation of Hillebrand in the amount of €1,330 million. Staff costs rose by €2,156 million to €26,035 million, particularly as a result of the increased number of employees. At €4,177 million, depreciation, amortisation and impairment losses came in €409 million above the prior year, primarily on account of investments. Other operating expenses came to €5,712 million, thus likewise exceeding the prior year (€4,896 million) driven by factors such as higher currency translation expenses as well as increased travel, entertainment and training costs.

### Consolidated EBIT up 5.7%

Totalling €8,436 million in the year under review, profit from operating activities (EBIT) came in €458 million higher than the prior-year figure (€7,978 million). It amounted to €1,922 million in €2,213 million). At €−5 over the prior year ( lower strain from the rights (SARs) at fair v by €552 million to €7, taxes increased by €2 to a slightly higher tax

### Improved consolidat

Consolidated net p the 2022 financial y €5,717 million. Of thi able to Deutsche Post non-controlling inter share also rose from per share from €4.01

**Dividend of €1.85 per share proposed**

Our finance strategy calls for paying out 40% to 60% of net profit as dividends as a general rule. The Board of Management and the Supervisory Board will therefore propose to the shareholders at the Annual General Meeting on 4 May 2023 a dividend of €1.85 per share for the 2022 financial year (previous year: €1.80). The payout ratio in relation to the consolidated net profit attributable to Deutsche Post AG shareholders amounts to 41.1%. The net dividend yield based on the year-end closing price for our shares is 5.3%. The dividend will be disbursed on 9 May 2023.

**Total dividend and dividend per no-par-value share**

€m



─── Dividend per no-par-value share (€).

¹ Proposal.

**EBIT after asset charge declines slightly**

EAC declined slightly in 2022, falling from €5,186 million to €5,118 million. Whilst EBIT was up, the imputed asset charge rose disproportionately.

**EBIT after asset charge (EAC)**

| €m | 2021 | 2022 | +/– % |
|---|---|---|---|
| EBIT | 7,978 | 8,436 | 5.7 |
| ⊖ Asset charge | –2,792 | –3,318 | –18.8 |
| ⊖ EAC | **5,186** | **5,118** | **–1.3** |

The net asset base increased by €5,644 million to €40,137 million as at the reporting date. Intangible assets and property, plant and equipment increased, mainly on account of the consolidation of Hillebrand as well as the acquisition of freight aircraft and investments in warehouses, sorting facilities and the vehicle fleet. Net working capital decreased compared with the previous year.

Operating provisions remained at the level of the previous year, whilst other non-current assets and liabilities fell slightly.

**Net asset base (cons**

€m

| | |
|---|---|
| Intangible assets and pro plant and equipment² | |
| ⊕ Net working capital | |
| ⊖ Operating provisions (excluding provisions for pensions and simila obligations) | |
| ⊕ Other non-current asse and liabilities | |
| ⊖ **Net asset base** | |

¹ Assets and liabilities as des consolidated financial stat
² Including assets held for sal

## Divisions

### EXPRESS

**Continuing to expand and modernise network and intercontinental fleet**

As part of upgrading our intercontinental fleet, we signed contracts with Boeing between 2018 and 2022 to purchase a total of 28 new B777 aircraft. By the end of 2022, 18 of the aircraft ordered had been delivered and entered service. The remaining ten aircraft will be delivered in the years 2023 to 2025. Furthermore, over the course of 2022, we continued to expand our air network with the addition of new direct services, for example between Brussels (BRU) and Atlanta (ATL).

In Europe, our fleet of next-generation aircraft grew to five A321-200s and twelve B737-800s in service in the year under review. We now operate three airlines regionally: DHL Air UK expanded its B767 operations in its new intercontinental role and added new B777s to its fleet. We also completed the integration of DHL Air Austria into the EU Aviation platform, and European Air Transport (EAT) has expanded operations into Asia (Bangkok, Hong Kong) and into the United States.

In the Americas region, we've opened a new regional hub located in Atlanta, USA. The hub in Mexico City was also expanded. At the end of the year, ten B737-800s were in service in the United States. Furthermore, DHL Aero Expreso Panama will become our primary carrier between the United States and Central and South America in the first half of 2023, with another converted B767-300 being introduced. Dedicated flights from Miami to Viracopos,

Brazil, were introduced, with more than 300 tons of cargo capacity added per week.

In the Asia Pacific region, we added intercontinental connections, increased direct flights to and from South and East China and added intra-Asia capacity on key growth lanes. Further, DHL Express and Singapore Airlines signed a crew and maintenance agreement in March 2022 to expand our link to the Americas. The first of the five freighters arrived in August 2022, and the second entered service in November 2022. An additional converted Airbus 330-300 aircraft entered service in September 2022, which enabled the upgrade of capacity between Hong Kong and Chengdu, China. Another four converted aircraft of this model are planned for delivery during 2023. With Air Incheon, a new regional partner airline was added to our network in northern Asia.

In the MEA region, we continue to invest in our infrastructure by building new facilities in Abu Dhabi and Dubai, United Arab Emirates, Muscat – the capital of Oman – as well as Jeddah and Dammam in Saudi Arabia, and by expanding our hub in Bahrain. We also acquired seven B767-300 aircraft for conversion, of which the last entered service in May 2022. Furthermore, we introduced new flights to the Asia Pacific and Europe regions, improving the link between east and west.

In sub-Saharan Africa, we committed to four converted ATR 72-500 aircraft; the first was delivered in the year under review, and the rest will follow in 2023.

**Impacts of external factors on our business**

Pandemic-related restrictions were lifted in the reporting year. Also for this reason, B2C Express shipment volumes

declined year-on-yea[...]
are still well above p[...]
nomic slowdown afte[...]
noticeable in B2B volu[...]
ronment, our virtual [...]
flexibility, allowing us [...]
volume expectations.[...]

**Continued growth in[...]**

Revenue in the divis[...]
under review to €27[...]
currency effects of €1[...]
the revenue increase[...]
reflects the fact that [...]
the previous year in a[...]
and fuel surcharges, [...]
Definite International [...]
were up, whilst shipm[...]
Definite Domestic (T[...]
were flat, whilst shipm[...]

Revenue in the [...]
to €11,287 million i[...]
ure includes negativ[...]
Growth excluding cu[...]
to the previous year. [...]
day increased by 14.[...]
decreased by 5.0%. I[...]
national revenues pe[...]
shipment volumes do[...]

**Key figures, Express**

**€m**

|  | 2021 | 2022 | +/−% | Q4 2021 | Q4 2022 | +/−% |
|---|---|---|---|---|---|---|
| Revenue | 24,217 | 27,592 | 13.9 | 6,856 | 7,029 | 2.5 |
| of which Europe | 10,193 | 11,287 | 10.7 | 2,863 | 2,994 | 4.6 |
|     Americas | 5,120 | 6,149 | 20.1 | 1,464 | 1,563 | 6.8 |
|     Asia Pacific | 8,871 | 9,908 | 11.7 | 2,560 | 2,475 | −3.3 |
|     MEA (Middle East and Africa) | 1,361 | 1,569 | 15.3 | 364 | 400 | 9.9 |
|     Consolidation/Other | −1,328 | −1,321 | 0.5 | −395 | −403 | −2.0 |
| Profit from operating activities (EBIT) | 4,220 | 4,025 | −4.6 | 1,111 | 941 | −15.3 |
| Return on sales (%)[1] | 17.4 | 14.6 | – | 16.2 | 13.4 | – |
| Operating cash flow | 5,894 | 5,549 | −5.9 | 1,331 | 1,173 | −11.9 |

[1] EBIT/revenue.

**Express: revenue by product**

**€m per day[1]**

|  | 2021 | 2022 | +/−% | Q4 2021 | Q4 2022 | +/−% |
|---|---|---|---|---|---|---|
| Time Definite International (TDI) | 72.7 | 81.2 | 11.7 | 82.0 | 84.0 | 2.4 |
| Time Definite Domestic (TDD) | 6.0 | 6.0 | – | 6.5 | 6.2 | −4.6 |

[1] To improve comparability, product revenues were translated at uniform exchange rates. These revenues are also the basis for the weighted calculation of working days.

**Express: volume by product**

**Items per day (thousands)**

|  | 2021 | 2022 | +/−% | Q4 2021 | Q4 2022 | +/−% |
|---|---|---|---|---|---|---|
| Time Definite International (TDI) | 1,211 | 1,145 | −5.5 | 1,282 | 1,192 | −7.0 |
| Time Definite Domestic (TDD) | 645 | 554 | −14.1 | 671 | 564 | −15.9 |

Revenue in the
€6,149 million in 202
rency effects of €481
revenue increased by
15.0% and shipment v
quarter of 2022, per-
1.4% and shipment vo

In the Asia Pacifi
to €9,908 million in th
includes positive cu
enue growth excludi
TDI product line, reve
per-day volumes decr
quarter of 2022 cam
−8.2% for per-day vol

Revenue in the M
improved by 15.3% to
The revenue figure i
€98 million. Revenue
was 8.1%. Per-day TD
day volumes decreas
quarter of 2022 cam
−11.5% for per-day vo

**EBIT declines year-o**
In light of the volume
declined by 4.6% in 2
decreased from 17.4%
a special bonus paym
€37 million. Fourth-q
by 15.3% to €941 mill

# GLOBAL FORWARDING, FREIGHT

### Key figures, Global Forwarding, Freight

€m

|  | 2021 | 2022 | +/−% | Q4 2021 | Q4 2022 | +/−% |
|---|---|---|---|---|---|---|
| Revenue | 22,833 | 30,212 | 32.3 | 7,134 | 6,805 | −4.6 |
| of which Global Forwarding | 18,108 | 24,976 | 37.9 | 5,894 | 5,435 | −7.8 |
| Freight | 4,848 | 5,374 | 10.8 | 1,270 | 1,405 | 10.6 |
| Consolidation/Other | −123 | −138 | −12.2 | −30 | −35 | −16.7 |
| Profit from operating activities (EBIT) | 1,303 | 2,311 | 77.4 | 403 | 402 | −0.2 |
| Return on sales (%)[1] | 5.7 | 7.6 | – | 5.6 | 5.9 | – |
| Operating cash flow | 1,008 | 3,221 | >100 | 622 | 999 | 60.6 |

[1] EBIT/revenue.

### Global Forwarding: revenue

€m

|  | 2021 | 2022 | +/−% | Q4 2021 | Q4 2022 | +/−% |
|---|---|---|---|---|---|---|
| Air freight | 8,788 | 10,428 | 18.7 | 2,848 | 2,200 | −22.8 |
| Ocean freight | 7,115 | 11,477 | 61.3 | 2,456 | 2,455 | 0.0 |
| Other | 2,205 | 3,071 | 39.3 | 590 | 780 | 32.2 |
| **Total** | **18,108** | **24,976** | **37.9** | **5,894** | **5,435** | **−7.8** |

### Global Forwarding: volumes

Thousands

|  |  | 2021 | 2022 | +/−% | Q4 2021 | Q4 2022 | +/−% |
|---|---|---|---|---|---|---|---|
| Air freight exports | tonnes | 2,096 | 1,902 | −9.3 | 561 | 449 | −20.0 |
| Ocean freight | TEU[1] | 3,142 | 3,294 | 4.8 | 802 | 769 | −4.1 |

[1] Twenty-foot equivalent units.

**Impacts of external f**

The global forwarding
tailwind continued at t
ume slowed down ov
the development of
influenced by factors
ic-related lockdowns
with the recovering o
markets, the prices s
half of the year.

In the European
slowdown became a
umes declined, espe
Despite this develop
primarily to the prev
with the effects of th
this led to an immen
high throughout the y

**Positive revenue tre**

Revenue in the divisio
review to €30,212 m
effects of €896 millio
year. In the fourth qu
€6,805 million and fel
In the Global Forwar
37.9% to €24,976 mill
freight rates in the ye
currency effects of €
At €4,949 million, gr
business unit was lik
€3,366 million.



Deutsche Post DHL Group –

**Higher gross profit in air freight**

We registered a decrease of 9.3% in air freight volumes in 2022, due to lower demand as well as shifts to ocean freight. Declines were seen primarily on the trade lanes between China and the United States as well as between China and Europe. Air freight revenue exceeded the prior-year level by 18.7%; gross profit improved by 48.5%. In the fourth quarter of 2022, lower volumes and rates caused air freight revenue to decrease by 22.8%, whilst gross profit was up 10.8%.

**Capacity situation in ocean freight eases**

Ocean freight volumes for the year under review were up 4.8% year-on-year. Excluding the acquisition of Hillebrand, this figure was 7.4% below the prior-year level, with the decline in volume development caused by trade lanes from China. Ocean freight revenue increased by 61.3% in the reporting year; excluding Hillebrand, the increase amounted to 41.5%. Gross profit improved by 54.5%. The capacity situation continued to ease on the ocean freight market in the fourth quarter of 2022 and the freight rates declined significantly. In the fourth quarter of 2022, ocean freight revenue remained flat, whilst gross profit was up 6.2%.

**Revenue increase in European overland transport business**

In the Freight business unit, revenue rose by 10.8% to €5,374 million in the reporting year, with negative currency effects of €73 million. The volume was down by 4.8% year-on-year. The gross profit of the business unit rose by 7.3% to €1,330 million in the reporting year. The fourth quarter also proved to be stronger with revenue 10.6% above the previous year.

**Earnings significantly exceed prior-year figure**

In light of the price development described, EBIT in the division increased significantly from €1,303 million to €2,311 million in the year under review, accompanied by an EBIT margin of 7.6%. In the Global Forwarding business unit, EBIT amounted to 43.7% of gross profit. The previous year included a special bonus of €14 million. At €402 million, division EBIT in the fourth quarter of 2022 was slightly below the prior-year level of €403 million.

# SUPPLY CHAIN

**Key figures, Supply Chain**

€m

| | 2021 | 2022 | +/− % | Q4 2021 | Q4 2022 | +/− % |
|---|---|---|---|---|---|---|
| Revenue | 13,864 | 16,431 | 18.5 | 3,655 | 4,363 | 19.4 |
| of which EMEA (Europe, Middle East and Africa) | 6,596 | 7,252 | 9.9 | 1,806 | 1,946 | 7.8 |
| Americas | 5,266 | 6,832 | 29.7 | 1,329 | 1,787 | 34.5 |
| Asia Pacific | 2,046 | 2,419 | 18.2 | 534 | 649 | 21.5 |
| Consolidation/Other | −44 | −72 | −63.6 | −14 | −19 | −35.7 |
| Profit from operating activities (EBIT) | 705 | 893 | 26.7 | 198 | 225 | 13.6 |
| Return on sales (%)[1] | 5.1 | 5.4 | – | 5.4 | 5.2 | – |
| Operating cash flow | 1,582 | 1,433 | −9.4 | 664 | 820 | 23.5 |

[1] EBIT/revenue.

**Impacts of external factors on our business**

External factor such as high inflation, ongoing regional constraints due to the pandemic, shortages in labour and partially materials as well as geopolitical conflicts continued to cause global supply chain bottlenecks and additional complexity for businesses in the year under review. We were able to manage our customers' supply chains well thanks to our flexibility, our standardised processes and our targeted data analyses.

**Double-digit revenue growth**

Revenue in the division was up by 18.5% to €16,431 million in the year under review. Excluding positive currency effects of €780 million, revenue – which also included the most recent acquisitions – was up by 12.9% year-on-year. Revenue growth is furthermore based on new business and contract renewals. Additionally, eFulfillment and omnichannel solutions supported the growth. The positive development can be seen in all regions and all sectors, with Consumers and Auto-mobility recording the highest revenue growth. In the fourth quarter of 2022, revenue increased by 19.4% to €4,363 million.

**Supply Chain: revenue by sector and region, 2022**

Total revenue: €16,431 million

| | | |
|---|---|---|
| of which | Retail | 28% |
| | Consumer | 23% |
| | Auto-mobility | 15% |
| | Technology | 12% |
| | Life Sciences & Healthcare | 12% |
| | Engineering & Manufacturing | 6% |
| | Others | 4% |
| of which | Europe/Middle East/Africa/Consolidation | 44% |
| | Americas | 41% |
| | Asia Pacific | 15% |

**New business worth

The division conclude
existing customers w
nue) in the year unde
tract volume of €6,50
contracts compared
Retail, Consumer and
most of the new bus
accounted for a 33% s
contract renewal rate

**EBIT above prior-yea

EBIT in the division i
under review (previou
year included a speci
nue performance spu
year, which was susta
due to investments i
The EBIT margin was
for the fourth quarte
€225 million.

## ECOMMERCE SOLUTIONS

### Key figures, eCommerce Solutions

€m

|  | 2021 | 2022 | +/− % | Q4 2021 | Q4 2022 | +/− % |
|---|---|---|---|---|---|---|
| Revenue | 5,928 | 6,142 | 3.6 | 1,664 | 1,696 | 1.9 |
| of which Americas | 2,079 | 2,188 | 5.2 | 617 | 636 | 3.1 |
| Europe | 3,140 | 3,235 | 3.0 | 855 | 884 | 3.4 |
| Asia | 719 | 720 | 0.1 | 195 | 177 | −9.2 |
| Consolidation/Other | −10 | −1 | 90.0 | −3 | −1 | 66.7 |
| Profit from operating activities (EBIT) | 417 | 389 | −6.7 | 93 | 91 | −2.2 |
| Return on sales (%)[1] | 7.0 | 6.3 | – | 5.6 | 5.4 | – |
| Operating cash flow | 654 | 582 | −11.0 | 99 | 113 | 14.1 |

[1] EBIT/revenue.

### Impacts of external factors on our business

The war in Ukraine and the marked increase in cost of living led to a slight decrease in parcel volumes in some regions. Thanks to our diversified portfolio, however, our business remained resilient and avoided extreme fluctuations. We are experiencing volumes well above the level from before the pandemic in 2019 in all markets.

### Revenue growth in all regions in the year under review

The division generated revenue of €6,142 million in the year under review, up 3.6% on the prior-year figure. This figure was reduced by €112 million through portfolio adjustments in Asia. Excluding positive currency effects of €272 million, revenue was down by 1.0% year-on-year. Division revenue increased by 1.9% in the fourth quarter of 2022 to €1,696 million.

### EBIT declines year-on-year

In the year under review, EBIT in the division was €389 million, thus coming in below the prior-year figure of €417 million. This was due to decreasing volumes in B2C business and higher costs. The previous year included a special bonus of €11 million. The EBIT margin was 6.3% in the year under review. EBIT amounted to €91 million (previous year: €93 million) in the fourth quarter of 2022.

## POST & PARCEL G

### Impacts of external f

The structural transf
tinues: as conventiona
uments continue to de
the mail network are

The Dialogue Ma
with the advertising
compared with the p
impacted by the pan

The German par
effects: The successi
restrictions in retail bu
and the increase in
online shopping and

### Revenue down comp

At €16,779 million, div
under review. The de
the decline in the Ger
below the strong prio
quarter of 2022 was

### Varying business un

In the reporting year,
volumes follow the o
This development wa
numbers of mail-in v
decline in volumes h
not compensated for
increases effective fro

COMBINED MANAGEMENT REPORT REPORT ON ECONOMIC POSITION                                        Deutsche Post DHL Group –

In 2022, Dialogue Marketing's revenue and sales volumes were above their levels of the previous year, which suffered from lower advertising expenditure in retail in particular.

In the German parcel business, macroeconomic developments led to declining volumes compared with the high-growth prior year. Even the pre-Christmas business could not increase year-on-year. Mitigated by price increases, revenue generated by Parcel Germany fell by 5.6% in the year under review. Parcel volume declined by 8.3%.

The trend of decreasing document shipments continued in international business. Shipments of lightweight goods also fell, in import due primarily to increased import regulations. By contrast, the number of parcels shipped by business customers increased once again.

**EBIT down sharply year-on-year**

Division EBIT in 2022 amounted to €1,271 million and thus fell 27.2% short of the remarkable prior year, in which we had generated higher revenues in parcel business in particular. Strict cost management helped mitigate higher materials costs as a result of accelerating inflation, but this did not fully compensate for the development. The special bonus amounting to €52 million was included in the previous year's figure. Division EBIT in the fourth quarter of 2022 totalled €384 million, a decline of 33.3% versus the comparable prior-year figure. The revenue decreases as well as higher material costs due to inflation and to ensure high quality during the Christmas season, a high sickness rate as well as higher personnel recruiting expenses influenced EBIT.

**Key figures, Post & Parcel Germany**

€m

|  | 2021 | 2022 | +/− |
|---|---|---|---|
| Revenue | 17,445 | 16,779 |  |
| of which Post Germany | 7,995 | 7,892 |  |
| Parcel Germany | 6,785 | 6,408 |  |
| International | 2,570 | 2,400 |  |
| Consolidation/Other | 95 | 79 |  |
| Profit from operating activities (EBIT) | 1,747 | 1,271 |  |
| Return on sales (%)[1] | 10.0 | 7.6 |  |
| Operating cash flow | 1,811 | 1,558 |  |

[1] EBIT/revenue.

**Post & Parcel Germany: revenue**

€m

|  | 2021 | 2022 | +/− |
|---|---|---|---|
| Post Germany | 7,995 | 7,892 |  |
| of which Mail Communication | 5,473 | 5,361 |  |
| Dialogue Marketing | 1,811 | 1,833 |  |
| Other/Consolidation Post Germany | 711 | 698 |  |
| Parcel Germany | 6,785 | 6,408 |  |

**Post & Parcel Germany: volumes**

Mail items (millions)

|  | 2021 | 2022 | +/− |
|---|---|---|---|
| Post Germany | 14,216 | 14,122 |  |
| of which Mail Communication | 6,314 | 6,256 |  |
| Dialogue Marketing | 6,928 | 6,946 |  |
| Parcel Germany | 1,818 | 1,668 |  |

# Financial position

## Selected cash flow indicators

€m

|  | 2021 | 2022 | Q4 2021 | Q4 2022 |
|---|---|---|---|---|
| Cash and cash equivalents as at 31 December | 3,531 | 3,790 | 3,531 | 3,790 |
| Net change in cash and cash equivalents | −1,055 | 375 | −444 | −127 |
| Net cash from operating activities | 9,993 | 10,965 | 2,616 | 3,090 |
| Net cash used in investing activities | −4,824 | −3,179 | −2,184 | −2,087 |
| Net cash used in financing activities | −6,224 | −7,411 | −876 | −1,130 |

## Finance strategy



**Credit rating**
- Maintain stand-alone ratings between "Baa1" and "A3" and "BBB+" and "A−", respectively

**Regular dividend policy**
- Pay 40% to 60% of net profit
- Consider cash flow and continuity

**Debt portfolio**
- Syndicated credit facility as a liquidity reserve
- Sustainability-linked finance framework as option for future funding

**Priorities for available liquidity**

Free cash flow generation

Fund business operations

Finance organic investments

Pay regular dividend

Shareholder distribution beyond regular dividend | Fund inorganic growth

Balance sheet strength

**Investors**
- Value creation through transparent and effective capital allocation
- Transparent and reliable information from the company
- Predictability of expected shareholders distribution

**Group**
- Preserve financial and strategic flexibility
- Commitment to the Group's ESG Roadmap
- Assure access to debt capital markets and low cost of capital

**Financial management the Group**

The Group's financial aging liquidity along interest rates, currency Group financing, issui and liaising with ratin activities rests with C ters in Bonn, which i sury Centres in Bonn ( Singapore. The region Group headquarters a the companies on fina compliance with Grou

Corporate Financ risk and the cost of c Group's financial stab

**Updated finance stra**

Building on the princi agement, and in light tion, the Corporate B in January 2022. It t interests and the lend creation through a tra capital. It also aims to cost of capital for the G and predictability for ESG roadmap.

One key component of the strategy is a stand-alone target rating between "Baa1" and "A3" and "BBB+" and "A–", respectively. The strategy also sets clear priorities on how available liquidity is allocated. It will first be used to fund business operations, finance organic investments and make regular dividend payments. Thereafter, additional dividend payments or share buy-backs as well as inorganic growth will be considered.

### Cash and liquidity managed centrally

The cash and liquidity of our globally operating subsidiaries is managed centrally by Corporate Treasury. Approximately 80% of the Group's external revenue is consolidated in cash pools and used to balance internal liquidity needs. In countries where this practice is ruled out for legal reasons, internal and external borrowing and investment are managed centrally by Corporate Treasury. In this context, we observe a balanced banking policy in order to remain independent of individual banks. Our subsidiaries' intra-Group revenue is also pooled and managed by our in-house bank (inter-company clearing) in order to avoid paying external bank charges and margins. Payment transactions are executed in accordance with uniform guidelines using standardised processes and IT systems. Many Group companies pool their external payment transactions in the intra-Group Payment Factory, which executes payments on behalf of the respective companies via Deutsche Post AG's central bank accounts.

### Limiting market risk

The Group uses both primary and derivative financial instruments to limit market risk. Interest rate swaps are used to hedge against interest rate risks, and forward transactions are used for currency risks. We pass on most of the risk arising from commodity price fluctuations to our customers and, to some extent, use commodity swaps to manage the remaining risk. The parameters, responsibilities and controls governing the use of derivatives are laid down in internal guidelines.

### Flexible and stable financing

The Group covers its long-term financing requirements by means of equity and debt. This ensures our financial stability and also provides adequate flexibility. Our most important source of funds is net cash from operating activities.

We also have a syndicated credit facility in a total volume of €2 billion that guarantees us favourable market conditions and acts as a secure, long-term liquidity reserve. The term of the syndicated credit facility is through 2025, it does not contain any further covenants concerning the Group's financial indicators and, thanks to our solid liquidity situation, it was not drawn down during the year under review.

As part of our banking policy, we spread our business volume widely and maintain long-term relationships with the financial institutions we entrust with our business. In addition to credit lines, we meet our borrowing requirements

through other indep
bonds, promissory no
out centrally in order
specialisation benefits

One bond in the a
the year under revie
in ❯ **Note 39 to the cons**

### Group's credit rating

In April, the outlook o
stable to positive by
the BBB+ rating was
credit rating was upg
from A3 to A2 with a c
positioned in the tran
ratings. The following
reporting date and the
and current analyses
categories can be fou

## Agency ratings

### Fitch

**Long-term: BBB+**
**Short-term: F2**
**Outlook: positive**

⊕ **Rating factors**

- Company size and geographic diversification
- Broad portfolio of services and customers
- Market leadership
- Excellent results, driven by a clear rise in global trade and the continuation of strong e-commerce
- Balanced business risk profile between the parcel and express segments, which are growing due to online retail, contract logistics business and the cyclical freight forwarding business
- Solid key figures and liquidity

⊖ **Rating factors**

- Structural volume decline in letter mail business
- Increased capital expenditure and dividends to shareholders

### Moody's

**Long-term: A2**
**Short-term: P−1**
**Outlook: stable**

⊕ **Rating factors**

- Large scale and global presence as the world's biggest logi market positions in express and logistics, and by the large C
- Indirect shareholding of the German government
- Solid financial profile
- Good earnings momentum

⊖ **Rating factors**

- Cost inflation, in particular for fuel
- Challenges faced in domestic letter mail business which re conventional letter mail business
- Exposure to highly competitive markets and volatile marke
- Increasing capital spending, which hampers cash generatic

### Liquidity and sources of funds

As at the reporting date, the Group reported centrally available liquidity in the amount of €2.0 billion (previous year: €3.6 billion), which is comprised of cash and cash equivalents as well as current financial assets. Due to our solid liquidity situation, the syndicated credit line in the amount of €2 billion was not drawn. In addition to the syndicated credit line, unused bilateral credit lines totalling €1.4 billion were available to the Group at the reporting date.

The following table gives a breakdown of the financial liabilities reported in the balance sheet. Additional information is provided in  **Note 39 to the consolidated financial statements.**

### Financial liabilities

| €m | 2021 | 2022 |
|---|---|---|
| Lease liabilities | 11,805 | 13,514 |
| Bonds | 6,669 | 6,180 |
| Amounts due to banks | 544 | 530 |
| Promissory note loans | 150 | 100 |
| Financial liabilities at fair value through profit or loss | 13 | 134 |
| Other financial liabilities | 716 | 1,360 |
| | **19,897** | **21,818** |

### Capital expenditure prior-year level

Investments in prope gible assets acquired €4,123 million in the €3,895 million). Plea **consolidated financial sta** asset classes and reg

**Capex and depreciation, amortisation and impairment losses, full year**

| | Express | | Global Forwarding, Freight | | Supply Chain | | eCommerce Solutions | | Post & Parcel Germany | | Group Functions | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 |
| Capex (€m) relating to acquired assets | 1,707 | 1,528 | 132 | 159 | 483 | 504 | 245 | 431 | 883 | 1,043 | 445 | 459 |
| Capex (€m) relating to leased assets | 1,246 | 1,860 | 215 | 281 | 667 | 900 | 178 | 135 | 14 | 27 | 760 | 536 |
| **Total (€m)** | **2,953** | **3,388** | **347** | **440** | **1,150** | **1,404** | **423** | **566** | **897** | **1,070** | **1,205** | **995** |
| Depreciation, amortisation and impairment losses (€m) | 1,511 | 1,690 | 245 | 318 | 756 | 859 | 179 | 198 | 334 | 354 | 744 | 758 |
| Ratio of total capex to depreciation, amortisation and impairment losses | 1.95 | 2.00 | 1.42 | 1.38 | 1.52 | 1.63 | 2.36 | 2.86 | 2.69 | 3.02 | 1.62 | 1.31 |

[1] Including rounding.

**Capex and depreciation, amortisation and impairment losses, Q4**

| | Express | | Global Forwarding, Freight | | Supply Chain | | eCommerce Solutions | | Post & Parcel Germany | | Group Functions | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 |
| Capex (€m) relating to acquired assets | 758 | 825 | 37 | 59 | 166 | 155 | 138 | 213 | 403 | 375 | 136 | 178 |
| Capex (€m) relating to leased assets | 334 | 470 | 60 | 91 | 155 | 237 | 90 | 41 | 5 | 6 | 263 | 166 |
| **Total (€m)** | **1,092** | **1,295** | **97** | **150** | **321** | **392** | **228** | **254** | **408** | **381** | **399** | **344** |
| Depreciation, amortisation and impairment losses (€m) | 400 | 428 | 65 | 84 | 117 | 232 | 51 | 52 | 90 | 97 | 190 | 199 |
| Ratio of total capex to depreciation, amortisation and impairment losses | 2.73 | 3.03 | 1.49 | 1.79 | 2.74 | 1.69 | 4.47 | 4.88 | 4.53 | 3.93 | 2.10 | 1.73 |

[1] Including rounding.

Investments in the Express division related to buildings and technical equipment. Continuous maintenance and renewal of our intercontinental air fleet represented an additional focus of investment spending, ❯ Divisions. Some of these investments were attributable to rights of use.

In the Global Forwarding, Freight division, we invested in warehouses, office buildings and IT.

In the Supply Chain division, the majority of funds were invested to support customer implementations in all regions, above all in the Americas and EMEA regions.

In the eCommerce Solutions division, most of the investments were attributable to network expansion in the Netherlands, Poland and the United States.

In the Post & Pa[r...] capex portion was a[...] infrastructure. The a[...] erty were stepped up[...] focus was expanding[...]

At Group Functio[...] were mainly in the ve[...]

**Increase in net cash from operating activities**

Net cash from operating activities rose from €9,993 million to €10,965 million. The improved EBIT was offset by increased income tax payments. The cash inflow from changes in the working capital was €215 million, compared with a cash outflow of €430 million in the previous year.

Net cash used in investing activities fell from €4,824 million to €3,179 million, although we made payments for the acquisition of subsidiaries and other business units amounting to €1,613 million. The acquisition of Hillebrand at €1,379 million net (less assumed cash) was the main contributor in this regard. Cash paid to acquire non-current assets rose from €3,736 million to €3,912 million and related primarily to the expansion and renewal of our vehicle and air fleets. The change in current financial assets produced a cash inflow of €1,664 million. For the most part, we sold money market funds to cover the dividend payment to the shareholders and the purchase price for Hillebrand. This is in contrast to a cash outflow of €1,508 million in the previous year, primarily for the purchase of money market funds in the amount of €950 million.

Free cash flow declined substantially from €4,092 million to €3,067 million and mainly reflects the payments for the acquisition of companies. Adjusted for the payments for acquisitions and divestitures of €1,540 million net, free cash flow stood at €4,607 million.

**Calculation of free cash flow**

| €m | 2021 | |
|---|---|---|
| **Net cash from operating activities** | **9,993** | |
| Sale of property, plant and equipment and intangible assets | 190 | |
| Acquisition of property, plant and equipment and intangible assets | −3,736 | |
| **Cash outflow from change in property, plant and equipment and intangible assets** | **−3,546** | |
| Disposals of subsidiaries and other business units | 13 | |
| Disposals of investments accounted for using the equity method and other investments | 1 | |
| Acquisition of subsidiaries and other business units | 0 | |
| Acquisition of investments accounted for using the equity method and other investments | −2 | |
| **Cash inflow / outflow from acquisitions / divestitures** | **12** | |
| Proceeds from lease receivables | 143 | |
| Interest from lease receivables | 16 | |
| Repayment of lease liabilities | −2,051 | |
| Interest on lease liabilities | −383 | |
| **Cash outflow for leases** | **−2,275** | |
| Interest received (without leasing) | 75 | |
| Interest paid (without leasing) | −167 | |
| **Net interest paid** | **−92** | |
| **Free cash flow** | **4,092** | |

Net cash used in financing activities rose from €6,224 million to €7,411 million. The dividend paid out to our shareholders in May increased by €532 million to €2,205 million. Payments for the acquisition of treasury shares in the amount of €1,099 million were made primarily as part of the current share buy-back programme, slightly below the level of the previous year (€1,115 million).

Cash and cash equivalents increased from €3,531 million as at 31 December 2021 to €3,790 million.

## Net assets

### Selected indicators for net assets

|  |  | 31 Dec. 2021 | 31 Dec. 2022 |
|---|---|---|---|
| Equity ratio | % | 30.7 | 34.7 |
| Net debt | €m | 12,772 | 15,856 |
| Net interest cover |  | 17.4 | 18.6 |
| Net gearing | % | 39.6 | 40.1 |

### Increase in consolidated total assets

The Group's total assets amounted to €68,278 million as at 31 December 2022 and were thus €4,686 million higher than at 31 December 2021 (€63,592 million).

Intangible assets rose from €12,076 million to €14,096 million. In particular the consolidation of Hillebrand caused goodwill and the purchased customer lists to increase significantly. Property, plant and equipment grew significantly from €24,903 million to €28,688 million, as investments exceeded disposals and depreciation, amortisation and impairment losses. Current financial assets dropped considerably from €3,088 million to €1,355 million, due mainly to the sale of money market funds. Trade receivables increased by €570 million to €12,253 million.

At €23,236 million, equity attributable to Deutsche Post AG shareholders was considerably higher than at

31 December 2021 (€ profit for the period, ment of pension provi dividend payment and ticular, higher interest of €2,249 million in obligations to €1,93 from €19,897 million lease liabilities increa payables increased fr The increase of €374 €6,512 million stems

### Balance sheet structure of the Group as at 31 December

€m




**Higher net debt**

Our net debt increased from €12,772 million as at 31 December 2021 to €15,856 million as at 31 December 2022. At 34.7%, the equity ratio was well above the prior-year figure (30.7%). At 18.6, net interest cover also exceeded the previous year's level (17.4). Net gearing was 40.1% as at 31 December 2022.

**Net debt**

€m

| | 31 Dec. 2021 | 31 Dec. 2022 |
|---|---|---|
| Non-current financial liabilities | 16,589 | 17,616 |
| + Current financial liabilities | 2,802 | 3,486 |
| **= Financial liabilities[1]** | **19,391** | **21,102** |
| – Cash and cash equivalents | 3,531 | 3,790 |
| – Current financial assets | 3,088 | 1,355 |
| – Positive fair value of non-current financial derivatives[2] | 0 | 101 |
| **= Financial assets** | **6,619** | **5,246** |
| **Net debt** | **12,772** | **15,856** |

[1] Less operating financial liabilities.
[2] Recognised in non-current financial assets in the balance sheet.

# DEUTSCHE POST AG (HGB)

## Deutsche Post AG as parent company

In addition to the reporting on the Group, the performance of Deutsche Post AG is outlined below.

As the parent company of Deutsche Post DHL Group, Deutsche Post AG prepares its annual financial statements in accordance with the principles of the *Handelsgesetzbuch* (HGB – German Commercial Code) and the *Aktiengesetz* (AktG – German Stock Corporation Act).

There are no separate performance indicators relevant for management purposes that are applicable to the parent company Deutsche Post AG. For this reason, the explanations presented for Deutsche Post DHL Group are also applicable to Deutsche Post AG.

## Employees

The number of full-time equivalents at Deutsche Post AG at the reporting date was 161,772 (previous year: 165,221).

## Results of operations

Revenue fell by a total of €478 million (2.9%) year-on-year.

Revenue from German letter mail business was €7,537 million in the year under review and thus 1.7% below the prior-year level of €7,670 million. Of this revenue, €4,861 million (previous year: €4,952 million) was attributable to Mail Communication, €1,711 million (previous year: €1,697 million)

to Dialogue Marketi
€1,021 million) to othe
cel business in the rep
short of the prior-year
attributable primarily t
previous year was hea
enue of €2,049 millio
reported for our Inter
period. Other revenue
year: €661 million) an
employee leasing, rent
from service level agre

**Income statement fo
1 January to 31 Dece**

€m

| | |
|---|---|
| Revenue | |
| Other own work capitalise | |
| Other operating income | |
| | |
| Materials expense | |
| Staff costs | |
| Amortisation of intangibl depreciation of property, equipment | |
| Other operating expenses | |
| | |
| **Financial result** | |
| **Taxes on income** | |
| **Result after tax/Net prof** | |
| **Retained profits brought previous year** | |
| **Net retained profit** | |

Deutsche Post DHL Group –

Other operating income registered a year-on-year increase of €156 million, or 14.1%, driven mainly by higher income from currency translation (€365 million) with offsetting lower income from the disposal of real estate (€174 million).

Materials expense rose by €131 million on account of an increase in the cost of transport services for letters and parcels as well as an increase for leases and rents due to higher costs on account of inflation.

Staff costs were down by €104 million year-on-year. In the year under review, lower expenses for early-retirement programmes and severance payments totalling €47 million were presented. In addition, a special bonus of €52 million was paid in the previous year.

The increase in other operating expenses by €502 million stemmed mainly from higher expenses from currency translation (€402 million).

The financial result in the amount of €3,078 million (previous year: €3,616 million) mainly comprises net investment income of €3,739 million (previous year: €4,085 million) and a net interest expense of €657 million (previous year: €460 million). The change in net investment income is due mainly to the €346 million decrease in income from profit transfer agreements attributable to Deutsche Post Beteiligungen Holding GmbH, whose earnings were the result of lower profit transfers from subsidiaries from the Express and Post & Parcel Germany divisions as well as higher dividend income from investments having an opposite effect. Lower income from plan assets / assets due to a decreased return as well as changes in fair value led to the worsening of net interest expenses.

After accounting for taxes on income of €−369 million (previous year: €−426 million), net profit for the period totalled €2,601 million (previous year: €3,935 million). Including retained profits carried forward, net retained profit for the period amounted to €10,635 million (previous year: €10,239 million).

## Net assets and financial position

### Total assets up

Total assets rose to €46,735 million as at the reporting date (previous year: €46,255 million).

Fixed assets increased from €17,365 million to €17,882 million. Investments in property, plant and equipment totalled €828 million (previous year: €700 million) and related mainly to land and buildings (€241 million), technical equipment (€173 million) and advance payments and assets under development (€357 million). Investments were made mainly in mail and parcel centres, conveyor and sorting systems, Packstations and real estate for network expansion. Non-current financial assets were down by €93 million, due primarily to lower loans to affiliated companies.

**Balance sheet of Deu...**
**as at 31 December**

**€m**

**ASSETS**
**Fixed assets**
Intangible assets
Property, plant and equip...
Non-current financial ass...

**Current assets**
Inventories
Receivables and other ass...
Securities
Cash and cash equivalents

**Prepaid expenses**

**TOTAL ASSETS**

**EQUITY AND LIABILITIES**
**Equity**
Subscribed capital
Treasury shares
Issued capital
(Contingent capital: €159...
Capital reserves
Earnings reserves
Net retained profit

**Provisions**
**Liabilities**
**Deferred income**

**TOTAL EQUITY AND LIAB...**

Current assets grew by €70 million, with receivables from affiliated companies increasing by €1,462 million mainly as a result of higher intra-Group cash management (€1,807 million) and the lower receivables from profit transfer agreements (€346 million). Securities holdings of €1,745 million were completely sold. Cash and cash equivalents increased by €165 million.

Equity was down from €19,740 million in the previous year to €19,224 million. Net profit for 2022 of €2,601 million exceeded the dividend paid to shareholders of €2,205 million in 2022. Earnings reserves declined by €887 million, due in particular to the offsetting of share buy-backs amounting to €1,058 million. The offsetting increase in the earnings reserves by €171 million is attributable to the commitment and settlement of shares for executive remuneration plans. The equity ratio decreased slightly from 42.7% to 41.1%.

Provisions were up by €640 million in the reporting period. Provisions for pensions and similar obligations increased by €685 million due to lower returns from, and fair value changes in, plan assets/assets. The decline in provisions for taxes of €56 million is due to higher advance income tax payments and the lower net income in the 2022 financial year.

Liabilities increased by €312 million to €21,510 million. The liabilities arising from bonds remain unchanged. Liabilities to banks fell by €40 million. Trade payables and liabilities to investees increased by €85 million and €64 million, respectively. The increase in liabilities to affiliated companies amounting to €197 million resulted largely from intra-Group cash management.

**Increase in cash funds**

Deutsche Post AG's cash funds rose by €165 million to €2,026 million in the 2022 financial year.

**Increase in debt**

Deutsche Post AG's debt (provisions and liabilities) rose by €952 million to €27,377 million compared with the previous year. The increase was due chiefly to an increase of €685 million in provisions for pensions and similar obligations as well as higher liabilities to affiliated companies (€197 million).

# Expected developments, opportunities and risks

The international strategy and associated performance forecast of Deutsche Post DHL Group also reflect the expectations for Deutsche Post AG as the parent company. Since Deutsche Post AG is interconnected with the companies of Deutsche Post DHL Group through arrangements, including financing and guarantee commitments and direct and indirect investments in its investees, Deutsche Post AG's opportunities and risks fundamentally align with those of the Group. The section titled ❯ **Expected developments, opportunities and risks** therefore also covers expected developments, opportunities and risks with respect to Deutsche Post AG as the parent company. The Post & Parcel Germany division reflects Deutsche Post AG's core business in material respects. The subsidiaries have

an indirect influence
investment income f
a result, the subsidia
influence the future r
financial statements
dend. For the 2023 f
for Deutsche Post AG
compatible with our t

COMBINED MANAGEMENT REPORT — NON-FINANCIAL STATEMENT                                    Deutsche Post DHL Group –

# NON-FINANCIAL STATEMENT

for Deutsche Post AG and for Deutsche Post DHL Group in accordance with Sections 289b(1) and 315b(1) HGB

The year 2022 was one of the most challenging of the last few decades. The war in Ukraine and the economic sanctions it caused and the discontinuation of energy supplies from Russia, as well as the significant rise in natural disasters due to extreme weather conditions, impacted living conditions around the world and put the stability of supply chains to the test. Moreover, employees and business partners as well as the capital market are still all increasing their expectations for sustainable business. In addition, legislators continued to intensify their requirements of sustainable financing and reporting.

### General information

The Global Reporting Initiative (GRI) standards are taken as the framework for determining material non-financial topics, supplemented by HGB requirements. The key performance indicators used for managing the Group were determined in accordance with the HGB and the German Accounting Standard 20 was applied.

### ESG standards anchored in the Code of Conduct

We conduct our business in accordance with applicable law and high ethical, social and environmental standards. As a signatory to the UN Global Compact, Deutsche Post DHL Group implements its ten principles in areas where we have influence. Additionally, we take guidance from the principles set out in the Universal Declaration of Human Rights, the OECD Guidelines for Multinational Enterprises and the International Labour Organization's (ILO) Declaration on Fundamental Principles and Rights at Work, as well as from the principle of social partnership. Our ethical, social and environmental values are anchored for the entire Group in our Code of Conduct for employees, and in the Supplier Code of Conduct for our suppliers and subcontractors. Since respect for human rights is particularly important to us, we specify them in our Human Rights Policy Statement, ❯ **Corporate governance.**

Moreover, we participate in numerous United Nations initiatives and support the UN Sustainable Development Goals (SDGs). Our commitment is most closely aligned with the goals of Quality Education (SDG 4), Gender Equality (SDG 5), Decent Work and Economic Growth (SDG 8), Sustainable Cities and Communities (SDG 11), Climate Action (SDG 13) and Partnerships for the Goals (SDG 17), ◎ **Company website.**

## Strategic orientation

Our purpose – Connecting people, improving lives – reflects our understanding of sustainability, which is embedded in our strategic bottom lines throughout the Group. The degree to which we meet the needs of our key stakeholder groups, minimise the environmental impact of our business, increase our contributions to society and act as trustworthy business partners are also determinants of the success of our company. That is why we adhere to principles aimed at reducing our environmental footprint, creating a safe, inclusive and motivating workplace for our employees, and ensuring that our business practices are transparent and in compliance with the law.



Our ESG Roadmap
action and environme
bonisation measures
towards social respo
❯ **Strategy.** In addition,
into, and for the year
tively, of the target p
of the Board of Mana
a separate statutory r
lished on our ◎ **Webs**
be included in the an
To support our co
we published a susta
which enables us to is
The framework follow
ciples of the Internati
provides an overview
at achieving our ambi
view of the potential
instrument, ◎ **Compa**

Deutsche Post DHL Group –

**Material topics and performance indicators**

The materiality analysis was updated at its regular interval in 2021. Using this, six topics were derived on which our business has a material influence or, conversely, which can affect our business. These topics also represent the basis for the alignment of our ESG Roadmap, which was reviewed together with the Board of Management and the Supervisory Board during the year under review: the topics were confirmed and the cybersecurity rating key figure introduced in the reporting year was additionally determined to be steering- and remuneration-relevant for the 2023 financial year.

| | Material topic | Performance indicator |
|---|---|---|
| | Climate and environmental protection with a focus on greenhouse gas (GHG) emissions | Absolute logistics-related GHG emissions and Realised Decarbonisation Effects |
| | Employee Engagement | Employee Engagement: Approval rate in the annual survey |
| | Diversity and inclusion | Share of women in middle and upper management |
| | Occupational health and safety | Lost time injury frequency rate (LTIFR)[1] |
| | Compliance | Share of valid compliance-relevant training certificates in middle- and upper-level management |
| | Cybersecurity | Cybersecurity rating[2] |

[1] Work-related accidents per 200,000 working hours resulting in at least one working day of absence for the affected person following the accident.
[2] Steering- and remuneration-relevant from the 2023 financial year.

The development of actual versus planned key performance indicators is presented to the Board of Management along with financial KPIs, and discussed monthly. Deviations are analysed and solutions developed and approved. The Employee Engagement KPI is determined once per year and discussed with the Board of Management. We completely integrated the ESG metrics and targets into our financial systems and reporting and planning processes, as well as the internal control system and the opportunity and risk management process in the reporting period.

**Non-financial risks**

Opportunity and risk management takes place in Group Controlling and also covers sustainability-related aspects. In addition to financial assessment, opportunities and risks arising from climate change are analysed on the basis of a scenario analysis according to the standards of the Task Force on Climate-related Financial Disclosures (TCFD), which was developed further in the year under review and supplemented with provisions of the EU Taxonomy. This involves discussing and assessing both transitory and physical risks stemming from climate change using various scenarios. The details are provided under the heading ❱❱ **Environment.** ESG risks of medium significance for the Group were determined in the material issues of climate change (risk categories: operational, market- and customer-specific and from regulation), employee matters (risk category: human resources) and in cybersecurity (risk category: information technology), ❱❱ **Expected developments, opportunities and risks.**

**Responsibility for the** 
**indicators**

The Board of Manag
on Group-wide sustai
are responsible for in
our success within th
progress achieved is
of Management. The
with in the meetings
the Strategy and Sust
**Supervisory Board.**

Our Code of Cond
agers with clear rule
bilities. Additional gu
of Conduct to offer m
guidelines on anti-co
ethics and on the env
Human Rights Policy
particular our execut
to implementing our
made the Code of Co
employment contract

The Code of Con
Conduct) is a reflecti
mental standards we
component of the Gro
including subcontrac
plying with our stand
own supply chains.

The codes and the
ensure that they are c

**Relevant boards for sustainability issues**

| Board of Management | | | | | | |
|---|---|---|---|---|---|---|
| **Central decision-making and sustainability focus** | | | | | | |
| **Strategy and management** | **Responsibility for topics** | | | | | **Repor... cont...** |
| **Sustainability Steering Board** (CEO, CFO, CHRO)[1] | **Operations Board** Chair: Tobias Meyer | **Global Commercial Board** Chair: John Pearson | **HR Board** Chair: Thomas Ogilvie | **GBS Board** Chair: Tobias Meyer | **IT Board** Chair: Tobias Meyer | **Finan...** Chair: M... |
| Ongoing monitoring of the Group-wide sustainability agenda | Climate protection and occupational safety | GoGreen Plus products | Employee matters, social standards, respect for human rights | Corporate Procurement, Corporate Real Estate, Cybersecurity | Cybersecurity, IT systems | KPIs, ... risk ass... controls, ... rep... |
| **Sustainability Advisory Council** Members from the sciences, business and politics | | | | | | |
| **Functions in the divisions: Operational control of the topics** | | | | | | |

[1]  Chief Executive Officer, Board of Management members responsible for Finance and HR.

Responsibility for strategic orientation, the materiality analysis, stakeholder dialogue and implementation of the strategic and operational ESG programme falls under the auspices of the CEO board department, where the ESG topics are developed further in the Group strategy and regularly reviewed by the Sustainability Steering Board. The Sustainability Steering Board comprises the CEO, the CFO and the Board member for Human Resources, as well as executives from central and divisional functions.

Group-wide concepts for leadership and corporate culture, promotion of talents and skills, specifications related to HR processes and services, maintaining relationships with the employee representatives and respect for human rights in our workforce are developed, implemented across divisions and managed by the HR board department.

Responsibility for ESG reporting and controlling, opportunity and risk assessment, integration of the internal control system and the financial systems, compliance

management and dat... the CFO board depart...

Among other to... board department i... Group-wide standar... the process for selec... cations for cybersecu...

COMBINED MANAGEMENT REPORT NON-FINANCIAL STATEMENT                                                    Deutsche Post DHL Group –

## Contents of the combined non-financial statement

### Reporting in accordance with Sections 289b(1) and 315b(1) HGB

| Aspects (HGB) | Concepts | Target for 2022[1] | Result for 2022 | Target for 2023[1] |
|---|---|---|---|---|
| Business model | | | | |
| Environmental matters | Climate and environmental protection: Avoiding GHG emissions | Limit logistics-related GHG emissions to 41 million tonnes of $CO_2e$ | Logistics-related GHG emissions[1,2] decrease to 36.46 million tonnes of $CO_2e$ | Limit logistics-related GHG emissions to a maximum of 39 million to |
| | | Generate Realised Decarbonisation Effects of 969 kilotonnes of $CO_2e$ | 1,004 kilotonnes of $CO_2e$ avoided through Realised Decarbonisation Effects[1,2] | Generate Realised Decarbon Effects[2] of 1.3 million tonne |
| Employee matters | Maintain employee engagement and motivation at a high level | Employee Engagement KPI approval rate of more than 80% | Employee Engagement[1,2] at the prior-year level: approval rate at 83% | Employee Engagement KPI rate[2] of more than 80% |
| | Diversity and inclusion: Increase share of women in middle and upper management | The share of women in middle and upper management amounts to 25.9% | The share of women in middle and upper management[1,2] amounts to 26.3% | Share of women in middle a management[2] amounts to 2 |
| | Ensure health at work: Prevent accidents | LTIFR[3] amounts to 3.7 | LTIFR[1,2,3] amounts to 3.4 | LTIFR[2,3] amounts to 3.5 |
| Social matters | Corporate citizenship: Measure employee pride in contribution to society | | Approval rate of 79% for this question in annual survey of employees[2] | – |
| Compliance, including anti-corruption and -bribery matters | Compliance with laws, principles and policies: Participation by executives in compliance training | At least 97% valid training certificates in middle and upper management | 98% valid training certificates in middle and upper management[1,2] | 98% valid training certifica and upper management[2] |
| Respect for human rights | Carry out internal audits with regard to human rights | | 33 audits carried out[2] | – |
| | Implement standards in the supply chain | | Key figures introduced: Supplier spend covered by an accepted Supplier Code of Conduct | – |
| Cybersecurity | Guarantee IT system and data security | | Introduced cybersecurity rating[2] key figure | Rating[2] is at least 710 out o |
| Taxes | Avoid corporate structuring only for the purpose of tax optimisation | | Tax strategy adhered to Group-wide | – |

[1] Steering-relevant.   [2] Reviewed with reasonable assurance, ❯ Assurance Report.   [3] Work-related accidents per 200,000 working hours with at least one day of absence for the affected person followi

### Reporting on the facilitation of sustainable investments (EU Taxonomy)
pursuant to Regulation 2020/852, Article 8, of the European Parliament and of the Council as well as Delegated Regulation 2021/2178 of the European Commission

| EU Taxonomy | Result for 2022 |
|---|---|
| Determine the taxonomy-eligible and -aligned shares of revenue, capital expenditure (capex) and operating expenditure (opex) | 53% of revenue, 63% of capex, 58% of opex are taxonomy-eligible |
| | 12% of revenue, 25% of capex, 11% of opex are taxonomy-aligned |

# Environment 

### Climate action in the focus of our operations

Our business activities impact the climate and the environment mainly in the form of greenhouse gases (GHG), which contribute to climate change. Within the framework of our ESG Roadmap, we have defined measures and ambitious targets to minimise these effects.

Medium term: We have set ourselves a target of reducing our emissions to below 29 million tonnes of $CO_2e$ by the year 2030. This target also includes the transport services carried out by our subcontractors (Scope 3). It was developed based on the requirements of the Science Based Targets Initiative and supports global efforts to limit global warming in accordance with the Paris Agreement of the United Nations.

In the year under review, the Science Based Targets Initiative verified the following sub-targets in this regard and assessed them as aligned with limiting global warming to 1.5 degrees Celsius: using 2021 as the base year, Deutsche Post DHL Group has committed to reducing its absolute direct emissions from the use of fuels and the indirect emissions from purchased energy (Scopes 1 and 2) by 42% by the year 2030. Absolute Scope 3 emissions from fuel- and energy-related activities, upstream transport and sales and business travel are to be reduced by 25% by 2030.

Long-term: We want to reduce the GHG emissions of our logistics services to net zero by 2050. That means we will use active reduction measures to reduce emissions (Scopes 1, 2 and 3) down to an unavoidable minimum, which is to be fully compensated for with recognised countermeasures (excluding offsetting).

The central climate protection measures are defined by Corporate Development in the board department of the CEO. The Finance board department collects environmental data, monitors progress towards goals, assesses opportunities and risks and carries out internal and external reporting, embedded in the internal control system.

Orientation and targets with regard to climate and environmental protection are set in Group policies: in the Code of Conduct and the Supplier Code of Conduct, in the Environmental and Energy Policy, the Paper Policy, the Sustainable Fuel Policy (not public) and the policies for procurement processes.

For achieving our goals by 2030, we plan to spend up to an additional €7 billion to expand the use of sustainable fuels and technologies in our fleets and buildings. We round out this package of measures with a range of specifically environmentally friendly products: GoGreen Plus enables customers to make a conscious decision for sustainable transport solutions or the use of sustainable fuels. This approach allows us to uphold our responsibility to the climate and the environment.

In addition, together with our subcontractors, we work as part of initiatives to reduce fuel consumption and lower GHG emissions. This also enables us to procure the consumption and emissions data necessary for subcontractor management, which is why we take part in industry-wide initiatives and collaborate closely with customers, suppliers and industry partners.

### Risks arising from cl

In the reporting perio
risks arising from clim
according to the stan
related Financial Discl
scenarios including po
2.4 or 4.3 degrees Ce
could result from a r
transitory risks, we us
narios of the Internat

Together with th
members responsibl
evaluated the possib
business models, st
workshops and consi
achieving net zero GH
tions with an increase
of division-internal w
and documented.

This results mai
particularly with reg
pricing, GHG emissio
to stricter regulation
fuels and energy fro
sion underscores the
activities: reducing G
technologies and fuel
fuels. We provide det
ment in  Expected de

**Decarbonisation avoids 1 million tonnes of $CO_2$e**

The management and the reporting are focused on the development of absolute logistics-related GHG emissions and the GHG emissions avoided by our decarbonisation measures. Our calculation includes the entire process chain for generating and supplying energy for transport as an additional Scope 3 category, ❯ General information, Steering metrics.

In the year under review, development of the absolute logistics-related GHG emissions was better than planned, decreasing to 36.46 million tonnes of $CO_2$e. Our GHG intensity amounts to 386 grams per euro of revenue. The GHG emissions are the result of the air (69%), land (22%) and ocean (8%) modes of transport, as well as buildings (1%).

The decrease in GHG emissions is attributable primarily to lower transport volumes and was additionally supported by the improved utilisation of passenger aircraft after the increasing loosening of restrictions on account of the pandemic. In addition, Realised Decarbonisation Effects from our measures contributed 1,004 kilotonnes of $CO_2$e to this decrease; this includes 205 kilotonnes of $CO_2$e through the use of sustainable fuels. An additional reduction of 178 kilotonnes of $CO_2$e results from the statutory blending of biofuels.

We estimate the amount of the non-logistics-related Scope 3 emissions (Category 1: Purchased goods and services, 2: Capital goods, 7: Employee commuting) to be around 6 million tonnes of $CO_2$e, which are not accounted for in our medium-term target.

According to our planning for the medium-term 2030 target, despite limited availability we expect a further increase in blending of sustainable fuels in air and ocean freight for the coming reporting year.

**GHG emissions (well-to-wheel)**

| Total GHG emissions | million tonnes of $CO_2$e | |
|---|---|---|
| of which Scope 1 | | |
| Scope 2[1] | | |
| Scope 3[2] | | |
| Realised Decarbonisation Effects | kilotonnes of $CO_2$e | |
| Reduction resulting from statutory blending of biofuels | kilotonnes of $CO_2$e | |

[1] Market-based method.    [2] Logistics-related emissions of GHG categories 3, 4 and 6.

**Our path to the 2030 target**

Million tonnes of $CO_2$e



Development of GHG emissions in 2023 will also depend on the development of the global economy. If transport volumes undergo weaker development, we expect GHG emissions to remain approximately at the prior-year level; if the economy proves to be more dynamic, we aim to limit GHG emissions to a m… This includes decarb… of $CO_2$ which we pla… expect a significant re… half of the decade.

**Using sustainable technologies and fuels**

Our focus of our measures is mainly on the modes of transport using the most fuel and generating the most emissions, namely air and ocean freight and road transport, and further increasing the electrification of our fleet of pick-up and delivery vehicles. We also invest in technologies to design our own new buildings to be climate neutral. The share of sustainable fuels is to top 30% in air, ocean and road freight by 2030. In pick-ups and deliveries, 60% of vehicles used are to be electric vehicles. All of the company's new buildings are to be climate-neutral. We also drive decarbonisation with our range of GoGreen Plus products, with which we enable our customers to make use of, among other things, air and ocean freight transports with sustainable fuels, ⊙ Company website.

In the year under review, we nearly doubled additional expenditure for decarbonisation measures compared to the previous year to €284 million, and in doing so avoided around 1 million tonnes of $CO_2$e.

The share of sustainable fuels increased by 0.5 percentage points to 1.7% (previous year: 1.2%). In pick-ups and deliveries, we increased the number of e-vehicles used in the reporting period by 34% to approximately 27,800 (previous year: 20,700). At 94%, the share of electricity from renewable sources used was well above the level of the previous year (previous year: 86%).

In addition to our reduction measures, we offer our customers offsetting products to compensate for GHG emissions. However, in accordance with the GHG Protocol and for the presentation of the Realised Decarbonisation Effects, this offsetting is not taken into account as an emissions reduction for the calculation of our GHG footprint.

**Expenditure for decarbonisation measures**

€m

|  | 2021 | 2022 | +/−% |
|---|---|---|---|
| **Sustainable fuels and technologies** | **156** | **284** | **82.1** |
| of which sustainable fuel | 28 | 66 | >100 |
| electrification of the fleet | 115 | 179 | 55.7 |
| buildings | 13 | 24 | 84.6 |
| further measures (shifting shipments to rail, biogas trucks) | – | 15 | – |

**Examples from the divisions in the year under review**

In the year under review, Express was able to conclude further delivery contracts for sustainable aircraft fuels. Moreover, the modernisation of the aircraft fleet was continued and the network of partnerships with transport subcontractors was expanded. In addition, the Alice – the first all-electric aircraft – successfully completed its maiden flight, with the first deliveries of this model scheduled for 2027 to be used for shuttle flights in the United States. Moreover, we continued with the expansion of our international fleet of e-vehicles.

Global Forwarding, Freight expanded its partnerships for insetting with sustainable fuels. Unlike offsetting, insetting offers the ability to specifically implement climate protection in our own supply chain, enabling a positive impact on the achievement of our targets through the direct replacement of fossil fuels. With its Green Carrier Certification, the division creates transparency regarding the sustainability of our subcontractors. Global Forwarding, Freight is one of the first companies in our industry to offer air and ocean freight solutions that make use of sustaina-

ble fuels. The myDHL
GHG reports in all mo
air and ocean freight
objectives.

Supply Chain is dr
chains with a portfolio
ucts for carbon-neutra
the year under review
carbon-neutral wareh
example of which is t
the United Kingdom.

eCommerce Solu
fleet of e-vehicles and
renewable sources. I
GoGreen products int

Post & Parcel Ger
fleet of electric vehicl
tric vehicles in use in
rail transport for par
sustainability. The ra
customers to actively
parcels and thus avoi

COMBINED MANAGEMENT REPORT NON-FINANCIAL STATEMENT

**Energy consumption and efficiency**

Group-wide energy consumption (Scopes 1 and 2) rose to 34,498 million kWh in the reporting period. We increased the energy used from renewable sources by 24% compared to the previous year. Energy efficiency amounts to 0.4 kWh per euro of revenue.

In our business model, air freight is the most energy-intensive mode of transport. With continuous modernisation processes in our own fleet and at our locations, we will have a positive impact on our energy consumption. Moreover, our divisions are increasingly using our own fleet and training the pilots in the use of energy-conserving flight manoeuvres.

**Energy consumption of the company's own fleet and buildings (Scopes 1 and 2)**

Million kWh

| | 2021 | 2022 | +/−% |
|---|---|---|---|
| **Total energy consumption** | **30,486** | **34,498** | **13.2** |
| **from fossil sources** | **28,660** | **32,227** | **12.4** |
| of which air transport | 22,484 | 26,649 | 18.5 |
| road transport (excluding e-vehicles) | 4,486 | 4,237 | −5.6 |
| buildings and facilities | 1,690 | 1,341 | −20.7 |
| **from renewable sources** | **1,826** | **2,271** | **24.4** |
| of which air transport | 175 | 343 | 96.0 |
| road transport[1] | 150 | 242 | 61.3 |
| of which e-vehicles | – | 58 | – |
| buildings and facilities | 1,501[2] | 1,686 | 12.3 |

[1] Includes legally required blending.    [2] Includes consumption by electric vehicles.

# Workforce 

**Common DNA as a factor for success**

Our corporate culture makes us strong. It is underpinned by common values, convictions and behaviours and is one of the most important factors in our business success. We call it our common DNA, ❯ Strategy. It connects us across all business units and operating regions and defines who we are and how we operate. As early as 2006 we defined a Code of Conduct applicable to the whole Group. We value the diversity of our workforce and treat one another with respect, so that we may work together cooperatively and lay the foundation for our company's financial success.

**Employee matters**

| Material topic | KPI | | 2021 | |
|---|---|---|---|---|
| Employee Engagement | Employee Engagement[1]: Approval rate in the annual survey | % | 84 | |
| | Continuing education: Total training hours | million hours | – | |
| Diversity and inclusion | Share of women in middle and upper management[2] | % | 25.1 | |
| | Employees with disabilities[3] | headcount | 14,652 | |
| | Employment rate[3] | % | 8.0 | |
| Occupational health and safety | Lost time injury frequency rate (LTIFR)[2,4] | | 3.9 | |
| | Sickness rate | % | 5.5 | |

[1] Steering- and remuneration-relevant in the year under review.    [2] Steering-relevant KPIs.    [3] Deutsche Post AG (pro 163 SGB IX.    [4] Work-related accidents per 200,000 working hours with at least one working day of absence for the a

**Being an employer o**

Our employees are o 600,000 employees employers in our se choice, attracting co continuously develop the long term. Only m service quality, meet and therefore ensure business activities. Fo and lock in their com icated to the principl belonging to create a ination where each i workplaces that pro

COMBINED MANAGEMENT REPORT — NON-FINANCIAL STATEMENT

Deutsche Post DHL Group –

**Preserving employee interests**

In addition to direct dialogue with their superiors and management representatives, our employees can turn to employee committees, works councils, trade unions and other bodies to indirectly represent their interests. At the global level, we engage in regular, open dialogue with international trade union confederations such as UNI Global Union (UNI) and International Transport Workers' Federation (ITF). At the European level, employee concerns are regularly discussed with our European works council, the Deutsche Post DHL Forum. The Board Member for Human Resources takes part in the discussions twice per year. UNI and the European Transport Workers' Federation are also represented.

In addition, as the largest postal service provider in Europe, the Group is a member of the EU Commission's European Social Dialogue Committee for the Postal Sector and has been the Committee Chair since 2016. The work of this committee involves exchange between the employers and union representatives in the postal sector of European member states on relevant topics in consideration of social matters.

Together with the two trade union confederations, we reviewed and strengthened the joint OECD Protocol from 2019 in the year under review, ⊚ **Company website.** With this agreement, all parties undertake to maintain a continuous dialogue on employment and working relationships for the next three years. During the yearly meeting between the secretaries general of the ITF and UNI and the Board Member for Human Resources, the revised agreement was approved by all parties and then signed by the German National Contact Point for the OECD Guidelines for Multinational Enterprises in Berlin.

**Performance-based remuneration and development of the workforce**

We foster employee loyalty and motivation by offering performance-based remuneration in line with market standards. It includes a base salary plus the agreed variable remuneration components such as bonus payments. In many countries, we also provide employees with access to defined benefit and defined contribution retirement plans. We also use neutral job evaluations to prevent discrimination on the basis of personal characteristics. These evaluations focus on the type of job, position in the company and responsibilities assigned. This systematic approach enables an independent and balanced remuneration structure.

In Germany, wages or salaries are generally regulated through either industry-level or company-level collective wage agreements. In many of our subsidiaries throughout Germany, our wage-scale employees also receive a performance-based bonus in addition to their monthly wage or salary. The collectively bargained principles are gender-neutral, so the use of collective agreements ensures equity in pay for women and men. Employees of Deutsche Post AG covered by the collective wage agreement may opt to take additional time off in lieu of a pay increase. A total of 18.7% of the workforce there had exercised this option as at 31 December 2022. The remuneration of employees in a non-pay-scale employment relationship (Deutsche Post AG, principal entity in Germany) is bound by existing works agreements.

Moreover, we offer both defined benefit and defined contribution pension plans in which approximately 70% of the Group's employees participate. Our main retirement benefit plans are provided in Germany, the UK, the USA, the

Netherlands and Swit

**financial statements.**

At €26,035 milli
figure of €23,879 milli
**to the consolidated finan**

As at 31 Decemb
ple around the worl
ous year. Added to thi
83,951 external FTEs i
the Group were empl

**Workforce developm**

| | |
|---|---|
| Headcount at year-end[1] | |
| Average for the year[1] | |
| Full-time equivalents at year-end[1] | |
| of which Express | |
| Global Forwardi Freight | |
| Supply Chain | |
| eCommerce Solu | |
| Post & Parcel Ge | |
| Group Functions | |
| Average for the year[1] | |
| Share of part-time emplo | |
| Average age of Group em (years) | |
| Share of female employe | |
| Unplanned employee tur | |

[1] Including trainees.

**Employee engagement and motivation**

Each year we measure employee satisfaction and engagement by conducting a Group-wide survey. This important tool helps us determine where we are in our journey toward becoming an employer of choice. We use the analysis of the annual survey to determine the Employee Engagement KPI, which is also included in the remuneration of the Board of Management.

Once again, 75% of employees took the opportunity to express their opinion and provide valuable feedback in the year under review. This is used as the foundation for creating the best possible working conditions at our company, thus corresponding to our strategic goal of being an employer of choice. We once again exceeded the target of more than 80% with an approval score of 83%.

**Selected results from the Employee Opinion Survey**

| % | 2021 | 2022 |
|---|---|---|
| Response rate | 75 | 75 |
| Approval rate for Employee Engagement KPI | 84 | 83 |

Training and opportunities for professional development can have a positive influence on the motivation of a workforce, which is why all of our employees generally have the option of taking advantage of our training offers digitally or as part of in-person events. Our training offers convey knowledge about our Group strategy and how everyone can make an individual contribution to our success. One example is our Group-wide "Certified" employee motivation and development programme, which aims to make our employees experts in their respective areas of responsibility. It also creates an atmosphere that places our customers at the heart of our activities and ensures we provide excellent service. In addition to a certified foundation module, we offer our employees a wide range of follow-up modules customised to their specific roles and areas of expertise. We place special emphasis on providing training for management and team leaders to help reinforce employees in their roles and support executives in carrying out their leadership duties. Such training focuses on leadership attributes that are applicable to all Group executives and serve as a behavioural compass. We also offer qualified employees a number of personal development options, such as special training for those with potential and development ambitions in self-management and in participation in interdisciplinary or international projects.

In the year under review, a total of 3.7 million training hours were completed. Moreover, time and money were invested in qualification elements integrated in the job, such as orientation and service training, which are not accounted for in this figure.

**Diversity, Equity, Inclusion & Belonging**

Our organisation brings together people from cultures and cultural backgrounds from all over the world who possess a wide range of experiences, abilities and perspectives, with 178 nationalities represented at our German sites alone. The diversity of our employees is not only an asset to the company but also one of its major strengths. Diversity, inclusion and freedom from discrimination are anchored

throughout the Group[...]
expressly reject any a[...]

We take an equal[...]
both internally and ex[...]
didate's qualifications[...]

During the repor[...]
of our diversity mana[...]
of equity and belongi[...]
sion & Belonging) Bo[...]
prised of executives[...]
central and divisional[...]
took place in the year[...]

The focus of our[...]
share of women in ex[...]
women to occupy at[...]
agement positions in[...]
ous approaches and p[...]
female junior staff fo[...]
the way to becoming[...]
including coaching, n[...]
under review, we man[...]
occupying 25.9% of m[...]
tions. This figure ca[...]
improve the share to[...]

Our company's in[...]
space for LGBTQ+ em[...]
a founding member of[...]
are committed to pro[...]
workplace so that ou[...]
ual career goals rega[...]
gender identity.

COMBINED MANAGEMENT REPORT  NON-FINANCIAL STATEMENT                                          Deutsche Post DHL Group –

In line with our inclusive approach, we give disabled individuals professional prospects. In Germany, employers are required by law to ensure that employees with disabilities make up at least 5% of their workforce. At Deutsche Post AG, our principal entity in Germany, 14,274 persons with disabilities were employed in the reporting year, 20 of whom were trainees; that represents 8.0% of the total workforce.

The average age of employees throughout the Group remains at 40 years old. In response to demographic change in Germany as well as for the purpose of ensuring an ageing-friendly workplace, we have established a Generations Pact enabling employees of Deutsche Post AG aged 55 and over to reduce their working hours. The option of early retirement for civil servants with a commitment to undertake voluntary work *(engagierter Vorruhestand)* is also still in effect. To recruit and retain young, talented employees, we focus in particular on positions with on-the-job training as well as trainee and dual-study programmes. In Germany, we offered a total of around 1,500 spots in our post-secondary educational training and dual-study programmes during the reporting year. We provide college and university graduates with the chance to choose between various post-graduate training programmes.

**Occupational health and safety**

The health and safety of our employees in the workplace is of central importance to us and is therefore embedded in our Codes of Conduct. We comply with the Group's existing occupational health and safety policies, statutory regulations and industry standards.

The Group policy on occupational health and safety defines seven core elements implemented Group-wide in our safety management system. The management system complies with the international ISO 45001 standards, to which various business units are also externally certified. Our Supplier Code of Conduct requires our suppliers and subcontractors to adhere to these same high standards. ❯ **Corporate governance.**

Accident prevention in the workplace is the top priority of our occupational health and safety activities. Some of our biggest challenges are in our pick-up and delivery operations, because external influences can only be managed to a certain extent in this area. Bad weather, road work, complex traffic situations and dealing with animals require employees to pay attention, concentrate and take responsibility for themselves. The most frequent causes of accidents remain slipping, tripping and falling, as well as dropping objects. Accidents are analysed, the respective root causes are identified and measures are introduced which facilitate the continuous improvement of safety for our employees. Solutions proven in practice to reduce or eliminate potential hazards are shared across the Group. Additionally, we hold regular work meetings and workplace inspections and place signage at locations with greater potential hazards to increase the awareness of employees.

To measure the success of our efforts, we use the steering-relevant KPI of lost time injury frequency rate (LTIFR), which we calculate based on the number of work-related accidents per 200,000 working hours resulting in an absence of at least one working day for the affected person. We use the accident investigations to derive measures to

eliminate the respecti[...]
to avoid reoccurrenc[...]

The lost time inju[...]
3.4 in the year under[...]
target of an LTIFR of 3[...]
accidents with a fatal[...]
expressly regret this[...]
LTIFR at 3.5 for 2023.[...]
2025 of lowering the[...]

**Work-related accide[...]**

| Lost time injury frequenc[...] | | |
| --- | --- | --- |
| of which Express | | |
| Global Forwardi[...] | | |
| Supply Chain | | |
| eCommerce Solu[...] | | |
| Post & Parcel Ge[...] | | |
| Group Functions[...] | | |
| Working days lost per acc[...] | | |
| Number of fatalities due t[...] | | |
| accidents | | |
| of which as a result of tra[...] | | |

[1] Work-related accidents per[...]
   working day of absence for[...]

We carry out health projects and local initiatives to create a health-promoting work environment and raise awareness of a healthy lifestyle amongst our employees. Incentives are provided to local management to offer health-promoting programmes to employees and their families.

The Chief Medical Officer advises the Board of Management in all matters regarding occupational health – for instance how to deal with physical and psychological diseases in the work environment – as well as how to deal with the circumstances of a pandemic or epidemic. During the year under review, we continued the vaccination and testing of our employees at the locations throughout the Group. The Group-wide sickness rate increased by 0.8 percentage points to 6.3% in the year under review. This development is attributable primarily to the significant increase in respiratory illnesses caused not only by COVID-19, but also by the common cold and flu-like infections.

Some of our employees work in countries that offer insufficient statutory health coverage, or none at all. For this reason, we offer employees and their families in numerous countries high-quality primary or supplementary health insurance coverage at attractive terms through our Group's in-house employee benefits programme. Some 250,000 employees in 100 countries are covered by this programme.

## Corporate citizenship

### Contributing to economic development and social progress

We contribute to the socioeconomic development of the regions in which we operate through our sites, our employees and our business partners, thereby making a contribution to social and individual prosperity. As part of our corporate citizenship initiatives, we are leveraging our global network and the expertise of local employees in line with our purpose: Connecting people, improving lives.

### Partnerships and initiatives

Our initiatives enable us to use our strengths and capabilities to effect change locally and to work together to meet global challenges. We partner with established international organisations to ensure that our initiatives have the greatest impact possible. With GoGreen (environmental protection), GoHelp (disaster management), GoTeach (increasing employability) and GoTrade (promoting trade) we also support SDGs 4, 5, 8, 11, 13 and 17.

We dignify employee engagement through our Global Volunteer Day, the "DHL's Got Heart" initiative and the Improving Lives Fund. Volunteering encourages employees to participate in, and give back to, local communities.

Based on the Group-wide annual survey of employees, we know that corporate citizenship is a relevant factor in determining their overall level of motivation. They want to

contribute to social an[...]
in their personal lives[...]
the environment and [...]
We therefore measur[...]
the approval rate for [...]
our employees are p[...]
contribution to societ[...]
employees responded[...]

### Large numbers of en[...]
### Go programmes
Our employees volun[...]
again in the reporting[...]
in Ukraine: for the fir[...]
to use in Europe to ca[...]
for Ukraine.

But our employee[...]
by the war. Thanks to [...]
workforce, we were [...]
those impacted quic[...]
our internal We Help [...]
were matched by the [...]
contributions.

We expanded ou[...]
countries. GoTrade in[...]
ship programme, wh[...]
and accompany sma[...]
a year.

# Corporate governance 

## Role model for responsible corporate governance

We intend to serve both as a role model for responsible corporate governance in our sector and as a trustworthy company. Ensuring our interactions with business partners, employees, the capital market and the general public are conducted with integrity and within the bounds of the law is vital to maintaining our reputation and is the basis for sustainable business success. We take steps to guarantee an honest and transparent business practice in compliance with the law by focusing on training executives in compliance-relevant content, building cybersecurity skills, shaping sustainable and stable relationships with business partners and fully integrating ESG metrics into management processes and incentive systems.

The rules for ethical conduct included in our Code of Conduct are further specified in our Human Rights Policy Statement as well as our Anti-Corruption and Business Ethics Standards Policy. Our focus at all times is on preventing potential violations of statutory requirements and internal guidelines.

Corporate Internal Audit evaluates the effectiveness of our risk management system, control mechanisms, management and monitoring processes and compliance with Group policies, contributing to their improvement. It does this by performing independent regular and ad hoc audits at all Group companies and at corporate headquarters with the authority of the Board of Management. The audit teams discuss the audit findings and agree on measures for improvement with the audited organisational units and their management. The Board of Management is regularly informed of the findings. The Supervisory Board is provided with a summary once a year.

### Corporate governance

| Material topic | Key figure | | |
|---|---|---|---|
| Compliance: Train executives (Code of Conduct, fighting corruption and bribery, competition compliance and data protection) | Training level: Share of valid compliance training certificates in middle and upper management² | % | |
| Respecting human rights | Carry out internal audits with regard to human rights | number | |
| | Carry out on-site audits at locations in countries | countries | |
| | Training level in middle and upper management | % | |
| Standards in the supply chain | Supplier spend covered by an accepted Supplier Code of Conduct | € billion | |
| | Potential high-risk suppliers assessed | number | |
| Cybersecurity | Training level in middle and upper management | % | |
| | External assessment of our cybersecurity³ | points | |

¹ Steering-relevant KPIs.   ² Steering-relevant KPI in the year under review.   ³ Steering- and remuneration-relevant
agency announced after the time this report was prepared that it would be making changes to its method which will [...]
influence our results.

## Trusted business partner thanks to compliance

We render all of our services in compliance with current legislation as well as our corporate values as defined in our Group policies. One important aspect of compliance is the legally required disclosures relating to fighting corruption and bribery matters. We observe all applicable international anti-corruption standards and statutes and are a member of the Partnering Against Corruption initiative of the World Economic Forum.

Ensuring legally compliant conduct in our business activities and in our interactions with employees is an essential task of all Group management bodies. In line with our

objective, participation of executives in middle- and upper-level management in various types of relevant compliance training is mandatory. We believe one thing: managers have to be well informed to identify potential compliance risks and ensure that such risks are mitigated appropriately.

The foundation to this approach is our compliance training comprising our Core Compliance Curriculum (anti-corruption, competition compliance, Code of Conduct) and training on data protection. All employees who have already completed their training must update their certification every two years. We will use the share of valid training certificates amongst executives in middle- and upper-level management as a steering-relevant KPI.

With our compliance management system (CMS) we have implemented effective measures for the prevention of corruption and bribery throughout the Group. Responsibility for designing the system lies with the Chief Compliance Officer. Uniform minimum standards are laid down in the CMS and accompanied by related activities initiated by the compliance officer in the divisions.

Our Code of Conduct and Anti-Corruption Policy, along with training on these topics, help employees identify situations in which the integrity of the company could be called into question with respect to relevant third parties.

Potential violations can be reported 24 / 7 – if legally permitted, anonymously – via our professional compliance incident reporting system (whistle-blower hotline). In addition, potential violations can also be reported by telephone, ⊙ **Company website.** The incident reporting system was made available to third parties during the year under review. Reports are reviewed and investigated internally

for potential violations as part of a standardised process. Information on relevant violations is collected and included in the regular compliance reports made to the Board of Management and to the Supervisory Board's Finance and Audit Committee, ❯ **Report of the Supervisory Board.**

In the interest of raising awareness of compliance amongst employees, a Group-wide campaign – Compliance Awareness Week – was carried out in the year under review and rounded out by measures tailored to the specific divisions and regions. The campaign was additionally supported by "tone from the top" statements from the members of the Board of Management to emphasise to each employee the importance of compliance for the Group. To strengthen the internal dialogue, our workforce was made aware of and informed about compliance aspects on an ongoing basis by means of further communication measures and via the compliance channels.

The compliance training certification rate was 98% in middle and upper management in the year under review. We plan to maintain the rate at this high level for 2023.

In the context of its 208 audits, Corporate Internal Audit also reviewed compliance management system processes and the implementation of agreed follow-up measures. Findings from the regular audits facilitate the identification of other compliance risks and the refinement of the compliance programme.

**Respecting human ri**
Our commitment to
adherence to the prin
the International Lab
embedded in our Co
detail in our Human
**website.** These stipula
ments for our emplo
suppliers and subcont
to comply with our et
understanding and im
UN Global Compact.

Our human rights
child and forced labo
neration, working ho
and the right to freed
Code of Conduct, we c
to comply with our eth
ples and implement t

The implementa
human rights in the
have been monitored
Act (*Lieferkettensorg*
since the end of the re
executives in upper m
Employee Relations,
Public Affairs, Lega
Corporate Procureme

As part of its aud
ducted reviews relat
verified that the agre
plemented. In the repo

**Preventing human rights violations in the workforce**

With our internal management system, we ensure that our Human Rights Policy Statement is implemented amongst our workforce. In addition, we use the system to monitor compliance with due diligence. Key components are training initiatives and on-site reviews; these reviews are conducted by specially trained and externally certified professionals from the divisions and corporate headquarters. A risk-based approach is applied to select of countries and locations for the on-site reviews based on internal criteria, such as number of employees, as well as external criteria from Verisk Maplecroft (Human Rights Index). Additionally, we consider suggestions from international trade union confederations.

Under the leadership of the HR department, on-site reviews were held at various locations in ten countries as planned in the reporting year. These were again conducted largely as in-person reviews thanks to the loosening of pandemic-related travel restrictions. Once again, some cases of non-compliance with working time regulations and knowledge gaps concerning occupational safety requirements were identified and subsequently rectified by way of a structured action plan in the year under review.

Further employees were certified according to the Sedex Members Ethical Trade Audit (SMETA) standard, so that the annual number of on-site reviews can be increased. Moreover, as planned, the training module we use to raise employees' awareness for respecting human rights was rolled out throughout the Group. Participation is recommended for all employees. Participation is mandatory for executives in middle and upper management beginning with this reporting year; the certification rate was 98%.

**Standards in the supply chain**

Corporate Procurement selects suppliers that meet our ethical, social and environmental standards. Supplier selection is based on a standardised assessment process which also takes aspects such as diversity and respect for human rights into account, as well as external criteria such as those from Transparency International (Corruption Perceptions Index).

Procurement employees are regularly trained to identify potential supplier-related risks early on. We convey our expectations to our suppliers and subcontractors via our Supplier Portal ⊚ **Website** and introduce our selection processes. Suppliers can also use our portal to familiarise themselves with our Supplier Code of Conduct, which we make available in numerous languages along with the corresponding training module. From there, they can also access our professional compliance whistle-blower system which they can use to report potential violations of the Code or statutory provisions as well as cybersecurity incidents.

In the year under review, we continued developing a Group-wide risk management system for supplier assessments and adapted the Corporate Procurement Policy accordingly. In addition, we developed and implemented two key figures: supplier spend covered by an accepted Supplier Code of Conduct and the potential high-risk suppliers assessed.

We calculate the potential for risk of suppliers at the level of purchase categories. The risk assessment is influenced by 45 types of economic, technical, l which were evaluated egory. The ultimate based on the evaluation impact. More than 2,7 assessed in the year

We use supplier s Code of Conduct to me of our standards in th regarding the key fig report to managemen developments with th review, supplier spen Code of Conduct amo

**Cybersecurity**

Our cybersecurity information of the G employees as well as or manipulation and c uninterrupted availa tions. Our internal gu ISO 27002 and our da with ISO 27001.

The Group Chief CISO) reports directly ness Services. The IT strategy and defines for cybersecurity, for

COMBINED MANAGEMENT REPORT — NON-FINANCIAL STATEMENT

Deutsche Post DHL Group –

digitalisation processes. The Information Security Committee is made up of the central functions of Group CISO, IT Audit, Legal Services, Data Protection and Corporate Security, as well as the divisional CISOs. The committee assesses potential threats on an ongoing basis, evaluates the potential of new risks and monitors compliance with our security standards.

We limit access to our systems and data such that employees can only access the data they need to perform their duties. All systems and data are backed up on a regular basis, and critical data are replicated across data centres. Additionally, by performing regular software updates, we can fix potential security vulnerabilities and protect system functionality.

A variety of communication measures and training sessions help our workforce become more aware of possible cybersecurity risks. All employees and executives with a corporate email address are continuously made aware of current risks by means of phishing and IT crisis simulations. Participation in Information Security Awareness training is mandatory for all employees with a computer workstation. All participants who have already completed their training must update their certification every two years. In the reporting period, the share of valid training certificates amongst middle- and upper-level management was 97%.

In the year under review, the Board of Management and the Supervisory Board decided to have our cybersecurity evaluated by BitSight, an external rating agency, and to report this rating as a steering- and remuneration-relevant KPI beginning in the coming financial year. This

cybersecurity rating assesses the security situation and brings potential security risks to the attention of the rated company. Assessment of the security situation is carried out by an automated service on a daily basis. Unlike with manual assessments, a cybersecurity rating offers transparency and enables comparison with other companies thanks to standardisation.

The rating amounted to 700 of a possible 900 points as at the end of the year under review. We are striving for a position in the top quartile of our reference group with BitSight for 2023, which means we expect a rating of at least 710 points. The rating agency announced after the time this report was prepared that it would be making changes to its method which will have an impact on the rating scale and which could influence our results.

**Tax strategy as a standard adhered to worldwide**

Our tax strategy is aligned with our Group strategy and must be adhered to throughout the Group. The overarching approach applied by the Group is that taxes are always incidental to and follow business needs. We do not undertake aggressive tax planning or enter into artificial arrangements with the goal of avoiding taxes. Our Group maintains locations in more than 220 countries and territories, including some with lower tax rates than those in Germany. These locations are necessary for carrying out our operational business in those regions. None of our companies was established with the purpose of obtaining tax benefits or is currently used to pursue aggressive tax structuring.

In interpreting an[...] merely follow the let[...] spirit and intended p[...] companies, our activi[...] countries where unce[...] tainty through contin[...] tax advisers to obtain[...] certainty. This allow[...] ments in the countrie[...] our knowledge and be[...] tem incorporates a ta[...] enables us to monitor[...]

In the year unde[...] social security contri[...]

**Taxes and social sec[...]**

| €m | |
|---|---|
| **Total** | |
| Income taxes paid | |
| Other business taxes | |
| of which  taxes on capital, vehicles | |
|  other operating | |
| Employer's social security | |

# EU Taxonomy

Pursuant to Article 8 of Regulation 2020/852 of the European Parliament and of the Council as well as Delegated Regulation 2021/2178 of the European Commission

We are reporting our contribution to the European Union's environmental objectives of climate change mitigation and climate change adaptation according to the guidelines laid down in the EU Taxonomy regulation and, beginning with this reporting year, are reporting the taxonomy-aligned (aligned) shares of revenue, capital expenditure (capex) and operating expenditure (opex) in addition to the taxonomy-eligible shares thereof.

Taxonomy-eligible economic activities (activities) are considered environmentally sustainable and therefore aligned if they make a substantial contribution to one of the six EU environmental objectives and are not associated with significant harm to one or more other environmental objectives (do-no-significant-harm (DNSH) criteria). In addition, the company complies with required frameworks for minimum safeguards that relate to respecting human rights and social and labour standards, as well as anti-corruption fair competition and taxation, for all activities.

Activities identified as aligned exclusively make a contribution to the EU environmental objective of climate change mitigation. Moreover, they prevent significant harm to the other EU environmental objectives of climate change adaptation, the sustainable use and protection of water and marine resources, the transition to a circular economy, pollution prevention and control and the protection and restoration of biodiversity and ecosystems.

In the reporting year, the Group policy for implementing the requirements of the EU Taxonomy was supplemented with the provisions for determining the aligned shares of revenue, capex and opex; the Group-wide financial and controlling systems were adapted accordingly.

**Applied evaluation method**

In the year under review, the analysis of the taxonomy-eligible activities carried out in the previous year was reviewed and confirmed. We still assign our transport services, including the necessary infrastructure and buildings, to Sector 6 "Transport", whilst real estate not used for transport services is assigned to Sector 7 "Construction and real estate".

The EU Taxonomy does not yet take into account all economic activities which are relevant for our business. Revenue from warehousing (Supply Chain division) in par-

ticular, as well as reve (Express division and including the associa reported as taxonom

Capex generated assigned directly to in opex can generally n we primarily use a co the business models counting by assigning activity respectively into account on a cons activities were review method applied for th teria is presented in t

| Criterion | Evaluation method |
|---|---|
| Substantial contribution to climate change mitigation, prevents significant harm (DNSH) to the EU environmental objectives of the sustainable use and protection of water and marine resources (DNSH 3), the transition to a circular economy (DNSH 4), pollution prevention and control (DNSH 5), the protection and restoration of biodiversity and ecosystems (DNSH 6) | Carried out on the basis of indivi that the evaluation of the criteri means of uniform Group proces national or EU regulations. Thes all other cases. |
| Causes no significant harm (DNSH) to the EU environmental objective of climate change adaptation (DNSH 2) | The climate-change-related risk TCFD analysis, which we supple physical climate risks, **⊗ Enviro** |
| EU minimum safeguards for the respect for human rights and the preserving of employees' rights, as well as regarding anti-corruption, fair competition and taxation | Ensured with our Code of Cond and standards for business eth Competition Compliance Policy corresponding processes and m carried out by Corporate Interna in the supply chain with our Sup processes and supplier managen At the time this report was prep ceedings ongoing in this contex **statements.** |
| If shares of revenue and opex could not be directly assigned to aligned activities, specific allocation ke aligned vehicles in the entire fleet – were applied which also take special circumstances of the divisio | |

COMBINED MANAGEMENT REPORT NON-FINANCIAL STATEMENT                                                    Deutsche Post DHL Group –

**Determining taxonomy alignment**

In the following, we provide an overview of the aligned assets per activity. The statements are in regard to the associated shares of revenue, capex and opex.

We generate a significant portion of our revenue from transport services (transport sector) in collaboration with suppliers and subcontractors, who render their services on an independent basis from a legal perspective. As a result, these economic activities and the assets associated with them must be evaluated there with regard to alignment with the EU Taxonomy. At the time this report was prepared, we did not have any information on the meeting of technical criteria for these activities and assets, so we are reporting them as not taxonomy-aligned.

The property, plant and equipment from business combinations were allocated largely to the transport sector; no aligned activities could be identified. Intangible assets from business combinations were classified as taxonomy non-eligible, ❯ Capex template.

**Determining taxonomy alignment (EU environmental objective of climate change mitigation)**

| Activity | | Evaluation of alignment |
|---|---|---|
| 6.4 | Operation of personal mobility devices, cycle logistics: devices for personal mobility not subject to permits | Assets within this activity, e.g. bicycles, meet the requirements of the substantial contribution to cycle... certified recycling companies, compliance with the requirements of DNSH 4 can be ensured and dem... |
| 6.5 | Transport by motorbikes, passenger cars and light commercial vehicles: light commercial vehicles[1] | Our electric vehicles operate without emissions and therefore meet the requirements of the substanti... Compliance with regard to recyclability (DNSH 4) and emissions thresholds (DNSH 5) is a basic requi... in Europe, which is why we considered these to be met. In addition, the simultaneous meeting of the c... of tyres represents a substantial requirement in accordance with DNSH 5. For this reason, we have de... use-specific requirements of the tyres, including the load coefficients, and identified the highest class... database for each specification as well as checked the tyre classification under DNSH 5 for each vehic... |
| 6.6 | Freight transport services by road[3]: heavy-duty vehicles[4] | Method is analogous to 6.5. Our electric vehicles do not transport any fossil fuels and are evaluated as... |
| 6.15 | Infrastructure enabling low-carbon road transport and public transport[3]: infrastructure necessary for transport,[5] for example sorting and distribution centres as well as integral equipment | Sorting and distribution centres, as well as Packstation parcel lockers, enable cargo handling betwee... fulfil the substantial contribution of this activity. Compliance with the requirements of DNSH 4 could b... new buildings[5] for locations in selected countries in consideration of national waste removal statistic... location and noise pollution of our sites showed that nearly all of them meet the requirements of DNS... |
| 7.1 | Construction of new buildings: Office and administration buildings as well as warehouses | Alignment could not be evaluated due to a lack of well-founded thresholds for non-residential buildin... |
| 7.7 | Acquisition and ownership of buildings: Office and administration buildings as well as warehouses | |

[1] EU Taxonomy vehicles classes M1 and N1 (unladen weight of up to 2.8 tonnes and total permitted weight of up to 3.5 tonnes).  [2] European Product Registry for Energy Labelling.  [3] Not including subco... classes N1 to N3 (unladen weight of more than 2.8 tonnes or total permitted weight of more than 3.5 tonnes).  [5] The criteria for recycling requirements for construction and demolition works are not appli...

**Template: Proportion of revenue from products or services associated with Taxonomy-aligned economic activities – disclosure covering year 2**

| Economic activities (1) | Code(s) (2) | Absolute revenue (3) €m | Proportion of revenue (4) % | Climate change mitigation (5) % | Climate change adaptation (6) % | Water and marine resources (7) % | Circular economy (8) % | Pollution (9) % | Biodiversity and ecosystems (10) % | Climate change mitigation (11) Y/N | Climate change adaptation (12) Y/N | Water and marine resources (13) Y/N | Circular economy (14) Y/N | Pollution eco (15) Y/N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A Taxonomy-eligible activities** | | | | | | | | | | | | | | |
| **A.1 Environmentally sustainable activities (Taxonomy-aligned)** | | | | | | | | | | | | | | |
| **Transport** | | **11,288** | **12.0** | | | | | | | | | | | |
| Operation of personal mobility devices, cycle logistics | 6.4 | 2,078 | 2.2 | 100.0 | | | | | | | Y | | Y | |
| Transport by motorbikes, passenger cars and light commercial vehicles | 6.5 | 2,292 | 2.4 | 100.0 | | | | | | | Y | | Y | Y |
| Freight transport services by road | 6.6 | 188 | 0.2 | 100.0 | | | | | | | Y | | Y | Y |
| Infrastructure enabling low-carbon road transport and public transport | 6.15 | 6,730 | 7.2 | 100.0 | | | | | | | Y | Y | Y | Y |
| **Revenue of environmentally sustainable activities (Taxonomy-aligned) (A.1)** | | **11,288** | **12.0** | **100.0** | | | | | | | | | | |
| **A.2 Taxonomy-eligible but not environmentally sustainable activities (not Taxonomy-aligned activities)** | | | | | | | | | | | | | | |
| **Transport** | | **38,898** | **41.1** | | | | | | | | | | | |
| Freight rail transport | 6.2 | 92 | 0.1 | | | | | | | | | | | |
| Operation of personal mobility devices, cycle logistics | 6.4 | 49 | 0.1 | | | | | | | | | | | |
| Transport by motorbikes, passenger cars and light commercial vehicles | 6.5 | 8,351 | 8.8 | | | | | | | | | | | |
| Freight transport services by road | 6.6 | 17,371 | 18.3 | | | | | | | | | | | |
| Sea and coastal freight water transport, vessels for port operations and auxiliary activities | 6.10 | 8,029 | 8.5 | | | | | | | | | | | |
| Infrastructure enabling low-carbon road transport and public transport | 6.15 | 5,006 | 5.3 | | | | | | | | | | | |
| **Construction and real estate activities** | | **331** | **0.4** | | | | | | | | | | | |
| Construction of new buildings | 7.1 | 330 | 0.4 | | | | | | | | | | | |
| Acquisition and ownership of buildings | 7.7 | 1 | 0.0 | | | | | | | | | | | |
| **Revenue of Taxonomy-eligible but not environmentally sustainable activities (not Taxonomy-aligned activities) (A.2)** | | **39,229** | **41.5** | | | | | | | | | | | |
| **Total (A.1 + A.2)** | | **50,517** | **53.5** | | | | | | | | | | | |
| **B Taxonomy-non-eligible activities** | | | | | | | | | | | | | | |
| **Revenue of Taxonomy-non-eligible activities (B)** | | **43,919** | **46.5** | | | | | | | | | | | |
| **Total (A + B)** | | **94,436[2]** | **100.0** | | | | | | | | | | | |

[1] Do no significant harm. [2] Revenue pursuant to the Income statement. [3] Enabling. [4] Transitional.

**Template: Proportion of Capex from products or services associated with Taxonomy-aligned economic activities – disclosure covering year 20**

| Economic activities (1) | Code(s) (2) | Absolute Capex (3) €m | Proportion of Capex (4) % | Climate change mitigation (5) % | Climate change adaptation (6) % | Water and marine resources (7) % | Circular economy (8) % | Pollution (9) % | Biodiversity and ecosystems (10) % | Climate change mitigation (11) Y/N | Climate change adaptation (12) Y/N | Water and marine resources (13) Y/N | Circular economy (14) Y/N | Bio Pollution eco (15) Y/N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A Taxonomy-eligible activities** | | | | | | | | | | | | | | |
| **A.1 Environmentally sustainable activities (Taxonomy-aligned)** | | | | | | | | | | | | | | |
| **Transport** | | **2,188** | **25.2** | | | | | | | | | | | |
| Operation of personal mobility devices, cycle logistics | 6.4 | 1[2] | 0.0 | 100.0 | | | | | | | Y | | Y | |
| Transport by motorbikes, passenger cars and light commercial vehicles | 6.5 | 212[3] | 2.5 | 100.0 | | | | | | | Y | | Y | Y |
| Freight transport services by road | 6.6 | 19[4] | 0.2 | 100.0 | | | | | | | Y | | Y | Y |
| Infrastructure enabling low-carbon road transport and public transport | 6.15 | 1,956[5] | 22.5 | 100.0 | | | | | | | Y | Y | Y | Y |
| **Construction and real estate activities** | | **4** | **0.0** | | | | | | | | | | | |
| Installation, maintenance and repair of energy efficiency equipment | 7.3 | 1[6] | 0.0 | 100.0 | | | | | | | Y | | Y | |
| Installation, maintenance and repair of renewable energy technologies | 7.6 | 3[7] | 0.0 | 100.0 | | | | | | | Y | | | |
| **Capex of environmentally sustainable activities (Taxonomy-aligned) (A.1)** | | **2,192** | **25.2** | **100.0** | | | | | | | | | | |
| **A.2 Taxonomy-eligible but not environmentally sustainable activities (not Taxonomy-aligned activities)** | | | | | | | | | | | | | | |
| **Transport** | | **1,732** | **20.0** | | | | | | | | | | | |
| Operation of personal mobility devices, cycle logistics | 6.4 | 0 | 0.0 | | | | | | | | | | | |
| Transport by motorbikes, passenger cars and light commercial vehicles | 6.5 | 204 | 2.3 | | | | | | | | | | | |
| Freight transport services by road | 6.6 | 479 | 5.5 | | | | | | | | | | | |
| Infrastructure enabling low-carbon road transport and public transport | 6.15 | 1,049 | 12.2 | | | | | | | | | | | |
| **Construction and real estate activities** | | **1,505** | **17.3** | | | | | | | | | | | |
| Construction of new buildings | 7.1 | 8 | 0.1 | | | | | | | | | | | |
| Renovation of existing buildings | 7.2 | 2 | 0.0 | | | | | | | | | | | |
| Installation, maintenance and repair of energy efficiency equipment | 7.3 | 5 | 0.1 | | | | | | | | | | | |
| Installation, maintenance and repair of instruments and devices for measuring, regulation and controlling energy performance of buildings | 7.5 | 1 | 0.0 | | | | | | | | | | | |
| Installation, maintenance and repair of renewable energy technologies | 7.6 | 1 | 0.0 | | | | | | | | | | | |
| Acquisition and ownership of buildings | 7.7 | 1,488 | 17.1 | | | | | | | | | | | |
| **Information and communication** | | **10** | **0.1** | | | | | | | | | | | |
| Data processing, hosting and related activities | 8.1 | 10 | 0.1 | | | | | | | | | | | |
| **Capex of Taxonomy-eligible but not environmentally sustainable activities (not Taxonomy-aligned activities) (A.2)** | | **3,247** | **37.4** | | | | | | | | | | | |
| **Total (A.1 + A.2)** | | **5,439** | **62.6** | | | | | | | | | | | |
| **B Taxonomy-non-eligible activities** | | | | | | | | | | | | | | |
| **Capex of Taxonomy-non-eligible activities (B)** | | **3,250** | **37.4** | | | | | | | | | | | |
| **Total (A + B)** | | **8,689[8],[9]** | **100.0** | | | | | | | | | | | |

[1] Do no significant harm.   [2] Of which property, plant and equipment: €1 million.   [3] Of which property, plant and equipment: €186 million; right-of-use assets: €26 million.   [4] Of which property, plant and equipment: €14 million; right-of-use equipment: €1,216 million; right-of-use assets: €711 million; intangible assets: €29 million.   [6] Of which property, plant and equipment: €1 million.   [7] Of which property, plant and equipment: €2 million; right-of-use assets: €1 million.   [8] reporting and investment properties. ▶ **Note 10 and 24 to the consolidated financial statements.**   [9] Includes additions from business combinations: intangible assets (excluding goodwill) of €592 million, property, plant and equipment   [10] Enabling.   [11] Transitional.

**Template: Proportion of Opex from products or services associated with Taxonomy-aligned economic activities – disclosure covering year 202**

| Economic activities (1) | Code(s) (2) | Absolute Opex (3) €m | Proportion of Opex (4) % | Climate change mitigation (5) % | Climate change adaptation (6) % | Water and marine resources (7) % | Circular economy (8) % | Pollution (9) % | Biodiversity and ecosystems (10) % | Climate change mitigation (11) Y/N | Climate change adaptation (12) Y/N | Water and marine resources (13) Y/N | Circular economy (14) Y/N | Pollution eco (15) Y/N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A Taxonomy-eligible activities** | | | | | | | | | | | | | | |
| **A.1 Environmentally sustainable activities (Taxonomy-aligned)** | | | | | | | | | | | | | | |
| **Transport** | | **309** | **11.4** | | | | | | | | | | | |
| Operation of personal mobility devices, cycle logistics | 6.4 | 26² | 1.0 | 100.0 | | | | | | | Y | | Y | |
| Transport by motorbikes, passenger cars and light commercial vehicles | 6.5 | 50³ | 1.8 | 100.0 | | | | | | | Y | | Y | Y |
| Freight transport services by road | 6.6 | 7⁴ | 0.3 | 100.0 | | | | | | | Y | | Y | Y |
| Infrastructure enabling low-carbon road transport and public transport | 6.15 | 226⁵ | 8.3 | 100.0 | | | | | | | Y | Y | Y | Y |
| **Opex of environmentally sustainable activities (Taxonomy-aligned) (A.1)** | | **309** | **11.4** | **100.0** | | | | | | | | | | |
| **A.2 Taxonomy-eligible but not environmentally sustainable activities (not Taxonomy-aligned activities)** | | | | | | | | | | | | | | |
| **Transport** | | **683** | **25.2** | | | | | | | | | | | |
| Operation of personal mobility devices, cycle logistics | 6.4 | 2 | 0.1 | | | | | | | | | | | |
| Transport by motorbikes, passenger cars and light commercial vehicles | 6.5 | 185 | 6.8 | | | | | | | | | | | |
| Freight transport services by road | 6.6 | 340 | 12.5 | | | | | | | | | | | |
| Sea and coastal freight water transport, vessels for port operations and auxiliary activities | 6.10 | 5 | 0.2 | | | | | | | | | | | |
| Infrastructure enabling low-carbon road transport and public transport | 6.15 | 151 | 5.6 | | | | | | | | | | | |
| **Construction and real estate activities** | | **556** | **20.5** | | | | | | | | | | | |
| Construction of new buildings | 7.1 | 3 | 0.1 | | | | | | | | | | | |
| Acquisition and ownership of buildings | 7.7 | 553 | 20.4 | | | | | | | | | | | |
| **Information and communication** | | **22** | **0.8** | | | | | | | | | | | |
| Data processing, hosting and related activities | 8.1 | 22 | 0.8 | | | | | | | | | | | |
| **Opex of Taxonomy-eligible but not environmentally sustainable activities (not Taxonomy-aligned activities) (A.2)** | | **1,261** | **46.5** | | | | | | | | | | | |
| **Total (A.1 + A.2)** | | **1,570** | **57.9** | | | | | | | | | | | |
| **B Taxonomy-non-eligible activities** | | | | | | | | | | | | | | |
| **Opex of Taxonomy-non-eligible activities (B)** | | **1,140** | **42.1** | | | | | | | | | | | |
| **Total (A + B)** | | **2,710⁶** | **100.0** | | | | | | | | | | | |

¹ Do no significant harm.   ² Of which €9 million in costs for maintenance, repairs and replacement parts; €17 million in costs for short-term and low-value leases.   ³ Of which €49 million in costs for maintenance and replacement p...
⁴ Of which €6 million in costs for maintenance and repairs and replacement parts.   ⁵ Of which €168 million in expenses for maintenance, repairs and replacement parts; €58 million in costs for short-term and low-value leases.   ⁶ Includes inv...
for maintenance and non-capitalised lease expenses pursuant to ▶ **Note 14 to the consolidated financial statements.**   ⁷ Enabling.   ⁸ Transitional.

# EXPECTED DEVELOPMENTS, OPPORTUNITIES AND RISKS

## Forecast period

The information contained in the report on expected developments generally refers to the 2023 financial year.

## Future economic prospects

### Outlook still shaped by uncertainty

The ramifications of the energy crisis in Europe have turned out to be less dramatic than feared last autumn, being mitigated by above-average gas storage levels, a double-digit decline in gas demand by both households and industry and mild winter weather since mid-December. Downward corrections of wholesale energy prices should reduce energy costs quite soon for industrial customers and, in the medium term, also for private households. In addition, China's departure from its zero-COVID policy promises to enable an economic recovery from the second quarter of 2023 onwards. The phase of weak global economic growth during the two quarters saddling the turn of the year 2022 / 23 nonetheless should weaken average global GDP growth in 2023 anew to 1.9%. This is below pre-pandemic growth rates of more than 3%, which are unlikely to be achieved again for the time being.

For the most important countries and regions, S&P Global predicts the following GDP growth rates in 2023: Chinese economic activity should accelerate markedly to 5.0%, whereas the United States and the eurozone will grow by only 0.5% and 0.2%, respectively. The latest growth forecast for the German economy at 0.3% represents a significant improvement versus a prediction for −1.5% only three months earlier, which is evidence of the major uncertainty in current forecasts.

### Highly cyclical international express market

Growth in the international express market, particularly in the B2B segment, is highly dependent upon the economic situation. For 2023, we expect below-average growth overall, depending on economic development.

### Air and ocean freight business influenced by the easing of the capacity situation

Particularly with regard to the core business of air and ocean freight, the further development will depend significantly on whether and when the capacity situation eases. In light of the uncertain market situation, this remains difficult to predict, but a recovery in demand is expected in the second half of the year at best. In light of the volatility in capacities and demand, uncertainty with regard to price will remain high.

Of additional significance for the air cargo market is how quickly passenger flights resume, which is also closely linked to how the global economy develops.

In the European road transport market, depending on economic development, we expect moderate volume growth in 2023 following a cautious start, with prices remaining at a consistently high level.

### Contract logistics ma[...]

Growth in omnichan[...] increase the comple[...] with the apparent vul[...] will increase the dem[...] driving outsourcing. [...] logistics is likely to c[...] scarcity of labour and[...] tunity and a threat.

### Good growth prospe[...]

The trend of the incre[...] retail revenue will c[...] invest in the expansio[...] flows for the last m[...] affordable for our cus[...]

### Stable trends in the [...]

The German market f[...] will decline further as[...] part of the digital tran[...] Germany, we will con[...] to reflect the rise in o[...]

The German adv[...] slightly in 2023. The [...] to online marketing v[...]

According to cur[...] of goods shipments v[...] volumes of docume[...] the compensatory eff[...] on developments in c[...] freight capacity.

We expect development in e-commerce to stabilise and the German parcel market to grow again in 2023, and are therefore expanding our parcel network and our network of Packstations. We are also expanding our range of electronic communications services, securing our standing as a quality leader and, where possible, making our transport and delivery costs more flexible.

## Expected developments

### Declining income due to the economy still above levels of pre-pandemic years

The 2023 financial year should initially be characterised by economic headwinds: for the development of B2B volumes, at least in the first half of the year, this should mean a continuation of the weak trend from the fourth quarter of 2022. The development of B2C delivery volumes is also likely to be shaped by a certain level of caution on the part of consumers. Overall, the international transport markets should find an equilibrium with prices above those of the last year before the beginning of the pandemic. The start and the momentum behind any potential recovery will be crucial for development in the second half of the year.

To facilitate a better assessment of how an economic recovery in the second half of the year – as expected by many market observers – could impact earnings in 2023, we have considered different scenarios. If there is no significant recovery from the level of the first half of the year, we expect consolidated EBIT of at least €6.0 billion. In the event of only a modest economic recovery in the second

half of the year, we expect consolidated EBIT of around €6.5 billion. A scenario with a dynamic recovery across all markets would result in EBIT of around €7.0 billion.

### Expectations for consolidated EBIT

In the 2023 financial year, we anticipate consolidated EBIT between €6.0 billion and €7.0 billion. The DHL divisions are projected to generate total EBIT between €5.5 billion and €6.5 billion. In the Post & Parcel Germany division, EBIT is forecast to come in at around €1.0 billion. The earnings contributed by Group Functions are expected to amount to around €−0.45 billion.

### Proposed dividend: €1.85 per share

The Board of Management and the Supervisory Board will propose to the shareholders at the Annual General Meeting on 4 May 2023 a ▶ Dividend of €1.85 per share for the 2022 financial year (previous year: €1.80).

### Group's credit rating remains the same

In consideration of the earnings projections for 2023, we expect no change or even an improvement in our current credit rating by rating agencies as a result.

### Liquidity remains very solid

Due to the dividend payment for the 2022 financial year in May 2023, our liquidity is expected to decrease up to mid-year 2023. Due to the usually good business development in the second half of the year, the liquidity situation will improve again towards the end of the year.

### Capital expenditure o

Even in the difficult e will make appropriate and future growth a with economic develo ture (excluding lease €3.9 billion in 2023, v in previous years.

### Expected EAC and fr

In view of the expecte with a predicted incre EAC to be down year at around €3.0 billion

### Limiting greenhouse

Development of GHG on the development volumes undergo we emissions to remain a if the economy prove GHG emissions to a m This includes decarbo of $CO_2$e which we pla expect a significant re half of the decade.

### Continued strong em

With regard to the Em indicator, we are strivi 80% across the Grou remain steady until 2


**Increase share of female executives**

In 2023, 27.7% of the positions in middle and upper management should be held by women; the share of women should rise to at least 30% by 2025.

**Reduce LTIFR**

We expect to be able to stabilise the LTIFR at 3.5 in 2023; by 2025 this figure should be reduced to less than 3.1.

**Conduct compliance-relevant training**

In the reporting year, the share of valid training certificates amongst middle- and upper-level management should remain at the high level and amount to 98%.

**External cybersecurity rating**

In the cybersecurity rating from BitSight, we strive for a position in the top quartile of our reference group, which means we expect a rating of at least 710 points. The external rating agency announced after the reporting date that it would be making changes to its method which will have an impact on the rating scale and which could influence our results.

## Opportunity and risk management

### Uniform reporting standard

As an internationally operating logistics company, we are facing numerous changes. Our aim is to identify the resulting opportunities and risks at an early stage and take the necessary measures in the specific areas affected in due time to ensure that we achieve a sustained increase in enterprise value. Our Group-wide opportunity and risk management system (RMS) facilitates this aim. Each quarter, executives estimate the impact of future scenarios, evaluate opportunities and risks in their departments and present planned measures as well as those already taken. Queries are made and approvals given on a hierarchical basis to ensure that different managerial levels are involved in the process. Opportunities and risks can also be reported at any time on an ad-hoc basis.

We advanced the implementation of the recommendations of the Task Force on Climate-related Financial Disclosures (TCFD) in 2022 and supplemented them with the provisions of the EU Taxonomy. This involves discussing and assessing both transitory and physical risks stemming from climate change using various scenarios. The material risks identified during this process are explained in "Opportunity and risk categories".

Our early-identification process intertwines the RMS throughout the Group into a uniform reporting standard using a proprietary IT application that is constantly updated. Furthermore, we use a Monte Carlo simulation for the purpose of aggregating opportunities and risks in standard evaluations.

The simulation is a stochastic model that takes the probability of occurrence of the underlying risks and oppor-

tunities into conside
large numbers. Rando
opportunity and risk –
tribution functions for

The most import
management process

❶ **Identify and ass**
regions evaluate
a quarterly basis a
use scenarios to a
Each identified ris
who assesses and
procedures for g
The same applies
ment process use
be reported for g
cases where it is
tative assessmen
tive basis to ensu
tured. The results
conduct an annua
the Divisional Bo
process. Worksho
and risks of signi
same time, newly
subsequently inte

❷ **Aggregate and**
the results, evalu
sibility. If individ
noted in our data
compilation proc
sion risk owners,
level in the hiera

**Opportunity and risk management process**



**❶ Identify and assess**
Assess
Define measures
Analyse
Identify

**❺ Control**
Review results
Review measures
Monitor early warning indicators

Corporate Audit reviews processes

**❷ Aggregate and report**
Review
Supplement and change
Aggregate
Report

**❸ Overall strategy / risk management / compliance**
Determine
Manage

**❹ Operating measures**
Plan
Implement

— Divisions  — Opportunity and risk-controlling processes  — Board of Management  — Corporate Audit

Corporate Controlling reports to the Group Board of Management and the Supervisory Board on significant opportunities and risks as well as on the potential overall impact each division might experience. For this purpose, opportunities and risks are aggregated for the key organisational levels. We use two methods for this. In the first method, we calculate a possible spectrum of results for the divisions and combine the respective scenarios. The totals for "worst case" and "best case" indicate the total spectrum of results for the respective division. Within these extremes, the total "expected cases" shows current expectations. The second method makes use of a Monte Carlo simulation, the divisional results of which are regularly included in the opportunity and risk reports to the Board of Management and the Supervisory Board.

**❸ Overall strategy:** The Group Board of Management decides on the methodology that will be used to analyse and report on opportunities and risks. The reports created by Corporate Controlling provide the Board of Management with an additional, regular source of information for managing the Group as a whole. The Group Board of Management has defined the thresholds for risk tolerance and risk-bearing ability and uses the Monte Carlo simulation to review the necessity for strategic changes on a quarterly basis. The Board of Management is supported in its duties by a Risk Committee, which analyses individual risks on a quarterly basis and reviews the results from risk reporting. The Risk Committee also regularly discusses adjustments to the opportunity and risk management process.

**❹ Operating meas**
advantage of opp
mined within the
use cost–benefit
be avoided, mitig

**❺ Control:** With re
early-warning in
monitored const
Internal Audit ha
of Management's
reviews the quali
management op
analyse all parts
from Corporate
ent auditor, with
improvement an
where necessary

**Reporting and asses**
In the following, we l
and opportunities wh
have a significant im
cast period beyond th
business plan. In add
well as latent opportu
tunities have been as
of occurrence and the
classify opportunitie
high. Medium and h
sidered significant, a
following table. The
(measured on a net b

## Classification of risks and opportunities



The following assessment scale applies to qualitative risk (measured on a net basis):

## Assessing qualitative risk



figures provided in the
a significant correlati
economy and global
specified, a low rele
opportunities and ris
The opportunities and
unless indicated othe

High-impact risks tend to affect the entire Group, whereas medium-impact risks play out at a divisional level and low-impact risks at a local level. Qualitative risks can be assigned in terms of their impact to financial risk, reputational risk, operational risk and environmental risk.

The opportunities and risks described here are not necessarily the only ones the Group faces or is exposed to. Our business activities could also be influenced by additional factors of which we are currently unaware or which we do not yet consider to be material.

Opportunities and risks are identified and assessed decentrally at Deutsche Post DHL Group. Reporting on possible deviations from projections, as well as long-term and latent opportunities and risks, occurs primarily at the country or regional level. In view of the degree of detail provided in the internal reports, we have combined the decentrally reported opportunities and risks in categories for the purposes of this report. It should be noted that the


# Opportunity and risk categories

### Overview of material opportunities and risks

As outlined on the pages that follow and listed in the over-view below, we have assigned material opportunities and risks to the following categories:

### Overview of material opportunities and risks

| Category | Opportunity/risk | Significance |
| --- | --- | --- |
| Corporate strategy | Market pressure on pricing | Medium |
| Legal and compliance-related | – | – |
| Capital expenditure and projects | – | – |
| Operational | Risk of operational restrictions due to climate change | Medium |
| Human resources | Impact of collective bargaining | Medium |
| Information technology | IT security incident | Medium |
| Financial | Currency effects (opportunity and risk) | Medium |
| Tax-related | – | – |
| Real estate | – | – |
| Market- and customer-specific | Inflation | Medium |
| | Customer insolvencies | Medium |
| | Development of the global economy | Medium |
| | Availability of sustainable aviation fuels (SAF) and renewable energy | Medium |
| Regulation | Regulatory framework of the German post and parcel market | Medium |
| | Carbon taxation | Medium |
| | Restriction of greenhouse gas emissions | Medium |
| Environment, catastrophes and epidemics | – | – |

### Opportunities and risks arising from corporate strategy

Over the past few years, the Group has ensured that its business activities are well positioned in the world's fast-est-growing regions and markets. We are also constantly working to create efficient structures in all areas to enable us to flexibly adapt capacities and costs to demand – a con-dition for lasting, profitable business success. With respect to our strategic orientation, we are focusing upon our core competencies in the
with an eye towards
our processes for the
ings projections reg
opportunities arising

We take action ea
In so doing, it helps
supplier companies a
focus on profitable se
customer and produ
management and add

In the Express d
above all upon gener
petitive environment,
plus capacities and a
to market pressure fro
could limit our pricing
of medium significan
our international busi
shipment volumes ov
upon this assumption
services, our employe

In the Global Fo
chase transport servi
ping companies and
them ourselves. In th
transport services at
a margin. In the wors
not being able to pass
ers. The extent of ou
depends on trends in
transport services as

Comprehensive knowledge in the area of brokering transport services helps us to capitalise on opportunities and minimise risk.

In the Supply Chain division, our success is highly dependent on our customers' business performance. Since we offer companies a widely diversified range of products in different sectors all over the world, we are able to diversify our risk portfolio and thus counteract the incumbent risks. Our future success moreover depends on our ability to continuously improve our existing business, seamlessly integrate new business and grow in our most important markets and segments.

The eCommerce Solutions division is responsible for domestic and international non-time-definite standard parcel delivery services in various countries around the globe. It predominantly serves customers in the fast-growing e-commerce sector. Our goal is to leverage our international resources and services to build a cross-border solutions platform that can be connected to the most cost-efficient networks for last-mile delivery. We want to grow profitably in all sectors and segments. To counteract the fundamental risk of rising cost pressure, we took measures with which we intend to improve network efficiency and cost flexibility.

In the German mail and parcel business, we are responding to the challenges posed by the structural shift from a physical to a digital business and the continual decline in letter mail occurring parallel to the steady increase in volumes of parcels and merchandise mail items. We are counteracting the risk arising from changing demand by expanding our range of services. Due to the rise in e-commerce, we expect our parcel business to continue growing in the coming years and are therefore expand-

ing our network of parcel and Packstations. We are also expanding our range of electronic communications services, securing our standing as a quality leader and, where possible, making our transport and delivery costs more flexible. We follow developments in the market very closely and take them into account in our earnings projections.

We currently do not see any further specific corporate strategy opportunities or risks of material significance, either for the Group or individual divisions.

**Legal and compliance-related opportunities and risks**

Legal disputes may arise in case of non-compliance with national or international laws and regulations as well as agreements. Examples are violations of antitrust and competition law or of regulatory, statutory or contractual requirements. Investigations of any such violations may result in considerable costs, penalties and damage to our company's reputation, which could have a disadvantageous impact on the business activities of the Group.

Compliance with external laws, regulations and agreements is a clearly formulated obligation of all employees of the Group, and ensuring this is one of the fundamental tasks of our managers. To support our employees and managers, we have established a corporate compliance unit differentiated according to relevant topics which, on the basis of our risk management system, monitors compliance with Group-wide standards at both Group and divisional level with respect to typical compliance risks. Thus, in addition to our compliance initiative aimed at fighting corruption and violations of cartel and competition law, we have introduced initiatives in all divisions intended to ensure compliance with data protection laws – for example, to ensure adherence to

the provisions of the E
tion Regulation (GDP
initiative aims to ens
national export contr
over, our compliance
itors the observance o
environmental standa
in our external supply

At present, we do
ance-related opportu

**Opportunities and ri
expenditure and pro**

The Group invests in r
in buildings and techr
its fleet of vehicles an
investment projects is
divisions in considera
efficiency and ESG.

The risks associa
marily to deviations in
complexity of the pro
This can lead to adver
continuity and quality

The aforemention
project management
targeted countermea
The status of investm
ular basis and reporte
and, for larger project
the Group Board of M
any critical projects.

We do not currently see any specific opportunities or risks of significance in the area of investment projects.

**Operational opportunities and risks**

Logistics services are generally provided in bulk and require a complex operational and external infrastructure with high quality standards. Any weaknesses with regard to the tendering, sorting, transport, warehousing, customs clearance or delivery of shipments could seriously compromise our competitive position. To consistently guarantee reliability and punctual delivery, processes must be organised so as to proceed smoothly with no technical or personnel-related glitches. We counteract potential operational risks, e.g. through efficient workflows and structures. We also take out insurance policies to guard against potential losses.

Most recently, the war in Ukraine and global pandemic in the past few years have revealed how external factors can restrict our transport routes and means or reduce the availability of our employees, and hence potentially impair our operating performance. For information on the measures we are taking to protect our employees, please refer to the categories titled "Human resources" and "Environment, catastrophes and epidemics".

A large number of internal processes must be aligned so that we can render our services. These include – in addition to our fundamental operating processes – supporting functions such as sales and purchasing. The extent to which we succeed in aligning our internal processes to meet customer needs whilst simultaneously lowering costs correlates with potential positive deviations from the current projections. Our earnings projections already incorporate the expected cost savings.

Increased restrictions imposed by law to combat climate change can be expected in the coming years, including limits on air transport or access to city centres. In certain cases this may also affect our business models. The resulting risk represents a risk of medium significance for us currently.

At this time we do not see any additional specific operational opportunities or risks of material significance.

**Opportunities and risks arising from human resources**

It is essential for us to have qualified and motivated employees in order to achieve long-term success. In some markets, however, demographic change and – depending on the region – a tight labour market situation may lead to a scarcity of available workers.

Our work in the area of human resources aims to avoid potential risk that may arise from the changing demographic and social structures. The goal is to motivate our personnel, to provide them with employee development opportunities and to foster their long-term loyalty to the company. Of particular importance in this context is training management and team leaders in our leadership attributes, which are applicable Group-wide and serve as a behavioural compass.

We keep a constant eye on developments in the job market, communicate directly with our employees and endeavour to further enhance our attractiveness to both existing and prospective employees.

The health and safety of our employees are of central importance for Deutsche Post DHL Group. We therefore place high value on health and occupational safety measures. With respect to occupational health, we make use of

initiatives tailored to
ating across division
initiatives, such as ap
grammes, options to h
a Group-wide employ
we address risk in th
system for assessing

With approximate
as at 31 December 2
ritories, upholding hu
also reflected in our o
infringements are rep
ures for clarification.

Thanks to a targe
were able to limit so
pandemic in the year
significant repercussi
We foresee similar re
require it.

The development
due to the large num
current collective bar
be considered a risk o
not currently see any
opportunities or risks

**Opportunities and ri
technology**

The security of our i
important to us. The g
operation and preven
and databases. To th

standards and procedures based upon ISO 27001, the international standard for information security management. In addition, IT risks are monitored and assessed on an ongoing basis by Group Risk Management, Corporate Internal Audit, Data Protection and Corporate Security.

For our business processes to run smoothly at all times, the essential IT systems must be continuously available. We have therefore designed our systems to protect against complete system failure. All of our software is updated regularly to address potential bugs, close gaps in security and increase functionality. We employ a patch management process – a defined procedure for managing software upgrades – to control risks that could arise from outdated software or from software upgrades.

We limit access to our systems and data such that employees can only access the data they need to perform their duties. All systems and data are backed up on a regular basis, and critical data are replicated across data centres. In addition to outsourced data centres, we operate central data centres in the Czech Republic, Malaysia and the United States. Our systems are thus geographically separate and can be replicated locally.

To assess risks in the area of information security, we take a uniform Group-wide approach that factors in risks from the lack of availability, manipulation, misuse, spying and infection of data and information, as well as physical damage to IT facilities. In total, these represent a latent risk of medium significance.

We also take continuous action to minimise risk, such as holding regular training courses for our employees and monitoring all of our networks and IT systems globally via our Cyber Defence Centre, along with regular information security incident simulations.

We currently do not see any other specific IT-related opportunities or risks of material significance.

**Financial opportunities and risks**

As a global operator, we are exposed to financial opportunities and risks arising from fluctuating foreign exchange rates, interest rates and commodities prices, as well as the Group's capital requirements. Changes in pension obligations also impact our business. We attempt to reduce the volatility of our financial performance due to financial risk by implementing both operational and financial management measures.

With respect to currencies, opportunities and risks result from scheduled foreign currency transactions as well as those budgeted for the future. Any significant currency risks arising from budgeted transactions are quantified as a net position over a rolling 24-month period. Highly correlated currencies are consolidated in blocks. At the Group level, the most important net surpluses are budgeted for the US dollar block as well as for the pound sterling, the Japanese yen and the Australian dollar. The Czech koruna is the only currency with a considerable net deficit. As at the reporting date, there were no significant currency hedges for scheduled foreign currency transactions.

Any general depreciation of the euro presents an opportunity as regards the Group's earnings position. The main risk to the Group's earnings position would be a general appreciation of the euro.

We currently assess the aggregate effect of all foreign currency gains and losses both as an opportunity and a risk of medium relevance for the Group.

As a logistics group, our biggest commodity price risks result from changes in fuel prices (kerosene, diesel

and marine fuels). In t[...]
are passed on to cus[...]
surcharges).

The key control p[...]
are the centrally avai[...]
liquidity is secured [...]
Moreover, the Group[...]
markets on account [...]
try and is well positio[...]
requirements are fulf[...]
risk to the Group at p[...]

Further informat[...]
and finance strategy[...]
financial risks can be f[...]
tion and in ❱ Note 43[...]
Detailed information[...]
defined benefit retire[...]
to the consolidated finan[...]

Risk may also aris[...]
accounting processe[...]
monitor those proces[...]
from materialising.

We do not curren[...]
opportunities or risks[...]

**Tax-related opportu[...]**

Due to the internatio[...]
subject to a variety of[...]
arise from the introdu[...]
changes and judicial r[...]

We mitigate this [...]
taxation authorities a[...]
possible degree of le[...]

tax compliance requirements in the countries in which we operate to the best of our knowledge and belief. Our Group risk management system incorporates a tax risk management framework that enables us to monitor and avoid tax risk as far as possible.

Currently, we have not identified any significant tax-related opportunities or risks.

**Opportunities and risks related to real estate transactions**

Deutsche Post DHL Group is one of the world's largest corporate users of industrial properties. A large portion of the Group's industrial real estate portfolio consists of leased properties. Ownership solutions have additionally been implemented for a number of especially strategic properties. Our business may be impacted by opportunities and risks arising from the lease, purchase, sale, construction or use of real estate. A global team of real estate professionals manages the Group portfolio and ensures that any opportunities or risks are identified at an early stage and a suitable response is selected.

We negotiate suitable solutions early with our lessors, analyse real estate markets and identify suitable properties for expanding or optimising the current portfolio based on our divisions' business strategies and operational location planning. The main objective is to secure the availability of properties needed for our core business.

We do not currently see any specific opportunities or risks of significance in the area of real estate.

**Market- and customer-specific opportunities and risks**

Macroeconomic and sector-specific conditions are a key factor in determining the success of our business. In addition to the development of the global economy, growth in the logistics market and its interaction with our stakeholders – our customers, suppliers and competitors – is of particular importance in this regard. Changes in demand present both opportunities and risks.

As a provider of choice, our business is based on our customers' needs. Our customers are likewise exposed to macroeconomic trends that impact growth in their respective sectors. We monitor market developments on an ongoing basis and review the potential financial effects of relationships with business partners and suppliers at regular intervals to enable us to avert any risk that could arise from potential insolvencies, for example, at an early stage. Our Customer Solutions & Innovation unit uses a risk dashboard for this purpose. Due to the current economic situation, potential customer bankruptcies represent a risk of medium significance.

Global trade weakened significantly due to economic developments, the war in Ukraine, the energy crisis and the corresponding high levels of inflation. In addition, the easing of the previously heavily used market capacities for transport services is leading to a normalisation of freight rates. We expect moderate business performance in 2023. In spite of the expected weakening of global economic growth, we will see opportunities for growth, for instance through structural growth in e-commerce. The general trend of businesses outsourcing processes continues as well. In addition, our DHL divisions are benefitting from rising demand for complex and integrated

logistics solutions th
market leader.

Our strong positi
ate allows us to comp
lanes based on grow
our divisions different
point in time, which c
over, we have taken m
more flexible and to a
in market demand. H
nomic growth beyon
of medium significan

Deutsche Post a
ready-established co
the market. Such com
customer base as we
in our markets. In the
key factors for succe
petitive prices. Than
with the cost savings
we believe that we sh
keep any negative eff

As a logistics con
the effects of fluctuat
The current rise in in
significance.

The availability
importance for us to a
with our ESG Roadma
the total fuel we use
sources (sustainable
sibility that the marke

may not be sufficient therefore represents a risk of medium significance.

In addition, no significant opportunities or risks are seen at present in this risk category.

### Opportunities and risks arising from political, regulatory or legal conditions

Our business is fundamentally intertwined with the political and legal environment in which we operate. The stability and security of international transport routes represent the first line in this framework, and they could be critically disrupted by events ranging from geopolitical developments to military conflicts such as the war in Ukraine. A number of the indirect effects of the war in Ukraine, such as the development of the global economy and inflation, have been taken into account for the corresponding risks. The remaining direct effects in Russia and Ukraine currently represent a risk of low significance.

In addition, the international transport of goods is subject to the import, export and transit regulations of more than 220 countries and territories as well as their applicable foreign trade laws. In recent years, not only has the number but also complexity of such laws and regulations increased significantly (including their extraterritorial application). Violations are also being pursued more aggressively by the competent authorities, with stricter penalties imposed. We have implemented, on the one hand, ongoing monitoring of the regulatory and legislative developments in the markets most relevant for us and, on the other, a Group-wide compliance programme in response to this development. This comprises the legally prescribed checking of all senders, recipients, suppliers and employees against current embargo lists. In addition, this includes in particular the legally required review of shipments for the purpose of enforcing applicable export restrictions as well as country sanctions and embargos. Deutsche Post DHL Group also co-operates with the responsible authorities, both in working to prevent violations as well as in assisting in the investigation of any infringements in order to avoid or limit potential sanctions.

A number of risks arise primarily from the fact that the Group provides some of its services in regulated markets. Many of the postal services rendered by Deutsche Post AG and its subsidiaries (particularly the Post & Parcel Germany division) are subject to sector-specific regulation by the German federal network agency *(Bundesnetzagentur)*. The German federal network agency approves or reviews prices, formulates the terms of downstream access, has special supervisory powers to combat market abuse and guarantees the provision of universal postal services. This general regulatory risk could lead to a decline in revenue and earnings in the event of negative decisions.

The German federal government agreed in the coalition agreement that the Postal Act would again be amended. The aim is to further enhance social and environmental standards and strengthen fair competition. Depending upon the structure of the new regulatory framework and its application by the German federal network agency, opportunities and risks may arise for the company's regulated areas.

Revenue and earnings risk can arise in particular from the price cap procedure used to determine the rates for individual pieces of letter mail. Approval of the rates for the period from 1 January 2022 to 31 December 2024 was issued by the G[...]
29 April 2022. The C[...]
expected to carry o[...]
rates applicable from [...]
version of the German [...]
at the time.

An association fr[...]
with the Cologne Ad[...]
cap approval of the C[...]
the years 2022 to 202[...]

The same CEP a[...]
and other customers [...]
Cologne Administrati[...]
granted as part of th[...]
2019 to 2021. In a ru[...]
Cologne Administrati[...]
the years 2019 to 20[...]
well as the postal ser[...]
of the Federal Admi[...]
due to a formal legal [...]
ing legal ordinance. [...]
by the German gove[...]
the German Postal A[...]
The Cologne Admini[...]
two customers beca[...]
Administrative Court [...]
four further major cu[...]
have been adjourned[...]
cation to be granted a[...]
2021 was also denied [...]
The association has f[...]
Federal Administrativ[...]

who were completely unsuccessful in their claims with the Cologne Administrative Court; the appeals with the Federal Administrative Court are still pending.

The rulings of the Cologne Administrative Court from 17 August 2022 are only applicable to the legal relationships with the respective plaintiffs and have no legal impact vis-à-vis other consumers.

One postal service provider, which had also filed an action against the pricing approval for the years 2019 to 2021 with the Cologne Administrative Court, also filed a civil suit for repayment of allegedly excessive conveyance fees for standard letters delivered in 2017. The action is based primarily on the claim that Deutsche Post charged postage whose approval is unlawful pursuant to the ruling of the Federal Administrative Court from 27 May 2020. The action was denied by the Cologne District Court in a ruling from 17 June 2021. The cartel court of the Düsseldorf Higher Regional Court denied the appeal of this ruling on 6 April 2022 and did not permit any further appeals of the ruling. On 2 May 2022, the plaintiff submitted an appeal against non-permission with Germany's Federal Court of Justice to have its appeal allowed.

It cannot currently be ruled out that the effects on existing pricing approvals, or on future price cap procedures, of the court's decisions, the change in the regulatory framework or the actions currently pending could be negative for Deutsche Post. According to current assessments, this represents a medium risk.

We describe other significant legal proceedings in ❯ **Note 45 to the consolidated financial statements.**

The fight against climate change can result in increased regulatory and legal changes in the coming years. An increase in, or stepped up introduction of, carbon taxes and levies, certification regulations and other direct costs in conjunction with $CO_2$ emissions represents a risk of medium importance for us, as do increased restrictions on GHG emissions. We have implemented ongoing monitoring of the regulatory and legislative developments in the markets most relevant for us in response to this risk, but above all we constantly work to reduce our greenhouse gas emissions and have also set ourselves verified targets from the Science Based Targets Initiative to this end.

We have not identified any other significant opportunities or risks associated with the political, regulatory or statutory environment.

### Opportunities and risks arising from the environment, catastrophes and epidemics

Our business operations can be both positively and negatively impacted by natural disasters, epidemics and ecological factors, also including physical risks caused by climate change such as floods and storms.

The year 2022 was again shaped by the consequences of the COVID-19 pandemic. Measures aimed at containing the pandemic still led to economic restrictions and uncertainty about how the global economy as a whole and our business in particular will fare going forward. Our focus at all times was, and continues to be, on safeguarding the health of our employees. We are therefore making a collective effort to continue to contain the effects of the virus and thus confront the current situation by improving hygiene protocols, enabling mobile working and holding virtual meetings. Currently, the virological development can be given a rather more optimistic outlook. We nevertheless examine the impact o...

COVID-19 is currently...
longer a risk of mate...
more virulent strains...

Overall, we do no...
nities or risks of mate...

## Internal contr...

**Structure of the inter...**
Our internal control s...
the internationally re...
control systems (COS...
izations of the Tread...
updated and improve...

A Group-wide gu...
and objectives of the...
ICS and the underlyin...

The scope of the...
ICS is derived from a...
risks identified and c...
ments are defined w...
implementation of su...
works of the divisions...

All companies a...
the activities to be ca...
depends on, amongst...
entity for the consol...
specific risks which...
companies are analy...


qualitative aspects and categorised into companies material to the ICS in consideration of relevant financial figures and functional KPIs.

### Internal control system in the functions
⌐⌐ Disclosures unrelated to the management report (unaudited), ❱ **Reporting practice**

The ICS of Deutsche Post DHL Group takes the Finance, Human Resources (HR), Compliance and IT functions into account as part of the functional design of the Group-wide risk landscape.

The Group-wide risk landscape is supplemented for the respective function as part of an extended risk analysis and regularly reviewed, also including the consideration of sustainability-related targets within the ESG Roadmap. Risks and controls in this regard are identified and assigned to the respective functions and covered by the control frameworks of the divisions. Self-assessments are carried out in all functions, documented and prepared in a central reporting tool.

From 2023, the Operations function will also be integrated into the ICS throughout the Group. The goal of taking all functions of the Group into account is to ensure compliance with applicable standards and internal Group regulations as well as divisional and local provisions in all business transactions and the core processes.

The compliance management system (CMS) is a major component of the monitoring system of Deutsche Post DHL Group. The CMS was established with the goal of creating rules, standards and processes for conduct compliant with laws and guidelines as well as measurable self-commitments.

It therefore serves to protect Deutsche Post DHL Group from financial risks and damage to its reputation, to minimise personal liability risks of governing bodies, managers and other employees, and to avoid competitive disadvantages.

The CMS is organised according to divisions. The Compliance Committee acts as a joint decision-making body chaired by the Chief Compliance Officer. The Compliance Committee facilitates the exchange of information on developments in compliance management in the individual divisions, co-ordinates fundamental strategic questions related to the CMS and ensures consistent implementation in the divisions.

Compliance management at Deutsche Post DHL Group is based on a values-oriented Code of Conduct which sets out a uniform Group-wide commitment to ethical, responsible and legally compliant conduct in business. Our managers act as role models and should set a good example to promote compliance. Deutsche Post DHL Group uses targeted communication and regular training sessions to help its employees and business partners understand and adhere to the compliance guidelines and regulations.

At Deutsche Post DHL Group, compliance risks are identified and assessed on a regular basis and systematically across all divisions. The identified risks are assessed and analysed according to qualitative criteria and, if necessary, supplemented by further risk minimisation measures.

Our compliance programme comprises the preventive elements of guidelines, training sessions and business partner reviews. In addition, detective elements such as violation reporting and case processing management contribute to ensuring the business integrity of Deutsche Post DHL Group. ⌐

**Accounting-related i**

The accounting-relate… ing and financial re… included in the Group… ensure the complianc… reporting with genera… it is intended to ensu… promptly, accurately a… of the applicable norm… Group regulations. Ac… principle and materia… promptly.

Within the framew… and process-related m… in the Group. Centrall… govern the reconcili… statements and ensu… ing standards (EU IFR… ner throughout the G… accepted accounting… lished for Deutsche Po… subject to HGB reporti… accounts is required t… We immediately asses… accounting for releva… tion in a timely manne… Often, accounting pro… centre in order to cent… financial statements o… recorded in a standa… cessed at a central lo… is performed. Other q…

automatic plausibility reviews and system validations of the accounting data. In addition, regular, manual checks are carried out centrally at the Corporate Center by Corporate Accounting & Controlling, Taxes and Corporate Finance. If necessary, we call in outside professionals with the requisite expertise. Finally, the Group's standardised process of preparing financial statements by using a centrally administered financial statements calendar guarantees a structured and efficient accounting process.

Both preventive and detective control mechanisms are used to ensure that existing risks are addressed and minimum requirements are met along with all division-specific and local requirements. To maintain the system's effectiveness and implement continuous improvements, the ICS is subjected to regular reviews. To this end, self-assessments are carried out using the dual-control principle and documented in a central IT application. If a self-assessment results in the finding of inadequate control implementation, an action plan must be created and the successful execution thereof must be confirmed by the person responsible for the process.

The results of the self-assessments are documented in a central reporting tool. The Supervisory Board, Board of Management and the functional bodies are regularly informed of the findings. In addition, this information is analysed with regard to potential improvements.

**Regular monitoring by Corporate Internal Audit**

Over and above the ICS and risk management, Corporate Internal Audit is an essential component of the Group's control and monitoring system. Using risk-based auditing procedures, Corporate Internal Audit regularly examines the processes related to financial reporting and reports its results to the Board of Management.

⌐ **Statement on the appropriateness and effectiveness of the RMS and ICS**

⌐⌙ Disclosures unrelated to the management report (unaudited), ❯ **Reporting practice**

Based on the regular reporting on the RMS and ICS, the analysis of the underlying results of the self-assessments and the appraisal of the reports from the internal audit department, the Board of Management is not aware of any circumstances which would cause it to believe that the design of the risk management system and the internal control system is not appropriate and effective for the risk situation of Deutsche Post DHL Group.

It should, however, always be taken into consideration that no ICS, regardless of how well designed, can offer absolute certainty that all material accounting misstatements will be avoided or detected. ⌙

**Overall assess**

In the 2023 financial between €6.0 billion are projected to gene and €6.5 billion. In the is forecast to come in contributed by Group around €−0.45 billion opment in combinatio asset charge, we expe Free cash flow is proj

The current busi significant changes in risk situation compa risks with a potential result have been ide ments. Based upon th in the estimation of it no identifiable risks f period which, individ the Group's ability to any such risks appare ble to positive outloo reflected in our ❯ **Cre**


# GOVERNANCE

## Annual Corporate Governance Statement

pursuant to Sections 289f and 315d HGB with respect to Deutsche Post AG and Deutsche Post DHL Group.

### Declaration of Conformity with the German Corporate Governance Code

Deutsche Post AG complied with the suggestions and rec-ommendations of the German Corporate Governance Code in the year under review. This did not include the reserved limitation with regard to the CEO's chairmanship of the supervisory board of Deutsche Telekom AG. The Board of Management and Supervisory Board intend to comply with all suggestions and recommendations in the future. In December 2022, they issued the following declaration of conformity:

The Board of Management and the Supervisory Board of Deutsche Post AG declare that all recommendations of the Government Commission German Corporate Govern-ance Code in the version dated 16 December 2019 have also been complied with after issuance of the Declaration of Conformity in December 2021 – except for the reserved partial restriction regarding recommendation C.5. In the future, all recommendations of the code in the version dated 28 April 2022 shall be complied with.

Dr Frank Appel is permitted to chair the supervisory board of Deutsche Telekom AG until he leaves the company in May 2023.

You can view the current Declaration of Conformity and the Annual Corporate Governance Statement along with the Declarations of Conformity for the past five years on the ⊚ **Company's website.**

### Corporate governance principles and shared values

Our business relationships and activities are based upon responsible business practices that comply with applica-ble laws, international guidelines and ethical standards, and this also forms part of the Group's strategy. Equally, we require our suppliers to act in this way. We encourage relationships with our employees, customers and other stakeholders, as well as the shareholders, whose decisions to select Deutsche Post DHL Group as an employer, supplier or investment are increasingly also based upon the require-ment that we apply good corporate governance criteria.

With the ⊚ **Code of Conduct,** we have laid out the require-ments of the conduct of our employees. It is applicable across all divisions and regions. In the Code of Conduct, we commit ourselves in particular to the principles set out in the United Nations (UN) Global Compact, comply with the principles of the Universal Declaration of Human Rights and follow additional recognised legal standards, including the applicable anti-corruption legislation and agreements. In addition, we take the International Labour Organization (ILO) Declaration on Fundamental Principles

and Rights at Work a
tional Enterprises into
of the United Nations,
Development Goals (

The Code of Cond
of diversity and inclus
respect promote co-o
contribute to econom
ment and professiona
exclusively their skill
of the Board of Mana
support the diversity
the Group's goal of i
management.

Doing business i
vice provider in the ma
benefit of society and
our employees to eng

Ensuring that ou
shareholders and the
and within the bound
reputation. This is als
Group's lasting busine
ment system (CMS) is
as well as to prevent
duct in particular. Ins
and reported violation
and upgrade the CMS

**Co-operation between the Board of Management and the Supervisory Board, remuneration, retirement ages**

As a listed German public limited company, Deutsche Post AG has a two-tier board structure comprising the Board of Management and the Supervisory Board.

Members of the Board of Management are responsible for the management of the company. The Board of Management's principles governing its internal organisation, management and representation, as well as co-operation between its individual members are set out in rules of procedure. The members of the Board of Management manage their board departments independently, except where decisions of particular significance and consequence for the company or the Group must be made by all members of the Board of Management. They are obligated to subordinate the interests of their individual board departments to the collective interests of the company and to inform the full Board of Management about significant developments in their departments. The Board of Management ensures compliance with statutory provisions and internal guidelines within the company (compliance). The internal control system and the risk management system comprise a CMS aligned with the risk situation of the company and also include risks related to sustainability.

The CEO conducts Board of Management business, aligns board department activities with the company's collective goals and plans, and ensures that corporate policy is carried out. When making decisions, members of the Board of Management may not act in their own personal interest or exploit corporate business opportunities for their own benefit. Any conflicts of interest must be disclosed to the chairs of the Supervisory Board and the Board of Management without delay; the other Board of Management members must also be informed.

The members of the Supervisory Board appoint, advise and oversee the Board of Management. They propose the remuneration system for Board of Management members to the Annual General Meeting, and – together with the Board of Management – are jointly responsible for the long-term succession planning for the Board of Management.

The retirement age for Board of Management members defined by the Supervisory Board is generally the year in which the Board of Management member reaches the age of 65. The Supervisory Board defined the retirement age for members of the Supervisory Board in such a way that, for nominations for the election of members of the Supervisory Board, attention shall be paid to the fact that the term of office shall end no later than the close of the Annual General Meeting after the Supervisory Board member reaches the age of 72. As a general rule, Supervisory Board members should not serve more than three terms of office.

The company's D&O (directors and officers) insurance for the members of the Board of Management provides for a deductible as set out in the AktG.

The principles governing the Supervisory Board's internal organisation, a catalogue of Board of Management transactions requiring approval and the work of the Supervisory Board committees are governed by the rules of procedure, which are available on the ◎ **Company's website.** The Chair elected by the members of the Supervisory Board

from their ranks co-o[...]
Board and represents[...]
Chair holds talks with[...]
Supervisory Board. Th[...]
company in respect of[...]
Members of the Supe[...]
remuneration of €100[...]
the chairs (plenary an[...]
the Deputy Chair of [...]
mittee members by 5[...]
Board of Manageme[...]
can be accessed alon[...]
◎ **Company's website.** [...]
company and Super[...]
those governing their[...]
employment contract[...]

The Supervisory [...]
year, regularly also [...]
present. Extraordina[...]
held whenever decisi[...]
or particular issues re[...]
year, Supervisory Boa[...]
ings, 22 committee m[...]
meetings took place in[...]
virtually, as described[...]
Not all members we[...]
and four committee [...]
mitted in writing in a [...]
of 96% is broken dow[...]
**Supervisory Board.**

The Board of Management and the Supervisory Board regularly discuss the Group's strategy, the divisions' objectives and strategies, the financial position and performance of the company and the Group, key business transactions, the progress of acquisitions and investments, compliance and compliance management, risk exposure and risk management, and all material business planning and related implementation issues.

The Board of Management informs the Supervisory Board promptly and in full about all issues of significance. The Chair of the Supervisory Board and the CEO maintain close contact about current issues; the Chair of the Finance and Audit Committee regularly discusses important matters with the Board member responsible for Finance, even outside of meetings.

Supervisory Board decisions are prepared in advance in separate meetings of the shareholder representatives and the employee representatives, and by the relevant committees. Each plenary Supervisory Board meeting includes a detailed report regarding the committees' work and the decisions made. Supervisory Board members are personally responsible for ensuring they receive training and professional development measures. They receive appropriate support from the company in the process. The core elements are the so-called Directors' Days, which took place in June and September 2022 and which centred around the topic of data analytics at Deutsche Post DHL Group, a follow-up presentation on the German Supply Chain Due Diligence Act *(Lieferkettensorgfaltspflichtengesetz)*, the EU Taxonomy and the Corporate Sustainability Reporting Directive (CSRD).

**Succession planning for the Board of Management**

The search for suitable Board of Management members is primarily the responsibility of the Executive Committee. In the event of an upcoming vacancy, the Executive Committee selects suitable candidates for personal interviews, taking into account specific requirements for experience and qualifications to be met by the members and the composition of the Board of Management as a whole and, after discussing this list of candidates, submits it to the Supervisory Board.

Potential successors from within the Group are generally given the opportunity to give a presentation on topics from their own areas of responsibility before the Supervisory Board. In this way, the Supervisory Board continuously maintains an overview of promising managers within the Group. When appointing new members to the Board of Management, the Supervisory Board ensures that the different skills and experiences of the members supplements the Board of Management and that its membership is thus diverse. Great store is set by experience in various countries in addition to industry experience. The initial term of service for members of the Board of Management generally runs for three years.

**Independence of shareholder representatives on the Supervisory Board**

All Supervisory Board members are independent within the meaning of the German Corporate Governance Code. This exceeds the target of filling at least 60% of mandates on the shareholder side with independent members.

The largest shar...
engruppe, currently...
Deutsche Post AG and...
Accordingly, Luise Hö...
independent.

The term of Stefa...
of the board for over ...
pendence; it also fall...
bership limit determi...
terms. When determi...
must also include co...
with an overall view ...
the Supervisory Boar...
be reached that other...
longer term of office. ...
visory Board in consi...
Stefan Schulte contri...
experience to the ben...
of the Financial and A...
of Management in dif...

Lawrence Rosen'...
department ended m...
does not impair his i...
profound knowledge...
make it possible for h...
ment as an experienc...
the monitoring duties...

No Supervisory ...
mum age limit of 72, ...
the Group's main co...

**COMBINED MANAGEMENT REPORT  GOVERNANCE**

services to, or maintains other personal relationships with, such competitors.

**Effectiveness of the Supervisory Board's advisory and monitoring duties**

The Supervisory Board carries out an annual review to determine how well it performs its duties. This review is carried out in intensive discussions of all relevant aspects as part of a Supervisory Board meeting, without the Board of Management, and is based upon a questionnaire at least once every three years. Suggestions made by individual members of the Supervisory Board are also taken up and implemented during the year. In the year under review, the Supervisory Board reviewed the effectiveness of its activities in its September meeting. One focus of the discussions was on ensuring and expanding the skills of the Supervisory Board with respect to digitalisation, cybersecurity and sustainability. As a result of these discussions, the Supervisory Board concluded that it had performed its monitoring and advisory duties effectively and efficiently. Constructive collaboration within the Supervisory Board and with Board of Management members in an atmosphere of trust enables duties to be performed in a proper and professional manner.

**Targets for the composition of the Supervisory Board (skills profile)**

In addition to legal requirements (notably Sections 100 and 107 AktG), the composition of the Supervisory Board is guided by recommendations C.1 and C.6 of the German Corporate Governance Code (DCGK). Overall, the Supervisory Board set the following targets for its composition which also reflect the skills profile it aspires to have:

❶ When proposing candidates to the Annual General Meeting for election as Supervisory Board members, the Supervisory Board is to be guided purely by the best interests of the company. Subject to this requirement, the Supervisory Board aims to ensure that the independent group of shareholder representatives as defined in C.6 of the German Corporate Governance Code is to account for at least 60% of the Supervisory Board, and that at least 30% of Supervisory Board members are women.

❷ The company's international activities are already adequately reflected in the current composition of the Supervisory Board. The Supervisory Board strives to maintain this and, for its future proposals to the Annual General Meeting, will consider candidates whose origins, education or professional experience equip them with particular international knowledge and experience.

❸ The Supervisory Board should collectively serve as a competent advisor to the Board of Management on future issues, in particular digital transformation and sustainability issues.

❹ The Supervisory [...] cient expertise in [...] cial statement a[...] international dev[...] Additionally, the [...] independence of [...] integrity of the a[...] independence of [...]

❺ Conflicts of intere[...] bers are an obsta[...] advice to, and su[...] ment. The Super[...] with potential or [...] by-case basis, in [...] due considera[...] ance Code.

❻ In accordance wit[...] visory Board and [...] for the Supervis[...] of Supervisory B[...] term of office en[...] Annual General M[...] sory Board mem[...] eral rule, Supervis[...] more than three [...]

The current Supervis[...] fils this skills profile. [...] and the skills profile i[...] it made to this year's [...]

COMBINED MANAGEMENT REPORT   GOVERNANCE

**Qualification matrix pursuant to C.1 of the German Corporate Governance Code**

Skills and qualifications of the individual Supervisory Board members can be found in the following overview.

**Qualification matrix**

| | Dr Nikolaus von Bomhard | Dr Mario Daberkow | Ingrid Deltenne | Dr Heinrich Hiesinger | Prof. Dr Luise Hölscher | Simone Menne | Lawrence Rosen | Dr Stefan Schulte |
|---|---|---|---|---|---|---|---|---|
| Member since/appointed until | 2016/2025 | 2018/2023 | 2016/2025 | 2019/2024 | 2022/2026 | 2014/2024 | 2020/2025 | 2009/2024 |
| Independence[1] | ● | ● | ● | ● | ● | ● | ● | ● |
| No overboarding[1] | ● | ● | ● | ● | ● | ● | ● | ● |
| Gender | Male | Male | Female | Male | Female | Female | Male | Male |
| Year of birth | 1956 | 1969 | 1960 | 1960 | 1971 | 1960 | 1957 | 1960 |
| Nationality | German | German | Dutch/Swiss | German | German | German | US American | German |
| International experience | ● | | | | | | | |
| Educational background | Legal expert | Mathematician | Journalist and educational researcher | Engineer | Business administration | Business administration | Economist | Business administration |
| Accounting | ● | ● | | | | ● | ● | |
| Financial expert in accordance with Section 100(5) AktG | ● | ● | | | ● | [2] | ●[2] | [2] |
| Risk management | ● | ● | ● | ● | | ● | ● | |
| Logistics | | | | | | ● | ● | |
| Strategy | ● | ● | ● | ● | ● | ● | ● | ● |
| Sustainability | ● | | | ● | ● | ● | ● | ● |
| Corporate governance/controlling | ● | ● | | ● | ● | ● | ● | ● |
| Digitalisation, IT | | ● | ● | ● | ● | | ● | ● |
| Cybersecurity and IT security | | ● | | ● | ● | ● | | |
| Human resources | ● | | ● | ● | ● | | | |

[1] In accordance with the German Corporate Governance Code.   [2] Expert in the fields of accounting and financial statement auditing within the meaning of Sections 100(5) and 107(4) AktG.



## Board of Management and Supervisory Board committees

Business review meetings are held on a quarterly basis for each division, attended by representatives of management, once with the entire Board of Management and the other three times with the CEO and CFO. Additionally, quarterly review meetings are held for the cross-divisional functions with the CEO and CFO as well as representatives of management.

The review meetings involve discussions of strategic initiatives, operational matters and the budgetary situation in the divisions. In addition, all departments have Board committees where decisions are made on the fundamental strategic orientation of the respective department and prominent topics. Finally, the responsible Board departments resolve on investment, real estate and M&A plans within certain threshold limits using defined decision-making and approval processes.

The members of the Supervisory Board's committees prepare the resolutions to be taken in the plenary meetings and perform the duties assigned to them by the law, the company's Articles of Association and the rules of procedure for the Supervisory Board.

The Executive Committee prepares the resolutions to be taken in the plenary meetings regarding the appointment of members to the Board of Management, preparation of their service agreements (including remuneration), the system for remunerating Board of Management members, the establishment of variable remuneration targets, the establishment of variable remuneration according to degrees of target achievement, the review of the appropriateness of

## Committees of the Supervisory Board

### Executive Committee

Dr Nikolaus von Bomhard (Chair)
Andrea Kocsis (Deputy Chair)
Ingrid Deltenre
Thomas Held
Prof. Dr Luise Hölscher (since 6 April 2022)
Thorsten Kühn
Dr Jörg Kukies (until 9 March 2022)

### Personnel Committee

Andrea Kocsis (Chair)
Dr Nikolaus von Bomhard (Deputy Chair)
Ingrid Deltenre
Mario Jacubasch

### Finance and Audit Committee

Dr Stefan Schulte (Chair, independent and expert in the areas of accounting and auditing of financial statements as defined in Sections 100(5) and 107(4) AktG and D.3 of the German Corporate Governance Code)
Stephan Teuscher (Deputy Chair)
Jörg von Dosky (since 22 March 2022)
Prof. Dr Luise Hölscher (since 6 April 2022)
Dr Jörg Kukies (until 9 March 2022)
Simone Menne (independent and expert in the areas of accounting and auditing of financial statements as defined in Sections 100(5) and 107(4) AktG and D.3 of the German Corporate Governance Code)
Yusuf Özdemir
Lawrence Rosen (since 22 March 2022, independent and expert in the areas of accounting and auditing of financial statements as defined in Sections 100(5) and 107(4) AktG and D.3 of the German Corporate Governance Code)
Stefanie Weckesser

### Strategy and Sustainabili

Dr Nikolaus von Bomhard
Andrea Kocsis (Deputy Cha
Dr Günther Bräunig (until a
Thomas Held
Dr Heinrich Hiesinger
Stephan Teuscher
Stefan B. Wintels (since 6 f

### Nomination Committee

Dr Nikolaus von Bomhard
Ingrid Deltenre
Prof. Dr Luise Hölscher (si
Dr Jörg Kukies (until 9 Ma

### Mediation Committee
(pursuant to Section 27(3

Dr Nikolaus von Bomhard
Andrea Kocsis (Deputy Cha
Dr Heinrich Hiesinger
Thorsten Kühn

Board of Management remuneration and the remuneration report to be prepared annually. In addition, it regularly focuses on long-term succession planning for the Board of Management.

The Finance and Audit Committee reviews the company's accounts, including sustainability reporting, and oversees its accounting process and the effectiveness of the internal control system, the risk management system and the internal audit system, as well as the audit of the annual financial statements, in particular with respect to audit quality and the independence of the auditors. Consultation with the auditor also takes place without the Board of Management members being present. The Finance and Audit Committee prepares the proposals of the Supervisory Board to be made to the Annual General Meeting concerning the choice of the audit firm and is responsible for carrying out the selection process. As an exception, the 2023 Annual General Meeting will not make a proposal for the appointment of an auditor for the financial year, as the 2022 Annual General Meeting has already appointed Deloitte GmbH Wirtschaftsprüfungsgesellschaft (Deloitte), Munich, as the auditors of the company and the Group for the 2023 financial year and for the audit review of interim financial reports which are compiled from 1 January 2023 until the 2024 Annual General Meeting. Following a selection process in 2020, Deloitte was proposed to the Supervisory Board as the preferred new audit firm by the Finance and Audit Committee. The Supervisory Board followed this recommendation in its proposal to the 2022 Annual General Meeting.

If the auditor is to be engaged to perform non-audit services, the Finance and Audit Committee must also approve any such engagement. It examines corporate compliance and discusses the half-yearly financial reports and the quarterly statements with the Board of Management prior to their publication. Based upon its own assessment, the committee submits proposals for the approval of the annual and consolidated financial statements to the Supervisory Board. As required, the Finance and Audit Committee is also responsible for issuing findings on the required Supervisory Board approvals of significant transactions between the company and related parties.

As previously described, the Chair of the Finance and Audit Committee, Stefan Schulte, is independent and, on account of his many years of experience as the CFO and CEO of Fraport AG and as Chair of the Finance and Audit Committee of Deutsche Post AG, an expert both in accounting as well as in the auditing of financial statements. Of the members of the Finance and Audit Committee, Simone Menne and Lawrence Rosen also have comprehensive expertise in accounting and the auditing of financial statements thanks to their many years of service as board members for finance of Deutsche Lufthansa AG (Menne) as well as Deutsche Post AG and Fresenius Medical Care AG & Co. KGaA (Rosen). In the year under review, two members were added to the Finance and Audit Committee, bringing the total number of members to eight.

An agreement has been reached with the auditor that the Chair of the Supervisory Board and the Chair of the Finance and Audit Committee will be informed without delay of any potential grounds for exclusion or for impair-

ment of the auditors' [...] audit, to the extent th[...] impairment are not i[...] has been agreed that [...] Board without delay [...] occurring in the cours[...] tor must inform the Su[...] the financial statemen[...] to the Declaration of [...] Management and Sup[...] Finance and Audit Co[...] of the financial staten[...] Finance and Audit Co[...] financial statements [...] the plenary where the[...] statements are appro[...] Board closely examin[...] the financial stateme[...]

The Strategy and [...] the Supervisory Boa[...] larly discusses imple[...] competitive position [...] the divisions. In add[...] corporate acquisition[...] Supervisory Board's a[...] at ESG topics relevan[...] marily the implemen[...] in particular with re[...] emissions, the safety [...] promotion of the sha[...] and the strengthenin[...]

expertise on the Supervisory Board can be found in the ❯ Qualification matrix.

The Nomination Committee presents the shareholder representatives of the Supervisory Board with recommendations for shareholder candidates for election to the Supervisory Board at the Annual General Meeting.

The Personnel Committee discusses human resources principles and material topics for the Group, such as safety, recruiting and equal opportunities.

The Mediation Committee carries out the duties assigned to it pursuant to the *Mitbestimmungsgesetz* (MitbestG – German Co-Determination Act): it makes proposals to the Supervisory Board on the appointment of members of the Board of Management in those cases in which the required majority of two-thirds of the votes of the Supervisory Board members is not reached. The committee did not meet in the past financial year.

Further information about the work of the Supervisory Board and its committees in the 2022 financial year is contained in the ❯ Report of the Supervisory Board. The members of the Board of Management and all additional offices held by them as well as the members of the Supervisory Board and all additional offices held by them can be found in ❯ Boards and committees. The Board members' curriculum vitae, information about their qualifications and the terms of their current appointments are also published on our ◉ Website. The website also has current curriculum vitae of the shareholder representatives on the Supervisory Board along with information on their professional occupation, their membership on the Supervisory Board and their current term of office.

### Diversity

During succession planning and the selection of members for the Board of Management, the Supervisory Board pays close attention to ensuring that they complement each other in terms of their qualifications, skills and experience. Long-term succession planning in all divisions guarantees that there will be sufficient qualified internal candidates to fill Board of Management positions in future. The early promotion of women in the company also plays a key role. With two women on the Board of Management, the company has exceeded the minimum number applicable since August 2022 under Section 76(3a) AktG, which stipulates that listed companies to which the German Co-determination Act applies with more than three board of management members include at least one woman and one man on the board.

In addition, the target set by the Supervisory Board of a 25% share of women on the Board of Management, which exceeds the statutory participation requirement, to be reached by the end of 2024 will be achieved when Frank Appel leaves the company upon the conclusion of the 2023 Annual General Meeting.

For the period beginning 1 January 2020, the Board of Management set a target of 30% for the percentage of women at Deutsche Post AG at both executive tiers below the Board of Management. We aim to meet these targets by 31 December 2024. The two executive tiers are defined on the basis of their reporting lines: Tier 1 comprises executives assigned to the N-1 reporting line and tier 2 comprises executives from the N-2 reporting line. The share of women in both tiers was 31.7% as at 31 December 2022.

The company intends [to strengthen] management globally [...] of increasing the pe[...] upper management [...] has risen continually [...] at 31 December 2022 [...]

The diversity cri[...] Board when consider[...] in the list of its goals[...] women of 40%, the S[...] own target of 30%, w[...] utory requirement.

### Shareholders and A[...]

Shareholders exercis[...] right to receive infor[...] eral Meeting. Each sh[...] to one vote. The agen[...] the Annual General M[...] be made available on[...] the Annual General M[...] vides information ab[...] and functional exper[...] their essential duties [...] is published for each S[...] for election. Moreov[...] overview of the skills [...] Board members.

We assist our sh[...] rights not only by mak[...] but also by appointin[...]

votes solely as instructed by the shareholders. Additionally, shareholders can authorise company proxies and submit postal votes via the online service offered by the company. Due to the pandemic, the 2022 Annual General Meeting was also held online in line with the applicable statutory provisions. Shareholders were able to submit their questions online up to one day prior to the AGM. They were able to vote either by absentee ballot or by authorising a company proxy to vote in their place. In addition, beyond the legal requirements, shareholders had the opportunity to ask questions and submit statements regarding the agenda in advance of the Annual General Meeting. The 2023 Annual General Meeting is planned as an in-person event.

The remuneration system applied to Board of Management members must be presented to the Annual General Meeting for approval in the event of significant changes, or at least every four years; the four-year interval also applies to the remuneration of the Supervisory Board members. The 2021 Annual General Meeting approved the Board of Management remuneration system with 93.39% and the Supervisory Board remuneration with 99.46% of the votes cast in favour. The resolution proposed to the Annual General Meeting on the remuneration of the members of the Supervisory Board was passed with an approval rate of 99.07%. The Board of Management remuneration system and the resolutions of the Annual General Meeting on the remuneration of Supervisory Board members can also be accessed on the ⊙ **Company's website.** Information regarding the remuneration of the individual members of the Board of Management and the Supervisory Board can be found in the remuneration reports available there.

# Disclosures required by takeover law

Disclosures required under Sections 289a and 315a HGB and explanatory report.

### Composition of issued capital, voting rights and transfer of shares

As at 31 December 2022, the company's share capital totalled €1,239,059,409 and was composed of the same number of no-par-value registered shares. Each share carries the same rights and obligations stipulated by law and/or in the company's Articles of Association and entitles the holder to one vote at the Annual General Meeting (AGM). There are no shares with special rights conveying powers of control.

The exercise of voting rights and the transfer of shares are based upon statutory provisions and the company's Articles of Association, which places no restrictions on the exercise of voting rights or transfer of shares. Under the Employee Share Plan share-based remuneration programme, stocks are subject to time-related trading restrictions during the two-year holding period. As at 31 December 2022, Deutsche Post AG held a total of 40,320,726 treasury shares, which are excluded from rights for the company in accordance with Section 71b AktG.

### Shareholdings exceeding 10% of voting rights

KfW Bankengruppe (KfW), Frankfurt am Main, is our largest shareholder, holding 20.49% of the share capital. The Federal Republic of Germany holds an indirect stake in Deutsche Post AG via KfW.

### Appointment and rep
### Board of Manageme

The members of the B and replaced in acco provisions (cf. Section MitbestG). Article 6 lates that the Board of members. Beyond th determined by the Su agement is comprised one woman and at lea board, cf. Section 76 (

### Amendments to the

In accordance with S tion 179 (1), Sentence of Association are ac accordance with Arti tion in conjunction w such amendments ge the votes cast and a represented on the da where the law require to the Articles of Asso

### Board of Management authorisation, particularly regarding the issue and buy-back of shares

The Board of Management is authorised, subject to the consent of the Supervisory Board, to issue up to 130,000,000 new no-par-value registered shares (2021 Authorised Capital). Details may be found in Article 5 (2) of the Articles of Association. The Articles of Association can be accessed on the ⦿ Company's website or in the electronic company register. They may also be viewed in the commercial register of the Bonn Local Court.

The Board of Management has furthermore been authorised by resolution of the AGMs of 28 April 2017 (agenda item 7), 24 April 2018 (agenda item 6), 27 August 2020 (agenda item 7) and 6 May 2022 (agenda items 8 and 9) to issue Performance Share Units (PSUs). The authorisation resolutions are included in the notarised minutes of the AGM, which can be viewed in the commercial register. In order to service both current PSUs and those yet to be issued, the AGM approved contingent capital increases. Details may be found in Article 5 of the Articles of Association. As at 31 December 2022, the PSUs already issued conferred rights to up to 28,410,813 Deutsche Post AG shares, assuming the conditions are met. Under the authorisations granted, up to 57,197,508 additional PSUs may still be issued.

The AGM of 6 May 2021 authorised the company to buy back shares on or before 5 May 2026 up to an amount not to exceed 10% of the share capital existing as at the date of adoption of the resolution. Further details, including the option of using the treasury shares acquired on that basis or on the basis of a preceding authorisation, may be found in the authorisation resolution adopted by the AGM of 6 May 2021 (agenda item 8). In addition, the AGM of 6 May 2021 authorised the Board of Management to buy back shares within the scope specified in agenda item 8, including through the use of derivatives (agenda item 9). The company repurchased 29,608,323 shares in the financial year based upon the authorisation resolution.

### Significant agreements that are conditional upon a change of control following a takeover bid and agreements with members of the Board of Management or employees providing for compensation in the event of a change of control

Deutsche Post AG holds a syndicated credit facility with a volume of €2 billion under an agreement entered into with a consortium of banks. If a change of control within the meaning of the agreement occurs, each member of the bank consortium is entitled, under certain conditions, to cancel its share of the credit facility as well as its share of any outstanding loans and to request repayment. The terms and conditions of the bonds issued under the Debt Issuance Programme established in March 2012 and those of the convertible bond issued in December 2017 also contain change-of-control clauses. In the event of a change of control within the meaning of those terms and conditions, creditors are, under certain conditions, granted the right to demand early redemption of the respective bonds.

In the event of a change of control, any member of the Board of Management is entitled to resign their office for good cause within a period of six months following the change of control after giving three months' notice to the

end of a given month, agement contract (ri associated with a sev the Annual Bonus Pla the holding period fo immediate effect in th company. The particip number of matching ment (or a cash equiv the employer will be n resulting from a redu mally incurred after t this provision. Under t of control occurs, ar invested and for whic reimbursed. Effective waived for shares tha


# INCOME STATEMENT

**1 January to 31 December**

| €m | Note | 2021 | 2022 |
|---|---|---|---|
| Revenue | 11 | 81,747 | 94,436 |
| Other operating income | 12 | 2,291 | 2,925 |
| Changes in inventories and work performed and capitalised | 13 | 348 | 511 |
| Materials expense | 14 | −43,897 | −53,473 |
| Staff costs | 15 | −23,879 | −26,035 |
| Depreciation, amortisation and impairment losses | 16 | −3,768 | −4,177 |
| Other operating expenses | 17 | −4,896 | −5,712 |
| Net income/expenses from investments accounted for using the equity method | 25 | 32 | −39 |
| **Profit from operating activities (EBIT)** | | **7,978** | **8,436** |
| Financial income | | 191 | 427 |
| Finance costs | | −746 | −847 |
| Foreign currency result | | −64 | −105 |
| **Net finance costs** | 18 | **−619** | **−525** |
| **Profit before income taxes** | | **7,359** | **7,911** |
| Income taxes | 19 | −1,936 | −2,194 |
| **Consolidated net profit for the period** | | **5,423** | **5,717** |
| attributable to Deutsche Post AG shareholders | | 5,053 | 5,359 |
| attributable to non-controlling interests | | 370 | 358 |
| **Basic earnings per share (€)** | 20 | **4.10** | **4.41** |
| **Diluted earnings per share (€)** | 20 | **4.01** | **4.33** |

# STATEMENT OF COMPREHENSIVE INCO

**1 January to 31 December**

| €m | |
|---|---|
| **Consolidated net profit for the period** | |
| **Items that will not be reclassified to profit or loss** | |
| Change due to remeasurements of net pension provisions | |
| Reserve for equity instruments without recycling | |
| Income taxes relating to components of other comprehensive income | |
| **Total, net of tax** | |
| **Items that may be reclassified subsequently to profit or loss** | |
| **Hedging reserves** | |
| Changes from unrealised gains and losses | |
| Changes from realised gains and losses | |
| **Currency translation reserve** | |
| Changes from unrealised gains and losses | |
| Changes from realised gains and losses | |
| Income taxes relating to components of other comprehensive income | |
| Share of other comprehensive income of investments accounted for using the equity method, net of tax | |
| **Total, net of tax** | |
| **Other comprehensive income, net of tax** | |
| **Total comprehensive income** | |
| attributable to Deutsche Post AG shareholders | |
| attributable to non-controlling interests | |


# BALANCE SHEET

| €m | Note | 31 Dec. 2021 | 31 Dec. 2022 |
|---|---|---|---|
| **ASSETS** | | | |
| Intangible assets | 22 | 12,076 | 14,096 |
| Property, plant and equipment | 23 | 24,903 | 28,688 |
| Investment property | 24 | 48 | 22 |
| Investments accounted for using the equity method | 25 | 111 | 76 |
| Non-current financial assets | 26 | 1,190 | 1,216 |
| Other non-current assets | 27 | 587 | 581 |
| Deferred tax assets | 28 | 1,943 | 1,440 |
| **Non-current assets** | | **40,858** | **46,119** |
| Inventories | 29 | 593 | 927 |
| Current financial assets | 26 | 3,088 | 1,355 |
| Trade receivables | 30 | 11,683 | 12,253 |
| Other current assets | 27 | 3,588 | 3,551 |
| Income tax assets | | 230 | 283 |
| Cash and cash equivalents | 31 | 3,531 | 3,790 |
| Assets held for sale | 32 | 21 | 0 |
| **Current assets** | | **22,734** | **22,159** |
| **TOTAL ASSETS** | | **63,592** | **68,278** |

| EQUITY AND LIABILITIES | |
|---|---|
| Issued capital | |
| Capital reserves | |
| Other reserves | |
| Retained earnings | |
| Equity attributable to Deutsche Post AG shareholders | |
| Non-controlling interests | |
| **Equity** | |
| Provisions for pensions and similar obligations | |
| Deferred tax liabilities | |
| Other non-current provisions | |
| Non-current financial liabilities | |
| Other non-current liabilities | |
| **Non-current provisions and liabilities** | |
| Current provisions | |
| Current financial liabilities | |
| Trade payables | |
| Other current liabilities | |
| Income tax liabilities | |
| Liabilities associated with assets held for sale | |
| **Current provisions and liabilities** | |
| **TOTAL EQUITY AND LIABILITIES** | |

# CASH FLOW STATEMENT

**1 January to 31 December**

**€ m**

| | |
|---|---|
| Consolidated net profit for the period | |
| Income taxes | |
| Net finance costs | |
| **Profit from operating activities (EBIT)** | |
| Depreciation, amortisation and impairment losses | |
| Net income from disposal of non-current assets | |
| Non-cash income and expense | |
| Change in provisions | |
| Change in other non-current assets and liabilities | |
| Dividend received | |
| Income taxes paid | |
| **Net cash from operating activities before changes in working capital** | |
| | |
| **Changes in working capital** | |
| Inventories | |
| Receivables and other current assets | |
| Liabilities and other items | |
| **Net cash from operating activities** | |
| | |
| Subsidiaries and other business units | |
| Property, plant and equipment and intangible assets | |
| Investments accounted for using the equity method and other investments | |
| Other non-current financial assets | |
| Proceeds from disposal of non-current assets | |
| | |
| Subsidiaries and other business units | |
| Property, plant and equipment and intangible assets | |
| Investments accounted for using the equity method and other investments | |
| Other non-current financial assets | |
| **Cash paid to acquire non-current assets** | |
| | |
| Interest received | |
| Current financial assets | |
| **Net cash used in investing activities** | |

| | |
|---|---|
| Proceeds from issuance of non-current financial liabilities | |
| Repayments of non-current financial liabilities | |
| Change in current financial liabilities | |
| Other financing activities | |
| Cash paid for/proceeds from transactions with non-controlling interests | |
| Dividend paid to Deutsche Post AG shareholders | |
| Dividend paid to non-controlling interest holders | |
| Purchase of treasury shares | |
| Interest paid | |
| **Net cash used in financing activities** | |
| **Net change in cash and cash equivalents** | |
| Effect of changes in exchange rates on cash and cash equivalents | |
| Changes in cash and cash equivalents associated with assets held for sale | |
| Changes in cash and cash equivalents due to changes in consolidated group | |
| Cash and cash equivalents at beginning of reporting period | |
| **Cash and cash equivalents at end of reporting period** | |

# STATEMENT OF CHANGES IN EQUITY

**1 January to 31 December**

€ m

| | | | Other reserves | | | | attr<br>to D |
| | | | Hedging<br>reserves | Reserve for<br>equity<br>instruments<br>without<br>recycling | Currency<br>translation<br>reserve | Retained<br>earnings | share |
| | Issued capital | Capital reserves | | | | | |
|---|---|---|---|---|---|---|---|
| Note | 33 | 34 | | | | 34 | |
| Balance as at 1 January 2021 | 1,239 | 3,519 | −17 | −27 | −1,622 | 10,685 | |
| Dividend | | | | | | −1,673 | |
| Transactions with non-controlling interests | | | 0 | 0 | 1 | −1 | |
| Changes in non-controlling interests due to changes in consolidated group | | | | | | | |
| Capital increase/decrease | −15 | 14 | | | | −981 | |
| **Total comprehensive income**<br>Consolidated net profit for the period | | | | | | 5,053 | |
| Currency translation differences | | | | | 894 | | |
| Change due to remeasurements of net pension provisions | | | | | | 1,930 | |
| Other changes | | | 23 | 15 | | 0 | |
| **Total** | | | | | | | |
| **Balance as at 31 December 2021** | **1,224** | **3,533** | **6** | **−12** | **−727** | **15,013** | |
| Balance as at 1 January 2022 | 1,224 | 3,533 | 6 | −12 | −727 | 15,013 | |
| Dividend | | | | | | −2,205 | |
| Transactions with non-controlling interests | | | 0 | 0 | 0 | −145 | |
| Changes in non-controlling interests due to changes in consolidated group | | | | | | | |
| Capital increase/decrease | −25 | 10 | | | | −1,195 | |
| **Total comprehensive income**<br>Consolidated net profit for the period | | | | | | 5,359 | |
| Currency translation differences | | | | | 154 | | |
| Change due to remeasurements of net pension provisions | | | | | | 2,185 | |
| Other changes | | | 52 | 9 | | 0 | |
| **Total** | | | | | | | |
| **Balance as at 31 December 2022** | **1,199** | **3,543** | **58** | **−3** | **−573** | **19,012** | |


# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG

## Company information

Deutsche Post DHL Group is a global mail and logistics group. The Deutsche Post and DHL corporate brands represent a portfolio of logistics (DHL) and communication (Deutsche Post) services. The financial year of Deutsche Post AG and its consolidated subsidiaries is the calendar year. Deutsche Post AG, whose registered office is in Bonn, Germany, is entered in the commercial register of the Bonn Local Court under HRB 6792.

## Basis of preparation

As a listed company, Deutsche Post AG prepared its consolidated financial statements in accordance with Section 315e *Handelsgesetzbuch* (HGB – German Commercial Code) ("consolidated financial statements in accordance with International Financial Reporting Standards") in compliance with International Financial Reporting Standards (IFRSs) and related Interpretations of the International Accounting Standards Board (IASB) as adopted in the European Union in accordance with Regulation (EC) No. 1606/2002 of the European Parliament and of the European Council on the application of international accounting standards.

### 1  Basis of accounting

The requirements of the standards applied have been satisfied in full, and the consolidated financial statements therefore provide a true and fair view of the Group's net assets, financial position and results of operations.

The consolidated financial statements consist of the income statement and the statement of comprehensive income, the balance sheet, the cash flow statement, the statement of changes in equity and the notes. In order to improve the clarity of presentation, various items in the balance sheet and in the income statement have been combined. These items are disclosed and explained separately in the notes. The income statement has been classified in accordance with the nature-of-expense method.

The accounting policies and the explanations and disclosures in the notes to the IFRS consolidated financial statements for the 2022 financial year are generally based on the same accounting policies used in the 2021 consolidated financial statements. Exceptions to this are the changes in international financial reporting under the IFRSs described in ❯ Note 5 that have been required to be applied by the Group since 1 January 2022. The accounting policies are explained in ❯ Note 7.

These consolidated financial statements were authorised for issue by a resolution of the Board of Management of Deutsche Post AG dated 17 February 2023.

The consolidated financial statements are prepared in euros (€). Unless otherwise stated, all amounts are given in millions of euros (€ million, €m).

### 2  Consolidated group

The consolidated group includes all companies controlled by Deutsche Post AG. Control exists if Deutsche Post AG has decision-making powers, is exposed, and has rights, to variable returns, and is able to use its decision-making powers to affect the amount of the variable returns. The Group companies are consolidated from the date on which Deutsche Post DHL Group is able to exercise control.

When Deutsche Post DHL Group holds less than the majority of voting rights, other contractual arrangements may result in the Group controlling the investee.

DHL Sinotrans International Air Courier Ltd. (Sinotrans), China, is a significant company that has been consolidated despite Deutsche Post DH[...] rights. Sinotrans provi[...] delivery and transport[...] Express segment. The c[...] DHL network and oper[...] Group. Due to the arra[...] Deutsche Post DHL Gro[...] ing Sinotrans' relevant[...] consolidated although [...] than 50% of the compa[...]

The complete list [...] ance with Section 313(2[...] in the ⊙ List of sharehold[...]

The number of c[...] Post AG is shown in the[...]

### Consolidated group

| | |
|---|---|
| **Number of fully consolida[...] (subsidiaries)** | |
| German | |
| Foreign | |
| **Number of joint operations** | |
| German | |
| Foreign | |
| **Number of investments ac[...] the equity method** | |
| German | |
| Foreign | |

The increase in the num[...] solidated group results[...] freight specialist J.F. Hi[...] fully consolidated com[...] formed, merged and lic[...] the acquisitions of the A[...]

four companies, and the Netherlands-based Monta B.V. Group with a total of 21 companies.

## 2.1  Acquisitions in 2022

The following significant acquisitions occurred in the 2022 financial year:

| Name | Country | Segment | Equity interest % | Acquisition date |
|---|---|---|---|---|
| J.F. Hillebrand Group (Hillebrand) | Germany (headquarters) | Global Forwarding, Freight | 100 | March 2022 |
| Glen Cameron Group (Cameron) | Australia | Supply Chain | 100 | August 2022 |
| Monta B.V. Group (Monta) | Netherlands | Supply Chain | 51 | October 2022 |

### Hillebrand Group

At the end of March 2022, Deutsche Post DHL Group acquired Hillebrand, including its around 90 companies. Hillebrand is a global service provider specialised in the ocean freight forwarding, transport and logistics of beverages, non-hazardous bulk liquids and other products that require special care. The acquisition enables Global Forwarding, Freight to expand its business in this market segment. Following the clearance of the transaction by the responsible competition authorities, the purchase price of €1,452 million was paid in full at the end of March 2022.

The final purchase price allocation resulted in non-tax-deductible goodwill of €1,211 million, which is allocated to the Global Forwarding, Freight division. It is mainly attributable to the synergies and network effects expected from the dynamic ocean freight forwarding market. The customer relationships are amortised over a period of 20 years and the brand name over a period of 30 years. The software has a useful life of five years. Current assets include trade receivables of €332 million. There was a difference of €21 million between the gross amount and the carrying amount.

### Opening balance of Hillebrand

**€m**

| | Final fair value |
|---|---|
| Non-current assets | 672 |
| of which Customer relationship | 417 |
| Brand name | 60 |
| Software | 87 |
| Current assets | 484 |
| Cash and cash equivalents | 72 |
| **ASSETS** | **1,228** |
| Non-current provisions and liabilities | 488 |
| of which Deferred taxes | 171 |
| Current provisions and liabilities | 488 |
| **EQUITY AND LIABILITIES** | **976** |
| **Net assets** | **252** |
| Purchase price paid in cash | 1,452 |
| **Difference** | **1,200** |
| Non-controlling interests | 11 |
| **Goodwill** | **1,211** |

### Cameron Group

In August 2022, Deutsch[...]
based Glen Cameron Gr[...]
road freight and contra[...]
the logistics core busin[...]
include trade receivable[...]
of €1 million between th[...]
goodwill of €28 million.[...]
and network effects exp[...]
tics in Australia.

### Opening balance of Ca[...]

**€m**

| Non-current assets | |
| Current assets | |
| Cash and cash equivalents | |
| **ASSETS** | |
| Non-current provisions and | |
| Current provisions and liabi[...] | |
| **EQUITY AND LIABILITIES** | |
| **Net assets** | |
| Purchase price paid in cash | |
| **Difference** | |
| Non-controlling interests | |
| **Goodwill** | |

 Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 894 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL    Deutsche Post DHL Group –

## Monta Group

DHL Supply Chain acquired a majority holding of 51% in the Netherlands-based e-commerce specialist Monta Group in October 2022. This partnership can support small and medium-sized online shops in e-fulfilment and online sales and, thanks to the international roll-out of Monta's logistics services, Deutsche Post DHL Group can better respond to the specific needs of SMEs and smaller web shops. The measurement of the assets acquired and liabilities assumed has not yet been completed due to time restrictions. The acquisition resulted in preliminary goodwill, which currently amounts to €92 million and cannot be deducted from tax. It is mainly attributable to the synergies and network effects expected from the e-commerce market in the Netherlands. There is an option to purchase the remaining 49% of shares which can be exercised at any time. Current assets include trade receivables of €16 million. There was no difference between the gross amount and the carrying amount. The final purchase price allocation will be presented at a later date.

### Preliminary opening balance of Monta

| €m | Preliminary fair value |
| --- | --- |
| Non-current assets | 62 |
| Current assets | 18 |
| Cash and cash equivalents | 3 |
| **ASSETS** | **83** |
| Non-current provisions and liabilities | 51 |
| Current provisions and liabilities | 31 |
| **EQUITY AND LIABILITIES** | **82** |
| **Net assets** | **1** |
| Purchase price paid in cash | 103 |
| **Difference** | **102** |
| Fair value of the option | 10 |
| Non-controlling interests | 0 |
| **Preliminary goodwill** | **92** |

| €m | Hillebrand | Cameron | Monta |
| --- | --- | --- | --- |
| Group revenue since consolidation | 1,640 | 111 | 26 |
| Group EBIT since consolidation | 79 | 1 | 2 |
| Transaction costs (reported under other operating expenses) | 21 | 1 | 2 |

If the companies had already been consolidated as at 1 January 2022, Hillebrand would have additionally generated revenue of €437 million and EBIT of €20 million, Cameron revenue of €155 million and EBIT of €2 million and Monta revenue of €131 million and EBIT of €12 million.

### 2.2 Disposal and deconsolidation effects

The following companies were sold in the 2022 financial year:

### Disposals in 2022

| Name | Country | Segment |
| --- | --- | --- |
| **Significant disposals** | | |
| StreetScooter companies | Germany, Japan, Switzerland | Group Functions |
| **Insignificant disposals** | | |
| Greenplan GmbH | Germany | Group Functions |
| Véron Grauer AG | Switzerland | Global Forwarding, Freight |
| DHL Global Forwarding Cote d'Ivoire S.A. | Ivory Coast | Global Forwarding, Freight |
| DHL Global Forwarding (Senegal) S.A. | Senegal | Global Forwarding, Freight |

On 3 January 2022, Deutsche Post DHL Group sold the production rights and the complete ownership of the intangible assets for the production of StreetScooter electric vans, as well as all shares in StreetScooter Japan K.K. and StreetScooter Schweiz AG, to ODIN Automotive S.à r.l., Luxembourg. The assets and liabilities had previously been reported under assets held for sale and liabilities associated with assets held for sale. StreetScooter GmbH, which remains within the Group, continues to serve as a supplier of vehicle parts and batteries and focuses on repairing and maintaining the existing fleet.

| €m | StreetScooter |
|---|---|
| Non-current assets | 15 |
| Current assets | − |
| Cash and cash equivalents | 2 |
| **ASSETS** | **17** |
| Non-current provisions and liabilities | 1 |
| Current provisions and liabilities | 5 |
| **EQUITY AND LIABILITIES** | **6** |
| **Net assets** | **11** |
| Consideration | 67 |
| Equity interest in ODIN | 10 |
| **Deconsolidation gain** | **66** |

In addition, the sale of Greenplan GmbH, Germany, a provider of route-planning solutions, resulted in income of €3 million, whilst the sale of Véron Grauer AG, a provider of shipment services, generated income of €5 million. These gains are reported under other operating income. The sale of the two African companies led to a loss of less than €1 million reported under other operating expenses.

### 2.3   Joint operations

Joint operations are consolidated in accordance with IFRS 11, based on the interest held.

Aerologic GmbH (Aerologic), Germany, a cargo airline domiciled in Leipzig, is the only joint operation in this regard. Aerologic has been assigned to the Express segment. It was jointly established by Lufthansa Cargo AG and Deutsche Post Beteiligungen Holding GmbH, which each hold 50% of its capital and voting rights. Aerologic's shareholders are simultaneously its customers, giving them access to its freight aircraft capacity. Aerologic mainly serves the DHL Express network from Monday to Friday, and flies for the Lufthansa Cargo network at weekends. Individual aircraft are also used exclusively by the two respective shareholders. In contrast to its capital and voting rights, the company's assets and liabilities, as well as its income and expenses, are allocated based on this user relationship.

### 3   Significant transactions

In addition to the business combinations and disposals of shareholdings mentioned under ❷ **Note 2**, the following significant transactions occurred in the 2022 financial year:

**Share buy-back of up to €3 billion**

In February 2022, the Board of Management of Deutsche Post AG resolved a share buy-back programme for up to 50 million shares at a total purchase price of up to €2 billion. The repurchased shares will either be retired, used to service long-term executive remuneration plans and any future employee participation programmes or used to meet potential obligations if rights accruing under the 2017/2025 convertible bond are exercised. The repurchase via the stock exchange started on 8 April 2022 and will end no later than in December 2024. The buy-back programme is based on the authorisation resolved by the company's Annual General Meeting on 6 May 2021, ❷ **Note 33 and 34.**

On 14 February 20
to expand the current sh
of up to 105 million trea
of now up to €3 billion
remain unaffected.

**Business in Russia**

In the first half of the y
that the Group would fu
which resulted in impai
to subsequent changes
intended sale of the co
therefore decided to dis
ing, Freight division enti
at year end. Liquidation
the Express division, di
has been decided, along
exclusively humanitaria
in total one-off effects
division and of €−25 m
division from impairme
impairment losses, ❷ **N**

### 4   Adjustment of pr

There were no adjustm
financial year.

## 5    New developments in international accounting under IFRSs

**New accounting standards effective in the 2022 financial year**

The following standards, changes to standards and interpretations must be applied from 1 January 2022:

| Standard | Subject matter and significance |
|---|---|
| Amendment to IFRS 3, Reference to the Conceptual Framework | The amendments contain an update to IFRS 3 so that it refers to the 2018 revision of the Conceptual Framework. Addition scope of IAS 37 or IFRIC 21, an acquirer applies IAS 37 or IFRIC 21 to identify liabilities assumed in a business combination in liabilities are excluded from this requirement. IFRS 3 continues to prohibit recognition of contingent assets. The consolidated |
| Amendments to IAS 16, Property, Plant and Equipment – Proceeds | The amendment prohibits deducting from the cost of an item of property, plant and equipment any proceeds from selling location and condition necessary for it to be capable of operating in the manner intended. The consolidated financial statem |
| Amendments to IAS 37, Onerous Contracts – Cost of Fulfilling a Contract | The amendment defines the cost of fulfilling a contract. All costs that relate directly to the contract must be included when consolidated financial statements were not materially affected. |
| Annual Improvements to IFRSs (2018–2020 Cycle) | The amendments relate to IFRS 1, First-Time Adoption of International Financial Reporting Standards, IFRS 9, Financial Inst The consolidated financial statements were not materially affected. |

**New accounting standards adopted by the EU but only effective in future periods**

The following standards, changes to standards and interpretations have already been endorsed by the EU. However, they will only be required to be applied in future periods.

| Standard | Subject matter and significance |
|---|---|
| Amendments to IAS 1 and IFRS Practice Statement 2: Disclosure of Accounting Policies (issued on 12 February 2021 and applicable for financial years beginning on or after 1 January 2023) | The amendments serve to assist entities with deciding which accounting policies to disclose in their financial statements. Th a disclosure of "material" rather than "significant" accounting policies must be made. To support this approach, the amendm application of the concept of materiality to accounting policy disclosures. The effects on the consolidated financial statemen |
| Amendments to IAS 8, Definition of Accounting Estimates (issued on 12 February 2021 and applicable for financial years beginning on or after 1 January 2023) | The amendments introduced a new definition of accounting estimates and explain how entities should distinguish changes in policies. The effects on the consolidated financial statements are being assessed. |
| Amendments to IAS 12, Deferred Tax related to Assets and Liabilities arising from a Single Transaction (issued on 7 May 2021 and applicable for financial years beginning on or after 1 January 2023) | The amendment limits the exemption from the (initial) recognition of deferred tax in that it no longer applies to transactions liability (e.g. leases and decommissioning obligations). In future, deferred tax assets and liabilities must be recognised for s of deductible and taxable temporary differences arise. Application is not expected to have a material effect on the consolida |
| IFRS 17, Insurance Contracts (issued on 18 May 2017), including amendments to IFRS 17 (issued on 25 June 2020 and applicable for financial years beginning on or after 1 January 2023) | The standard will replace IFRS 4, Insurance Contracts, in future. It outlines the principles governing the recognition, measu contracts. The objective of the standard is to ensure that the reporting entity provides relevant information that faithfully re on an entity's net assets, financial position, results of operations and cash flows. Application is not expected to have a mate |
| Amendments to IFRS 17, First-Time Adoption of IFRS 17, and IFRS 9, Comparative Information (issued on 9 December 2021 and applicable for financial years beginning on or after 1 January 2023) | The narrow-scope amendment to IFRS 17 permits entities to apply an optional classification overlay, if certain conditions are information on financial instruments for 2022. The amendment was issued because the initial application of IFRS 9 is not requ IFRS 17. This can result in accounting mismatches for financial instruments. Application is not expected to have a material eff |

 

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 897 of 1025

CONSOLIDATED FINANCIAL STATEMENTS    NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL    Deutsche Post DHL Group –

**New accounting standards not yet adopted by the EU (endorsement procedure)**

The IASB and the IFRIC issued further standards, amendments to standards and interpretations in the 2022 financial year and in previous years whose application is not yet mandatory for the 2022 financial year. The application of these IFRSs is dependent on their adoption by the EU.

| Standard | Subject matter and significance |
|---|---|
| Amendments to IAS 1, Classification of Liabilities as Current or Non-current (issued on 23 January 2020 and applicable for financial years beginning on or after 1 January 2024) and Deferral of the Effective Date | The amendments to IAS 1 relate solely to the presentation of debt and other liabilities in the statement of financial position. [...] non-current if the entity has a substantial right at the reporting date to defer settlement of the liability for at least 12 month[...] is that such a substantial right exists; no intention to exercise that right is required. No material effects on the consolidated f[...] date was deferred to 1 January 2024 due to the COVID-19 pandemic. |
| Amendments to IAS 1, Non-Current Liabilities with Covenants (issued on 31 October 2022 and applicable for financial years beginning on or after 1 January 2024) | The supplementary amendment to IAS 1 clarifies that, if the right to defer payment is subject to compliance with conditions [...] these conditions do not affect the presentation as either current or non-current. Further information on liabilities classified a[...] assessment. No material effects on the consolidated financial statements are expected. |
| Amendments to IFRS 16, Lease Liability in a Sale and Leaseback (issued on 22 September 2022 and applicable for financial years beginning on or after 1 January 2024) | This amendment adds provisions governing the subsequent measurement of a lease liability in the case of a sale-and-leaseb[...] is to be measured so that no profit or loss on the right-of-use asset retained results from subsequent measurement. The effe[...] being assessed. |

**6    Currency translation**

The financial statements of consolidated companies prepared in foreign currencies are translated into euros (€) in accordance with IAS 21 using the functional currency method. The functional currency of foreign companies is determined by the primary economic environment in which they mainly generate and use cash. Within the Group, the functional currency is predominantly the local currency. In the consolidated financial statements, assets and liabilities are therefore translated at the closing rates, whilst periodic income and expenses are generally translated at the monthly closing rates. The resulting currency translation differences are recognised in other comprehensive income. In the 2022 financial year, currency translation differences amounting to €153 million (previous year: €931 million) were recognised in other comprehensive income, see the ❯ **Statement of comprehensive income.**

Goodwill arising from business combinations after 1 January 2005 is treated as an asset of the acquired company and therefore carried in the functional currency of the acquired company.

The exchange rates for the currencies that are significant for the Group were as follows:

| | | Closing rates | | Average rates | |
|---|---|---|---|---|---|
| Currency | Country | 2021<br>1 EUR = | 2022<br>1 EUR = | 2021<br>1 EUR = | 2022<br>1 EUR = |
| AUD | Australia | 1.5622 | 1.5723 | 1.5781 | 1.5157 |
| CNY | China | 7.2024 | 7.3823 | 7.6120 | 7.0875 |
| GBP | United Kingdom | 0.8401 | 0.8866 | 0.8581 | 0.8549 |
| HKD | Hong Kong | 8.8351 | 8.3317 | 9.1859 | 8.2241 |
| INR | India | 84.2390 | 88.2947 | 87.3248 | 82.7138 |
| JPY | Japan | 130.4249 | 140.8789 | 130.3173 | 138.1186 |
| SEK | Sweden | 10.2528 | 11.1005 | 10.1551 | 10.6552 |
| USD | United States | 1.1328 | 1.0686 | 1.1816 | 1.0502 |

The carrying amounts of non-monetary assets recognised at significant consolidated companies operating in hyperinflationary economies are generally indexed in accordance with IAS 29 and thus reflect the current purchasing power at the reporting date. Turkey has met the criteria regarding a cumulative inflation rate of more than 100% over a period of three years since the beginning of 2022. As a result of the insignificant effects on the consolidated financial statements, it was decided also not to apply the principles of financial reporting in hyperinflationary economies for Turkish companies.

In accordance with IAS 21, receivables and liabilities in the financial statements of consolidated companies that have been prepared in local currencies are translated at the closing rate as at the reporting date. Currency translation differences are recognised in other operating income and expenses in the income statement. In the 2022 financial year, gains from sale-and-leaseback transactions came in at €696 million (previous year: €336 million) and expenses from currency translation differences at €673 million (previous year: €321 million). In contrast, currency translation differences relating to net investments in a foreign operation are recognised in other comprehensive income.

## 7 Accounting policies

Uniform accounting policies are applied to the annual financial statements of the entities included in the consolidated financial statements. The consolidated financial statements are prepared under the historical cost convention, except for items that are required to be recognised at their fair value.

**Revenue and expense recognition**

Deutsche Post DHL Group's normal business operations consist of the provision of logistics services comprising express delivery, freight transport, supply chain management, e-commerce solutions and letter and parcel dispatch in Germany. All income relating to normal business operations is recognised as revenue

in the income statement under [...]
operating income.

Revenue is recog[...]
vices transfers to the cu[...]
ability to control the u[...]
provided and generally [...]
must be a contract with [...]
amongst other things, t[...]
taking into account the [...]
sponds to the transactio[...]
be entitled. Variable co[...]
price when it is highly p[...]
amount of revenue rec[...]
that the uncertainty ass[...]
no longer exists. The G[...]
where the period betwe[...]
and/or services to the c[...]
exceeds one year. Accor[...]
adjusted for the time va[...]
gation, revenue is either[...]
The obligation to perfor[...]
and revenue is recognis[...]

The revenue gen[...]
vices is recognised in th[...]
was rendered.

Whenever third pa[...]
a service, a distinction [...]
agent. If Deutsche Post[...]
the gross amount of rev[...]
the agent, the net amou[...]
this specific service is li[...]
be received. Deutsche P[...]
when transport service[...]

Operating expens[...]
the service is utilised o[...]

**Intangible assets**

Intangible assets, which comprise internally generated and purchased intangible assets and purchased goodwill, are measured at amortised cost.

Internally generated intangible assets are recognised at cost if it is probable that their production will generate an inflow of future economic benefits and the costs can be reliably measured. In the Group, this concerns internally developed software. If the criteria for capitalisation are not met, the expenses are recognised immediately in income in the year in which they are incurred. In addition to direct costs, the production cost of internally developed software includes an appropriate share of allocable production overhead costs. Any borrowing costs incurred for qualifying assets are included in the production cost. Value added tax arising in conjunction with the acquisition or production of intangible assets is included in the cost to the extent that it cannot be deducted as input tax.

Intangible assets (excluding goodwill) are amortised using the straight-line method over their useful lives. Impairment losses are recognised in accordance with the principles described in the Impairment section. The useful lives of significant intangible assets are as follows:

**Useful lives**

| | Years[1] |
|---|---|
| Software | 5 to 15 |
| Licences | up to 5 |
| Customer relationships | up to 20 |

[1] The useful lives indicated represent maximum amounts specified by the Group. The actual useful lives may be shorter due to contractual arrangements or other specific factors such as time and location.

Intangible assets with uncertain useful lives are not amortised but are tested for impairment annually or whenever there are indications of impairment. This includes goodwill almost exclusively. Impairment testing is carried out in accordance with the principles described in the Impairment section.

**Property, plant and equipment**

Property, plant and equipment is carried at cost, reduced by accumulated depreciation and valuation allowances. In addition to direct costs, production cost includes an appropriate share of allocable production overhead costs. Borrowing costs that can be allocated directly to the purchase, construction or manufacture of property, plant and equipment are capitalised. Value added tax arising in conjunction with the acquisition or production of items of property, plant or equipment is included in the cost to the extent that it cannot be deducted as input tax. Depreciation is charged using the straight-line method. The estimated useful lives applied to the major asset classes are presented in the table below:

**Useful lives**

| | Years[1] |
|---|---|
| Buildings | 20 to 50 |
| Technical equipment and machinery | 10 to 20 |
| Aircraft | 15 to 25 |
| IT equipment | 4 to 10 |
| Transport equipment and vehicle fleet | 5 to 20 |
| Other operating and office equipment | 7 to 10 |

[1] The useful lives indicated represent maximum amounts specified by the Group. The actual useful lives may be shorter due to contractual arrangements or other specific factors such as time and location.

If there are indications
be carried out; see the I

**Impairment losses**

At each reporting date, t
property, plant and eq
reviewed for indication
indications, an impairm
determining the recove
comparing it with the c

In accordance wit
asset's fair value less c
value of the pre-tax free
(the asset in future), wh
for the value in use is a
rent market conditions
determined for an ind
is determined for the s
which the asset in que
pendently generates ca
If the recoverable amo
ing amount, an impair
nised, a higher recovera
respect of the asset. If
value in use of the indi
carrying amount. If, aft
nised, a higher recovera
or the CGU at a later da
a carrying amount that
The increased carrying a
impairment loss is limi

have been determined (net of amortisation or depreciation) if no impairment loss had been recognised in the past. The reversal of the impairment loss is recognised in the income statement. Impairment losses recognised in respect of goodwill may not be reversed. Since January 2005, goodwill has been accounted for using the impairment-only approach in accordance with IFRS 3. This stipulates that goodwill must be subsequently measured at cost, less any cumulative adjustments from impairment losses. Purchased goodwill is therefore no longer amortised and instead is tested for impairment annually in accordance with IAS 36, regardless of whether any indication of possible impairment exists, as in the case of intangible assets with an indefinite useful life. In addition, the obligation remains to conduct an impairment test if there is any indication of impairment. Goodwill resulting from company acquisitions is allocated to the CGUs or groups of CGUs that are expected to benefit from the synergies of the acquisition. These groups represent the lowest reporting level at which the goodwill is monitored for internal management purposes. The carrying amount of a CGU to which goodwill has been allocated is tested for impairment annually and whenever there is an indication that the unit may be impaired. Where impairment losses are recognised in connection with a CGU to which goodwill has been allocated, the existing carrying amount of the goodwill is reduced first. If the amount of the impairment loss exceeds the carrying amount of the goodwill, the difference is allocated to the remaining non-current assets in the CGU.

**Leases**

A lease is a contract in which the right to use an asset (the leased asset) is granted for an agreed-upon period in return for compensation.

**Lessee**

In accordance with IFRS 16, the Group as lessee has recognised at present value assets for the right of use received and liabilities for the payment obligations entered into for all leases in the balance sheet. Lease liabilities include the following lease payments:

• fixed payments, less lease incentives offered by the lessor;
• variable payments linked to an index or interest rate;
• expected residual payments from residual-value guarantees;
• the exercise price of call options when exercise is estimated to be sufficiently likely; and
• contractual penalties for the termination of a lease if the lease term reflects the exercise of a termination option.

Lease payments are discounted at the interest rate implicit in the lease to the extent that this can be determined. Otherwise, they are discounted at the incremental borrowing rate of the respective lessee.

Right-of-use assets are measured at cost, which comprises the following:

• lease liability;
• lease payments made at or prior to delivery, less lease incentives received;
• initial direct costs; and
• restoration obligations.

Right-of-use assets are subsequently measured at amortised cost. They are depreciated over the term of the lease using the straight-line method.

The Group makes use of the relief options provided for leases of low-value assets and short-term leases (shorter than twelve months) and expenses the payments in the income statement using the straight-line method. Additionally, the requirements do not apply to leases of intangible assets. The

Group also exercises th
ing both lease and non-
components, except in t
In addition, under IFRS
nal management – are
in segment reporting.

Extension and ter
leases, particularly for
the Group greatest
determining lease term
economic incentives for
cising termination optio
to the exercise or non-e
determining the lease t

**Lessor**

For operating leases, th
tised cost as an asset un
it is the lessor. The lease
ognised under other op
to ordinary business ac

Where the Group
nises the assets as leas
investment in the balan
in customer contracts a
lessor.

**Investments accounte**

Investments accounted
ciates and joint venture
method in accordance w
Joint Ventures. Based o

purchase of the investments, the carrying amount of the investment is increased or reduced annually to reflect the share of earnings, dividends distributed and other changes in the equity of the associates and joint ventures attributable to the investments of Deutsche Post AG or its consolidated subsidiaries. An impairment loss is recognised on investments accounted for using the equity method, including the goodwill in the carrying amount of the investment, if the recoverable amount falls below the carrying amount. Gains and losses from the disposal of investments accounted for using the equity method are recognised in other operating income or other operating expenses. Impairment losses and their reversal are recognised in net income/loss from investments accounted for using the equity method.

### Financial instruments

A financial instrument is any contract that gives rise to a financial asset of one entity and a financial liability or equity instrument of another entity. Financial assets include in particular cash and cash equivalents, trade receivables, originated loans and receivables, and derivative financial assets. Financial liabilities include contractual obligations to deliver cash or another financial asset to another entity. These mainly comprise trade payables, liabilities to banks, liabilities arising from bonds and leases, and derivative financial liabilities.

### Measurement

The Group measures financial assets at fair value plus the transaction costs directly attributable to the acquisition of these assets on initial recognition if they are not subsequently measured at fair value through profit or loss. The transaction costs of assets measured at fair value through profit or loss are recognised as expenses. For financial liabilities measured according to the fair value option, the part of the change in fair value resulting from

changes in the Group's own credit risk is recognised in other comprehensive income rather than in the income statement.

### Classification

Financial assets are classified in the measurement categories below. The classification of debt instruments depends on the business model used to manage the financial assets and their contractual cash flows.

### DEBT INSTRUMENTS AT AMORTISED COST

Debt instruments that are assigned to the "hold to collect contractual cash flows" business model and whose cash flows exclusively comprise interest and principal are measured and recognised at amortised cost. Interest income from these financial assets is reported in financial income using the effective interest method.

### DEBT INSTRUMENTS AT FAIR VALUE THROUGH OTHER COMPREHENSIVE INCOME (FVOCI)

Debt instruments that are assigned to the "hold to collect and sell" business model must be measured and recognised at fair value. Gains and losses from fair value measurement are recognised in other comprehensive income. Cumulative gains and losses are reclassified to the income statement when the financial asset is derecognised.

### DEBT INSTRUMENTS, DERIVATIVES AND EQUITY INSTRUMENTS AT FAIR VALUE THROUGH PROFIT OR LOSS (FVTPL)

Debt instruments, derivatives and equity instruments acquired to maximise their cash flows by selling them in the short to medium term are assigned to the "sell" business model. They are measured at fair value. The resulting measurement gains and losses are reported in the income statement.

### EQUITY INSTRUMENTS O

Most of the equity ins
strategic reasons are as
gory. They are measure
in the fair value of thes
other comprehensive i
are not reclassified to
such instruments are r
statement.

### Impairment losses

The Group makes a forw
credit losses associat
ed-credit-loss model).

Expected credit lo
an estimate of credit los
instrument, weighted fo
is the difference betwe
the Group is entitled an
The expected credit los
ing of payments. Accor
Group expects paymen
contractually agreed da

The Group disting
assets, both of which ar
ables and contract asset
measured at amortised
alents are also subject t

ECL is generally m
in exceptional cases, suc
credit risk characteristi
level. The Standard stip

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 902 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL  Deutsche Post DHL Group –

to determining credit loss for this process. This does not include trade receivables and contract assets.

In accordance with the three-stage model, debt instruments measured at amortised cost are initially recognised in Stage 1. The expected loss is equal to the loss that may occur due to possible default events in the 12 months following the reporting date. Financial assets that have experienced a significant increase in counterparty credit risk since initial recognition are transferred from Stage 1 to Stage 2. A significant increase includes situations in which debtors are no longer able to meet their payment obligations at short notice or when it appears that the debtor has experienced an actual or expected deterioration in business performance. The credit risk can then be measured using the probability of default (PD) over the instrument's lifetime (lifetime PD). The impairment loss is equivalent to the loss that may occur due to possible default events during the remaining term of the financial asset. Assets must be transferred from Stage 1 to Stage 2 when the contractual payments are more than 30 days past due. If there is objective evidence that a financial asset is impaired, it must be transferred to Stage 3. In cases where payments are more than 90 days past due, there is reason to believe that the debtor is experiencing significant financial difficulties. This constitutes objective evidence of a credit loss. The financial asset must therefore be transferred to Stage 3.

All debt instruments measured at amortised cost are considered to be at low risk of default. The impairment loss recognised in the period was therefore limited to the 12-month expected credit loss. Management considers listed bonds to meet the criteria for a low risk of default when they have been assigned an investment-grade rating by at least one major rating agency. Other instruments qualify for the low-default-risk category if the risk of non-performance is low and the debtor is at all times in a position to meet contractual payment obligations at short notice.

Trade receivables and contract assets are generally short term in nature and contain no significant financing components. According to the simplified impairment approach in IFRS 9, a loss allowance in an amount equal to the lifetime expected credit losses must be recognised for all instruments, regardless of their credit quality. The Group calculates the expected loss using impairment tables for the individual divisions. The loss estimate, documented by way of loss rates, encompasses all of the available information, including historical data, current economic conditions and reliable forecasts of future economic conditions (macroeconomic factors).

Impairment losses on trade receivables and contract assets are offset against gains on the reversal of impairment losses.

Further details are presented in ❯ **Note 43.**

### Derivatives and hedges

The Group began to apply the IFRS 9 hedge accounting requirements as at 1 January 2020. Derivative hedging instruments are used to minimise variations in earnings due to payments in foreign currencies and variable-rate borrowing. The gains and losses from the underlying and hedging transactions are recognised simultaneously in profit or loss (hedge accounting). Depending on the type of risk, the Group uses fair value hedges and cash flow hedges.

A fair value hedge hedges the fair value of recognised assets and liabilities. Changes in the fair value of both the derivatives and the hedged item are recognised in profit or loss simultaneously.

A cash flow hedge hedges the fluctuations in future cash flows from recognised assets and liabilities (in the case of interest rate risks), highly probable forecast transactions as well as unrecognised firm commitments that entail a currency risk. The effective portion of a cash flow hedge is recognised in the

hedging reserve in equ[...]
changes in the fair valu[...]
nised directly in income[...]
hedging transactions a[...]
then reclassified to pro[...]
cial asset acquired or f[...]
or loss. If a hedge of a [...]
in the recognition of a n[...]
recognised directly in e[...]
amount of the asset (ba[...]

Net investment he[...]
same way as cash flow [...]
tive portion of the hedg[...]
income, whilst the gain [...]
tion is recognised direc[...]
losses recognised in oth[...]
until the disposal or par[...]

### Recognition and dere[...]

Regular-way purchase[...]
nised at the settlement[...]
in particular. A financia[...]
to receive the cash flo[...]
been transferred, and t[...]
risks and opportunitie[...]
derecognised if the pa[...]
have expired.

### Offsetting

Financial assets and lia[...]
agreements (master n[...]
an enforceable right of[...]
intended as at the repo[...]

If the right of offset is not enforceable in the normal course of business, the financial assets and liabilities are recognised in the balance sheet at their gross amounts as at the reporting date. The master netting arrangement then creates only a conditional right of offset.

**Investment property**

In accordance with IAS 40, investment property is property held to earn rentals or for capital appreciation or both, rather than for use in the supply of services, for administrative purposes or for sale in the normal course of the company's business. It is measured in accordance with the cost model. Depreciable investment property is depreciated over a period of between 20 and 50 years using the straight-line method. The fair value is determined on the basis of expert opinions. Impairment losses are recognised in accordance with the principles described in the Impairment section.

**Inventories**

Inventories are assets that are held for sale in the ordinary course of business, are in the process of production or are consumed in the production process or in the rendering of services. They are measured at the lower of cost or net realisable value. Valuation allowances are charged for obsolete inventories and slow-moving goods.

**Government grants**

In accordance with IAS 20, government grants are recognised at their fair value only when there is reasonable assurance that the conditions attached to them will be complied with and that the grants will be received. The grants are reported in the income statement and are generally recognised as income over the periods in which the costs they are intended to compensate for are incurred. Where the grants relate to the purchase or production of assets, they are reported as deferred income and recognised in the income statement over the useful lives of the assets. Such deferred income is presented in other operating income.

**Assets held for sale and liabilities associated with assets held for sale**

Assets held for sale are assets available for sale in their present condition and whose sale is highly probable. The sale must be expected to qualify for recognition as a completed sale within one year of the date of classification. Assets held for sale may consist of individual non-current assets, groups of assets (disposal groups), components of an entity or a subsidiary acquired exclusively for resale (discontinued operations). Liabilities intended to be disposed of together with the assets in a single transaction form part of the disposal group or discontinued operation and are also reported separately as liabilities associated with assets held for sale. Assets held for sale are no longer depreciated or amortised, but are recognised at the lower of their fair value less costs to sell and the carrying amount. Gains and losses arising from the remeasurement of individual non-current assets or disposal groups classified as held for sale are reported in profit or loss from continuing operations until the final date of disposal. Gains and losses arising from the measurement at fair value less costs to sell of discontinued operations classified as held for sale are reported in profit or loss from discontinued operations. This also applies to the profit or loss from operations and the gain or loss on disposal of these components of an entity.

**Cash and cash equivalents**

Cash and cash equivalents comprise cash, demand deposits and other short-term liquid financial assets with an original maturity of up to three months; t[...]
Overdraft facilities use[...]
amounts due to banks. [...]

**Non-controlling intere[...]**

Non-controlling interes[...]
ests in the equity of sub[...]
rying amount. If an int[...]
shareholders without [...]
ship, this is presented a[...]
between the proportion[...]
other shareholders and [...]
comprehensive income. [...]
by the proportionate sh[...]
proportionate net asset[...]

**Share-based payment[...]**

Equity-settled share-ba[...]
at fair value at the gran[...]
recognised in staff cost[...]
equity-settled share-ba[...]
using internationally re[...]

Cash-settled, sha[...]
rights, SARs) are meas[...]
model in accordance w[...]
The amount determine[...]
probably be exercised [...]
staff costs, to reflect t[...]
during the vesting per[...]
ognised for the same a[...]
price movements occu[...]
as other finance costs i[...]



### Retirement benefit plans

There are arrangements (plans) in many countries under which the Group grants post-employment benefits to its employees. These benefits include pensions, lump-sum payments on retirement and other post-employment benefits and are referred to in these disclosures as retirement benefits, pensions and similar benefits, or pensions. A distinction must be made between defined benefit and defined contribution plans.

#### THE GROUP'S DEFINED BENEFIT RETIREMENT PLANS

Defined benefit obligations are measured using the projected unit credit method prescribed by IAS 19. This involves making certain actuarial assumptions. Most of the defined benefit retirement plans are at least partly funded via external plan assets. The remaining net liabilities are funded by provisions for pensions and similar obligations; net assets are presented separately as pension assets. Where necessary, an asset ceiling must be applied when recognising pension assets. With regard to the cost components, the service cost is recognised in staff costs, net interest cost in net finance cost and the remeasurements outside the income statement in other comprehensive income. Any rights to reimbursement are reported separately in financial assets.

#### DEFINED CONTRIBUTION RETIREMENT PLANS FOR CIVIL SERVANT EMPLOYEES IN GERMANY

In accordance with statutory provisions, Deutsche Post AG pays contributions for civil servants employees in Germany to retirement plans which are defined contribution retirement plans for the company. These contributions are recognised in staff costs.

Under the provisions of the *Gesetz zum Personalrecht der Beschäftigten der früheren Deutschen Bundespost* (PostPersRG – Former *Deutsche Bundespost* Employees Act), Deutsche Post AG provides retirement benefits and assistance benefits through the

*Postbeamtenversorgungskasse* (PVK – Postal civil servant pension fund) at the *Bundesanstalt für Post und Telekommunikation* (BAnst PT – German federal post and telecommunications agency) to retired employees or their surviving dependants who are entitled to benefits on the basis of a civil service appointment. The amount of Deutsche Post AG's payment obligations is governed by Section 16 PostPersRG. This act obliges Deutsche Post AG to pay into the PVK an annual contribution of 33% of the gross compensation of its active civil servants and the notional gross compensation of civil servants on leave of absence who are eligible for a pension.

Under Section 16 PostPersRG, the federal government makes good the difference between the current payment obligations of the PVK on the one hand, and the funding companies' current contributions or other return on assets on the other, and guarantees that the PVK is able at all times to meet the obligations it has assumed in respect of its funding companies. Insofar as the federal government makes payments to the PVK under the terms of this guarantee, it cannot claim reimbursement from Deutsche Post AG.

#### DEFINED CONTRIBUTION RETIREMENT PLANS FOR THE GROUP'S HOURLY WORKERS AND SALARIED EMPLOYEES

Defined contribution retirement plans are in place for the Group's hourly workers and salaried employees, particularly in the United Kingdom, the United States and the Netherlands. The contributions to these plans are also reported in staff costs.

This also includes contributions to certain multi-employer plans which are basically defined benefit plans, especially in the United States and the Netherlands. However, the relevant institutions do not provide the participating companies with sufficient information to use defined benefit accounting. The plans are therefore accounted for as if they were defined contribution plans.

Regarding these [...] contributions are made [...] the employer and the [...] pension fund. There is [...] beyond the bargained [...] withdrawal meeting sp[...] a liability for other enti[...] law. The expected emp[...] are €77 million (actual [...] period: €81 million, in [...] the plans in which Deu[...] underfunded accordin[...] No information is avail[...] any change from the c[...] tive agreements. Deuts[...] a significant level to an[...] exception of one fund w[...] employer in terms of c[...]

Contribution rate[...] plan in the Netherlands [...] agement body of the p[...] central bank of the Net[...] contribution rates are t[...] involved. There is no lia[...] beyond the contributio[...] obligations not met by [...] funding ultimately resu[...] and/or no indexation [...] contributions to the f[...] employer contributions [...] the previous year: €28[...] coverage degree of plan[...] of approximately 105%[...]

the fund. Deutsche Post DHL Group does not represent a significant portion of the fund in terms of contributions.

**Other provisions**

Other provisions are recognised for all legal or constructive obligations to third parties existing at the reporting date that have arisen as a result of past events, that are expected to result in an outflow of future economic benefits and whose amount can be measured reliably. They represent uncertain obligations that are carried at the best estimate of the expenditure required to settle the obligation. Provisions with more than one year to maturity are discounted at market rates of interest that reflect the region and time to settlement of the obligation. The discount rates used in the financial year were between −0.00% and 10.75% (previous year: −0.30% to 10.00%). The effects arising from changes in interest rates are recognised in net financial income/net finance cost.

Provisions for restructurings are only established in accordance with the aforementioned criteria for recognition if a detailed, formal restructuring plan has been drawn up and communicated to those affected.

The technical reserves (insurance) consist mainly of outstanding loss reserves and IBNR (incurred but not reported claims) reserves. Outstanding loss reserves represent estimates of obligations in respect of actual claims or known incidents expected to give rise to claims, which have been reported to the company but which have yet to be finalised and presented for payment. Outstanding loss reserves are based on individual claim valuations carried out by the company or its ceding insurers. IBNR reserves represent estimates of obligations in respect of incidents taking place on or before the reporting date that have not been reported to the company. Such reserves also include provisions for potential errors in settling outstanding

loss reserves. The company carries out its own assessment of ultimate loss liabilities using actuarial methods and also commissions an independent actuarial study of these each year in order to verify the reasonableness of its estimates.

**Financial liabilities**

Financial liabilities are carried at fair value less transaction costs on initial recognition. The price determined in an efficient and liquid market or a fair value determined using the treasury risk management system deployed within the Group is taken as the fair value. Financial liabilities are measured at amortised cost in subsequent periods. Any differences between the amount received and the amount repayable are recognised in the income statement over the term of the loan using the effective interest method.

Disclosures on financial liabilities under leases can be found in the Leases section.

**CONVERTIBLE BOND ON DEUTSCHE POST AG SHARES**

The convertible bond on Deutsche Post AG shares is split into an equity and a debt component, in line with the contractual arrangements. The debt component, less the transaction costs, is reported under financial liabilities (bonds), with interest added back up to the issue amount over the term of the bond using the effective interest method (unwinding of the discount). The value of the call option, which allows Deutsche Post AG to redeem the bond early if a specified share price is reached, is attributed to the debt component in accordance with IAS 32.31. The conversion right is classified as an equity derivative and is reported in capital reserves. The carrying amount is calculated by assigning to the conversion right the residual value that results from deducting the amount calculated separately for the debt component from the fair value of the instrument as a whole. The transaction costs are deducted on a proportionate basis.

**Liabilities**

Trade payables and othe
Most of the trade payab
The fair value of the lial
carrying amount.

**Deferred taxes**

In accordance with IAS
temporary differences
IFRS financial statemen
entities. Deferred tax a
which arise from the ex
loss carryforwards and
erability of the tax redu
each entity's earnings
Group projections and
The planning horizon is

In compliance with
tax assets or liabilities
ferences between the d
statements and in the t
the differences arose
assets or liabilities are
resulting from initial di
Deutsche Post AG as at

In accordance wit
ties are calculated usin
ual countries at the rep
when the deferred tax
tax rate applied to Ger
30.5%. It comprises the
surcharge, as well as a
as the average of the di

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 906 of 1025

CONSOLIDATED FINANCIAL STATEMENTS / NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL    Deutsche Post DHL Group –

Group companies use their individual income tax rates to calculate deferred tax items. The income tax rates applied for foreign companies amount to up to 38% (previous year: 38%).

**Income taxes**

Income tax assets and liabilities are recognised when they are probable. They are measured at the amounts for which repayments from, or payments to, the tax authorities are expected to be received or made. If uncertain tax items are recognised because they are probable, they are measured at their most likely amount. Tax-related fines are recognised in income taxes if they are included in the calculation of income tax liabilities, due to their inclusion in the tax base and/or tax rate. All income tax assets and liabilities are current and have maturities of less than one year.

**Contingent liabilities**

Contingent liabilities represent possible obligations whose existence will be confirmed only by the occurrence, or non-occurrence, of one or more uncertain future events not wholly within the control of the enterprise. Contingent liabilities also include certain obligations that will probably not lead to an outflow of resources embodying economic benefits, or where the amount of the outflow of resources embodying economic benefits cannot be measured with sufficient reliability. In accordance with IAS 37, contingent liabilities are not recognised in the balance sheet.

**8    Exercise of judgement in applying the accounting policies**

The preparation of IFRS-compliant consolidated financial statements requires the exercise of judgement by management. All estimates are reassessed on an ongoing basis and are based on historical experience and expectations with regard to future events that appear reasonable under the given circumstances.

For example, this applies to assets held for sale. In this case, management must determine whether the assets are available for sale in their present condition and whether their sale is highly probable. If that is the case, the assets and associated liabilities must be measured and recognised as assets held for sale or liabilities associated with assets held for sale.

**Estimates and assessments made by management**

The preparation of the consolidated financial statements in accordance with IFRSs requires management to make certain assumptions and estimates that may affect the amounts of the assets and liabilities included in the balance sheet, the amounts of income and expenses, and the disclosures relating to contingent liabilities. Examples of the main areas where assumptions, estimates and the exercise of management judgement occur are the recognition of provisions for pensions and similar obligations, the calculation of discounted cash flows for impairment testing and purchase price allocations, taxes and legal proceedings. Disclosures regarding the assumptions made in connection with the Group's defined benefit retirement plans can be found in ❯ Note 37.

The Group has operating activities around the globe and is subject to local tax laws. Management can exercise judgement when calculating the amounts of current and deferred taxes in the relevant countries. Although management believes that it has made a reasonable estimate relating to tax matters that are inherently uncertain, there can be no guarantee that the actual outcome of these uncertain tax matters will correspond exactly to the original estimate made. Any difference between actual events and the estimate made could have an effect on tax liabilities and deferred taxes in the period in which the matter is finally decided. The amount recognised for deferred tax assets could be reduced if the estimates of planned taxable income or

changes to current tax
tax benefits can be real

Goodwill is regula
as a consequence of bus
is initially recognised in
all identifiable assets,
measured at their fair
the important estimate
fair values of these ass
tion. Land, buildings an
by independent expert
active market are reco
intangible assets are id
their measurement can
ent external expert valu
asset and the complexi
The independent exper
priate valuation technic
cash flows. In addition
ment of future cash flo
affected by the discoun

Impairment testin
about the future. The G
also whenever there ar
impaired. The recovera
culated. This amount is
and value in use. Deter
and estimates to be ma
flows and the discoun
believes that the assu
lating the recoverable a
seeable changes in the
EBIT margin, an increas

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 907 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –

long-term growth rate – could result in an impairment loss that could negatively affect the Group's net assets, financial position and results of operations.

Pending legal proceedings in which the Group is involved are disclosed in ❯ Note 45. The outcome of these proceedings could have a significant effect on the net assets, financial position and results of operations of the Group. Management regularly analyses the information currently available about these proceedings and recognises provisions for probable obligations including estimated legal costs. Internal and external legal advisors participate in making this assessment. In deciding on the necessity for a provision, management takes into account the probability of an unfavourable outcome and whether the amount of the obligation can be estimated with sufficient reliability. The fact that an action has been launched or a claim asserted against the Group, or that a legal dispute has been disclosed in the notes, does not necessarily mean that a provision is recognised for the associated risk.

It is possible that climate change will give rise to uncertainties and risks for the net assets, financial position and results of operations of the Group. Increased restrictions imposed by law to combat climate change are expected in the coming years, including limits on air transport or access to city centres. In certain cases this may also affect our existing business models and our ability to operate optimally. Moreover, Deutsche Post DHL Group considers itself to be exposed to an increasingly complex and uncertain macroeconomic and geopolitical environment. This includes potential increases in fuel, energy and gas prices, which can be at least partially compensated for or passed on to customers through strict cost management and the established levers such as price increases and price surcharge mechanisms. In addition, strong volatility is still expected on the goods and financial markets and in exchange rates, driven by rising interest and inflation rates. Moreover, the risk of a potential decline in global economic growth, which could lead to an increased number of customer bankruptcies, can be observed.

All assumptions and estimates are based on the circumstances prevailing and assessments made at the reporting date. For the purpose of estimating the future development of the business, a realistic assessment was also made at that date of the economic environment likely to apply in the future to the different sectors and regions in which the Group operates. In the event of developments in these economic parameters that diverge from the assumptions made, the actual amounts may differ from the estimated amounts. In such cases, the assumptions made and, where necessary, the carrying amounts of the relevant assets and liabilities are adjusted accordingly.

At the date of preparation of the consolidated financial statements, there is no indication that any significant change in the assumptions and estimates made will be required, so that on the basis of the information currently available it is not expected that there will be significant adjustments in the 2023 financial year to the carrying amounts of the assets and liabilities recognised in the financial statements.

## 9  Consolidation methods

The consolidated financial statements are based on the IFRS financial statements of Deutsche Post AG and the subsidiaries, joint operations and investments accounted for using the equity method included in the consolidated financial statements and prepared in accordance with uniform accounting policies as at 31 December 2022.

Acquisition accounting for subsidiaries included in the consolidated financial statements uses the purchase method of accounting. The cost of the acquisition corresponds to the fair value of the assets given up, the equity instruments issued and

the liabilities assumed a[…]
costs are recognised a[…]
recognised at fair value[…]

The assets and lia[…]
of joint operations are[…]
statements in proportio[…]
in accordance with IFR[…]
share of the assets an[…]
measurement of goodw[…]
the consolidation of su[…]

In accordance wit[…]
which the parent can ex[…]
are accounted for in ac[…]
the purchase method o[…]
under investments acco[…]

In the case of ste[…]
ously held is remeasure[…]
sition date, and the res[…]
income statement.

Intra-Group reven[…]
as well as receivables, li[…]
nies that are consolida[…]
eliminated. Intercompa[…]
deliveries and services[…]
eliminated. Unrealised[…]
tions with investments[…]
are eliminated on a pro[…]

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 908 of 1025

CONSOLIDATED FINANCIAL STATEMENTS    NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –



# Segment reporting disclosures

## 10    Segment reporting

### Segments by division

| €m | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Express | Global Forwarding, Freight | | Supply Chain | | eCommerce Solutions | | Post & Parcel Germany | | Group Functions | |
| 1 January to 31 December | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 |
| External revenue | 23,704 | 26,986 | 21,553 | 28,770 | 13,760 | 16,333 | 5,792 | 6,004 | 16,895 | 16,309 | 44 | 35 |
| Internal revenue | 513 | 606 | 1,280 | 1,442 | 104 | 98 | 136 | 138 | 550 | 470 | 1,750 | 1,846 |
| Total revenue | 24,217 | 27,592 | 22,833 | 30,212 | 13,864 | 16,431 | 5,928 | 6,142 | 17,445 | 16,779 | 1,794 | 1,881 |
| Profit/loss from operating activities (EBIT) | 4,220 | 4,025 | 1,303 | 2,311 | 705 | 893 | 417 | 389 | 1,747 | 1,271 | −413 | −451 |
| of which: net income from investments accounted for using the equity method | −2 | 3 | −1 | −3 | 2 | −4 | 0 | 0 | 0 | 0 | 33 | −35 |
| Segment assets | 18,806 | 20,748 | 11,536 | 13,158 | 8,386 | 10,063 | 2,212 | 2,593 | 6,902 | 7,727 | 5,645 | 5,795 |
| of which: investments accounted for using the equity method | 6 | 8 | 20 | 19 | 15 | 9 | 0 | 0 | 0 | 0 | 71 | 40 |
| Segment liabilities | 5,233 | 5,437 | 5,012 | 5,157 | 3,505 | 4,003 | 876 | 896 | 2,631 | 2,673 | 1,718 | 1,772 |
| Net segment assets | 13,573 | 15,311 | 6,524 | 8,001 | 4,881 | 6,060 | 1,336 | 1,697 | 4,271 | 5,054 | 3,927 | 4,023 |
| Capex (assets acquired) | 1,707 | 1,528 | 132 | 159 | 483 | 504 | 245 | 431 | 883 | 1,043 | 445 | 459 |
| Capex (right-of-use assets) | 1,246 | 1,860 | 215 | 281 | 667 | 900 | 178 | 135 | 14 | 27 | 760 | 536 |
| Total capex | 2,953 | 3,388 | 347 | 440 | 1,150 | 1,404 | 423 | 566 | 897 | 1,070 | 1,205 | 995 |
| Depreciation and amortisation | 1,511 | 1,666 | 245 | 311 | 756 | 848 | 179 | 198 | 334 | 354 | 744 | 753 |
| Impairment losses | 0 | 24 | 0 | 7 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 5 |
| Total depreciation, amortisation and impairment losses | 1,511 | 1,690 | 245 | 318 | 756 | 859 | 179 | 198 | 334 | 354 | 744 | 758 |
| Other non-cash income (−) and expenses (+) | 524 | 386 | 158 | 215 | 245 | 270 | 5 | 24 | 302 | 263 | 51 | 107 |
| Employees² | 108,896 | 113,735 | 42,348 | 46,718 | 167,666 | 178,585 | 32,099 | 31,715 | 164,429 | 158,770 | 12,641 | 13,393 |

¹ Including rounding.    ² Average FTEs.

### Information about geographical regions

| €m | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Germany | Europe (excluding Germany) | | Americas | | Asia Pacific | |
| 1 January to 31 December | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 |
| External revenue | 21,554 | 21,870 | 23,740 | 27,704 | 17,487 | 22,318 | 15,736 | 18,383 |
| Non-current assets | 11,043 | 12,485 | 11,308 | 13,061 | 8,943 | 10,781 | 5,213 | 5,985 |
| Capex | 2,347 | 2,392 | 1,746 | 1,932 | 2,085 | 2,321 | 606 | 1,023 |

Deutsche Post DHL Group –

### 10.1  Segment reporting disclosures

Deutsche Post DHL Group reports five operating segments for the 2022 financial year; these are managed independently by the responsible segment management bodies in line with the products and services offered and the brands, distribution channels and customer profiles involved. Components of the entity are defined as a segment on the basis of the existence of segment managers with bottom-line responsibility who report directly to Deutsche Post DHL Group's top management.

External revenue is the revenue generated by the divisions from non-Group third parties. Internal revenue is revenue generated with other divisions. If comparable external market prices exist for services or products offered internally within the Group, these market prices or market-oriented prices are used as transfer prices (arm's-length principle). The transfer prices for services for which no external market exists are generally based on incremental costs.

The expenses for services provided in the IT service centres are allocated to the divisions by their origin. The additional costs resulting from Deutsche Post AG's universal postal service obligation (nationwide retail outlet network, delivery every working day), and from its obligation to assume the remuneration structure as the legal successor to Deutsche Bundespost, are allocated to the Post & Parcel Germany division.

In keeping with internal reporting, capital expenditure (capex) is disclosed. Additions to intangible assets net of goodwill and to property, plant and equipment, including right-of-use assets, are reported in the capex figure. Depreciation, amortisation and impairment losses relate to the segment assets allocated to the individual divisions. Other non-cash income and expenses relate primarily to expenses from the recognition of provisions.

The profitability of the Group's operating divisions is measured as profit from operating activities (EBIT).

### 10.2  Segments by division

Reflecting the Group's predominant organisational structure, the primary reporting format is based on the divisions. The Group distinguishes between the following divisions:

**Express**

The Express division offers time-definite courier and express services to business and private customers. The division comprises the Europe, Middle East and Africa, Americas and Asia Pacific regions.

**Global Forwarding, Freight**

The Global Forwarding, Freight division comprises international air, ocean and overland freight forwarding services. The division's business units are Global Forwarding and Freight.

**Supply Chain**

The Supply Chain division delivers customised supply chain solutions to its customers based on globally standardised modular components including warehousing, transport and value-added services. The division comprises the Europe, Middle East and Africa, Americas and Asia Pacific regions.

**eCommerce Solutions**

The eCommerce Solutions division is home to the Group's international parcel delivery business. The core business activities are domestic parcel delivery in selected countries in Europe, the United States and Asia and non-TDI cross-border services.

**Post & Parcel Germany**

The Post & Parcel Germany division transports, sorts and delivers documents and goods in and outside of Germany. Its business units are called Post Germany, Parcel Germany and International.

In addition to the repo
reporting comprises the

**Group Functions**

Group Functions inclu
Services (GBS) and Cus
profit/loss generated b
ments, whilst its assets
metrical allocation).

**Consolidation**

The data for the divisio
interdivisional transact
sions are eliminated in t

### 10.3  Information abou

The main geographica
are Germany, Europe (
Pacific and Middle East
assets and capex are dis
and capex are allocated
the domicile of the rep
prise intangible assets,
non-current assets (exc

### 10.4  Reconciliation of
amounts

The following table show
Group's total assets to
ponents, income tax ass
alents and other asset o

## Reconciliation to segment assets

| €m | 2021 | 2022 |
|---|---|---|
| Total equity and liabilities | 63,592 | 68,278 |
| Investment property | −48 | −22 |
| Non-current financial assets | −1,006 | −1,040 |
| Other non-current assets | −421 | −355 |
| Deferred tax assets | −1,943 | −1,440 |
| Income tax assets | −230 | −283 |
| Receivables and other current assets | −9 | −15 |
| Current financial assets | −2,989 | −1,313 |
| Cash and cash equivalents | −3,531 | −3,790 |
| **Segment assets** | **53,415** | **60,020** |
| of which Group Functions | 5,645 | 5,795 |
| total for reported segments | 47,842 | 54,289 |
| Consolidation[1] | −72 | −64 |

[1] Including rounding.

The following table shows the reconciliation of Deutsche Post DHL Group's total liabilities to the segment liabilities. Components of the provisions and liabilities as well as income tax liabilities and deferred taxes are deducted.

## Reconciliation to segment liabilities

| €m | 2021 | 2022 |
|---|---|---|
| Total equity and liabilities | 63,592 | 68,278 |
| Equity | −19,499 | −23,703 |
| **Consolidated liabilities** | **44,093** | **44,575** |
| Non-current provisions and liabilities | −21,513 | −20,402 |
| Current provisions and liabilities | −3,658 | −4,290 |
| **Segment liabilities** | **18,922** | **19,883** |
| of which Group Functions | 1,718 | 1,772 |
| total for reported segments | 17,257 | 18,166 |
| Consolidation | −53 | −55 |

The following table shows the reconciliation of the segment amounts to the income statement:

## Reconciliation to the income statement

| €m | Total for reported segments | | Group Functions | | Recon |
|---|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 | 20 |
| External revenue | 81,704 | 94,402 | 44 | 35 | |
| Internal revenue | 2,583 | 2,754 | 1,750 | 1,846 | −4,3 |
| **Total revenue** | **84,287** | **97,156** | **1,794** | **1,881** | **−4,3** |
| Other operating income | 2,236 | 2,836 | 1,607 | 1,856 | −1,5 |
| Changes in inventories and work performed and capitalised | 214 | 386 | 134 | 125 | |
| Materials expense | −46,955 | −56,768 | −1,325 | −1,436 | 4,3 |
| Staff costs | −22,778 | −24,860 | −1,112 | −1,182 | |
| Depreciation, amortisation and impairment losses | −3,025 | −3,419 | −744 | −758 | |
| Other operating expenses | −5,586 | −6,438 | −800 | −902 | 1,4 |
| Net expenses / income from investments accounted for using the equity method | −1 | −4 | 33 | −35 | |
| **Profit/loss from operating activities (EBIT)** | **8,392** | **8,889** | **−413** | **−451** | |
| Net finance costs | | | | | |
| **Profit before income taxes** | | | | | |
| Income taxes | | | | | |
| **Consolidated net profit for the period** | | | | | |
| of which attributable to | | | | | |
| Deutsche Post AG shareholders | | | | | |
| Non-controlling interests | | | | | |

[1] Including rounding.


## Income statement disclosures

### 11    Revenue by business unit

| €m | 2021 | 2022 |
|---|---|---|
| Express | 23,704 | 26,986 |
| Global Forwarding, Freight | 21,553 | 28,770 |
| Global Forwarding | 17,795 | 24,523 |
| Freight | 3,758 | 4,247 |
| Supply Chain | 13,760 | 16,333 |
| eCommerce Solutions | 5,792 | 6,004 |
| Post & Parcel Germany | 16,895 | 16,309 |
| Post Germany | 7,952 | 7,844 |
| Parcel Germany | 6,756 | 6,388 |
| International | 2,036 | 1,936 |
| Other | 151 | 141 |
| Group Functions/Consolidation | 43 | 34 |
| Total revenue | 81,747 | 94,436 |

The total amount includes revenue from performance obliga-
tions in the amount of €47 million (previous year: €45 million)
settled in prior periods. The following table shows the factors
affecting revenue:

**Factors affecting revenue, 2022**

| €m | |
|---|---|
| Organic growth | 7,946 |
| Portfolio changes | 1,786 |
| Currency translation effects | 2,957 |
| Total | 12,689 |

The allocation of revenue to geographical regions is presented
in the segment reporting.

### 12    Other operating income

| €m | 2021 | 2022 |
|---|---|---|
| Income from currency translation | 336 | 696 |
| Insurance income | 301 | 340 |
| Income from the remeasurement of liabilities | 195 | 284 |
| Income from the reversal of provisions | 274 | 214 |
| Income from the disposal of assets | 85 | 175 |
| Operating lease income | 130 | 150 |
| Income from fees and reimbursements | 112 | 133 |
| Sublease income | 74 | 87 |
| Subsidies | 96 | 72 |
| Income from prior-period billings | 61 | 54 |
| Income from loss compensation | 30 | 47 |
| Income from the derecognition of liabilities | 25 | 40 |
| Reversals of impairment losses on receivables and other assets | 16 | 39 |
| Recoveries on receivables previously written off | 18 | 16 |
| Income from derivatives | 6 | 8 |
| Miscellaneous | 532 | 570 |
| Total | 2,291 | 2,925 |

The increase in income from currency translation results from
the volatility on the currency markets. This income is offset by
corresponding expenses.

Income from the d
items, the gain on the d

The reversals of
other assets amountin
non-current non-finan
utable to the Express c

❯ Note 3. A further €8 m
Income from oper
leasing of the aircraft fl

Miscellaneous oth
number of smaller indiv

### 13    Changes in inven
capitalised

| €m | |
|---|---|
| Changes in inventories, expense (–)/income (+) | |
| Work performed and capita | |
| Total | |

Changes in inventories
development projects. I
primarily to IT projects.

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 912 of 1025

CONSOLIDATED FINANCIAL STATEMENTS    NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –

## 14  Materials expense

| €m | 2021 | 2022 |
|---|---|---|
| **Cost of raw materials, consumables and supplies, and of goods purchased and held for resale** | | |
| Aircraft fuel | 1,833 | 3,808 |
| Fuel | 762 | 1,253 |
| Packaging material | 401 | 466 |
| Goods purchased and held for resale | 302 | 443 |
| Spare parts and repair materials | 150 | 165 |
| Branch and office expenses | 96 | 85 |
| Other expenses | 250 | 313 |
| | **3,794** | **6,533** |
| **Cost of purchased services** | | |
| Transport costs | 32,434 | 38,783 |
| Cost of temporary staff and services | 2,559 | 2,704 |
| Maintenance costs | 1,586 | 1,887 |
| IT services | 773 | 850 |
| Lease expenses | | |
| Short-term leases | 506 | 535 |
| Leases (incidental expenses) | 110 | 249 |
| Low-value asset leases | 74 | 98 |
| Variable lease payments | 21 | 24 |
| Commissions paid | 637 | 622 |
| Other purchased services | 1,403 | 1,188 |
| | **40,103** | **46,940** |
| **Materials expense** | **43,897** | **53,473** |

The increase in materials expense resulted mainly from a rise in transport costs in the Global Forwarding, Freight division, higher aircraft fuel costs in the Express division and price increases in heating and fuels.

The other expenses item includes furthermore a large number of individual items.

## 15  Staff costs/employees

| €m | 2021 | 2022 |
|---|---|---|
| Wages, salaries and compensation | 18,987 | 20,794 |
| Social security contributions | 2,921 | 3,192 |
| Retirement benefit expenses | 1,031 | 1,027 |
| Cost of other services for employees | 940 | 1,022 |
| **Staff costs** | **23,879** | **26,035** |

Staff costs relate mainly to wages, salaries and compensation, as well as all other benefits paid to employees of the Group for their services in the financial year. The rise was due largely to salary increases and new hires, as well as the acquisitions of companies in the financial year.

Social security contributions relate, in particular, to statutory social security contributions paid by employers.

Retirement bene
related to the defined b
expenses also include
retirement plans for ci
of €308 million (previ
the Group's hourly wo
€470 million (previous

The average num
period, broken down by

**Employees**

| | |
|---|---|
| **Headcount (annual averag** | |
| Hourly workers and salarie | |
| Civil servants | |
| Trainees | |
| **Total** | |
| **Full-time equivalents**[1] | |
| As at 31 December | |
| Average for the year | |

[1] Including trainees.

The employees of comp
financial year were inc
equivalents at joint oper
cial statements as at 31
proportionate basis (pre

## 16  Depreciation, amortisation and impairment losses

| €m | 2021 | 2022 |
|---|---|---|
| **Amortisation of and impairment losses on intangible assets (excluding goodwill), of which impairment losses: 1 (previous year: 0)** | **201** | **230** |
| **Depreciation of and impairment losses on property, plant and equipment acquired, of which impairment losses: 22 (previous year: 0)** | | |
| Land and buildings | 235 | 256 |
| Technical equipment and machinery | 401 | 449 |
| Transport equipment | 311 | 354 |
| Aircraft | 459 | 502 |
| IT equipment | 147 | 145 |
| Operating and office equipment | 95 | 99 |
| | **1,648** | **1,805** |
| **Depreciation of and impairment losses on right-of-use assets, of which impairment losses: 24 (previous year: 0)** | | |
| Land and buildings | 1,347 | 1,513 |
| Technical equipment and machinery | 43 | 48 |
| Transport equipment | 223 | 259 |
| Aircraft | 296 | 320 |
| IT equipment | 1 | 1 |
| Investment property | 9 | 1 |
| | **1,919** | **2,142** |
| **Impairment of goodwill** | **0** | **0** |
| **Depreciation, amortisation and impairment losses** | **3,768** | **4,177** |

The increase in depreciation, amortisation and impairment losses is due directly to capital expenditure on the one hand and, on the other, the result of the business combinations in the financial year, ❯ **Note 22 and 23.**

The impairment losses are spread amongst the various asset classes and segments as follows:

### Impairment losses

| €m | 2021 | 2022 |
|---|---|---|
| **Express** | **0** | **24** |
| Intangible assets | 0 | 1 |
| Acquired property, plant and equipment | 0 | 12 |
| Right-of-use assets | 0 | 11 |
| **Global Forwarding, Freight** | **0** | **7** |
| Acquired property, plant and equipment | 0 | 1 |
| Right-of-use assets | 0 | 6 |
| **Supply Chain** | **0** | **11** |
| Acquired property, plant and equipment | 0 | 8 |
| Right-of-use assets | 0 | 3 |
| **Group Functions** | **0** | **5** |
| Right-of-use assets | 0 | 5 |
| **Impairment losses** | **0** | **47** |

The impairment losses in the Express and Global Forwarding, Freight divisions relate solely to the impairment losses on assets and liabilities of the Russian companies, ❯ **Note 3.**

The impairment losses from the previous year were spread amongst different asset classes and each amounted to less than €1 million after rounding.

## 17  Other operating e[...]

| €m | |
|---|---|
| Currency translation expens[...] | |
| Cost of purchased cleaning [...] services | |
| Warranty expenses, refunds [...] compensation payments | |
| Expenses for advertising an[...] | |
| Other business taxes | |
| Travel and training costs | |
| Office supplies | |
| Insurance costs | |
| Telecommunication costs | |
| Entertainment and corporat[...] expenses | |
| Write-downs and remeasurat[...] | |
| Customs clearance-related [...] | |
| Consulting costs (including [...] | |
| Monetary transaction costs | |
| Voluntary social benefits | |
| Services provided by the *Bur[...] und Telekommunikation* (Ge[...] and telecommunications ag[...] | |
| Commissions paid | |
| Legal costs | |
| Losses on disposal of assets [...] | |
| Contributions and fees | |
| Audit costs | |
| Donations | |
| Expenses from prior-period [...] | |
| Expenses from derivatives | |
| Miscellaneous | |
| **Total** | |

 **CONSOLIDATED FINANCIAL STATEMENTS** NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG   Deutsche Post DHL Group –

Case 3:22-cv-07182-WHA   Document 39-1   Filed 10/18/23   Page 914 of 1025

The increase in expenses from currency translation results from the volatility on the currency markets. These expenses are offset by corresponding income.

The travel and training costs increased due to loosening of the pandemic-related restrictions.

Taxes other than income taxes are either recognised in the related expense item or, if no specific allocation is possible, in other operating expenses.

Miscellaneous other operating expenses include a large number of smaller individual items.

## 18  Net finance costs

| €m | 2021 | 2022 |
|---|---|---|
| **Financial income** | | |
| Interest income | 101 | 180 |
| Gains on changes in fair value of financial assets | 80 | 191 |
| Other financial income | 10 | 56 |
| | **191** | **427** |
| **Finance costs** | | |
| Interest expense from unwinding discounts on provisions | −46 | 29 |
| Interest expense on leases | −383 | −452 |
| Other interest expenses | −142 | −176 |
| Losses on changes in fair value of financial assets | −107 | −222 |
| Other finance costs | −68 | −26 |
| | **−746** | **−847** |
| **Foreign currency result** | **−64** | **−105** |
| **Net finance costs** | **−619** | **−525** |

Of interest income, €21 million (previous year: €16 million) relates to income from finance lease receivables. The improvement in financial income is also the result of the change in fair value of the stock appreciation rights (SARs).

The expense from the unwinding of discounts on bonds resulting from the application of the effective interest method amounted to €12 million (previous year: €12 million).

Interest income and interest expenses result from financial assets and liabilities that were not measured at fair value through profit or loss.

Information on interest expenses from unwinding discounted net pension provisions can be found in ❯ **Note 37.** Positive effects on the interest expense resulted from changes in the discount rate for other non-current provisions.

## 19  Income taxes

| €m | 2021 | 2022 |
|---|---|---|
| Current income tax expense | −1,459 | −1,701 |
| Current recoverable income tax | 47 | 19 |
| | **−1,412** | **−1,682** |
| Deferred tax expense (previous year: tax income) from temporary differences | 13 | −17 |
| Deferred tax expense from tax loss carryforwards | −537 | −495 |
| | **−524** | **−512** |
| **Income taxes** | **−1,936** | **−2,194** |

The reconciliation to the consolidated net profit income tax expense is a

**Reconciliation**

| €m |
|---|
| Profit before income taxes |
| Expected income taxes |
| Deferred tax assets not rec differences |
| Deferred tax assets of Germ companies not recognised f carryforwards and tempora |
| Deferred tax assets of forei companies not recognised f carryforwards and tempora |
| Effect from previous years |
| Tax-exempt income and no expenses |
| Differences in tax rates at fo |
| **Income taxes** |

The difference from def differences is due to dif in the opening tax acc rying amounts in the b ary 1995 (initial differe and IAS 12.24(b), the G assets in respect of the mainly to property, pla provisions and similar differences between th

of accumulated depreciation or amortisation, and the tax base amounted to €99 million as at 31 December 2022 (previous year: €107 million).

The effects from deferred tax assets of German Group companies not recognised for tax loss carryforwards and temporary differences relate primarily to Deutsche Post AG and members of its consolidated tax group. Effects from deferred tax assets of foreign companies not recognised for tax loss carryforwards and temporary differences relate primarily to the Americas region.

Effects from deferred tax assets not recognised for tax loss carryforwards and temporary differences in the amount of €3 million (previous year: €7 million) relate to the reduction of the effective income tax expense due to the utilisation of tax loss carryforwards and temporary differences, for which deferred tax assets had previously not been recognised. In addition, the recognition of deferred tax assets previously not recognised for tax loss carryforwards and of deductible temporary differences from a prior period (and resulting mainly from the Americas region) reduced the deferred tax expense by €274 million (previous year: €323 million). Effects from unrecognised deferred tax assets included income of €12 million (previous year: expenses of €4 million) due to a valuation allowance recognised for a deferred tax asset. Other effects from unrecognised deferred tax assets relate primarily to tax loss carryforwards for which no deferred taxes were recognised.

A deferred tax asset in the amount of €20 million was recognised in the balance sheet for companies that reported a loss in the previous year or in the current period as, based on tax planning, realisation of the tax asset is probable.

In the 2022 financial year, there was no effect from tax rate changes for domestic Group companies. Tax rate changes in some tax jurisdictions abroad also had no material effects.

The effective income tax expense includes prior-period tax expenses from German and foreign companies in the amount of €2 million (tax income) (previous year: expense of €13 million).

The following table presents the tax effects on the components of other comprehensive income:

**Other comprehensive income**

| €m | Befo |
| --- | --- |
| **2022** | |
| Change due to remeasurements of net pension provisions | |
| Hedging reserves | |
| Reserve for equity instruments without recycling | |
| Currency translation reserve | |
| Share of other comprehensive income of investments accounted for using the equity method | |
| **Other comprehensive income** | |
| **2021** | |
| Change due to remeasurements of net pension provisions | |
| Hedging reserves | |
| Reserve for equity instruments without recycling | |
| Currency translation reserve | |
| Share of other comprehensive income of investments accounted for using the equity method | |
| **Other comprehensive income** | |

 Case 3:22-cv-07182-WHA   Document 39-1   Filed 10/18/23   Page 916 of 1025

**CONSOLIDATED FINANCIAL STATEMENTS** / NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG   Deutsche Post DHL Group –

## 20  Earnings per share

Basic earnings per share are computed in accordance with IAS 33, Earnings per Share, by dividing consolidated net profit by the weighted average number of shares outstanding. Outstanding shares relate to issued capital less any treasury shares held.

Basic earnings per share for the 2022 financial year were €4.41 (previous year: €4.10).

### Basic earnings per share

|  |  | 2021 | 2022 |
|---|---|---|---|
| Consolidated net profit for the period attributable to Deutsche Post AG shareholders | €m | 5,053 | 5,359 |
| Weighted average number of shares outstanding | number | 1,232,451,264 | 1,214,024,931 |
| **Basic earnings per share** | **€** | **4.10** | **4.41** |

### Diluted earnings per share

|  |  | 2021 | 2022 |
|---|---|---|---|
| Consolidated net profit for the period attributable to Deutsche Post AG shareholders | €m | 5,053 | 5,359 |
| Plus interest expense on the convertible bond | €m | 8 | 8 |
| Less income taxes | €m | 1 | 1 |
| Adjusted consolidated net profit for the period attributable to Deutsche Post AG shareholders | €m | 5,060 | 5,366 |
| Weighted average number of shares outstanding | number | 1,232,451,264 | 1,214,024,931 |
| Potentially dilutive shares | number | 29,645,735 | 24,475,019 |
| Weighted average number of shares for diluted earnings | number | 1,262,096,999 | 1,238,499,950 |
| **Diluted earnings per share** | **€** | **4.01** | **4.33** |

To compute diluted earnings per share, the weighted average number of shares outstanding is adjusted for the number of all potentially dilutive shares. This item includes the executives' rights to shares under the Performance Share Plan and Share Matching Scheme (as at 31 December 2022: 6,292,011 shares; previous year: 11,678,092) and the maximum number of ordinary shares that can be issued on exercise of the conversion rights under the convertible bond issued in December 2017. Consolidated net profit for the period attributable to Deutsche Post AG shareholders was increased by the amounts spent for the convertible bond.

Diluted earnings per share in the reporting period were €4.33 (previous year: €4.01).

## 21  Dividend per share

A dividend per share of €1.85 is being proposed for the 2022 financial year (previous year: €1.80 paid). Further details on the dividend distribution can be found in ❯ **Note 35.**



# Balance sheet disclosures

## 22 Intangible assets

### 22.1 Overview

| €m | Internally generated intangible assets | Purchased brand names | Purchased customer lists | Other purchased intangible assets | Goodwill | Adv intai |
|---|---|---|---|---|---|---|
| **Cost** | | | | | | |
| **Balance as at 1 January 2021** | **1,273** | **450** | **41** | **1,565** | **12,040** | |
| Additions from business combinations | 0 | 0 | 0 | 0 | 0 | |
| Additions | 43 | 0 | 0 | 60 | 0 | |
| Reclassifications | 66 | 0 | 0 | 81 | 0 | |
| Disposals | −73 | 0 | 0 | −139 | −14 | |
| Currency translation differences | 4 | 30 | 2 | 33 | 392 | |
| **Balance as at 31 December 2021/1 January 2022** | **1,313** | **480** | **43** | **1,600** | **12,418** | |
| Additions from business combinations | 13 | 64 | 432 | 99 | 1,366 | |
| Additions | 53 | 0 | 0 | 77 | 0 | |
| Reclassifications | 67 | 0 | 0 | 76 | 0 | |
| Disposals | −22 | 0 | 0 | −105 | −4 | |
| Currency translation differences | −3 | −23 | −2 | 13 | 11 | |
| **Balance as at 31 December 2022** | **1,421** | **521** | **473** | **1,760** | **13,791** | |
| **Amortisation and impairment losses** | | | | | | |
| **Balance as at 1 January 2021** | **1,098** | **422** | **26** | **1,247** | **1,042** | |
| Additions from business combinations | 0 | 0 | 0 | 0 | 0 | |
| Amortisation | 65 | 0 | 3 | 133 | 0 | |
| Impairment losses | 0 | 0 | 0 | 0 | 0 | |
| Reclassifications | −1 | 0 | 0 | 1 | 0 | |
| Reversals of impairment losses | 0 | 0 | 0 | 0 | 0 | |
| Disposals | −59 | 0 | 0 | −120 | −13 | |
| Currency translation differences | 2 | 28 | 2 | 27 | 36 | |
| **Balance as at 31 December 2021/1 January 2022** | **1,105** | **450** | **31** | **1,288** | **1,065** | |
| Additions from business combinations | 7 | 0 | 0 | 11 | 0 | |
| Amortisation | 74 | 2 | 19 | 134 | 0 | |
| Impairment losses | 0 | 0 | 0 | 1 | 0 | |
| Reclassifications | 0 | 0 | 0 | 4 | 0 | |
| Reversals of impairment losses | 0 | 0 | 0 | 0 | 0 | |
| Disposals | −21 | 0 | 0 | −86 | 0 | |
| Currency translation differences | −2 | −24 | −1 | 10 | −4 | |
| **Balance as at 31 December 2022** | **1,163** | **428** | **49** | **1,362** | **1,061** | |
| **Carrying amount as at 31 December 2022** | **258** | **93** | **424** | **398** | **12,730** | |
| **Carrying amount as at 31 December 2021** | **208** | **30** | **12** | **312** | **11,353** | |

The increase in intangible assets results from the business combinations in the 2022 financial year and the corresponding goodwill, as well as the disclosing of hidden reserves primarily from customer relationships and brand names of Hillebrand, Cameron and Monta, ❯ Note 2. The disposals of goodwill mainly concern the companies Greenplan and Véron Grauer.

Purchased software, concessions, industrial rights, licences and similar rights and assets are reported under purchased intangible assets. Internally generated intangible assets relate to development costs for internally developed software.

**22.2  Allocation of goodwill to CGUs**
For the purposes of annual impairment testing in accordance with IAS 36, the Group determines the recoverable amount of a CGU on the basis of its value in use. This calculation is based on projections of free cash flows that are initially discounted at a rate corresponding to the post-tax cost of capital. Pre-tax discount rates are determined iteratively.

| €m | 31 Dec. 2021 | 31 Dec. 2022 |
|---|---|---|
| Express | 3,910 | 3,913 |
| Global Forwarding, Freight | | |
|   Global Forwarding | 4,072 | 5,329 |
|   Freight | 279 | 280 |
| Supply Chain | 1,977 | 2,095 |
| eCommerce Solutions | 159 | 159 |
| Post & Parcel Germany | 956 | 954 |
| **Total goodwill** | **11,353** | **12,730** |

The cash flow projections are based on the detailed planning for EBIT, depreciation and amortisation / investment planning adopted by management, as well as changes in net working capital, and take both internal historical data and external macroeconomic data into account. From a methodological perspective, the detailed planning phase covers a three-year planning horizon from 2023 to 2025. Planning is supplemented by a perpetual annuity representing the value added from 2026 onwards. This is calculated using a long-term growth rate, which is determined for each CGU separately and is shown in the table below. The growth rates applied are based on long-term real growth figures for the relevant economies, growth expectations for the relevant sectors and long-term inflation forecasts for the countries in which the CGUs operate. The cash flow forecasts are based both on past experience and on the effects of the anticipated future general market trend. In addition, the forecasts take into account growth in the respective geographical sub-markets and in global trade, and the ongoing trend towards outsourcing logistics activities. Cost trend forecasts for the transport network and services also have an impact on value in use. A key planning assumption for the impairment test is the EBIT margin for the perpetual annuity.

The pre-tax cost of capital is based on the weighted average cost of capital. The (pre-tax) discount rates for the significant CGUs and the growth rates assumed in each case for the perpetual annuity are shown in the following table:

| % | 20 |
|---|---|
| Express | |
| Global Forwarding, Freight | |
|   Global Forwarding | |
|   Freight | |
| Supply Chain | |
| eCommerce Solutions | |
| Post & Parcel Germany | |

The increase in the dis...
the interest rates in ger...
risk premium.

On the basis of t...
tests carried out for the...
allocated, it was establ...
all CGUs exceed their c...
were recognised on goo...
ber 2022.

When performing...
Group conducted sensi...
in accordance with IAS...
margin, the discount ra...
which included varying...
within an appropriate r...
ment to goodwill.

 Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 919 of 1025

CONSOLIDATED FINANCIAL STATEMENTS NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –

## 23  Property, plant and equipment

**Overview of property, plant and equipment, including right-of-use assets**

€m

| | Land and buildings | Technical equipment and machinery | IT equipment, operating and office equipment | Aircraft | Transport equipment |
|---|---|---|---|---|---|
| **Cost** | | | | | |
| **Balance as at 1 January 2021** | **16,672** | **6,605** | **2,495** | **6,352** | **4,071** |
| Additions from business combinations¹ | 0 | 0 | 0 | 35 | 5 |
| Additions | 2,428 | 240 | 125 | 719 | 738 |
| Reclassifications | 360 | 520 | 129 | 881 | 101 |
| Disposals | −1,457 | −198 | −335 | −187 | −355 |
| Currency translation differences | 330 | 124 | 61 | 343 | 64 |
| **Balance as at 31 December 2021/1 January 2022** | **18,333** | **7,291** | **2,475** | **8,143** | **4,624** |
| Additions from business combinations¹ | 165 | 26 | 60 | −22 | 91 |
| Additions | 2,558 | 296 | 163 | 1,123 | 799 |
| Reclassifications | 515 | 638 | 98 | 490 | 83 |
| Disposals | −591 | −185 | −263 | −357 | −429 |
| Currency translation differences | −11 | 30 | 22 | 282 | −2 |
| **Balance as at 31 December 2022** | **20,969** | **8,096** | **2,555** | **9,659** | **5,166** |
| **Depreciation and impairment losses** | | | | | |
| **Balance as at 1 January 2021** | **5,896** | **3,845** | **1,845** | **2,247** | **1,956** |
| Additions from business combinations¹ | 0 | 0 | 0 | 8 | 5 |
| Depreciation | 1,582 | 444 | 243 | 755 | 534 |
| Impairment losses | 0 | 0 | 0 | 0 | 0 |
| Reclassifications | 1 | −15 | 8 | 0 | 12 |
| Reversals of impairment losses | −10 | 0 | 0 | 0 | 0 |
| Disposals | −757 | −171 | −325 | −156 | −306 |
| Currency translation differences | 142 | 72 | 45 | 98 | 35 |
| **Balance as at 31 December 2021/1 January 2022** | **6,854** | **4,175** | **1,816** | **2,952** | **2,236** |
| Additions from business combinations¹ | 22 | 12 | 34 | 0 | 32 |
| Depreciation | 1,742 | 491 | 241 | 822 | 604 |
| Impairment losses | 27 | 6 | 4 | 0 | 9 |
| Reclassifications | 1 | −1 | −3 | 0 | 0 |
| Reversals of impairment losses | −18 | −4 | −3 | 0 | −9 |
| Disposals | −447 | −160 | −250 | −298 | −377 |
| Currency translation differences | 12 | 20 | 17 | 78 | 4 |
| **Balance as at 31 December 2022** | **8,193** | **4,539** | **1,856** | **3,554** | **2,499** |
| **Carrying amount as at 31 December 2022** | **12,776** | **3,557** | **699** | **6,105** | **2,667** |
| **Carrying amount as at 31 December 2021** | **11,479** | **3,116** | **659** | **5,191** | **2,388** |

¹ Including proportionate change from joint operations.

Disclosures on right-of-use assets are contained in ❯ **Note 41.**

Property, plant and equipment increased both due to capital expenditure as well as from the acquisition of companies. In the previous year, a portion of disposals was attributable to the reclassification of subleases embedded in customer contracts to financial assets, ❯ **Note 7.**

Advance payments relate only to advance payments on items of property, plant and equipment for which the Group has paid advances in connection with incomplete transactions. They relate in particular to the renewal of the Express air fleet. Advances for this purpose amounted to €616 million in the financial year (previous year: €412 million). Assets under development relate to items of property, plant and equipment in progress at the reporting date for whose production internal or third-party costs have already been incurred.

### 24  Investment property

The investment property largely comprises leased property encumbered by heritable building rights and developed and undeveloped land.

| €m | 2021 | 2022 |
|---|---|---|
| **Cost** | | |
| Balance as at 1 January | 28 | 71 |
| Additions | 4 | 8 |
| Reclassifications | 39 | −44 |
| Disposals | −1 | −4 |
| Currency translation differences | 1 | 0 |
| **Balance as at 31 December** | **71** | **31** |
| | | |
| **Depreciation and impairment losses** | | |
| Balance as at 1 January | 16 | 23 |
| Depreciation and impairment losses | 9 | 1 |
| Disposals | −1 | −3 |
| Reclassifications | −1 | −12 |
| **Balance as at 31 December** | **23** | **9** |
| **Carrying amount as at 31 December** | **48** | **22** |
| of which right-of-use assets | 41 | 9 |

### 25  Investments acco

The following table is a
consolidated financial s
those companies which
are not of material sign

Companies acco
decreased due to the r
surement as well as due
the British joint venture
Limited. The company is
the previous year, the di
of the shares in Global-
of €39 million.

| €m | Associates | | Joint v |
|---|---|---|---|
| | 2021 | 2022 | 2021 |
| Balance as at 1 January | 58 | 95 | 15 |
| Additions | 2 | 7 | 0 |
| Disposals | 0 | 0 | 0 |
| Impairment losses | −3 | 0 | 0 |
| Changes in Group's share of equity Changes recognised in profit or loss | 34 | −34 | 1 |
| Profit distributions | −2 | −2 | 0 |
| Changes recognised in other comprehensive income | 6 | 4 | 0 |
| **Balance as at 31 December** | **95** | **70** | **16** |
| Aggregate financial data Profit after income taxes | −11 | −34 | 1 |
| Other comprehensive income | 6 | 4 | 0 |
| Total comprehensive income | −5 | −30 | 1 |

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 921 of 1025

CONSOLIDATED FINANCIAL STATEMENTS    NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL    Deutsche Post DHL Group –

## 26  Financial assets

| €m | Non-current | | Current | | Total | |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 | 2021 | 2022 |
| Assets measured at cost | 834 | 788 | 1,257 | 1,272 | **2,091** | **2,060** |
| Assets at fair value through other comprehensive income | 46 | 65 | 0 | 0 | **46** | **65** |
| Assets at fair value through profit or loss | 310 | 363 | 1,831 | 83 | **2,141** | **446** |
| **Financial assets** | **1,190** | **1,216** | **3,088** | **1,355** | **4,278** | **2,571** |

Assets measured at cost include €700 million (previous year: €579 million) in receivables from finance leases. This relates primarily to receivables from certain embedded subleases, ❯ Note 7. The notional amounts of the outstanding lease payments have the following maturity dates:

### Maturities of undiscounted lease payments

| €m | 2021 | 2022 |
|---|---|---|
| Up to 1 year | 160 | 168 |
| More than 1 year to 2 years | 139 | 159 |
| More than 2 years to 3 years | 108 | 120 |
| More than 3 years to 4 years | 70 | 91 |
| More than 4 years to 5 years | 46 | 64 |
| More than 5 years | 100 | 209 |
| **Total undiscounted lease payments** | **623** | **811** |
| Interest component included over entire term | −44 | −111 |
| **Receivable from leasing** | **579** | **700** |
| of which current | 160 | 168 |
| non-current | 419 | 532 |

Assets measured at fair value decreased, largely on account of the sale of money market fund units during the year. For details on impairment losses, default risk, maturity structures and restraints on disposal, see ❯ Note 43.

## 27  Other assets

| €m |
|---|
| Prepaid expenses |
| Tax receivables |
| Pension assets, non-current |
| Receivables from cost abso |
| Contract assets |
| Recoverable start-up costs, |
| Other assets from insuranc |
| Receivables from insurance |
| Receivables from private p |
| Creditors with debit balanc |
| Receivables from loss comp (recourse claims) |
| Receivables from employee |
| Receivables from cash on d |
| Miscellaneous of which non-current: 92 (p |
| **Other assets** |
| of which current |
| non-current |

The decrease in prepaid
Global Forwarding, Frei
ments for transport se

Of the tax receiva
lion) relates to VAT, €13
customs and duties and
to other tax receivables

Pension assets de
ments in the United Kin

Miscellaneous oth
vidual items.


Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 922 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL  Deutsche Post DHL Group –

## 28  Deferred taxes

**Breakdown by balance sheet item and maturity**

€m

|  | 2021 | | 2022 | |
| --- | --- | --- | --- | --- |
|  | Deferred tax assets | Deferred tax liabilities | Deferred tax assets | Deferred tax liabilities |
| Intangible assets | 13 | 145 | 15 | 362 |
| Property, plant and equipment | 479 | 2,102 | 789 | 2,904 |
| Non-current financial assets | 3 | 34 | 13 | 29 |
| Other non-current assets | 16 | 44 | 18 | 70 |
| Other current assets | 67 | 102 | 85 | 99 |
| Provisions | 640 | 159 | 626 | 147 |
| Financial liabilities | 1,700 | 24 | 2,124 | 40 |
| Other liabilities | 244 | 13 | 300 | 21 |
| Tax loss carryforwards | 1,267 | | 806 | |
| **Gross amount** | **4,429** | **2,623** | **4,776** | **3,672** |
| of which  current | 1,029 | 231 | 986 | 429 |
|          non-current | 3,400 | 2,392 | 3,790 | 3,243 |
| Netting | −2,486 | −2,486 | −3,336 | −3,336 |
| **Carrying amount** | **1,943** | **137** | **1,440** | **336** |

A total of €98 million (previous year: €438 million) of the deferred taxes on tax loss carryforwards relates to tax loss carryforwards in Germany and €708 million (previous year: €829 million) to foreign tax loss carryforwards (mainly from the Americas region).

Deferred taxes have not been recognised for loss carryforwards expected to not be usable in the amount of around €1.4 billion (previous year, adjusted: €2.8 billion). Of these, around €0.6 billion (previous year: €1.5 billion) is attributable to loss carryforwards from US subsidiaries for state taxes. The tax loss carryforwards from the Americas region for which no deferred tax assets were recognised do not expire prior to 2028. Moreover, deferred taxes have not been recognised for temporary differences expected to not be usable in the amount of around €0.2 billion (previous year: €3.0 billion).

Deferred taxes have not been recognised for temporary differences of €675 million (previous year: €568 million) for accrued earnings of German and foreign subsidiaries, because these temporary differences will probably not reverse in the foreseeable future.

## 29  Inventories

€m

|  | 2021 | 2022 |
| --- | --- | --- |
| Work in progress | 254 | 490 |
| Raw materials, consumables and supplies | 222 | 243 |
| Finished goods and goods purchased and held for resale | 106 | 181 |
| Advance payments | 11 | 13 |
| **Inventories** | **593** | **927** |

The increase in finishe
butable mainly to real
valuation allowances w

## 30  Trade receivable

For information on imp
structures, see ❯ Note 4

€m

| | |
| --- | --- |
| Trade receivables |
| Deferred revenue |
| **Trade receivables** |

## 31  Cash and cash eq

€m

| | |
| --- | --- |
| Cash equivalents |
| Bank balances/cash in tran |
| Cash |
| Other cash and cash equiva |
| **Cash and cash equivalents** |

Of the €3,790 million i
lion was not available
reporting date (previou
€1,880 million (previou
to countries where exch
apply (mostly China, In
lion (previous year: €8
non-controlling interes

## 32  Assets held for sale and liabilities associated with assets held for sale

The sale of the assets held for sale recognised under this item in the previous year was completed in the 2022 financial year, ❯ Note 2. For the companies reported here during the year, see ❯ Note 3.

## 33  Issued capital and purchase of treasury shares

As at 31 December 2022, KfW Bankengruppe (KfW) held a 20.49% interest, unchanged from the previous year, in the share capital of Deutsche Post AG. Free float accounts for 76.26% of the shares and the remaining 3.25% of shares are owned by Deutsche Post AG. KfW holds the shares in trust for the Federal Republic of Germany.

### 33.1  Changes in issued capital

The issued capital amounts to €1,239 million. It is composed of 1,239,059,409 no-par-value registered shares (ordinary shares) with a notional interest in the share capital of €1 per share and is fully paid up.

### Changes in issued capital and treasury shares

| €m | | |
|---|---|---|
| | 2021 | 2022 |
| **Issued capital** | | |
| Balance as at 1 January | 1,239 | 1,239 |
| **Balance as at 31 December** | **1,239** | **1,239** |
| **Treasury shares** | | |
| Balance as at 1 January | 0 | −15 |
| Purchase of treasury shares | −20 | −30 |
| Issue/sale of treasury shares | 5 | 5 |
| **Balance as at 31 December** | **−15** | **−40** |
| **Total as at 31 December** | **1,224** | **1,199** |

### 33.2  Authorised and contingent capital

The Articles of Association may be viewed on the ◉ Company's website or in the electronic company register. They may also be viewed in the commercial register of the Bonn Local Court.

### Authorised/contingent capital as at 31 December 2022

| | Amount €m | Purpose |
|---|---|---|
| Authorised Capital 2021 (Annual General Meeting from 6 May 2021) | 130 | Increase in share capital against cash/non-cash contributions (authorisation until 5 May 2026) |
| Contingent Capital 2017 (Annual General Meeting from 28 April 2017) | 75 | Issue of options/conversion rights (authorisation until 7 May 2018) |
| Contingent Capital 2018/1 (Annual General Meeting from 24 April 2018) | 12 | Issue of Performance Share Units to executives (authorisation until 8 October 2020) |
| Contingent Capital 2020/1 (Annual General Meeting from 27 August 2020) | 12 | Issue of Performance Share Units to executives (authorisation until 26 August 2023) |
| Contingent Capital 2022/1 (Annual General Meeting from 6 May 2022) | 20 | Issue of Performance Share Units to executives (authorisation until 5 May 2027) |
| Contingent Capital 2022/2 (Annual General Meeting from 6 May 2022) | 40 | Issue of options/conversion rights (authorisation until 5 May 2027) |

### Authorised Capital 2021

The Board of Management is authorised, subject to the consent of the Supervisory Board, to issue up to 130 million new, no-par-value registered shares until 5 May 2026 in exchange for cash and/or non-cash contributions and thereby increase the company's share capital by up to €130 million. The authorisation may be used in full or for partial amounts. Shareholders generally have pre-emptive rights. However, subject to the approval of the Supervisory Board, the Board of Management may disapply the shareholders' pre-emptive rights to the shares covered by the authorisation. No use was made of the authorisation in the financial year under review.

### Contingent Capital 201

The contingent capital i rants, convertible bond participation certificate gate principal amount o or conversion rights fo tionate interest in the s The new shares partici financial year in which exercised in part in De bond 2017/2025 in an The share capital was to €75 million. Conting financial year.

### Contingent Capital 201

The contingent capital Share Units (PSUs) to se participate in profit fro which they are issued. contingent basis by up to 12 million no-par-va was not utilised in the 2

### Contingent Capital 202

The contingent capital Share Units (PSUs) to capital was increased o through the issue of up shares. The new shares of the financial year in v was not utilised in the 2

### Contingent Capital 202

The contingent capital Share Units (PSUs) to capital was increased o through the issue of up



shares. The new shares participate in profit from the beginning of the financial year in which they are issued. Contingent capital was not utilised in the 2022 financial year.

### Contingent Capital 2022/2

The contingent capital increase serves to issue bonds with warrants, convertible bonds and/or income bonds as well as profit participation certificates, or a combination thereof, in an aggregate principal amount of up to €2 billion, and to grant options or conversion rights for up to 40 million shares with a proportionate interest in the share capital not to exceed €40 million. The new shares participate in profit from the beginning of the financial year in which they are issued. The share capital was increased on a contingent basis by up to €40 million. Contingent capital was not utilised in the 2022 financial year.

### 33.3 Authorisation to acquire treasury shares

By way of a resolution adopted by the Annual General Meeting on 6 May 2021, the company is authorised to acquire treasury shares in the period to 5 May 2026 of up to 10% of the share capital existing when the resolution was adopted. The authorisation permits the Board of Management to exercise it for every purpose permitted by law, and in particular to pursue the goals mentioned in the resolution by the Annual General Meeting. In addition, the

Board of Management is authorised to acquire treasury shares totalling up to 5% of the share capital existing when the resolution was adopted by means including using derivatives.

### Share buy-back programme

In February 2022, the Board of Management resolved a share buy-back programme for up to 50 million Deutsche Post AG shares at a total purchase price of up to €2 billion. The repurchased shares will either be retired, used to service long-term executive remuneration plans and any future employee participation programmes or used to meet potential obligations if rights accruing under the 2017/2025 convertible bond are exercised. The repurchase via the stock exchange started on 8 April 2022 and will end no later than in December 2024.

The first tranche of the share buy-back programme with a buy-back volume (excluding transaction costs) of €790 million was carried out in the period from 8 April 2022 to 3 October 2022. The buy-back volume of the second tranche amounted to €225 million between 9 November 2022 and 31 December 2022. The maximum total volume of this tranche amounts to €500 million and ends on 31 March 2023. In total, 27,963,429 shares had been repurchased for €1,015 million as at 31 December 2022 as part of the share buy-back programme (excluding transaction costs) at an average price of €36.28 per share.

In the 2022 fina[...] acquired and issued to e[...] claims to matching sha[...] lion shares were acquire[...] for a total of €73 million[...]

A total of 1.4 milli[...] concerned to settle the [...] to settle the Employee [...]

Deutsche Post AG[...] 31 December 2022 (pre[...]

### 33.4 Disclosures on c[...]

In the 2022 financial ye[...] year: 30.7%). The comp[...] gearing ratio, which is d[...] equity and net debt.

#### Corporate capital

| €m |
| --- |
| Financial liabilities |
| Less operating financial liab[...] |
| Less cash and cash equivale[...] |
| Less current financial assets[...] |
| Less non-current derivative[...] instruments |
| **Net debt** |
| Plus total equity |
| **Total capital** |
| Net gearing ratio (%) |

¹ Relates to liabilities from over[...]

#### Prior tranches of the share buy-back programme 2022

| | Total volume €m | Maximum duration | Buy-back Number | Buy-back volume (excluding transaction costs) €m |
| --- | --- | --- | --- | --- |
| Tranche I | 800¹ | 8 April 2022 to 7 November 2022 | 21,931,589 | 790 |
| Tranche II | 500 | 9 November 2022 to 31 March 2023 | 6,031,840² | 225² |

¹ The total volume was increased by €300 million from €500 million on 29 June 2022.  ² Until 31 December 2022.

## 34  Reserves

### 34.1  Capital reserves

The capital increases or decreases in capital reserves relate to the following items:

| €m | 2021 | 2022 |
|---|---|---|
| Balance as at 1 January | 3,519 | 3,533 |
| Change due to Share Matching Scheme | 5 | 8 |
| Change due to Performance Share Plan | −3 | 3 |
| Change due to Employee Share Plan | 3 | −1 |
| Differences between purchase and issue prices of treasury shares | 9 | 0 |
| **Balance as at 31 December** | **3,533** | **3,543** |

### 34.2  Retained earnings

In addition to the items evident in the statement of changes in equity, retained earnings also include changes due to capital increases/decreases:

**Capital increase/decrease**

| €m | 2021 | 2022 |
|---|---|---|
| Obligation share buy-back 2022 under tranche II | 0 | −275 |
| Share buy-back 2022 under tranche II | 0 | −219 |
| Share buy-back 2022 under tranche I | 0 | −768 |
| Share buy-back 2021 | −982 | 0 |
| Change due to Share Matching Scheme | −19 | 39 |
| Change due to Performance Share Plan | 26 | 23 |
| Change due to Employee Share Plan | 0 | 16 |
| Differences between purchase and issue prices of treasury shares | −9 | 0 |
| Other | 3 | −11 |
| **Total** | **−981** | **−1,195** |

The second tranche of the share buy-back programme, with a total volume of up to €500 million, began on 9 November 2022 and is being implemented by an independent financial services provider until 31 March 2023 on the basis of an irrevocable agreement. At the time the agreement was concluded, the resulting obligation was charged in full to retained earnings and recognised as a financial liability. It was reduced by the buy-back transactions carried out by 31 December 2022. The obligation to repurchase shares after 31 December 2022 is included in the amount of €275 million.

## 35  Equity attributable to Deutsche Post AG shareholders

The equity attributable to Deutsche Post AG shareholders in the 2022 financial year amounted to €23,236 million (previous year: €19,037 million).

**Dividends**

Dividends paid to the shareholders of Deutsche Post AG are based on the net retained profit of €10,635 million reported in Deutsche Post AG's annual financial statements in accordance with the HGB. The Board of Management is proposing a dividend of €1.85 per no-par-value share carrying dividend rights (proposed and distributed in the previous year: €1.80). This corresponds to a total dividend of €2,205 million. Moreover, the Board of Management is proposing to transfer €2,000 million from net retained profit to other revenue reserves. The amount of €6,430 million remaining after deduction of the planned total dividend and the transfer to other revenue reserves will be carried forward to new account. The final total dividend will be based on the number of shares carrying dividend rights at the time the Annual General Meeting resolves upon the appropriation of net retained profit on the date of the Annual General Meeting.

| | |
|---|---|
| Dividend distributed in the year for the year 2021 | |
| Dividend distributed in the year for the year 2020 | |

## 36  Non-controlling i

This balance sheet item non-Group shareholder accounting, as well as lowing table shows the interests relate:

| €m | |
|---|---|
| DHL Sinotrans International China | |
| Blue Dart Express Limited, I | |
| DHL Aero Expreso S.A., Pan | |
| PT. Birotika Semesta, Indon | |
| DHL Global Forwarding (Vie Vietnam | |
| Other companies | |
| **Non-controlling interests** | |

There are material non-companies:

DHL Sinotrans In China, which is assig domestic and internatio vices. Deutsche Post DH pany. Deutsche Post AG

 Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 926 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL  Deutsche Post DHL Group –

Limited (Blue Dart), India, which is assigned to the eCommerce Solutions segment. Blue Dart is a courier service provider. The following table gives an overview of their aggregated financial data:

**Financial data for material non-controlling interests**

| €m | | Sinotrans | | Blue Dart |
|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 |
| **Balance sheet** | | | | |
| **ASSETS** | | | | |
| Non-current assets | 149 | 178 | 122 | 124 |
| Current assets | 966 | 826 | 125 | 153 |
| **Total ASSETS** | **1,115** | **1,004** | **247** | **277** |
| | | | | |
| **EQUITY AND LIABILITIES** | | | | |
| Non-current provisions and liabilities | 35 | 57 | 28 | 22 |
| Current provisions and liabilities | 391 | 343 | 100 | 100 |
| **Total EQUITY AND LIABILITIES** | **426** | **400** | **128** | **122** |
| **Net assets** | **689** | **604** | **119** | **155** |
| Non-controlling interests | 345 | 302 | 25 | 34 |
| | | | | |
| **Income statement** | | | | |
| Revenue | 2,720 | 2,867 | 482 | 619 |
| Profit before income taxes | 753 | 713 | 49 | 78 |
| Income taxes | 189 | 180 | 13 | 16 |
| **Profit after income taxes** | **564** | **533** | **36** | **62** |
| Other comprehensive income | 58 | 0 | 4 | −7 |
| **Total comprehensive income** | **622** | **533** | **40** | **55** |
| attributable to non-controlling interests | 311 | 267 | 10 | 14 |
| Dividend distributed to non-controlling interests | 162 | 309 | 1 | 4 |
| Consolidated net profit attributable to non-controlling interests | 282 | 267 | 9 | 15 |
| | | | | |
| **Cash flow statement** | | | | |
| Net cash from operating activities | 610 | 500 | 84 | 53 |
| Net cash from/used in investing activities | 17 | −17 | −46 | −14 |
| Net cash used in financing activities | −343 | −642 | −34 | −37 |
| Net change in cash and cash equivalents | 284 | −159 | 4 | 2 |
| Cash and cash equivalents at 1 January | 370 | 711 | 9 | 15 |
| Effect of changes in exchange rates on cash and cash equivalents | 57 | −2 | 2 | 0 |
| **Cash and cash equivalents as at 31 December** | **711** | **550** | **15** | **17** |

The portion of other c
non-controlling interes
lation reserve. The chan

| €m | |
|---|---|
| Balance as at 1 January | |
| Transactions with non-cont | |
| Total comprehensive incom | |
| Changes from unrealised | |
| Changes from realised g | |
| **Currency translation reser** | |
| **31 December** | |

## 37  Provisions for pe

The Group's most signi
are in Germany and the
defined benefit retirem
in the Netherlands, Sw
number of other countr
with these plans along

### 37.1  Plan features

**Germany**

In Germany, Deutsche
benefit arrangement ba
open to new hourly wor
on the weekly working h
benefit components a
worker and salaried em
sion account. A 2.5% inc
every newly allocated c
falls due, the hourly wor
whether to receive paym
lifelong monthly benefit
The large majority of D

vested entitlements of hourly workers and salaried employees from a previous agreement, and to legacy pension commitments towards former hourly workers and salaried employees who have left or retired from the company. In addition, retirement benefit arrangements are available to executives below the Board of Management level and to specific employee groups through deferred compensation in particular. For information on the pension scheme for the Board of Management, see ❯ Note 47.2.

The prime source of external funding for Deutsche Post AG's respective retirement benefit obligations is a contractual trust arrangement, which also includes a pension fund. The trust is funded on a case-by-case basis in line with the Group's finance strategy. In the case of the pension fund, the regulatory funding requirements can, in principle, be met without additional employer contributions. Part of the plan assets consists of real estate that is leased out to the Group on a long-term basis. In addition, *Versorgungsanstalt der Deutschen Bundespost* (VAP – *Deutsche Bundespost* institution for supplementary retirement pensions), a shared pension fund for successor companies to *Deutsche Bundespost*, is used for some of the legacy pension commitments.

Individual subsidiaries in Germany have retirement benefit plans that were acquired in the context of acquisitions and transfers of operations and that are closed to new entrants. Contractual trust arrangements are in place for two subsidiaries for external funding.

## United Kingdom

In the United Kingdom, the Group's defined benefit pension arrangements are closed to new entrants and for further service accrual. With regard to some of the arrangements, a full commutation exercise was carried out during the previous year, which entailed offering certain members with small pensions the opportunity to exchange their pension for a lump-sum payment. This led to settlement payments in the year under review.

The Group's defined benefit pension arrangements in the United Kingdom have mainly been consolidated into a Group plan with different sections for the participating divisions. These are funded mainly via a Group trust. The amount of the employer deficit contributions must be negotiated with the trustee in the course of funding valuations, which are carried out every three years and most recently in the previous year. Normal contribution amounts no longer accrue because the arrangements have been closed.

## Other

In the Netherlands, collective agreements require that those employees who are not covered by a sector-specific plan participate in a dedicated defined benefit retirement plan. The dedicated plan provides for annual accruals which are subject to a pensionable salary cap. The plan provides for monthly benefit payments that are indexed in line with inflation, on the one hand, and the funds available for such indexation, on the other. In

Switzerland, employee[s] with statutory requirement[s] on the contributions pa[...] certain annuity factors [...] separate plan providi[ng] lifelong pension payme[...] ponents. In the United [...] retirement plans have b[...] entitlements have been [...] small pensions there w[...]

The Group compa[ny's] fit retirement plans in [...] respective joint funding [...] Switzerland, both empl[...] funding. In the United St[ates] are currently made in t[he] limited employer defic[it] the year under review.

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 928 of 1025

CONSOLIDATED FINANCIAL STATEMENTS / NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –

### 37.2 Financial performance of the plans and determination of balance sheet items

The present value of defined benefit obligations, the fair value of plan assets and net pension provisions changed as follows:

| €m | Present value of the defined benefit obligations | | Fair value of plan assets[2] | | Effect of asset | |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 | 2021 | |
| Balance as at 1 January | 19,664 | 18,503 | 13,854 | 14,785 | 5 | |
| Current service cost, excluding employee contributions | 274 | 251 | – | – | – | |
| Past service cost | −6 | −13 | – | – | – | |
| Settlement gains (−)/losses (+) | −4 | – | – | – | – | |
| Other administration costs in accordance with IAS 19.130 | – | – | −10 | −11 | – | |
| **Service cost[1]** | **264** | **238** | **−10** | **−11** | **–** | |
| Interest cost on defined benefit obligations | 192 | 301 | – | – | – | |
| Interest income on plan assets | – | – | 140 | 241 | – | |
| Interest on the effect of asset ceilings | – | – | – | – | – | |
| **Net interest cost** | **192** | **301** | **140** | **241** | **–** | |
| **Income and expenses recognised in the income statement** | **456** | **539** | **130** | **230** | **–** | |
| Actuarial gains (−)/losses (+) – changes in demographic assumptions | −180 | 43 | – | – | – | |
| Actuarial gains (−)/losses (+) – changes in financial assumptions | −1,209 | −4,752 | – | – | – | |
| Actuarial gains (−)/losses (+) – experience adjustments | 112 | 110 | – | – | – | |
| Return on plan assets excluding interest income | – | – | 769 | −2,304 | – | |
| Change in the effect of asset ceilings excluding interest | – | – | – | – | 41 | |
| **Remeasurements recognised in the statement of comprehensive income** | **−1,277** | **−4,599** | **769** | **−2,304** | **41** | |
| Employer contributions | – | – | 48 | 90 | – | |
| Employee contributions | 28 | 30 | 28 | 30 | – | |
| Benefit payments | −729 | −741 | −417 | −568 | – | |
| Settlement payments | −55 | −15 | −54 | −14 | – | |
| Transfers | −13 | – | 1 | 3 | – | |
| Acquisitions/divestitures | – | −2 | – | −6 | – | |
| Currency translation effects | 429 | −264 | 426 | −269 | – | |
| **Balance as at 31 December** | **18,503** | **13,451** | **14,785** | **11,977** | **46** | |

[1] Including other administration costs in accordance with IAS 19.130 from plan assets.    [2] In the 2021 annual report, for simplified presentation the fair value of plan assets was reduced by the effects of asset ceilings.

There were settlement payments in the United Kingdom in particular in the reporting period. Moreover, in Germany, the proportion of benefit payments paid directly by the company decreased. There were settlement payments in the United States in particular in the previous year. The remeasurements caused net pension provisions to fall significantly once again. Total payments amounting to €396 million are expected with regard to

net pension provisions in 2023. Of this amount, €328 million is attributable to the Group's expected direct benefit payments and €68 million to expected employer contributions to pension funds.

The disaggregation of the present value of defined benefit obligations, fair value of plan assets and net pension provisions, as well as the determination of the balance sheet items, is as follows:

| €m | Germany | UK | |
|---|---|---|---|
| **31 December 2022** | | | |
| Present value of defined benefit obligations | 7,254 | 3,735 | |
| Fair value of plan assets | −5,665 | −4,054 | |
| Effect of asset ceilings | 0 | 0 | |
| **Net pension provisions** | **1,589** | **−319** | |
| | | | |
| **Reported separately** | | | |
| Pension assets | 0 | 319 | |
| Provisions for pensions and similar obligations | 1,589 | 0 | |
| **31 December 2021** | | | |
| Present value of defined benefit obligations | 9,927 | 5,497 | |
| Fair value of plan assets[1] | −6,229 | −5,895 | |
| Effect of asset ceilings[1] | 0 | 0 | |
| **Net pension provisions** | **3,698** | **−398** | |
| | | | |
| **Reported separately** | | | |
| Pension assets | 0 | 400 | |
| Provisions for pensions and similar obligations | 3,698 | 2 | |

[1]  In the 2021 annual report, for simplified presentation the fair value of plan assets was reduced by the effects of asset ceilings.

In the "Other" area, the Netherlands, Switzerland and the United States account for a share in the corresponding present value of the defined benefit obligations of 47%, 19% and 9%, respectively (previous year: 48%, 18% and 9%, respectively).

Additionally, rights to reimbursement from former Group companies existed in the Group in Germany in the amount of

€10 million (previous year: €13 million), which had to be reported separately under financial assets. Corresponding benefit payments are being made directly by the former Group companies.


CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 930 of 1025

### 37.3  Additional information on the present value of defined benefit obligations

The significant financial assumptions are as follows:

| % | Germany | UK |
|---|---|---|
| **31 December 2022** | | |
| Discount rate (defined benefit obligations) | 4.00 | 4.90 |
| Expected annual rate of future salary increase | 3.00 | n.a. |
| Expected annual rate of future pension increase | 2.25 | 3.00 |
| **31 December 2021** | | |
| Discount rate (defined benefit obligations) | 1.50 | 1.90 |
| Expected annual rate of future salary increase | 2.50 | n.a. |
| Expected annual rate of future pension increase | 1.75 | 3.15 |

The discount rates for defined benefit obligations in the euro-zone and the United Kingdom were each derived from an individual yield curve comprising the yields of AA-rated corporate bonds and taking into account membership composition and duration. For other countries, the discount rate for defined benefit obligations was determined in a similar way, provided there was a deep market for AA-rated (or, in some cases, AA- and AAA-rated) corporate bonds. By contrast, government bond yields were used for countries without a deep market for such corporate bonds. The determination of the discount rates was modified for the eurozone at the end of 2022. The generation of the yield curve taking into account corporate bonds with a rating of AA was further developed in the current market environment. This development resulted in detailed changes to the derivation of interest rates.

As a result of the changes made, the discount rate used to calculate the present value of the defined benefit obligations in the eurozone as at 31 December 2022 was 0.60% lower, which resulted in a higher present value of the defined benefit obligations for the Group and the corresponding deterioration in other comprehensive income (before taxes) of around €379 million; for 2023, the adjustments result in an expected minor increase in both service cost and net interest cost.

For the annual pension increase in Germany, fixed rates in particular must be taken into account, in addition to the assumptions shown. The effective weighted average therefore amounts to approximately 1.00% (previous year: 1.00%).

The most significant demographic assumptions made relate to life expectancy and / or mortality. For the Group companies in Germany, they are based on the HEUBECK RICHTTAFELN 2018 G mortality tables. Life expectancy for the retirement benefit plans in the United Kingdom was based mainly on the S3PMA_H / S3PFA_H tables of the Continuous Mortality Investigation (CMI) of the Institute and Faculty of Actuaries, adjusted to reflect plan-specific mortality according to the latest funding valuation. Future mortality improvements were taken into account based on the current CMI projections model and an updated long-term trend assumption. For other countries, their own country-specific current standard mortality tables were used.

If one of the significant financial assumptions were to change, the present value of the defined benefit obligations would change as follows:

| | Change in assumption percentage points | Change in present value of defined benefit obligations % | |
|---|---|---|---|
| | | Germany | UK |
| **31 December 2022** | | | |
| Discount rate (defined benefit obligations) | 1.00 | −8.36 | −10.99 |
| | −1.00 | 10.64 | 13.48 |
| Expected annual rate of future salary increase | 0.50 | 0.10 | n.a. |
| | −0.50 | −0.08 | n.a. |
| Expected annual rate of future pension increase | 0.50 | 0.29 | 4.20 |
| | −0.50 | −0.25 | −4.05 |
| **31 December 2021** | | | |
| Discount rate (defined benefit obligations) | 1.00 | −12.50 | −13.76 |
| | −1.00 | 16.00 | 17.53 |
| Expected annual rate of future salary increase | 0.50 | 0.14 | n.a. |
| | −0.50 | −0.13 | n.a. |
| Expected annual rate of future pension increase | 0.50 | 0.34 | 5.32 |
| | −0.50 | −0.31 | −5.12 |

These are effective weighted changes in the respective present value of the defined benefit obligations, e.g. taking into account the largely fixed nature of the pension increase for Germany.

A one-year increase in life expectancy for a 65-year-old beneficiary would increase the present value of the defined benefit obligations by 3.95% in Germany (previous year: 4.87%) and by 3.19% in the United Kingdom (previous year: 4.77%). The corresponding increase for other countries would be 2.75% (previous year: 3.37%) and the total increase would be 3.52% (previous year: 4.59%).

When determining the sensitivity disclosures, the present values were calculated using the same methodology used to calculate the present values at the reporting date. The presentation does not take into account interdependencies between the assumptions; rather, it supposes that the assumptions change in isolation. This would be unusual in practice, since assumptions are often correlated.

The weighted average duration of the Group's defined benefit obligations as at 31 December 2022 was 9.8 years in Germany (previous year: 14.3 years) and 13.0 years in the United Kingdom (previous year: 15.6 years). In the other countries it was 16.1 years (previous year: 18.6 years), and in total it was 11.8 years (previous year: 15.4 years).

A total of 29.2% (previous year: 30.5%) of the present value of the defined benefit obligations was attributable to active beneficiaries, 19.3% (previous year: 20.6%) to formerly employed beneficiaries and 51.5% (previous year: 48.9%) to retirees.


Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 932 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL    Deutsche Post DHL Group –

## 37.4 Additional information on the fair value of plan assets

The fair value of the plan assets can be disaggregated as follows:

| €m | Germany | UK | Others² | Total |
|---|---|---|---|---|
| **31 December 2022** | | | | |
| Equities | 426 | 57 | 636 | **1,119** |
| Fixed income securities | 855 | 3,053 | 1,018 | **4,926** |
| Real estate | 1,821 | 272 | 329 | **2,422** |
| Alternatives¹ | 481 | 255 | 50 | **786** |
| Insurances | 510 | 0 | 132 | **642** |
| Cash | 1,552 | 83 | 40 | **1,675** |
| Other | 20 | 334 | 53 | **407** |
| **Fair value of plan assets** | **5,665** | **4,054** | **2,258** | **11,977** |
| **31 December 2021** | | | | |
| Equities | 1,153 | 564 | 783 | **2,500** |
| Fixed income securities | 2,080 | 4,554 | 1,237 | **7,871** |
| Real estate | 1,785 | 309 | 357 | **2,451** |
| Alternatives¹ | 434 | 277 | 57 | **768** |
| Insurances | 519 | 0 | 158 | **677** |
| Cash | 230 | 151 | 25 | **406** |
| Other | 28 | 40 | 44 | **112** |
| **Fair value of plan assets²** | **6,229** | **5,895** | **2,661** | **14,785** |

¹ Primarily includes absolute return products and private equity investments.
² In the 2021 annual report, for simplified presentation the fair value of plan assets was reduced by the effects of asset ceilings.

Quoted market prices in an active market exist for around 58% (previous year: 68%) of the total fair values of plan assets. The remaining assets for which no such quoted market prices exist are attributable as follows: 18% (previous year: 14%) to real estate, 12% (previous year: 10%) to fixed income securities, 6% (previous year: 5%) to insurances, 3% (previous year: 2%) to alternatives and 3% (previous year: 1%) to other. The majority of the investments on the active markets are globally diversified, with certain country-specific focus areas.

Real estate included in plan assets in Germany with a fair value of €1,689 million (previous year: €1,653 million) is occupied by Deutsche Post DHL Group.

In the year under review, hedging measures triggered by developments on the capital markets in 2022 resulted in a decrease in the proportion of equity and fixed-income holdings and an increase in the proportion of the cash holdings.

Asset–liability studies are performed at regular intervals in Germany, the United Kingdom and, amongst other places, the Netherlands, Switzerland and the United States, for the purpose of matching assets and liabilities; the strategic allocation of plan assets is adjusted accordingly.

Sustainable approaches based mainly on an integration of ESG criteria are increasingly being used when investing plan assets.

## 37.5 Risk

Specific risks are assoment plans. This ca re
Deutsche Post DHL Gro
income, whose overall
In contrast, a low releva
on staff costs and net f
applied depending on t

### INTEREST RATE RISK

A decrease (increase) i
to an increase (decreas
gation and would in pr
(decrease) in the fair v
tained in the plan asset
in some cases using de

### INFLATION RISK

Pension obligations – es
or schemes involving i
phase – can be linked di
The risk of increasing in
value of the defined ben
case of Germany, for ex
ment benefit componen
by closing the defined
rates of increase have l
and/or lump-sum payr
also a positive correlati




**INVESTMENT RISK**

The investment is in principle subject to a large number of risks; in particular, it is exposed to the risk that market prices may change. This is managed primarily by ensuring broad diversification and the use of hedging instruments.

**LONGEVITY RISK**

Longevity risk may arise in connection with the benefits payable in the future due to a future increase in life expectancy. This is mitigated in particular by using current standard mortality tables when calculating the present value of the defined benefit obligations. The mortality tables used in Germany and the United Kingdom, for example, include an allowance for expected future increases in life expectancy.

## 38 Other provisions

Other provisions break down into the following main types of provision:

| €m | Non-current | | Current | |
| --- | --- | --- | --- | --- |
| | 2021 | 2022 | 2021 | 2022 |
| Other employee benefits | 799 | 670 | 160 | 114 |
| Technical reserves (insurance) | 517 | 571 | 250 | 178 |
| Aircraft maintenance | 209 | 200 | 98 | 73 |
| Tax provisions | – | – | 275 | 278 |
| Restructuring provisions | 25 | 10 | 50 | 45 |
| Miscellaneous provisions | 396 | 450 | 375 | 471 |
| **Other provisions** | **1,946** | **1,901** | **1,208** | **1,159** |

### 38.1 Changes in other provisions

| €m | Other employee benefits | Restructuring provisions | Technical reserves (insurance) | Aircraft maintenance | Tax provisions |
| --- | --- | --- | --- | --- | --- |
| Balance as at 1 January 2022 | 959 | 75 | 767 | 307 | 275 |
| Changes in consolidated group | 3 | 0 | 0 | −9 | 1 |
| Utilisation | −596 | −34 | −68 | −91 | −33 |
| Currency translation differences | 29 | 1 | 4 | 8 | 3 |
| Reversal | −50 | −21 | −25 | −5 | −50 |
| Unwinding of/changes in discount rate | −51 | 0 | −30 | −1 | 0 |
| Reclassification | 3 | 0 | 0 | 0 | 0 |
| Addition | 487 | 34 | 101 | 64 | 82 |
| **Balance as at 31 December 2022** | **784** | **55** | **749** | **273** | **278** |


Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 934 of 1025

CONSOLIDATED FINANCIAL STATEMENTS   NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL   Deutsche Post DHL Group –

The provision for other employee benefits primarily covers workforce reduction expenses such as severance payments, partial retirement, early retirement, stock appreciation rights (SARs) and jubilee payments. The decrease results primarily from higher utilisation compared to the previous year and lower additions to the obligations for partial retirement and pension plans in the United States.

Technical reserves (insurance) mainly consist of outstanding loss reserves and IBNR (incurred but not reported) reserves, ❯ Note 7.

The provision for aircraft maintenance relates to obligations for major aircraft and engine maintenance by third-party companies.

Of the tax provisions, €140 million (previous year: €131 million) relates to VAT, €31 million (previous year: €45 million) to customs and duties, and €107 million (previous year: €99 million) to other tax provisions.

Miscellaneous provisions, which include a large number of individual items, break down as follows:

| €m | 2021 | 2022 |
|---|---|---|
| Litigation costs of which non-current: 53 (previous year: 56) | 114 | 130 |
| Risks from business activities of which non-current: 35 (previous year: 6) | 45 | 129 |
| Miscellaneous other provisions of which non-current: 362 (previous year: 334) | 612 | 662 |
| **Miscellaneous provisions** | **771** | **921** |

**38.2  Maturity structure**

The maturity structure of the provisions recognised in the 2022 financial year is as follows:

| €m | Up to 1 year | More than 1 year to 2 years | More than 2 years to 3 years | More than 3 years to 4 years | More than 4 years to 5 years |
|---|---|---|---|---|---|
| **2022** | | | | | |
| Other employee benefits | 114 | 130 | 48 | 33 | 34 |
| Technical reserves (insurance) | 178 | 243 | 82 | 38 | 28 |
| Aircraft maintenance | 73 | 120 | 20 | 13 | 9 |
| Tax provisions | 278 | 0 | 0 | 0 | 0 |
| Restructuring provisions | 45 | 4 | 4 | 2 | 0 |
| Miscellaneous provisions | 471 | 183 | 70 | 47 | 34 |
| **Total** | **1,159** | **680** | **224** | **133** | **105** |

## 39  Financial liabilities

| €m | | Non-current | | Current |
|---|---|---|---|---|
| | 2021 | 2022 | 2021 | 2022 |
| Bonds | 6,167 | 5,680 | 502 | 500 |
| Amounts due to banks | 356 | 342 | 188 | 188 |
| Lease liabilities[1] | 9,841 | 11,316 | 1,964 | 2,198 |
| Liabilities at fair value through profit or loss | 1 | 5 | 12 | 129 |
| Other financial liabilities | 249 | 316 | 617 | 1,144 |
| **Financial liabilities** | **16,614** | **17,659** | **3,283** | **4,159** |

[1] Explanations under ❯ Note 41.

The amounts due to banks comprise mainly current overdraft facilities and long-term loans due to various banks. The amounts reported under liabilities at fair value through profit or loss relate mainly to the negative fair values of derivative financial instruments. Other financial liabilities includes the obligation of €275 million for the repurchases still to be carried out from tranche II of the share buy-back programme and the obligation of €138 million for the acquisition of the remaining shares in the Monta Group.

### Bonds

The 2012/2022 bond of Deutsche Post Finance B.V. was fully repaid in June 2022.

### Significant bonds

| | Nominal coupon % | Notional volume €m | Issuer | Carrying amount €m | Fa |
|---|---|---|---|---|---|
| Bond 2012/2022 | 2.950 | 500 | Deutsche Post Finance B.V. | 500 | |
| Bond 2012/2024 | 2.875 | 700 | Deutsche Post AG | 699 | |
| Bond 2013/2023 | 2.750 | 500 | Deutsche Post AG | 499 | |
| Bond 2016/2026 | 1.250 | 500 | Deutsche Post AG | 498 | |
| Bond 2017/2027 | 1.000 | 500 | Deutsche Post AG | 497 | |
| Bond 2018/2028 | 1.625 | 750 | Deutsche Post AG | 743 | |
| Bond 2020/2026 | 0.375 | 750 | Deutsche Post AG | 746 | |
| Bond 2020/2029 | 0.750 | 750 | Deutsche Post AG | 748 | |
| Bond 2020/2032 | 1.000 | 750 | Deutsche Post AG | 747 | |
| Convertible bond 2017/2025[1] | 0.050 | 1,000 | Deutsche Post AG | 974 | |

[1] Fair value of the debt component; the fair value of the convertible bond 2017/2025 is €956 million (previous year: €1,200 million).


Case 3:22-cv-07182-WHA   Document 39-1   Filed 10/18/23   Page 936 of 1025

CONSOLIDATED FINANCIAL STATEMENTS / NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG   Deutsche Post DHL Group –

**Convertible bond**

The convertible bond issued carries a conversion right that allows holders to convert the bond into a predetermined number of Deutsche Post AG shares.

In addition, Deutsche Post AG was granted a call option allowing it to repay the bond early at face value plus accrued interest if Deutsche Post AG's share price more than temporarily exceeds 130% of the conversion price applicable at that time. The convertible bond has a debt component and an equity component. In subsequent years, interest will be added to the carrying amount of the bond, up to the issue amount, using the effective interest method and recognised in profit or loss.

**Convertible bond**

|  | 2017/2025 |
|---|---|
| Issue date | 13 Dec. 2017 |
| Issue volume | €1 billion |
| Outstanding volume | €1 billion |
| Exercise period, conversion right | 13 Dec. 2020 to 13 June 2025[1] |
| Exercise period, call option | 2 Jan. 2023 to 10 June 2025 |
| Value of debt component at issue date[2] | €946 million |
| Value of equity component at issue date[3] | €53 million |
| Transaction costs (debt/equity component) | €4.7/€0.3 million |
| Conversion price at issue | €55.69 |
|  |  |
| Conversion price after adjustment[4] |  |
| in 2018 | €55.61 |
| in 2019 | €55.63 |
| in 2020 | €55.74 |
| in 2021 | €55.66 |
| in 2022 | €55.00 |

[1] Excluding possible contingent conversion periods according to the bond terms.
[2] Including transaction costs and call option granted.
[3] Recognised in capital reserves.
[4] After dividend payment.

## 40  Other liabilities

**€m**

|  | 2021 | 2022 |
|---|---|---|
| Tax liabilities | 1,622 | 1,709 |
| Incentive bonuses | 1,157 | 1,267 |
| Compensated absences | 446 | 517 |
| Contract liabilities of which non-current: 62 (previous year: 30) | 360 | 516 |
| Wages, salaries, severance payments | 342 | 343 |
| Deferred income of which non-current: 136 (previous year: 95) | 210 | 274 |
| Payables to employees and members of executive bodies | 241 | 240 |
| Social security liabilities | 210 | 212 |
| Postage stamps (contract liabilities) | 107 | 144 |
| Overtime claims | 128 | 138 |
| Debtors with credit balances | 149 | 135 |
| Insurance liabilities | 58 | 113 |
| Liabilities from cheques issued | 43 | 77 |
| Liabilities for damages of which non-current: 2 (previous year: 0) | 45 | 62 |
| Other compensated absences | 45 | 49 |
| COD liabilities | 54 | 43 |
| Liabilities from the sale of residential building loans of which non-current: 22 (previous year: 30) | 40 | 31 |
| Accrued insurance premiums for damages and similar liabilities | 18 | 21 |
| Accrued rentals | 14 | 16 |
| Miscellaneous other liabilities of which non-current: 99 (previous year: 149) | 1,153 | 926 |
| **Other liabilities** | **6,442** | **6,833** |
| of which current | 6,138 | 6,512 |
| non-current | 304 | 321 |

Of the tax liabilities, €7... relates to VAT, €767 mil... toms and duties and €2... to other tax liabilities.

Miscellaneous oth... individual items.

**Maturity structure**

There is no significant d... and the fair values of the... ities or near-market inte... rate risk because most... of interest at market ra...

**€m**

| | |
|---|---|
| Up to 1 year | |
| More than 1 year to 2 years | |
| More than 2 years to 3 year... | |
| More than 3 years to 4 year... | |
| More than 4 years to 5 year... | |
| More than 5 years | |
| **Other liabilities** | |

 Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 937 of 1025

CONSOLIDATED FINANCIAL STATEMENTS / NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –

# Lease disclosures

### 41   Lease disclosures

Currency translation income on lease liabilities totalled €41 million (previous year: €16 million), whilst the related expenses amounted to €51 million (previous year: €49 million). Gains from sale-and-leaseback transactions came in at €84 million (previous year: €105 million) with €39 million (previous year: €96 million) attributable to real estate development projects. The right-of-use assets carried as non-current assets resulting from leases are presented separately in the following table:

**Right-of-use assets**

€m

| | Land and buildings | Technical equipment and machinery | IT equipment, operating and office equipment | Aircraft | Transport equipment | Advance payments and assets under development | Total |
|---|---|---|---|---|---|---|---|
| **31 December 2021** | | | | | | | |
| Accumulated cost | 12,472 | 236 | 9 | 3,016 | 1,098 | 251 | **17,082** |
| of which additions | 2,116 | 24 | 1 | 543 | 310 | 86 | **3,080** |
| Accumulated depreciation and impairment losses | 4,318 | 117 | 7 | 961 | 511 | 0 | **5,914** |
| **Carrying amount** | **8,154** | **119** | **2** | **2,055** | **587** | **251** | **11,168** |
| **31 December 2022** | | | | | | | |
| Accumulated cost | 14,344 | 244 | 11 | 4,096 | 1,297 | 264 | **20,256** |
| of which additions | 2,260 | 40 | 3 | 987 | 366 | 83 | **3,739** |
| Accumulated depreciation and impairment losses | 5,462 | 132 | 7 | 1,202 | 613 | 0 | **7,416** |
| **Carrying amount** | **8,882** | **112** | **4** | **2,894** | **684** | **264** | **12,840** |

In the real estate area, office buildings and ma are predominantly dep segment. The additions fleet. Leased transport cle fleet. The real estate The Group had 77 real e of more than 20 years 79 leases). Aircraft leas 14 years. Leases may in

❯ **Note 7.** The leases ar wide range of different in the following table:

€m

| | |
|---|---|
| Non-current lease liabilities | |
| Current lease liabilities | |
| **Total** | |

Future cash outflows a €14 billion) as at the re cash outflows amounti lion) were not included sonably certain that th nated). Leases that the that have not yet comm outflows totalling €2.6 primarily result from th information on the les in ❯ **Note 12, 14, 18 and 4**

## Cash flow disclosures

### 42  Cash flow disclosures

The following table shows the reconciliation of changes in lia-
bilities arising from financing activities in accordance with the
IFRS requirements:

**Liabilities arising from financing activities**

| €m | Bonds | Amounts due to banks | Lease liabilities | Other financial liabilities[1] | Total |
|---|---|---|---|---|---|
| Balance as at 1 January 2021 | 7,410 | 479 | 10,459 | 324 | **18,672** |
| Cash changes[2] | −845 | 21 | −2,395 | 12 | **−3,207** |
| | | | | | |
| Non-cash changes | | | | | |
| Leases | 0 | 0 | 3,408 | 0 | **3,408** |
| Currency translation | 1 | 32 | 309 | 8 | **350** |
| Changes in consolidated group | 0 | 0 | 23 | 3 | **26** |
| Other changes | 103 | 12 | 1 | 14 | **130** |
| **Balance as at 31 December 2021/1 January 2022** | **6,669** | **544** | **11,805** | **361** | **19,379** |
| Cash changes[2] | −589 | −371 | −2,735 | −68 | **−3,763** |
| | | | | | |
| Non-cash changes | | | | | |
| Leases | 0 | 0 | 4,263 | 0 | **4,263** |
| Currency translation | 1 | 27 | 74 | 1 | **103** |
| Changes in consolidated group | 0 | 322 | 107 | 4 | **433** |
| Other changes | 99 | 8 | 0 | 447 | **554** |
| **Balance as at 31 December 2022** | **6,180** | **530** | **13,514** | **745** | **20,969** |

[1]  Differences from the financial liabilities presented in  **Note 39** (other financial liabilities and financial liabilities at fair value through profit or loss) in the amount of €849 million (previous year: €518 million) are due to factors presented in other cash flow items, e.g. derivatives or operating financial liabilities.

[2]  Differences in cash changes from the total amount of net cash used in financing activities (€−7,411 million; previous year: €−6,224 million) are due primarily to interest payments in addition to payments relating to equity transactions. The interest payments reported in the cash flow statement also include payments that do not relate to liabilities from financ-
ing activities.

As at the reporting date,
to the liabilities arising
cash flows from hedge
activities" cash flow iter

**42.1  Net cash from op**
At €10,965 million, net
€972 million higher th
lion. Income taxes paid
Cash inflow from the c
€215 million, compared
the prior year.

Non-cash income

**Non-cash income and**

| €m | |
|---|---|
| Expense from the remeasu | |
| Income from the remeasu | |
| Staff costs relating to equity share-based payments | |
| Net income from investment using the equity method | |
| Other | |
| **Non-cash income (−) and e** | |

### 42.2  Net cash used in investing activities

Net cash used in investing activities fell from €4,824 million to €3,179 million. Payments of €1,613 million were made for the acquisition of subsidiaries and other business units, primarily for the acquisition of Hillebrand in the net amount of €1,379 million. Cash paid to acquire property, plant and equipment and intangible assets increased by €176 million to €3,912 million. Investing activities focused on, for example, the ongoing expansion and renewal of the road vehicle and air fleet. Amongst other things, the sale of money market funds resulted in a cash inflow of €1,664 million from the change in current financial assets. In the previous year, the purchase of money market funds totalling €950 million was the primary contributor to cash outflow for the acquisition of current financial assets amounting to €1,508 million.

The assets acquired and liabilities assumed in the course of acquisitions of material and immaterial companies undertaken in the 2022 financial year are presented in the following table:

**Assets acquired and liabilities assumed**

| €m | 2022 |
| --- | --- |
| Non-current assets | 283 |
| Current assets (excluding cash and cash equivalents) | 547 |
| Cash and cash equivalents | 82 |
| Non-current provisions and liabilities | −422 |
| Current provisions and liabilities | −557 |

### 42.3  Net cash used in financing activities

At €7,411 million, net cash used in financing activities came in €1,187 million higher than the prior-year figure of €6,224 million. The repayment of non-current financial liabilities increased from €2,903 million to €3,169 million due to lease liabilities and the repayment of the 2012/2022 bond. The dividend payment to the shareholders also increased, rising by €532 million to €2,205 million. Share buy-backs led to payments in the amount of €1,099 million for the acquisition of treasury shares, thereby coming in slightly below the level of the previous year (€1,115 million).

## Other disclosures

## 43  Risks and financial instruments of the Group

### 43.1  Risk management

As a result of its operating activities, the Group is exposed to financial risks that may arise from changes in exchange rates, commodity prices and interest rates. Deutsche Post DHL Group manages these risks centrally through the use of non-derivative and derivative financial instruments. Derivatives are used exclusively to mitigate non-derivative financial risks, and fluctuations in their fair value should not be assessed separately from the underlying transaction.

The Group's internal risk guidelines govern the universe of actions, responsibilities and necessary controls regarding the use of derivatives. Financial transactions are recorded, assessed and processed using proven risk management software, which

also regularly documen[...] ships. Portfolios of deri[...] banks concerned.

To limit counterpar[...] Group may only enter in[...] banks. The conditions [...] assigned to the banks a[...] Board of Management [...] vals about existing fina[...] deployed to mitigate the[...] for and measured and h[...] ance with IFRS 9.

Disclosures regar[...] defined benefit retirem[...] found in ❯ Note 37.5.

**Liquidity managem[...]**

The ultimate objective o[...] solvency of Deutsche P[...] Consequently, liquidity [...] possible in cash pools a[...]

The centrally avail[...] ity), consisting of centr[...] committed credit lines, [...] is to have at least €2 bil[...]

As at 31 Decembe[...] reserves of €4 billion (p[...] central financial invest[...] dicated credit facility o[...]

The maturity structure of non-derivative financial liabilities within the scope of IFRS 7 based on cash flows is as follows:

**Maturity structure of financial liabilities**

| €m | Up to 1 year | More than 1 year to 2 years | More than 2 years to 3 years | More than 3 years to 4 years |
|---|---|---|---|---|
| **As at 31 December 2022** | | | | |
| Non-current financial liabilities[1] | 60 | 847 | 1,215 | 1,327 |
| Non-current lease liabilities | 0 | 2,244 | 1,916 | 1,610 |
| Other non-current financial liabilities | 0 | 7 | 6 | 4 |
| **Non-current financial liabilities** | **60** | **3,098** | **3,137** | **2,941** |
| Current financial liabilities | 1,846 | | | |
| Current lease liabilities | 2,662 | | | |
| Trade payables | 9,933 | | | |
| Other current financial liabilities | 409 | | | |
| **Current financial liabilities** | **14,850** | | | |
| **As at 31 December 2021** | | | | |
| Non-current financial liabilities[1] | 74 | 745 | 798 | 1,076 |
| Non-current lease liabilities | 0 | 1,993 | 1,603 | 1,350 |
| Other non-current financial liabilities | 0 | 8 | 7 | 6 |
| **Non-current financial liabilities** | **74** | **2,746** | **2,408** | **2,432** |
| Current financial liabilities | 1,321 | | | |
| Current lease liabilities | 2,355 | | | |
| Trade payables | 9,556 | | | |
| Other current financial liabilities | 339 | | | |
| **Current financial liabilities** | **13,571** | | | |

[1] The convertible bond 2025 is contained in the "More than 2 years to 3 years" range.

The maturity structure of the derivative financial instruments based on cash flows is as follows:

**Maturity structure of derivative financial instruments**

| €m | Up to 1 year | More than 1 year to 2 years | More than 2 years to 3 years | More than 3 years to 4 years |
|---|---|---|---|---|
| **As at 31 December 2022** | | | | |
| **Derivative receivables – gross settlement** | | | | |
| Cash outflows | −2,299 | −141 | −20 | −14 |
| Cash inflows | 2,369 | 168 | 29 | 23 |
| **Net settlement** | | | | |
| Cash inflows | 3 | 0 | 0 | 0 |
| **Derivative liabilities – gross settlement** | | | | |
| Cash outflows | −4,505 | −1 | −1 | 0 |
| Cash inflows | 4,399 | 1 | 1 | 0 |
| **Net settlement** | | | | |
| Cash outflows | −12 | −4 | 0 | 0 |
| **As at 31 December 2021** | | | | |
| **Derivative receivables – gross settlement** | | | | |
| Cash outflows | −2,944 | −15 | −1 | 0 |
| Cash inflows | 3,008 | 16 | 1 | 0 |
| **Net settlement** | | | | |
| Cash inflows | 8 | 0 | 0 | 0 |
| **Derivative liabilities – gross settlement** | | | | |
| Cash outflows | −1,195 | −20 | −19 | −6 |
| Cash inflows | 1,183 | 21 | 21 | 7 |
| **Net settlement** | | | | |
| Cash outflows | 0 | 0 | 0 | 0 |

The contract terms stipulate how the parties must meet their obligations arising from derivative financial instruments, either by net or by gross settlement.

**CURRENCY RISK AND CURRENCY MANAGEMENT**

The international business activities of Deutsche Post DHL Group expose it to currency risks from recognised or planned future transactions:

On-balance-sheet currency risks arise from the measurement and settlement of recognised foreign currency items if the exchange rate on the measurement or settlement date differs from the rate at initial recognition. The resulting foreign exchange differences directly impact profit or loss. In order to mitigate this impact as far as possible, all significant on-balance-sheet currency risks within the Group are centralised in Deutsche Post AG's in-house bank function. The centralised currency risks are aggregated by Corporate Treasury to calculate a net position per currency and hedged externally based on value-at-risk limits. The currency-related value at risk (95% / one-month holding period) for the portfolio totalled €6 million (previous year: €5 million) at the reporting date; the limit is currently a maximum of €5 million. The notional amount of the currency forwards and currency swaps used to manage on-balance-sheet currency risks amounted to €6,101 million at the reporting date (previous year: €4,078 million); the fair value was €−86 million (previous year: €46 million). Hedge accounting was not applied. Derivatives are accounted for as trading derivatives (free-standing derivatives).

Currency risks arise from planned foreign currency transactions if the future transactions are settled at exchange rates that differ from the originally projected rates. These currency risks are also captured centrally in Corporate Treasury. Currency risks from planned transactions and transactions with existing contracts are only hedged in selected cases. The relevant hedged items and derivatives used for hedging purposes are accounted for using cash flow hedge accounting. ❯ Note 43.3.

Currency risks also result from translating assets and liabilities of foreign operations into the Group's currency (translation risk). No translation risks were hedged at the reporting date.

Currency forwards and currency swaps in a notional amount of €7,130 million (previous year: €4,270 million) were outstanding at the reporting date. The corresponding fair value was €−55 million (previous year: €49 million).

Of the unrealised gains or losses from currency derivatives recognised in equity as at 31 December 2022, €20 million (previous year: €4 million) is expected to be recognised in profit or loss in the course of the following year.

IFRS 7 requires the disclosure of quantitative risk data, showing how profit or loss and equity are affected by changes in exchange rates at the reporting date. The impact of these changes in exchange rates on the portfolio of foreign currency financial instruments is assessed by means of a value-at-risk

calculation (95% confi[dence]... assumed that the portf... ative for the full year. T... basis for the sensitivity...

Primary financial... by Group companies are... bank. Deutsche Post A... and guarantees these... related changes therefo... equity of the Group com... permitted to participat... their currency risks fro... hedged locally through... have no impact on the C...

The following tab... value at risk:

**Risk data on currency risk**

€m

| | 2021 | | |
|---|---|---|---|
| | Profit or loss effects | Equity effects | |
| Primary financial instruments and free-standing derivatives | 4 | | |
| Derivative instruments (cash flow hedges) | | 5 | |
| Total value at risk[1] | | 6 | |

[1] The total amount is lower than the sum of the individual amounts, owing to interdependencies.

**INTEREST RATE RISK AND INTEREST RATE MANAGEMENT**

As at the reporting date, interest rate hedging instruments with a notional amount of €500 million (previous year: €0 million) and a fair value of €57 million (previous year: €0 million) were outstanding and are accounted for as cash flow hedges, ❯ Note 43.3.

If the interest rates underlying the derivatives had been 100 basis points higher as at the reporting date, this would have increased fair values and equity by €30 million (previous year: €0 million). A corresponding decrease in the interest rates would have had an effect of €−33 million (previous year: €0 million). The proportion of financial liabilities with short-term interest lock-ins, ❯ Note 39, amounts to 19% (previous year: 16%) of the total financial liabilities as at the reporting date. The effect of potential interest rate changes on the Group's financial position remains insignificant.

**MARKET RISK**

Most of the risks arising from commodity price fluctuations, in particular fluctuating prices for kerosene and marine diesel fuels, were passed on to customers via operating measures. As the impact of the related fuel surcharges is delayed by one to two months, earnings may be affected temporarily if there are significant short-term fuel price variations.

The remaining fuel price risk is partly hedged with swap transactions in the notional amount of €1 million (previous year: €13 million) and a fair value of €1 million (previous year: €7 million) running until the end of 2023.

Commodity price risks also result from the ongoing purchase of natural gas. Swap transactions with a notional amount of €24 million (previous year: €0 million) were outstanding as at the reporting date. The corresponding fair value was €−9 million (previous year: €0 million). A 10% increase in the commodity prices underlying the derivatives as at the reporting date would have increased fair values and equity by €1 million (previous year: €2 million). A corresponding decline in commodity prices would have had the opposite effect.

The Group received share price options as part of the conclusion of contracts from operational and M&A transactions. As at the reporting date, share price options with a notional amount of €252 million (previous year: €0 million) and a term of two to six years were outstanding. The corresponding fair value was €33 million (previous year: €0 million).

A 10% increase in the share prices underlying the derivatives as at the reporting date would have thus increased fair values and the financial result by €8 million (previous year: €0 million). A corresponding decrease in the share prices would have had an effect of €−7 million (previous year: €0 million).

**CREDIT RISK**

Credit risk arises for the Group from operating activities and from financial transactions. The aggregate carrying amount of financial assets represents the maximum default risk.

In an effort to minimise credit risk from operating activities and financial transactions, counterparties are assigned individual limits, the utilisation of which is regularly monitored. The Group's heterogeneous customer structure means that there is no risk concentration. Financial transactions are only entered into with prime-rated counterparties. A test is performed at the reporting dates to establish whether an impairment loss needs to be charged on financial assets and the positive fair values of derivatives due to changes in credit quality. This was not the case for any of the counterparties as at 31 December 2022.

The credit risk of financial assets arising from operations is managed by the divisions.

As a rule, the expected credit loss associated with financial assets must be determined. Based on the expected credit loss model (impairment model), a loss allowance must be anticipated for the possible credit loss, ❯ Note 7.

The impairment model is applicable to non-current and current debt instruments recognised at amortised cost and to lease receivables. Debt instruments comprise mainly deposits, collateral provided and loans to third parties.

The gross amount
ment model are pres

**Stage 1 – 12-month EC**

€m

| |
|---|
| Balance as at 1 January 20 |
| Newly originated financial assets |
| Impairment loss |
| Disposal |
| Reversal of loss allowance |
| Increase in loss allowance |
| Currency translation differences |
| Changes in consolidated group/reclassifications |
| **Balance as at 31 December 2021/ 1 January 2022** |
| Newly originated financial assets |
| Impairment loss |
| Disposal |
| Reversal of loss allowance |
| Increase in loss allowance |
| Currency translation differences |
| Changes in consolidated group/reclassifications |
| **Balance as at 31 December 2022** |

No cash flows from deb
cial year and no chang
ing risk parameters. Th

All debt instruments and lease receivables were recognised in Stage 1 at the reporting date; they were neither past due nor impaired. There were no indications at the reporting date of any poor performance of the debt instruments and lease receivables. There was no reclassification between the stages in the financial year.

Trade receivables from customer relationships amounting to €12,253 million were due within one year at the reporting date (previous year: €11,683 million). They are held primarily with the aim of collecting the principal amount of the receivables. These items are therefore assigned to the "held to collect contractual cash flows" business model and measured at amortised cost. Trade receivables changed as follows:

### Changes in receivables

| €m | 2021 | 2022 |
|---|---|---|
| **Gross receivables** | | |
| Balance as at 1 January | 9,213 | 11,971 |
| Changes | 2,758 | 610 |
| **Balance as at 31 December** | **11,971** | **12,581** |
| | | |
| **Loss allowances** | | |
| Balance as at 1 January | −228 | −288 |
| Changes | −60 | −40 |
| **Balance as at 31 December** | **−288** | **−328** |
| **Carrying amount as at 31 December** | **11,683** | **12,253** |

The following table provides an overview of loss rates by age band that were used in the Group for the financial year under review:

### Loss rates by age band

| % | 2021 | 2022 |
|---|---|---|
| 1 to 60 days | 0.1–0.2 | 0.03–1.3 |
| 61 to 120 days | 1.4–3.1 | 0.8–22.4 |
| 121 to 180 days | 8.0–25.0 | 6.0–56.0 |
| 181 to 360 days | 40.0–75.0 | 19.0–100.0 |
| More than 360 days | 80.0–100.0 | 80.0–100.0 |

Trade receivables are derecognised when a reasonable assessment indicates they are no longer recoverable. The relevant indicators include a delay in payment of more than 360 days.

In the 2022 financial year, there were factoring agreements in place that obliged the banks to purchase existing and future trade receivables. The banks' purchase obligations were limited to a maximum portfolio of receivables of €501 million (previous year: €616 million). Deutsche Post DHL Group can decide at its discretion whether, and to what extent, the revolving notional volume is utilised. The risks relevant to the derecognition of the receivables include credit risk and the risk of delayed payment (late payment risk).

Credit risk represents primarily all the risks and rewards associated with ownership of the receivables. This risk is transferred in full to the bank against payment of a fixed fee for doubtful accounts. A significant late payment risk does not exist. All of the receivables were therefore derecognised. In the 2022 financial year, the Group recognised programme fees (interest, allowances for doubtful accounts) of €0.5 million (previous year: €2 million) as an expense in the context of its continuing exposure. The notional volume of receivables factored as at 31 December 2022 amounted to €15 million (previous year: €90 million).

### 43.2  Collateral

**Collateral provided**

**€m**

| Non-current collateral | | |
| of which for assets for the s... | | |
| residential buildin... | | |
| for sureties paid | | |
| Current collateral | | |
| of which for restricted cash | | |
| for sureties paid | | |

The collateral provided restricted cash.

### 43.3  Derivative financ...

**FAIR VALUE HEDGES**

There were no fair value the previous year.

**CASH FLOW HEDGES**

The Group uses currenc... the cash flow risk from... nue and expenses. The... wards and currency swa... year: €192 million) at a... €3 million). The hedged... by 2028.

The following tabl... at the reporting date in... positions and their weig...

 Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 945 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL  Deutsche Post DHL Group –

**Notional volume of hedging instruments**

€m

| | | Remaining term | |
| | Total notional volume | Up to 1 year | 1 year to 5 years |
|---|---|---|---|
| **31 December 2022** | | | |
| Hedges of currency risk | | | |
| Currency forwards buy EUR/GBP | 546 | 546 | |
| Currency forwards sell EUR/CZK | 364 | 204 | 158 |
| Currency forwards buy EUR/HUF | 47 | 47 | |
| **31 December 2021** | | | |
| Hedges of currency risk | | | |
| Currency forwards buy EUR/CZK | 132 | 65 | 66 |
| Currency forwards sell EUR/USD | 21 | 21 | |
| Currency forwards buy USD/CNY | 16 | 16 | |

Interest rate risks from the planned refinancing of a maturing bond were hedged via payer interest rate swaps with a term until 2031. The notional amount of the swaps as at the reporting date was €500 million (previous year: €0 million) at a fair value of €57 million (previous year: €0 million).

In addition, as part of cash flow hedging, fuel and natural gas price risks were hedged with corresponding swap transactions in the notional amount of €25 million (previous year: €13 million) and a fair value of €−8 million (previous year: €7 million) running until the end of 2024. Only the product price component of the fuel price was designated as the hedged item. In the financial year under review, €17 million in realised gains from cash flow hedges for fuel and natural gas price risk were recognised in materials expense.

The total gains and losses on open hedging instruments recognised in equity at the reporting date amounted to €82 million (previous year: €10 million).

As in the previous year, carrying amounts of derivative assets amounting to €91 million (previous year: €11 million) and derivative liabilities amounting to €−10 million (previous year: €−1 million) included in cash flow hedges did not result in

**Reserve for cash flow hedges**

€m

| | 2021 | OCI I Effective portion of the hedge |
|---|---|---|
| Balance as at 1 January | −20 | 12 |
| Gains and losses on effective hedges | 28 | 70 |
| Reclassification due to the recognition of hedged items | 2 | −10 |
| **Balance as at 31 December[1]** | **10** | **72** |

[1] Excluding deferred taxes.

ineffectiveness within the period. This is because the changes in the fair value of the hedged items (€−60 million) and hedging transactions (€60 million) offset each other (previous year: €30 million and €−30 million, respectively).

**NET INVESTMENT HEDGES**

Currency risks resulting from the translation of foreign operations were not hedged in 2022. At the reporting date, there was still a positive amount of €25 million from terminated net investment hedges in th
previous year.

**43.4  Additional disclo
used in the Group**

The Group classifies fina
balance sheet items. T
cial instruments to the
reporting date:

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 946 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST    Deutsche Post DHL Group –

**Reconciliation of carrying amounts in accordance with IFRS 9 and level classification**

€m

| | 31 December 2021 | | | | | | | 31 De |
| | | | | | Level classification financial instruments within the scope of IFRS 9 | | | | |
| | Carrying amount | Financial instruments within the scope of IFRS 9 | Other financial instruments outside IFRS 9[1] | IFRS 7 fair value | Level 1 | Level 2 | Level 3 | Carrying amount | Financial instruments within the scope of IFRS 9 | Other financial instrume outsi IFR |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| **Debt instruments measured at cost** | **17,724** | **17,157** | **567** | **846** | | **436** | | **18,579** | **17,889** | 6 |
| Non-current financial assets | 834 | 424 | 410 | 846 | | 436 | | 788 | 263 | 5 |
| Current financial assets[2] | 1,257 | 1,100 | 157 | n.a. | | | | 1,272 | 1,106 | 1 |
| Other current assets[2] | 419 | 419 | | n.a. | | | | 476 | 476 | |
| Trade receivables[2] | 11,683 | 11,683 | | n.a. | | | | 12,253 | 12,253 | |
| Cash and cash equivalents[2] | 3,531 | 3,531 | | n.a. | | | | 3,790 | 3,790 | |
| **Equity instruments at fair value through other comprehensive income** | **46** | **46** | | **46** | **46** | | | **65** | **65** | |
| Non-current financial assets | 46 | 46 | | 46 | 46 | | | 65 | 65 | |
| Reserve for equity instruments without recycling | 46 | 46 | | 46 | 46 | | | 65 | 65 | |
| Current financial assets | | | | | | | | | | |
| Reserve for equity instruments without recycling | | | | | | | | | | |
| **Debt instruments and equity instruments at fair value through profit or loss** | **2,141** | **2,141** | | **2,141** | **2,072** | **69** | | **446** | **446** | |
| Non-current financial assets | 310 | 310 | | 310 | 310 | 0 | | 363 | 363 | |
| Debt instruments | 309 | 309 | | 309 | 309 | | | 261 | 261 | |
| Equity instruments | 1 | 1 | | 1 | 1 | | | 1 | 1 | |
| Fair value option | | | | | | | | | | |
| Trading derivatives | | | | | | | | 33 | 33 | |
| Derivatives designated as hedges | 0 | 0 | | 0 | | 0 | | 68 | 68 | |
| Current financial assets | 1,831 | 1,831 | | 1,831 | 1,762 | 69 | | 83 | 83 | |
| Debt instruments | 1,762 | 1,762 | | 1,762 | 1,762 | | | 23 | 23 | |
| Trading derivatives | 58 | 58 | | 58 | | 58 | | 37 | 37 | |
| Derivatives designated as hedges | 11 | 11 | | 11 | | 11 | | 23 | 23 | |
| **Not IFRS 7** | **3,756** | | | **n.a.** | | | | **3,654** | | |
| Other non-current assets | 587 | | | n.a. | | | | 581 | | |
| Other current assets | 3,169 | | | n.a. | | | | 3,073 | | |
| **TOTAL ASSETS** | **23,667** | **19,344** | **567** | **3,033** | **2,118** | **505** | | **22,744** | **18,400** | 6 |

| | 31 December 2021 | | | | Level classification financial instruments within the scope of IFRS 9 | | | 31 De | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Carrying amount | Financial instruments within the scope of IFRS 9 | Other financial instruments outside IFRS 9[1] | IFRS 7 fair value | Level 1 | Level 2 | Level 3 | Carrying amount | Financial instruments within the scope of IFRS 9 | Other financial instruments outside IFR... |
| **EQUITY AND LIABILITIES** | | | | | | | | | | |
| **Liabilities measured at cost** | **29,853** | **18,048** | **11,805** | **7,343** | **6,689** | **653** | | **32,049** | **18,535** | **13,5...** |
| Non-current financial liabilities[3] | 16,613 | 6,772 | 9,841 | 7,313 | 6,689 | 623 | | 17,655 | 6,339 | 11,3... |
| Other non-current liabilities | 30 | 30 | | 30 | | 30 | | 22 | 22 | |
| Current financial liabilities[2] | 3,271 | 1,307 | 1,964 | n.a. | | | | 4,030 | 1,832 | 2,1... |
| Trade payables[2] | 9,556 | 9,556 | | n.a. | | | | 9,933 | 9,933 | |
| Other current liabilities[2] | 383 | 383 | | n.a. | | | | 409 | 409 | |
| **Liabilities at fair value through profit or loss** | **13** | **13** | | **13** | | **13** | | **134** | **134** | |
| Non-current financial liabilities[3] | 1 | 1 | | 1 | | 1 | | 5 | 5 | |
|   Earn-out obligation | | | | | | | | | | |
|   Trading derivatives | | | | | | | | | | |
|   Derivatives designated as hedges | 1 | 1 | | 1 | | 1 | | 5 | 5 | |
| Current financial liabilities | 12 | 12 | | 12 | | 12 | | 129 | 129 | |
|   Earn-out obligation | | | | | | | | | | |
|   Trading derivatives | 12 | 12 | | 12 | | 12 | | 123 | 123 | |
|   Derivatives designated as hedges | 0 | 0 | | 0 | | 0 | | 6 | 6 | |
| **Not IFRS 7** | **6,029** | | | **n.a.** | | | | **6,402** | | |
| Other non-current liabilities | 274 | | | n.a. | | | | 299 | | |
| Other current liabilities | 5,755 | | | n.a. | | | | 6,103 | | |
| **TOTAL EQUITY AND LIABILITIES** | **35,895** | **18,061** | **11,805** | **7,356** | **6,689** | **666** | | **38,585** | **18,669** | **13,5...** |

[1] Relates to lease receivables or liabilities.

[2] The fair value is assumed to be equal to the carrying amount (IFRS 7.29a). Levels are not disclosed for these financial instruments.

[3] The Deutsche Post AG and Deutsche Post Finance B.V. bonds included in non-current financial liabilities are carried at amortised cost. The convertible bond issued by Deutsche Post AG in December 2017 had a fair value of the debt component at the reporting date was €914 million. The convertible bond issued by Deutsche Post AG in December 2017 had a fair value of €1,200 million as at 31 December 2021. The fair value of the debt com...

If there is an active market for a financial instrument (e.g. a stock exchange), its fair value is determined by reference to the market or quoted exchange price at the reporting date. If no fair value is available in an active market, quoted market prices for similar instruments or recognised valuation models are used to determine fair value.

IFRS 13 requires financial assets to be assigned to the appropriate level of the fair value hierarchy:

Level 1 comprises equity and debt instruments measured at fair value and debt instruments measured at amortised cost whose fair values can be determined based on quoted market prices.

In addition to financial assets and financial liabilities measured at amortised cost, commodity, interest rate and currency derivatives are reported under Level 2. The fair values of assets measured at amortised cost are determined using the multiplier method, amongst other things. The fair values of the derivatives are measured on the basis of discounted expected future cash flows, taking into account forward rates for currencies, interest rates and commodities (market approach). For this purpose,

price quotations observable in the market (exchange rates, interest rates and commodity prices) are imported from standard market information platforms into the treasury management system. The price quotations reflect actual transactions involving similar instruments on an active market. All significant inputs used to measure derivatives are observable in the market.

As at the reporting date, a call option and warrants are recognised under Level 3 which entitle the holder to acquire further shares in the company. The fair values of the derivative financial instruments are determined on the basis of the Black Scholes option pricing model. If possible, parameters observable on the market or derived from market data are used to determine the value. A volatility of 41% is taken into account for the call option and a volatility of 39% for the warrants. The volatilities are based on the volatilities of a comparable group of companies. No major fluctuations in earnings are to be expected with regard to the call option in future. Because the warrants are based on a listed underlying share, there could be earnings fluctuations in the subsequent years.

**Unobservable inputs (Level 3)**

€m

| | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|
| | Assets | | Liabilities | Assets | | Liabilities |
| | Equity instruments | Debt instruments | Derivatives, of which equity derivatives | Equity instruments | Debt instruments | Derivatives, of which equity derivatives |
| Balance as at 1 January | 0 | 0 | 0 | 0 | 0 | 0 |
| Profit recognised in the income statement | 0 | 0 | 0 | 18 | 0 | 0 |
| Losses recognised in the income statement | 0 | 0 | 0 | −43 | 0 | 0 |
| Additions | 0 | 0 | 0 | 58 | 0 | 0 |
| Disposal | 0 | 0 | 0 | 0 | 0 | 0 |
| Currency translation effects | 0 | 0 | 0 | 0 | 0 | 0 |
| **Balance as at 31 December** | **0** | **0** | **0** | **33** | **0** | **0** |



**CONSOLIDATED FINANCIAL STATEMENTS** / **NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG** Deutsche Post DHL Group –

The following tables show the impact of netting agreements based on master netting arrangements or similar agreements on financial assets and financial liabilities as at the reporting date:

**Offsetting – assets**

€m

| | Gross amount of assets | Gross amount of liabilities offset | Recognised net amount of assets offset | Assets and<br>Liabilities that do not meet offsetting criteria |
|---|---|---|---|---|
| **As at 31 December 2022** | | | | |
| Derivative financial assets | 128 | 0 | 128 | 64 |
| Trade receivables | 12,281 | 28 | 12,253 | 0 |
| Funds | 578 | 562 | 16 | 0 |
| **As at 31 December 2021** | | | | |
| Derivative financial assets | 69 | 0 | 69 | 12 |
| Trade receivables | 11,793 | 110 | 11,683 | 12 |
| Funds | 550 | 462 | 88 | 0 |

**Offsetting – liabilities**

€m

| | Gross amount of liabilities | Gross amount of assets offset | Recognised net amount of liabilities offset | Assets and<br>Assets that do not meet offsetting criteria |
|---|---|---|---|---|
| **As at 31 December 2022** | | | | |
| Derivative financial liabilities | 134 | 0 | 134 | 64 |
| Trade payables | 9,961 | 28 | 9,933 | 0 |
| Funds | 562 | 562 | 0 | 0 |
| **As at 31 December 2021** | | | | |
| Derivative financial liabilities | 13 | 0 | 13 | 12 |
| Trade payables | 9,666 | 110 | 9,556 | 18 |
| Funds | 462 | 462 | 0 | 0 |

To hedge cash flow and fair value risks, Deutsche Post AG enters into financial derivative transactions with a large number of financial services institutions. These contracts are subject to a standardised master agreement for financial derivative transactions. This agreement provides for a conditional right of offset, resulting in the recognition of the gross amount of the financial derivative transactions at the reporting date. The conditional right of offset is presented in the tables.

Settlement processes arising from services related to postal deliveries are subject to the Universal Postal Convention and the Letter-mail INTERCONNECT Remuneration Agreement Europe (LIRAE). These agreements, particularly the settlement conditions, are binding on all public postal operators in respect of the specified contractual arrangements. Imports and exports between the parties to the agreement during a calendar year are summarised in an annual statement of account and presented on a net basis in the final annual statement. Receivables and payables covered by the Universal Postal Convention and the LIRAE are presented on a net basis at the reporting date. In addition, funds are presented on a net basis if a right of offset exists in the normal course of business. The tables show the receivables and payables before and after offsetting.

### 44  Contingent liabilities and other financial obligations

In addition to provisions and liabilities, the Group has contingent liabilities and other financial obligations. The contingent liabilities are broken down as follows:

**Contingent liabilities**

| € m | | |
| --- | --- | --- |
| | 2021 | 2022 |
| Guarantee obligations | 132 | 119 |
| Warranties | 8 | 11 |
| Liabilities from litigation risks | 213 | 258 |
| Other contingent liabilities | 470 | 523 |
| **Total** | **823** | **911** |

The obligation for settlement payments in the United States, which was still recognised here in the previous year, no longer applies due to new estimates. In addition, contingent liabilities include tax-related obligations.

Other financial obligations such as the purchase obligation for investments in non-current assets amounted to €2,668 million (previous year: €1,190 million). The relates primarily to the delivery of additional cargo aircraft as well as obligations from fleet management.

### 45  Litigation

Many of the postal services rendered by Deutsche Post AG and its subsidiaries (particularly the Post & Parcel Germany division) are subject to sector-specific regulation on the basis of the German Postal Act *(Postgesetz)* by the German federal network agency *(Bundesnetzagentur)*. The German federal network agency approves or reviews prices, formulates the terms of downstream access, has special supervisory powers to combat market abuse and guarantees the provision of universal postal services. This general regulatory risk could lead to a decline in revenue and earnings in the event of negative decisions.

Revenue and earn... cedure used to determin... mail. Approval of the ra... 31 December 2024 was... agency on 29 April 2022... filed an action with the C... price cap approval of the... years 2022 to 2024. Th...

The aforemention... service providers and c... approval granted as par... 2019 to 2021. In a ruling... Administrative Court on... to 2021 in relation to the... providers as a result of... Court from 27 May 202... text of the underlying le... rectified by the German... the German Postal Act... Cologne Administrative... ers because they had ex... has not yet ruled on the... because the proceeding... additional application to... 2019 to 2021 was also... Court. The association... Federal Administrative... were completely unsuc... Administrative Court; t... tive Court are still pend...

The rulings of the Cologne Administrative Court from 17 August 2022 are only applicable to the legal relationships with the respective plaintiffs and have no legal impact vis-à-vis other consumers.

One postal service provider, which had also filed an action against the pricing approval for the years 2019 to 2021 with the Cologne Administrative Court, also filed a civil suit for repayment of allegedly excessive conveyance fees for standard letters delivered in 2017. The action is based primarily on the claim that Deutsche Post charged postage whose approval is unlawful pursuant to the ruling of the Federal Administrative Court from 27 May 2020. The action was denied by the Cologne District Court in a ruling from 17 June 2021. The cartel court of this ruling on 6 April 2022 and did not permit any further appeals of the ruling. On 2 May 2022, the plaintiff submitted an appeal against non-permission with Germany's Federal Court of Justice to have its appeal allowed.

Possible negative effects on Deutsche Post of these court rulings and the proceedings underway cannot be ruled out.

Since 1 July 2010, as a result of the revision of the relevant tax exemption provisions, the VAT exemption has only applied to those specific universal services in Germany which are not subject to individually negotiated agreements or provided on special terms (discounts etc.). Deutsche Post AG and the tax authorities hold different opinions on the VAT treatment of certain products. In the interest of resolving these issues, proceedings have been initiated by Deutsche Post AG at the tax court with jurisdiction in this matter, ❯ Note 44.

In view of the ongoing or announced legal proceedings mentioned above, no further details are given on their presentation in the financial statements.

## 46  Share-based payment

Assumptions regarding the price of Deutsche Post AG's shares and assumptions regarding employee fluctuation are taken into account when measuring the value of share-based payments for executives. All assumptions are reviewed on a quarterly basis. The staff costs are recognised pro rata in profit or loss to reflect the services rendered as consideration during the vesting period (lock-up period). In the financial year, a total of €140 million (previous year: €184 million) was recognised for share-based payments, €40 million (previous year: €105 million) of which were cash-settled and €100 million (previous year: €79 million) of which were equity-settled.

### 46.1  Share-based payment for executives
     (Share Matching Scheme)

Under the share-based payment system for executives (Share Matching Scheme), certain executives receive part of their variable remuneration for the financial year in the form of shares of Deutsche Post AG in the following year (deferred incentive shares). All Group executives can specify an increased equity component individually by converting a further portion of their variable remuneration for the financial year (investment shares). After a four-year lock-up period during which the executive must be employed by the Group, they again receive the same number of Deutsche Post AG shares (matching shares). Assumptions are

made regarding the co…
respect to their relevan…
arrangements are enter…
respective year and 1 A…
dates for each year's tra…
and matching shares ar…
payments, investment…
ments and the debt an…
separately. However, i…
debt component is mea…
Matching Scheme. The…
as cash-settled share-b…

Of the expenses…
€57 million (previous…
equity-settled share-ba…
to cash-settled paymen…
€54 million), all of whic…

Additional informa…
rights can be found in ❯…

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 952 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG          Deutsche Post DHL Group –

**Share Matching Scheme**

|  |  | 2017 tranche | Alternative programme 2018 tranche | 2019 tranche | 2020 tranche |
|---|---|---|---|---|---|
| Grant date of deferred incentive shares and associated matching shares |  | 1 December 2017 | – | 1 December 2019 | 1 December 2020 |
| Grant date of matching shares awarded for investment shares |  | 1 April 2018 | 1 March 2019 | 1 April 2020 | 1 April 2021 |
| Term | months | 52 | 52 | 52 | 52 |
| End of term |  | March 2022 | June 2023 | March 2024 | March 2025 |
| Share price at grant date (fair value) |  |  |  |  |  |
| Deferred incentive shares and associated matching shares | € | 39.26 | n.a. | 33.29 | 40.72 |
| Matching shares awarded for investment shares | € | 34.97 | 27.30 | 23.83 | 46.52 |
| Number of deferred incentive shares | thousands | 256 | n.a. | 369 | 246 |
| Number of matching shares expected |  |  |  |  |  |
| Deferred incentive shares | thousands | 230 | n.a. | 332 | 222 |
| Investment shares | thousands | 864 | 854 | 1,343 | 1,007 |
| Matching shares issued | thousands | 1,057 |  |  |  |

[1]  Estimated provisional amount; the final amount will be determined on 1 April 2023.
[2]  Expected number.

### 46.2  Long-Term Incentive Plan (2006 LTIP) for members of the Board of Management

Since the 2006 financial year, the company has granted members of the Board of Management cash remuneration linked to the company's long-term share price performance through the issue of stock appreciation rights (SARs) as part of a Long-Term Incentive Plan (LTIP). Participation in the LTIP requires Board of Management members to make a personal investment of 10% of their annual base salary by the grant date of each tranche, primarily in shares.

The SARs granted can be fully or partly exercised after the expiration of a four-year lock-up period at the earliest, provided absolute or relative performance targets have been achieved at the end of this lock-up period. After expiration of the lock-up period, the SARs must be exercised within a period of two years (exercise period); any SARs not exercised expire.

How many, if any, of the SARs granted can be exercised is determined in accordance with four (absolute) performance targets based on the share price and two (relative) performance targets based on a benchmark index. One-sixth of the SARs granted are earned each time the closing price of Deutsche Post shares exceeds the issue price by at least 10, 15, 20 or 25% at the end of the waiting period (absolute performance targets). Both relative performance targets are tied to the performance of the shares in relation to the STOXX Europe 600 Index (SXXP; ISIN EU0009658202). They are met if the share price equals the index performance or if it outperforms the index by more than 10%. Performance is determined by comparing the average price of

Deutsche Post shares ar[...]
ence and a performance[...]
the last 20 consecutive[...]
performance period is t[...]
the lock-up period. The[...]
the average closing pri[...]
Börse AG's Xetra tradin[...]
mance targets are not m[...]
SARs attributable to th[...]
compensation. Each SA[...]
ment member to receive[...]
the five trading days pre[...]
price of the SAR.


Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 953 of 1025

CONSOLIDATED FINANCIAL STATEMENTS  NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST DHL  Deutsche Post DHL Group –

**LTIP 2006**

|  | Issue date | Issue price € | Waiting period expires |
|---|---|---|---|
| 2017 tranche | 1 September 2017 | 34.72 | 31 August 2021 |
| 2018 tranche | 1 September 2018 | 31.08 | 31 August 2022 |
| 2019 tranche | 1 September 2019 | 28.88 | 31 August 2023 |
| 2020 tranche | 1 September 2020 | 37.83 | 31 August 2024 |
| 2021 tranche | 1 September 2021 | 58.68 | 31 August 2025 |
| 2022 tranche | 1 September 2022 | 39.06 | 31 August 2026 |

The Board of Management members received a total of 1,176,006 SARs (previous year: 862,272 SARs) with a total value, at the time of issue, of €9.3 million (previous year: €8.3 million).

A stochastic simulation model is used to determine a fair value for the SARs from the 2006 LTIP. The result in the 2022 financial year was an income of €24 million (previous year: expense of €52 million) and a provision at the reporting date of €14 million (previous year: €44 million). The provision for the rights exercisable by the Board of Management amounted to €4 million at the reporting date (previous year: €14 million).

For further disclosures on share-based payment for members of the Board of Management, see ❯ **Note 47.2.**

**46.3  Performance Share Plan (PSP) for executives**
The Annual General Meeting on 27 May 2014 resolved to introduce the Performance Share Plan (PSP) for executives. Under the PSP, shares are issued to participants at the end of the waiting period. The granting of the shares at the end of the waiting period is linked to the achievement of demanding performance targets. The performance targets under the PSP are identical to the performance targets under the LTIP for members of the Board of Management.

Performance Share Units (PSUs) were issued to selected executives for the first time on 1 September 2014. It is not planned that members of the Board of Management will participate in the PSP. The Long-Term Incentive Plan (2006 LTIP) for members of the Board of Management remains unchanged.

In the consolidated financial statements as at 31 December 2022, a total of €27 million (previous year: €25 million) has been appropriated to capital reserves for the purposes of the plan, with an equal amount recognised in staff costs.

The value of the PSP is measured using actuarial methods based on option pricing models (fair value measurement). Future dividends were taken into account, based on a moderate increase in dividend distributions over the respective measurement period.

The average remaining maturity of the outstanding PSUs as at 31 December 2022 was 25 months.


## Performance Share Plan

|  | 2018 tranche | 2019 tranche | 2020 tranche |
|---|---|---|---|
| Grant date | 1 September 2018 | 1 September 2019 | 1 September 2020 |
| Exercise price | 31.08 € | 28.88 € | 37.83 € |
| Waiting period expires | 31 August 2022 | 31 August 2023 | 31 August 2024 |
| Risk-free interest rate | −0.39% | −0.90% | −0.72% |
| Initial dividend yield of Deutsche Post shares | 3.70% | 3.98% | 3.57% |
| Yield volatility of Deutsche Post shares | 22.39% | 21.38% | 24.89% |
| Yield volatility of Dow Jones EURO STOXX 600 Index | 16.29% | 14.79% | 16.62% |
| Covariance of Deutsche Post shares to Dow Jones EURO STOXX 600 Index | 2.66% | 2.21% | 3.05% |
| **Number** |  |  |  |
| Rights outstanding as at 1 January 2022 | 2,952,402 | 3,326,664 | 2,596,194 |
| Rights granted | 0 | 0 | 0 |
| Rights lapsed | 1,500,240 | 114,534 | 91,956 |
| Rights settled at the end of the waiting period | 1,452,162 | 0 | 0 |
| Rights outstanding as at 31 December 2022 | 0 | 3,212,130 | 2,504,238 |

### 46.4 Employee Share Plan (ESP) for executives

The Employee Share Plan (ESP) was introduced for another selected group of executives starting on 1 September 2021. Participation in the ESP is voluntary. Executives participating in the ESP can acquire shares of Deutsche Post AG at a discount of 25% from the market price, up to an annual cap of €10,000 or €15,000, depending on their level. The ESP is offered quarterly. Prior to every savings period, the participating executives can choose the share of their remuneration they wish to invest in the ESP during the upcoming three-month savings period. At the beginning of the following quarter, executives receive shares at a discount of 25% from the market price. The shares acquired under the ESP are subject to a two-year lock-up period.

In the consolidated financial statements as at 31 December 2022, a total of €16 million (previous year: €3 million) has been appropriated to capital reserves for the purposes of the ESP, with an equal amount recognised in staff costs.

## 47  Related-party disclosures

### 47.1  Related-party disclosures (companies and Federal Republic of Germany)

All companies that are controlled by the Group or with which a joint arrangement exists, or over which the Group can exercise significant influence, are recorded in the 🔴 List of shareholdings.

Deutsche Post AG maintains a variety of relationships with the Federal Republic of Germany (Federal Republic) and other companies controlled by the Federal Republic of Germany.

The Federal Republic is a customer of Deutsche Post AG and as such uses the company's services. Deutsche Post AG has direct business relationships with the individual public authorities and other government agencies as independent individual customers. The services provided for these customers are insignificant in respect of Deutsche Post AG's overall revenue.

**RELATIONSHIPS WITH K**

KfW supports the Fede
companies such as Deu
In 1997, KfW, together
"placeholder model" as
companies. Under this
part of its investments
these state-owned co
chased shares of Deut
in several stages since
ket transactions using
Deutsche Post AG's sha
is thus considered to be

**RELATIONSHIPS WITH THE *BUNDESANSTALT FÜR POST UND TELEKOMMUNIKATION* (BANST PT)**

The *Bundesanstalt für Post und Telekommunikation* (BAnst PT) is a government agency and falls under the technical and legal supervision of the German Federal Ministry of Finance. The BAnst PT continues to manage the social facilities such as the postal civil servant health insurance fund, the recreation programme, the *Postbeamtenversorgungskasse* (PVK – Postal civil servant pension fund), the *Versorgungsanstalt der Deutschen Bundespost* (VAP – *Deutsche Bundespost* institution for supplementary retirement pensions) and the welfare service for Deutsche Post AG, Deutsche Bank AG (as legal successor to Deutsche Postbank AG) and Deutsche Telekom AG. Tasks are performed on the basis of agency agreements. In 2022, Deutsche Post AG was invoiced for €85 million (previous year: €142 million) in instalment payments relating to services provided by the BAnst PT. Further disclosures on the PVK and the VAP can be found in ❯ **Note 7 and 37.**

**RELATIONSHIPS WITH THE GERMAN FEDERAL MINISTRY OF FINANCE**

Deutsche Post AG entered into an agreement with the German Federal Ministry of Finance dated 30 January 2004 relating to the transfer of civil servants to German federal authorities. Under this agreement, civil servants are seconded, with the aim of transferring them, initially for 6 months, and are then transferred permanently if they successfully complete their probation. Once a permanent transfer is completed, Deutsche Post AG contributes to the cost incurred by the Federal Republic by paying a flat fee. In 2022, this initiative resulted in 5 permanent transfers (previous year: 8) and 2 secondments with the aim of a permanent transfer in 2023 (previous year: 4).

**RELATIONSHIPS WITH THE GERMAN FEDERAL EMPLOYMENT AGENCY**

Deutsche Post AG and the German Federal Employment Agency entered into an agreement dated 12 October 2009 relating to the transfer of Deutsche Post AG civil servants to the Federal Employment Agency. In 2022, this initiative resulted in no permanent transfer (previous year: 1).

**RELATIONSHIPS WITH DEUTSCHE BAHN AG AND ITS SUBSIDIARIES**

Deutsche Bahn AG is wholly owned by the Federal Republic. Owing to this control relationship, Deutsche Bahn AG is a related party to Deutsche Post AG. Deutsche Post DHL Group has various business relationships with the Deutsche Bahn Group. These mainly consist of transport service agreements.

**RELATIONSHIPS WITH PENSION FUNDS**

The real estate with a fair value of €1,689 million (previous year: €1,653 million) – which can be offset as plan assets – of which Deutsche Post Pensions-Treuhand GmbH & Co. KG, Deutsche Post Altersvorsorge Sicherung e. V. & Co. Objekt Gronau KG and Deutsche Post Grundstücks-Vermietungsgesellschaft beta mbH Objekt Leipzig KG are the legal owners, is let almost exclusively to

the Group via Deutsche ... ments led to lease liab... ber 2022 (previous ye... year, Deutsche Post Imm... (previous year: €25 mil... lion (previous year: €19... sions-Treuhand GmbH ... Pensionsfonds AG. Furt... found in ❯ **Note 7 and 37.**

**RELATIONSHIPS WITH ... INVESTMENTS ACCOUNT... AND JOINT OPERATIONS**

In addition to the cons... ect and indirect relatio... investments accounted ... operations deemed to ... course of its ordinary b...

Transactions wer... with major related par... the consolidated financ...

| €m | Investments accounted f... the equity ... | |
|---|---|---|
| | 2021 | |
| Trade receivables | 16 | |
| Loans | 1 | |
| Receivables from in-house banking | 0 | |
| Financial liabilities | 0 | |
| Trade payables | 5 | |
| Income[1] | 91 | |
| Expenses[2] | 1 | |

[1] Relates to revenue and other operating income.    [2] Relates to materials expense, staff costs and other operating expenses.

CONSOLIDATED FINANCIAL STATEMENTS / NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG    Deutsche Post DHL Group –

Deutsche Post AG issued letters of commitment in the amount of €2 million (previous year: €7 million) for these companies. Of this amount, €1 million (previous year: €1 million) was attributable to investments accounted for using the equity method and €1 million (previous year: €6 million) to joint operations.

### 47.2   Related-party disclosures (individuals)

Effective as of 1 July 2022, Nikola Hagleitner assumed responsibility on the Board of Management for Post & Parcel Germany from Dr Tobias Meyer, who is now responsible for Global Business Services. Ken Allen left the company upon the expiration of his term of appointment on 31 July 2022. Pablo Ciano has been the new Board of Management member responsible for eCommerce Solutions since 1 August 2022. John Pearson has been responsible for Customer Solutions & Innovation (CSI) since 1 August 2022.

In accordance with IAS 24, the Group also reports on transactions between the Group and related parties or members of their families. Related parties are defined as the Board of Management, the Supervisory Board and the members of their families. There were no reportable transactions or legal transactions involving these related parties in the 2022 financial year. In particular, the company granted no loans to these related parties.

The remuneration of key management personnel of the Group requiring disclosure under IAS 24 comprises the remuneration of the active members of the Board of Management and the Supervisory Board. The active members of the Board of Management and the Supervisory Board were remunerated as follows:

| €m | 2021 | 2022 |
|---|---|---|
| Short-term employee benefits (excluding share-based payment) | 18 | 22 |
| Post-employment benefits | 4 | 3 |
| Termination benefits | 0 | 0 |
| Share-based payment | 45 | −23 |
| **Total** | **67** | **2** |

The employee representatives on the Supervisory Board employed by the Group also receive their normal salaries for their work in the company in addition to the aforementioned benefits for their work on the Supervisory Board. These salaries are determined at levels that are commensurate with the salary appropriate for the function or work performed in the company.

Post-employment benefits are recognised as the service cost resulting from the pension provisions for active members of the Board of Management. The corresponding liability amounted to €42 million at the reporting date (previous year: €42 million).

Starting in 2008, newly appointed Board of Management members began receiving a defined contribution pension commitment. This entails the company crediting an annual amount totalling 35% of each Board of Management member's base salary to a virtual pension account. This capital bears interest until eligibility to receive benefits begins. The pension benefit is paid out as capital in the amount of the accumulated pension balance. Pension eligibility is triggered at the earliest when retirement age is reached, in the event of invalidity during the term of office or upon death. When eligible for the pension benefit, the beneficiary may choose an annuity option. The Chairman of the Board of Management is still entitled to a legacy commitment in the form of a direct pension based on his final salary.

### 47.3   Remuneration dis

**BOARD OF MANAGEMEN**

The remuneration paid
ment (excluding share
year totalled €17.6 mi
performance-related c
accounted for €9.3 mil
of €4.4 million (previou
the annual bonus paid
along with €3.9 million
ment (previous year: €2
component). An additio
lion) of the annual bon
component in 2022 and
that payout is that the E
ity target is met. In the
members also received
862,272 SARs), which a
lion (previous year: €8.

**FORMER MEMBERS OF T**

Benefits paid to former
and beneficiaries amo
€5.2 million). The defin
pensions calculated un
€92 million).

**REMUNERATION OF THE**

The total remuneration
financial year amounte
lion); €3.5 million (prev
was attributable to a fi
€0.2 million to attenda

Further informati
Board of Management a
no later than at the time
in the remuneration rep

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 957 of 1025


CONSOLIDATED FINANCIAL STATEMENTS — NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG          Deutsche Post DHL Group –

**SHAREHOLDINGS OF THE BOARD OF MANAGEMENT AND SUPERVISORY BOARD**

As at 31 December 2022, shares held by the Board of Management and the Supervisory Board of Deutsche Post AG amounted to less than 1% of the company's share capital.

**REPORTABLE TRANSACTIONS**

The transactions of Board of Management and Supervisory Board members involving securities of the company and notified to Deutsche Post AG in accordance with Article 19 of the Market Abuse Regulation can be viewed on the ⊙ **Company's website.**

### 48   Auditing fee

The fee for the auditing services provided by Pricewaterhouse-Coopers GmbH Wirtschaftsprüfungsgesellschaft amounted to €11 million in the 2022 financial year and was recognised as an expense.

**Auditing fee**

| €m | 2022 |
| --- | --- |
| Audit services | 10 |
| Other assurance services[1] | 0 |
| Tax advisory services | 0 |
| Other services | 1 |
| **Total** | **11** |

[1]  Rounded below €1 million.

The audit services category includes the fees for auditing the consolidated financial statements and for auditing the annual financial statements prepared by Deutsche Post AG and its German subsidiaries. The fees for reviewing the interim reports and the fees for voluntary audits beyond the statutory audit engagement, such as audits of the internal control system (ICS), are also reported in this category.

Other assurance services related in particular to attestation reports relating to the internal control system and the issuing of comfort letters. Other services were comprised mainly of general consulting in areas outside of accounting.

### 49   Exemptions under the HGB

For the 2022 financial year, the following German subsidiaries have exercised the simplification options under Section 264(3) HGB or Section 264b HGB and, if applicable, Section 291 HGB:

• Agheera GmbH
• Albert Scheid GmbH
• ALTBERG GmbH
• Betreibergesellschaft Verteilzentrum GmbH
• Danzas Deutschland Holding GmbH
• Deutsche Post Adress Beteiligungsgesellschaft mbH
• Deutsche Post Assekuranz Vermittlungs GmbH
• Deutsche Post Beteiligungen Holding GmbH
• Deutsche Post Customer Service Center GmbH
• Deutsche Post DHL Beteiligungen GmbH
• Deutsche Post DHL Corporate Real Estate
  Management GmbH & Co. Logistikzentren KG
• Deutsche Post DHL Express Holding GmbH
• Deutsche Post DHL Facility Management Deutschland GmbH
  (formerly: CSG.TS GmbH)
• Deutsche Post DHL Real Estate Deutschland GmbH
• Deutsche Post DHL Research and Innovation GmbH
• Deutsche Post Dialog Solutions GmbH
• Deutsche Post Direkt GmbH
• Deutsche Post E-POST Solutions GmbH
• Deutsche Post Expansion GmbH
• Deutsche Post Fleet GmbH
• Deutsche Post Immobilien GmbH
• Deutsche Post InHaus Services GmbH
• Deutsche Post Investments GmbH
• Deutsche Post IT Services GmbH
• Deutsche Post Mobility GmbH
• Deutsche Post Shop Essen GmbH
• Deutsche Post Shop Hannover GmbH
• Deutsche Post Shop München GmbH
• Deutsche Post Transport GmbH (formerly: DHL Delivery GmbH)

• Deutsche Post Verma
• Deutsche Post Zahlun
• DHL 2-Mann-Handling
• DHL Airways GmbH
• DHL Automotive Gmb
• DHL Automotive Offe
• DHL Consulting Gmbl
• DHL Express Custome
• DHL Express Germany
• DHL Express Network
• DHL FoodLogistics Gr
• DHL Freight Germany
• DHL Freight GmbH
• DHL Freight Grundstü
• DHL Global Event Log
• DHL Global Forwardir
• DHL Global Forwardir
• DHL Global Managem
• DHL Home Delivery G
• DHL Hub Leipzig Gmb
• DHL International Gm
• DHL Paket GmbH
• DHL Solutions GmbH
• DHL Sorting Center G
• DHL Supply Chain (Le
• DHL Supply Chain Ma
• DHL Supply Chain Op
• DHL Supply Chain VA!
• Erste End of Runway I
• Erste Logistik Entwick
• European Air Transpo
• Gerlach Zolldienste G
• interServ Gesellschaf
  Beraterdienstleistung
• it4logistics GmbH
• Saloodo! GmbH
• StreetScooter GmbH

Case 3:22-cv-07182-WHA    Document 39-1    Filed 10/18/23    Page 958 of 1025

CONSOLIDATED FINANCIAL STATEMENTS — NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS OF DEUTSCHE POST AG —
RESPONSIBILITY STATEMENT —
INDEPENDENT AUDITOR'S REPORT

Deutsche Post DHL Group –

**50    Declaration of Conformity with the German Corporate Governance Code**

Deutsche Post AG complied with the suggestions and recommendations of the German Corporate Governance Code in the 2022 financial year. This did not include the reserved limitation with regard to the CEO's chairmanship of the supervisory board of Deutsche Telekom AG. The Board of Management and Supervisory Board intend to comply with all suggestions and recommendations in future. This Declaration of Conformity required by Section 161 AktG can be accessed on the ◎ **Company's website.**

**51    Significant events after the reporting date and other disclosures**

On 14 February 2023, the Board of Management resolved to expand the current share buy-back programme so that a total of up to 105 million treasury shares are to be purchased at a price of now up to €3 billion through the end of 2024. The purposes remain unaffected, ❱ **Note 3.**

Beyond that, there were no reportable events after the reporting date.

# RESPONSIBILITY STATEMENT

To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the management report of the Group, which is combined with the management report of Deutsche Post AG, includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group.

Bonn, 17 February 2023

Deutsche Post AG
The Board of Management

Dr Frank Appel                    Pablo Ciano

Oscar de Bok                      Melanie Kreis

Nikola Hagleitner                 Dr Thomas Ogilvie

Dr Tobias Meyer                   Tim Scharwath

John Pearson

# INDEPEN
# AUDITOR

To Deutsche Post AG, B

### Report on the A
### Financial State
### Management R

**Audit opinions**

We have audited the
Deutsche Post AG, Bonn
comprise the consolida
31 December 2022, an
prehensive income, co
consolidated statemen
statement of cash flow
to 31 December 2022,
statements, including
policies. In addition, w
report of Deutsche Pos
pany's management re
ary to 31 December 20
requirements, we have
the group managemen
section of our auditor's

In our opinion, on
the audit,
• the accompanying co
ply, in all material re
the EU and the additi
cial law pursuant to §

CONSOLIDATED FINANCIAL STATEMENTS INDEPENDENT AUDITOR'S REPORT                                                    Deutsche Post DHL Group –

[*Handelsgesetzbuch*: German Commercial Code] and, in compliance with these requirements, give a true and fair view of the assets, liabilities, and financial position of the Group as at 31 December 2022, and of its financial performance for the financial year from 1 January to 31 December 2022, and

• the accompanying group management report as a whole provides an appropriate view of the Group's position. In all material respects, this group management report is consistent with the consolidated financial statements, complies with German legal requirements and appropriately presents the opportunities and risks of future development. Our audit opinion on the group management report does not cover the content of those parts of the group management report listed in the "Other Information" section of our auditor's report.

Pursuant to § 322 Abs. 3 Satz [sentence] 1 HGB, we declare that our audit has not led to any reservations relating to the legal compliance of the consolidated financial statements and of the group management report.

**Basis for the Audit Opinions**

We conducted our audit of the consolidated financial statements and of the group management report in accordance with § 317 HGB and the EU Audit Regulation (No. 537/2014, referred to subsequently as "EU Audit Regulation") in compliance with German Generally Accepted Standards for Financial Statement Audits promulgated by the Institut der Wirtschaftsprüfer [Institute of Public Auditors in Germany] (IDW). We performed the audit of the consolidated financial statements in supplementary compliance with the International Standards on Auditing (ISAs). Our responsibilities under those requirements, principles and standards are further described in the "Auditor's Responsibilities for the Audit of the Consolidated Financial Statements and the Group Management Report" section of our auditor's report. We are independent of the group entities in accordance with the requirements of European law and German commercial

and professional law, and we have fulfilled our other German professional responsibilities in accordance with these requirements. In addition, in accordance with Article 10 (2) point (f) of the EU Audit Regulation, we declare that we have not provided non-audit services prohibited under Article 5 (1) of the EU Audit Regulation. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions on the consolidated financial statements and on the group management report.

**Key Audit Matters in the Audit of the Consolidated Financial Statements**

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements for the financial year from 1 January to 31 December 2022. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our audit opinion thereon; we do not provide a separate audit opinion on these matters.

In our view, the matters of most significance in our audit were as follows:

❶ Recoverability of goodwill
❷ Pension obligations and plan assets

Our presentation of these key audit matters has been structured in each case as follows:

① Matter and issue
② Audit approach and findings
③ Reference to further information

Hereinafter we present the key audit matters:

❶ **Recoverability of goodwill**
① In the consolidated financial statements of Deutsche Post AG, goodwill amounting to EUR 12.7 billion is reported under

the balance sheet
approximately 19%
reported equity. T
EUR 1.2 billion fro
Group in the fin
allocated to the c
Goodwill is teste
annual basis or if
be impaired. The
the recoverable a
a measurement r
method. This ma
audit, because the
a large extent on
the Company's ex
used, and is there

② We satisfied ours
future cash inflo
comparing this da
year plan prepared
by the Company'
against general a
With the knowled
in the discount r
recoverable amou
focused our testi
the discount rate a
cost of capital, an
procedure. Due to
that its measuremе
which are outside
we carried out our
found that the res
the discounted fu
ment parameters
directors to be rep

CONSOLIDATED FINANCIAL STATEMENTS  *INDEPENDENT AUDITOR'S REPORT* Deutsche Post DHL Group –

③ The Company's disclosures regarding goodwill are contained in note 22, the disclosures regarding acquisitions in note 2 of the notes to the consolidated financial statements.

**❷ Pension obligations and plan assets**

① In the consolidated financial statements of Deutsche Post AG a total of EUR 1.9 billion is reported under the balance sheet item "Provisions for pensions and similar obligations". As a result of pension scheme surpluses in some defined benefit plans, pension assets of EUR 0.36 billion are reported under the balance sheet item "Other non-current assets". The net pension provisions of EUR 1.6 billion were calculated on the basis of the present value of the obligations amounting to EUR 13.5 billion, less the plan assets of EUR 12.0 billion, which were measured at fair value, as well as an asset ceiling effect of EUR 0.1 billion. The obligations from defined benefit pension plans were measured using the projected unit credit method in accordance with IAS 19. This requires in particular that assumptions are made as to the long-term salary and pension trend as well as average life expectancy. Furthermore, the discount rate must be determined as of the balance sheet date by reference to the yield on high-quality corporate bonds with matching currencies and consistent terms. Changes to these measurement assumptions are recognized directly in equity as actuarial gains or losses. Changes in the financial measurement parameters and experience adjustments resulted in actuarial gains of EUR 4.6 billion. The plan assets are measured at fair value, which in turn involves making estimates that are subject to estimation uncertainties. Deviations from the planned development of the fair value of the plan assets are also recognized directly in equity. These deviations resulted in losses of EUR 2.3 billion.

In our view, these matters were of particular significance, as the measurement of the pension obligations and plan assets is to a large extent based on the estimates and assumptions made by the Company's executive directors. With the knowledge that estimated values bear an increased risk of accounting misstatements and that the executive directors' measurement decisions have a direct and significant effect on the consolidated financial statements, we assessed the appropriateness of the values adopted, in particular the measurement parameters used in the calculation of the pension provisions, inter alia on the basis of actuarial reports made available to us and taking into account the expert knowledge of our internal specialists for pension valuations. Our evaluation of the fair values of plan assets was in particular based on bank confirmations submitted to us, as well as other statements of assets and real estate appraisals.

On the basis of our audit procedures, we were able to satisfy ourselves that the estimates and assumptions made by the executive directors were sufficiently documented and supported to justify the recognition and measurement of the material pension provisions.

③ The Company's disclosures relating to provisions for pensions and similar obligations as well as pension assets are contained in note 37 of the notes to the consolidated financial statements.

**Other Information**

The executive directors are responsible for the other information. The other information comprises the following non-audited parts of the group management report:

• the statement on cor
HGB and § 315 d HGB
group management r
• the non-financial stat
HGB and with §§ 315
financial statement" c
• the passages "interna
"statement on the ap
RMS and ICS" in the
the section "Expected

The other information
of the annual report –
information – with the
financial statements, th
our auditor's report.

Our audit opinion
ments and on the grou
other information, and c
opinion or any other for

In connection wit
the other information n
sider whether the othe
• is materially inconsist
ments, with the group
terms of content or wi
• otherwise appears to

If, based on the work
there is a material miss
are required to report
this regard.


**Responsibilities of the Executive Directors and the Supervisory Board for the Consolidated Financial Statements and the Group Management Report**

The executive directors are responsible for the preparation of the consolidated financial statements that comply, in all material respects, with IFRSs as adopted by the EU and the additional requirements of German commercial law pursuant to § 315 e Abs. 1 HGB and that the consolidated financial statements, in compliance with these requirements, give a true and fair view of the assets, liabilities, financial position, and financial performance of the Group. In addition, the executive directors are responsible for such internal control as they have determined necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud (i.e., fraudulent financial reporting and misappropriation of assets) or error.

In preparing the consolidated financial statements, the executive directors are responsible for assessing the Group's ability to continue as a going concern. They also have the responsibility for disclosing, as applicable, matters related to going concern. In addition, they are responsible for financial reporting based on the going concern basis of accounting unless there is an intention to liquidate the Group or to cease operations, or there is no realistic alternative but to do so.

Furthermore, the executive directors are responsible for the preparation of the group management report that, as a whole, provides an appropriate view of the Group's position and is, in all material respects, consistent with the consolidated financial statements, complies with German legal requirements, and appropriately presents the opportunities and risks of future development. In addition, the executive directors are responsible for such arrangements and measures (systems) as they have considered necessary to enable the preparation of a group management report that is in accordance with the applicable German legal requirements, and to be able to provide sufficient appropriate evidence for the assertions in the group management report.

The supervisory board is responsible for overseeing the Group's financial reporting process for the preparation of the consolidated financial statements and of the group management report.

**Auditor's Responsibilities for the Audit of the Consolidated Financial Statements and of the Group Management Report**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and whether the group management report as a whole provides an appropriate view of the Group's position, in all material respects, is consistent with the consolidated financial statements and the knowledge obtained in the audit, complies with the German legal requirements and appropriately presents the opportunities and risks of future development, as well as to issue an auditor's report that includes our audit opinions on the consolidated financial statements and on the group management report.

Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with § 317 HGB and the EU Audit Regulation and in compliance with German Generally Accepted Standards for Financial Statement Audits promulgated by the Institut der Wirtschaftsprüfer (IDW) and supplementary compliance with the ISAs will always detect a material misstatement. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements and this group management report.

We exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess th[...] consolidated financial s[...] report, whether due to [...] procedures responsive [...] that is sufficient and ap[...] opinions. The risk of [...] resulting from fraud is [...] as fraud may involve c[...] misrepresentations, o[...]
- Obtain an understandi[...] of the consolidated fin[...] and measures (syste[...] management report i[...] are appropriate in the [...] of expressing an audit[...] systems.
- Evaluate the appropria[...] executive directors an[...] by the executive direc[...]
- Conclude on the appr[...] use of the going conce[...] audit evidence obtaine[...] related to events or co[...] on the Group's ability t[...] clude that a material un[...] attention in the auditor[...] consolidated financia[...] ment report or, if suc[...] our respective audit op[...] audit evidence obtaine[...] However, future even[...] cease to be able to co[...]

- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements present the underlying transactions and events in a manner that the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and financial performance of the Group in compliance with IFRSs as adopted by the EU and the additional requirements of German commercial law pursuant to § 315 e Abs. 1 HGB.
- Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express audit opinions on the consolidated financial statements and on the group management report. We are responsible for the direction, supervision and performance of the group audit. We remain solely responsible for our audit opinions.
- Evaluate the consistency of the group management report with the consolidated financial statements, its conformity with German law, and the view of the Group's position it provides.
- Perform audit procedures on the prospective information presented by the executive directors in the group management report. On the basis of sufficient appropriate audit evidence we evaluate, in particular, the significant assumptions used by the executive directors as a basis for the prospective information, and evaluate the proper derivation of the prospective information from these assumptions. There is a substantial unavoidable risk that future events will differ materially from the prospective information.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with the relevant independence requirements, and communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, actions taken to eliminate threats or safeguards applied.

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the key audit matters. We describe these matters in our auditor's report unless law or regulation precludes public disclosure about the matter.

## Other legal and regulatory requirements

**Report on the Assurance on the Electronic Rendering of the Consolidated Financial Statements and the Group Management Report Prepared for Publication Purposes in Accordance with § 317 Abs. 3a HGB**

### Assurance Opinion

We have performed assurance work in accordance with § 317 Abs. 3a HGB to obtain reasonable assurance as to whether the rendering of the consolidated financial statements and the group management report (hereinafter the "ESEF documents") contained in the electronic file DP_AG_KA_KLB_ESEF-2022-12-31.zip and prepared for publication purposes complies in all material respects with the requirements of § 328 Abs. 1 HGB for the electronic reporting format ("ESEF format"). In accordance with German legal requirements, this assurance work extends only to the conversion of the information contained in the con-

solidated financial sta[...]
report into the ESEF for[...]
information contained [...]
information contained [...]

In our opinion, th[...]
cial statements and the[...]
in the electronic file id[...]
lication purposes com[...]
requirements of § 328 [...]
format. Beyond this ass[...]
accompanying con[...]
accompanying group m[...]
from 1 January to 31 De[...]
on the Audit of the Con[...]
the Group Managemen[...]
assurance opinion on t[...]
renderings or on the o[...]
tronic file identified ab[...]

**Basis for the Assuran[...]**

We conducted our assu[...]
solidated financial state[...]
contained in the electron[...]
§ 317 Abs. 3a HGB and [...]
Work on the Electronic [...]
Management Reports, [...]
Accordance with § 317 [...]
and the International Sta[...]
(Revised). Our responsi[...]
described in the "Group [...]
ance Work on the ESEF D[...]
the IDW Standard on Qu[...]
Quality Management in [...]


**Responsibilities of the Executive Directors and the Supervisory Board for the ESEF Documents**

The executive directors of the Company are responsible for the preparation of the ESEF documents including the electronic renderings of the consolidated financial statements and the group management report in accordance with § 328 Abs. 1 Satz 4 Nr. [number] 1 HGB and for the tagging of the consolidated financial statements in accordance with § 328 Abs. 1 Satz 4 Nr. 2 HGB.

In addition, the executive directors of the Company are responsible for such internal control as they have considered necessary to enable the preparation of ESEF documents that are free from material non-compliance with the requirements of § 328 Abs. 1 HGB for the electronic reporting format, whether due to fraud or error.

The supervisory board is responsible for overseeing the process for preparing the ESEF documents as part of the financial reporting process.

**Group Auditor's Responsibilities for the Assurance Work on the ESEF Documents**

Our objective is to obtain reasonable assurance about whether the ESEF documents are free from material non-compliance with the requirements of § 328 Abs. 1 HGB, whether due to fraud or error. We exercise professional judgment and maintain professional skepticism throughout the assurance work. We also:

• Identify and assess the risks of material non-compliance with the requirements of § 328 Abs. 1 HGB, whether due to fraud or error, design and perform assurance procedures responsive to those risks, and obtain assurance evidence that is sufficient and appropriate to provide a basis for our assurance opinion.

• Obtain an understanding of internal control relevant to the assurance work on the ESEF documents in order to design assurance procedures that are appropriate in the circum-

stances, but not for the purpose of expressing an assurance opinion on the effectiveness of these controls.

• Evaluate the technical validity of the ESEF documents, i.e., whether the electronic file containing the ESEF documents meets the requirements of the Delegated Regulation (EU) 2019/815 in the version in force at the date of the consolidated financial statements on the technical specification for this electronic file.

• Evaluate whether the ESEF documents provide an XHTML rendering with content equivalent to the audited consolidated financial statements and to the audited group management report.

• Evaluate whether the tagging of the ESEF documents with Inline XBRL technology (iXBRL) in accordance with the requirements of Articles 4 and 6 of the Delegated Regulation (EU) 2019/815, in the version in force at the date of the consolidated financial statements, enables an appropriate and complete machine-readable XBRL copy of the XHTML rendering.

**Further Information pursuant to Article 10 of the EU Audit Regulation**

We were elected as group auditor by the annual general meeting on 6 May 2022. We were engaged by the supervisory board on 2 November 2022. We have been the group auditor of the Deutsche Post AG, Bonn, without interruption since the company first met the requirements of a public-interest entity within the meaning of 316a Satz 2 Nr. 1 HGB in financial year 2000.

We declare that the audit opinions expressed in this auditor's report are consistent with the additional report to the audit committee pursuant to Article 11 of the EU Audit Regulation (long-form audit report).

**Reference to an [...] use of the audit[...]**

Our auditor's report m[...] audited consolidated fin[...] management report as [...] consolidated financial s[...] report converted to the [...] be filed in the company[...] ings of the audited con[...] audited group manage[...] In particular, the "Repo[...] Rendering of the Cons[...] Group Management Rep[...] Accordance with § 317 A[...] contained therein are to[...] ESEF documents made [...]

**German Public [...] for the engage[...]**

The German Public Au[...] Dietmar Prümm.

Düsseldorf, 17 February [...]

PricewaterhouseCoope[...] Wirtschaftsprüfungsge[...]

Dietmar Prümm
*Wirtschaftsprüfer*
(German Public Auditor[...]


# INDEPENDENT PRACTITIONER'S REPORT

## on a Limited and Reasonable Assurance Engagement on Non-financial Reporting

PricewaterhouseCoopers GmbH has performed a limited assurance engagement on the German version of the combined non-financial statement and issued an independent practitioner's report in German language, which is authoritative. The following text is a translation of the independent practitioner's report.

To Deutsche Post AG, Bonn

We have performed an assurance engagement on the combined non-financial statement of Deutsche Post AG, Bonn, (hereinafter the "Company") for the period from 1 January to 31 December 2022 (hereinafter the "Combined Non-financial Statement") included in section "Non-financial Statement" of the combined management report. In accordance with our engagement we have divided the level of assurance to be obtained by us and

• performed a reasonable assurance engagement on the indicators
◦ Absolute logistics-related GHG emissions 2022 in the second paragraph of the section "Decarbonisation avoids 1 million tonnes of $CO_2e$"
◦ GHG emissions by mode of transport in the second paragraph of the section "Decarbonisation avoids 1 million tonnes of $CO_2e$"
◦ Realised Decarbonisation Effects 2022 in the third paragraph of the section "Decarbonisation avoids 1 million tonnes of $CO_2e$"
◦ Total GHG emissions (million tonnes of $CO_2e$), thereof Scope 1, Scope2, Scope 3 in the table "GHG emissions (well-to-wheel)"

◦ Share of sustainable fuels (%) 2022 in the third paragraph of the section "Using sustainable technologies and fuels"
◦ Share of electricity from renewable sources 2022 in the third paragraph of the section "Using sustainable technologies and fuels"
◦ Disclosures for 2022 in the table "Energy consumption in the company's own fleet and buildings (Scopes 1 and 2)"
◦ Number of employees: Headcount average for the year 2022 in the table "Workforce development"
◦ Number of employees: Full-time equivalents at year-end 2022 in the table "Workforce development"
◦ Number of employees: Full-time equivalents average for the year 2022 in the table "Workforce development"
◦ Share of female employees (%) 2022 in the table "Workforce development"
◦ Share of unplanned employee turnover (%) 2022 in the table "Workforce development"
◦ Disclosures for 2022 in the table "Selected results from the Employee Opinion Survey"
◦ Share of women in middle and upper management in the fourth paragraph of the section "Diversity, Equity, Inclusion & Belonging"
◦ Disclosures in the table "Work-related accident statistics"
◦ Sickness rate in the seventh paragraph of the section "Occupational health and safety"
◦ Approval rate for pride of the Group's contribution to society in the third paragraph of the section "Partnerships and initiatives"
◦ Compliance training certification rate in middle and upper management 2022 in the eighth paragraph of the section "Trusted business partner thanks to compliance"
◦ Number of audits by Corporate Internal Audit in the ninth paragraph of the section "Trusted business partner thanks to compliance"
◦ Number of audits relating to respect for human rights by Corporate Internal Audit in the fourth paragraph of the section "Respecting human rights"

◦ Number of on-site rev[...]
  in the second paragraph[...]
  rights violations in the[...]
◦ Certification rate in r[...]
  training to raise emp[...]
  rights in the third para[...]
  rights violations in the[...]
◦ Share of valid training[...]
  agement for the Infor[...]
  fourth paragraph of th[...]
◦ Cybersecurity rating[...]
  "Cybersecurity") and[...]
  disclosed in the Combi[...]
  the "Indicators") and
• performed a limited a[...]
  tion other than the In[...]
  Statement.

Not subject to our ass[...]
sources of documentat[...]
Combined Non-financia[...]

**Responsibility of the E[...]**
The executive directors[...]
preparation of the Com[...]
ance with §§ (Articles) 3[...]
("*Handelsgesetzbuch*": [...]
8 of regulation (EU) 20[...]
of the Council of 18 Jur[...]
facilitate sustainable in[...]
2019/2088 (hereinaft[...]
the Delegated Acts add[...]
their own interpretation[...]
the EU Taxonomy Regu[...]
thereunder, as set out in[...]
Non-financial Statemen[...]

This responsibility includes the selection and application of appropriate non-financial reporting methods and making assumptions and estimates about individual non-financial disclosures of the Company that are reasonable in the circumstances. Furthermore, the executive directors are responsible for such internal controls as they consider necessary to enable the preparation of a Combined Non-financial Statement that is free from material misstatement whether due to fraud or error.

The EU Taxonomy Regulation and the Delegated Acts issued thereunder contain wording and terms that are still subject to considerable interpretation uncertainties and for which clarifications have not yet been published in every case. Therefore, the executive directors have disclosed their interpretation of the EU Taxonomy Regulation and the Delegated Acts adopted thereunder in section "EU Taxonomy" of the Combined Non-financial Statement. They are responsible for the defensibility of this interpretation. Due to the immanent risk that indeterminate legal terms may be interpreted differently, the legal conformity of the interpretation is subject to uncertainties.

**Independence and Quality Control of the Audit Firm**

We have complied with the German professional provisions regarding independence as well as other ethical requirements.

Our audit firm applies the national legal requirements and professional standards – in particular the Professional Code for German Public Auditors and German Chartered Auditors *("Berufssatzung für Wirtschaftsprüfer und vereidigte Buchprüfer": "BS WP/vBP")* as well as the Standard on Quality Control 1 published by the Institut der Wirtschaftsprüfer (Institute of Public Auditors in Germany; IDW): Requirements to quality control for audit firms *(IDW Qualitätssicherungsstandard 1: Anforderungen an die Qualitätssicherung in der Wirtschaftsprüferpraxis – IDW QS 1)* – and accordingly maintains a comprehensive system of quality control including documented policies and procedures regarding compliance with ethical requirements,

professional standards and applicable legal and regulatory requirements.

**Responsibility of the Assurance Practitioner**

Our responsibility is to express a conclusion with reasonable assurance on the Indicators disclosed in the Company's Combined Non-financial Statement and a limited assurance on all information other than the Indicators in the Combined Non-financial Statement based on our assurance engagement.

We conducted our assurance engagement in accordance with International Standard on Assurance Engagements (ISAE) 3000 (Revised): Assurance Engagements other than Audits or Reviews of Historical Financial Information, issued by the IAASB. This Standard requires that we plan and perform the assurance engagement to

- obtain reasonable assurance whether the Indicators disclosed in the Company's Combined Non-financial Statement for the period from 1 January to 31 December 2022 have been prepared, in all material respects, in accordance with §§ 315 c in conjunction with 289c to 289e HGB by the executive directors and
- obtain limited assurance about whether any matters have come to our attention that cause us to believe that all information other than the Indicators in the Company's Combined Non-financial Statement, other than the external sources of documentation or expert opinions mentioned in the Combined Non-financial Statement, has not been prepared, in all material respects, in accordance with §§ 315 c in conjunction with 289c to 289e HGB and the EU Taxonomy Regulation and the Delegated Acts issued thereunder disclosed in section "EU Taxonomy" of the Combined Non-financial Statement.

The procedures performed for the limited assurance engagement part are less extensive than those performed for the reasonable assurance engagement part, and accordingly a substantially lower level of assurance is obtained. [...] cedures is subject to the [...] practitioner.

In the course of [...] amongst other things, [...] cedures and other activi[...]

- Gain an understanding [...] tainability organization[...]
- Inquiries of the execu[...] involved in the prepa[...] Statement about the [...] control system relating [...] in the Combined Non-[...]
- Identification of likely[...] Combined Non-financ[...]
- Analytical procedures [...] Non-financial Statemen[...]
- Reconciliation of sele[...] data in the consolidat[...] agement report
- Evaluation of the pro[...] taxonomy-aligned eco[...] disclosures in the Con[...]
- Inquiries on the releva[...]
- Evaluation of the pres[...] Statement

In the course of our reaso[...] Indicators disclosed in [...] Statement, we have p[...] cedures and other activi[...]

- Evaluation of the intern[...]
- Inspection of processe[...] aggregation of selecte[...] on the basis of sample[...]


In determining the disclosures in accordance with Article 8 of the EU Taxonomy Regulation, the executive directors are required to interpret undefined legal terms. Due to the immanent risk that undefined legal terms may be interpreted differently, the legal conformity of their interpretation and, accordingly, our assurance engagement thereon are subject to uncertainties.

**Assurance Opinion**

In our opinion the Indicators disclosed in the Company's Combined Non-financial Statement for the period from 1 January to 31 December 2022 have been prepared, in all material respects, in accordance with §§ 315 c in conjunction with 289c to 289e HGB by the executive directors.

Based on the assurance procedures performed and evidence obtained, nothing has come to our attention that causes us to believe that all information other than the Indicators in the Combined Non-financial Statement of the Company for the period from 1 January to 31 December 2022 has not been prepared, in all material respects, in accordance with §§ 315 c in conjunction with 289c to 289e HGB and the EU Taxonomy Regulation and the Delegated Acts issued thereunder as well as the interpretation by the executive directors disclosed in section "EU Taxonomy" of the Combined Non-financial Statement. We do not express an assurance opinion on the external sources of documentation or expert opinions mentioned in the Combined Non-financial Statement.

**Restriction of Use**

We draw attention to the fact that the assurance engagement was conducted for the Company's purposes and that the report is intended solely to inform the Company about the result of the assurance engagement. Consequently, it may not be suitable for any other purpose than the aforementioned. Accordingly, the report is not intended to be used by third parties for making (financial) decisions based on it. Our responsibility is to the Company. We do not accept any responsibility to third parties. Our assurance opinion is not modified in this respect.

Düsseldorf, 17 February 2023

PricewaterhouseCoopers GmbH
Wirtschaftsprüfungsgesellschaft

Hendrik Fink                    ppa. Thomas Groth
*Wirtschaftsprüfer*
[German Public Auditor]

# FINANCIAL CALENDAR



| | |
|---|---|
| **2023** | |
| 3 May | **Results of the first quarter of 2023** |
| 4 May | **2023 Annual General Meeting** |
| 9 May | **Dividend payment** |
| 1 August | **Results of the first half of 2023** |
| 7 November | **Results of the first nine months of 2023** |
| **2024** | |
| 6 March | **Results of financial year 2023** |
| 3 May | **2024 Annual General Meeting** |
| 7 May | **Results of the first quarter of 2024** |
| 8 May | **Dividend payment** |
| 1 August | **Results of the first half of 2024** |
| 5 November | **Results of the first nine months of 2024** |

Updates to the financial calendar as well as information on live webcasts can be found on our **Reporting hub.**

# CONTACTS

**Deutsche Post AG**
Headquarters
53250 Bonn
Germany

**Investor Relations**
 ir@dpdhl.com

**Press**
 pre

**Deutsche Post AG**
**Headquarters**
**Investor Relations**
**53250 Bonn**
**Germany**

# EXHIBIT AE

# Black, female, and a Silicon Valley 'trade secret'



*A CNNMoney investigation of 20 of the largest tech companies found that the few firms willing to share data about workplace diversity have mostly white and Asian males in their ranks.*

## How diverse is Silicon Valley? Most tech companies really, really don't want you to know, and the U.S. government isn't helping shed any light on the issue.

In an investigation that began in August 2011, CNNMoney probed 20 of the most influential U.S. technology companies, the Department of Labor, and the Equal Employment Opportunity Commission, filing two Freedom of Information Act requests for workforce diversity data.



See the five companies' diversity data

A year and a half, a pile of paperwork, and dozens of interviews later, we have a little more insight -- but not much.

Most of the companies stonewalled us, but the data we were able to get showed what one might expect: Ethnic minorities and women are generally underrepresented, sometimes severely so -- particularly in management roles. White and Asian males often dominate their fields.

Our investigation demonstrated how difficult -- and sometimes impossible -- gaining any insight into Silicon Valley's employee diversity can be. It shows a general lack of transparency in an industry known for its openness.

**First attempt:** In 2011, as part of CNN's *Black in America* series, CNNMoney reached out to 20 tech companies: the industry's 10 largest firms by annual sales and 10 smaller but prominent companies. We asked each for information about the race and sex makeup of their staff.

Only Dell (DELL), Ingram Micro (IM) and Intel (INTC) played ball. Intel, in stark contrast to the rest of the tech industry, actually makes its employment diversity information public on its website.

"Intel believes that transparency with our data is the best way to have a genuine dialogue," Intel chief diversity officer Rosalind Hudnell told CNNMoney last week. "We are tech companies and data drives our business; we need to get beyond our fears that the numbers are a poor reflection on our individual organizations and work together to address the issue collectively. "

The other 17 companies refused to turn over their data. Having made little headway by asking the companies ourselves, the only way to compel them to release the data was through a Freedom of Information Act (FOIA) request.

Every U.S. company with more than 100 employees is required to fork over an annual report to the government, called the EEO-1, that categorizes U.S. workers by their race and sex. An independent federal agency called the Equal Employment Opportunity Commission (EEOC) collects the data, using it to play watchdog: It keeps a close eye on companies' hiring practices and occasionally assists in investigations.

We sent the EEOC a FOIA request on Aug. 18, 2011, and three weeks later it was denied. The EEOC said it is legally prohibited from releasing EEO-1 reports.

Read CNNMoney's FOIA requests and the government's responses

**Second attempt:** After consulting with experts and CNN's legal team, we learned the Department of Labor has access to EEOC data for some companies -- and unlike the EEOC, no federal statute bars the DOL from releasing the reports.

We re-filed the FOIA request to the Department of Labor on Nov. 1, 2011. It took more than a year for that request to be processed.

On Dec. 7, 2012, we finally received the data, but for only five companies: Cisco (CSCO), Dell, eBay (EBAY), Ingram Micro and Intel.

What happened to the other 15 companies' information is complicated.

The Labor Department has no authority to release EEO-1 reports for companies that aren't federal contractors. That knocked out 10 companies: Amazon (AMZN), Facebook, Groupon (GRPN), Hulu, LinkedIn (LNKD), LivingSocial, Netflix (NFLX), Twitter, Yelp (YELP) and Zynga (ZNGA).

But even contractors may block the release of their data. Apple (AAPL), Google (GOOG), Hewlett-Packard (HPQ), IBM (IBM) and Microsoft (MSFT) all submitted written objections, successfully petitioning the Department of Labor for their data to be excluded on the basis that doing so would cause "competitive harm."

Those five companies declined or ignored CNNMoney's requests for comment on their unwillingness to turn over their data.

**The information gap:** "It's absolutely preposterous," said John Sims, a FOIA expert and law professor at the University of the Pacific. "Knowing how many white male sales workers a company has is a trade secret? Absurd."

Sims questioned why five companies consider these reports trade secrets, while the other five allowed them to be released.

The data show diversity in Silicon Valley remains a serious issue. Some companies cite a "pipeline problem," saying too few minorities and women are graduating with technical degrees. Others argue that people tend to hire people like themselves, and in tech, that's largely white and Asian males.

But the biggest obstacle, according to industry experts, is that few are talking about the problem.

"This data is a just a baseline for discussion, but we can't end the problem if we can't start the conversation," said Aditi Mohapatra, associate tech sector director at BSR, a consulting group that works with companies on social and sustainability issues. "For the tech industry to remain silent about diversity is so not aligned with what they preach."

The Department of Labor said it does sometimes go back to companies and demand defense of their claims.

In "rare" situations, the DOL said, this can escalate into lawsuits between the government and the companies.

But lawsuits and appeals take time and money, and there's no guarantee of data waiting at the end of the road. Mike Swift, a reporter with the *San Jose Mercury News,* began probing the topic in 2008 by sending similar FOIA requests for data from the region's 15 largest employers.

His inquiry sparked a two-year legal battle, resulting in access to data from just one company -- HP -- that had opposed its release.

The Black Economic Council and the National Asian American Coalition have also attempted to uncover diversity data at major companies, but most of those requests have turned up little information.

"Companies are happy to hide behind a law that provides so little access to this data," said Sims, the law professor. "Tech is the most vibrant sector of the American economy, and rather than trying to fix problems, they want to keep secrets."

Are you a minority and/or woman working for a large technology company? Want to share your story? E-mail julianne.pepitone@turner.com for the chance to be included in an upcoming story.

CNNMoney (New York) First published March 17, 2013: 5:38 PM ET

# Five Silicon Valley companies fought release of employment data, and won

Google, the company that wants to make the world's information accessible, says the race and gender of its work force is a trade secret that cannot be released.

So do Apple, Yahoo, Oracle and Applied Materials. These five companies waged an 18-month Freedom of Information battle with the Mercury News, convincing federal regulators who collect the data that its release would cause "commercial harm" by potentially revealing the companies' business strategy to competitors. A sixth company, Hewlett-Packard, fought the release and lost.

But many of their industry peers see the issue differently. The Mercury News initially set out to obtain race and gender data on the valley's 15 largest companies, and nine — including Intel, Cisco Systems, eBay, AMD, Sanmina and Sun Microsystems — agreed to allow the U.S. Department of Labor to provide it.

"There's nothing to hide, in our view," said Chuck Mulloy, a spokesman for Intel, which contacted the Mercury News to share its employment data after learning of the newspaper's federal FOIA request filed in early 2008. "We just felt that we're very proud of the (diversity) programs we have in place and the efforts we put forth, and we don't have any trouble sharing it."

Experts in the area of equal employment law scoffed at the idea that public disclosure of race and gender data — for example, the number of black men or Asian women in job categories such as "professionals," "officials & managers" and "service workers" — could really allow competitors to discern a big tech company's business strategy. A bigger issue, they said, is the social cost of allowing large, influential corporations to hide their race and gender data.

"One of the main ways that we track how society is doing in terms of race relations, in terms of eliminating discrimination, in terms of promoting diversity, is by looking at statistics," said Richard Ford, a Stanford University law professor who is an expert in civil rights and anti-discrimination law. "But if we can't get the data, we can't know if it's a problem or not."

John Sims, a law professor at the University of the Pacific and an expert in FOIA law, called the objections of Google, Apple and other companies "absurd."

"The whole debate on affirmative action is based on the question, 'Is racial discrimination a thing of the past, or is it still going on?'" Sims said. "These companies are very interesting to look at, because they are new and they are not just in the rut of what they were doing 50 years ago, because they didn't exist 50 years ago."

The Labor Department data ultimately obtained by the Mercury News shows that while the collective work force of 10 of the valley's largest companies grew by 16 percent from 1999 to 2005, an already small population of black workers dropped by 16 percent, while the number of Hispanic workers declined by 11 percent. By 2005, only about 2,200 of the 30,000 Silicon Valley-based workers at those 10 companies were black or Hispanic.

In addition, among the roughly 5,900 managers at those companies in 2005, about 300 were either black or Hispanic — a 20 percent dip from five years earlier. Women slipped to 26 percent of managers in 2005, from 28 percent in 2000.

Companies such as Google and Apple are particularly crucial to study, Ford said, because many of the nation's civil rights laws were written in the 1960s for a different workplace than the information-driven jobs of today.

The Mercury News initially asked the Labor Department to release so-called EEO-1 race and gender data for the 15 largest companies ranked by sales in the newspaper's SV150 Index.

Following an appeal lodged by the Mercury News against the six companies that objected, the Labor Department released Hewlett-Packard's data after the company failed, government lawyers said, to provide a detailed objection "when we requested its views."

But the Labor Department accepted arguments filed by lawyers for Google, Apple, Yahoo, Oracle and Applied Materials that release of the information would cause commercial harm. The department declined to share the text of the detailed arguments made by the companies.

"Such data can demonstrate a company's evolving business strategy," William W. Thompson II, an associate solicitor with the Labor Department, wrote in the agency's notification of its final action.

"The companies have articulated to us that they are in a highly competitive environment in which less mature corporations can use this EEO-1 data to assist in structuring their business operations to better compete against more established competitors."

Google recently announced that it donated $8 million over the last two weeks of 2009 to help underrepresented minorities follow careers in technology, including the donation of laptops to more than 600 high schools, and donations to groups such as the National Society of Black Engineers.

Still, the company declined to release any racial or gender breakdown of its 20,000 workers.

"As we've previously said, we don't release this information for competitive reasons," a spokeswoman said.

Contact Mike Swift at 408-271-3648. Follow him at Twitter.com/swiftstories and view his Google+ profile.

# Five Silicon Valley companies fought release of employment data, and won

Google, the company that wants to make the world's information accessible, says the race and gender of its work force is a trade secret that cannot be released.

So do Apple, Yahoo, Oracle and Applied Materials. These five companies waged an 18-month Freedom of Information battle with the Mercury News, convincing federal regulators who collect the data that its release would cause "commercial harm" by potentially revealing the companies' business strategy to competitors. A sixth company, Hewlett-Packard, fought the release and lost.

But many of their industry peers see the issue differently. The Mercury News initially set out to obtain race and gender data on the valley's 15 largest companies, and nine — including Intel, Cisco Systems, eBay, AMD, Sanmina and Sun Microsystems — agreed to allow the U.S. Department of Labor to provide it.

"There's nothing to hide, in our view," said Chuck Mulloy, a spokesman for Intel, which contacted the Mercury News to share its employment data after learning of the newspaper's federal FOIA request filed in early 2008. "We just felt that we're very proud of the (diversity) programs we have in place and the efforts we put forth, and we don't have any trouble sharing it."

Experts in the area of equal employment law scoffed at the idea that public disclosure of race and gender data — for example, the number of black men or Asian women in job categories such as "professionals," "officials & managers" and "service workers" — could really allow competitors to discern a big tech company's business strategy. A bigger issue, they said, is the social cost of allowing large, influential corporations to hide their race and gender data.

"One of the main ways that we track how society is doing in terms of race relations, in terms of eliminating discrimination, in terms of promoting diversity, is by looking at statistics," said Richard Ford, a Stanford University law professor who is an expert in civil rights and anti-discrimination law. "But if we can't get the data, we can't know if it's a problem or not."

John Sims, a law professor at the University of the Pacific and an expert in FOIA law, called the objections of Google, Apple and other companies "absurd."

"The whole debate on affirmative action is based on the question, 'Is racial discrimination a thing of the past, or is it still going on?' " Sims said. "These companies are very interesting to look at, because they are new and they are not just in the rut of what they were doing 50 years ago, because they didn't exist 50 years ago."

The Labor Department data ultimately obtained by the Mercury News shows that while the collective work force of 10 of the valley's largest companies grew by 16 percent from 1999 to 2005, an already small population of black workers dropped by 16 percent, while the number of Hispanic workers declined by 11 percent. By 2005, only about 2,200 of the 30,000 Silicon Valley-based workers at those 10 companies were black or Hispanic.

In addition, among the roughly 5,900 managers at those companies in 2005, about 300 were either black or Hispanic — a 20 percent dip from five years earlier. Women slipped to 26 percent of managers in 2005, from 28 percent in 2000.

Companies such as Google and Apple are particularly crucial to study, Ford said, because many of the nation's civil rights laws were written in the 1960s for a different workplace than the information-driven jobs of today.

The Mercury News initially asked the Labor Department to release so-called EEO-1 race and gender data for the 15 largest companies ranked by sales in the newspaper's SV150 Index.

Following an appeal lodged by the Mercury News against the six companies that objected, the Labor Department released Hewlett-Packard's data after the company failed, government lawyers said, to provide a detailed objection "when we requested its views."

But the Labor Department accepted arguments filed by lawyers for Google, Apple, Yahoo, Oracle and Applied Materials that release of the information would cause commercial harm. The department declined to share the text of the detailed arguments made by the companies.

"Such data can demonstrate a company's evolving business strategy," William W. Thompson II, an associate solicitor with the Labor Department, wrote in the agency's notification of its final action.

"The companies have articulated to us that they are in a highly competitive environment in which less mature corporations can use this EEO-1 data to assist in structuring their business operations to better compete against more established competitors."

Google recently announced that it donated $8 million over the last two weeks of 2009 to help underrepresented minorities follow careers in technology, including the donation of laptops to more than 600 high schools, and donations to groups such as the National Society of Black Engineers.

Still, the company declined to release any racial or gender breakdown of its 20,000 workers.

"As we've previously said, we don't release this information for competitive reasons," a spokeswoman said.

Contact Mike Swift at 408-271-3648. Follow him at Twitter.com/swiftstories and view his Google+ profile.

# EXHIBIT AF

🏠 Home    @DiversityData                                                                Co



# Open Diversity Data

Companies already collect data about their employee demographics, lets ask them to publish it.
Open Diversity Data will make it easier for everyone to better understand the diversity landscape and work toward solutions.

Won't see a company you're interested in? Add to the list by submitting a pull request or issue. All source: open-diversity-data at arrest on github.com.

| Technology | Data | EEO-1 | Updated | Tweet |
|---|---|---|---|---|
| 🔴 Airbnb | 🔗 | 〰️ | 2017 | ▭ THANK THEM! |
| a Amazon | 🔗 | 〰️ | 2016 | ▭ THANK THEM! |
| 🍎 Apple | 🔗 | 〰️ | 2016 | ▭ THANK THEM! |
| 🔺 Atlassian | 🔗 | | 2016 | ▭ THANK THEM! |
| 🟣 Canonical | 🔗 | | 2014 | ▭ THANK THEM! |
| Cisco | 🔗 | 〰️ | 2014 | ▭ THANK THEM! |
| 🔵 Cloudera | | | | ▭ TELL THEM TO RELEASE THEIR DIVERSITY DATA |
| Dell | 🔗 | 〰️ | 2011 | ▭ TELL THEM TO UPDATE |
| 🔵 eBay | 🔗 | | 2014 | ▭ THANK THEM! |
| 📘 Facebook | 🔗 | 〰️ | 2016 | ▭ THANK THEM! |
| 🪟 Fog Creek | | | | ▭ TELL THEM TO RELEASE THEIR DIVERSITY DATA |

🏠 Home    @DiversityData                                                    Co

| | | | | |
|---|---|---|---|---|
| 🔵 Google | | | 2016 | THANK THEM! |
| 🟢 Groupon | | | 2014 | THANK THEM! |
| 💠 Hewlett-Packard | TELL THEM TO RELEASE THEIR DIVERSITY DATA | | | |
| 🟢 Hulu | TELL THEM TO RELEASE THEIR DIVERSITY DATA | | | |
| IBM | TELL THEM TO RELEASE THEIR DIVERSITY DATA | | | |
| Ingram Micro | | | 2011 | TELL THEM TO UPDATE |
| Intel | | | 2014 | THANK THEM! |
| 🔵 LinkedIn | | | 2015 | THANK THEM! |
| 🌈 Living Social | TELL THEM TO RELEASE THEIR DIVERSITY DATA | | | |
| 🪟 Microsoft | | | 2014 | THANK THEM! |
| Mozilla | | | 2015 | THANK THEM! |
| 🔴 Netflix | | | 2015 | THANK THEM! |
| 🔴 Oracle | | | 2012 | TELL THEM TO UPDATE |
| 🟢 Pivotal | | | 2016 | THANK THEM! |
| 🔴 Red Hat | | | 2014 | THANK THEM! |
| ☁️ Salesforce | | | 2014 | THANK THEM! |
| 🔵 SendGrid | | | 2014 | THANK THEM! |
| 🔴 Shutterstock | TELL THEM TO RELEASE THEIR DIVERSITY DATA | | | |



⌂ Home    @DiversityData

| | | | | |
|---|---|---|---|---|
| 🟦 Stack Exchange | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| ⬛ Tesla | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| 🟦 Trello | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| 🐦 Twitter | ↗ | ✔ | 2016 | 🐦 THANK THEM! |
| 🟠 Veeva Systems | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| 🔵 VMware | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| 🟣 Yahoo | ↗ | ✔ | 2014 | 🐦 THANK THEM! |
| 🔴 Yelp | ↗ | ✔ | 2014 | 🐦 THANK THEM! |
| 🔴 Zynga | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |

## Services

| Services | Data | EEO-1 | Updated | Tweet |
|---|---|---|---|---|
| ⬛ Buffer | ↗ | | 2015 | 🐦 THANK THEM! |
| 🔵 DigitalOcean | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| 🟠 Etsy | ↗ | | 2014 | 🐦 THANK THEM! |
| GO Indiegogo | ↗ | | 2014 | 🐦 THANK THEM! |
| 🟢 KickStarter | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| P Pandora | ↗ | | 2014 | 🐦 THANK THEM! |
| 📌 Pinterest | ↗ | | 2015 | 🐦 THANK THEM! |
| ✳ Slack | ↗ | | 2015 | 🐦 THANK THEM! |

## Banking / Finance

| Banking / Finance | Data | EEO-1 | Updated | Tweet |
|---|---|---|---|---|



## Defense and Space

| | Data | EEO-1 | Updated | Tweet |
|---|---|---|---|---|
| Ⓡ Raytheon | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| SAIC | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| SpaceX | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |

## Other

| | Data | EEO-1 | Updated | Tweet |
|---|---|---|---|---|
| Bustle | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |
| BuzzFeed | ↗ | | 2014 | 🐦 THANK THEM! |
| Ⓥ Vox | | 🐦 TELL THEM TO RELEASE THEIR DIVERSITY DATA | | |

See an issue or want to add to this website? Fork it or create an issue on GitHub.

Made by members of Double Union with help from some awesome Contributors.

# EXHIBIT AG

 The Keyword

DIVERSITY AND INCLUSION

# Getting to work on diversity at Google

May 28, 2014 · 1 min read

Share

**Laszlo Bock**
SVP of People Operations

We've always been reluctant to publish numbers about the diversity of our workforce at Google. We now realize we were wrong, and that it's time to be candid about the issues. Put simply, Google is not where we want to be when it comes to diversity, and it's hard to address these kinds of challenges if you're not prepared to discuss them openly, and with the facts. So, here are our numbers:



* Data from Jan 2014 – Gender data are global, ethnicity data are US only
**See our EEO-1 report for more information

There are lots of reasons why technology companies like Google struggle to recruit and retain women and minorities. For example, women earn roughly 18 percent of all computer science degrees in the United States. Blacks and Hispanics each make up under 10 percent of U.S. college grads and each collect fewer than 10 percent of degrees in CS majors. So we've invested a lot of time and energy in education.

Among other things, since 2010 we've given more than $40 million to organizations working to bring computer science education to women and girls. And we've been working with historically black colleges and universities to elevate coursework and attendance in computer science. For example, this year Google engineer Charles Pratt was in-residence at Howard University, where he revamped the school's Intro to CS curriculum.

But we're the first to admit that Google is miles from where we want to be—and that being totally clear about the extent of the problem is a really important part of the solution. To learn more about our work on diversity—for our workforce, for the web and for the tech leaders of the future—visit google.com/diversity.

**Update** *May 31:* We updated the language of this post to correct the number of degrees black and Hispanic students earn in CS majors, which are 8 percent and 6 percent respectively, according to the National Science Foundation.

POSTED IN:

Diversity And Inclusion        Inside Google

# EXHIBIT AH

# Behind the EEO Curtain[*]

**Thomas Bourveau**[†]    **Rachel W. Flam**[‡]    **Anthony Le**[§]

July 14, 2023

**Abstract**

We leverage the release of standardized Equal Employment Opportunity (EEO-1) reports for over 800 federal contractors to provide empirical evidence on public firms' diversity practices. Using unique data for 2016-2020, we first document that public firms significantly lack diversity, especially in their first and middle managerial ranks. Second, we find robust evidence that imbalances in workforce diversity are associated with the decision to withhold the public release of firms' EEO-1 forms. Overall our results suggest that market forces have not achieved unraveling and that a disclosure mandate may be necessary for investors to observe the DEI practices of all firms, rather than just the more diverse ones.

**Abstract**

**Keywords:** EEO Form; Diversity Metrics; Strategic Disclosure

**JEL Classification:** J15, M14, M51

---

[*]We thank Qingkai (Kai) Dong, Emmanuel DeGeorge, Raphael Duguay, Alex Edmans, Stephen Glaeser, Jon Glover, John Kepler, Mirko Heinle, Sinja Leonelli, Christian Leuz, Sara Malik, Maximilian Muhn, Venky Nager, Gaizka Ormazabal, Paul Rissman, Gabriel Smagghue, Sameer Srivastava, Robert Stoumbos, Daniel Wolfenzon, Li Yang and Frank Zhou for helpful discussions and suggestions. We acknowledge excellent research assistance from Chandresh Gupta. All errors are ours.

[†]Columbia University, Columbia Business School - tb2797@columbia.edu
[‡]London Business School - rflam@london.edu
[§]Columbia University, Columbia Business School - ale25@gsb.columbia.edu

Electronic copy available at: https://ssrn.com/abstract=4452298

# 1　Introduction

Rising interest in diversity, equity, and inclusion (DEI) practices has increased calls from investors and other stakeholders for firms to publicly disclose workforce composition and DEI metrics. Regulators are also taking notice, as the lack of consistency across existing disclosures has led the SEC to consider "further enhancements" to its rules on human capital disclosures (Gensler, 2022).[1] In this paper, we leverage the April 2023 release of standardized EEO-1 reports for a large sample of federal contractors to provide empirical evidence on public firms' diversity practices across various levels, particularly middle management. We use this data to answer two questions: (1) how diverse are U.S. public firms, and (2) do firms strategically disclose diversity metrics based on their underlying level of diversity?

In the United States, all firms with more than 100 employees must annually file comprehensive data on their workforce diversity with the Equal Employment Opportunity Commission (EEOC) in a standardized EEO-1 report. While the EEOC requires certain firm disclosures (see Leibbrandt and List, 2018), EEO-1 reports are filed confidentially. Some firms voluntarily disclose these reports to the public, but the vast majority do not. Firms have typically resisted the call to share their EEO-1 reports on the grounds that their workforce composition is akin to a trade secret and its disclosure could hurt their competitive position (Williams, 2019), similar to the proprietary costs argument documented in the context of financial information (Verrecchia, 1983). This behavior has contributed to a lack of publicly available information about DEI practices (e.g., Dobbin and Kalev, 2022).[2] Investors also face data constraints, with over two-thirds of U.S. public firms not disclosing a single diversity-related metric in their 10-K filings (Bourveau et al., 2022).

The universe of publicly available firm diversity-related information expanded signifi-

---

[1] Legal scholars have argued that pursuing DEI policies is consistent with the traditional fiduciary duties of executives and directors (e.g., Brummer and Strine, 2022).

[2] To study workforce diversity outside of senior management, scholars have had to rely on data provided by employers (e.g., Holzer et al., 2006), occasional confidential agreements with the Equal Employment Opportunity Commission (e.g., Kalev et al., 2006; Tomaskovic-Devey et al., 2006), or third-party information providers such as Glassdoor and Revelio Labs (e.g., Baker et al., 2022; Cai et al., 2022).

Electronic copy available at: https://ssrn.com/abstract=4452298

cantly with the recent release of EEO-1 reports for over 18,000 federal contractors. Although EEO-1 reports are confidential, firms with federal contracts can be subject to the Freedom of Information Act (FOIA). In 2018, a reporter from The Center for Investigative Reporting submitted FOIA requests for the EEO-1 reports of all firms with federal contracts from 2016–2020. After extended litigation, these data were released in April 2023 for all firms that did not object to disclosure. Because these forms were initially filed confidentially and are subject to regulatory oversight (and hence less prone to manipulation), the release presents a uniquely powerful setting for examining firm diversity (see Bailey et al., 2022). Focusing on a constant panel of the 2,500 largest public firms from 2016–2020, we identify federal contractors in this sample and determine which of them permitted or objected to the release of their EEO-1 reports. We find that EEO-1 forms were released for approximately two-thirds of the government contractors in our sample, indicating that one in three objected to the release of their EEO-1 reports. Using these data, we seek to achieve two objectives.

The first aim of our study is to depict the landscape of workforce diversity (or lack thereof) among public firms that are federal contractors. These firms are important economic players and employ millions of people in the United States. EEO-1 forms typically include a breakdown of gender and race by occupation types, including executives, managers, and sales workers, among other categories. This breakdown is unique, as other sources of data (e.g., Bureau of Labor Statistics and the U.S. Census) are typically pooled across all employees. We primarily focus on the first- and middle-manager levels because studies have argued that managerial diversity is firms' primary diversity challenge (Dobbin and Kalev, 2022).

Our data quantify the lack of diversity in our sample. With respect to gender diversity, we find that women hold 35% of the first- and middle-level managerial positions while accounting for 39% of the workforce. The racial composition of the workforce presents even more striking patterns. White individuals hold 71% of the first- and middle-level manager positions, while they only account for 63% of the total workforce. Asian individuals hold 8% of the first- and middle-level positions while accounting for 9% of the workforce. On the other hand, Hispanic

2

Electronic copy available at: https://ssrn.com/abstract=4452298

and Black employees only account for 6% and 4% of the first- and middle-level managers while accounting for 10% and 8% of the total workforce in our sample. We also observe significant heterogeneity in the distribution of minority employees across firms: while 17% of the firms in our sample employ fewer than 10% minority managers, half of them employ less than 20% minority managers. This finding confirms longstanding results in sociology that firm-initiated diversity training has not led to increased representation of minorities in managerial roles (Dobbin and Kalev, 2022).

After providing descriptive evidence on workforce diversity, we turn to our second objective: examining whether a firm's decision to voluntarily disclose its EEO-1 form is associated with the diversity of its workforce. Around 7% of the EEO-1 reports in our sample were voluntarily disclosed by the firm, and the number of firms disclosing in our sample rose from 0.8% in 2016 to 15% in 2020.[3] By revealed preferences, firms operate in a partial disclosure equilibrium where only some firms disclose their EEO-1 form publicly. This indicates that firms play a strategic disclosure game, trading off costs and benefits associated with disclosure. On the benefit side, EEO-1 forms can inform investors about a firm's material risks (Balakrishnan et al., 2023a), as well as consumers (Balakrishnan et al., 2023b) and prospective employees (Choi et al., 2023). Conversely, revealing a lack of workforce diversity might have adverse consequences for firms in capital, labor, and consumer markets.

Our setting is unique in that we are able to observe the underlying performance of the firm (here about workforce diversity) regardless of the voluntary disclosure choice. This feature departs from the typical voluntary disclosure setting where firms' underlying data is inferred from public disclosure. We examine firms' disclosure decision with a focus on employees in first- and middle-level managerial positions (Dobbin and Kalev, 2022; Richard et al., 2021). Our results reveal that a firm's gender imbalance in managerial ranks does not seem to correlate with the decision to publicly disclose its EEO-1 form. In contrast, racial composition seems to play a major role. A 10 percentage point increase in the share

---

[3]For clarity, we refer to voluntary disclosure by the firm as "disclosure" and the release of the data under the FOIA request as "release."

Electronic copy available at: https://ssrn.com/abstract=4452298

of minority managers increases a firm's probability of sharing its EEO-1 report by just over one percentage point, or 16.4% of the mean disclosure rate.

We next test whether the decision to publicly disclose an EEO-1 report is associated with firms' managerial diversity relative to the diversity of lower rank employees. While we again find no evidence that gender diversity influences disclosure, our results indicate that firms are more likely to disclose as the ratio of racial minority managers to lower-level racial minority employees increases. Firms with above-median proportions of racial minority managers relative to lower-level racial minority employers are 4 percentage points more likely to disclose their EEO-1 reports voluntarily, an economically sizeable effect of 60% of the sample mean.[4]

Finally, we re-run our analyses benchmarking firms' levels of managerial diversity against their industry's average level of managerial diversity. We assess whether a firm being above or below its industry's average diversity level correlates with its disclosure decision. We again fail to find any association based on gender. However, our results suggest that having a higher share of diverse managers than the industry average increases the likelihood of the public disclosure of the EEO-1 report by close to 5 percentage points. This association is robust and statistically significant for all Blacks and Hispanics. Our findings are consistent with recent research suggesting that firms both learn and are influenced by the non-financial disclosures of industry peers (e.g., Bochkay et al., 2022; Keeve, 2022; Tomar, 2023).

Our paper makes two contributions to the literature. First, it contributes to the literature on workforce diversity. Scholars in sociology and management have studied how to improve workforce diversity (e.g., Barrios et al., 2020; Benson et al., 2022; Dobbin and Kalev, 2022). Following the seminal work of Becker (1957), a cross-disciplinary body of research focuses on the (positive) externalities created by having either a more diverse workforce overall (e.g., Nishii, 2013; Edmans et al., 2023) or more diversity within firms' governance institutions

---

[4]When we consider specific ethnicities, we find that these results hold for both Black and Hispanic employees. We do not find evidence that this association holds for the share of Asian managers to total employees, perhaps because this distribution exhibits less variation.

Electronic copy available at: https://ssrn.com/abstract=4452298

(e.g., Cai et al., 2022).Our study contributes to this literature by providing unique, up-to-date statistics on the workforce diversity of some of the largest publicly traded U.S. federal contractors. Despite past efforts and increased attention by various stakeholders, our data reveals that under-representation of racial minorities persists, especially among Black and Hispanic employees at the managerial level.

Second, our paper contributes to the literature on strategic disclosure. A growing body of work studies firms' decision to voluntarily disclose information on the social aspects of their actions.[5] In a recent survey, Christensen et al. (2021) argue that similar market forces are driving the strategic voluntary disclosure of both financial and non-financial information. Since firms disclose this information privately to the government, our results do not reflect an information endowment friction (Dye, 1985). We find that firms with below-average representation of minority managers are significantly less likely to disclose their EEO-1 form, consistent with the potential costs of disclosure influencing this decision (Verrecchia, 1983). Our paper also complements two recent studies. Balakrishnan et al. (2023b) find that consumers perceive firms that disclose their EEO-1 forms more positively, while Baker et al. (2022) find that companies engage in "diversity washing." That is, they disclose ambitious public commitments about diversity targets but fall short of reaching those targets in their hiring practices. In contrast, our results show that private knowledge about their lack of workforce diversity leads firms to withhold the EEO-1 form.

Finally, our results have clear policy implications. Investors increasingly view the lack of diversity as a material source of risk for public companies (Balakrishnan et al., 2023a; Shelby, 2023) and have called for the SEC to mandate disclosure to obtain comprehensive and comparable public data on DEI practices (Augustine et al., 2021; Mennie, 2021). Our findings based on a sample of public federal contractors offer useful insights for this discussion. First, we provide timely information about the distribution of diversity metrics that would

---

[5]Topics range from human capital broadly defined (Bourveau et al., 2022) and general social policies (Cyr-Jones et al., 2022) to more specific topics, including the gender pay gap (e.g., Bennedsen et al., 2022; Huang and Lu, 2022), workplace safety (Christensen et al., 2017), and forced labor (e.g., She, 2022).

Electronic copy available at: https://ssrn.com/abstract=4452298

be observable to investors with a mandate in place. This is important because actual DEI practices cannot be derived from commonly observable diversity characteristics of boards (Edmans et al., 2023). Second, our results quantify the differences in workforce diversity between the growing sample of firms that choose to voluntarily release this data and those that remain silent. In the short term, market forces seem unable to achieve unraveling, allowing firms with less workforce diversity to stay silent. If investors continue to want information on workforce diversity, our results suggest that a disclosure mandate may be necessary (Leuz and Wysocki, 2016).

## 2   Data

Obtaining data on the workforce composition of U.S. firms is very challenging. Employers with at least 100 employees must annually submit EEO-1 reports to the Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Labor (DOL).[6] EEO-1 reports contain data on the gender and racial/ethnic composition of the firm's workforce by job category. These forms are filed confidentially, and the EEOC does not make them public.

In 2018, The Center for Investigative Reporting (CIR) submitted Freedom of Information Act (FOIA) requests for the official EEO-1 reports of several technology firms that had qualified as federal contractors. Most firms requested that the FOIA requests be blocked, arguing that their diversity data qualified as a trade secret and was therefore exempt. When the federal government agreed with these arguments, CIR sued, alleging a violation of FOIA. It won the suit in 2019 and subsequently requested EEO-1 reports from 2016-2020 for *all* federal contractors. In April 2023, this data was released publicly for approximately 18,000 companies that agreed to the disclosure or simply did not object.

We use the CRSP-Compustat universe as of December 31, 2022, as the basis for our sample. We require that firms be present in the sample for all fiscal years between 2016 and 2020, and we restrict our sample to a balanced panel of the 2,500 largest firms that fit these

---

[6]Facing a lower threshold, federal contractors must submit reports if they have at least 50 employees.

Electronic copy available at: https://ssrn.com/abstract=4452298

criteria. We then manually match federal contractors whose EEO-1 reports were released with our sample of public firms, obtaining 830 unique firms. Of the remaining 1,670 firms, we identify 482 federal contractors using USAspending.gov, suggesting that approximately one-third of the federal contractors in our sample objected to the release of their data.

We face two potential forms of bias in our sample of EEO-1 reports relative to the population of public firms. First, there may be systemic differences between government contractors that object and do not object to the release of their EEO-1 reports. Second, given that firms choose to bid to obtain federal contracts, there may be differences between government contractors and other firms. To help us assess potential concerns about selection bias, we quantify the similarities and differences along various dimensions across our group of federal contractors with EEO-1 reports available, our group of federal contractors without EEO-1 reports available, and our group of other firms.

As shown in Figure 1, the geographical distribution of the three groups is largely similar. Table 1 Panel A reveals some differences in industry composition. For example, government contractors in finance and insurance are more likely to permit the release of their EEO-1 reports, while those in the information industry are more likely to object. Compared to non-contractors, manufacturers and utilities are more likely to be federal contractors, while firms in the mining, oil and gas, and real estate industries are less likely to be federal contractors.

Table 1 Panel B displays descriptive statistics by groups. We first examine the differences between federal contractors that permitted the disclosure of their EEO-1 forms and those that objected. Our data reveal that contractors permitting the release of their EEO-1 filings are slightly smaller and more profitable than those that objected. We next consider the differences between federal contractors and other firms. Federal contractors that permit the release of their EEO-1 reports are larger, more profitable, and have a higher market-to-book ratio and percentage of institutional ownership, relative to the other firms. Federal contractors further exhibit a lower leverage ratio and a lower ratio of capital expenditures. These descriptive statistics are largely consistent with those in the recent study of federal contrac-

Electronic copy available at: https://ssrn.com/abstract=4452298

tors by Samuels (2021).[7] On average, the differences are more significant between federal contractors and other firms than between objecting and non-objecting federal contractors. Further, our finding that federal contractors that permit the release of their EEO-1 reports are more profitable than objecting contractors is more consistent with objectors hiding poor DEI practices rather than protecting valuable trade secrets (Williams, 2019).

While EEO-1 reports are filed confidentially, a growing number of firms choose to separately disclose their EEO-1 reports to the public.[8] We exploit this dimension by manually searching companies' websites using the WayBack machine to identify whether firms disclosed their EEO-1 form annually throughout our sample period.[9] We find that, on average, 7% of the federal contractors in our sample disclosed their EEO-1 report voluntarily (See Table 2). This rate increased from 0.8% to 15% between 2016 and 2020.

Equipped with our data, we turn to our two empirical objectives. First, we use EEO-1 report data to comprehensively depict the degree of workforce diversity among federal contractors (Section 3). Next we assess whether firms' decision to publicly disclose their EEO filings on their websites relates to their degree of workforce diversity (Section 4).

## 3    Workforce Composition

Table 2 presents descriptive statistics for the EEO data for firms in our sample. From 2016–2020, we obtain just over 3,000 EEO-1 reports for our sample of Compustat firms. Only 7% of the reports in our sample were voluntarily disclosed by the firms directly (i.e., made available on their websites). Thus the majority of our data were not publicly available prior to the mass release of the EEO-1 reports in April 2023.

When we consider employees at all levels, we observe that 37% of them belong to a racial

---

[7]The two dimensions along which our sample differs from that of Samuels (2021), leverage and market-to-book ratio, are due to the different sample periods. Samuels (2021) uses the period of FY 2000 - 2016, while our sample spans from FY 2016 - 2020.

[8]The number of firms in the Russell 1000 disclosing an EEO-1 report tripled from 11% in 2021 to 34% in 2022. See the 2023 Just Capital Report.

[9]The use of the WayBack machine is becoming popular to collect information disclosed on public and private firms' websites (e.g., Boulland et al., 2021).

Electronic copy available at: https://ssrn.com/abstract=4452298

minority group while 63% are nonminority White. For the purposes of comparison, the 2020 U.S. Census identified 59.3% of the U.S. population as White (U.S. Census Bureau, 2020). We present data for Black, White, Hispanic, and Asian employees, as these ethnic groups are disclosed in EEO metrics. Black employees comprise 8% of the workforce, Hispanic employees 10%, and Asian employees 9%. When we compare the labor force to the population, we find that Black and Hispanic employees are most underrepresented relative to their representation in the population: 18.9% (13.6%) of the population is Hispanic (Black), but only 10% (8%) of public firm employees are Hispanic (Black).

The last section of Table 2 presents the diversity of managers in our sample. Here we observe that diversity in managerial roles declines compared to the full sample. For example, 39% of all employees are female, but only 35% of managers are female. Racial minorities show an even steeper decline: they comprise 37% of all employees but only 29% of managers. Further, ethnic minorities are less represented in managerial positions across all minority ethnic groups in our data. The most significant underrepresentation occurs for Black managers, as the share of Black employees in managerial roles declines by half compared to the share of Black employees in all roles.

The data presented in Table 2 demonstrate a lack of workplace diversity on average, particularly at the managerial level. However, these averages mask significant heterogeneity across firms, so we turn to Figure 2 to explore the data in more detail.

Figure 2 presents shares of female and minority employees across the various job titles. The distributions for both females and ethnic minorities are right-skewed, with many firms employing a lower proportion of female and ethnic minority employees. The skewness of the distributions becomes much more pronounced as we move up the hierarchy from all employees (Panel A) to first- and middle-level managers (Panel B) to executives (Panel C). For example, very few firms employ fewer than 5% women across all job titles, but approximately one in 20 firms employ fewer than 5% women at the executive level. These patterns become even more striking when we examine ethnic diversity. Considering all levels

Electronic copy available at: https://ssrn.com/abstract=4452298

of employment, around 3% of firms employ fewer than 5% ethnic minority employees. This proportion rises to over 5% for first- and middle-level managers. However, the most drastic disparities are at the executive level, where one-quarter of firms employ fewer than 5% minority executives. Our data also reveal that 17% of firms employ zero ethnic minorities at the executive level (untabulated). This lack of diversity at the executive level is consistent with the findings of prior research (Hekman et al., 2017).

Given the granularity of our data, we consider variation in the diversity of specific ethnic groups. Figure 3 presents the distribution of ethnic minority groups across the public firms in our sample. We observe a left-skewed distribution for White employees, where more firms employ a higher proportion of White employees (Panel A). We also observe severe skewness at the executive level: at least 85% of executives are white for most firms in our sample.

In contrast, we observe right-skewed distributions for Black, Hispanic, and Asian employees (Panels B–D). The skewness of the distributions for individual ethnic minorities is consistent with the distributions for pooled ethnic minorities in Figure 2. Black employees experience the lowest levels of representation at the managerial and executive levels, with nearly 70% of firms employing fewer than 5% Black managers and over 85% of firms employing fewer than 5% Black executives (Panel B). Similarly, slightly less than half of firms employ fewer than 5% Hispanic managers, and over 70% of firms employ less than 5% Hispanic executives. The center of these distributions for management and executive roles is also quite far from the population average. The distribution of Asian employees (Panel D) is also skewed but slightly differently. Just under half of firms employ fewer than 5% Asian employees. However, the disparities between the percentage of all employees and the percentage of employees in managerial roles are less severe for this ethnic group.

Overall we find the firms in our sample exhibit a lack of diversity which becomes more pronounced as we move up the managerial hierarchy. Our findings confirm longstanding results in sociology that firm-initiated diversity training has not led to minority representation in managerial roles in proportions similar to their proportions in the population (Dobbin and

Electronic copy available at: https://ssrn.com/abstract=4452298

Kalev, 2022). However, our findings are subject to the caveat that EEO-1 form data does not account for pre-market differences (e.g., education or skill) or selection in employees' decisions to enter the labor market and subsequently obtain a job in a large public company, both of which may be correlated with minority status (Neal and Johnson, 1996).

# 4    The Strategic Disclosure of EEO-1 Reports

Having established the landscape of diversity for public firms, we next turn to whether a firm's absolute or relative diversity influences its decision to publicly disclose its EEO-1 report. We focus on managers for the remainder of our tests because research argues that diversifying at the management level is the primary diversity challenge for firms (Dobbin and Kalev, 2022). As discussed in Section 2, public disclosure of EEO-1 reports has risen drastically in recent years, as investors and other stakeholders have demanded more information on DEI practices and outcomes. For the firms in our sample, the number publicly disclosing the EEO-1 report rose from 0.8% in 2016 to 15% in 2020. This drastic increase notwithstanding, the vast majority of firms continue not to disclose their EEO-1 reports. The release of this data to the public permits us to investigate whether firms that disclose their EEO-1 reports do so strategically as well as to explore which diversity metrics appear to have the greatest influence on the decision to disclose.

Table 3 presents the results of these tests. In Panel A, we first investigate whether the proportion of female or minority managers influences the choice to disclose. We first examine the proportion of female managers in Column (1), finding no evidence that the proportion of female managers is associated with public disclosure of EEO-1 reports. This result likely reflects that the imbalances across gender are less severe relative to imbalances across ethnicity, as shown in Figure 2. We next turn to the proportion of ethnic minority managers. In Column (2), our independent variable of interest is the proportion of employees belonging to any racial minority. We find a positive and significant coefficient on the proportion of racial

11

Electronic copy available at: https://ssrn.com/abstract=4452298

minority employees, indicating that firms are more likely to disclose as the percentage of racial minority managers increases. Economically, a one standard deviation increase in the proportion of racial minority managers is associated with a 36% increase in the probability of disclosure relative to the mean.[10]  When we consider specific ethnic groups in Columns (3)–(5), our results suggest that this association is partially driven by Black and Hispanic managers. However, we do not find evidence that this association holds for the share of Asian managers to total employees (although the sign is also positive), perhaps because there is less variation in this distribution.[11]

Next we test whether the representation of minority managers relative to lower-rank minority employees influences the decision to publicly disclose an EEO-1 report. Table 3 Panel B presents the results of these tests. As in Panel A, we again find no evidence that gender diversity influences the disclosure decision. However, our results indicate that firms are more likely to disclose as the representation of racial minority employees who are managers increases. When we consider specific ethnicities, we again find that these results hold for both Black and Hispanic employees.

With Table 3 Panel C, we move from absolute to relative workforce diversity. Specifically, we consider whether a firm's decision to disclose relates to its workforce diversity versus its industry peers (defined using four-digit NAICS codes).[12]  As with our tests of absolute workforce diversity, we find no evidence in Column (1) that gender diversity influences the disclosure decision. However, the results presented in Columns (2)–(5) indicate that a firm's *relative* ethnic diversity among industry peers is associated with the choice to disclose, and these results are driven by the proportion of Black and Hispanic managers.

---

[10]We acknowledge that the economic magnitude of our results is large. We believe that this is due to (i) a relatively small (though growing) sample mean and (ii) the fact that we likely capture a first-order factor (i.e. firms' underlying workforce diversity) in firms' decision to disclose their EEO-1 forms publicly.

[11]Our results also reveal a positive and robust correlation between a firm's size and its probability of releasing its EEO-1 form, consistent with the argument that large public firms face more scrutiny on ESG issues than do smaller ones (Christensen et al., 2021) and that profitability is associated with more public disclosure (Miller, 2002). The positive association between profitability and EEO-1 form disclosure is inconsistent with the argument that EEO-1 data are kept confidential to hide valuable trade secrets (Williams, 2019).

[12]These findings are robust to using GICS industry codes to define industry peers.

Electronic copy available at: https://ssrn.com/abstract=4452298

Taken together, our results are consistent with firms strategically disclosing their diversity metrics when they appear more ethnically diverse, particularly compared to their industry peers. We view our results as responding to the call from Gow et al. (2016) for descriptive studies on first-order questions. Our partial disclosure equilibrium reveals that full unravelling has not been achieved yet through market forces (Grossman, 1981; Milgrom, 1981). While we do not formally test a disclosure theory, we argue that our disclosure equilibrium is not driven by uncertainty about the information endowment since firms must file this information privately to the government Dye (1985). Instead, our partial equilibrium is consistent with diversity disclosure being costly (Verrecchia, 1983). This cost could arise from reputational concerns if investors and other stakeholders notice firms' lack of workforce diversity. Given that the number of firms publicly disclosing their EEO-1 forms is growing steadily in recent years, this could provide a valuable setting for future research to test a dynamic disclosure game.

## 5    Conclusion

Using a recently released dataset based on government contractors' EEO-1 reports, we provide evidence on the lack of racial diversity among U.S. public firms, particularly among the first and middle managerial ranks. We further document that the lack of workforce diversity at the middle management level is negatively associated with the public disclosure of firms' EEO-1 reports, suggesting that firms with greater imbalances hide their lack of diversity from investors and other stakeholders. To the extent that this information is material to shareholders, the lack of unraveling through market forces suggests that a disclosure mandate might be necessary to inform and protect investors (Leuz and Wysocki, 2016).

Electronic copy available at: https://ssrn.com/abstract=4452298

# References

Augustine, A., M. Frerichs, S. Wooden, and B. Murphy, 2021, Letter to the SEC, *(Link)* .

Bailey, M., S. Glaeser, J. Omartian, and A. Raghunandan, 2022, Misreporting of mandatory ESG disclosures: Evidence from gender pay gap information, *Working Paper (Link)* .

Baker, A., D. Larcker, C. McClure, D. Saraph, and E. Watts, 2022, Diversity washing, *Working Paper (Link)* .

Balakrishnan, K., R. Copat, D. De La Parra, and K Ramesh, 2023a, Racial diversity exposure and firm responses following the murder of George Floyd, *Journal of Accounting Research* 61, 737–804.

Balakrishnan, M., J. Nam, and R. Buell, 2023b, Differentiating on diversity: How disclosing workforce diversity improves brand attitudes, *Working Paper (Link)* .

Barrios, J., L. Giuliano, and A. Leone, 2020, In living color: Does in-person screening affect who gets hired?, *Working Paper (Link)* .

Becker, G., 1957, *The Economics of Discrimination* (University of Chicago Press).

Bennedsen, M., E. Simintzi, M. Tsoutsoura, and D. Wolfenzon, 2022, Do firms respond to gender pay gap transparency?, *Journal of Finance* 77, 2051–2091.

Benson, A., D. Li, and K. Shue, 2022, "Potential" and the gender promotion gap, *Working Paper (Link)* .

Bochkay, K., S. Choi, and J. Hales, 2022, 'Mere puffery' or credible disclosure? The real effects of adopting voluntary ESG disclosure standards, *Working Paper (Link)* .

Boulland, R., T. Bourveau, and M. Breuer, 2021, Corporate websites: A new measure of voluntary disclosure, *Working Paper (Link)* .

Bourveau, T., M. Chowdhury, A. Le, and E. Rouen, 2022, Human capital disclosures, *Working Paper (Link)* .

Brummer, C., and L. Strine, 2022, Duty and diversity, *Vanderbilt Law Review* 75, 1–92.

Cai, W., A. Dey, J. Grennan, J. Pacelli, and L. Qiu, 2022, Do diverse directors influence DEI outcomes?, *Working Paper (Link)* .

Choi, J., J. Pacelli, K. Rennekamp, and S. Tomar, 2023, Do jobseekers value diversity information? Evidence from a field experiment and human capital disclosures, *Journal of Accounting Research* 61, 695–735.

Christensen, H., E. Floyd, and M. Liu, L. Maffett, 2017, The real effects of mandated information on social responsibility in financial reports: Evidence from mine-safety records, *Journal of Accounting and Economics* 64, 284–304.

Electronic copy available at: https://ssrn.com/abstract=4452298

Christensen, H., L. Hail, and C. Leuz, 2021, Mandatory CSR and sustainability reporting: Economic analysis and literature review, *Review of Accounting Studies* 26, 1176–1248.

Cyr-Jones, A., S. Malik, and M. Ringgenberg, 2022, Testing the separability condition: Do investors price social policy disclosures correctly?, *Working Paper (Link)* .

Dobbin, A., and F. Kalev, 2022, *Getting to Diversity* (Harvard University Press).

Dye, R., 1985, Disclosure of nonproprietary information, *Journal of Accounting Research* 23, 123–145.

Edmans, A., C. Flammer, and S. Glossner, 2023, Diversity, equity, and inclusion, *Working Paper (Link)* .

Gensler, G., 2022, Remarks to the investor advisory committee, *(Link)* .

Gow, I., D. Larcker, and P. Reiss, 2016, Causal inference in accounting research, *Journal of Accounting Research* 54, 477–523.

Grossman, S., 1981, The informational role of warranties and private disclosure about product quality, *Journal of Law & Economics* 24, 461–483.

Hekman, D., S. Johnson, M. Foo, and Y. Wei, 2017, Does diversity-valuing behavior result in diminished performance ratings for non-white and female leaders?, *Academy of Management Journal* 60, 771–797.

Holzer, H., S. Raphael, and A. Stoll, 2006, Perceived criminality, criminal background checks, and the racial hiring practices of employers, *Journal of Law & Economics* 49, 451–480.

Huang, J., and S. Lu, 2022, ESG performance and voluntary ESG disclosure: Mind the (gender pay) gap, *Working Paper (Link)* .

Kalev, A., F. Dobbin, and E. Kelly, 2006, Best practices or best guesses? Assessing the efficacy of corporate affirmative action and diversity policies, *American Sociological Review* 71, 589–617.

Keeve, T., 2022, Peer effects in ESG ratings: Evidence from gender pay gap disclosures, *Working Paper (Link)* .

Leibbrandt, A., and J.A. List, 2018, Do equal employment opportunity statements backfire? evidence from a natural field experiment on job-entry decisions, *Working Paper (Link)* .

Leuz, C., and P. Wysocki, 2016, The economics of disclosure and financial reporting regulation: Evidence and suggestions for future research, *Journal of Accounting Research* 54, 525–622.

Mennie, P., 2021, Letter to the SEC, *(Link)* .

Milgrom, P., 1981, Good news and bad news: Representation theorems and applications, *Bell Journal of Economics* 12, 380–391.

Electronic copy available at: https://ssrn.com/abstract=4452298

Miller, G., 2002, Earnings performance and discretionary disclosure, *Journal of Accounting Research* 40, 173–204.

Neal, D.A., and W.R. Johnson, 1996, The role of premarket factors in Black-White wage differences, *Journal of Political Economy* 104, 869–895.

Nishii, L., 2013, The benefits of climate for inclusion for gender-diverse groups, *Academy of Management Journal* 56, 1754–1774.

Richard, O.C., M.d.C. Triana, and M. Li, 2021, The effects of racial diversity congruence between upper management and lower management on firm productivity, *Academy of Management Journal* 64, 1355–1382.

Samuels, D., 2021, Government procurement and changes in firm transparency, *The Accounting Review* 96, 401–430.

She, G., 2022, The real effects of mandatory nonfinancial disclosure: Evidence from supply chain transparency, *The Accounting Review* 97, 399–425.

Shelby, C. M., 2023, Racism and systemic risk, *Northwestern University Law Review* 118.

Tomar, S., 2023, Greenhouse gas disclosure and emissions benchmarking, *Journal of Accounting Research* 61, 451–492.

Tomaskovic-Devey, D., K. Stainback, T. Taylor, C. Zimmer, C. Robinson, and T. McTague, 2006, Documenting desegregation: Segregation in American workplaces by race, ethnicity, and sex, 1966-2003, *American Sociological Review* 71, 565–588.

U.S. Census Bureau, 2020, Population, Census, April 1, 2020, *(Link)* .

Verrecchia, R., 1983, Discretionary disclosure, *Journal of Accounting and Economics* 5, 179–194.

Williams, J., 2019, Diversity as a trade secret, *Georgetown Law Journal* 107, 1685–1732.

Electronic copy available at: https://ssrn.com/abstract=4452298

**Figure 1:** Geographic Distribution of Sample

This figure shows the geographic distribution across the United States for three groups of firms in our sample: CRSP-Compustat firms which are not government contractors, CRSP-Compustat firms which are government contractors and objected to the release of their EEO-1 data, and CRSP-Compustat firms which are government contractors and agreed to or did not object to the release of their EEO-1 data. Panel A shows the proportion of the non-government contractor CRSP-Compustat firms in each state. Panel B shows the proportion of firms that refused disclosure of their EEO-1 data in each state. Panel C shows the proportion of firms that agreed to or did not object to the release of their EEO-1 data in each state.



**Panel A**: Share of Non-Government Contractors in Each State



**Panel B**: Share of Government Contractors that Withheld in Each State



**Panel C**: Share of Government Contractors that Disclosed in Each State

17

Electronic copy available at: https://ssrn.com/abstract=4452298

**Figure 2:** Histograms of Female and Racial Minority Shares for Public Firms

This figure shows the distribution of racial minority shares and female shares across the CRSP-Compustat firms that permitted the release of their EEO-1 data. The distribution of the share of racial minorities is shaded in blue, while the distribution of the share of women is shaded in red. Panel A shows the distributions across all employees. Panel B shows the distributions across first- and middle-level managers. Panel C shows the distributions across executives.



**Panel A**: All Employees          **Panel B**: First- and Middle-Level Managers



**Panel C**: Executives

18

Electronic copy available at: https://ssrn.com/abstract=4452298

**Figure 3:** Distribution of Racial Minority Groups in Public Firms

This figure shows the distribution of racial groups across the CRSP-Compustat firms that permitted the release of their EEO data. Panel A shows the distribution of White employee shares within firms. Panel B shows the distribution of Black employee shares within firms. Panel C shows the distribution of Hispanic employee shares within firms. Panel D shows the distribution of Asian employee shares within firms. In each panel, the blue-shaded bars denote the representation of that group among all employees, the red-shaded bars denote the representation of that group among first and middle-level managers, and the green-shaded bars denote the representation of that group among executives. In each panel, the dashed black line represents the proportion of that racial group across the U.S. population in 2020.



**Panel A**: White Employees               **Panel B**: Black Employees



**Panel C**: Hispanic Employees            **Panel D**: Asian Employees

19

Electronic copy available at: https://ssrn.com/abstract=4452298

## Table 1: Descriptive Statistics of FOIA Sample

This table shows the descriptive statistics for the firms that did not object to or agreed to release their EEO-1 data relative to the firms that either refused to disclose their data or were not federal contractors. Panel A shows the industry breakdown of the firms in each sample. "Gov't Contractors who Disclosed" refers to firms that did not object to, or agreed to release their EEO-1 data. "Gov't Contractors who Withheld" refer to firms that refused to disclose their data and were government contractors. "Non-Gov't Contractors" refers to firms that were not federal contractors. Panel B compares these two groups along key financial dimensions. All continuous variables are winsorized at the 1st and 99th percentile. Detailed variable definitions are provided in Appendix 2.

**Panel A:** Industry Distribution of Financial Characteristics Of Contractor Disclosers, Contractor Non-Disclosers, and Non-Contractors

| 2-Digit NAICS | Gov't Contractors who Disclosed | Gov't Contractors who Withheld | Non-Gov't Contractors |
|---|---|---|---|
| 11: Agriculture, Forestry, Fishing, and Hunting | 0.12 | 0.00 | 0.42 |
| 21: Mining, Quarrying, and Oil and Gas Extraction | 3.38 | 1.45 | 7.07 |
| 22: Utilities | 4.47 | 5.19 | 1.35 |
| 23: Construction | 1.69 | 1.45 | 1.68 |
| 31: Manufacturing | 3.74 | 3.53 | 3.28 |
| 32: Manufacturing | 10.74 | 15.77 | 8.41 |
| 33: Manufacturing | 28.35 | 23.86 | 11.77 |
| 42: Wholesale Trade | 2.05 | 5.19 | 2.44 |
| 44: Retail Trade | 1.57 | 1.24 | 3.45 |
| 45: Retail Trade | 0.36 | 0.83 | 2.35 |
| 48: Transportation and Warehousing | 3.26 | 2.28 | 4.96 |
| 49: Transportation and Warehousing | 0.36 | 0.00 | 0.00 |
| 51: Information | 6.63 | 10.79 | 7.82 |
| 52: Finance and Insurance | 20.63 | 9.34 | 28.34 |
| 53: Real Estate and Rental and Leasing | 4.10 | 5.81 | 9.08 |
| 54: Professional, Scientific, and Technical Services | 3.62 | 4.77 | 1.68 |
| 56: Administrative and Support and Waste Management | 1.81 | 2.70 | 0.93 |
| 61: Educational Services | 0.24 | 1.45 | 0.42 |
| 62: Health Care and Social Assistance | 1.33 | 2.07 | 0.93 |
| 71: Arts, Entertainment, and Recreation | 0.24 | 0.21 | 0.59 |
| 72: Accommodation and Food Services | 1.09 | 0.83 | 2.52 |
| 81: Other Services (except Public Administration) | 0.12 | 0.41 | 0.34 |
| 99: Public Administration | 0.12 | 0.83 | 0.17 |
| Total | 100.00 | 100.00 | 100.00 |

Electronic copy available at: https://ssrn.com/abstract=4452298

**Panel B:** Comparison of Financial Characteristics Of Contractor Disclosers, Contractor Non-Disclosers, and Non-Contractors

| Variables | (1) Gov't Contractors who Disclosed | | | | | | (2) Gov't Contractors who Withheld | | | | | | (3) Non-Gov't Contractors | | | | | | t-test of (2) - (1) | | t-test of (3) - (1) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Obs | Mean | SD | p25 | p50 | p75 | Obs | Mean | SD | p25 | p50 | p75 | Obs | Mean | SD | p25 | p50 | p75 | Diff. in Means | p-value | Diff. in Means | p-value |
| Log(Total Assets) | 4,145 | 8.26 | 1.82 | 6.98 | 8.03 | 9.37 | 2,410 | 8.53 | 2.02 | 7.07 | 8.41 | 9.95 | 5,944 | 7.94 | 1.82 | 6.59 | 7.80 | 9.12 | 0.27 | <0.01 | -0.32 | <0.01 |
| Return on Assets | 4,145 | 0.03 | 0.09 | 0.01 | 0.03 | 0.07 | 2,410 | 0.01 | 0.12 | 0.00 | 0.03 | 0.06 | 5,943 | 0.02 | 0.09 | 0.00 | 0.02 | 0.06 | -0.01 | <0.01 | -0.01 | <0.01 |
| Market to Book | 3,944 | 3.25 | 6.71 | 1.34 | 2.25 | 3.91 | 2,091 | 3.42 | 7.09 | 1.46 | 2.42 | 4.17 | 4,869 | 2.61 | 6.86 | 1.01 | 1.69 | 3.14 | 0.17 | 0.36 | -0.63 | <0.01 |
| Capex to Sales | 4,136 | 0.07 | 0.11 | 0.02 | 0.03 | 0.06 | 2,408 | 0.07 | 0.11 | 0.01 | 0.03 | 0.07 | 5,909 | 0.09 | 0.18 | 0.01 | 0.03 | 0.07 | -0.00 | 0.32 | 0.02 | <0.01 |
| COGS to Sales | 4,145 | 0.55 | 0.35 | 0.33 | 0.58 | 0.73 | 2,410 | 0.67 | 0.54 | 0.45 | 0.64 | 0.77 | 5,943 | 0.59 | 0.59 | 0.44 | 0.58 | 0.75 | 0.12 | <0.01 | 0.03 | <0.01 |
| Leverage | 4,128 | 0.27 | 0.20 | 0.10 | 0.25 | 0.39 | 2,402 | 0.30 | 0.21 | 0.14 | 0.28 | 0.42 | 5,919 | 0.29 | 0.24 | 0.08 | 0.26 | 0.46 | 0.03 | <0.01 | 0.03 | <0.01 |
| Institutional Ownership | 3,090 | 0.74 | 0.25 | 0.63 | 0.82 | 0.92 | 2,294 | 0.70 | 0.29 | 0.55 | 0.78 | 0.92 | 5,489 | 0.61 | 0.32 | 0.34 | 0.69 | 0.89 | -0.04 | <0.01 | -0.13 | <0.01 |

Electronic copy available at: https://ssrn.com/abstract=4452298

**Table 2:** Descriptive Statistics of EEO Variables

This table shows the descriptive statistics for various workforce diversity metrics obtained from firms' disclosed EEO-1 data for the sample of Compustat firms who did not object to, or agreed to release their EEO-1 data. All continuous variables are winsorized at the 1st and 99th percentile. Detailed variable definitions are provided in Appendix 2.

| | Obs | Mean | SD | p25 | p50 | p75 |
|---|---|---|---|---|---|---|
| **Disclosure Decision** | | | | | | |
| Public EEO Disclosure | 3,076 | 0.07 | 0.25 | 0.00 | 0.00 | 0.00 |
| | | | | | | |
| **Overall Diversity** | | | | | | |
| Proportion of Female Employees | 3,076 | 0.39 | 0.19 | 0.00 | 0.00 | 1.00 |
| Proportion of Racial Minority Employees | 3,076 | 0.37 | 0.21 | 0.00 | 0.00 | 0.00 |
| Proportion of White Employees | 3,076 | 0.63 | 0.21 | 1.00 | 1.00 | 1.00 |
| Proportion of Black Employees | 3,076 | 0.08 | 0.06 | 0.00 | 0.00 | 0.00 |
| Proportion of Hispanic Employees | 3,076 | 0.10 | 0.08 | 0.00 | 0.00 | 0.00 |
| Proportion of Asian Employees | 3,076 | 0.09 | 0.11 | 0.00 | 0.00 | 0.00 |
| | | | | | | |
| **Diversity of Managers** | | | | | | |
| Proportion of Female Managers | 3,076 | 0.35 | 0.18 | 0.21 | 0.30 | 0.47 |
| Proportion of Racial Minority Managers | 3,076 | 0.29 | 0.22 | 0.13 | 0.21 | 0.37 |
| Proportion of White Managers | 3,076 | 0.71 | 0.22 | 0.63 | 0.79 | 0.87 |
| Proportion of Black Managers | 3,076 | 0.04 | 0.04 | 0.02 | 0.04 | 0.06 |
| Proportion of Hispanic Managers | 3,076 | 0.06 | 0.05 | 0.03 | 0.05 | 0.08 |
| Proportion of Asian Managers | 3,076 | 0.08 | 0.09 | 0.02 | 0.05 | 0.10 |
| | | | | | | |
| **Diversity of Lower-Level Employees** | | | | | | |
| Proportion of Female Lower-Level Employees | 3,076 | 0.41 | 0.21 | 0.00 | 0.00 | 1.00 |
| Proportion of Racial Minority Lower-Level Employees | 3,076 | 0.39 | 0.22 | 0.00 | 0.00 | 1.00 |
| Proportion of White Lower-Level Employees | 3,076 | 0.61 | 0.22 | 0.00 | 1.00 | 1.00 |
| Proportion of Black Lower-Level Employees | 3,076 | 0.09 | 0.07 | 0.04 | 0.08 | 0.12 |
| Proportion of Hispanic Lower-Level Employees | 3,076 | 0.11 | 0.09 | 0.05 | 0.09 | 0.14 |
| Proportion of Asian Lower-Level Employees | 3,076 | 0.09 | 0.11 | 0.02 | 0.05 | 0.12 |
| | | | | | | |
| **Other Variables** | | | | | | |
| Female Manager Share to Female Lower-Level Employee Share | 3,076 | 0.90 | 0.26 | 0.74 | 0.87 | 1.01 |
| Racial Minority Manager Share to Racial Minority Lower-Level Employee Share | 3,061 | 0.70 | 0.32 | 0.51 | 0.67 | 0.86 |
| Black Manager Share to Black Lower-Level Employee Share | 3,018 | 0.53 | 0.38 | 0.31 | 0.46 | 0.66 |
| Hispanic Manager Share to Hispanic Lower-Level Employee Share | 3,022 | 0.62 | 0.36 | 0.41 | 0.59 | 0.78 |
| Asian Manager Share to Asian Lower-Level Employee Share | 3,012 | 0.97 | 0.77 | 0.57 | 0.83 | 1.13 |

Electronic copy available at: https://ssrn.com/abstract=4452298

## Table 3: Strategic Disclosure of EEO Reports

This table reports the estimates for the associations between firms' underlying workforce diversity and their decision to publicly disclose their EEO-1 form. Panel A reports the results for measures of manager diversity on the public disclosure decision. Panel B reports the results for whether a firm's minority manager share relative to its lower-level workforce minority share is associated with their disclosure decision. Panel C reports the results for whether a firm being above or below the industry average level of manager diversity is associated with their decision to disclose their EEO-1 form publicly. All columns include industry and year fixed effects. Standard errors are clustered on the industry level. ***, **, and * indicate statistical significance at the 1%, 5%, and 10% level, respectively.

**Panel A**: Proportion of Minority Managers and Public Disclosure of EEO-1 Reports

| | Public EEO Disclosure | | | | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| Proportion of Female Managers | 0.061 | | | | |
| | (0.075) | | | | |
| Proportion of Female Lower-Level Employees | -0.071 | | | | |
| | (0.076) | | | | |
| Proportion of Racial Minority Managers | | 0.115** | | | |
| | | (0.049) | | | |
| Proportion of Racial Minority Lower-Level Employees | | -0.026 | | | |
| | | (0.034) | | | |
| Proportion of Black Managers | | | 0.478** | | |
| | | | (0.208) | | |
| Proportion of Black Lower-Level Employees | | | -0.166 | | |
| | | | (0.156) | | |
| Proportion of Hispanic Managers | | | | 0.354** | |
| | | | | (0.157) | |
| Proportion of Hispanic Lower-Level Employees | | | | -0.150** | |
| | | | | (0.075) | |
| Proportion of Asian Managers | | | | | 0.144 |
| | | | | | (0.135) |
| Proportion of Asian Lower-Level Employees | | | | | 0.089 |
| | | | | | (0.152) |
| Log(Total Assets) | 0.053*** | 0.052*** | 0.052*** | 0.052*** | 0.051*** |
| | (0.007) | (0.007) | (0.007) | (0.007) | (0.006) |
| ROA | 0.137* | 0.137* | 0.135* | 0.137* | 0.134* |
| | (0.076) | (0.076) | (0.075) | (0.076) | (0.076) |
| Market to Book | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) |
| Capex to Sales | 0.036 | 0.038 | 0.043 | 0.041 | 0.032 |
| | (0.093) | (0.096) | (0.094) | (0.096) | (0.097) |
| COGS to Sales | -0.016 | -0.018 | -0.019 | -0.018 | -0.015 |
| | (0.033) | (0.031) | (0.031) | (0.032) | (0.028) |
| Inst. Ownership | -0.071 | -0.073 | -0.068 | -0.072* | -0.072 |
| | (0.044) | (0.044) | (0.044) | (0.043) | (0.044) |
| N | 2,834 | 2,834 | 2,834 | 2,834 | 2,834 |
| Adj. R-squared | 0.183 | 0.185 | 0.184 | 0.184 | 0.188 |
| Year FE | Yes | Yes | Yes | Yes | Yes |
| Industry FE | Yes | Yes | Yes | Yes | Yes |
| Clusters | Industry | Industry | Industry | Industry | Industry |

Electronic copy available at: https://ssrn.com/abstract=4452298

**Panel B**: Above Median Ratio of Minority Managers to Minority Employees and Public Disclosure of EEO-1 Reports

| | Public EEO Disclosure | | | | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| Above Median Female Manager to Lower-Level Employee Share | 0.010 | | | | |
| | (0.012) | | | | |
| Proportion of Female Lower-Level Employees | -0.024 | | | | |
| | (0.056) | | | | |
| Above Median Racial Minority Manager to Lower-Level Employee Share | | 0.041** | | | |
| | | (0.016) | | | |
| Proportion of Racial Minority Lower-Level Employees | | 0.046* | | | |
| | | (0.026) | | | |
| Above Median Black Manager to Lower-Level Employee Share | | | 0.022* | | |
| | | | (0.013) | | |
| Proportion of Black Lower-Level Employees | | | 0.059 | | |
| | | | (0.130) | | |
| Above Median Hispanic Manager to Lower-Level Employee Share | | | | 0.027** | |
| | | | | (0.012) | |
| Proportion of Hispanic Lower-Level Employees | | | | 0.046 | |
| | | | | (0.039) | |
| Above Median Asian Manager to Lower-Level Employee Share | | | | | 0.011 |
| | | | | | (0.012) |
| Proportion of Asian Lower-Level Employees | | | | | 0.207** |
| | | | | | (0.095) |
| Log(Total Assets) | 0.053*** | 0.052*** | 0.052*** | 0.053*** | 0.052*** |
| | (0.007) | (0.007) | (0.007) | (0.007) | (0.007) |
| ROA | 0.137* | 0.135* | 0.133* | 0.131* | 0.121 |
| | (0.076) | (0.076) | (0.077) | (0.077) | (0.074) |
| Market to Book | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) |
| Capex to Sales | 0.036 | 0.034 | 0.035 | 0.035 | 0.030 |
| | (0.093) | (0.092) | (0.096) | (0.096) | (0.100) |
| COGS to Sales | -0.016 | -0.016 | -0.017 | -0.017 | -0.016 |
| | (0.033) | (0.030) | (0.032) | (0.032) | (0.027) |
| Inst. Ownership | -0.071 | -0.070 | -0.067 | -0.065 | -0.063 |
| | (0.043) | (0.044) | (0.044) | (0.043) | (0.043) |
| N | 2,834 | 2,824 | 2,786 | 2,788 | 2,780 |
| Adj. R-squared | 0.183 | 0.188 | 0.184 | 0.187 | 0.190 |
| Year FE | Yes | Yes | Yes | Yes | Yes |
| Industry FE | Yes | Yes | Yes | Yes | Yes |
| Clusters | Industry | Industry | Industry | Industry | Industry |

24

Electronic copy available at: https://ssrn.com/abstract=4452298

**Panel C**: Above Average Proportions of Minority Managers and Public Disclosure of EEO-1 Reports

| | Public EEO Disclosure | | | | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| Above Average Proportion of Female Managers | 0.017 | | | | |
| | (0.016) | | | | |
| Proportion of Female Lower-Level Employees | -0.080 | | | | |
| | (0.076) | | | | |
| Above Average Proportion of Minority Managers | | 0.048** | | | |
| | | (0.024) | | | |
| Proportion of Racial Minority Lower-Level Employees | | -0.009 | | | |
| | | (0.035) | | | |
| Above Average Proportion of Black Managers | | | 0.025*** | | |
| | | | (0.010) | | |
| Proportion of Black Lower-Level Employees | | | -0.089 | | |
| | | | (0.139) | | |
| Above Average Proportion of Hispanic Managers | | | | 0.024** | |
| | | | | (0.011) | |
| Proportion of Hispanic Lower-Level Employees | | | | -0.068 | |
| | | | | (0.057) | |
| Above Average Proportion of Asian Managers | | | | | 0.018 |
| | | | | | (0.012) |
| Proportion of Asian Lower-Level Employees | | | | | 0.148 |
| | | | | | (0.103) |
| Log(Total Assets) | 0.053*** | 0.052*** | 0.052*** | 0.052*** | 0.050*** |
| | (0.007) | (0.007) | (0.007) | (0.007) | (0.007) |
| ROA | 0.134* | 0.141* | 0.137* | 0.140* | 0.136* |
| | (0.075) | (0.075) | (0.076) | (0.076) | (0.075) |
| Market to Book | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| | (0.002) | (0.002) | (0.002) | (0.002) | (0.002) |
| Capex to Sales | 0.032 | 0.032 | 0.043 | 0.043 | 0.040 |
| | (0.093) | (0.097) | (0.093) | (0.095) | (0.098) |
| COGS to Sales | -0.017 | -0.018 | -0.019 | -0.017 | -0.015 |
| | (0.032) | (0.031) | (0.032) | (0.032) | (0.027) |
| Inst. Ownership | -0.072 | -0.069 | -0.072 | -0.070 | -0.072 |
| | (0.044) | (0.043) | (0.044) | (0.043) | (0.045) |
| N | 2,834 | 2,834 | 2,834 | 2,834 | 2,834 |
| Adj. R-squared | 0.184 | 0.187 | 0.185 | 0.184 | 0.188 |
| Year FE | Yes | Yes | Yes | Yes | Yes |
| Industry FE | Yes | Yes | Yes | Yes | Yes |
| Clusters | Industry | Industry | Industry | Industry | Industry |

25

Electronic copy available at: https://ssrn.com/abstract=4452298

# Appendix 1    Example of EEO-1 Report

CO= D140290
u= D140290

**EQUAL EMPLOYMENT OPPORTUNITY**
2021 EMPLOYER INFORMATION REPORT EEO-1
CONSOLIDATED REPORT

**SECTION B – COMPANY IDENTIFICATION**

1. APPLE INC.
ONE APPLE PARK WAY
CUPERTINO, CA 95014

2.a. APPLE INC.
ONE APPLE PARK WAY
CUPERTINO, CA 95014

c. EIN= 942404110

**SECTION C – TEST FOR FILING REQUIREMENT**

1- Y  2- N  3- Y    DUNS= 060704780

**SECTION E - ESTABLISHMENT INFORMATION**
NAICS: 334111 - Electronic Computer Manufacturing

**SECTION D - EMPLOYMENT DATA**

| JOB CATEGORIES | HISPANIC OR LATINO | | NOT-HISPANIC OR LATINO | | | | | | | | | | | | OVERALL TOTALS |
| | | | * * * MALE * * * | | | | | | * * * FEMALE * * * | | | | | | |
| | MALE | FEMALE | WHITE | BLACK OR AFRICAN AMERICAN | NATIVE HAWAIIAN OR PACIFIC ISLANDER | ASIAN | AMERICAN INDIAN OR ALASKAN NATIVE | TWO OR MORE RACES | WHITE | BLACK OR AFRICAN AMERICAN | NATIVE HAWAIIAN OR PACIFIC ISLANDER | ASIAN | AMERICAN INDIAN OR ALASKAN NATIVE | TWO OR MORE RACES | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXECUTIVE/SR OFFICIALS & MGRS | 2 | 0 | 77 | 0 | 0 | 17 | 0 | 1 | 21 | 2 | 0 | 6 | 0 | 0 | 126 |
| FIRST/MID OFFICIALS & MGRS | 602 | 305 | 5184 | 235 | 13 | 2926 | 16 | 109 | 1888 | 173 | 9 | 1122 | 4 | 74 | 12660 |
| PROFESSIONALS | 1694 | 898 | 13170 | 697 | 79 | 14058 | 47 | 608 | 4393 | 436 | 26 | 5918 | 25 | 338 | 42387 |
| TECHNICIANS | 870 | 625 | 2335 | 554 | 18 | 484 | 12 | 148 | 1070 | 339 | 16 | 320 | 2 | 96 | 6889 |
| SALES WORKERS | 3367 | 1975 | 6344 | 2239 | 103 | 1097 | 68 | 567 | 2854 | 1343 | 46 | 607 | 39 | 413 | 21062 |
| ADMINISTRATIVE SUPPORT | 1377 | 1054 | 3476 | 924 | 36 | 537 | 34 | 216 | 2356 | 1194 | 30 | 595 | 31 | 269 | 12129 |
| CRAFT WORKERS | 22 | 2 | 42 | 2 | 2 | 13 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 84 |
| OPERATIVES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LABORERS & HELPERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SERVICE WORKERS | 211 | 292 | 78 | 24 | 7 | 86 | 3 | 15 | 33 | 17 | 2 | 37 | 3 | 7 | 815 |
| TOTAL | 8145 | 5151 | 30706 | 4675 | 258 | 19218 | 180 | 1664 | 12616 | 3504 | 129 | 8605 | 104 | 1197 | 96152 |
| PREVIOUS REPORT TOTAL | 8162 | 5064 | 31766 | 4651 | 274 | 17930 | 185 | 1679 | 12927 | 3485 | 136 | 7860 | 109 | 1218 | 95446 |

**SECTION F - REMARKS**

DATES OF PAYROLL PERIOD: 12/16/2021 THRU 12/31/2021
**SECTION G - CERTIFICATION**
CERTIFYING OFFICIAL: Lenai Butterfield
EMAIL: Lenai@apple.com
EEO1 REPORT CONTACT PERSON: Lenai Butterfield
EMAIL: Lenai@apple.com

CERTIFIED DATE [EST]: 5/16/2022 10:19 PM

TITLE: Senior Manager, Global EEO & Affirmative Action
PHONE: 4088620893
TITLE: Senior Manager, Global EEO & Affirmative Action
PHONE: 4088620893

26

Electronic copy available at: https://ssrn.com/abstract=4452298

# Appendix 2    Variable Definitions

| Variable | Definition | Source |
|---|---|---|
| Public EEO Disclosure | An indicator variable that takes on the value of one if the firm publicly discloses their EEO-1 report | Corporate Websites, ESG Reports |
| Proportion of Female Employees | The total number of female employees divided by the total numbers of employees | EEO-1 Forms |
| Proportion of Racial Minority Employees | The total number of racial minorities (i.e., non-white employees) divided by the total numbers of employees | EEO-1 Forms |
| Proportion of Black Employees | The total number of Black employees divided by the total numbers of employees | EEO-1 Forms |
| Proportion of Hispanic Employees | The total number of Hispanic employees divided by the total numbers of employees | EEO-1 Forms |
| Proportion of Asian Employees | The total number of Asian and Pacific Islander employees divided by the total numbers of employees | EEO-1 Forms |
| Proportion of Female Lower-Level Employees | The total number of female non-manager employees divided by the total number of non-manager employees | EEO-1 Forms |
| Proportion of Racial Minority Lower-Level Employees | The total number of racial minority (i.e., non-white employees) non-managers divided by the total number of non-manager employees | EEO-1 Forms |
| Proportion of Black Lower-Level Employees | The total number of Black non-manager employees divided by the total number of non-manager employees | EEO-1 Forms |
| Proportion of Hispanic Lower-Level Employees | The total number of non-manager Hispanic employees divided by the total number of non-manager employees | EEO-1 Forms |
| Proportion of Asian Lower-Level Employees | The total number of non-manager Asian and Pacific Islander employees divided by the total number of non-manager employees | EEO-1 Forms |
| Proportion of Female Managers | The total number of female first/mid-level managers divided by the total numbers of first/mid-level officials and managers | EEO-1 Forms |
| Proportion of Racial Minority Managers | The total number of racial minority first/mid-level managers, (i.e., non-white managers) divided by the total numbers of first/mid-level officials and managers | EEO-1 Forms |
| Proportion of Black Managers | The total number of Black first/mid-level managers divided by the total numbers of first/mid-level officials and managers | EEO-1 Forms |
| Proportion of Hispanic Managers | The total number of Hispanic first/mid-level managers divided by the total numbers of first/mid-level officials and managers | EEO-1 Forms |
| Proportion of Asian Managers | The total number of Asian and Pacific Islander first/mid-level managers divided by the total numbers of first/mid-level officials and managers | EEO-1 Forms |
| Female Manager to Female Lower-Level Employee Share | An indicator that takes on a value of one if the firm has an above-median ratio of female managers to female employees. This ratio captures the share of female managers relative to the share of women among all employees. | EEO-1 Forms |
| Racial Minority Manager to Racial Minority Lower-Level Employee Share | An indicator that takes on a value of one if the firm has an above-median ratio of racial minority managers to racial minority employees. This ratio captures the share of racial minority managers relative to the share of racial minorities among all employees. | EEO-1 Forms |
| Black Manager to Black Lower-Level Employee Share | An indicator that takes on a value of one if the firm has an above-median ratio of Black managers to Black employees. This ratio captures the share of black managers relative to the share of Blacks among all employees. | EEO-1 Forms |
| Hispanic Manager to Hispanic Lower-Level Employee Share | An indicator that takes on a value of one if the firm has an above-median ratio of Hispanic managers to Hispanic employees. This ratio captures the share of Hispanic managers relative to the share of Hispanics among all employees. | EEO-1 Forms |
| Asian Manager to Asian Lower-Level Employee Share | An indicator that takes on a value of one if the firm has an above-median ratio of Asian managers to Asian employees. This ratio captures the share of Asian managers relative to the share of Asians among all employees. | EEO-1 Forms |
| Above Average Proportion of Female Managers | An indicator that takes on a value of one if the firm has a proportion of female managers that is above the average proportion in their 4-digit NACE industry and zero otherwise | EEO-1 Forms |
| Above Average Proportion of Racial Minority Managers | An indicator that takes on a value of one if the firm has a proportion of racial minority managers that is above the average proportion in their 4-digit NACE industry and zero otherwise | EEO-1 Forms |
| Above Average Proportion of Black Managers | An indicator that takes on a value of one if the firm has a proportion of Black managers that is above the average proportion in their 4-digit NACE industry and zero otherwise | EEO-1 Forms |
| Above Average Proportion of Hispanic Managers | An indicator that takes on a value of one if the firm has a proportion of Hispanic managers that is above the average proportion in their 4-digit NACE industry and zero otherwise | EEO-1 Forms |
| Above Average Proportion of Asian Managers | An indicator that takes on a value of one if the firm has a proportion of Asian and Pacific Islander managers that is above the average proportion in their 4-digit NACE industry and zero otherwise | EEO-1 Forms |
| Return on Assets (ROA) | Net income before extraordinary items divided by total assets | Compustat |
| Market to Book (MTB) | Market capitalization divided by total assets | Compustat |
| CapEx/Sales | Capital expenditures divided by sales | Compustat |
| COGS/Sales | Cost of goods sold divided by sales | Compustat |
| Leverage | (Long Term Debt + Short-Term Debt)/Total Assets | Compustat |
| Institutional Ownership | Percentage of outstanding shares held by institutional investors | Thomson Reuters 13F |

Electronic copy available at: https://ssrn.com/abstract=4452298

# Top Companies for Diversity & Inclusion

These days most companies know how important diversity is — after all, diversity can boost innovation, productivity and even financial performance. But despite that, many companies still struggle when it comes to diversity and inclusion. Some companies don't view it as a top business priority, some don't know how to start and still others are paying lip service only without taking real action. But make no mistake — there are companies out there that are getting it right.

To identify and honor these forward-thinking companies, we're highlighting some of the best companies for diversity and inclusion. If you're looking for a company where you can bring your whole self to work, check out their job opportunities and apply today!

## Rush University Medical Center

**D&I Details:** "Rush's commitment to recruit and hire qualified individuals with disabilities, veterans, and people who live on the West Side of Chicago serves its goal of having a diverse workforce that reflects the communities that Rush serves. Rush understands that its employees will provide the best services possible when they can bring their authentic selves to work and feel valued and supported. To support the inclusion of our diverse team members, Rush has active and engaged Employee Resource Groups or affinity groups for LGBTQ employees, women, veterans, individuals with disabilities and Chicago's West Side residents."

**Where Hiring:** Chicago, IL

**What Employees Say:** "They perform annual employee satisfaction surveys to identify staff concerns/complaints and makes strides to improve what they can. Great opportunity for advancement and lateral transfers. Great benefits." —*Current RN Staff Nurse*

See Open Jobs

## Visa

**D&I Details:** "It takes all of us to make Visa a place where everyone feels they belong. So, we provide our people with tools and training to become more aware and informed professionals … and people. Our Executive Committee is responsible for overseeing our diversity and inclusion efforts together with our CEO and Chief Diversity Officer. At least quarterly, the Committee meets to review, recommend and develop opportunities to enhance our D&I initiatives, model diverse and inclusive behaviors and drive accountability for our program and results. Our Diversity & Inclusion College within Visa University includes tools, trainings and resources to help employees become more aware and informed. It's available to every employee, everywhere. We also instituted Unconscious Bias Training to help identify and eliminate hidden stereotypes and biases. And, all people managers are encouraged to complete Inclusive Leadership Training to drive inclusion on an individual, team and company level."

**Where Hiring:** Foster City, CA; San Francisco, CA; Denver, CO; Austin, TX; Ashburn, VA; Phoenix, AZ; Miami, FL & more.

**What Employees Say:** "Encourages innovation, best IT techs ever, great benefits and compensation, promotes diversity, gives back to the community. CEO is engaged with the people, customers, and the

market. Great place to work. —*Current Director*

See Open Jobs

# Here Technologies

**D&I Details:** "HERE's vision is to enable an Autonomous World for everyone. To achieve this, we're committed to creating a culture that embraces inclusion, diversity and belonging for everyone. Inclusion not only makes our employees feel welcomed and supported, but the inclusion of diverse perspectives helps drive innovation and create the world we want to live in. We foster a culture where the uniqueness and creativity from individual employees fuels our success and allows each of us to Be True to who we are. As we drive innovation to realize an Autonomous World for everyone… we want our employees, our partners and our customers to always feel "I belong HERE"."

**Where Hiring:** Boston, MA; Amsterdam, Netherlands; Boulder, CO; Berkeley, CA; Chicago, IL; Alpharetta, GA; Seattle, WA & more.

**What Employees Say:** "I've really come to appreciate how flexible our company is in terms of working hours, work from home, time off (we just switched to a new unlimited time off policy which has been great). In speaking with other friends they are quite blown away by the work/life balance that HERE provides. Also, I feel as though the company is really trying to tackle some hard and complex problems which I appreciate. It's not always easy and some projects can be quite grueling, but I'd rather work on something meaningful and challenging." —*Current Employee*

See Open Jobs

# Accenture

**D&I Details:** "Equality in the workplace has never been more relevant than it is today. In fact, our research shows that equality is a powerful multiplier of innovation and growth. It drives creativity and inspires a sense of belonging. It's why we're committed to championing a culture of equality. One where our people are empowered to be their best, professionally and personally. Our diversity helps us bring unique perspectives and skills to the table. And our culture ensures we can all leverage these unique contributions to the benefit of our clients and our communities. As equals, anything is possible."

**Where Hiring:** San Francisco, CA; New York, NY; San Antonio, TX; Atlanta, GA; Denver, CO & more

**What Employees Say:** "Accenture definitely fosters a healthy working environment across the board from challenging you, having diverse projects, promoting a very diverse work place, having flexibility in how you complete your work, and always pushing you in regards to professional and personal growth." —*Current Business Analyst*

See Open Jobs



## Novartis

**D&I Details:** Elena Rodriguez, Global Head of Diversity & Inclusion at Novartis shares: "My vision is that we live D&I at Novartis. I want everyone to feel heard, respected and valued. Our culture aspiration as a company is to become more self-aware, more curious about each other, with more inspiring and empowering leaders. I see D&I at the heart of this aspiration, and it starts with listening. Taking time to listen to someone is a powerful act of inclusion; it shows that you are curious about them, it creates an opportunity to learn something new, it says: "I hear you. I value you. You matter." When leaders take time to do this, it can have a particularly strong impact, even if it is only a brief hallway conversation. This small act of caring may inspire a person to find a new solution to bring medicine to patients faster, or simply make them feel recognized for who they are. From a strategic perspective, D&I is a key enabler. Our business needs diverse people working in an inclusive environment in order to spark more innovation, improve our productivity and be sustainable. Our employees expect the same to enable their personal and professional growth, and increase their impact in the world. I want D&I to be a fundamental part of how we serve our people, patients, and customers."

**Where Hiring:** Cambridge, MA; San Diego, CA; Morris Plains, NJ; Raleigh, NC; Melville, NY & more

**What Employees Say:** "Great science and good group of people. Compensation was generous. Amazing work-life balance. Great resources to learn from." —*Former Scientist*

See Open Jobs

## Medtronic

**D&I Details:** "We seed our culture to foster inclusion, ignite confidence and build a sense of community so that all of our employees can grow and thrive. And to make sure the seeds we plant take root and grow, our managers are expected to ensure their team members are heard, their ideas cultivated and leveraged to make a difference. We believe this is the best and only way to drive innovative solutions that deliver better care to more patients worldwide."

**Where Hiring:** Boulder, CO; Pittsburgh, PA; Houston, TX; Minneapolis, MN; Atlanta, GA & more

**What Employees Say:** "Great salary and benefits. Excellent culture that prides itself on diversity." — *Former Employee*

See Open Jobs

## Diageo

**D&I Details:** "In all aspects of employment, we treat employees justly according to their abilities to meet the requirements of the role. We will not discriminate based on factors such as race, religion, colour, ethnicity, national origin, disability, sexual orientation, gender, gender identity, gender expression or marital status.

However, our commitment goes beyond industry standards and policies. We are one of the few FTSE 100 companies to have made diversity and inclusion a business priority while all our markets have built-in diversity and inclusion plans within their talent and organisation strategies. These plans are supported by robust governance, with direct oversight and responsibility from the HR Director and Managing Director in each market."

**Where Hiring:** New York, NY; Norwalk, CT; Seattle, WA; Plainfield, IL; Carson City, NV & more

**What Employees Say:** "Great place to learn a strong fundamental marketing framework that can apply across industries. Good work-life balance and flexibility with working from home if you manage it for yourself, good benefits. Some great people and the opportunity to move around globally or departments." —*Former Employee*

See Open Jobs

## Gap Inc.

**D&I Details:** "Embracing the differences we all bring to work is where diversity and inclusion begin … but at Gap Inc., that's truly only the beginning. Our Equality & Belonging Network Groups (EBNGs) were created by our employees to ensure that we build a work force that reflects our customer base and the communities where we do business, and develop a company culture and network that embraces differences and individuality.

Members come from different brands, levels, and capacities to create a space of learning and inclusion for all. These groups provide a platform for employees to share ideas, accelerate careers, and help contribute to our company growth."

**Where Hiring:** San Francisco, CA; Erlanger, KY; Albuquerque, NM; East Fishkill, NY; Groveport, OH & more

**What Employees Say:** "Large org with career opportunities across the business / brands & company supports that development; beyond great product, the company is committed to supporting local and

global communities; fun and professional co-workers; overall great culture." —*Current Employee*

See Open Jobs

## Kering

**D&I Details: "**With 35,000 employees around the globe, diversity is part and parcel of every day life at Kering. Across our Group, we share the belief that an inclusive company culture is a rich source of creation and innovation. We made our belief a reality in 2004 with the signing of our Diversity Charter —making Kering a pioneer for workplace diversity in France. The charter, which commits to a Group-wide inclusive hiring policy, engages every employee to support diversity and condemn all forms of workplace discrimination."

**Where Hiring:** New York, NY; Secaucus, NJ; Miami, FL; Philadelphia, PA; Honolulu, HI & more

**What Employees Say:** "Fantastic projects to lead in an open-minded team that wants to get the best from you. I would advocate anyone to go working for this on growing company." —*Former Employee*

See Open Jobs



## Acciona

**D&I Details:** "ACCIONA has approved an Equality Plan for the defense and effective application of the universal principle of equality between women and men. An Action Plan was developed in 2009 and the first steps towards implementation have already been taken.

All ACCIONA subcontractor contracts and purchase agreements include a clause which requires the subcontractor to respect the principles and obligations of the Organic Law on the Effective Equality of Women and Men in order to prevent sexual or gender-based harassment and any other type of direct or indirect discrimination."

**Where Hiring:** Chicago, IL; Ashley, ND; Oklahoma (remote)

**What Employees Say:** "Acciona is a leader developing utility-scale renewables in Latin America and Europe. Working there exposes you to world's iconic projects that look great on a resume." —*Former Employee*

See Open Jobs


## Bristol-Myers Squibb

**D&I Details:** "At Bristol-Myers Squibb, we provide employees at all levels with resources related to unconscious bias and diversity insights. In addition, we offer a broad range of best-in-class professional training and education for the career advancement and leadership development of employees. Through a groundbreaking partnership with Columbia University Graduate School of Business, Bristol-Myers Squibb offers LEAD (Lead. Engage. Accelerate. Develop.), an accelerated leadership development program for women and multicultural employees who demonstrate strong leadership potential. The program is designed to accelerate the movement and to improve readiness and visibility of high performing and traditionally under-represented employees into positions of greater responsibility."

**Where Hiring:** Princeton, NJ; Tampa, FL; Redwood City, CA; Devens, MA; Manchester, NH & more

**What Employees Say:** "Truly seem patient focused. Management cares about employees. Integrity and to do what is right is an overwhelming theme." —*Senior Territory Business Manager*

See Open Jobs


## UCB

**D&I Details:** "UCB has been named among the Top 25 companies in the 2019 Diversity & Inclusion Index. This reflects our continued efforts to ensure that our workforce reflects the wider community.

Diversity and inclusion matter here at UCB. We want to bring life-changing medicines to patients around the world and to play an active, positive role in the communities where we operate. It is vital that our teams are connected to our local and global communities; that we see ourselves in those we serve and that our patients see themselves in us."

**Where Hiring:** Atlanta, GA; Raleigh, NC; Madison, WI; Toledo, OH; Huntington, WV & more

**What Employees Say:** "Friendly people and great training. I love what the company stands for and the support they give their employees. This is the one Biotech company that truly puts the patient first! Amazing healthcare benefits." —*Current Senior Sales Consultant*

See Open Jobs


## Roche

**D&I Details:** "Our business environment is changing and we must continually adapt. We need to ensure that we have, and make best use of, varied skills, perspectives and backgrounds to address these business issues in order to be successful today and tomorrow. The best solutions will come by gaining different perspectives, asking and answering hard questions and challenging the status quo. Our success in creating a truly diverse and inclusive workplace will directly impact our ability to bring targeted treatment to patients."

**Where Hiring:** Indianapolis, IN; Branchburg, NJ; Tucson, AZ; Boston, MA; Santa Clara, CA & more

**What Employees Say:** "Awesome culture and co-workers. Everyone is dedicated, hard working, and intelligent. With a company this large, there is always room to move around." —*Current Research Scientist*

See Open Jobs

## Woolworths Group

**D&I Details:** "Celebrating diversity in all its forms is part of creating a vibrant and inclusive place to work; where everyone can bring their whole selves to work and our LGBTI community are supported and respected. In 2018, Woolworths Group was proud to be recognised as a Gold Tier Employer in the Australian Workplace Equality Index for our continued commitment to creating an inclusive culture. Recognised across Woolworths Group, 'Wear it Purple Day' is a day where our stores can celebrate diversity. Wear it Purple Day is about letting our LGBTI peers know that they are supported and respected. With a focus on LGBTI youth, Wear it Purple Day has a simple message – everyone has the right to be proud of who they are. Find out more at wearitpurple.org"

**Where Hiring:** Portland, OR; Bella Vista, AR; Seaford, NY; Broadway, VA; Dickson, TN & more

**What Employees Say:** "Woolworths provides [an] open, comforting environment for all employees and encourages people to work together well in a team environment." —*Current Customer Service Representative*

See Open Jobs


nestlé usa employees join a company town hall

## Nestlé

**D&I Details:** "Nestlé's Diversity and Inclusion starts with a culture of support and empowerment, aided by employee-led engagement groups, inclusive hiring approaches, and company-wide learning and development. Innovation starts with listening to diverse voices. Through unconscious bias training and workplace flexibility policies, we work to remove constraints that limit employees of diverse backgrounds. Our commitment goes beyond representation and partnerships – it's about the way we treat one another. It's an expectation that we all are acting in a way which fosters a society that is inclusive of all."

**Where Hiring:** Arlington, VA; Solon, OH; Anderson, IN; Laurel, MD; Trenton, MO & more

**What Employees Say:** "Nestle provides an open and inclusive environment that provides accelerated career growth opportunities, excellent work life balance & flexibility, and the ability to impact business results quickly." —*Current Manager*

See Open Jobs

## Microsoft

**D&I Details:** "Inclusive Design is a methodology, born out of digital environments, that enables and draws on the full range of human diversity. Most importantly, this means including and learning from people with a range of perspectives. Exclusion happens when we solve problems using our own biases. As Microsoft designers, we seek out those exclusions, and use them as opportunities to create new ideas and inclusive designs."

**Where Hiring:** Redmond, WA; San Francisco, CA; Washington, DC; New York, NY; Fargo, ND & more

**What Employees Say:** "This is a place to exercise your growth mindset. The company values diversity in all senses, including thinking. Management embraces failures and victories at balance as everything is an opportunity to learn. If you have the grit to continuously improve yourself and your career, this is the place for you." —*Current Technology Solutions Professional*

See Open Jobs

## Colgate-Palmolive

**D&I Details:** "The Colgate culture is one that reflects our values of caring, global teamwork and continuous improvement, as well as our unwavering commitment to integrity in everything we do. Building skills and developing Colgate people is critical to our success. Our leaders take responsibility for valuing the contributions of all Colgate people and have the knowledge and skills necessary to transform the work environment into one where all employees can contribute fully to meet the business goals."

**Where Hiring:** New York, NY; Emporia, KS; Hodges, SC; Piscataway, NJ;  Cambridge, OH & more

**What Employees Say:** "Challenging roles that every day is different, keeps you fresh. Lot of diversity in colleagues. Caring Company." —*Current Employee*

See Open Jobs

## Procter & Gamble

**D&I Details:** "We know the importance of diversity in the workplace. That's why we attract, hire, and keep diverse people on our team so that we can better understand our world and our consumers. To keep that talent here, we're creating opportunities and investing in plans for hiring, retaining, and developing them—to the executive level. For over 40 years, our Supplier Diversity program has been awarding contracts to women- and minority-owned businesses—including military vets, people with disabilities, and LGBT owners. When our Supply Network reflects the diversity of our consumers, employees, and stakeholders, our community thrives."

**Where Hiring:** Cincinnati, OH; Boston, MA; Seattle, WA; Chicago, IL; Sacramento, CA & more

**What Employees Say:** "Great company to work for, offers challenges where you can learn from and improve your skills. Good work environment and benefits." —*Former Employee*

See Open Jobs

## Eli Lilly and Company

**D&I Details:** "A focus on diversity and inclusion is built into our workplace culture. From recruiting and hiring to talent management processes, we see direct benefit when our workforce is not only representative of a the marketplace we serve, but fully engaged so we benefit from each employee's diverse views and ideas."

**Where Hiring:** Indianapolis, IN; Branchburg, NJ; Philadelphia, PA; San Diego, CA; Fort Dodge, IA & more

**What Employees Say:** "The benefits are absolutely wonderful, especially as someone who just graduated and is trying to stick with a good company. I love the culture and most people are very friendly. Additionally it seems people are already open to networking and sharing their knowledge, especially if you are looking to move to a different area." —*Current Machine Operator*

See Open Jobs



## HP Inc.

**D&I Details:** "In a world that is growing and evolving every day, HP creates technology that makes life better for everyone, everywhere. HP innovation springs from a team of individuals, each collaborating and contributing their own perspectives, knowledge, and experience to advance the way the world works and lives. From our earliest days, we've recognized that capturing and drawing from diverse points of view improves our products and services — and our company as a whole."

**Where Hiring:** Palo Alto, CA; Boise, ID; Vancouver, WA; Houston, TX; Corvallis, OR & more

**What Employees Say:** "There are many options for career experiences and different roles. It's a major corporation which performs at a high level. Great peers who have great values and are great to work with." —*Current Manager*

See Open Jobs

## Merck

**D&I Details:** Ken Frazier, Chairman and CEO of Merck says, "For more than 70 years now, we have been deeply committed to fostering an inclusive environment that embraces different perspectives and values the contributions of each individual. Having a globally and locally diverse workforce makes us a more innovative and agile company-and one better attuned to the needs of our customers, health care providers and patients who ultimately use our products."

**Where Hiring:** Kenilworth, NJ; South San Francisco, CA; Elkhorn, NE; West Point, PA; Elkton, VA & more

**What Employees Say:** "flexible work arrangements, intelligent and motivated staff that genuinely cares about improving human health. big enough that you can make several career moves and stay within the same firm." —*Current Employee*

See Open Jobs

## BMO Financial Group

**D&I Details:** "Our Leadership Committee for Inclusion and Diversity (LCID), which comprises 25 senior executives from across the bank, has developed a bold, multi-year strategy to drive performance by excelling at diversity and inclusion. We are focused on achieving industry leadership by increasing diversity across all levels of the organization through ambitious workforce representation goals. Our employees have the option to participate in one of our 14 Employee Resource Groups (ERGs) which help foster an inclusive workplace by bringing together people with similar interests, values, or affinities."

**Where Hiring:** Chicago, IL; Milwaukee, WI; New York, NY; Irvine, CA; Indianapolis, IN & more

**What Employees Say:** "Very customer focussed organization, personalized service. Excellent benefits, competitive salary. Invests in technology to keep pace. Opportunities to move within the bank into various roles." —*Current Employee*

See Open Jobs

## Siemens

**D&I Details:** "At Siemens, our culture of inclusion doesn't end with the filling of required quotas. We promote diversity and want all employees to be able to be themselves. We support our employees' many different ways of life as much as possible, for example by offering childcare, flexible work schedules, diversity employee networks, and workplaces equipped for the disabled. Inclusion creates an atmosphere of acceptance that profoundly enhances the company climate. All measures that

promote inclusion achieve this: Employees feel more motivated and committed. Accessible and inclusive work environments open up perspectives, especially in areas where the shortage of skilled workers is a growing concern: Inclusion enables us to retain talents."

**Where Hiring:** Hayward, CA; Austin, TX; Johnson City, TN; Amherst, NY; Reston, VA & more

**What Employees Say:** "Great working environment with a lot of benefits and job related perks for a better quality of life during work. A lot of support from the higher ups and also colleagues on a day to day basis." —*Former Employee*

See Open Jobs

