1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

THE CENTER FOR INVESTIGATIVE
REPORTING and WILL EVANS,

       Plaintiffs,

 v.

UNITED STATES DEPARTMENT OF
LABOR,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 21-cv-09613-SK

**DECLARATION OF MARC BENDICK, JR., PH.D. IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

Date:  December 14, 2023
Time: 8:00 AM
Judge: Hon. William Alsup

In opposition to defendant's Motion for Summary Judgment and in support of plaintiffs' Cross Motion for Summary Judgement, I, Marc Bendick, Jr., Ph.D., submit the following declaration in the above-captioned case.  This declaration is based on my personal knowledge of the matters below, and I am competent to testify.

## I.  Introduction

1. Attachment A provides my professional resume. I am an employment economist and co-founder of Bendick and Egan Economic Consultants, Inc. I earned a Ph.D. in economics from the University of Wisconsin and have engaged in the practice of economics, specializing in

1  employment and related issues, for more than 40 years.  I work primarily as a researcher and am

2  the widely-cited author of 142 scholarly publications including articles in peer-reviewed journals,

3  books, book chapters, and Congressional testimony.  Concurrently, I have been a consultant for

4  major employers such as Macy's Department Stores, Ford Motor Co., Johns Hopkins Hospitals,

5  IBM, the Michigan Civil Service Commission, National Institutes of Health, and The World Bank.

6      2.    My work has included analyses for litigation in which I have examined virtually every

7  aspect of employer HR practices and their relationships to business operations.  Attachment B lists

8  217 cases in which I have been involved, sometimes on behalf of employees, sometimes

9  employers, and occasionally as a neutral party. I have been accepted as an expert in 40 federal

10  district courts and 11 state courts or other tribunals.

11      3.    Since 1995, I have repeatedly analyzed EEO-1 data, for the OFCCP,[1] EEOC,[2] state

12  Fair Employment Practice Agencies,[3] the Ford Foundation,[4] employee groups,[5] and employers.

---

[1] E.g., Marc Bendick Jr., et al., *The Availability of Women, Racial Minorities, and Hispanics for On-Site Construction Employment* (2011); Marc Bendick, Jr., *Collecting Earnings Data to Guide OFCCP Compensation Compliance Reviews: A Proposed Design (2013).*

[2] E.g., Marc Bendick, Jr., "Setting Industry-Level Priorities for EEOC Enforcement." *Testimony, Equal Employment Opportunity Commission Hearings on the Strategic Enforcement Plan* (2012); Marc Bendick, Jr. et al., *Likely Investigative Subjects Identified through "Outlier" Analysis of EEO-1 Data* (2000).

[3] E.g., Marc Bendick, Jr. et al., *Likely Investigative Subjects Identified from EEO-1 Reports of California Employers* (2020).

[4] E.g., Marc Bendick, Jr., et al., *Employment Discrimination Against Women and Minorities in Georgia* (1999)*; Marc Bendick, Jr., et al., *Gender Occupational Segregation: An Analysis of Employers' EEO-1 Reports* (2000).

[5] E.g., Marc Bendick, Jr., et al, *Research Perspectives on Race and Employment in the Advertising Industry* (2009).

This work has appeared as expert testimony in litigation,[6] been used to train HR staff,[7] reported in news media,[8] and cited by academic scholars.[9]

4.    Because of the public policy importance of the issues in this case, this declaration is being provided *pro bono,* without compensation.

## II.  Summary of My Opinions

5.    In this declaration, I discuss three issues raised in *The Center for Investigative Reporting and Will Evans v. United States Department of Labor*:[10] (1) commercially-valuable information contained in or derivable from Federal contractors' Type 2 Consolidated EE0-1 records for 2016-2020; (2) confidential personal information contained in or derivable from those records; and (3) foreseeable harm likely to result from public release of those records.

6.    Based on the analyses in this declaration,[11] I have reached six principal conclusions:

[6] E.g., Declaration of Marc Bendick, Jr., Ph.D. in *Ellis v. Costo,* U.S. District Court for the Northern District of California C-04-3341MHP (2006); Declaration of Marc Bendick, Jr., Ph.D. in *EEOC v. Mavis Discount Tire, Inc. et al,* U.S. District Court for the Southern District of New York, 12-CV-0741 (JGK) (GWG).

[7] E.g., Marc Bendick, Jr., "Using EEO-1 Data to Analyze Allegations of Employment Discrimination," *Presentation to the Section on Labor and Employment Law, American Bar Association* (2000).

[8] E.g., Stuart Ellis, "A Lawyer's Call for Greater Black Presence in [Advertising] Agencies," *New York Times* (Jan. 8, 2009).

[9] E.g., National Academy of Sciences, *Collecting Compensation Data from Employers* (2012); Myrtle Bell and Joy Leopold, *Diversity in Organizations* (Cengage, 4th Edition, 2022).

[10] See Complaint for Injunctive Relief, Center for Investigative Reporting and Will Evan v. United States Department of Labor, Case 3:22-cv-07182, document 1, filed 11/15/22 (hereafter, "*Complaint*"); Answer to Complaint of Defendant United States Department of Labor, Document 16, filed 1/18/23 (hereafter, "*Answer to Complaint*"); and Declaration of Kelechi Ahaghotu, Document 35, filed 8/18/2023 (hereafter, "*Ahaghotu Declaration*").

[11] In developing these opinions, I have applied modes of analysis, computational procedures, information sources, and standards of care identical to or comparable to those I use in my scholarly research, and I apply theories, models, concepts, reasoning, assumptions, estimates, and calculations that command general acceptance among my professional peers. I hold the opinions I present to a reasonable degree of scientific certainty.

The documents and data available to me or relied on by me are identified in this document's text, footnotes, and attachments.  My work is based on information currently available to me.  If additional material becomes available, I would like the opportunity to update my analyses as appropriate.

a.  EEO-1 Type 2 Consolidated Records provide six specific pieces of workforce information about the reporting firm.  These six pieces themselves are not commercially-valuable operational, financial, or trade secret information as these terms are commonly understood by economists, other business analysts, and business managers. *See Section III below.*

b.  These same six pieces of information do not relate to operational, financial, or trade secret information in ways that would indirectly reveal commercially-valuable operational, financial, or trade secret information. *See Section IV below.*

c.  If the EEO-1 Type 2 Consolidated Records at issue in this case were publicly released, parties seeking commercially-valuable operational, financial, or trade secret information would generally ignore them and instead rely on readily-available alternative sources offering information that is more detailed, timely, complete, and relevant. For commercial purposes, these EEO-1 reports are commonly considered essentially useless. *See Section V below.*

d.  Because public release of the records at issue in this case would not reveal commercially-valuable information, economists, other business analysts, and business managers would generally not reasonably forsee any commercial harm to the firms filing those reports. *See Section VI below.*

e.  Public release of the EEO-1 records at issue in this case would rarely if ever provide race/ethnic gender information on any individual not already available from other sources. Nor could they not reveal any other kind of confidential personal information. *See Section VII below.*

f.  Because public release of these records would rarely if ever reveal confidential personal information, economists, other business analysts, and business managers would generally not reasonably forsee any harm to individuals covered in these reports. *See Section VIII below.*

7.  The remainder of this declaration sets forth the basis for these six opinions.

### III.  Is the Information in EEO-1 Reports Commercially Valuable?

8.      To economists, other business analysts, and business managers, commercially-valuable information takes one of three forms: (1) *managerial information* concerns internal management of revenue-producing aspects of a firm -- for example, sales, costs, profit margins, resource allocation, and strategic plans for different parts of its operations or different products.[12] (2) *Financial information* refers to the firm's assets, liabilities, owner equity, revenues, or expenses quantified in money terms.[13] (3) *Trade secrets* consist of "information -- commonly a customer list, business plan, or manufacturing process -- that the firm possessing the information wants to conceal from its competitors in order to prevent them from duplicating it."[14] Commercially-valuable information may concern tangible aspects of a firm's operations, such as its investment in new plants and equipment, or intangible one, such as the firm's investment in research and development or its purchase of reputational goodwill through a merger or acquisition.[15]

9.  The records at issue in this case -- five years of Federal contractors' Type 2 Consolidated EEO-1 reports -- contain exactly six types of information:[16]

---

[12] According to the Institute for Managerial Accounting (www.imanet.org), "management accounting [involves]…partnering in management decision making…and assist[s] management in the formulation and implementation of an organization's strategy." A similar definition is available in essentially any standard textbook on managerial accounting, for example, Jerry Weygandt, Paul Kimmel, and Jill Mitchell, *Managerial Accounting: Tools for Business Decision Making* (Wiley, 9th edition 2023).

[13] See the Master Glossary provided by the Financial Accounting Standard Board (FASB) for its statement of Generally Accepted Accounting Principles (GAAP), at https://asc.fasb.org. A similar definition is available in essentially any standard textbook on financial accounting, for example, Jerry Weygandt, Paul Kimmel, and Jill Mitchell, *Financial Accounting* (Wiley, 12th edition 2023).

[14] David Friedman, William Lander, and Richard A. Posner, "Some Economics of Trade Secret Law," *Journal of Economic Perspectives* 5 (Winter 1991), p. 61. A similar definition is provided in, for example, Sandy Klasa et al., "Protection of Trade Secrets and Capital Structure Decisions," *Journal of Financial Economics* 128 (3, May 2018), p. 266.

[15] Ann Wyatt, "What Financial and Non-Financial Information on Intangibles is Value-Relevant? A Review of the Evidence," *Accounting and Business Research* 38 (2008), p. 217.

[16] See EEOC, Standard Form 100, Instruction Booklet Rev. January 2006, Employer Information Report EEO-1 (hereafter *'EEO-1 Instructions"),* at Declaration of Michelle Hodge, Document 34-3, filed 8/18/2023 (hereafter, *"Hodge Declaration"),* Exhibit D; and Consolidated Type 2 EEO-1 Reports for Federal contractors (releases 1 and 2) at https://www.dol.gov/agencies/ofccp/foia/library/ Employment-Information-Reports.

(1)    The company's total number of employees.

(2)    The number of company employees in 10 broad occupational categories (for example, "professionals," "craft workers," and "service workers").

(3)    The number of employees in each of those categories by race/ethnicity and gender.

(4)    How total employment at the company changed from year to year in recent years.

(5)    How the distribution of the company's workforce by those 10 categories changed from year to year in recent years.

(6)    How the race/ethnic and gender composition of employees in these categories changed from year to year in recent years.

10.    None of these six items constitutes managerial information, financial information, or trade secrets as defined in paragraph 8.  It is clear on their face that they do not report sale revenues, costs, expenses, profit margins, strategic plans, assets, liabilities, owner equity, customer lists, manufacturing processes, investment in R&D, mergers and acquisitions, or similar topics.

11.    Instead, the six items simply provide a broad "snapshot" of the firm's workforce at specific points in time. Economists, other business, analysts, and business managers do not generally consider such broad descriptive workforce data to be commercial ly-valuable managerial or financial information or trade secrets.  In fact, it is a widespread complaint among corporate executives and managers with profit-and-loss responsibility that such HR reports chronically provide nothing of value to them,[17] while, correspondingly, HR specialists chronically complain that these executives and managers treat their work as irrelevant.[18]

---

The only substantive information in EEO-1 reports other than these six items is the industry, as defined by the North American Industrial Classification System (NAICS), in which the firm has filed the report. However, this categorization essentially universally conveys less (and sometimes misleading) information about the firm's products and services than is readily available from other sources, usually including the firms' own marketing materials.  For example, bellwether firm NMR Consulting (see footnote 27 below) files its EEO-1 reports in the generic catchall industry "Administrative Management and General Management Consulting Services" (NAICS code 541611), while the firm's own website (https://www.nmrconsulting.com) more informatively details the firm's services as: IT facilities engineering, IT procurement, data management, data analytics, process automation, software development, biometric security, and IT training.

[17] For example, in a typical article titled "Why We Hate HR," (*Fast Company*, December 19, 2007), business analyst Keith R. Hammands wrote:

After close to 20 years of hopeful rhetoric about becoming "strategic partners" with a "seat at the table" where the business decisions that matter are made, most human-resource

12.     Employers filing EEO-1 reports typically regard those reports as nothing more than a necessary cost of doing business, to be completed solely because they are legally required. They consider the reports so uninformative for business purposes that they are not generally even consulted in operational or financial decision-making. Firms large enough to employ specialized HR staff inevitably assign the task of completing the reports to that staff and do not circulate the completed reports among managers with operational or financial responsibilities. In short, the standard practice among these employers concerning their EEO-1 reports is, "File 'em and forget 'em."

13.   A substantial -- and growing -- number of U.S. employers now voluntarily release their EEO-1 report data annually, typically in their corporate annual report, in a separate annual diversity report, or on their website.  According to one survey, this was the practice among 11% of the 1,000 largest firms nationwide in 2021, up from 4% the year before.[19] These public releases provide further evidence of managements' judgment that these data contain nothing confidential of commercial relevance. That absence is what makes public release of these data a safe way to respond to growing demands from stockholders and others for public release of information on firms' workforce diversity. [20]

---

professionals aren't nearly there. They have no seat, and the table is locked inside a conference room to which they have no key….The human-resource trade long ago proved itself, at best, a necessary evil.

[18] See, for example, Veronica Hope-Hailey et al., "A Chameleon Function? HR in the '90s," *Human Resource Management Journal* 7 (July 1997), pp. 5-18; David Ulrich, "The Twenty-First-Century HR Organization," *Human Resource Management* 47 (November 2008), pp. 829-850.

[19] Ashley Marchand Orme, "Big Companies Are Already Collecting Important Data on Workforce Diversity. More of Them Need to Make it Public." *Fortune* (February 9, 2022).  The releasing firms include 50 of the 100 largest publicly-traded firms. About half are in high technology, while others are broadly distributed across public utilities, finance, consumer services, manufacturing, and other sectors (Leslie Norton, "50 of the 100 Largest U.S. Public Companies Agree to Release Key Diversity Data," *Barrons*, December 7, 2020; Kavya Vaghul, "A Small Fraction of Corporations Share Diversity Data, But Disclosure is Rapidly on the Rise, *Just Capital*, January 19, 2021).

[20] Such public release of EEO-1 reports is part of a broader trend among U.S. corporations of publicly reporting broad summary workforce information, either voluntarily or under government mandates. Some observers see this as an evolving "new normal" standard practice in corporate governance (e.g., Arlon Fung, Mary Graham, and David Weil, *Full Disclosure, The Perils and Promise of Transparency*, Cambridge University Press, 2007).

## IV.  Can EEO-1 Reports Indirectly Reveal Commercially-Valuable Information?

14.    A more complex question is whether, despite themselves containing only workforce data, the six pieces of information in EEO-1 reports can be interpreted or analyzed to *indirectly* reveal commercially-valuable managerial information, financial information, or trade secrets. The defendant repeatedly claims that they can.  Specifically:

> Defendant's *Bellwether Motion* states, "The headcount and workforce composition data contained in the EEO-1 reports both reveal 'basic commercial operations' and are directly 'related to the income-producing aspects' of the submitting companies.  These are human resource management metrics that are a central component of every organization's operational framework."[21]

> Defendant's declarant Michele Hodge states that "release of the objectors' data would cause…competitors gaining knowledge of business plans that companies have invested substantial resources in developing, refining, and implementing to gain competitive advantage."[22]

> Defendant's declarant Dr. McKay states that "release of companies' EEO-1 workforce data poses several commercial disadvantages to firms. These include allowing competing firms to see a company's employee headcount, calculate the company's turnover rate, poach its employees, and estimate headcount-company performance relationships."[23]

---

One example of mandated release is expansion of "10-K" annual reporting requirements for publicly traded firms by the Securities and Exchange Commission (SEC). Until 2020, the SEC only required firms to report the total size of their workforce. Starting in 2020, firms are required to disclose information about their "human capital" (their workforce and its capabilities) to the extent that this information "is material to understanding the listed company's business." Although it is yet unclear what these new requirements entail, they could be interpreted to include information on the race and gender composition of the firm's workforce (G. Pandit, "First Look at the Human Capital Disclosures on Form 10-K," *The CPA Journal* (August/September 2021).

An example of non-mandated release is firms' disclosure of summary information about the race/gender composition of their workforce in "corporate social responsibility" (CSR) reports. The basic principle of CSR is that a business has responsibilities to the society and environment in which it operates, not only to its stockholders.  Accordingly, it is appropriate for firms to publicly report business outcomes in terms of a "triple bottom line" – not only profits but also "planet" (the environment) and "people" (including its workforce). As of 2019, 90% of the 500 largest publicly-traded U.S. firms issued some form of CSR report annually, up from only 20% in 2011 ("What is a CSR Report & Why Is It Important?" *Harvard Business School Online Business Insights*, downloaded 10/11/2023 from https://online.hbs.edu).

[21] Department of Labor's Bellwether Motion for Summary Judgment, Document 34, filed 8/18/23 (hereafter, "*Bellwether Motion*"), p. 9.

[22] *Hodge Declaration*, paragraph 19.

[23] Declaration of Partick F. McKay, Ph.D., Document 34-1, filed 8/18/2023 (hereafter, "*McKay Declaration*"), paragraph 14.

Defendant's declarant Dr. Roberson states, "With demonstrated relationships between the composition of organizational resources and indicators of firm financial performance, including profitability, market share, and valuation, [EEO-1]…information may be considered financial in nature."[24]

Defendant's declarant Helene Baxter states that bellwether firm Allied Universal "considers its EEO-1 Type 2 reports…to be commercial information given their significant relationship to Allied Universal's business model, profitability, and strategic planning."[25]

Defendant's declarant Jack Jasinowski states that for bellwether firm Brandenberg, "The Type 2 EEO-1 Reports disclose…staffing levels, which is commercially-valuable…information." [26]

Defendant's declarant Josh Barcon states that at bellwether firm DHL, "The organizational structure of DHL is private, commercially valuable information that reveals the staffing levels DHL has determined are necessary to maintain and grow the business." [27]

Defendant's declarant Karen Sobieski states that for bellwether firm NMR Consulting, "The EEO-1 Reports have commercial value to companies in government information technology industries, like NMR, and is used by our company for commercial purposes."[28]

15.  A firm's workforce data are undoubtedly "related to" the firm's commercial and financial data in one obvious, essentially definitional sense:  Every firm needs to have a workforce

---

[24] Declaration of Quinetta M. Roberson, Ph.D., Document 34-2, filed 8/18/23 (hereafter, "*Roberson Declaration*"), paragraph 19.

[25] Declaration of Helene Baxter, Document 34-4, filed 8/18/23 (hereafter, "*Baxter Declaration*"), paragraph 7.  This declaration concerns Allied Universal Security Services (hereafter, "*Allied Universal*"), which it describes as "the nation's largest provider of [private] security guards and related services." The firm's North American operations are headquartered in Irvine CA, apparently has about 300,000 employees, and appears likely to report in the Security Guards and Patrol Services industry (NAICS code 561612).

[26] Declaration of Jack Jasinowski, Document 34-5, filed 8/18/23 (hereafter, "*Jasinowski Declaration*"), paragraph 13.  This declaration concerns Brandenberg Industrial Service Co., (hereafter, "*Brandenberg*"), which it describes as "one of the nation's premier firms specializing in [construction] demolition and environmental remediation." The firm is headquartered in Chicago, apparently has about 800 employees, and appears likely to report in the Remediation Services industry (NAICS code 562910).

[27] Declaration of Josh Barcon, Document 34-6, filed 8/18/23 (hereafter, "*Barcon Declaration*"), paragraph 7.  This declaration concerns DHL Global Business Services (hereafter, "*DHL*"), which it describes as "the leading global brand in the logistics services industry." In the U.S., the firm is headquartered in Plantation, FL, apparently has about 110,000 employees, and appears likely to report in the Couriers and Express Delivery Services industry (NAICS code 492110).

[28] Declaration of Karen Sobieski, Document 34-7, Filed 8/18/23 (hereafter, "*Sobieski Declaration*"), paragraph 8. This document concerns Network Management Resources, Inc. (hereafter, "*NMR Consulting*"), which it describes as "a service disabled veteran owned small business providing information technology, infrastructure and procurement services…almost exclusively in the federal sector."  The firm is headquartered in Huntsville, AL, apparently has about 125 employees, and, according to the NAICS Association (www.naics.com), reports in the Administrative Management and General Management Consulting Services industry (NAICS code 541611).

1  if it is to have any commercial operations or financial results.  It is self-evident that without any

2  workforce, the firm could not operate.

3      16.    A more meaningful question is whether these six data items relate to operational and

4  financial information in *direct, relevant, reliable,* and *interpretable ways* that reveal commercially-

5  valuable information *by proxy*. The answer is that they do not. As a proxy source of commercially-

6  valuable information, the six items of data in Consolidated Type 2 EEO-1 records for Federal

7  contractors are *essentially worthless*.

8      17.    Four characteristics of Consolidated Type 2 EEO-1 reports undermine their use as a

9  proxy source of commercially-valuable information.

10     18.    The first characteristic is that the data in EEO-1 reports are *broad and non-specific*.

11 For information to be commercially valuable, almost inevitably it needs to be identifiable for

12 narrow, specific aspects of a firm's operations -- for example, a specific product line, production

13 facility, marketing strategy, or merger or acquisition.  In contrast, EEO-1 Consolidated Type 2

14 records provide data on broad categories of employees that are not possible to relate to specific

15 commercial activities.

16     19.    For instance, hypothetically suppose that a petrochemical manufacturer wants to infer

17 whether a competitor is expanding its production capacity for a particular chemical product by

18 looking in the competitor's EEO-1 report to see if the number of chemical engineers is

19 unexpectedly high or rapidly increasing. This would not be possible because the narrowest

20 category in which EEO-1 report place chemical engineers is "Professionals," within which it is

21 impossible to isolate chemical engineers from other types of engineers as well as other

22 professionals such as chemists, accountants, lawyers, HR staff, logistics specialists, and purchasing

23 agents.[29]

24     20.    The FOIA requests at issue in this case seek only "Type 2 Consolidated" records.

25 "Type 2" reports means the reporting firms have multiple offices or plants, while "consolidated"

26 means reports providing only total numbers for all these locations combined.  For example,

27 _____

28 [29]*EEO-1 Instructions,* Appendix 5.

BENDICK DECL. IN SUPP. OF
OPP. & CROSS MOT. SUMM. J

hypothetically suppose that an advertising agency wants to infer whether a competitor is expanding its political lobbying services by looking at the number of employees reported in the competitor's EEO-1 report for its Washington, DC office.  This would not be possible because the Consolidated Type 2 records merge together employees at all the competitor's offices nation-wide.

21.    The second limiting characteristic of EEO-1 reports is the data are *retrospective and old* -- describing the past, and particularly the past that, in the fast-moving world of business, is the distant past.  Commercially-valuable information is inherently about either the present or the future -- where does a firm stands now, and where is it trying to position itself in the near-term (such as the current year) and long-term (such as the next 5-10 years).[30]  The first two FOIA requests at issue in this case was submitted in 2019 for data from 2016 and 2017, and a subsequent request was submitted in 2022 for data from 2019 and 2018.[31]  If data requests for 2016-20209 data were fulfilled in the current year -- 2023 -- the data provided would be approximately three to seven years old.[32]

22.    In the business world, data even two years old seldom reveal anything useful about a firm's current capabilities or future intentions. For example, hypothetically suppose that a hospital chain operating hospitals in Georgia wants to know if a hospital chain currently operating only in Florida intends to become a competitor by operating local hospitals in Georgia.  All that EEO-1 data from several years ago could possibly reveal is whether the Florida chain had already

---

[30] See, for example, James Poterba and Lawrence Summers, "A CEO Survey of U.S. Companies' Time Horizons and Hurdle Rates," *MIT Sloan Management Review* 37 (Fall 1995), p. 43; and Ashkan Negahban and Mohammad Dehghanimohammadabadi, "Optimizing the Supply Chain Configuration and Production-Sales Policies for New Products Over Multiple Time Horizons," *International Journal of Production Economics* 196 (February 2018), pp. 150-162.

[31] *Complaint*, paragraphs 37, 38, and 54.

[32] Historically, it takes the EEOC (the agency which manages EEO-1 data for itself and the OFCCP) about two years to receive, clean, and organize the hundreds of thousands of EEO-1 reports it receives each year from both Federal contractors and other firms. Accordingly, these is an inevitable lag of several years between firms' reports and the availability of data in useable form.  For example, on September 8, 2023, I checked the website where EEOC posts highly aggregated summaries of EEO-1 data (www.eeoc.gov/jobs/job-patterns-minorities-and-women-private -industry-eeo-1#explore).  On that date, the latest EEO-1 data presented was from 2021.

been operating in Georgia for several years, not whether it is doing so in the present, let alone whether it plans to start doing so in the future.

23.    The third limiting characteristic of EEO-1 reports is that they are *incomplete* as measures of a firm's productive capacity or strategic intentions.  The EEO-1 report instructions mandate that the reports count only the firm's own employees, both full time and part time.[33] In the business world of the 21st Century, firms implementing a commercial initiative often rely on many different types of workers other than those two categories to get its work done. Many firms use temporary workers hired through staffing agencies, employees on short-term contracts, or non-employee consultants to supplement their own full-time and part-time workforce, especially when making a strategic move requiring rapid or flexible expansion or staff with skills different from current employees.[34] In addition, they often make such moves through teaming agreements, alliances, partnerships, or subcontracts with other firms.[35] Thus, if a firm tries  to infer from a competitor's EEO-1 reports that firm's production capacity or expertise by looking at that firm's work force in isolation, it risks being seriously mislead.

24.    For example, suppose hypothetically that a package delivery company wants to assess the volume of packages a competitor can process.  It might attempt to do so by examining EEO-1 data on the number of package sorters and delivery drivers the competitor employs in the most recent EEO-1 report, and perhaps how rapidly that number had expanded from prior years. But those data would fail to reflect the competitor's hiring of temporary package sorters through

---

[33] *Instructions*, especially Appendix 1.  Employees who are "permanently leased" are also included, while independent insurance agents are excluded.

[34] See David Weil, *The Fissured Workplace* (Harvard University Press, 2014), and Bushan Sethi, "6 Strategies to Maximize Success with Your Growing Contingent Workforce," *Human Resource Executive* (June 23, 2022) at www.hrexecutive.com)

[35] See, for example, Scott Masten, "The Organization of Production: Evidence from the Aerospace Industry," *Journal of Law and Economics* 27 (October 1984); Dries Faems et al., "Toward an Integrative Perspective on Alliance Governance: Connecting Contract Design, Trust Dynamics, and Contract Application," *Academy of Management Journal* 51 (November 2017); and S. Tadelis, "Complexity, Flexibility, and the Make-or-Buy Decision," *American Economic Review* 92 (May 2002), pp. 433-437.

BENDICK DECL. IN SUPP. OF
OPP. & CROSS MOT. SUMM. J

staffing agencies,[36] particularly to handle the Christmas rush season which falls between the summer "snapshot" dates on which firms base their EEO-1 reports. Equally, it would not reflect the competitor's possible subcontracting or teaming with other package delivery services for the services of delivery vehicles and their drivers.[37]

25. Typically, each of these three limitations accompanies and reinforces the other limitations. For example, in the hypothetical examples of the petrochemical manufacturer (paragraph 19) and the advertising agency (paragraph 20), the commercial value of EEO-1 data is undermined not only by lack of specificity but also by obsolescence and incompleteness; that of the hospital chain (paragraph 22) is undermined not only by obsolescence but also by lack of specificity and incompleteness; and that of the package delivery service (paragraph 24) is undermined not only by incompleteness but by lack of specificity and obsolescence.

## V.  Better Sources of Commercially-Valuable Information

26. Ultimately, the most important characteristic rendering EEO-1 Type 2 Consolidated reports essentially worthless as a source of commercially-valuable information is that they are almost never the best source of such information. In the internet-based information age of the 21st Century, business firms typically enjoy as little privacy as individuals do. On essentially any commercial question, there are multiple, readily available sources of operational and financial information about a firm. One source estimates the revenues in 2023 of the "business intelligence industry" -- the industry providing and analyzing internal and external data for use by operational staff and corporate decision-makers -- at $26.8 billion.[38] Why would firms bother with implausible analyses and far-fetched interpretations of EEO-1 reports when more relevant, more accurate answers are available faster and cheaper elsewhere?

---

[36] Marc Bendick, Jr., and Eli Cohn, "Race Discrimination and Segregation in Manufacturing Jobs: Evidence from Matched-Pair Testing of Staffing Agencies." *Social Science Journal* (2021).

[37] For example, according to the U.S. Postal Service (www.fact.usps.com), both UPS and FEDEX subcontract with it to deliver hundreds of millions of ground packages annually.

[38] www.mordorintelligence.com.

27.    Consider, for example, the hypothetical example of the hospital chain in paragraph 22. That firm might seek commercially-valuable information about the expansion intentions or actions of its possible competitor from a large range of sources.  These include:

- online news media that focus on their industry -- for example, *AHA Today* (American Hospital Association, www.aha.org); *Georgia Health Care News* (www.gha.org); *Becker's Hospital Review* (beckershopsitalreview.com), *Hospital and Health Care Management* (www.hhcmglobal.com), and *Kaiser Health News* (www.kffhealthnews.org).

- Fee-based commercial providers of detailed operational and financial data on specific firms -- for example, Dun and Bradstreet Hoovers (www.dnb.com) and Bloomberg (www.bloomberg.com).

- Regulatory bodies -- in this example, the Joint Commission on Hospital Accreditation (www.jointcommission.org) -- which often provide detailed operational and financial information for firms under their jurisdiction.

- Whether for-profit or non-profit, the competitor hospital chain is likely to publish an annual report, and these often include statements of strategic plans.  Hospitals often also issue public announcements or press releases about current operations or future intentions.

28.    It might be assumed that, while such information might be available for large, publicly-traded Federal contractors, small privately owned firms would be largely shielded from having their information exposed.  To test this hypothesis, on September 11, 2023, I worked with staff at Dun and Bradstreet Hoovers (see paragraph 27) to seek information on bellwether firm Brandenberg Industries. Within minutes, this information source had provided me with a 23 page report which included: (1) counts of employees at the firm's three separate operating locations (more detailed information than the company-wide employment total in its Type 2 Consolidated EEO-1 report); (2) an organization chart for the firm identifying which departments worked on which product lines; (3) recent coverage in the news media; (4) names, job titles, locations, telephone numbers, and recently-verified email addresses for 124 key employees; (5) financial data and other indicators suggesting the company's stability and capacity for growth; and (6) lists of the firm's closest competitors classified by location, size, and product line.  In this example, all this information was obtained essentially instantaneously for a privately-owned firm with fewer than 1,00 employees (see footnote 25).

29.    Here is a second example.  Paragraph 14 above quotes Professor McKay's statement that "release of companies' EEO-1 workforce data poses...commercial disadvantages to

firms….[that] include allowing competing firms to…calculate the company's turnover rate [and] poach its employees." Professor McKay further explains that a high turnover rate might signal that employees of a firm are unhappy with their current employer and therefore particularly open to offers of alternative employment.[39]

30.   Dr. McKay's contention is incorrect in several ways, the most important of which is that it is mathematically impossible to compute a firm's turnover rates from its EEO-1 data.[40]  But suppose hypothetically that turnover rates could be computed from those records.  Any insights they would provide would be at least several years out of date and therefore not necessarily an accurate measure of current employees' attitudes. Moreover, the rates would be for broad categories of employees (such as all professionals), whereas a competing firm would normally be interested in poaching employees with qualifications fitting specific job vacancies it is trying to fill (e.g., senior chemical engineers with experience in oil refinery operations).

31.   Where might the petrochemical manufacturers look instead to determine if a competitor's workforce is ripe for employee poaching?

- For insights into whether employes at a particular company are generally happy with that employer, the information-seeking firm might start with Glassdoor (www.glassdoor.com), a widely-consulted website which tabulates and publishes ratings for individual companies by current and former employees.  For larger employers, these ratings are provided for subsets of employees, and the data in the ratings are weighted by their recency to maximize relevance to the present. This site also provides ratings on specific aspects of employees' work situations such as "work-life balance."

- The competitiveness of salaries a firm offers could also be scrutinized to determine how open to alternative employment a firm's employees might be. Glassdoor (see previous bullet point) reports salary levels for specific job titles at specific companies. In addition, current job vacancy listings for a company can be found online at sites such as Indeed.com, ZipRecruiter.com. and Monster.com, and these postings often include salary ranges.[41]

---

[39] *McKay Declaration,* paragraphs 14 and 18.

[40] To compute a turnover rate from data for two years requires data which separates changes in total employment between the years into (1) employees hired, (2) employees terminating, and (3) employees employed in both years.  EEO-1 reports provide only the total number of employees each year. See, for example, Randy Ilg, "Analyzing CPS Data Using Gross Flows," *Monthly Labor Review* (September 2005), pp. 10-18.

[41] Many employers voluntarily state salary ranges in their job postings.  In addition, eight states, five cities, and one county now mandate that such information be included (see "U.S. Pay Transparency Laws," at www.paycheckanalytics.com).

- To move from general information on the company to identifying individual employees of a company who might be promising targets for recruitment, the petrochemical company could turn to LinkedIn (www.linkedin.com), a prominent website on which workers post resume-like self-descriptions typically stating their current position and employer, education, work history, and special skills. This site can be searched to identify persons employed at a specific company, and then those persons' job titles, work experience, and other information can be reviewed to identify, for example, senior-level chemical engineers with experience at oil refineries.

32.   Here is a third example.  Professor Roberson states in her declaration:[42]

Diversity data are used internally by firms for business purposes – specifically, to monitor human resource management effectiveness, many organizations use diversity metrics, such as that contained in EEO-1 reports, as a measurement analytic for workforce goal setting and planning.

33.   Dr. Roberson is correct that many firms use diversity data in designing and managing aspects of their internal operations.  Examples of these uses include: setting recruitment goals under affirmative action plans; estimating the potential adverse impact on employee diversity of a proposed layoff or reorganization; and awarding bonuses, raises, and promotions to managers who have excelled in hiring and retaining employees from under-represented backgrounds.  However, she is incorrect in implying that the diversity data they put to such uses are EEO-1 reports. As Paragraphs 18-20 above discussed, EEO-1 reports -- particularly Type 2 Consolidated Reports from earlier years -- are almost always too broad, too old, and inappropriately structured to relate to the specific internal operations that a firm would need to plan, estimate, or reward.

34.   Instead of consulting EEO-1 reports, employers typically direct the HR data analysts who prepare the EEO-1 reports to prepare *other reports* tailored to decisions that are being made. Both the EEO-1 reports and these other reports are typically derived from the same source, the company's Human Resource Information System (HRIS). However, they would be prepared separately and designed to serve very different information needs.  For instance, to allocate diversity-based bonuses, raises, and promotions to managers responsible for specific departments, firms would commission their EEO-1 staff to tabulate the race/ethnic/gender composition of its workforce department by department.  To set recruiting goals to implement affirmative action

---

[42] *Roberson Declaration* paragraph 21.

plans, data would be assembled for specific job titles.  To estimate potential adverse impacts of layoffs, special analyses would be tailored to the exact timing and scope of the layoff being contemplated.

35.    In short, Dr. Roberson confuses *EEO-1 reports themselves* with the *race/ethnicity/ gender data* underlying those reports.[43]  Only Type 2 Consolidated EEO-1 reports themselves are at issue in this litigation.  There are no FOIA requests for the underlying, detailed data or any non EEO-1 reports derived from those data.

## VI.  Foreseeable Harm to Firms from Releasing EEO-1 Reports

36.    Economists, other business analysts, and business managers would forsee potential commercial harm to a firm whose records are publicly released if those records are likely to reveal commercially-valuable managerial data, financial data, or trade secrets.  Section III documents that Federal contractors' Type 2 Consolidated EEO-1 reports do not directly provide such information; Section IV demonstrates that these reports cannot effectively be analyzed to reveal such information by proxy; and Section V illustrates that it is unlikely that anyone would even try to derive such information from these reports because of the ready availability of better alternative sources of information.  Accordingly, economists, other business analysts, and business managers generally would not reasonably foresee that public release of such records is likely to impose commercial harm on Federal contractor firms.

## VII.  Can EEO-1 Reports Reveal Confidential Personal Information?

37.    It is clear on their face that EEO-1 records do not contain, and therefore cannot reveal, data on multiple potentially sensitive or confidential personal characteristics about individual

---

[43] A similar confusion infects other aspects of the *Roberson Declaration*.  Dr. Roberson presents an extended discussion (for example, in her paragraphs 8, 9, 10, 16, 18, and 20) of scholarly research documenting how workforce diversity adds value to firms.  Her discussion here is largely correct.  She also states -- again correctly -- that EEO-1 data was used in some of this research.  But then she incorrectly implies that those two statements together mean that an individual company would find its own EEO-1 reports to add managerial value.  This implication not only confuses a particular report with the data underlying those reports.  It also confuses the value of *data on workforce diversity* with the value of *workforce diversity itself*.

employees -- for instance, age, disability, religion, family status, gender orientation, political affiliation, or criminal record.  These characteristics are nowhere addressed in these reports.

38.    The only personal information these records contain is employees' race/ethnicity/gender.  On these characteristics, Type 2 Consolidated EEO-1 reports provide only anonymous numerical counts and do not list, name, or otherwise identify individual employees included in those counts, let alone report race/ethnicity/gender for individual employees.  Accordingly, these records do not explicitly reveal information about the race/gender and gender of any individual.

39.    In Type 2 Consolidated EEO-1 reports filed by most Federal contractors, it is impossible to infer the race/ethnicity or gender of individual employees reported in most job categories because of the large number of individuals reported. For example, defendant's bellwether firm Allied Universal has about 300,000 employees nation-wide,[44] including many tens of thousands of those workers who are security guards presumablyreported in the EEO-1 job category of Service Workers.[45]  In that circumstance, it is extraordinarily unlikely that the number of Service Workers in even one of the less common race/ethnicity/gender categories (e.g., Native American females) would be small enough to identify any individual security guard.

40.    The only common circumstance in which it is even conceivable that EEO-1 data could identify the race/ethnicity/gender of any employee occurs when only a very small number of employees are reported in a job category.  Federal contractors with as few as 50 employees are required to file EEO-1 reports, and it is plausible to imagine that a firm of that small size might report, say, only five employees as Executives/Senior Level Officials and Managers.  Suppose hypothetically that such a firm's EEO-1 data reported one of those five as an Asian woman and the

---

[44] See footnote 24.

[45] I say "presumably" because, although Section 5 of the *EEO Instructions* provides both definitions and examples to guide assignment of types of employees to the 10 EEO-1 job categories, analysts of EEO-1 data have seen many instances in which reporting firms have not followed these rules.  One example from my own experience involves supermarket employees with the job title "Salad Bar Managers." These hourly employees' sole job duties of cleaning and stocking their store's salad bars clearly placed them in the category of Service Workers.  However, one supermarket chain categorized them as First/Mid-Level Officials and Managers to artificially inflate its number of women managers.

other four as White men.  An outside observer who knows those five individuals could reasonably identify which one is the Asian woman.  Attribution of race/ethnicity/gender from observation of a person's appearance is the same procedure employers are permitted to use in collecting data for EEO-1 reports.[46]

41.  But that identification would not necessarily mean that EEO-1 data had revealed personal information not already publicly known from non EEO-1 sources.  If the outside observer is familiar with the five individuals face-to-face, that observer could, *with no EEO-1 data*, independently identify that a person is an Asian woman by direct observation of her physical appearance, perhaps combined with other observable characteristics such as the person's accent or first or last names.

42.  Alternatively, if an outside observer seeks the race/ethnicity/gender of a person she or he has never met, information from which to infer the person's race/ethnicity/gender can frequently be obtained from a variety of non-confidential sources other than EEO-1 reports.  In particular:

- Some employers post employees' names, pictures, and other personal information on the firms' websites.  This practice most often applies to higher-level executives.[47]  For example, the website of bellwether firm Allied Universal provides names, pictures, and short biographies of its CEO and 12 members of its North American Executive Leadership Team.[48]  From these materials, an outside observer could reasonably attribute a race/ethnicity/gender to each of these individuals.

- Other firms extend online publication of the names and pictures to a broader range of employees, such as mid-level managers and professionals, and sometimes even their entire staff.  For example, the website of the nationally-prominent law firm Jones Day offers names and pictures for all its attorneys, both partners and associates,[49] while the website of the tax accounting firm TaxComp provides names and pictures of all 15 members of its staff including clerical employees.[50]

---

[46] Section 4 of the *EEO-1 Instructions* states that the race/ethnicity gender category assigned to individual employees may be based on either the employee's voluntary self-identification or "observer identification."

[47] Significantly, these persons are likely to be reported in the EEO-1 job category of Executives and Senior Managers and Officials, which is the category most likely to contain small numbers of employees to make possible release of confidential information even conceivable (see paragraphs 39 and 40).  This coinciding circumstance makes disclosure of individuals' race/ethnicity/gender via EEO-1 reports even less likely.

[48] https://www.aus/ceo-biography and https://www.aus.com/about-us/our-people/.

[49] https://www.jonesday.com/en/lawyers/.

[50] https://www.taxcomp.net/about-us/meet-the-team/.

- Some employees -- particularly those in senior managerial or professional positions -- make public appearances, receive coverage in the news media (especially the "trade press" covering their industry or profession), or otherwise have their physical appearance and other information publicly exposed.  Such information is typically easy to find using search engines such as Google, Google Scholar, or Google Image.

- Additional images revealing the physical appearance of employees in any EEO-1 job category may be exposed in news media coverage of those individuals in non-work contexts or in voluntary postings of images on internet sites that are not work-focused such as Facebook, Tik Tok, or match.com.

- Many members of the labor force seek to build their professional networks and advance their careers by posting extensive information about themselves on business- and employment-focused social media platforms. The best known example, LinkedIn,[51] posts such information for some 500 million individuals worldwide.  These postings commonly include photographs of the person, along with other information that may suggest the person's race/ethnicity/gender such as first and last name, colleges attended, or volunteer activities.

## VIII.  Foreseeable Harm to Individuals from Releasing EEO-1 Reports

43.    Section VII has documented that the only employee personal data even conceivably discernable from Type 2 Consolidated EEO-1 reports for Federal contractors is employees' race/gender/ethnicity; that revelation of such data is only conceivable in the limited circumstance of a very small number of people being reported in the same race/gender/ethnicity group in the same job group; and that for employees in that circumstance, a wide range of non EEO-1 sources are likely to reveal, or have already revealed, those employee's race/ethnicity/gender. Accordingly, because public release of these EEO-1 reports is extremely unlikely to newly reveal confidential personal information, economists, other business analysts, and business managers would generally not reasonably forsee any harm to individuals covered in these reports.

---

[51] See paragraph 31 above.

1

\* \* \* \* \* \* \* \* \* \*

2

3       I declare under penalty of perjury of the laws of the United States of America that the

4   foregoing is true and correct to the best of my knowledge and belief.

5

6       Executed on October 13, 2023 at Alexandria VA.

7

8

9       _____

10                      Marc Bendick, Jr., Ph.D.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BENDICK DECL. IN SUPP. OF
OPP. & CROSS MOT. SUMM. J

# ATTACHMENT A

**RESUME**

**MARC BENDICK, JR.**

_____

**Dr. Bendick is an employment economist and nationally-recognized researcher specializing in public and private initiatives to enhance mainstream opportunities for traditionally-excluded individuals, families, businesses, and communities. For additional information, visit http://www.bendickegan.com or the entry for Marc Bendick, Jr. in Wikipedia.**

_____

## ADDRESS

marc@bendickegan.com

**319 Prince Street**                                                                 **www.bendickegan.com**
**Alexandria, VA 22314 USA**                                                          **(202) 746-8268**

## CAREER CHRONOLOGY

**Bendick and Egan Economic Consultants, Inc.**, Alexandria, VA (1984 - 2023)

> Co-founder and Co-Principal in a firm providing economic, business, and social science analysis to the public, private, international, and non-profit sectors.

**The Urban Institute**, Washington, DC (1975 - 1984)

> Senior Research Associate and Program Manager leading needs assessment, program evaluation, and policy analysis studies under government and foundation sponsorship.

**University of Bristol**, Great Britain (1980)

> Visiting Associate Professor, School for Policy Studies.

**Nika Corporation**, Chicago (1973 - 1974)

> Urban development project planner and financial analyst.

**McDonnell Douglas Corporation**, Los Angeles (1968 - 1970)

> Staff economist and management analyst.

## EDUCATION

**Ph.D.**    Economics/Public Policy, University of Wisconsin, 1975 (with distinction)

**M.S.**    Economics/Management Science, University of Wisconsin, 1972

**B.A.**    Economics/Social Psychology, University of California, Berkeley, 1968 (with honors)

## PROFESSIONAL ACTIVITIES

**Consultant/contractor to public agencies** including City of Alexandria VA (Alexandria Fire Department, Alexandria Fund for Human Services); City of Atlanta; City of Chicago; California Department of Fair Employment & Housing; Congressional Government Accountability Office; Congressional Office of Technology Assessment; City of Detroit; District of Columbia Commission on Vocational Education; District of Columbia Commission on Social Services; City of Flint, MI; Mayoral Transition Team for the District of Columbia; Illinois Prairie State 2000 Authority; City of Miami; Michigan Civil Service Commission; New Jersey Office of the Public Advocate; New York City Commission on Human Rights; New York State Office of the Solicitor General; New York State Office of the Attorney General Civil Rights Bureau; Ohio Bureau of Employment Services; City of Pontiac, MI; City of Seattle Office of Civil Rights; City of Southfield, MI; U.S. Community Services Administration; U.S. Economic Development Administration; U.S. Environmental Protection Agency; U.S. Equal Employment Opportunity Commission; U.S. Food and Nutrition Service; U.S. Department of Health and Human Services; U.S. Department of Housing and Urban Development; U.S. Department of Justice; U.S. Department of Labor Office of Contract Compliance Programs; U.S. Department of Labor Office of Disability Employment Programs; U.S. Department of Labor Women's Bureau; U.S. National Commission for Employment Policy; U.S. National Institutes of Health Office of Equity, Diversity, and Inclusion; U.S. National Skills Standards Board; U.S. National Science Foundation,

**Consultant/grantee for non-profit and research organizations** including Abt Associates, Aetna Foundation, American Association of Retired Persons, American Bar Association Commission on Women in the Profession, American Civil Liberties Union, American Public Human Services Association, Annie E. Casey Foundation, Brody & Weiser, Carnegie Corporation, Center for Frontline Retail, Chase Bank Foundation, Cleveland Foundation, Committee for Economic Development, Committee on Strategies against Chronic Poverty, Community Development Research Center, Disability Rights New York, Economic Development Assistance Consortium, Educational Testing Service, Employment Justice Research Center, Fair Employment Council of Greater Washington, Ford Foundation, German Marshall Fund of the United States, Grantmakers Concerned with Immigrants and Refugees, Greater Washington Research Center, Heinz Awards, Hewlett Foundation, Housing for All (Denver), The Impact Fund, In for 13, Institute for Women's Policy Research, Interstate Conference of Employment Security Agencies, Job Opportunities Task Force (Baltimore), Jobs for District of Columbia Graduates, JP Morgan Chase Foundation, Justice Catalyst, Lawyers' Committee for Civil Rights under Law, Legal Services Corporation, MacArthur Foundation, Make the Road New York, Manpower Demonstration Research Corporation, Metlife Foundation, Charles Stewart Mott Foundation, NAACP Legal Defense Fund, National Academy of Public Administration, National Commission on Testing and Public Policy, National Center for Occupational Readjustment, National Employment Law Project, National League of Cities, National Planning Association, National Wildlife Federation, OMNI Institute, Organization of Women in International Trade, Organization Resources Counselors, Pelavin Associates, Primerica Foundation, Restaurant Opportunities Center of New York (ROC-NY) and Restaurant Opportunity Center United (ROC-U), Retail Action Project, Rider Pool Foundation, Rockefeller Foundation, Russell Sage Foundation, Sloan Foundation, Worker Rights Consortium, and Youngstown-Warren Regional Growth Association.

**Consultant to employers, employer associations, and employee associations** including American Express Corporation, Blue Cross/Blue Shield of Michigan, Center for Creative Practices, Control Data Corporation, Dupont Corporation, Equitable Life Assurance, Economic Systems Inc., Ford Motor Company/Visteon, Georgetown Day School, IBM, International Monetary Fund, Iron Reinforced Rodmen, Johns Hopkins Hospital and Health Systems, Macy's Department Stores, NewsGuild of New York, Orient Express Hotels, Royal Ahold NV/Giant Foods, Southern California Edison, Southern Wines and Spirits, U.S. Foodservice, World Bank Group, and Zenith National Insurance.

**Consultant to international and multinational organizations** including U.S. Agency for International Development, Australian Bureau of Labour Market Research, Australian Institute for Multicultural Affairs, Center for American Studies-Fudan University (China), Commission of the European Union, International Finance Corporation, International Monetary Fund, International Institute of Management-Berlin,

International Labour Organisation, Japanese Institute for Research Advancement, Organisation for Economic Cooperation and Development, UN Persons of African Descent, and the World Bank.

**Media source** quoted or appearing in AARP Bulletin, ABC World News, Advertising Age, Adweek, American Bar Association Perspective, Arkansas Gazette, Associated Press, Atlanta Journal-Constitution, Atlantic, Augusta (GA) Chronicle, Austin Chronicle, Baltimore Sun, Beaumont (TX) Enterprise, BET.com, Black Enterprise, BNet Business Network, Bloomberg Business Week, BBC News, BBC Panorama, Business and Human Rights Resource Centre, BNA Union Labor Report, Boston Globe, Center for Investigative Reporting/Reveal, Chicago Crusader, Christian Science Monitor, Class Action Litigation Report, CNN, CNNMoney.com, Congressional Quarterly, Congressional Digest, Corporate Board Member Magazine, Corporate Social Responsibility Data Network, Crain's New York Business, D Magazine (Dallas), Daily Beast, Daily Labor Report, Dallas Channel 8 (ABC), Deseret News, Detroit Free Press, Diversity Digest, DiversityInc, Diversity Officer Magazine, Employment Discrimination Report, Epoch Times, Fast Company, fireengineering.com, Fortune, Fox News, The Guardian (UK), Health Planning Reports, Houston Chronicle, HUDuser.org, Huffington Post, Inc., Institute for Social Entrepreneurs, Journal of Commerce, Journal of Housing, Lear's, the Linda Chavez Program, Los Angeles Times, McNeil-Lehrer News Hour, Mainstreet.com, Management Review, mediabistro.com, Memphis Commercial Appeal, Milwaukee Journal, Ms. Magazine, MSNBC, The Nation, Nation's Cities, National Civic Review, National Journal, National Public Radio, NBC Nightly News, New York, New York Post, New York Times, NPR Marketplace, NYTimes.com, Newsday, Newsweek, NY1, Occupational Health Safety, Phoenix Focus, Poverty and Race Research Action Council Newsletter, Public Affairs Information Service Bulletin, The Public Interest, racismreview.com, Restaurant News, Reuters, Revista University Sao Paulo (Brazil), San Francisco Chronicle, San Gabriel Valley News, San Jose Mercury News, Seattle Post-Intelligencer, Social Care Online, SHRM Online, Time, Times Higher Education, the Today Show, Tolerance.org, Training and Development Journal, United Press International, Univision, Urban Futures Information Exchange, Urban Outlook, USA Today, U.S. News and World Report, Voice of America, Wall Street Journal, Washington Business Journal, Washington Post, WBZ, WFUV, Which Way L.A, Women's Wear Daily, workforceanswers.com, Workforce Management, Working Papers, and WorkCite.

**Guest lecturer** at colleges and universities including American, Brandeis, Brown, Columbia, Cornell, Florida State, Franklin and Marshall, George Mason, George Washington, Georgetown, Johns Hopkins, Maryland, Missouri, New School for Social Research, North Texas, Princeton, Southern California, West Virginia, and Wisconsin. Non-faculty member of Ph.D. dissertation committees: Devah Pager, University of Wisconsin, 2002; Lauren Brown, Brandeis University, 2008.

**International** researcher and consultant with experience in Australia, Belgium, Commonwealth of the Northern Mariana Islands, Denmark, Finland, France, Germany, Ghana, Great Britain, Ireland, Jamaica, the Netherlands, New Zealand, Senegal, Switzerland, and Sweden.

**Member** (past or current): Alexandria VA Human Rights Commission (Commissioner, 2022-    ); National Academy of Sciences/National Research Council Committee on Methods for Collecting Pay Information; Board of Directors, Workplace Fairness, Inc.; Board of Directors and Treasurer, U.S. Committee to the International Council on Social Welfare; Board of Trustees, World Neighbors, Inc.; Program Advisory Committee, Equal Rights Center, Washington DC;[1] Board of Directors, Jobs for District of Columbia Graduates; Advisory Panel on Cities and Technology, Congressional Office of Technology Assessment; Advisory Panel on Dislocated Workers, Congressional Office of Technology Assessment; Employment Law Task Force; National Community Reinvestment Coalition; Academy of Management; American Economic Association; Society of Labor Economists; Association for Public Policy and Management (Equity & Inclusion Fellowship Committee); Council for Urban Economic Development; Industrial Relations Research Association; International Association for Diversity Management; International Association of Professionals in Employment Security; International Society of Diversity and Inclusion Professionals;; National Association for Forensic Economics; National Committee on Pay Equity; National Council on Public History (Committee on Inclusion, Diversity, Equity, and Accessibility, 2023-  ); Phi Beta Kappa; Social Psychology Network; Society for Human Resource Management (Senior Professional in

---

[1] Received the Equal Rights Center's Impact for Equality Award, January 2022.

Human Resources, Special Expertise Panel on Workforce Diversity; Taskforce on Diversity and Inclusion Standards); Society of Government Economists; Society for the Psychological Study of Social Issues; Unite the Park.org (Range of Light National Monument], Advisory Board).

**Speaker** before professional and general audiences including Academy of State and Local Government, AFL-CIO Meany Center for Labor Studies, All-African Conference on Housing and Urban Development (Senegal), American Academy of Arts and Sciences, American Association of Schools of Teacher Education, American Bar Association Section on Labor and Employment Law, ACLU National Leadership Conference, American Economic Association, American Human Services Association, American Psychological Association, Association for Global Business, Association of Providers of Employment and Training, Association for Public Policy and Management, Bar Association of San Francisco, Brookings Institution, Business Coalition for Education Reform, Business Development and Retention Council (Kansas City), Center for Strategic Analysis of the Office of the Prime Minister (France), Chase Manhattan Bank Community Development Group, Commission of the European Union (Brussels), Community Matters Forum (Florida), Congressional Research Service, Corporation for Enterprise Development, Council of State Governments, Council on Foundations, Cultural Contact Working Group, Department of Defense Workshop on Outplacement, DC Agenda, District of Columbia City-Wide Education Conference, District of Columbia Committee on Public Education, District of Columbia Department of Human Services, Diversity Best Practices, Equal Employment Trial Practice Institute, European Centre for Social Welfare Research and Training (Switzerland), Family Impact Seminar, Federal Reserve Bank of Boston, Florida Bar Association, Forty Plus, Georgia Rural Urban Summit, Grantmakers in Health, Greater London Enterprise (UK), Greater Washington Board of Trade, House of Representatives Republican Conference, Institute on the Urban Economy (France), In for 13, International Association of Fire Chiefs, International Association of Personnel in Employment Security, Interstate Conference of Employment Security Agencies, International Association of Women in Fire and Emergency Services, International Downtown Association, International Youth Employment Conference (New Zealand), Jobs for the Future, Job Opportunities Task Force (Baltimore), Johannesburg (South Africa) Regional Development Initiative, Labor Institute of Public Affairs, League of Women Voters, Manpower Demonstration Research Corporation, Metropolitan Washington Council of Governments, Milwaukee Economic Development Summit, Minority Business Legal Defense and  Education Fund, National Alliance of Business, NAACP Legal Defense Fund Training Institute, National Association for Welfare Research and Statistics, National Association of Black MBAs, National Association of Protective and Advocacy Systems, National Center for Research on Vocational Education, National Center for Neighborhood Enterprise, National Conference on Social Welfare, National Conference of State Legislatures, National Cooperative Bank, National Council for Employment Policy, National Council of La Raza, National Employment Law Institute, National Institute of Education, National League of Cities, National Science Foundation Social Behavioral and Economic Sciences Directorate, National Task Force on Tradeswomen Issues, National Urban Coalition, New York Restaurant Industry Summit, Northeast-Midwest Institute, Organization for Economic Cooperation and Development (Paris), ORIGIN (Organizational and Institutional Gender Information Network), Passaic County (NJ) Economic Development Authority, President's National Equal Pay Enforcement Task Force, Prince Georges County (MD) Planning Department, Program on Community Problem Solving, Public Education Network, Seattle-King County Workforce Development Council, Social Policy Association (UK), Society of Government Economists, Society for Human Resource Management, Society for Industrial and Organizational Psychology, Society for the Psychological Study of Social Issues, Southern Economic Association, Swedish National Labor Market Board, United Way of America, U.S. Chamber of Commerce, U.S. Department of Labor Women's Bureau, U.S. Equal Employment Opportunity Commission, U.S. Conference of Mayors, U.S. Information Agency, U.S. State Department International Information Program (Warsaw Embassy), and Vermont Department of Social Welfare.

**Expert witness** or consulting expert in more than 200 federal and state court cases concerning race, ethnicity, gender, age, disability, sexual orientation, and other discrimination in employment; patterns of employment and earnings; the employment implications of business development; and interpretation of social science data. According to search engines such as Westlaw, this work has been cited in 44 Federal court opinions and 109 law review articles or legal treatises.

**Research reviewer/journal referee**, <u>Academy of Management Learning and Education</u>;  <u>Administration in Social Work</u>; <u>Administrative Sciences</u>;  <u>American Journal of Psychotherapy</u>; <u>Analyses of Social Issues and Public Policy (ASAP)</u>; <u>Behavioral Sciences</u>; Cornell Industrial and Labor Relations Press; <u>Disability Studies Quarterly</u>; <u>Economic Development Quarterly</u>; <u>European Journal of Management Issues</u>; <u>European Sociological Review</u>; <u>Government & Policy</u>; <u>The Gerontologist</u>; <u>HealthCare</u>; Institute for Research on Poverty, University of Wisconsin; <u>*International Journal of Diversity in Communities, Organisations and Nations*</u>; <u>*International Journal of Environmental Research and Public Health*</u>; <u>*Journal of Aging and Social Policy*</u>*;* <u>*Journal of Community and Applied Social Psychology*</u>; <u>*Journal of Ethnic and Migration Studies*</u>, <u>*Journal of Forensic Economics*</u>; <u>*Journal of Policy Analysis and Management*</u>; <u>*Journal of Social Issues*</u> *(editorial board, 2022-    );* <u>*Journal of Social Policy*</u>; <u>*Journal of Regional Science*</u>; <u>*Land Economics*</u>; *National Association of Forensic Economics; National Commission on Testing and Public Policy; National Science Foundation;* <u>*National Tax Journal*</u>*; Nuffield Foundation; Praeger Publishers;* <u>*Research on Aging*</u>; <u>*Sage Open*</u>*; Sloan Foundation;* <u>*Sex Roles*</u>; <u>*Social Science Journal*</u>; <u>*Social Service Review*</u>; <u>*Social Sciences*</u>; <u>*Societies*</u>; <u>*Sociological Perspectives*</u>*; Springer Publishing;* <u>*State and Local Government Review*</u>*, and University of Wisconsin Press.*

September 2023

# PROFESSIONAL PUBLICATIONS

***(Google Scholar and other search engines report that these publications have been cited by other researchers and analysts more than 5,000 times)***

## <u>2016 -</u>

142.   ***Economic Report: Range of Light National Monument****.* Alexandria, VA: Bendick and Egan Economic Consultants, Inc., for <u>Unitetheparks.org</u>, 2023.

141.   "Race Discrimination and Segregation in Manufacturing Jobs: Evidence from Matched-Pair Testing of Staffing Agencies.*" **Social Science Journal*** (2021) (with Elias Cohn).[2]

140.   "The Global Advertising Workforce: Who is Excluded and Why it Matters." Presentation at the ***Second Biennial Race in the Marketplace Forum***, June 2019 (with Mary Lou Egan).

139.   "Increasing Minority Employment: Are You Ready to Recruit?" ***Employment Relations Today*** (July 2018), pp. 1-5 (with Mary Lou Egan).[3]

138.   "Making it Count: Discrimination Auditing and the Activist Scholar Tradition." In: S. M. Gaddis (ed.). ***Audit Studies: Behind the Scenes with Theory, Method, and Nuance*** (Springer, 2018), pp. 45-62 (with Frances Cherry).

137.   ***Compliance with the Fair Chance Act: An Exploratory Testing Study****.* New York: Commission on Human Rights, 2017.

---

[2] An earlier version appeared as *Opening the Door: Ending Racial Discrimination in Industrial Temp Hiring through Innovative Enforcement*.  New York: Partners for Dignity and Rights, 2021.

[3] An earlier version of this paper was presented at the Workshop on Attracting and Retaining U.S. Minorities, World Bank, Washington, DC, November 2010.

136. "Employment Discrimination Against Persons with Disabilities: Evidence from Match Pair Testing," *International Journal of Diversity in Organizations, Communities, and Nations: Annual Review* 17 (1, 2017), pp. 11-25.[4]

135. *Pathways to Equity, Narrowing the Wage Gap by Improving Women's Access to Good Middle-Skill Jobs* Washington: Institute for Women's Policy Research, 2016. (with Ariane Hegewisch, Barbara Gault, and Heidi Hartmann).

## **2011 - 2015**

134. "Using Information Regulation to Enhance Workplace Diversity, Inclusion and Fairness." *Argumenta Oeconomica Cracoviensia* 10 (2015), pp. 59-77 (with Mary Lou Egan).[5]

133. "What Research Tells us about Women in Firefighting" **Testimony, City Council of the City of New York**, December 13, 2013.

132. "Professionalizing Diversity and Inclusion Practice:  Should Voluntary Standards be the Chicken or the Egg?" *Industrial and Organizational Psychology: Perspectives on Science and Practice* 6 (2013), pp. 193-205 (with Rosemary Hayes-Thomas).[6]

131. "Availability Estimates for Women and Why They Matter**."  Presentation, AFL-CIO Third Annual Conference on Women in the Trade**s, Sacramento, April 2013.

130. "Setting Industry-Level Priorities for EEOC Enforcement." **Testimony, Equal Employment Opportunity Commission Hearings on the Strategic Enforcement Plan**, July 2012.

129. "Making Invisible Difference Visible in Measuring Inclusion." **Presentation at the George Mason University Conference on Diversity; Practice and Research,** June 2012.

128. "Developing the Research Base for Controlling Bias in Hiring." *Journal of Social Issues* 68 (2012), pp. 238-263 (with Ana Nunes).

127. *The Availability of Women, Racial Minorities, and Hispanics for On-Site Construction Employment.* Alexandria, VA: Bendick and Egan Economic Consultants, Inc. for the U.S. Department of Labor, 2011 (with M. Egan, J. Miller & L. Lanier).

126. "Research Evidence on Disparate Treatment in Hiring.**" Testimony, U.S. Equal Employment Opportunity Commission Hearings on Discrimination in Hiring**, June 2011.

## **2006 - 2010**

125. "Employment Discrimination in Upscale Restaurants: Evidence from Paired Comparison Testing." *Social Science Journal* 47 (2010), pp. 802-818 (with Rekha Rodriguez and Sarumathi Jayaraman).[7]

---

[4] An earlier version of this paper was presented at the International Conference on Diversity in Organizations, Communities, and Nations, Toronto, July 2017.

[5] An earlier version of this paper was presented at the 13th International Human Resource Management Conference, Krakow, Poland, June 2014.

[6] An earlier version of this paper was presented as the Society for Industrial and Organizational Psychology Annual Conference, San Diego, April 2012.

124.    "The Business Case for Diversity and the Perverse Practice of Matching Employees to Customers." *Personnel Review* 39 (4, 2010), pp. 468-486 (with Mary Lou Egan and Louis Lanier).[8]

123.    "Taking the Heat, Gender Discrimination in Firefighting." **Journal of Gender, Social Policy and the Law** 17 (2010), pp. 705-749. (with Amanda Dupree, Richard Ugelow, et al.).

122.    **Transgender Need Not Apply: Gender Identity Job Discrimination in New York City's Retail Sector** New York: Make the Road New York, 2009 (with Chase Madar et al.).

121.    "Using Situation Testing to Document Employment Discrimination Against Persons with Psychiatric Disabilities." **Employee Relations Law Journal** 35 (Winter, 2009), pp. 40-60 (with Amir Tal, Galia Moran, and Dan-Olof Rooth).[9]

120.    "France's Mandatory 'Triple Bottom Line' Reporting: Promoting Sustainable Development through Informational Regulation," **International Journal of Environmental, Cultural, Economic, and Social Sustainability** 7 (5, 2009), pp. 27-47 (with Mary Lou Egan, Fabrice Mauleon, and Dominique Wolff).[10]

119.    **Research Perspectives on Race and Employment in the Advertising Industry** (Washington: Bendick and Egan Economic Consultants, Inc., 2009) (with Mary Lou Egan).

118.    "Manage Employer Inclusion, not Workforce Diversity!" **Presentation to the Society for Human Resource Management Annual Diversity Conference, Atlanta, October 2008** (with Mary Lou Egan).

117.    "Combining Multicultural Management and Diversity into One Course on Cultural Competence," **Academy of Management Learning and Education** 7 (September 2008), pp. 387-393 (with Mary Lou Egan).

116.    "Enhancing Women's Inclusion in Firefighting in the USA," **International Journal of Diversity in Communities, Organisations, and Nations** 8, 2 (2008), pp. 189-208 (with Denise Hulett, Sheila Thomas, and Francine Moccio).[11]

115.    "Measuring Inclusion in the Workplace: A Somewhat Economics Perspective," **Presentation to the National Science Foundation Social Economic and Behavioral Sciences Directorate, June 2008** (with Mary Lou Egan).

114.    "Measuring Inclusion in the Workplace," **Presentation to the American Psychological Association National Conference, San Francisco, August 2007** (with Mary Lou Egan).

---

[7] Portions of this paper also appear in **The Great Service Divide, Occupational Segregation and Inequality in the New York City Restaurant Industry** (New York: Restaurant Opportunity Center of New York and the New York City Restaurant Industry Coalition, 2009).

[8] An earlier version was presented at the 10th International Human Resource Management Conference, Santa Fe, NM, 2009.

[9] An earlier version was presented at the Fourth International Stigma Conference, London, 2009.

[10] Earlier versions were presented at the Second International Conference of the International Center for Corporate Accountability, New York, June 2007, and at the 25th Annual Research Conference, Association for Public Policy and Management, 2003.

[11] Alternative versions appeared as **A National Report Card on Women in Firefighting** (International Association of Women in Fire and Emergency Services, April 2008), and "A Fair Shake," **Fire Chief** (April 2008), pp. 36-40.

113.  "Situation Testing for Employment Discrimination in the United States of America," **Horizons Strategiques** 5 (July 2007), pp. 17-39.

112.  "How Can the EEOC Effectively Promote Employer Efforts to Hire the Best Employees and Avoid Discrimination?" **Testimony, Equal Employment Opportunity Commission Hearings on the E-RACE (Eliminate Racism and Colorism in Employment) Initiative**, February 2007.

### 2000 - 2005

111.  "Behavioral Science, Workforce Diversity Management, and Employment Litigation: Implications for Employment Testing," **Presentations to the Monash University Conference on Field Experiments on Discrimination in Markets,** Prato, Italy, July 2005 (with Ana Nunes and Mary Lou Egan).

110.  "Using Paired Comparison Testing to Develop a Social Psychology of Civil Rights," **Presentation to the Annual Conference of the Society for the Psychological Study of Social Issues, June 2004**.

109.  "Workforce Diversity Initiatives of US Multinational Corporations in Europe," **Thunderbird International Business Review** 45 (November-December 2003), pp. 701-727 (with Mary Lou Egan).[12]

108.  "The Emerging Job Market on the Internet," **Proceedings of the 7th Conference on International Human Resource Management, Limerick, Ireland, June 2003** (with Lauren E. Brown).

107.  "Beyond Simple Counts:  A New Approach to Measuring and Monitoring Workforce Diversity," **Proceedings of the 7th Conference on International Human Resource Management, Limerick, Ireland, June 2003** (with Mary Lou Egan and John J. Miller).

106.  "US Firms' Evaluation of Employee Qualifications in International Business Careers."  **International Journal of Human Resource Management** 13 (February 2002), pp. 76-88 (with Mary Lou Egan and John Miller).

105.  "Diversity Training: From Anti-Discrimination Compliance to Organization Development." **Human Resource Planning**  24 (2, 2001), pp. 10-25 (with Mary Lou Egan and Suzanne Lofhjelm).[13]

104.  "Using EEO-1 Data to Analyze Allegations of Employment Discrimination,"  **Presentation to the Section on Labor and Employment Law, American Bar Association**, July 2000.

103.  "Changing Workplace Cultures to Reduce Employment Discrimination." **Presentation to the Conference on Low Wage Workers in the New Economy**, Washington, DC May 2000.

102.   **Gender Occupational Segregation: An Analysis of Employers' EEO-1 Report**s. Newark, NJ: Employment Discrimination Project, Rutgers Law School (with Alfred W. Blumrosen, John J. Miller, and Ruth Blumrosen), 2000.

### 1995 - 1999

101.   **Surmounting Five Barriers to Business Participation**.  Presentation to the Urban Institute/Department of Labor Conference on Workforce Development, May 1999.  Washington: Bendick & Egan Economic Consultants, Inc., 1999.

---

[12]Reprinted in **Value Creation through Diversity** (Philadelphia: Wharton School of the University of Pennsylvania, 2002) and **Executive Reference Book** (Hyderabad: Institute of Chartered Financial Analysts of India, 2003).

[13]Awarded Walker Prize for Best Published Research in 2001, Human Resource Planning Society.

100.    **Welfare Reform and Beyond: Making Work *Work*.** New York: Committee for Economic Development, 2000 (with others).

99.    "No Foot in the Door: An Experimental Study of Employment Discrimination Against Older Workers." **Journal of Aging and Social Policy** 10 (4, 1999), pp. 5-23) (with Lauren Brown and Kennington Wall).[14]

98.    "Adding Testing to the Nation's Portfolio of Information on Employment Discrimination." In Michael Fix and Margery Turner (eds), **A National Report Card on Discrimination in America: The Role of Testing**. Washington: The Urban Institute, 1999, pp. 47-68.

97.    **Employment Discrimination Against Women and Minorities in Georgia**. Newark, NJ: Employment Discrimination Project, Rutgers Law School, 1999 (with Alfred W. Blumrosen, John J. Miller, and Ruth Blumrosen).

96.    **The Documentation and Evaluation of Anti-Discrimination Training in the United States.** Geneva: International Labour Office, 1998 (with Mary Lou Egan and Suzanne Lofhjelm).

95.    **Employment Discrimination Against Women in Washington State, 1997**. Newark, NJ: Employment Discrimination Project, Rutgers Law School, 1998 (with Alfred W. Blumrosen, John J. Miller, and Ruth Blumrosen).

94.    **Access, Diversity and Civil Rights Issues in the Development of Skills Standards.** Washington: National Skills Standards Board, 1997.

93.    **Connecting Inner-City Youth to the World of Work.** New York: Committee for Economic Development, 1997 (with others).

92.    "Employment Discrimination Against Older Workers: An Experimental Study of Hiring Practices." **Journal of Aging and Social Policy** 8 (4, 1996), pp. 25-46 (with Charles Jackson and J. Horacio Romero).

91.    **State of Michigan Equal Employment Opportunity Review**. Lansing: Civil Service Commission of the State of Michigan, 1996 (with Peter Robertson and Alfred W. Blumrosen).

90.    **Employment Practices and Employment Discrimination: A Bibliography Combining Economic, Managerial, and Behavioral Science Research.** Washington: Fair Employment Council of Greater Washington, Inc., second edition 1996.

89.    "Linking Learning and Earning." **Economic Development Quarterly** 10 (August 1996), pp. 217-223.

88.    **Discrimination Against Racial/Ethnic Minorities in Access to Employment in the United States**. Geneva: International Labour Office, 1996.

87.    "Employee Ownership and Participation Enhance Economic Development in Low-Opportunity Communities." **Journal of Community Practice** 2 (Winter 1995), pp. 61-85 (with Mary Lou Egan).

86.    "Making the Federal Government an Effective Partner in Community Revitalization." **Testimony**, Committee on Small Business, United States Senate, October 19, 1995.

85.    **Rebuilding Inner-City Communities: A New Approach to the Nation's Urban Crisis.** New York: Committee for Economic Development, 1995 (with others).

84.    "Research Evidence on Discrimination and Affirmative Action in Employment." **Testimony**, Committee on the Judiciary, California State Assembly, May 4, 1995.[15]

---

[14]Cited in *Reeves v. Sanderson Plumbing Products, Inc.*, U.S. Supreme Court, 99-536, pp. 10-11.

**1990 - 1994**

83.    "The Case against a Misdirected Federal Neighborhood Strategy." **Environment and Planning C: Government and Policy** 12 (1994), pp. 490-493 (with Terra Geiger).

82.    "Measuring Employment Discrimination through Controlled Experiments." **Review of Black Political Economy** 23 (Summer 1994), pp. 25-48 (with Charles Jackson and Victor Reinoso).[16]

81.    "International Business Careers in the United States: Salaries, Advancement, and Male-Female Differences." **International Journal of Human Resource Management** 5 (February 1994), pp. 33-50 (with Mary Lou Egan).

80.    "Use of Testing in Civil Rights Enforcement." in Michael Fix and Raymond Struyk (eds.), **Clear and Convincing Evidence: Measurement of Discrimination in America**.  Washington, D.C.: Urban Institute Press, 1993: 345-376 (with Roderic Boggs and Joseph Sellers).

79.    "Linking Business Development and Community Development in Inner Cities." **Journal of Planning Literature** 8 (August 1993), pp. 3-19 (with Mary Lou Egan).

78.    "Racial and Ethnic Discrimination in Restaurant Franchising." **Testimony**, Committee on Small Business, U.S. House of Representatives, June 30, 1993 (with Kerry Scanlon).

77.    **EEO Testing Manual**. Washington: Fair Employment Council of Greater Washington, 1993 (with others).

76.    "Goal Setting." in **Opportunity Denied! A Study of Racial and Sexual Discrimination Related to Government Procurement in New York State**.  New York: New York State Department of Economic Development, 1992.

75.    "Designing an Effective Re-employment Program for Dislocated Workers." **Testimony**, Committee on Ways and Means, U.S. House of Representatives, April 30, 1992.

74.    **Getting a Job is a Job: A Curriculum for High School**. Washington: Fair Employment Council of Greater Washington, 1992 (with others).

73.     **Linking Learning with Earning: The Report of the Commission on Vocational Education**. Washington: District of Columbia Public Schools, 1992 (with others).

72.    "Discrimination Against Latino Job Applicants: A Controlled Experiment." **Human Resource Management** 30 (Winter 1991), pp.  469-484 (with Charles Jackson, Victor Reinoso, and Laura Hodges).[17]

---

[15]Reprinted in **Employee Advocate Supplement** 41(Fall 1995): 30-50; Stuart Nagel (ed.), **Research in Public Policy Analysis, Volume 9** (Greenwich, CT: JAI Press, 1998); **International Journal of Public Administration** 22 (8): 1213-1240; **International Journal of Economic Development** 2 (2): 256-274; and Stuart Nagel (ed.), **Diverse Perspectives on Peace, Prosperity, and Democracy** (Nova Publishers, 2002).

[16]Reprinted in **Discrimination and Affirmative Action: Are There Any Facts Out There?** (Sacramento: California State Legislature, 1995); James Stewart (ed.), **African-Americans in Post-Industrial Labor Markets** (New Brunswick, NJ: Transaction Books, 1997); and Fred L. Pincus & Howard J. Ehrlich (eds.), **Race and Ethnic Conflict: Contending Views on Prejudice, Discrimination, and Ethnoviolence** (Boulder: Westview Press, 1998).

[17]Reprinted in John Kromkowski (ed.), **Race and Ethnic Relations** (Guilford, CT: Dushkin Publishing, 1993), pp. 86-93, and **Discrimination and Affirmative Action: Are There Any Facts Out There?** (Sacramento: California State Legislature, 1995).

71.  **Managing Greater Washington's Changing Work Force: Keys to Productivity and Profit**. Washington: Greater Washington Research Center, 1991 (with Mary Lou Egan).

70.  "Should Labor Market Analyses Recognize that Blacks and Other Minorities are Disproportionately Omitted from Census Counts?  in **Papers of the 1990 Training Conference**. New York: NAACP Legal Defense & Education Fund, 1990 (with Daniel Edelman).

69.  "Upgrade Training in Other Industrial Nations." in Michael Kane and Ann Meltzer, **Upgrade Training for Employed Workers**. Washington: Pelavin Associates for the U.S. Department of Labor, 1990 (with Mary Lou Egan).

68.  "Financing Exports: What is the State Role?" in Richard D. Bingham, Edward W. Hill, and Sammis White (eds.), **Financing Economic Development**. Newberry Park, CA: Sage Publications, 1990: 222-240 (with Mary Lou Egan).

67.  "The Croson Decision Mandates that Setaside Programs be Tools of Business Development." **George Mason University Civil Rights Law Journal** 1 (Spring 1990): 87-104.[18]

### 1985 - 1989

66.  "Welfare to Work: The Research Basis for a Program Emphasizing the Employer Side of the Labor Market." **Proceedings of the National Workshop on Welfare Research and Statistics**.  Washington: National Association for Welfare Research and Statistics, 1989.

65.  **Building a Job Service for the Year 2000: Innovative State Practices.**  Washington: Interstate Conference of Employment Security Agencies, 1989.

64.   **Auditing Race Discrimination in Employment: A Research Design**. Washington: The Urban Institute, 1989.

63.  "Privatizing the Delivery of Social Welfare Services: An Idea to be Taken Seriously." in Sheila Kamerman and Alfred J. Kahn (eds.), **Privatization and the Welfare State**.  Princeton: Princeton University Press, 1989, pp. 97-120.

62.  "Matching Workers and Job Opportunities: What Role for the Federal-State Employment Service?" in D.L. Bawden and Felicity Skidmore (eds.), **Rethinking Employment Policy**.  Washington, DC: Urban Institute Press, 1989: 81-108.

61.  **Jobs: Employment Opportunities in the Washington Area for Persons with Limited Employment Qualifications.**  Washington: Greater Washington Research Center, 1988 (with Mary Lou Egan).

60.   "Alternative Uses of Unemployment Compensation: Self-Employment Allowances." **Testimony**, Committee on Ways and Means, U.S. House of Representatives, December 14, 1987 (with Mary Lou Egan).

59.   "Promoting Employer-Provided Worker Reskilling: Lessons from a Tax Credit System in France." **Testimony**, Joint Economic Committee, U.S. Congress, October 29, 1987 (with Mary Lou Egan).

58.  "Transfer Payment Diversion for Small Business Development: British and French Experience." **Industrial and Labor Relations Review** 40 (July 1987): 528-542 (with Mary Lou Egan).[19]

---

[18]Also presented as **Testimony**, **Committee on the Judiciary, U.S. House of Representatives**, November 30, 1989.

[19]Reprinted as **The New Entrepreneurs.**  London: Centre for Employment Initiatives, 1988.

57.    "Enhancing Employment Opportunities for Minority and Disadvantaged Youth." in Ray Rist (ed.), **Policy Studies Review Annual, Volume 8**. New Brunswick, N.J.: Transaction Books, 1987: 452-466.

56.    "Look Who's Becoming an Entrepreneur." **Across the Board** 24 (January 1987): 52-54 (with Mary Lou Egan).

55.    **The Human Resources Component of an Economic Revitalization Strategy for the Mahoning Valley.** Youngstown, Ohio: Regional Growth Association, 1987.

54.    "Targeting Benefit Payments in the British Welfare State." in Jerome McKinney and Michael Johnston (eds.) **Fraud, Waste, and Abuse in Government**. Philadelphia: Institute for the Study of Human Issues, 1986: 49-59.

53.    "Enterprise Zones and Inner City Economic Revitalization." in George Peterson (ed.) **Reagan and the Cities.** Washington: Urban Institute Press, 1986: 97-130 (with David W. Rasmussen).

52.    "The Role of Small Business Entrepreneurship in Urban Economic Development," in Marc Lipsitz (ed.), **Revitalizing Our Cities**. Washington: National Center for Neighborhood Enterprise, 1986: 48-52.

51.    "The Rural-Urban Dimension in National Economic Development." **Journal of Developing Areas** 20 (January 1986): 203-222 (with Mary Lou Egan).[20]

50.    **A Program to Address the Employment Consequences of Acid Rain Control.** Washington: National Wildlife Federation, 1985.

49.    "Housing Assistance Shifts from Construction to Vouchers." **Journal of the American Planning Association** 8 (September 1985): 475- 476.

48.    "The Role of Retraining in the Reemployment of Trade-Displaced Workers." **Testimony**, Committee on Finance, U.S. Senate, September 17, 1985.

47.    "Research Evidence on the Cost-Effectiveness of the Job Corps." **Testimony**, Committee on Government Operations, U.S. House of Representatives, May 23, 1985.

46.    "Improved Program Administration Can Benefit both Recipients and Oregon Taxpayers." **Testimony**, Committee on Human Resources and the Aging, Oregon House of Representatives, March 1985.

45.    "Private Sector Initiatives or Public-Private Partnerships?" in Lester A. Salamon and Michael Lund (eds.) **The Reagan Presidency and the Governing of America.** Washington: Urban Institute Press, 1985: 455-479 (with P. Levinson).

44.    **The Role of Publicly-Sponsored Export Trading Companies in the Relief of Unemployment and Regional Economic Distress.** Washington: Bendick & Egan Economic Consultants, Inc., 1985 (with Mary Lou Egan).

<u>**1980 - 1984**</u>

43.    "Worker Mobility in Response to a Plant Closure." in Richard Swigart (ed.) **Managing Plant Closures and Occupational Readjustment**. Washington: National Center for Occupational Readjustment, 1984: 47-59.

42.    "Privatization of Public Services: Recent Experience." in Harvey Brooks et al. (eds.) **Public-Private Partnership**. Cambridge, MA: Ballinger, 1984: 153-171.[21]

---

[20]Reprinted in **Problemes Politiques et Sociaux** 572 (November 27, 1987), pp. 25-27.

41.    "Dislocated Workers and Midcareer Retraining in Other Industrial Nations." in Kevin Hollenbeck et al. (eds.) **Displaced Workers: Implications for Education and Training Institutions**. Columbus, Ohio: National Center for Research in Vocational Education, 1984: 189-208.[22]

40.    "A Methodology for Selecting Economic Development Incentives." **Growth and Change** 15 (January 1984): 18-25 (with David W. Rasmussen and Larry C. Ledebur).

39.    "Federal Tax Incentives, Federal Expenditures, and Inner City Economic Revitalization." **Testimony**, Committee on Ways and Means, U.S. House of Representatives, November 1983 (with David W. Rasmussen).

38.    **Reinvesting in Employment and Training Programs: A Portfolio of Innovative Federal Initiatives**. The Urban Institute, 1983.

37.    **How's Business in the Reagan Era?** Washington: The Urban Institute, 1983 with Phyllis M. Levinson).

36.    "Employment and Training Programs to Reduce Structural Unemployment." **Testimony**, Joint Economic Committee, U.S. Congress, September, 1983.[23]

35.    "America's Implicit Industrial Policy." **Testimony**, Committee on Banking, U.S. House of Representatives, June 1983.

34.    "Government's Role in the Job Transitions of America's Displaced Workers." **Testimony**, Committee on the Budget, U.S. House of Representatives, June 1983.[24]

33.    "Reemploying Displaced Workers: Five Strategies for Pennsylvania." **Testimony**, House of Representatives' Committee on Appropriations, Legislature of the Commonwealth of Pennsylvania, March 1983.

32.    "The Swedish 'Active Labor Market' System for Reemploying Displaced Workers." **Journal of Health and Human Resources Administration** 6 (Fall 1983): 209-224.

31.    **Employment and Training Programs for Migrant and Refugee Youth: Lesson from the United Statesd Experience. Washington:** The Urban Institute, 1983 (with Manuel De La Puente).

30.    "Lessons for Future Social Experiments." in Joseph Friedman and Daniel Weinberg (eds.) **The Great Housing Experiments**. Beverly Hills, Ca.: Russell Sage, 1983: 258-265 (with Raymond J. Struyk).

29.    "The Role of Public Programs and Private Markets in Reemploying Displaced Workers." **Policy Studies Review** 2 (May 1983): 715-733.

28.    "Vouchers versus Income versus Services: An American Experiment in Housing Policy." **Journal of Social Policy** 11 (July 1982): 365-377.

---

[21]Reprinted in J. Steven Ott, Albert C. Hyde, and Jay M. Shafritz (eds.), **Public Management: The Essential Readings** (Chicago: Nelson-Hall Publishers, 1991).

[22]Reprinted in Ray Rist (ed.) **Finding Work: Cross-National Perspectives on Employment and Training.** London: Falmer Press, 1986: 159-172.

[23]Reprinted in Ray Rist (ed.), **Policy Studies Review Annual, Volume 7**. New Brunswick, NJ: Transaction Books, 1985: 359-378; and in **The Entrepreneurial Economy** 3 (August 1984): 8-9.

[24]Reprinted in Terry F. Buss et al. (eds.) **Revitalizing the American Economy**. New York: Praeger Publishers, 1986: 158-175.

27.  "Recent Research in the United States on Social Problems Common to Industrial Societies." in **Trends in Policy Research in the United States and Europe.** Tokyo: National Institute for Research Advancement, 1982: 247-511.

26.  "Evaluating State Economic Development Incentives from a Firm's Perspective." **Business Economics** 17 (May 1982): 23-29 (with David W. Rasmussen and Larry C. Ledebur).

25.  "Employment, Training, and Economic Development." in John R. Palmer and Isabel V. Sawhill (eds.) **The Reagan Experiment**. Washington: Urban Institute Press, 1982: 247-269.

24.  "Providing Industrial Jobs in the Inner City." **Business** 32 (January - March 1982): 2-9 (with Mary Lou Egan).[25]

23.  "Enterprise Zones: Area Targeting is the Key to the Job Generation Process." **Testimony**, Committee on Finance, U.S. Senate, April 1982 (with David W. Rasmussen).[26]

22.  Plant Closure and Worker Layoff Procedures in the United States.  Washington, DC: The Urban Institute, 1981.

21.  "Enterprise Zones: A Land Banking Approach." **Testimony**, Senate Minority Task Force on Economic Development, Legislature of the State of New York, September 1981.[27]

20.  **A Federal Entrepreneur? Industrial Policy and American Economic Revitalization.** Washington: The Urban Institute, 1981.

19.  **Public-Private Partnerships for Urban Development, Preconditions and Payoffs**.  Washington, DC: U.S. Department of Housing and Urban Development, 1981 (with Raymond J. Struyk and James Zais).

18.  "National Industrial Policy and Economically-Distressed Communities." **Policy Studies Journal** 10 (December 1981): 220-234 (with Larry C. Ledebur). [28]

17.  "Workers Dislocated by Economic Change: Do They Need Federal Employment and Training Assistance?" in **The Federal Interest in Employment and Training**. Washington: National Commission For Employment Policy, 1981: 175-226 (with Judith Radlinski Devine).[29]

16.  **Housing Vouchers for the Poor: Lessons from a National Experiment**. Washington: Urban Institute Press, 1981 (editor, with Raymond J. Struyk).

15.  "Failure to Enroll in Public Assistance Programs." **Social Work** 25 (July 1980): 268-274.

14.  "Quality Control in a Federal-State Public Assistance Program." **Administration in Social Work** 4(Spring 1980): 7-20.

---

[25]Reprinted in **Economic Development Commentary** 5 (January 1981): 13-16.

[26]Reprinted in **Congressional Quarterly** 64 (May 1982): 145-147.

[27]Reprinted in **Economic Development Commentary** 6 (Summer 1982): 11-13.

[28]Reprinted in F. Stevens Redburn and Terry H. Buss (eds.) **Public Policies for Distressed Communities**. Lexington, MA: D.C. Heath, 1982: 3-14.

[29]Reprinted in **The Entrepreneurial Economy** 1 (December 1982): 10-11.

**1970 – 1979**

13.   "A Management Analysis Process for Public Assistance Quality Control." in **Welfare Research and Statistics**. Washington: Department of Health, Education, and Welfare, 1979.

12.   **The Anatomy of AFDC Errors.** Washington: Urban Institute Press, 1978 (with Abe Lavine and Toby H. Campbell).

11.   Improving Measures of Economic Well Being [Review]." **Social Service Review** 52 (June 1978): 315-316.

10.   "The Literacy of Welfare Clients." **Social Service Review** 52 (March 1978): 56-68 (with Mario Cantu).

9.    "WIC and the Paradox of In-Kind Transfers." **Public Finance Quarterly** 6 (July 1978): 359-80.

8.    "Management Training for Public Welfare Agencies." **Administration in Social Work** 1 (Winter 1977): 359-67 (with Mary Lou Egan).

7.    "Cost-Effective Actions for Reducing AFDC Eligibility and Payment Errors." **Testimony**, Committee on Government Operations, U.S. House of Representatives, October 1977.

6.    **Income-Conditioned Programs and their Clients.** Washington: Urban Institute Press, 1977 (with D. Lee Bawden).

5.    "Education as a Three-Sector Industry." in B. A. Weisbrod. **The Voluntary Non-Profit Sector: An Economic Analysis**. Lexington, MA: D.C. Heath, 1977: 101-142.

4.    **Toward Efficiency and Effectiveness in the WIC Delivery System**. Washington: Urban Institute Press, 1976 (with Toby H. Campbell, D. Lee Bawden, and Melvin Jones).

3.    "Designing Circuit-Breaker Property Tax Relief." **National Tax Journal** 27 (March 1974): 19-28.[30]

2.    "Reforming the Homestead Credit for Property Tax Relief." **Testimony**, Joint Finance Committee, Wisconsin State Legislature, February 1974.

1.    **Linear Programming Tools for Aircraft Systems Analysis**. Long Beach, CA: McDonnell Douglas Corporation, 1970.

---

[30]Awarded Harold M. Groves Prize for Excellence in Public Finance Research, 1974.

# **ATTACHMENT B**

**MARC BENDICK, JR., Ph.D.**

**CASES AND PROJECTS IN LITIGATION SUPPORT**

**September 2023**

## I. CASES IN WHICH A FEDERAL COURT
## ACCEPTED BENDICK AS AN EXPERT[1]

[217]    <u>Adams et al. v. Brookshire Grocery Company</u> (U.S. District Court for the Eastern District of Texas, Tyler Division, 6:98-CV-00462)

Expert testimony via reports concerning gender patterns in promotion, assignment, and compensation of retail sales employees.  Client: Rod Tanner and Associates, Fort Worth, TX, representing plaintiffs

[216]    <u>Alcarez v. Block</u> (U.S. District Court for the Eastern District of California, C.A. S-82-298-RAR)

Expert testimony before a judge via declaration concerning the demographic characteristics of low-income persons.  Client: California Rural Legal Assistance, San Francisco, CA, representing plaintiffs.

[215]    <u>Anderson v. Douglas & Lomason Co.</u>  (U.S. District Court for the Northern District of Mississippi, C.A. DC 85-160-LS-0)

Expert testimony before a judge concerning racial patterns in employment in a manufacturing company.  Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[214]    <u>Appleton et al. v. Deloite, Touche</u> (U.S. District Court for the Middle District of Tennessee, No, C-95-0483)

Expert testimony via deposition and reports concerning race patterns in the hiring, promotion, assignment, and compensation of professional and administrative employees.  Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs.

[213]    <u>Armstrong et al. v. Ford Motor Company and Visteon Corporation</u> (U.S. District Court for the Middle District of  Tennessee, Nashville Division, 3-01-0012)

Design and implementation of a post-settlement monitoring system concerning race patterns in the employment of salaried employees.  Client:  Visteon Corporation/ Ford Motor Co., Detroit, MI, on behalf of both plaintiffs and defendants.

[212]    <u>Baker et al v. City of Detroit</u> (U.S. District Court for the Eastern District of Michigan, 1979)

Expert testimony via a report before a judge concerning racial patterns in promotions in a police department.  Client:  Law Department, City of Detroit, MI, representing defendants.

[211]    <u>Berger et al. v. United Ironworkers Reinforced Rodmen</u> (U.S. District Court for the District of Columbia, C.A. 75-1743)

---

[1] Court stated that he was qualified as an expert, allowed him to present an opinion, explicitly cited his evidence in a decision, or appeared to rely on his evidence in a decision.

1

Expert testimony before a magistrate concerning the economic loss associated with racial patterns in admission to a construction craft union.  Client: Washington Lawyers' Committee for Civil Rights with Patton Boggs & Blow, Washington, DC, representing plaintiffs.

[210]   Brionez et al. v. U.S. Department of Agriculture (U.S. District Court for the Northern District of California, C 01 3969CW)

Expert testimony before a special master and a judge via a report concerning the employment of Hispanics in the United States Forest Service. Client: Mexican American Legal Defense and Education Fund, Inc. San Francisco, representing plaintiffs.

[209]   Bush et al. v. Ruth's Chris Steak House, Inc. (U.S. District Court for the District of Columbia, C 1:10-cv-01721-RBW)

Expert testimony via deposition and reports concerning gender patterns in promotion, assignment, compensation, discipline, and termination of administrative and managerial employees.  Client: Mehri & Skalet, PLLC, Washington, DC, representing plaintiffs.

[208]   Butler et al. v. Home Depot, Inc. and Frank et al. v. Home Depot, Inc. (U.S. District Court for the Northern District of California, C 94 - 4335 (SI) and C 95 -2182 (SI))

Expert testimony via deposition and reports concerning gender patterns in the hiring, promotion, assignment, and compensation of retail sales employees. Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs.

[207]   Clark et al. v. Anna's Linen Company et al. (U. S. District Court for the Northern District of California, C05-02670)

Expert testimony via deposition and reports concerning gender patterns in the employment of retail employees.  Client:  Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland, CA, representing plaintiffs.

[206]   Coleman v. Best (U.S. District Court for the District of Maryland, C.A. H85-1828)

Expert testimony before a jury concerning the economic loss associated with the death of a blue collar worker. Client:  Kiersh and Buckman, Washington, DC, representing plaintiffs.

[205]   Detroit Police Officers' Association v. Young (U.S. District Court for the Eastern District of Michigan, Southern Division, C.A. 74-71838)

Expert testimony via deposition and reports concerning racial and gender patterns in employment in a police department.  Client:  Law Department, City of Detroit, MI, representing defendants.

[204]   Dukes et al. v. Wal-Mart Stores, Inc. (U.S. District Court for the Northern District of California, No. C-01-2252 MJJ)

Expert testimony via deposition and reports concerning gender patterns in the employment of retail managers.  Client:  The Impact Fund, Oakland, CA, representing plaintiffs.

[203]   Easterling et al. v. Connecticut Department of Corrections (U.S. District Court for the District of Connecticut, Civil Action 3:08-cv-0826 (JCH))

Consultation and data analysis concerning economic damages to female job applicants adversely affected by a physical abilities test.  Client: Outten & Golden, New York, representing plaintiffs.

[202]  EEOC v. Francis Parker School (U.S. District Court for the Northern District of Illinois, Eastern Division, C 91 4674)

Expert testimony via a report concerning age patterns in the employment of secondary school faculty.  Client: U.S. Equal Employment Opportunity Commission, Chicago, District Office, representing          plaintiffs.

[201]  EEOC v. Walgreen Co.  (U.S. District Court for the Southern District of Illinois, 07-172).

Expert testimony via deposition and reports concerning racial patterns in hiring, promoting, and assigning managerial and professional employees in a large retail chain. Client:  U.S. Equal Employment Opportunity Commission, St.  Louis office, representing plaintiffs.

[200]  Ellis et al. v. Costco  (U.S. District Court for the Northern District of California, C.A. 04 3341 MHP)

Expert testimony via deposition and reports concerning gender patterns in employment among retail employees.  Client:  The Impact Fund, Berkeley, CA, representing plaintiffs.

[199]  Foggs v. Block (U. S. District Court for the District of Massachusetts, C.A. 81-0365-F)

Expert testimony via deposition concerning the demographic characteristics of low-income persons. Client: Western Massachusetts Legal Services, Springfield, MA, representing plaintiffs.

[198]  Zollicoffer et al. v. Gold Standard Baking, Inc. and Personnel Staffing Group (U.S. District Court for the Northern District of Illinois, Eastern Division, C.A. 13 C 1524)

Expert testimony via reports and deposition concerning employment referrals and employment of unskilled manufacturing workers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[197]  Guerrero v. California Department of Corrections  (U. S. District Court for the Northern District of California, C 13-05671 WHA)

Expert testimony before a judge concerning national origin patterns in employment restrictions on persons who previously used a false Social Security number.  Client: Employment Law Center-Legal Aid Society, San Francisco, representing plaintiff.

[196]  Haynes et. al. v. Shoney's Inc. et al. (U. S. District Court for the Northern District of Florida, Penascola Division, C.A. 89-3093-WEA).

Expert testimony before a judge concerning racial patterns in the employment of restaurant workers.  Client: NAACP Legal Defense Fund, New York, representing plaintiffs.

[195]  Houser et al.  v. Prtizker (U.S. District Court for the Southern District of New York, 10 CIV-3105-FM)

Expert testimony via deposition and reports concerning the race/ethnic patterns in the employment of enumerators for the 2010 Census.  Client:  Outten & Golden LLP, New York, representing Plaintiffs.

[194]  Kraszewski v. State Farm Insurance Co. (U.S. District Court for the Northern District of California, C 79-1261 TEH)

Expert testimony via deposition and reports concerning gender patterns in the employment of professional sales agents.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[193]  Lewis et al. v. City of Chicago (U.S. District Court for the Northern District of Illinois, Eastern Division, 98 C 5596)

Expert testimony before a judge concerning racial patterns in the hiring of fire fighter and economic damages associated with those patterns.  Client: Chicago Lawyers' Committee for Civil Rights under Law, representing plaintiffs.

[192]  Middleton et al v. City of Flint et al (U.S. District Court for the Eastern District of Michigan, Southern Division - Flint, C.A. 90-CV40148-FL)

Expert testimony via reports concerning racial patterns in employment in a police department.  Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, Detroit, MI, representing defendants.

[191]  NAACP v. Detroit (U.S. District Court for the Eastern District of Michigan, Southern Division, C.A. 80-73693)

Expert testimony before a judge concerning racial patterns in employment in a police department.  Client: Law Department, City of Detroit, MI, representing defendants.

[190]  Nelson and Armstrong et. al. V. Wal-Mart Stores, Inc. et al. (U.S. District Court for the Eastern District of Arkansas, Eastern Division, Case 2:04-cv-00171-WRW)

Expert testimony via reports concerning racial patterns in employment of truck drivers by a large retail firm. Daubert motion to exclude was denied.  Client:  Cauley, Bowman, Carney & Williams, P.L.L.C., Little Rock, AR, representing plaintiffs.

[189]  Pearce v. Griffin Bell (U.S. District Court for the District of Columbia, C.A. 86-0008)

Expert testimony before a jury on the economic loss associated with separation from employment of a corporate manager.  Client: Milliken, Van Susteren, and Canan, P.C., Washington, DC, representing plaintiff.

[188]  Pegues v. Mississippi State Employment Service (U.S. District Court for the Northern District of Mississippi, C.A. DC 72-4-LS)

Expert testimony before a judge concerning racial and gender patterns in referrals by a state employment service.  Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[187]  Peterson and Olson et al. v. Seagate Technologies et al.  (U.S. District Court for the District of Minnesota, C.A. 84 Civil 07-2502 MJD/AJB)

Expert testimony via deposition and reports concerning age patterns in a layoff in a high tech firm. Client: Bertelson Law Offices, Minneapolis, MN, Dorene R. Sarnoski Law Office, Minneapolis, MN, and AARP, Washington, DC representing plaintiffs.

[186]  Pines v. State Farm Insurance (U.S. District Court for the Central District of California, C.A. SACU 89-63/AHS)

Expert testimony via reports concerning age patterns in the employment of professional sales agents.  Client: American Association of Retired Persons, Washington, DC, representing plaintiffs.

[185]  Satchell et al. v. Fedex Express (U.S. District Court for the Northern District of California, C-03-2659 SI)

Expert testimony via deposition and reports concerning race/ethnic patterns in the employment of manual workers and supervisors in a package delivery service.  Client:  Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs

**4**

[184]  <u>Shores et al. v. Publix Super Markets, Inc</u>. (U.S. District Court for the Middle District of Florida, Tampa Division, C.A. 95-1162-CIV-T-25E).

Expert testimony via deposition and reports concerning gender patterns in employment in the retail industry. Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[183]  <u>Tucker et al. v, Walgreen Company</u>  (U.S. District Court for the Southern District of Illinois, East St. Louis Division, cv.  05-00440-GPM CJP)

Expert testimony via deposition and reports concerning racial patterns in hiring, promoting, and assigning managerial and professional employees in a large retail chain. Client: Goldstein, Demchak, Baller Borgen & Dardarian, Oakland, CA, representing plaintiffs.

[182]  <u>United States v. City of Miami</u> (U.S. District Court for the Southern District of Florida, C. A. 75-3096-CIV-KEHOE)

Expert testimony before a judge concerning race, sex, and national origin patterns in hiring and promotions in a fire department.  Client: City Attorney for the City of Miami, FL, representing defendants.

[181]  <u>United States v. Commonwealth of the Northern Mariana Islands</u> (U.S. District Court for the Northern Mariana Islands, C.A. 92-0016)

Expert testimony via deposition and reports concerning national origin patterns in the promotion and compensation of public school teachers. Client: Civil Rights Division, U.S. Department of Justice, Washington, D.C., representing complainants.

[180]  <u>Walker v. Prince Georges County</u> (U.S. District Court for the District of Maryland, C.A. Y86-3446)

Expert testimony before a jury concerning the economic loss associated with the death of a blue collar worker/ small business owner.  Client:  Milliken, Van Susteren & Canan, P.C., Washington, DC, representing plaintiffs.

[179]  <u>Williams v. New Orleans</u> (U.S. District Court for the Eastern District of Louisiana, C.A. 73-629)

Expert testimony before a judge concerning racial patterns in hiring and promotion in a large police department.  Client: NAACP Legal Defense Fund, New York, representing plaintiffs.

[178]  <u>Workman v. J.R. Simplot Company, Inc.</u> (U. S. District Court for the District of Idaho, C.A. CIV 91-0105 S EJL)

Expert testimony via deposition and reports concerning gender patterns in employment and wages in a manufacturing firm.  Client: Givens, Pursley & Huntley, Boise, ID, representing plaintiffs.


## II.  CASES IN WHICH A STATE COURT OR OTHER TRIBUNAL ACCEPTED BENDICK AS AN EXPERT[2]

[177]  <u>Ball v. Blue Cross Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, C.A. 04-411518-CD)

Expert testimony before an arbitration tribunal concerning the separation from employment of an executive. Client: Plunkett & Cooney, P.C., Detroit, MI, representing defendant.

---

[2] For a definition, see footnote 1.

[176]   Blackwell v. Administrator, General Services Administration (EEOC 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X)

Expert testimony before an EEOC hearing examiner concerning racial patterns in promotions in a large federal agency.  Client: Yablonski, Both & Edelman, Washington, DC, representing plaintiff.

[175]   Dysert v. Westinghouse Electric, Inc. (Court of Common Pleas of Philadelphia County, Pennsylvania, Number 2572, July Term 1988)

Expert testimony before a jury concerning the economic loss associated with separation from employment of a professional employee.  Client:  Bernabei & Katz, Washington, D.C., representing plaintiff.

[174]   Jock et al. v. Sterling Jewelers, Inc. (American Arbitration Association Case 11 160 00655 08)

Consultation and data analysis concerning gender patterns in assignment, promotion and compensation of retail sales and sales management employees. Client: Cohen Milstein Hausfeld & Toll, Washington, DC, representing plaintiffs.

[173]   Lee v. District of Columbia (Superior Court of the District of Columbia, C.A. 13578-83)

Expert testimony before a jury via deposition concerning the economic loss associated with the death of a homemaker/ parent.  Client: Milliken, Van Susteren, and Canan, P.C., Washington, DC, representing plaintiffs.

[172]   McDowell v. District of Columbia (Superior Court of the District of Columbia, C.A. 8665-84)

Expert testimony before a jury concerning the economic loss associated with the death of a blue collar worker. Client: Milliken, Van Susteren, and Canan, P.C., Washington, DC, representing plaintiffs.

[171]   OFCCP v. Packaging Corporation of America (U. S. Department of Labor, Office of Federal Contract Compliance Programs, Case 92-OFC-15)

Expert testimony via reports concerning gender patterns in hiring in a manufacturing plant. Client:  Office of the Solicitor, U.S. Department of Labor, representing plaintiffs.

[170]   Pontiac, Michigan Public Safety Departments (1988, 1990, 1995)

Consultation, data analysis, and presentation before a Michigan Act 312 arbitration panel concerning race patterns in employment in police and fire departments.  Client: Department of Law, City of Pontiac, MI, representing potential defendants.

[169]   Hill v. Administrator, General Services Administration (EEOC 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).

Expert testimony before an administrative law judge concerning racial patterns in promotions in a large federal agency.  Client: Yablonski, Both & Edelman, Washington, DC, representing plaintiff.

[168]   Sondel et al. v. Northwest Airlines (District Court for Dakota County, Minnesota, Case CO-92-8193)

Expert testimony before a judge concerning gender patterns and economic losses associated with limitation of employment opportunities for service personnel. Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA., representing plaintiffs.

[167]   Stepakoff v. University of Maryland (Circuit Court for Prince George's County, Maryland, CA 92-17117)

6

Expert testimony before a jury concerning the economic loss associated with interruption of professional education. Client: Bernabei & Katz, Washington, DC, representing plaintiff.

## III. OTHER CASES

[166]    [firm name confidential] (no litigation pending)

Consultation and data analysis concerning patterns in compensation of lawyers in a large law firm. Client: Katz, Marshall & Banks, Washington, DC, representing a potential plaintiff.

[165]    [firm name confidential] (no litigation pending)

Consultation and data analysis concerning race patterns in employment of sales and marketing professionals in a high technology firm. Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[164]    [firm name confidential] (no litigation pending)

Consultation and data analysis concerning race patterns in employment of sales and marketing professionals in a financial services firm. Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[163]    [firm name confidential] (no litigation pending)

Consultation and data analysis concerning race patterns in employment among professional employees in a financial services firm. Client: Asian Pacific American Legal Center, Los Angeles, representing plaintiffs.

[162]    Adams and Allard v. Indiana Bell Telephone Co. and Ameritech (U.S. District Court for the Southern District of Indiana, C.A. IP93-420c and C.A.s IP93-1341C through 1346C)

Consultation and data analysis concerning age patterns in employment by a telecommunications company. Client: Rose and Rose, Washington, D.C., representing plaintiffs.

[161]    Alberto et al. v. City of Miami (U.S. District Court for the Southern District of Florida, C. A. 95-1111-CIV-MARCUS)

Consultation and data analysis concerning race, sex, and national origin patterns in hiring and promotions in a police department. Client: City Attorney for the City of Miami, FL, representing defendants.

[160]    Allen v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, C.A. 90-00-3011 CZ)

Consultation and data analysis concerning the separation from employment of a professional employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[159]    Alvarado et al. v. Nestle Food Co. (U. S. District Court for the District of Idaho, CIV 94-0248-S-EJL)

Consultation and data analysis concerning ethnic patterns in promotions within a manufacturing plant. Client: Givens, Pursley & Huntley, Boise, Idaho, representing plaintiffs.

[158]    Appolon et al. v. University of Miami (U. S. District Court for the Southern District of Florida, Miami Division, 1:10-cv-24166-CIV-Ungaro/Simonton)

Consultation and data analysis concerning the effect of credit checks on racial and ethnic minority job applicants for administrative jobs. Client: Outten & Golden, New York, representing plaintiffs.

7

[157]   Arnold v. The Kroger Co. (Circuit Court for Wayne County, Michigan)

Consultation and data analysis concerning age patterns in the employment of corporate managers.  Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, P.C., representing defendant.

[156]   Artis v. John Deere (EEOC Charge 550-2008-0016N)

Consultation and data analysis concerning gender patterns in the employment of customer service representatives.  Client: The Impact Fund, Berkeley, CA, representing plaintiffs.

[155]   Bell et al v. Lockheed Martin  (U.S. District Court for the District of New Jersey, C.A. 08-6292)

Consultation and data analysis concerning gender patterns in the promotion, assignment, and compensation of professional and managerial employees.  Client: Console Law Offices, Philadelphia, PA, representing plaintiffs.

[154]   Barcume v. Flint (U.S. District Court for the Eastern District of Michigan, C.A. 84-8066)

Consultation and data analysis concerning race and gender patterns in employment in a police department. Client: Office of the City Attorney, City of Flint, MI, representing defendant.

[153]   Barnes et al. v. Canadian National/Illinois Central Railroad (U.S. District Court for the Northern District of Illinois,  Eastern Division, 04-C1249)

Consultation and data analysis concerning racial patterns in promotions to first-level supervisors among transportation workers.  Client: Wiggins, Childs, Quinn & Pantazis, Birmingham, AL, representing plaintiffs.

[152]   Barnett et al. v Wal-Mart Stores, Inc. (Superior Court for the State of Washington, County of King, No. 03-2-15301-0 SEA)

Consultation and data analysis concerning compensation of hourly retail employees. Client: Lieff, Cabraser, Heimann  & Bernstein, LLP, San Francisco, CA, representing plaintiffs.

[151]   Barrow et al. v. Georgia Pacific Corporation (U.S. District Court for the Southern  District of Alabama, Southern Division, Civil Action 01-0141-BH-M)

Consultation and data analysis concerning racial patterns in the assignment and promotion of manufacturing employees. Client: Taylor, Martino & Hedge, PC, Mobile, AL, representing plaintiffs.

[150]   Bergmann et al. v. University of Maryland (U.S. District Court for the District of Maryland, C.A. H85-446, H86-445 consolidated)

Consultation and data analysis concerning gender patterns in the employment of university faculty.  Client: Zwerdling, Paul, Leibig, Kahn & Thompson, Washington, DC, representing plaintiffs.

[149]   Bogle v. Burroughs (Circuit Court for Wayne County, Michigan, 86-634866-CZ)

Consultation and data analysis concerning age patterns in the employment of corporate middle managers. Client: Schureman, Frakes, Glass & Wulfmeier, Detroit, MI, representing plaintiff.

[148]   Borders and Woolbright et al. v. Wal-Mart Stores, Inc.  (U.S. District Court for the Southern District of Illinois, C.V.00506-MJR-DGW.

Consultation and data analysis concerning employment practices relating to pregnant employees in a large retail chain. Maehri & Skalet, PLLLC, representing plaintiffs

[147]  Bouman et al. v. Baca  (U.S. District Court for the Central District of California, C.V. 80-1341 – RMT)

Consultation and data analysis concerning gender patterns in the employment of uniformed officers in a large urban police department.  Client: Dennis M. Harley, A Law Corporation, Pasadena, CA, presenting plaintiffs.

[146]  Bowman v. Blue Care Network and Blue Cross Blue Shield of Michigan  (U.S. District Court for the Eastern District of Michigan, Southern Division, 2:06-cv-14165)

Consultation and data analysis concerning the economic loss associated with termination of a supervisory office employee.   Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendants.

[145]  Brienza v. United Press International, et al. (U.S. District Court for the District of Columbia, C.A. 90-2925)

Consultation and data analysis concerning the economic loss associated with separation from employment of a journalist.  Client: Bernabei & Katz, Washington, DC, representing plaintiff.

[144]  Broadnax v. General Electric Company (U.S. District Court for the District of Massachusetts, C.A. 00-11033-WGY)

Consultation and data analysis concerning racial patterns in employment at a large manufacturing firm.  Client: Rosenfeld & Associates, Boston, representing plaintiff.

[143]  Brooks v. Blue Cross Blue Shield of Michigan (U.S. District Court for the Eastern District of Michigan, Southern Division, 2:08-CV10621)

Consultation and data analysis concerning promotion of a mid-level manager.  Client:  Office of the General Counsel, Blue Cross Blue Shield of Michigan, Detroit, MI, representing defendant.

[142]  Brown et al. v. Pro Football, Inc. et al. (U.S. District Court for the District of Columbia, C.A. 90-1071)

Consultation and data analysis concerning the economic loss associated with monopolistic practices in the compensation of professional athletes.  Client: Yablonski, Both & Edelman, Washington, DC, representing plaintiffs.

[141]  Brown et al. v. Sacramento Regional Transit District  (U.S. District Court for the Northern District of California)

Consultation and preparation of a declaration concerning the job relatedness of job requirements for first-level supervisors.  Client: The Impact Fund, Berkeley, CA, representing plaintiffs.

[140]  Bryant v. Blue Cross Blue Shield of Michigan (American Arbitration Association, 54 160 00242 09)

Consultation and data analysis concerning economic damages associated with discharge of an administrative employee.  Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[139]  Byrd et al. v. Sprint (Circuit Court of Jackson County, MO, at Independence, Case No. CV92-018979)

Consultation and data analysis concerning economic losses associated with failure to comply with compensation agreements with independent sales agents.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[138]  California Department of Fair Employment and Housing  v. Equity Residential Properties

Consultation and data analysis concerning racial patterns among residents of apartment complexes. Client: California Department of Fair Employment and Housing, Sacramento, representing plaintiffs.

[137]  California Department of Fair Employment and Housing  v. Airbandb.  California Department of Fair Employment and Housing Cases 574743-231889 and 574743-231624.

Consultation and data analysis concerning racial patterns in provision of short-term housing.  Client: California Department of Fair Employment and Housing, Sacramento, representing plaintiffs.

[136] California Department of Fair Employment and Housing  v. Lawrence Livermore Laboratory  (no litigation)

Consultation and data analysis concerning racial patterns in the hiring, assignment, and promotion of technical and professional employees.   Client: California Department of Fair Employment and Housing, Sacramento, representing plaintiffs.

[135]  Campbell et al v. Amtrak (U.S. District Court for the District of Columbia, Civil Action 1:99CV02979 (EGS))

Consultation and data analysis concerning racial patterns in the hiring, assignment, promotion, and compensation of transportation employees. Client: Wiggins, Childs, Quinn & Pantazes, P.C., Washington, DC, representing plaintiffs.

[134]  Carstarphen v. Georgia Pacific Corporation (U.S. District Court for the Northern District of Georgia, Atlanta Division, Civil Action 1:01-CV-1654, WBH)

Consultation and data analysis concerning racial patterns in the assignment, promotion, and compensation of manufacturing employees. Client: McCleave & Denson, LLC, Mobile, AL, representing plaintiffs.

[133]   Carter et al. v. United Parcel Service of America, Inc. (U.S. District Court for the Northern District of California, C-97-01590)

Consultation and data analysis concerning racial patterns in the assignment, promotion, and compensation of hourly employees. Client: Lieff, Cabraser, Heimann & Bernstien, San Francisco, CA, representing plaintiffs.

[132]  Carter and Phillips et al. v. Wells Fargo Advisors et al. [Wachovia Bank] (U.S. District Court for the District of Columbia, 1:09-cv-01752-CKK0

Consultation and data analysis concerning gender patterns in employment among professional employees in a financial services firm.  Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[131]  City of Burlington v. Dague et al. (U.S. Supreme Court, 91-810)

Consultation and analysis concerning the role of risk in the earnings of professional workers.  Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing respondent (plaintiff).

[130]  City of Chicago Minority Purchasing Ordinance (1990).

Consultation and data analysis concerning public programs to promote minority and women-owned business enterprises.  Client: Mayor's Panel of Minority and Women-Owned Business, City of Chicago, IL, representing potential defendants.

[129]  City of Detroit Executive Order 22 (1988).

Consultation and data analysis concerning public programs to promote minority employment in the construction industry.  Client: Law Department, City of Detroit, MI representing potential defendants.

[128]  Clark v. Blue Cross/Blue Shield of Michigan (U.S. District Court for the Eastern District of Michigan, CV-13609-JCO-RSW)

Consultation and data analysis concerning the separation from employment of a technical employee.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[127]  Coalition for Economic Equity et al. v. Pete Wilson et al (U.S. District Court for the Northern District of California, C-96-4024-TEH)

Consultation and data analysis concerning the role of affirmative action in employment of women and minorities.  Client: ACLU Foundation of Southern California, Los Angeles, CA, representing plaintiffs.

[126]  Cook et. al. v. Billington et al. (U.S. District Court for the District of Columbia, C.A. 82-0400 (NHJ/PJA)

Consultation and data analysis concerning racial patterns in promotions in a large federal government agency.  Client: Washington Lawyers Committee for Civil Rights and Urban Affairs and Arent Fox Kintner Plotkin & Kahn, representing plaintiffs.

[125]  Cote et al. v. Wal-Mart (U.S. District Court for the District of Massachusetts, C.A. 1:15-CV-12945 (WGY)

Consultation and data analysis concerning economic damages associated with denial of health insurance coverage for same-sex partners.  Client: Washington Lawyers Committee for Civil Rights and Urban Affairs, representing plaintiffs

[124]  Danies v. MCI Worldcom Network Services, Inc (U.S. District Court for the District of Maryland, Northern Division, C.A. WMN - 00 –CV-3046)

Consultation and data analysis concerning economic damages experienced by a technical worker as a consequence of termination of his employment. Client: Thomas Gagliardo, Esq., Silver Spring, MD, representing plaintiff.

[123]  Davis et al v. Shaw Industries, Inc.  (U.S. District Court for the Middle District of Georgia, Albany Division, C.A. 03-CV-139)

Consultation and data analysis concerning racial patterns in promotions and other employment outrcomes in a manufacturing firm.  Client:  Wiggins, Childs, Quinn & Pantazis, P.C., Washington DC, representing plaintiffs.

[122]  Dixon v. Recruit U.S.A., Inc. et al. (U.S. District Court for the Northern District of California, C 91-0347-JPV)

Consultation, data analysis, and deposition testimony concerning the economic loss associated with racial patterns in referrals by an employment referral agency. Client: Employment Law Center, San Francisco, CA, representing plaintiffs.

[121]  Donaldson et al. v. Microsoft Corp. (U.S. District Court for the Western District of Washington, C00-1684P)

Consultation and data analysis concerning patterns of compensation for male and female employees.  Client: Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, representing plaintiffs.

[120]   <u>Duling et al. V. Gristede's Operating Corp</u> (U.S. District Court for the Southern District of New York, 06 Civ. 10197 (LTS)/(BHP))

Consultation and data analysis concerning gender patterns in hiring, promotions, and compensation.  Client: Outten & Golden, LLP, New York, representing plaintiffs.

[119]   <u>Dunn v. Blue Cross Blue Shield of Michigan</u> (American Arbitration Association, 54-160-01677-08-02 LAVA-R)

Consultation and data analysis concerning separation from employment of a mid-level manager.  Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[118]   <u>EEOC v. Allstate Insurance Company</u> (U.S. District Court for the Eastern District of Missouri Eastern Division, C.A. 4:04CV01359 ERW)

Consultation and data analysis concerning rehiring policies and damages associated with separation from employment of older insurance sales agents.  Client: U.S. Equal Employment Opportunity Commission, St. Louis Office, representing plaintiffs.

[117]   <u>EEOC v. Hamtramck</u> (U.S. District Court for the Eastern District of Michigan, C.A. 81-71353)

Consultation and data analysis concerning the economic loss associated with separation from employment of fire fighters.  Client: U.S. Equal Employment Opportunity Commission, Detroit Office, representing plaintiffs.

[116]   <u>EEOC and Davis et al. v. J & R Baker Farms</u> (U.S. District Court for the Middle District of Georgia, Valdosta Division, C.A. 7:11-cv-136-HL)

Consultation and data analysis concerning employment patterns of U.S. and foreign agricultural workers.  Client: Georgia Legal Services Program, Atlanta, GA, representing plaintiff-intervenors.

[115]   <u>EEOC v. McCormick & Schmick</u> (EEOC Commissioner's Charge 550-2006002139)

Consultation and data analysis concerning racial patterns in employment in a restaurant chain.  Client: U.S. Equal Employment Opportunity Commission, San Francisco Office, representing plaintiffs.

[114]   <u>EEOC v. Mach Mining, LLC</u> (U.S. District Court for the Southern District of Illinois, 11-879-JPG/PMF)

Consultation and data analysis concerning gender patterns in employment in a coal mine.  Client: U.S. Equal Employment Opportunity Commission, Chicago Office, representing plaintiffs.

[113]   <u>EEOC v. Mavis Discount Tire, Inc. et al.</u>  (U.S. District Court for the Southern District of New York, 12-CV-0741 (JGK) (GWG)

Consultation and data analysis concerning gender patterns in employment in an auto services chain.  Client: U.S. Equal Employment Opportunity Commission, New York Office, representing plaintiffs.

[112]   <u>EEOC v. United Air Lines, Inc.</u> (U.S. District Court for the Northern District of California, C.A. 84-0560).

Consultation and data analysis concerning gender patterns in employment among skilled technicians.  Client: U.S. Equal Employment Opportunity Commission, San Francisco Office, representing plaintiffs.

[111]  <u>Fair Employment Council of Greater Washington et al. v. BMC Marketing Trading as Snelling & Snelling Personnel Consultants</u>  (U.S. District Court for the District of Columbia, C.A. 91 - 0989)

Analysis through employment "testers" of racial patterns in the placement activities of an employment referral agency.  Client:  Washington Lawyers' Committee for Civil Rights under Law with Arnold & Porter, Washington, DC, representing plaintiffs.

[110]  <u>Fair Employment Council of Greater Washington et al. v. Gale S. Molovinski Trading as Executive Suite</u> (Superior Court for the District of Columbia. C.A. 91-CA07202)

Analysis through employment "testers" concerning gender patterns in the placement activities of an employment referral agency.  Client:  Washington Lawyers' Committee for Civil Rights under Law with Reed Smith Shaw & McClay, Washington, DC, representing plaintiffs.

[109]  <u>Field v. Philadelphia Electric Co.</u> (Court of Common Pleas of York County, Pennsylvania, 87-SU-0254-01)

Consultation and analysis concerning the economic loss associated with separation from employment of a skilled technician.  Client: Bernabei & Katz, Washington, DC, representing plaintiff.

[108]  <u>Fogle v. U.S. General Accounting Office</u> (EEOC 091-80X0055)

Consultation and data analysis concerning the economic loss associated with racial patterns in the employment of professional employees in a public agency.  Client: Washington Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[107]  <u>Fowler v. McCrory Stores</u> (Circuit Court for Montgomery County, Maryland, C.A. 23-098)

Consultation and data analysis concerning the economic loss associated with separation from employment of a mid-level corporate manager.  Client:  NAACP Legal Defense Fund, Washington, DC, representing plaintiff.

[106]  <u>Freed v. Georgetown University</u> (Superior Court of the District of Columbia, C.A. 89-CA12859)

Consultation and data analysis concerning the economic loss associated with separation from employment of a medical research scientist.  Client: Bernabei & Katz, Washington, DC, representing plaintiff.

[105]  <u>Fulcher et al. v. 24 Hour Fitness USA, Inc.</u> (Superior Court of the State of California for Alameda County, 10524911)

Consultation and data analysis concerning race, ethnic, and gender patterns in promotions and compensation in health and fitness clubs.  Client: Lewis, Feinberg, Lee, Renaker & Jackson, P.C., Oakland, CA., representing plaintiffs.

[104]  <u>Giant Food. Inc</u>. (no litigation filed)

Consultation and data analysis concerning race and gender patterns in the employment of retail sales employees. Client: Venable, Baetjer, Howard & Civiletti, LLP, representing potential defendants.

[103]  <u>Gonzalez et al. v. Abercrombie & Fitch Stores, Inc.</u> (U. S. District Court for the Northern District of California, San Francisco/Oakland Division, 03-2817 SI0)

Consultation and data analysis concerning racial and ethnicity patterns in the retail employees.  Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, representing plaintiffs.

[102] <u>Gonzalez et al. v. Local 52, International Alliance of Theatrical Stage Employees et al.</u>  (U. S. District Court for the Eastern District of New York, 2:14-cv-03407)

Consultation and data analysis concerning ethnicity patterns in admission to a craft union. Client: Levy Ratner P.C., representing plaintiff.

[101]  <u>Goshton v. Arva Overton and Blue Cross/Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, 08-105466-CZ)

Consultation and data analysis concerning the separation from employment of an administrative employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[100]  <u>Gutierrez  and Morgan, et al. v. Johnson & Johnson</u>  (U. S. District Court for the District of  New Jersey, C.A. 01-5302)

Consultation and data analysis concerning racial and ethnicity patterns in the employment of professional workers.  Client: Mehri & Skalet, PLLC, Washington, DC, representing plaintiffs.

[99]  <u>Hardie v. National Collegiate Athletic Association (NCAA) et al.</u>  (U. S. District Court for the Southern District of California, 13CV0346 W – DHB)

Consultation and data analysis concerning racial patterns in criminal records.  Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, and Morrison & Foerster LLP, representing plaintiff.

[98]  <u>Harris et al. v. Medical Transportation Management, Inc.</u> (U. S. District Court for the District of Columbia, case 1:17-cv-01371)

Consultation and data analysis concerning financial adequacy of payments for minimum wage transportation drivers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[97]  <u>Heatherly v. University of Alabama</u> (U. S. District Court for the Northern District of Alabama, Western Division, C.A. 7:16-cv-00275-RDP)

Consultation and data analysis concerning gender discrimination in the compensation of a senior administrative employee.   Client: Haynes & Haynes, P.C. Birmingham, AL, representing plaintiff.

[96]  <u>Hensel et al. v. Noll Printing Co., Inc.</u> (U. S. District Court for the Northern District of Indiana, Fort Wayne Division, C.A. F91-00292)

Consultation and data analysis concerning age patterns in the termination from employment of skilled manufacturing workers. Client: Rose and Rose, Washington, D.C., representing plaintiffs.

[95] <u>Hinson v. Blue Cross Blue Shield of Michigan</u> (Circuit Court for Wayne County, Michigan, 09-006726-CD)

Consultation and data analysis concerning economic damages associated with discharge of a customer service employee.  Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[94]  <u>Hioutakos v. Simplex Grinnell</u> (Third District Court, State of New Jersey, 2:10-cv-04505-DMC-JAD)

Consultation and data analysis concerning payment of prevailing wages to employees working on public contracts.   Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[93]   Hogle v. Accident Fund Insurance Company of America. (District Court for the County of Ingram, Michigan, Case 06-131-CL)

Consultation and data analysis concerning damages associated from employment of a corporate manager. Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[92]   Holloway et al. v. Best Buy Co., Inc.   (U. S. District Court for the Northern District of California, San Francisco/Oakland Division, 05-5056 MEJ)

Consultation and data analysis concerning gender and race patterns in the employment of retail employees. Client:  Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, representing plaintiffs.

[91]   Hubbard v. Wal-Mart et al. (U. S. District Court for the Northern District of Ohio, Western Division, 07-CV-3169)

Consultation and data analysis concerning gender and race patterns in the employment of retail managers. Client:  Law Office of J. Baron, Toledo, Ohio, representing plaintiff.

[90]   Hudson et al. v. First Transit  (U. S. District Court for the Northern District of California, C10-03158-WHA)

Consultation and data analysis concerning race and national origin patterns in the effect of criminal convictions on the hiring of transportation employees.  Client: Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland, CA, representing plaintiffs.

[89]   Johnson v. Blue Cross Blue Shield of Michigan  (arbitration)

Consultation and data analysis concerning the economic consequences of termination for a professional employee.  Client:  Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[88]   Jones et al. v. Ford Motor Co. (U.S. District Court for the District of Minnesota, C. F. 3-93-370)

Consultation and data analysis concerning race patterns in the hiring, promotion, assignment, and compensation of professional employees. Client: Sprenger & Lang, Washington, D.C., representing plaintiffs.

[87]   Joyner et al. v. Archers Daniel Midland  (U.S. District Court for the Central District of Illinois, Urbana Division, Civil Action 03-2177 (MPM))

Consultation and data analysis concerning racial patterns in employment in the promotion and pay of manufacturing workers.  Client: Wiggins, Childs, Quinn & Pantazis, PC, Washington, DC, representing plaintiffs.

[86]   Kaden v. Macalaster College (U.S. District Court for the District of Minnesota, case not filed)

Consultation and data analysis concerning the economic loss associated with separation from employment of an athletic coach.  Client: Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, representing plaintiff.

[85]   [Keo] Ratha et al v. Phatthana Seafood Co, Ltd. et al.  (U. S. District Court for the Central District of California, Western Division, Case 2:16-cv-04271)

Consultation and data analysis concerning financial benefits to the employer and economic damages to the plaintiffs from human trafficking practices in food processing.  Client: Cohen, Milstein, Sellers & Toll, Washington DC, representing plaintiffs.

[84]   Kujan v. The Kroger Co. (Circuit Court for Wayne County, Michigan, C.A. 92-210725CZ)

15

Consultation and data analysis concerning age patterns in the employment of corporate managers.  Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, P.C., representing defendant.

[83]  Labor Committee for NAACP, Front Royal, VA v. Laborers' International Union of North America, Local 69 (EEOC 033 810402)

Consultation and data analysis concerning racial patterns in job assignments allocated by a construction craft union.  Client: Washington Lawyers' Committee for Civil Rights with Arent Fox Kintner Plotkin & Kahn, Washington, DC, representing plaintiffs.

[82]  Lewis and Powell et al. v. Pitney Bowes, Inc. (EEOC)

Consultation and data analysis concerning racial patterns in the assignment of industrial sales workers. Client: Mehri & Skalet PLLC, Washington, DC, representing plaintiffs.

[81]  Little et al. v. Washington Metropolitan Transit Authority et al. (U.S. District Court for the District of Columbia, C. A. 1:14-cv-01289-RMC)

Consultation and data analysis concerning economic damages accruing to un-hired and terminated transportation workers.    Client: Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, DC, and NAACP Legal Defense Fund, New York, representing plaintiffs.

[80]  City of Los Angeles v. County of Los Angeles (Superior Court for the County of Los Angeles, C.A. 655-274)

Consultation and data analysis concerning the demographic characteristics of homeless persons.  Client: Western Center on Law and Poverty, Los Angeles, CA, representing plaintiffs.

[79]  Lucas et al. v. Ferrara Candy Company et al. (U.S. District Court for the Northern District of Illinois, Eastern Division, C.A. 13 C 1525)
Consultation and data analysis concerning employment referrals and employment of unskilled manufacturing workers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[78]  Lucas et al. v. Vee Pak, Inc. et al. (U.S. District Court for the Northern District of Illinois, Eastern Division, C.A. 12 C 9672)

Consultation and data analysis concerning employment referrals and employment of unskilled manufacturing workers.  Client: Cohen, Milstein, Sellers & Toll, Washington, DC, representing plaintiffs.

[77]  Lucas et al. v. Kmart Corp (U.S. District Court for the District of Colorado, C.A. 99-K-1923)

Consultation and data analysis concerning access to retail services by persons in wheelchairs. Client: Fox and Robertson, P.C., Denver, CO, representing plaintiffs.

[76]  Maliniak v. City of Tucson (U.S. District Court for the District of Arizona, Tucson Division, CV 07-125 TUC JMR)

Consultation and data analysis concerning on-the-job harassment of a female firefighter. Client: Jenne S. Forbes, Esq., Tucson, AZ, representing plaintiff.

[75]  McCrossan v. Sutton (Federal District Court for New Mexico, CV 95-6556-HB)

Consultation and data analysis concerning the utilization of minority and disadvantaged owned businesses on federally-funded construction projects.  Client: Civil Rights Division, U.S. Department of Justice, Washington, D.C., representing defendant.

[74]  McReynolds et al. v. Merrill Lynch (Federal District Court for Northern District of Illinois, Eastern Division, 1:2008cv06105).

Consultation and data analysis concerning racial patterns in the employment of financial services professional employees.  Client: Stowell and Friedman, Ltd., Chicago, IL, representing plaintiffs.

[73]  Marcus v. Stevens (Illinois Human Rights Commission, Charge 1989CF3102)

Consultation and data analysis concerning racial and obesity patterns in referrals by an employment placement agency.  Client:  Legal Assistance Foundation of Chicago, Chicago, representing plaintiff.

[72]  Martinez v. Pomona College (Superior Court of Los Angeles County, BC518863)

Consultation and data analysis concerning the separation from employment of a college professor.  Client: Mexican American Legal Defense and Education Funds, Inc., representing plaintiff.

[71]  Mates Food System, Inc. v. Hardee's Food System, Inc. (U.S. District Court for the Eastern District of North Carolina, C.A. 93-451-CIV-5-F)

Consultation and data analysis concerning racial patterns in the award and management of fast food franchises.  Client: Smallwood and Associates, Windsor, N.C., representing plaintiff.

[70]  Matthews v. Johnson and Johnson (EEOC, 2004)

Consultation and data analysis concerning racial adverse impact in the use of credit histories as an employment criterion.  Client: Outten and Golden, New York, NY, representing plaintiff.

[69]  Mayfield v. Thornburgh (EEOC 033-085-x5214, Baltimore District Office)

Consultation and data analysis concerning racial patterns in employment among clerical employees in a public agency.  Client: Washington Lawyers' Committee for Civil Rights under Law with Sidley and Austin, Washington, DC, representing plaintiffs.

[68]  Michigan Civil Service Affirmative Action Plan (1994, 2006)

Consultation and data analysis concerning the design of an affirmative action plan covering administrative and public safety employees.  Client: Civil Service Commission of the State of Michigan, representing potential defendants.

[67]  Milwaukee Brotherhood of Firefighters v. City of Milwaukee (EEOC Charge 260970100)

Consultation and data analysis concerning the economic loss associated with racial patterns in the employment of employees in a public agency.  Client: Hall, Charne Burce and Olsen, PC, Milwaukee, representing plaintiffs.

[66]  Mitchell et al. v. Metropolitan Life Insurance Company, Inc. (U.S. District Court for the Southern District of New York, 01 CIV 2112 (WHP)

Consultation and data analysis concerning gender patterns in employment in a large life insurance company.  Client:  Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[65]  Moeller et al. v. Taco Bell Corporation (U.S. District Court for the Northern District of California, C 02-5849 MJJ)
Consultation and data analysis concerning economic damages arising from inaccessibility of restaurant services to persons in wheelchairs.  Client: Fox & Robertson, P.C., Denver, CO, representing plaintiffs.

[64]  Moody v. Blue Cross Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, 09-007926-NZ)

Consultation and data analysis concerning economic damages associated with discharge of a clerical employee. Client: Office of the General Counsel, Blue Cross Blue Shield of Michigan, representing defendant.

[63]  Morgan v. Federal Home Loan Mortgage Corporation (U.S. District Court for the District of Columbia, C.A. 1: 98CV01397 (ESH))

Consultation and data analysis concerning racial patterns in employment among professional employees in a financial services firm. Client: Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, representing plaintiffs.

[62]  Morgan Stanley (no litigation pending)

Consultation and data analysis concerning racial patterns in employment among professional employees in a financial services firm. Client: Asian Pacific Americans Legal Center of Southern Caliufornia, Los Angeles, representing plaintiffs.

[61]  Morris v. Communications Satellite Corp. (U.S. District Court for the District of Columbia, C.A. 88-3480)

Consultation and data analysis concerning the economic loss associated with separation from employment of a skilled technician.  Client:  Yablonski, Both & Edelman, Washington, DC, representing plaintiff.

[60]  Munchus v. Friedman Billings Ramsey & Co., Inc. (Financial Industry Regulatory Authority 08163, 2009)

Consultation and data analysis concerning the separation from employment of a highly-paid financial services sales employee.  Client: Bernabei & Wachtel, PLLC, Washington, DC, representing defendant.

[59]  Murphy-Clay  v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, No. 97-701244- CZ)

Consultation and data analysis concerning the separation from employment of an administrative employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[58]  Murphy-Taylor  and United States v. Queen Ann's County,  MD et al. (U.S. District Court for the District of Mayland , 1:12-cv-02521-ELH)

Consultation and data analysis concerning economic damages associated with separation from employment of a police officer. Client: Civil Rights Division, U.S. Department of Justice, Washington, DC, representing plaintiff-intervenor.

[57]  NAACP, et al. v. Imperial Irrigation District, et al. (U.S. District Court for the Southern District of California, Civ. 70-0302GT)

Consultation and data analysis concerning racial patterns in employment at a public utility company.  Client: Employment Law Center, San Francisco, CA, representing plaintiffs.

[56]  New Era Cap Co., Inc (2008)

Consultation and data analysis concerning race and gender patterns in compensation and promotions in a manufacturing distribution center.    Client: Workers Rights Consortium, Washington DC, a third-party investigator.

[55]  New York State Procurement Setasides (1991)

Consultation and data analysis concerning public programs to promote the development of minority and women-owned business enterprises. Client: Office of the Solicitor General, State of New York, representing potential defendants.

[54]  O'Bannon et al. v. Friedman's Jewelers, Inc. (United States District Court for the  District of Maryland, Southern Division)

Consultation and data analysis concerning racial patterns in employment in a retail chain.  Client: Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland CA, representing plaintiffs.

[53]  Ochoa et al. v. Mcdonald's Corporation et al. (United States District Court for the Northern District of California, No. 3:14-cv-02098-JD)

Consultation and data analysis concerning uncompensated work by low-wage restaurant employees.  Client: Altschuler Berzon, LLP, San Francisco, representing plaintiffs.

[52]   Oldham v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, No. 94-407474 ND)

Consultation and data analysis concerning the separation from employment of a clerical employee.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[51]  O'Neal v. City of New Albany (U.S. District Court for the Southern District of Indiana, C.A. NA 90-90C)

Consultation and data analysis concerning racial patterns in employment in a police department.  Client: Lynch, Cox, Gilman & Mahan, Louisville, KY, representing plaintiff.

[50]   OFCCP v. Elim Care Center

Consultation and data analysis concerning racial patterns in hiring health care employees.  Client: Regional Solicitor's Office, U.S. Department of Labor, representing plaintiff.

[49]   Osborne v. Blue Cross/Blue Shield of Michigan (U.S. District Court for the Eastern District of Michigan, 08-11195)

Consultation and data analysis concerning the separation from employment of an administrative worker. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[48]  Phipps et al. v. Wal-Mart Stores, Inc. (U.S. District Court for the Middle District of Tennessee, No. 3:12-cv-1009)

Consultation and data analysis concerning gender patterns in the employment and compensation of retail employees.  Client:  Cohen Milstein Sellers & Toll, Washington, DC, representing plaintiffs.

 [47] Perry  v. New York Health and Racquet Club (U.S. District Court for the Southern District of New York, C.A. 84 Civ. 3610 and 85 Civ. 4606)

Consultation and data analysis concerning racial patterns in the employment of service workers. Client: Hill, Betts, and Nash, New York, NY, representing plaintiffs.

[46] Piasecki .v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, No. 97-728747-NZ)

Consultation and data analysis concerning the separation from employment of a professional employee. Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[45] Pierre et al. v. Debby's Staffing Services, Inc. (U.S. District Court for the Southern District of Iowa, Central Division, Case 3:15-CV-00089

Consultation and data analysis concerning racial patterns in referrals by an employment staffing agency. Client: Newkirk Zwagerman, Des Moines, IA, representing plaintiffs.

[44] Pike and Thomas v. Lucent Technologies, Inc. (U.S. District Court for the Northern District of Georgia, Atlanta Division, C.A. 1:00-CV-1406-RWS)

Consultation and data analysis concerning the economic damages associated with layoffs of older, professional employees. Client: Greene, Buckley, Jones & McQueen, Atlanta, Georgia, representing plaintiffs.

[43] Quintero v. Temporaries, Inc. et al. (Superior Court of the State of California, San Francisco County, C.A. 895-675)

Consultation and data analysis concerning racial patterns in referrals by a private employment placement agency. Client: Employment Law Center, San Francisco, CA, representing plaintiffs.

[42] Rabin et al. v. Price Waterhouse Coopers LLP (U.S. District Court for the Northern District of California, San Francisco Division, Case 3:16-cv-02276)

Consultation and data analysis concerning age patterns in hiring by a professional services firm. Client: Outten & Golden, New York, representing plaintiffs.

[41] Raskin v. Wyatt (U.S. District Court for the Southern District of New York, C.A. 94-CIVIL-2314)

Consultation and data analysis concerning age patterns in employment by a professional services firm. Client: Rose and Rose, Washington, DC, representing plaintiff.

[40] Ricci v. DeStefano (U.S. Supreme Court, Docket 07-1428)

Consultation and data analysis concerning racial patterns among employees of fire departments. Client: NAACP Legal Defense and Education Fund, New York, representing defendants.

[39] Rice et al. v. Southern California Edison Company (U.S. District Court for the Central District of California, Case 94-6353-JMI (JRx))

Consultation and data analysis concerning racial patterns among employees of a large public utility company and diversity management programs affecting these patterns. Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

[38] Ridgeway et al. v. Denny's Inc. (U.S. District Court for the Northern District of California, C.A. C-93-20202).

Consultation and data analysis concerning racial patterns among restaurant customers. Client: Saperstein, Goldstein, Demchak & Baller, Oakland, CA, representing plaintiffs.

20

[37] <u>Rodriguez et al. v. Merrill Lynch et al.</u> (Superior Court of New Jersey, Law Division: Hudson County, Docket l-5905-98)

Consultation and data analysis concerning employment patterns of low-skill immigrant workers alleging sexual harassment and employment discrimination.  Client: Arenson, Dittmar & Karban, New York, representing plaintiffs.

[36] <u>City of San Francisco Minority Purchasing Ordinance</u> (1989)

Consultation and data analysis concerning public programs to promote minority and women-owned business enterprises.  Client: Lawyers' Committee for Urban Affairs, San Francisco, CA, representing potential defendants.

[35] <u>Saephan v. Oakland Unified School District</u> (U.S. District Court for the Northern District of California, C-06-4428 JCS)

Consultation and data analysis concerning the effect of English language requirements on race/ethnic patterns of employment among service workers.  Client:  Employment Law Center of the Legal Aid Society, San Francisco, representing plaintiff.

[34] <u>Salazar et al. v. McDonalds et al.</u> (U.S. District Court for the Northern District of California, 3:14-CV-02096-RS)

Consultation and data analysis concerning uncompensated work by low-wage restaurant employees.  Client: Altschuler Berzon, LLP, San Francisco, representing plaintiffs.

[33] <u>Scott v. Eastman Chemical Company</u> (U.S. District Court for the Eastern District of Tennessee at Greenville, No. 2:03-cv-311)

Consultation and data analysis concerning gender patterns in employment in a manufacturing firm. Client: Jennifer B. Morton, Esq., Knoxville, TN, representing plaintiff.

[32] <u>Second Chance, Inc. v. Bell South Telecommunications, Inc.</u> (Circuit Court of Calhoun Co., AL, C.V. 92-417)

Consultation and data analysis concerning the economic loss suffered by an non-profit organization experiencing a business interruption.  Client: Floyd, Keener, Cusimano & Roberts, Gadsden, AL, representing plaintiffs.

[31] <u>Segar et al. v. Meese et al</u> (U.S. District Court for the District of Columbia, C.A. 77-0081)

Consultation and data analysis concerning the economic loss associated with racial patterns in employment in a large federal government agency.  Client: Washington Lawyers' Committee for Civil Rights under Law with Wilmer, Cutler & Pickering, Washington, D.C., representing plaintiffs.

[30] <u>Serrano et al. v. Cintas Corporation.</u> (U.S. District Court for the Eastern District of Michigan, Southern Division, File 04-cv-40132)

Consultation and data analysis concerning gender patterns in the employment of sales service representatives. Client: Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA,  representing plaintiffs..

[29] <u>Siri v. City of Dallas, et al.</u>  (District Court for Dallas County, Texas. Cause 09-04875)

Consultation and data analysis concerning gender patterns in employment and workforce diversity management issues in a large fire department.  Client: Herman Sargent, Bates, LLP, Dallas, TX, representing plaintiff.

[28]   Slonim v. The Kroger Co. (Circuit Court for Wayne County, Michigan, C.A. 94-423190)

Consultation and data analysis concerning age patterns in the employment of corporate managers.  Client: Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, P.C., representing defendant.

[27]   Smikle et al. v.  Coca-Cola Enterprises, Inc. (U. S. District Court for the District of New Jersey, C.A. 03W431(MLC))

Consultation and data analysis concerning racial patterns in the employment of route sales employees.  Client: Joseph, Greenwald & Laake, Greenbelt, MD, representing plaintiffs.

[26]   Sneed v. District of Columbia Department of Corrections (Superior Court of the District of Columbia).

Consultation and data analysis concerning the economic loss associated with separation from employment of a public employee.  Client: Dolkhart and Zavos, Washington, DC, representing plaintiff.

[25]   Sova v. Northrup Grumman v. Information Technology Inc. (American Arbitration Association 74 160 00535 08 (LMT))

Consultation and data analysis concerning the economic loss associated with separation from employment of a professional employee.  Client: Gary M. Gilbert & Associates, Silver Spring, MD, representing claimant.

[24]   City of Southfield Affirmative Action Plan (1991)

Consultation and data analysis concerning the design of an affirmative action plan covering administrative and public safety employees.  Client: City of Southfield, MI, representing potential defendants.

[23]   Stoner v. George Washington University Hospital (Superior Court of the District of Columbia, C.A. 88-CA 05433).

Consultation and data analysis concerning the economic loss associated with the death of a clerical worker. Client: Debevoise and Plimpton, New York, representing plaintiff.

[22]   Terrell v. U.S. Pipe and Foundry (U.S. District Court for the Northern District of Alabama, C.A. 72-P-0887-S) Consultation and data analysis concerning the economic loss associated with racial patterns in employment in a manufacturing firm.  Client: NAACP Legal Defense Fund, Washington, DC, representing plaintiffs.

[21]   Thomas et al. v. City of St. Paul  (U. S. District Court for the District of Minnesota, Third Division,  C.A. 04-5101 JMR/FLN)

Consultation and data analyses concerning racial patterns in public contracting.   Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[20]   Thomas v. Plusquellic (U. S. District Court for the Northern District of Ohio, Eastern Division, C.A. CV73-478)

Consultation and data analyses concerning racial patterns in employment in police and fire departments. Client: Lawyers' Committee for Civil Rights under Law, Washington, DC, representing plaintiffs.

[19]   Tolbert v. Bessemer (U. S. District Court for the Northern District of Alabama, C.A. 83P-3050S).

Consultation and data analysis concerning the impact on the demographic characteristics of residents of annexations to a city.  Client: NAACP Legal Defense Fund, Washington, DC, representing plaintiffs.

[18]  Torres et al. v. Gristede's et al.  (U.S. District Court for the Southern District of New York, 4 CIV 3316 (RMB) (AJP))

Consultation and data analysis concerning compensation practices violating the Fair Labor Standards Act. Client: Outten & Golden LLP, New York, NY, representing plaintiffs.

[17]  Tykocki and Tycocki v. Blue Cross Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, C.A. 91-107456)

Consultation and data analysis concerning age patterns associated with separation from employment of a professional employee.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendants.

[16]  United Building and Construction Trades Council v. Camden(Supreme Court of the State of New Jersey, Docket A-79, September term 1981)

Consultation and data analysis concerning the employment and economic development impacts of requirements to employ city residents as a condition of receiving construction contracts.  Client: New Jersey Office of the Public Advocate, Trenton, NJ, representing defendants.

[15]  United States v. Becker C.P.A. Review (U.S. District Court for the District of Columbia, CV-92-2879 (TFH))

Consultation and data analysis concerning the economic loss associated with delays in obtaining professional licensing.  Client: Civil Rights Division, U.S. Department of Justice, Washington, D.C., representing plaintiff.

[14]  Vandell et al. v. Chevron (Superior Court of the State of California, City and County of San Francisco, No. 945302)

Consultation and data analysis concerning gender patterns in employment and compensation in an industrial firm.  Client: Ryu, Dickey & Larkin, Oakland, CA, representing plaintiffs.

[13]  Vasquez et al. v. USM & Dollar Stores, et al. (Superior Court for Alameda County, CA RG136 3:2006:cv00963)

Consultation and data analysis concerning financial adequacy of payments for minimum wage janitorial workers.          Client: Chavez & Gertler LLP, Mill Valley, CA, representing plaintiffs.

[12]  Vedachalam et al. v. Tata American International Corp. (U.S. District Court for the Northern District of California,  3:2006:cv00963)

Consultation and data analysis concerning prevailing wage determinations for information technology professionals.  Client: Lieff, Cabraser, Heimann & Bernstein, LLP, representing plaintiffs.

[11]  Villarreal v. R.J. Reynolds Tobacco Co., Inc.  (Petition for Writ of Certiorari, U.S. Supreme Court)

Party to *amicus* brief by labor economists and social scientists discussing age discrimination in hiring. Client: Altschuler Berzon, LLP, representing plaintiff-petitioner.

[10]  Helen Watts v. City of Dallas et al. (District Court for Dallas County, Texas, Cause 08-13000).

Consultation and data analysis concerning gender patterns in employment and workforce diversity management issues in a large fire department.  Client: Law Offices of Aaron Ramirez, Dallas, TX, representing plaintiff.

23

[9]    Wachovia Financial Services (no litigation filed)

Consultation and data analysis concerning race patterns in employment among professional employees in a financial services firm.  Client: Mehri & Skalet, Washington, DC, representing plaintiffs.

[8]    Marcus Washington v. William Morris Endeavor Entertainment (American Arbitration Association Case 13 160 01426 12)

Consultation and data analysis concerning economic damages associated with race-based employment practices and the separation from employment of a professional employee.  Client: Marcus Washington, *pro se* plaintiff, New York, NY, representing plaintiff.

[7]    Wegher v. Blue Cross/Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, 06-613799-CZ)

Consultation and data analysis concerning the separation from employment of a temporary worker.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[6]    Wiggins v. PSSC (American Arbitration Association Arbitration)

Consultation and data analysis concerning economic damages experienced by a terminated administrative employees.   Client: Law Offices of Frank Jackson, Esq., Detroit, MI, representing plaintiff.

[5]    Williams et al. v. Well Fargo Bank (Iowa District Court for Polk County, LACL 131387)

Consultation and data analysis concerning racial patterns in criminal records background check for financial services employees.  Client: Goldstein, Borgen, Dardarian & Ho, San Francisco, representing plaintiffs.

[4]    Wren et al. v. RGIS Inventory Specialists (U.S. District Court for the Northern District of California, C 06-05778 JCS and C 07-0032 JCS)

Consultation and data analysis concerning employee compensation for travel time to a work sites.  Client: Schneider and Wallace, San Francisco, CA, representing plaintiffs.

[3]    Wynne et al. v. McCormick & Schmick's (U.S. District Court for the Northern District of California, C 06 3153 CW)

Consultation and data analysis concerning race/ethnic patterns in employment of service workers.   Client: Lieff, Cabraser, Heimann & Bernstein, LLP, representing plaintiffs.

[2]    Yang v. Blue Cross Blue Shield of Michigan (Circuit Court for Wayne County, Michigan, C.A. 95-514482 CZ)

Consultation and data analysis concerning the separation from employment of a professional employee.  Client: Office of the General Counsel, Blue Cross/Blue Shield of Michigan, Detroit, MI, representing defendant.

[1]    Zuniga et al. v. Bernalillo County et al (U.S. District Court for the District of New Mexico, Civil No. 1:11-cv-00877, RHS/LAM)

Consultation and data analysis concerning gender patterns in hiring, promotion, and compensation of salaried civil servants. Client: Moody & Warner, PC, Albuquerque, NM, representing plaintiffs.

**ATTORNEY ATTESTATION**

I, Aaron R. Field, am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from the other Signatories.

*/s/ Aaron Field*
AARON R. FIELD

CANNATA O' TOOLE & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA, 94111
TEL: 415.409.8900 – FAX: 415.409.8904