UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>Defendant. | Case No. 3:22-cv-07182-WHA<br><br>**DECLARATION OF JAMILLAH BOWMAN WILLIAMS IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   Dec 14, 2023<br>Time:  8:00 a.m.<br>Judge: Hon. William Alsup |

**DECLARATION OF JAMILLAH BOWMAN WILLIAMS**

I, Jamillah Bowman Williams, declare:

1. I am Dr. Jamillah Bowman Williams. I have personal knowledge of the matters stated in this declaration. If called upon to do so, I am competent to testify to all matters set forth herein.

**Professional Background**

2. I am a Professor of Law and Faculty Director of the Workers' Rights Institute at Georgetown University Law Center in Washington, D.C. Currently, I am in residence at the Harvard Business School, as part of the inaugural cohort of Visiting Faculty Fellows with the Institute for the Study of Business in Global Society. I completed my master's degree in Higher Education from the University of Michigan, my J.D. at Stanford Law School, and my Ph.D. in Sociology at Stanford University.

3. My research focuses on contemporary bias and anti-discrimination law, including in the employment context. More specifically, I use social psychological theory and empirical data analysis to examine the impact of antidiscrimination laws and the effects of diversity and inclusion polices on individuals and companies across the workforce.

4. I have published articles in the Georgetown Law Journal, California Law Review, Boston College Law Review, University of Chicago Legal Forum, Washington Law Review, Iowa Law Review, William and Mary Law Review, the Employee Rights and Employment Policy Journal, and the ABA Journal of Labor and Employment Law. I have also authored several white papers and peer-reviewed articles that have been featured by a range of media outlets including Politico and the New York Times.

5. In 2021, I received the Michael J. Zimmer Memorial Award as a rising scholar who values workplace justice and community, and as someone who has made significant contributions to labor & employment law scholarship.

6. As part of my research, many of the law review articles and news articles I have written detail how some companies incorrectly claim that the workforce demographic data they compile and submit to the Department of Labor in their EEO-1 Reports, amount to either trade secrets or otherwise confidential commercial information. I have written extensively on why workforce equal

employment opportunity (EEO) data should not be treated as a trade secret by the nation's largest tech companies.

**The Problem: Lack of Transparency and Access to Workforce Demographic Data**

7. Bias and lack of opportunity for women and racialized minorities have long been systemic problems in our nation's most powerful and elite industries, including finance, technology, law, and film. Media outlets, members of Congress, social justice groups, and other stakeholders have repeatedly called on these industries to improve representation of women and racialized minorities, make their workplace environments more inclusive, and adopt more equitable employment practices.[1]

8. A core purpose of the Civil Rights Act of 1964 is to open opportunities for women and racialized minorities, and to eliminate old patterns of inequality. In addition, Executive Order 11246 requires employers with government contracts to take affirmative steps to increase the participation of women and racialized minorities if these groups are underrepresented, relative to the available labor pool. The Equal Employment Opportunity Commission (EEOC) and the Department of Labor (DOL) regularly collect workforce data to monitor employer compliance with these laws.

9. A significant challenge to those investigating and exploring solutions for continuing workplace inequality is that employers and government agencies possess the relevant information

---

[1] San Jose Mercury News requested information in 2008 from the fifteen largest Silicon Valley companies. See Mike Swift, Five Silicon Valley Companies Fought Release of Employment Data, and Won, MERCURY NEWS (Feb. 11, 2010, 4:52 AM), https://www.mercurynews.com/2010/02/11/five-silicon-valleycompanies-fought-release-of-employment-data-and-won/; CNN requested information in 2011 from twenty U.S. technology companies. *See* Diversity in Silicon Valley: The Fight to Uncover Data, CNN MONEY (Aug. 18, 2011), https://money.cnn.com/interactive/technology/diversity-tech/; California Representative Barbara Lee and North Carolina Representative G.K. Butterfield met with tech leaders in 2015 and 2017 to request greater transparency and urge change. *See* Will Evans, Congresswoman to Tech Firms: 'You're Hiding Something,' REVEAL (Dec. 11, 2017), https://www.revealnews.org/blog/congresswoman-to-tech-firmsyoure-hiding-something/; Reverend Jesse Jackson and the Rainbow Push Coalition have pressured the tech industry for change since 2014, most recently contacting "25 large technology companies, including Google, Facebook, Tesla and Oracle, calling on them to release information on their hiring practices, board diversity measures and employee retention statistics in addition to their latest diversity data." Sinduja Rangarajan, Jesse Jackson Calls Out Silicon Valley 'Empty Promises' on Diversity, REVEAL (Apr. 6, 2018), https://www.revealnews.org/blog/jessejackson-calls-out-silicon-valley-empty-promises-on-diversity/.

on workforce representation, hiring, promotion, compensation, and related employment policies and practices. Without access to this information, potential plaintiffs, civil rights advocates, and concerned members of the public are unable to properly assess the disparities, let alone strive for effective solutions. Two ways of controlling access to this kind of data have recently been gaining steam, particularly among companies resistant to workforce demographic transparency – the "diversity as trade secret" argument and the workforce data as sensitive "commercial business information" argument.

10. When government agencies like the DOL collect information to monitor compliance with laws that are important to the public, such as EO 11246, there is a longstanding presumption favoring disclosure of that information. The Freedom of Information Act (FOIA) also requires the government agencies to proactively provide this data to keep citizens informed, which is a vital part of our democracy. Thus, exemption from disclosure requires a strong and compelling argument that such disclosure would lead to competitive harm to a person or a business. In the case of workforce demographic data, the legal arguments for exemption are very weak.

11. My research has shown that there is no evidence that nondisclosure of workforce demographic data secures a company's competitive advantage in a way that needs to be protected by trade secret law. Instead, these efforts to withhold basic workforce data seem to be aimed at concealing inequality and avoiding reputational harm that may occur if employees, competitors, and the public become more aware of discriminatory patterns. Calling something a "trade secret" to avoid possible embarrassment or legal risk abuses the purpose of intellectual property law and is in direct conflict with the purposes of Title VII and EO 11246.[2]

**The Reasoning: EEO-1 Workforce Demographic Data Should Not be Treated as a Trade Secret or "Commercial" Information**

---

[2] *See* Jamillah Bowman Williams, *Diversity as a Trade Secret*, 107 GEO. L.J. 1684, 1695-96 (2019) (examining corporate claims that workforce diversity data and company diversity strategies are trade secrets); Jamillah Bowman Williams, *Why Companies Shouldn't Be Allowed to Treat Their Diversity Numbers as Trade Secrets*, HARV. BUS. REV. (Feb. 15, 2019), https://hbr.org/2019/02/why-companies-shouldnt-be-allowed-to-treat-their-diversitynumbers-as-trade-secrets; *see also* Will Evans & Sinduja Rangarajan, *Oracle and Palantir Said Diversity Figures Were Trade Secrets. The Real Secret: Embarrassing Numbers*, REVEAL (Jan. 7, 2019), https://www.revealnews.org/ article/oracle-and-palantir-said-diversity-figures-were-trade-secrets-the-real-secretembarrassing-numbers/ [https://perma.cc/8WDG-VG4C].

12. Public access to EEO-1 Report data would make it easier to study workforce demographic trends and address diversity deficiencies among federal contractors.

13. The EEO-1 Reports collected and maintained by the Department of Labor are one of the few instances where the public has a right to access the workforce representation data of employers who are federal contractors, in a standardized format. The DOL requires all federal contractors with fifty or more employees and $50,000 in government contracts to submit EEO-1 reports so that it can monitor compliance with nondiscrimination requirements under the Office of Federal Contract Compliance Programs (OFCCP).[3]

14. In my research, I have examined the workforce data compiled in the submitted EEO-1 reports and explained why this information does not constitute protected "commercial" information or "a trade secret."  Information that might appropriately be considered "commercial" includes information about revenue, pricing strategy, purchase records, and a company's commercial assets. Information that might constitute "trade secrets" includes valuable intellectual property, such as proprietary inventions, formulas, or algorithms that the business must keep secret to protect a competitive advantage it has in the marketplace.  Workforce EEO data does not fall under either category.[4]

15. Described in its simplest form, the workforce data from the EEO-1 Reports amounts to a straightforward count of the number of male and female employees, by race/ethnicity, in various roles at a specific company. This numerical "employee count" is simply not the product of a secret proprietary formula, it does not require significant internal effort or research investment to compile, and there is no competitive outcome that is threatened if these counts were to be known by competitors.  Further, nothing in these aggregate counts of employees reveals any insights about a company's inner workings – such as strategy, recruiting practices, operations, or costs. No secret intellectual property regarding core goods and services are divulged to competitors in these reports. Thus, these aggregate employee counts should not be treated as a trade secret or commercial information withheld under Exemption 4.

---

[3] 41 C.F.R. § 60-1.7(a) (2018).
[4] Williams *supra* note 2.

4
WILLIAMS DECL. IN SUPP. OF
OPP. & CROSS MOT. SUMM. J
Case No. 3:22-cv-07182-WHA

16. In my research, I have shown how companies that disclose their EEO-1 reports and other workforce diversity data do not face competitive threats, financial disadvantage, or any other marketplace harm. Rather, many companies that are transparent about their workforce demographic trends reap considerable benefits, including positive reputational effects for prioritizing diversity, greater accountability to the public and consumer trust, and ensuring compliance with anti-discrimination laws. For example, favoring transparency, a number of the leading tech companies now release workforce data voluntarily, and have not faced any competitive threats, financial disadvantage or other kind of commercial harm.[5] Many of the largest federal contractors—such as Lockheed Martin Corp., General Dynamics Corp., Oracle Corp., Exxon Mobil Corp., and Abbott Laboratories—have started regularly sharing their EEO-1 forms with investors and the public in 2020 with no quantifiable commercial consequences.

**The Harm: Denying Access to Workforce Demographic Data Harms the Individual Employees that Antidiscrimination Laws are Meant to Protect.**

17. My research shows how the government's withholding of EEO-1 reports and other workforce data exacerbates several problems surrounding equal employment opportunity. This is particularly an issue in industries with historical and continuing patterns of inequality, such as technology, which has systemic issues with hiring and retaining women and racialized minorities.

18. If employers are claiming Exemption 4 protections to keep the count of their women and racialized minority employees secret, this not only conceals potential inequality, it is also commodification of the very workers who Title VII and EO 11246 were designed to protect. For example, some companies have claimed that if competitors knew the number of Black and Latinx employees they employ, the competitors would recruit them away, creating a competitive disadvantage, because diversity is a competitive asset. Companies making this argument assert

---

[5] *Id*; *see also* Kavya Vaghul, Aleksandra Radeva, and Kim Ira, *Workforce Diversity Data Disclosure*, Harvard Law School Forum on Corporate Governance, March 2022, https://corpgov.law.harvard.edu/2022/03/09/workforce-diversity-data-disclosure/. INTEL, VISION & VALUES: GLOBAL CITIZENSHIP REPORT 2001, at 30 (2002), http://csrreportbuilder.intel.com/PDFfiles/archived_reports/Intel%202001%20CSR%20Report.pdf; The UK Equality Act 2010 (Gender Pay Gap Information) requires all employers with 250 or more employees to publish aggregate pay data by sex on their websites and to make these data publicly available for at least three years.

ownership of employees from underrepresented backgrounds, seeking to profit from their racial identities in a way that they do not do to White employees. This is an intentional effort to restrict the visibility, professional prospects, and mobility, of women and racialized minorities, specifically because of their race or gender. This is ironic, because in many other cases, these same companies seek to showcase their underrepresented employees on websites, at conferences, in advertisements, etc., if they feel it is profitable or otherwise advantageous. This trend is consistent with the theory of "identity capitalism."[6]

19. Identity capitalism has been defined as the derivation of social and economic value from the racial or gender identity of another person at that person's expense. This phenomenon is particularly apparent in recent years as the social climate across many industries is preoccupied with the notion of diversity, and non-whiteness and non-maleness are essentially commodified and exploited for their perceived market value. Paradoxically, this argument is often used to the detriment of the underrepresented employees whose identities are supposed to provide the value.

20. My research has shown that if the counts of incumbent employees, by gender, race, and ethnicity, are considered trade secrets or confidential commercial information, this conceals inequality, interfering with the purpose of Title VII and EO 11246. The individuals from historically underrepresented groups, some of which suspect current discrimination, will not be able to assess whether their current or prospective employers are broadening access and opportunity over time consistent with goals of Title VII and EO 11246. The public will also remain uninformed about the compliance status and progress of major companies.

21. Seeking to conceal this information through trade secret protections and commercial confidentiality, by arguing that the count of historically underrepresented talent is an asset that must be guarded is disingenuous, or at best misguided. This allows companies to continue with workplace practices that perpetuate barriers and bias, with little accountability.

22. If employers continue to use competitive trade secret arguments to justify withholding critical EEO information, not only will inequalities remain concealed, but they are likely to remain

---

[6] *See generally* Nancy Leong, Racial Capitalism, 126 HARV. L. REV. 2151 (2013) (analyzing the phenomenon of racial capitalism, which is "the process of deriving social and economic value from the racial identity of another person" and broadly mentioning identity capitalism)

6
WILLIAMS DECL. IN SUPP. OF
OPP. & CROSS MOT. SUMM. J
Case No. 3:22-cv-07182-WHA

unresolved due to the lack of transparency and accountability. Favoring disclosure, as required by FOIA, would incentivize more equitable workplace practices, while also allowing various stakeholders, including employees, investors, legislators, consumers, civil rights advocates, and the public to become informed about companies that have been successful at closing inequality gaps, which could open opportunities for debate and learning that can help solve chronic underrepresentation across industries.

23. The widespread use of the "trade secret" and "commercial information" exemption in this context is not only continuing weak legal arguments, it is also interfering with the core purposes of civil rights and EEO law.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed October 18 in Cambridge, Massachusetts.

/s/ *Jamillah Bowman Williams*
Jamillah Bowman Williams

## **ATTORNEY ATTESTATION**

I, Aaron R. Field, am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from the other Signatories.

*/s/ Aaron Field*
AARON R. FIELD

CANNATA O' TOOLE & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA, 94111
TEL: 415.409.8900 – FAX: 415.409.8904