1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2  MICHELLE LO (NYRN 4325163)
   Chief, Civil Division
3  PAMELA T. JOHANN (CABN 145558)
   Assistant United States Attorney
4
         450 Golden Gate Avenue, Box 36045
5        San Francisco, California 94102
         Telephone: (415) 436-7025
6        Facsimile: (415) 436-7234
         pamela.johann@usdoj.gov
7
   Attorneys for Defendant UNITED STATES
8  DEPARTMENT OF LABOR

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14 THE CENTER FOR INVESTIGATIVE          ) Case No. 22-cv-07182-WHA
   REPORTING and WILL EVANS,             )
                                         ) **DEFENDANT DEPARTMENT OF LABOR'S**
15                                       ) **OPPOSITION TO CROSS-MOTION FOR**
         Plaintiffs,                     ) **SUMMARY JUDGMENT AND REPLY IN**
16                                       ) **SUPPORT OF BELLWETHER MOTION FOR**
      v.                                 ) **SUMMARY JUDGMENT**
17                                       )
   UNITED STATES DEPARTMENT OF           )
   LABOR,                                ) Date:  December 14, 2023
18                                       ) Time:  8:00 a.m.
                                         ) Place: Courtroom 12, 19th Floor
19       Defendant.                      )
                                         ) The Hon. William Alsup
20 _____ )

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ................................................................................................ ii

3   I.      INTRODUCTION ..............................................................................................1

4   II.     ARGUMENT ......................................................................................................1

5           A.      This Court is Not Precluded from De Novo Review of DOL's Decision To
                    Withhold the 16,755 EEO-1 Reports That Were Not Before the *CIR 1* Court................1

6

            B.      The EEO-1 Reports Were Appropriately Withheld Under Exemption 4. ...........................7
7
                    1.      The EEO-1 Data Is Commercial Information. .........................................7
8
                    2.      The Objecting Submitters' EEO-1 Reports Are Confidential. ................................13
9
                            (i)     The EEO-1 Reports Are Customarily and Actually Treated As
10                                  Confidential By The Bellwether Objectors. ................................13

11                          (ii)    The EEO-1 Reports Were Provided Under an Assurance of
                                    Privacy................................................17
12
            C.      The FOIA Improvement Act Does Not Compel Disclosure ................................19
13
                    1.      Disclosure is Prohibited by the Trade Secrets Act. ..............................19
14
                    2.      The Agency's Conclusion of Foreseeable Harm was Reasonable. ........................20
15
            D.      The EEO-1 Reports Of Federal Contractors Not Subject To OFCCP Reporting
16                  Requirements Are Not Agency Documents. .............................21

17          E.      Plaintiffs Are Not Entitled To Declaratory Relief. ...........................22

18  III.    CONCLUSION ................................................................................................25

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

### Cases

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
    475 F.3d 1080 (9th Cir. 2007) ................................................................................. 2, 6

*Am. Airlines, Inc. v. Nat'l Mediation Bd.*,
    588 F.2d 863 (2d Cir. 1978)..................................................................................... 9, 13

*Am. Small Bus. League v. U.S. Dep't of,*
    *Def.*, 411 F. Supp. 3d 824 (N.D. Cal. 2019) ............................................................ 6, 16

*Am. Soc'y for Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*,
    No. 19-cv-3112, 2021 WL 1163627 (S.D.N.Y. Mar. 25, 2021)........................................ 19

*Baker & Hostetler LLP v. Dep't of,*
    *Com.*, 473 F.3d 312 (D.C. Cir. 2006) .......................................................................... 8

*Brown v. Perez*,
    835 F.3d 1223 (10th Cir. 2016) ................................................................................. 8

*Callahan v. PeopleConnect, Inc.*,
    No. 20-cv-09203-EMC, 2022 WL 2132912 (N.D. Cal. June 14, 2022)................................ 1

*Camreta v. Greene*,
    563 U.S. 692 (2011)................................................................................................ 23

*Carlson v. U.S. Postal Serv.*,
    504 F.3d 1123 (9th Cir. 2007) ............................................................................... 7, 8

*Cause of Action Inst. v. Exp.-Imp. Bank of the United States*, No. 19-cv-1915 (JEB),
    2022 WL 252028 (D.D.C. Jan. 27, 2022) .................................................................. 18

*Center for Auto Safety v. National Highway Traffic Safety Admin.*,
    93 F. Supp. 2d 1 (D.D.C. 2000) ............................................................................... 14

*Center for Investigative Reporting v. Dep't of Labor*,
    No. 18-cv-2414-DMR, 2020 WL 2995209 (N.D. Cal. June 4, 2020) ................................ 15

*Center for Investigative Reporting v. Dep't of Labor*,
    424 F. Supp. 3d 771 (N.D. Cal. 2019) ................................................................ passim

*Center for Investigative Reporting v. U.S. Customs and Border Protection*,
    No. 18-cv-2901-BAH, 2019 WL 7372663 (D.D.C. Dec. 31, 2019)............................... 14, 18

*Clark v. Bear Stearns & Co.*,
    966 F.2d 1318 (9th Cir. 1992) ................................................................................. 2

*CNA Fin. Corp. v. Donovan*,
 830 F.2d 1132 (D.C. Cir. 1987) ................................................................... 19, 20

*CREW v. F.E.C.*,
 711 F.3d 180 (D.C. Cir. 2013) ....................................................................... 22, 23

*Critical Mass Energy Proj. v. Nuclear Regul. Comm'n*,
 830 F.2d 278 (D.C. Cir. 1987) ............................................................................. 11

*Comm'r of Internal Revenue v. Sunnen*,
 333 U.S. 591 (1948) ................................................................................... 5, 6, 7

*Ecological Rts. Found. v. U.S. Env't Prot. Agency*,
 No. 22-15936, 2023 WL 4342100 (9th Cir. July 5, 2023) ................................. 23

*Ecological Rts. Found. v. U.S. Env't Prot. Agency*,
 607 F. Supp. 3d 979 (N.D. Cal. 2022) ................................................................. 24

*Elec. Frontier Found. v. D.O.J.*, No. 11-cv-05221-YGR,
 2014 WL 3945646 (N.D. Cal. Aug. 11, 2014) ...................................................... 4

*Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*,
 873 F.2d 229 (9th Cir. 1989) ..................................................................... 2, 5, 6

*Food Marketing Institute v. Argus Leader Media*, 139 S. Ct.  (2019) .................................. passim

*Forest County Potawatomi Comm. v. Zinke*,
 278 F. Supp. 3d .................................................................................................. 11

*Friends of Animals v. Bernhardt*,
 15 F.4th 1254 (10th Cir. 2021) ........................................................................... 18

*Frontier Found. v. D.O.J.*,
 141 F. Supp. 3d 51 (D.D.C. 2015) ........................................................................ 2

*Frontier Found. v. D.O.J.*,
 No. 11-cv-05221-YGR, 2014 WL 3945646 (N.D. Cal. Aug. 11, 2014) ............... 3

*Greenspan v. Bd. of Governers, Fed. Reserve System*,
 643 F. Supp. 3d 176 ..................................................................................... 20, 21

*Kalbers v. D.O.J.*,
 22 F.4th 816 (9th Cir. 2021) ................................................................................. 4

*Lardner v. U.S. Dep't of Justice*,
 638 F. Supp. 2d 14 (D.D.C. 2009) ............................................................ 2, 3, 4, 5, 6

*LaRouche v. U.S. Dep't of Treasury*,
  112 F. Supp. 2d 48 (D.D.C. 2000) ............................................................................. 2

*Long v. I.R.S.*,
  693 F.2d 907 (9th Cir. 1982) .................................................................................... 25

*Martin v. Dep't of Just.*,
  488 F.3d 446 (D.C. Cir. 2007) ................................................................................... 2

*Marzen v. U.S. Dep't of Health & Hum. Servs.*,
  632 F. Supp. 785 (N.D. Ill. 1986) ............................................................................ 21

*McQueen v. U.S.*,
  264 F. Supp. 2d 502 (S.D. Tex. 2003) ................................................................... 2, 4

*Nat'l Ass'n of Home Builders v. Norton*,
  309 F.3d 26 (D.C. Cir. 2002) ............................................................................... 9, 20

*Nat'l Pub. Radio, Inc. v. U.S. Cent. Command*,
  646 F. Supp. 3d 1245 (S.D. Cal. 2022) .................................................................... 25

*Nat'l Treasury Employees Union v. I.R.S.,*
  765 F.2d 1174 (D.C. Cir. 1985) ............................................................................. 3, 6

*New York Times Co. v. F.D.A.*,
  529 F. Supp. 3d 260 (S.D.N.Y. 2021) ............................................................ 6, 16, 18, 19

*Osen LLC v. U.S. Cent. Command*,
  No. 18-cv-6069, 2019 WL 4805805 (S.D.N.Y. Sept. 30, 2019) ............................... 3

*OSHA Data/CIH, Inc. v. U.S. Dep't of Lab.*,
  220 F.3d 153 (3d Cir. 2000) ............................................................................... 23, 24

*Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*,
  85 F. Supp. 3d 1074 (N.D. Cal. 2015) ...................................................................... 25

*Pac. Architects & Engineers Inc. v. U.S. Dep't of State*,
  906 F.2d 1345 (9th Cir. 1990) ................................................................................... 19

*Pub. Citizen Found. v. D.O.L.*,
  No. 18-cv-00117, 2020 WL 9439355 (D.D.C. June 23, 2020) .................................. 10

*Pub. Citizen v. H.H.S.*,
  975 F. Supp 2d 81 (D.D.C. 2013) ....................................................................... 10, 22

*Pub. Justice Found. v. Farm Serv. Agency*,
  538 F. Supp. 3d 934 (N.D. Cal. 2021) ...................................................................... 19

*Public Citizen Health Research Group v. FDA*,
   704 F.2d 1280 (D.C.Cir.1983) ............................................................................................ 8

*Reporters Comm. for Freedom of the Press v. F.B.I.*,
   613 F. Supp. 3d 104 (D.D.C. 2020) ............................................................................ 2, 4, 5

*Rodriguez-Valencia v. Holder*,
   652 F.3d 1157 (9th Cir. 2011) ............................................................................................ 7

*Roman v. Nat'l Reconnaissance Off.*,
   952 F. Supp. 2d 159 (D.D.C. 2013) .................................................................................... 2

*Seife v. FDA*,
   43 F.4th 231 (2d Cir. 2022) ................................................................................................ 6

*Starkey v. U.S. Dep't of Interior*,
   238 F. Supp. 2d 1188 (S.D. Cal. 2002) ............................................................................... 9

*Stonehill v. I.R.S.*,
   534 F. Supp. 2d 1 (D.D.C. 2008) ........................................................................................ 3

*Synopsys, Inc. v. U.S. Dep't of Lab.*,
   No. 20-16414, 2022 WL 1501094 (9th Cir. May 12, 2022) ................................................ 4

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ............................................................................................................ 2

*Thompson v. Schweiker*,
   665 F.2d 936 (9th Cir. 1982) .............................................................................................. 1

*Van Bourg, et al. v. N.L.R.B.*,
   728 F.2d 1270 (9th Cir. 1984) ........................................................................................ 8, 12

*Washington v. D.O.J.*,
   58 F.4th 1255 (D.C. Cir. 2023) ....................................................................... 6, 9, 11, 19

*Watkins v. U.S.P.S.*,
   643 F.3d 1189 (9th Cir. 2011) ........................................................................................ 7, 8

*Western Oil & Gas Ass'n v. E.P.A.*,
   633 F.2d 803 (9th Cir. 1980) .......................................................................................... 1, 6

*Wilson v. F.C.C.*,
   No. 21-cv-895, 2022 WL 4245485 (D.D.C. Sept. 15, 2022) ............................................ 16

*WP Co. LLC v. U.S. Small Bus. Admin.*,
   502 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 16, 18. 21

*WP Co. LLC v. U.S. Small Bus. Admin,*,
   575 F. Supp. 3d 114 (D.D.C. 2021) ................................................................ 21

*WP Company v. U.S. Small Bus. Admin,*
   No. 20-cv-1240, 2021 WL 2982173 (D.D.C. July 15, 2021) ............................. 18

**Statutes**

5 U.S.C. § 552(a)(4)(B) ................................................................................................ 1

5 U.S.C. § 552(a)(6)(C) ............................................................................................... 23

5 U.S.C. § 552(a)(6)(C)(i) ........................................................................................... 23

18 U.S.C. § 1905 .......................................................................................................... 19

**Regulations**

29 C.F.R. § 70.26 ........................................................................................................ 23

29 C.F.R. § 70.26(d)(2) ............................................................................................... 23

41 C.F.R. § 60-1.7(a) ................................................................................................... 21

## I.    INTRODUCTION

The Supreme Court in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ("*Argus Leader*"), announced that the Exemption 4 protection focuses on how the *owner* of information treats it, and conferred Exemption 4 protection on all commercial information submitted to the government that is otherwise treated as private by its owner. Defendant Department of Labor ("DOL") has established, through direct, uncontroverted evidence, that the Bellwether Objectors customarily and actually treat their EEO-1 reports as confidential. Plaintiffs now claim that these records are not "actually" confidential, yet Plaintiffs have failed to come forward with any evidence to support this assertion. This information is kept confidential by its owners precisely because of its intrinsic commercial significance. Even Plaintiffs' expert concedes that this information is inherently commercial. DOL respectfully requests that the Court deny Plaintiffs' motion and grant summary judgment in its favor.

## II.    ARGUMENT

### A.    This Court is Not Precluded from De Novo Review of DOL's Decision To Withhold the 16,755 EEO-1 Reports That Were Not Before the *CIR 1* Court.

Plaintiffs' FOIA requests seek, for the first time, the EEO-1 reports for *all* federal contractors—24,355 different entities—for five consecutive years, from 2016 through 2020.  DOL's decision to withhold approximately 16,755 reports, including the 25 reports of the five Bellwether Objectors at issue in these motions, has never been litigated in federal court. Although FOIA provides that an agency's decision to withhold responsive documents shall be reviewed de novo by a federal district court, 5 U.S.C. § 552(a)(4)(B), Plaintiffs argue that this Court cannot engage in that de novo review with regard to these newly requested documents, from 4,796 unique federal contractors, because another court ruled in 2019 that Exemption 4 did not cover ten different documents—the 2016 EEO-1 reports submitted by ten Silicon Valley tech companies. The doctrine of collateral estoppel does not preclude this Court's review.

Collateral estoppel is an equitable doctrine that is invoked by a court at its discretion. *See Callahan v. PeopleConnect, Inc.*, No. 20-cv-09203-EMC, 2022 WL 2132912, at *3 (N.D. Cal. June 14, 2022); *Western Oil & Gas Ass'n v. E.P.A.*, 633 F.2d 803, 809 (9th Cir. 1980). It is not "'rigidly applied,'" *Thompson v. Schweiker*, 665 F.2d 936, 941 (9th Cir. 1982)), but rather is "tempered by fairness and equity" and is subject to considerations of countervailing policies. *Id.* The party asserting collateral estoppel bears

1   the burden of establishing its applicability, *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008); *Lardner v. U.S.*

2   *Dep't of Justice*, 638 F. Supp. 2d 14, 22 (D.D.C. 2009), *aff'd*, 398 F. App'x 609 (D.C. Cir. 2010), and the

3   doctrine will not be applied if "there is any doubt as to whether an issue was actually litigated in a prior

4   proceeding." *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 233 (9th Cir.

5   1989). Moreover, the doctrine "has never been applied to issues of law with the same rigor as to issues of

6   fact." *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007) (cleaned up).

7       As Plaintiffs acknowledge, the collateral estoppel doctrine can be invoked only where the identical

8   issue was actually litigated in the prior case.  Dkt. No. 39 at 15 (citing *Clark v. Bear Stearns & Co.*, 966

9   F.2d 1318, 1320 (9th Cir. 1992)). In FOIA cases, the "identical issue" criterion generally requires that the

10  two cases involve identical documents. "The key to collateral estoppel in the FOIA context is that the

11  *documents* withheld, not the rationales for the withholdings, be the same." *Reporters Comm. for Freedom*

12  *of the Press v. F.B.I.*, 613 F. Supp. 3d 104, 115 (D.D.C. 2020), *aff'd in part, rev'd in part on other*

13  *grounds,* 3 F.4th 350 (D.C. Cir. 2021) (emphasis in original). As the *Reporters Committee* court observed,

14  courts that have applied collateral estoppel in FOIA disputes have done so where "the plaintiff sought

15  disclosure of the same [documents] for which the agency's withholding had already been litigated and

16  decided."  613 F. Supp. 3d at 115 (citing *Martin v. Dep't of Just.*, 488 F.3d 446, 454 (D.C. Cir. 2007)); *see*

17  *also LaRouche v. U.S. Dep't of Treasury*, 112 F. Supp. 2d 48, 55–56 (D.D.C. 2000); *Roman v. Nat'l*

18  *Reconnaissance Off.*, 952 F. Supp. 2d 159, 164 (D.D.C. 2013). Thus, in *National Treasury Employees*

19  *Union v. I.R.S.* ("*NTEU*"), collateral estoppel was applied defensively against a FOIA plaintiff who had

20  requested the same IRS job description form for successive years, where the parties stipulated that the

21  information withheld was "the same kind" that the court had ordered redacted in the prior case. 765 F.2d

22  1174, 1177 & n.7 (D.C. Cir. 1985). Subsequent cases discussing *NTEU* have emphasized that "the

23  documents there were exactly the same." *Reporters Comm.*, 613 F. Supp. 3d at 115; *see also McQueen v.*

24  *U.S.*, 264 F. Supp. 2d 502, 514 (S.D. Tex. 2003), *aff'd*, 100 F. App'x 964 (5th Cir. 2004).

25      By contrast, where the documents at issue in the second action were not litigated in the first, the

26  issues cannot be considered to be "identical." Courts have declined to apply collateral estoppel in these

27  circumstances, even where the documents were similar and the agency's rationale for withholding was the

28  same. *See*, *e.g.*, *Reporters Comm.*, 613 F. Supp. 3d at 115-16; *Elec. Frontier Found. v. D.O.J.*, 141 F.

1    Supp. 3d 51, 56 (D.D.C. 2015); *Lardner*, 638 F. Supp. 2d at 22-23; *cf. Elec. Frontier Found. v. D.O.J.*,

2    No. 11-cv-05221-YGR, 2014 WL 3945646, at *8 (N.D. Cal. Aug. 11, 2014) (declining to give preclusive

3    effect to earlier ruling that Office of Legal Counsel memoranda were exempt from disclosure).[1]

4         Moreover, collateral estoppel is generally applied *defensively* in FOIA cases to prevent the plaintiff

5    from compelling the release of information that was previously found to be exempt from disclosure. *See*,

6    *e.g.*, *NTEU*, 765 F.2d 1174, 1177 (applying collateral estoppel to uphold the agency's redactions of IRS

7    employee-identifying material). Courts have rejected attempts to apply collateral estoppel offensively

8    against the government. *See*, *e.g.*, *Lardner*, 638 F. Supp. 2d at 22-23. The doctrine has never been applied

9    offensively against the government to compel the release of documents not previously disclosed.[2] And the

10    doctrine has never been applied offensively in an Exemption 4 case, much less to compel the disclosure of

11    documents obtained from third parties that were not at issue in the previous litigation.

12         Applying these principles, collateral estoppel does not preclude this Court from considering the

13    merits of the present dispute. First, this litigation grows out of different FOIA requests and encompasses

14    different documents. The request underlying the first case, *CIR v. Dep't of Labor*, 424 F. Supp. 3d 771,

15    779 (N.D. Cal. 2019) ("*CIR I*"), targeted 35 specific Silicon Valley federal contractors and was limited to

16    a single year—2016—of EEO-1 reports. Only ten of those reports remained at issue at the time of the

17    *CIR-1* court's decision and were actually litigated in that case. The consolidated FOIA requests underlying

18    this lawsuit seek all EEO-1 reports for all federal contractors for five consecutive years—74,999 reports,

19    from 24,355 companies. 16,755 of those reports were withheld by OFCCP and are at issue in the current

20    litigation. Whether these 16,755 specific documents, containing different information corresponding to

21    different companies not before the court in *CIR 1*, may be withheld under Exemption 4 has never been

22    litigated.  Moreover, DOL's motion for summary judgment specifically tests the Exemption 4 withholding

23

---

24    [1] Collateral estoppel was applied defensively to prevent the relitigation of Exemption 6
      redactions in similar, but not identical, documents in *Osen LLC v. U.S. Cent. Command*, No. 18-cv-
25    6069, 2019 WL 4805805 (S.D.N.Y. Sept. 30, 2019). In that case, however, the plaintiff acknowledged
      that the first case involved some of the same reports and did not contend that there were any relevant
26    factual or legal differences between the two cases. *Id.* at *9 & n.9.

27    [2] In the one FOIA case in which collateral estoppel was applied offensively against the agency, a
      district court had already determined that the plaintiff was entitled to disclosure of the same 48
28    documents withheld in the second FOIA action on the basis of attorney-client privilege. *Stonehill v.
      I.R.S.*, 534 F. Supp. 2d 1, 8 (D.D.C. 2008), *aff'd on other grounds*, 558 F.3d 534 (D.C. Cir. 2009).

of the reports of five Bellwether Objectors. These objectors were not part of the *CIR 1* litigation, the evidentiary declarations justifying their objections were not considered, and DOL's rationale for withholding their reports, predicated on those objections, has never been litigated. This basic requirement for application of collateral estoppel in the FOIA context—that the two cases involve the same documents—is therefore absent here. *See McQueen*, 264 F. Supp. 2d at 514 (where requests for information are not "essentially identical," a full analysis of the merits must be undertaken).

Second, while both cases involve EEO-1 reports generally, the *CIR 1* court's analysis of whether they are protected by Exemption 4 involved an inquiry into specific facts and circumstances that cannot be applied universally to all reports. The set of EEO-1 reports in this case diverges significantly—both qualitatively and quantitatively—from the set considered in *CIR 1*. Unlike the *CIR 1* request, which sought one year of reports from a limited number of companies within a specific market segment, the current requests are unprecedented in scope, encompassing five consecutive years of data from companies that provide all types of products and services and represent every corner of American industry. "A valid rationale for withholding one set of documents does not necessarily apply equally to every other set of documents." *Reporters Comm.*, 613 F. Supp. 3d at 115; *see also Elec. Frontier Found.*, 2018 WL 3945646, at *8 (rejecting "blanket argument" regarding applicability of Exemption 5 to similar documents); *Lardner*, 638 F. Supp. at 22-23 (refusing to apply collateral estoppel in second action involving the propriety of withholding the identities of unsuccessful clemency applicants).

Here, the Government has justified its withholdings through separate evidentiary declarations corresponding to the unique EEO-1 reports under consideration, "with details specific to the documents at issue." *Reporters Comm.*, 613 F. Supp. 3d at 116. The Government also provided declarations in *CIR 1*, and the court considered them in rendering its decision, but ultimately concluded that the Government had failed to explain how the objectors' corporate structure could be discerned from the EEO-1 reports' general job categories or provide sufficient "information pertaining to specific positions or departments." *CIR 1*, 424 F. Supp. at 777-779. This is a factual inquiry that depends on the circumstances of the particular company at issue, as Plaintiffs concede in criticizing the specificity of DOL's evidentiary showing on this issue. *See* Dkt. No. 39 at 22; *see also Kalbers v. D.O.J.*, 22 F.4th 816, 825 (9th Cir. 2021) (permitting intervention in Exemption 4 case where submitter's "knowledge about the confidentiality and

commercial nature of its records" was important); *Synopsys, Inc. v. U.S. Dep't of Lab.*, No. 20-16414, 2022 WL 1501094, at *2 (9th Cir. May 12, 2022). The declarations of the Bellwether Objectors are materially different from declarations in *CIR 1* and contain company-specific facts relevant to the *CIR 1* court's analysis. *See, e.g.*, Dkt. No. 34-4 (Allied Universal) ¶¶ 10-11, 30; Dkt. No. 34-5 (Brandenurg) ¶¶ 13-14; Suppl. Jasinowski Decl. ¶ 13, 15; Dkt. No. 34-7 (NMR Consulting) ¶¶ 12, 31-32; Dkt. No. 37 (Northshore) ¶¶ 8-9. Moreover, the five consecutive years of data at issue in this litigation creates additional factual considerations that were not presented or addressed in *CIR 1*. *See, e.g.*, Dkt. No. 34-5 ¶ 25; Dkt. No. 34-7 ¶ 33. Foreseeability of harm, where applicable, is likewise a company-specific issue; the Bellwether Objectors' declarations address the harm that each would each suffer if their documents were released, based on considerations specific to their individualized circumstances.[3] *See, e.g.*, Dkt. No. 34-7 ¶¶ 29-35; Dkt. No. 34-6 ¶¶ 19-29. Given these "separable" facts, collateral estoppel "does not govern the legal issues which recur in the second case." *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 601 (1948); *Reporters Comm.*, 613 F. Supp. 3d at 115.

Third, the scale and scope of the information presently sought dwarfs the number of reports at issue in *CIR 1*, significantly raising the stakes and implications of the current litigation. In *Lardner*, the court declined to apply collateral estoppel against the government in a FOIA case where the plaintiff sought the disclosure of over 7,000 clemency applicants, as compared to 141 applicants who were at issue in the initial case. *Lardner*, 638 F. Supp. at 22. *CIR 1* involved the EEO-1 reports for a single year for ten companies; the stakes here are greater by a factor of almost 1,700. But the implications of the potential release in this case are more significant than a simple multiplier can measure. Even for each individual company, the cumulative impact of the disclosure of five years creates additional risks. *See, e.g.*, Dkt. No. 34-5 ¶ 25; Dkt. No. 34-2 ¶ 26. "[D]iscrepancies in amounts at issue between two actions may make application of collateral estoppel inappropriate." *Eureka Fed. Sav. & Loan*, 873 F.2d at 233.

Fourth, offensive application of collateral estoppel is particularly inappropriate here because it

---

[3] The *CIR 1* court, moreover, did not hold that the foreseeable harm standard could never be satisfied with respect to EEO-1 reports, but rather that the requirement was generally applicable in Exemption 4 cases. 424 F. Supp. 3d at 780. The objectors in *CIR 1* did not assert that their information was protected by the Trade Secrets Act, and therefore DOL did not argue that the FOIA Improvement Act was inapplicable because disclosure was prohibited by another law outside of FOIA. This issue was thus not litigated in the prior action. *See* Dkt. No. 38 at 27-28 & n.10.

involves the interests of third parties with no connection to the prior litigation. DOL is not merely defending its own interests in this case (as it would under most other FOIA exemptions) but the interests of third-party submitters whose information was collected by the government. *See Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019) ("*ASBL*"). DOL should not be foreclosed from defending the interests of the 4,796 companies that were not before the court in *CIR 1*, and the confidentiality of their information should not be controlled by a case in which they had no involvement and could not have appeared. *See Eureka Fed. Sav. & Loan*, 873 F.2d at 233 ("it is inappropriate to apply collateral estoppel when its effect would be unfair"). Collateral estoppel has never been applied offensively to compel the disclosure of previously unreleased information; to do so here, in light of the unprecedented scale of the new requests, would be particularly inequitable.

Fifth, "there is 'more room for a second look when the issue is one of law than when a fact question is at stake.'" *Lardner*, 638 F. Supp. 2d at 23 (quoting *Nat'l Treasury*, 765 F.2d at 1177); *Af-Cap*, 475 F.3d at 1086. The Ninth Circuit and other courts of appeals "traditionally have permitted federal agencies to relitigate substantially identical legal issues raised by different transactions or events, after adverse decisions elsewhere." *Western Oil & Gas*, 633 F.2d at 808–09. Where "the 'legal atmosphere' has changed since the first suit, collateral estoppel is inappropriate." *Id.*, 633 F.2d at 808 (quoting *Sunnen*, 333 U.S. at 600). Changes in the rapidly developing post-*Argus Leader* Exemption 4 landscape counsel against application of collateral estoppel here. Prior to *Argus Leader*, Exemption 4 analysis generally focused on whether the government had satisfied the "substantial competitive harm test" required to establish confidentiality. Since *Argus Leader*, attention has shifted to the commercial prong of Exemption 4. In the four years since *CIR 1*, there have been developments in the law clarifying the commerciality standard, which may bear on the analysis in this case and which reflect the dynamic nature of this area of the law. *See, e.g.*, *Citizens for Responsibility & Ethics in Washington v. D.O.J.*, 58 F.4th 1255, 1262–63 (D.C. Cir. 2023) ("*CREW*"); *Sunoco Pipeline, L.P. v. U.S. Dep't of Transp.*, No. 21-cv-1760-TSC, slip op. at 6-7 (D.D.C. Sept. 29, 2023). Similarly, the scope and applicability of the FOIA Improvement Act of 2016 in Exemption 4 cases has developed significantly since *CIR 1*, which itself conflicted with a decision that this Court rendered just two weeks earlier. *See ASBL*, 411 F. Supp. 3d at 832; *see also Seife v. FDA*, 43 F.4th 231, 242 (2d Cir. 2022); *New York Times Co. v. F.D.A.*, 529 F. Supp. 3d 260, 288 (S.D.N.Y. 2021). In

1  urging this Court to depart from the foreseeable harm standard it articulated in *ASBL*, Plaintiffs themselves

2  acknowledge that "case law since *ASBL* has considerably developed." Dkt. No. 39 at 30 n.21.

3      In short, this is not an area in which the legal atmosphere has remained "substantially static."

4  *Sunnen*, 333 U.S. at 599. Precluding a "second look" at the legal issues underlying the *CIR* court's

5  decision would allow Plaintiffs, in a dynamic legal landscape, to lock in a single favorable result that

6  conflicts with other decisions on an issue of widespread interest, and would interfere with the development

7  of this important question of law. *See* Dkt. No. 34-3 ¶ 23 & Ex. E. In these circumstances, the parties—and

8  the thousand of companies that will be affected by this litigation—deserve a "'fresh determination of [the]

9  law.'" *Id.* (quoting Restatement (Second) of Judgments § 29 cmt. 1).

10      **B.**    **The EEO-1 Reports Were Appropriately Withheld Under Exemption 4.**

11      Exemption 4 protects "trade secrets and commercial or financial information obtained from a

12  person [that is] privileged or confidential." The exemption covers two broad categories of information: (1)

13  trade secrets, and (2) information that is commercial or financial and privileged or confidential. In its

14  motion, Defendant does not argue that the Bellwether Objectors' EEO-1 reports are protected as trade

15  secrets under Exemption 4; rather, Defendant's Exemption 4 argument is limited to the second prong,

16  applicable to commercial information. *See* Dkt. No. 38 at 13-25.  Plaintiffs' argument that the EEO-1 data

17  does not qualify as "trade secrets" under Exemption 4, Dkt. No. 39 at 17-18, is thus inapposite.

18      **1.**    **The EEO-1 Data Is Commercial Information.**

19      Plaintiffs acknowledge that Exemption 4's "commercial" requirement is governed by the ordinary

20  meaning of that term, and that the Ninth Circuit recognizes information as commercial "if it relates to

21  commerce, trade, or profit." *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1129 (9th Cir. 2007); *see* Dkt.

22  No. 39 at 19. The phrase "relates to" "has a broad scope and an expansive sweep." *Rodriguez-Valencia v.*

23  *Holder*, 652 F.3d 1157, 1159 (9th Cir. 2011) (cleaned up).

24      Plaintiffs state that the Ninth Circuit "narrowed" the definition of "commercial" in *Watkins v.*

25  *U.S.P.S.*, 643 F.3d 1189 (9th Cir. 2011), to encompass "only" records that relate to the "income-producing

26  aspects" of a company, Dkt. No. 39 at 19, but *Watkins* contains no such holding. The *Watkins* court found

27  the information at issue, which disclosed "intimate aspects of an importer[']s business such as supply

28  chains and fluctuations of demand for merchandise," to be "plainly commercial" even though it related to

possibly counterfeit goods. 643 F.3d at 1195. The court never suggested that the type of information at issue in that case defined the outer limits of the commerciality test, did not hold that "only" information that revealed "intimate aspects" of a business would be considered commercial, and provided no discussion or refinement of the commerciality standard whatsoever. Indeed, *Watkins* cites the D.C. Circuit's *Public Citizen* case for the proposition that "[t]he terms 'commercial or financial' are given their ordinary meanings." *Id.*, 643 F.3d at 1195 (citing *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C.Cir.1983)). In the cited passage, *Public Citizen* held that the "ordinary meaning" is not limited "to records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business" but extends to information in which submitters have a "commercial interest"—in direct contrast to the holding that Plaintiffs seek to ascribe to *Watkins*. *See Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006).[4]

Plaintiffs' argument that the EEO-1 data cannot be considered commercial under Exemption 4 because it is "too attenuated from the commercial aspects of the business," Dkt. No. 39 at 20-21, is predicated on a specious legal standard, belied by the opinions of Plaintiffs' own expert, contradicted by the undisputed evidence submitted by the Objectors, and inconsistent with a long line of cases pre-dating *Argus Leader*. First, although Plaintiffs claim this "attenuated" test is dictated by the "law of this Circuit," none of the cases they cite articulates this standard. As discussed above, *Watkins* incorporates *Public Citizen*'s "commercial interest" test. *Van Bourg* suggests that even an *Excelsior* list of employees eligible to vote in a union election could be considered commercial if the names were collected with an "express promise of confidentiality." *Van Bourg, et al. v. N.L.R.B.*, 728 F.2d 1270, 1272 (9th Cir. 1984). And *Carlson* stands for the unremarkable proposition that post office names, locations, and hours of operation do not have intrinsic commercial significance. *Carlson*, 504 F.3d at 1126.[5] This holding is consistent with

---

[4] Plaintiffs suggest that the broad "commercial interest" standard articulated by the D.C. Circuit in *Public Citizen Health*, *see* Dkt. No. 38 at 15, is "distinguishable" because that case dealt with "sales statistics and profits." Dkt. No. 39 at n.13. But the records at issue in *Public Citizen* were safety and efficacy data regarding medical devices. *Public Citizen*, 704 F.2d at 1283. Moreover, *Public Citizen*'s commercial interest test has been embraced by courts throughout the country in a variety of contexts. *See, e.g.*, *Baker & Hostetler*, 473 F.3d at 319; *Brown v. Perez*, 835 F.3d 1223, 1230 (10th Cir. 2016).

[5] Contrary to Plaintiff's characterization, Dkt. No. 39 at 19, the *Carlson* court never found that the information requested had a "putative commercial value." Rather, it held that the information was not "commercial in nature." *Carlson*, 504 F.3d at 1128, 1130.

the principle that not every bit of information submitted to the government by a commercial entity

qualifies for Exemption 4 protection; rather, the information will be considered commercial "if, 'in and of

itself,' it serves a 'commercial function' or is of a 'commercial nature.'" *Nat'l Ass'n of Home Builders v.*

*Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863,

870 (2d Cir. 1978)). The district court in *Starkey*, which Plaintiffs claim applied this "attenuated

connection" test, in fact embraced an expansive notion of confidentiality that encompassed information

only tenuously connected to the submitter's commercial interests.  *See Starkey v. U.S. Dep't of Interior*,

238 F. Supp. 2d 1188, 1195 (S.D. Cal. 2002) (basic data about groundwater quantities on a reservation was

commercial in nature, even though the landowners were not engaged in any commercial activities, because

"water is a precious, limited resource" and would affect the tribe's ability to negotiate its water rights").

But whatever standard is applied, the EEO-1 data requested by Plaintiffs squarely qualifies as

"commercial or financial information" because it relates directly to the commercial aspects of the

submitters' businesses.  First, the EEO-1 reports contain headcount data that is intrinsically commercial in

nature. *See* Dkt. No. 38 at 16-17; Supplemental Declaration of Patrick McKay ("McKay Suppl. Decl.")

¶¶ 3-9, 17. Plaintiffs' expert Dr. Bendick concedes this point: "A firm's workforce data are undoubtedly

'related to' the firm's commercial and financial data in one obvious, essentially definitional sense." Dkt.

No. 39-2 ¶ 15. He argues that the EEO-1 reports are not commercially valuable to competitors, however,

because they are "almost never the best source of information," *id.* ¶¶ 26-27, but this argument, even if it

were correct,[6] does not refute the direct connection between headcount and workforce composition data

and a company's basic commercial operations. The commerciality standard is a binary inquiry that does

not depend on the quantum of commercial value, much less the relative commercial value to *others*. *Cf.*

*Argus Leader*, 139 S. Ct. at 2365 (rejecting argument that "commercial or financial information [that is

privileged or confidential" covers only "information whose release would lead to substantial competitive

harm"). Rather, the test looks to "the character of the information" to determine whether it is, "in and of

itself," of a commercial nature. *See CREW*, 58 F.4th at 1265. The commercial nature of data is not

---

[6] Dr. Bendick's assumptions about the irrelevance of human resource management, the limited value of headcount and diversity data, and the availability of alternative sources of similar or better information, are not supported. McKay Suppl. Decl. ¶¶ 3-13, 16-20; Roberson Suppl. Decl. ¶¶ 3-6, 9-13; Jasinowski Suppl. Decl. ¶¶ 3-16; Baxter Suppl. Decl. ¶¶ 7-11.

"attenuated" simply because the same kind of data in other formats might be more useful to competitors. The multiple EEO-1 cases pre-dating *Argus Leader* recognize the inherent commercial nature of this headcount and workforce composition data, with each court concluding explicitly or implicitly that EEO-1 reports qualify as commercial for purposes of Exemption 4. Dkt. No. 38 at 17. Plaintiffs do not address and cannot distinguish this authority. The "attenuated connection" cases on which Plaintiffs rely address information that, unlike the headcount and diversity data here, has no inherent commercial significance. *Compare Pub. Citizen v. H.H.S.*, 975 F. Supp 2d 81, 105 (D.D.C. 2013) ("static" information about the identity of certain individuals held not to be commercial where "no defendant declarant has provided any information revealing how such information could be 'commercial'") *with Pub. Citizen Found. v. D.O.L.*, No. 18-cv-00117, 2020 WL 9439355, at *7 (D.D.C. June 23, 2020) ("Information about a business's 'number of employees and employee work-hours' directly pertains to 'labor costs and productivity.'").

Second, the diversity data is itself inherently commercial. *See* Dkt. No. 38 at 18; Suppl. Roberson Decl. ¶¶ 3, 6, 11, 15, 17. Dr. Bendick also concedes this point, acknowledging that "many firms use diversity data in designing and managing aspects of their internal operations." Dkt. No. 39-2 ¶ 33. That some firms may, according to Dr. Bendick, use the same diversity data that is captured in EEO-1 reports to prepare other reports that are tailored to specific operational needs does not somehow negate the inherent commercial nature of the data presented in the EEO-1 format. Roberson Suppl. Decl. ¶ 17. Whether or not the EEO-1 reports *themselves* are circulated is not the relevant question; the commerciality inquiry asks whether the information contained in those reports are "of a commercial nature." On this point, there is no disagreement. In any event, Dr. Bendick's assertion that EEO-1 reports themselves "are not generally even consulted in operational or financial decision-making," Dkt. No. 39-2 ¶ 12, is both unsupported by research and limited by his own reasoning to "[f]irms large enough to employee specialized HR staff." Roberson Suppl. Decl. ¶¶ 6, 16. Many firms do not have the resources to generate the specialized reports that he describes and rely on the EEO-1 data itself to provide this information to management. *Id.* ¶ 16; *see* Dkt. No. 34-7 ¶¶ 13, 16, 18; McKay Suppl. Decl. ¶ 13. Plaintiffs' position boils down to an assertion that the EEO-1 reports are not the best and latest version of information that they concede to be inherently commercial. While this argument, if accurate, might affect the competitive value of the information, it does not bear on the question of whether the requested information is of a commercial nature.

1    Plaintiffs' claim that the EEO-1 data is "too attenuated from the commercial aspects of the

2    business" also cannot be squared with the declarations submitted by the Bellwether Objectors. Each of

3    these declarations describes in detail how the EEO-1 reports contain information that relates directly to

4    their commercial operations, with reference to the individualized circumstances of their companies,

5    industries, and business models. *See* Dkt. No. 34-4 ¶¶ 7-12; Baxter Suppl. Decl. ¶¶ 2-7; Dkt. No. 34-5

6    ¶¶ 10-16; Jasinowski Suppl. Decl. ¶¶ 13-15; Dkt. No. 34-6 ¶¶ 7-10; Dkt. No. 34-7 ¶¶ 9-16. These

7    declarations are corroborated by Defendants' experts and by non-profit employer associations. Dkt. No.

8    34-1 ¶¶ 7, 14-15, 22; McKay Suppl. Decl. ¶¶ 16-18; Dkt. No. 34-3 ¶¶ 8-15, 20-21; Roberson Suppl. Decl.

9    ¶¶ 9-13; Declaration of Center for Workplace Compliance ("CWC Decl.") ¶¶ 20-23; Declaration of

10   Barbara Moskowitz ("IWE Decl.") ¶ 12.,15. Plaintiffs does not meaningfully challenge this showing.[7]

11   Their assertion that Defendants' declarations are "almost entirely comprised of conclusory assertions,"

12   Dkt. No. 39 at 22, is belied by the detailed explanations in the declarations themselves.

13   Citing the *CIR 1* court's decision, Plaintiffs suggest that the EEO-1 reports are a "non-commercial

14   formation" of workforce composition data because they were created for governmental reporting purposes

15   and do not correlate precisely to corporations' internal divisions. Dkt. No 39 at 21. This argument, which

16   posits that headcount data is commercial but headcount data by EEO-1 job categories is not, is internally

17   illogical, factually incorrect, and legally unsupported. *See* Dkt. No. 38 at 19-20. The combination of all

18   EEO-1 categories is the company's total headcount, a metric that itself is contained in the reports and that

19   has inherent commercial significance. McKay Suppl. Decl. ¶ 3. Moreover, it is the nature of the

20   information, not the format of the data or the purpose of its compilation, that is the relevant inquiry. *See*

21   *CREW*, 58 F.4th at 1265 (citing cases); *Critical Mass Energy Proj. v. Nuclear Regul. Comm'n*, 830 F.2d

22   278, 279-81 (D.C. Cir. 1987), *vacated on other grounds*, 975 F.2d 871 (D.C. Cir.1992) (en banc)

23   (information contained in nuclear plant safety reports generated to promote industry safety held to be

24   commercial). The information that populates these forms is headcount and workforce demographic data.

25

26   [7] Apparently quoting one of the Bellwether Objectors' declarations, Plaintiffs assert that one of
     the Objectors "admits" that the EEO-1 reports are vague and do not explain "resource allocation across
27   its segments." Dkt. No. 39 at 21. These statements are not contained in the cited declaration, however.
     *See* Dkt. No. 34-5 ¶¶ 25-26. To the contrary, that declaration describes in detail how the EEO-1 reports
28   contain significant information about Brandenburg's commercial operations. *Id.* ¶¶ 10-14, 25-26; *see
     also* Suppl. Jasinowski Decl. ¶¶ 13-14.

Even if the specific format of the EEO-1 report was designed for government reporting purposes, "governmental and commercial information are not mutually exclusive categories." *Forest County*, 278 F. Supp. 3d at 201. Information is routinely submitted to the government for a "governmental purpose," in the format and frequency dictated by official requirements, yet retains its commercial nature. In *Argus Leader*, for example, the store-level food stamp redemption data was provided to the government because it was "useful to its administration of the [food stamp] program." *Argus Leader*, 139 U.S. at 2363. By definition, all information subject to Exemption 4 has been submitted to the government and thus at some level serves a governmental purpose.

In any event, the *CIR 1* court's assumption that the EEO-1 categories are not meaningful indicators of a company's workforce stratification is contradicted by the evidence is inaccurate. These categories were not created "to evaluate discrimination," as Plaintiffs suggest, but correspond to existing job analytic categories. *See* Dkt. No. 34-1 ¶ 16. The Bellwether Objectors explain how these categories reflect meaningful distinctions within their specific business frameworks. *See*, *e.g.*, Dkt. No. 34-4 ¶¶ 10-13; Baxter Suppl. Decl. ¶ 4; Dkt. No. 34-7 ¶ 32; Suppl. Jasinowski Decl. ¶ 13. Companies also consider the EEO-1 classifications to have commercial relevance because their standardization allows companies to benchmark their own staffing patterns and demographics within and across industries. CWC Decl. ¶ 21.

This leaves Plaintiffs with only the "*Excelsior* list" cases to support their position. While Plaintiffs claim that courts have been careful "to avoid holding that employee information, like the information in EEO-1 Reports, is commercial," Dkt. No. 39 at 20, the "bare list" cases that they cite to support this assertion do not address "employee information" in general, and the narrow holdings in these cases have never been understood to extend broadly to all information that "concerns employees." Rather, these cases address the very specific, discrete issue of *Excelsior* lists—lists containing the names and addresses of employees eligible to vote in an union elections—and similar bare lists of individuals' names. *See Van Bourg*, 728 F.2d at 1272 n.4. As explained in Defendant's motion, the workforce demographic information in the EEO-1 reports is substantively different from a bare list of employee names because a person's identity, without more, has no commercial significance "in and of itself." Dkt. No. 38 at 11-12. Plaintiffs do not address this fundamental distinction or explain why the *Excelsior* cases should be extended to encompass information that is, in and of itself, of a commercial nature. The Second Circuit articulated this

precise distinction in *American Airlines v. Nat'l Mediation Board,* holding that the *number* of union authorization cards submitted for a union election was commercial information because "[l]abor unions, and their representation of employees, quite obviously pertain to or are related to commerce and deal with the commercial life of the country." 588 F.2d at 870. The court contrasted this quantification with the list of employee names and addresses in *Getman* because that list "in and of itself served no commercial function." *Id.* As the court concluded in *American Airlines*, these cases "are entirely inapposite." *Id.*

Finally, Plaintiffs propose that, notwithstanding clear precedent establishing that the ordinary meaning of "commercial" extends to information in which a submitted has a commercial interest, a narrower definition should be adopted here so that the business records of private contractors engaged in quasi-governmental activities will not be shielded from disclosure. *See* Dkt. No. 39 at 22 n.13. The headcount and workforce composition information at issue here, however, falls squarely within the core of Exemption 4's "commercial or financial" standard. Plaintiffs' desire for disclosure cannot justify their proposed departure from the ordinary meaning of the term, as enshrined in existing case law. *See Argus Leader*, 139 S. Ct. at 2366. Plaintiffs' suggestion "boils down to a policy argument about the benefits of broad disclosure," *id.*, which is an issue for Congress, not the courts, to consider.

## 2.    The Objecting Submitters' EEO-1 Reports Are Confidential.

### (i)    The EEO-1 Reports Are Customarily and Actually Treated As Confidential By The Bellwether Objectors.

DOL demonstrated, through detailed declarations from each of the Objecting Submitters, that their EEO-1 reports are customarily and actually treated as confidential. *See* Dkt. No. 39 at 22-23.  Plaintiffs do not meaningfully contest this showing. Instead, they argue that the records are not actually held confidential because the Bellwether Objectors "have published some kinds of EEO-1 data on their own websites or in annual reports." Dkt. No. 39 at 25. But Plaintiffs do not point to *any* EEO-1 data of these five Bellwether Objectors—other than the approximate total number of U.S. employees for DHL and Brandenburg, which they provided in their declarations and which they do not claim to be confidential— that is published by the companies or available through other sources.  Plaintiffs' attempt to demonstrate that the Bellwether Objectors' EEO-1 workforce data is readily ascertainable from other sources demonstrates the opposite: the information relating to Allied Universal that Plaintiffs claim to have

uncovered through a Google search does not contain any of the confidential data points disclosed in the EEO-1 reports. Suppl. Baxter Decl. ¶¶ 8-9. And the 23-page Dun & Bradstreet report that Dr. Bendick commissioned for Brandenburg, *see* Dkt. No. 39 at 30; Dkt. No. 39-2 ¶ 28, (1) is inaccurately summarized by Plaintiffs, Suppl. Jasinowski Decl. ¶¶ 6-7, 12; (2) contains inaccurate information about the company (with the exception of information that Brandenburg supplied itself), *id.* ¶¶ 4-11; and (3) does not report any diversity data, headcount across job categories, or trends. *Id.* ¶¶ 13-15. The EEO-1 reports contain 140 points of unique data, in addition to 38 cells of data for category and race/ethnicity totals and two cells for total number of employees (for the current and previous year). Dkt. No. 34-3 at 17.  From a confidentiality perspective, what is remarkable is not that several of the Bellwether Objectors have provided approximate employee totals, but that Plaintiffs were unable to uncover data for the remaining 178 cells.

Unable to mount a meaningful challenge to the Bellwether Objectors' customary and actual treatment of their EEO-1 reports, Plaintiffs assert that under *Argus Leader*, confidentiality can also be determined by "industry standards," and they proceed to argue that the "industry norm" is to disclose these reports. Dkt. No. 39 at 22-24. Plaintiffs are mistaken on both counts. First, Plaintiffs' proposed "industry custom" test was never "suggested" by the Court in *Argus Leader* and is contrary to its actual holding. *Argus Leader* held, unambiguously, that information is considered confidential under the "treated-as-private" prong where it is "both customarily and actually treated as private *by its owner*." 139 S. Ct. at 2366 (emphasis added); *see also id.* at 2363 ("In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, *by the person imparting it*.") (emphasis added). While Plaintiffs concede that the D.C. Circuit, contrary to the standard they are proposing, "has focused on the 'particular party['s]' treatment of the data," Dkt. No. 39 at 23, they fail to acknowledge that the *Argus Leader*  Court cited the D.C. Circuit's *Critical Mass* standard as "a much more traditional understanding of the statutory term 'confidential,'" and adopted this "traditional" test, in nearly identical language. *Argus Leader*, 139 S. Ct. at 2365. This traditional understanding explicitly denounces consideration of industry treatment. *See Center for Auto Safety v. National Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 17-18 (D.D.C. 2000) (under *Critical Mass*, courts "will consider how the particular party customarily treats the information, not how the industry as a whole treats the information"); *see also Center for Investigative Reporting v. U.S. Customs and Border Protection*, No. 18-

cv-2901-BAH, 2019 WL 7372663, at **12-13 (D.D.C. Dec. 31, 2019) (rejecting an attempt to establish confidentiality on the basis of "'how the industry as a whole treats the information'"). While testimony from industry representatives may be relevant *as a proxy* to evaluate how the submitters themselves treat the information where individualized proof is not possible, direct evidence from the submitters of their actual treatment is the gold standard under *Argus Leader*.

Plaintiff appears to infer an alternative standard from their assumption that the Supreme Court's reference to "the Institute's retailers" meant that the Court "considered an industry association's treatment of the information, in addition to the particular business[es]' practice." Dkt. No. 39 at 23. But the "Institute," the petitioner on appeal, intervened after trial. *Argus Leader*, 139 S. Ct. at 2362. The individual retailers whose injuries conferred standing on appeal were "the Institute's retailers." *See id.* The Supreme Court's summary of the trial testimony on this issue states only that "witnesses for the USDA testified that retailers closely guard store-level SNAP data." *Id.* at 2361. The Court's reference to "the Institute's Retailers," therefore, cannot be understood as countenancing an "industry standard" confidentiality test, much less one that could, as Plaintiffs suggest here, override proof of treatment "by its owner."

Nor has the Ninth Circuit adopted a standard that looks to customary treatment in the industry. In support of that assertion, Plaintiffs cite *Center for Biological Diversity v. Fish & Wildlife Serv.*, a case in which the Ninth Circuit explicitly declined to decide the confidentiality question, instead remanding to the district court for further development of the record. 802 F. App'x 309, 310 (9th Cir. 2020). The court in particular sought additional information *from the individual submitters* regarding how they "'customarily and actually' treat the commercial information as private.'" *Id.* There was no discussion by the Ninth Circuit of industry-wide treatment, and the court never considered "how other businesses 'customarily treat the type of data at issue'"; indeed, the "NABR members' declarations" that the court references were submitter-specific declarations, and the vast majority of businesses whose information was subject to the FOIA request had not objected to the release of the data. *Id.*; *see Ctr. for Biological Diversity v. Fish & Wildlife Serv.*, No. 16-cv-00527 (D. Ariz.), Dkt. No. 39 at 1-2, 6-8 (Defendant's Statement of Facts).

No case, in this Circuit or elsewhere, has held that evidence of "industry custom" can override individualized proof by the owner of information that it keeps its information private. In *Center for Investigative Reporting v. Dep't of Labor*, No. 18-cv-2414-DMR, 2020 WL 2995209 (N.D. Cal. June 4,

2020), the court *rejected* DOL's attempt to establish confidentiality through comments by trade groups and employers. 2020 WL 2995209, at *4. In that case, involving 237,000 annual injury summary forms submitted by employers to DOL, individualized declarations were not feasible due to the enormous quantity of submitters. And in this Court's *ASBL* decision, it observed in *dicta* and without elaboration that evidence regarding "other competitors who release the information" might "possibly" be relevant. *ASBL*, 411 F. Supp. 3d at 832.[8] While this Court did not further explain the circumstances in which such evidence might be entertained, it was perhaps contemplating a scenario in which the sincerity of the submitters' attestations of confidentiality was suspect. Those problems are not presented here, where DOL has submitted specific declarations from each of the Bellwether Objectors, describing in detail how (and why) they treat the information as private. To permit evidence of competitors' conduct to override individualized proof of the actual treatment by the submitters would contravene the holding in *Argus Leader* and paradoxically put veto power into the hands of those who might be most eager to learn a company's secrets. Even if "every other" company treats the information differently, evidence of competitors' conduct is not relevant if the evidence shows that the submitter itself did not publicly disclose the information. *See Wilson v. F.C.C.*, No. 21-cv-895, 2022 WL 4245485, at *9 (D.D.C. Sept. 15, 2022)

But in any event, Plaintiffs have not provided any evidence of competitors' practices, much less evidence that could undermine the conclusion that the Bellwether Objectors customarily and actually keep this information private. First, they have not submitted any industry-specific evidence. Federal contractors do not constitute a monolithic industry but rather "are a group of employers diverse in size, function, and geography," representing every corner of commercial life. CWC Decl. ¶ 9; IWE Decl. ¶ 7. Plaintiffs have made no evidentiary showing with regard to the Bellwether Objectors' specific industries. Nor have they rebutted the evidence submitted by Defendants that the Bellwether Objectors' competitors do not disclose this data. *See*, *e.g.*, Dkt. No. 34-4 ¶ 16; Dkt. No. 34-5 ¶ 11; Dkt. No. 34-7 ¶ 22.

Second, to the extent the statistics cited by Plaintiffs demonstrate any standard practice, it is the

---

[8] The court in *New York Times Co. v. FDA* cited this Court's dicta in *ASBL* but did not have occasion to consider whether or how evidence of competitors' treatment might be relevant because no such evidence was submitted in that case. 529 F. Supp. 3d 260, 285 (S.D.N.Y. 2021). And contrary to Plaintiffs' parenthetical, the court in *WP Co. LLC v. U.S. Small Bus. Admin.*, 502 F. Supp. 3d 1, 13 (D.D.C. 2020), did not cite *ASBL* or otherwise discuss evidence of industry standards.

opposite: that the overwhelming majority of companies *do not* disclose their EEO-1 data voluntarily, and only a tiny number of even the largest companies did so during the relevant time period. Dkt. No. 39-2 ¶ 13 (11% of the 1,000 largest firms disclosed their EEO-1 data in 2021, and only 4% did so in 2020); *see* McKay Suppl. Decl. ¶ 15; Roberson Suppl. Decl. ¶ 7. Even among those companies that did disclose their data, some published modified versions that masked the sensitive information. Roberson Suppl. Decl. ¶ 8. While Plaintiffs include the released EEO-1 reports in this lawsuit as part of this purported "industry norm," these companies either failed or chose not to object for a variety of reasons, and their conduct can neither be considered voluntary nor presumed categorically to indicate that these companies do not consider their EEO-1 data to be private. CWC Decl. ¶¶ 10-18; IWE Decl. ¶¶ 6, 20.  *Cf. Ctr. for Biological Diversity*, 802 F. App'x at 310 (remanding for consideration of confidentiality with respect to 32 objecting submitters after *Argus Leader* even though a large number of other submitters did not object to disclosure).

Third, the fact that some companies have disclosed their EEO-1 reports does not call into question the sincerity of the Bellwether Objectors' assertions that they actually and customarily treat their data as confidential. Each company's assessment of the need for confidentiality is industry-, context-, and circumstance-specific.  IWE Decl. ¶¶ 9-15; CWC Decl. ¶¶ 11-14, 18; Dkt. No. 34-2 ¶ 29; Roberson Suppl. Decl. ¶¶ 7; McKay Suppl Decl. ¶¶ 16.  In the wake of the racial and social unrest in summer 2020, some companies, especially larger, public-facing companies in certain industries, felt pressured to release the data by activist shareholder and institutional investors. IWE Decl. ¶¶ 9-11, 21; Roberson Suppl. Decl. ¶ 7; Dkt. No. 34-2 ¶ 30. The releasers tend to be larger companies with the resources and ability to provide additional context for the raw data to mitigate the potential harm from misinterpretation. CWC Decl. ¶ 12; Dkt. No. 34-2 ¶ 29. Each company has unique concerns that may inform their decision to release the reports or to keep them confidential. *See* Baxter Suppl. Decl. ¶¶ 5-6. The notion that "customary practices" can be inferred from the releases by some companies, or that they reflect a general consensus that EEO-1 report data is not confidential and does not need to be protected, cannot be squared with the varied and individualized circumstances of these releases.

        **(ii)**        **The EEO-1 Reports Were Provided Under an Assurance of Privacy**

Plaintiffs do not contest DOL's showing that the government has long promised the EEO-1 submitters that it will keep the information private, and that the Bellwether Submitters all understood that

1    the government would protect their reports.  Dkt. No. 38 at 23-25. Even assuming that the "assurance of

2    privacy prong" is appropriately applied in this case,[9] it is easily satisfied here, where the assurances were

3    clearly conveyed and understood. Plaintiff's suggestion that the qualification "to the maximum extent

4    permitted by law" somehow negates this assurance is both illogical (because an agency is always bound by

5    the law) and contrary to the case law. *See, e.g.*, *Cause of Action Inst. v. Exp.-Imp. Bank of the United*

6    *States*, No. 19-cv-1915 (JEB), 2022 WL 252028, at *19 (D.D.C. Jan. 27, 2022) (government will protect

7    "to the maximum extent permitted" is sufficient assurance); *New York Times*, 529 F. Supp. 3d at 286.

8            Nor does the possibility that disclosure may be required as a result of FOIA litigation defeat the

9    government's assurance of confidentiality. "If the possibility of disclosure under FOIA alone was enough

10   to defeat that privacy interest, no information could ever be protected under this exemption." *Friends of*

11   *Animals v. Bernhardt*, 15 F.4th 1254, 1264 n.7 (10th Cir. 2021) (rejecting argument that submitters waived

12   their privacy interest by submitting information on a form that stated that it "may be subject to disclosure

13   under FOIA"). DOL's consistent response to FOIA requests for EEO-1 reports has been to notify

14   submitters to give them a chance to object, and to withhold the reports under Exemption 4 where the

15   submitter has provided a sufficiently supported objection. Dkt. No. 34-3 ¶ 18. Plaintiffs acknowledge that

16   DOL's practice is to withhold the EEO-1 reports of objecting submitters, "adamantly defend[] contractors

17   opposing disclosure," and force direct FOIA litigation.  Dkt. No. 39 at 27; Dkt. No. 39-1 ¶¶ 3-4. Indeed,

18   DOL's efforts to protect EEO-1 data have resulted in the filing of multiple FOIA cases against DOL in

19   district court to compel the disclosure of EEO-1 reports. But DOL's responses to FOIA requests have

20   signaled to submitters that it is the agency's policy to deny FOIA requests.[10] DOL's conduct can be

21   directly contrasted with the agency's actions in *American Society for the Prevention of Cruelty to Animals*,

22

23          [9] This prong contemplates a hypothetical scenario where a submitter may functionally waive the
     confidentiality of the information by providing it to the government voluntarily and without an
     indication that it would be held confidential. *See CIR v. CBP*, 2019 WL 7372663, at *13 (noting that the
24   *Argus Leader* Court stopped short of imposing this second requirement, possibly because it intended "to
     treat involuntarily submitted information and voluntarily submitted information differently from one
25   another"). Some cases have declined to impose a blanket assurance of confidentiality requirement in every
     case.  *See WP Company*, 2021 WL 2982173, at *4. An involuntary submitter has not engaged in any
26   conduct that is inconsistent with an assertion of privacy, regardless of the government's assurances.

27          [10] That DOL has published the EEO-1 Reports of non-objecting contractors on its website does
     not undermine its assurances of confidentiality. DOL posted the EEO-1 data only of contractors that did
28   not object to its release. Without an objection to release, DOL has no legal basis to withhold the reports
     under FOIA.

1    in which the government "took the public position that [it] would *not* treat the [requested] information as

2    confidential," forced *reverse*-FOIA cases by the submitters, and defended those cases on the ground that

3    the information was *not* exempt under FOIA. *Am. Soc'y for Prevention of Cruelty to Animals v. Animal &*

4    *Plant Health Inspection Serv.*, No. 19-cv-3112, 2021 WL 1163627, at \*5 (S.D.N.Y. Mar. 25, 2021), *aff'd*

5    *on other grounds*, 60 F.4th 16 (2d Cir. 2023) (emphasis in original). Indeed, a "growing chorus" of

6    opinions in this area agrees that the "assurances of privacy" prong should only be invoked where the

7    government has affirmatively and publicly announced its intention to make the information public. *New*

8    *York Times*, 529 F. Supp. 3d at 287; *cf. Pub. Justice Found. v. Farm Serv. Agency*, 538 F. Supp. 3d 934,

9    942 (N.D. Cal. 2021). That is far from the case here.

10        **C.    The FOIA Improvement Act Does Not Compel Disclosure**

11            **1.    Disclosure is Prohibited by the Trade Secrets Act.**

12        Plaintiffs do not dispute that the foreseeable harm requirement is inapplicable where disclosure is

13    prohibited by the Trade Secrets Act ("TSA"). *See* Dkt. No. 38 at 27-28. Instead, they attempt to engraft

14    the test for "trade secrets" under Exemption 4 onto the Trade Secrets Act, and argue that the EEO-1

15    reports do not satisfy this "stringent" standard. Plaintiffs are mistaken; the TSA is much broader in scope,

16    and encompasses far more information, than the traditional notion of "trade secrets" contained in

17    Exemption 4. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151-52 (D.C. Cir. 1987); 18 U.S.C.

18    § 1905. Courts, including the Ninth Circuit, have held that the TSA is co-extensive with the *entirety* of

19    Exemption 4, including the "commercial or financial information" prong, not just the "trade secret" prong,

20    as Plaintiffs mistakenly suggest. *See Pac. Architects & Engineers Inc. v. U.S. Dep't of State*, 906 F.2d

21    1345, 1347 (9th Cir. 1990). Relevant to this dispute, the TSA specifically encompasses "confidential

22    statistical data . . . of any person, firm, partnership, corporation, or association." 18 U.S.C. § 1905. While

23    Plaintiffs argue that courts have "expressed opprobrium for the government's 'expansive interpretation' of

24    § 1905," Dkt. No. 39 at 18, neither of the cases that Plaintiffs cite discusses the TSA, much less offers a

25    contrary interpretation. *See CIR 1*, 424 F. Supp. 3d at 779; *CREW*, 58 F.4th at 1268. To be clear,

26    Defendants are not arguing that the TSA prohibits disclosure of information otherwise found to fall outside

27    of Exemption 4; rather, because the EEO-1 Reports here contain commercial information that may be

28    withheld under Exemption 4, the TSA prohibits their disclosure, regardless of any showing of foreseeable

harm. Plaintiffs are left with a superficial policy argument that, notwithstanding its facially unambiguous language, an interpretation of the TSA that encompassed "confidential statistical data," would be "dange[]rously expansive." Dkt. No. 39 at 18. To the contrary, the TSA represents "a uniform, comprehensive, and reasonable though perhaps stringent approach to discouraging unauthorized disclosures of private commercial and financial data entrusted to the Government. *CNA Financial*, 830 F.2d at 1151. Plaintiffs have offered no reasoned analysis to suggest it does not apply to the EEO-1 reports here. As such, disclosure is prohibited, regardless of any showing of foreseeable harm.

### 2.  The Agency's Conclusion of Foreseeable Harm was Reasonable.

In any event, DOL's prediction of reasonably foreseeable harm, from multiple vectors, was fully explained and fulsomely supported. *See* Dkt. No. 38 at 30-32. Plaintiffs do not even attempt to dispute most of these identified harms. First, Plaintiffs never address the harms to the governmental interests that DOL reasonably foresees, including the negative impact on contractors' cooperation with OFCCP's information collection efforts. *Id.* at 31-32. This is a paradigmatic example of foreseeable harm. *See Greenspan v. Bd. of Governers, Fed. Reserve System*, 643 F. Supp. 3d 176, 189 (D.D.C. 2022). Second, Plaintiffs ignore the concrete and individualized showing  in the Bellwether Objectors' declarations as to how disclosure would harm their specific economic interests, dismissing these concerns as "vague potential harms" involving "hiring practices and "retaining strategies." Dkt. No. 39 at 29. But the companies' explanations, based on their intimate knowledge of their own businesses, industries, and competition, offer detailed, individualized, and unrebutted descriptions of how other companies could use the EEO-1 data for their competitive advantage. *See, e.g.*, Dkt. No. 34-7 ¶¶ 31-32; Baxter Suppl. Decl. ¶¶ 5-6. These explanations provide ample support for DOL's conclusion of foreseeable harm. *See Greenspan*, 643 F. Supp. 3d at 189. While Dr. Bendick claims that the EEO-1 reports of limited value because better information is already available to competitors, his purported alternative sources did not provide any of the detailed EEO-1 data, much less the trend data that five years of reports would afford, and his conclusions are vigorously disputed by Defendants' experts. McKay Suppl. Decl. ¶¶ 13, 16-20; Roberson Suppl. Decl. ¶¶ 9-12. In the competitive industries in which the Bellwether Objectors operate, any incremental information provides insight that can be used for competitive advantage. McKay Suppl. Decl. ¶ 12, 17-18.  In any event, it is not necessary for the agency to predict *substantial* competitive harm;

1   it need only reasonably foresee that disclosure would cause some harm.

2        Third, Plaintiffs' assertion that "reputational injury" cannot be considered is supported only by

3   cases that were decided under the old substantial competitive harm rubric. None of those cases speaks to

4   whether reputational harm is relevant for purposes of the foreseeable harm inquiry. And indeed, courts

5   have specifically recognized reputational injury as a cognizable harm under the foreseeable harm standard.

6   *See*, *e.g.*, *Greenspan*, 643 F. Supp. 3d at 189 (damage to reputation included as one of the "textbook

7   articulations of foreseeable harm"); *WP Co.*, 575 F. Supp. 3d at 119. In any event, DOL linked the

8   concerns about increased scrutiny and criticism to concrete economic implications. Dkt. No. 34-3 ¶ 21.d.

9        Finally, Plaintiffs discount the damage to the confidentiality of the documents because the Title

10  VII provision criminalizing the disclosure of EEO-1 reports does not apply to OFCCP. But the point is that

11  a heightened sensitivity attaches to these documents, and their confidentiality has been recognized as

12  especially worthy of protection. Employers too have pledged to their employees that they would keep

13  these documents private. Releasing the reports would both destroy the special protection that these

14  documents have been deemed to warrant and undermine the trust of the employees.

15  **D.    The EEO-1 Reports Of Federal Contractors Not Subject To OFCCP Reporting Requirements Are Not Agency Documents.**

16

17       In the course of processing Plaintiffs' FOIA request, OFCCP's Department of Program Operations

18  ("DPO") determined that a number of EEO-1 reports that had originally been pulled as potentially

19  responsive in fact were submitted by entities that were not subject to OFCCP's EEO-1 reporting

20  requirement.  Ahaghotu Suppl. Decl. ¶¶ 18-23.  EEO-1 reports are collected by EEOC and OFCCP

21  through the Joint Reporting Committee, administered by the EEOC.  Dkt. No. 34-3 ¶ 9.  Pursuant to

22  regulation, only certain federal contractors are required to provide EEO-1 reports to OFCCP: those with 50

23  or more employees and a contract for $50,000 of more.  41 C.F.R. § 60-1.7(a).  The EEO-1 reports for

24  these contractors subject to OFCCP reporting are co-owned by EEOC and OFCCP.  While the EEOC has

25  from time to time transmitted some reports to OFCCP that do not meet these criteria, those documents are

26  not obtained under OFCCP's legal authority and are not owned or controlled by OFCCP.  Ahaghotu

27  Suppl. Decl. ¶¶ 7, 12-13.  As such, they are not "agency records." *Marzen v. U.S. Dep't of Health & Hum.*

28  *Servs.*, 632 F. Supp. 785, 802 (N.D. Ill. 1986), *aff'd on other grounds*, 825 F.2d 1148 (7th Cir. 1987)

1    (agency records do not include records obtained by a governmental agency without legal authority).  The

2    1,334 reports of the 621 contractors deemed not to be federal contractors subject to OFCCP's reporting

3    requirements were properly withheld for this reason.

4              **E.      Plaintiffs Are Not Entitled To Declaratory Relief.**

5              Citing what they claim to be DOL's "delays," Plaintiffs ask the Court for unspecified declaratory

6    relief "for DOL's FOIA violations."  Dkt. No. 39 at 23-24.  While it is unclear what purported FOIA

7    violations Plaintiffs are asserting as the basis for this relief, DOL has undertaken the immense task of

8    processing this large and complex request with diligence and due attention at every step.

9              Plaintiffs assert that DOL has "delayed at every juncture," but they indicate that it was the course

10   of DOL's processing, not the lack of an initial determination, that was improper. Dkt. No. 39 at 32. Indeed,

11   DOL complied with the requirement that it communicate a "determination" to Plaintiffs within the

12   statutory timeframe. A "determination" does not require that the agency produce the requested records but

13   rather that it indicate "the scope of the documents it will produce and the exemptions it will claim with

14   respect to any withheld documents." *CREW v. F.E.C.*, 711 F.3d 180, 189 (D.C. Cir. 2013).  The FOIA

15   request underlying this lawsuit, FOIA Request No. 872421, was finalized on June 3, 2022.[11]  In a June 15,

16   2022 letter to Plaintiffs, OFCCP confirmed its previously communicated position (first conveyed in 2019,

17   following the initial request for 2016 data) that it was required to provide notice to submitters and an

18   opportunity to object because the reports may be protected by Exemption 4.  Dkt. No. 35 at 210-11, 97.

19   On June 27, 2022, sixteen working days after the FOIA request was finalized, OFCCP communicated to

20   Plaintiffs that this notification would take place shortly; that following the objection period, OFCCP would

21   evaluate the objections submitted by contractors; and that OFCCP would then "disclose to CIR the EEO-1

22   data for all contractors that have not objected to disclosure."  Dkt. No. 35 at 212. OFCCP further informed

23   Plaintiffs that it would make an "independent assessment" of each written objection to determine whether

24   the information should be withheld under Exemption 4." *Id.* These communications satisfy the

25

26        [11] While Plaintiffs submitted an initial version of this FOIA request—for the 2016 EEO-1 reports
     only—on January 10, 2019, that request remained in flux over the following two and a half years, with
27   Plaintiffs adding, withdrawing, and combining their various requests, until Request No. 872421 was
     amended for the final time, with Plaintiffs' agreement, on June 3, 2022, to create a single consolidated
28   request for all EEO-1 reports from 2016 through 2020.  *See* Dkt. No. 35 ¶¶ 5-6, 9, 17-18, 20-21; *id.* at
     104, 111.  The 2019 and 2020 reports were requested for the first time on June 2, 2022.  *Id.* at 104.

1    requirement that the agency inform Plaintiffs of the scope of documents it intended to release and the

2    exemptions it would claim with respect to withheld documents.

3        Following the finalization of Plaintiffs' requests, DOL undertook to notify the nearly 25,000

4    contractors of the FOIA requests, following the mandatory predisclosure procedure set forth in its

5    regulations. *See* 29 C.F.R. § 70.26. Any argument that DOL's invocation of the predisclosure procedure

6    was itself a violation of FOIA is not tenable. DOL's regulations require that it provide notice to submitters

7    whenever it "has reason to believe that the information requested under the FOIA may be protected from

8    disclosure under Exemption 4." 29 C.F.R. § 70.26(d)(2). DOL's position was reasonable; the "standard for

9    triggering mandatory predisclosure notification is obviously much less burdensome than the standard for

10   justifying an ultimate withholding of information under Exemption 4." *OSHA Data/CIH, Inc. v. U.S. Dep't*

11   *of Lab.*, 220 F.3d 153, 167 (3d Cir. 2000). While Plaintiffs took the position that the *CIR 1* decision was

12   "binding authority" compelling disclosure, Dkt. No 35 at 76, that earlier decision compelled only the

13   disclosure of the ten specific 2016 EEO-1 reports before that court.  Moreover, DOL's administrative

14   processing of FOIA requests is not governed by the law of this District, and even if it were, "'[a] decision

15   of a federal district court judge is not binding precedent in either a different judicial district, the same

16   judicial district, or even upon the same judge in a different case.'" *Camreta v. Greene*, 563 U.S. 692, 709

17   n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], at 134–26 (3d ed. 2011)).

18        Finally, to the extent that Plaintiffs are asserting that DOL unnecessarily delayed the processing of

19   the FOIA request by extending the objection period for contractors, they have not established a violation

20   of  FOIA, much less any entitlement to declaratory relief. Following a "determination" to release records,

21   the agency may require additional time to process the documents for production; FOIA directs the agency

22   to make the records available "promptly." 5 U.S.C. § 552(a)(6)(C)(i); *see CREW*, 711 F.3d at 188-89.

23   Even extended processing periods will not warrant relief where there is "'no indication that [the agency]

24   deliberately caused needless delay'" and the parties "'engaged in frequent communications' regarding how

25   to best respond to [the requester's] comprehensive FOIA request." *See Ecological Rts. Found. v. U.S.*

26   *Env't Prot. Agency*, No. 22-15936, 2023 WL 4342100, at *4 (9th Cir. July 5, 2023). Moreover, in

27   "exceptional circumstances, the agency may continue to process the request, and the court (if suit has been

28   filed) will supervise the agency's ongoing progress, ensuring that the agency continues to exercise due

diligence in processing the request." *CREW*, 711 F.3d at 189; 5 U.S.C. § 552(a)(6)(C).

There is no evidence of "needless delay" in this case; to the contrary, DOL worked diligently and devoted considerable resources to complete the processing of the FOIA request. The processing of the request, including the notification process, confirmation of the list of non-objecting contracts, and evaluation of objections, was a massive undertaking requiring the creation of new systems, the involvement of numerous DOL employees from multiple components, and the participation of a number of outside contractors specifically engaged for this purpose. *See* Dkt. Nos. 19, 21, 23; *cf. OSHA Data*, 220 F.3d at 156-57 (estimating that notifying 80,000 establishments and reviewing objections would cost $1.7 million). While DOL initially sought to notify submitters through publication in the Federal Register and its website and through emails, it soon became apparent that many contractors had not received notice of the intended release of their documents.  Dkt. No. 21 at 2-3; Dkt. No. 35 at 126-28.  At the same time, DOL received numerous requests from contractors that they needed additional time to allow them a reasonable opportunity to object, and it extended the objection period in part due to concerns about the inadvertent release of non-federal contractor data. To ensure that its list of non-objectors was correct before releasing their reports, DOL mailed a notice to all submitting contractors, with a final response date of March 31, 2023.  Dkt. No. 23 at 2. Three weeks after the final objector response date, on April 17, 2023, DOL provided a release of 56,419 EEO-1 reports. OFCCP completed its initial evaluation of the objections on July 5, 2023, and withheld 16,755 EEO-1 reports under Exemption 4. Dkt. No. 35 ¶ 64.

Throughout this process, DOL provided updates to Plaintiffs regarding the status of the notification and objection process, the reasons for the extensions of the objection deadlines, and the anticipated dates of release. Despite the monumental undertaking that the notification and objection process required and the many obstacles that DOL needed to overcome, it was able to complete the release of over 50,000 responsive, non-exempt EEO-1 reports in under a year. While Plaintiffs complain that DOL "further delayed its own objection deadlines," Dkt. No. 39 at 24, it does not challenge DOL's explanation for why these extensions were necessary or otherwise explain why the schedule was unreasonable. *Cf. Ecological Rts. Found. v. U.S. Env't Prot. Agency*, 607 F. Supp. 3d 979, 1005 (N.D. Cal. 2022), *aff'd*, No. 22-15936, 2023 WL 4342100 (9th Cir. July 5, 2023) (denying relief, even though the production "could have been more prompt," where the agency kept plaintiff "up to date on the ongoing search and provided updates on

1    estimated completion dates as well as rolling productions").

2         Moreover, the scope of the FOIA request, and the challenges associated with notifying 25,000

3    entities and processing over 2,500 objections qualify as "exceptional circumstances" that entitled DOL to

4    "additional time to complete its review of the records" under Section 522(a)(6)(C)(i). Indeed, the

5    processing timeline was fully presented to the Court in three case management statements submitted

6    while these efforts were underway, *see* Dkt. Nos. 19, 21, 23, and the dates and deadlines, including the

7    April 17, 2023 release date, were discussed with the Court at the April 13, 2023 case management

8    conference. *See* Nos. 25, 26 ¶ 1.

9         In any event, a technical violation of the FOIA deadlines alone does not warrant declaratory relief;

10    Plaintiffs must also allege and prove a "pattern and practice" of violating these time limits, *see Long v.*

11    *I.R.S.*, 693 F.2d 907, 910 (9th Cir. 1982), or that the agency "has repeatedly and substantially violated the

12    time limits, and it is possible the violations will recur with respect to the same requesters." *Our Children's*

13    *Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1090 (N.D. Cal. 2015). Plaintiffs have

14    not asserted a "pattern and practice" claim in this action, *see* Dkt. No. 1 at 13-14, and they have neither

15    established repeated violations—they point only to DOL's response to the request in this case—nor

16    provided any "indication that any violations of the FOIA's time limits are likely to recur with respect to

17    Plaintiffs' request at issue." *See Nat'l Pub. Radio, Inc. v. U.S. Cent. Command*, 646 F. Supp. 3d 1245,

18    1257–58 (S.D. Cal. 2022). Nor do they contest that their FOIA request presented unique processing

19    challenges that OFCCP did not anticipate and had not previously encountered.

20         In the final analysis, it appears that Plaintiffs' primary complaint is that DOL considered the

21    interests of the submitting contractors in protecting their confidential information in addition to Plaintiffs'

22    interest in the immediate release of the requested information. But FOIA's "exemptions are as much a part

23    of FOIA's purposes and policies as the statute's disclosure requirements." *Argus Leader*, 139 S. Ct. at

24    2366 (cleaned up). DOL should not be penalized for its diligent and good faith efforts to execute its duties

25    under this statutory scheme.

26  **III.**    **CONCLUSION**

27         For the foregoing reasons, Defendant respectfully requests that the Court grant summary

28    judgment in its favor and deny Plaintiffs' cross-motion.

1    DATED: November 13, 2023                    Respectfully submitted,

2                                                ISMAIL J. RAMSEY
                                                 United States Attorney
3
                                                 */s/ Pamela T. Johann*
4                                                PAMELA T. JOHANN
                                                 Assistant United States Attorney
5
                                                 Attorneys for Defendant UNITED STATES
6                                                DEPARTMENT OF LABOR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28