UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, <br><br> Defendant. | Case No. 3:22-CV-07182-WHA <br><br> **Declaration of Barbara L. Moskowitz** |

### DECLARATION OF BARBARA L. MOSKOWITZ

I, Barbara Moskowitz, state as follows:

1.      I submit this declaration in support of the United States Department of Labor's ("DOL" or "Defendant") Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment in the above captioned matter. I have personal knowledge of the following facts and I could competently testify.

2.      I am the Director of The Institute for Workplace Equality, and my responsibilities include the continued provision of critical updates on federal contractor obligations and the expansion of The Institute's programs and services to assist employers in complying with their legal workplace obligations. I work closely with employer members as well as The Institute's Co-founders, Counsel, the Advisory Board, and national Faculty. I am also a Co-Chair of the Colorado Industry Liaison Group, as well as a Co-Chair for the Sponsorship Committee for Industry Liaison Group National Conferences. I have extensive experience and expertise in human resources and legal compliance matters prior to the Director position. Before to joining The Institute, I was an AVP and compliance consultant for Wells Fargo's Regulatory Compliance

Risk Management team. During my 21 years with Wells Fargo, I also managed the Affirmative Action & EEO program, including related OFCCP audits and corporate management reviews, and held several HR positions, including an HR controls compliance consultant and an HR Generalist. I graduated from the University of Denver with an M.S. in HR Strategic Management and HR Employment Relations, and from the University of Colorado with a B.A. in Sociology. In my capacity as Director of The Institute, I have knowledge and insight into how employers handle their EEO-1 Reports.

3.  The Institute is a national non-profit employer association based in Washington, D.C. The Institute's mission includes the education of federal contractors regarding their affirmative action, diversity, and equal employment opportunity responsibilities. Members of The Institute are senior corporate leaders in EEO compliance, compensation, legal, and staffing functions who represent many of the nation's largest and most sophisticated federal contractors. The Institute's Faculty are recognized as leading practitioners in the field.

4.  There are currently forty-four Institute corporate members coming from a wide range of industries including finance, tech, manufacturing, hospitality, defense, pharmaceutical, health care, higher education, insurance, energy, food and beverage and commercial outsourcing. As part of their membership, these organizations share information and concerns with The Institute and with other members on EEO compliance, compensation, legal and staffing.

5.  As part of my responsibilities at Wells Fargo, I was familiar with the collection and submission of data for EEOC's EEO-1 Report. As Director of The Institute, I have held discussions with Institute members in our meetings as to their practices with respect to confidential employee data. We have specifically discussed whether and why they plan to publish their EEO-1 Reports prospectively. All of The Institute's members are required to file

EEO-1 Reports as they are either federal contractors, have more than 100 employees or both. Only those members who are federal contractors are subject to this lawsuit as any release of EEO-1 Reports by EEOC would subject the individual who released them to criminal penalties.[1]

6. As Director of The Institute, I raised the issue of the release of EEO-1 Reports with our Advisory Board and with our members. Based on those conversations it is clear that some of our members are now releasing some or part of the data on their EEO-1 Reports. Other Institute members have not released their data for various reasons discussed in Paragraph 12 below. The wide variety of approaches taken by federal contractors to releasing their EEO-1 Reports reinforces that whether, how, and when the confidential EEO-1 Reports should be released is an individualized decision, based on factors specific to each company, and varies based on the facts and circumstances of each individual federal contractor.

7. It is important to understand that federal contractors, including those Institute members who are federal contractors, come from every part of the economy and represent every type of industry with different customs, concerns and experience.

8. As a former Human Resources professional and as Director of The Institute, I am aware that corporations treat all individualized human resources data as confidential, limiting the number of individuals who have access to such data. Additionally, aggregated data regarding the demographic composition of the workforce, such as that in the EEO-1 Reports, is generally maintained even more securely with fewer employees having the ability to access that data.[2]

---

[1] Section 709(e) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-8(e), as amended (Title VII).
[2] In fact, the limited access to race/ethnicity and gender data even internally in corporations continues to be a bone of contention between corporate compliance groups and their Diversity, Equity & Inclusion (DEI) colleagues who prefer broader access to this data.

9. Historically, all corporations, including Institute members, did not publicly release their EEO-1 Report or the data contained in those reports. We have seen some changes in recent years. Now, although most companies still do not disclose their EEO-1 data, some companies, and particularly some larger, public-facing companies, have released some form of this information, and in some cases the full EEO-1 Report themselves, as explained in the following paragraphs.

10. After George Floyd's murder in 2020, large public corporations including some Institute members were pressured by shareholder proposals from activist shareholders, including the City Comptroller of New York City, and some agreed to publish their EEO-1 Reports prospectively.[3] It is my understanding that without this pressure, many would not have published their EEO-1 Reports.

11. Although the pressure from institutional investors and shareholder proposals has increased the number of corporations releasing EEO-1 data prospectively, which corporations disclose EEO-1 Reports varies widely by industry.[4] While tech companies and utility companies are most likely to release demographic data including EEO-1 Reports, industries in Basic Resources (such as oil and gas) and Telecommunications are less likely to release such data.

12. I understand from Institute members who have not released their EEO-1 Reports that they have not done so because they consider the information provided to the EEOC to be confidential and because they believe the data could be used by others to the companies'

---

[3] One Diversity Initiative Companies Aren't Backtracking On, *Bloomberg Law News*, Sept. 25, 2023.
[4] *See* Just Capital Report, January 19, 2021, cited in Declaration of Marc Bendick, https://justcapital.com/news/a-small-fraction-of-corporations-share-diversity-data-but-disclosure-is-rapidly-on-the-rise/ ("EEO-1 Report disclosure is heavily concentrated among companies in the technology industry, where 24 companies make up nearly half of all disclosures").

competitive disadvantage. Specifically, since this FOIA request would release five years of EEO-1 data from which competitors could determine business trends, Institute members are concerned that the workforce numbers in different positions would reveal confidential internal operational decisions as to staffing; that EEO-1 data diversity numbers could be misconstrued harming recruiting and performance; and that having to releasing the confidential data could hurt employee relations because it will break the commitment to keep this data confidential.

13. Many corporations which have released EEO-1-type data have done so through percentages, not actual numbers. The specific counts of employees in the EEO-1 Reports by EEO-1 Job Category and demographics provide more information about a company's workforce than percentages of workforce frequently included when reporting diversity numbers. The specific numbers in the EEO-1 Report are more commercially sensitive than the diversity percentages most companies report publicly. For example, the counts of the number of employees in the EEO-1 can be used to calculate ratios between the ten EEO-1 Job categories and provide insights into the relative size of the salesforce versus the company overall, or the ratio of Managers to Professionals which can be an indicator of the management span of control and provide insight into the cost structure of a business. This is why many employers in general, and Institute members in particular, publish only percentages of certain workforce demographics. Similarly, year over year changes in the counts of employees by EEO-1 Job Category provide sensitive information about changes in staffing/cost structure.

14. The importance of this distinction between the employee counts in an EEO-1 report and the percentages used by most employers is recognized by the Global Reporting Initiative (GRI). They are the provider of the world's most widely used sustainability disclosure standards which cover topics that range from biodiversity to tax, waste to emissions, diversity

and equality to health and safety. As such, GRI reporting is the enabler for transparency and dialogue between companies and their stakeholders.[5] The GRI 405-1 standard specifically calls for the use of percentages of employees instead of counts.[6] The use of percentages strikes an appropriate balance between disclosing the demographic composition of the workforce while enabling employers to keep confidential precise counts of employees by EEO-1 Job Category which are commercially sensitive.

15. As a general matter, Institute members who voluntarily released their EEO-1 Reports in full, including those who have done so in response to shareholder and other external pressure, are careful to provide context to the data, as the raw data can be misinterpreted in ways harmful to their business. The raw data in EEO-1 Reports can be misleading and without proper context and understanding of a variety of complex market conditions can be misconstrued to paint an inaccurate picture of a company's diversity efforts. The raw data can also be misleading because availability based on race and gender can be very different depending on where the company is located. In addition, any analysis of EEO-1 Reports could misrepresent the actual diversity of the members' workforce. This is another reason that the GRI standards described in Paragraph 14 suggest the use of percentages by employee category rather than the counts by EEO-1 Job Category.

16. Our members have made it clear that they provide the EEO-1 data to EEOC under the expectation that the data will be protected as confidential under Title VII and FOIA's Exemption 4. Currently, our Institute members submit their EEO-1 Report directly to the EEOC

---

[5] More information on the GRI is available at: https://www.globalreporting.org/.
[6] GRI is the Global Reporting Initiative and 405-1 is the global standard for ESG reporting which can be viewed here on page 6.

through its portal.[7] The EEOC then shares the collected data for federal contractors subject to OFCCP jurisdiction directly with OFCCP. Former OFCCP Director and current Institute Faculty member Craig Leen who signed the most recent Memorandum of Understanding among EEOC, the Department of Labor, and the Department of Justice ("MOU")[8] has told The Institute that he believes the confidentiality provisions in Section 5 in the MOU strengthen the agency's obligations to protect the EEO-1 data. This position is reinforced by the FAQ on how to handle the confidentiality of EEO-1 data which requires the agency to determine whether Exemption 4 of FOIA will apply to federal contractors' EEO-1 Reports on a case-by-case basis.[9]

17. The Institute members who expected the EEO-1 data to be kept confidential were surprised and dismayed that their EEO-1 Reports could be made public without an individualized assessment of the facts and circumstances specific to each company. They consider the efforts of CIR to access all federal contractors' EEO-1 Reports as though FOIA Exemption 4 does not exist as an "end-run" around the requirements of both the Civil Rights Act of 1964 and FOIA.

18. The efforts of CIR to eliminate the ability of federal contractors to protect their EEO-1 Reports from being released under FOIA Exemption 4 places federal contractors at a substantially significant competitive disadvantage as compared to their competitors which are not federal contractors.

---

[7] This is a change from the process cited in *Sears Roebuck & Co. v. Gen. Servs. Admin*, 509 F. 2d 527, 529 (D.C. Cir. 1974) when the data was collected under Executive Order 11246 as OFCCP no longer collects the EEO-1 Report jointly with OFCCP but rather receives the data from EEOC after EEOC collects it. *See* EEOC website at https://www.eeocdata.org/eeo.
[8] *See* 2020 Memorandum of Understanding among US Department of Labor, the Equal Employment Opportunity Commission and the Department of Justice, https://www.eeoc.gov/memorandum-understanding-among-us-department-labor-equal-employment-opportunity-commission-and-us.
[9] OFCCP FOIA FAQ 6--How does OFCCP determine to release or withhold EEO-1 data, https://www.dol.gov/agencies/ofccp/faqs/foia#Q6.

19. In response to CIR's FOIA requests for contractors' 2016-2020 EEO-1 Reports, some of the Institute members did not submit formal objections to OFCCP, as discussed in Paragraph 21 below. Many Institute members did object, however. Even some of the corporations that have agreed to release certain diversity data prospectively, including in some cases their EEO-1 Reports, objected to the release of their EEO-1 Reports in response to CIR's FOIA request as the request is for five years of data, which will provide competitors and others with trend data that could be commercially harmful.

20. The Institute members who decided not to object to the release of their EEO-1 Reports customarily keep this information confidential. Nevertheless, they made the decision not to object to the release for a number of different reasons. Many cited the expense in challenging the release while others have explained that they did not receive notice of the requests in time to submit objections. These non-objectors do not consider themselves to have released their reports voluntarily.

21. The trend toward voluntary disclosure of diversity information, as discussed in Paragraphs 10 to 14 above, now appears to be slowing, with recent developments in the legal climate (including the *Students For Fair Admissions* case) and public opinion. Based on these developments, including the litigation against corporate diversity, equity and inclusion programs, Institute members are increasingly concerned about public scrutiny and litigation over their attempts to increase and maintain diversity.[10] Even those Institute members who previously

---

[10] For example, one of the most active conservative groups—Steven Miller led AFL -- has filed complaints seeking to have the EEOC investigate companies' alleged discriminatory DEI programs. Although the complaints are not public, AFL reports that it has filed complaints against Activision/Blizzard, Alaska Air, Anheuser-Busch, DICK'S Sporting Goods, The Hershey Company, The Kellogg Company, Lyft, Major League Baseball, Mars, McDonald's Corporation, Morgan Stanley, Nordstrom, Inc., Salesforce, Starbucks, Unilever, and Yum! Brands. Additionally, Advocacy groups, including the American Civil Rights Project ("ACRP"), have

agreed to release their EEO-1 Report (or did not object to the release of the reports) are concerned about the consequences of this release. Those Institute members who have not released their EEO-1 Reports are even more concerned about the potential harm that could result from the public availability of this raw data.

    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

    Executed this 10th day of November, 2023, at 4:00 PM Central.

*Barb L. Moskowitz*

_____

---

sent threat letters to corporations and their boards, claiming that the legal risk associated with DEI programs threatens stockholders' value. ACRP has publicly announced that it sent letters to the boards of American Airlines, Coca-Cola, Levi Strauss & Co., Lowe's, McDonald's, Novartis AG, and Pfizer.