UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>Defendant. | Case No. 22-cv-07182-WHA<br><br>**DECLARATION OF THE CENTER FOR WORKPLACE COMPLIANCE IN SUPPORT OF DEFENDANT DEPARTMENT OF LABOR'S OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT** |

I, Danny E. Petrella, state as follows:

1.  I serve as Senior Vice President, Compliance, and Assistant General Counsel to the Center for Workplace Compliance ("CWC"). I submit this declaration on behalf of CWC in support of the United States Department of Labor's Opposition to Cross-Motion for Summary Judgment in the above-captioned matter. I have personal knowledge of the following facts and if called to testify, I could and would competently testify thereto.

Professional Background

2.  I serve as an elected officer to the Center for Workplace Compliance, formerly known as the Equal Employment Advisory Counsel. I am also an attorney and partner with the law firm NT Lakis, LLP. My practice focuses on leveraging both legal and practical experiences to develop solutions to the daily challenges employers face under a myriad of labor and employment laws, with a particular emphasis on the nondiscrimination and affirmative action requirements enforced by the Labor Department's Office of Federal Contractor Compliance Programs ("OFCCP"). I have 18 years of professional experience counseling and representing employers on matters before the OFCCP, the Equal Employment Opportunity Commission ("EEOC"), the National Labor Relations Board, and many other

federal, state, and local workplace regulatory and enforcement agencies. This experience includes providing regular advice and counsel regarding compliance with the Employer Information ("EEO-1") Report.

<u>The Center for Workplace Compliance</u>

3. Founded in 1976, the Center for Workplace Compliance ("CWC") is the nation's leading nonprofit association of employers dedicated exclusively to helping its members develop practical and effective programs for ensuring compliance with fair employment and other workplace requirements. CWC's membership includes approximately 200 major U.S. employers, collectively providing employment to millions of workers.

4. CWC's directors and officers include many of industry's leading experts in the fields of fair employment, workplace compliance, and risk management. Their combined experience gives CWC a unique depth of understanding of the practical, as well as legal, considerations relevant to the proper interpretation and application of workplace rules and regulations.

5. All CWC member companies are employers subject to the federal employment nondiscrimination statutes enforced by the EEOC and are required to file EEO-1 Reports each year. The vast majority are also federal contractors subject to the nondiscrimination and affirmative action obligations imposed by Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veterans' Readjustment Assistance Act, and their implementing regulations.

6. CWC has a long track record of working closely with the EEOC to ensure that the EEO-1 Report maintains its relevance and utility to both the Commission and the employers who must file it. Indeed, over the years, CWC has many times been the only organization to submit public comments in response to the EEOC's invitations for stakeholder input on the burdens and utility of the EEO-1 Report under the Paperwork Reduction Act (*See, e.g.*, the supporting documents maintained by the Office of Management and Budget related to EEOC's <u>2014</u>, <u>2011</u>, and <u>2009</u> information collection requests for approval of the EEO-1 Report.). And, for more than three decades, we have regularly communicated less formally with Commission staff in an attempt to resolve practical concerns regarding the EEO-1 reporting process in ways that facilitated timely and compliant reporting.

7. The overwhelming majority of CWC's membership consist of employers that are subject

to the Freedom of Information Act ("FOIA") request from Will Evans and the Center for Investigative Reporting (CIR) seeking "all Type 2 Consolidated Employer Information Reports, Standard Form 100 (EEO–1 Report), filed by federal contractors from 2016–2020," and were informed of this matter following the OFCCP's August 19, 2022 *Notice of Request Under the Freedom of Information Action Act for Federal Contractors' Type 2 Consolidated EEO-1 Report Data* (87 Fed. Reg. 51,145).

8.  Dozens of CWC member employers filed objections with OFCCP in response to the above-referenced FOIA request. And yet, dozens of other CWC member employers elected *not to file an objection*, and their EEO-1 data have since been released by the OFCCP. Having engaged in detailed discussions with both groups of employers over the past year, CWC is uniquely qualified to comment on this matter, and we feel that the court can benefit from understanding the varying perspectives within each of these employer groups.

<u>Employers Whose Data Have Been Released</u>

9.  As a threshold matter, we respectfully disagree with the notion offered by the Plaintiffs that "industry standard is to disclose EEO-1 data" (Plaintiffs' Cross-Motion, Dkt. No. 39 at 23). First, federal contractors do not reflect a single "industry," but rather are a group of employers diverse in size, function, and geography, spanning multiple industries within the North American Industry Classification System ("NAICS"). Indeed, the EEO-1 dataset released by the OFCCP thus far in this litigation reveals employers identified in over eight hundred (800) unique NAICS designations.

10. Second, we disagree with Plaintiffs' assumption that "customary practices" can be inferred from the fact that some employers reveal their diversity data while others did not file an objection with OFCCP. Employers that did not file an objection with the OFCCP in the instant matter did so for a variety of reasons.

11. For example, some employers (a minority, even among our membership of large employers) already release their consolidated "Type 2" EEO-1 Reports each year, at times voluntarily, and other times in response to increasing pressure from shareholders, advocacy groups, and media entities.

12. Employers who disclose their consolidated EEO-1 Reports often do so while providing additional context to the data in those reports, such as part of a larger discussion regarding the

DECLARATION OF THE CENTER FOR WORKPLACE COMPLIANCE
No. 22-cv-07182-WHA                                3

company's diversity challenges and successes, and by contrasting their data against the aggregate EEO-1 data of their respective industries. Providing this context takes employers time and often considerable resources that are not enjoyed by all employers.

13. In releasing these reports, employers often redact sensitive information, such as the personal contact information of the employer's certifying official, and small headcounts that could be used to identify the race, ethnicity, and gender of at least some individual employees. This is particularly true in all instances where a specific "cell" on an EEO-1 Report – that is, a specific race, ethnicity, gender, and EEO-1 job category – displays a small number such as one (1) or two (2). In these cases, anyone reviewing the disclosed information would be able to identify confidential race, ethnicity, and gender information of employees simply by cross-referencing other publicly available information about these employees' jobs, such as information that is available on social media sites.

14. Other employers do not release the headcount for each job group and demographic category, but instead provide the percentage of employees that are included within each category as a way of mitigating the harm of releasing the precise headcount from each category.

15. Still, prior to the instant litigation, a larger group of employers did not—and still do not—release their consolidated EEO-1 reports. Yet some of these employers declined to file an objection with OFCCP because they were concerned how such objections, if disclosed, might be used to cast the organization in a negative light, invite scrutiny by Plaintiffs, and expose the organization to unjustified reputational harm.

16. Other employers did not raise an objection due to the time, expense, and distraction of participating in litigation.

17. Yet another group of employers simply were not aware of the instant litigation and the underlying FOIA request and learned of this matter only after their data had been made public by OFCCP.

18. The motivations of these employers, both big and small, vary wildly and one should not presume that the inactions of one group of employers—in this case, those that failed to file an objection under FOIA—have anything to do with the employers that elected to exercise their rights under the Freedom of Information Act.

DECLARATION OF THE CENTER FOR WORKPLACE COMPLIANCE
No. 22-cv-07182-WHA                                                  4

Employers That Filed FOIA Objections

19. Employers that filed a FOIA objection with OFCCP did so because they believe that the EEO-1 Reports reflect and contain confidential commercial information, which are exempt from disclosure pursuant to FOIA Exemption 4 as set forth at 5 U.S.C. § 552(b)(4). Additionally, they expect that the release of these data, particularly without context and over a period of several years, may harm their commercial or financial interests.

The EEO-1 Reports Contain Commercial Information

20. The EEO-1 Reports, and the data contained therein, reveal information about the nature, character, structure, and operations of an organization's business. EEO-1 Reports reflect the exact number of employees by race, ethnicity, and sex in each of the ten (10) EEO-1 job categories as of a specific point in time each year. These data disclose information about an employer's staffing strategies, including, importantly, the ratios between and among EEO-1 job categories.

21. While the EEO-1 job categories have been described by some as "general," the fact remains that the EEO-1 job classification system remains one of the *only* classification systems that links employers both within and across industries. Indeed, because of its standardization, employers regularly use this classification system in assessing their own staffing patterns and demographics, particularly as they fare against aggregate benchmarks published by the EEOC each year.

22. Once disclosed, the headcount information in the EEO-1 for any one individual year identifies how an employer has deliberately staffed areas of its business to maximize efficiencies, operations, and profit, and to minimize unnecessary expenses. This includes, for example: how many Executive and Senior Level Officials and Managers employed versus those classified as a First/Mid-Level Official and Managers; how many First/Mid-Level Officials and Managers employed versus the headcounts these individuals manage in each of the remaining eight (8) non-management EEO-1 job categories; and how many Sales Workers an employer maintains to generate revenue, which in combination with other available financial information could be used to calculate approximate revenue generated per Sales Worker. Furthermore, within a given industry, the data reveals staffing patterns in those EEO-1 job categories that are critical, and in some cases unique, to sensitive areas of an employer's business.

23. Moreover, the composition of an employer's workforce, and the demographics of that workforce is inherently "commercial." Employers regularly use this information to generate representational benchmarks, to assist in recruiting, and to allow management to determine areas of opportunity to increase diversity. Increased diversity in turn ensures the consideration of different perspectives and permits the employer to meaningfully serve its customers.

<u>Employers Protect These Data to Prevent Competitive Harm</u>

24. As noted earlier, once disclosed, the data described above would allow an employer's competitors to gain a competitive advantage by identifying how an employer has deliberately staffed segments of its business to maximize efficiencies, operations, and profit, and minimize unnecessary expenses.

25. The harm caused by release of these data in any given year is only compounded when the data for multiple consecutive years are disclosed, as is the case with the Plaintiff's request in this case. Releasing these data over multiple consecutive years allows competitors to discern additional information about year-over-year changes to staffing and structure, including the nature and frequency of changes resulting from highly confidential business plans.

26. Furthermore, competitors will be able gain a competitive advantage from determining those job categories where a competitor has invested or is investing in additional personnel or, conversely, has reduced or is reducing personnel. Especially paired with other sources of available information and a competitor's own knowledge of the industry, this provides insight into a competitor's confidential business growth or development plans.

27. Finally, employer demographic data, once released, can also be used by competitors, advocacy groups, and media outlets to paint a negative picture of the employer and expose the organization to reputational harm. This is often accomplished by "cherry picking" key demographics without important context such as workforce trends, availability benchmarks, and market constraints. This has real and concrete economic implications. Scrutiny of demographic data can lead to consumer boycotts and threats of (or actual) litigation. Over time, reputational harm can manifest as long-term damage to revenue, employee engagement and retention, and facilitate diversity poaching efforts from competitors.

Employers Customarily and Actually Regard Their EEO-1 Reports as Confidential

28.  Employee demographic data, in particular their race, ethnicity, and sex of individual employees, are among the most confidential information maintained by employers. Indeed, these data, alongside other confidential information such as one's status as an individual with disability and other medical records, are typically kept confidential and inaccessible to all but a small number of an employer's staff who must have access to these sensitive data pursuant to their job responsibilities—notably, those responsible for compliance with federal reporting requirements.

29.  The tabulated race, ethnicity, and sex information contained in EEO-1 Reports and data are retrieved, processed, and submitted to the EEOC by an even smaller number of employees, and these tabulated reports and data typically reside on servers with access limited to only authorized employees. In turn, EEOC-provided security credentials (username and password) to access and file EEO-1 Reports and Data are shared only with those individuals whose services are necessary for ensuring compliance with EEO-1 requirements.

30.  So too, does the EEOC designate this information as confidential, whose regulations provide that employers should maintain "a permanent record as to the racial or ethnic identity of an individual for purpose of completing the [EEO-1 Report] only where the employer keeps such records separately from the employee's basic personnel form or other records available to those responsible for personnel decisions, *e.g.*, as part of an automatic data processing system in the payroll department." 29 C.F.R. § 1602.13.

Employers Submit EEO-1 Reports to the Government with Express and Implied Assurances of Confidentiality

31.  Employers file their EEO-1 Reports directly with the EEOC based on the assurance of confidentiality provided under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-8(e), which states that "It shall be unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding under this subchapter involving such information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty of a misdemeanor and upon

conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year."

32. This provision makes clear that were an employee of the EEOC to disclose, in the absence of an "investigation" under Section 2000e-8(e), any of the EEO-1 Reports or Data now being sought by the Plaintiff, such employee would be guilty of a misdemeanor and subject to fine or imprisonment. This explicit assurance of confidentiality is an essential part of the overall recordkeeping and reporting scheme established by the EEOC. It should not be voided or violated by OFCCP through the disclosure under FOIA of the very data that the EEOC is prohibited by law from disclosing.

33. With this framework in mind, employers collect from their employees the sensitive race, ethnicity, and sex data required for the EEO-1 Report based on similar assurances of confidentiality. For example, the EEOC's EEO-1 Instruction Booklet states that employers should collect these data with the promise of confidentiality, offered through the following statement: "The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race or ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information obtained will be kept confidential and may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual."

34. Employers routinely follow the EEOC's instructions and include similar if not identical statements to the sample language provided by the EEOC, to assure employees that any data reported to the federal government "will not identify any specific individual."

35. Moreover, these concerns are precisely why the EEOC has implemented strict disclosure criteria to limit even the publication of aggregated EEO-1 Reports and Data that comprise reports from multiple employers for multiple physical locations. For example, the EEOC's Job Patterns For Minorities And Women In Private Industry (EEO-1) website states as follows: "The confidentiality provision which governs release of these data (Section 709 (e) of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972) prohibits release of individually identifiable information. Data in aggregated format for major geographic areas and by industry group for

private employers (EEO-1) are available. The following tables are national aggregations by those industries with the greatest employment. With the release of EEOC data from 2016 forward, new disclosure criteria were implemented and applied at all aggregate types to ensure the protection of identifiable information of our survey respondents and maintain EEOC's commitment to protect the data confidentiality. Participation rates and certain industry aggregates are no longer published due to disclosure limitation rules."

36.     The EEOC's implementation and application of disclosure criteria for EEO-1 Reports reinforces the express assurance set forth above that EEO-1 Submitting companies understand that reports and data are confidential and will be treated as such by any and all federal agencies that come into possession of those EEO-1 Reports and Data, including OFCCP. It would be incongruous, indeed absurd, and contrary to the expectations of submitting companies, for one of the two federal civil rights enforcement agencies responsible for administering the EEO-1 Report to freely disclose under FOIA the very same data and information that the other federal civil rights enforcement agency responsible for administering the EEO-1 Report is prohibited by statute from disclosing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of November, 2023, at Washington, D.C.

_____
Danny E. Petrella