UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>Defendant. | Case No. 22-cv-07182-WHA<br><br>**DECLARATION OF QUINETTA M. ROBERSON, Ph.D., IN SUPPORT OF DEFENDANT DEPARTMENT OF LABOR'S MOTION FOR SUMMARY JUDGMENT** |

I, Quinetta M. Roberson, Ph.D., state as follows:

1. My name is Quinetta M. Roberson. Having provided an expert declaration in the case of Center for Investigative Reporting v. U.S. Department of Labor (Document 34-2, filed 8/18/23), I was asked by the Assistant United States Attorney, Deputy Civil Chief of the Northern District of California, on behalf of the U.S. Department of Labor, to respond to the declaration of Marc Bendick, Jr., Ph.D. in opposition to defendant's motion for summary judgment and in support of plaintiffs' cross motion for summary judgment (hereafter, "Bendick's Declaration").

2. I was asked to offer my thoughts on accuracy of the analyses offered and principal conclusions drawn regarding commercially-valuable information contained in or derivable from Federal contractors' Type 2 Consolidated EEO-1 records, confidential personal information contained in or derivable from those records, and foreseeable harm likely to result from public release of those records. EEO-1 reports. Although Dr. Bendick agrees in his Declaration that many firms use diversity data in designing and managing aspects of their internal operations (see Paragraph 33), he attempts to debate the commercial value and confidentiality of information contained in EEO-1 Type 2 Consolidated Records. Yet, much of his debate is either unsupported or imprecise. This declaration offers my best scientific judgment of the accuracy and appropriateness of the claims made in Dr. Bendick's Declaration.

3.	In Paragraph 8, Dr. Bendick indicates that "to economists, other business analysts, and business managers, commercially-valuable information takes one of three forms": managerial information, financial information, and trade secrets. He defines the former, managerial information, as that which "concerns internal management of revenue-producing aspects of a firm – for example, sales costs, profit margins, resource allocation, and strategic plan for different parts of its operations or different products." Although this is a definition of managerial accounting and how it helps managerial decision-making as stated by the Institute of Management Accountants[1], Dr. Bendick ignores that the types of information included in EEO-1 are used in the development of diversity strategic plans and therefore, constitutes managerial information in this important regard. For example, in the Diversity, Equity and Inclusion Strategic Plan (2022-2025) for the Federal Reserve System, a stated strategy for attracting highly qualified and diverse slates of applicants and candidates is to "Use data from annual diversity and EEO reports to support divisions in the development of action plans with relevant and measurable results to address underrepresented workforce demographics in major job families".[2] Similarly, research suggests that EEO-1 data can be considered an indicator of a firm's diversity commitment, as organizational leaders who work with and evaluate such data are positioned to address staffing and compensation patterns.[3] As HR costs directly related to bringing goods and services to market are incorporated into sales costs and subsequently, influence profit margins, diversity data may be considered managerial information. Thus, while there might be certain broad business decisions where diversity data are not relevant, there are many for which they are both commercially relevant and valuable

4.	In Paragraph 11, Dr. Bendick assumes that "economists, other business analysts and business managers do not generally consider such broad descriptive workforce data to be commercially valuable managerial or financial information" based on what is described as "a widespread complaint

---

[1] Institute of Management Accountants (IMA) (2008), Definition of Management Accounting, Montvale, NJ.

[2] https://www.federalreserve.gov/publications/files/distrategicplan_202211.pdf

[3] Graham, M. E., Belliveau, M. A., & Hotchkiss, J. L. (2017). The View at the Top or Signing at the Bottom? Workplace Diversity Responsibility and Women's Representation in Management. *ILR Review*, *70*(1), 223-258.

among corporate executives and managers with profit-and-loss responsibility that HR reports chronically provide nothing of value to them". However, he makes this claim based on a 2005 *Fast Company* article that speaks to the competence of human resource departments in handling "administrivia" yet their inability to take on the more "strategic role of raising the reputational and intellectual capital of the company".[4] This research, on which Dr. Bendick relies, is outdated as contemporary scholarly and practitioner research shows HR to be a core operational function and demonstrates the evolution and strategic value of the HR function.[5] As noted in a recent Forbes article, "over the past few years, the role of the chief human resources officer has been thrust to the forefront as an invaluable company asset."[6]

5.  Dr. Bendick also generalizes the tenets of the 2005 *Fast Company* article to the diversity function, which is not referenced by the authors. Further, the diversity function is distinguished from the HR function in current organizational structures.[7]

6.  Dr. Bendick opines that EEO-1 reports are regarded only as a compliance requirement and are considered "so uninformative for business purposes that they are not generally even consulted in operational or financial decision-making (see Paragraph 12). However, this is a generalized assertion that is unsupported by research. He also takes a very narrow view of business purposes and decision-making, one that does not acknowledge the business case for or business value of diversity.[8] Further, this perspective is at odds with his work which suggests a business case for diversity and inclusion[9] as

---

[4] Erroneously referenced in Bendick's Declaration as *Fast Company*, December 19, 2007, the correct citation is: Hammonds, K. H. (2005, August). Why we hate HR. *Fast Company*, 97, 40-47.

[5] Storey, J., Ulrich, D., & Wright, P.M. (2019). *Strategic Human Resource Management: A Research Overview* (Routledge). Komm, A., Pollner, F., Schaninger, B. & Sikka, S. (2021, March 12). The new possible: How HR can help build the organization of the future. *McKinsey & Company*: https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/the-new-possible-how-hr-can-help-build-the-organization-of-the-future

[6] Majercsik, E. (2023, September 5). The evolution and future of the HR leader. Forbes: https://www.forbes.com/sites/forbeshumanresourcescouncil/2023/09/05/the-evolution-and-future-of-the-hr-leader/?sh=47b0d0a3596f

[7] Shi, W., Pathak, S., Song, L. J., & Hoskisson, R. E. (2018) The adoption of chief diversity officers among S&P 500 firms: Institutional, resource dependence, and upper echelons accounts. *Human Resource Management,* 57: 83–96.

[8] Eswaran, V. (2019, April 29). The business case for diversity in the workplace is now overwhelming. *World Economic Forum*: https://www.weforum.org/agenda/2019/04/business-case-for-diversity-in-the-workplace/

[9] Bendick, M., Egan, M. L., & Lanier, L. (2010). The business case for diversity and the perverse

well as statements later in his declaration (see Paragraph 33). Thus, even if the forms themselves are not circulated, they contain information that is used by firms as part of their commercial operations.

7.      Dr. Bendick draws attention to an increase in the number of U.S. employers that release their EEO-1 report data annually – from 4% in 2020 to 11% in 2021 – and interprets the increase in such reporting as evidence of "management's judgment that these data contain nothing confidential of commercial relevance." It is important to note that this statistic reveals that 89% of the 1,000 largest firms nationwide were not revealing their data by the end of 2021 and therefore, suggests that the vast majority of these companies did feel that the information should be kept confidential. In addition, Dr. Bendick's perspective ignores several contextual factors that may have influenced disclosure. One such factor is the relevant time period over which the increase in disclosure occurred, as many organizations made a commitment to greater transparency in the composition of their workforces with the murder of George Floyd and accompanying social protests in 2020.[10] Another factor is stakeholder pressures, as one of the articles referenced by Dr. Bendick also notes that investor and advocate groups have pushed for diversity data disclosure in an effort to hold companies accountable for these commitments.[11] There are also variations in disclosure according to industry. Because decisions to disclose EEO-1 report data are not made in a vacuum, it cannot be inferred from disclosure statistics provide evidence of "management's judgment that these data contain nothing confidential of commercial relevance", as concluded by Dr. Bendick.

8.      The *Just Capital* article that Dr. Bendick references also notes that not all of the disclosing companies released their EEO-1 reports. Instead, some published a modified version of the report, which presents percentages instead of counts, features select job categories, alters or condenses the job categories listed, or omits job categories altogether.

---

practice of matching employees to customers. *Personnel Review*, 39, 468-486.

[10] Green, J. (2023, September 25). There's one diversity initiative companies aren't likely to backtrack on. Bloomberg: https://www.bloomberg.com/news/articles/2023-09-25/transparency-is-one-workplace-diversity-effort-that-companies-won-t-backtrack-on?embedded-checkout=true

[11] Vaghul, K. (2021, January 19). A small fraction of corporations share diversity data, but disclosure is rapidly on the rise. *Just Capital*: https://justcapital.com/news/a-small-fraction-of-corporations-share-diversity-data-but-disclosure-is-rapidly-on-the-rise/#:~:text=As%20of%20January%202021%2C%20only,by%2027%25%20from%20December%202019.

SUPPLEMENTAL DECLARATION OF QUINETTA ROBERSON
No. 22-cv-07182-WHA                                                    4

9. In Paragraphs 14-23, Dr. Bendick elaborates on three assumed characteristics of the data in EEO-1 reports that make such reports "essentially worthless" (see Paragraph 16). The first assumed characteristic is that EEO-1 records "provide data on broad categories of employees that are not possible to relate to specific commercial activities" (see Paragraph 18). Dr. Bendick overlooks the specificity of such information relative to representation. Information on the representation of various groups at each level may be used by a company to benchmark the effectiveness of its approach to diversity management relative to competitors. Similarly, while companies may not be able to infer information about specific geographic location (see Paragraph 20), employment data across levels from the EEO-1 reports may be used to do comparative workforce planning against those with whom they share a labor market. Data from EEO-1 reports, alone and in combination with other reports, have also been used by investors to assess the effectiveness of a company's human capital management program and to determine the economic value of firms.[12] Therefore, it represents useful information to competitors and other stakeholders.

10. The second assumed characteristic is that the data in EEO-1 reports are "retrospective and old" and unrevealing of "anything useful about a firm's current capabilities or future intentions" in today's "fast-moving world of business" (see Paragraph 21-22). Although Dr. Bendick conceptualizes data that is two or more years old as unrevealing of "anything useful about a firm's current capabilities or future intentions", this two-year benchmark is unsupported. The 1995 *MIT Sloan Management Review* article references actually focuses on the time horizon in which U.S. companies expect to realize gains from capital expenditures rather than on the timeframe for data usefulness. Similarly, the *International Journal of Production Economics* article referenced focuses on different planning horizons for optimizing supply chain decisions rather than on the age or utility of information.

11. In his argument about the usefulness of data in EEO-1 reports, Dr. Bendick also supposes that workforce diversity is not a capability-creating resource for a firm. Yet, my research and that of others identifies a subset of capabilities through which firms can extract benefits from diversity,

---

[12] As You Sow and Whistle Stop Capital (2022). *Workplace Diversity and Financial Performance: An Analysis of Equal Employment Opportunity (EEO-1) Data*: https://www.asyousow.org/report-page/workplace-diversity-and-financial-performance.

including market access, innovation, and strategic flexibility.[13] Dr. Bendick's opinion also ignores the value of workforce composition data over time, which can used to determine goal progress in staffing, retention or other aspects of workforce planning. Further, while composition data itself may be useful for identifying a problem, the examination of such data over time can help to identify problems in employee-management processes, such as staffing, performance management and promotion.[14]

12. The third assumed characteristic of EEO-1 reports are that they are "incomplete as measures of a firm's productivity capacity or strategic intentions" (see Paragraph 23). While it is accurate that firms cannot gain insight into the qualitative nature of competitors' "production capacity or expertise" based on their EEO-1 reports, it is inexact to assume that such reports do not provide information on a firm's human capital and its diversity resources at different levels. Dr. Bendick uses an example of a package delivery company interested in assessing the volume of packages a competitor can process and makes the point that an EEO-1 report "would not reflect the competitor's possible subcontracting or teaming with other package delivery services for the services of delivery vehicles and their drivers (see Paragraph 24). Yet, an EEO-1 report would reflect the diversity of the competitor's workforce and subsequently, signal its attractiveness for "team agreements, alliances, partnerships or subcontracts with other firms", which is how Dr. Bendick's argues that strategic moves occur (see Paragraph 23).

13. In Section V of his declaration, Dr. Bendick poses a question as to "why would firms bother with implausible analyses and far-fetched interpretations of EEO-1 reports when more relevant, more accurate answers are available faster and cheaper elsewhere?" (see Paragraph 26). To illustrate this question, he offers a hypothetical example of a hospital chain interested in gaining insight into "the expansion intentions or actions of its possible competitor" and lists a range of sources of such

---

[13] Declaration of Quinetta Roberson, Ph.D., Document 34-2, filed 8/18/23. Roberson, Q. M., Holmes, O. H. & Perry, J. L. (2017). Transforming Research on Diversity and Firm Performance: A Dynamic Capabilities Perspective. *Academy of Management Annals*, 11, 189-216. Cox Jr., T., & Blake, S. (1991). Managing cultural diversity: Implications for organizational competitiveness. *Academy of Management Executive*, *5*, 45–56.

[14] Williams, J. C., & Dolkas, J. (2022, March-April). Data-driven diversity. *Harvard Business Review*.

SUPPLEMENTAL DECLARATION OF QUINETTA ROBERSON
No. 22-cv-07182-WHA                                    6

information (see Paragraph 27). While he is correct in that the sources listed may be useful for garnering such information, he ignores the appropriateness of these sources for workforce diversity data. Specifically, although most of these sources do not provide diversity-related information, those that do offer resources for creating equitable and inclusive systems rather than supply diversity data.[15] He also provides a personal example of accessing firm information from Dun and Bradstreet Hoovers (see Paragraph 28), although none of the information obtained was diversity-related data. Thus, his assumption that there are other viable sources of information other than EEO-1 reports is unsupported.

14. In Paragraphs 30-31, Dr. Bendick contests Dr. Patrick McKay's contention that data from EEO-1 reports could be used by firms to poach talent from their competitors and offers alternate sources of information "to determine if a competitor's workforce is ripe for employee poaching."[16] Specifically, he references various job and recruiting sites on which current and former employees can review companies. However, as reviewers are anonymous, voluntarily provide reviews, and have the option of self-identifying along several dimensions, including race/ethnicity, gender, sexual orientation, disability, caregiver status and veteran status, such platforms are not representative of the composition of a firm's workforce but of those who provide reviews. Consequently, the diversity data from such sources are incomplete and potentially misleading.

15. Dr. Bendick also contests my contention that data contained in EEO-1 reports are used by firms in designing and managing aspects of their internal operations and argues that such data "are almost always too broad, too old, and inappropriately structured to relate to the specific internal operations that a firm would need to plan, estimate, or reward" (see Paragraph 33). Yet, there is published scholarly research that shows EEO-1 reports to be useful for uncovering trends in labor segregation, locating such segregation across contexts, and combining with other organizational data to develop diversity-related policies, practices, and interventions.[17]

---

[15] Dun & Bradstreet Supplier Diversity Data: https://www.dnb.com/products/third-party-risk/supplier-diversity-data.html. Health Equity Action Library: https://www.aha.org/heal.

[16] Declaration of Partick F. McKay, Ph.D., Document 34-1, filed 8/18/2023

[17] Kalev, A., Dobbin, F., & Kelly, E. (2006). Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies. *American Sociological Review*, *71*(4), 589–617. Kurtulus, F.A. (2016), The Impact of Affirmative Action on the Employment of Minorities and Women: A Longitudinal Analysis Using Three Decades of EEO-1 Filings. *Journal of Policy Analysis and Management*, 35: 34-66. Kurtulus, F. A., & Tomaskovic-Devey, D. (2012). Do Female

16. In disputing the commercial value of EEO-1 reports, Dr. Bendick references "firms large enough to employ specialized HR staff" (see Paragraph 12), which is a limiting factor given that many firms – particularly those smaller in size – do not have specialized HR staff. As EEO-1 reports provide data that can be used for the development of diversity policies and practices (e.g., establishing staffing goals, developing attribution interventions, self-auditing potential areas of inequity, etc.), especially for firms without the resources to assign report management specialized staff, they represent more than "a necessary cost of doing business." Dr. Bendick also assumes that firms would elect to utilize data from other reports compiled by "HR data analysts" and from the company's "Human Resource Information System (see Paragraph 34)", although this presupposition derives from a limited set of firms that would have the financial resources available for such HR investments.

17. Dr. Bendick argues that I confuse "EEO-1 reports themselves with the race/ethnicity/gender data underlying those reports" (see Paragraph 35) or "the value of data on workforce diversity with the value of workforce diversity itself" (see Footnote 43). While I note and provide evidence of the value of workforce diversity, I also note and provide evidence of how data on workforce diversity at different levels of firms are used for organizational decision-making. These separate values are also based on distinguishable logics of the commercial value of a firm's workforce (i.e., the business case for diversity) and the commercial value of information on a firm's workforce (i.e., the business case for diversity metrics).[18] More importantly, however, is that such evidence indicates the commercial value of EEO-1 data rather than its commerciality and value relative to other sources.

18. In Paragraphs 37-42, Dr. Bendick argues that "if an outside observer seeks the race/ethnicity/gender of a person she or he has never met, information from which to infer the person's race/ethnicity/gender can frequently be obtained from a variety of non-confidential sources other than

---

Top Managers Help Women to Advance? A Panel Study Using EEO-1 Records. *The ANNALS of the American Academy of Political and Social Science*, *639*(1), 173-197. Robinson, C. L., Taylor, T., Tomaskovic-Devey, D., Zimmer, C., & Irvin, M. W. (2005). Studying Race or Ethnic and Sex Segregation at the Establishment Level: Methodological Issues and Substantive Opportunities Using EEO-1 Reports. *Work and Occupations*, *32*(1), 5-38.

[18] Buttner, E. H., & Tullar, W. L. (2018). A representative organizational diversity metric: A dashboard measure for executive action. *Equality, Diversity and Inclusion: An International Journal,* 37, 219-232.

SUPPLEMENTAL DECLARATION OF QUINETTA ROBERSON
No. 22-cv-07182-WHA                     8

EEO-1 reports" and provides three very specific examples of firms that post employees' names, pictures and other personal information on their website. Yet, this argument only holds *if* the company provides such information. Many organizations do not disclose workforce demographic information (either individualized or in composite form) for several reasons. In addition to some state-level restrictions on employers' use of individuals' personal information (including photos and/or other likenesses for commercial purposes without prior consent), employees may also have concerns about experiencing bias or discrimination based on physical appearance.[19] If such information is not publicly disclosed, EEO-1 reports may reveal the demographic membership of employees – particularly those at levels of the firm where they are underrepresented and thus, easily identified.

19. In addition, as research has also shown that photos, including user social media profile images, are by themselves not enough to be a reliable source for inferring demographic information[20], the data contained in EEO-1 reports would supplement in the disclosure of such personal information even if photographs were available.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of November, 2023, at East Lansing, Michigan.

*[signature]*

QUINETTA ROBERSON, PhD.

---

[19] SHRM: *Can an employer use employees' photographs for marketing purposes such as a company web site or promotional materials?* Can an employer use employees' photographs for marketing purposes such as a company web site or promotional literature? (shrm.org)

[20] Jung, S.G., An, J., Kwak, H., Salminen, J. & Jansen, B.J. (2017). Inferring social media users' demographics from profile pictures: A Face++ analysis on Twitter users. In *Proceedings of The 17th International Conference on Electronic Business* (pp. 140-145). ICEB, Dubai, UAE, December 4-8.