UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and WILL EVANS,<br><br>  Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF LABOR,<br><br>  Defendant. | Case No. 22-cv-07182-WHA<br><br>**SUPPLEMENTAL DECLARATION OF PATRICK F. McKAY, Ph.D., IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION (CORRECTED)[1]** |

I, Patrick F. McKay, Ph.D., state as follows:

1. This declaration supplements my initial declaration submitted in support of the Department of Labor's motion for summary judgment and addresses points raised in Plaintiffs' cross-motion for summary judgment and the declarations of Dr. Mark Bendick ("Bendick Declaration") and Jamillah Bowman Williams ("Bowman Williams Declaration") on issues relating to the use and value of EEO-1 data and the potential commercial harms to reporting firms should it be publicly released.

2. The Bendick Declaration argues that workforce data and "HR Reports" are not commercially valuable to organizational functioning. As a human resource management (HRM) scholar, practitioner, and educator for nearly 25 years, I can say that such a characterization of the HRM function in organizations is inaccurate.

3. First, the Bendick Declaration speaks generally of "HR reports." The data in EEO-1 reports contain detailed human resource management ("HRM") data. HRM involves an organization's effort to acquire, deploy, and retain a qualified workforce, thus allowing a firm to pursue and achieve its strategic objectives. A key component of the HRM system is a company's employee headcount,

---

[1] This corrected filing contains an attachment with references that had been inadvertently omitted from the original filing, Dkt. No. 43-4, and does not contain any other changes to that submission.

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                                           1

particularly among those in its core workforce (i.e., employees who are central to a company's production of goods and services such as engineers in an engineering firm), as well as the requisite number of support staff (e.g., administrative personnel, management, etc.) across the occupational categories of its workforce. Employee headcount is a pivotal metric as it represents the human resources a company has at its disposal in pursuing its business objectives (Noe et al., 2022).

4.  Failure to monitor the employee headcount effectively can result in employee shortages or surpluses, both of which are damaging to a firm's bottom line (through reduced product generation/service provision and unnecessary labor expenditures, respectively). For example, a retailer must forecast the number of qualified sales associates it must have deployed on the sales floor to ensure that it provides the requisite quality of customer service, product availability, etc. to sustain the business. Likewise, the retail company must have sufficient headcounts of support staff such as cashiers and product stockers, all needed to build a store workforce that maximizes company revenue, customer service, and repeat business. Companies that have a greater number of qualified workers tend to have higher labor productivity than firms that have a lower number of qualified workers (Della Torre et al., 2018).

5.  Moreover, an important function in human resource management is human resource planning, which is undertaken to determine if a company has a sufficient quality and quantity of labor in a year to produce goods and provide services central to an organization's operation. HR planning is part of a firm's overall HRM strategy. Strategic plans consist of short-term (1-2 years) or long-term planning cycles (3-5 years). Consequently, a company's monitoring of employee headcount is not a singular event, but part of a company's overall HRM strategy to ensure that it has the necessary human talent to conduct its business effectively over time. Thus, it is a company imperative, and a central human resource management responsibility, to monitor employee headcounts in terms of sufficient quality and quantity of labor, maintain the optimal ratio of management to labor, and be responsive to needed headcount adjustments to enable a firm to operate effectively, capture market value, and maximum returns to shareholders.

6.  The Bendick Declaration states at Paragraph 8 that "To economists, other business analysts, and business managers, commercially-valuable information takes one of three forms:" financial

information, trade secrets, and "managerial information," which he describes as "internal management of revenue-producing aspects of a firm -- for example, sales, costs, profit margins, resource allocation, and strategic plans for different parts of its operations or different products." Staffing activities involve the allocation of human resources, which falls within "resource allocation," which Dr. Bendick concedes is part of managerial information. And the other parts of "managerial information" that he cites are strongly dependent upon the employee headcounts necessary for a company to function effectively enough to drive revenues, profits, strategic plans for product/business expansion, and other strategic initiatives.

7. In fact, in my business school classes, I teach budding HRM practitioners and managers that company strategic planning is prefaced on product/service demand and the employee headcounts necessary to execute strategic objectives such as meeting desired profit margins, capturing a product market, etc. I teach an HR planning case study that has students compute employee headcount needs (using Markov analysis, a labor need forecasting technique) based upon various forms of employee movements (i.e., promotions, demotions, quitting, etc.) from one year to the next. The employee movements affect the number of employees available to serve in a series of job categories. The identified gaps in employment (e.g., a shortage of 150 sales staff) become hiring targets for the upcoming fiscal year. The assignment aptly demonstrates the commercial importance of managing employee headcount to the effective operation of a business.

8. Dr. Bendick claims that EEO-1 reports do not provide commercially valuable operational, financial, or trade secret information *as commonly understood by economists, other business analysts, and business managers*. These professional specialties (and Dr. Bendick's expertise) are outside the area of human resource management. Dr. Bowman Williams, who states that EEO-1 data does not constitute "commercial information," is a lawyer and sociologist with no apparent expertise in HRM. As a human resource management scholar and practitioner, I strongly disagree with Dr. Bowman Williams's assertion and Dr. Bendick's position that EEO-1 reports are not commercially valuable. This is inconsistent with the scholarship and commonly accepted understanding in my field.

9. First, HRM systems are far from irrelevant to business operations as shown by decades of research on the positive linkage between human resource management system functioning and

1  organizational performance (Combs et al, 2006; Huselid, 1995; Jiang et al., 2012). In response to the
2  impact of HRM on company performance, HRM professionals are no longer viewed as merely support
3  personnel, but key members of the C-suite in most major organizations. On November 8, 2023, Jacqui
4  Canney, Chief People Officer at ServiceNow, authored an article chronicling the "6 Key Realities for
5  HR Leaders in 2024" in *Human Resource Executive* (https://hrexecutive.com/6-key-realities-for-hr-
6  leaders-in-2024/). She cited a recent Accenture report which stated that, "89% of CEOs say the CHRO
7  (Chief Human Resource Officer) should play a central role in driving long-term profitable growth."
8  Issues highlighted in the article include HR leaders' responsibilities to (1) drive business growth using
9  talent, (2) confront the growing mental health crisis, (3) teach employees how to leverage generative
10 artificial intelligence capabilities, (4) speed progress on diversity, equity, and inclusion, (5) shift toward
11 skills-based organizations, and (6) learn how to manage in an unpredictable political climate. These
12 broad issues are a far cry from the support functions of administering compensation and benefits plans
13 or hosting onboarding sessions for new employees. More importantly, the responsibilities speak to the
14 central role that effective human resource management plays in the success of a business. In fact, a
15 quick survey of my own LinkedIn professional contacts list includes HRM practitioners who serve as
16 the Senior Vice-President and Chief of Human Capital Management (at WIRB-Copernicus Group),
17 Vice-President of Human Resources (at Regeneron), Senior Director of Human Resources (at Generac
18 Power Systems), Director of Global Talent Management (at Hyster-Yale Group), and Chief People and
19 Diversity Officer (at the AMC television network) to name a few. These officers are among the highest-
20 ranking executives in the companies named. Overall, HRM systems are highly integral to business
21 operations and corporate performance since the achievement of organizational strategic objectives
22 depends upon the successful acquisition and retention of labor that is sufficient in quantity and quality.
23        10.     Second, HRM system effectiveness is directly tied to a company's bottom-line (Huselid,
24 1995; Jiang et al., 2012). EEO-1 reports provide data that can be used as a reasonable indicator of a
25 company's employee headcounts in key roles, as HRM professionals can easily surmise which of the 10
26 occupational categories contains a firm's core workforce. This is valuable information for a competitor
27 trying to determine the effectiveness of a company's HRM system. The potential for commercial
28 damage from the release of EEO-1 reports does not come from the precise accuracy of such data with

respect to a company's HRM system, but its access alone. The mere presence of the data provides additional information to competing firms trying to decipher how a firm manages its human resources. The 10 occupational categories provide meaningful insight into a company's headcounts for a company's internal divisions. Furthermore, competing firms can pair such data, which is not publicly available, with company information that is available (e.g., Glassdoor surveys, corporate financial performance) to estimate the relationship between workforce occupational composition (from the EEO-1 reports) and corporate outcomes. Even if the information does not precisely detail all specific corporate divisions and job titles, providing access to such internal company information provides information that is not otherwise available and potentially undermines fair commercial market competition between firms.

11. Third, EEO-1 reports provide racial-ethnic and gender demographic information that job seekers are likely to interpret as symbolic of a company's stance on diversity. This information has an impact on recruiting efforts, although as I explained in my initial declaration, racial-ethnic and gender demographic information does not predict how strongly a company supports workforce diversity (McKay, Avery, & Morris, 2008). Thus, companies with low racial-ethnic and gender diversity as revealed in their EEO-1 reports may be unfairly disadvantaged in recruiting applicants from these respective demographic subgroups.

12. Some companies, including, for example, smaller companies, or companies without "specialized HR staff," use the EEO-1 reports themselves for business purposes to track their demographic representation, changes, and trends. Others may use the demographic data contained in those reports but not the reports themselves. But my point of contention regarding the public release of company EEO-1 reports is not a matter of whether companies utilize them internally for operational purposes. The problem is that competing companies can consult an organization's EEO-1 reports for insight into how a firm distributes its employees across the 10 occupational categories. Any additional information regarding a firm's employee headcount offers incremental information about that company's HRM system. Again, the harm does not depend on accuracy but access, and there is no overriding reason why a company's competitors should have access to how the company's personnel are distributed across occupational categories.

13. This is especially problematic as the FOIA request involves five years of EEO-1 reports, which offer insights into a company's headcount trends across multiple years. The movement of employees across or out of jobs provides a window into how well (or poorly) a company's HRM system is functioning (Noe et al., 2022). Although Dr. Bendick is correct in noting that employee movement out of job categories does not directly measure an organization's employee turnover rates, the movements can be easily interpreted as a proxy for employee movement out of positions, whether for turnover, downsizing, or other reasons. Employee movements that result in loss of human talent from firms (i.e., turnover and downsizing) have negative financial and operational implications for an organization (Della Torre et al., 2018; Guthrie & Dutta, 2008). This provides information that a competitor would not otherwise have, and that can be used to draw conclusions about a company's HRM effectiveness, both by itself and especially when paired with other data. Thus, I am of the strong opinion that the release of this information could cause competitive harm to companies.

14. Paragraph 13 of the Bendick Declaration states, "A substantial -- and growing -- number of U.S. employers now voluntarily release their EEO-1 report data annually, typically in their corporate annual report, in a separate annual diversity report, or on their website. According to one survey, this was the practice among 11% of the 1,000 largest firms nationwide in 2021, up from 4% the year before." A significant takeaway from the above statement is that even in 2021, following the George Floyd murder and pressure on companies to increase their diversity, the vast majority -- 89% -- of the 1,000 largest firms in the U.S. did not release their EEO-1 form data.

15. For the companies that release their data, Dr. Bendick assumes that they do so willingly rather than as a response to market and/or public or other pressures. The fact that some companies are willing (or pressured) to report EEO-1 workforce demographic information does not mean that they do not consider this information to be sensitive. Also, it does not preclude the potential for commercial harm due to unjustified negative implications for recruiting underrepresented minorities and women, as well as reputational harm, which can directly affect a company's bottom line. The economic impact of "reputation," whether deserved or undeserved, is real. Roberson and Park (2007) reported that companies who were named to Fortune magazine's top-50 list for diversity (a reputational rating) had higher financial performance than Fortune 100 companies who failed to make the Fortune list over a

1  five-year period (1998-2003). In contrast, Wright, Ferris, Hiller, and Kroll (1995) showed when
2  companies lost employment discrimination lawsuits, they suffered subsequent reductions in their stock
3  prices.

4      16.    Contrary to Paragraphs 18-20 of the Bendick Declaration, EEO-1 reports are not as broad
5  and non-specific as he suggests. First, HRM professionals can easily infer the EEO-1 occupational
6  category within which a company's core workforce is classified. For example, it would not require much
7  guesswork to determine that the Vice-President of Human Resources would be classified as EEO-1
8  category "Executive/Senior-Level Officials and Managers." Similarly, for an engineering firm, its
9  engineers would likely be classified within the "Technicians" occupational category, while its
10 manufacturing plant staff would be classified as "Operatives."  Second, many of the categories are quite
11 specific and provide meaningful information. Thus, comparing the EEO-1 categories of "First/Mid-
12 Level Officials and Managers" with others can provide insight into the proportion of direct supervisors
13 relative to core personnel such as engineers or manufacturing employees from the engineering firm
14 example. Third, in many companies, including smaller companies, these categories can be quite
15 revealing. Imagine a 50-person company wherein it would be very informative to know how the
16 employees are distributed across the ten categories. Fourth, the fact that the EEO-1 reports cannot
17 provide all the information that might be useful doesn't mean that it can't provide any useful
18 information to a competitor. In Bendick's specific example, a competitor might not be able to isolate
19 chemical engineers from other types of engineers for a large petrochemical manufacturer, but it would
20 provide other information.  Knowing that a competitor is increasing its engineering headcount would be
21 valuable to a competitor even if it doesn't know the precise type of engineers.  A competing firm would
22 also find it informative to know the relative proportion of engineers to other employees as means of
23 deducing how the firm distributes its core employees to non-core, support employees, especially if the
24 focal firm is highly successful relative to its peers.  It is not uncommon for firms to attempt to mimic the
25 strategy of their successful rivals. Thus, the release of EEO-1 data could offer insights into competitor's
26 workforce profile for other companies to potentially duplicate.

27     17.    Dr. Bendick states that EEO-1 reports are "incomplete as measures of a firm's productive
28 capacity or strategic intentions" because many companies rely on temporary or contract workers in

SUPPLEMENTAL DECLARATION OF PATRICK McKAY
No. 22-cv-07182-WHA                                   7

addition to the full- and part-time employees counted in the reports. Dr. Bendick rightfully acknowledges that companies often deploy contingent workers (e.g., contractors, temporary employees, etc.) to fulfill their human resource requirements. However, the bulk of HR planning is undertaken with respect to core personnel who perform the job functions that are central to a company's business (Noe et al., 2022). In fact, short-term employees are often released upon the completion of project-based work, thus suggesting they are not an integral part of a company's central HR planning. Furthermore, high-commitment HR practices such as investments in training and development, advancement opportunities, compensation and benefits are targeted toward core workers instead of temporary personnel. The point of high-commitment HR practices is to retain a long-term, qualified core workforce to ensure that a company has sufficient quality and quantity of workers to provide a company's products and services in support of a company's strategic objectives (Lepak & Snell, 1999). Therefore, the numbers of actual, full-time employees reported in the EEO-1 reports communicates valuable HRM data in which a competitor would be keenly interested.

18.     Thus, Dr. Bendick's point about companies' usage of temporary personnel does not invalidate EEO-1 report data as indicative of a firm's workforce composition. Again, the nature of a firm's business allows an astute HRM professional to infer the occupational category within which its core personnel are classified, thus offering insight (albeit imperfect) into how a firm mobilizes its personnel. Again, the fact that the information may be incomplete—and doesn't provide all the information that could be useful—doesn't mean that it can't provide any useful information to a competitor. In a commercial market environment, any incremental information that provides this sort of information can be used by competitors for their advantage. Competing firms should not be allowed public access to such information, particularly across 5 years of EEO-1 data.

19.     Dr. Bendick takes issue in Paragraph 30 with my opinion about the use of EEO-1 reports to calculate a firm's turnover rates. The point I am making, however, is not that competing companies could perfectly estimate a firm's turnover rates from EEO-1 data. A firm could estimate the movement of employees out of (or across) the various EEO-1 job categories from 5-years of EEO-1 reports. Again, this movement offers some insight into how employees are being deployed in an organization, with reductions in the proportion of employees in a occupational category signaling (potentially) labor losses.

This pattern of labor losses is even more telling if it occurs across five years of EEO-1 reports, which indicates a poor-functioning HRM system (and potential loss of company market share).

20. Dr. Bendick's point about EEO-1 retrospective reports being not useful because they are outdated is erroneous. HRM practice guidelines suggest companies' usage of short-term (1-2 years) and/or long-term (3-5 years) HR planning (Noe et al., 2022). Accordingly, a firm that uses longer HR planning horizons may be managing its current employee headcounts based upon retrospective estimates of company HR requirements (i.e., the quality and quality of employees needed to provide company products and services). Thus, the EEO-1 report data for firms that operate according to long-term HR planning may still be relevant despite the retrospective nature of EEO-1 data reporting.

21. Dr. Bowman Williams argues that EEO-1 should be publicly available to protect equal employment opportunity. Whether public dissemination of diversity data might serve this purpose, the research illustrates, starkly, that companies should not be forced to disclose the raw data in their EEO-1 reports. Such information must be handled judiciously because it is very easy to overinterpret organizational racial-ethnic and gender demographic information without the requisite context provided. For instance, the exhibits attached to the Baranetsky declaration (see Exhibit Y, Dkt. No. 39-1) offer keen insight into how technology companies' workforce racial-ethnic and gender demographic representation has been wholly overinterpreted as indicative of racial-ethnic and gender bias, respectively. What the exhibits fail to mention is that Blacks, Hispanics, and women are woefully underrepresented in science, technical, engineering, and mathematics (STEM) fields (Porter & Serra, 2020; Wynn & Correll, 2018). Yet, the EEO-1 reports are used to lay the burden of racial-ethnic minority and female representation in STEM fields at the feet of employing organizations. Instead, as Jonathan Kozol so eloquently articulated in his 1991 book "Savage Inequalities," racial-ethnic (and likely gender due to gender stereotyping) inequalities in educational quality and opportunities in public schools are huge drivers of minority and female underrepresentation in STEM fields due to academic under-preparation in compulsory K-12 education. In fact, raw data about a company's racial-ethnic and gender diversity has a weak relation to a firm's actual climate for diversity in organizations (Kossek, Zonia, & Young, 2006; McKay, Avery, & Morris, 2008).

22. By contrast, a company with "impressive" diversity numbers may ill-serve the communities that Title VII and EO 11246 were meant to protect. Anecdotally, I am aware of a large manufacturer that contracts with the U.S. government (and with whom I performed employment testing/assessment consulting work). The company engaged in annual 'minority hiring blitzes' to ensure that they had sufficient racial-ethnic diversity in their workforce for federal contractor compliance. Yet, owing to the firm's unfavorable climate for diversity, the turnover rate for its Black personnel was 200%! Such practices explain why McKay and Avery (2005) warned companies that diversity recruitment could backfire to the extent that firms misrepresent their work climates as more supportive of diversity to minority recruits than is the actual case.

23. Racial-ethnic and gender diversity in organizations is affected by contextual features far outside the control of any focal organization (e.g., underrepresentation of women and minorities in certain occupations, related disparities in educational attainment, etc.), as opposed to seemingly vague inferences of purposeful racial-ethnic and/or gender discrimination in hiring implied by low racial-ethnic and/or gender diversity in a company's workforce. Consequently, requiring organizations to publicly release their EEO-1 reports could undermine their ability to offer equal employment opportunities to historically underrepresented minorities and women, in direct contradiction of the principles upon which EEO-1 reporting is based.

Conclusion

24. Based upon my research and practice in the human resource management domain, it is my opinion that Dr. Bendick's conclusion that the public release of companies' EEO-1 reports has no potential for commercial harm to reporting firms is incorrect. The reports have the potential for helping competing firms to learn how a firm manages its employee headcounts. This is especially problematic since HRM professionals can easily infer the EEO-1 occupational category within which a company's core workforce is classified. Such data may be paired with publicly available corporate data to assess the relationship between a company's employment profile (across the 10 occupational categories) and corporate performance indicators (e.g., revenues, profits, customer satisfaction metrics, etc.). Furthermore, five-year EEO-1 reports will allow competing firms to estimate the patterns of employee movement in and out of the 10 occupational categories, with reductions in force as indicative of poor

1  HRM system functioning—because firms do not reduce their workforces in response to successful
2  corporate performance. Finally, the public release of company EEO-1 reports could unfairly
3  disadvantage companies that possess low racial-ethnic and/or gender diversity. Erroneously, the lay
4  public may infer that companies lacking racial-ethnic and gender diversity as inhospitable to members of
5  these demographic groups. However, research (including my own) and anecdotal company practice
6  examples suggest that workforce diversity is virtually unrelated to how strongly a firm values diversity
7  (McKay et al., 2008). Nonetheless, low-diversity firms may experience difficulties in recruiting women
8  and minorities if EEO-1 reports are made public despite their potential desire to increase its workforce
9  diversity. Ultimately, this undermines the principles upon which EEO-1 reporting is based, ensuring
10 equal employment opportunity regardless of demographic group membership.

11  I declare under penalty of perjury that the foregoing is true and correct.
12  Executed this 13th day of November, 2023, at Kinston, North Carolina.

*Patrick F. McKay*
PATRICK F. McKAY, PhD.

# Attachment

# References

Avery, D. R. (2003). Reactions to diversity in recruitment advertising - Are differences black and white? *Journal of Applied Psychology*, *88*, 672-679.

Combs, J., Liu, Y., Hall, A., & Ketchen, D. (2006). How much do high-performance work practices matter? A meta-analysis of their effects on organizational performance. *Personnel Psychology*, *59*, 501-528.

Della Torre, E., Zatzick, C. D., Sikora, D., & Solari, L. (2018). Workforce churning, human capital disruption, and organizational performance in different technological contexts. *Human Resource Management Journal*, *28*, 112-127.

DePatie, T. P., Sachdeva, A., Shahani-Denning, C., Grossman, R., & Nolan, K. P. (2022). Enhancing the representation of women: How gender diversity signals and acknowledgment affect attraction to men-dominated professions. *Personnel Assessment and Decisions*, *8*, 37-59.

Guthrie, J. P., & Datta, D. K. (2008). Dumb and dumber: The impact of downsizing on firm performance as moderated by industry conditions. *Organization Science*, *19*, 108-123.

Huselid, M. A. (1995). The impact of human resource management practices on turnover, productivity, and corporate financial performance. *Academy of Management Journal*, *38*, 635-672.

Jiang, K., Lepak, D. P., Hu, J., & Baer, J. C. (2012). How does human resource management influence organizational outcomes? A meta-analytic investigation of mediating mechanisms. *Academy of Management Journal*, *55*, 1264-1294.

Kossek, E. E., Zonia, S. C., & Young, W. (1996). The limitations of organizational demography: Can diversity climate be enhanced in the absence of teamwork? In M. N. Ruderman, M. W. Hughes-James, & S. E. Jackson (Eds.), *Selected research on work team diversity* (pp. 121-154). Washington, DC: American Psychological Association.

Kozol, J. (1991). *Savage inequalities*: *Children in America's schools*. New York: Harper Perennial.

Lepak, D. P., & Snell, S. A. (1999). The human resource architecture: Toward a theory of human resource allocation and development. *Academy of Management Review*, *54*, 31-48.

McKay, P. F. (forthcoming). Targeted recruitment of racial-ethnic minorities: A research review. In J. Slaughter, D. G. Allen, & S. Highhouse (Eds.), *Essentials of employee recruitment: Individual and organizational perspectives*. New York: Routledge.

McKay, P. F., & Avery, D. R. Warning! Diversity recruitment can backfire. *Journal of Management Inquiry*, *14*, 330-336.

McKay, P. F., Avery, D. R., & Morris, M. A. 2008. Mean racial-ethnic differences in work performance: The moderating role of diversity climate. **Personnel Psychology**, *61,* 349-374.

Noe, R. A., Hollenbeck, J. R., Gerhart, B., & Wright, P. M. (2022). **Fundamentals of human resource management** (9th edition). New York, NY: McGraw-Hill.

Porter, C., & Serra D. (2020). Gender differences in the choice of major: The importance of female role models. **American Economics Journal: Applied Economics**, *12,* 226-254.

Roberson, Q. M., & Park, H. J. (2007). Examining the link between diversity and firm performance: The effects of diversity reputation and leader racial diversity. **Group & Organization Management**, *32,* 548-568

Walker, H. J., Feild, H. S., Berneth, J. B., & Becton, J. B. (2012). Diversity cuse on recruitment website: Investigating the effects on job seekers' information processing. **Journal of Applied Psychology**, *97,* 214-244.

Wright, P., Ferris, S. P., Hiller, J. S., & Kroll, M. (1995). Competitiveness through management of diversity: Effects on stock price valuation. **Academy of Management Journal**, *38*, 272–287.

Wynn, A. T., & Correll, S. J. (2018). Puncturing the pipeline: Do technology companies alienate women in recruiting sessions? **Social Studies of Science**, *48,* 149-164