1  D. VICTORIA BARANETSKY (SBN 311892)
   THE CENTER FOR INVESTIGATIVE REPORTING
2  1400 65th Street, Suite 200
   Emeryville, CA 94608
3  Telephone:    (510) 982-2890
   Facsimile:    (510) 849-6141
4  Email:        vbaranetsky@revealnews.org

5  THERESE Y. CANNATA (SBN 88032)
   AARON R. FIELD (SBN 310648)
6  ZACHARY E. COLBETH (SBN 297419)
   CANNATA O'TOOLE & OLSON LLP
7  100 Pine Street, Suite 350
   San Francisco, CA 94111
8  Telephone:    (415) 409-8900
   Facsimile:    (415) 409-8904
9  Email:        tcannata@cofolaw.com
                 afield@cofolaw.com
10               zcolbeth@cofolaw.com

11 Attorneys for Plaintiffs
   THE CENTER FOR INVESTIGATIVE
12 REPORTING and WILL EVANS

13

14                   UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16                          SAN FRANCISCO

17

18 THE CENTER FOR INVESTIGATIVE          Case No. 3:22-cv-07182-WHA
   REPORTING and WILL EVANS,
19                                        **DECLARATION OF D. VICTORIA**
                Plaintiffs,               **BARANETSKY IN SUPPORT OF REPLY**
20                                        **IN SUPPORT OF PLAINTIFFS' CROSS-**
         v.                               **MOTION FOR SUMMARY JUDGMENT**
21
   UNITED STATES DEPARTMENT OF            Date:      Dec 14, 2023
22 LABOR,                                 Time:      8:00 a.m.
                                          Judge:     Hon. William Alsup
                Defendant.
23

24

25

26

27

28

I, D. VICTORIA BARANETSKY, declare:

1.    I am a member in good standing of the State Bars of California, New York and New Jersey and General Counsel at The Center for Investigative Reporting. I am counsel of record for plaintiffs The Center for Investigative Reporting and Will Evans (hereafter "plaintiffs" or "CIR") in this action. I make this declaration of personal knowledge, and if called as a witness I could and would testify competently to the facts stated herein.

2.    Attached hereto as **Exhibit A** is a true and correct copy of the Department of Justice's own guidance interpreting *Argus Leader*, which is entitled *Exemption 4 After the Supreme Court's Ruling in* Food Marketing Institute v. Argus Leader Media and which I obtained at https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media.

3.    Attached hereto as **Exhibit B** is a true and correct copy the Department of Justice's guidance regarding FOIA's Exemption 4, which is entitled *Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA* and which I obtained at https://www.justice.gov/oip/step-step-guide-determining-if-commercial-or-financial-information-obtained-person-confidential.

4.    Attached hereto as **Exhibit C** is a true and correct copy of *Submitter Notice Response Portal Frequently Asked Questions: 17. Does the agency plan to release a list of companies who objected to the FOIA release of their EEO-1 data?*, published by the Department of Labor and which I obtained at https://www.dol.gov/agencies/ofccp/faqs/submitter-notice-response#g17.

5.    Attached hereto as **Exhibit D** is a true and correct copy of an January 4, 2017 news article entitled, *Here are the 52 public companies that make the most money from the federal government* and which I obtained at https://www.cnbc.com/2017/01/04/top-government-contractors-52-public-companies-that-make-the-most.html.

1    I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3    Executed in Berkeley, California on December 5, 2023.

4

5    _____

6    D. VICTORIA BARANETSKY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Exemption 4 after the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media



**Share** **>**

### Exemption 4 after the Supreme Court's Ruling
### in *Food Marketing Institute v. Argus Leader Media*

On June 24, 2019, the Supreme Court issued an opinion addressing the meaning of the word "confidential" in Exemption 4 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(4) (2012 & Supp. V 2017), that overturned over forty years of precedent. *See Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019). This guidance will discuss the newly defined contours of Exemption 4 in the wake of the Supreme Court's decision, and will provide agencies with workable rules in applying Exemption 4 going forward.

### Exemption 4 before *Argus Leader*

Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). The word "confidential" is not defined in the FOIA and over the years courts have applied various tests to determine whether commercial and financial information provided to an agency fell within the parameters of Exemption 4. In the early years of the FOIA, courts of appeals defined the term "confidential" based on whether there was an express or implied promise of confidentiality by the government to the submitting party, s*ee GSA v. Benson*, 415 F.2d 878, 881 (9th Cir. 1969), or whether the information was of the type not customarily released to the public by the submitter and which the government "agreed to treat . . . as confidential." *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 709 (D.C. Cir. 1971); *see also M.A. Schapiro & Co. v. SEC*, 339 F. Supp. 467, 471 (D.D.C. 1972).

In 1974, however, these earlier tests were superseded by *National Parks & Conservation Association v. Morton,* 498 F.2d 765 (D.C. Cir. 1974), which significantly altered the test for confidentiality under Exemption 4 and became the leading case on the issue until the Supreme Court's recent decision. In *National Parks,* the Court of Appeals for the District of Columbia Circuit determined that the term confidential should be defined using an objective standard that satisfies the legislative purpose of the exemption. *See id.* at 767. Relying on legislative

history, the D.C. Circuit declared that the term confidential should be read to protect governmental and private interests in accordance with a two-prong test. *Id.* at 770. The court determined that information should be treated as confidential if its disclosure would: 1) impair the government's ability to obtain necessary information in the future, or 2) cause substantial harm to the competitive position of the submitter of the information. *Id.* While establishing this two-prong test, the court expressly reserved the question of whether any other governmental interests might also be embodied in a "third prong." S*ee id.* at 770 n.17. Subsequent courts eventually did adopt a third prong to protect information that would compromise agency program compliance and effectiveness.

Almost two decades after *National Parks*, the D.C. Circuit, sitting en banc, had an opportunity to reexamine the standard for determining confidentiality and reaffirmed the *National Parks* test. *See Critical Mass Energy Project v. NRC*, 975 F.2d 871, 875 (D.C. Cir. 1992). Notably, however, the court's decision in *Critical Mass* was based primarily on the principle of *stare decisis*, a legal doctrine which counsels against the overruling of an established precedent. While the court reaffirmed the *National Parks* test, it also set out to clarify "some misunderstanding as to its scope and application." *Id.* Relying on its understanding of Exemption 4's legislative purpose, the D.C. Circuit confined the application of the *National Parks* test to information that was required to be provided to the government and established a separate standard for determining whether information "voluntarily" submitted to an agency is "confidential." Under *Critical Mass*, commercial or financial information that was "voluntarily" provided to the government was categorically protected as long as it was not customarily disclosed to the public by the submitter. *Id.* at 879. On March 22, 1993, the Supreme Court denied a petition for certiorari to review the decision in *Critical Mass,* leaving it and *National Parks* as the leading cases for defining the term "confidential" under Exemption 4 until the Supreme Court's recent review of the issue in *Argus Leader.*

### *Procedural History Leading to the Supreme Court's Decision*

The records at issue in *Argus Leader* involved the Supplemental Nutrition Assistance Program (SNAP), formerly known as the food-stamp program, maintained by the U.S. Department of Agriculture (USDA). *See Argus Leader Media v. USDA*, 900 F. Supp. 2d 997, 1000 (D.S.D. 2012). The requester sought five years of data that included the names and addresses of all retail stores that participated in the SNAP program, as well as the yearly amount of SNAP benefits each store redeemed. *Id.* USDA released the names and addresses of over 321,000 retailers participating in the SNAP program, but withheld the store-level redemption data under Exemptions 3 and 4 of the FOIA. *Id.* at 1001; *see also* S. Ct. Joint App. 87, *Argus Leader*.

The District Court affirmed USDA's action under Exemption 3, in conjunction with 7 U.S.C. § 2018(c), a statute that protects certain SNAP related data. *Id.* at 1008. The Court of Appeals for the Eighth Circuit reversed and remanded, finding that the withheld redemption data did not fall

within withholding provision of Section 2018(c). *Argus Leader Media v. USDA*, 740 F.3d 1172, 1173 (8th Cir. 2014).

On remand, USDA continued to withhold the data under Exemption 4, arguing that disclosure would likely cause retailers substantial competitive harm. *Argus Leader*, 224 F. Supp. 3d 827, 830 (D.S.D. 2016). The District Court held a two-day bench trial and heard expert testimony from both agency and industry witnesses in order to determine whether the *National Parks* test for confidentiality was met. *Id.* at 830-831. The agency presented testimony from representatives from three retail store chains that participated in the SNAP program and from an officer of an association of retail grocery stores to show that store-level SNAP redemption data was customarily held confidential within the retail-food-store industry. *Id.* at 830. The agency did not proffer specific evidence about the practices of the roughly 321,000 other individual SNAP retailers whose information was sought by the FOIA request. *See id.* The district court ultimately found the competitive harm arguments made by USDA to be speculative and insufficient to meet the standard set by *National Parks. Id.* at 835. Accordingly, the court ordered the release of the redemption data. *Id.*

After being notified that USDA did not plan to appeal, Food Marketing Institute (FMI), a trade group representing grocery retailers, intervened and appealed to the Court of Appeals for the Eighth Circuit. *See Argus Leader Media v. USDA*, 889 F.3d 914, 916 (8th Cir. 2018). Before the Eighth Circuit, FMI argued that the court should disregard the *National Parks* standard and should instead apply the ordinary dictionary definition of the term "confidential" to determine whether Exemption 4 applied. *See id.* at 916 n.4. The court rejected this argument and affirmed the district court's decision that the data did not satisfy the "substantial competitive harm" test. *Id.* at 917.

FMI petitioned the Supreme Court to review the matter, and on January 11, 2019, the Court granted FMI's petition for writ of certiorari. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 915, 202 L. Ed. 2d 641 (2019).

### The Supreme Court's Rejection of the *National Parks* Test

In *Argus Leader* the Supreme Court addressed the question of "when does information provided to a federal agency qualify as 'confidential'" under Exemption 4. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2360 (2019). Noting that the FOIA itself does not provide a definition of the term "confidential," the Court found that "as usual, [it must] ask what [the] term's 'ordinary, contemporary, common meaning' was when Congress enacted FOIA in 1966." *Id.* at 2362 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Citing a version of Webster's New Collegiate Dictionary contemporaneous to the enactment of Exemption 4, the Court found that "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'" *Id.* at 2363.

The Supreme Court emphasized that "[n]otably lacking from dictionary definitions, early case law, or any other usual source that might shed light on the statute's ordinary meaning is any mention of the 'substantial competitive harm' requirement" established in *National Parks. Id.* The Court criticized the *National Parks* standard for expanding the definition of confidential beyond the term's ordinary meaning based on select portions of legislative history. *Id.* at 2364. The Court explained that it could not approve such "a casual disregard of the rules of statutory interpretation," which focus on "the ordinary meaning and structure of the law itself," when as in this case, that examination provides a clear answer. *Id.* In rejecting the *National Parks* test, the Court noted that it "has drawn considerable criticism over the years," and that even the D.C. Circuit had "distanced itself from the opinion" in *Critical Mass. Id.* at 2365. In *Critical Mass* the D.C. Circuit had retained the substantial competitive harm test for required submissions, but "adhered to a much more traditional understanding of the statutory term 'confidential'" for voluntary submissions. *Argus Leader,* 139 S. Ct. at 2365. That, in and of itself was problematic, though, as the Supreme Court could not "discern a persuasive reason to afford the *same* statutory term two such radically different constructions." *Id.*

In rejecting *National Parks*, the Court was not persuaded by Argus Leader's attempts "to try to salvage the result, if not the reasoning" of that decision. *Id.* First, the Court rejected Argus Leader's "rearranging [of] the text of Exemption 4 to create a phrase that does not appear in the statute: 'confidential commercial information,'" which Argus Leader maintained was a phrase akin to a preexisting common law term of art that covers only information "whose release would lead to substantial competitive harm." *Id.* The Court explained that it does not ordinarily "imbue statutory terms of art associated with a specialized common law meaning when Congress hasn't itself invoked the common law terms of art associated with that meaning." *Id.*

The Court also rejected Argus Leader's argument that Congress effectively ratified the *National Parks* standard by enacting similar phrases in other statutes. *Id.* The Court noted that while this "might (or might not) tell us what later Congresses understood those other statutes to mean, it tells us nothing about Congress's understanding of the language it enacted in Exemption 4 in 1966." *Id.* at 2366.

Finally, the Court also rejected Argus Leader's policy argument that the "substantial competitive harm" requirement from *National Parks* should be maintained because FOIA exemptions should be construed narrowly. *See id.* at 2366. The Court explained that it normally has "no license to give [statutory] exemption[s] anything but a fair reading." *Id.* The Court opined that "just as [it] cannot properly *expand* Exemption 4 beyond what its terms permit," it likewise "cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms." *Id.*

## Supreme Court's Definition of "Confidential"
## Based on the Ordinary Meaning of the Term

As noted above, from the outset of its analysis, the Supreme Court found that the term "confidential" under Exemption 4 continues to carry the same meaning today that it did during the FOIA's enactment, which is information that is "private" or "secret."  *Id.* at 2363.  The Court further held that "[c]ontemporary dictionaries suggest two conditions that might be required for information communicated to another to be considered confidential."  *Id.*  First, "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it."  *Id.*  Second, "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret."  *Id.*

The Court determined that the first condition – that the information customarily be kept private or closely held by the submitter – must be met, because "it is hard to see how information could be deemed confidential if its owner shares it freely."  *Id.*  The Court determined that this condition had been met in the case because the record reflected that SNAP retailers do not customarily disclose store-level SNAP data.  *See id.*; *see also Argus Leader*, 224 F. Supp. 3d at 830 (discussing testimony from agency witnesses).

As to the second condition – whether information must be communicated to the government with some assurance that it will be kept private – the Court found that it did not need to resolve that question, as that condition was clearly satisfied in the case before it.  *Argus Leader*, 139 S. Ct. at 2363. USDA had a long history, through its promulgation of regulations, of promising retailers that it would keep the store-level SNAP data confidential.  *Id.*; *see, e.g.,* 43 Fed. Reg. 43275 (1978).

In conclusion, the Court held that "at least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."  *Argus Leader*, 139 S. Ct. at 2366.

The Court's ruling thus leaves two questions open.  First, is it necessary for the government to provide some assurance of confidentiality to the submitter of information at the time the information is conveyed to the government so that it does not "*lose* its confidential character," *Id.* at 2363, and if such an assurance is required, can it be implied?  The Supreme Court's prior decision in *Department of Justice v. Landano*, which the Court cited in *Argus Leader*, *see* 139 S. Ct. at 2364, provides helpful analysis in answering these questions.

### *Department of Justice v. Landano*, 508 U.S. 165 (1993)

Decades prior to its decision in *Argus Leader*, the Supreme Court had examined the term "confidential" in the context of the protections afforded to confidential sources under Exemption 7(D) of the FOIA.  *See Dep't of Justice v. Landano,* 508 U.S. 165 (1993).  The requester in *Landano* argued that certain FBI sources could not have reasonably expected confidentiality because they could be called to testify and the FBI might be obliged to reveal their names and

the information they provided under *Brady,* the Jenks Act, or federal discovery rules. *Id.* at 173. Like the Court in *Argus Leader*, the Court in *Landano* rejected that argument based on the dictionary definition of the term "confidential." In light of that definition, the Court determined that "[i]n common usage, confidentiality is not limited to complete anonymity or secrecy." *Id.* The Court explained, "[a] statement can be made 'in confidence' even if the speaker knows the communication will be shared with limited others, as long as the speaker expects that the information will not be published indiscriminately." *Id.*

Applying this understanding of the term "confidential" to Exemption 7(D), the Court then turned to the government's argument for a presumption that *all* FBI sources who provide information during the course of a criminal investigation should be considered confidential. The Court rejected this argument, finding that "the communications the FBI receives can range from the extremely sensitive to the routine," and it is therefore not reasonable to infer an implied understanding of confidentiality in all cases. *Id.* at 176. At the same time, the Court explained that "[m]ore narrowly defined circumstances," could "provide a basis for inferring confidentiality." *Id.* at 179. Using an objective test, the Court explained that factors that could be considered in determining if confidentiality can be inferred in the context of Exemption 7(D) are the "nature of the informant's ongoing relationship with the [government]" and "the character of the crime at issue," as well as "the source's relation to the crime." *Id.*

As discussed more fully below, the Supreme Court's approach to defining the term "confidential" in *Landano*, including the objective test it provides for determining if confidentiality can be implied, provides a helpful framework for applying the new Exemption 4 standard established in *Argus Leader*.

### Applying the *Argus Leader* Decision in Determining Whether Information Is "Confidential" Under Exemption 4

In light of the Supreme Court's decision in *Argus Leader*, agencies should no longer apply the "substantial competitive harm" test from *National Parks* to determine whether information is "confidential" under Exemption 4. Rather, as the Supreme Court detailed in its opinion, agencies should apply the ordinary meaning of that term. That meaning can potentially implicate two conditions, namely, (1) whether the information is "customarily kept private, or at least closely held," by the submitter; and (2) whether the government provides "some assurance" that the information will not be publicly disclosed. *See Argus Leader*, 139 S. Ct. at 2363. Although the first condition must normally be established at least with evidence about general industry practices, it is yet unclear whether future judicial precedents governing Exemption 4 will require that both conditions exist. The Supreme Court did not have occasion to decide that issue in *Argus Leader*, where both were "clearly satisf[ied]." *Id.* In light of that current legal uncertainty, agencies should as a matter of sound administrative practice consider both conditions in the process of determining whether to invoke Exemption 4's protection for "confidential" commercial or financial information. The step-by-step guide being issued

contemporaneously with this guidance should be followed to aid agencies in making that determination.

### *First Condition – Submitter's Treatment of the Information*

First, in order to qualify as "confidential," the party imparting the information (*i.e.*, the submitter) should customarily treat the information as private. As the Supreme Court explained, "it is hard to see how information could be deemed confidential if its owner shares it freely." 139 S. Ct. at 2363. Often an agency can determine whether this condition is met based on its own knowledge of the information, the submitter's practices, and/or from the records themselves. Agencies may also seek additional information from the submitter about its practices. And as *Argus Leader* itself demonstrates, industry representatives can provide the necessary information regarding the customary treatment of such information. That option is particularly appropriate in contexts in which a large number of submitters would make it difficult to collect information from each submitter directly.

### *Second Condition – Assurance of Confidentiality by Government*

As mentioned above, while the Supreme Court's opinion did not determine to what extent the second condition – an assurance of confidentiality by the government – must also be met, agencies should as a matter of sound administrative practice consider whether the context in which the information was provided to the agency reflects such an assurance.

Such an assurance of confidentiality can be either explicit or implicit. Neither the Court's decision in *Argus Leader* nor any of the authority it cited suggests a requirement of an express (as opposed to implied) assurance of confidentiality by the government. Notably, when discussing "assurances," the Court cited approvingly to the Ninth Circuit's "conclu[sion] that Exemption 4 would 'protect information that a private individual wishes to keep confidential for his own purposes, but reveals to the government under the express or *implied* promise' of confidentiality." *Argus Leader,* 139 S. Ct. at 2363 (quoting *GSA v. Benson*, 415 F.2d 878, 881 (9th Cir. 1969) (emphasis added).

### *Express Assurance*

An express assurance of confidentiality can be established in several ways. It can be found in direct communications with the submitter, as well as through general notices on agency websites or, as in *Argus Leader*, through regulations indicating that information will not be publicly disclosed. Where an express assurance of confidential treatment exists, assuming that the submitter also satisfies the first condition, the standards for confidentiality under Exemption 4 are met.

Of course, such notices or communications could also explicitly notify submitters of the agency's intention to *publicly disseminate* the information. In those situations, the information,

when objectively viewed in context, would be deemed to have lost its "confidential" character under Exemption 4 upon its submission to the government, given that the submitter was on notice that it would be disclosed.

*Implied Assurance*

In determining whether there was an implied assurance of confidentiality, agencies can be guided by the analytical framework provided in *Landano*.  As noted above, in *Landano*, the Court provided an objective test to assess whether "an implied assurance of confidentiality can be inferred," based on "generic circumstances" surrounding the communication between the informant and the government that would "characteristically support an inference of confidentiality."  508 U.S. at 179.  As *Landano* explained for criminal investigation contexts, factors such as the "nature of the informant's ongoing relationships with the [government]" and "the nature of the crime and the source's relation to it" may help determine whether there was an implied promise of confidentiality under Exemption 7(D).  *Id.*

Similarly, in the context of Exemption 4, agencies can look to the context in which the information was provided to the government to determine if there was an implied assurance of confidentiality.  Factors to consider include the government's treatment of similar information and its broader treatment of information related to the program or initiative to which the information relates.  For example, an agency's long history of protecting certain commercial or financial information can serve as an implied assurance to submitters that the agency will continue treating their records in the same manner.

Conversely, such factors may in some contexts result in the opposite conclusion that the submitter could not have had a reasonable expectation of confidentiality.  For example, absent an express assurance by the agency, a submitter would not normally have a reasonable expectation of confidentiality for records the agency has historically disclosed.  In addition, what the government pays a private entity to supply goods or services to the government reflects the government's own actions and will often undermine a submitter's claim to reasonably expect such information to be kept confidential.

**Submitter-Notice Process**

Prior to *Argus Leader,* agencies had a long history of conducting predisclosure notification of submitters, seeking their views on whether a contemplated FOIA disclosure could likely result in substantial competitive harm.

Many agency predisclosure notification regulations have followed the model provided by the Department of Justice, which defines the term "confidential commercial information" more broadly, without reference to competitive harm, and instead refers more generically to material that may be protected under Exemption 4.  In the wake of *Argus Leader*, agencies should now use those predisclosure notification procedures when necessary to seek the submitter's views

on whether the two conditions that agencies should consider in determining whether information is "confidential" for purposes of Exemption 4 of the FOIA, as outlined in this guidance, are met.

## Conclusion

The Supreme Court's decision in *Argus Leader* changed the way agencies should define the word "confidential" for purposes of Exemption 4 of the FOIA.  The "substantial competitive harm" test was found to be inconsistent with the terms of the statute.  Instead, the term confidential is to be afforded its ordinary, common meaning.  Attached to this guidance is a step-by-step guide for agencies to use to determine whether information can be protected as confidential under Exemption 4.  Agency personnel with any questions about applying the new standard are encouraged to contact OIP.

**Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA**

*Updated October 4, 2019*

---

✉  Office of Information Policy (OIP)

U.S. Department of Justice

6th Floor

441 G St. NW

Washington DC 20530

📞  202-514-3642

Email: DOJ.OIP.FOIA@usdoj.gov

The above e-mail address is used for general correspondence and inquiries. To submit a FOIA request or FOIA administrative appeal to OIP, please visit the Submit and Track a Request or Appeal page.

# EXHIBIT B

# Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA



Share  >

**Step-by-Step Guide for Determining if
Commercial or Financial Information Obtained from a Person is
Confidential Under Exemption 4 of the FOIA**

In the wake of the Supreme Court's decision in *Argus Leader,* the term "confidential" under Exemption 4 must be given its "ordinary" meaning.  This step-by-step guide can be used by agencies, in conjunction with OIP's guidance, to determine whether commercial or financial information provided by a person is "confidential" under Exemption 4.

**1.  Does the submitter customarily keep the information private or closely-held?  (This inquiry may in appropriate contexts be determined from industry practices concerning the information.)**

- If no, the information is *not* confidential under Exemption 4.

- If yes, answer question 2.

**2.  Did the government provide an express or implied assurance of confidentiality when the information was shared with the government?**

- If no, answer question 3.

- If yes, the information is confidential under Exemption 4 (this is the situation that was present in *Argus Leader*).

**3.  Were there express or implied indications at the time the information was submitted that the government would publicly disclose the information?**

- If no, the information is "confidential" under Exemption 4 (the government has effectively been silent – it hasn't indicated the information would be protected or disclosed – so a

submitter's practice of keeping the information private will be sufficient to warrant confidential status).

- If yes, and no other sufficient countervailing factors exist, the submitter could not reasonably expect confidentiality upon submission and so the information is *not* confidential under Exemption 4.

**Agencies should feel free to contact OIP if they have any questions or for assistance in applying this analysis.**

*Updated November 18, 2022*

✉ Office of Information Policy (OIP)
U.S. Department of Justice
6th Floor
441 G St. NW
Washington DC 20530

📞 202-514-3642
Email: DOJ.OIP.FOIA@usdoj.gov

The above e-mail address is used for general correspondence and inquiries. To submit a FOIA request or FOIA administrative appeal to OIP, please visit the Submit and Track a Request or Appeal page.

# EXHIBIT C

**Office of Federal Contract Compliance Programs**

# Submitter Notice Response Portal Frequently Asked Questions

1. What is the Freedom of Information Act (FOIA)?
2. Who submitted this FOIA request?
3. What is the scope of the request?
4. Will information from this request be made public?
5. How can contractors receive updates about this FOIA request from OFCCP?
6. How do contractors find out whether their company filed Type 2 EEO-1 Reports from 2016-2020?
7. If a company was only a federal contractor for part of the time from 2016-2020, is its EEO-1 data included in this request?
8. What is FOIA Exemption 4?
9. Where can contractors find the Federal Register Notice that OFCCP published?
10. What happens if a contractor does not submit a written objection?
11. What information should contractors include in a written objection if their company decides to file one?
12. What will OFCCP do with the written objection once it receives it?
13. If a contractor submits a written objection and OFCCP, after its review, determines that the company's EEO-1 Report Type 2 data can be withheld from disclosure, what happens then?
14. If a contractor submits a written objection and OFCCP, after its review, determines that the EEO-1 Report Type 2 data must be disclosed, what happens then?
15. Does OFFCP have a position on whether the requested data should be disclosed or withheld?
16. How long after the contractors submit their response will they be notified of the determination?
17. Does the agency plan to release a list of companies who objected to the FOIA release of their EEO-1 data?
18. If contractors have additional questions that are not answered by these FAQs, how can they contact OFCCP to ask these questions?

## 1. What is the Freedom of Information Act (FOIA)?

The Freedom of Information Act (FOIA) provides that any person has the right to request access to federal agency records or information. Like all federal agencies, the U.S. Department of Labor (DOL) is required to disclose records requested in writing by any person. However, agencies may withhold information pursuant to nine exemptions and three exclusions contained in the statute. FOIA applies only to federal agencies and does not create a right of access to records held by Congress, the courts, or by state or local government agencies. Read more about FOIA.

Back to Top

## 2. Who submitted this FOIA request?

Will Evans from the Center for Investigative Reporting (CIR), a non-profit news organization based in Emeryville, California.

Back to Top

## 3. What is the scope of the request?

The request seeks all Type 2 Consolidated EEO-1 Report demographic data (i.e., "Component 1" EEO-1 Reports) submitted by federal contractors and first-tier subcontractors for reporting years 2016-2020. The Type 2 Consolidated EEO-1 Report is one of several different types of reports that are filed by entities with multiple establishments. EEO-1 reports filed by single-establishment contractors (Type 1) and other EEO-1 reports filed by multi-establishment contractors (Types 3, 4, 6, and 8) are not covered by the request. EEO-1 reports containing compensation information (i.e., "Component 2" EEO-1 reports), which were collected by the EEOC, are also not covered by the request. Furthermore, Type 2 data only applies to multijurisdictional establishments and not to contractors with only one establishment. Contractors that only have one establishment are not subject to this request.

For more information on the EEO-1 Report, please refer to our EEO-1 FAQs.

Back to Top

---

## 4. Will information from this request be made public?

Yes. FOIA requires that if agencies receive three or more requests for the same information, it must make all records that have been disclosed in response to those requests available for public inspection in an electronic format 5 U.S.C. 552(a)(2)(D)(ii)(II). OFCCP has received more than three requests for the information requested by CIR. Responses and productions provided to the requester of this FOIA request will be made publicly available in our FOIA library.

Back to Top

---

## 5. How can contractors receive updates about this FOIA request from OFCCP?

We encourage all contractors to subscribe to OFCCP's stakeholder communications to receive updates from OFCCP about this FOIA request and other important OFCCP matters. You can subscribe on the OFCCP webpage and click on **SUBSCRIBE** at the top right of our website to complete our questionnaire. Please remember to add OFCCP@subscriptions.dol.gov and govdelivery.com address on your safe senders list. We remind current federal contractors that they must **register** each establishment and/or functional business unit in **OFCCP's Contractor Portal**, and **annually certify compliance** by accessing the OFCCP Contractor Portal.

If you have questions, please email us at OFCCP-FOIA-EEO1-Questions@dol.gov or contact our helpdesk at 800-397-6251.

Back to Top

---

## 6. How do contractors find out whether their company filed Type 2 EEO-1 Reports from 2016-2020?

If a company has filed EEO-1 Reports in the past, the EEO-1 Component 1 Reports from 2016-2020 are available in the EEO-1 Online Filing System. From the Company Dashboard, click on Historic Data (Prior EEO-1 Reports) to download prior year reports.

Back to Top

---

## 7. If a company was only a federal contractor for part of the time from 2016-2020, is its EEO-1 data included in this request?

Any Type 2 EEO-1 Report filed from 2016-2020 indicating that a company was a federal contractor is included in the request.

Back to Top

---

## 8. What is FOIA Exemption 4?

The Freedom of Information Act (FOIA) is a statute that provides the public the right to request access to records from any federal agency. FOIA also contains some "exemptions" under which agencies may redact, or withhold entirely, certain information that is requested. FOIA Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4).

Back to Top

---

## 9. Where can contractors find the Federal Register Notice that OFCCP published?

Here at the <u>Federal Register Notice</u>.

Back to Top

---

## 10. What happens if a contractor does not submit a written objection?

If OFCCP does not receive a written objection, the agency will assume that the company has no objection to disclosure and will begin the process of sending the contractor's Type 2 EEO-1 Report data to the FOIA requester (CIR).

Back to Top

---

## 11. What information should contractors include in a written objection if their company decides to file one?

Contractors should include the first and last name of their company's point of contact (POC), the POC's phone number and email address, the company's name and address, any other entities associated with your company for which contractors are also submitting objections, and the parent company's EEO-1 unit number.

Contractors should also provide as much information as possible addressing why they believe their Type 2 EEO-1 Report data should not be released under FOIA, including whether the information is commercial/financial and confidential. At a minimum, OFCCP suggests that written objections address the following questions:

- Do you consider information from your EEO-1 Report to be a trade secret or commercial information? If yes, please explain why.
- Do you customarily keep the requested information private or closely held? If yes, please explain what steps have been taken to protect data contained in your reports, and to whom it has been disclosed?
- Do you contend that the government provided an express or implied assurance of confidentiality? If yes, please explain. If no, skip to the next question.
- If you answered "no" to the previous question, were there expressed or implied indications at the time the information was submitted that the government would publicly disclose the information? If yes, please explain.
- Do you believe that disclosure of this information could cause harm to an interest protected by Exemption 4 (such as by causing genuine harm to your economic or business interests)? If yes, please explain.

Back to Top

---

## 12. What will OFCCP do with the written objection once it receives it?

For contractors that submitted a timely objection, OFCCP will independently evaluate the objection(s) submitted and make a determination as to whether the information can be properly withheld under FOIA Exemption 4 based on the information provided in the written objection.

Back to Top

---

## 13. If a contractor submits a written objection and OFCCP, after its review, determines that the company's EEO-1 Report Type 2 data can be withheld from disclosure, what happens then?

OFCCP will notify the company and the FOIA requester of our determination to withhold the data.

Back to Top

## 14. If a contractor submits a written objection and OFCCP, after its review, determines that the EEO-1 Report Type 2 data must be disclosed, what happens then?

OFCCP will provide written notice to the contractor of the reasons the disclosure objections were not sustained, a description of the information that will be disclosed, and a specified disclosure date that is a reasonable time after the contractor receives notice of OFCCP's determination.

Back to Top

---

## 15. Does OFFCP have a position on whether the requested data should be disclosed or withheld?

OFCCP believes the information requested may be protected from disclosure under FOIA Exemption 4, which protects disclosure of confidential commercial information, but has not yet determined whether the requested information is protected from disclosure under that exemption. OFCCP will make a determination about whether a particular contractor's Type 2 EEO-1 data can be withheld under Exemption 4 after evaluating the written objection submitted by that contractor.

Back to Top

---

## 16. How long after the contractors submit their response will they be notified of the determination?

We cannot give an exact time by when OFCCP will make its determination before we know how many objections we will receive. We intend to issue responses as soon as practicable.

Back to Top

---

## 17. Does the agency plan to release a list of companies who objected to the FOIA release of their EEO-1 data?

OFCCP is currently processing and cataloguing the submitter objections it has received, and thus it does not yet have a complete, finalized list of federal contractors that have submitted objections. In the course of the ongoing FOIA litigation, CIR has requested a list of contractors that have submitted objections. Under FOIA and relevant interpretive case law, the identities of objecting contractors are not exempt under FOIA Exemption 4. Accordingly, once the processing of the objector list has been completed and the accuracy of the list has been confirmed, OFCCP will provide CIR with the requested list of objecting contractors.

Back to Top

---

## 18. If contractors have additional questions that are not answered by these FAQs, how can they contact OFCCP to ask these questions?

The best method of contact for specific questions is by emailing us at OFCCP-FOIA-EEO1-Questions@dol.gov. They may also contact our Help Desk number at 1-800-397-6251.

Back to Top

Scroll to Top ⊕

| Agencies | Forms | About Us | News | Contact Us |



## FEDERAL GOVERNMENT⊞

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

U.S. Office of Special Counsel

## LABOR DEPARTMENT⊞

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

## ABOUT THE SITE⊞

Disclaimers

Plug-Ins Used on DOL.gov

Accessibility Statement

**Office of Federal Contract
Compliance Programs**

An agency within the U.S.
Department of Labor

200 Constitution Ave NW
Washington, DC 20210

<u>1-866-4-USA-DOL</u>
<u>1-866-487-2365</u>
<u>www.dol.gov</u>

Connect With DOL

     

Site Map  |  Important Website Notices  |  Privacy & Security Statement

# EXHIBIT D

 **CNBC**    ● WATCH LIVE  



  with ERIC CHEMI

# Here are the 52 public companies that make the most money from the federal government

Mark Fahey | Nick Wells | Eric Chemi
Published 9:16 AM ET Wed, 4 Jan 2017 | Updated 10:14 AM ET Wed, 4 Jan 2017





Trump vs. federal contractors
10:13 AM ET Wed, 4 Jan 2017 | 01:24

President-elect Donald Trump can influence stock prices and change corporate plans simply by tweeting, and few companies are as dependent on the government as the big contractors.

About 61 entities earned $1 billion or more from federal contracts in the 2015 fiscal year, and 34 of those are publicly traded companies, according to data from the federal procurement data system. As you would expect, the biggest recipients are defense contractors, which already had good reason to watch Trump closely after he was involved in a deal to keep Carrier jobs in Indiana.

Companies like Lockheed Martin may top the list at $36 billion in contractual obligations, but companies across several other



**Understanding Nas integrity**
Paid Post For Nasdaq

FROM THE WEB                    Sponsored Links by Taboola

**American Shoppers Should Think Twice Before Buying from These 2 Stores**
Online Shopping Tools

**Cardiologist: Too Much Belly Fat? Do This Before Bed**
Health & Welfare

**Here Are 23 Of The Coolest Gifts For Christmas 2023**
Best Tech Trend

**This Superconductor Stock Is Set To Skyrocket!**
The Financial Star                    Read More

 MARKETS         CNBC TV         WATCHLIST         MENU



| Company | Contracts (B) | % Revenue | Sector |
|---|---|---|---|
| LOCKHEED MARTIN | $36.26 | 79% | Industrials |
| BOEING | $16.65 | 17% | Industrials |
| GENERAL DYNAMICS | $13.63 | 43% | Industrials |
| RAYTHEON | $13.11 | 56% | Industrials |
| NORTHROP GRUMMAN | $10.64 | 45% | Industrials |
| MCKESSON | $8.36 | 4% | Health Care |
| UNITED TECHNOLOGIES CORP | $6.79 | 12% | Industrials |
| L-3 COMMUNICATIONS | $5.45 | 52% | Industrials |
| BAE SYSTEMS | $4.44 | 17% | Industrials |
| HUNTINGTON INGALLS | $3.66 | 52% | Industrials |
| HUMANA INC. | $3.61 | 7% | Health Care |
| SAIC | $3.38 | 78% | info tech |
| BOOZ ALLEN HAMILTON | $3.30 | 61% | info tech |

mistakes. With one, many 'aren't even aware' they're missing o...

**Here are the top sacrifices made by 'super savers'**

**Wall Street opens wallets wide for 'Trump alternative' Nikki Haley at $500K fundraiser**

**Cramer examines Tuesday's market 'mistakes,' points out underappreciated stocks**

**Fed is 'disconnected' from reality, must cut rates 5 times next year, portfolio manager says**

**Elon Musk says he won't vote for Biden over Trump**

Promoted Links

For the energy sector, Exxon Mobil is the biggest contractor with almost $800 million in petroleum contracts, mostly for the Defense Logistics Agency. That may seem like a lot, but it's a negligible fraction of the energy giant's revenue each year. The same is true for the telecom leader, AT&T, and shipping leader FedEx, which each made a little over $600 million from the government in 2015.

The situation is completely different for the leading firm in information technology, SAIC, which depends on government contracts for 78 percent of its revenue. Private prisons firm GEO Group lead the real estate sector, making about 71 percent of its $1.8 billion in sales from government contracts.

In health care, McKesson Corp. made over $8 billion, most of which came from its lucrative relationship with Veteran's Affairs. That's about 4 percent of the pharmaceutical distributor's revenue.

For companies classified as financial firms, Berkshire Hathaway was the largest government contractor. But the company didn't earn that position through its financial businesses — most of its government revenue came from its nonfinancial holdings, including providing metals to the U.S. Mint, mobile homes for FEMA and flight training for the FAA, according to government data.

Not counting state or local spending, the federal government paid almost $240 billion to its top 100 contractors in 2015. Those are big sums, and those companies are going to be noticing everything Trump says.

 **Mark Fahey**
Data Journalist


  



**CNBC**    ● WATCH LIVE

Eric Chemi

RELATED SECURITIES

| Symbol | Price | Change | %Change |
|---|---|---|---|
| GEO | --- | | |
| LMT | --- | | |

MORE FROM CNBC    by Taboola

Americans are 'doom spending' — here's why that's a problem

Return to office is 'dead,' Stanford economist says. Here's why

Trump slams JPMorgan CEO Jamie Dimon for praising Nikki Haley

Trump financial watchdog tells judge about $40 million in previously unreported transfers

IBM to end 401(k) match, offering a hybrid plan. Other firms can't 'pull off this type of change,' expert says

Here's what it would take for the Fed to start slashing interest rates in 2024

CCPA Notice

FROM THE WEB    Sponsored Links by Taboola

Amazon Hates When Prime Members Do This, But They Can't Stop You

Online Shopping Tools

50-Year Wall Street Legend Issues New Nvidia Warning

Chaikin Analytics

Amazon Hates When You Do This, But They Can't Stop You (It's Genius)

 MARKETS     CNBC TV     WATCHLIST    ☰ MENU





CNBC WATCH LIVE

Breakthrough Device Shocks Neuropathy Experts Worldwide
Health Insight Journal
Learn More

this pillowcase is becoming the most sought after gift in 2023
Blissy

CNBC

Subscribe to CNBC PRO
Licensing & Reprints
Select Personal Finance
Join the CNBC Panel
Select Shopping
Digital Products
Internships
About CNBC
Site Map
Careers
Contact

Subscribe to Investing Club
CNBC Councils
CNBC on Peacock
Supply Chain Values
Closed Captioning
News Releases
Corrections
Ad Choices
Podcasts
Help

News Tips
Got a confidential news tip? We want to hear from you.
GET IN TOUCH

Advertise With Us
PLEASE CONTACT US

CNBC Newsletters
Sign up for free newsletters and get more CNBC delivered to your inbox
SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.



Top government contractors: 52 public companies that make the most



CA Notice

Terms of Service

© 2023 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by REFINITIV



MARKETS



CNBC TV

WATCHLIST

MENU

**ATTORNEY ATTESTATION**

I, Aaron R. Field, am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from the other Signatories.

*/s/ Aaron Field*
AARON R. FIELD

CANNATA O' TOOLE & OLSON LLP
ATTORNEYS AT LAW
100 PINE STREET, SUITE 350, SAN FRANCISCO CA, 94111
TEL: 415.409.8900 – FAX: 415.409.8904